## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

PEN AMERICAN CENTER, INC.,              :
SARAH BRANNEN, LINDSAY                  :
DURTSCHI, on behalf of herself and her  :  Case No. 3:23-cv-10385
minor children, GEORGE M. JOHNSON,      :
DAVID LEVITHAN, KYLE LUKOFF,            :  JURY TRIAL DEMANDED
ANN NOVAKOWSKI, on behalf of            :
herself and her minor child, PENGUIN    :
RANDOM HOUSE LLC, and ASHLEY            :
HOPE PÉREZ,                             :

             *Plaintiffs*,

      v.

ESCAMBIA COUNTY SCHOOL
DISTRICT, and the ESCAMBIA
COUNTY SCHOOL BOARD,

_____ *Defendants*. _____

## **COMPLAINT**

This lawsuit, on behalf of PEN American Center, Inc. ("PEN America"), select book authors, a book publisher, and two parents of students attending public schools in Escambia County (collectively, "Plaintiffs"), challenges the decisions of the Escambia County School District (the "School District") and the Escambia County School Board (the "School Board") to remove and restrict books from public school libraries. The School District and the School Board have done so based on their disagreement with the ideas expressed in those books. They have repeatedly

ignored their existing policies for review.  In every decision to remove a book, the School District has sided with a challenger expressing openly discriminatory bases for challenge, overruling the recommendations of review committees at the school and district levels.  These restrictions and removals have disproportionately targeted books by or about people of color and/or LGBTQ people, and have prescribed an orthodoxy of opinion that violates the First and Fourteenth Amendments.   In support of their claims, Plaintiffs allege as follows:

## I.   INTRODUCTION

1.     The Supreme Court has long recognized that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools," which serve as a "marketplace of ideas."  *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969).  That is because "the Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection."  *Id.* (cleaned up).

2.     School libraries, where students discover new areas of interest and engage in voluntary inquiry outside the context of required curriculum, are an essential part of this exchange of ideas.

3.     While school administrators "possess significant discretion to determine the content of their school libraries," that "discretion may not be exercised

in a ***narrowly partisan or political manner***.”  *Board of Education v. Pico*, 457 U.S. 853, 870 (1982) (emphasis added).  That is because “[o]ur Constitution does not permit the official suppression of ideas.”  *Id.* at 871.  Accordingly, the First Amendment bars a school district from removing books from school libraries, or restricting access to such books, based on political or ideological disagreement with the ideas they express.

4.      Plaintiffs bring this lawsuit because that is exactly what is happening in Escambia County.  Books are being ordered removed from libraries, or subject to restricted access within those libraries, based on an ideologically driven campaign to push certain ideas out of schools.  Further, the School Board is ordering the removal *against* the recommendations of experts within the School District.  This disregard for professional guidance underscores that the agendas underlying the removals are ideological and political, not pedagogical.

5.      As a result, the School District and the School Board are depriving students of access to a wide range of viewpoints, and depriving the authors of the removed and restricted books of the opportunity to engage with readers and disseminate their ideas to their intended audiences.  Such viewpoint discrimination violates the First Amendment.

6.      Today, Escambia County seeks to bar books critics view as too “woke.” In the 1970s, schools sought to bar *Slaughterhouse-Five* and books edited by

Langston Hughes.  Tomorrow, it could be books about Christianity, the country's founders, or war heroes.  All of these removals run afoul of the First Amendment, which is rightly disinterested in the cause du jour.

7.     The actions of the School District and School Board also violate the Equal Protection Clause because the books being singled out for possible removal are disproportionately books by non-white and/or LGBTQ authors, or which address topics related to race or LGBTQ identity.  This is no accident.  The clear agenda behind the campaign to remove the books is to categorically remove all discussion of racial discrimination or LGBTQ issues from public school libraries.  Government action may not be premised on such discriminatory motivations.

8.     The plaintiffs bringing this suit include (a) PEN America, a nonprofit member-based organization that represents authors throughout the United States, including authors whose books have been ordered removed from libraries in the School District and targeted for such removal and subjected to restricted access; (b) authors whose books have been ordered removed from or subjected to restricted access in these libraries; (c) Penguin Random House LLC ("PRH"), the publisher of many books that have been ordered removed from, or subjected to restricted access in, these libraries; and (d) parents of students who attend schools in the School District, who are suing on behalf of both themselves and their minor children for access to removed and restricted books.

9.     The plaintiffs have joined together in this lawsuit to vindicate the rights of parents, students, authors, and book publishers to ensure that public school libraries continue to serve all communities and provide spaces dedicated to the exploration and dissemination of a wide variety of ideas, points of view, and experiences, free from viewpoint discrimination and discrimination based on race, sexuality, or gender identity.

## II.     PARTIES

### A.     Plaintiffs

10.     Plaintiff PEN America is a nonprofit membership organization headquartered in New York.  Founded in 1922, PEN America works to ensure that people everywhere have the freedom to create literature, to convey information and ideas, to express their views, and to access the views, ideas, and literatures of others. PEN America's membership is made up of more than 7,500 novelists, journalists, nonfiction writers, editors, poets, essayists, playwrights, publishers, translators, agents, and other writing professionals.  Members of PEN America live in every state in the country.

11.     PEN America operates "Free Expression Programs" that serve to defend writers and journalists and protect free expression rights in the United States and around the world.  These efforts typically include research and reports, public advocacy, and campaigns on behalf of particular policy issues or individuals.  Topics

for these programs have included campus free speech, online harassment, and writers and artists facing political persecution abroad.

12.   PEN America includes among its members many authors whose books have been removed or subject to restricted access within the School District.   These include each of the Author Plaintiffs, as well as other award-winning authors such as Margaret Atwood, Judy Blume, Alex Gino, John Green, Khaled Hosseini, Susan Kuklin, and Jodi Picoult.

13.   Plaintiffs Sarah Brannen, George M. Johnson, David Levithan, Kyle Lukoff, and Ashely Hope Pérez (collectively, the "Author Plaintiffs") are each authors whose books have either been ordered removed from libraries within the School District, or are currently targeted for such removal and subject to indefinite restricted access during the review period.

14.    Plaintiff Brannen resides in Massachusetts.   She has authored and/or illustrated 23 books for children.   Her book *Uncle Bobby's Wedding* was challenged in February 2023 and is currently subject to restricted access in elementary school libraries pending review.   No schedule has yet been set for the review of *Uncle Bobby's Wedding*.

15.   Plaintiff Johnson is a resident of California and Black and non-binary; they are the author of young adult books.   Johnson's book *All Boys Aren't Blue* is a "memoir of growing up Black and gay" in the form of a series of coming-of-age

essays. *All Boys Aren't Blue* was challenged in September 2022. Despite a unanimous vote by the district review committee in favor of retaining the book in high school libraries, the School Board voted to remove *All Boys Aren't Blue* from all libraries on February 21, 2023.

16.    Plaintiff Levithan is a New Jersey resident. He is a gay author of young adult fiction. Levithan's book *Two Boys Kissing* was challenged in September 2022 and is currently subject to restricted access within high school libraries pending review. No schedule has been set for the review of *Two Boys Kissing*.

17.    Plaintiff Lukoff is a Pennsylvania resident. He is a transgender man and the author of multiple children's books. Prior to becoming a published author, he was an elementary school librarian. His book *When Aidan Became a Brother* was challenged in September 2022. Despite a district review committee recommending 4–1 that the book be retained in libraries at all levels, the School Board voted to remove *When Aidan Became a Brother* from all libraries on February 20, 2023.

18.    Another book, *Too Bright to See*, also by Plaintiff Lukoff and published by Plaintiff PRH, was challenged in February 2023 and is currently subject to restricted access in elementary school libraries pending review. No schedule has been set for the review of *Too Bright to See*.

19.    Plaintiff Pérez is a white woman and resident of Ohio. She is an author of young adult fiction, a former public school teacher of high school English, and,

currently, a literature professor at The Ohio State University.  Her book *Out of Darkness* was challenged in September 2022 and is currently subject to restricted access within School District libraries pending review.  No schedule has been set for the review of *Out of Darkness*.

20.     For each Author Plaintiff, it is important, personally and professionally, that their books are available without restriction to students within public school libraries.  That is a critical means of reaching the books' intended audiences, and obtaining the broadest possible readership.

