UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| PEN AMERICAN CENTER, INC., ET AL.,<br><br>*Plaintiffs*,<br><br>v.<br><br>ESCAMBIA COUNTY SCHOOL BOARD,<br><br>*Defendant*. | Case No. 3:23-cv-10385-TKW-ZCB |

**BRIEF OF *AMICUS CURIAE* THE STATE OF FLORIDA
IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

## INTRODUCTION AND STATEMENT OF INTEREST

Plaintiffs challenge "the decisions of the Escambia County School Board ('the School Board') to remove and restrict" certain materials in "public school libraries within the Escambia County School District." DE25-1 at 1–2. The restrictions, Plaintiffs say, violate the First Amendment because the government may not restrict access to materials "based on viewpoint" or "deny students access to ideas with which" the "school board disagrees." DE25-1 ¶¶ 218, 225 (cleaned up). But public-school systems make value-based judgments like that every day. They exclude materials like Nazi propaganda because they disagree that Nazis were wonderful, regardless of any educational value the materials may have. Viewpoint-based educational choices are constitutionally permissible because public-school systems, including their libraries, convey the government's message, and, when the government speaks, it may "regulate the content of . . . its own message," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995), "including choosing not to speak and speaking through the removal of speech that the government disapproves," *Gundy v. City of Jacksonville*, 50 F.4th 60, 71 (11th Cir. 2022) (cleaned up). Plaintiffs—who include the authors and publishers of certain books restricted by Defendant—are free to take their concerns to the ballot box. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 468–69 (2009). But they have no constitutional right to inculcate Florida's schoolchildren with their preferred ideas through Florida's school libraries. To

vindicate that principle, the Attorney General respectfully submits this amicus brief in support of Defendant's motion to dismiss.

## ARGUMENT

I. **PLAINTIFFS FAIL TO STATE A FIRST AMENDMENT CLAIM.**

**1.** Plaintiffs contend that "[s]chool libraries are . . . of great importance to book authors and book publishers, especially with regard to books aimed at" their intended audience—"children and young adults." DE25-1 ¶ 41. In their view, "[t]he libraries within the School District constitute, at a minimum, non-public forums," and, "[b]ecause they are non-public forums, the School Board cannot" restrict access to materials "based on viewpoint." *Id.* ¶ 218. That is wrong because Florida's public-school libraries are a forum for government, not private, speech. And when the government speaks, it "can freely select the views that it wants to express, including choosing not to speak and speaking through the removal of speech that the government disapproves." *Gundy*, 50 F.4th at 71 (cleaned up).

Although the Eleventh Circuit has not yet addressed whether the government's "book collection (and book removal) decisions" for school libraries are "government speech," *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1201 (11th Cir. 2009),[1] the Supreme Court and Eleventh Circuit have repeatedly

---

[1] In *Miami-Dade County School Board*, the court had no occasion to decide that question because the plaintiffs lost even under the "standard . . . of their dreams"—"the standard that failed to attract a majority in the *Pico* case." 557 F.3d

held that the government's authority to "regulate the content of . . . its own message," *Rosenberger*, 515 U.S. at 833, includes the discretion to select materials and content for compilation and presentation to citizens, be it a government parade,[2] a broadcasted debate,[3] a state-university commencement,[4] or a state-sponsored art gallery.[5] In *Pleasant Grove City v. Summum*, for example, the Supreme Court held that the selection of monuments for a public park was government speech, even when the monuments were funded or donated by private parties. 555 U.S. at 470–73. "Government decisionmakers select[ed] the monuments that portray[ed] what they view[ed] as appropriate for the place in question, taking into account such content-based factors as esthetics, history, and local culture." *Id.* at 472. Accordingly, the "decision to accept certain privately donated monuments while rejecting respondent's" was "government speech," and the government was not required to "maintain viewpoint neutrality" in making that decision. *Id.* at 479, 481.

---

at 1202 (citing *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 872 (1982) (plurality op.)).

[2] *See Leake v. Drinkard*, 14 F.4th 1242, 1253 (11th Cir. 2021).

[3] *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998).

[4] *Id.*

[5] *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 586 (1998).

