# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

| | | |
|---|---|---|
| PEN AMERICAN CENTER, INC., | : | |
| SARAH BRANNEN, LINDSAY | : | |
| DURTSCHI, on behalf of herself and her | : | CASE NO.: 3:23-CV-10385-TKW- |
| minor children, BENJAMIN GLASS, on | : | ZCB |
| behalf of himself and his minor child, | : | |
| GEORGE M. JOHNSON, DAVID | : | |
| LEVITHAN, KYLE LUKOFF, ANN | : | JURY TRIAL DEMANDED |
| NOVAKOWSKI, on behalf of herself and | : | |
| her minor child, PENGUIN RANDOM | : | |
| HOUSE LLC, SEAN PARKER, on behalf | : | |
| of himself and his minor child, ASHLEY | : | |
| HOPE PÉREZ, ERICA ROY, on behalf of | : | |
| herself and her minor children, | : | |
| CHRISTOPHER SCOTT | : | |
| SATTERWHITE, on behalf of himself and | : | |
| his minor child, and CARIN SMITH, on | : | |
| behalf of herself and her minor children. | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | |
| | : | |
| ESCAMBIA COUNTY SCHOOL | : | |
| BOARD, | : | |
| | : | |
| *Defendant*. | : | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Lynn B. Oberlander*
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019-5820
Telephone: 212.223.0200
Facsimile: 212.223.1942

Paul J. Safier*
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: 215.864.8500
Facsimile: 215.864.8999

Shalini Goel Agarwal (FBN 90843)
Kristy Parker*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
Telephone: 202.579.4582
Facsimile: 929.777.8428

John Langford*
PROTECT DEMOCRACY PROJECT
82 Nassau Street, #601
New York, NY 10038
Telephone: 202.579.4582
Facsimile: 929.777.8428

*Admitted pro hac vice


Attorneys for Plaintiffs

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................... iii

PRELIMINARY STATEMENT ........................................................1

FACTUAL BACKGROUND ............................................................3

I.      THE PLAINTIFFS ...............................................................3

II.     THE CHALLENGED BOOK REMOVALS AND
        RESTRICTIONS ................................................................5

        A.      The Removed Books ............................................6

        B.      The Restricted Books ...........................................7

III.    THIS LAWSUIT ................................................................9

ARGUMENT ..................................................................................10

I.      THE BOARD'S SHOTGUN-PLEADING ARGUMENT IS
        WITHOUT MERIT ...........................................................11

II.     HB 1069 HAS NO BEARING ON THIS LAWSUIT ...................12

        A.      Plaintiffs Are Challenging Book Removals and Restrictions
                that Occurred Pursuant to Pre-HB 1069 Policies................12

        B.      Even If HB 1069 Governed, Its Special Review Procedures
                Would Not Apply to Plaintiffs' Claims ...............14

III.    EACH SET OF PLAINTIFFS HAS STANDING .......................16

        A.      HB 1069 Has No Impact on Standing....................17

        B.      The Parent Plaintiffs Have Standing to Challenge Removals
                or Restrictions of Books Their Children Planned to Check
                Out ....................................................................18

        C.      The Author Plaintiffs and PRH Have Standing to Challenge
                Removals or Restrictions of Their Books ...........19

     D.     PEN Has Associational and Organizational Standing ........................22

IV.   THE GOVERNMENT-SPEECH DOCTRINE DOES NOT
     APPLY .................................................................................................25

     A.     The Board Failed to Address the Government-Speech
           Factors, Which Are Not Appropriately Applied at This
           Stage ........................................................................................27

     B.     The Government-Speech Factors Cut Decisively In
           Plaintiffs' Favor ......................................................................28

V.    THE BOARD'S ATTACK ON THE "RIGHT TO RECEIVE
     INFORMATION" SHOULD BE REJECTED .............................................35

VI.   PLAINTIFFS' CHALLENGES TO THE BOOK
     RESTRICTIONS ARE RIPE ...................................................................37

VII.  THE BOARD'S CHALLENGES TO THE EQUAL
     PROTECTION CLAIM FAIL ....................................................................39

VIII. REQUEST FOR ORAL ARGUMENT .........................................................42

CONCLUSION ....................................................................................................42

RULE 7.1(F) CERTIFICATION .............................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of Florida, Inc. v. Miami-Dade County School Board*,
  557 F.3d 1177 (11th Cir. 2009) .......................................................18, 19, 26, 37

*Arce v. Douglas*,
  793 F.3d 968 (9th Cir. 2015) ..............................................................................41

*Arcia v. Florida Secretary of State*,
  772 F.3d 1335 (11th Cir. 2014) ..........................................................................23

*Arkansas Educational Television Commission v. Forbes*,
  523 U.S. 666 (1998)................................................................................33, 34, 37

*Bloedorn v. Grube*,
  631 F.3d 1218 (11th Cir. 2011) ..........................................................................20

*Board of Education v. Pico*,
  457 U.S. 853 (1982)......................................................................................25, 29

*Cambridge Christian School v. Florida High School Athletic
  Association*,
  942 F.3d 1215 (11th Cir. 2019) .......................................................27, 28, 30, 31

*Campbell v. St. Tammany Parish School Board*,
  64 F.3d 184 (5th Cir. 1995) .........................................................................26, 36

*Case v. Unified School District No. 233*,
  908 F. Supp. 864 (D. Kan. 1995)........................................................................27

*Chiras v. Miller*,
  432 F.3d 606 (5th Cir. 2005) .......................................................................29, 30

*Counts v. Cedarville School District*,
  295 F. Supp. 2d 996 (W.D. Ark. 2003) ...........................................19, 26, 38, 39

*Covenant Christian Ministries, Inc. v. City of Marietta*,
  654 F.3d 1231 (11th Cir. 2011) ..........................................................................13

*Daker v. Chief Legal Affairs Officer*,
2023 U.S. App. LEXIS 5099 (11th Cir. Mar. 2, 2023) ......................................36

*Dean v. Warren*,
12 F.4th 1248 (11th Cir. 2021) ............................................................................32

*Doe v. City of Albuquerque*,
667 F.3d 1111 (10th Cir. 2012) ...........................................................................36

*Fayetteville Public Library v. Crawford County*,
2023 U.S. Dist. LEXIS 131427 (W.D. Ark. July 29, 2023) ..............................26

*Florida State Conference of the NAACP v. Browning*,
522 F.3d 1153 (11th Cir. 2008) ...........................................................................23

*Georgia Association of Latino Elected Officials, Inc. v. Gwinnett
County Board of Registration and Elections*,
36 F.4th 1100 (11th Cir. 2022) ............................................................................24

*Georgia Republican Party v. SEC*,
888 F.3d 1198 (11th Cir. 2018) ...........................................................................22

*Gay Guardian Newspaper v. Ohoopee*,
235 F. Supp. 2d 1362 (S.D. Ga. 2002) ................................................................26

*Gundy v. City of Jacksonville*,
50 F.4th 60 (11th Cir. 2022) ................................................................................32

*Hazelwood School District v. Kuhlmeier*,
484 U.S. 260 (1988) .............................................................................................37

*Health Ins. Plans v. Hudgens*,
742 F.3d 1319 (11th Cir. 2014) ...........................................................................17

*Leake v. Drinkard*,
14 F.4th 1242 (11th Cir. 2021) ............................................................................32

*Little v. Llano County*,
2023 U.S. Dist. LEXIS 54716 (W.D. Tex. Mar. 30, 2023) ...............................26

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .............................................................................................18

iv

*Matal v. Tam*,
    582 U.S. 218 (2017)..................................................................30, 35

*McGriff v. City of Miami Beach*,
    522 F. Supp. 3d 1225 (S.D. Fla. 2020)...............................................28

*Mech v. School Board of Palm Beach County*,
    806 F.3d 1070 (11th Cir. 2015) .........................................................32

*Minarcini v. Strongsville City School District*,
    541 F.2d 577 (6th Cir. 1976) .............................................................26

*Monell v. Department of Social Services*,
    436 U.S. 658 (1978)..........................................................................12

*Moody v. Warden, Holman CF*
    887 F.3d 1281, 1285 (11th Cir. 2018) ...............................................22

*Naturist Society, Inc. v. Fillyaw*,
    958 F.2d 1515 (11th Cir. 1992) .........................................................13

*NEA v. Finley*,
    524 U.S. 569 (1988)....................................................................33, 34

