# Exhibit 1

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

PETER PARNELL, et al.,

     Plaintiffs,

v.                                                                       Case No. 5:23-cv-381-BJD-PRL

SCHOOL BOARD OF LAKE
COUNTY, FLORIDA, et al.,

     Defendants.

_____/

## ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**THIS CAUSE** is before the Court on Plaintiffs Parnell and Richardson's (Collectively, Author Plaintiffs) and Plaintiffs D.S., E.S., and M.H.'s (Collectively, Student Plaintiffs) Motion for Preliminary Injunction (Doc. 6; Motion), the responsive briefing (Docs. 39, 43), and the parties' oral arguments (Doc. 46).

Plaintiffs move to require Defendants Diane Kornegay and the School Board of Lake County, Florida (Collectively, Defendants) "to temporarily restore students' ability to access *And Tango Makes Three* ("*Tango*") regardless of grade level in Lake County public school libraries before the first day of school on August 10, 2023, and through the pendency of this action." (Doc. 6 at 6). Outlined below, Plaintiffs' Motion is denied as moot.

## A. Background

Roy and Silo are two chinstrap penguins that resided at the Central Park Zoo. (Doc. 6.1 at ¶5). By 2004, newspapers reported on the two penguins, detailing they had been "devoted to one another for nearly six years." Id. A zookeeper recognized the relationship between Roy and Silo and "observed the pair building a nest and attempting to incubate an egg-shaped rock." Id. at ¶6. A different penguin pair with difficulty hatching more than one egg at a time laid two fertile eggs. Id. at ¶7. The zookeeper who cared for all four penguins gave one of the two eggs to Roy and Silo so both eggs could hatch, and the resulting chicks survive. Id. The chick cared for by Roy and Silo was named Tango. Id.

When Author Plaintiffs read about Roy, Silo, and Tango, the Author Plaintiffs wrote *Tango*. Id. at ¶9. *Tango*, a factually accurate story, is marketed as a fiction book most suitable for young children but appropriate for all ages. Id. at ¶¶9, 11. Author Plaintiffs attest "*Tango* has been available in public school libraries nationwide for more than 15 years." Id. at ¶16; (see also Doc. 6.2 at ¶16).

In 2022, Florida enacted House Bill 1557 (HB 1557). Relevant to this Motion, the legislation prohibits "[c]lassroom instruction by school personnel or third parties on sexual orientation or gender identity" in "kindergarten through grade 3 or in a manner that is not age-appropriate or

developmentally appropriate for students in accordance with state standards." Fla. Stat. § 1001.42(8)(c)(3) (2022). The law was amended in 2023 to extend the prohibition to kindergarten through grade 8. Fla. Stat. § 1001.42(8)(c)(3) (2023). District school boards enforce the law. Fla. Stat. § 1001.42.

By December 2022, following the enactment of HB 1557, the Lake County School Board restricted library access to *Tango* to students below the fourth grade. (Doc. 6.8 at 2); see also Fla. Stat. § 1001.42(8)(c)(3) (2022) (enacted July 1, 2022). *Tango* was "[a]dministratively removed due to content regarding sexual orientation/gender identification" which is "prohibited in HB 1557." (Doc. 6.8 at 2).

On June 21, 2023, Plaintiffs moved for a preliminary injunction to return students' access to *Tango* regardless of grade level. (See generally Doc. 6). Author Plaintiffs argue Defendants removing *Tango*'s access to students in kindergarten through third grade violates Author Plaintiffs' "First Amendment rights because it censors *Tango*'s viewpoint that same-sex relationships and families with same-sex parents exist; that [those families and relationships] can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children." (Doc. 6 at 14). Student Plaintiffs argue that the restriction beginning in December 2022 has continuously injured D.S. and M.H., who would have checked out the book

during the 2022–23 academic year. <u>Id.</u> Student Plaintiffs argue that all three will be injured in the 2023–24 academic year should the restrictions persist. <u>Id.</u>

