UNITED STATES DISTRICT
COURT NORTHERN DISTRICT OF
FLORIDA PENSACOLA DIVISION

PEN AMERICAN CENTER, INC., ET AL.,

    *Plaintiffs*,

    v.

ESCAMBIA COUNTY SCHOOL BOARD,

    *Defendant*.

Case No. 3:23-cv-10385-TKW-ZCB

**BRIEF OF AMICUS CURIAE LAW PROFESSORS IN
OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Exhibit B

## INTRODUCTION AND STATEMENT OF INTEREST

The Amici are First Amendment scholars who have an interest in both the freedom of expression and access to information. Amici write to caution the court against adopting the aggressive, unprecedented interpretation of the government speech doctrine proffered in the Motion to Dismiss filed by Defendant the Escambia County School Board (D.E. 28) to justify the politically motivated manipulation of the contents of public school libraries. This view of government speech doctrine takes it beyond its limited scope and undermines other First Amendment precedents; the court should thus reject Defendant's invocation of government speech to insulate its unconstitutional actions from judicial review. Because Plaintiffs have the better of the constitutional arguments, the court should deny Defendant's motion to dismiss.

Amici raise two primary points. First, the government speech doctrine must remain narrow in scope; Defendant's interpretation would expand it beyond what the Supreme Court has counseled. And the government speech doctrine cannot apply within the school library context given the Supreme Court's decision in *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982).

Second, other First Amendment doctrines provide a better mode of analysis for school libraries. Contra Defendant's assertions, public forum doctrine — which

is more sophisticated than Defendant's characterizations — offers enough flexibility to apply to school libraries. Alternatively, the Supreme Court's decision in *Legal Services Corp v. Velazquez* provides a non-public forum framework better suited to the school library context than the government speech doctrine.

Finally, Amici write to briefly rebut the position of the State of Florida, which filed an amicus supporting Defendant's motion. (D.E. 31-1). Florida relied heavily upon the Supreme Court's plurality opinion in *United States v. American Library Association* — an opinion that in actuality supports Plaintiffs' arguments.

In 2017, Justice Alito noted for a majority in *Matal v. Tam* that the government speech doctrine, although "important – indeed, essential," is "susceptible to dangerous misuse." 582 U.S. 218, 235 (2017). He called for the exercise of "great caution before extending our government-speech precedents." *Id.* Such reticence is warranted. The government speech doctrine can enable states to manipulate the speech of publicly funded institutions that distribute or produce expression, even as those institutions purport to be more than mere vessels for official messaging. Applying the government speech doctrine to school libraries would create a dangerous incompatibility with the nature and purpose of those libraries. The court should therefore reject the Defendant's government speech claims to avoid a constitutional morass.

I.  **The Government Speech Doctrine Is Narrow in Scope and Should Not Encompass School Libraries**

    A. *The Supreme Court Has Rejected Expansive Constructions of Government Speech*

The government speech doctrine serves an important yet narrow purpose. The doctrine allows government actors and institutions to speak to advance state policies or otherwise to convey the views of the state. *See, e.g.*, *Tam*, 582 U.S. at 234 ("When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others. The Free Speech Clause does not require government to maintain viewpoint neutrality when its officers and employees speak about that venture."); *Walker v. Sons of Confederate Veterans*, 576 U.S. 200, 207–208 (2015) ("[I]t is not easy to imagine how government could function if it lacked th[e] freedom" to select the messages it wishes to convey") (quoting *Pleasant Valley Grove v. Summum*, 555 U.S. 460, 468 (2009)). But while the doctrine allows the government to speak to "promote a program, to espouse a policy, or to take a position," as Justice Breyer observed in *Walker*, that ability is limited. 576 U.S. at 209. Defendant's arguments would effectively nullify those limits.

