# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

PEN AMERICAN CENTER, INC., *et al.*,

      *Plaintiffs*,

             v.

ESCAMBIA COUNTY SCHOOL BOARD,

      *Defendant*.

Case No.: 3:23-cv-10385-TKW-ZCB

# BRIEF OF *AMICI CURIAE* FLORIDA STATE CONFERENCE OF THE NAACP AND EQUALITY FLORIDA ACTION, INC. IN SUPPORT OF PLAINTIFFS

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, the undersigned counsel for the Florida State Conference of the National Association for the Advancement of Colored People ("Florida NAACP") and Equality Florida Action, Inc. ("Equality Florida") certify that:

1. Florida NAACP and Equality Florida, respectively, have no parent corporation.

2. No corporations hold stock in Florida NAACP or Equality Florida.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ...................................................... ii

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF INTEREST ............................................................ 1

INTRODUCTION ........................................................................ 3

ARGUMENT........................................................................... 7

I.      BOOK REMOVALS AND RESTRICTIONS DENY STUDENTS
        ACCESS TO PERSPECTIVES ABOUT RACE, RACISM, AND
        LGBTQ IDENTITIES. ........................................................ 7

II.     BOOK REMOVALS AND RESTRICTIONS
        DISPROPORTIONATELY HARM BLACK AND LGBTQ
        STUDENTS AND THEIR FAMILIES. .................................... 11

CONCLUSION ......................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ambach v. Norwick,*
    441 U.S. 68, 76–77 (1979) ............................................................................5

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
    457 U.S. 853 (1982) .................................................................................5, 7

*Burton v. City of Belle Glade,*
    178 F.3d 1175 (11th Cir. 1999) ..................................................................11

*City of Cleburne v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985) ...................................................................................11

*First National Bank of Boston v. Bellotti,*
    435 U.S. 765 (1978) .....................................................................................4

*Keyishian v. Bd. of Regents of Univ. of State of N. Y.,*
    385 U.S. 589 (1967) .....................................................................................7

*Obergefell v. Hodges,*
    576 U.S. 644 (2015) ...................................................................................11

*Sioux City Bridge Co. v. Dakota Cty.,*
    260 U.S. 441, 445 (1923) ...........................................................................12

*Stanley v. Georgia,*
    394 U.S. 557 (1969) .....................................................................................7

*United States v. Associated Press,*
    52 F. Supp. 362, 372 (S.D.N.Y. 1943) ........................................................8

*Vill. of Willowbrook v. Olech,*
    528 U.S. 562 (2000) (per curiam) ..............................................................11

*Wieman v. Updegraff,*
    344 U.S. 183 (1952) (Frankfurter, J., concurring) .....................................10

**Constitutional Provisions**

First Amendment ...........................................................................4, 6, 7

Fourteenth Amendment ......................................................6, 11, 12, 14

**Other Authorities**

Amanda LaTasha Armstrong, *The Representation of Social Groups in U. S. Educational Materials and Why it Matters: A Research Overview* (Dec. 1, 2021). .............................................................3, 4

Becky Sullivan & Neda Ulaby, *Penguin Random House and 5 Authors are Suing a Florida School Board Over Book Bans* (March 18, 2023) .............................................................5

Raymond Garcia, *American Library Association Reports Record Number of Demands to Censor Library Books and Materials in 2022*, (March 22, 2023) .............................................................5

U.S. Dep't of Educ., Access to Reading Materials .................................................4

## STATEMENT OF INTEREST

The Florida State Conference of the National Association for the Advancement of Colored People ("Florida NAACP") and Equality Florida Action, Inc. ("Equality Florida") (collectively, "Amici") submit this brief in support of PEN American Center, Inc. ("PEN America"), select book authors, Penguin Random House LLC, and a number of parents of students attending public schools in Escambia County (collectively, "Plaintiffs"). The Amici share an interest in ensuring that students attending public schools in Florida and their parents are not discriminated against on the basis of race, gender, or sexual orientation by the decisions of Defendant Escambia County School Board (the "School Board") to deny students access to information and ideas in books by or about people of color and/or lesbian, gay, bisexual, transgender, and queer ("LGBTQ") people. Amici also share an interest in protecting the right of students in Escambia County and Florida to read books by diverse authors and to access books with diverse characters, content, and ideas in their public school libraries.

