1                    **UNITED STATES DISTRICT COURT**
                     **NORTHERN DISTRICT OF FLORIDA**
2                         **PENSACOLA DIVISION**

3

PEN AMERICA CENTER, INC.; SARAH        )
4   BRANNEN; LINDSAY DURTSCHI, on behalf  )
of herself and her minor children;    )
5   BENJAMIN GLASS, on behalf of himself   )
and his minor child; GEORGE M.        )
6   JOHNSON; DAVID LEVITHAN; KYLE LUKOFF;  )
ANN NOVAKOWSKI, on behalf of herself   )
7   and her minor child; PENGUIN RANDOM    )
HOUSE LLC; SEAN PARKER, on behalf of  )
8   himself and his minor child; ASHLEY    ) Case No: 3:23-CV-10385
HOPE PEREZ; ERICA ROY, on behalf of   )
9   herself and her minor children;        )
CHRISTOPHER SCOTT SATTERWHITE, on     ) Pensacola, Florida
10   behalf of himself and his minor        ) January 10, 2024
child; and CARIN SMITH, on behalf of  )
11   herself and her minor children,        ) 9:59 a.m.
                                        )
12                        Plaintiffs,     )
                                        )
           v.                            )
13                                        )
ESCAMBIA COUNTY SCHOOL BOARD,          )
14                                        )
                         Defendant.      )
15   _____)

16

17

18                **TRANSCRIPT OF ORAL ARGUMENT**
          **BEFORE THE HONORABLE T. KENT WETHERELL, II**
19                **UNITED STATES DISTRICT JUDGE**
                    **(Pages 1 through 136)**
20

21

22

23

24            *Julie A. Wycoff, RMR, CRR*
          *Official United States Court Reporter*
25         *(850) 470-8196 * julieawycoff@gmail.com*

```
1    APPEARANCES:

2
     For Plaintiffs:          Ballard Spahr, LLP
3                             by:  PAUL JOSEPH SAFIER and
                                   LYNN BETH OBERLANDER
4                             1735 Market Street
                              51st Floor
5                             Philadelphia, Pennsylvania 19103
                              (215) 864-8266
6                             safierp@ballardspahr.com
                              oberlanderl@ballardspahr.com
7
                              Protect Democracy
8                             by:  SHALINI GOEL AGARWAL
                              2020 Pennsylvania Avenue NW
9                             Washington DC  20006-1811
                              (850) 860-9344
10                            shalini.agarwal@protectdemocracy.org

11
     For the Defendant:       Rumberger Kirk & Caldwell PA
12                            by:  NICOLE S. SMITH and
                                   JEFFREY J. GROSHOLZ
13                            101 North Monroe Street
                              Suite 1050
14                            Tallahassee, Florida 32301
                              (850) 222-6550
15                            nsmith@rumberger.com
                              jgrosholz@rumberger.com
16

17   amicus:                  Office of the Attorney General
                              by:  BRIDGET K. O'HICKEY and
18                                 NATHAN FORRESTER
                              The Capitol, Suite Pl-01
19                            400 South Monroe Street
                              Tallahassee, Florida 32399
20                            (850) 414-3300
                              bridget.ohickey@myflorida.com
21

22

23

24

25
```

1                        **P R O C E E D I N G S**

2          *(Call to Order of the Court.)*

3                    THE COURT:  Good morning.  Please be seated.

4                    Good morning, everyone.  Welcome to the Northern

5    District of Florida.  We are here today for oral argument on the

6    School Board's motion to dismiss in Case Number 3:23cv10385.

7                    Now, for the benefit of those of you who have come to

8    join us from the public to watch the proceedings today, I want

9    to give you an overview of what's going to happen.

10                   This is not a trial.  No witnesses will be testifying.

11   I am not going to be reading books or deciding what books should

12   or should not be in the school libraries.  All of that will

13   happen at a later stage of the proceeding if I deny the School

14   Board's motion to dismiss.

15                   A motion to dismiss challenges the legal sufficiency

16   of a complaint.  To withstand a motion to dismiss, the complaint

17   must state a plausible claim for relief, so that is all I am

18   determining today.  Have the plaintiffs stated a plausible claim

19   for relief, not whether they will ultimately prove their claims.

20                   Now, the parties have submitted extensive briefing on

21   the motion to dismiss.  There's probably more than a hundred

22   pages of briefs that were filed.  I've read all those filings.

23   I've read the cases and the statutes cited in those filings.

24   The purpose of the argument today is to give me an opportunity

25   to ask the lawyers questions that I have based upon my review of

1   the parties' filings.  This questioning will either confirm the

2   preliminary opinions that I have formed based on my review of

3   the filings or it will change my mind.  I hope to be in a

4   position at the end of the argument today to orally announce my

5   decision and then follow that up with a short written order

6   memorializing that ruling.

7           With that, let's begin with appearances of counsel.

8           For the plaintiff.

9           MR. SAFIER:  Your Honor, Paul Safier on behalf of the

10  plaintiffs.

11          MS. OBERLANDER:  Lynn Oberlander for the plaintiffs.

12          MS. AGARWAL:  And Shalini Agarwal for plaintiffs.

13          THE COURT:  Who do you anticipate doing most of the

14  argument today?

15          MR. SAFIER:  That's a great question, Your Honor.

16  Hopefully this won't be too cumbersome.  I'm taking on the First

17  Amendment issues and other threshold issues to the extent that

18  they come up.  My colleague, Ms. Agarwal, is taking on the equal

19  protection issue; and my colleague, Ms. Oberlander, will discuss

20  the issues that are going forward relating to 1069 and potential

21  statutory changes in the legal regime.

22          THE COURT:  All right.  Well, I will try to remember

23  that.

24          MR. SAFIER:  I appreciate that, Your Honor.

25          THE COURT:  All right.  And for the defendants.

1          MS. SMITH:  Good morning, Your Honor.  Nicole Smith on

2     behalf of the defendant, Escambia County School Board.

3          MR. GROSHOLZ:  Good morning, your Honor.  Jeffrey

4     Grosholz also on behalf of the Escambia County School Board.

5          THE COURT:  And how do you-all anticipate breaking up

6     your argument?

7          MS. SMITH:  I anticipate speaking on behalf of the

8     Board.

9          THE COURT:  All right.  And for the State?

10         MR. FORRESTER:  Good morning, Your Honor.  David

11    Forrester on behalf of the State of Florida.

12         MS. O'HICKEY:  And Bridget O'Hickey on behalf of the

13    State.

14         THE COURT:  And how do y'all anticipate spending your

15    time?

16         MS. O'HICKEY:  I'll be arguing, Your Honor.

17         THE COURT:  All right.  Well, very well.  This is the

18    defendant's motion to dismiss, so you have the floor first.

19         MS. SMITH:  May I approach, Your Honor?

20         THE COURT:  Yes, ma'am.

21         MS. SMITH:  May it please the Court, Your Honor.

22         Today I will be speaking on behalf of the Escambia

23    County School Board in support of our motion to dismiss.

24    Ms. O'Hickey from the Solicitor General's office will be

25    speaking on the issue of government speech.  So for purposes of

1    today's argument, I will dive right into the First Amendment,

2    but that does not withstand, you know, the arguments that she

3    will make today that the First Amendment does not apply for the

4    reasons that she will set forth to you today concerning

5    government speech.

6              THE COURT:  Okay.

7              MS. SMITH:  Okay, Your Honor.

8              Does Your Honor have a preference as to how I shall

9    proceed?  Would you like to address the questions that you

10   posed, or may I --

11             THE COURT:  Well, I guess on the First Amendment, what

12   I didn't see in your brief -- or I guess the State primarily

13   addressed the government speech issue.  What I didn't see from

14   your brief is what you think the standard is.  I thought your

15   brief essentially said, We don't think the First Amendment

16   applies.  But what I didn't see was if I disagree with that,

17   which I'm inclined to do absent Ms. O'Hickey changing my mind,

18   what standard applies here.

19             MS. SMITH:  So, Your Honor, as to the viewpoint

20   discrimination claims, we believe that the *Hazelwood* standard

21   should apply, and we believe that the *Hazelwood* standard is a

22   subset of the larger forum analysis that these -- the First

23   Amendment juris prudence has set forth.

24             THE COURT:  And for the benefit of the people who have

25   showed up here and aren't students of *Hazelwood*, what does that

1    mean?  What does that allow the School Board to do?

2            MS. SMITH:  So in *Hazelwood*, the U.S. Supreme Court

3    held that a school board is permitted to regulate content if the

4    regulation is based upon legitimate pedagogical purpose.

5            THE COURT:  And how is that different from the

6    plurality in the *Pico* decision?

7            MS. SMITH:  So, Your Honor, in the plurality decision

8    in *Pico*, the decision held that a school board may not

9    discriminate based upon solely political orthodoxy, partisan

10   concerns if that is the only basis for regulating that speech.

11           So *Pico* was similar to *Hazelwood* in the sense that it

12   spoke to if the only reason was so-called viewpoint

13   discrimination, if the School Board says, for example, we are

14   not going to allow any republicans to have books in the library,

15   if it is per se discrimination, if that is directly stated as

16   the reason for the regulation, *Pico* says, according to the

17   plurality at least, that that is not permissible.

18           THE COURT:  And I guess what confuses me a little bit

19   is how that's really any different than *Hazelwood*, how that's

20   different than a limited public forum.  I mean, essentially

21   what -- maybe the question is how could a restriction that says

22   no republican books can be in the library, how could that have a

23   pedagogical purpose?

24           MS. SMITH:  According to *Hazelwood*, if, in fact, it is

25   solely based on viewpoint discrimination, the Court would likely

1    have to strike down that regulation -- again, if it's not

2    government speech -- based upon both *Hazelwood* and *Pico*.

3            THE COURT:  So it seems to me no matter what standard

4    applies here, assuming the First Amendment applies, we get to

5    the same point that the government -- and I don't think the

6    plaintiffs, and I'll ask them, of course -- I don't think

7    they're arguing any different, that the government can make

8    content-based determinations.  It just has to have a -- I'll use

9    the word "legitimate" -- reason to do that.

10           MS. SMITH:  Yes, Your Honor.

11           THE COURT:  Is that kind of the essence of the

12   standard the School Board think applies here?

13           MS. SMITH:  We do.  And we believe that the *ACLU v.*

14   *Miami-Dade School Board* case sort of illuminates where we will

15   ultimately get in these cases.

16           First of all, that is the only case in our circuit

17   that has dealt with the issue that is at hand in this lawsuit,

18   which is the removal of a school library book.  The Eleventh

19   Circuit has plainly said that *Pico* is not binding precedent.

20   But what the Eleventh did in the *ACLU* case is went a step

21   farther and said even if *Pico* applies in that case when the

22   *Miami-Dade School Board* removed that one book, the *Vamos a Cuba*

23   book, there was a legitimate basis.  The legitimate basis there

24   was factually inaccuracies.

25           THE COURT:  Right.  And so it seems to me that there

1    are two categories of books here.  There's the category of books

2    that are pornographic, prohibited under 847.012, or depicting

3    sexual conduct as defined by state statute.  The books that fall

4    into that category, it seems to me the School District would

5    have a fairly easy ability to show there's a legitimate

6    pedagogical reason for excluding those books.

7        But then there's the other category of books that fall

8    into the -- just to use a vernacular -- a "woke" category, the

9    HB 1557 category of books.  That seems to me to be where the rub

10   is in this case.  Am I missing something?

11       MS. SMITH:  Well, Your Honor, I completely agree with

12   you as to the first part of your statement.  The statute

13   1006.28, the amendments that were codified as of July 1st, 2023,

14   clearly prohibit any books that are pornographic or depicts or

15   describe sexual conduct.  However, as to --

16       THE COURT:  That's not -- that's new in the sense of

17   it was clearly articulated, but I think it's always been -- not

18   always, but it's long been Florida law that that kind of

19   material can't be provided to children.

20       MS. SMITH:  Agree, Your Honor.  And the distinction I

21   was making there with the amendment was the restriction.

22       So as the Court has noted, there are the removed

23   books.  There are ten of them.  They're in a chart in

24   plaintiffs' Complaint.  But then we have over 150 or so books

25   that have been restricted because of the language in the

1   amendments of the -- I'll call it the "library materials law" --

2   but that prior to the amendment, the School Board had discretion

3   whether upon its review of the book, you know, first path -- the

4   first review, whether the superintendent in coordination with

5   the media -- the media specialists believed that it met that

6   standard.  Now, the School Board does not even have that

7   discretion anymore.  The law provides that the District must

8   immediately restrict those materials within five days.  This

9   is --

10          THE COURT:  Based merely on an allegation?

11          MS. SMITH:  Merely on the allegation.  If the

12   challenge --

13          THE COURT:  So if someone comes in and *Goodnight Moon*

14   is on the kindergarten library, and they -- somebody comes in

15   and says this book contains pornography or sexual content, the

16   School District has no discretion, they must pull that off the

17   shelves until they complete their review?

18          MS. SMITH:  Correct, Your Honor.  So that is a very

19   important change that occurred.  And because the plaintiffs'

20   allegations are confined to the period of time prior to the

21   enactment of these amendments that we're discussing, any relief

22   that is ordered by the Court is going to run headfirst into that

23   new law.

24          For example, if the Court were to order the District

25   to immediately return one of these books that the challenge

1   alleged included sexual -- you know, depiction of sexual

2   conduct, that would be in violation of this law.

3           THE COURT:  We're here on a motion to dismiss, so I

4   have to assume that everything that's alleged in the Complaint

5   is true, and I think -- I'm pretty sure.  And I don't know if I

6   have the paragraph in front of me, but I'm pretty sure they

7   allege that none of these books that they're challenging here

8   that are part of the suit meet those criteria, do they not?

9           MS. SMITH:  That is their characterizations of many of

10  these books.  Keep in mind, again, Your Honor, part of our issue

11  with the shotgun pleading and the standing that I hope to

12  persuade you are valid arguments is we don't understand at this

13  point are they making allegations about all 150 restricted books

14  plus the ten books; that, in fact, every single one of those

15  challenges do not, in fact -- are not accurate?  We just don't

16  know.  And we don't know if the plaintiffs are asking this Court

17  to say that each of their clients have standing to have their

18  rights vindicated with regard to all 160 books.  We just don't

19  know that.

20          THE COURT:  Let me ask about that.  Maybe I'm confused

21  about what the facts are.

22          It was my understanding that there are ten books that

23  have been removed for one reason or another, whether they're

24  pornographic, whether they're -- using my vernacular, not trying

25  to offend anybody, but -- the "woke" vernacular, that they fall

1    into one of those two categories.  They've been removed.  So

2    there's ten -- there's a known universe of those.  Of the other

3    books that have been restricted, do all of those fall into the

4    pornographic/sexual content category or some of those restricted

5    for being woke?

6        MS. SMITH:  Right.  And I never answered the woke

7    question, so let me begin my answer with that to make sure we're

8    on the same page.

9        The statute, as Your Honor noted, 1006.28 Florida Law,

10   has long provided not only that pornographic and depictions of

11   sexual conduct should not be necessarily in our school

12   libraries, it also had language as to the suitability to the

13   student needs and their ability to comprehend the materials

14   presented or whether the content is inappropriate for the grade

15   level and age group for which the material is used.

16       So that language has been around for a long time.  So

17   rather than call it the "woke" language, I'll refer to it as the

18   "age appropriate" --

19       THE COURT:  I like that better.  That won't offend

20   anybody.

21       MS. SMITH:  Okay.  So whether a book is age

22   appropriate or not, there are books of the 150 and of the ten

23   books that were either being challenged on those bases alone or

24   in addition to.

25       So my point is it would be a case-by-case analysis of

1    each of the challenges to the almost 160 books that are at issue

2    in this case to determine what was the basis for the challenge.

3    And, Your Honor, importantly -- I don't want this point to be

4    missed -- it's not just the basis for the challenge when we talk

5    about the removed books.  It's also what was the basis for the

6    School Board's action.

7            THE COURT:  Right.  And --

8            MS. SMITH:  It does not necessarily adopt the --

9            THE COURT:  I understand that.  But I guess where one

10   of my questions that I asked the parties to be prepared to

11   discuss was as I understand the School District's current

12   policy, it is if someone comes in and challenges *Goodnight Moon*

13   because it's got sexual content in it, that gets pulled off the

14   shelf, by statute, within five days without any debate,

15   discussion, or analysis.  If somebody comes in and challenges

16   *Goodnight Moon* because it's age inappropriate, it stays on the

17   shelf until the challenge is complete, correct, under current

18   policy?

19           MS. SMITH:  Under the current policy, that is correct,

20   Your Honor.

21           THE COURT:  And so my question, I guess, is why are

22   any books currently restricted that are only being challenged

23   for being age inappropriate?

24           MS. SMITH:  Well, the answer's complex in terms of the

25   internal machinations of the School Board.  I will tell you that

1   the review is ongoing.  There are, of course, thousands of books

2   in our school libraries.  So we're dealing with not, of course,

3   just the challenges brought today but trying to make sure we are

4   implementing this law that has been the priority to all of, I

5   think, our District to not run afoul of this law.  And so --

6          THE COURT:  What independent review the District is

7   doing apart, I'm not sure is at issue in this case.  What I

8   understood to be at issue in this case were just the books that

9   have been challenged and put on the restricted list.

10          MS. SMITH:  Right.  So as to the restricted books, if

11   we're just talking about the 150 books, if indeed one of our

12   media specialists goes through, reviews the particular book, has

13   to go through the challenge, has to go through the whole process

14   to make sure there is no depiction of sexual conduct, there is

15   no prohibited pornography, it's not vulgar, it's not obscene,

16   then they have to make a determination whether it is what we're

17   calling age appropriate.

18          THE COURT:  I know it's a cumbersome process, a

19   time-consuming process, and that's another question I have that

20   maybe we'll talk about when we get to the end of this of where

21   we're going next.

22          MS. SMITH:  Right.

23          THE COURT:  Because it certainly seems to me that one

24   thing that is lacking in the District policy is a time frame for

25   completing that review.  And I understand it's got to be

1    cumbersome to have everybody sit down and have a book club and

2    read these books, but there doesn't seem to be anything in the

3    policy that says when that's going to be done.  And so if what's

4    happening is somebody walks in and says *Goodnight Moon* has

5    sexual conduct in it, it gets put in the restricted zone within

6    five days, and it's just in there in purgatory until this

7    bureaucratic process runs its course.

8              MS. SMITH:  Right.

9              THE COURT:  That to me -- there's a problem with that.

10   I don't know if that's a constitutional problem, a government

11   bureaucracy problem, what it is, but that seems to be something

12   that perhaps the parties can figure out a way to resolve part of

13   this case in that manner.

14              But I guess my real question is, it seems to me that

15   given the policy the School Board has adopted that says if

16   somebody comes in and says there's sexual content in this book,

17   by state law we have to take it off the shelf, we've got no

18   debating, discussion with that, that makes sense to me -- and

19   I'll see if the plaintiffs can persuade me that there's a

20   constitutional problem with that.  But as for any other book

21   that might currently be restricted, if it's only challenged for

22   being age inappropriate, under the District's own policy, it

23   shouldn't be restricted.

24              And it seems like that would help get -- narrow the

25   focus down that at the end of this process I'm reading ten books

1  rather than 160 books, that these books that somebody believes

2  are age inappropriate and shouldn't be -- or woke or whatever

3  they believe -- shouldn't be on the shelves, the School Board

4  has made a policy decision that they should be on the shelves

5  until they complete the review.  And that seems to be

6  inconsistent with having a list of 150 books that have books on

7  it that, under the current policy, wouldn't be on there.

8            MS. SMITH:  Yes.  And to be fair, this is not the only

9  lawsuit that -- you know, the School Board is a target

10  defendant.  So while litigation is ongoing, the laws are being

11  challenged, I do think that there is a hesitation as to --

12            THE COURT:  I understand.  This is the only lawsuit

13  I'm concerned about.

14            MS. SMITH:  Fair.  I understand.

15            THE COURT:  And the only lawsuit that I have control

16  over.

17            MS. SMITH:  Totally understood, Your Honor --

18            THE COURT:  Okay.

19            MS. SMITH:  -- but just for context.

20            So the additional point that I think Your Honor made

21  in your questions to the parties was what about this opt-in

22  form.  And I think that's a very fair question because the

23  policy does not prohibit any one of these parent plaintiffs from

24  filling in one of these opt-in forms if it is a book that does

25  not fall within the pornographic or depicting sexual content,

1    you know, that there can be access gained potentially.  To my

2    understanding, none of those opt-in forms have been filled out.

3              THE COURT:  And so is that still available for

4    parents?

