# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| PEN AMERICAN CENTER, INC., et al.,<br><br>    Plaintiffs,<br><br>vs.<br><br>ESCAMBIA COUNTY SCHOOL BOARD,<br><br>    Defendant. | CASE NO.: 3:23-CV-10385-TKW-ZCB |

# PLAINTIFFS PEN AMERICAN CENTER, INC. AND SEAN PARKER'S MOTION FOR PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ........................................................... 1

FACTUAL BACKGROUND ............................................................... 2

I.    The PI Plaintiffs .................................................................... 2

    A.    PEN ....................................................................... 2

    B.    Sean Parker ............................................................ 5

II.   The Board's Book Challenge Policies ...................................... 5

III.  The Board's Book Challenge Practices ..................................... 9

IV.   HB 1069 ............................................................................... 12

V.    The Seven Books at Issue ...................................................... 14

LEGAL STANDARD ....................................................................... 17

ARGUMENT ................................................................................. 18

I.    The PI Plaintiffs Are Likely to Succeed on the Merits of Their
Claim ..................................................................................... 18

    A.    The PI Plaintiffs Are Likely to Succeed on the Merits of
Their Viewpoint Discrimination Claim Regarding the Seven
Books ..................................................................... 18

    B.    The Indefinite Restriction of the Books at Issue Violates the
First Amendment ..................................................... 21

    C.    HB 1069 Does Not Warrant Further District-Wide
Restriction of These Books ........................................ 22

    D.    The PI Plaintiffs Have Standing .................................. 25

        1.    PEN Has Organizational Standing ........................... 25

i

2. PEN Has Associational Standing ............................................... 26

3. Sean Parker Has Standing ....................................................... 27

II. The PI Plaintiffs Will Suffer Irreparable Injury Unless the Injunction Issues ............................................................................ 28

III. An Injunction Would Be Equitable and in the Public Interest ..................... 29

CONCLUSION ............................................................................ 30

RULE 7.1(B), (F) CERTIFICATIONS ................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of Florida, Inc. v. Miami-Dade County School Board*,
  557 F.3d 1177 (11th Cir. 2009) .........................................................18

*Arcia v. Florida Secretary of State*,
  772 F.3d 1335 (11th Cir. 2014) .........................................................26

*Board of Education, Island Trees Union Free School District No. 26
  v. Pico*,
  457 U.S. 853 (1982) ...........................................................................18

*Catholic Legal Immigration Network, Inc. v. Executive Office for
  Immigration Review*,
  513 F. Supp. 3d 154 (D.D.C. 2021) ...................................................28

*Common Cause Indiana v. Lawson*,
  937 F.3d 944 (7th Cir. 2019) .............................................................29

*Complete Angler, LLC v. City of Clearwater*,
  607 F. Supp. 2d 1326 (M.D. Fla. 2009) .............................................29

*Democratic Executive Committee v. Lee*,
  915 F.3d 1312 (11th Cir. 2019) .........................................................30

*East Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) .............................................................28

*Environmental Defense Fund, Inc. v. Hardin*,
  428 F.2d 1093 (D.C. Cir. 1970) .........................................................22

*FF Cosmetics FL, Inc. v. City of Miami Beach*,
  866 F.3d 1290 (11th Cir. 2017) ....................................................17, 28

*Florida State Conference of the NAACP v. Browning*,
  522 F.3d 1153 (11th Cir. 2008) .........................................................25

*Gillman v. School Board for Holmes County, Florida*,
  567 F. Supp. 2d 1359 (N.D. Fla. 2008) .............................................20

iii

*Groome Resources Ltd. v. Parish of Jefferson,*
     234 F.3d 192 (5th Cir. 2000) ...............................................................22

*Hazelwood School District v. Kuhlmeier,*
     484 U.S. 260 (1988).............................................................................18

*Hispanic Interest Coalition of Alabama v. Governor of Alabama,*
     691 F.3d 1236 (11th Cir. 2012) ...........................................................28

*Joelner v. Village of Washington Park,*
     378 F.3d 613 (7th Cir. 2004) ...............................................................30

*KH Outdoor, LLC v. City of Trussville,*
     458 F.3d 1261 (11th Cir. 2006) ......................................................28, 30

*LaCroix v. Town of Fort Myers Beach,*
     38 F.4th 941 (11th Cir. 2022) ..............................................................29

*Little v. Llano County,*
     103 F.4th 1140 (5th Cir. 2024) .................................................20, 27, 30

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
     141 S. Ct. 63 (2020)........................................................................22, 28

*Rosenberger v. Rector & Visitors of University of Virginia,*
     515 U.S. 819 (1995).............................................................................18

*Scott v. Roberts,*
     612 F.3d 1279 (11th Cir. 2010) ...........................................................29

*Speech First, Inc. v. Cartwright,*
     32 F.4th 1110 (11th Cir. 2022) ......................................................28, 30

**Statutes**

F.S. 847.001 ............................................................................*passim*

F.S. 847.012 ............................................................................*passim*

F.S. 1006.28 ...............................................................2, 5, 12, 24

iv

## PRELIMINARY STATEMENT

For well over a year, defendant Escambia County School Board ("Board") has restricted access to books in its school libraries based on nothing more than discriminatory viewpoint-based challenges by local residents who dislike the messages in those books. These restrictions violate the First Amendment and they need to end immediately. The school children of Escambia County should be free to peruse and check books out of a school library, and the authors of the books should be free to have their works available to the school children of Escambia County, unless and until the Escambia County School Board (the "Board") makes a substantive determination that a particular book should be removed from or restricted in a particular school library for appropriate pedagogical or other legitimate, non-discriminatory reasons. Accordingly, Plaintiffs PEN American Center, Inc. ("PEN") and Sean Parker ("PI Plaintiffs") move for a preliminary injunction directing the Board to immediately return seven challenged library books to general circulation in Escambia County Public School (ECPS) libraries so that they are available for the 2024-25 school year. These seven books have *not* been challenged for reasons that would require their restriction pending review

under the Board's own policies, and should be returned to the shelves immediately, while any review and resolution of the challenges proceeds.[1]

## FACTUAL BACKGROUND

Plaintiffs brought this lawsuit in response to the Board's actions to remove or restrict access to library books based on hostility to the ideas they express and/or their authors or themes. Amended Complaint ("Am. Compl.") ¶¶ 3-7, ECF 27. The Board's restrictions and removals have disproportionately targeted books by or about people of color and/or LGBTQ people.

