**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| PEN AMERICAN CENTER, INC., et al., <br><br>   Plaintiffs, <br><br> vs. <br><br> ESCAMBIA COUNTY SCHOOL BOARD, <br><br>   Defendant. | CASE NO.: 3:23-CV-10385-TKW-ZCB |

**PLAINTIFFS' OPPOSITION TO MOTION FOR ENTRY OF A
PROTECTIVE ORDER AS TO THE DEPOSITIONS OF THE ESCAMBIA
COUNTY SCHOOL BOARD MEMBERS, SUPERINTENDENT KEITH
LEONARD AND FORMER SUPERINTENDENT TIM SMITH**

**PRELIMINARY STATEMENT**

In this case, Plaintiffs are challenging on First Amendment grounds the

decisions of the Escambia County School Board (the "Board") to remove or

restrict access to over 150 library books.  In its ruling denying the Board's Motion

to Dismiss, this Court held that, to prevail, Plaintiffs must show that the books

were removed or restricted "based on ideological objections to the books' content

or disagreement with their messages or themes, rather than for pedagogical

reasons."  Order on Motion to Dismiss ("MTD Order") at 7, ECF 65.  In other

words, as the Eleventh Circuit has explained, in a case challenging library-book

removals or restrictions, "the Board's motive is the ultimate fact upon which the resolution of the constitutional question depends." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1204 (11th Cir. 2009).

Notwithstanding the clear law providing that the Board's motives for the book removals/restrictions are the central issue in the case, the Board has now filed a Motion for a Protective Order (the "Motion" or "Mot."), ECF 82, in which it seeks to bar Plaintiffs from deposing the Board Members, as well as former Superintendent Tim Smith, about their reasons for removing or restricting the books at issue.  Fortunately, nothing in the law dictates such an absurd result.  In particular:

1. The legislative privilege, which the Board invokes as a basis for the Board Members to avoid testifying about the motivations behind their book removal and restriction decisions, does not apply because (a) the actions at issue were not legislative in nature, and (b) the Board has already waived any such privilege.

2. The Board's contention that the testimony of no one Board Member can establish the motivation of the Board as a whole, even if accurate, is not a reason to bar depositions of the Board Members.  Rather, it is a reason to permit Plaintiffs to depose *all of the Board Members*.

3. The apex doctrine has no application under circumstances, such as these, in which a party seeks to depose government officials about their own actions and reasons for taking those actions.

4. Florida's "Sunshine Law," which requires Board Members to deliberate in public, does not in any way affect the right of Plaintiffs to depose those Board Members about the reasons—whether public or otherwise—for their book-removal and book-restriction decisions.

For those reasons, the Board's Motion should be denied. In fact, Judge Winsor recently rejected an almost identical motion from the Board in the *Parnell v. School Board of Lake County* case, which is also pending in this District. *See* Ex. 1 (copy of July 10, 2024 Order from *Parnell* case denying the Board's motion for a protective order).[1] This Court should do so as well.

---

[1] The *Parnell* case relates only to one removed book (*And Tango Makes Three*), but, otherwise, involves nearly identical First Amendment claims against the Board. In the Order referenced above, Judge Winsor denied the Board's protective order motion "without prejudice" based on concerns that the Board lacked standing to assert the legislative privilege on behalf of the Board Members. Ex. 1 at 3-4. Accordingly, he did not reach the merits of the Board's legislative privilege argument, though he did decisively reject each of the other arguments the Board asserts here. *See id.* at 1-4. The Board's failure to establish that it has been authorized by individual Board Members to assert the legislative privilege on their behalf is an additional reason to deny the Motion.

## BACKGROUND

### I.    <u>THIS LAWSUIT</u>

Plaintiffs are challenging decisions by the Board to remove 10 books from Escambia County school libraries and restrict access pending review to over 150 additional books.  Amended Complaint ("Am. Compl.") ¶¶ 88, 98, 105, ECF 25-1. The process resulting in those book removals and restrictions began in May 2022, when a single Escambia County school teacher, Vicki Baggett, started a campaign to get library books to which she objected on ideological grounds removed from libraries in the District.  *Id.* ¶¶ 42, 46-65, 112-19, 124-26 & Exs. 5-7, 13-14, 19.

