## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

PEN AMERICAN CENTER, INC.,
SARAH BRANNEN, LINDSAY
DURTSCHI, on behalf of herself and
her minor children, BENJAMIN
GLASS, on behalf of himself and his
minor child, GEORGE M.
JOHNSON, DAVID LEVITHAN,
KYLE LUKOFF, ANN
NOVAKOWSKI, on behalf of herself
and her minor child, PENGUIN
RANDOM HOUSE LLC, SEAN
PARKER, on behalf of himself and
his minor child, ASHLEY HOPE
PÉREZ, ERICA ROY, on behalf of          CASE NO.:  3:23-CV-10385-TKW-ZCB
herself and her minor children, and
CHRISTOPHER SCOTT
SATTERWHITE, on behalf of
himself and his minor child,

     Plaintiffs,

vs.

 ESCAMBIA COUNTY SCHOOL
BOARD,

     Defendant.

_____ /

## DEFENDANT'S RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

     Defendant, Escambia County School Board ("Board"), responds to Plaintiffs'

Motion for Preliminary Injunction, [D.E. 87 ("Motion")], and states:

## I.    INTRODUCTION

On May 17, 2023, Plaintiffs sued the Board for alleged First Amendment violations. [D.E. 1]. On July 1, 2024—almost 14 months later—Plaintiffs PEN American Center, Inc. ("PEN") and Sean Parker ("Plaintiffs") filed their Motion asking the Court order the Board restore seven currently restricted books to the shelves of the Escambia County School District's ("District") libraries. Motion at 1. Plaintiffs argue their Motion is limited to these books because there is allegedly "no reasonable argument" they have been challenged on the basis they "depict[] or describe[] sexual conduct as defined" in section 847.001(19), Florida Statutes. *Id.* at 15.

Plaintiffs are incorrect. These books are currently restricted because the District has determined they contain "sexual conduct" as defined by section 1006.28(2)(a)2.b.(II), Florida Statutes, i.e., House Bill 1069 (2023) ("HB 1069"). *See* Declaration of Bradley Vinson ¶¶ 37-77, **attached as Exhibit A** ("Vinson Declaration"). No final decision on the status of these seven books has been made by the Board because 1,036 titles out of the 468,670 in the District's total collection remain on the HB 1069 list for further review, including at least 176 titles that have received requests for reconsideration/challenges. *Id.* ¶ 31. Plaintiffs' focus on outdated policies and purported improper motives are irrelevant to the issue before the Court—the *current* restriction of these seven books.

2

In this lawsuit Plaintiffs challenge actions by the Board that occurred prior to July 1, 2023, [D.E. 27 ¶ 69 n.4]; namely, Plaintiffs claim they do not seek an injunction regarding books restricted pursuant to HB 1069, Motion at 2 n.1, which took effect on July 1, 2023. But Plaintiffs' Motion is nonsensical because, with the real world passage of time, that is what they seek.

Plaintiffs have walked headfirst into HB 1069. Plaintiffs filed the Motion before they took a single deposition, instead relying on written discovery and inadmissible hearsay from meet and confer conferences with undersigned counsel regarding this discovery. Plaintiffs misunderstand the fluid and complex processes existing within the District from July 2022 through present to comply with changing Florida laws concerning library books.

While this case purportedly is not about the Board's compliance with HB 1069, the Board has included the Declaration of its Coordinator of Media Services, Bradley Vinson, to explain how Board policy regarding HB 1069 resulted in the restriction of the seven books. *E.g.*, Vinson Decl. ¶¶ 18-23, 25-28, 32, 37-77. Although undersigned counsel explained this to Plaintiffs, the thrust of their Motion is Plaintiffs' disagreement the Board properly applied HB 1069 to these books and that this somehow proves their allegations of viewpoint discrimination and entitles Plaintiffs to an injunction.

Plaintiffs' Motion should be denied. First, Plaintiffs lack standing to sue on behalf of these seven books. Second, Plaintiffs' First Amendment claims fail because the decision of what books to have on school library shelves is government speech and the Board has legitimate pedagogical reasons for restricting these books. Third, Plaintiffs failed to demonstrate *Monell* liability. Fourth, the policy Plaintiffs seek to enjoin is defunct, mooting their claims. Fifth, Plaintiffs failed to show irreparable harm. Finally, the balance of harms and public interest favor the Board. The Court should deny Plaintiffs' Motion on its face as a matter of law. However, should the Court determine Plaintiffs plausibly alleged their burden as to the elements of a preliminary injunction, the Court should order an evidentiary hearing given the existence of bitterly disputed facts.[1]

## II.    MEMORANDUM OF LAW

### A. Plaintiffs Lack Article III Standing

Federal courts have an independent obligation to ensure subject-matter jurisdiction exists before reaching the merits of a dispute. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). Those seeking to invoke a federal court's jurisdiction must satisfy Article III's threshold requirement by "alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). To satisfy this requirement, "the plaintiff must have a personal stake in the case."

---

[1] The Board is filing a separate motion requesting an evidentiary hearing on Plaintiffs' Motion.

*TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (cleaned up). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *Id.* at 431. Standing requires a plaintiff to "allege and prove that the personal injury" is fairly traceable to the defendant's allegedly unlawful conduct. *Fla. Ass'n of Med. Equip. Dealers, Med-Health Care v. Apfel*, 194 F.3d 1227, 1230 (11th Cir. 1999).

Plaintiffs imply this Court already adjudicated the matter of their standing. Motion at 25-27. Not so. The Court's "denial of the [Board's] initial motion to dismiss [regarding standing] was not a final judgment," and is not law of the case, which only applies "where there has been a final judgment." *Vintilla v. United States*, 931 F.2d 1444, 1447 (11th Cir. 1991) (cleaned up).

