## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | | |
|---|---|---|
| PEN AMERICAN CENTER, INC., et al.,<br><br>         Plaintiffs,<br><br>vs.<br><br>ESCAMBIA COUNTY SCHOOL BOARD,<br><br>          Defendant. | | CASE NO.: 3:23-CV-10385-TKW-ZCB |

## DECLARATION OF LYNN B. OBERLANDER

I, Lynn B. Oberlander, declare as follows:

1.     I am over the age of 18 and have personal knowledge of the facts in this declaration.

2.     I am Of Counsel to the law firm of Ballard Spahr LLP, and counsel to the Plaintiffs in this action.

3.     I was engaged in preparing Summer Lopez, the corporate deponent for PEN American Center, Inc. ("PEN America"), for her deposition pursuant to Federal Rule of Civil Procedure 30(b)(6).

4.     The Deposition Notice called for the corporate deponent to testify on 19 different topics. In addition to topics concerning the factual bases for the

Amended Complaint, Pen's standing, and the organizational and management structure of PEN America, the Deposition Notice contained nine topics that sought specific information "[f]or each book" for which PEN claims to have standing – or over 160 books. Those topics included "the basis for the allegation that each book was removed and/or restricted based on viewpoint discrimination, including the viewpoint that was purportedly discriminated against" (Topic 10); "the basis for the allegation that each book was removed and/or restricted based on political or ideological disagreement with the ideas expressed in the book" (Topic 11); and "the bases for the allegation that "[n]one of the books at issue" qualify as harmful material under section 847.012, Florida Statutes" (Topic 12), among others. A true and correct copy of the Deposition Notice is attached as Exhibit 1.

5.    I was aware that at the 30(b)(6) deposition of Plaintiff Penguin Random House ("PRH), Defendant's counsel had asked the deponent detailed questions about many of the nearly 40 books published by PRH, including to describe the book's plot, and the viewpoint that was discriminated against, and, in certain instances, whether the book depicted or described sexual conduct in violation of Florida Statute section 847.001(19). At the PRH deposition, Defendant's counsel had shown the deponent the challenge forms for each of the books, which had facilitated his ability to answer the questions.

6.      As PEN America is asserting organizational standing for all of the books at issue in this litigation, I expected Defendant's counsel to engage in a similar process at PEN America's 30(b)(6) deposition.  Accordingly, I asked Diane Elizabeth Brinkley, PEN America's Legal Fellow, to prepare a spreadsheet of information about each of the books that could be used as a reference for the deponent.

7.      I asked Ms. Brinkley to combine data about the books from PEN America's filings in the case; from the School District's own spreadsheet of books subject to challenge; and from PEN America's analyses of the books during the period of November 2022 through April 2023 conducted by the Freedom to Read Team.  The document titled "Book pages for Summer's deposition" ("Book Pages") at the heart of Defendant's motion was the result of this work. As I understood that material that the deponent would rely upon at her deposition might need to be produced, I did not want nor expect the Book Pages to include any work-product or other attorney-client privileged information.

8.      Indeed, when I reviewed an early version of the document, it included a category entitled "Sexual conduct under 847.001(19) (from BookLooks/Challenge excerpts)", and I reasonably believed that any information in that category was pulled from those documents – the Book Looks website and the Challenge forms.

9.     However, unbeknownst to me, and in an effort to be helpful, Ms. Brinkley also conducted her own analysis for some of these categories, including attempting to determine whether it could be plausibly argued or alleged by a challenger that the books at issue contain a description of sexual content or conduct that could be possibly considered a violation of F.S. 847.001(19), using the broadest possible interpretation of the statute.  She also added her own analysis and opinions to certain other categories, including by identifying the type of viewpoint discrimination in the removal or restriction of any given book in the Viewpoint Discrimination category, and in her entries for the Challenge Form; Summary; Content; Accolades; Author Identity; and Audience categories.