21.     Plaintiff PRH is a Delaware Limited Liability Corporation headquartered in New York.  It is a general interest publisher committed to publishing books for everyone.  Two books published by PRH have already been removed from some School District libraries:  *The Bluest Eye* by Toni Morrison and *Push* by Sapphire.  Several more books published by PRH have been targeted for removal and are currently subject to indefinite restricted access pending completion of the review process.  Among such books are: *The Kite Runner* by Khaled Hosseini, *Milo Imagines the World* by Matt de La Pena, *Two Boys Kissing* by Plaintiff David Levithan, *Too Bright to See* by Plaintiff Lukoff, and *Slaughterhouse-Five* by Kurt Vonnegut.

22.     PRH's mission is to lay the seeds for the future of reading for generations to come by promoting literacy, giving voice to many and varied

experiences and stories and fostering empathy and inspiring free and open debate. PRH aims to publish books that provide children with a gateway to the whole world. Inclusion in public school libraries is critical to PRH's mission, especially for books intended for elementary and young-adult readers.

23. Plaintiffs Lindsay Durtschi and Ann Novakowski (collectively, the "Parent Plaintiffs") are parents of students currently attending an elementary school in the School District. They bring these claims both on behalf of themselves, as parents who want their children to have access to books that have been removed from, or restricted within, their children's school library, and their minor children, who also want such access.

24. Plaintiff Durtschi is a Florida resident. She is the mother of a first grade and third grade student at A.K. Suter Elementary School in the School District. Her children want to check out books from their school library that are currently unavailable because they have been removed or restricted. In addition, Durtschi wants her children to have access to these books, and others like them, to expose her children to different viewpoints and experiences so that they will be better prepared to engage with a wide range of people.

25. Plaintiff Novakowski is also a Florida resident. She is the mother of a kindergarten student at A.K. Suter Elementary School in the School District. Her child wants to check out books from her school library that are currently unavailable

because they have been removed or restricted.  In addition, Novakowski wants her child to have access to these books, and others like them, to expose her to different viewpoints and experiences so that she will be better prepared to engage with a wide range of people.

### B.    Defendants

26.    Defendant School District administers the public schools of Escambia County, Florida, including 32 elementary schools, nine middle schools, and seven high schools, as well as several alternative and technical programs.

27.    Defendant School Board is the five-member governing body of the School District, elected from geographical districts within Escambia County.

## III.   JURISDICTION AND VENUE

28.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the First and Fourteenth Amendments to the United States Constitution, and under 42 U.S.C. § 1983.

29.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because the Defendants reside in this district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## IV.   FACTUAL ALLEGATIONS

### A.    The Unique and Important Function of Public School Libraries

30.    Libraries occupy a unique and important role within public schools. Like schools more generally, school libraries are spaces for learning and the

exploration of ideas.  But, unlike a structured classroom setting, libraries afford students opportunities to learn and explore ideas in self-directed ways, guided by their own interests, curiosities, and questions about the world.  They provide students with the opportunity to engage with and explore new and unfamiliar perspectives and ideas, as well as to see representations of their own experiences, communities, and ideas.

31.    As the Supreme Court has emphasized, it is fundamental to our understanding of what schools are that "students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding." *Pico*, 457 U.S. at 868.  And, "*[t]he school library is the principal locus of such freedom*." *Id.* at 869 (emphasis added).  That is because, "in the school library a student can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum. The student learns that a library is a place to test or expand upon ideas presented to him, in or out of the classroom." *Id.* (cleaned up).

32.    Accordingly, public school libraries are crucial spaces for student learning.  In libraries, students can explore their own interests, and encounter different ideas and experiences in ways that help prepare them for citizenship in our diverse, democratic society.

33.    The right to speak means little without the ability to reach listeners.  It is extraordinarily important to book authors and book publishers that their books

continue to be fully accessible in public school libraries, particularly for books aimed at children and young adults.  The free exploration of books of students' choosing in libraries shapes their relationship to reading and to books as a meaningful part of their lives.  Accordingly, for authors and publishers, access to such libraries is a vital means for disseminating ideas, and for reaching, and engaging with, the audiences for whom the works are intended. This is especially so with respect to those students who lack easy access to books and learning material outside of school.  For such students, public school libraries may be the only way for them to access an author's or publisher's book.

**B.     The Nationwide Push to Remove Books from School Libraries Based on Viewpoint**

34.     The last few years have witnessed a coordinated national campaign to remove books from public school libraries based on ideological objections to their contents, particularly, their exploration of themes related to race or LGBTQ identity.

35.     This movement first picked up steam in Texas.  In late 2021, a Texas state legislator compiled and sent to the Texas Education Agency a list of 850 books he believed schools should review for objectionable content.  Many of these books contained content related to LGBTQ issues or to race.  Shortly thereafter, the Governor of Texas followed up with a similar letter to the Texas Association of School Boards regarding supposed "pornographic or obscene material" in school libraries.

36.     While these letters had no independent legal force, they spurred a wave of reviews and removals of material from Texas public school libraries.  By April of the following year, an analysis by Plaintiff PEN America found more than 700 temporary or permanent book removals in Texas.

37.     Texas is not alone. This trend of calling for the removal of books from school libraries on ideological grounds has spread throughout the country and has been spearheaded by certain national organizations, such as the Florida-based "Moms for Liberty."  Moms for Liberty is a politically conservative organization that is focused on combating what it describes as the "woke" influence in public schools.  The organization shares and disseminates lists of books it finds politically objectionable, and urges individuals to seek the removal of those books from school libraries.

38.     The nature of the books targeted for removal by this nationwide movement reveal an unmistakable ideological pattern.  According to a PEN America analysis, more than 40 percent of the books permanently or temporarily removed from school libraries nationwide in the year ending June 30, 2022 involved LGBTQ themes or prominent LGBTQ characters.  More than 20 percent directly addressed issues of race or racism.

39.    During this period, Florida has emerged as an epicenter of these removal efforts, with more than 500 books permanently or temporarily removed in the year ending June 30, 2022 alone.

40.    The Escambia County School District is at the heart of that effort in Florida.

### C.    The Push to Remove Books Comes to the School District

41.    On or about May 23, 2022, Vicki Baggett, a language arts teacher at the School District's Northview High School, filled out a form for the "Request for the Reconsideration of Educational Media."  This would be the beginning of what turned out to be a widespread—and largely successful—campaign to restrict access to books throughout the School District.

42.    The subject of the first form Baggett filled out was *The Perks of Being a Wallflower* ("*Wallflower*") by Stephen Chbosky.  Baggett objected to the book's inclusion in classroom sets for potential use as an optional novel for study in high schools.[1]

---

[1] Plaintiffs' claims in this action do not involve, rely on, or challenge any action taken by Defendants with respect to any classroom curricular materials, whether optional or required.  Plaintiffs' claims are limited solely to the removal of materials from the School District's libraries, and/or the restriction of access to such materials within such libraries.

43.    *Wallflower*, based on the author's own experiences growing up in suburban Pittsburgh in the 1980s, deals with common adolescent struggles, including drugs, sexuality, mental illness, and family difficulties.  The book also chronicles the characters' personal growth past these challenges.

44.    Baggett would later admit that she had not heard of *Wallflower* prior to her efforts to prevent it from being read in the School District, making clear that the book came to her attention because it was one of the books frequently targeted as part of the nationwide book-removal movement.  Research that PEN America has published—and that Baggett would later cite as a ***justification*** for her attempts to get *Wallflower* removed—shows that *Wallflower* has been among the most removed books in the country.

45.    In July 2022, a panel consisting of Northview leadership, faculty, staff, and one parent voted 4–3 to retain *Wallflower* as optional study material, noting that "[t]he concerns raised in the complaint are part of the characters' development throughout the novel.  These concerns do not outweigh the potential discussions and literary value of the novel enough to remove it" from the school.  Ex. 1 at 3.

46.    On July 28, 2022, Baggett appealed the panel's determination with a letter to the School District's Assistant Superintendent for Curriculum and Instruction, copying, among others, the members of the School Board, the superintendent, and the Governor of Florida.  *Id.* at 4-7.

47.     Baggett alleged that *Wallflower* and the other titles were "pornographic material" of the type prohibited by Fla. Stat. §§ 775.082 through .084.

48.     The Assistant Superintendent responded by convening a "district review committee of lay persons, media specialists, administrators, teachers, and parents."

49.     On or before October 4, the district review committee voted 4–3 to retain *Wallflower*, citing the same justification as had the Northview panel in July. Ex. 2.