As the Supreme Court has explained, "forum analysis and heightened judicial scrutiny . . . are also incompatible with the discretion that [government-run] libraries must have to fulfill their traditional missions." *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 205 (2003) (plurality op.). Like the monument park in *Summum*, a library's purpose is "to provide its patrons with materials of requisite and appropriate quality, not to create a public forum for [private parties] to express themselves." *Id.* at 209 n.4. "To fulfill their traditional missions, public libraries must have broad discretion to decide what material to provide to their patrons," and need not "provide universal coverage." *Id.* at 201. Like the selection of monuments, "the government speaks through its selection of which books to put on the shelves and which books to exclude," *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005), because that selection reflects the *government*'s view about what materials have the "requisite and appropriate quality," *Am. Libr. Ass'n, Inc.*, 539 U.S. at 204, 206 (plurality op.) (citations omitted); *see also Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) (the government speaks when it "compil[es]" the "speech of third parties" in a public library). And because the compilation of library materials is government speech, the First Amendment does not bar the government from making viewpoint-based choices about what to curate. *See Gittens*, 414 F.3d at 29; *Am. Libr. Ass'n*, 539 U.S. at 204–05 (plurality op.).

That principle applies with even more force in public-*school* libraries, the purpose of which is to support the government's educational mission by "providing materials that properly supplement the basic readings assigned through the standard curriculum." *Zykan v. Warsaw Cmty. Sch. Corp.*, 631 F.2d 1300, 1308 (7th Cir. 1980). By curating a school library, the government conveys its view on which books have the "requisite and appropriate quality" to bolster student development. *Am. Libr. Ass'n*, 539 U.S. at 204 (plurality op.) (citation omitted). "Absurd results would follow," *Dean v. Warren*, 12 F.4th 1248, 1266 (11th Cir. 2021), if private parties were allowed to hijack the government's message by forcing their preferred books onto school-library shelves, *see Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 572–73 (1995) (parade organizers not required to include voices they wished to exclude); *Leake*, 14 F.4th at 1253 (same for government parade organizer). Forcing the government "to speak" in a school library "what [it] do[es] not believe on pain of" lawsuit, *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2313–14 (2023), would put policy decisions about what to teach in schools in the hands of litigants rather than elected representatives. "Indeed, it is not easy to imagine how government could function if it lacked this freedom." *Summum*, 555 U.S. at 468. "If every citizen were to have a right to insist" that his preferred books be included in a school's library, "debate over issues of great concern to the public would be limited to those in the private sector." *Id.* (citing *Keller v. State Bar of Cal.*,

6

496 U.S. 1, 12–13 (1990)). The government would not only have to curate those litigants' preferred materials, but also reallocate resources and student attention away from those that advance the government's selected educational mission. *See Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007).

Plaintiffs make much of Defendant's professed commitment in its policy manual to provide in school libraries "a wide range of materials of different difficulty levels, with diversity of appeal and representing different points of view." DE25-1 ¶¶ 39–40 (citing DE25-1 Exh. 1 at 8–9). But the policy manual merely identifies that goal as one among many competing objectives for Defendant's libraries—among them, "provid[ing] a broad background of information in all areas of knowledge," "support[ing] the general educational goals of the District and the objectives of specific courses," and "[s]upport[ing] the professional needs of teachers and administrators." DE25-1 Exh. 1 at 7–8. If anything, the policy manual confirms that Defendant's libraries are not a forum for free expression, warning that "[n]o parent, guardian or resident of the county has the right to determine the reading, viewing or listening resources for students other than their own children" and reserving to school officials—not authors, publishers, or students—the authority to "mak[e] the final selection for library-media." *Id.* at 9, 12. Far from the blanket "accommodat[ion]" of "all applicants" that reflects a "lack of meaningful involvement in the selection" process and thus creates a forum for free expression, Defendant's policies show that

7

school officials "always select[]" their library materials and "maintain direct control" of them. *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1592–93 (2022) (citing *Summum*, 555 U.S. at 472–473, and *Walker v. Tex. Div., Sons of Confederate Veterans*, 576 U.S. 200, 213 (2015)). State law indeed requires as much. *See* Fla. Stat. § 1006.28(2)(d)(1) ("Each book made available to students through a school district library . . . must be selected by a school district employee . . ., regardless of whether the book is purchased, donated, or otherwise made available to students."); *see also id*. § 1006.28(2)(d)(2) (requiring that "[e]ach district school board . . . adopt procedures for developing library . . . collections" to "support . . . state academic standards and aligned curriculum, and the academic needs of students and faculty.").