*Parents, Families, & Friends of Lesbians and Gays, Inc. v.*
    *Camdenton R-III School District*,
    853 F. Supp. 2d 888 (W.D. Mo. 2012)..........................20, 21, 26, 39

*Parnell v. School Board of Lake County, Florida*,
    No. 5:23-cv-381, ECF 51 (M.D. Fla. Aug. 3, 2023) ....................19, 36

*Parris v. 3M Co.*,
    595 F. Supp. 3d 1288 (N.D. Ga. 2022)...............................................11

*Pernell v. Florida Board of Governors of the State University System*,
    2022 U.S. Dist. LEXIS 243016 (N.D. Fla. Nov. 22, 2022)................40

*Perry v. Sindermann*,
    408 U.S. 593 (1972)..........................................................................21

*Pleasant Grove v. Summum*,
    555 U.S. 460 (2009)..........................................................................32

*Prison Legal News v. Livingston*,
   683 F.3d 201 (5th Cir. 2012) ..............................................................20

*Rumsfeld v. Forum for Academic & Institutional Rights., Inc.*,
   547 U.S. 47 (2006)..............................................................................17

*South River Watershed Alliance, Inc. v. Dekalb County*,
   69 F.4th 809 (11th Cir. 2023) ............................................................17

*Shurtleff v. City of Boston*,
   142 S. Ct. 1583 (2022)...................................................................30, 31

*Sprint Solutions, Inc. v. Fils-Amie*,
   44 F. Supp. 3d 1224 (S.D. Fla. 2014)................................................27

*Stanley v. Georgia*,
   394 U.S. 557 (1969)............................................................................36

*Sund v. City of Wichita Falls*,
   121 F. Supp. 2d 530 (N.D. Tex. 2000) ....................................26, 27, 39

*Thigpen v. Bibb County*,
   223 F.3d 1231 (11th Cir. 2000) .........................................................40

*United States v. American Library Association, Inc.*,
   539 U.S. 194 (2003)............................................................................33

*Vibe Micro, Inc. v. Shabanets*,
   878 F.3d 1291 (11th Cir. 2018) .........................................................11

*Weiland v. Palm Beach Cnty. Sheriff's Office*,
   792 F.3d 1313 (11th Cir. 2015) .........................................................11

*West Virginia Board of Education v. Barnette*,
   319 U.S. 624 (1943)..............................................................................1

## Statutes

Fla. Stat. § 1006.28 ...................................................................14, 15, 31

## Other Authorities

Fla. Admin. Code 6A-1.094126, 2023........................................14, 15, 16

## <u>PRELIMINARY STATEMENT</u>

The Supreme Court long ago explained that, "[i]f there is any fixed star in our constitutional constellation, it is that no official . . . can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  In its Motion to Dismiss ("Mot."), ECF 28, the Escambia County School Board (the "Board") defies that foundational principle.

The Plaintiffs—parents of students in the Escambia County School District (the "School District"), authors, a publisher, and an organization that represents authors—brought this suit because the Board has been removing books from libraries, and restricting access to such books, based on political disagreement with the ideas they express and/or discriminatory animus toward their authors or themes. In its Motion, the Board does not dispute that Plaintiffs have adequately alleged that these book removals and restrictions were motivated by such hostility, rather than pedagogical considerations.  Nor does it dispute that Plaintiffs have adequately alleged that the animating purpose of these book removals and restrictions is to exclude certain ideas, perspectives, and points of view from school libraries.

Instead, the Board contends that none of that matters because:

1. a new law governing library-book removals was passed *after* those books were removed or restricted, which supposedly renders Plaintiffs' claims moot or unripe;

2. none of the Plaintiffs has standing to challenge the politically motivated book removals and restrictions; and

3. school officials supposedly have absolute discretion to remove library books for any reason, including to suppress the circulation of ideas they oppose for political reasons.

The Board is wrong in all respects.  <u>First</u>, that there is a new law governing library-book removals has no bearing on whether book removals and restrictions that took place under the prior system, and which are still in place, are constitutional. Further, the Board badly misconstrues how the new law actually operates.  <u>Second</u>, each of the Plaintiffs has standing to challenge the specific injuries they incurred as a result of the Board's book removals and restrictions.  <u>Third</u>, the Board's extreme position that the management of school libraries is subject to *no constitutional constraints at all* because it constitutes "government speech" finds no support in the governing case law.

The Board's Motion to Dismiss should be denied, and Plaintiffs should be given the opportunity to prove their claims.[1]

## FACTUAL BACKGROUND

Plaintiffs brought this lawsuit in response to the Board's actions to remove and restrict access to library books based on hostility to the ideas they express and/or their authors or themes.  Amended Complaint ("Am. Compl.") ¶¶ 3-7, ECF 25-1. These books include many classics of American literature, which have been on school-library shelves for years, if not decades.  *Id.* ¶¶ 68, 82.  The Board's restrictions and removals have disproportionately targeted books by or about people of color and/or LGBTQ people.  *Id.* ¶¶ 161-69.

## I.   THE PLAINTIFFS

The Plaintiffs are 7 parents of children attending schools in the School District (the "Parent Plaintiffs"), 5 authors (the "Author Plaintiffs"), Penguin Random House LLC ("PRH"), and PEN American Center, Inc. ("PEN").  *Id.* ¶¶ 8, 10-31.

The Parent Plaintiffs—Lindsay Durtschi, Benjamin Glass, Ann Novakowski, Sean Parker, Erica Roy, Christopher Scott Satterwhite, and Carin Smith—are each parents to at least one student attending an Escambia County public school.  *Id.* ¶¶

---

[1] To the extent the Court disagrees as to the legal sufficiency of the Amended Complaint, Plaintiffs respectfully request an opportunity to move for leave to amend to correct any defects.  Plaintiffs will attach a copy of a proposed Second Amended Complaint to any such motion.

24-31, 170-94.  For each such student, there are specific books he or she intended to check out from the library in the current school year, but cannot—or cannot without encountering cumbersome and stigmatizing obstacles—because of the books' removal or restriction.  *Id.* ¶¶ 72, 87, 171-73, 176-77, 179-80, 182-83, 185-86, 189-90, 193-94.  The Parent Plaintiffs bring this lawsuit on behalf of both themselves and their minor children.  *Id.* ¶¶ 24-31, 171-94, 203-10.

The Author Plaintiffs—Sarah Brannen, George M. Johnson, David Levithan, Kyle Lukoff, and Ashley Hope Pérez—are authors of books aimed primarily at children or young adults.  *Id.* ¶¶ 13-17, 19.  Each Author Plaintiff has had at least one of their books removed or restricted by the Board.  *Id.* ¶¶ 13-19, 101, 105, 116-23, 145-54, 201.  For the Author Plaintiffs, public school libraries are a critical means of reaching their intended audiences.  *Id.* ¶ 20.  Accordingly, they are harmed when their books are removed from public school libraries or subjected to restricted access within such libraries.  *Id.*

PRH is one of the nation's leading book publishers, and the publisher of multiple books that have been removed or restricted by the Board.  *Id.* ¶¶ 21-22, 77-82, 86, 127-31, 134-37, 148-51, 157-58, 202.  PRH has a long-standing commitment to promoting reading, inspiring free and open debate, and giving voice to many and diverse experiences.  *Id.* ¶ 23.  Accordingly, continued inclusion of its books in

school libraries is critical to its mission, especially for books intended for younger readers. *Id.*

PEN is a nonprofit membership organization dedicated to ensuring people have the freedom to create literature, express their views and ideas, and access the views, ideas, and literatures of others. *Id.* ¶ 10. It includes among its members many authors whose books have been removed or restricted by the Board, including each of the Author Plaintiffs, as well as Margaret Atwood, Judy Blume, and Khaled Hosseini. *Id.* ¶¶ 12, 197. Due to efforts in Escambia County and elsewhere to remove library books based on political or ideological objections, PEN has had to reallocate significant resources away from other institutional priorities. *Id.* ¶ 196. It brings this lawsuit on behalf of both its author members and itself. *Id.* ¶¶ 195-200.

## II.   THE CHALLENGED BOOK REMOVALS AND RESTRICTIONS

This lawsuit concerns 10 books the Board has removed from libraries, and over 150 additional books it has subjected to restricted access pending further review. *Id.* ¶¶ 88, 98, 105. For purposes of its dismissal arguments, the Board is not disputing that Plaintiffs have adequately alleged that the book removals/restrictions were based on political disagreements with the books' ideas and messages, rather than pedagogical considerations. *See* Mot. at 7-34 (urging dismissal on multiple grounds, none of which involves the contention that Plaintiffs failed to adequately

allege viewpoint discrimination).  Those allegations of viewpoint discrimination are briefly recounted here.