Defendants argue this motion is moot because, "[o]n June 21, 2023, [ ] Defendants received a legal memorandum [from] the Florida Department of Education[, which advises Defendants] that the HB 1557 age restriction on sexual orientation and gender identity applies only to classroom instruction and does not apply to library books." (Docs. 39 at 7; 39.1 at 3). The legal memorandum was drafted as part of litigation in a different lawsuit and was filed on December 21, 2022. (Docs. 39 at 7; 39.1 at 3). On June 22, 2023, Defendant Kornegay removed the age-restriction on *Tango* and made the book available in libraries for all students in Lake County Schools. (Docs. 39 at 7; 39.1 at 4). On July 31, 2023, the Lake County School Board passed a Resolution that provides direction for further administrative action to comply with Fla. Stat. § 1001.42(8)(c)(3) (2023). (Doc. 47.1). Specifically, the background and rationale of the Resolution provide that Lake County too broadly construed Fla. Stat. § 1001.42(8)(c)(3) to apply to school libraries when the legislation explicitly applies to "classroom instruction." (<u>See</u> Doc. 47.3).

**B. Legal Standard**

"For a district court to grant a preliminary injunction, the movant must establish: (1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve the public interest." Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1246–47 (11th Cir. 2002); see also Fed. R. Civ. P. 65. A preliminary injunction is a drastic and extraordinary remedy which should not be granted unless the movant can clearly establish each of the four elements. America's Health Ins. Plans v. Hudgens, 742 F.3d 1319, 1329 (11th Cir. 2014).

"The burden of persuasion on all of the four requirements is at all times upon the [movant]." Canal Auth. of Fla. v. Callaway, 489 F.2d 567, 573 (5th Cir. 1974).[1] Failing to establish an element, such as a substantial likelihood of success on the merits, will warrant denial of the request for preliminary injunctive relief and obviate the need to consider the remaining prerequisites. See Pittman v. Cole, 267 F.3d 1269, 1292 (11th Cir. 2001) (citing Church v.

---

[1] In Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994)); see also Del Monte

Fresh Produce Co. v. Dole Food Co., 148 F. Supp. 2d 1326, 1339 n.7 (S.D. Fla.

2001) ("Because Del Monte has not met the first requirement, it is not

necessary to discuss the remaining elements required for a preliminary

injunction.").

    In deciding whether a party has made the requisite showing for entry

of a preliminary injunction, "[a] district court may rely on affidavits and

hearsay materials which would not be admissible evidence for a permanent

injunction, if the evidence is appropriate given the character and objectives of

the injunctive proceeding." Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,

51 F.3d 982, 985 (11th Cir. 1995) (internal quotation marks and citation

omitted). The Court is mindful that "[p]reliminary injunctions are, by their

nature, products of an expedited process often based upon an underdeveloped

and incomplete evidentiary record." Cumulus Media, Inc. v. Clear Channel

Commc'ns, Inc., 304 F.3d 1167, 1171 (11th Cir. 2002).

## C. General Standards

### a. Subject-Matter Jurisdiction

#### i. Separation of Powers

    "The United States Constitution 'confers limited authority on each

branch[.]'" Edgerton v. City of St. Augustine, Fla., No. 3:20-cv-941-BJD-PDB,

2023 WL 4687563, at *14 (M.D. Fla. Jan. 31, 2023), report and

recommendation adopted 2023 WL 4687515 (M.D. Fla. Mar. 20, 2023) (quoting Spokeo, Inc. v. Robins, 578 U.S. 330, 337 (2016)). "The Constitution vests Congress with enumerated 'legislative Powers,' U.S. Const. art. I, § 1, the President with '[t]he executive Power,' U.S. Const. art. II, § 1, cl. 1, and federal courts with '[t]he judicial Power of the United States,' U.S. Const. art. III, § 1. Edgerton, 2023 WL 4687563, at *14. "[T]o remain faithful to this tripartite structure, the power of the Federal Judiciary may not be permitted to intrude upon the powers given to the other branches." Spokeo, Inc., 578 U.S. at 337.