Importantly, the government speech doctrine *only* applies to state programs in which the government conveys an official message that the public would recognize as such. *Walker* likely serves as the outer bounds of the doctrine, as Justice Alito observed in *Tam*. *See Tam*, 582 U.S. at 238 ("*Walker* . . . likely marks the outer

4

bounds of the government-speech doctrine"). In *Walker*, the Court determined that Texas' specialized license plate designs were government speech. Although Texas commissioned private parties to design the plates and had approved a wide array of design ideas and topics over the years, the Court held that the designs ultimately "'deliver[ed] a government-controlled message.'" *Walker*, 576 U.S. at 217, *quoting Summum*, 555 U.S. at 468. The *Walker* Court relied partly on the facts that "license plates have long been used by the States to convey state messages," that they "are often closely identified in the public mind' with the State," and that the state retained "direct control over the messages conveyed on its specialty plates." *Id.* at 210–13.

Those dynamics are not at play in this case, making government speech an inapt fit. The Plaintiffs' brief extensively explores *Tam* and *Cambridge Christian v. Florida High School Athletic Association*, a recent Eleventh Circuit case on government speech. (D.E. 40 at 27–35). Amici support Plaintiffs' interpretation of those cases and write separately to emphasize why expanding government speech contravenes the Supreme Court's direct command.

Justice Alito's description of *Walker* in his *Tam* opinion acknowledges two core aspects of government speech: that it only applies in limited circumstances, and that it does not apply outside of settings in which the government seeks to convey its own message. School libraries do not qualify under this framing of government speech; Defendant's attempt to expand the doctrine to cover such libraries cannot

5

succeed. The notion that such libraries exist to carry official messaging is profoundly antithetical to their very nature and purpose. The court should therefore reject Defendant's invocation of government speech to justify its unconstitutional practices.

> B. *The Supreme Court's* Pico *Decision Demonstrates Why Government Speech Should Not Apply to School Libraries*

The Supreme Court has spoken precisely on how courts should evaluate school libraries in First Amendment cases. In *Pico* a plurality of the Supreme Court concluded that school boards could not, given the nature and purpose of school libraries, order books removed from library shelves in order to deny students "access to ideas" with which board members disagreed. 457 U.S. at 871–72. *Pico* remains the only Supreme Court case to date to consider the First Amendment implications of public-school library book removals. Its reasoning thus provides instructive guidance as to why government speech should not apply to school libraries.

The *Pico* plurality "acknowledged that public schools are vitally important in the preparation of individuals for participation as citizens, and as vehicles for inculcating fundamental values necessary to the maintenance of a democratic political system." *Id.* at 864 (quotation marks omitted). To fulfill this aspect of the public-school mission, school boards require substantial leeway over curricular and even library content. *Id.* Yet this mission also requires First Amendment limitations as to the scope of school board control over library book removals.

*Pico*'s reasoning rests on the Supreme Court's foundational opinion in *West Virginia Board of Education v. Barnette*, which held as to public schools: "'That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.'" *Id.*, *quoting West Virginia Board of Education v. Barnette*, 319 U.S. 624, 637 (1943). The public-school library plays an especially important role in educating children about free thought and encouraging their intellectual growth. *See id.* at 868–69 ("'[S]tudents must always remain free to inquire, to study and to evaluate, and to gain new maturity and understanding.' The school library is the principal locus of such freedom"), *quoting Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967).

It is true that *Pico* produced only a plurality opinion as well as separate concurrences and dissents. Indeed, in 2009 the Eleventh Circuit deemed *Pico* "a non-decision so far as precedent is concerned." *American Civil Liberties Union of Florida v. Miami-Dade County School Board*, 557 F.3d. 1177, 1200 (11th Cir. 2009). But *Miami-Dade County School Board* did not *foreclose* adopting the *Pico* standard. The Eleventh Circuit simply left the question open because it concluded that the book removal at issue was *not* ideologically motivated and thus passed muster under *Pico*. *Id.* at 1227. The court found that the book removal stemmed from factual

7

inaccuracies; thus, even assuming *Pico* applied to the school library context, it did not prohibit the challenged removal. *Id.* at 1207 ("Under the *Pico* standard we are applying, the Board did not act based on an unconstitutional motive.").