**Florida NAACP** is a nonprofit, nonpartisan civil rights organization located in Florida. Founded in 1909, Florida NAACP is the oldest civil rights organization in Florida, and serves as the umbrella organization for local branch units throughout the state. Florida NAACP's 12,000 members are predominately Black and other minority persons based in Florida. Its mission is to ensure the political, social,

educational, and economic equality of all persons and to eliminate race-based discrimination.

**Equality Florida** is a civil rights organization whose mission is to secure full equality for Florida's LGBTQ community. Through grassroots organizing and public education, Equality Florida is working to end LGBTQ discrimination, accelerate acceptance of all Floridians, make schools safe for LGBTQ students, and move equality forward.

# INTRODUCTION

Across literature, "coming-of-age" novels narrate the stories of protagonists as they transition from adolescence to adulthood, allowing readers to follow characters that reflect themselves or others in their lives. This "mirroring" effect "make[s] connections with students' daily experiences" and is an essential aspect of the educational experience.[1] Wider access to literature that includes characters that mirror students demographically, culturally, and experientially leads to increased student engagement.[2]

Diversity in literature also has social benefits. It is not limited to allowing students of different races, ethnicities, sexual orientation, gender, or societal groups to read about characters that bear similarities to their own experience. Access to content about marginalized groups, including LGBTQ and racial minorities, also inures to the benefit of all students where it "builds students' accurate knowledge of diverse people and their awareness of different perspectives, and uses their existing knowledge and experiences as bridges to new content."[3]

---

[1] Amanda LaTasha Armstrong, *The Representation of Social Groups in U. S. Educational Materials and Why it Matters: A Research Overview* 6, New America (Dec. 1, 2021), https://www.newamerica.org/education-policy/reports/the-representation-of-social-groups-in-u-s-educational-materials-and-why-it-matter/what-is-the-role-of-materials-in-culturally-responsive-education.

[2] *Id.* at 8.

[3] *Id.* at 6.

Traditional public school curricula, which predominantly feature perspectives of white authors or characters, deny the benefits of inclusive literature to almost 40% of students.[4] Moreover, a "2020 study of award-winning books revealed 97 percent of them included male and female characters and no instances of nonbinary representation."[5] Public school libraries, however, provide what standard syllabi do not—choice. Underrepresented students can use school libraries as a convenient source to access literature of their choosing, particularly for "socioeconomically disadvantaged children, including children of color, [who] are less likely to have books in the home or read at home."[6]

Indeed, the law has long recognized school libraries as an essential vehicle by which students can exalt their constitutional right to access information. Where the First Amendment both "foster[s] individual self-expression but also . . . afford[s] the public access to discussion, debate, and the dissemination of information and ideas," *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978), public schools, and the libraries within them, are "vitally important 'in the preparation of

---

[4] *Id.* "In a 2019 study, the Cooperative Children's Book Center examined the frequency of children's books by and about BIPOCs published in the United States. They found that of the 3,717 books they received from U.S. publishers, 451 (12 percent) were about Black people or those of African descent; 328 (8.8 percent) were about Asians; 5 (0.13 percent) were about Pacific Islanders; 235 (6.3 percent) were about Latinx individuals; 43 (1.2 percent) were about Indigenous people; and 32 (0.86 percent) were about Arabs." *Id.* at 12.

[5] *Id.* at 15.

[6] U.S. Dep't of Educ., Access to Reading Materials, https://www2.ed.gov/datastory/bookaccess/index.html.

individuals for participation as citizens,' and as vehicles for 'inculcating fundamental values necessary to the maintenance of a democratic political system.'" *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 864 (1982) (quoting *Ambach v. Norwick*, 441 U.S. 68, 76–77 (1979)).