5              MS. SMITH:  As long as it is not -- as long as the

6    challenge -- because, again, it's based on the challenge.  As

7    long as the challenge is not made on the basis of

8    sub-subparagraph b.(I) or sub-subparagraph b.(II) of the library

9    material statute, that should be available.

10             THE COURT:  And I guess the reason -- and I appreciate

11   the representation and the confirmation, because the way I came

12   across that in doing the research on this, I guess I had

13   found -- I don't know if it was attached to the pleadings or I

14   came across it in my independent research -- a prior version of

15   the School Board's policy where there was actually reference to

16   that in that prior version.  It's no longer in the current

17   policy.  But your representation is even though it's not in the

18   current policy, it's still available to parents?

19             MS. SMITH:  Yes.  The policy is completely silent on

20   that and so is the statute.  So as long as the parent opts in,

21   my understanding is that a book that -- as long as it does not

22   have -- and, again, the challenge has to be the guiding force,

23   so if the challenge includes allegations of pornography, sexual

24   content, anything under those provisions of the law, our hands

25   are tied, completely tied.

1          THE COURT:  And so that's just for restricted books,

2     not for removed books?

3          MS. SMITH:  Correct.  Not for removed books.  The

4     policy, as Your Honor has read, once the book is removed, then

5     that is for the period of five years, absent the provisions of

6     the special magistrate and if a parent wants to try to go

7     through that appellate route.

8          THE COURT:  On the special magistrate, is it the

9     District's position that a parent who is aggrieved or believes

10    they're aggrieved by the removal of the book, is it your view

11    that that parent has the ability to use the special magistrate

12    process?

13         MS. SMITH:  We believe so based on the law, and that's

14    what our arguments were founded upon.  I think that the

15    administrative -- the subsequent administrative regulation

16    suggests that it might be a little bit narrower as to what the

17    availability was.

18         So when we set these arguments forth, it seemed to us

19    like the parent could bring that type of challenge through the

20    special magistrate process so that the state Board of Education

21    would be the final decision-maker.  Since the promulgation of

22    the administrative rule, we are not believing that to be the

23    case anymore.

24         THE COURT:  And I would agree with you on that.

25    Particularly, I think that also undercuts the School Board's

1  original argument that, we, the School Board, are no longer the

2  final decision-maker.  The final decision-maker is the

3  commissioner of education.  I think you would agree at this

4  point, based on the administrative rule where the commissioner

5  of education says this process can't be used to put books -- to

6  remove books from the shelves --

7          MS. SMITH:  Right.

8          THE COURT:  -- that's a disclaiming of the State being

9  the decision-maker.

10          MS. SMITH:  I agree.

11          THE COURT:  Okay.

12          MS. SMITH:  It seems like the final rule states that

13  it's more to make sure that the districts are abiding by the

14  procedural processes that should be in place.  But, yes, I agree

15  with that.

16          THE COURT:  Do you know, obviously well beyond the

17  record and the argument we're dealing with on motion to dismiss,

18  but just out of curiosity, do you know if that special

19  magistrate process has been used?

20          MS. SMITH:  I do not, Your Honor.  Not to my

21  knowledge.

22          THE COURT:  I don't either.  What I found most

23  interesting in it, being a former administrative law judge, that

24  they have co-opted DOAH into having a hearing that if I was the

25  ALJ, what do you want me to find?  But, irrespective.

1          All right.  I'll let you continue.

2          MS. SMITH:  Okay.  So if I could return to the

3    impermissible shotgun pleading argument, which is one of our

4    threshold issues here.

5          Because the counts have commingled the plaintiffs

6    together and because each count incorporates the previous

7    paragraphs and because there's an omnibus prayer for relief, we

8    honestly were not certain as to which particular books, which

9    plaintiffs, you know, were claiming they could vindicate their

10   rights for.  For example, is PEN, the organization, saying that

11   it has the right to bring a claim on behalf of all of the ten

12   removed books and all of the 150 books?

13         And this sort of bleeds into standing as well,

14   because, for example, with the parents, the parent plaintiffs on

15   behalf of their children have said on the right-to-receive

16   claim -- which we haven't talked about yet, but we will -- that

17   their child, for example, wanted to read, you know, one or two

18   of the books on the removed and/or the restricted list.

19         Certainly, there needs to be some sort of clarity in

20   this Complaint so that the Court and School Board knows which

21   books are at issue as to which plaintiffs.  It can't be the case

22   that just because Judy Blume is an author of some book that --

23   and she happens to be a member of PEN, you know, which book is

24   it that you're referencing?  Why is she referenced in the

25   Complaint?

1          It can't be the case, Your Honor, that these

2     plaintiffs, the parents on behalf of the children, that they can

3     seek this Court to redress their rights as to each and every of

4     the 160 books at issue.  If that was the case -- and, again, I'm

5     kind of bleeding shotgun pleading and standing together, but

6     it's just -- we truly do not understand the Complaint as it is

7     currently drafted.

8          THE COURT:  How would -- what would make it

9     understandable to you?  I mean, I guess what --

10         MS. SMITH:  Sure.

11         THE COURT:  I mean, it's already --

12         MS. SMITH:  It's very lengthy.

13         THE COURT:  -- 80 pages and 240 paragraphs, a lot

14     longer than it needs to be.  But to plead it in the way that you

15     seem to want it, it would probably be twice that or maybe ten

16     times that because you have allegations as to each book and each

17     plaintiff and, you know, 40 counts rather than three counts.

18         MS. SMITH:  I don't mind if it's in one count, but

19     tell me that this author wrote these books and that the

20     association or the organization is suing -- are they suing on

21     behalf of all of the 160 books?

22         What we realized -- and, again, this is outside of the

23     record on the motion to dismiss, but when we received the

24     discovery requests, they were seeking documents and information

25     on all of the 160 books.  So we just independently went out and

1    did research to try to figure out who these authors were, which

2    books did they actually write of the 160 or so books, you know,

3    the universe of books that were at issue.  Is that person a

4    member of PEN?  You know, we shouldn't have to go out and do all

5    that homework.

6           I think if the Court is looking for a way to narrow

7    this case and not want to have to read 160 books, that would be

8    a very efficient way to require the plaintiffs to actually

9    identify which books are at issue or are they, in fact -- and

10    they'll tell us today -- are they, in fact, claiming that their

11    plaintiffs, their clients have the right to sue on behalf or in

12    connection with all of these 160 books?  That's the question.

13           THE COURT:  At least -- I read the Complaint, at least

14    as to the parents, that's the case.

15           MS. SMITH:  I hope that's the case because that's

16    exactly what the Eleventh held in the *ACLU* case.  The parent

17    there was trying to claim that he could redress his rights as to

18    the whole -- there's a travel series called *Vamos a* -- fill in

19    the blank, whether it's Cuba or the country.  And the

20    Eleventh there said he could only bring the claim as to the

21    *Vamos a Cuba* book, not the travel to Ireland, not the travel to

22    England, because there were no allegations in the Complaint or

23    any of his declarations that his child actually sought to check

24    out or read those books.  So that's --

25           THE COURT:  Isn't that different than what we have

1    here?  We have allegations that these children wanted to read

2    these restricted books but couldn't.  I don't know if that's

3    true.  They're going to have to put these kids on the stand, put

4    them under oath, and swear to that; but at this point, I have to

5    accept that as true, and so how doesn't that cover all the

6    books?

7              MS. SMITH:  Well, then I think we have a serious issue

8    as to the standing allegations because they -- if they are truly

9    claiming that each one of these students sought to read these

10   books, then they have to make those allegations.  That's not

11   what the factual allegations say.  The factual allegations only

12   reference a couple -- they only identify a couple named books

13   for each parent plaintiffs.  So in terms of --

14             THE COURT:  Let me -- while it's fresh in my mind, the

15   parents have sued on their own behalf and on behalf of the

16   children.  And I think the *ACLU* case talked about -- and you

17   touched on it -- it talked about standing on behalf of the

18   child.  And essentially, there has to be some immediacy, that

19   the child wanted to read this book this semester.

20             MS. SMITH:  Right.

21             THE COURT:  And I read that to be in here.

22             As to the parent, the parent, I think in that case,

23   was found to have standing because the library policy in

24   Miami-Dade County was, in effect, that parents were also patrons

25   of the school libraries.

1          MS. SMITH:  Right, very different.

2          THE COURT:  Is that -- I don't know if they've alleged

3     that to be the case here, but is that the case here?

4          MS. SMITH:  It is very different.  I think that just

5     is -- you know, older times we were able to have our school

6     districts' libraries open more to parents than we are today.

7     Today, no.  The Escambia County school library, a parent can't

8     just walk in and check out books.  That is not the case, I don't

9     think, of any of our Florida districts given, you know,

10    post-Marjorie Stoneman Douglas and all of the -- you know, the

11    hardening that has been undertaken, so --

12         THE COURT:  And I guess I don't have to decide today

13    whether the parents have standing on their own behalf if I

14    conclude that the parents have standing on behalf of their

15    children who want to check out -- who have intentions.  They

16    allege they have intentions -- to check out the challenged books

17    but can't because of the restrictions or removal.

18         MS. SMITH:  Yes.  My understanding is that the parents

19    brought the representation --

20         THE COURT:  But the problem -- and I'll talk to the

21    plaintiffs about that.  I want to be very clear what that means

22    is these children are going to be forced to testify, under oath,

23    that they, in fact, want to check out these books.  And y'all's

24    seven-year-olds may be different than my seven-year-olds were,

25    but I've got an allegation that a first-grader -- so maybe a

```
 1   six-year-old -- is particularly interested in books about

 2   families and different family arrangements.

 3            When my kids were seven years old, they were

 4   interested in -- not that.  And it seems hard to believe that

 5   that's the case, but I have to accept that as true.  And I think

 6   it's just a -- obviously these people got involved in this

 7   lawsuit because they believe in the cause, but I think it's very

 8   important for them to understand that they're putting their

 9   children on that witness stand, under oath, to testify to things

10   that I can't imagine a first-grader can testify to.

11            But, again, that's beyond where we are today.  You're

12   talking about standing, and I guess I'm struggling to understand

13   how if the Complaint can be construed in the way I've construed

14   it that each one of these kids wants each one of these removed

15   books -- and had an intention to check out each one of these

16   removed books -- how that doesn't address both your shotgun

17   pleading standpoint and standing issue, at least to the kids.

18            MS. SMITH:  Well, I think because later in the

19   Complaint the parents on behalf of their children do identify

20   names of particular books.  And that's where I'm saying there's

21   only one or two books identified.

22            So I don't know that a fair reading of the Complaint

23   that, you know, satisfies standing is that these children want

24   to read all 160 or so books.  So I think that's very helpful to

25   have this argument today because we are concerned about not just
```

1    what Your Honor expressed, but trying to streamline this case.

2              THE COURT:  Well, and to that point, I do agree with

3    you when we get into the 170-paragraph portion of the

4    Complaint -- I didn't say that right.  Paragraph 170 and

5    thereabouts in the Complaint, it does tie specific children to

6    specific books.

7              I didn't go through with the chart, but my assumption

8    was -- maybe I shouldn't have made an assumption.  My assumption

9    was each one of the removed books has one or more parents or one

10   or more children, rather, associated with it.  So somebody is

11   saying they want to remove each one of the removed books.  Your

12   issue is with restricted books.

13             MS. SMITH:  With the restricted books, Your Honor.  I

14   honestly didn't do that cross-reference either because I just

15   wasn't certain -- or if I did, I've since now forgotten.  I

16   apologize.  But under *Lujan* these someday intentions are not

17   enough as to -- aside from the books that are specifically

18   identified:  My child wanted to read X book.  That might be

19   enough.  But these generalized intentions of, I just have an

20   interest in, like you said, family issues, that is not enough to

21   provide them standing to redress their rights over.

22             THE COURT:  Right.  And to be fair, that parent's --

23   or that plaintiff alleged they wanted to read *Tango*, *Aidan*, and

24   *Uncle Bobby's Wedding.*

25             MS. SMITH:  Right.

1        THE COURT:  And, again, they're going to have to get

2   up on the stand and tell us that at some point.

3        Is *Tango* the one about the two penguins?

4        MS. SMITH:  Yes, sir.

5        THE COURT:  I mean, I can imagine seven-year-olds

6   saying, I really like penguins, I want to read a book about

7   penguins.  I can't imagine a seven-year-old saying, I want to

8   read a book about different family arrangements.

9        MS. SMITH:  Right.

10       THE COURT:  And that just happens to be a book about

11  different family arrangements.  I mean, it may be semantics --

12       MS. SMITH:  Yes.

13       THE COURT:  -- but it will come out in the

14  examination.

15       MS. SMITH:  Yes.  And I don't want to kick a dead

16  horse here, but we have the same problem with the author

17  plaintiffs.  I would assume the author plaintiffs are alleging

18  they only have standing to sue in regards to the books that they

19  themselves have authored.  And then I would assume that -- well,

20  I can't assume.

21       I'm not sure what PEN, as the organization, is

22  claiming, if they have standing to sue on behalf of all of these

23  books.  I don't know if they've gone through and verified

24  whether each of the authors of 160-so books are indeed members

25  of PEN, but that's sort of the connections with traceability and

1   redressability that I think are most concerning to us.

2           THE COURT:  Okay.  I guess my view of it -- and I'll

3   certainly talk to the plaintiffs about it.  My view of the

4   shotgun pleading, I mean, I agree with you in some respects.

5   This Complaint is far longer than it needs to be, it's got a lot

6   more rhetoric in it than it needs, but it seemed to me -- and it

7   incorporates every paragraph of every prior complaint, which is

8   an indication of a shotgun pleading.  But all things considered,

9   it seemed to me that it provided fair notice of the claims

10  they're asserting and the grounds upon which they're based.

11          You're at least giving me something to think about

12  there, but at the end of the day, it seemed like all of the

13  issues that you're talking about will sort themselves out in

14  discovery.  But I understand your argument.

15          MS. SMITH:  Okay.

16          And then the additional argument that we make is as to

17  Count Three, which is the right to receive.

18          THE COURT:  That would be Count Two.

19          MS. SMITH:  Oh, forgive me.

20          THE COURT:  Three is equal protection.

21          MS. SMITH:  Equal protection.  Forgive me.  Count Two,

22  as to the right to receive.

23          Your Honor, this is not a right that has been

24  recognized in the context of a public school library.  *Pico*, as

25  the *ACLU* case, the Eleventh Circuit said that is not binding

1    precedent, so there is no Eleventh Circuit case that holds that

2    these parents on behalf of their children have the right to

3    receive information --

4         THE COURT:  Why isn't that, I mean, the *ACLU* case

5    involved a parent-child who wanted -- I guess they wanted the

6    book removed, right?  No, they -- somebody wanted it removed,

7    got the Cuba book removed because it was full of factual

8    inaccuracies about Cuba.  Somebody else, another parent, said

9    no, I want my child to read that book.  The child wanted to read

10   the book.  They challenged -- the Court didn't say there that

11   they had no right to pursue that First Amendment claim.  They

12   just said the School Board had a good reason for keeping it out.

13        So I guess what I'm struggling to understand, whether

14   it's called "right to receive" or something else, it seems like

15   just by virtue of the fact that the Eleventh Circuit engaged,

16   they've recognized, there is a First Amendment right that you

17   have to have access to information from school libraries.  And

18   ultimately the question is whether that right violated.

19        So what am I missing?

20        MS. SMITH:  I have a little bit of a different

21   reading --

22        THE COURT:  Okay.

23        MS. SMITH:  -- than the Court did of the *ACLU* case.

24   The *ACLU* case, again, affirmatively said *Pico* is a fractured

25   decision.  It is not binding precedent.  So we're not going to

1   find it there.  Then they went on, they said, However, even if

2   we were to assume that *Pico* applies, which is the plaintiffs' --

3   I think they said at one point, you know, "dream standard" --

4   that that is the standard that plaintiffs believe should apply

5   here --

6                THE COURT:  Right.  Well, let me stop you.

7                MS. SMITH:  -- even if --

8                THE COURT:  Let me stop you.

9                MS. SMITH:  -- for purposes of --

10               THE COURT:  They're talking about dream standards and

11  standards.  They're talking about a standard to determine

12  whether a right has been violated or not.  Not whether it

13  exists, but whether it's been violated.  So doesn't that assume

14  that that right exists?

15               MS. SMITH:  The right to receive is a corollary of

16  whether there has been either viewpoint or content

17  discrimination.  So unfortunately for us, the Eleventh tiptoed

18  to the edge of *Hazelwood* and acknowledged *Hazelwood* but didn't

19  actually apply *Hazelwood* to this context.

20               So, no, I don't believe that that *ACLU* case, that the

21  Eleventh actually said there is a right.  Because if *Hazelwood*

22  applied, it will define what that right to receive is.  If

23  *Hazelwood* applies, Your Honor, then the School District can

24  regulate content, and that would cut off any right to receive.

25  The only way that the right to receive could coexist --

1          THE COURT:  I don't know if I agree with you there.

2     It seems -- I may agree with you on the ultimate -- and it

3     sounds like both parties are kind of arguing a similar ultimate

4     standard applies, but that assumes that there's a right there

5     that we need to evaluate whether it's been violated or not.

6          I mean, it would have been a lot easier -- I'll talk

7     to the Solicitor General about this, but it would be a lot

8     easier if the Eleventh Circuit really thought there was no First

9     Amendment protections, it could have written the NAACP page in

10    one paragraph saying that the plaintiff brings a First Amendment

11    challenge to the removal of a school book.  There is no such --

12    or that the removal of school books is government speech and,

13    thus, the First Amendment doesn't apply.  Therefore, we affirm.

14    Boom.  They're done.

15         By the same token, it seems to me if it was that there

16    is no First Amendment right here because there's no right to

17    receive information, they would have told us that.  Instead,

18    they said, We're engaging.  We're going to determine whether

19    that right has been violated, and here's the competing standards

20    we have to look at.

21         MS. SMITH:  Your Honor, yes, other circuits have read

22    *Hazelwood*, other sister circuits, to hold that there is no

23    viewpoint discriminations within public schools.  The Eleventh

24    Circuit has held in *Searcey*, which was not a case about public

25    schools, that it does apply even under the *Hazelwood* standard,

1   that even though school districts can regulate content, that

2   they still cannot discriminate based on viewpoint.  I don't know

3   if the argument of government speech was or was not made --

4            THE COURT:  Right.

5            MS. SMITH:  -- within the *ACLU* case, but I completely

6   agree with you that if Ms. O'Hickey is able to convince you that

7   government speech applies to the curation of these school

8   library books --

9            THE COURT:  We can all get lead --

10           MS. SMITH:  -- discussions and no right exists it, so.

11           THE COURT:  All right.  Well, let me ask you this.

12   The way I looked at Count One and Count Two, it's the same --

13   it's a First Amendment claim, and it's just looking at the First

14   Amendment from different context.  Count One is looking at the

15   First Amendment based upon the speaker:  The publishers, the

16   authors.  They're the ones who are speaking.  Count Two is

17   looking at it in the context from the receiver of the speech,

18   the listener.

19           MS. SMITH:  Yes, Your Honor.

20           THE COURT:  And each one of them -- and I know you may

21   disagree, but it seems like each one of them has First Amendment

22   rights in some way that are being restricted, and the -- really,

23   the ultimate question -- both counts, they're looking at the

24   same standard -- we're determining whether we can discriminate

25   against the speaker by saying, Your viewpoint is not welcome

1    here because this pedagogical reason.  And we're telling the

2    receiver, You can't receive that speech here because it's

3    inappropriate for pedagogical reasons.  It seems like it's two

4    sides of the same coin, and I'm just struggling to understand

5    how there can be a First Amendment right on one hand, but not a

6    First Amendment right -- on Count One, but not a First Amendment

7    right on Count Two.

8              MS. SMITH:  Well, we don't agree that any court -- as

9    to the first count -- that any court has held that an author or

10   a publisher or a member -- professional organization on behalf

11   of those authors have the right to bring a claim based on

12   viewpoint discrimination, that alleges their book must be in our

13   public schools, that we do not believe that they have alleged

14   standing properly to show that what they are asking this Court

15   to do, that there is any traceability, any redressability, any

16   connection between what these folks up here in Count One are

17   asking the Court to do and ultimately the relief that this Court

18   can address.