## I.    The PI Plaintiffs

### A.    PEN

Plaintiff PEN is a nonprofit membership organization dedicated to ensuring people have the freedom to create literature, express their views and ideas, and access the views, ideas, and literature of others. Decl. of Summer Lopez ("Lopez Decl.") ¶ 3. Among other things, protecting the free-expression rights of its author members is central to PEN's purpose as an organization. *Id.* ¶ 5. PEN operates "Free Expression Programs" that serve to defend writers and journalists and protect free expression rights in the United States and around the world. *Id.* ¶ 4. Initiatives

---

[1] Plaintiffs are not currently seeking the immediate return of books that have been challenged on the basis that they (I) are "pornographic" or otherwise prohibited under F.S. 847.012 or (II) depict or describe sexual conduct as defined in F.S. 847.001(19). *See* F.S. 1006.28(2)(a)(2)(b)(I), (II).

of these programs include research and reports, public advocacy, and campaigns on behalf of particular policy issues or individuals. *Id.* Topics for these initiatives have included campus free speech, online harassment, and writers and artists facing political persecution abroad. *Id.* Laurie Halse Anderson, the author of *Speak*, one of the seven books at issue in this motion, is a PEN member. *Id.* ¶ 6.

As a consequence of efforts in Escambia County to remove books from public school libraries based on political or ideological objections, PEN America has expended significant resources and time to addressing these books bans and has diverted resources away from its other priorities. Indeed, PEN eventually had to expand its workforce to address the proliferating book bans in Escambia County and across the country. In response to these bans, PEN has (1) hired four full-time staff to work on (a) tracking and reporting on book removals and restrictions, (b) supporting author-members who have concerns about what is happening to their own books, and (c) responding to a consistent onslaught of inquiries and notifications from parents, teachers, students, and media concerned about Defendant's and others' removal and restriction of books, who looked to PEN for insight and guidance; and (2) diverted existing staff away from its other priorities of free speech education for youth and free speech issues on college campuses to focus on the book bans in Escambia County. *Id.* ¶ 7.

The staff hired by PEN in response to book bans in Escambia County and elsewhere include a Program Director, Program Manager, Program Consultant and Program Assistant for PEN's Freedom to Read program. *Id.* ¶ 8. In 2022-2023, much of these individuals' time was taken up with the book bans in Escambia County, diverting resources away from other projects and issues to work on matters directly related to the removal and restriction of books in Escambia County. *Id.* ¶ 9. This work included engaging in research and tracking book removals and restrictions in Escambia County since at least 2022, public and community outreach and education, media communications, advocacy efforts directed at the Board, local partner coordination, and communications with authors directly impacted by book removals and restrictions in Escambia County that are the subject of this lawsuit. *Id.* ¶ 10.

In addition, other PEN employees were diverted from their work dedicated to free speech education for youth or to free speech issues on college campuses, two other areas related to education on which PEN has typically focused its resources. *Id.* ¶¶ 11-14. Specifically, at least seven PEN staff members have been diverted from working on the organization's free expression and education teams to working on issues related to book removals and restrictions in Escambia County school libraries. *Id.* ¶ 11.

**B.      Sean Parker**

Plaintiff Sean Parker is the parent of a 14-year old student (M.P.) in the Escambia County Public Schools. Decl. of Sean Parker ("Parker Decl.") ¶ 2. Parker has recommended to his child that he check out and read *The Hate U Give*, by Angie Thomas. *Id*. ¶¶ 3-4. Parker would like the book to be available to M.P. in his school library and would like M.P. to check the book out from his school library. *Id.* ¶ 9. M.P. has expressed an interest in checking out and reading *The Hate U Give* from his school library. *Id.* ¶ 4. *The Hate U* Give tells the story of a Black teenager who is killed by a police officer and the consequences that follow for his friend who witnesses the killing. *Id.* ¶ 5. Parker believes it is important for M.P. to read and reflect on *The Hate U Give*, as it reflects a sad reality for many young Black people growing up in America, and thinks that exposure to such stories is critical to developing M.P.'s consciousness as a young Black teenager. *Id.* ¶¶ 6, 8.

**II.     The Board's Book Challenge Policies**

As required by state law, the Board maintains a program of school library media services for all public schools in the district. F.S. 1006.28(2)(d). The purpose of the libraries, in the Board's own words, is to:

1.       provide a *broad background* of information resources in all areas of knowledge; and

2.     support the general educational goals of the District and the objectives of specific courses, including *materials that represent diverse points of view*.

3.     Meet the personal needs and interests of students, including materials that:

a.     nurture the development of recreational/listening/viewing, cultural appreciation, and aesthetic values;

b.     *represent the many religious, racial, ethnic, linguistic, and cultural groups in our society* and reflect their contributions to the heritage and culture of our civilization;

c.     foster respect for the diverse roles available to all people in today's society;

d.     *provide education media that reflect differing and/or opposing viewpoints*; and

e.     provide a comprehensive collection appropriate for the users of the library media center and classroom library.