Each of the 10 removed books was removed by the Board based on a vote by its individual members.  *Id.* ¶¶ 100-03, 111-37.  In each case, the removal decision was contrary to the recommendation of a district review committee, made up of media specialists, school staff, parents, and community members, which had determined each of the books to be of educational or literary value and suitable for the relevant grade levels.  *Id.* ¶¶ 93-98, 100-03, 112-37.

With respect to the restricted books, Plaintiffs are still using discovery to sort out how the process worked, especially as it changed multiple times during the relevant time-period.  *See generally* Plaintiffs PEN America Center, Inc. and Sean Parker's Motion for Preliminary Injunction ("PI Mot.") at 5-14, ECF-87 (describing evolution of the relevant book-restriction practices).  At a minimum, it appears that,

in Fall 2022, Former Superintendent Smith, acting on behalf of the Board, began developing policies providing for the restriction of access to challenged books pending completion of the review process, a policy which marked a change from the previous policy of permitting access pending the review. *Id.* at 9-11 & n.4. That process appears to have originated with Board Member Kevin Adams, who, at the urging of Ms. Baggett, pressed Mr. Smith to develop such policies. Ex. 2 (collected emails from K. Adams to T. Smith). It appears that Mr. Smith was then tasked with making specific book-restriction decisions pursuant to the policies he had been asked to adopt. Ex. 3 (collected emails between T. Smith and M. White). Under this arrangement, books dealing with topics such as sexual assault, sexual identities, LGBTQ identity, and feminism were singled out for restricted access. *See* PI Mot. at 9-11; Am. Compl. ¶¶ 74-86, 145-54, 157-60.

Plaintiffs' central allegation in this case is that the books were removed or restricted based on hostility to the ideas they express and/or their themes, rather than for legitimate pedagogical reasons. Am. Compl. ¶¶ 3-7. In its Order denying the Board's Motion to Dismiss, the Court described the applicable legal standard as follows:

> The applicable legal standard for evaluating alleged First Amendment violations in the school library context is not entirely clear but the common theme in all of the potentially relevant standards . . . is that school officials cannot remove books solely because they disagree with the views expressed in the books, but that they can make content-based removal

> decisions based on legitimate pedagogical concerns including
> things like pornographic or sexual content, vulgar or offensive
> language, gross factual inaccuracies, and educational unsuitability
> for certain grade levels.

MTD Order at 7. Plaintiffs seek to depose the decision-makers behind the relevant

book removals and books restrictions—the Board Members, and, in some cases, Mr.

Smith, acting at the direction of the Board—so they can meet that standard.

## II.    THE AT-ISSUE DEPOSITIONS AND THE PARTIES' MEET AND CONFER EFFORTS

Early in the parties' discussions regarding discovery, the Board made clear

that it intended to object to any effort to depose the individual Board Members or

the current or former District Superintendent. Accordingly, the parties agreed that

Plaintiffs would go ahead and notice such depositions, with placeholder dates, in

order to permit the Board to file the subject Motion. Mot. at 2-3 & n.4.

On May 31, 2024, Plaintiffs served—and the Board agreed to accept—

deposition notices for each of the individual Board Members, as well as current

Superintendent Keith Leonard. *Id.* at 3 & Ex. A. Plaintiffs have also indicated to

the Board that they intend to depose Former Superintendent Smith. *Id.* at 2 & n.1.

Plaintiffs have not yet been able to serve a deposition notice or subpoena with respect

to Mr. Smith because they have been waiting for guidance as to whether the Board's

counsel would also be representing him. *See* Ex. 4 (email exchange between counsel

for the Board and counsel for Plaintiffs regarding representation of Former Superintendent Smith).

On June 6, 2024, the parties met and conferred telephonically regarding the subject matter of the Board's Motion.  During that discussion, Plaintiffs agreed to serve a Rule 30(b)(6) deposition notice on the Board focused on topics other than the Board-Member-specific reasons for removing, or restricting access to, the books.  Mot. at 3 & Ex. B.  Plaintiffs, however, did not agree to forgo their efforts to depose the Board Members and Former Superintendent Smith pending completion of that Rule 30(b)(6) deposition.  *Id.* at 3.