### i. **PEN Lacks Standing**

#### a. *Organizational Standing*

PEN argues it has organizational standing based on its diversion of resources. Motion at 25-26. Namely, PEN asserts "[a]s a consequence of efforts in Escambia County to remove books," PEN "has expended significant resources and time to addressing these book [restrictions and removals] and has diverted resources away from its other priorities." *Id.* at 3. PEN details supposed actions it has been forced to take in response to actions within the District to establish its standing. *Id.* at 3. PEN

relies on a declaration submitted by its Chief Program Officer, Free Expression Programs. [D.E. 87-3 ("Lopez Declaration")].[2]

The Lopez Declaration shows PEN does not have standing to sue; it states PEN has, "[a]s a consequence of efforts in Escambia County and elsewhere," hired full-time staff to track and report on book removals/restrictions, supported author members with concerns about their books, and responded to queries from individuals about book removals/restrictions. *Id.* ¶ 7. PEN has purportedly diverted staff and hired four new staffers to work on these tasks. *Id.* ¶¶ 7-8. PEN claims at least seven staff members were diverted from their prior work to focus on Escambia County. *Id.* ¶ 11.

The Supreme Court recently clarified the limits of organizational standing, finding organizations may have standing to sue on behalf of injuries they sustain. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 393 (2024) ("*FDA*") (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)). However, organizations must still satisfy Article III's requirements that apply to individuals. *Id.* at 393-94. "[A]n organization may not establish standing simply based on the intensity of the litigant's interest or because of strong opposition to the government's conduct, no matter how longstanding the interest and no matter how

---

[2] The Board has set Lopez for deposition on August 1, 2024. The Board may request leave to supplement this Response with her deposition transcript in support of the arguments made herein.

qualified the organization." *Id.* at 394 (cleaned up). An organization must show more than setbacks to its abstract social interests and cannot assert standing because it merely objects to governmental action. *See id.* (citing *Havens*, 455 U.S. at 379).

PEN's organizational standing is premised on the flawed idea "standing exists when an organization diverts its resources in response to a defendant's actions." *Id.* at 395; *e.g.*, Motion at 3 (stating PEN "has expended significant resources and time" based on actions in Escambia County and elsewhere "and has diverted resources away from its other priorities"); *id.* at 25-26 (detailing PEN's diversion of resources). PEN's diversion of resources theory "is incorrect." *FDA*, 602 U.S. at 395. "[T]hat theory would mean that all the organizations in America would have standing to challenge almost every [government] policy that they dislike, provided they spend a single dollar opposing those policies." *Id.* But an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action," and "cannot manufacture its own standing in that way." *Id.* at 394.

The inquiry is whether the organization has suffered a concrete injury. For example, in *Havens*, the organization had standing because the defendant "had provided [the organization's] black employees false information about apartment availability." *Id.* at 395 (citing *Havens*, 455 U.S. at 366 & n.1, 368). And because its

employees were given false information, this "directly affected and interfered with [the organization's] core business activities." *Id.*

"That is not the kind of injury that [PEN] ha[s] alleged here." *Id.* The Lopez Declaration admits PEN's standing is premised on diverting its resources—i.e., diverting financial resources to hire new staff and diverting existing staff—to address actions taken in Escambia County and elsewhere. Nowhere, however, does the Lopez Declaration state any actions *by the Board*—much less the restriction of these seven books—have impeded PEN's "core business activities." *Id.*; *see also Jacobson*, 974 F.3d at 1250 (finding testimony did not explain what activities the organization would divert resources away from, thus testimony failed to establish injury based on diversion of resources).

At best, the Board's actions have disrupted PEN's advocacy efforts, for which PEN has supposedly diverted resources to address. But *FDA* makes clear advocacy (and money spent advocating) is not a core business activity. 602 U.S. at 394. Plaintiffs presented no evidence demonstrating restricting *these seven books* pending the challenge process resulted in any injury to PEN.[3]

---

[3] The Lopez Declaration amalgamates PEN's diversion of resources taken due to actions in Escambia County "and elsewhere." An "injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1115 (11th Cir. 2022) (cleaned up). PEN cannot assert standing based on actions done "elsewhere," especially when the "elsewhere" location(s) is/are not identified or defined, and the ratio of resources diverted to address actions in Escambia County versus "elsewhere" is similarly

### b. Associational Standing

PEN claims associational standing through its member Laurie Halse Anderson. Motion at 26-27. However, Anderson is not a party to this suit, nor has she submitted her own declaration establishing her standing; rather, she relies on the Lopez Declaration to establish her standing secondhand. Lopez Decl. ¶ 6. Given Plaintiffs' "heavy burden" in seeking a preliminary injunction, *Diaz v. Bd. of Cnty. Comm'rs of Dade Cnty.*, 502 F. Supp. 190, 192 (S.D. Fla. 1980), PEN's bald assertions concerning Anderson are insufficient to satisfy Article III.[4]

And even assuming Anderson has standing, she is the author of only one of the books subject of Plaintiffs' Motion. PEN's associational standing would solely be to *Speak*, the book Anderson authored. Plaintiffs must prove their allegations of standing for each book in their Motion. *Apfel*, 194 F.3d 1227, 1230 (11th Cir. 1999); *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) ("Where, as here, the parties have taken discovery, the plaintiff cannot rest on 'mere allegations,' but must instead point to factual evidence."). Standing is not dispensed in gross. *TransUnion*, 594 U.S. at 431.

---

unexplained. Such bare allegations do not satisfy Plaintiffs' burden of *proving* standing. *Apfel*, 194 F.3d at 1230.

[4] Anderson's disputed standing creates bitterly disputed facts requiring an evidentiary hearing. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1311 (11th Cir. 1998). Alternatively, there is "much dispute as to the inferences to be drawn from the raw facts" of this case concerning Anderson and PEN's standing. *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1178 (11th Cir. 2002) (cleaned up).