10.    Ms. Brinkley did not complete the Book Pages document until the night before the deposition.  She sent the Book Pages document to me at 10:20 p.m. on July 31, 2024.

11.    At the time, I was unaware that the Book Pages document contained any legal analysis, work product, or legal opinions.  I regret that during our final preparations for the deposition, I simply had a miscommunication with my client. I did not have time to thoroughly review the Book Pages document prior to the deposition and believed that, as with previous reviews and discussions of the books at issue in this case, it was merely a compilation of previously produced and/or publicly available information.

12.     I had the document printed out and put in a binder, so that Ms. Lopez would be able to access it if needed during her deposition.  I never reviewed the final Book Pages document with Ms. Lopez and I never witnessed her review the Book Pages document in any detail.

13.     In an effort to facilitate the deposition for both Defense Counsel and the deponent, when Ms. Smith asked me to provide her with the material that the deponent had in front of her, I acquiesced and quickly emailed the Book Pages document to her and a spreadsheet summarizing the time and money that PEN America had diverted to researching and analyzing the actions of the School Board.  I made it clear that these documents were only created for the purpose of the deposition, and both were marked "Privileged and Confidential".  *See* Ex. 2 at 11:23 – 12:1; Def.'s Mot. Ex. B.

14.     Had I realized that the document included Ms. Brinkley's work product, we would not have printed it out for Ms. Lopez's use during the deposition, nor provided it to Defense Counsel at the beginning of the deposition.

15.     We did not refer to the document at all during the first day of the deposition, as Defense Counsel's questions focused on organizational standing and PEN America's structure and programs.  As a result, neither I nor the deponent, had reason to look or review the document.  The document was not utilized,

5

referred to, or used to refresh any of the deponent's recollection on the entire first day of the deposition.

16.      It was only at the beginning of the second day of testimony, on August 2, when Defense Counsel moved to enter the document as an Exhibit that I realized that the document contained attorney work-product information.  I realized this when I saw what I believed to be an error in some of the information for one of the books, and I asked Ms. Brinkley about it.  It is for this reason, that I first told Defense Counsel that the documents had errors in it.  Ex. 2 at 7:13-7:23; *id.* at 8:8-12.  We took a short recess to review the document, during which Ms. Brinkley explained that the Book Pages contained her analysis, and upon our return, I immediately indicated that the document contained privileged work-product information, and asked for it to be returned or destroyed.  *Id.* at 11:12 – 12:01.

17.      I also indicated to Defense Counsel that not all of the categories in the Book Pages document contained work-product information.  I stated that the information concerning whether the books were removed or restricted; what type of standing PEN America was claiming for each book; and whether the book appeared on Book Looks was not work-product information or analysis. I offered to provide Defense Counsel with a redacted version of the document.  Defense Counsel refused.  *Id.* at 13:15 – 14:19.

18.     I repeated my request to claw back the document which had been inadvertently disclosed as it had attorney work-product information. *Id.* at 21:23 – 22:02. Defense Counsel indicated that she intended to file a motion with the Court. The deposition continued on August 2 without further reference to the document.

19.     I acknowledged that the deposition would remain open pending the Court's determination of the Defense counsel's motion. *Id.* at 22:16-19.

20.     Ms. Lopez did not rely on the Book Pages document at any time to refresh her recollection about any question posed to her during the deposition.

21.    On August 6, I sent a letter to Defense Counsel, formally requesting the return or certification of destruction of the Book Pages document (the "Inadvertently Disclosed Information") and any documents created based upon the Inadvertently Disclosed Information, pursuant to the Confidentiality Order. A true and correct copy of this letter is attached as Exhibit 3. The letter noted, correctly, that "The Inadvertently Disclosed Information was not relied upon during the deposition in any way: it had been prepared with the intent of using it, but was not looked at or reviewed by the deponent prior to our sending it to you." *Id.*

I certify under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge.

Executed in New York County, New York, this 21st day of August 2024.

Lynn B. Oberlander