50.     On October 4 and then on October 19, Baggett wrote letters to the School District's superintendent, assistant superintendent, and the School Board again protesting the inclusion of *Wallflower*, notwithstanding the district review panel's determination.  Ex. 3.

51.     In her October 4 letter, Baggett explicitly linked her effort to get *Wallflower* removed to the national removal efforts underway.  She attached to her letter an image showing a section of PEN America's "Index of School Book Bans." The image showed eight instances in which *Wallflower* had been removed from school libraries, classrooms, or both.  *Id.* at 10.

52.     Baggett's October 4 letter also stated that *Wallflower* had a "parental book rating" of 4/5, "meaning it is NOT FOR MINORS," and attached several excerpts from the book.  *Id.* at 3, 5-9.  Although Baggett's letter did not state the

source for the "parental book rating," both that rating and the selected excerpts appear to have been taken from a report created by a website called Book Looks, which comprises hundreds of such reports about books containing material that the website's operators consider ideologically objectionable.

53.     While Book Looks disclaims affiliation with Moms for Liberty, it was founded by a member of, and uses the same rating criteria as, the Moms for Liberty chapter of Brevard County, Florida.

**D.     One Teacher Adopts Talking Points from National Groups to Get Books Removed from Libraries**

54.     On the heels of her initial efforts with respect to *Wallflower*, Baggett broadened her efforts to limit access to reading material considerably, focusing now on school libraries, rather than curriculum.

55.     In August, while the *Wallflower* review process was ongoing, Baggett prepared several lists of books containing what she considered to be objectionable content and which she targeted for removal.  She ultimately identified 116 such titles, including *Wallflower*.  She stated that the books "should be evaluated based on explicit sexual content, graphic language, themes, vulgarity and ***political pushes***," noting that she had confirmed the titles were at that time available in School District libraries.

56.     These titles run the gamut from picture books to teen and adult novels, and include both works of fiction and nonfiction.   As with other book lists

nationwide, a substantial portion of the titles on Baggett's lists address LGBTQ themes and/or deal with issues of race or racism.

57.    As was true with her initial challenge to *Wallflower*, Baggett's challenges drew heavily from materials that are part of the national book-removal movement.  For instance, in connection with her challenge to Raina Telgemeier's book *Drama*, Baggett submitted a list of quotes from the book relating to one character's identification as gay (which was the sole ground on which she objected to the book).  Each quote is identical to a quote the Book Looks website identifies as objectionable.  The same pattern exists for numerous other books Baggett challenged.  In some instances, typos from the Book Looks website were carried over into her challenges.

58.    In other instances, Baggett's challenges employ the same language as was previously used as part of the book-removal campaigns in Texas.  For instance, in her challenge to Mark Weakland's book *When Wilma Rudolph Played Basketball*—a picture book about the childhood of Olympic athlete Wilma Rudolph that includes descriptions of her experiences growing up Black in the segregated South—Baggett objected that the book "opines prejudice based on race."  Ex. 4. The identical objection was included in a challenge form previously submitted in the Prosper Independent School District in Texas.

59.    The bases for Baggett's challenges are nakedly ideological.  For instance, one book she challenged is *Race and Policing in Modern America* by Duchess Harris, a non-fiction resource guide intended for middle school readers that deals with race and policing.  In her challenge, Baggett objected to the book on the sole basis that it "[p]ush[es] the idea that all police are bad + non-blacks are racist," and claimed the purpose of the book was "[t]o race-bait."  Ex. 5.  Baggett did not provide any specific examples of objectionable content, challenge any of the facts in the book, or make any allegation that the material in *Race and Policing in Modern America* was otherwise inappropriate for its targeted middle school audience.  Her sole objection was that the book addresses a topic—the intersection of race and policing—that she did not consider suitable for discussion in schools.  Baggett's challenge to that book is still outstanding.

60.    By early September 2022, Baggett had shared her list with School District administrators, including members of the School Board, and prepared "Request for Reconsideration of Educational Media" forms for the more than 100 books on her list.

61.    As of now, the total number of books challenged in the School District—by Baggett or someone else—has reached 197.

62.    Under the School District's existing policies—and as had happened with Baggett's challenge to *Wallflower*—each individual book challenge had to

begin at the school level with review by a school-level panel.  The decision of that panel could then be appealed to a district-wide review panel, and, from there, to the School Board.  In addition, any challenged book was supposed to remain on library shelves during the pendency of that review process unless and until a decision was made to remove it.

63.     Despite these policies, the then-Chair of the School Board, Kevin Adams, was quoted in local media announcing a plan to short-circuit that process, saying that he had "asked the superintendent to quarantine or remove from circulation the challenged books until a review consistent with [an unspecified] state statute is conducted."

64.     Around the same time, the School Board's general counsel stated that, although the School Board has the power to remove titles from School District libraries, "***it cannot do so simply because it disagrees with the message of a book or it offends the personal morals of an individual***."

65.     Nonetheless, in a move indicative of the alignment between Defendants and the ideologically-driven movement to restrict access to these books, the School District announced a sudden and dramatic change in procedure.  Under the new procedure, any challenged book would automatically be subject to restricted access during the pendency of the review process.  Specifically, such books would be physically moved in each school to the "restricted access area of the library/media

center."  Students would then be prohibited from accessing the restricted books without an "opt-in" form signed by the student's parent allowing access to the restricted section, either for all titles or for specific individual titles.

66.    Following public meetings and extensive public comment over the ensuing months, the School Board later amended its policy so that not all challenged books were automatically subject to restricted access during the review process. Nonetheless, a significant portion of challenged books are still being automatically subject to restricted access.  The School District is reaching this result through two policies.

67.    First, the School District is restricting access to any title where the challenge to the book can be interpreted as alleging that the book "contains content that is pornographic or prohibited under F.S. 847.012."

68.    F.S. 847.012 prohibits the sale or distribution to minors of "harmful" material.  As applied to books, it incorporates F.S. 847.001, which defines material "harmful to minors" as material that, *inter alia*, "***[p]redominately appeals*** to a prurient, shameful, or morbid interest," *and* "[t]aken as a whole, is ***without serious literary, artistic, political, or scientific value for minors***."    Fla. Stat., § 847.001(7)(a)-(c) (emphases added).  None of the books at issue here qualify as harmful material under this standard.[2]

---

[2] Additionally, F.S. 847.012 expressly exempts material approved for use in schools.

69.     Despite this statutory language, the School District has been automatically restricting access to *any* book challenged on the ground that it contains "sexual" content, regardless of the nature of that content or anything else about the book.

70.     Under this policy, *Slaughterhouse-Five*, the classic work by Kurt Vonnegut that Plaintiff PRH publishes, has been placed on restricted access.  That is because the challenge form complained that it includes "bestiality, nudity, [and] crude language."  Ex. 6.

71.     Under this policy, the picture book *Draw Me A Star* by Eric Carle, also published by PRH, was subject to restricted access, at least in elementary school libraries.  Carle is an award winning and highly regarded author and illustrator who has written and/or illustrated such well-known classics for young children as *The Very Hungry Caterpillar* and *Brown Bear, Brown Bear, What Do You See?  Draw Me A Star* was subject to restricted access because, according to the complaint form that was filled out, it contains "[o]ne image of [a] naked man + woman."  Ex. 7.

72.     Likewise, books that deal with the topic of sexual assault are being automatically restricted under this policy.  One revealing example is *The Kite Runner* by PEN America member Khaled Hosseini, which is also published by

---

Fla. Stat., § 847.012(5).  It, therefore, cannot be an independent basis for excluding books from a school library.

Plaintiff PRH.  *The Kite Runner* follows an Afghan boy named Amir into adulthood, including his flight from Afghanistan to the United States after the 1979 Soviet invasion, and his later return to the country under the rule of the Taliban.  One key scene in the novel involves Amir's failure to protect his friend from a sexual assault, and his subsequent guilt and shame over that failure.  The book sold over seven million copies, spent two years on the *New York Times* bestseller list, and was made into a major motion picture in 2007.

73.    Baggett challenged *The Kite Runner* based on its depiction of sexual assault, as well as unspecified "horrific language," and stated that the purpose of the book was "[i]ndoctrination."  Ex. 8.  On that basis, *The Kite Runner* was placed on restricted access pending completion of the review process.  As of this date, the book does not appear to have been scheduled for committee review.