**2.** The Student Plaintiffs are just as wrong that the First Amendment bars the government from restricting library books "for the purpose of 'deny[ing] students access to ideas with which' the school district disagrees." DE25-1 ¶ 225 (citing *Pico*, 457 U.S. at 870–71 (plurality op.). The government has no constitutional obligation to present educational material with which it disagrees. Because a "listener's right to receive information is reciprocal to the speaker's right to speak," *Doe ex rel. Doe v. Governor of N.J.*, 783 F.3d 150, 155 (3d Cir. 2015), that right cannot be deployed to interfere with the government's own message. Students certainly have no more right to control what the government puts in its libraries than they do to control the content of a school cheer, *see Dean*, 12 F.4th at 1265–66 (cheerleading is

government speech), or the message they communicate while participating in a training practicum, *see Keeton v. Anderson-Wiley*, 664 F.3d 865, 877 (11th Cir. 2011) (same for school practica).

In arguing the contrary, Plaintiffs attach considerable significance to *Board of Education v. Pico*, in which a plurality of the Supreme Court concluded that school library materials may not be selected "in a narrowly partisan or political manner." 457 U.S. at 870. But the Eleventh Circuit has recognized that *Pico* was "a badly fractured decision" that is "of no precedential value as to the application of the First Amendment to these issues" and "establishes no standard." *Miami-Dade Cnty. Sch. Bd.*, 557 F.3d at 1199–1200 (quotations omitted). In addition, *Pico* predates the Supreme Court's government-speech cases, which—as Justice Rehnquist foreshadowed—would have required a different result in that case. *See* 457 U.S. at 920 (Rehnquist, J., dissenting) ("[T]he Court will far better serve the cause of First Amendment jurisprudence by candidly recognizing that the role of government as sovereign is subject to [stricter] limitations than [its] role" as "educator.").

## II.   PLAINTIFFS FAIL TO STATE AN EQUAL PROTECTION CLAIM.

Plaintiffs also claim that "[m]any of these books have been targeted simply because they address themes relating to race, sexuality, or gender identity" and, from that they infer the "intent . . . to exclude speech by authors based on their race, sexuality, or gender identity." DE25-1 ¶ 236. In other words, Plaintiffs allege that

9

Defendant's governmental message constitutes invidious discrimination in violation of the Equal Protection Clause. That claim fails for the same reason as Plaintiffs' First Amendment claims: "[A] government entity is entitled to say what it wishes and to select the views it wants to express," with a notable exception for the establishment of religion. *Am. Atheists, Inc. v. Port Auth. of N.Y. & N.J.*, 760 F.3d 227, 246 (2d Cir. 2014) (cleaned up) (rejecting equal protection claim alleging animus in the adoption of the September 11 Memorial at Ground Zero). Accordingly, "the Equal Protection Clause does not apply to government speech." *Fields v. Speaker of Penn. House of Representatives*, 936 F.3d 142, 161 (3d Cir. 2019); *see Freedom from Religion Found., Inc. v. City of Warren*, 707 F.3d 686, 698 (6th Cir. 2013); *Bloomberg v. Blocker*, 586 F. Supp. 3d 1251, 1258 (M.D. Fla. 2022). That makes sense because, when—as here—the government speaks for itself rather than creating a forum for private speech, it necessarily treats all citizens equally.

## CONCLUSION

For the foregoing reasons, as well as those stated in Defendant's motion to dismiss, the Court should dismiss all claims against Defendant.

<div style="display: flex;">

<div>
Office of the Attorney General<br>
The Capitol, PL-01<br>
Tallahassee, Florida 32399-1050<br>
(850) 414-3300<br>
(850) 410-2672 (fax)<br>
*daniel.bell@myfloridalegal.com*
</div>

<div>
Respectfully submitted,

ASHLEY MOODY
  *Attorney General*
HENRY C. WHITAKER (FBN 1031175)
  *Solicitor General*
*/s/ Daniel W. Bell*
DANIEL W. BELL (FBN 1008587)
  *Chief Deputy Solicitor General*
DAVID M. COSTELLO (FBN 1004952)
  *Deputy Solicitor General*

*Counsel for Amicus Curiae the State of Florida*
</div>

</div>

### CERTIFICATE OF SERVICE

On this 22nd day of August, 2023, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

  */s/ Daniel W. Bell*
  Chief Deputy Solicitor General