### A.   The Removed Books

As of April 13, 2023, the Board had removed the following books from libraries:  *The Perks of Being a Wallflower*, *All Boys Aren't Blue*, *And Tango Makes Three*, *When Aidan Became a Brother*, *New Kid*, *Drama*, *The Bluest Eye*, *The Nowhere Girls*, *Push*, and *Lucky*.  Am. Compl.  ¶¶ 100-05.

For each removed book, the removal process began with a challenge from a single community member:  a language arts teacher named Vicki Baggett who, starting in May 2022, submitted challenges to over 100 library books.  *Id.* ¶¶ 42-65, 111-37.  Baggett's objections to the removed books—and to the other books she sought to have removed—have been nakedly political.  For instance, Baggett objected to *New Kid*, a graphic novel that tells the story of a 12-year-old Black boy who experiences culture shock after enrolling in a private school, on the ground that it involved "race-baiting," reflected "anti-whiteness," and promoted a "woke agenda."  *Id.* ¶ 124 & Ex. 18; *see also id.* ¶¶ 60-62 & Exs. 5-7 (describing other instances in which Baggett objected to books featuring Black characters or exploring themes relating to race, including a children's book about Olympian Wilma Rudolph, on grounds of "race-baiting").  Likewise, Baggett objected to *And Tango Makes Three*, *When Aidan Became a Brother*, and *Drama* as "LGBTQ

indoctrination" because each book features a gay or transgender character.  *Id.* ¶¶ 112-19, 125-26 & Exs. 13-14, 19.

Each of the removed books was reviewed by a district review committee made up of media specialists, school staff, parents, and community members prior to being removed by the Board.  *Id.* ¶¶ 93-97.  In each case, the committee determined the book to be of educational or literary value and suitable for the relevant grade levels, following its extensive review. *Id.* ¶¶ 93-98, 100-03, 112-37.  Nonetheless, for each removed book, the Board sided with Baggett over the district review committee.  *Id.* ¶¶ 100-03, 111-37.  The Board has yet to reject a single one of Baggett's challenges. *Id.* ¶ 99.

### B.   <u>The Restricted Books</u>

The other library books at issue are the ones the Board has subjected to restricted access.  Of the 218 library books targeted for potential removal as of the filing of Plaintiffs' Amended Complaint, 155 are being subject to restricted access pending review, with no timetable for when that process will be completed.  *Id.* ¶¶ 14, 16, 18-19, 88, 147, 149, 151, 154, 156, 158, 160.

Prior to Baggett's book challenges, the Board's policies required that any challenged book remain on library shelves during the pendency of the review process unless and until a decision was made to remove it.  *Id.* ¶ 69.  In response to her book

challenges, the Board amended its policies so that access to certain books is restricted during the challenge process. *Id.* ¶¶ 70, 72-76, 83-84.

Specifically, during the relevant time-period, the Board subjected two classes of books to automatic restriction. First, the Board restricted access to any book where the challenge could be interpreted as alleging that the book contains material that is pornographic or prohibited under F.S. 847.012, which applies to books that "predominantly appeal[] to a prurient, shameful or morbid interest" and "taken as a whole, [are] without serious literary, artistic, political or scientific value for minors." *Id.* ¶¶ 74-75. In practice, this has meant that a challenger who objects to a book on political or ideological grounds can get it restricted merely by asserting—however fancifully—that it contains pornographic or otherwise prohibited content. *Id.* ¶¶ 74-81. As a result, many books that do not even arguably qualify as pornographic or prohibited under F.S. 847.012, but *do* contain content or address themes that some might object to on ideological grounds, are currently being restricted. *See id.* ¶¶ 77-82, 152-54, 157-60 (discussing, *inter alia*, *Beloved*, *The Kite Runner*, *The Handmaid's Tale*, and *Out of Darkness*).

Second, the Board restricted access to any book challenged on the ground that it violates Florida HB 1557, the "Parental Rights in Education Act" (sometimes referred to as the "Don't Say Gay Bill"). *Id.* ¶ 83. The Board instituted this policy even though the statute only applies to "[c]lassroom instruction," and not to library

materials. *Id.* (citing statute and legal filings in which the Florida State Board of Education and the Attorney General of Florida have disclaimed application of statute to library materials). As a result, challenged books that merely recognize the *existence* of LGBTQ people and same-sex relationships are being subjected to restricted access for the pendency of the review period. *See id.* ¶¶ 85-86, 145-51 (discussing multiple books subjected to restricted access on that ground, including *Uncle Bobby's Wedding*, *Two Boys Kissing*, and *Too Bright to See*).

Books subject to restricted access are placed in a special section of the library, where they can only be accessed with an "opt-in" form signed by the student's parent. *Id.* ¶ 72. To access such a book, even to browse its contents, a student must muster the courage to ask a librarian for permission to access a book that has been designated—however disingenuously—as having inappropriate content, and then wait while that librarian verifies that the student, in fact, has parental permission to access it. *Id.* ¶ 87.

## III.   **THIS LAWSUIT**

Plaintiffs assert three claims:

- a First Amendment viewpoint-discrimination claim brought by the Author Plaintiffs, PRH, and PEN (Count One);

9

- a First Amendment right-to-receive-information claim brought by the Parent Plaintiffs on behalf of themselves and their minor children (Count Two); and

- an equal protection claim brought by PEN, the Author Plaintiffs, and the Parent Plaintiffs, on behalf of themselves and their minor children (Count Three).

*Id.* ¶¶ 215-240. The First Amendment claims are based on the removal and restriction of library books because of hostility to their ideas, themes, or messages. *Id.* ¶¶ 215-30. The equal protection claim is based on the disproportionate targeting for removal or restriction of books authored by people of color and/or LGBTQ persons, and/or books that explore themes relating to race, gender, or sexual orientation. *Id.* ¶¶ 231-40.

Plaintiffs seek injunctive relief. They ask that the improperly removed and restricted books be restored to their previous places on library shelves in the School District. *Id.* § VI.(A-B).

## **ARGUMENT**

Each of the Board's dismissal arguments fails. Its Motion to Dismiss should be denied.

## I.   THE BOARD'S SHOTGUN-PLEADING ARGUMENT IS WITHOUT <u>MERIT.</u>

The Board's accusation that the Amended Complaint constitutes a "shotgun pleading" should be rejected out of hand. "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015). The Amended Complaint, which identifies a single defendant and a single course of conduct, and asserts three counts based on distinct injuries to particular classes of plaintiffs, easily passes that very low bar.

The Board's own Motion to Dismiss belies any suggestion that the Amended Complaint fails to provide adequate notice. The Motion makes clear that the Board understands both the claims Plaintiffs are asserting and the legal theories and factual allegations on which those claims are based. *See, e.g.*, Mot. at 1-2, 4-6, 15, 17, 23-24, 29-34 (addressing Plaintiffs' theories of liability and standing, as well as factual allegations supporting such theories). There is, thus, no basis to dismiss the Amended Complaint on shotgun-pleading grounds.[2] *See Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1312 (N.D. Ga. 2022) (rejecting "shotgun pleading" argument

---

[2] Dismissal with prejudice would not be an appropriate remedy at any rate. Rather, "a district court must *sua sponte* give [the plaintiff] one chance to replead before dismissing his case with prejudice on non-merits shotgun pleading grounds." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018).

where, "contrary to its protestations, [defendant's] own arguments for dismissal reveal that it understands in detail the nature of and basis for the claims against it").

## II.    HB 1069 HAS NO BEARING ON THIS LAWSUIT.

The Board's other threshold argument—that the passage of a new law governing library-book removals moots Plaintiffs' challenge to book removals and restrictions that occurred prior to its passage—is equally unavailing.  The Board's specific contention is that the intervening passage of House Bill 1069 ("HB 1069") "dooms" this lawsuit because the statute and its implementing regulations take final decision-making authority over library book removals away from school boards and vest it in the State Board of Education ("BOE"), which acts pursuant to the recommendations of a special magistrate.  *See* Mot. at 9-13, 26-29 (asserting that HB 1069 renders Plaintiffs' claims moot, and/or unavailable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978)).  The Board's argument misconstrues both the nature of Plaintiffs' challenges and how HB 1069 operates.