### ii. Article III: Cases and Controversies

"The Constitution does not fully explain the phrase 'the judicial Power of the United States.'" Edgerton, 2023 WL 4687563, at *14 (quoting Spokeo, Inc., 578 U.S. at 337). "But the Constitution 'does specify that this power extends only to "Cases" and "Controversies."'" Edgerton, 2023 WL 4687563, at *14 (quoting Spokeo, Inc., 578 U.S. at 337). "The case-and-controversy requirement serves 'to identify those disputes which are appropriately resolved through the judicial process.'" Edgerton, 2023 WL 4687563, at *14 (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)).

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." Spokeo, Inc., 578 U.S. at 337

(cleaned up). "Continued adherence to the case-or-controversy requirement ... maintains the public's confidence in an unelected but restrained Federal Judiciary." Ariz. Christian Sch. Tuition Org. v. Winn, 563 U.S. 125, 133 (2011).

The case-and-controversy requirement has three "strands": standing, ripeness, and mootness. Gardner v. Mutz, 962 F.3d 1329, 1336 (11th Cir. 2020). Of these strands, standing and mootness are at issue here. (See generally Docs. 6; 39; 43).

### 1. Standing

Federal courts have an obligation to ensure litigants have Article III standing "before proceeding to the merits of a case." Dep't of Educ. v. Brown, 143 S. Ct. 2343, 2350–51 (2023). Standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." Spokeo, Inc., 578 U.S. at 338. Standing asks "whether a particular plaintiff even has the requisite stake in the litigation to invoke the federal 'judicial Power' in the first place." Gardner, 962 F.3d at 1337. The standing doctrine is "an essential and unchanging part of the case-or-controversy requirement." Lujan, 504 U.S. 555, 560 (1992).

"[S]tanding is not dispensed in gross." Town of Chester v. Laroe Ests., Inc., 581 U.S. 433, 439 (2017) (quoting Lewis v. Casey, 518 U.S. 343, 358 n.6 (1996)). "[A] plaintiff must demonstrate standing for each claim he seeks to

press and for each form of relief that is sought." <u>Davis v. Fed. Election</u>
<u>Comm'n</u>, 554 U.S. 724, 734 (2008) (internal quotation marks omitted); <u>see</u>
<u>also</u> <u>Los Angeles v. Lyons</u>, 461 U.S. 95, 105–06 and n.7 (1983) (explaining a
plaintiff who has standing to seek damages must also demonstrate standing
to pursue injunctive relief).

To establish Article III standing, a "plaintiff must have (1) suffered an
injury in fact, (2) that is fairly traceable to the challenged conduct of the
defendant, and (3) that is likely to be redressed by a favorable judicial
decision." <u>Spokeo, Inc.</u>, 578 U.S. at 338. Absent these elements, a federal
court's exercise of power "would be gratuitous and thus inconsistent with the
[Article] III limitation." <u>Simon v. E. Ky. Welfare Rts. Org.</u>, 426 U.S. 26, 38
(1976).

As to the first standing element, "a plaintiff's alleged injury must be
*both* concrete and particularized." <u>Gardner</u>, 962 F.3d at 1341 (emphasis in
original). "[T]o be concrete, an alleged injury must be 'de facto' and 'real'—
and just as importantly, 'not abstract.'" <u>Id.</u> (quoting <u>Spokeo, Inc.</u>, 578 U.S. at
340). "[W]hile a concrete injury needn't be 'tangible,' [<u>Spokeo, Inc.</u>, 578 U.S.
at 340], the Court has consistently held that purely psychic injuries arising
from disagreement with government action—for instance, 'conscientious
objection' and 'fear'—don't qualify." <u>Gardner</u>, 962 F.3d at 1341.