The Eleventh Circuit's decision allows this court to treat *Pico*, as the Fifth Circuit has done, as "useful guidance in determining the constitutional implications of removing books from a public school library." *Campbell v. St. Tammany Parish School Board*, 64 F.3d 184, 189 (5th Cir. 1995). Judged purely for its persuasive force, *Pico* provides the correct standard. It strikes the most sensible balance among the practical imperatives of school board control, the need for public schools to train future leaders, and the "special role of the school library as a place where students may freely and voluntarily explore diverse topics." *Id.* at 190. And while *Pico*'s critics (including Defendant and its amicus) assert that its plurality opinion cannot stand for much, they neglect to acknowledge that the Supreme Court has not repudiated its logic in the intervening forty years despite ample opportunities to do so. Denigrating *Pico* as valueless thus ignores its careful consideration of competing interests that school libraries must balance.

At minimum, the government speech doctrine has no place in public school library book removal decisions; applying it in this setting, as Defendant urges, would fly in the face of *Pico*'s guidance. Indeed, it would run counter not only to the *Pico* plurality, but also to the view of a majority of the Justices in *Pico* that school boards

8

cannot constitutionally remove library books in a "'narrowly partisan or political manner.'" *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853, 907 (Rehnquist, J., dissenting) (quoting the plurality opinion to this effect and "cheerfully conced[ing] the point").

The notion that public school libraries are platforms for official government messaging is anathema to libraries' very nature. It is also incompatible with a key tenet of the government speech doctrine: the idea that democratic accountability will prevent the doctrine's abuse. As the Supreme Court stated in *Walker*, "it is the democratic electoral process that first and foremost provides a check on government speech." *Walker*, 576 U.S. at 207. Yet this logic assumes a citizenry that can take in and critically evaluate evidence and ideas. Indeed, the *Walker* Court elaborated that "the Free Speech Clause helps produce informed opinions among members of the public, who are then able to influence the choices of a government that, through words and deeds, will reflect its electoral mandate." *Id.* This elegant plan works only if the government does not seek — or is not restrained by the judiciary should they attempt — "to strangle the free mind at its source." *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 637 (1943).

## II. Other First Amendment Doctrines Exist to Provide a Superior Framework for Denying Defendant's Motion to Dismiss

Rejecting government speech does not leave this Court without a doctrinal frame to evaluate Defendant's arguments. Amici describe below two alternate

9

characterizations of school libraries that provide a better fit within First Amendment doctrine than government speech; both demonstrate why the Court should deny Defendant's motion to dismiss.

Most obviously, forum doctrine provides a better fit for evaluating school library restrictions. In *Summum*, the Supreme Court held that government speech does not apply to government-created forums — even designated public forums and limited public forums. *Summum*, 555 U.S. at 469–70. In such forums, courts give states the necessary leeway to contain the forum's scope. For example, states may impose topical restrictions on speech in such forums, so long as those restrictions are reasonable in light of the forum's purpose. *See Cornelius v. NAACP Legal Defense and Educational Fund*, 473 U.S. 788, 806, *quoting Perry Education Association v. Perry Local Educators Association*, 460 U.S. 37, 49 (1983) ("Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity."). What states may *not* do, however, is to limit speakers in ways that are viewpoint-based or unreasonable given the nature of the forum. *Cornelius*, 473 U.S. at 806 ("The government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.").

Defendant's actions more comfortably fit within the forum doctrine than government speech. To promote the educational goals described in *Pico* and

*Barnette*, public school libraries must avoid viewpoint-based discrimination, but they may make reasonable pedagogical choices. These dynamics recall those described in *Cornelius* and *Summum*.

Alternatively, the Supreme Court has opined on state programs that do not necessarily qualify as forums but nevertheless remain protected from extensive government interference. Justice Kennedy's opinion in *Legal Services Corp v. Velazquez* provides instructive guidance here: *Velazquez* invalidated a statutory restriction that barred Legal Services Corporation (LSC) attorneys from making certain arguments — specifically, from challenging the constitutionality of state or federal welfare laws or the consistency of state welfare laws with federal statutes — when they carried out federally funded legal representation. 531 U.S. 533 (2001).