Despite this longstanding recognition of the import of the right to access information and ideas, students' ability to access inclusive literature critical to their self-expression and social development is under siege across the United States. In 2022, 2,571 unique titles—the "vast majority . . . written by or about members of the LGBTQIA+ community and people of color"—were targeted for censorship, which is a 38% increase from the previous year.[7] Of reported book challenges, 58% targeted books in school libraries.[8]

In Escambia County, Florida, students' Free Speech rights have been, and are at imminent risk of being, deprived; and the removal of books discussing race, racism, and LGBTQ identities likewise denies students in protected groups Equal Protection under the laws. During the 2022−2023 school year, officials in Escambia County removed 10 books and restricted access to over 150 more.[9] Rather than

---

[7] Raymond Garcia, *American Library Association Reports Record Number of Demands to Censor Library Books and Materials in 2022*, ALA News (March 22, 2023), https://www.ala.org/news/press-releases/2023/03/record-book-bans-2022.

[8] *Id*.

[9] Becky Sullivan & Neda Ulaby, *Penguin Random House and 5 Authors are Suing a Florida School Board Over Book Bans*, NPR (March 18, 2023), https://www.npr.org/2023/05/18/1176879171/florida-book-ban-lawsuit.

allowing students and parents to continue to choose what books to read or not read, Escambia County instead seeks to intentionally and arbitrarily limit the ability of all students, including Black and LGBTQ students, to access books by Black and LGBTQ authors and with content and characters reflecting diverse backgrounds.

Plaintiffs allege that Defendant's book removals and restrictions violate the First and Fourteenth Amendments. PEN America, Penguin Random House, and the author plaintiffs allege that Defendant is systematically excluding viewpoints from school libraries, in violation of the First Amendment. The parent plaintiffs claim that Defendant's practices unconstitutionally limit the types of books that their children can access, in violation of their right to receive information under the First Amendment. PEN America and the author and parent plaintiffs assert claims under the Equal Protection Clause of the Fourteenth Amendment, alleging that Defendant has discriminated against them based on race or LGBTQ status by disproportionately limiting their access to books by or about Black or LGBTQ persons.

Amici write in support of Plaintiffs to describe the harms that result from sharply curtailed access to books that explore themes relating to race, racism, and LGBTQ identities. With this brief, amici submit statements by three individuals with family affected by book removals and restrictions across the State of Florida. Their stories demonstrate why Black and LGBTQ students and their families are harmed by the suppression of race and LGBTQ-related books.

I. **BOOK REMOVALS AND RESTRICTIONS DENY STUDENTS ACCESS TO PERSPECTIVES ABOUT RACE, RACISM, AND LGBTQ IDENTITIES.**

The Supreme Court has long held that the First Amendment protects not only the right to speak but also "the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *see Pico*, 457 U.S. at 867 (plurality opinion) (recognizing the right to receive information as an "inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution . . . "). The Supreme Court has also recognized the school library as "the principal locus of such freedom," because it is where students "can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum." *Id.* at 868−69 (internal quotation marks and citation omitted).

The ability to engage with books, history, and ideas in a school library prepares children for "active and effective participation in the pluralistic, often contentious society in which they will soon be adult members." *Id.* at 868; *cf. Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967) (students can be prepared for participation in democratic society only if they are "trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative

selection.'" (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943))).

Defendant's actions in Escambia County—and similar practices occurring in other school districts across Florida—are denying students that training. Indeed, as the statements by Raquel Wright, Vivian Green, and Jennifer Cousins illustrate, students and their families are being denied access to stories involving race, gender, and sexual orientation. These stories are critical to students' education and their participation in society. Their stories are vivid examples of the harmful effects of Florida's campaign to remove and restrict books on Black and LGBTQ students and their families.

Raquel Wright, a former elementary and middle school teacher in Florida, described the profound impact that certain books have had on her niece's growth. Toni Morrison's *The Bluest Eye* is one of the books that Defendant has removed from school libraries in Escambia County. *See* Am. Compl. at ¶¶ 105, 127–31. Yet Wright's niece's experience reading the novel demonstrates why access to Morrison's literature matters. *The Bluest Eye* allowed Wright's niece, a 17-year old senior attending a public high school in Indian River County, Florida, to reckon with systemic abuses of race and gender, *see* Exhibit 1, Statement of Raquel Wright ("Wright") at ¶ 6—topics that are hard to face but important to acknowledge if one is to have a full appreciation of our society. Wright's niece

described *The Bluest Eye* as "healing." *Id.* ¶ 6. The novel showed her that "through all the travesty there is light at the end of the tunnel." *Id.* ¶ 6.