19             We believed that on a motion to dismiss, it was very

20   difficult, given -- again, maybe we were at a disadvantage in

21   reading their Complaint.  We thought this case was about 160

22   books, so we didn't move to dismiss Count One because could

23   there potentially be a cause of action there?  Maybe.  But based

24   upon our reading and the breadth of the Complaint, we did not

25   bring it.  But we do -- I do believe -- I do agree with what the

```
 1    Court is saying with two sides of the same coin, Your Honor.
 2            THE COURT:  So the School Board did not move to
 3    dismiss Count One on anything other than government speech, or
 4    not at all?
 5            MS. SMITH:  We moved to dismiss on government speech,
 6    on impermissible shotgun pleading, and on standing.
 7            THE COURT:  Okay.
 8            MS. SMITH:  I think we also at that point had some of
 9    those mootness issues that we --
10            THE COURT:  Right.
11            MS. SMITH:  -- no longer believe to be the case.
12            THE COURT:  All right.  Well, I think we've beat the
13    First Amendment to death here.  If you want to talk to me about
14    the equal protection claim, or you may want to save that for
15    rebuttal, because my preliminary assessment of that is it's not
16    an equal protection case.  This is a First Amendment case.  And
17    I have even greater concerns about the equal protection
18    component of this as to the kids.
19            And, again, I know it's not my job to protect their
20    clients, but if the allegation is that these removal decisions
21    are having a disparate impact on minority and LGBT students, at
22    some point, we've got to have a minority student and an LGBT
23    student to assert those claims.  And I see in the allegations
24    that there are at least minority parents, in which I can infer
25    they're minority students, but I didn't see a single allegation
```

1    as to whether any of these children are LGBTQ children.  And I

2    certainly hope this is not going -- if that count was allowed to

3    go forward, that we weren't going to be outing elementary school

4    kids and high school kids in federal court.

5         And so I have a grave concern about that going

6    forward.  I'm obviously -- if they show me, if they can convince

7    me that they've alleged a plausible claim, we'll do that, but it

8    just seems to be a dangerous thing to try to do.  And even more

9    fundamentally, I think your argument, if I understood it, is

10   they're conflating the -- whatever animus there may be against

11   topics of books with animus against discrete protected classes.

12   Is that right?

13        MS. SMITH:  Yes, Your Honor.  It's hard for lawyers to

14   shut up, but I don't think I can make my argument any better.

15   So if I --

16        THE COURT:  Well, I'll let you reserve on that --

17        MS. SMITH:  Thank you.

18        THE COURT:  -- and maybe Ms. Agarwal will convince me

19   that that's a viable and wise equal protection claim and First

20   Amendment case.

21        But at this point, I think you've answered all of the

22   questions that I raised in the order setting oral argument.  So

23   I will let you sit down, and we'll hear from the State.

24        MS. SMITH:  Thank you, Your Honor.

25        THE COURT:  Thank you.

1           All right.  Ms. O'Hickey.

2           MS. O'HICKEY:  Good morning.

3           THE COURT:  All right.  Just to set the stage for

4   those in the audience who aren't familiar with all of the

5   nuances, the State of Florida's position is that the content

6   of -- or the collection of books that are in the school

7   district -- or school libraries, that decision as to what to put

8   in and what to take out is government -- is the government

9   speaking and, thus, the First Amendment does not apply.

10          MS. O'HICKEY:  That's correct, Your Honor.

11          THE COURT:  Okay.  Tell me why you think that may be

12  the case.

13          MS. O'HICKEY:  Okay.  If I may just start from the

14  top.

15          THE COURT:  Sure.

16          MS. O'HICKEY:  The Court should grant defendant's

17  motion because the plaintiffs failed to state a First Amendment

18  or a Fourth Amendment Equal Protection claim because, as you

19  said, the selection of public school library materials is

20  government speech, and when the government speaks, it freely

21  selects the views it wants to express.

22          Plaintiffs advance the position that the First

23  Amendment requires the government to promote their preferred

24  materials in public school libraries.  And under their view,

25  because a library is, at a minimum, a nonpublic forum, the

1    government would be forbidden from refusing to carry a book

2    because of its viewpoint, whether it expresses -- no matter

3    whether the viewpoint expressed is so reprehensible or

4    antithetical to the government's --

5            THE COURT:  Well, help me understand, just at a

6    fundamental level, this is -- you're right.  This is an argument

7    that, if I agreed with it, that would end this case because

8    there's no First Amendment protection, there's no 14th Amendment

9    protection.  That would be the end of the case.

10            It just seemed odd to me -- and I know the Solicitor

11   General's Office has got a lot of smart lawyers.  It seems odd

12   to me that no one has come up with this argument.  No court

13   seems to have bought this argument.  It only got four votes in

14   the dissent in *Pico*.  The *ACLU* case went through -- I don't know

15   how many pages -- discussing a First Amendment claim when they

16   could have resolved that entire case in a sentence.

17            Doesn't that cut against the idea that this is

18   government speech if no one else has come up with that idea

19   before now?

20            MS. O'HICKEY:  I don't think so, Your Honor, because I

21   think the stage at which you're deciding now is different, the

22   legal stage, as far as the precedence that we have, that -- the

23   cases the Eleventh Circuit has decided and the Supreme Court.

24   Because the government speech doctrine, at least as we have it

25   today, didn't really begin until 1991 with *Rust* and then 1998

1    with *Rosenberger*, and then really, I would say, not to the

2    robust form that we have today with *Summum* in 2009.

3              So I think that explains some of my -- why perhaps

4    those arguments weren't made in the way that the State is making

5    them today before, and courts haven't decided them that way.

6              THE COURT:  Well, okay.  *Summum*, I agree with that.

7    *Summum* has just been evolving, and now we know what the

8    government speech standard doctrine is.

9              The Eleventh Circuit has be given us three factors to

10   consider in deciding whether something is government speech.

11   One of them is control, one of them is history, and the other is

12   endorsement.  And I guess what I'm struggling to understand in

13   the school library context, or the library context in general,

14   is how -- one, how can I decide each of those factors on a

15   motion to dismiss; and, second, how any reasonable person would

16   think that simply because a book is on the library shelf that

17   that's the government endorsing that speech?

18             MS. O'HICKEY:  Yeah, if I may.  First, I think it's

19   helpful to look at some of the binding precedence that we have.

20   We have applied those factors -- or I could go through each

21   factor individually if Your Honor would prefer that I start

22   there.

23             THE COURT:  Well, I guess maybe start with my

24   question.  I mean, how -- start with the endorsement factor.

25             Even if I could decide it at this stage of the case,

1   I've got a school library policy that's attached to the
2   Complaint, so it's something I can consider at this stage of the
3   case.  And what it says in one of the paragraphs -- various
4   paragraphs talk about:

5           "The purpose of the school library is including
6       materials with diverse points of view, representing
7       many religious, racial, ethnic, linguistic, cultural
8       groups to reflect their contributions to the heritage,
9       culture of our civilization."

10          It also says, "It's the duty of the District to
11      provide a wide range of materials of different levels
12      of difficulty with diversity of appeal and
13      representing different points of view, taking into
14      account the varied interest, abilities, and maturity
15      levels of the people being served.

16          "The utilization of any specific item in an
17      educational media does not necessarily mean that the
18      school or district advocates or endorses the contents
19      of the item."

20          So in light of what I have right now, assuming I could
21  make this determination at a motion to dismiss, in light of
22  that, how could I find that the endorsement prong is met when
23  you have the School District saying the whole purpose of our
24  library is to have all kinds of different views in it, and we
25  disclaim any of those views as being our own?

1          MS. O'HICKEY:  Well, first of all, I should have said

2    to your previous question, Your Honor, that in *Dean v. Warren*,

3    the Eleventh Circuit did decide the government speech issue on

4    motion to dismiss and so determined that in an appropriate case

5    that that's possible.  And I think that if you, on the face of

6    plaintiffs' Complaint, taking everything as true, that it is

7    government speech.

8          I will say with respect to the endorsement factor that

9    that doesn't look at the proper message.  It's not -- the

10   government's message is not the message of each individual book

11   and the words on the page.  It's that in selecting those

12   materials for the library, the government has said that these

13   are the materials that are appropriate for our students and

14   support the academic needs of students here.

15         THE COURT:  But is that the case?  I mean, that's not

16   what the policy says.  It says the purpose of us putting books

17   in the library is to include diverse points of view, different

18   religious, ethnic, racial, foster respect for diverse roles in

19   society.  I mean, it seems like what the government is -- what

20   the School Board is saying is that when we put something on the

21   shelf, it's for these reasons.

22         MS. O'HICKEY:  I think that's true and that the -- of

23   course, their policy is to put differing viewpoints in the

24   library, but I think that also goes back to the control factor.

25   And so the government still gets to determine, under Florida

1    Statute 1006.28(2)(d), has the -- each library or each book in
2    the school library must be approved by a school district
3    employee.  And so therefore the government still chooses which
4    of those varied viewpoints it wants to include in its library
5    and which are appropriate for its students.
6              THE COURT:  And I would tend to agree with you that
7    the control factor, of the three factors that the Eleventh
8    Circuit laid out, is the one that's strongest in favor of a
9    finding of government speech.  But it just seems to me that the
10   other factors -- endorsement, history -- because endorsement
11   looks at whether a reasonable person would believe that the
12   message being delivered is the message of the government, right?
13             MS. O'HICKEY:  That's correct.
14             THE COURT:  And so we would have to ask:  Would a
15   reasonable person believe that simply because the *Tango* book is
16   on the school library shelf that the School Board supports
17   whatever is in that book.
18             MS. O'HICKEY:  Well, I think, Your Honor, again, it's
19   which message you look at.  And the government's message here is
20   not the message of each individual book, words on that page.
21             For example, *Gundy*, the Eleventh Circuit said that it
22   wasn't the message of each invocation speaker that was the
23   government speech, but it was the selection of those speakers
24   and in inviting them that was the government speech.
25             And so, too, here, I think a reasonable member of the

1    public --

2          THE COURT:  Well, then how -- I guess I don't

3    understand that.  I haven't looked at any of these books.  I

4    don't know what their covers or their spines have on them.  But

5    I think I have, at one point or another, seen the cover of the

6    *Tango* book, and it's got two penguins sitting on an egg.  And so

7    for somebody to think that that's the government putting that on

8    the shelf, is somehow endorsing any idea, they would have to

9    know what's inside of it.

10         So it seems different than saying we're inviting a

11   Protestant speaker, a Jewish speaker, or an atheist speaker to

12   come speak.  Just simply having a book on the shelf without

13   knowing what the contents are, I don't know how you could -- I

14   guess I'm just missing your point.

15         MS. O'HICKEY:  Well, I will say that, as a practical

16   matter, I think a reasonable member of the public would

17   understand that he or she couldn't just walk into a library and

18   place a book on the shelf.  So I think that that person would

19   understand that the entity organizing the library has determined

20   that these are the books that should be on the shelf and

21   therefore appropriate for the school children that would

22   frequent that library.

23         With respect to the endorsement factor in particular,

24   as far as there being competing viewpoints expressed, the

25   plaintiffs in *Leake*, the Eleventh Circuit case about the

1    military parade, expressed a similar argument, and they argued

2    that the government couldn't endorse both union and confederate

3    floats.  But the Eleventh Circuit there said that the

4    government's message need not be -- or may not endorse any one

5    individual group's message, that it could have a different

6    message.

7            And the Supreme Court similarly said in *Summum* that

8    the act of placing private speech on government property is

9    expressive conduct, even though the government's message may not

10   be that of the private speech.

11           THE COURT:  I guess it just seems to me -- you gave me

12   a supplemental authority case, another Miami case involving a

13   piece of artwork that the City commissioned and then decided

14   that they didn't want to display.  And the Eleventh Circuit in

15   that case found that to be government speech, and so their

16   decision not to display it didn't violate any First Amendment

17   rights.

18           And I guess it seems to me that most of the cases

19   where you're involving artwork hanging in the rotunda of city

20   hall, a statute out front of city hall, a parade for which the

21   city has blocked out speech, all of those things, the message

22   being sent is -- smacks you right in the face.  And I guess I

23   don't see that as much with a book on a library shelf without

24   knowing what the content of that book is.

25           And so it just, to me, seems a lot different than all

1    of these government speech cases where you have the government

2    kind of slapping you in the face with a message, or being

3    perceived as doing that.

4        MS. O'HICKEY:  I think that, perhaps, is a somewhat

5    different message.  But I think that art, an art exhibit, is

6    speech just like books are, and they're -- the government's

7    selection of those particular pieces of artwork is really no

8    different than the selection of books in a library.

9        Or in *Summum*, for example, I don't think that anyone

10   particularly alleged that the government was endorsing the City

11   as to the Ten Commandments monument, but still the Supreme Court

12   said that the government spoke in placing that monument on the

13   property.

14       Specifically, we think that the *McGriff* case is very

15   on point here and closely analogous, which is -- to our case.

16   There, the city-sponsored art exhibit was government speech, as

17   you said, and the government was not required to display any

18   particular artwork in the exhibit that it funded, organized, and

19   promoted.

20       And I think the control factor was also particularly

21   relevant in that case.  Because there, the Eleventh Circuit held

22   that the City controlled the art exhibit because it commissioned

23   and funded the artists' work, subjected the art to the city

24   manager's approval, and provided the space.  And so, too, here,

25   with respect to the library, the School District purchases and

```
 1    approves those books, controls their display, and provides the
 2    space where they're housed.
 3              THE COURT:  You didn't prepare the amicus brief in
 4    this case, right?  You weren't on that?
 5              MS. O'HICKEY:  I was not on the brief.
 6              THE COURT:  I assume you've reviewed it before now.
 7    Would you agree with me that it doesn't discuss the three
 8    factors?
 9              MS. O'HICKEY:  It does not go through the factors;
10    however, Your Honor, we do discuss --
11              THE COURT:  Would you be surprised that the word
12    "endorsement" is not in there at all?
13              MS. O'HICKEY:  I would not be surprised, Your Honor.
14              THE COURT:  Would you be surprised that the word
15    "control" was only in there twice on a completely different
16    matter than the control factor?
17              MS. O'HICKEY:  No, that doesn't surprise me, Your
18    Honor.
19              THE COURT:  I guess that -- I have a great deal of
20    respect for the SG's office, but it seemed to me that that
21    argument was not presented -- certainly not presented in the way
22    that you're presenting it now with citations or with going
23    through the factors that the Eleventh Circuit has asked me to
24    look at, and that's troubling.
25              MS. O'HICKEY:  Well, Your Honor, the State thought
```

1    that the -- particularly in *Summum* and *Leake*, at that stage,

2    because we didn't yet have *McGriff*, that those closely

3    binding -- closely analogous binding precedents that do analyze

4    the factors were so on point that it was most persuasive to

5    discuss those authorities.

6            THE COURT:  And I guess to that point, I think the --

7    you did cite the *Leake* case which did list the factors, and so

8    you had more faith in me than you should've that I would go

9    through and figure out, based on that citation, what the

10   standards are and what the factors are.  And fortunately I have

11   very smart law clerks that can do that, but it just seems to me

12   that the better course of action would have been to articulate

13   this is -- we argue this is government speech, here is the

14   standards that apply, here's how they're met.  But that's just

15   me.  That's not a fault on you because you didn't write the

16   brief.

17           MS. O'HICKEY:  Sure.  I will say, though, however,

18   Your Honor, that the Supreme Court and the Eleventh Circuit have

19   both said that the factors are neither necessary nor sufficient

20   for determination that something is government speech; though we

21   think that they do indicate in this case that it is government

22   speech.

23           THE COURT:  So just to put a pin in this, what the

24   defendants and -- maybe not directly the State, but what the

25   defendants have criticized the plaintiffs for asking me to do is

1    adopt the view of the four-member plurality in *Pico* and the

2    standard they laid out.  What the State's essentially asking me

3    to do is adopt the view of the four dissenters in *Pico* who said

4    there are no restrictions on school library decisions.  Is that

5    a fair summary?

6         MS. O'HICKEY:  I wouldn't characterize it that way,

7    Your Honor.  I think that the State's position is that *Pico*, as

8    the Eleventh Circuit said in *ACLU*, is of no precedential value

9    with respect to the First Amendment on these issues.  And so

10   rather than characterizing it as asking you to adopt the *Pico*

11   dissenters' decision, we're just asking you to follow the

12   Eleventh Circuit and Supreme Court government speech precedent

13   in this case.

14        THE COURT:  Anything else you want to tell me about

15   government speech?

16        MS. O'HICKEY:  I would conclude by addressing briefly

17   just the right-to-receive-information claim, of course, is

18   government speech, then that would -- if no student has a right

19   to speak in the library because the government speaks with its

20   selection of materials, then, of course, there's no reciprocal

21   right to receive information, so that claim would fail.

22        And so, too, the equal protection claim would fail

23   because the government entity is entitled to say what it wishes

24   and to select its views, and so the Equal Protection Clause also

25   does not apply to government speech.

1          THE COURT:  If that's the case -- I mean, I guess it

2     just -- and obviously a higher court than me would ultimately

3     have to say that was the case.  I mean, I could say -- I can say

4     today:  It's government speech; therefore, this Complaint is

5     dismissed.  That would go to the Eleventh Circuit.  That may go

6     to the Supreme Court to address that.

7          But it just seems to me that that's a dangerous

8     conclusion to reach that, you know, here we have Escambia County

9     who, the allegation is, is deciding to remove books that are

10    LGBT, promoting critical race theory-type books, things like

11    that, that conservatives might be offended by.  You might have

12    another school district in some other community that wants to

13    eliminate all Jewish books because it's a pro-Palestine group.

14         It just seems to me that that's a dangerous precedent to

15    set if we allow elected officials in one area to essentially

16    mandate doctrine for our students.  It just seems like the

17    better view would be that the First Amendment applies.  We have

18    a standard that recognizes the school district's authority to

19    restrict books that are inappropriate for the students.  But

20    outside of that, we let the marketplace of ideas play itself

21    out.

22         Why is that not -- from a policy perspective.  And I

23    know I do law, not policy.  But why is that not a better policy?

24    Why should we allow school districts to act without any

25    constraints at all on the First Amendment in the context of a

1   school library?

2           MS. O'HICKEY:  Respectfully, Your Honor, the State

3   disagrees.  We think that the plaintiffs' position is the more

4   dangerous one.  Because there, if the school district is not

5   permitted to refuse to carry any books on the basis of

6   viewpoint, then it would have to carry books with reprehensible

7   or -- you know, books such as even *Mein Kampf*.  Or, say, for

8   example, if there are books from the 1950s in the school

9   libraries still that are holdovers from the segregationist era

10  that express positive views on those policies, then the

11  government wouldn't be able to move them -- remove them based on

12  that viewpoint.

13          THE COURT:  Why is that bad?  I guess I'm struggling

14  to understand why is that bad.  I mean, why shouldn't the

15  libraries, public or school, have *Mein Kampf* in it and *Anne*

16  *Frank's Diary* and let students see both sides of it, be

17  educated, and, in a perfect world, not perpetuate the issues,

18  the problems that the bad ideas have and go down the road of the

19  good ideas?

20          I guess I'm struggling to understand what is bad about

21  having horrible things on the library shelves, as long as

22  they're not pornographic?

23          I'm not trying to jump on the plaintiffs before they

24  get a chance to argue, but I guess I'm struggling to understand

25  why they're advocating -- or if they're advocating -- for

1   pornography to be in school libraries; and if so, that's very --

2   I don't see why we're debating that.  That should be --

3   everybody ought to agree.  Pornography shouldn't be in school

4   libraries, and we should just be focusing on these ideas that

5   are uncomfortable for some people, but why shouldn't they be in

6   libraries?

7           MS. O'HICKEY:  Because I think students are more

8   impressionable and perhaps they might not be able to look at

9   those ideas through an academic lens and they might be overly

10  influenced.

11          THE COURT:  But isn't that the parents' job?  Isn't

12  that the parents' job to say when they come home with *Tango*

13  about two daddy penguins raising an egg if their belief in their

14  family is that that is wrong?  Why is it not the parents' job to

15  say, you know, You have this book, it's talking about two daddy

16  penguins raising an egg, that's not how God made us?

17          And, again, I'm playing devil's advocate here, but why

18  is that not the parents' job to instruct their kids that what

19  they're reading is not consistent with that family's values?

20  Why is one family able to control what another family reads?

21          And it works both ways.  I don't think somebody who

22  wants something on the shelves to the detriment of everybody

23  else can have it on the shelves, but why can't this be resolved

24  by having parents say, My kid can go in the library and check

25  out any book he wants, no books, or only books that are deemed

1  age appropriate?

2       MS. O'HICKEY:  I would say, respectfully, Your Honor,

3  that the State disagrees that the government under Florida

4  statute maintains full control over the selection of books in

5  the library; and to the extent the parent wants the child to be

6  exposed to those particular ideas, of course they're free to

7  purchase at that book.

8       THE COURT:  All right.  Well, I appreciate you

9  entertaining my devil's advocacy.

10      MS. O'HICKEY:  Thank you, Your Honor.

11      THE COURT:  All right.  Mr. Safier, are you proceeding

12  first?