ECSB Policy Manual, *Educational Media Materials*, Policy 4.06 ("Policy 4.06"), at 8-9, § 9.A (emphasis added), attached as Exhibit 8 to the Declaration of Ori Lev ("Lev Decl."). *See also* Lev Decl. ¶ 17 (explaining provenance of Exhibit 8).

Until December 19, 2022, Policy 4.06 was silent on the question of whether a challenged book should remain available to students during the pendency of the challenge. Lev Decl. Ex. 9.[2]

---

[2] This document was filed in *Parnell v. Sch. Bd. of Lake Cnty.*, No. 5:23-cv-00381-BJD-PRL (M.D. Fla.), in which the Board was also a defendant. The redlines and notations on the document are explained in the upper-right hand corner of the first page of the document. As explained there, the stricken language on the first page is the version of Policy 4.06 in effect until December 19, 2022. The redline additions reflect the version in effect from December 19, 2022 through June 20, 2023, as described below.

On December 19, 2022, the Board adopted a revised version of Policy 4.06 with a more detailed book challenge process. *Id.* The Policy recognized that "*Parents* have the right to determine what they believe is and is not appropriate reading material for their student" and provided that parents can choose to opt their children out of access to school libraries. *Id.* at 10, § 9.B (emphasis added). The Policy also recognized that "No parent, guardian or resident of the county has the right to determine the reading, viewing or listening resources for students other than their own children." *Id.* at 14, § 10.A.3. Accordingly, the Policy expressly provided that other than material challenged on the basis that it is pornographic or prohibited under F.S. 847.012, "*challenged material will remain in circulation during the pendency of the review process*. Parents may at any time opt their child out of all materials currently under review which remain in circulation." *Id.* at 15, § 10.A.4.c (emphasis added). The Policy also provided that the Superintendent "shall retain the right to make a determination that a challenge lacks sufficient facts to support a preliminary finding that the material contains content that is pornographic or prohibited under F.S. 847.012. In such case, the challenged material will remain in circulation during the review process." *Id.* at 14-15, § 10.A.4.b.

On June 20, 2023, the Board adopted on an emergency basis what would later be permanently adopted as the current version of Policy 4.06. Lev Decl. ¶ 19

& Ex. 10. In recognition of recently enacted HB 1069 (discussed below), the new version of the Policy provides that material challenged on the basis that it "depicts or describes sexual conduct as defined in F.S. 847.001(19)" should also be restricted pending the challenge process "until a decision has been made by the Superintendent in consultation with the Coordinator of Media Services, District Materials Review Committee or Board." Lev Decl. Exh. 10 (Policy 4.06), at 16-17, §10.A.4.a. The Policy continues to provide that "*all other challenged material will remain in circulation during the pendency of the review process*" and that "Parents may at any time opt their child out of all materials currently under review which remain in circulation." *Id.* at 17, § 10.A.4.b (emphasis added).[3] The revised Policy, however, removed the superintendent's authority to determine that a "challenge lacks sufficient facts to support" the removal of a book pending a final decision. *Id.* at 17 (removing former Section 10.A.4.c.).

On September 19, 2023, the Board adopted the revised Policy 4.06 on a permanent basis, with no further changes to Section 10 governing Challenged Material. Lev. Decl. ¶¶ 15, 17.

---

[3] The quoted language appears next to Section 10.A.4.**d**, but because subparagraphs (b) and (c) were deleted when the Policy was updated, the language constitutes new section 10.A.4.**b**, which is how it is cited above.

### III.    The Board's Book Challenge Practices

Even prior to adopting its December 2022 policy, the Board had a practice of restricting books subject to challenge. Shortly after the wave of book challenges began in 2022, on or around October 1, 2022, the Board implemented a new practice of restricting all challenged books pending a determination of the challenge (while allowing parents to affirmatively opt-in to allow their children access to the books, which were kept in a restricted part of the library). Lev Decl. Ex. 11.[4] Under the new procedure, any challenged book was automatically subjected to restricted access during the pendency of the review process. *Id.* This procedure empowered book challengers to ensure that any book they objected to for any reason would automatically be subject to restricted access.

Although the Board ultimately adopted the December 2022 policy that facially limited restricting books to those challenged as pornographic or prohibited under F.S. 847.012, in practice the Board restricted access more broadly to books that dealt with sexual assault, sexual identities or feminist themes. *See* Am. Compl.

---

[4] *See also* NorthEscambia.com, "*School Superintendent Moves Questioned Library Books to Parental Opt-In 'Restricted Section'*" (Oct. 1, 2022), *available at* https://www.northescambia.com/2022/10/school-superintendent-moves-questioned-library-books-to-parental-opt-in-restricted-section; Pensacola News Journal, "*100+ 'questionable' books placed in restricted section while Escambia schools review them,*" (Oct. 4, 2022), *available at* https://www.pnj.com/story/news/local/escambia-county/2022/10/04/escambia-county-banned-books-over-100-books-reviewed-ban/8166391001/.

9

¶¶ 77-82 (discussing *Kite Runner*, *The God of Small Things*, *the Handmaid's Tale*, *Slaughterhouse Five*, *Beloved*, *Forever*); Lev Decl. ¶¶ 3-4.