On June 21, 2024, the Board filed the subject Motion.  Later that day, the Court issued an Order directing "the parties to confer telephonically or in person regarding the issues raised in the motion for entry of a protective order."  Order at 2, ECF 84.  On June 26, 2024, the parties met and conferred telephonically for approximately one-half hour regarding the issues raised in the Board's Motion.  During that discussion, Plaintiffs agreed to withdraw their deposition notice to Mr. Leonard without prejudice to re-notice his deposition following the Rule 30(b)(6) deposition of the Board.  Plaintiffs did not, however, agree to withdraw their deposition notices to the Board Members, or to hold off on deposing Former Superintendent Smith.  Accordingly, Plaintiffs now file their Opposition to the Board's Motion for a Protective Order.

## ARGUMENT

## I.   THE LEGISLATIVE PRIVILEGE DOES NOT SHIELD THE BOARD MEMBERS FROM TESTIFYING ABOUT WHY THEY REMOVED OR RESTRICTED SPECIFIC BOOKS.

### A.   Legislative Privilege Does Not Apply Because The Board Members' Book-Removal And Book-Restriction Decisions Are Not Legislative In Nature.

The legislative privilege does not shield the Board Members from being questioned about their book-removal and book-restriction decisions.[2]   That is because those decisions were administrative, rather than legislative, in nature.

As the Board itself notes, "legislative immunity and privilege are 'parallel concept[s],' and the privilege 'exists to safeguard' the immunity." Mot. at 9 (quoting *Common Cause Fla. v. Byrd*, 674 F. Supp. 3d 1097, 1003 n.2 (N.D. Fla. 2023)). Under well-established law, "legislative immunity 'extends *only* to actions taken within the sphere of legitimate legislative activity.'" *Brown v. Crawford Cnty.*, 960 F.2d 1002, 1011 (11th Cir. 1992) (emphasis added) (quoting *Finch v. City of Vernon*, 877 F. 2d 1497, 1505 (11th Cir. 1989)).   Contrary to what the Board implies, *see* Mot. at 17, the Eleventh Circuit has "expressly rejected the argument that the act of voting, in itself, constitutes legislative action giving rise to immunity." *Smith v.*

---

[2] The Board is not asserting that the testimony of Former Superintendent Smith is protected by the legislative privilege.   Instead, it asserts only that "the Board [M]embers are protected by the legislative privilege."   Mot. at 4.   Thus, this issue does not affect whether Mr. Smith can be deposed.

*Lomax*, 45 F.3d 402, 406 (11th Cir. 1995); *see also Crymes v. DeKalb Cnty.*, 923 F.2d 1482, 1485 (11th Cir. 1991) (mere fact that "a local legislator may [have] vote[d] on an issue . . . does not necessarily determine that he or she was acting in a legislative capacity"); *Abraham v. Pekarski*, 728 F.2d 167, 174 (3d Cir. 1984) ("The fact that the action complained of resulted from a vote of the members of the governing body is not dispositive" of whether legislative immunity attaches). In addition, "[a]n act is not . . . considered a legislative act for immunity purposes merely because the actor is a legislator or legislature." *Israel v. Desantis*, 2020 WL 2129450, at *7 (N.D. Fla. May 5, 2020).

The Eleventh Circuit has set forth criteria for distinguishing between administrative and legislative acts in this context, which make clear that the decisions at issue were administrative in nature. In *Crymes*, the Court explained that a decision by a government body is likely to be "administrative" where (1) "the facts utilized in making the decision are specific, rather than general, in nature," or (2) "the decision impacts specific individuals, rather than the general population." 923 F.2d at 1485; *see also id.* (explaining that "[a] legislative act involves policy-making rather than mere administrative application of existing policies"). In *Bryant v. Jones*, 575 F.3d 1281, 1306-07 (11th Cir. 2009), the Court further clarified that the focus of legislative activity is primarily prospective, whereas administrative action is primarily backward-looking and focused on the facts of a particular case.

Applying that framework, courts consistently hold that where, as here, a lawsuit challenges government decisions about a specific person or entity based on facts particular to that person or entity, the decision is administrative in nature. For example, in *Oakes Farms Food & Distribution Services v. School District of Lee County*, 541 F. Supp. 3d 1334, 1338 (M.D. Fla. 2021), which likewise involved decisions by a Florida school board, a food distributor brought suit under the First Amendment after its contract was terminated based on the owner's politically controversial social media posts. The court rejected the school board members' contention that legislative immunity protected them from the suit, holding that the termination decision did not qualify as legislative because the decision was directed specifically at the contractor. *Id.* at 1348-49. As the Court explained: "[T]he termination decision at the center of this case—whether it required a public vote by the School Board or not—does not involve the kind of 'prospective legislative-type rules' that are protected by absolute legislative immunity.'" *Id.* at 1349 (quoting *Bogan v. Scott-Harris*, 523 U.S. 44, 45 (1998)); *see also Israel*, 2020 WL 2129450, at *9 (legislative immunity did not apply to decision by legislature to remove sheriff from office).