## ii.  **Parker Lacks Standing**

Parker lacks standing on his own behalf and on behalf of his son M.P. As this Court recognized, "it is unlikely that the Parent Plaintiffs will have standing in their own right" "simply because they <u>want</u> certain books to be in school libraries for one reason or another." [D.E. 65 at 3 n.5]. But it is exactly upon this "want" Parker—in his own right—claims standing. Parker claims standing because he would "like the book [*The Hate U Give*] to be available to M.P. in his school library and would like M.P. to check the book out from his school library." Motion at 5. Parker has submitted a declaration averring this nebulous intent. [D.E. 87-2 ("Parker Declaration")].

Parker's freestanding "want" is not sufficient for Article III standing, as this Court acknowledged. [D.E. 65 at 3 n.5]; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562-63 (1992). Parker has no independent right to visit the Board's libraries. *Compare* Vinson Decl. ¶ 36, *with Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1195 (11th Cir. 2009) ("*ACLU*") (noting school board's policy allowed parents the right to visit the library). Because Parker's claims of injuries do not rise above his own wants, he has no individual standing.

Plaintiffs do not seriously attempt to establish Parker's standing, arguing instead the Court need not decide it at this time. Motion at 27 n.20. This is incorrect. Standing is a threshold inquiry, *E.F. Hutton & Co. v. Hadley*, 901 F.2d 979, 983

(11th Cir. 1990), without which Plaintiffs cannot succeed. *Murthy*, 144 S. Ct. at 1986 ("At the preliminary injunction stage, then, the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing.").

Parker also cannot satisfy Article III's requirements for M.P. His declaration simply avers M.P. "has expressed an interest in checking out and reading *The Hate U Give* from his school library." Motion at 4 (citing Parker Decl. ¶ 4). There are no allegations M.P. intended to check out *The Hate U Give* either in the past or during the upcoming school year. [D.E. 65 at 3]. Nor could there be, because *The Hate U Give* was not available at M.P.'s school, either in the past or currently.[5] Vinson Decl. ¶ 63.

M.P.'s standing also fails against circuit precedent. Unlike in *ACLU*, where the student's parent's declaration professed he "anticipated checking out [the book]" when school resumed, i.e., "a specific intention pegged to a sufficiently fixed period of time," 557 F.3d at 1194, the Parker Declaration contains no such specific intentions. M.P. simply provided his father the kind of someday intention *Lujan* holds is insufficient. 504 U.S. at 562-63. The book the Parker Declaration claims M.P. wants to check out does not even align with Plaintiffs' pleading. *Compare* Parker Decl. ¶ 4, *with* [D.E. 27 ¶ 183 (alleging M.P. wants to check out *The Freedom*

---

[5] To protect M.P.'s identity, his school is not identified. The Board will provide such details, should the Court request.

*Writers Diary* and *Concrete Rose*)]. Plaintiffs cannot fall back upon their pleadings to establish M.P.'s standing at this stage.[6] *Murthy*, 144 S. Ct. at 1986.

### B. Plaintiffs Have Not Met Their Burden for a Preliminary Injunction

A preliminary injunction is "an extraordinary and drastic remedy" requiring the movant to "clearly establish the burden of persuasion." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (cleaned up). The moving party must show "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Id.* A preliminary injunction is the "exception rather than the rule." *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1286 (11th Cir. 2021).

#### i. <u>No Substantial Likelihood on the Merits</u>

##### a. *The Decision to Restrict School Library Books Is Government Speech*

Plaintiffs do not have a First Amendment right to have certain books available in a school library. *See, e.g.*, *United States v. Am. Libr. Ass'n*, 539 U.S. 194, 206 (2003) ("*ALA*"). The shelves of a public school library are not fora for private speech

---

[6] The vague statements in Plaintiffs' Declarations show any adjudication of Plaintiffs' Motion should be deferred until the Board deposes Parker and M.P., whose depositions are set for August 6, 2024. The Board may seek leave to supplement the record with their deposition transcripts.

and the Board's decision to restrict certain books pending the challenge review process is government speech, not subject to First Amendment scrutiny.

As the Eleventh Circuit recently summarized:

> The First Amendment works as a shield to protect *private* persons from encroachments by the government on their right to speak freely, not as a sword to compel the government to speak for them. In other words, the Free Speech Clause of the First Amendment restricts government regulation of private speech; it does not regulate government speech. That is, a government entity has the right to speak for itself, which consists generally in the ability to say what it wishes and to select the views that it wants to express.

*Leake v. Drinkard*, 14 F.4th 1242, 1247 (11th Cir. 2021) (cleaned up). When the government speaks, it may refuse to endorse or freely remove speech which it disapproves. *Id.* at 1248 (citing *Mech v. Sch. Bd. of Palm Beach Cnty.*, 806 F.3d 1070, 1074 (11th Cir. 2015)). Government speech is regulated by "the political process," not the Constitution. *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000).

The Supreme Court has long recognized schools, at times, stand *in loco parentis* (i.e., in the place of parents) with respect to their students. *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 187 (2021). The selection of age-appropriate library materials is in line with this well-established doctrine: Florida Statutes make plain the Board's supervisory duty over District students extends to the selection of library materials. *See* § 1006.28(2)(a)1., Fla. Stat. ("The district school board has the constitutional duty and responsibility to select and provide

adequate instructional materials for all students in accordance with the requirements of this part," including the "content of materials made available in a school or classroom library." (cleaned up)); *see also id.* § 1006.40(3)(c) (stating library materials must be: "1. [f]ree of pornography and material prohibited under s. 847.012; 2. [s]uited to student needs and their ability to comprehend the material presented; [and] 3. [a]ppropriate for the grade level and age group for which the materials are used or made available")

As a result, the decision as to which books are available on the shelves of a school library reflects the Board's constitutional duty as well as Florida law, and thus the decision to restrict the seven books pending the challenge review process is government speech. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995) ("When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed."). In public schools, "expression delivered directly through the government or indirectly through private intermediaries" is government speech, and the school "is free to make subject-matter-based choices." *Bannon v. Sch. Dist. of Palm Beach Cnty.*, 387 F.3d 1208, 1213 (11th Cir. 2004).