74.    Second, starting in early 2023, the School District appears to have adopted a new practice of automatically subjecting to restricted access any book challenged on the ground that it violates Florida HB 1557 (the "Parental Rights in Education Act," also commonly known as the "Don't Say Gay Bill").  However, Florida HB 1557, on its face, only applies to "[c]lassroom instruction," and not to library materials.  *See id.* § 1 (amending Fla. Stat. § 1001.42(8)(c)(3)).  Indeed, the Florida State Board of Education and the Attorney General of Florida have, in other litigation, explicitly disclaimed any application of that law to library materials.  *See*

State Defendants' Second Motion to Dismiss, ECF 112, *Cousins v. Grady*, No. 6:22-cv-1312, at 8 (M.D. Fla. Dec. 16, 2022) ("[T]he statute regulates only 'classroom instruction,' not the availability of library books.").

75.    Nonetheless, as a result of this practice, challenged books that merely recognize the *existence* of same-sex relationships or transgender persons are being subject to restricted access for the pendency of the—often indefinite—review period.

76.    For example, Plaintiff Brannen's book *Uncle Bobby's Wedding* has been subject to restricted access within elementary school libraries since it was challenged in March 2023.  The picture book, which is intended for children between 3 and 6, contains no explicit sexual content.  The sole ground of the objection is that the "Uncle Bobby" character marries another man.

77.    Another revealing example is Matt de la Pena's book *Milo Imagines the World*, which is published by Plaintiff PRH.  *Milo Imagines the World* is an award-winning book for young children that depicts its lead character passing the time during a long subway ride by imagining the people around him in different situations.  While the challenge to the book acknowledged that it has "[c]olorful pictures and a good story line about creativity and imagination," it objected to one image in which Milo imagines two women marrying each other.  Ex. 9.  On that basis, the complaint asserted that the "book contains subtle alternate sexual

ideology," and was in violation of "HB 1557/Parental Rights Law." *Id. Milo Imagines the World* is currently restricted in all elementary school libraries in the School District.

78.     The barriers for students to access restricted books are significant.  To access them, a student—who could be as young as 5 years old—must find a librarian, ask the librarian for permission to access a book that has been designated as "pornographic" or otherwise unsuitable for school-aged children, and then wait while that librarian verifies that the student, in fact, has parental permission to access it.  Forcing students to undertake these steps, and endure the stigma that goes along with undertaking them, is having a profound chilling effect on students seeking access to the restricted books.

79.     Of the 197 books targeted for removal in the district, 154 books remain restricted as of this filing, approximately 70%.

**E.     The School District and School Board Ratify Baggett's Book Challenges by Removing Books**

80.     The School District began its review of the challenged books in November 2022, starting with *Wallflower*.

81.     The process included community input via online forms as well as an assessment of the book by a district review committee.  This process ultimately resulted in a decision that *Wallflower* was appropriate for high school seniors.

82.    Baggett appealed the decision, and the School Board, overruling the district review committee, voted to remove *Wallflower* from School District libraries.

83.    Around the same time, Adams, the School Board Chair, was quoted admitting that he was largely deferring to Baggett, saying: "I'm not gonna sit here and read 125 books.  Fortunately, it don't take long, ***particularly with this English teacher because she's identified every page in there***.  I don't have to read a smut book all the way from the very beginning to the very end."

84.    Titles that have been listed for reconsideration meetings on the School District's calendar in the first four months of 2023 include:

- *When Aidan Became a Brother* by Plaintiff Kyle Lukoff

- *Push* by Sapphire

- *And Tango Makes Three* by Justin Richardson and Peter Parnell

- *The Kite Runner* by Khaled Hosseini

- *Draw Me a Star* by Eric Carle

- *Drama* by Raina Telgemeier

- *New Kid* by Jerry Craft

- *All Boys Aren't Blue* by Plaintiff George M. Johnson

- *The 57 Bus* by Dashka Slater

- *The Absolutely True Diary of a Part-Time Indian* by Sherman Alexie

- *The Nowhere Girls* by Amy Reed

- *The Bluest Eye* by Toni Morrison

- *Ground Zero* by Alan Gratz

- *Lucky* by Alice Sebold

- *Black Brother, Black Brother* by Jewell Parker Rhodes

- *The Sun and Her Flowers*, *Milk and Honey*, and *Home Body* by Rupi Kaur

- *The Poet X* by Elizabeth Acevedo

- *Looking for Alaska* by John Green

- *The Hate U Give* by Angie Thomas

- *George* by Alex Gino

- *Better Nate than Ever* by Tim Federle

- *Born Ready* by Jodi Petterson, and

- *Tricks* by Ellen Hopkins

85.     Many of these books were published decades ago, and have appeared on library shelves in the School District—and throughout the country—for years without objection or incident.

86.     Thus far, there have been four waves of book removals by the School Board, resulting in the removal of 10 books.[3]   In each instance, the School Board

---

[3] Five books have been removed upon the recommendation of the district review committee, rather than by order of the School Board: *Looking for Alaska* by John Green, which was removed from middle school libraries only, and four books from Sarah J. Mass's *A Court of Thorns and Roses Series*.

voted for removal over the recommendations of the district review committee, which had deemed the book educationally suitable.  To date, there has not been a *single* instance in which the School Board has rejected a Baggett challenge.[4]

87.    On November 1, 2022, the School Board voted to remove *Wallflower* from all School District libraries.  As noted above, it did so despite the recommendation of the district review committee that the book be retained.

88.    On February 21, 2023, the School Board voted to remove three books from all School District libraries: *All Boys Aren't Blue* by Plaintiff Johnson, *And Tango Makes Three* by Peter Parnell and Justin Richardson, and *When Aidan Became a Brother* by Plaintiff Lukoff.  Again, it did so despite the district review committee's conclusions that the books were appropriate for the grades served by the libraries in question and its recommendation, in all three cases, that the books be retained.

89.    On March 20, 2023, the School Board voted to remove four additional books from some libraries: *New Kid* by Jerry Craft and *Drama* by Raina Telgemeier, which were removed from elementary school libraries; and *The Bluest Eye* by Toni Morrison and *The Nowhere Girls* by Amy Reed, which were removed from

---

[4] In some instances, such as with regard to *When Wilma Rudolph Played Basketball* by Mark Weakland, Baggett chose not the appeal the district review committee's decision to the School Board.

elementary and middle school libraries in the School District, and restricted to 11th and 12th graders within high school libraries.  Once again, the School Board overrode the recommendations of the district review committee.

90.    On April 13, 2023, the School Board voted to remove *Push* by Sapphire and *Lucky* by Alice Sebold from all School District libraries, again overriding the recommendation of the district review committee that the titles be made available in high school libraries.

91.    In all, 10 books have so far been removed (the "Removed Books"), from some or all libraries by the School Board, while over a 150 additional books have been targeted for removal (the "Targeted Books"), and are currently under review.

**F.    Defendants Remove Books Based on Viewpoint**

92.    Although the School Board's General Counsel has acknowledged that the School District cannot order removal of books from its libraries "simply because it disagrees with the message of a book or it offends the personal morals of an individual," it is clear that books are, in fact, being removed on such impermissible grounds, rather than based on pedagogical considerations.

93.    The ideological bases for the removals are apparent from: (a) the contents and themes of the books themselves, (b) the nature of the asserted objections to them, (c) the fact that, in every instance, the School Board's removal

decision overrode the expert judgment of the district review committee, which had deemed the book educationally appropriate, and recommended that it be retained, and (d) there are no instances in which the School Board rejected a challenge from Baggett, despite the transparently ideological nature of her challenges.  Indeed, the School District and School Board have consistently acceded to, and ratified, Baggett's blatantly political and message-based objections.

94.     The *Wallflower* book that kicked off this slate of removals is discussed in detail above.  The other Removed Books exhibit the same basic pattern of targeting books based on ideological objections to their message, theme, or the identities of their characters and/or authors.

95.     For instance, *And Tango Makes Three* ("*Tango*") is a 2005 picture book based on the true story of Roy and Silo, two male penguins at the Central Park Zoo who formed a pair bond, successfully incubated an egg that another penguin couple was unable to care for, and raised the resulting baby penguin, a female named Tango, after she hatched.  *Tango* received numerous awards.  The book was listed by the American Library Association as a Notable Children's Book in 2005 and won the ASPCA's Henry Bergh Children's Book Award for books promoting the humane and compassionate treatment of animals that same year.