### A.    Plaintiffs Are Challenging Book Removals and Restrictions that Occurred Pursuant to Pre-HB 1069 Policies.

Contrary to what the Board implies, Plaintiffs are *not* challenging, or seeking to enjoin, the pre-HB 1069 laws or procedures that previously governed book removals.  Rather, they are challenging specific pre-HB 1069 book removals and restrictions that the Board does not dispute are still in effect, and the relief Plaintiffs

seek is an injunction restoring those books to their previous status.  Am. Compl. ¶¶ 211-14 & n.11 & VI.(A-B).

Accordingly, the legal principle on which the Board's mootness argument rests—*i.e.*, that, "[w]hen a party *challenges an ordinance* and seeks injunctive relief, a superseding ordinance moots the claim for injunctive relief," *Covenant Christian Ministries, Inc. v. City of Marietta*, 654 F.3d 1231, 1239 (11th Cir. 2011) (cited in Mot. at 28) (emphasis added)—has no application here.  The passage of a new law to govern future book removals/restrictions cannot render moot Plaintiffs' challenges to actions undertaken under the prior system that have not been undone. *See Naturist Soc'y, Inc. v. Fillyaw*, 958 F.2d 1515, 1520 (11th Cir. 1992) (explaining that an intervening statute or regulation "moots a claim only where the amendment completely eliminates the harm of which plaintiffs complained").

In other words, it is the Board—not Plaintiffs—that asks this Court to render an "advisory opinion," Mot. at 27, specifically, an advisory opinion as to the viability of Plaintiffs' claims in a world in which the challenged book removals/restrictions occurred pursuant to HB 1069 instead of the scheme under which they actually occurred.  The Court should reject that invitation.

If, at some future point, library books are removed or restricted pursuant to HB 1069, the constitutionality of those removals and restrictions—as well as the

statute itself—can be assessed by this Court.  For now, HB 1069 has no bearing on this lawsuit.

**B.     Even If HB 1069 Governed, Its Special Review Procedures Would Not Apply to Plaintiffs' Claims.**

Moreover, even if HB 1069 *did* apply to removals/restrictions that predate it, the special review procedures it creates would still have no impact on Plaintiffs' claims.

First, while HB 1069 does create a mechanism for a parent seeking removal of a book to request appointment of a special magistrate to review the school board's decision not to do so (whose recommendations are then ultimately assessed by the BOE), Fla. Stat. § 1006.28(2)(a)(6), no comparable option exists for parents who are challenging a decision to remove or restrict access to a library book.  HB 1069's implementing regulation provides that "the appointment of a Special Magistrate will be considered *for parental objections to any type of material made available* to a student in a school library."  Fla. Admin. Code 6A-1.094126(3)(a), 2023 FL Reg. Text 49943 (Aug. 23, 2023) (emphasis added).  There is no corollary for parental objections to materials made *un*available in the library.  In addition, the regulation provides that BOE may deny a request for appointment of a special magistrate if the school board subsequently "removed the specific material objected to or the district has agreed to reconsider the objection," *id.* 6A-1.094126(8)(c), further underscoring that the special magistrate procedure exists only to review school board decisions

*not* to remove books.  Thus, even in a world in which HB 1069 governed, its special review procedures would not be available to Plaintiffs.

Second, altogether apart from who can access HB 1069's special review procedures, the law does not give either the special magistrate or BOE substantive authority over book removals.  That authority remains fully with local school boards. *See* Fla. Stat. § 1006.28(2) ("Each district school board is responsible for the content of all instructional materials and any other materials . . . made available in a school or classroom library.").  The special magistrate and BOE review is limited to determining whether the school board created and followed an appropriate policy in ruling on the book challenge.  *See* Fla. Admin. Code 6A-1.094126(4) (explaining that "relief available to a parent under the special magistrate process *does not include the removal of material or limiting student access to material*" (emphasis added)). In a statement provided to the press about the new procedure, Florida's Commissioner of Education, Manny Diaz Jr., reiterated that the BOE is only "mak[ing] sure that there is a policy in place and that the process was followed.  It doesn't have to do with the content.  Those decisions are made locally. . . .  We are here to make sure that the process is in place and followed at the local level.  The law requires this to be done at the local level."  *See* https://flvoicenews.com/state-board-of-education-approves-rules-for-parents-critical-of-schools-handling-of-

challenged-materials/.  Thus, school boards remain final decision-makers over book removals in all relevant respects.

Third, the regulations make clear that the special magistrate procedure is not an exclusive remedy, which would have to be exhausted before seeking judicial intervention.  The special magistrate procedure, which pre-dates HB 1069 and has been in use for other types of disputes with a school board, is characterized by the State Department of Education as "*an alternative* to filing a declaratory judgment action in court."  *See* Special Magistrate Requests, Fla. Dept. of Educ., https://www.fldoe.org/schools/k-12-public-schools/special-magis.stml   (emphasis added).  The rule implementing HB 1069 indicates that the request for a special magistrate can be denied if "the parent *is seeking or has already sought* relief in court."  *See* Fla. Admin. Code 6A-1.094126(8)(b) (emphasis added) (listing factors to govern whether a special magistrate should be appointed).  That makes clear that review by a special magistrate is not intended to be an exclusive remedy even for those—unlike Plaintiffs here—for whom it is otherwise available.

The Board's dismissal arguments based on the intervening passage of HB 1069 are without merit.

## III.    **EACH SET OF PLAINTIFFS HAS STANDING.**

The Board's various challenges to standing also fail.  To satisfy the requirements of standing, a plaintiff must "demonstrate that he has suffered injury

in fact, that the injury is fairly traceable to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *S. River Watershed All., Inc. v. Dekalb Cnty.*, 69 F.4th 809, 819 (11th Cir. 2023).  At the motion to dismiss stage, "general factual allegations of injury resulting from the defendant's conduct may be sufficient to show standing." *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1327 (11th Cir. 2014).  In addition, in cases like this one, involving claims for injunctive relief, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Inst'l Rights., Inc.*, 547 U.S. 47, 52 n.2 (2006).

Here, each Plaintiff satisfies each of the elements of standing.

### A.   <u>HB 1069 Has No Impact on Standing.</u>

The Board's assertion that the passage of HB 1069 deprives Plaintiffs of standing (presumably by rendering their injuries no longer capable of redress), *see* Mot. at 13, is wrong for the reasons discussed above.  Plaintiffs are asserting injuries arising from book removals and restrictions that took place prior to the new law.  An order from this Court directing that those books be restored to their previous status would redress those injuries.  *See supra* at 12-14.  The intervening passage of HB 1069, thus, has no bearing on standing.

**B.**     **The Parent Plaintiffs Have Standing to Challenge Removals or Restrictions of Books Their Children Planned to Check Out.**

The Parent Plaintiffs have standing, both on behalf of themselves and their minor children, to challenge the Board's book removals and restrictions.   Each Parent Plaintiff has identified specific books their children planned to check out this school year, but cannot—or cannot without encountering significant obstacles—because of the Board's book removal and restriction decisions.  Am. Compl. ¶¶ 24-31, 170-94, 203-10.   Thus, all the standing requirements are met.   There is (1) a concrete injury (deprivation of access to specific books) that was (2) caused by the Board, which (3) would be redressed by an order restoring the books to their prior status.

In its Motion, the Board contends that the Parent Plaintiffs' allegations regarding the removed/restricted library books amount to the sort of vague "'some day' intentions" deemed insufficient for standing purposes in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).  *See* Mot. at 22-23.  That is wrong.  The Board's assertion is directly contradicted by *ACLU of Florida, Inc. v. Miami-Dade County School Board*, 557 F.3d 1177 (11th Cir. 2009), which, likewise, involved parent/student challenges to the removal of books from public school libraries. There, the Court held that, while unspecific attestations of a "free-floating desire to access" removed books did not establish a sufficiently concrete injury for standing purposes, a father's identification of a *specific* book his son planned to check out of

his school library in the near future, but could not because it had been removed, was sufficient to confer standing. *Id.* at 1194-96.[3]

The same applies here. Each of the Parent Plaintiffs has identified specific library books their children intended to check out upon returning to school, but cannot (or cannot without stigmatizing restrictions) because of the actions of the Board. Under *ACLU*, that is sufficient for standing purposes.