"For an alleged injury to be sufficiently particularized to confer Article III standing, it must 'affect the plaintiff in a personal and individual way.'" Id. at 1342 (quoting Lujan, 504 U.S. at 560 n.1). "A plaintiff must show that she has been 'directly affected apart from her special interest in the subject' at issue." Gardner, 962 F.3d at 1342 (quoting Koziara v. City of Casselberry, 392 F.3d 1302, 1305 (11th Cir. 2004)). "Article III standing, the Supreme Court has emphasized, is not to be placed in the hands of concerned bystanders because they will use it simply as a vehicle for the vindication of value interests." Gardner, 962 F.3d at 1342 (quotation marks omitted) (quoting Hollingsworth v. Perry, 570 U.S. 693, 707 (2013)).

As to the second standing element, "there must be a causal connection between the injury and the conduct complained of"; in other words, "the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court." Lujan, 504 U.S. at 560 (cleaned up). "[W]hen the plaintiff is not himself the object of the government action ... he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." Id. at 562 (cleaned up).

If a court determines a group of plaintiffs lack standing, then the court must not evaluate the merits of the case. See Brown, 143 S. Ct. at 2351–52.

However, "[i]f at least one plaintiff has standing, the suit may proceed." Biden v. Nebraska, 143 S. Ct. 2355, 2365 (2023).

### 2. Mootness

"At all stages of litigation, a plaintiff must maintain a personal interest in the dispute. The doctrine of standing generally assesses whether that interest exists at the outset, while the doctrine of mootness considers whether it exists throughout the proceedings." Uzuegbunam v. Preczewski, 141 S. Ct. 792, 796 (2021). "To demonstrate standing, the plaintiff must ... establish an injury that is fairly traceable to the challenged conduct" and "seek a remedy that redresses that injury." Id. "[I]f in the course of litigation a court finds that it can no longer provide a plaintiff with any effectual relief, the case generally is moot." Id.

An issue "becomes moot—and therefore no longer a case or controversy for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." Already, LLC. v. Nike, Inc., 568 U.S. 85, 91 (2013) (cleaned up). "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." Id. (internal quotation marks and quoted authority omitted).

An actual controversy must "be extant at all stages of review, not merely at the time the complaint is filed." Campbell-Ewald Co. v. Gomez, 577 U.S. 153, 160 (2016) (quoted authority omitted). "If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot." Id. at 160–61 (internal quotation marks and quoted authorities omitted). "A case becomes moot, however, only when it is impossible for a court to grant any effectual relief what[so]ever to the prevailing party." Id. at 161 (internal quotation marks and quoted authority omitted). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." Id. (quoted authority omitted).

### D. Discussion

#### a. Plaintiffs have standing to seek a preliminary injunction.

"First Amendment rights, applied in light of the special characteristics of the school environment, are available to … students." Tinker v. Des Moines Indep. Comty. Sch. Dist., 393 U.S. 503, 506 (1969). The Supreme Court has explained "the First Amendment rights of students may be directly and sharply implicated by the removal of books from the shelves of a school library." Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853, 866 (1982).

The Supreme Court's "precedents have focused 'not only on the role of the First Amendment in fostering individual self-expression but also on its role in affording the public access to discussion, debate, and the dissemination of information and ideas.'" Id. (quoting First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 783 (1978)). The Supreme Court has "recognized that 'the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge.'" Pico, 457 U.S. at 866 (quoting Griswold v. Connecticut, 381 U.S. 479, 482 (1965)). "In keeping with this principle, [the Supreme Court has] held that in a variety of contexts 'the Constitution protects the right to receive information and ideas.'" Pico, 457 U.S. at 866–67 (quoting Stanley v. Georgia, 394 U.S. 557, 564 (1969)).