*Velazquez* did not describe the LSC as a forum akin to *Cornelius*, but the statutory restrictions still ran afoul of the First Amendment. Justice Kennedy's opinion held that even where a state program or institution is not labeled a "forum," the state may not "use an existing medium of expression" to carry it out "in ways which distort [the medium's] usual functioning." *Id.* at 543. The LSC restrictions altered "the traditional role of [] attorneys," prohibiting them from analyzing legal issues that they might otherwise pursue and forcing them to "truncate [their] presentation to the courts." *Id.* at 544–45. Ideologically motivated public school library book removals present a similar situation to the LSC restrictions in *Velazquez*.

11

Such removals fly in the face of libraries' traditional roles — educating students and creating an informed citizenry. *Velazquez* cautions against such distortion.

Given alternative First Amendment frameworks, this Court can reject Defendant's motion without fear of finding itself doctrinally adrift. Both the forum doctrine and the *Velazquez* program analysis provide ample support for Plaintiffs' First Amendment claims.

### III. *U.S. v. American Library Association* Supports Plaintiffs' and Amici's Framing of the Purpose of School Libraries

The State of Florida, in its amicus brief supporting Defendant, argues that the above-mentioned constitutional frameworks cannot apply to school libraries. (D. E. 31 at 5). Amici disagree with Florida's contentions and its reliance upon *United States v. American Library Association*, 539 U.S. 194 (2003) ("*ALA*"). Close reading of *ALA* shows that its reasoning supports Plaintiffs' and Amici's arguments regarding the proper standard for evaluating school libraries.

Florida invokes language in *ALA*'s plurality opinion that "forum analysis and heightened judicial scrutiny… are also incompatible with the discretion that [government-run] libraries must have to fulfill their traditional missions." (D.E. 31-1 at 5), *quoting ALA* at 205. Yet this statement tells us nothing more than that certain public expressive institutions — including public libraries – are not *traditional* public forums, and that they must engage in content-based decision-making to carry

12

out their expressive missions. It certainly does *not* mean that such institutions convey "government speech."

The law does not present a simple binary, whereby publicly funded forums or expressive institutions either must welcome all comers or face no First Amendment restrictions at all. Such a holding would be inconsistent with *Cornelius* and *Velazquez*. Non-public forums and non-forum expressive institutions that are not government speakers have wide leeway to make content-based expressive choices. *Perry Education Association*, 460 U.S. at 49 ("Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity."). What they do *not* possess is an unfettered power to engage in viewpoint discrimination or otherwise to make content-based choices incompatible with their purposes.

Indeed, *ALA* actually *supports* Amici's assertions regarding the purpose of school libraries. Though *ALA* addressed public library restrictions, the plurality's description of such libraries applies to school libraries as well. Chief Justice Rehnquist observed that public libraries "pursue the worthy missions of facilitating learning and cultural enrichment." *ALA,* 539 U.S. at 203. This necessarily entails making content-based judgments as to which materials "have requisite and appropriate quality." *Id.* at 204 (quotation marks omitted). Making such judgments, of course, is a very different practice from basing book removals on ideological

13

opposition. The plurality opinion in *Pico* drew this precise distinction between judgments based on content, including quality and pedagogical merit, and those "exercised in a narrowly partisan or political manner." *Pico*, 457 U.S. at 870. *ALA* ultimately supports Amici's position that Defendant's motion and Florida's arguments cannot prevail.

## CONCLUSION

For the foregoing reasons, Amici urge the Court to deny Defendant's motion to dismiss.

Respectfully submitted,

SHULLMAN FUGATE PLLC

*/s/ Rachel E. Fugate*
Rachel E. Fugate
Florida Bar No. 144029
rfugate@shullmanfugate.com
Minch Minchin
Florida Bar No. 1015950
mminchin@shullmanfugate.com
100 N. Ashley Drive, Suite 600
Tampa, FL 33602
Tel: (813) 935-5098

Counsel for the Amici

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this 25th day of September 2023, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ Rachel E. Fugate*
Counsel for the Amici