    *The Hate U Give* by Angie Thomas also had a positive effect on Wright's niece, teaching her about issues at the intersection of race and policing. *Id.* ¶ 7. *The Hate U Give* has been targeted for removal by Moms for Liberty. *Id.* ¶ 7.[10] As a result, future students may face barriers to accessing the type of knowledge that Wright's niece gained from *The Hate U Give*. Wright worries that the book removals and restrictions will cause children to be taught a false narrative, leaving them ill-equipped to navigate the realities of a diverse society. *Id.* ¶ 10.

    Vivian Green, a former elementary school principal, is similarly concerned about the negative effects of the book removals and restrictions on her family's education. Exhibit 3, Statement of Vivian Green ("Green") at ¶ 1. As Green's relative attends public school in Okaloosa County, she hopes that her relative will be exposed to literature about Black identity and history, including works by James Baldwin, Langston Hughes, John Ellison, and Toni Morrison. *Id.* ¶ 5. But Green fears that Florida is "turning back the clock" to a time in the 1950s and 1960s, when Florida public schools strictly limited access to books about race. *Id.* ¶ 2. In

---

[10] After reading *The Hate U Give*, Wright's niece was motivated to read the prequel by Angie Thomas, *Concrete Rose*. Wright at ¶ 7. *Concrete Rose* is targeted for removal and currently restricted at high school and middle school libraries in Escambia County. *See* Am. Compl. at ¶¶ 159–60.

particular, she is concerned that her relative will not be exposed to perspectives that depict "what real life is like" for historically marginalized persons. *Id.* ¶¶ 5, 7. To Green, this is a disservice to racially diverse students, as well as white students, who are denied the chance to learn about the trials of lives not like their own. *Id.* ¶ 7.

Green is also concerned about the chilling effect on teachers caused by book removals and restrictions. Citing a story about a teacher she knows who left the profession after facing a parent-led backlash for teaching a race-related book, Green is concerned that teachers will avoid teaching books disfavored by their school system. *Id.* ¶ 7. Such a chilling effect would prevent teachers from carrying out their "special task" of serving as "exemplars of open-mindedness and free inquiry." *Wieman v. Updegraff*, 344 U.S. 183, 196 (1952) (Frankfurter, J., concurring) ("[Teachers] cannot carry out their noble task if the conditions for the practice of a responsible and critical mind are denied to them.").

Jennifer Cousins, the mother of four children in public schools in Orange County, Florida, similarly worries about the impact of the book removals and restrictions on her children's abilities to learn freely. As discussed in greater detail below, access to books about LGBTQ people, including *Gender Queer* by Maia Kobabe and *Drama* by Raina Telgemeier, have provided "a path to self-discovery" for Cousins' children who identify as LGBTQ. Exhibit 2, Statement of Jennifer

Cousins ("Cousins") at ¶¶ 2, 4, 11. *Gender Queer* has been removed from Orange County public schools, *id.* ¶ 3, and Defendant has removed *Drama* from elementary school libraries in Escambia County. Am. Compl. ¶¶ 102, 105. Like Green, Cousins is afraid that restricting access to books about LGBTQ identities will not only harm LGBTQ students, but will deny all students the chance to learn about people with identities that may differ from their own. Cousins at ¶ 12.

## II. BOOK REMOVALS AND RESTRICTIONS DISPROPORTIONATELY HARM BLACK AND LGBTQ STUDENTS AND THEIR FAMILIES.

The equal protection clause "prohibit[s] states from discriminating against individuals on the basis of race," *Burton v. City of Belle Glade*, 178 F.3d 1175, 1190 (11th Cir. 1999), or sexual orientation, *Obergefell v. Hodges*, 576 U.S. 644, 672 (2015). The book removals and restrictions disproportionately affect books addressing themes related to race, sexual orientation, and gender identity. As a result, these actions disproportionally harm Black and LGBTQ students and their families.

The equal protection clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The equal protection clause protects against not only state-imposed classifications, but also against "intentional and arbitrary discrimination." *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564

(2000) (per curiam) (quoting *Sioux City Bridge Co. v. Dakota Cty.*, 260 U.S. 441, 445 (1923)).