13      MR. SAFIER:  I am, Your Honor.

14      THE COURT:  Do you need a break, or are you good?

15      MR. SAFIER:  A break would be wonderful.

16      THE COURT:  Okay.  Let's take -- we'll take 15

17  minutes, and then we'll be back to proceed with your argument.

18      MR. SAFIER:  Thank you, Your Honor.

19      *(Recess taken from 11:12 a.m. to 11:27 a.m.)*

20      THE COURT:  All right.  Y'all can be seated.

21      Mr. Safier, the floor is yours.

22      MR. SAFIER:  Thank you, Your Honor.

23      So my name is Paul Safier.  I'm honored to represent

24  the plaintiffs in this matter.  Some of them are seated here

25  today.

 1              With Your Honor's indulgence, I would like to work

 2    backwards, so I will begin where things ended with the

 3    government speech issue and then work backwards to standing and

 4    the other issues.  Is that acceptable?

 5              THE COURT:  I would like to -- well, let me step back.

 6              MR. SAFIER:  Okay.

 7              THE COURT:  I'm still not particularly persuaded about

 8    government speech.  I'll certainly hear your argument on it just

 9    to reaffirm my view on that, but I guess a couple things I'd

10    like to --

11              MR. SAFIER:  Sure.

12              THE COURT:  -- sort of talk about while they're fresh

13    in my mind.  And I don't know whether it goes to standing,

14    whether it goes to the merits -- what it goes to, but I

15    understand correctly, do I not, that what the plaintiff has

16    challenged here are decisions that were made, whether it be to

17    remove a book or restrict a book, correct?

18              MR. SAFIER:  Correct, Your Honor.

19              THE COURT:  You haven't challenged the policy pursuant

20    to which those books have been removed or the statute which

21    might mandate the removal of certain books or restriction,

22    correct?

23              MR. SAFIER:  We have certainly not challenged the

24    statute.  There's some ambiguity with respect to a policy,

25    because there are some various informal policies to restrict

1   books on various grounds that existed prior to the passage of

2   1057; but for the most part, that's a correct characterization.

3           THE COURT:  And so I guess I'm wondering, whether it

4   be from a standing/redressability standpoint or the merits, I

5   don't know where it would fall, but it seems to me that as to

6   the restriction of books the School District's hands are tied by

7   state law with respect to books involving pornography, sexual

8   content, or prohibited under 847.012.  And so that category of

9   books, even if I held a hearing and found that they did that for

10  evil reasons, the answer would still be:  Those books are

11  restricted.  And on the flip side, any other books that have

12  been restricted, at least as I read the policy that the School

13  District has, they ought to be still available to students until

14  the removal decision is made.

15          So as to the restricted books, what relief can I

16  provide?

17          MS. OBERLANDER:  Your Honor --

18          THE COURT:  And jump in, Ms. Oberlander.

19          MS. OBERLANDER:  If I may address it.

20          So first of all, let me just say --

21          THE COURT:  Why don't you come up to the podium.

22          MS. OBERLANDER:  Yes.

23          MR. SAFIER:  I will cede seed the floor.

24          MS. OBERLANDER:  Good afternoon, I guess, Your Honor.

25  Or good morning.

1      So first of all, I do want to say that we absolutely

2   agree with you that as to the restricted books that are not out,

3   they don't have allegations of sexual conduct in violation of

4   the statute -- and I will talk about those -- that there is

5   absolutely -- that those books should be on the library shelves

6   right now, that you can and should -- you know, it's obviously

7   just a motion to dismiss, which obviously affects --

8      THE COURT:  But to stop you, but your understanding --

9   and I think Ms. Smith may have confirmed it.  Your understanding

10  is some of those books are not on the library shelves though.

11     MS. OBERLANDER:  They are not.  The books that we sued

12  under, the -- obviously the ten removed books that are

13  completely removed and 154 or 155 books that have been

14  restricted -- those books, at least to some substantial set of

15  them that we believe do not have sexual content in them, sexual

16  depict -- anything depicting sexual conduct and that they are

17  still being restricted, and they're still being restricted

18  for -- and, for example, one of our plaintiffs' books, *Uncle*

19  *Bobby's Wedding*, which is Plaintiff Sarah Brannen, it is -- it

20  is a picture book.  It's for small children.  It is about a

21  young child whose uncle gets married to his partner.  There is

22  no sex.  There is no sexual conduct at all.  There's nothing

23  like that.  There is, perhaps, a picture of two men holding

24  hands.

25     THE COURT:  Let me ask --

1          MS. OBERLANDER:  And that's --

2          THE COURT:  Hold on.  Let me ask a question.

3          MS. OBERLANDER:  Yeah.

4          THE COURT:  Is your understanding that book was -- was

5     there an allegation that it has sexual content in it?

6          MS. OBERLANDER:  No.  There was an allegation that it

7     was LGBTQ indoctrination, there was an allegation that it was

8     violative of "Don't Say Gay," 1557, but not that it actually had

9     any depiction of sex in it.

10         THE COURT:  And so I know there's -- you've made

11    allegations in your Complaint, which I have to accept as true,

12    that some of the books that have been restricted for having

13    sexual content in fact do not have sexual content.  You've made

14    that allegation, correct?

15         MS. OBERLANDER:  What we've -- what we have said is,

16    we have made the allegation that they are not violative of the

17    statute.  Some of them do describe -- well, some of them do

18    describe sex and sex acts, but they are not harmful to minors

19    under the statute -- well, under the -- and this gets into 1069.

20    And they're not pornographic, and they're not harmful to minors.

21         THE COURT:  I guess here's where I'm going with this.

22    And I know we're here on a motion to dismiss.  We're talking

23    about legal sufficiency of the Complaint, but one of the things

24    that I'm hoping comes out of today is a narrowing of things.

25    And it seems to me that one area that is ripe for narrowing --

1    and, again, I don't know whether it's a standing issue -- if

2    there are books that have been alleged, rightly or wrongly, but

3    have been alleged to violate either the pornographic prohibited

4    any 847.102 or depicting sexual conduct as defined by statute.

5    That's the allegation, and that's why they've been restricted.

6              It seems to me that there is nothing that I could do

7    ultimately in this case to put those books back on the shelves.

8              MS. OBERLANDER:  So I have -- let me -- I have a, sort

9    of, lengthier response about that.

10             So first of all, the books -- as a practical matter,

11   none of the books that we are suing over were sued -- were

12   removed pursuant or restricted pursuant to 1069.  They may

13   have -- the challenges may have had allegations that they

14   contain sexual content in it, but they weren't being restricted

15   pursuant to the statute because all of our actions happened

16   prior to the effective date of the statute, which was

17   July 1st of last year.

18             Now, I understand that's a little bit of --

19             THE COURT:  Why does that matter?  Because we are

20   after July 1st of that last year.

21             MS. OBERLANDER:  We are now, but they are -- well, so

22   first of all, none of those books, none of the books that we

23   have, that we named, there has -- I just want to be clear.

24             According to the School Board's public chart of what's

25   happened, none of those books have moved, none of them have been

1    removed, none of them have been replaced, none have been --

2    there has been no process with respect to any of those books.

3    So what they have -- essentially been done is they have been put

4    in an indefinite purgatory, and the process is not completed.

5              And just vis-a-vis 1069, 1069 clearly does call for a

6    process, a process of evaluation and a process of resolution.

7              THE COURT:  And I guess -- and I hate to keep

8    interrupting you --

9              MS. OBERLANDER:  That's okay.

10             THE COURT:  -- but I'm -- where I'm struggling here

11   is -- and I share your frustration on that.  I conveyed that

12   frustration with Ms. Smith that there's got to be an end to this

13   process.  But I guess for my purposes and -- you're ultimately

14   asking me to say -- and let's, again, just talking about this

15   restricted book category, you're asking me to order them to put

16   those books back on the shelves.  And for any books -- as I read

17   the statute, for any books that have alleged, rightly or

18   wrongly, to meet one of those -- and I'm just calling them the

19   "pornography category," and I know the category is broader than

20   pornography, but just for my shorthand reference -- the

21   pornography category, if it's alleged that -- the statute says

22   "any material that is subject to an objection on that basis must

23   be removed."

24             And so even if I were to adjudicate the case and find

25   that it was wrongfully alleged to be pornographic, can I,

1  without a challenge to statute, without -- I don't know what I
2  could do about it.
3          MS. OBERLANDER:  Well, so, so -- I hear you, and it is
4  definitely, you know, a tricky -- a tricky issue.  I'm not --
5  we're not going suggest otherwise.  But first of all, we have
6  sued under the First Amendment, and the First Amendment and
7  14th Amendment trump, you know, the statute.
8          Now, you are correct -- and we promoted it in our
9  papers that we did not make a -- we did not bring a statutory
10 challenge at the time we sued and timely filed our Amended
11 Complaint because we did not yet know how the statute was going
12 to be interpreted by the Escambia School Board and, frankly, by
13 other school boards.
14         What we know -- and, of course, it's not in our
15 Complaint, but the School Board has now released documents that
16 in addition to the hundred and -- they have basically restricted
17 an additional 1600 titles which are not part of our Complaint,
18 based on 1069, since the summer.  None of which we understand
19 have gone through review.  So we're talking -- there is
20 ultimately, you know, an enormous amount of books that have been
21 reviewed.
22         Now, I understand that -- I'm not affirmatively saying
23 what this means.  We think -- and, again, it might not be
24 satisfactory, but we don't think that the School Board here went
25 through their own process under 1069 to be able to -- yes, the

1     statute says if there is a challenge based on this, they should

2     be removed.  But the statute also lays out and the School

3     Board's policy also lays out how they are going to decide

4     whether there is a challenge.  Right?  There is a very specific

5     form you have to fill out.  You have to -- you have to go

6     through a particular process.  The book, they have to receive

7     this form, then they have to go and remove the book from the

8     shelves within five business days.

9              THE COURT:  But at this --

10             MS. OBERLANDER:  As far as we're aware --

11             THE COURT:  But at this point, you haven't alleged

12    that -- or you haven't challenged the removal decisions based on

13    all of what you're telling me now, correct?

14             MS. OBERLANDER:  We have not because -- and we don't

15    think -- and that's why we think that there is -- I mean, this

16    is trying to answer your question.

17             We don't think you have to reach 1069 to rule in our

18    favor and to -- now, it may be that if you found -- again, this

19    is -- we're just at the motion to dismiss stage.  We haven't

20    done discovery.  We don't know exactly what procedures have

21    gone -- taken place with regard to the books we've challenged

22    on.  But if at the end of the day and after summary judgment and

23    trial you determine that you should, in fact, order the

24    restricted books back because they were removed for

25    unconstitutional purposes, then at that point, if this -- I

```
1    mean, if the State then -- or the School Board then says, Well,
2    now these were -- we're going to remove these books because they
3    contain sexual content, we'll go through the whole -- you know,
4    an objection because they received sexual content, then I guess
5    the School Board is free to do that under the statute.  And I
6    don't think -- I mean, it's not particularly satisfying that
7    way, but that is -- but the statute does, in fact, set out a
8    substantial protocol for --
9             THE COURT:  And I guess thinking it through -- and I
10   am listening, but I'm also thinking.  I guess if your argument
11   is that the -- if there's a book on the restricted list that
12   doesn't have sexual content in it and, thus, there's no other
13   reason for it to be restricted, I can rule from a First
14   Amendment perspective that the -- the First Amendment reason
15   that it has sexual content wasn't proven and, thus, the
16   restriction of that book is unconstitutional, put it back on the
17   shelves -- that's how you see the sexual content books playing
18   out?
19            MS. OBERLANDER:  Well --
20            THE COURT:  You're not -- you're not -- well, let
21   me --
22            MS. OBERLANDER:  Yes.
23            THE COURT:  And I apologize.  I'm all over the place,
24   but I want to try to get --
25            MS. OBERLANDER:  Yes.
```

1          THE COURT:  -- limit down these restricted books.

2          What I would hope would happen at the end of this

3     hearing, they will go back to the School District and say, You

4     have a policy that says if a book is challenged for reasons

5     other than sexual content, it stays on the shelf.  And so there

6     will be a mass of books that go back onto the shelf because,

7     under their policy, that's what's supposed to happen.  And then

8     what we can debate is -- or litigate over as to the restricted

9     books are books that somebody has claimed, rightly or wrongly,

10    or the School Board has determined, rightly or wrongly, has

11    sexual content.  And if it does, has the plaintiff got any

12    argument that they're going to put forward that a book that has

13    sexual content should be on a school library shelf?

14         MS. OBERLANDER:  Yes.  We absolutely are going to make

15    that argument, but let me start by saying, if, in fact, you

16    narrow the case at the end of this --

17         THE COURT:  Well, and are you talking about the First

18    Amendment or Mr. Safier's going to talk about that?  Because as

19    I understand the First Amendment, as I understand even *Pico*,

20    that the justices that were even in the plurality in *Pico*

21    recognized that vulgarity, those type of things, don't go in

22    school libraries.  And you're going to have a heck of a time

23    convincing me, given all the case law out there that kids are

24    different, adult pornography can go to adults but adult

25    pornography can't go to kids, you're going to have a hard time

 1    convincing me that a book that has as a matter of fact -- and I

 2    know at this point I have to assume the facts in your favor, but

 3    if the facts come out that a book depicts sexual content

 4    prohibited any 847 or is pornographic, it's not going to go on

 5    these library shelves.

 6              MS. OBERLANDER:  So, Judge, we -- actually, we

 7    actually agree with you about --

 8              THE COURT:  Okay.

 9              MS. OBERLANDER:  -- pornography.  We are clear -- I

10    want to be clear.  We are not advocating and saying that books

11    that are pornographic should be on library shelves.

12              THE COURT:  Okay.

13              MS. OBERLANDER:  However --

14              THE COURT:  We got that, so let's talk --

15              MS. OBERLANDER:  Right.

16              THE COURT:  Let's --

17              MS. OBERLANDER:  Yes.

18              THE COURT:  -- narrow this down.  So 847.012 talks

19    about books with "visual representation or images of a person or

20    portion of the human body which depicts nudity, sexual content,

21    sexual excitement, sexual battery, bestiality, or

22    sadomasochistic abuse that is harmful to minors."

23              The plaintiffs think that should be on school library

24    shelves?

25              MS. OBERLANDER:  Well, the actual -- the statute

```
 1    thinks that some of those books probably should be on library
 2    shelves.  And let me explain.
 3               THE COURT:  If they're taught in health class --
 4               MS. OBERLANDER:  No, no.
 5               THE COURT:  -- we're not talking about health class.
 6               MS. OBERLANDER:  Honestly, we go beyond that
 7    because --
 8               THE COURT:  Okay.
 9               MS. OBERLANDER:  -- if you look at the statute, if you
10    look at subpart (I), right, is "pornographic or prohibited under
11    847.012."
12               THE COURT:  Correct.
13               MS. OBERLANDER:  Right?  So that's -- we're just
14    talking about b. subpart (I) right now.
15               THE COURT:  Correct.
16               MS. OBERLANDER:  So pornography, we're agreeing with
17    you.
18               THE COURT:  Gotcha.
19               MS. OBERLANDER:  So take that out.
20               847.012 contains --
21               THE COURT:  And that's what I was just reading you.
22               MS. OBERLANDER:  Contains a definition that is
23    "harmful material, sale" -- right?  It talks about that "and
24    which is harmful to minors."  It has to both contain
25    inappropriate imagery, right, and has to be harmful to minors.
```

1          "Harmful to minors" is a defined term in the statute.

2          THE COURT:  Okay.

3          MS. OBERLANDER:  And if you go to 847.001(7):

4           "Harmful to minors means any reproduction,

5      imitation, characterization, description, exhibition,

6      presentation, or representation of whatever kind or

7      form depicting nudity, sexual conduct, or sexual

8      excitement when it (a) predominantly appeals to

9      prurient, shameful, or morbid interests; (b) is

10     patently offensive to prevailing standards in the

11     adult community as a whole with respect to what is

12     suitable material or conduct for minors; and (c) taken

13     as a whole, is without serious literary, artistic,

14     political, or scientific value for minors."

15         THE COURT:  That's just basically pornography

16 standard, isn't it?

17         MS. OBERLANDER:  No, that is -- I mean, that is, in

18 fact, the *Miller* -- it's the *Miller* obscenity standard for

19 minors, that's correct, but it's not -- but that's -- that makes

20 it not pornography.  That makes it -- if it's not harmful for

21 minors, then it --

22         THE COURT:  Right.  I guess we're saying the same

23 thing, I think.  The definition of harmful to minors is

24 effectively pornography.  If it is --

25         MS. OBERLANDER:  Yes, yes.

1    THE COURT:  -- pornography, it's harmful to minors.

2    MS. OBERLANDER:  Yes, yes --

3    THE COURT:  Anyway, I --

4    MS. OBERLANDER:  -- that's right.  But taken as a

5 whole --

6    *(Interruption by the court reporter.)*

7    MS. OBERLANDER:  Taken as a whole element of it where

8 you to look at the context and where you have to look at -- that

9 it is "without serious literary, artistic, political, or

10 scientific value for minors" is crucial to that definition, is

11 crucial to *Miller*, and --

12    THE COURT:  And so that's what the litigation will be

13 over?

14    MS. OBERLANDER:  We would argue -- that's right.

15 That's right.

16    And then the other point I do want to make about --

17    THE COURT:  And so if we have a book -- and I don't

18 know if we do -- on the restricted list in the middle school

19 library, *How to Perform Oral sex* --

20    MS. OBERLANDER:  I don't think we have that book.

21    THE COURT:  I hope we don't have that book.

22    -- or books that describe that in a way that somebody

23 could figure out how to perform oral sex, then what would you --

24 you wouldn't be debating the first part because it's visual

25 representations or sexual -- or describes explicit detail of

1    that, you would just be saying that in the context of the

2    book -- this is the rape in *To Kill a Mockingbird*.   In the

3    context of the book, it's not about rape, it's about the

4    prosecution that happens after.   So that's what the litigation

5    is going to be over on those books?

6              MS. OBERLANDER:   That's right.   And then the second

7    note -- I mean, that's absolutely right.   And then the second

8    element of the statute, and -- I mean, further back to the

9    second -- the second -- that's para -- sub 1.b.(I).   b.(II)

10   has -- is -- it does not have the -- doesn't have the -- contain

11   the "harmful to minors" standard in it.   It's just a -- does it

12   depict or describe sexual conduct as defined in the statute.

13             THE COURT:   Right.

14             MS. OBERLANDER:   But b.(II) specifically under the

15   statute as well has -- is not to be -- it is -- so if it is --

16   the way that the statute works, that if it's under b.(I), which,

17   as we talked about, is this sort of pornography, no *Miller*

18   exception test, the school board can discontinue the material.

19             "If the district school board" -- continues down

20   here -- "finds that any other material contains prohibited

21   content under sub-subparagraph b.(II)-(IV)" -- so that includes

22   this Section (II) where the depiction of sexual conduct -- "the

23   school board shall discontinue use of the material for any grade

24   level or age group for which such use is inappropriate or

25   unsuitable."

1          Obvious -- recognizing that it should not be removed

2     for everybody, unless they determine that it is inappropriate or

3     unsuitable for every grade level.

4          But even the statute recognizes that there are going

5     to be books that -- and may be many, many books and

6     instructional materials that depict sexual conduct that are

7     going to pass muster, frankly, and that should be in the school

8     libraries for all sorts of other reasons.  And so -- and so we

9     don't view the statute as being a flat-out ban on -- if -- if

10    implemented the right way.

11         We do have -- I mean, I want -- I want to be honest

12    with you.  We have some significant constitutional concerns

13    about the statute.  And if it turns out that you are -- and --

14    but we, of course, did not challenge them in this Complaint.

15    And if it turns out that you do not feel that you can provide

16    redress without running afoul of 1069, we would ask that we be

17    allowed to re-plead to at least consider a constitutional

18    challenge to the statute.

19         But we actually don't think you have to get that far

20    on the case, and we do think that our case stands without

21    getting to the constitutionality of 1069 as it's been applied in

22    Escambia County.

23         THE COURT:  So ultimately on the category of books

24    that hopefully after today will be the limited category that are

25    still restricted, which are the sexual related ones, then your

1    argument is that I could provide redress, really without even

2    reaching the First Amendment, if I find that as a matter of fact

3    any books that have -- that were prohibited under 847.012, based

4    on an allegation of that, actually aren't harmful to minors and

5    that any books that were restricted based on describing sexual

6    conduct as a matter of fact either don't have sexual conduct in

7    it or they're still grade-level appropriate even with that in

8    it?