In addition, starting in early 2023, the School Board implemented a new (albeit not codified) practice in elementary schools of automatically subjecting to restricted access any book challenged on the ground that it violates Florida HB 1557, the "Parental Rights in Education Act," also commonly known as the "Don't Say Gay Bill," even though that statute, on its face, applies only to "classroom instruction." Lev Decl. Ex. 12 & ¶ 5.[5] And a review of challenges from that time period where the challenge form did not reference HB 1557 but did include the word or phrase "LGBTQ," "gay," "lesbian," "alternate sexualities," "alternate gender ideologies," "sexual alternatives," "transgenderism," "racist," "racial division," "racial commentary," "controversial racial … commentary," "inflammatory racial commentary," "inflammatory racism," or "inflammatory social commentary"—that is, buzz words for alleged "woke" content of the kind covered by HB 1557—shows that in virtually all instances the books challenged on those grounds were restricted more broadly than just in elementary schools pending a resolution of the challenges. Lev Decl. ¶ 6. As a result, challenged books

---

[5] Indeed, the Florida State Board of Education and the Attorney General of Florida have, in other litigation, explicitly disclaimed any application of HB 1557 to library materials. *See* State Defs.' Second Mot. to Dismiss, *Cousins v. Grady*, No. 6:22-cv-1312, at 8 (M.D. Fla. Dec. 16, 2022) (ECF 112) ("[T]he statute regulates only 'classroom instruction,' not the availability of library books.").

that merely recognize the existence of same-sex relationships or transgender persons have been subject to restricted access for the pendency of the often indefinite review period for that reason alone. *See Am. Compl.* ¶¶ 85-86 (discussing *Uncle Bobby's Wedding* and *Milo Imagines the World*); Lev Decl. ¶ 7.[6]

As of April 2023 (well over a year ago), the Board suspended the work of the review committees adjudicating book challenges and many of the books that were restricted based on those challenges have remained restricted to this day. *See, e.g.,* Lev Decl. ¶ 22 & Ex. 13; *ECPS 22-23 Reconsiderations (website)* ("ECPS Restricted Access Spreadsheet") (showing books currently restricted during review process in Column E).[7]

On June 13, 2024, the Board held a "workshop" to discuss how to revitalize the process to review and adjudicate challenges. The workshop makes clear that the Board has no timeline for resolution of the challenges. Lev Decl. ¶¶ 13-14.[8]

---

[6] While those two books have since been returned to circulation pending completion of the challenge review process, they were restricted for many months.
[7] *Available at* https://docs.google.com/spreadsheets/d/1hv6Wtu55zY3t5bmbksY2ie7Q-L3zAQdjrtaFh4duLC4/edit#gid=0.
[8] *See also* Wear News, "*Escambia County forms committees to review challenged books in schools*" (June 15, 2024) ("It's not like we are going to be like finish overnight. There is 232 books, it's going to take time."), available at https://weartv.com/news/local/escambia-county-forms-committees-to-review-challenged-books-in-schools.

IV.    **HB 1069**

HB 1069 went into effect on July 1, 2023. It provides, in relevant part, that where a book is challenged "on the basis" that it (I) is pornographic or prohibited under F.S. 847.012[9] or (II) "depicts or describes sexual conduct as defined" in F.S. 847.001(19), the book is to be removed within 5 days and "remain unavailable to students *of that school* until the [challenge] is resolved." F.S. 1006.28(2)(a)(2) (emphasis added). "Sexual conduct" is defined in F.S. 847.001(19) to mean:

> actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, or sadomasochistic abuse; actual or simulated lewd exhibition of the genitals; actual physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such person is a female, breast with the intent to arouse or gratify the sexual desire of either party; or any act or conduct which constitutes sexual battery or simulates that sexual battery is being or will be committed.

F.S. 847.001(19). For books challenged on the basis that they "depict or describe sexual conduct," once the challenge is resolved, the books are only to be discontinued "for any grade level or age group for which such use is inappropriate or unsuitable." F.S. 1006.28(2)(a)(2). In other words, the statute implicitly recognizes that books that "depict or describe sexual conduct" will be included in school library collections.

---

[9] F.S. 847.012 only applies to material that is "harmful to minors." "Harmful to minors" is defined as material that "[t]aken as a whole, is without serious literary, artistic, political, or scientific value for minors." F.S. 847.001(7). The Florida Statutes do not contain a definition of "pornography."

Under HB 1069, therefore, the only books that must be removed within five days of a challenge are those (a) challenged on the basis of (b) depicting or describing (c) the specific kinds of sexual conduct defined by statute. A challenge based on allegations that a book contains nudity, descriptions or depictions of kissing, or sexual information or otherwise references sex or sexuality does not alone trigger HB 1069; the challenge must be "bas[ed]" on the book "depicting or describing" one of the sexual acts defined by statute. And even then HB 1069 only requires removal of the book from the specific school where it was challenged.

Notwithstanding the plain text of HB 1069, the Board has apparently interpreted HB 1069 as requiring media specialists in each school to determine whether *any* books in the media specialist's school's library contain material describing or depicting sexual conduct. Lev Decl. ¶ 9. As explained by defense counsel, the current status of these reviews is supposedly reflected on a spreadsheet captioned "*Website Destiny HB 1069 Storage Further Review*" (the "1069 Spreadsheet").[10] Lev Decl. ¶ 9.[11]

---

[10] *Available at*
https://docs.google.com/spreadsheets/d/1dwSpSRyR1ejSLC5OBj3qzO8xQRgydT
cImmbjNZysEuM/edit#gid=1785816646.

[11] The interplay between the book challenge process and this separate HB 1069-based review process is depicted on a flowchart available at
https://www.escambiaschools.org/Page/978, which links to both the ECPS Restricted Access Spreadsheet and the 1069 Spreadsheet. Books highlighted in

13

As explained by defense counsel, each dated tab on the 1069 Spreadsheet reflects all books restricted pending the 1069 review as of the date of that tab. *Id.* ¶ 9(a). That is, the most recently dated tab reflects the complete universe of books restricted as of the date of that tab (and the other tabs are relevant only for a historical understanding of books previously restricted). *Id.* Multiple entries for the same book on the most recent tab of the 1069 Spreadsheet indicate multiple copies of that book have been pulled from library shelves at one or more schools and restricted pending that school or schools' review of the book. *Id.* ¶ 9(b). But in all cases, the review is being conducted on a school-by-school basis by media specialists exercising their own independent judgment, and inclusion of a book on the 1069 Spreadsheet does *not* reflect a district-wide decision to restrict access to the book. *Id.* ¶ 9(e). As of June 27, 2024, there were 3,414 copies of 1,031 different books restricted under this process. *Id.* ¶ 10.