The same logic applies here. Each of the Board's individual book removal or restriction decisions turned on the specific nature of the book at issue, and related

only to that specific book. That makes those decisions administrative in nature, which, in turn, means that the legislative privilege does not apply.

This conclusion is reinforced by the cases on which the Board relies for the proposition that legislative immunity/privilege can apply to school board decisions. For instance, in *Doe v. Metro Government of Nashville & Davidson County*, 2021 WL 5882653, at *4 (M.D. Tenn. Dec. 13, 2021), which the Board cites as an example where "the legislative privilege preclude[d] the noticed depositions of the school board members," Mot. at 10-11, the court held that the reason the legislative privilege applied was that, based on the existing record, it appeared that the employment decisions complained of were made as part of the school's forward-looking budgetary process, not based on backward-looking facts particular to the employees at issue. *Doe*, 2021 WL 5882653, at *3. The court explained its ruling as follows:

> It is not clear from the record what role the school board plays in specific personnel decisions, including termination or demotion of school directors. If the school board is called upon to consider or approve such decisions, those would arguably be administrative in nature. But that does not change the legislative character of the subject vote on the school budget. If, however, after further discovery, Plaintiffs uncover facts that tend to support their theory that the elimination of positions was not part of the budget process or that specific individuals were targeted for adverse employment actions, they may request permission to take the depositions of the school board members.

*Id.*  The other school-board-legislative privilege/immunity cases on which the Board relies are in the same vein, and further reinforce that school board actions targeting individual books are not legislative in nature.[3]

The Board's only response to this line of argument appears to be to assert that the Board's specific book-removal or book-restriction decisions were legislative in nature because (1) they were made pursuant to a Board-dictated policy requiring it to rule on book challenges, and (2) they have "prospective implications that reach[] the entirety of the District's libraries."  Mot. at 15-16.  Neither assertion has any merit.  That the Board's specific book-removal or book-restriction decisions involve

---

[3] *See Cincotta v. Hempstead Union Free Sch. Dist.*, 313 F. Supp. 3d 386, 402-03 (E.D.N.Y. 2018) (cited in Mot. at 11) (noting that "terminations of positions and votes based on budgetary constraints are legislative in nature," while "[p]ersonnel decisions are administrative . . . if they are directed at a particular employee," and holding that the school board decisions at issue were subject to legislative immunity because they fell into former category); *Cunningham v. Chapel Hill, ISD*, 438 F. Supp. 2d 718, 723 (E.D. Tex. 2006) (cited in Mot. at 11) (legislative privilege applied to school trustee members where employment-termination complained of was part of the budgetary process and involved plaintiff's entire department); *Smith v. Jefferson Cnty. Bd. of School Commissioners*, 641 F.3d 197, 217-19 (6th Cir. 2011) (cited in Mot. at 11) (school board members were entitled to legislative immunity where they eliminated entire school as part of budgetary process); *Callaway v. Hafeman*, 628 F. Supp. 1478, 1487 (W.D. Wisc. 1986) (cited in Mot. at 11) (legislative immunity applied to school board's decision to eliminate plaintiff's position and reassign her as part of budgetary process).  The only school board cases the Board cites that do not fall into this pattern involved a special exception that applies only in cases in which a government body acts to expel one of its own.  *See Stepien v. Schaubert*, 2010 WL 1875763, at *8 (W.D.N.Y. Feb. 23, 2010) (cited in Mot. at 11); *Wilson v. Marshall Indep. Sch. Dist.*, 2011 WL 1431410, at *4-5 (E.D. Tex. Feb. 1, 2011) (cited in Mot. at 11).  That exception has no bearing here.

application of a policy to specific cases is precisely what makes them administrative in nature. *See Crymes*, 923 F.2d at 1485 (contrasting the "administrative application of existing policies," which is not legislative in nature, with "policy-making," which is legislative). Likewise, that book-removal or book-restriction decisions have some prospective implications does not, on its own, make such decisions legislative. Any decision involving a particular person or entity, such as decision to fire an employee or cancel a contract, will necessarily have *some* prospective implications (*e.g.*, that the terminated employee will no longer be employed). What makes such decisions administrative, nonetheless, is that the facts and considerations underlying the decisions are particular to the person or entity in question. *See Oakes Farms*, 541 F. Supp. 3d at 1348 (explaining that "the hallmarks of an administrative decision include whether 'the facts utilized in making [the] decision are specific, rather than general in nature,' and whether 'the decision impacts specific individuals, rather than the general population'" (quoting *Crymes*, 923 F.2d at 1485)). That squarely applies here.