Plaintiffs' reliance on *Board of Education v. Pico*, 457 U.S 853, 870 (1982), to establish a First Amendment right to access certain books in a school library is

misplaced. *See* [D.E. 27 ¶¶ 3, 37, 225]. Not only does *Pico* not govern, it lacks "precedential value as to the application of the First Amendment to these issues" and "establishes no standard." *ACLU*, 557 F.3d at 1200 (citation omitted).

Further, post-*Pico* developments show *Pico*'s plurality should, at a minimum, be narrowly construed. Since *Pico*, courts have recognized public libraries are not public forums for private speech because "the government speaks through its selection of what books to put on the shelves and which books to exclude." *PETA, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005); *ALA*, 539 U.S. at 207. The First Amendment does not override a state's discretion to select materials based on content and viewpoint, *see Gittens*, 414 F.3d at 29, and that analysis does not change based on the forum. *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015) ("When the government speaks, it is not barred by the Free Speech Clause from determining the content of what it says.").

*Pico*'s narrow view of the right to remove books from libraries predates the Supreme Court's explanation of the government-speech doctrine, which took on fuller shape after *Rosenberger*. 515 U.S. at 819. Courts have since concluded forum analysis does not apply to public libraries due to the discretionary nature of their mission. *ALA*, 539 U.S. at 204, 213 n.7. And the Eleventh Circuit has reiterated government speech includes the freedom "not to speak" and to "'speak through the

removal' of speech that the government disapproves." *Mech*, 806 F.3d at 1074 (quoting *Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003, 1012 (9th Cir. 2000)).

The Eleventh Circuit applies a three-factor analysis to determine whether speech constitutes government speech, although none are "individually or jointly necessary" to support such a finding. *Gundy v. City of Jacksonville*, 50 F.4th 60, 76-77 (11th Cir. 2022). The first factor is "whether the type of speech under scrutiny has traditionally communicated messages on behalf of the government." *Id.* at 77 (citing *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n*, 942 F.3d 1215 (11th Cir. 2019)). The second is "whether the kind of speech at issue is often closely identified in the public mind with the government." *Id.* at 78. The final factor is "whether the relevant government unit maintains direct control over the messages conveyed through the speech in question." *Id.* at 79.

## 1.   History

The first factor weighs in favor of restricting school library books as government speech. Libraries have traditionally existed as a channel for communicating the written word to facilitate research, learning, and recreational pursuits, rather than as a "forum for the authors of books to speak." *ALA*, 539 U.S. at 206. And for nearly 140 years the State of Florida has enshrined the right to public free schools for its citizens, and at one point even explicitly provided for expenditure of funds "for the purchase of school libraries and textbooks." Art. XII, § 11, Fla.

Const. (1885).[7] Further, the Board's policy on the issue—Policy 4.06—was adopted more than 30 years ago, and the primary law upon which it is based was created more than 20 years ago. *See* Ch. 2002-387, § 303, Laws of Fla. (creating section 1006.28, Florida Statutes, requiring district school boards to "[e]stablish and maintain a program of school library media services").[8]

Accordingly, the first factor weighs in the Board's favor. Since school boards have long had the authority to maintain and curate the content within public school libraries in Florida, these libraries have traditionally communicated messages on behalf of the government. *McGriff v. City of Miami Beach*, 84 F.4th 1330, 1335 (11th Cir. 2023); *see also Cambridge Christian*, 942 F.3d at 1232.

## 2.   <u>Endorsement</u>

The endorsement factor asks whether the speech is closely identified with the government. *Cambridge Christian*, 942 F.3d at 1232. The Eleventh Circuit has found activities "'observers would interpret [as] promoted, organized, and funded by the government as conveying some message on [its] behalf,' as '[government entities] typically do not organize and fund events that contain messages with which they do not wish to be associated.'" *McGriff*, 84 F.4th at 1336 (second alteration in

---

[7]    Publicly    available    at:    http://library.law.fsu.edu/Digital-Collections/CRC/CRC-1998/conhist/1885con.html.

[8] Florida law has provided similarly for even longer. *See Logan v. Bd. of Pub. Instr. for Polk Cnty.*, 158 So. 720 (Fla. 1935).

original) (quoting *Leake*, 14 F.4th at 1250). Observers would interpret school libraries maintained, organized, and funded by the Board as "conveying some message" on its behalf. *See, e.g.*, *Mech*, 806 F.3d at 1076 (finding banners hung on government-owned school fences often closely identified the public mind with the government unit that owns the land); *see also Gundy*, 50 F.4th at 78-79 (ruling "City Council's invocation can be closely identified in the public mind with the government because the City Council organizes that invocation, it provides the venue for the invocation, it selects the speaker for the invocation, and then it begins its business meeting"). The books in the Board's libraries bear its imprimatur through their location on the shelves; they also include either a barcode, property stamp, or both indicating they are property of the school in which the book is kept. Vinson Decl. ¶ 36. This imprimatur indicates they are Board property. *Id.*; § 1001.42(2), Fla. Stat.

And, even though the seven books at issue were authored by private parties, "that a private party takes part in the propagation of a message does not extinguish the governmental nature of the message or transform the government's role into that of a mere forum-provider." *Gundy*, 50 F.4th at 79 (internal quotations omitted). When a school makes certain books available on its library shelves to be read by its students, it is conveying the message it has approved these books as age-appropriate and suitable for those students who patronize the library. Even though the books are

18

authored by others, the Board speaks through the decision as to what books to maintain on its school library shelves. The endorsement factor is met here.