96.     Baggett's sole listed reason for objecting to *Tango* was disagreement with its message.  She asserted that the book was serving an "***LGBTQ agenda using***

*penguins*." Ex. 10.  No basis was offered for the removal of *Tango* other than the mere fact that it is based on the true story of two male zoo penguins who formed a pair bond and hatched and raised a baby penguin.

97.    At the School Board meeting at which *Tango* was addressed, School Board members made clear that they, too, believed that the mere fact that the book depicts two male penguins jointly raising a chick warranted removing it from school libraries.  One School Board member observed: "The fascination is still on that it's two male penguins raising a chick.  And, most people that came up and spoke were talking about that fascination, so I'll be voting to remove the book from our libraries."  Another School Board member stated that he would be fine with the book being available if *Tango* was "edited or rewritten to make it less and less of a sexual or even a romantic thing and more of the compassion and nature that nature has."

98.    Ultimately, despite the review process having deemed the book educationally suitable and recommending retaining it, the School Board sided with Baggett and removed the title from School District libraries.

99.    The grounds for removing *When Aidan Became a Brother* by Plaintiff Lukoff ("*Aidan*") were similarly ideological.  *Aidan* is a 2019 picture book about a young transgender boy helping his family welcome a new baby.  The book has received multiple awards, including a Charlotte Huck Honor, which recognizes "outstanding children's fiction that invites compassion, imagination, and wonder,"

and the Stonewall Book Award, which is given out by the American Library Association to honor "books that have exceptional merit relating to the LGBTQIA+ experience."  *Aidan* is used in classrooms throughout the country.

100.   In her challenge, Baggett condemned *Aidan* as: "LGBTQ introduction," and "not age appropriate."  Ex. 11.  No basis was offered for the removal of *Aidan* other than the mere fact that it is about a transgender character.

101.   The district review committee recommended retaining *Aidan*.   In addition, at the School Board meeting at which the book was addressed, one School Board member spoke in favor of retaining the book, saying: "I happen to know someone who shared with me how important this book was to her child.  And, I know that I appreciate those people who keep reminding us that reading a book does not change someone.  If it did, all of the hundreds of gay children out there who have to read the books that are [about] heterosexual companions, they'd all change.  So I'm one of those people that think reading books opened your mind, but it doesn't necessarily change who you are or what you are.   But it makes you a more compassionate caring person."

102.   Nonetheless, the School Board as a whole sided with Baggett, and removed the title from all School District libraries.  At the meeting, the School Board chair expressed the view that, while some parents may find the perspective *Aidan* offers valuable, "it's just something that should not be in the school district.  We

should be concentrating on the education of these students, and if I can't fit those dots, I won't approve the book."

103.   The grounds for removing *All Boys Aren't Blue* by Plaintiff Johnson were likewise ideological.  *All Boys Aren't Blue* was published in 2020.  It is, as the district review committee put it, a "memoir of growing up black and gay."  Ex. 12 at 3.   While the book contains depictions of sex (including a sexual assault), the district review committee recognized that these depictions are critical to the story and "extremely important to understand the trajectory of [the narrator's] life. . . . Without these moments, the memoir would not make sense." *Id.* at 2.  As the committee further noted, the sexual content is "clearly not intended to be arousing." *Id.* at 4.  The district review committee found that "[t]here are teenagers in our community who benefit from hearing [the narrator's] experiences and perspectives," and voted unanimously to retain it as high school library material. *Id.* at 3.

104.   *All Boys Aren't Blue* has received numerous awards and recognitions. *Kirkus Review* named it one of the best young adult biographies/memoirs of 2020. The New York Public Library and Chicago Public Library both included it in their list of the top ten books of 2020 for young adults.

105.   Baggett's challenge characterized the purpose of *All Boys Aren't Blue* as "indoctrination" and included "LGBTQ content" among her objections.  Ex. 13.

After the district review committee voted to retain the book, Baggett's appeal characterized the book as pornographic. Ex. 14. At the School Board meeting at which the book was discussed, multiple Board members characterized it as "pornographic."

106.   Ultimately, despite the review committee's findings and unanimous vote in favor of retaining *All Boys Aren't Blue*, the School Board sided with Baggett and ordered the book removed from libraries within the School District.

107.   Another of the Removed Books is *New Kid* by Jerry Craft, which was part of the March 20, 2023 removals. *New Kid* is a Newbery Medal Award-winning graphic novel that tells the story of a 12-year-old Black boy who experiences culture shock when he enrolls at a private school.  It was published in 2019.  There is no sexual content of any kind in *New Kid*.  Baggett objected to the book because, in her opinion, it involved "race-baiting," reflected "anti-whiteness," and promoted a "woke agenda." Ex. 15.  Even though the book is intended for young audiences, the School Board ordered that *New Kid* be removed from all elementary school libraries within the School District.  In doing so, it overruled the district review committee, which had voted 7-2 to keep *New Kid* in libraries at all levels.

108.   Another Removed Book, *Drama* by Raina Telgemeier, was published over a decade ago, in 2012.  It is a graphic novel about a seventh-grade girl who joins the stage crew for her middle school musical.  She has a secret crush on one

boy; a different boy has a crush on her.  One character is openly gay.  At the story's climax, when the female lead in the musical refuses to perform, a male character saves the show by dressing in her outfit and performing the role, including sharing a stage kiss with the male lead.  As the district review committee noted, "[t]here is nothing in this work that could be considered offensive. . . . ***There is no sex in any part of the story***."  Ex. 16 at 3.  *Drama* enjoyed wide critical praise and appeared on the American Library Association's 2013 list of Notable Children's Books.

109.    Baggett objected to the book as "[i]ndoctrination of LGBTQ; age inappropriate + content not relevant."  Ex. 17.  She asserted that the purpose of the book to be "[i]ndoctrination."  *Id.*  Despite the district review committee voting 6–3 to retain the book in all elementary, middle, and high school libraries, the School Board ordered *Drama* removed from all elementary school libraries.

110.    Another Removed Book is *The Bluest Eye*, which is Toni Morrison's first novel.  It is published by Plaintiff PRH.  Published over 50 years ago, *The Bluest Eye* is set primarily in Morrison's Ohio hometown in 1941.  It is told from the perspective of a nine-year-old Black girl.  The central character, eleven-year-old Pecola, is taken in temporarily by the narrator's family.  Pecola, friendless and tormented because of her chaotic home life, dark skin, and "ugliness," prays for God to give her blue eyes.  Pecola is eventually raped and impregnated by her abusive father.  The baby is stillborn and Pecola loses her mind, believing that her wish for

blue eyes has been granted.  While the book received relatively little attention when it was originally published, it has since become part of the canon of American literature.  In 1993, Morrison was awarded the Nobel Prize in Literature for "novels characterized by visionary force and poetic import" that "give[] life to an essential aspect of American reality."

111.    *The Bluest Eye* is frequently taught in AP Literature courses throughout the country.  It is an example of the kind of narratively and thematically challenging works that students in high school are asked to navigate to become more sophisticated readers and students of literature and to prepare for post-secondary study.

112.    *The Bluest Eye* undisputedly contains difficult and graphic content. However, as the district review committee noted, it explores "[t]he harsh truth of racism in the 1940s" and themes of "self-loathing" and "preconceived notions of beauty."  Ex. 18 at 2, 3.  As the committee also pointed out, "[m]any classics," including *The Great Gatsby*, *The Sun Also Rises*, and *The Sound and the Fury*, "deal with sexual themes."  The difference is that *The Bluest Eye* moves the reader's attention "away from the implied off-stage tragedy to a sensory-oriented language from which the readers cannot look away or pretend the tragedy is not occurring or is not important.  . . . The strength of Morrison's work, which critics seem disturbed by, is that the disturbing is disturbing."  *Id.* at 6.  The committee further noted that

*The Bluest Eye* is the only one of Morrison's novels "told from the viewpoint of adolescents." *Id.* at 4. All five members of the committee unanimously agreed to keep the book in high school libraries.

113. Among Baggett's initial objections to the books was "pedophilia glorified"; she said it contained no strengths as educational media and its purpose was "shock." Ex. 19. At the March 20, 2023 meeting, a School Board member noted that *The Bluest Eye* had been optional reading material in one district school's International Baccalaureate program (along with Toni Morrison's most famous novel, *Beloved*) for nearly two decades and had never received a single parental complaint. Nonetheless, the School Board voted 3–2 to restrict the book to 11th and 12th graders. (The two dissenters would have removed the book entirely.)