### C.   The Author Plaintiffs and PRH Have Standing to Challenge Removals or Restrictions of Their Books.

The case for standing on behalf of the Author Plaintiffs and PRH is similarly straightforward. Each of the Author Plaintiffs has authored at least one book the Board has either removed or restricted. Am Compl. ¶¶ 13-20, 101, 116-23, 145-54, 201. Likewise, PRH is the publisher of multiple books the Board has either removed or restricted. *Id.* ¶¶ 21-23, 77-82, 86, 127-31, 134-37, 148-51, 157-58, 202. Thus, the Author Plaintiffs and PRH (1) have incurred concrete injuries (the exclusion of their speech from a particular forum and/or the placement of substantial restrictions on their ability to reach their intended audience in that forum), (2) those injuries were

---

[3] *See also, e.g.*, *Parnell v. Sch. Bd. of Lake Cnty., Fla.*, No. 5:23-cv-381, ECF 51 at 20-21 (M.D. Fla. Aug. 3, 2023) (attached as Ex. 1) at 13-15 (representations by parents/students plaintiffs that they wanted to check out a library book, but could not due to its removal, were sufficient to confer standing); *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 998-99 (W.D. Ark. 2003) (requiring students to undergo burdensome and stigmatizing process in order to access specific library books was a sufficient injury to confer standing).

caused by the Board, and (3) an order requiring the at-issue books to be restored to library shelves would redress those injuries.  That is all that standing requires.

In its Motion, the Board contends that the Author Plaintiffs and PRH have not suffered an injury because the removal of their books from libraries (or their restriction within such libraries) is not otherwise preventing them from "writ[ing], market[ing], and sell[ing] th[ose] books."  Mot. at 20; *see also id.* at 21 (asserting that PRH is not harmed by the removals and restrictions because the Board "already purchased the publisher's books").  This misses the point.  In *any* case based on unlawful exclusion or removal of speech from a particular forum—as opposed to an outright ban on the speech—the speaker will be free to engage in that same speech in other contexts.  That does not mean there is no injury in the loss of access to a particular audience in a particular forum.  *See, e.g.*, *Bloedorn v. Grube*, 631 F.3d 1218, 1225, 1228-29 (11th Cir. 2011) ("Christian evangelical preacher" had standing to challenge restrictions on his ability to preach on public university campus, notwithstanding that nothing in challenged restrictions prevented him from preaching elsewhere or reaching students with his message over the internet).[4]

---

[4] *See also Prison Legal News v. Livingston*, 683 F.3d 201, 212-13 (5th Cir. 2012) (publisher's loss "of the opportunity to communicate with certain inmates" through circulation of its books into prison was sufficient to establish standing, notwithstanding that restrictions had no effect on publisher's ability to otherwise circulate its books); *Parents, Families, & Friends of Lesbians and Gays, Inc. v. Camdenton R-III School District )* ("*PFLAG*"), 853 F. Supp. 2d 888, 896-97 (W.D. Mo. 2012) (digital publishers had standing to challenge use of software that blocked

Here, the Author Plaintiffs and PRH are, for impermissible reasons, being deprived of the opportunity to have their books available and/or easily accessible in School District libraries, which are uniquely important forums for reaching the intended audiences for those books. *See* Am. Compl. ¶¶ 20, 23. That is an injury sufficient for standing purposes.

Nor is the Board on any stronger ground in contesting standing for the Author Plaintiffs and PRH on the basis that there is no "constitutional right to have one's books on the shelves of a public school library." Mot. at 19. That mischaracterizes the claim, which is based on the right not to have one's books removed from a public school library based on viewpoint discrimination or for other impermissible reasons. *See* Am. Compl. ¶ 218; *see also PFLAG*, 853 F. Supp. 2d at 899 (digital publishers had First Amendment claim arising out of school library's use of software that blocked student access to their websites based on viewpoint discrimination); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (noting generally that, even where there is no right to a particular government benefit, there are still First Amendment constraints on the grounds on which the government can deny or withdraw the benefit).

---

access to their websites in school libraries because blocking was preventing them from reaching students).

Regardless, the Board's contentions about the merits of the underlying claim have nothing to do with the standing inquiry.  It is hornbook law that "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Moody v. Warden, Holman CF*, 887 F.3d 1281, 1285 (11th Cir. 2018) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).  Here, the Author Plaintiffs and PRH have unquestionably suffered an injury at the hands of the Board.  The Board's view that that injury does not give rise to a cause of action is wrong, but also irrelevant to standing.

### D.   PEN Has Associational and Organizational Standing.

Finally, PEN has both associational and organizational standing.  As for associational standing, the Amended Complaint pleads that (1) PEN has multiple author members whose books have been removed or restricted by the Board, (2) those author members would have standing themselves to challenge those book removals and restrictions, and (3) protecting the free-expression rights of its author members is central to PEN's purpose as an organization.  Am. Compl. ¶¶ 197-200. That is sufficient to confer associational standing.  *See Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018) ("An association has standing to bring suit . . . when [(1)] its members would otherwise have standing to sue in their own right, [(2)] the interests at stake are germane to the organization's purpose, and [(3)]

22

neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.").

The Board's only response is to assert that PEN's "members lack standing in their own right." Mot. at 17-18. Because the Board is wrong as to author standing, *see supra* at 19-22, it is equally wrong as to PEN's associational standing.

The Board's arguments with respect to organizational standing fare no better. An organization has standing under a "diversion-of-resources theory" when "a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014). As relevant here, "diversion of resources" can include increased costs for "voluntary" activities, such as education or outreach to members. *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1164-66 (11th Cir. 2008). PEN has alleged that, because of the Board's book removals and restrictions, PEN has had to divert resources away from other projects. Am. Compl. ¶ 195.

The Board's assertion that PEN has failed to adequately plead standing under a "diversion of resources" theory because it has not pleaded what specific activities it diverted resources away from, *see* Mot. at 15-16, is flatly incorrect. The Amended Complaint details *both* the resources PEN has dedicated to addressing the library-book-removal issues, *and* the programs from which those resources were diverted.

*See* Am. Compl. ¶ 196 ("[B]ecause of the focus on book removals, PEN has had fewer personnel dedicated to free speech education for youth or to free speech issues on college campuses, two other areas related to education on which [PEN] has typically focused its resources."). The Eleventh Circuit has made clear that a "broad allegation of diversion of resources is enough" to survive a motion to dismiss. *Ga. Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cnty. Bd. of Registration and Elections*, 36 F.4th 1100, 1115 (11th Cir. 2022). PEN easily surmounts that hurdle here.

The Board is equally wrong in contending that PEN cannot establish organizational standing because the Amended Complaint puts the Board's activities into the broader context of the national book-removal movement. *See* Mot. at 16-17. That Escambia County is not the *only* place in which ideologically motivated library-book removals are taking place, and that the Amended Complaint references that national background in order to underscore the highly politicized nature of the Board's activities, has no bearing on whether PEN has standing to challenge book removals in Escambia County. PEN is challenging book removals/restrictions that occurred in Escambia County—not elsewhere—and those removals/restrictions have caused it to have to divert resources from other programs. *See* Am. Compl. ¶¶ 42-194, 196. That is sufficient to establish standing under a "diversion of resources" theory.

Each of the Plaintiffs has standing, and the Board's arguments for dismissal based on standing should be rejected.

## IV.   **THE GOVERNMENT-SPEECH DOCTRINE DOES NOT APPLY.**

Nor is the Board on stronger ground in contending that Plaintiffs' claims fail because managing a public school library collection constitutes government speech, not subject to any constitutional constraints.  Under the position advanced by the Board—and echoed by the State of Florida in its Amicus Brief ("Fla. Br."), ECF 31-1—school officials have unfettered discretion to remove or restrict access to library books for *any reason*, including to suppress ideas for nakedly political or partisan reasons.

Not a single court has adopted that extreme position.  In fact, in *Board of Education v. Pico*, 457 U.S. 853 (1982), which the Board and the State of Florida each tries to dismiss as lacking a precedential holding, *see* Mot. at 31-32; Fla. Br. at 9, a majority of justices agreed that state officials may not remove library books for narrowly political reasons.  In his dissent, Justice Rehnquist "cheerfully concede[d]" the point articulated in the three-justice plurality opinion, and reiterated in the one-justice concurrence, that school officials' "discretion to determine the content of their school libraries . . . may not be exercised in a narrowly partisan or political manner."  *Pico*, 457 U.S. at 907 (Rehnquist, J., dissenting).