At a minimum, the Court has jurisdiction because Student Plaintiffs have standing. See Biden, 143 S. Ct. at 2365.[2] D.S. is six years old and was a kindergartener in Beverly Shores Elementary School in Lake County, Florida for the 2022–23 academic year. (Docs. 6 at 14; 6.3 at ¶¶2, 5). M.H. is eight years old and was in the second grade at Beverly Shores Elementary School

---

[2] "Federal courts are courts of limited jurisdiction." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). As such, federal court have an obligation to inquire into their subject matter jurisdiction. Kirkland v. Midland Mortgage Co., 243 F.3d 1277, 1279–1280 (11th Cir. 2001). This obligation exists regardless of whether the parties have challenged the existence of subject matter jurisdiction. See Univ. of S. Ala. v. Am. Tobacco Co., 168 F.3d 405, 410 (11th Cir. 1999) ("[I]t is well settled that a federal court is obligated to inquire into subject matter jurisdiction sua sponte whenever it may be lacking."). The Court reserves ruling on standing as it pertains to the Author Plaintiffs.

in Lake County, Florida for the 2022–23 academic year. (Docs. 6 at 14; 6.3 at ¶¶2, 5). E.S. is five years old and will begin kindergarten in the Fall. (Doc. 6.3 at ¶¶2, 11). All three children will be enrolled at Triangle Elementary School in Lake County for the 2023–24 academic year. Id. at ¶5.

When this lawsuit and Motion were filed, Student Plaintiffs would not have had access to *Tango* once the school year began in August 2023. (See Doc. 39.1 at 4) (showing access to *Tango* was restored one day after Plaintiffs moved for a preliminary injunction); see also Fla. State Conf. of the NAACP v. Browning, 522 F.3d 1153, 1159 (11th Cir. 2008) (explaining the standing analysis requires the plaintiff to "have suffered, or must face[,] an imminent and not merely hypothetical prospect of suffering, an invasion of a legally protected interest resulting in a 'concrete and particularized' injury").

Student Plaintiffs would have suffered an injury in fact by August 2023. See Spokeo, Inc., 578 U.S. at 560. Student Plaintiffs want to read *Tango* because of their interest in learning about different family structures since they themselves have a non-traditional family structure. (See Doc. 1 at ¶¶41, 53). D.S. also wants to read *Tango* because he is fascinated with animals and is interested in becoming an "animal doctor" when he grows up. Id. at ¶42. Student Plaintiffs would have suffered a concrete and particularized injury if Defendants continued restricting access to *Tango*, in contravention of the First Amendment. See Pico, 457 U.S. at 866–67; see also

Elrod v. Burns, 427 U.S. 347, 373–74 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

Student Plaintiffs' First Amendment injury is directly traceable to Defendants' restricting access to *Tango* under HB 1557. (See Doc. 6.8 at 2) (showing *Tango* was "[a]dministratively removed due to content regarding sexual orientation/gender identification" which is "prohibited in HB 1557"); see also Spokeo, Inc., 578 U.S. at 338.

Finally, Student Plaintiffs' injury can be redressed by a favorable decision by the Court. See Spokeo, Inc., 578 U.S. at 338. Should the Court find Plaintiffs prevail on the merits of their preliminary injunction argument, then Plaintiffs would have access to *Tango* in the 2023–24 academic year.

### b. *Plaintiffs' Motion is moot.*

The Court next turns to the mootness analysis. While standing regards the interests at the time of filing[,] mootness exists through the case's pendency. Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 187–89 (2000).

Plaintiffs filed this lawsuit on June 20, 2023. (Doc. 1). Plaintiffs moved for a preliminary injunction on June 21, 2023. (Doc. 6). Defendants restored access to *Tango* on June 22, 2023. (Doc. 39.1 at 4). Plaintiffs move for the Court to both restore access to *Tango* and prevent Defendants from

restricting access to *Tango* in the future. (Doc. 6 at 6). Defendants argue Plaintiffs' Motion is moot because Defendants have restored access to *Tango*. (See Docs. 39; 47).