Access to books in which students can see themselves represented can have a tremendously positive impact on those students. And limiting students' access to books with content on Black history, diversity, racism, and gender identity is intentional and arbitrary discrimination that disproportionately harms Black and LGBTQ students in violation of the Fourteenth Amendment. Moreover, in light of the history of unequal treatment of these groups in the United States, the book removals and restrictions cause disproportionate harm to students and their families through intentional and arbitrary discrimination.

For example, Cousins described the impact that reading *Gender Queer* by Maia Kobabe had on her child who identifies as non-binary and uses "she/they/them" pronouns. *See* Cousins at ¶ 2. The book provided a "deep sense of relief that other people felt the same way as them and that they were not isolated in their experience." *Id.* In other words, the book allowed them to feel "seen" and allowed them to better understand their own identity. Cousins's third oldest child, who identifies as gay, read and loved *Drama* by Raina Telgemeier. *See* Cousins at ¶ 4. Reading these books has allowed Cousins' children who identify as LGBTQ to have deeper and more open conversations about their identities. *Id.*

The families of Black and LGBTQ students also benefit from the students' access to these types of books and are disproportionately harmed when access to these books in school libraries is eliminated or restricted. Cousins describes her family as very close and notes that access to books is essential for her children to understand each other's experience and have informed communication throughout the family. *See* Cousins at ¶ 7. Cousins' oldest child was thrilled when his younger sibling read *Gender Queer* and was able to feel more at ease with themself. *See* Cousins at ¶ 7.

Depriving students of these types of books has larger effects than simply prohibiting students from having these positive experiences. The act of removing and restricting books in which Black or LGBTQ students can see themselves can make those students feel like their identity is being attacked. *See* Cousins at ¶ 8. Upon learning that *Drama* by Raina Telgemeier was removed from some libraries across Florida, Cousins' child, who identifies as non-binary, asked "why does the State [of Florida] hate us so much?" Cousins at ¶ 4. Similarly, Wright's niece, upon learning that Moms for Liberty was targeting *The Hate U Give* for removal, stated, "they just want to take everything from us." *See* Wright at ¶ 7.

Depriving students of books with characters who represent them can cause students to feel inferior. Green stated that she believes the book removals and restrictions convey that some students are "not important enough to be included in a

book," causing distress to students and families alike. *See* Green at ¶ 6. Remembering her own educational experience when she did not have access to books about Black people, Green stated that she felt "devalued." *See* Green at ¶ 2. Drawing on her own experience with a school curriculum that did not have much teaching about African American history, Wright stated that "it makes you feel like you aren't important enough to know who you are as a person." *See* Wright at ¶ 2. Wright's niece has similarly felt unrepresented in her curriculum and felt as if she is less than her counterparts. *See* Wright at ¶ 5.

The equal protection clause of the Fourteenth Amendment protects against discriminatory treatment on the basis of race and sexual orientation. As these stories demonstrate, Defendant's book removals and restrictions cause disproportionate harm to Black and LGBTQ students and their families by intentionally and arbitrarily limiting their access to books by or about Black or LGBTQ persons.

## CONCLUSION

For these reasons, Defendant's motion to dismiss Plaintiffs' amended complaint should be denied.

Respectfully submitted,

/s/ Robert C. Buschel
Robert C. Buschel (FBN 0063436)
BUSCHEL GIBBONS, P.A.
501 East Las Olas Boulevard
Suite 304
Fort Lauderdale, FL 33301
buschel@bglaw-pa.com
(954) 530-5301

/s/ Jayni F. Hein
Jayni F. Hein (*pro hac vice* forthcoming)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
jhein@cov.com
(415) 591-6000

/s/ C. William Phillips
C. William Phillips (*pro hac vice* forthcoming)
Nicholas Eli Baer (*pro hac vice* forthcoming)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
cphillips@cov.com
nbaer@cov.com
(212) 841-1000

*Counsel for Amici Curiae the Florida State Conference of the NAACP and Equality Florida Action, Inc.*

## CERTIFICATE OF SERVICE

On September 25, 2023, a true and correct copy of the foregoing was filed with the Court's electronic filing system, which will provide service to all parties for whom counsel has entered an appearance.

/s/ Robert C. Buschel
Robert C. Buschel