9           MS. OBERLANDER:  Yes.  Now, but I will also tell you,

10   Judge, Your Honor, please, that in one of your orders, you

11   expressed, you know, some concern that you shouldn't be the one

12   who is weighing in on 160 or 1600 books.  And we -- we actually

13   agree with you.  We're not -- we are not trying to set up a

14   situation where you are weighing in on the -- on all of these

15   decisions and deciding what should be on the shelves of the

16   Escambia County School Board.  We are just saying that at this

17   point in this litigation the School Board has not followed their

18   policies.  We believe that they have made unconstitutional

19   content decisions.  They have further decided not to --

20          THE COURT:  And I get it.  And I -- as the parties

21   have seen, I give thoughts, and those thoughts evolve.  And

22   you've seen those thoughts evolve from the first order where I

23   thought this whole case was going to go away, based on the

24   government speech idea, to now where I think that's probably not

25   going to be the case.

1          But I guess the pitch I was making there is it just
2     seems to me that these decisions don't need to be made by
3     parents who either like or don't like certain books on the
4     shelves.  They don't need to be made by judges.  They probably
5     don't even need to be made by politicians.  They ought to be
6     made by experts who can evaluate all these different factors and
7     decide whether this book which talks about one character giving
8     oral sex to somebody -- or whatever it talks about -- whether
9     that has literary value as a whole or not.
10         But obviously if the parties can't come to that
11    conclusion, if the politicians don't allow the parties to come
12    to that conclusion, then so be it.  Because at the end of the
13    day, ultimately this is each parent's responsibility to decide
14    what their kid can and cannot read.  And if there's something in
15    the library a parent doesn't want their child to read, then they
16    need to make -- do that.
17         But, again, that's well beyond where we are today.
18    You have very helpfully answered the question I had about the
19    restricted categories of books that are based on sexual content
20    and whether somehow redress is unavailable.  And that's very
21    helpful.
22         MS. OBERLANDER:  Thank you.
23         THE COURT:  I'll revert back to Mr. Safier.
24         MR. SAFIER:  Thank you, Your Honor.
25         So on the government speech doctrine just, you know,

```
 1    to briefly touch upon it, there are two sort of -- a number of

 2    remarks you made toward the end of your questioning of counsel

 3    for the State of Florida.  And mostly what we have to say is we

 4    agree.

 5            Two points you made is you think that dismissing the

 6    Complaint based on government speech would set a dangerous

 7    precedent, and it would do so -- it would embrace the idea that

 8    school libraries exist just sort of to the impose or mandate

 9    doctrine.  We think those are the two critical points anyway.

10            THE COURT:  Let me ask -- well, I'm sorry.  You're

11    still on government speech --

12            MR. SAFIER:  Oh, sure.

13            THE COURT:  -- but I wanted to roll you in to *Pico*.

14            MR. SAFIER:  Sure.

15            THE COURT:  Because it seemed to me that even the

16    plurality -- you had five justices in *Pico* saying school boards

17    can do whatever they want with restricting books in the library.

18    You had four that said not so fast.  But of those four, there

19    were several opinions where they recognized that certain

20    things -- they seem to take for granted that certain things

21    could be restricted, content-based restrictions such as

22    vulgarity -- I don't have the list in front of me -- gross

23    factual inaccuracies, and things like that.  And so I guess what

24    I'm struggling to understand here is is the standard the

25    plaintiffs are advocating, how different is it from the standard
```

1    that we now know the defendants are advocating?  That it seems

2    to be very similar in a sense.

3              MR. SAFIER:  If what you're saying is we now know the

4    defendants are advocating *Hazelwood*, then they're very similar.

5    I tried to think about this in preparation for the argument and

6    was unable to really find any meaningful daylight between the

7    nonpublic forum standard, the *Hazelwood* standard, and the *Pico*

8    standard.  I think conceptually the way you think about it is

9    say the *Pico* standard is what the nonpublic forum standard looks

10   like in the school library context.

11             So if you look at the *Searcey* decision, right, the

12   Eleventh Circuit decision there, they did similar with respect

13   to *Hazelwood*.  They said the *Hazelwood* standard is what the

14   nonpublic forum standard looks like in the curriculum context,

15   so I think we would say something similar.

16             But in terms of what the standards are getting at,

17   yes, they're pretty much the same.  The core of idea is there's

18   an area in which the decision-maker has discretion with respect,

19   in the *Pico* context, educational suitability.  But they can't

20   engage in viewpoint discrimination, and that applies across all

21   four standards.

22             THE COURT:  And so in this context, I think

23   Ms. Oberlander conceded the point that pornographic materials --

24   if any of these books restricted or removed are -- meet the

25   definition of pornography, those -- you would lose a First

```
1    Amendment claim there, correct?

2              MR. SAFIER:  We agree.  The only caveat we would say

3    is simply because it's alleged to be pornographic, that doesn't

4    decide the issue.  And you could even -- you know, if there's an

5    ultimate decision by a school board --

6              THE COURT:  Well, let me stop you.  It does decide the

7    issue for purposes of whether it's restricted pending

8    determination.

9              MR. SAFIER:  Correct.  And that gets you back into

10   what you were just discussing.

11             THE COURT:  Exactly.  And so by the same token, if as

12   a matter of fact it is determined that a book would be

13   prohibited under 847, which includes the harmful-to-minor

14   component, there would be no First Amendment violation for the

15   school board removing that book, correct?

16             MR. SAFIER:  If it actually meets the statutory

17   definition of pornographic.  The only potential nuance in the

18   standard in *Pico* and *Hazelwood* is the subjective standard, and

19   so there might be -- there might be some --

20             THE COURT:  But you haven't raised an overbreadth or

21   anything like that that would bring that in.  I'm just

22   determining --

23             MR. SAFIER:  Correct.  I'm just thinking about the

24   case where -- you know, this is a fanciful case.  But there are

25   a bunch of pornographic books, but the only ones that are being
```

1    targeted for removal express viewpoints or have authors that,

2    you know, come from particular backgrounds.  You could imagine,

3    at least under the *Pico* or *Hazelwood* standard, a case in that

4    context, but that's --

5              THE COURT:  That kind of gets into Ms. Agarwal's equal

6    protection claim a little bit.

7              MR. SAFIER:  Sure.

8              THE COURT:  And then I guess, just to close the loop

9    on that, the same answer would be for books that contain sexual

10   content -- conduct or depict sexual conduct as a matter of fact,

11   and as a matter of fact are not -- whatever the other component

12   of that standard is, grade-level appropriate or something.

13             MR. SAFIER:  Essentially the same answer.  If there's

14   some kind of *Miller* backstop there, then you're okay with the

15   First Amendment, provided you don't have the subject motivation

16   problem where you're targeting particular kind of books or

17   particular kind of authors.  Correct.

18             THE COURT:  But is that a First Amendment problem?

19   Why would that matter from the First Amendment perspective if --

20   I mean, particularly in the way that I understand this to be

21   coming up, which is private actors come in and start the ball

22   rolling.  And so if it just so happens that the private actors

23   are targeting homosexual books -- books with homosexual sex

24   versus books with heterosexual sex acts, why does it matter if

25   at the end of the day the book that's in front of me for

1    litigation meets one of these definitions?

2              MR. SAFIER:  Are we just talking about restricted

3    books at this point?

4              THE COURT:  I'm talking about either.  Why would it

5    matter if as a matter of fact the books meet the definition, the

6    fact that it -- you know, all ten of them are -- and, again, I'm

7    in the sexual conduct side of things --

8              MR. SAFIER:  Right.

9              THE COURT:  -- rather than the 1557.

10             MR. SAFIER:  I mean, as a practical matter, this case

11   likely would not come up, right?  If it clearly meets the

12   factual definition, then I'm not sure we would have a subjective

13   problem.  But ultimately the Eleventh Circuit was clear about

14   this in the *ACLU* case.  The *Pico* standard is subjective, right?

15   You look at the actual -- the ultimate factual question is what

16   motivated the removal.

17             So you can imagine a case -- I doubt it comes up, but

18   you could imagine a case where a book that was factually

19   prohibited under the statute was nonetheless removed for

20   constitutionally impermissible reasons.  But, you know, we're in

21   hypothetical land at this point.

22             THE COURT:  Right.  Okay.

23             MR. SAFIER:  I want to make a few points just about

24   standing to clarify some issues.

25             One is -- and I'm loathe to say this, but I think

1   Ms. Smith was correct with respect to -- at least as to how the

2   parent standard is working.  So as, you know, you noted and

3   Ms. Smith noted, we have a section in our Amended Complaint

4   where we link, you know, specific parents and their children to

5   specific books.  For those parents, we are only challenging

6   those books.  Right?

7           And the same thing goes -- you know, they only have

8   standing to challenge the books that, you know, their minor

9   children, you know, have expressed an interest to check out, and

10  that comports with the analysis in *ACLU*.

11          THE COURT:  While we're on those parents and those

12  kids, does the Complaint, does it allege that the parents are

13  also patrons of the library, similar to what was at issue or

14  what was at play in the *ACLU* case?

15          MR. SAFIER:  I don't know that we alleged that.  I do

16  believe as a factual matter the libraries in Escambia County are

17  available to students, but -- or to parents, but that is

18  something that we could work out in discovery.

19          But I agree with the point Your Honor made earlier,

20  which is for this stage, I don't think we need to settle that

21  standing issue.  At a minimum, the parents have standing for

22  their children.

23          THE COURT:  Okay.

24          MR. SAFIER:  Just to follow up on one additional point

25  too.  Your Honor was mentioning that, you know, these -- the

```
1   students whose parents are plaintiffs will at some point have to
2   take the witness stand.  We recognize that and acknowledge that.
3           And with respect to the seven-year-olds,
4   seven-year-olds are interested in different interesting things.
5   And one of the reasons why we think libraries are important is
6   because some seven-year-olds are interested in butterflies, some
7   are interested, at least for a phase, in different families.  So
8   that's -- we think that's a crucial point in our case.
9           THE COURT:  And, again, I'm -- I was playing devil's
10  advocate --
11          MR. SAFIER:  Understood.
12          THE COURT:  -- as much as anything.  But it's not been
13  my experience that when you talk to the average seven-year-old
14  they say I'm interested in different family arrangements.
15          MR. SAFIER:  Sure.  But kids are different, and
16  that's --
17          THE COURT:  Kids are --
18          MR. SAFIER:  -- one of the great things about
19  libraries is they cater to the fact that kids are different.
20          THE COURT:  Understood.
21          MR. SAFIER:  Are there any additional questions Your
22  Honor has about government speech?
23          THE COURT:  Not about government speech.  I mean, I
24  think my -- I guess there was one case that the government
25  mentioned, the State mentioned, and it was about speakers.  I
```

1    don't remember the exact case, but I think it was -- may have

2    been a convocation speech or some sort of speakers, that the

3    representation was that that case turned on not the content of

4    the speaker's message they were delivering but the fact that

5    that speaker was invited, that that was the government message.

6              Are you familiar with that case or --

7              MR. SAFIER:  That's not how I read the case --

8              THE COURT:  Okay.

9              MR. SAFIER:  -- but is that the *Gundy* case?

10             I think that was the *Gundy* legislative prayer case.

11   And here, I mean, it's clear how the -- the key differences

12   here, you're talking about, you know, three or four different

13   speakers invited for a specific occasion.  The endorsement

14   factor that Your Honor was focused on is clear and apparent.

15   We, the legislators, have invited these speakers to speak on

16   behalf of the legislature to express views.  And even though one

17   is giving a Jewish prayer; the other, a Protestant prayer, it's

18   understood because of the occasion that we've endorsed, sort of,

19   the general idea that we will bless this session with some kind

20   of prayer convocation.

21             And I think it is crucial -- and that sort of brings

22   up a crucial distinction, which is, you know, in that case,

23   you're talking five or six speakers.  The *McGriff* case, you're

24   talking about seven or eight paintings.  Libraries, you're

25   talking about thousands and thousands and thousands of books,

1    and you're not talking about a one-off event, right?  You're

2    talking about --

3          *(Interruption by the court reporter.)*

4          MR. SAFIER:  Oh, sorry.

5          You're not talking about a one-off event.  You're

6    talking about an institution that has served a community for

7    decades and decades and decades and have a history of doing it

8    in a particular way.

9          And the other crucial point, which is consistent with

10   what Your Honor said about concerns of indoctrination, it's

11   very crucial to, you know, emphasize that school libraries --

12   unlike the *McGriff* case, unlike the *Gundy* case -- take place in

13   an educational setting.  And courts have held over and over

14   again -- in the *Tinker* case, in the *Barnette* case, the Eleventh

15   Circuit in the *Searcey* case -- over and over again that schools

16   can't be used as tools for enforcing orthodoxy and repeatedly

17   said there needs to be some kind of prohibition on viewpoint

18   discrimination in the school context.

19         THE COURT:  Subject to -- but with the recognition --

20   even in *Pico*, with the recognition that there are certain things

21   that can be viewpoint restricted.

22         MR. SAFIER:  Can you say more, Your Honor?

23         THE COURT:  If I understood what you're saying, it's

24   not a free-for-all, even in a school library.  There are certain

25   things that simply because of the viewpoint expressed, if

1    there's a legitimate pedagogical reason for it, it can be taken

2    out of the library simply because of the view being expressed,

3    correct?

4            MR. SAFIER:  I would answer that in two ways.  The

5    first is, what *Pico* and *Hazelwood* let you do is distinguish

6    based on content, unlike in many of the contexts without the

7    strict scrutiny, they don't, in fact, right?  They let you

8    distinguish based on content.  I don't think they let you

9    distinguish based on viewpoint.  So you can't say, you know, We

10   dislike this viewpoint, it's at a library -- and I have no --

11           THE COURT:  I think you're fair.  I misspoke.  It's

12   content.  I mean, normally --

13           MR. SAFIER:  Right.

14           THE COURT:  -- when somebody's out on a public square,

15   if they want to be yelling, you know, Judge Wetherell is

16   corrupt.

17           MR. SAFIER:  They never would.

18           THE COURT:  Who knows, after today.

19           They -- you  know, they're free to yell that, and we

20   can't stop them from doing that, but if you're in the school

21   setting, simply because of the content of your speech, if it

22   doesn't have a pedagogical purpose, we can restrict that.

23           MR. SAFIER:  Exactly.  Content versus viewpoint.  You

24   can imagine books that express the viewpoint that are removed

25   because the book is damaged, we have too many copies.  You know,

1    there are other reasons why a book might be removed that have

2    nothing to do with viewpoint discrimination.

3         THE COURT:  One issue, and I guess -- so I'm done --

4    well, it's the government's speech context.  I mean, one of the

5    arguments the State has, and I think the School District echoes,

6    is if you take government speech to its logical end, a book

7    author could essentially force school districts to buy their

8    book.  So how is that not the case?

9         MR. SAFIER:  That is not the case, Your Honor, and the

10   reason it's not the case is this point that we've been

11   discussing that the *Pico* test and the *Hazelwood* test ultimately

12   hinges on the subjective motivation.  Right?  So there has to be

13   some kind of clean opportunity to exclude or remove the book for

14   constitutionally impermissible reasons.

15        If I, you know, show up in Escambia library and say, I

16   wrote this book, please put it on the shelf.  And they say,

17   That's not how this works here.  That's a fine reason.  Right?

18   That's a constitutionally permissible reason not to include my

19   book.  Or simply if some author says, you know, My book is on

20   your shelves, I think it should be.  That's not a claim.

21        So for there to be a claim, there has to be a

22   plausible case that this book was excluded.  Here, we're just

23   talking about removals; but in theory, there could be other

24   kinds of exclusions for constitutionally impermissible reasons.

25   As a practical matter, that's almost exclusively going to come

1    up in the removal context.

2            There's actually -- in the *Pico* case, Justice Blackmun

3    in his concurrence sort of addressed that issue, and he says --

4    he said essentially, There are so many potentially legitimate

5    reasons why a book would never be in a library in the first

6    instance.  There aren't that many legitimate reasons why once a

7    book is in the library it gets taken out.  And that's how he

8    answers that question.

9            THE COURT:  That's another distinction kind of in my

10   mind on the government speech idea.  It seems to be one thing to

11   make a decision at the outset to say, This speech is not going

12   to be allowed here; but it's another thing to say, once you've

13   made that decision to allow the speech, somebody is in the

14   process of speaking, you say, Stop, I don't like what you're

15   saying, therefore you must stop speaking.

16           MR. SAFIER:  Right.  In the second instance, you have

17   the "I don't like what you're saying part," and that gets you

18   into the viewpoint discrimination.  Whereas, the threshold, you

19   know, you become the speaker essentially.

20           (Interruption by the court reporter.)

21           MR. SAFIER:  So the initial, sort of, you're the

22   invited speaker position could be made for all sorts of reasons.

23           THE COURT:  Talk to me about standing.  Because I

24   think as to the kids -- and I know that defendants dispute that

25   there's even a right that they have standing to vindicate, but

```
 1  assuming I disagree with that, it seems to me that the children

 2  have alleged enough to say, I want to read these particular

 3  books, this coming semester, I can't do it, and so they've

 4  alleged something.

 5          But the parents, on their own behalf aside for the

 6  time being, because it seems to me that that's fact-dependent

 7  upon whether they can check books out on their own.  The fact

 8  that they want their kid to have the book to me means very

 9  little.

10          But talk to me about the -- who has -- and so talk to

11  me about the authors.

12          MR. SAFIER:  Sure.

13          THE COURT:  Is their standing limited to just the

14  books they wrote?

15          MR. SAFIER:  It is, Your Honor.

16          THE COURT:  Okay.  And then talk to me about who,

17  then, you believe has standing to challenge either restricted or

18  removed books -- well, let me step back.

19          There are ten removed books.  Is there a child

20  associated with each of those ten books?

21          MR. SAFIER:  I do not believe so.

22          THE COURT:  Is there a child and/or an author

23  associated with each of those ten books?

24          MR. SAFIER:  There is not.

25          THE COURT:  Okay.  So who has standing to challenge
```

1    the book that nobody here wrote and that nobody here wants to

2    look at?

3              MR. SAFIER:  The answer is PEN does.  Right.  So we

4    have -- the students have standing to challenge the books that

5    we have said in the Amended Complaint they wanted to check out

6    and weren't able to.  The authors have standing to challenge the

7    removal/restriction of their own books.  Penguin has standing to

8    challenge the removal/restriction of its own books.  And then

9    PEN American, which is an organization which represents authors

10   generally, is here under associational standing and

11   organizational standing.  And under organizational standing,

12   based on its imperatives as the organization --

13             THE COURT:  Let me pause you there.  On associational

14   standing, does the Complaint allege that PEN's members are

15   authors of each of the individual books that have been

16   restricted that don't have a specific author or specific

17   plaintiff tied to them?

18             MR. SAFIER:  It does not.

19             THE COURT:  Is that a problem for associational

20   standing?

21             MR. SAFIER:  It means that associational standing is

22   limited to the authors that we mentioned.  Now, there are

23   authors in the Complaint that we mention -- or the Amended

24   Complaint who are PEN members who are not plaintiffs.  Right.

25   Judy Blume, the author of *Kite Runner* whose the name I'm

1   blanking on at this moment.

2            UNIDENTIFIED SPEAKER:  Arundhati Roy.

3            MR. SAFIER:  Arundhati Roy.

4            So there are a number of authors who are PEN members

5   that we identified in the Complaint where their books have been

6   removed or restricted, and we have associational standing for

7   them.  The sort of catchall is organizational standing.

8            THE COURT:  Okay.  So that's where -- to just to put a

9   if finer point on it, your argument is that you've adequately

10  alleged that the students have standing to challenge the books

11  that have either been removed or restricted that they want to

12  check out, correct?

13           MR. SAFIER:  Yes.

14           THE COURT:  The authors and publisher have standing to

15  challenge the books that have either been removed or restricted

16  that they either wrote or published.

17           MR. SAFIER:  Yes.

18           THE COURT:  That PEN has associational standing to

19  challenge the books that have either been removed or restricted

20  by authors that are neither named in the Complaint or

21  specifically identified as members who have written those books.

22           MR. SAFIER:  Correct.

23           THE COURT:  And that for the -- do you know how many

24  of the universe of books that encompasses?

25           MR. SAFIER:  I can tell you quickly.

1              Or I thought I could.  I was overconfident.

2              With Your Honor's indulgence -- here we go.

3              So that is -- so the authors who are identified in the

4     complaint as PEN America members include each author plaintiff

5     and then Khaled Hosseini, the author of *Kite Runner*.

6              THE COURT:  What paragraph are you in?

7              MR. SAFIER:  Those are going to be -- I apologize.

8     Paragraph 77.

9              And then paragraph 79 you have Arundhati Roy.

10             THE COURT:  All right.  So you don't need to go

11    further.  That's just the area of the Complaint to look in.

12             All right.  So, then, ballpark.  Give me -- can you

13    give me a ballpark idea?  Are we talking of the

14    hundred-and-however-many books that are either restricted or

15    removed that you're challenging, is it the majority?