V.    **The Seven Books at Issue**

Since the filing of the Amended Complaint and the hearing on Defendant's Motion to Dismiss on January 10, 2024, the Board has returned certain challenged books to circulation pending a completion of the challenge process. Nevertheless,

---

yellow on the 1069 Spreadsheet are supposed to reflect books that are also subject to a challenge, but that highlighting is imperfect. Lev Decl. ¶ 9(d).

as of June 27, 2024, some 178 challenged books remain restricted, although no decision has been made about the validity of the challenge. Lev. Decl. ¶ 2. To be clear, Plaintiffs believe *all* those books should be back on library shelves, including because HB 1069's provisions are not applicable to the book restrictions at issue in this case (both because the challenges to those books were made prior to HB 1069 being enacted and because many of the challenges are not based on the depiction or description of "sexual conduct"), and unconstitutional as applied to the restrictions at issue. Nonetheless, this particular motion is limited to the ongoing restriction of only seven books. Plaintiffs have identified these books as those where there is no reasonable argument that the book has been challenged "on the basis" that it is pornographic or prohibited under F.S. 847.012 or "depicts or describes sexual conduct as defined" in F.S. 847.001(19). The seven books and the basis for their challenge are set forth in the following table (see also Lev Decl. Exhs. 1-7):

| Title of Restricted Book | Date of Challenge | Basis of Challenge[12] | Alleged Purpose of Media[13] |
|---|---|---|---|
| *Ace of Spades* | 8-4-22 | "sexual obscenities; suicide; crude language; abuse; LGBTQ themes" | "indoctrination" |
| *Lady Midnight* | 3-31-23 | "This fiction book contains sexual situations, multiple killings and other violence, and is age and content inappropriate for middle schoolers."[14] | "Introduce the mystical" |
| *More Happy Than Not* | 8-4-22 | "LGBTQ explicit graphic story lines" | "Indoctrination" |
| *Speak* | 8-24-22 | "graphic content; biased against males" | "anti-men; anti-rape" |
| *The Hate U Give* | 8-24-22[15] | "anti-cop agenda; age inappropriate" | "anti-cop agenda" |
| *The Music of What Happens* | 8-24-22 | "LGBTQ content; sexual excitement" | "indoctrination" |
| *Where I End and You Begin* | 9-15-22 | "sexual nudity; alternate sexualities; profanity" | "push sexual deviance" |

[12] The "Basis of Challenge" in the chart is taken verbatim from the "Reasons for Objections" or "What first prompted your concern" section of the challenge form for each book. In some cases, additional excerpts from the book are included elsewhere on the challenge form but not included in the chart above. Those excerpts do not constitute pornography, material prohibited under F.S. 847.012 or depictions or descriptions of "sexual conduct." The challenge forms are attached as Exhibits 1-7 to the Lev Declaration and are also available as hyperlinks in the ECPS Restricted Access Spreadsheet on the School District's website.

[13] "Alleged Purpose of Media" in the chart is the information provided on the challenge form in response to the question: "what do you believe is the purpose of this educational media"?

[14] Among the passages specifically objected to on the challenge form for *Lady Midnight* was: "'Alexander Lightwood was Magnus's boyfriend for over a decade. They could've gotten married under the new laws . . .' (p. 157)."

[15] The ECSB Reconsiderations Spreadsheet indicates that *The Hate You Give* was considered by the District Review Committee over a year ago, on March 7, 2023, but that no decision regarding the challenge has been made by the Committee.

16

Of these seven books, as of May 21, 2024 (the date of the most recent tab of the 1069 Spreadsheet), four copies of *Ace of Spades*, four copies of *Lady Midnight*, three copies of *More Happy Than Not*, twenty-three copies of *Speak* (plus four copies of *Speak: the graphic novel*), eighteen copies of the *The Hate U Give*, one copy of *The Music of What Happens*, and twenty-eight copies of *Where I End and You Begin* were restricted at one or more schools as a result of the separate 1069-based review by school media specialists. Lev Decl. ¶ 11.

## <u>LEGAL STANDARD</u>

A party is entitled to a preliminary injunction if it shows that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the Plaintiff outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)).

## ARGUMENT

### I.     The PI Plaintiffs Are Likely to Succeed on the Merits of Their Claim

#### A.     The PI Plaintiffs Are Likely to Succeed on the Merits of Their Viewpoint Discrimination Claim Regarding the Seven Books

As this Court has recognized, "school officials cannot remove books solely because they disagree with the views expressed in the books." Order on Mot. to Dismiss ("MTD Order") at 7 (ECF 65) (relying on *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982), and *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988)). *See also id.* at 7 n.11 (noting parties agreed on this standard if government speech doctrine does not apply). That is because it is a cardinal principle of First Amendment law that, even in a nonpublic forum, the state cannot "'suppress expression merely because public officials oppose the speaker's view.'" *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1202 (11th Cir. 2009) (quoting *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677–78 (1998)); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."). Such viewpoint discrimination is "presumed to be unconstitutional." *Id.*

Such prohibited viewpoint discrimination is exactly what occurred here. Despite previously allowing the purchase of the seven books at issue by

18

professional staff tasked with staffing school libraries, providing the books in public school libraries, and allowing all students to check them out, the Board has now restricted access to these books because of the ideas or messages they express. That these books have been restricted for prohibited viewpoint-based reasons is evident from several incontrovertible facts.