Because the Board's decisions removing or restricting specific books were not legislative in nature, the legislative privilege does not shield the Board Members from being required to testify about those decisions.

### B.    Even If The Legislative Privilege Did Apply, It Has Been Waived.

The Board's invocation of legislative privilege should be rejected for the additional reason that, even if the privilege did apply to the circumstances of this case, that privilege has been waived.  Document discovery is still ongoing.  But, thus far, the Board has produced thousands of documents, many of which relate directly to the Board's decisions with respect to the at-issue books.   Throughout the document-discovery process, the Board has not once asserted legislative privilege with respect to any of Plaintiffs' document requests.  Nor has the Board produced a privilege log of any kind.  The Board has, however, produced numerous documents in which Board Members discuss their specific motivations for voting to remove or not remove specific books.  *See, e.g.*, Ex. 5 (collection of email exchanges in which Board Members disclose their reasons voting for or against removing certain books).

Accordingly, any privilege that might have conceivably shielded the Board Members from being required to testify regarding their reasons for removing specific books has been waived.  *See SE Prop. Holdings, LLC v. Gulfsouth Private Bank*, 2015 WL 12868077, at *3 (S.D. Fla. Feb. 27, 2015) (production of emails addressing purportedly privileged topic waived any associated privilege).  That is an additional ground for rejecting the Board's assertion of legislative privilege.

## II.    THE MOTIVATIONS OF INDIVIDUAL BOARD MEMBERS ARE RELEVANT TO THE CLAIMS AT ISSUE.

The Board fares no better in asserting that Plaintiffs should not be permitted to depose the individual Board Members because "comments by individual board members are not imputed to the body of which they are a member."[4]  Mot. at 20. That argument has no basis in the law.

The sole support the Board offers for its position are cases providing that the motives of a single member of a multi-member body cannot determine the motives of the body as a whole.  *See id.* at 20-22 (citing nine cases in support of that innocuous proposition).  To the extent that is an accurate statement of the law, it cuts in exactly the opposite direction.  If Plaintiffs cannot establish the motive of the Board based only on the motive of an individual Board Member, then the appropriate response is to permit Plaintiffs to do what the Board is now trying to prevent them from doing – *i.e.*, ***depose all of the Board Members***.  Judge Winsor explained exactly this, in rejecting the identical argument from the Board in the *Parnell* case:

> Escambia says we cannot impute a single member's motives to the whole board.  True enough.  But a single member's motives could move the needle somewhat in determining the Board's motives.  Regardless, Plaintiffs seek the deposition of *all* members.  Evidence that all (or even most) of members had some sort of unlawful motive would move the needle much more.

---

[4] This argument is, likewise, directed exclusively at the Board Members and not Former Superintendent Smith.

Ex. 1 at 1.

Consistent with this, in cases that hinge on the motivations of multi-member bodies, including cases involving book-removal decisions, courts hold that plaintiffs can prove their case by showing that a sufficiently decisive block of members was impermissibly motivated. *See, e.g.*, *Campbell v. St. Tammany Parish Sch. Bd.*, 64 F.3d 184, 190 (5th Cir. 1995) (remanding book-removal case in which 8 of 12 school board members had been deposed for further fact-finding because "[a]t this stage, we simply do not have a full picture of the reasons why the School Board members constituting the majority voted to remove the Book"); *Bivins v. Franklin*, 688 F. Supp. 3d 1258, 1270-71 (N.D. Ga. 2023) (denying summary judgment to county in employment-discrimination case where record indicated that "a majority of the . . . County Board of Commissioners . . . voted to take adverse employment action against Plaintiff with a shared unconstitutional motive").

Plaintiffs are entitled to establish that the Board as a whole acted for unconstitutional reasons by examining the reasons of the individual Board Members. The Board's argument otherwise—and, in particular, its bizarre suggestion that the Board possesses some abstract, institutional, motivation that exists separate and apart from the aggregated motives of the individual Board Members—should be rejected.