### 3.    Control

The control factor looks at "whether the relevant government unit 'maintains direct control over the messages conveyed' through the speech in question." *Cambridge Christian*, 942 F.3d at 1234 (quoting *Walker*, 576 U.S. at 213). The Eleventh Circuit has held "no case precedent says that the government must control every word or aspect of speech in order for the control factor to lean toward government speech." *Gundy*, 50 F.4th at 79 (citing *Cambridge Christian*, 942 F.3d at 1235-36) (finding city exerted control over message conveyed by speakers because inviting speakers to give invocations inherently exhibits government control from outset of selection process); *see also McGriff*, 84 F.4th at 1334 (city controlled art installation and painting because "it contracted to commission and fund the artists' work; to control its exhibition, including by subjecting the art to the City Manager's approval; and to provide the space in which the exhibition was housed")

The Board controls the materials within its libraries because it provides and controls the library space itself: it purchases and takes ownership of the books and materials within, and subjects those materials to Board approval. *See McGriff*, 84 F.4th at 1334. "Having bought the [book], the [Board's] decision to display it [and make available for selection], or not display it, was classic government speech." *Id.*

Plaintiffs do not identify any agreement between the authors and the Board by which the authors retain control over what the Board may and may not do with their book once purchased. That is because no such agreement exists, and once a book is purchased, it becomes the prerogative of the Board to do with it—including whether to select or deselect it for availability—as it chooses. All three factors weigh in favor of the Board's actions serving as government speech.

### b.  The Board Has Legitimate Pedagogical Reasons for the Restriction of the Seven Books

Plaintiffs are additionally unlikely to succeed on the merits of their claim because the decision to restrict the seven books pending the challenge review process was based on legitimate pedagogical reasons. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988).

The First Amendment rights of students in the public schools "are not automatically coextensive with the rights of adults in other settings," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986), and must be "applied in light of the special characteristics of the school environment." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). A school need not tolerate student speech inconsistent with its "basic educational mission," even though the government could not censor similar speech outside the school. *Hazelwood*, 484 U.S. at 267 (quoting *Fraser*, 478 U.S. at 685).

The Supreme Court held in *Fraser* a student could be disciplined for having delivered a speech that was "sexually explicit"—but not legally obscene—at an official school assembly, because the school was entitled to "disassociate itself" from the speech in a manner that would demonstrate to others that such vulgarity is "wholly inconsistent with the 'fundamental values' of public school education." 478 U.S. at 685-686. The Supreme Court further recognized "[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board," *id.* at 683, rather than the federal courts.

Plaintiffs' Motion cannot succeed because the Board has a legitimate pedagogical interest in restricting the books at issue pending the challenge process. The Board's current Policy states "[p]ersonnel holding responsibility for evaluation and selection of educational materials should reexamine" these materials periodically to ensure they meet selection criteria; one basis for removing materials includes "required removal pursuant to s. 1006.28(2)(a)2., F.S." Board Pol'y 4.06 § 9.D.8., **attached as Exhibit B**. This is in line with Florida law, which requires every book made available in a school district library "must be selected by a school district employee who holds a valid educational media specialist certificate." § 1006.28(2)(d)1., Fla. Stat.[9]; *see* Vinson Decl. ¶¶ 16-17, 20, 24, 26.

---

[9] As required by House Bill 1467 (2022) ("HB 1467"). *See* June 3, 2022 Memorandum, *Fla. Dep't of Educ.*, **attached as Exhibit C**.

Under section 1006.28(2)(a)2.b.(II), Florida Statutes, any book which depicts or describes sexual conduct as defined in section 847.001(19), Florida Statutes, shall be discontinued for any grade level or age group for which such use is inappropriate or unsuitable. Vinson Decl. ¶¶ 18-21, 25. Plaintiffs' Motion concerns seven books. Motion at 14-17. As explained below and in the Vinson Declaration, all seven are subject to restriction based on section 1006.28(2)(a)2.b.(II)—i.e., HB 1069. Vinson Decl. ¶¶ 37-77; *see also id.* at Exs. 3-9 (including portions of books subjecting them to restriction).

By law, the Florida Department of Education requires district librarians and media specialists to complete a training program. § 1006.28(2)(d), Fla. Stat.; *see also* Fla. Admin. Code R. 6A-7.0715. This training makes clear, in selecting materials which are suited to student needs and appropriate for age and grade level, district staff are to "[e]rr on the side of caution." *See* Library Media & Instructional Materials Training, *Fla. Dep't of Educ.* at 11, **attached as Exhibit D**.[10] And this training emphasizes the need for districts' objection processes to allow stakeholders to object on the basis of HB 1069, i.e., that a book "[d]epicts or describes sexual conduct," as defined in section 847.001(19), Florida Statutes. *Id.* at 12. A memorandum from the Florida Department of Education reinforces this by clearly stating any book made available in a school library "may not contain content that"

_____

[10] As the training notes, it is effective July 2024.

runs afoul of section 1006.28(2)(a)2.b.(II).[11] *See* Oct. 13, 2023 Memorandum, *Fla. Dep't of Educ.*, **attached as Exhibit E**.

Plaintiffs argue HB 1069 is not applicable to these books and that it does not warrant District-wide restriction of the books. Motion at 22-25. This is illogical. HB 1069 is the law of the State of Florida. The Board, as required by law, incorporated HB 1069 (through section 1006.28(2)(a)2.b.(II)) into Policy 4.06. Vinson Decl. ¶¶ 18-19, 22-23, 25. It is inconsistent for Plaintiffs to argue that these books were not challenged on the basis they violated section 847.001(19), Motion at 23, when the legal mandate that this kind of material be restricted did not yet exist. *Compare id.* at 16 (listing book challenges as occurring in August and September 2022 and March 2023), *with* HB 1069 (approved by governor on May 17, 2023, listing effective date of July 1, 2023).