114. Another of the Removed Books, *The Nowhere Girls*, is a 2017 novel by Amy Reed. The book concerns three misfit teenage girls who, outraged by an unpunished rape at their high school, band together to combat their school's misogynistic culture. As the district review committee noted, "[s]exual assault (rape) is an act of violence and is integral to the plot." Ex. 20 at 2. The review committee praised the diverse personalities and backgrounds of the characters, as well as the way the novel "address[es] an important theme of activism, self-acceptance, and empowerment. It has value for any high school student." *Id.* at 3.

The committee unanimously agreed that the book should remain in high school libraries; one member would have kept it in middle school libraries as well.

115.   As with other books she challenged, Baggett declared that *The Nowhere Girls* had no educational strengths.   She described its purpose as "sexual introductions; sexually excite."   Ex. 21.   Despite the review committee's recommendation, the School Board voted 3–2 to restrict the book to 11th and 12th graders.

116.   Another Removed Book is *Push*, the first novel by the author who goes by the pen name Sapphire, which was published by Plaintiff PRH.  First published over 25 years ago, the book concerns the struggles of a 16-year-old Black girl named Precious who lives in desperate poverty and endures unspeakable abuse at the hands of both her mother and father.  When the book opens, Precious is pregnant with her second child—like the first, the product of rape by her father.  Precious enrolls at an alternative school where she finds a teacher who helps her learn to read and write, as well as to escape from her abusive situation and give herself and her children a chance for a better future.  Stylistically, the book is told in Precious's voice and tracks her increasing English proficiency and self-esteem as she overcomes the functional illiteracy with which she begins the novel.  In 2009, *Push* was adapted into a feature film, *Precious*, that was nominated for six Academy Awards and won two, including for Best Adapted Screenplay.

117.  Like *The Bluest Eye*, *Push* depicts difficult and upsetting situations, sometimes in graphic terms.  However, as with that novel, the district review committee noted that these elements were "an important part of developing Precious' background and creating a greater understanding of her circumstances, trials, and ultimately, her ability to begin to see herself as a whole and worthy person despite her circumstances."  Ex. 22 at 3.  The committee also noted its "very artistic presentation of a journey from complete illiteracy to English language competency" and that "[t]hrough reading about Precious and her circumstances we are able to have a more developed understanding of the human condition, and hopefully a deeper compassion for someone who may be very different from ourselves."  *Id.* The district review committee voted 4–1 to retain *Push* as a high school library material.[5]

118.  In her appeal of the district review committee's decision, Baggett asserted as part of her criticism of the book that "[t]he purpose of fiction writing is simply **TO ENTERTAIN**.  It is not to inform or educate."  Ex. 23 at 2.

119.  At the April 13, 2023 School Board meeting at which *Push* was discussed, one School Board member observed: "While I concur with the board

---

[5] The dissenting voter did not dispute the novel's literary or artistic merit, but believed that due to its difficult content "[i]t is best read with the support of a teacher or trusted adult."  *Id.* at 5.

members who've spoken, while I do believe that it is a story of triumph, it is a story of somebody saving themselves, someone who has resilience and discovered her self-worth, it is not a book that I believe that should be available in public high schools." That subjective reaction carried the day, and the School Board voted to overrule the district review committee and remove *Push* from School District high school libraries.[6]

### G.    Defendants Restrict Access to Books for Indefinite Periods of Time Based on Viewpoint

120.    It is equally apparent that the books that have been targeted for removal, and which could be subject to permanent removal at any moment, are books in which the central objection to their presence in the library is ideological, not pedagogical. Indeed, because the School District is currently restricting access to virtually *any* book that the challenger alleges contains sexual content or references the existence of same-sex relationships or transgender persons—without regard to anything else about the book's contents—the School District is, in effect, giving private citizens the unilateral right to restrict student access to books to which they object.

---

[6] Included in the appeal record considered by the School Board was a set of "Relevant Florida State Statutes," among which was HB 1557. HB 1557 does not apply to library materials, and, accordingly, does not provide a basis to restrict or remove any title.

121.   For instance, one of the Targeted Books is *Uncle Bobby's Wedding* by Plaintiff Brannen.  *Uncle Bobby's Wedding* is a picture book about the wedding of the narrator's "Uncle Bobby" to his boyfriend Jamie.   The book has received numerous awards, including being recognized as one of the "Best Books of the Year" by both *Kirkus Reviews* and Bank Street in 2020, and being identified as one of the 100 Best Children's Books of the Past 100 Years by Booktrust.   *Uncle Bobby's Wedding* is used in classrooms throughout the country.

122.   The sole basis on which *Uncle Bobby's Wedding*'s was challenged was that it "contains alternate sexual ideologies, a violation of HB 1557/Parental Rights Law and is prohibited to be available to K-3."  Ex. 24 at 2.  The complaint objected in particular to one picture showing "Uncle Bobby and Jamie hold[ing] hands while announcing their marriage to everyone."  *Id.* at 3.

123.   On the basis of this challenge, access to *Uncle Bobby's Wedding* is currently restricted within elementary school libraries in the School District.   The book does not appear to have been scheduled for committee review.

124.   Another Targeted Book is *Too Bright to See*, a novel by Plaintiff Lukoff, published by Plaintiff PRH.  *Too Bright to See* is intended for students in grades 4–7.   The book involves two friends (Bug and Moira), and the ghost that haunts Bug's house, as Bug realizes over the course of the story he is a transgender boy.  *Too Bright to See* was one of five children's books selected in 2022 as a

Newbery Honor Book, and one of five selected as a finalist for the 2022 National Book Award for Young People's Literature.

125.   As with *Uncle Bobby's Wedding*, the sole stated objection to *Too Bright to See* is that the book "contains sexualities and alternate gender identities, a violation of HB 1557 and Parental Rights Law," and the claimed purpose of the book is "indoctrination."  Ex. 25.  There is no claim that the book contains any explicit material.  On the basis of this challenge, access to *Too Bright to See* is currently restricted within elementary school libraries in the School District.  The book does not appear to have been scheduled for committee review.

126.   Another Targeted Book is *Two Boys Kissing*, a young adult novel by Plaintiff Levithan, published by Plaintiff PRH.  The title characters in *Two Boys Kissing* are two teenage boys who, in protest of a homophobic attack on another character, attempt to break the record for the world's longest kiss.  The book also includes other gay or transgender characters in various situations related to the main story, as well as a metafictional "Greek chorus" made up of gay men who died during the worst years of the AIDS crisis, who comment on the story, the characters, and the momentous changes in society's acceptance of gay people between the 1980s and the book's 2010s setting.  *Two Boys Kissing* has received multiple awards, including a Stonewall Honor, and the Lambda Literary Award, and was placed on the longlist for the 2013 National Book Awards.

127.   Baggett's objections to *Two Boys Kissing* include "LGBTQ push/indoctrination."  Ex. 26.  She also listed "indoctrination" as the book's purpose. *Id.*  On the basis of this challenge, access to *Two Boys Kissing* is currently restricted within all School District libraries.  The book does not appear to have been scheduled for committee review.

128.   Another Targeted Book is *Out of Darkness* by Plaintiff Pérez.  *Out of Darkness* is a historical young adult novel involving a secret romance between a Mexican-American girl and a Black boy in a small town in East Texas in the 1930s, in the months preceding a catastrophic real-life gas explosion that destroyed the town's school and killed hundreds of students and faculty.  The story ends violently and tragically.

129.   Booklist named *Out of Darkness* one of its "50 Best YA Books of All Time" in 2017, saying "Pérez's elegant and devastating Printz Honor winner begins with a real-life 1937 school explosion that killed 300 people in Texas before backtracking to Mexican-American Naomi, who struggles with racism, love, and Henry—the father of her siblings and one of the most vivid, complicated villains in YA history."  In 2015, the book was named as one of the "Best Teen" books of the year by *Kirkus Review*, and one of the "Best Books of 2015" by *Booklist* magazine.

130.   Baggett's objections to *Out of Darkness* include "graphic depictions of abuse + sexual scenes," she listed the strengths of the book as "none," and listed its

purpose as "sexual introductions; sexually excite."  Ex. 27.  The book is currently being restricted within School District libraries and does not appear to be scheduled for committee review.