As the State of Florida admits, the Eleventh Circuit has not addressed "whether the government's 'book collection (and book removal) decisions' for school libraries are 'government speech.'" Fla. Br. at 3-4 & n.1 (quoting *ACLU*, 557 F.3d at 1201).[5] Every court that *has* addressed that issue, however, has rejected the position that libraries—including school libraries—constitute Constitution-free zones in which government officials can freely discriminate based on viewpoint.[6]

---

[5] In its Motion, the Board cites to *dicta* from *ACLU* in which the Eleventh Circuit addressed the applicability of the government-speech doctrine to school library collections. *See* Mot. at 24 (quoting *ACLU*, 557 F.3d at 1202). It is worth pointing out that the version of the government-speech doctrine the Court discussed, but did not adopt, in *ACLU* is quite different from the one the Board and State of Florida advance here. Under that version, the substantial discretion the government has over content still does not encompass the right to exclude speech "merely because public officials oppose the speaker's view." *ACLU*, 557 F.3d at 1202. That is much closer to Plaintiffs' position than to the Board's or the State of Florida's.

[6] *See, e.g.*, *Campbell v. St. Tammany Parish Sch. Bd.*, 64 F.3d 184, 188-89 (5th Cir. 1995) (following *Pico* and rejecting position that school officials have "absolute discretion to remove books from their school libraries"); *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976) (school boards may not remove books based "solely [on] the social or political tastes of school board members"); *Fayetteville Pub. Library v. Crawford Cnty.*, 2023 U.S. Dist. LEXIS 131427, at *60 (W.D. Ark. July 29, 2023) (rejecting argument that "the state may censor non-obscene materials in a public library because such censorship is a form of government speech"); *Little v. Llano Cnty.*, 2023 U.S. Dist. LEXIS 54716, at *21 (W.D. Tex. Mar. 30, 2023) (government's discretion over public library collections is not absolute); *PFLAG*, 853 F. Supp. 2d at 899 (First Amendment bars viewpoint discrimination in determining materials students will have access to in school libraries); *Counts*, 295 F. Supp. 2d at 1004 (relying on *Pico* for proposition that school board members' "personal distaste" for content of books is a constitutionally impermissible basis for restricting access); *Gay Guardian Newspaper v. Ohoopee*, 235 F. Supp. 2d 1362, 1373 (S.D. Ga. 2002) (decisions to exclude materials from a public library do not involve "government speech"); *Sund v. City of Wichita Falls*,

The Board and the State of Florida have pointed to nothing that would warrant departing from that settled consensus here.

### A. The Board Failed to Address the Government-Speech Factors, Which Are Not Appropriately Applied at This Stage.

A court considers three factors in determining whether the government-speech doctrine applies: "history, endorsement, and control." *Cambridge Christian Sch. v. Fla. High Sch. Athletic Ass'n*, 942 F.3d 1215, 1231 (11th Cir. 2019). In its Motion, the Board does not even acknowledge those factors, let alone apply them. Because "[o]n a Rule 12(b)(6) motion to dismiss, the moving party bears the burden to show the complaint should be dismissed," *Sprint Solutions, Inc. v. Fils-Amie*, 44 F. Supp. 3d 1224, 1228 (S.D. Fla. 2014), it was incumbent on the Board to demonstrate that application of the government-speech factors to the current record cuts decisively in its favor. Its failure to do so warrants denying the motion as to the government-speech issue.

Moreover, even if the Board *had* properly addressed the government-speech factors, it would be inappropriate to decide that issue as a matter of law at this stage. The Eleventh Circuit has explained that the "government speech" inquiry "is a

---

121 F. Supp. 2d 530, 547-48 (N.D. Tex. 2000) (relying on *Pico* for proposition that officials "may not remove books from school library shelves simply because they dislike the ideas contained in those books"); *Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 874-75 (D. Kan. 1995) (First Amendment imposes constraints on a school board's removal of library books).

heavily fact-intensive one," which will typically not be capable of resolution on a Rule 12(b)(6) motion. *Cambridge Christian*, 942 F.3d at 1223 (reversing dismissal based on government-speech doctrine, and chastising District Court for being "too quick to dismiss" plaintiff's claims in light of the "many open factual questions"); *see also McGriff v. City of Miami Beach*, 522 F. Supp. 3d 1225, 1242-47 (S.D. Fla. 2020) (denying dismissal bid based on government-speech doctrine because issue could not be resolved on limited Rule 12(b)(6) record). That is an additional reason to deny the motion as to the government-speech issue.

### B.    The Government-Speech Factors Cut Decisively In Plaintiffs' Favor.

To the extent the Court deems it necessary to address the government-speech factors, those factors cut decisively against holding that managing a school library collection constitutes government speech. In particular:

**1.    History:** The first factor—"history"—pivots on whether "the type of speech under scrutiny has traditionally 'communicated messages' on behalf of the government." *Cambridge Christian*, 942 F.3d at 1232. Here, school library book collections have not historically been vehicles for communicating any particular message on behalf of the government. Instead, they have been vehicles for exposing students to the multiple—often diametrically opposed—ideas and points of view expressed by the books' authors and publishers.

The Board's own Policy Manual acknowledges this.  The Manual states that, with respect to libraries, "[i]t is the duty of the [School] District to provide a wide range of materials . . . with diversity of appeal and representing different points of view taking into account the varied interests, abilities, and maturity levels of the pupils being served."  Am. Compl. ¶ 39 (quoting *id.* Ex. 1 at 8).  It also provides that "school libraries media centers . . . shall," *inter alia*, "provide education media that reflects differing and/or opposing viewpoints; [and] provide materials which reflect the ideas and beliefs of many ethnic, religious, and political groups that have contributed to . . . American and world heritage and culture."  *Id.* ¶ 40 (quoting *id.* Ex. 1 at 9).

The Policy Manual's emphasis on providing students with a wide range of materials, which reflect diverse and potentially opposing points of view, is consistent with the historical understanding of the function of school libraries.  As the plurality opinion in *Pico* observed, school libraries—unlike "the compulsory environment of the classroom"—have not historically been understood as mechanisms through which a school expresses and inculcates its own messages.  *Pico*, 457 U.S. at 869.  Rather, school libraries have historically been places where "students can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum."  *Id.*; *see also Chiras v. Miller*, 432 F.3d 606, 619 (5th Cir. 2005) (contrasting "the removal of an optional book from the school library," which

29

is not subject to the government-speech doctrine, with "the selection of a textbook for use in the classroom").  The first government-speech factor cuts against a finding of government speech.

**2.**    <u>**Endorsement**</u>**:**    The second factor—"endorsement"—pivots on "whether the kind of speech at issue is often closely identified in the public mind with the government, or put somewhat differently, whether observers reasonably believe the government has endorsed the message."  *Cambridge Christian*, 942 F.3d at 1232-33.  This factor also cuts against a finding of government speech.

There is no reasonable expectation that a school district has endorsed the message of each and every book in its libraries.  That is true for the reason discussed above:  libraries house literally *thousands* of diverse, and often opposing, points of view.  No one thinks, for instance, that, when a school library collection includes both the Bible and the Quran, the school district has endorsed either or both religions.  As Justice Alito has noted on multiple occasions, the government-speech doctrine simply has no application when the underlying speech "express[es] contradictory views."  *Matal v. Tam*, 582 U.S. 218, 236 (2017); *see also Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1601 (2022) (Alito, J., concurring) (flags flown from city flagpole could not constitute government speech because they "reflected a dizzying and contradictory array of perspectives that cannot be understood to express the message of a single speaker").

3.   **Control:**  The third factor—"control"—pivots on "whether the relevant government unit maintains direct control over the messages conveyed through the speech in question."  *Cambridge Christian*, 942 F.3d at 1232.  This factor, likewise, cuts against a finding of government speech.  While the State of Florida notes that school officials are statutorily required to vet all potential library books, *see* Fla. Br. at 8 (citing Fla. Stat. § 1006.28(2)(d)(2)), there is nothing to indicate that school officials have historically exercised that authority to limit the "content and meaning" of library books to government-approved messages.  *Shurtleff*, 142 S. Ct. at 1592 (control factor cut against government-speech finding where, while city maintained approval authority with respect to use of flagpole, there was no evidence of it using it to limit flags to ones espousing "city-approved values or views").