"Article III of the Constitution limits the jurisdiction of the courts to actual cases and controversies." S.D. v. St. Johns Cnty. Sch. Dist., 632 F. Supp. 2d 1085, 1099 (M.D. Fla. 2009) (Schlesinger, J.). "A case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief. If events that occur subsequent to the filing of a lawsuit ... deprive the court of the ability to give the plaintiff ... meaningful relief, then the case is moot." Troiano v. Supervisor of Elections in Palm Beach Cnty., 382 F.3d 1276, 1282 (11th Cir. 2004). "Nevertheless, it is important to note that 'voluntary cessation provides an important *exception* to the general rule that a case is mooted by the end of the offending behavior.'" St. Johns Cnty. Sch. Dist., 632 F. Supp. 2d at 1099 (emphasis in original) (quoting Troiano, 382 F.3d at 1282).

The Eleventh Circuit thus explains the doctrine of voluntary cessation:

> It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. If it did, the courts would be compelled to leave the defendant free to return to his old ways. In accordance with this principle, the standard [ ] announced for determining whether a case has been mooted by the defendant's voluntary cessation is stringent: A case might become moot if subsequent

> events made it absolutely clear that the allegedly
> wrongful behavior could not reasonably be expected to
> recur.

Friends of the Earth, 528 U.S. at 189. "When a *government* voluntarily ceases

the challenged action, however, there is a presumption that the government

will not later resume the action, so the plaintiff bears the burden of showing

that there is a reasonable expectation that the government will reverse

course and reenact the allegedly offensive policy." Walker v. City of Calhoun,

GA, 901 F.3d 1245, 1270 (11th Cir. 2018) (quotation marks and citation

omitted).

The Eleventh Circuit considers "three factors to determine whether a

reasonable expectation exist[s]:"

> (1) "whether the change in conduct resulted from
> substantial deliberation or is merely an attempt to
> manipulate our jurisdiction," i.e., by examining "the
> timing of the repeal, the procedures used in enacting
> it, and any explanations independent of this litigation
> which may have motivated it"; (2) "whether the
> government's decision to terminate the challenged
> conduct was 'unambiguous,'" i.e., "whether the actions
> that have been taken to allegedly moot the case reflect
> a rejection of the challenged conduct that is both
> permanent and complete"; and (3) "whether the
> government has consistently maintained its
> commitment to the new policy or legislative scheme."

Schultz v. Alabama, 42 F.4th 1298, 1321 (11th Cir. 2022) (quoting Walker,

901 F.3d at 1270).

"The party asserting mootness bears a 'formidable and heavy burden' of persuading the court that the conduct could not reasonably be expected to occur again." St. Johns Cnty. Sch. Dist., 632 F. Supp. 2d at 1099 (quoting Sheely, 505 F.3d at 1184). A defendant's "assurance that they will not continue the [challenged] conduct at issue is 'one of the factors to be considered in determining the appropriateness in granting an injunction against the non-discontinued acts." St. Johns Cnty. Sch. Dist., 632 F. Supp. 2d at 1100 (quoting Sheely, 505 F.3d at 1184).

"Though government actors are, in some instances, granted a rebuttable presumption that the [challenged] conduct will not recur, courts have found injunctive relief appropriate when school districts are a party to controversies involving the First Amendment." St. Johns Cnty. Sch. Dist., 632 F. Supp. 2d at 1100 (citing Jager v. Douglas Cnty. Sch. Dist., 862 F.2d 824 (11th Cir. 1989); Hall v. Bd. of Sch. Comm'rs of Conecuh Cnty., 656 F.2d 999, 1000 (5th Cir. 1981)).

The facts of this case are distinguishable from St. Johns County School Board, Jager, and Hall. First, in Hall, a parent challenged a school's practice of having students conduct morning devotionals over the school's public address system and teaching an elective Bible Literature course in a manner which advanced religion. 656 F.2d at 1000. The Eleventh Circuit evaluated whether the defendants' allowing the morning devotionals "to continue until

- 18 -

the filing of the lawsuit was imminent in 1979, despite [ ] such religious readings in public schools were declared unconstitutional as early as 1963" implicated the voluntary cessation doctrine. Id. "[T]he superintendent of schools testified he was aware the activity was unconstitutional and had so advised the various school principals, [but had not] further attempt[ed] to ensure the practice had been discontinued in all Conecuh County schools." Id.