16    10 percent?

17             Just a ballpark.  I'm not going to hold you to it, but

18    just to get an idea of how many other books are at issue that

19    the only standing is based on organizational standing.

20             MR. SAFIER:  It would be over 50 percent.

21             THE COURT:  Okay.  Over 50 percent are only based on

22    organizational?

23             MR. SAFIER:  Correct, Your Honor.

24             THE COURT:  Okay.

25             MR. SAFIER:  I will note -- I have not thought through

1    the implications of this, but my co-counsel just handed me a

2    note that said -- that says that PEN America's made all living

3    authors of banned books honorary members.  I don't know -- I

4    have not thought through --

5              THE COURT:  But you haven't pled that, though, at

6    least.

7              MR. SAFIER:  That's correct, Your Honor.

8              THE COURT:  And so I was mistaken, then, when I was

9    talking to Ms. Smith by having construed the Complaint to allege

10   that each one of these kids wanted to check out each one of

11   these removed books.

12             MR. SAFIER:  That's correct, Your Honor.

13             THE COURT:  Okay.  And so talk to me, then, about

14   organizational standing.  Because as I understand the argument

15   is that you have that because your organization is -- promotes

16   reading and accessibility of books and, more importantly -- and

17   I don't think that -- that part's clearly alleged.  True or not,

18   we'll find out, but it's -- the other part that I think they

19   really challenge, which is to have organizational standing, this

20   has to -- you would have had to divert some sort of resources to

21   dealing with this.  Right?

22             MR. SAFIER:  Correct, Your Honor.  And we've alleged,

23   quite specifically, that as a result of what is happening

24   throughout the country, but also notably in Escambia County, PEN

25   America has had to divert significant resources away from

1   educational programs that previously hosted all sorts of other

2   programs to programs specifically addressing what's happening in

3   school libraries.

4           THE COURT:  And when you say "diverting resources,"

5   are you talking about participating in the -- resources

6   participating in the litigation or resources answering the phone

7   and doing other advocacy-type --

8           MR. SAFIER:  It's the latter.

9           THE COURT:  What are we talking about?

10          MR. SAFIER:  We're definitely not talking about

11  litigation context.

12          THE COURT:  Okay.

13          MR. SAFIER:  We're talking about person, time, and

14  money spent on things like information about what's happening on

15  the ground in different places, producing educational materials,

16  addressing the book removal issue, hosting seminars, answering

17  the phone -- that happens -- my understanding is that happens

18  quite a bit.  The authors will call up PEN America and say, My

19  book has been restricted here.  Is there anything I can do?

20  What do I do?  You know, what does that mean?  Those sorts of

21  things.

22          THE COURT:  And, again, I think -- for purposes of

23  pleading, I mean, it seems like to me that that was there.  I

24  guess I'm just wondering if as we're going down this road -- I

25  mean, this is happening all over the country.  Escambia County's

1    a small county in Northwest Florida, East Alabama -- whatever

2    you want to call us.  We're just a small place here.  And it

3    seems like this is a nationwide organization that's dealing with

4    this all over the place.  And so are you ultimately going to

5    have to demonstrate through evidence that whatever's happening

6    in little ole Escambia County is what's causing you to divert

7    resources rather than fighting the bigger fight?

8              MR. SAFIER:  That's right with two caveats.  The first

9    caveat is we at least get discovery, right, to get that

10   opportunity.  That's caveat one.  And caveat two is we certainly

11   don't have to show that all the resources that were diverted

12   were diverted because of Escambia.  For standing purposes, it

13   just has to be an injury, and an injury is some resources were

14   diverted.  And we're highly confident that discovery will -- we

15   certainly have pleaded that, and we're highly confident that

16   discovery will vindicate that.

17             THE COURT:  And I guess what that means on the flip

18   side of it is that your books and records and expenditures and

19   everything else are going to be laid bare to the County so they

20   can probe that, correct?

21             MR. SAFIER:  We will discuss that issue when it

22   arises, but that -- that is an issue that will arise, Your

23   Honor, correct.

24             THE COURT:  All right.  Well, that's been helpful on

25   understanding, clarifying what the standing is here.

1        MR. SAFIER:  Sure.  Shall I move on to my colleague on

2    equal protection?

3        THE COURT:  You may do that.

4        MR. SAFIER:  Thank you very much, Your Honor.

5        MS. OBERLANDER:  Your Honor, just to -- I mean, I just

6    went through the Complaint, and just to -- I believe this is

7    accurate.  We have student -- the student plaintiffs have

8    specifically asked to read eight of the ten removed books, and

9    we pled that.  And the two books that I did not find when I just

10   went back through this that they had specific students that --

11   students have asked to read are *The Bluest Eye* and *Lucky* of

12   the -- this is of the removed books.

13       THE COURT:  And neither one of those two books are

14   authored by the named author plaintiffs?

15       MR. SAFIER:  *The Bluest Eye* is published by Penguin

16   Random House.

17       THE COURT:  Okay.  So that captures that one so it

18   would just leave *Lucky* that would have to come in through some

19   sort of associational -- or organizational standing?

20       MR. SAFIER:  Correct.

21       THE COURT:  Gotcha.  Okay.

22       **MS. AGARWAL, GOVERNMENT WITNESS, DULY SWORN**

23       All right.  Ms. Agarwal, they let you bat cleanup.

24       MS. AGARWAL:  Fun position to be in.  Thank you, Your

25   Honor.  Shalini Agarwal on behalf of the plaintiffs.

1          So I am here to just sort of address the Court's

2     concern about the plausibility of our equal protection argument.

3     And we understand the Court's concern to be that we are alleging

4     discrimination against the books based on their content rather

5     than discrimination against individuals from a discrete

6     protected class.

7          THE COURT:  And let me ask this.  It's a

8     disparate-impact claim, correct?

9          MS. AGARWAL:  No, Your Honor.  It's not -- so equal

10    protection, as we all know, requires both a proof of a

11    differential impact, as well as an allegation of intent -- and a

12    plausible allegation of intent to discrimination.

13         THE COURT:  Right.  But that's disparate impact.

14    That's the version of equal protection you're saying is that --

15    you're not arguing that they have a policy that, on its face,

16    treats people in protected classes differently; you're arguing

17    that they're facially neutral policy has a disparate impact on

18    certain protected classes?

19         MS. AGARWAL:  That's right, Your Honor.  The *Village

20    of Arlington Heights* test.  That's right.

21         So just to clarify.  We're alleging here that the

22    School Board is distinguishing between books in ways that

23    violate the 14th Amendment and cause a harm to all of our

24    plaintiffs.

25         So, first, the Board is discriminating against authors

1   who fall within discrete protected classes based on their

2   immutable characteristics, and we've named three authors in our

3   Complaint who have discrete protected characterization.

4          THE COURT:  I guess what you keep bouncing back and

5   forth and which is the problem I'm having with equal protection

6   claim, it seems like you've at least plausibly alleged that they

7   are singling out books that involve issues that if they were a

8   person would be a discrete protected class, an LGBT idea in a

9   book, the allegation is they're singling out those; an

10  allegation that they're singling out critical race theory type

11  issues that might be a minority-type issue.  And so if that was

12  an individual person, if they're going in and saying, Okay,

13  you're a speaker, I'm not going to let you speak because that's

14  what you're talking about and that's who you are, I think you've

15  got an argument.  But when -- they're just taking out ideas.

16         And what you're asking me to do is extrapolate from

17  the fact that the idea in the book is LGBTQ, that means that the

18  person that they're discriminating against is LGBTQ because

19  that's who's reading that book or that's who's writing that

20  book.  And it seems to me that that's a very far stretch to be

21  asking me to make.

22         MS. AGARWAL:  Your Honor, I think that -- let's look

23  at one of the books, for example.  We've got a book by George

24  Johnson, *All Boys Aren't Blue*, which is a memoir, a personal

25  story about their experience.  And Mr. Johnson is a black

1     nonbinary person, so he is from a protected class, and he is

2     telling his story in this book.

3             So we think that is indisputably a person from a

4     protected -- like discrimination against the content of a book

5     is also discrimination against the author, necessarily

6     implicates the protected characteristics of the author.

7             Two of the other authors who we have as plaintiffs in

8     this case, Kyle Lukoff, who is a transgender white man, is

9     writing about a trans child.  That is *When Aidan Became a*

10    *Brother*.

11            Similarly, we have David Levithan who is a guy white

12    man, we've alleged in the Complaint, is writing a book about --

13    it's two boys kissing.  It is an LGBT relationship.  Those are,

14    we think, necessarily overlapping circles of the author's

15    identity and also the content of those books, and that that's --

16            THE COURT:  Now, were each of those books subject to

17    citizen complaints?

18            MS. AGARWAL:  Your Honor, they were each subject to

19    the challenged process.  That's right.

20            THE COURT:  And so that was -- the allegation isn't

21    that the School Board went out looking for those books, either

22    because of their content or because of who wrote them; it was

23    they were brought to the School Board's attention by an

24    individual, and then they made a decision to remove them, right?

25            MS. AGARWAL:  That's right, Your Honor, except I would

1  say that the challenge forms themselves are expressed
2  discriminatory animus on their face.
3          So for the George M. Johnson book, the challenge form
4  talks about challenging it because it has LGBTQ content.
5          THE COURT:  But not because of who George L. Johnson
6  is, right?
7          MS. AGARWAL:  It does not say:  I'm discriminating
8  against this book because it's written by George Johnson.
9          THE COURT:  And so for all we know -- I mean, I guess
10  I just have a fundamental problem with -- you're essentially
11  asking me to stereotype.  You're asking me to stereotype that
12  simply because a book talks about gay issues, it was written by
13  somebody who's gay.  If it talks about black issues, it was
14  written by somebody who's black, and that's offensive to me to
15  think that.
16          And in the same token with the students, you're
17  essentially asking me to say that simply because a book is about
18  gay issues, that's who primarily wants to read it.  And, one, I
19  don't think you've alleged that any of these kids are gay, and I
20  hope you're not going to be outing seven-year-olds.
21          MS. AGARWAL:  That's not our plan, Your Honor.
22          THE COURT:  Well, how are you -- let's go there then.
23  How are you going to prove a disparate impact on people in
24  the LGB -- students, LGBT students, without a plaintiff who is
25  an LGBT plaintiff, student plaintiff?

1          MS. AGARWAL:  So, Your Honor, I think the way that we
2     are intending to address that is that we have offered to our --
3     who are -- who are out LGBTQ individuals and are planning to
4     bring that claim on their behalf.
5          With respect to the students, we agree with you.  It
6     does not make sense to out a student who is, you know, a minor
7     and often many of them figuring out their own --
8          THE COURT:  You've alleged that.  You've alleged that.
9     You've alleged in paragraph 239, "As a result of that
10    discriminatory animus, non-white and/or LGBT students are being
11    denied access to books that reflect their identities and
12    experience on discriminatory grounds."
13         And what I see in this Complaint is you don't have a
14    student that you could come in and prove that to me to without
15    outing these students.  Am I wrong in that?
16         MS. AGARWAL:  Your Honor, I think that it's not an
17    unreasonable inference -- and we might disagree about this, but
18    I think it's not an unreasonable inference that if a School
19    Board, like the defendants are doing here, are removing books
20    that disproportionately are about LGBTQ individuals, that that
21    is not going to have a harm on LGBTQ students.
22         Now, you're right.  We do not have an LBGTQ plaintiff
23    identified, student, in this case --
24         THE COURT:  It seems to me that the allegations in
25    your Complaint refute that idea.  Because you allege, paragraph

1    25 through 27, all of which are white parents -- and, again,

2    their students may be biracial, or whatever they might be, but

3    each one of those complaints, each one of those allegations is

4    saying that parent wants their child to have these books because

5    it provides them a more wholesome life experience.  I don't know

6    if that's true.  I don't know -- that's their allegation.

7    That's what they believe.

8          And so it seems to undercut the whole idea of any sort

9    of equal protection claim on a disparate impact, at least as to

10   the students, because you're saying that the people that want

11   these books are white people so their kids can have a broader

12   experience.  And if we don't know if they're gay or not, it

13   seems to be the same thing.  I mean, I have to assume -- I'm

14   willing to assume at this point that, you know, the plaintiff in

15   paragraph 25, that their child is not gay, but they want this

16   wholesome experience.

17         So I just have a fundamental problem with what you're

18   asking me to infer, and I think that's exactly what it is.  I

19   mean, we're on allegations of the Complaint, I have to make

20   inferences to figure out if this is a plausible complaint, and

21   the inferences you're asking me to make are, frankly, as

22   discriminatory as the policies you're challenging because it

23   essentially says that the people who write these books and the

24   people who read these books have those same categories.  And I

25   thought we had gotten past that in society, but apparently not.

1          MS. AGARWAL:  I'm sorry if that's what we're -- what I

2     was conveying with my remarks.  We are not trying to

3     essentialize in saying that if a book is about a character who

4     is gay, that must mean the people who want to read it are gay

5     and also the people who are writing that book are gay.  That is

6     not what we are saying.  I guess I was just referring to the

7     individual identities of the authors in this case because Your

8     Honor was pointing to the fact that we're not talk -- we're

9     talking about content.  And I wanted to just be clear that if in

10    those three cases the authors themselves identified, you know,

11    this is not a stereotype that you would be making or applying to

12    them.  This is -- the authors are saying, Hey, I wrote this book

13    in part because of my identity.  Likely --

14         THE COURT:  And, again, I guess you may have a

15    stronger case if the complaint forms were saying:  I want this

16    book out because it was written by this author and -- or the

17    School District says:  We're going through our library, our

18    catalog, and we're getting rid of -- I don't know a gay author,

19    but, you know, pick a gay author -- we're getting rid of every

20    single one of his books.  We don't care what the subject is.  We

21    just want to get rid of that person because we disagree with

22    their lifestyle.

23         It seems to me, there you would have a case of

24    disparate treatment against a protected class.  Here, you have

25    disparate -- alleged disparate treatment against books.  But

1    books don't have constitutional rights; people do.  And these, I
2    guess -- I'm sorry.  I'm just not seeing it.  I know you're
3    doing your best to advocate, and I appreciate that.  I don't
4    mean to be rude, but I just don't see this being an equal
5    protection case.  This is a First Amendment case.
6           MS. AGARWAL:  Your Honor, I guess the thing that I
7    would ask you to consider is for any school district, then, that
8    wanted to avoid scrutiny or having discriminatory animus, they
9    would just say, Yeah, we're removing it because the content in
10   it, there's a gay character, and that's enough -- or it's LGBT
11   indoctrination.  We're not going to actually say it's because
12   the author is LGBTQ, and it's going to facilitate a lot of
13   discriminatory decisions.
14          THE COURT:  Isn't the First Amendment the backstop
15   against that, though?  That's what your entire first and second
16   counts are, is that the First Amendment doesn't allow them to do
17   that.
18          MS. AGARWAL:  Your Honor, I think that's true.  The
19   reason we added that count in this case is because it seems to
20   be, in the background, what is motivating a lot of the removal
21   and restriction decisions, and so we wanted to make sure that
22   that is represented.
23          The other thing I wanted to just mention is we have --
24   the protected characteristics of a particular authors and
25   particular students, but I just wanted to also mention that

1   apart from that, we are alleging that the School Board's

2   decisions have been discriminatory because they're

3   discriminating against the themes of the books.  You're right.

4   Those are not themselves individuals in this case, but that they

5   reflect the identities of the protected classes.

6          And, you know, I talked about the authors.  But for

7   students, we have individual students from, you know -- who are

8   black who are saying, I wanted to read about a character like

9   me, or I wanted to read about a story written by a prize-winning

10  black author, and that that is a valid interest for this Court

11  to recognize.  So that was the reason for those claims.

12         THE COURT:  And, again, I know we're in proof-land

13  rather than allegation-land, but I'm very highly skeptical that

14  most students -- maybe you have a unique -- maybe Escambia

15  County's got a lot of culturally attuned students who know what

16  the -- even the gender is of authors of books.  You know, J.K.

17  Rowling, of course, is very famous, so we all know she's a

18  woman -- or I think she is or was at one point.

19         But other than that, people aren't -- I just -- I have

20  a hard time believing that people independently know that and

21  think, Okay, I'm going to go read that book because a woman

22  wrote that book.  I'm going to go read that book because it's a

23  fascinating story about growth and students and witchcraft and

24  good versus evil and those sorts of things.

25         I don't know.  I think you're really stretching here.

1          MS. AGARWAL:  Well, so let me talk about a few of the

2     specific books that some of our students had said they wanted to

3     read and see if this makes more sense.

4          We have our parent, Sean Parker, who is a parent of an

5     eighth-grade student.  And he says he wants to read *Concrete*

6     *Rose*, which is the sequel to *The Hate U Give* by Angie Thomas,

7     which is a book about a shoot -- a police-involved shooting and

8     the ramifications for this girl who was a friend of the folks

9     involved.  And that has been one of the bases for challenge was

10    that it had controversial racial and social commentary.

11         And, you know, we think that the School Board has

12    ratified that in approving or -- I'm sorry.  That one is a

13    restricted book; that's not a removed book.

14         But I think that the expression by the student that

15    they would like to read that particular subject matter because

16    it reflects their cultural identity.  It's not -- it's not just

17    sort of -- it's not something to be cast aside lightly, I

18    suppose I would say, that it is part of what this Court should

19    consider as, like, their -- the protected class.  I mean, that

20    is part of the reason that they want to read that book.

21         Similarly, Carin Smith.  Two 12th grade girls had

22    mentioned they want to read *Beloved* because it is a prise --

23         THE COURT:  Again, you have that one student who wants

24    to read that book.  What you're asking me to infer is

25    essentially that the only people that want to read that book --

```
 1    even the majority of the people that want to read that book,
 2    some qualification -- are of a particular demographic race.
 3    That's what you would need to establish to tie the book's
 4    subject matter to the author's protected class.
 5           And I just think that's -- that just is a hard
 6    inference to make because it's a stereotyping-type thing, and,
 7    you know, it just -- if that's what you believe the facts are,
 8    that only blacks want to read black books and whites want to
 9    read white books, or only black authors write black books and
10    only gay authors write gay books, if that's what you believe the
11    facts are, maybe I have to accept that and go on, but that's --
12           MS. AGARWAL:  Your Honor, that's not what the facts
13    are.  I mean, that's what we've alleged, both -- I'm trying to
14    point to the individual examples since you were --
15           THE COURT:  Right.
16           MS. AGARWAL:  -- talking about that.
17           THE COURT:  I get it.  I understand what you're --
18           MS. AGARWAL:  We also have -- we also have plenty of
19    authors who are not gay --
20           THE COURT:  Writing gay books.
21           MS. AGARWAL:  -- and who are writing books that
22    involve gay characters.  We have plenty of authors --
23           THE COURT:  Which are being allegedly excluded just as
24    much as the gay authors writing gay books.  And so that's why I
25    don't see how this is a viable equal protection claim, absent
```

1    that one-to-one tie that doesn't exist.

2              MS. AGARWAL:  Your Honor, we're dealing with

3    particular harm that is visited on people from those protected

4    classes.

5              I guess the other thing that I would say is we're also

6    alleging equal protection and then maybe discuss rational basis

7    of scrutiny.  But for the community of people who are interested

8    in writing about these issues and who are interested in reading

9    about the issues.

10             In terms of the discriminatory animus, I would just

11   turn to the *Village of Arlington Heights* factors.  So in terms

12   of disproportionate impact of the decision, we've given some

13   numbers in the Complaint as to that.  40 percent of the removed

14   and restricted books have non-white or LGBTQ authors, and 60 --

15             THE COURT:  And let me ask on that.

16             MS. AGARWAL:  Sure.

17             THE COURT:  And I appreciate all the statistics, but,

18   you know, statistics lie.  Because statistics, you can make them

19   say whatever you want them to say.  And I'm not suggesting you

20   lied or made them say something else; but here, as I understand

21   the facts that have been alleged, is that somebody complains

22   about a book.  And so the fact that somebody is -- people are

23   complaining more frequently about books with gay topics in it or

24   critical race theory topics in it will necessarily mean that the

25   higher percentage of those books are what's being banned.

1          So how significant are those statistics, even in the

2    motion to dismiss stage?

3          MS. AGARWAL:  Your Honor, I think under -- for the

4    *Arlington Heights* factors, they are pretty significant.  It's

5    one of five things that the Court's supposed to consider.

6    There's a disproportionate impact on a protected class.  That is

7    one of the things that's indicative of potentially

8    discriminatory intent.