First, the Board restricted the books although its Policy was to only restrict books challenged for violating F.S. 847.012 or containing pornography.[16] Any reliance on alleged violations of F.S. 847.012—which applies solely to material that lacks "serious literary, artistic, political, or scientific value for minors"—as a basis for restriction is pretextual, as is clear from the restriction of numerous award-winning books of recognized literary value. Moreover, notwithstanding the then-applicable policy's provision for the superintendent to determine "that a challenge lacks sufficient facts to support a preliminary finding that the material contains content that is pornographic or prohibited under F.S. 847.012," these books were still restricted.

Second, the Board's decision to automatically restrict books challenged on certain discriminatory grounds without review—as evidenced by its practice of

---

[16] At the time of the challenges at issue and the decision to restrict access to these books, HB 1069 was not yet law and Policy 4.06 did not speak to descriptions or depictions of sexual conduct. The (in)applicability of HB 1069 to these challenges is discussed below.

restricting books challenged under HB 1557 or for referencing LGBTQ or racial issues and by the nature of the challenges at issue here—empowered the individuals objecting to these books to effectively restrict books based on their own prejudice against certain ideas and viewpoints. In providing for the restriction of books challenged on the basis of the books' alleged viewpoint, the Board effectively adopted those viewpoint-based objections. *See Little v. Llano Cnty.*, 103 F.4th 1140, 1153 (5th Cir. 2024) (where challenges directly lead to restrictions on book, it is likely that removing authority "adopted" motivation of challengers); *cf. Gillman v. Sch. Bd. for Holmes Cnty., Fla.*, 567 F. Supp. 2d 1359, 1378 (N.D. Fla. 2008) (principal's discriminatory actions imputed to school board).

And it is clear from the challenge forms themselves that viewpoint discrimination animated the challenges—and thus the subsequent restrictions. In articulating what they believed the "alleged purpose" of the books was, the challengers indicated "indoctrination" for three of the books, and various other viewpoints for the others, including "anti-men," "anti-cop agenda," and to "push sexual deviance." It was their opposition to these "alleged purposes"—i.e., viewpoints—that led to the challenges. And the "basis of challenge" for each book further demonstrates that the challenges—and thus the restrictions—were viewpoint-based. The challenge forms state that the challenges are based on "LGBTQ themes," "LGBTQ explicit graphic storylines," "biased against males,"

20

"anti-cop agenda," "LGBTQ content," and "alternate sexualities" as the bases for the challenges. Lev Decl. Exs. 1-7. Even the one book where the "alleged purpose of media" and "basis of challenge" sections of the challenge form do not expressly call out viewpoint discrimination was clearly challenged based on viewpoint; one of the examples of objectionable material quoted on the challenge forms is: "Alexander Lightwood was Magnus's boyfriend for over a decade. They could've gotten married under the new laws." *Id.* Ex. 2.

The record before this court is thus abundantly clear—these books were challenged—and restricted—based on the viewpoints they expressed in violation of the First Amendment.[17]

### B.    The Indefinite Restriction of the Books at Issue Violates the First Amendment

Nor can there be any doubt that the allegedly temporary "restriction" of the books pending resolution of the underlying challenges constitutes a restriction on speech subject to the First Amendment. The "restrictions" mean that the books are

---

[17] Specific evidence of viewpoint discrimination based on the content of the challenge forms is not a necessary predicate to establishing viewpoint discrimination. As alleged in the Amended Complaint, the entire course of conduct underlying these challenges and the Board's response reflects impermissible viewpoint discrimination by Vicki Baggett (the challenger on six of the seven books at issue), the groups she was working with, the other challengers, and the Board. Am Compl. ¶¶ 42-169. For purposes of this motion, however, the challenge forms themselves, along with the other evidence relied upon above, is more than sufficient to establish a likelihood of success on the PI Plaintiffs' claim of viewpoint discrimination.

not available to students. And "[t]he loss of First Amendment freedoms, for even minimal periods of time," is "unquestionably" irreparable. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Nor have these restrictions been temporary. *The books at issue have been restricted for well over a year, and some close to two years*—six of the books were challenged in August or September 2022, and even the most recent book was challenged in March 2023. And the Board still has no plan or timeline for their ultimate review. Lev Decl. ¶¶ 13-14; *cf. Groome Resources Ltd. v. Parish of Jefferson*, 234 F.3d 192, 199 (5th Cir. 2000) (defendant's inability to provide timeline or plan for action supports determination of constructive denial of reasonable accommodation due to delay). As this court recognized, "if the review process has not been completed in a reasonable period of time and the book has effectively been placed in an indefinite 'restriction purgatory' . . ., it would seem that the restriction could be considered a *de facto* removal." MTD Order at 8 n.12. *See also Envt'l Def. Fund, Inc. v. Hardin*, 428 F.2d 1093, 1100 (D.C. Cir. 1970) ("At some point administrative delay amounts to a refusal to act.").

### C.    HB 1069 Does Not Warrant Further District-Wide Restriction of These Books

Nor would HB 1069—even if it were applicable to these challenges and constitutional—provide a basis for the District-wide restrictions of these seven

books. First, as just discussed, the books were clearly challenged based on their positive portrayal of LGBTQ themes and other viewpoints that Baggett and others find objectionable. Second, the books were not challenged on the basis that they "depict or describe sexual conduct as defined in F.S. 847.001(19)." Although several of the challenge forms do include the word "sexual" (e.g., "sexual obscenities," "sexual situations," "sexual excitement" or "sexual nudity"), such statements alone are not the equivalent of alleging that the books at issue "depict or describe" the specific types of "sexual conduct" defined in F.S. 847.001(19). Ms. Baggett, who submitted six of the seven forms at issue, submitted dozens of other challenges in which she alleged that the challenged books contain, for example, "extreme graphic sexual scenes," "explicit sexual activities," "explicit depictions or oral sex" or other language that could arguably be read as alleging that the book "depicts or describes sexual conduct." Lev Decl. ¶ 8. The reference to "sexual" in the challenge forms for four of the seven books above does not come close to meeting that standard, as the forms do not allege that these acts are depicted or described (as opposed to merely referenced), and "sexual obscenities," "sexual situations," "sexual excitement" and "sexual nudity" do not constitute "sexual conduct" under F.S. 847.001(19). HB 1069—even if it applied and were constitutional—would therefore not provide a basis for the District-wide restriction of these books while the challenge to them was pending.