16

## III.  THE APEX DOCTRINE DOES NOT PROTECT THE BOARD MEMBERS FROM BEING DEPOSED ABOUT THEIR OWN ACTIONS.

The Board is on no stronger ground in contending that the "apex doctrine" protects the Board Members or Former Superintendent Smith from being deposed. Even assuming that the Board Members and Mr. Smith constitute "high ranking" government officials for purposes of application of the apex doctrine, nothing in that doctrine protects a government official from having to testify about his or her own actions.

The apex doctrine was developed by federal courts out of the concern that, due to their positions, "high-ranking officials . . . are vulnerable to numerous, repetitive, harassing, and abusive depositions, and therefore need some measure of protection." *Reyes v. Fla. A&M Univ. Bd. of Trs.*, 2024 U.S. Dist. LEXIS 93378, at *3 (M.D. Fla. May 24, 2024).  Accordingly, the doctrine "generally exempts 'high-ranking' government officials from depositions *where the individual lacks personal knowledge relevant to the case or some other witness could provide sufficient testimony*."  *Odom v. Roberts*, 337 F.R.D. 359, 363 (N.D. Fla. 2000) (emphasis added).

It follows from the foregoing that "the apex doctrine rarely, if ever, shields a lead official from discovery *when the official is directly involved in the event at issue and has personal knowledge about it*."  *Kimberly Regenesis, LLC v. Lee Cnty.*, 2021

17

WL 5285093, at *6 (M.D. Fla. Sept. 29, 2021) (emphasis added); *see also Citigroup Inc. v. Holtsberg*, 915 So. 2d 1265, 1270 (Fla. 4th DCA 2005) ("Courts should not hesitate to deny protection if it appears that the apex official has personal knowledge of the relevant claims at issue or if the motivations behind corporate actions are at issue.").

Accordingly, courts consistently deny requests for protective orders based on the apex doctrine where, as here, the proposed deponents were directly involved in the events or conduct at issue. *See, e.g.*, *Reyes*, 2024 U.S. Dist. LEXIS 93378, at *5-9 (denying protective order with respect to deposition of president of public university where president was at least tangentially involved with alleged employment discrimination); *Giannerini v. Embry Riddle Aeronautical Univ., Inc.*, 2024 WL 184252, at *1 (M.D. Fla. Jan. 17, 2024) (denying protective order with respect to vice president and general counsel of university where proposed deponent "was directly involved in the investigation into Plaintiff that is at issue in this case"); *Woolfolk v. Columbia Cnty.*, 2008 WL 11433240, at *2 (M.D. Fla. Feb. 22, 2008) (denying protective order with respect to head of government agency where agency head had first-hand knowledge regarding conduct at issue).

In this case, Plaintiffs are seeking to depose the Board Members and Former Superintendent Smith about actions they themselves undertook and their reasons for doing so. The apex doctrine simply has no application under such circumstances.

Indeed, in cases like this one involving allegations of viewpoint discrimination specifically by the government officials who are the proposed deponents, courts have not hesitated to order depositions of even sitting governors. *See, e.g.*, *Freedom from Religion Found., Inc. v. Abbott*, 2017 WL 4582804, at *11 (W.D. Tex. Oct. 13, 2017) (holding that Texas Governor was properly subject to a deposition where plaintiff was contending that "Governor Abbott engaged in viewpoint discrimination when he requested removal of [plaintiff's] exhibit from the Capitol"); *Bagley v. Blagojevich*, 486 F. Supp. 2d 786, 787, 789-90 (C.D. Ill. 2008) (holding that Illinois Governor was properly subject to a deposition where Governor was personally involved in the employment termination that plaintiffs contended involved retaliation based on viewpoint). If the apex doctrine does not prevent a sitting governor from being deposed about his or her alleged viewpoint discrimination, it certainly does not prevent part-time elected officials such as the Board Members from being deposed about their alleged viewpoint discrimination.