It was literally impossible for the challengers to these seven books to have challenged them on the basis they depicted or described impermissible sexual conduct unless they could see the future in which HB 1069 became law. Moreover, Plaintiffs concede "several of the challenge forms" did include "sexual" terms. Motion at 23. Simply because the challengers did not invoke the magic words of a

---

[11] The interplay between HB 1467 and HB 1069 is therefore clear: as of July 1, 2023 any book made available to students in a school district library must be selected by a trained media specialist who has determined the book does not depict or describe sexual conduct, as defined by law.

law not yet in existence does not preclude the District from independently relying on said law when fulfilling its statutory obligations.

Further, this Court recognized it was skeptical of the relief which could be granted for books restricted under section 1006.28(2)(a)2.b.(II)'s prohibition on any impermissible sexual conduct. [D.E. 65 at 8 n.12]. And while the Court was concerned by potential *de facto* removals, as demonstrated in Vinson's Declaration, the decision to restrict these books was "justified by actual <u>evidence</u> of a legitimate pedagogical reason under § 1006.28(2)(a)2.b." *Id.* (emphasis added); *see* Vinson Decl. ¶¶ 37-77. As such, Plaintiffs cannot succeed on the merits because HB 1069 provides a separate basis for restriction, a basis this Court recognized amounts to "a legitimate pedagogical reason for the [Board] to restrict access to the book." [D.E. 65 at 8 n.12].

In addition, Plaintiffs are not likely to succeed on the merits because they have not explained how the decision to restrict these books constitutes viewpoint discrimination.[12] Plaintiffs fail to explain the viewpoint or ideas purportedly being discriminated against by the Board through the restriction of these seven specific books. And, undercutting any argument that the viewpoint is related to LGBTQ characters, many books challenged on the basis of LGBTQ characters and themes

---

[12] HB 1069 is, on its face, viewpoint-neutral, applying to all sexual conduct. *See* Vinson Decl. ¶¶ 20, 32.

are currently unrestricted. *Compare* [D.E 27 ¶¶ 85-86 (alleging restrictions of *Uncle Bobby's Wedding* and *Milo Imagines the World*)], *with* Motion at 11 n.6 (conceding these two titles are currently unrestricted), *and* [D.E. 87-1 ¶ 2 (referencing District Reconsideration Spreadsheet where those two titles are currently unrestricted)].

Plaintiffs cannot find solace in *Pico*'s fractured judgment, whose plurality explained school library materials may not be removed "in a narrowly partisan or political manner." 457 U.S. at 870. But there is nothing partisan about restricting books containing depictions and descriptions of sexual content from school libraries. The example *Pico* feared was a "Democratic school board, motivated by party affiliation, order[ing] the removal of all books by or in favor of Republicans." *Id.* at 871. That is unlike the content choices here, which ensure school libraries contain age-appropriate books. The restriction of these books, pursuant to Florida Statutes, takes no partisan or viewpoint stance. *See* § 1006.28(2)(a)2.b.(II), Fla. Stat. And the Legislature's role in setting those standards, *see* Ex. E, is "consistent with" the responsibility of the proper decisionmakers for children: "the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Hazelwood*, 484 U.S. at 273.

### c. *Plaintiffs Have Not Shown* Monell *Liability*

As a condition of agency liability, *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and its progeny require the actions of a final

decisionmaker, or an agency custom, policy, or practice be the driving force behind the constitutional harm. Entities like the Board can only be liable under 42 U.S.C. § 1983 if they have final decisionmaking authority over the challenged action. *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016).

The Board is the policymaking body and final decisionmaker for the District. §§ 1001.41, 1001.42, Fla. Stat. The Board may not be liable under section 1983 for unconstitutional acts of its employees under a respondeat superior theory. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1290 (11th Cir. 2004). Rather, Plaintiffs must identify an express policy or a widespread practice that is so permanent and well-settled as to constitute a custom and usage with the force of law. *Cuesta v. Sch. Bd. of Miami-Dade Cnty.*, 285 F.3d 962, 966 (11th Cir. 2002).

There has been no decision on the seven books at issue by the Board. Rather, these books have been restricted by the Coordinator of Media Services based on her determination the seven challenged books contain "sexual conduct," as defined by section 847.001(19). Vinson Decl. ¶ 39. This determination has not yet been reviewed, or approved, by the Board.

Plaintiffs state they are not seeking the immediate return of books that have been challenged on the basis they depict or describe sexual conduct as defined in section 847.001(19). Motion at 2 n.1. Plaintiffs further argue these seven books were not challenged on that basis and therefore should be returned. *Id.* at 23. But

Plaintiffs' argument is essentially that the Coordinator of Media Services is acting outside the policy by impermissibly restricting books even when *the challenge form* does not reference section 847.001(19). If that is the case, then Plaintiffs must concede her acts are not based on Board policy. And, because there is no evidence the Board has reviewed these decisions, Plaintiffs cannot argue such allegedly impermissible restrictions were somehow ratified by the Board.

### d. Plaintiffs Challenge a Defunct Policy and Practice

Plaintiffs also cannot succeed to the extent they challenge a defunct policy or practice regarding book restrictions. Motion at 6-8. To give credence to Plaintiffs' claims would require the Court to stop the clock and find the Board liable for a policy no longer in existence and enjoin said defunct policy. This cannot be, as the policy which matters now for purposes of Plaintiffs' likelihood of success in obtaining an injunction is the Board's current policy governing maintenance of its libraries, including book removals and restrictions. *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (mootness is "standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)" (cleaned up)).

Plaintiffs' Motion recognizes Policy 4.06 was amended in June and September 2023 to comport with statutory changes effected through HB 1069. Motion at 7-8. Although the books at issue were all challenged before then, *id.* at 19

n.16, the Coordinator of Media Services independently determined under current policy—pursuant to HB 1069—these books must be restricted. Vinson Decl. ¶ 39. Because Plaintiffs seek to enjoin the Board for past decisions made under different policies, Plaintiffs' claims in this respect are moot. *See Littlejohn v. Sch. Bd. of Leon Cnty.*, 647 F. Supp. 3d 1271, 1275-76 (N.D. Fla. 2022) (finding plaintiffs' claims for injunctive relief stemming from outdated policy manual were moot given manual had been amended).