131.    Another Targeted Book is *Forever. . .* by PEN America member Judy Blume.  Blume is the author of more than 25 novels over more than five decades— mainly for children and young adults—including *Are You There God?  It's Me, Margaret*, and *Tales of a Fourth Grade Nothing* (along with its four sequels, comprising the *Fudge* series).  To celebrate its bicentennial in 2000, the Library of Congress recognized Blume as one of 78 "Living Legends" whose creative contributions embodied the richness and diversity of American cultural life.

132.    *Forever . . .* is a realistic and thoughtful portrayal of teen romance and sexuality told from the perspective of a high school senior entering her first serious relationship.  Although published in 1975, the book has remained a relevant and appreciated work in the nearly fifty years since its initial release.  In 1996, the book earned Blume the American Library Association's Margaret E. Edwards Award for a "significant and lasting contribution to young adult literature."  Netflix announced an upcoming television adaptation in November 2022.

133.  Baggett  challenged  *Forever . . .*  on  the  basis  that  it  contained "extremely graphic sexual content" and "sexual excitement," that it had no strengths as educational media, and that its sole purpose was "sexual excitement."  Ex. 28.

Based on that objection, *Forever . . .* is currently subject to restricted access within School District libraries. It does not yet appear to have been scheduled for committee review.

134. Another Targeted Book is *Beyond Magenta: Transgender Teens Speak Out* ("*Beyond Magenta*") by PEN America member Susan Kuklin. *Beyond Magenta* is a young adult nonfiction book based on interviews with six transgender or nonbinary teenagers. *Beyond Magenta* received numerous awards and positive reviews from *Booklist, Kirkus Reviews*, and *Publishers Weekly*, with the latter calling it "a sorely needed resource for teens and, frankly, many adults" that captures its subjects as "full, complex, and imperfect human beings."

135. Baggett challenged *Beyond Magenta* on the grounds that it was "sexually explicit" and contained "LGBTQIA content." Ex. 29. She claimed it had no strengths as educational media and its sole purpose was "total indoctrination." Access to *Beyond Magenta* is still being restricted by the School District, and the book does not yet appear to have been scheduled for committee review.

### H. Defendants Disproportionately Target Books by Minority and LGBTQ Authors or Books Addressing Themes Involving Race and LGBTQ Identity

136. The removal efforts of the School District and the School Board have been focused disproportionately on minority and LGBTQ authors and/or books that pursue themes related to minority or LGBTQ identity.

137.   Of the 10 Removed Books by the School Board, 6 have authors who are non-white and/or identify as LGBTQ, while 9 address themes relating to race or LGBTQ identity, or feature prominent non-white and/or LGBTQ characters.

138.   Of the 197 books that have been targeted for removal, approximately 40% have authors who are non-white and/or identify as LGBTQ, while approximately 60% address themes relating to race or LGBTQ identity.

139.   Of the 154 books that have either been removed or restricted, approximately 37% have authors who are non-white and/or identify as LGBTQ, while approximately 60% address themes relating to race or LGBTQ identity, or feature prominent non-white and/or LGBTQ characters.

140.   The disproportionate focus of the removal efforts is not an accident. Baggett and other challengers have routinely expressed the categorical view that a book is inappropriate for inclusion in a school library just on the ground that it explores themes relating to race or LGBTQ identity.   And, the School Board has repeatedly ratified—over the objections of the district review committee—Baggett's removal preferences.

141.   In addition, books that have been singled out for removal because they reference same-sex relationships or transgender people are being automatically placed under restriction during the review period.

142.   As a consequence of this targeting of books by non-white and LGBTQ authors, authors belonging to such groups are disproportionately hindered in their ability to reach young audiences, including non-white and LGBTQ students.

**I.     Students in the School District Are Being Deprived Access, or Restricted in Their Access, to Books to which They Previously Had Access**

143.   The book removals and restrictions enacted by the School District and School Board are denying students access to books they would like to read or chilling such access.

144.   For example, Plaintiff Durtschi is the parent of two students who currently attend A.K. Suter Elementary School, which is in the School District.  The students are in the third and first grades.  Both of Plaintiff Durtschi's children go to their school library at least once a week, where they check out books.

145.   Durtschi's third-grader would like to access and check out books that are no longer available in her school's library because of the book removals and book restrictions.  In particular, she would like to access and check out *Too Bright to See*, *Drama*, and *New Kid*.  Each of those books is currently unavailable or restricted in her school library as a result of the actions of the School District and the School Board.

146.   Durtschi's first-grader would also like to access and check out books that are no longer available in her school's library because of the book removals and

book restrictions.  In particular, she would like to access and check out *Tango*, *Aidan*, and *Uncle Bobby's Wedding*.  Each of those books is currently unavailable or restricted in her school library as a result of the actions of the School District and the School Board.

147.   Durtschi herself would like those particular books, and others like them, to be available to her children in their school library.  It is very important to her that her children have opportunities to be exposed to points of view, backgrounds, and experiences different from their own.  She believes such exposure is critical for preparing them for participation in our wider society.

148.   Durtschi expressed these views at the School Board meeting at which it was decided that Plaintiff's Johnson's book *All Boys Aren't Blue* would be removed.  She stated: "George Johnson has said that works like mine have saved their lives.  I'm the parent of two little girls at A.K. Suter Elementary.  . . . Each book brought for appeal this evening has been challenged on the basis of LGBTQ indoctrination and content, but storytelling is not indoctrination.  Indoctrination means teach[ing] someone to accept a set of beliefs without questioning them.  By not allowing our children to consume the entire world around them in and out of the classroom we aren't allowing them to question much of anything.  I want my girls to question intolerance.  I want my girls to question bigotry and misogyny.  I want to prepare them to be loving, kind, and empathetic friends.  I know many have said

our children already receive so much information in the real world.  Well that's all the more reason to increase positive discussion regarding otherwise taboo topics."

149.   Plaintiff Novakowski is the parent of a kindergartener at A.K. Suter Elementary School.  Her daughter visits the library at her school at least once a week and routinely checks out books.  Her daughter is particularly interested in books about families and different family arrangements.

150.   Novakowski's daughter would like to access and check out books that are no longer available in her school's library because of the book removals and restrictions.  In particular, she would like to check out *Tango*, *Aidan*, and *Uncle Bobby's Wedding*.  Each of those books is currently unavailable or restricted in her school library as a result of the actions of the School District and the School Board.

151.   Novakowski herself would like those particular books, and others books like them, to be available to her daughter in her school library.  It is important to her that her daughter has opportunities to be exposed to points of view, backgrounds, and experiences different from her own and that of her family.  She believes such exposure is critical to learning acceptance of people with different backgrounds and experiences and to being able to participate in our wider society.

**J.      Defendants' Book Removals and Restrictions Harm PEN America, Its Members, the Author Plaintiffs, PRH, and the Parent Plaintiffs and Their Children**

152.   PEN America has standing to sue to enjoin the Defendants' book removals and restrictions because the actions of the School District and School Board have caused direct organizational injury to PEN America.

153.   As a consequence of the national movement to remove books from public school libraries based on political or ideological objections—including in Escambia County—PEN America has had to reallocate significant financial resources and time to addressing this issue and away from other priorities.  For example, PEN America has had to hire full-time staff to work solely on (a) tracking and reporting on book removals, (b) supporting author-members who have concerns about what is happening to their own books, and (c) responding to a consistent onslaught of inquiries and notifications from parents, teachers, students and media concerned about the situation regarding book removals and looking to PEN America for insight and guidance.  In addition, because of the focus on book removals, PEN America has had fewer personnel dedicated to free speech education for youth or to free speech issues on college campuses, two other areas related to education on which PEN America has typically focused its resources.

154.   PEN America also has associational standing on behalf of its members. Among the PEN America members whose books have been removed from libraries

within the School District and/or subjected to restricted access within libraries in the School District are each of the Author Plaintiffs, as well as Margaret Atwood, Judy Blume, Alex Gino, John Green, Khaled Hosseini, Susan Kuklin, and Jodi Picoult.

155. Each of those affected author-members of PEN America would have standing to sue based on the School District's violation of their rights under the First and Fourteenth Amendments.

156. The interests at stake in this case are germane to PEN America's purpose of protecting the rights of its author-members and the right to free expression generally.

157. Neither the claims asserted nor the relief requested in this case requires the participation of the named non-plaintiff author-members above or any other of PEN America's author-members as the relief being sought is declaratory and injunctive in nature.