As it pertains specifically to library-book removals, the record points in the opposite direction.  Shortly before the Board removed the books at issue, its general counsel disclaimed *any* right to remove books based on "disagree[ment] with the message."  Am. Compl. ¶ 71.  Likewise, none of the criteria the district review committees have been provided to evaluate book challenges focuses on whether the books express messages with which the Board agrees.  *See id.* ¶ 96 (describing evaluation criteria).

Thus, each of the government-speech factors cuts against a finding of government speech.  This should not be surprising.  Library collections do not

express, and do not aspire to express, unified messages, which is a prerequisite for the government-speech doctrine to apply.  Indeed, each of the cases the Board and State of Florida cite in which the speech/conduct at issue *was* found to be government speech contrasts with these circumstances precisely in this regard.[7]

In its *Amicus* Brief, the State of Florida tries to head off this line of criticism by recasting the message school officials supposedly express through their library collections as a meta-message about what books the school district considers to "have the 'requisite and appropriate quality' to bolster student development."  Fla.

---

[7] *See Pleasant Grove v. Summum*, 555 U.S. 460, 469-80 (2009) (cited in Fla. Br. at 4) (selection of permanent monuments for city park was government speech because "[g]overnments have long used monuments to speak to the public," and city selected specific monuments "for the purpose of presenting the image of the [c]ity it wish[ed] to project"); *Gundy v. City of Jacksonville,* 50 F.4th 60, 75-80 (11th Cir. 2022) (cited in Fla. Br. at 2-3) (legislative prayer was government speech because "invocations are traditionally limited to a single purpose of solemnizing [legislative] proceedings," and contents of such prayers are understood as expressions of legislature's values);  *Dean v. Warren*, 12 F.4th 1248, 1264-66 (11th Cir. 2021) (cited in Fla. Br. at 6) (cheerleader routine at public university was government speech because "cheerleaders have traditionally been understood to communicate an important message on behalf of their schools: cheer for our team to win the game"); *Leake v. Drinkard*, 14 F.4th 1242, 1245, 1248-52 (11th Cir. 2021) (cited in Fla. Br. at 4 n.2) ("pro-Americans veterans" parade was government speech because city "organize[d] and sponsor[ed] parade to communicate a message"); *Mech v. Sch. Bd. of Palm Beach Cnty.*, 806 F.3d 1070, 1074-78 (11th Cir. 2015) (cited in Mot. at 24-25) (banners school board chose to hang on school fences acknowledging program sponsors were government speech because they expressed single unified message—gratitude toward sponsors—and fact that they were affixed to school property would lead public to assume schools approved of messages).

Br. at 6.[8]  That gives the game away.  Plaintiffs are not challenging the Board's broad discretionary authority to curate library materials based on judgments about educational value and appropriateness.  Rather, they are challenging the Board's decisions to remove or restrict access to books out of hostility to their ideas *instead of* based on such pedagogical considerations.

Two cases cited by the State of Florida underscore that government officials generally do not have absolute discretion to discriminate based on viewpoint when curating the messages of others.  For example, the State of Florida invokes *Arkansas Educational Television* for the proposition that the government has unfettered discretion "to select materials and content for compilation and presentation to citizens" in the context of political debates broadcasted on public television.  Fla. Br. at 4 & n.3.  That is not what the Supreme Court held in that case.  Rather, the

---

[8] The phrase "requisite and appropriate quality" comes from the plurality opinion in *United States v. American Library Association, Inc.* ("*ALA*"), 539 U.S. 194 (2003). Contrary to what the State of Florida implies, *see* Fla. Br. at 5, the *ALA* plurality did *not* hold that public libraries constitute government speech.  The position the plurality rejected was that public libraries are *public forums*, such that any content-based exclusion of material, including, as relevant in that case, the exclusion of pornography, would be "subject to strict scrutiny."  *ALA*, 539 U.S. at 203-04.  The *ALA* plurality took no position on whether library officials can exclude material based on viewpoint discrimination, and, in fact, directly analogized public libraries to contexts in which the Court has held that viewpoint discrimination is impermissible.  *See id.* at 204-05 (analogizing public libraries to the circumstances addressed in *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666 (1998) and *NEA v. Finley*, 524 U.S. 569 (1988)); *see also infra* at 33-34 (discussing those cases).

Court held that, while such broadcasters have "editorial discretion" to apply content-based criteria in determining which candidates to include in a debate, they must exercise that discretion in a "*reasonable, viewpoint-neutral*" fashion. 523 U.S. at 674-76 (emphasis added). That is because, just like the relationship of a government-run library to the individual library books in a library collection, "the implicit representation of the broadcaster was that the views expressed were those of the candidates, not its own." *Id.* at 675.

Likewise, in *NEA*, which the State of Florida invokes for the proposition that governments can exercise unfettered discretion with respect to "state-sponsored art," Fla. Br. at 4 & n.5, the Supreme Court expressly declined to hold that the government can engage in viewpoint discrimination in that context. Instead, the Court held only that a statute empowering the NEA to apply content-based criteria in selecting individual artists for grants was not vulnerable to a facial challenge, stating: "we have no occasion here to address an as-applied challenge in a situation *where the denial of a grant may be shown to be the product of invidious viewpoint discrimination*." *NEA*, 524 U.S. at 587 (emphasis added). The Court went on to observe that, "*[i]f the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints, then we would confront a different case*." *Id.* (emphasis added).

This is exactly that "different case." The Board is exercising its discretion to suppress "disfavored viewpoints." Justice Alito has warned that the government-speech exception to the general prohibition of viewpoint discrimination is "susceptible to dangerous misuse" precisely because it can permit "government [to] silence or muffle the expression of disfavored viewpoints." *Tam*, 582 U.S. at 235. Accordingly, "we must exercise great caution before extending our government-speech precedents." *Id.* The Board and State of Florida have done nothing to justify taking that extreme step here. The Board's motion to dismiss based on the government-speech doctrine should be denied.

## V.   THE BOARD'S ATTACK ON THE "RIGHT TO RECEIVE INFORMATION" SHOULD BE REJECTED.

The Board fares no better in arguing that, because *Pico* was only a plurality decision, the Court should dismiss Count Two of the Amended Complaint. *See* Mot. 31-32.

<u>First</u>, to the extent the Board is simply asserting that *Pico* does not apply because managing a school library collection is government speech, that argument should be rejected for the reasons discussed previously. *See supra* at 25-35.

<u>Second</u>, that *Pico* lacked a majority holding is not a reason to adopt the position articulated by the *dissenters* in the case, at least absent any further guidance from either the Supreme Court or the Eleventh Circuit. Since *Pico*, courts around the country have consistently applied the decision to library-book removals,

notwithstanding its plurality status.  For instance, in *Campbell*, the Fifth Circuit held that, in the absence of intervening binding authority, *Pico* "may properly serve as guidance" in evaluating challenges to school library book removals.  64 F.3d at 189.  Other courts have done the same.  *See supra* at 26-27 n.6 (citing multiple cases that have relied on *Pico*).  In fact, just last month, a court in the Middle District of Florida approvingly cited *Pico* for the proposition that "the First Amendment rights of students may be directly and sharply implicated by the removal of books from the shelves of a school library."  Ex. 1 at 12 (quoting *Pico*, 457 U.S. at 866).

Third, it is beyond dispute that the First Amendment encompasses a "right to receive information."  Indeed, more than 50 years ago, the Supreme Court explained that "[i]t is now well established that the Constitution protects the right to receive information and ideas."  *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *see also, e.g.*, *Daker v. Chief Legal Affairs Officer*, 2023 U.S. App. LEXIS 5099, at **8-9 (11th Cir. Mar. 2, 2023) ("The Supreme Court of the United States has recognized that the First Amendment protects the right to receive information and ideas."); *Doe v. City of Albuquerque*, 667 F.3d 1111, 1118 (10th Cir. 2012) ("The Supreme Court has repeatedly recognized that the First Amendment includes . . . a right to receive information.").  All that was novel in *Pico* was applying that right to the school-library setting.

Fourth, while the Eleventh Circuit described *Pico* in *ACLU* as "a non-decision so far as precedent is concerned," 557 F.3d at 1200, it accepted that parents/students have rights against the removal/restriction of library books based on viewpoint discrimination.  Each of the three legal standards the court considered in *ACLU* was premised on the existence of such rights.  *See ACLU*, 557 F.3d at 1999-02 (considering, as possible alternatives to *Pico*, the standards articulated in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988) and *Arkansas Educational Television*, each of which forbids exclusion based on viewpoint discrimination).  Thus, *ACLU* does not support the position the Board advances here.