In Jager, a student-member of a high school marching band challenged the practice of having "pregame invocations delivered [over the public address system] at home football games." 862 F.2d at 826. Jager, a Native American, argued the invocations which invoked Christian beliefs and convictions conflicted with Jager's sincerely held religious beliefs. Id. After Jager challenged the practice, the school district "voluntarily ceased the practice of having pregame religious invocations delivered by Protestant ministers[; h]owever, [an alternative plan] was [ ] implemented by the school principals." Id. at 833. The alternative plan "was not a formal policy adopted by the School District or the Douglas County Board of Education, and the defendants never promised not to resume the prior practice." Id. at 833–34.

In St. Johns County School Board, a parent moved to enjoin an elementary school from practicing and later performing a song titled *In God We Still Trust*. 632 F. Supp. 2d at 1088. After the lawsuit and motion for preliminary injunction were filed, but before the order granting the plaintiff's

preliminary injunction, the defendant school board had "voluntarily taken the song out of the program and indicated [the song would] no longer be practiced by the students." Id. There, the Court determined the voluntary cessation was not enough because the defendant school board "offer[ed] no other evidence, beyond the sworn affidavit of the school's principal, that [*In God We Still Trust*] will not be practiced or performed" while also "declin[ing] to stipulate to a preliminary injunction that would guarantee that playing or practicing [*In God We Still Trust*] would be prohibited." Id. at 1100.

Here, unlike in Hall, Jager, and St. Johns County School Board, Defendants present the affidavit of Ms. Kornegay, superintendent of the Lake County School Board. (Doc. 39.1). In the affidavit, Ms. Kornegay explains that a legal memorandum filed in a different lawsuit by the Florida Department of Education on December 21, 2022 guided Ms. Kornegay to restore access to *Tango* for students of all grade levels. Id. at 3–4. She explains that *Tango* was originally removed as an attempt to follow HB 1557. Id. at 3. Guidance from a training from the Florida Department of Education, directed "Florida school districts to 'err on the side of caution' when selecting and maintaining age[-]appropriate school library books." Id. at 3, 15.

After this lawsuit was filed, the Florida Department of Education clarified that HB 1557 does not apply to school library books. Id. at 4. Accordingly, on June 22, 2023, Ms. Kornegay seemingly unilaterally removed

the library restriction on *Tango*. Id. In addition to this, the School Board, "acting as a board," ratified Ms. Kornegay's decision and further clarified it would not apply HB 1557 to school library books, consistent with current Florida law. See Fla. Stat. § 1001.42 (explaining the statute is enforced by the school board, acting as a school board); (Docs. 47.1; 47.3).[3]

Plaintiffs have not shown there is a reasonable expectation that the government will reverse course. See Walker, 901 F.3d at 1270. While the decision to reverse the restriction on *Tango* came after the lawsuit and Motion were filed, Plaintiffs present no argument showing Defendants knew their actions might be unlawful until this suit was filed. See Hall, 656 F.2d at 1000 (explaining school officials knew an activity was unconstitutional for 16 years before the lawsuit was filed). Plaintiffs present no argument that they

---

[3] Plaintiffs object to the Court considering Defendants' Resolution, arguing the filing is "procedurally improper and does not establish any defense to the pending motion for preliminary injunction." (Doc. 48). Not so. A controversy must be live "at all stages of review." Gomez, 577 U.S. at 160. The Court has an ongoing obligation to ensure it has subject-matter jurisdiction. See Kirkland, 243 F.3d at 1279–80. At any stage of a case and on its own, a court may judicially notice a fact that cannot be reasonably disputed because it either is generally known or can be readily and accurately determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b)–(d). A court need not warn "parties before taking judicial notice of some fact, but, upon [a] party's request, it does require an opportunity to be heard" as to the propriety of taking judicial notice. Paez v. Sec'y, Fla. Dep't of Corr., 947 F.3d 649, 652 (11th Cir. 2020). Here, Plaintiffs had the opportunity to be heard as to the propriety of taking judicial notice. (See Doc. 48). In their objection, Plaintiffs do not dispute the accuracy of the Resolution; instead, Plaintiffs question Defendants' intentions in passing the Resolution after this matter was heard at oral argument and the Court raised questions about mootness. Id. at 3–4. The Court takes judicial notice of the Resolution because it is an accurate document necessary to complete the mootness analysis. See Shahar v. Bowers, 120 F.3d 211, 214 (11th Cir. 1997) ("[T]he kind of things about which courts ordinarily take judicial notice [include] matters of political history[.]").