9          The other things that I think are relevant are the --

10   like I mention, animus expressed on the challenge forms that

11   have been ratified by the School District.  And so far as there

12   have been district review committees in between who have

13   actually been charged with reading the books and evaluating the

14   teaching materials around them --

15         THE COURT:  And on that, I mean, I guess I'll just

16   throw you a bone here, because on that side of the equation, I

17   tend to agree with you that there's enough alleged here -- I

18   don't know whether you can ultimately prove it.  The School

19   District has argued, well, the fact that some parent is out

20   there rabble-rousing and complaining about all these books and

21   saying hateful things on the form doesn't necessarily mean that

22   that's what the School District believed.  But for your

23   allegation purposes, you probably met enough to infer that

24   animus all the way up to the School Board.  Whether you'll be

25   able to prove it would be another thing, but -- so that side of

1    the 14th Amendment claim I tend to agree with you.  That stated,

2    it's the other side that is -- I'm troubled by.

3              MS. AGARWAL:  Okay.  I just want to mention one more

4    thing to underscore that is that there's also been a lot of

5    procedural irregularities, I'll say, that the School Board has

6    gone through in deciding to remove and restrict these books.

7              You know, we noted in our Complaint that one of the

8    board members announced a plan to short-circuit the review

9    process by asking the superintendent to start quarantining the

10   books that were being challenged.  And then that initially was

11   every single book that was challenged was going to be in the

12   restricted pile.  That eventually got changed to only when a

13   book -- the thing that you were discussing with Ms. Oberlander

14   about when the challenged alleged pornography or a violation of

15   *Miller*.  And then in practices that meant that the books that

16   deal with sexual assault and those dealing with feminist themes

17   as well as books that are challenged for violating 1557, the

18   "Don't Say Gay" law, like *Uncle Bobby's Wedding*, have been in

19   the restricted pile.

20             And then the other sort of procedural irregularity we

21   note is that the superintendent -- the previous superintendent

22   was terminated.  And it seems from the record, we -- and

23   certainly one of his comments there in the Complaint for not

24   unilaterally pulling the challenged books in violation of the

25   School Board's policy and what the School Board attorney told

```
 1    them was permissible for them to do with the challenged books.
 2                THE COURT:  Gotcha.
 3                MS. AGARWAL:  Thank you, Your Honor.
 4                THE COURT:  All right.  Is that all the plaintiffs
 5    wanted to add to the discussion, or did anything come up there
 6    that you wanted to...
 7                MR. SAFIER:  Nothing further, Your Honor.
 8                THE COURT:  Okay.
 9                All right.  Ms. Smith, I did promise you rebuttal.
10    We've gone quite long.  I am going to give you that rebuttal,
11    but what I would like to do is take a short break, because
12    what -- well, let me hear your rebuttal, and then we'll take a
13    break, and then I'll come back and tell you what I think about
14    things.
15                All right.
16                MS. SMITH:  Thank you, Your Honor.
17                Your Honor just stated that you believed their
18    Complaint has alleged enough to show that the discriminatory
19    animus alleged in the challenges make it all the way up to the
20    School Board.  So I did want to point out on page 38 of the
21    Complaint, this is the second page of the chart, you can very
22    easily see the School Board decision.  And for a *New Kid*, for
23    *Drama, The Bluest Eye*, *The Nowhere Girls* -- how can that be
24    viewpoint discrimination, Your Honor?
25                If the School Board was truly going to be
```

1   discriminating based upon the viewpoint, they would just remove

2   it.  But here, what they did is went through their process and

3   decided, for a *New Kid*, we're going to remove that from

4   elementary schools only, and we're going to keep it for middle

5   and high school libraries.  That's exactly the type of

6   pedagogical, you know, reasons that the *Hazelwood* standard

7   allows us to do.

8           THE COURT:  Wasn't, on each one of those books, the

9   decision of the review committee was to keep the books in all

10  places?

11          MS. SMITH:  I don't believe for each and every one it

12  was for all places, but the School Board --

13          THE COURT:  Will keep it in --

14          MS. SMITH:  -- consider that.

15          THE COURT:  Keep it in more places than ultimately it

16  was kept.

17          MS. SMITH:  And the School Board determined that for

18  at least some of these books, which it should and can, these are

19  our duly-elected School Board officials, Your Honor, they can

20  make these decisions and the Court should not arrogate its own

21  decisions or allow the plaintiffs to come in and say, No, in

22  fact, we're going to go into the mind of these school -- of this

23  policymaking board and say that these decisions really were

24  based on animus, based on viewpoint.  I'm just saying, Your

25  Honor, take a look at those books on their face.

1       THE COURT:  Well, let me ask you this --

2       MS. SMITH:  They cannot be viewpoint discrimination.

3       THE COURT:  Let me ask you this.  If this case moves

4  on and goes to trial and we have a trial about *The Bluest Eyes*

5  and it turns out, as a matter of fact, there are no graphic rape

6  scenes, there's no pedophilia, there's no glorified -- excuse

7  me, pedophilia glorified, and no violence acts in it, if it

8  turns out as a matter of fact -- I've never read this book, I

9  don't know what it's about, and I frankly hope I never have to

10 read the book; but if that's where it goes, I'll read the

11 book -- if that's what it turns out, as a matter of fact that's

12 not the case, your argument is I just have to say, Well, that's

13 what the School Board said?  That's good enough?

14      MS. SMITH:  In that case, Your Honor, yes.  The School

15 Board decided that it is not suited to student needs and their

16 ability to comprehend the material presented for grades 9 and

17 10.  That's exactly what the School Board did.  Just because

18 there's not graphic sexual or pornographic depictions -- I want

19 to make sure the Court understands.  You started your discussion

20 with me early earlier, way back when when we first started

21 talking, you said, Ms. Smith but these prohibitions and the

22 control that the school boards have over these books, they

23 preexisted this 1006.28.  Yes, Your Honor.

24      So the newest revision, back on July 1st, 2023, might

25 have broken it up a little different and might now require that

1    we pull books immediately within that five-day period during the

2    review period, but please don't forget that these books are

3    still subject to these other criteria which I broadly

4    categorized as are they age appropriate --

5              THE COURT:  Right.  And that's --

6              MS. SMITH:  -- and that's the pedagogical reason.

7              THE COURT:  I guess what -- but at some point,

8    somebody has to make that determination.  At this point, the

9    School Board has made that determination.

10             These plaintiffs believe that they violated the First

11   Amendment when they made that determination, at least in part

12   because they've alleged that the basis that they've made that

13   determination on -- that it's not suitable, that it has

14   prohibited conduct in it -- is not accurate, and I have to

15   accept that as true.  And accepting that as true, all the

16   allegations about the process, it just seems to me that that's

17   enough to allege the animus component of an equal protection

18   claim.

19             I've already, you know, laid my feelings bare about

20   the rest of their equal protection claim, but I guess I'm

21   struggling to understand what you think.  I've heard what

22   Mr. Safier thinks our lawsuit -- or maybe it was

23   Ms. Oberlander -- thinks our lawsuit is about.  Do you disagree

24   with them that at some point if the parties can't resolve this,

25   I'm going to be making fact findings based on evidence I hear

```
 1   from this witness stand, from whomever I hear it from, that this
 2   book does or does not meet these statutory criteria?
 3           If it meets the statutory criteria, they've
 4   acknowledged that the First Amendment isn't violated.  If it
 5   doesn't meet the criteria, the First Amendment may very well
 6   have been violated.  Isn't that what we're going to be
 7   litigating?
 8           MS. SMITH:  I want to make sure when you're asking me
 9   about this statutory criteria, we are not only talking about
10   sub-subparagraph b.(I) and (II).
11           THE COURT:  Correct.
12           MS. SMITH:  That we are also understanding that --
13           THE COURT:  Right.  Somebody's going to come in and
14   sit on this witness stand and be an expert in educational
15   suitability, and they're going to tell me that *The Bluest Eyes*
16   doesn't add anything to the curriculum for -- or they're going
17   to either tell me that it meets one of the prohibited things:
18   It's sexually explicit, or whatever it is, and it has no -- it's
19   harmful to minors; or they're going to come in and say it
20   doesn't have any of that, but it's not suitable for education --
21   or whatever that other prong is.
22           MS. SMITH:  Let's stop right there.
23           THE COURT:  Okay.
24           MS. SMITH:  And this is a critical distinction.
25           No, you should not have an expert come in and testify
```

1    about that because *Hazelwood* provides that school boards are

2    able to regulate content for all of the reasons that you have

3    talked about.  The only exception to that is this viewpoint

4    determination that we can't cross over from content into

5    viewpoint discrimination.

6            THE COURT:  But who's going to decide the content

7    question?  Isn't that me?

8            MS. SMITH:  Well, Your Honor, the content question for

9    me is decided right here in this chart.  If they're going

10   through -- if the Board has already decided what grade level it

11   is appropriate for and what grade it's not, isn't it inherently

12   not viewpoint discrimination and they're regulating based on

13   content as to what is age appropriate or not?

14           They're going through that process for each of these

15   books.  And in order for the plaintiffs to prevail, they're

16   asking you to go into very dangerous territory where an author

17   or a publisher or a professional organization can come in and

18   question whether that school board really made the right

19   decision, and I don't believe that that is what any of our legal

20   authorities are asking you to do, Your Honor.

21           THE COURT:  What's the alternative then?

22           MS. SMITH:  This is a deferential standard under

23   *Hazelwood* --

24           THE COURT:  But does deference mean abdication in the

25   sense that nobody can question whether the content evaluation

```
 1    they made is legitimate or if it was for a discriminatory
 2    reason?
 3              MS. SMITH:  Absolutely.  Read -- you cannot do that.
 4    Read ACLU v. Miami-Dade and all of the discomfort that the Court
 5    goes through in reading what the district court judge did there
 6    by undercutting what the Board stated was their legitimate
 7    pedagogical reason, as the Court noted:  factual inaccuracies
 8    in a book.  That's what the Board said.
 9              So what you're setting up here, Your Honor, is that
10    we're going to have experts come in and we're going to have
11    plaintiffs come in to say that's --
12              THE COURT:  But what the --
13              MS. SMITH:  -- not really what they meant.
14              THE COURT:  But what the Eleventh Circuit didn't say
15    in that case, that the district court shouldn't have gone down
16    that road.  It's ultimately the district court went too -- made
17    the wrong decision or made -- the decision wasn't supported by
18    the evidence.  I guess it's --
19              MS. SMITH:  And maybe --
20              THE COURT:  I'm struggling to understand what you want
21    me to do.  Do you --
22              MS. SMITH:  Right.
23              THE COURT:  -- want me to just say they've got a First
24    Amendment claim but ultimately I have to defer to whatever the
25    School Board said the reason was they restricted it from, and
```

1    I'm looking at what they alleged, and, yeah, good enough?

2            MS. SMITH:  I want to make sure Your Honor understands

3    that if the board sets forth a legitimate pedagogical reason, it

4    doesn't matter if they disagree with it.  Respectfully, it

5    shouldn't say whether you disagree with it.  That should be the

6    local school board's decision.

7            THE COURT:  What if it's false?

8            MS. SMITH:  So we're going to then come in and allow

9    the plaintiffs to question each individual board member as to

10   whether that was really what their motive was, Your Honor?  This

11   is a state that's subject to the Sunshine Law.  School boards

12   are policymaking bodies.  They need to say on the record in the

13   public forum why they make the decisions that they make.

14           And the school board members have protection.  They

15   have legislative immunity.  They should not be made to answer

16   questions about was that really the reason that you stated in

17   the public record.  They are obligated under the laws to say why

18   they make the decisions that they're making.

19           THE COURT:  Yeah, I guess that's -- I don't

20   necessarily disagree with you on that.  That's a question for

21   discovery.  But it just seems to me the position you're

22   advocating, that whatever the -- whatever reason the government

23   said that they're restricting this book, if that -- if that

24   reason they stated is a legitimate pedagogical reason, nobody

25   can evaluate whether that's a supportable reason.

1          MS. SMITH:  Yes, Your Honor.  That is the deferential

2     standard that --

3          THE COURT:  And you get that from what case?

4          MS. SMITH:  I get that from reading the *ACLU*.

5          THE COURT:  Okay.

6          MS. SMITH:  Absolutely.  When they went back and they

7     said this is what the board member said on the record, how can

8     the District Court -- how can the plaintiffs, how can anybody

9     come in and question this?  This is what they said, and it's

10    legitimate.

11         So I just think it's a very dangerous territory, and I

12    want to make sure Your Honor understands --

13         THE COURT:  But wasn't it legitimate because the book

14    wasn't accurate?

15         MS. SMITH:  In that case, that was the example of the

16    legitimate pedagogical basis.  But I am very fearful --

17         THE COURT:  And so in that case, your view would be if

18    the school district in Miami had said that Cuban book is

19    inaccurate and it turned out it was an accurate depiction of

20    life in Cuba, or whatever the issue was about in the book, your

21    view would be, Oh, well?

22         MS. SMITH:  Well, I think black and white in today's

23    day and age, what's accurate and what's not, what's truth and

24    what's not, may be it's less clear than it once was.  But that

25    seems pretty obvious.  I think where it gets a little bit hazy

1    is the Court coming in or the plaintiffs coming in with their

2    expert trying to tell a local school board what is pedagogically

3    appropriate for their students.  That's what these duly-elected

4    officials are meant to do, and that's what our entire system of

5    education in this state is set up to do.  I just --

6              THE COURT:  I don't know the school board members,

7    don't know their qualifications, but it's -- I would be

8    surprised to learn that they have those qualifications.  Whether

9    they need those -- they certainly don't need them to be school

10   board members.  Anybody can pay the filing fee, run, get elected

11   to be a school board member.  A parent can do that.  I don't

12   think they have to have any level of expertise.  But it just --

13   I don't know.  That's -- I didn't see that in your filings that

14   you're making that -- taking that position.

15             MS. SMITH:  I was just worried that Your Honor might

16   be conflating the *Hazelwood* standard with *Pico*.  *Pico* is a

17   right-to-receive case.  The *Hazelwood* case is the one that deals

18   with viewpoint discrimination.  They're not the same standards.

19             However, I think the Court has absolutely hit upon the

20   fact that both standards do dictate that if there is a

21   legitimate pedagogical basis, then we have to give that tie, so

22   to speak, to the runner.  That means that the School Board has

23   to win; otherwise, the federal court's going to come in -- or

24   the expert's going to come in and try to undercut that.

25             Quickly, only other point I want to make, because I

1    hadn't heard this before, Your Honor, was a claim that

2    plaintiffs are entitled to an injunction because we're not

3    following our policy.  That would just be an obey-the-law kind

4    of injunction.  We have our policy.  It is content-neutral, it

5    is viewpoint-neutral, and I don't believe that that is --

6           THE COURT:  And they acknowledge that their Complaint

7    did not allege -- I don't know what it would be.  14th Amendment

8    process-based challenge.  They've alleged that.

9           MS. SMITH:  Thank you, Your Honor.  I appreciate your

10   time.

11          THE COURT:  Okay.  Thank you.

12          Let's take ten minutes, and then I'll come back.  And

13   if I can give you my answer, I'll give you an answer.  If not,

14   I'll tell you where we're going next.

15       *(Recess taken from 12:53 p.m. to 1:04 p.m.)*

16          THE COURT:  Y'all can be seated.

17          First of all, I'd thank the attorneys for a very

18   helpful argument.  It really did help crystallize some issues in

19   my mind and refine my thinking on other issues.

20          I'd also like to commend the members of the public who

21   stayed here through the duration of that.  That may be a little

22   more exciting than watching paint dry.

23          And particularly for our students who stuck around and

24   stayed here.  I think it's very helpful any time -- putting

25   aside libraries, putting aside books, putting aside viewpoints,

1    any time a student gets an opportunity to watch any part of our

2    government operate, I think it's very important, and it's -- I

3    would encourage more students.  Go back and tell your classmates

4    that it's kind of neat to go sit in court and send them in here

5    more frequently.  That's a good thing.

6            Anyway, here's my thoughts on where we are.

7            You know, I have a motion to dismiss in front of me.

8    It's been fully briefed.  It's been fully briefed for quite some

9    time, and I do apologize to the parties for not getting a

10    resolution to you quicker.  I've been dealing with a lot of

11    other important, pressing cases -- not that this is not an

12    important, pressing case, but sometimes things get shuffled

13    down, and this one has gotten shuffled down.  And I know that

14    you need a ruling so you can move forward with the case or not.

15            The long and the short of it is -- and I'll give you

16    my explanation, and I'm going to follow this up with a written

17    order.  It's not going to be a long tome on the First Amendment

18    or any of these issues, simply because I tend to not like to do

19    that, because -- particularly on a motion to dismiss when a case

20    is going to move forward.  It's not going to the appellate

21    court, and it's just going to kind of crystallize the issues.

22    And then when we get to the point of having to either make

23    written findings or oral findings based on the evidence, I can

24    give you more detail.  But at this point, just giving you an

25    answer, I think, is more important.

1              So the issues that were raised in the motion to

2       dismiss, the first one was whether the Complaint is a shotgun

3       pleading.  And certainly there was a hallmark or an indication

4       of a shotgun pleading in the sense that you had each subsequent

5       count incorporating the allegations in each prior count.  The

6       Eleventh Circuit said that's an indication of a shotgun

7       pleading.  But at the end of the day, what a shotgun pleading

8       involves is a complaint that doesn't provide fair notice of the

9       claims being asserted and the grounds upon which those claims

10      rest.

11             And I think, at least in my mind, even though this

12      Complaint was far longer than it needed to be and had more

13      rhetoric in it than it needed to have, at the end of day, it

14      provides defendants fair the notice of what the claims are and

15      the grounds upon which those claims rest.  The fact that you

16      have multiple different types of plaintiffs in each particular

17      count I don't think undermines that to the point of making this

18      a shotgun pleading.

19             Certainly, the standing issues that we discussed today

20      may be could have been pled more clearly or more apparent in the

21      Complaint, but I think the clarification we got today satisfies

22      me that the defendant can respond to this Complaint

23      intelligently.  It was able to file a 36-page motion to dismiss,

24      which, even though part of that motion expressed some confusion

25      about some of the issues, at the end of the day, it understood

1    enough of what was being alleged against it to formulate legal

2    argument in response, and I have no doubt that they'll be able

3    to formulate an answer in response as well.

4           On the issue of standing, the defendant argues that

5    none of these plaintiffs have standing to challenge the book

6    removal or restriction decisions.  My view is exactly the

7    opposite.  I think all of the plaintiffs have sufficiently

8    alleged standing here.  And, again, understand that simply

9    alleging standing is enough to allow the case to move forward.

10   You ultimately are going to have to prove standing.  But for

11   purposes of pleading, I think the plaintiffs have adequately

12   alleged their standing.

13          The parent plaintiffs have standing on behalf of their

14   children because the Amended Complaint alleges that the children

15   intended to check out specific books that either were removed or

16   restricted during the upcoming year, which is now ongoing, and

17   that they were, and now still are, unable to do that because of

18   the removal or restriction decisions.  And that falls squarely

19   within what the Eleventh Circuit said in the *ACLU* case as

20   providing standing.

21          I'm not going to reach the question as to whether the

22   parent plaintiffs have standing on their own behalf because they

23   clearly have standing, in my view, on the children's behalf.

24   And really whether they have standing on their own behalf will

25   probably turn on the question of whether they are patrons of the

1    library as well, as was the case in the *Miami-Dade County*.

2          At least at this point, I'm not persuaded by the idea

3    that simply because a parent wants their kid to check out a

4    book, that's enough to give them standing.  If the kid --

5    "child" I should say -- can't check out the book.  But, again,

6    I'm not going to be able to answer that question definitively

7    now because the parent plaintiffs clearly have standing on

8    behalf of their children.  In other words, the children have

9    standing but have to vindicate their rights through the parents.

10         The author plaintiffs and the publisher I believe have

11   adequately alleged their standing because the removal or

12   restriction -- and/or restriction of the books deprives them of

13   a target audience for those books that they've either written or

14   publish, and it takes away a forum that was previously available

15   to them for the speech that's embodied in those books.

16         And to me, the fact that -- and maybe it goes more to

17   the merits than the standing, but the fact that these authors

18   were previously allowed into the library to convey their speech

19   and now are removed from the library is a significant

20   difference, and it kind of undercuts the idea that they can

21   force themselves into the libraries to begin with.  That's not

22   what we're dealing with here.  If we were dealing with that, we

23   would have a different case and need to consider that

24   differently.