As part of the meet-and-confer process preceding this motion, Plaintiffs'
counsel asked if the Board would agree to return these books to the shelves
pending completion of the review process. Defense counsel responded that the
Board would not agree to do so because "[t]he challenge forms allege sexual
conduct *and the books contain sexual conduct* to warrant a full review by a District
Review Committee and, if necessary, the Board." Lev Decl. ¶ 15 (emphasis
added). The Board's policy, however, like HB 1069, only provides for restricting
access to a book during the challenge review process if the *basis for the challenge*
is that the book *depicts or describes sexual conduct as defined by F.S. 847.001(19)*.
Policy 4.06, § 10.A.4.a; F.S. 1006.28(2)(a)(2). Indeed, not only does the Board's
Policy state that removals are limited to those circumstances, it also provides that
"*all other challenged material* will remain in circulation during the pendency of
the review process." Lev Decl. Ex. 8 (Policy 4.06), at 14, § 10.A.4.b (emphasis
added). It is not clear what Defendant means when it says the challenge forms
"allege sexual conduct," but as described above it is clear that the basis for these
challenges is not the depiction or description of sexual conduct as defined by
statute. And if the books actually "contain sexual conduct" (whatever that phrase
might mean, based on some *ultra vires* review conducted by the Board) that is also
not a basis in law or the Board's own policy to restrict access to the books during

the pendency of the review process; particularly where, as here, it is clear that the challenges were the result of viewpoint discrimination.[18]

### D.    The PI Plaintiffs Have Standing

#### 1.    PEN Has Organizational Standing

"An organization has 'organizational standing' to sue on its own behalf 'when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response.'" MTD Order at 5 n.8 (quoting *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014)). "Diversion of resources" can include increased costs for "voluntary" activities, such as education and outreach to members. *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1164-66 (11th Cir. 2008).

PEN is likely to establish organizational standing. This court has already held that the allegations in the Amended Complaint, if proven, would establish

---

[18] That some copies of the seven books have separately been pulled from individual schools' shelves pending the media specialists in those schools conducting a review of those books under the Board's interpretation of HB 1069 is not relevant. Those school-by-school reviews affect only the individual schools at which a media specialist has determined to temporarily pull the book from circulation pending review, and do not reflect a District-wide restriction of the books. Injunctive relief directing the Board to remove its District-wide restriction on these books pending the challenge review process would allow the school-by-school process to continue. It would provide plaintiffs relief both with respect to those schools where the media specialist has not pulled the book and in those instances where media specialists determine that the books should be returned to the shelves. Lev Decl. ¶ 9(a).

organizational standing. MTD Order at 4-5. And the Declaration of Summer Lopez provides the evidentiary support to those allegations. As detailed in the declaration and described above, PEN's purpose as an organization is to ensure people have the freedom to create literature, express their views and ideas, and access the views, ideas, and literature of others. Lopez Decl. ¶ 3. PEN has both hired new staff and redirected existing staff from its other priorities of free speech education for youth and free speech issues on college campuses to track and report on book removals, support author-members, and respond to inquiries related to book removals in Escambia County. *Id.* ¶¶ 7-14; *see also supra* at 3-4. "This redirection of resources to counteract the [book removals] is a concrete and demonstrable injury, not an 'abstract social interest[ ],'" *Arcia*, 772 F.3d at 1342, and is thus sufficient to establish standing.

### 2.    PEN Has Associational Standing

PEN also has associational standing to represent the interests of PEN member Laurie Halse Anderson, the author of *Speak*. Lopez Decl. ¶ 6. "An organization has 'associational standing' to sue on behalf of it is members 'when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" MTD Order at 4 n.7 (quoting *Arcia*, 772 F.3d at 1342 ). As this court has

held, "PEN has associational standing as to the specific books its members authored because those members have standing to sue in their own right and the amended complaint alleges (at ¶¶ 10-12, 197-200)"—and the Lopez Declaration establishes (at ¶¶ 3-4)—"that the interests implicated by Defendant's actions are germane to the organizations' purpose." MTD Order at 4. Because Ms. Anderson is a PEN member and the author of one of the seven books at issue in this motion, PEN has associational standing to vindicate her First Amendment rights.

### 3. Sean Parker Has Standing

This court has also held that the parent plaintiffs would have standing "at least on behalf of their minor children" if they can establish that those children intended to check out specific restricted books but were unable to do so because of the Board's restrictions. MTD Order at 3-4. The Parker Declaration provides evidentiary support for the fact that Mr. Parker's child, M.P., wishes to check *The Hate U Give* out of the school library but cannot do so freely due to the Board's actions.[19] Accordingly, Sean Parker has standing.[20]

---

[19] As the court has recognized, the potential availability of *The Hate U Give* through use of an opt-in form does not negate the injury to Mr. Parker's child. MTD Order at 4 n.6. *See Little*, 103 F.4th at 1155-56 ("being unable to anonymously peruse the books in the library without asking a librarian for access" "is a valid First Amendment injury").

[20] Plaintiffs believe that Mr. Parker has standing in his own right due to his desire to have his son have access to *The Hate U Give* and other books, but the court need not decide that issue to determine that Parker is likely to have standing for purposes of this motion. *See* MTD Order at 3 n.5.