Finally, the Board cannot save its apex-doctrine argument with its assertion that Plaintiffs are required to take a Rule 30(b)(6) deposition of the Board before they can depose either the individual Board Members or Former Superintendent Smith. *See* Mot. at 32-33 (making this argument).[5] Any suggestion that Plaintiffs

---

[5] This particular argument is largely academic. As a practical matter, any deposition of the individual Board Members or Mr. Smith will almost certainly take place after the Rule 30(b)(6) deposition of the Board, as the Rule 30(b)(6) deposition is

need to exhaust other discovery avenues before deposing the Board Members or Mr. Smith is meritless. As noted above, Plaintiffs intend to depose the Board Members and Mr. Smith about *decisions they made and their reasons for doing so*. Even if there are other witnesses with personal knowledge on those topics, there is no conceivable universe in which such witnesses' knowledge would render depositions of the Board Members and Mr. Smith superfluous. As Judge Winsor noted in rejecting the Board's identical apex-doctrine argument in the *Parnell* case: "It is unlikely that other witnesses could speak to the Superintendent's or the Board members' personal motivations." Ex. 1 at 2; *see also Kimberly Regenesis*, 2021 WL 5285093, at *6 (holding that it was unnecessary for plaintiffs to take Rule 30(b)(6) deposition prior to deposing county commissioners because there was no reason to believe that "Defendant's 30(b)(6) designee could serve as an appropriate vehicle to explore the personal knowledge and motivations of the commissioners").

The apex doctrine does not provide any basis for preventing Plaintiffs from deposing the Board Members or Former Superintendent Smith.

---

presently set to go forward, while the other depositions are on hold pending resolution of this Motion.

20

**IV.    THAT THE BOARD MEMBERS ARE REQUIRED TO DELIBERATE IN "THE SUNSHINE" DOES NOT IN ANY WAY AFFECT WHETHER THEY CAN BE DEPOSED ABOUT THEIR DECISIONS.**

Finally, this Court should reject the Board's brazen contention that, because Board Members are statutorily required to conduct their deliberations in public, Plaintiffs are required to rely exclusively on their public statements regarding their book-removal and book-restriction decisions. *See* Mot. at 31 (asserting that "[t]o the extent Plaintiffs seek to enter evidence concerning the Board's deliberations, such information is already in the public record and Plaintiffs must find it there."). Nothing in Florida's Sunshine Law prevents Plaintiffs from deposing the Board Members about decisions they made subject to the Sunshine Law, including about their publicly stated reasons for those decisions. The Board, in fact, concedes as much, admitting that "the Sunshine Law *does not provide an immunity from providing examination testimony*." *Id.* (emphasis added).

That should end the matter. As Judge Winsor concluded in addressing the identical argument from the Board in *Parnell*: "Florida's Sunshine law does not make the Board members' testimony irrelevant either. Even if their anticipated testimony tracked their remarks at public meetings, that would not make it irrelevant. And the Board cites no authority suggesting that a party must accept wholesale a potential witness's unsworn public statements in lieu of deposition testimony." Ex. 1 at 2. That logic applies especially here because document discovery has indicated

that Board Members *did* discuss their reasons for taking or not taking actions as to specific books outside the context of public meetings.  *See, e.g.*, Exs. 2, 5.

That the Board Members are subject to the Sunshine Law simply has nothing to do with whether they can be deposed.

## CONCLUSION

For the reasons set forth above, the Court should deny the Board's Motion for a Protective Order and permit Plaintiffs to go forward with the depositions of the Board Members and Former Superintendent Smith.

## **RULE 7.1(F) CERTIFICATION**

Plaintiffs hereby certify that this opposition contains 5,021 words.

Date: July 15, 2024          /s/Paul J. Safier

Paul J. Safier (*pro hac vice*)
Facundo Bouzat*
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: 215.864.8500
Facsimile: 214.864.8999

Lynn B. Oberlander (*pro hac vice*)
**BALLARD SPAHR LLP**
1675 Broadway, 19th Floor
New York, NY 10019-5820
Telephone: 212.223.0200
Facsimile: 213.223.1942

Kirsten Fehlan (*pro hac vice*)
**BALLARD SPAHR LLP**
999 Peachtree Street, Suite 1600
Atlanta, GA 30309
Telephone: 678.420.3000
Facsimile: 678.420.9401

Goldie Fields (*pro hac vice)*
**BALLARD SPAHR LLP**
2029 Century Park East, Suite 1400
Los Angeles, CA 90067
Telephone: 424.204.4338
Facsimile: 424.204.4350

Shalini Goel Agarwal (FBN 90843)
Ori Lev (*pro hac vice*)
**PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
Telephone: 202.579.4582
Facsimile: 939.777.8428

\**Pro hac vice* forthcoming

*Attorneys for Plaintiffs*