To the extent the defunct policy is at issue, Plaintiffs' claims are not likely to succeed because of *Monell*. Concerning the now defunct policy and practice, Plaintiffs can identify no express policy supporting their alleged practice: the Motion acknowledges the Board's then-current policy was either silent on the issue or stated challenged materials should remain on the shelves pending adjudication, unless challenged on the basis they were pornographic or obscene. Motion at 6-7.

Plaintiffs attempt to circumvent this by identifying an alleged short-lived practice—only in existence from October to December 2022—in which challenged books were immediately restricted. *Id.* at 9. This fails because: (1) none of the Motion's books were challenged during this period of time, *id.* at 16; and (2) the Board's policy changed in December 2022 to require challenged books generally remain available during the pendency of challenges. *Id.* at 9.

28

The supposed change in practice in early 2023 to restrict books challenged on the basis of House Bill 1557 (2022) in elementary school, *id.* at 10, is again inapplicable because: (1) six of the books were challenged in 2022; and (2) the only book challenged in 2023, *Lady Midnight*, is a middle and high school book.[13] Vinson Decl. ¶ 47. Plaintiffs cannot identify any practice which had the force of custom.

That leaves ratification, which "exists when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policy making authority," but requires ratification of "not only the decision itself, but also the unconstitutional basis for it." *Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1297 (11th Cir. 2002) (citation omitted). The Board has not reviewed its subordinates' decisions. No final decision has been made on these books, no Board vote has occurred, and therefore there is no ratification of the decision to restrict these books. Moreover, Plaintiffs have not and cannot show the Board ratified any unconstitutional bases for these books' restrictions. In short, Plaintiffs have identified no express policy these books were restricted under, no working practice, and no act of ratification by the Board. They cannot show *Monell* liability to the now defunct policy and practice(s).

---

[13] Plaintiffs' evidence for this is a single email from the Board's prior Coordinator of Media Services sent in April 2023. A single email does not constitute official Board policy or practice. Whether this constitutes official practice is a bitterly disputed fact necessitating an evidentiary hearing.

### ii.  **Plaintiffs Have Not Established Irreparable Harm**

"A showing of irreparable injury is the sine qua non of injunctive relief." *Siegel*, 234 F.3d at 1176 (cleaned up). "[T]he absence of a substantial likelihood of irreparable injury," "standing alone, make[s] preliminary injunctive relief improper." *Id.* "[T]he asserted irreparable injury 'must be neither remote nor speculative, but actual and imminent.'" *Id.* at 1176-77 (citation omitted).

Plaintiffs' delay in seeking injunctive relief demonstrates the lack of irreparable harm. Of the seven books, five were challenged in August 2022, one in September 2022, and one in March 2023. Motion at 16. These books have all been subjected to various levels of restriction since at or around the time of their respective challenge. Vinson Decl. ¶¶ 42-43, 48-49, 53-54, 58-59, 64-65, 69-70, 74-75. Plaintiffs filed suit in May 2023. [D.E. 1]. From their initial pleading Plaintiffs requested, as injunctive relief, the Board be enjoined from removing and/or restricting access to certain books. *Id.* at 58.

And during the hearing on the Board's Motion to Dismiss, Plaintiffs' counsel argued:

> The books that we sued under, the -- obviously the ten removed books that are completely removed and 154 or 155 books that have been restricted -- those books, at least to some substantial set of them that we believe do not have sexual content in them, sexual depict -- anything depicting sexual conduct and that they are still being restricted, and they're still being restricted for -- and, for example, one of our

30

plaintiffs' books, *Uncle Bobby's Wedding*, which is Plaintiff Sarah Brannen, it is -- it is a picture book.[14]

[D.E. 66 at 54:11-54:20].

Yet, Plaintiffs only now—nearly 14 months after initiating litigation—actually moved for a preliminary injunction against the Board, and only for seven books despite statements a "substantial set of them" do not have sexual content. Plaintiffs' dilatory actions in seeking injunctive relief is cause for their Motion to be denied. *See Cousins v. Sch. Bd. of Orange Cnty.*, 636 F. Supp. 3d 1360, 1382 (M.D. Fla. 2022) ("[T]he Eleventh Circuit has clearly stated that such delays in seeking injunctive relief militate against a finding of irreparable harm."); *see also Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (upholding district court's finding that plaintiff's "unexplained five-month delay in seeking a preliminary injunction, by itself, fatally undermined any showing of irreparable injury" and collecting cases); *cf. Dow Jones & Co. v. Kaye*, 256 F.3d 1251, 1257-58 (11th Cir. 2001) (vacating injunction as moot and noting plaintiffs "did not respond quickly" to challenged action and "waited a year and a half before filing for injunctive relief in federal court"). This presumption towards finding a lack of irreparable harm in the face of unexplained delay applies towards constitutional claims. *E.g.*, *People's Party of Fla. v. Fla. Dep't of State, Div. of Elections*, 608 F.

---

[14] *Uncle Bobby's Wedding* is currently unrestricted. Motion at 11 n.6.

Supp. 3d 1195, 1199 (M.D. Fla. 2022) (applying *Wreal* to constitutional and First Amendment claims).

Plaintiffs have "failed to offer any explanation for [their] [14]-month delay," which cuts against "the very idea of a *preliminary* injunction [as it] is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Wreal*, 840 F.3d at 1248. This Court has, in other contexts, stated that because "Plaintiffs have not moved quickly to this point," this "is a factor in considering the equities." *Eq. Fla. v. DeSantis*, Order on Stay of Discovery, No. 4:22-cv-00134-AW-MJF, ECF No. 89 (N.D. Fla. July 21, 2022). This Court can, and should, consider Plaintiffs' unexplained delay as cutting against any claim of irreparable harm.