158. The Author Plaintiffs have standing to sue to enjoin Defendants' book removals and restrictions because their books have been (a) removed from libraries within the School District, and/or (b) subject to restricted access of an indefinite period pending adjudication of a challenge. Specifically:

> a. Plaintiff Brannen's book *Uncle Bobby's Wedding* is one of the Targeted Books and currently restricted from School District elementary libraries indefinitely pending an as-yet unscheduled review.

b. Plaintiff Johnson's book *All Boys Aren't Blue* is one of the Removed Books.

c. Plaintiff Levithan's book *Two Boys Kissing* is one of the Targeted Books and currently restricted from School District libraries indefinitely pending an as-yet unscheduled review.

d. Plaintiff Lukoff's book *Aidan* is one of the Removed Books.  His book *Too Bright to See* is one of the Targeted Books and is currently restricted from School District elementary libraries indefinitely pending an as-yet unscheduled review.

e. Plaintiff Pérez's book *Out of Darkness* is one of the Targeted Books and currently restricted from School District libraries indefinitely pending an as-yet unscheduled review.

159.   Millions of books published by PRH are sold into Florida each year, including to school districts and public libraries.  PRH has standing to sue to enjoin Defendants' book removal and restrictions because certain of the books it publishes, including books by Toni Morrison, Kurt Vonnegut, Eric Carle, Kyle Lukoff, Sapphire, and David Levithan, have been (a)  removed from libraries within the School District, and/or (b) subject to restricted access of an indefinite period pending adjudication of a challenge.  A publisher's ability to publish and sell books freely is affected when state or local officials restrict circulation or remove the publisher's

books.

160.   The Parent Plaintiffs have standing, on behalf of both themselves and their children, to sue to enjoin Defendants' book removals and restrictions because both they and their children have been harmed by the book removals and restrictions.

161.   Plaintiff Durtschi is the parent of two students who attend A.K. Suter Elementary School in the School District.  As a result of the actions of the School District and the School Board, Durtschi's daughters are unable to access books in their school library that were previously available.  Durtschi's daughters want to access and check out those books and Durtschi wants them to have that opportunity.

162.   Plaintiff Novakowski is the parent of a student who attends A.K. Suter Elementary School in the School District.  As a result of the actions of the School District and the School Board, Novakowski's daughter is unable to access books in her school library that were previously available.  Novakowski's daughter wants to access and check out those books and Novakowski wants her to have that opportunity.

## V.    CLAIMS FOR RELIEF

### COUNT ONE:
### FIRST AMENDMENT—VIEWPOINT DISCRIMINATION
### (On Behalf of PEN America, the Author Plaintiffs and PRH)

163.   The foregoing paragraphs are incorporated by reference as if fully set forth herein.

164.   The Fourteenth Amendment to the United States Constitution incorporates the protections of the First Amendment as applied to and binding on the State of Florida.

165.   Defendants are state actors operating under color of state law.

166.   The libraries within the School District constitute, at a minimum, non-public forums.  Because they are non-public forums, the School District and School Board cannot remove an author's or publisher's book from school libraries, or relegate it to restricted sections of such libraries, based on viewpoint discrimination.

167.   However, as detailed above with respect to the Removed Books, the School District and School Board are ordering books removed based on ideological objections to their contents or disagreement with their messages or themes, rather than for pedagogical reasons.

168.   The School District and School Board are likewise restricting access to books for indefinite periods of time based on ideological objections to their contents or disagreement with their messages.  Indeed, under the current system the School District and School Board has put in place, private citizens are empowered to restrict access to books they object to simply by alleging that the books contain sexual content or reference same-sex relationships or transgender people.

169.   The result is that the School District and School Board are systematically excluding certain viewpoints and perspectives from school libraries.

170.   Such removals, threatened removals, and restrictions of access constitute viewpoint discrimination in violation of the First Amendment.

## COUNT TWO:
## FIRST AMENDMENT—RIGHT TO RECEIVE INFORMATION
### (On Behalf of the Parent Plaintiffs)

171.   The Fourteenth Amendment to the United States Constitution incorporates the protections of the First Amendment as applied to and binding on the State of Florida.

172.   Defendants are state actors operating under color of state law.

173.   In the setting of a public school library, the First Amendment "protects the right to receive information and ideas." *Pico*, 457 U.S. at 867-68.  This right is violated when a school district or school board removes or restricts access to library books "in a ***narrowly partisan or political manner***," and for the purpose of "deny[ing] students access to ideas with which" the school district or school board disagrees.  *Id.* at 870-71 (emphasis added).  As detailed above, that is what has occurred here.

174.   The Parent Plaintiffs want their student children have access to some or all of the Removed Books.

175.   The Parent Plaintiffs also want their student children be able to access some or all of the Targeted Books without incurring the stigma of having to identify

themselves as wishing to access material deemed "pornographic" or otherwise inappropriate.

176.   The students on whose behalf the Parent Plaintiffs also bring this lawsuit likewise want to have access to some or all of the Removed Books.

177.   The students on whose behalf the Parent Plaintiffs also bring this lawsuit likewise want to be able to access some or all of the Targeted Books without incurring the stigma of having to identify themselves as wishing to access material deemed "pornographic."

178.   The unlawful conduct of the School District and the School Board has injured the rights of the Parent Plaintiffs that their student children have access to information and ideas within school libraries, and the rights of those student children to receive information and ideas.

## COUNT THREE:
## FOURTEENTH AMENDMENT—EQUAL PROTECTION
### (On Behalf of PEN America and the Author Plaintiffs)

179.   The foregoing paragraphs are incorporated by reference as if fully set forth herein.

180.   The Fourteenth Amendment to the United States Constitution constrains the ability of state actors, including Defendants, from discriminating on the basis of race, gender, or sexual orientation.  This includes taking official action motivated by discriminatory animus based on race, gender, or sexual orientation.

181. Defendants are state actors operating under color of state law.

182. As set forth above, the books that have been removed, or targeted for removal, by the School District and School Board are disproportionately books authored by non-white and/or LGBTQ authors, and/or books that explore themes relating to race, gender, or sexual orientation.

183. That disproportionate focus is evidence that the School District and School Board are targeting books and/or authors based on prohibited animus.

184. In addition, such prohibited animus is manifest on the face of the objections leveled against the Removed Books and Targeted Books. The majority of these books have been targeted simply because they address themes relating to race, sexuality, or gender identity. The clear intent is to exclude speech by authors based on their race, sexuality, or gender identity.

185. The School District and School Board have consistently acceded to, and ratified, that animus in their book-removal and book-restriction decisions.

186. The books removal efforts at issue are based on discriminatory animus in violation of the Equal Protection Clause of the Fourteenth Amendment.

## VI.   PRAYER FOR RELIEF

**WHEREFORE**, in light of the foregoing facts, Plaintiffs respectfully request that this Court:

A.     Issue preliminary and permanent injunctive relief requiring

Defendants and their agents, employees, and successors in office to restore to the libraries within the School District the Removed Books.

       B.     Issue preliminary and permanent injunctive relief restraining Defendants and their agents, employees, and successors in office from removing and/or restricting access to the Targeted Books;

       C.     Award Plaintiffs' costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. § 1988; and

       D.     Grant such other and further relief as the interests of justice may require.

Respectfully submitted,

Dated: May 17, 2023

*/s/* Shalini Goel Agarwal

Lynn B. Oberlander*
Kamera E. Boyd*
**BALLARD SPAHR LLP**
1675 Broadway, 19th Floor
New York, NY 10019-5820
Telephone: 212.223.0200
Facsimile: 212.223.1942

Paul J. Safier*
Shawn F. Summers*
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: 215.864.8500
Facsimile: 215.864.8999

Shalini Goel Agarwal (FBN 90843)
Kristy Parker*
**PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
Telephone: 202.579.4582
Facsimile: 929.777.8428

John Langford*
**PROTECT DEMOCRACY PROJECT**
82 Nassau Street, #601
New York, NY 10038
Telephone: 202.579.4582
Facsimile: 929.777.8428

*Pro hac vice application forthcoming*

*Attorneys for Plaintiffs PEN American Center, Inc., Sarah Brannen, Lindsay Durtschi, George M. Johnson, David Levithan, Kyle Lukoff, Ann Novakowski, Penguin Random House LLC, and Ashley Hope Pérez*