The Court should reject the Board's arguments with respect to Count Two.

## VI.   PLAINTIFFS' CHALLENGES TO THE BOOK RESTRICTIONS ARE RIPE.

The Board's ripeness challenge to Plaintiffs' claims based on the library books that have been subjected to indefinite restricted access—but not yet removed—also fails.

First, to the extent the Board is arguing that the claims based on the book restrictions are unripe because "the Parent Plaintiffs and their associational representatives have another avenue of redress—the special magistrate procedure— that they have not yet utilized," Mot. at 29-30, that is wrong for the reasons discussed above.  *See supra* at 14-16 (explaining that special magistrate procedure is not available to Plaintiffs).

37

Second, to the extent the Board is arguing that the claims based on the book restrictions are unripe because "the [School] Board has made no final judgment on these books," Mot. at 30-31, that misunderstands the nature of Plaintiffs' claims. With respect to the restricted books, the injury about which Plaintiffs complain is the restricted access itself, not the possibility that that restricted access might eventually mature into full-blown removal. Multiple courts have held that the kinds of access restrictions the Board has put in place here are actionable in and of themselves, at least where—as here—they are grounded in viewpoint discrimination or some other unconstitutional basis for encumbering access to speech.

For instance, in *Counts*, the court held that school officials violated the First Amendment rights of the parent/student plaintiffs when, based on personal distaste for the positive portrayals of witchcraft found in the Harry Potter books, they instituted a system under which parental permission was required to access those books. 295 F. Supp. 2d at 1002-05. The court explained that the students' rights were "burdened" by the restrictions because:

> the books in question are "stigmatized," with resulting "stigmatization" of those who choose to read them ("children carrying the book with them in the school will be known to be carrying a 'bad' book."). In addition, should [a student] want to review a passage in one of the books while at school, she cannot simply walk into the library and do so. She must locate the librarian, perhaps waiting her turn to consult the librarian, then ask to check the book out and wait while the librarian verifies that she has parental permission to do so, before she can even open the covers of the book.

*Id.* at 999. Other courts have likewise held that such restrictions on access to library books/materials constitute a First Amendment injury, at least where the restrictions were motivated by some form of viewpoint discrimination.[9]

The same applies here. Plaintiffs have alleged that the books subject to restricted access have been singled out based on viewpoint discrimination. Am. Compl. ¶¶ 69-86, 142-60. And, Plaintiffs have also alleged that those restrictions are significantly burdening access to those books, affecting both students who want to access those books and authors/publishers who want students to have unencumbered access to them. *Id.* ¶¶ 14, 16, 18-20, 22-23, 72, 87, 171-74, 176-87, 189-94, 201-10. That is a sufficient basis to challenge the indefinite restrictions on access to those books.

## VII.   THE BOARD'S CHALLENGES TO THE EQUAL PROTECTION CLAIM FAIL.

Finally, the Board's challenges to Plaintiffs' equal protection claim (Count Three) are likewise legally insufficient.

<u>First</u>, the Board's assertion that the equal protection claim should be dismissed because managing school library collections is government speech, *see* Mot. at 25,

---

[9] *See, e.g.*, *Sund*, 121 F. Supp. 2d at 549-50 (moving children's books about LGBTQ families to adult section of public library imposed a "significant burden" on access that amounted to a First Amendment violation); *PFLAG*, 853 F. Supp. 2d at 897 (ability of students to request access to material blocked based on viewpoint discrimination did not cure constitutional injury because of "the stigmatizing effect of condemning an idea by limiting access to it").

fails for the reasons discussed above:  the Board has not demonstrated that overseeing such collections is government speech.  *See supra* at 25-35.

Second, the Board's assertion that Plaintiffs have not adequately alleged an equal protection claim is equally faulty.  "[T]o properly plead an equal protection claim, a plaintiff need only allege that through state action, similarly situated persons have been treated disparately."  *Thigpen v. Bibb Cnty.*, 223 F.3d 1231, 1237 (11th Cir. 2000).  Plaintiffs allege that here.

Plaintiffs allege that, relative to their presence in School District libraries as a whole, the books that have been removed, subjected to restricted access, and/or targeted for potential removal have disproportionately been books by persons of color or LGBTQ persons.  Am. Compl. ¶¶ 161-68.  Plaintiffs also allege that books by persons of color and LGBTQ persons have been treated differently than comparable books by heterosexual, cis-gender, and white authors.  *Id.* ¶¶ 85-86, 112-19, 120-23, 125-31, 134-37, 139-40, 145-49.  And, Plaintiffs allege that the removals and restrictions emanate from discriminatory animus.  *Id.* ¶¶ 110, 166, 232-39.  That is sufficient to plead an equal protection claim, especially in light of the "complex, fact-intensive inquiry" on which such a claim hinges.  *Pernell v. Fla. Bd. of Governors of the State Univ. Sys.*, 2022 U.S. Dist. LEXIS 243016, at **12-13 (N.D. Fla. Nov. 22, 2022) (denying motion to dismiss equal protection claim because defendants' criticism of claim was properly evaluated on a more developed record).

Third, to the extent the Board's argument is that Plaintiffs cannot bring an equal protection claim because they are complaining about discrimination against *both* non-white and LGBTQ authors *and* books addressing themes relating to race, gender, and sexual orientation, Mot. at 25-26, 33, that misconstrues the nature of the claim. To be sure, Plaintiffs are claiming that authors of color and LGBTQ authors are being subject to discriminatory treatment. But, Plaintiffs are also claiming that, as a result of the discriminatory targeting of books that address themes relating to race, gender, and sexual orientation, students of color and LGBTQ students are being denied access to books that reflect their identities and experiences on discriminatory grounds. Am. Compl. ¶¶ 169, 182-94, 239. That is a valid ground for an equal protection claim.

For instance, in *Arce v. Douglas*, 793 F.3d 968, 978-81 (9th Cir. 2015), the Court held that an equal protection claim by student plaintiffs that challenged a law banning Mexican American Studies survived summary judgment, notwithstanding that the law targeted educational materials based on their themes, not the racial identity of their authors. As the court explained, evidence the law banning such curriculum had a disparate impact on students of Mexican or other Hispanic descent was sufficient to get past summary judgment, at least when combined with evidence the law was motivated in part by discriminatory animus. *Id.* Here, Plaintiffs have alleged both that books addressing themes relating to race, gender, and sexual

orientation are being targeted for removal based on discriminatory animus and that that targeting has disproportionately affected students of color and LGBTQ students. *See* Am. Compl. ¶¶ 166-69, 182-94, 239.  That is sufficient at this stage.

The Board's challenges to Plaintiffs' equal protection claims should be rejected.

## VIII.  REQUEST FOR ORAL ARGUMENT

Plaintiffs respectfully request oral argument on the Board's Motion.  Plaintiffs believe the amount of time necessary for argument is 30 minutes for each side.

CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Board's Motion to Dismiss be denied.

RULE 7.1(F) CERTIFICATION

Plaintiffs hereby certify that this Opposition contains 9,991 words, excluding those portions that do not count toward the word limit.

Respectfully submitted,

Dated: September 18, 2023          */s/Shalini Goel Agarwal*
                                   Lynn B. Oberlander*
                                   **BALLARD SPAHR LLP**
                                   1675 Broadway, 19th Floor
                                   New York, NY  10019-5820

Telephone: 212.223.0200
Facsimile: 212.223.1942

Paul J. Safier*
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA  19103
Telephone: 215.864.8500
Facsimile: 215.864.8999

Shalini Goel Agarwal (FBN 90843)
Kristy Parker*
**PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
Telephone: 202.579.4582
Facsimile: 929.777.8428

John Langford*
**PROTECT DEMOCRACY PROJECT**
82 Nassau Street, #601
New York, NY 10038
Telephone: 202.579.4582
Facsimile: 929.777.8428

*Admitted pro hac vice*

*Attorneys for Plaintiffs PEN American Center, Inc., Sarah Brannen, Lindsay Durtschi, Benjamin Glass, George M. Johnson, David Levithan, Kyle Lukoff, Ann Novakowski, Sean Parker, Penguin Random House LLC, Ashley Hope Pérez, Erica Roy, Christopher Scott Satterwhite, and Carin Smith.*