had asked Defendants to restore access to *Tango* before suing. See Jager, 862 F.2d at 826–34 (explaining how the student plaintiff challenged a practice before filing suit). What the record shows is that Defendants learned of the *Tango* challenge on June 20, 2023. By June 22, 2023, Defendants restored access to the book, explaining they erred on the side of caution to restrict the book, but have since been instructed that HB 1557 does not apply to school libraries. (See Docs. 39.1 at 3–4; 47.1; 47.3). Defendants' conduct since June 20, 2023 show their actions result from both substantial deliberation and that their decision to unrestrict access to *Tango* under HB 1557 is unambiguous. See Schultz, 42 F.4th at 1321; Walker, 901 F.3d at 1270. The Court cannot evaluate the third Walker factor because Defendants have not yet had the opportunity to demonstrate "consistent commitment" to not restricting access to school library books under HB 1557.

The issue Plaintiffs present in their Motion is moot because the Court cannot compel Defendants to do something they have already done and have promised to do in the future. See Uzuegbunam, 141 S. Ct. at 796. The Court cannot offer Plaintiffs the injunctive relief they seek.[4] The Court does not

---

[4] The Court reiterates that there are three "strands" to the case-and-controversy requirement: standing, ripeness, and mootness. See Gardner, 962 F.3d at 1336. For the sake of completion, this Motion is ripe. Ripeness is a temporal analysis that asks whether it is "too soon" to bring a case. Id. Plaintiffs ask for *Tango* to have no age restrictions during the pendency of this lawsuit. This matter is ripe. See 303 Creative LLC v. Elenis, 143 S. Ct. 2298 (2023) (conferring standing upon a plaintiff seeking to enforce her First Amendment rights). In 303 Creative LLC, the plaintiff wanted to, but had not yet, create a business offering

reach the merits of Plaintiffs' preliminary injunction argument because there
is no live controversy to consider.

Accordingly, after due consideration, it is

**ORDERED:**

1. Plaintiffs' Motion for Preliminary Injunction (Doc. 6) is **DENIED as moot.**

2. Plaintiffs' Objection to Defendants' Request for Judicial Notice is **OVERRULED.**

**DONE** and **ORDERED** in Jacksonville, Florida this ____ day of

August 2023.

BRIAN J. DAVIS
United States District Judge

8
Copies furnished to:
Counsel of Record

---

wedding website design services. Id. at 2310. The Supreme Court did not disturb a lower
appellate court's determination that the plaintiff had standing, in part, because 1) Colorado
had a history of enforcing its anti-discrimination law that protected members of the lesbian,
gay, bisexual, transgender, queer, plus (LGBT+) community; 2) the private citizens could file
a complaint under Colorado's law; and 3) Colorado had declined to disavow future
enforcement of the antidiscrimination law. Id. Here, as in 303 Creative LLC, Plaintiffs seek
the Court to review a "pre-enforcement" challenge, meaning Plaintiffs would like the Court
to contemplate the future harm present if Defendants had restricted access to Tango when
the academic year began in August 2023. This kind of review is ripe. Id. at 2309, 2318–19;
but see 303 Creative LLC, 142 S. Ct. at 2322 (Sotomayor, J., dissenting) ("Around the country,
there has been a backlash to the movement for liberty and equality for gender and sexual
minorities. New forms of inclusion have been met with reactionary exclusion. This is
heartbreaking.").