25         As to PEN, I think it has adequately alleged

```
 1    associational standing as to the specific books that its members
 2    either authored -- or author, and the Complaint alleges that the
 3    interests that are implicated by the defendant's actions are
 4    germane to PEN's purposes, and so I think that gives it
 5    associational standing.
 6         And as to organizational standing, I think that
 7    gives -- I think they've adequately alleged that as well, and
 8    that covers the rest of the books that were not either
 9    published, authored, or desired by a student or an author,
10    publisher, because they've alleged -- and ultimately they're
11    going to have to prove.  But they've alleged that the
12    defendant's actions here have required it to divert resources
13    from its other purposes, and the Eleventh Circuit has said that
14    that's the kind of thing that's necessary for organizational
15    standing.
16         So anyway, from a standing perspective, I think that's
17    been adequately alleged for everyone.
18         There was arguments in the motion to dismiss that the
19    case is either not ripe or moot based upon the special
20    magistrate process in Florida law.  That was more or less
21    conceded today as not being a viable claim.  And even if it
22    wasn't conceded, I would have rejected it because the objection
23    process in the magistrate -- special magistrate only applies,
24    only can be used by parents who are dissatisfied with the
25    Board's decision not to remove a book, rather than parents or
```

1  publishers or anyone else who was dissatisfied with the decision

2  to remove the book.

3          I think that's apparent from the language of the

4  statute.  I think that's apparent from the rule.  And, moreover,

5  that rule makes very clear that the commissioner of education

6  doesn't want to get himself in this because it says that the

7  relief available to a parent under the process -- special

8  magistrate process does not include the removal of the material

9  or limiting student access.  So in essence, the decision is

10 still made at the local level.  That process is just there to

11 review whether that process was complied with when a book was

12 left on the shelf.  So it just doesn't have any bearing on where

13 we are here.

14          So that gets us to the merits.

15          In my view, both the first and second count, Counts

16 One and Two state plausible First Amendment claims.  I'm not

17 persuaded -- I'll say "at this point" -- because I think the

18 government speech really is something that is fact-dependent.  I

19 don't think the facts are going to change here, so I don't think

20 the outcome is going to be any different.  But most of the

21 government speech cases I read -- I think the State cited one

22 that was a motion to dismiss, but the bulk of them are summary

23 judgment cases where the evidence is developed and you can

24 address the factors that are laid out:  the history,

25 endorsement, and control.

1          Here, my view of it is -- and I doubt it's going to

2     change even at summary judgment -- is that the content or the

3     decisions about content of school libraries is not government

4     speech that's unrestrained by the Constitution.  And that idea

5     only got four votes in *Pico*; and best I can tell, no court since

6     *Pico* has adopted that view.

7          Certainly, the Eleventh Circuit had -- I don't know if

8     it had the opportunity, if it was briefed in the *ACLU* case, but

9     it certainly could have made a lot shorter decision by saying

10    the First Amendment doesn't apply.  So my view of it is that

11    that just isn't a persuasive argument.

12         Additionally, if I had to, if I have a gun to my head

13    and I had to decide whether those factors were met, at this

14    stage, I don't see how the content of a school library would be

15    viewed by anyone as an endorsement of the ideas contained in

16    those books, particularly given that the historical purpose of a

17    library is to provide information on a broad range of subjects

18    and viewpoints.

19         And, in fact, the statements in the School Board's own

20    policies -- and that's 4.06.9.A and C -- I mean, clearly

21    articulate that they believe that the purpose of a library is to

22    provide these with divergent viewpoints and variety of content.

23    And so I just don't see how any reasonable person would construe

24    what's on the library shelves as being the government speaking.

25         In fact, the school district policy says exactly the

1    opposite of that.  I didn't overlook these cases that the

2    government gave me about government speech; but those, to me,

3    are just distinguishable art displays on public property.

4    Speeches -- or speakers before legislative sessions, things of

5    that nature, where it could reasonably be construed as the

6    government speaking just is not what we have in the library

7    context.

8          So moving on, so having determined that the First

9    Amendment does apply in this context, the question becomes what

10   standard applies and have the plaintiffs adequately alleged that

11   the actions here violate the standard.

12         And as we discussed, both sides, you know, the First

13   Amendment standards here are not entirely clear.  We don't have

14   an Eleventh Circuit case on point saying this is the standard

15   you apply in the school library context.  But looking at what

16   the Eleventh Circuit talked about in *ACLU*, looking at the

17   potentially relevant standards -- the *Pico* standard, the

18   *Hazelwood* standard, the nonpublic forum standard -- it appears

19   to me the lawyers seem to essentially acknowledge that they're

20   more or less conceptually the same.

21         And as I've kind of summarized them, it seems to me

22   that what the standard is is that school officials can't remove

23   books simply because they disagree with the views expressed in

24   the books, but they can make content-based removal decisions

25   based on legitimate pedagogical concerns, including things like

1   pornographic content, offensive language, gross factual

2   inaccuracies, educational unsuitability for certain grade

3   levels, all of which was -- those examples were talked about in

4   *Pico*.

5           And so at this point, the question is whether the

6   Complaint plausibly alleges that the School Board is making

7   decisions for reasons that it can't be -- can't constitutionally

8   make those decisions.  In my view, it is -- they've alleged

9   that.  Whether they'll be able to prove that remains to be seen,

10  but they have alleged that the decision -- the reasons these

11  books are being removed or restricted would not pass

12  constitutional muster on the standard as I've articulated.  And

13  so for that reason, I think both Counts One and Two, which I

14  view as a mirror -- or the opposite sides of the same coin, pass

15  constitutional muster and can proceed.

16          On Count Three, this probably will come as no surprise

17  to anyone who watched the argument today.  I don't think that

18  states a plausible equal protection claim.  Ms. Agarwal made a

19  valiant effort to convince me otherwise, but it just seems to me

20  that, you know, the plaintiffs have not alleged that the

21  policies pursuant to which defendant is making these removal

22  decisions are discriminatory in any way.  And, frankly, I don't

23  think they could make that claim with -- in good faith because

24  the policies are facially neutral.  They don't single out black

25  authors, white authors, gay authors, nongay authors.

1        And so really what the plaintiffs are trying to allege

2   here is what we call a disparate-impact claim.  In other words,

3   that the book removal or restriction decisions have a greater

4   impact on non-whites and/or LGBT authors and non-white and/or

5   LGBT students.  And to state such a claim, the plaintiffs got to

6   show intentional animus-based discrimination against members of

7   a protected class.  And so we're talking about discrimination

8   against individuals, not against ideas in books.

9        And in my reading of the Complaint, even giving it the

10  most liberal reading as I can give it, it just fails to meet

11  that standard because it does a variety of things.  It

12  amalgamates both non-whites and LGBT individuals even though

13  they're distinct protected classes, and it conflates -- most

14  significantly, it conflates alleged animus against ideas in

15  books with animus towards individuals within those discrete

16  classes.  And in my view, that just requires far too many

17  inferences to conclude that the removal of a particular

18  subject -- a book with a particular subject equates to

19  intentional discrimination against a person in a protected

20  class.

21        And as I talked with Ms. Agarwal about it, the

22  allegations in the Complaint that we have white parent

23  plaintiffs who want their children to read books about minority

24  issues and alternative lifestyles just undercuts the whole idea

25  that the subject matter of the books can be used as a proxy for

1    its readers or a proxy for its authors such that the

2    discrimination based on subject is the same as discrimination

3    against a person.  And I'm just not willing to make those

4    inferences.  This is the First Amendment case; this is not a

5    14th Amendment case.

6            And moreover, as I discussed, I just don't think as --

7    even if I wanted to a different direction, I don't think the

8    Complaint has plausibly alleged a disparate-impact claim based

9    on LGBTQ students because there's no allegations that any of

10   these children fall within those protected classes.

11           And I was encouraged to hear that the plaintiff did

12   not want to out these kids, which is a good thing, unless they

13   want to be outed.  But they would have to do that to prove this

14   claim, and so I'm glad -- by saying they weren't going to do

15   that, they effectively conceded they weren't going to be able to

16   prove it.  So at most what would have allowed it to go forward

17   was the 14th Amendment claim against the authors, but to me that

18   still requires too many inferences.

19           So and stepping back to the First Amendment claims,

20   one of the other notes I had was the Eleventh Circuit's been

21   clear that eliminating sexual conduct and explicit vulgarity is

22   a legitimate concern.  *Pico* plurality recognized that, as did

23   the *ACLU* case, and that's what the removal and restriction

24   statute and the Board's new policy focuses on.  All of that

25   being said, the plaintiffs alleged -- and I have to accept as

1    true at this point -- that none of those books meet that

2    standard.  And that's paragraph 75, 81 to 82 of the Complaint

3    that I particularly noted on that.

4           So for all those reasons, what the disposition of the

5    motion to dismiss is is granted in part as to Count Three, and

6    that count will be dismissed and denied in all other respects.

7           So at this point, the next stage in the litigation

8    process is the defendant will answer the Complaint and assert

9    any affirmative defenses or counterclaims that it might have.

10          Ms. Smith, have you given any thought to how long you

11   would need or want to do that?

12          MS. SMITH:  Would 30 days be acceptable, Your Honor?

13          THE COURT:  From plaintiffs' perspective, is that?

14          MR. SAFIER:  That's fine with us, Your Honor.

15          THE COURT:  Why don't we set it -- I like round

16   numbers, so let's make it 28 days so we don't have to worry

17   about counting on weekends in the event that it falls on that.

18   So I'll give you 28 days to answer.

19          The other thing I'd like to -- well, before I talk

20   about what I'd like to see the parties think about, from the

21   plaintiffs' perspective, what will come after this is I'm going

22   to enter an order that will be very similar to what you just

23   heard me read, very skeletal in nature, very here's what your

24   question is/here's what the answer is, with a lot of -- with not

25   a lot of dissertation about the law.  And so it will at least

```
1    give you an answer, it'll be memorialized, and you can do with
2    it what you want.
3            With that in mind, does the plaintiff need any
4    additional clarification, or are there any issues you think I
5    have not addressed?
6            MS. AGARWAL:  Your Honor, the only thing I would just
7    mention, and I know you're not -- you're dismissing the
8    protection claim, just to note that there were people of --
9    black students that we had also mentioned that you didn't
10   mention in the oral order.  I assume that is also dismissed.
11           THE COURT:  That's a fair point.  And so if I were to
12   have allowed that to go forward, it would have only been with
13   respect to the authors and the black plaintiffs -- or black
14   children, not the gay -- or maybe-gay, may-be-not-gay children.
15   I appreciate you saying that, and I'm not -- probably not even
16   going to mention what would have been allowed to go forward in
17   the claim.  I just wanted to give you the benefit of that
18   thought, but thank you.
19           Any additional clarification from the plaintiffs?
20           MR. SAFIER:  No, Your Honor.
21           THE COURT:  All right.  From the defendants?
22           Yes, ma'am.
23           MS. AGARWAL:  To confirm, you're dismissing it
24   without -- or with prejudice?
25           THE COURT:  I'm just dismissing it.  If you think
```

1  based upon what you've heard today that you can, in good faith,

2  come back and allege one, I'm not going to deny you that

3  opportunity, but this is a First Amendment case, not a

4  14th Amendment case so --

5          MS. AGARWAL:  Thank you, Your Honor.

6          THE COURT:  -- do with that as you please.

7          From the defendant's perspective, any clarification

8  you need on that ruling or anything?

9          MS. SMITH:  I will probably think of something at

10  2:00 o'clock in the morning, but as I sit here today --

11          THE COURT:  Don't call me at 2:00 o'clock in that

12  morning.

13          MS. SMITH:  No, Your Honor.

14          MR. SAFIER:  If you do, we need to be on the line.

15  You know the rules.

16          THE COURT:  All right.  Ms. O'Hickey, I know you're

17  not a party, but I have addressed the issue you've raised.

18  Anything that you think I have not explained sufficiently on

19  that issue?

20          MS. O'HICKEY:  No, Your Honor.  I think we're clear on

21  your view.

22          THE COURT:  Okay.  And it may be the wrong view, but

23  at least you're clear on it.  So very well.

24          All right.  So that will follow.  I don't know if I'll

25  be able to get that out today or tomorrow or the next day, but

1   within the next few days, I will get that out.  But we'll start

2   the 28-day clock from today because the outcome is not going to

3   change, just some of the wording might.

4           What I would like to talk about -- and, you know, take

5   this with a grain of salt.  We are early in the litigation.  The

6   parties are still feeling things out, trying to discover things.

7   But what I would like the parties to consider, with the

8   understanding that if at the end of the day I've got to read 160

9   books and make these determinations based on witnesses that tell

10  me one thing or the other -- assuming Ms. Smith doesn't later

11  convince me at summary judgment or some other point that I can't

12  do that -- I will do that.

13          That being said, it seems very -- I don't want to do

14  that if I don't have to.  And it seems to me that there has to

15  be a resolution that the School Board can live with that doesn't

16  require a potential attorney-fee award, if they lose this case,

17  and paying Ms. Smith and Mr. Grosholz, and all these attorneys,

18  you know, to fight this battle.  If this is a hill they want to

19  die on, we'll go up the hill and somebody will die on it.  But

20  it just seems to me that in light of the policy the School Board

21  passed that says that anything that is only being -- that is

22  only being challenged based on educational and suitability,

23  1557, whatever it is, the School Board's current policy says

24  those books should be available pending review.

25          And it seems to me that in view of that, there ought

1    to be a way that the parties can sit down with this list of

2    books and figure out the ones that are only being challenged on

3    that basis and get those back into the library, consistent with

4    current school board policy.  And that will at least -- doesn't

5    stop the review of them necessarily, but at least it will get

6    more books out there available to kids that may or may not want

7    them.

8            The litigation will focus on anything that gets

9    removed between now and whatever time we go to trial, or the

10   books that, by statute, the Board has to restrict at the present

11   time until we make a determination, either they make a

12   determination, as the Board, that those restrictions are valid,

13   or I make a determination that they're -- no sexual content or

14   all the different standards we talked about.  And so it seems to

15   me that that would be a productive effort to kind of narrow the

16   case.

17           And the other thing I would strongly encourage the

18   parties to talk about, because I am very troubled by this idea

19   that you can have a citizen, with the best of motives or with

20   the worst of motives, walk into the school board office and say,

21   *Goodnight Moon* has sexual content in it; and as a result, that

22   book is in purgatory because there's no time frame in the

23   current rule to get the decision made one way or the other.

24           And that seems to be a fundamental problem with the

25   rule.  The answer can't be a -- there's no threshold

1    determination -- there has to be some way to weed out either

2    complaints that are just facially ridiculous like sexual content

3    in *Goodnight Moon* and get the decision made a lot quicker.  Or

4    if it's, you know, *To Kill a Mockingbird*, where there's clearly

5    discussions of rape, to at least get the decision made at some

6    point whether that is going to be restricted or prohibited or

7    not, that it can't live in purgatory forever simply because,

8    rightfully or wrongfully, somebody said it meets one of these

9    categories.  And it seems like that would be something that

10   would be in both parties' interest.

11         I know it might get challenged from the School Board

12   because this is a cumbersome process, but you've created the

13   process, you can refine the process.

14         And one last thing I would suggest on that -- and take

15   this for absolutely what it's worth, because I understand -- I

16   believe in local control, I believe in the political process,

17   but I also recognize that politicians making decisions that

18   require some level of expertise that they likely don't have

19   aren't always the best decisions.  And I wonder, taking off my

20   judge hat and putting on my think-about-it hat, why the School

21   Board couldn't adopt a policy that essentially defers this

22   decision to this panel of experts.  Let them make the call.

23   Then the School Board has made the policy decision that:  We

24   trust this organization we set up to evaluate these books.

25         And, you know, maybe the PEN folks or somebody else,

1   if they get comfortable with who's on that, I mean, at some

2   point you're going to have to accept the fact that some books

3   that you would prefer to be on the shelves are not going to be

4   on the shelves.  And it seems to me that whether that decision

5   is made by me or it's made by a panel of experts, if that's the

6   decision, everybody ought to be able to live with it.

7           And so that was the spirit in which I wrote that

8   initial thing saying y'all have got -- y'all are a lot of smart

9   lawyers getting paid a lot of money.  It seems like there's a

10  way to figure out a solution to some of these issues.

11          So I know I've said a lot.  I know you're probably not

12  in a position to agree to it, but is it something we can build

13  into the time frame?  Would a facilitator help?  What can I do

14  to help you, at a minimum, narrow the case, if not come to a

15  solution that might resolve it?

16          So I'll let you take a stab.

17          MS. SMITH:  I'll go first.

18          We have a very good rapport, the counsel for the

19  parties.  We have already started discussions.  I think we can

20  continue those discussions of it after having the opportunity to

21  confer with our respective clients.  But at this point, I know

22  of nothing additional that we would need from you.

23          THE COURT:  Okay.  Mr. Safier.

24          MR. SAFIER:  I would just echo that.  I know --

25  correct me if I'm wrong -- but at some point we are required to

1    mediate; is that correct?

2         THE COURT:  I'm sure the scheduling order has

3    something in that that --

4         MR. SAFIER:  We would -- you know, we can talk about

5    it and see if we're make progress, maybe tie that to that

6    process as well.  But I agree with Ms. Smith.  The next step

7    should be for us to discuss with our clients and discuss with

8    each other.

9         THE COURT:  Okay.  And the reason I'm suggesting all

10   this is not to get out of work.  Because at the end of the day,

11   as I said, if the parties can't resolve the case, that's what

12   the court system exists for is to resolve disputes so you're not

13   out on the street fighting each other.  And if that means I've

14   got to review a book and say, This one goes in the trash bin,

15   this one doesn't -- then so be it.

16        But given that this -- there's a lot of policy issues

17   at play in this:  The First Amendment's at issue, there's local

18   control at issue, there's parental rights at issue -- there's

19   all kinds of things in it that are well beyond the scope of what

20   the court needs to be doing, and that just screams to me to be a

21   case that can be resolved in that setting.  And some people in

22   the public may be dissatisfied with it, but so be it.

23        So anyway, with that, I won't -- other than giving

24   those pieces of free advice -- will not order anything else.  I

25   would, though, encourage you also to consider in evaluating

1    those discussions some of the things I talked about today that

2    trouble me about where this case would likely go if it was

3    litigated to the hill to die on.  And that would be, again, we

4    would have from elementary school up to high-schoolers being

5    subjected to the deposition, being placed under oath, testifying

6    in federal courtrooms to prove the allegations that are made in

7    this that they want Book A or Book B.

8           Additionally, we would have this advocacy organization

9    opening -- and, again, I'm not prejudging; I'm just saying where

10   this could go.  Potentially opening its books and records to the

11   world to see, or at least parties.  We could protective-order

12   it, if necessary, but probably not something most advocacy

13   organizations like to do.

14          On the flip side of it, we very well could have school

15   board members being sat down for deposition.  I know we're going

16   to hear protective orders on legislative immunity and things of

17   that nature and protective orders on, They don't need all of our

18   information.  But it just seems like both sides have an

19   incentive to avoid the messiness of litigation.  And so, again,

20   I'm beating a dead horse here, perhaps, but that's my pitch to

21   you.

22          So with that, anything else we need to talk about

23   today from the plaintiffs' perspective?

24          MR. SAFIER:  No, Your Honor.

25          THE COURT:  From the defendant's perspective?

1          MS. SMITH:  No, Your Honor.  Thank you.

2          THE COURT:  State of Florida?

3          MS. O'HICKEY:  No, Your Honor.

4          THE COURT:  Okay.  Anything the State of Florida can

5     do to facilitate this, because I know you've got other issues

6     around the state going on, and at some point -- not this case

7     yet, but at some point your state statute might be challenged

8     and you're going to be neck-deep in it.  So anything you can do

9     to encourage it, or at least not discourage it, that would be

10    most appreciated.

11         So with that, I do appreciate everyone's time today.

12    I'm sorry we ran a bit long, but I hope everybody walks out of

13    here believing they got to say their piece.  It was all heard.

14    It was all appreciated.  And as I said, you'll get an order from

15    me within the next couple of days kind of memorializing what

16    I've said today, and it will look very similar to what I've said

17    today.

18         And with that thank you for your time, I hope you had

19    a good trip to Pensacola, and we're adjourned.

20         *(Proceedings adjourned at 1:35 p.m.)*

21                  *  *  *  *  *  *  *  *

22

23

24

25

1

2       I hereby certify that the foregoing is a true and correct

3  transcript of the stenographically reported proceedings held in

4  the above-entitled matter, pursuant to the provisions of Section

5  753, Title 28, United States Code.

6

7                                            1/13/24

8  _____        _____
   Julie A. Wycoff, RMR, CRR        Date
   Official U.S. Court Reporter

9

10                        **I N D E X**

11

12  **ARGUMENT BY:**

13          **Ms. Smith** .........................................**5**

14          **Ms. O'Hickey** .....................................**36**

15          **Ms. Oberlander** ...................................**54**

16          **Mr. Safier** .......................................**69**

17          **Ms. Agarwal** ......................................**89**

18          **Ms. Smith** .......................................**104**

19

20

21

22

23

24

25