## II.     The PI Plaintiffs Will Suffer Irreparable Injury Unless the Injunction Issues

"[A]n ongoing violation of the First Amendment constitutes an irreparable injury." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022) (quoting *FF Cosmetics*, 866 F.3d at 1298). Indeed, "[t]he loss of First Amendment freedoms, for even minimal periods of time," is "unquestionably" irreparable. *Cuomo*, 141 S. Ct. at 67 (quoting *Elrod*, 427 U.S. at 373 (plurality opinion)); *see also FF Cosmetics*, 866 F.3d at 1298 (same); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271–72 (11th Cir. 2006) (same). That alone is sufficient to meet this prong of the preliminary injunction inquiry. PEN and Parker will both suffer continuing deprivation of their First Amendment rights absent injunctive relief.

Moreover, PEN's diversion of resources necessitated by the restrictions at issue here similarly constitutes irreparable injury, as those harms are not otherwise remediable as PEN will be unable to recover economic damages from the Board. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677-78 (9th Cir. 2021) (diversion of resources constitutes "economic harm for which the Organizations have no vehicle for recovery" and is thus irreparable); *Catholic Legal Immigration Network, Inc. v. Exec. Office for Immigration Review*, 513 F. Supp. 3d 154, 175-76 (D.D.C. 2021) (diversion of resources constitutes irreparable harm); *cf. Hispanic Interest Coal. of Ala. v. Gov. of Ala.*, 691 F.3d 1236, 1249 (11th Cir. 2012)

28

(affirming preliminary injunction based on organizational standing and diversion of resources); *Common Cause Ind. v. Lawson*, 937 F.3d 944 (7th Cir. 2019) (same).

## III.    An Injunction Would Be Equitable and in the Public Interest

"When the nonmovant is the government, the third and fourth requirements [for a preliminary injunction]— 'damage to the opposing party' and 'the public interest'—can be consolidated" because "neither the government nor the public has any legitimate interest in enforcing an unconstitutional [policy]." *LaCroix v. Town of Fort Myers Beach*, 38 F.4th 941, 955 (11th Cir. 2022) (citing *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020)). Here, a preliminary injunction requiring that the seven books at issue be returned to circulation readily satisfies these last two requirements: the Board would suffer no damage from such an injunction and enjoining the Board's unconstitutional restriction of the books is unquestionably in the public interest.

Vindicating First Amendment rights is in the public interest. The public has no legitimate interest in restricting protected speech on the basis of viewpoint. *See Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009); *LaCroix*, 38 F.4th at 955; *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010) ("[T]he public … has no interest in enforcing an unconstitutional law."). And the Board has "no legitimate interest" in continuing its unconstitutional

29

behavior. *KH Outdoor*, 458 F.3d at 1272. Conversely, "it is always in the public interest to protect First Amendment liberties." *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004); *see Democratic Exec. Comm. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019) ("[T]he public interest is served when constitutional rights are protected."); *Speech First*, 32 F.4th at 1128 ("[T]he First Amendment, in particular, serves significant societal interests.") (quoting *First Nat'l Bank of Bos. v. Belotti*, 435 U.S. 765, 776 (1978)); *Little*, 103 F.4th at 1156 ("injunctions protecting First Amendment freedoms are always in the public interest").

The Board will suffer no injury if these books are returned to circulation. The books are library books that were available to students interested in them; they were not part of any school curriculum and an injunction returning them to circulation would have no impact on classes. Nor would the Board (or the public) suffer any injury from a student encountering the books in the library; those parents who do not wish their children to have access to the books can opt them out of such access. Lev Decl. Ex. 8 (Policy 4.06), at 14, § 10.A.4.b.

## CONCLUSION

For the reasons described above, the Court should enter a preliminary injunction requiring the Board, before the beginning of the 2024-25 school year, to remove any restriction on the seven books at issue imposed as a result of the pending challenge to those books, return those books to circulation at all schools at

which they were available at the time they were restricted (unless they are restricted at individual schools due to the ongoing 1069 review process described above, based on independent decisions made by school media), and maintain the books in circulation until the Board makes a final determination with respect to the pending challenge to each book.

\* \* \*

## RULE 7.1(B) CERTIFICATION

Undersigned counsel certifies that they have conferred with counsel for Defendant both telephonically and via email who objects to the relief requested herein.

## RULE 7.1(F) CERTIFICATION

Undersigned counsel hereby certify that this Memorandum contains 7,297 words, excluding those portions that do not count toward the word limit.

Dated: July 1, 2024                    Respectfully submitted,

                                       */s/Shalini Goel Agarwal*
                                       Shalini Goel Agarwal (FBN 90843)
                                       Ori Lev (*pro hac vice*)
                                       **PROTECT DEMOCRACY PROJECT**
                                       2020 Pennsylvania Ave. NW, Suite 163
                                       Washington, DC 20006
                                       Telephone: 202.579.4582
                                       Facsimile: 929.777.8428

Lynn B. Oberlander (*pro hac vice*)
**BALLARD SPAHR LLP**
1675 Broadway, 19th Floor
New York, NY 10019-5820
Telephone: 212.223.0200
Facsimile: 212.223.1942

Paul J. Safier (*pro hac vice*)
Facundo Bouzat*
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: 215.864.8500
Facsimile: 215.864.8999

Kirsten Fehlan (*pro hac vice*)
**BALLARD SPAHR LLP**
999 Peachtree Street, Suite 1600
Atlanta, GA 30309
Telephone:678.420.3000
Facsimile: 678.420.9401

Goldie Fields (*pro hac vice*)
**BALLARD SPAHR LLP**
2029 Century Park East, Suite 1400
Los Angeles, CA 90067
Telephone: 424.204.4338
Facsimile: 424.204.4350

* *Pro hac vice* forthcoming

*Attorneys for Plaintiff PEN American Center, Inc. and Sean Parker*