Moreover, that Plaintiffs only move for a preliminary injunction on behalf of 7 of the "154 or 155 books that have been restricted" further indicates the harm is not irreparable. By implication, Plaintiffs agree the purported harm in restricting 148 books can be remedied at the end of this litigation. Plaintiffs offer no explanation as to why the determination on these seven books cannot wait.

### iii. The Balance of Harms and Public Interest Do Not Favor Plaintiffs

"[T]he balance-of-the-harms and public-interest factors . . . 'merge' when, as here, 'the Government is the opposing party.'" *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Plaintiffs have

not established irreparable harm; the Board, meanwhile, is "responsible for the content of all materials made available in a school library." § 1006.28(2)(a)1., Fla. Stat. (cleaned up). "The 'inability to enforce its duly enacted [laws] clearly inflicts irreparable harm on the State.'" *See People's Party*, 608 F. Supp. 3d at 1199 (alteration in original) (quoting *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018)).

The balance of harms weighs in the Board's favor. *Swain v. Junior*, 958 F.3d 1081, 1090-91 (11th Cir. 2020). Under Florida law, "public officials are obligated to obey the legislature's duly enacted statute until the judiciary passes on its constitutionality." *Sch. Dist. of Escambia Cnty. v. Santa Rosa Dunes Owners Ass'n*, 274 So. 3d 492, 494 (Fla. 1st DCA 2019). An injunction would cause the Board irreparable harm by forcing it to deviate from Florida law it must follow.

Further, a preliminary injunction's purpose is to preserve the status quo until the controversy's merits can be fully adjudicated. *Robinson v. Att'y Gen.*, 957 F.3d 1171, 1179 (11th Cir. 2020). An injunction would disturb this status quo: these seven books have not been fully reviewed by the Board; any intervention by the Court would short-circuit the Board's statutory process and unnecessarily restrain its ability to comply with its legal duties. This is not in the public interest, which is best served by allowing elected officials—like the Board—to carry out their constitutional and legal duties uninhibited. Plaintiffs' Motion should be denied.

## III.    OBJECTIONS TO PROFFERED EVIDENCE

If an evidentiary hearing is not ordered, the Board lodges the following evidentiary objections to Plaintiffs' proffered evidence.

Specifically, the Board objects to the Declaration of Ori Lev, [D.E. 87-1], to the extent it includes hearsay from Board counsel. Mr. Lev's summaries of discussions with counsel is unauthenticated hearsay not supported by any verified discovery response. Mr. Lev's description of what counsel told him is inadmissible evidence. *See* [D.E. 87-1 ¶¶ 9, 12, 14, 15].

In addition, the Board objects to Mr. Lev's summaries of various documents because they are inadmissible under Federal Rule of Evidence 1006. *See id.* ¶¶ 8, 11, 13, 14.

**WHEREFORE**, Defendant, Escambia County School Board, requests the Court deny Plaintiffs' Motion for Preliminary Injunction, and for any further relief this Court deems just and proper.

## <u>CERTIFICATE OF WORD COUNT</u>

The undersigned certifies that this Motion complies with the word count limitation set forth in Local Rule 7.1(F) because this Motion contains 7,995 words, excluding the parts exempted by said Local Rule.

Respectfully submitted,

/s Nicole Sieb Smith
_____
NICOLE SIEB SMITH
Florida Bar No.: 0017056
E-mail: nsmith@rumberger.com
J. DAVID MARSEY
Florida Bar No.: 0010212
E-mail: dmarsey@rumberger.com
JEFFREY J. GROSHOLZ
Florida Bar No.: 1018568
E-mail: jgrosholz@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
101 North Monroe Street, Suite 1050
Tallahassee, Florida 32301
Tel: 850.222.6550
Fax: 850.222.8783

SAMANTHA DUKE
Florida Bar No. 0091403
Email: sduke@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
300 S. Orange Ave., Suite 300
Orlando, Florida 32801
Tel: 407.872.7300
Fax: 407.841.2133

Attorneys for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 31, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Kristy L. Parker at kristy.parker@protectdemocracy.org; John Thomas Langford at john.langford@protectdemocracy.org; Shalini Goel Agarwal at

shalini.agarwal@protectdemocracy.org; Kirsten Elizabeth Fehlan at fehlank@ballardspahr.com; Lynn Beth Oberlander at oberlanderl@ballardspahr.com; Paul Joseph Safier at safierp@ballardspahr.com (Counsel for Plaintiffs); Rachel Elise Fugate at rfugate@shullmanfugate.com (Counsel for Clay Calvert, et al.); Clarence William Phillips at cphillips@cov.com; Jayne Foley Hein at jhein@cov.com; Nicholas Eli Baer at nbaer@cov.com; Robert C. Buschel at buschel@bglaw-pa.com (Counsel for Florida State Conference NAACP, et al.); Bridget K. O'Hickey at bridget.ohickey@myfloridalegal.com; Daniel William Bell at daniel.bell@myfloridalegal.com; David Matthew Costello at david.costello@myfloridalegal.com; and Henry Charles Whitaker henry.whitaker@myfloridalegal.com (Counsel for State of Florida).

/s Nicole Sieb Smith
J. DAVID MARSEY
Florida Bar No.:  0010212
E-mail:  dmarsey@rumberger.com
NICOLE SIEB SMITH
Florida Bar No.:  0017056
E-mail:  nsmith@rumberger.com
JEFFREY J. GROSHOLZ
Florida Bar No.:  1018568
E-mail:  jgrosholz@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
101 North Monroe Street, Suite 1050

Tallahassee, Florida 32301
Tel:  850.222.6550
Fax:  850.222.8783
and

SAMANTHA DUKE
Florida Bar No. 0091403
Email:  sduke@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
300 S. Orange Ave., Suite 300
Orlando, Florida 32801
Tel:  407.872.7300
Fax: 407.841.2133

Attorneys for Defendant

37