UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| PEN AMERICAN CENTER, INC., et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>ESCAMBIA COUNTY SCHOOL BOARD,<br><br>Defendant. | CASE NO.: 3:23-CV-10385-TKW-ZCB |

**DECLARATION OF DIANE ELIZABETH BRINKLEY**

I, Diane Elizabeth Brinkley, declare as follows:

1. I am over the age of 18 and have personal knowledge of the facts in this declaration.

2. I am a 2023 graduate of the New York University School of Law.

3. I am a Legal Fellow at PEN American Center, Inc. ("PEN America"), where I work under the supervision of Katie Blankenship, the Senior Director, PEN America Florida, and the in-house attorney overseeing this case, and Eileen Hershenov, the Deputy Chief Executive Officer, Programs and Legal at PEN America.

4. I was asked to help gather information to help PEN America's corporate representative prepare for the Fed. R. Civ. P. 30(b)(6) deposition. Specifically, the notice for the corporate representative's deposition called for the witness to be prepared to speak on 19 topics.

5. Among other topics, the deposition notice called for the deponent to be able to testify in detail about PEN America's diversion of resources regarding the 164 books bans in Escambia at issue in this case and specific details about those books.

6. To aid PEN America's corporate representative prepare for the deposition, among other things, I interviewed PEN's employees, compiled data and information regarding the book challenges and the subsequent removal and/or restriction of the books at issue in this case, reviewed PEN America's internal documents regarding its diversion of resources, and then analyzed, synthesized and summarized these documents and data points.

7. I understood that PEN America's 30(b)(6) witness, Summer Lopez, would likely be questioned about the ten books that the School Board had voted to remove from the Escambia County school libraries, and the over 150 books that had been challenged in the period prior to the filing of the Amended Complaint and were still awaiting review. Many of these books were also restricted from student access pending the completion of the review.

8. In addition, I was aware that during the 30(b)(6) deposition of co-Plaintiff Penguin Random House, defense counsel had asked the deponent to read various passages from selected books and "opine" on whether that content constituted sexual conduct in violation of FS 847.001(19).

9. Plaintiffs' outside counsel Lynn Oberlander asked me to pull together a summary spreadsheet containing all of the books at issue in the litigation. She specifically asked me to include information on the book, whether or not it was listed as restricted or not restricted on the School District spreadsheet; whether PEN America claimed organizational and associational standing; the results of the content analysis of the challenge forms conducted by PEN America; and the results of a separate analysis of the themes and content of the books. We also discussed whether or not to include the author's identity in the spreadsheet.

10. Based on this instruction, I created a Word document providing details and analysis of the over 160 books at issue in this case. This is the document that Defendants seek to compel and which we contend is protected by privilege as attorney work product. I will refer to this document as the "Book Pages."

11. I also created a spreadsheet tracking PEN America's expenses and diversion of resources to address the book bans in Escambia County at issue in this case.

12. I do not remember whether Ms. Oberlander told me that the materials used at the deposition would be produced. I included legal analysis in the Book Pages document and, at that time, did not understand that the document would be produced, and therefore should be redacted or devoid of attorney client work product before being provided to counsel or actually used to refresh Ms. Lopez' memory.

13. I created the Book Pages document so as to capture not only details about each book, but the subject matter and contents of the book, along with legal analysis regarding same, in the event such information would be helpful to Ms. Lopez if and when defense counsel questioned her about the specific books at issue in this case. I also added other topics and background information about the books that I thought might be useful in the deposition, including information concerning awards and industry accolades; how the author identified (i.e. whether the author identified as LGBTQ+ or BIPOC); what the book's target audience is; whether the book also appeared on the Book Looks website; and whether, in my opinion, the challenge forms or other available information about the book could be argued to constitute Sexual Conduct under 847.001(19).

14. The document contains 169 pages, providing details and analysis for the books at issue in the case. For each book, there are 8-11 categories including: Removed or Restricted; PEN Standing (Organizational and/or Associational);

Challenge Form information; Description; Audience; Content (characters or themes); Author Identity; Accolades and Reviews; Sexual Conduct under 847.001(19); Viewpoint Discrimination; On Book Looks. [1] Each topic also contains space for a narrative or a check box, depending on the topic. A sample page of the document (without any content) is attached as Exhibit A.

    15.    In general, in gathering information for the Book Pages, I reviewed PEN America's internal documentation and materials filed in this case, including the Amended Complaint and the Interrogatory responses. However, I also conducted independent research on some of the books to augment some of the categories and to create new categories for viewpoint discrimination and sexual conduct. For example, for the category entitled "Sexual Conduct Under 847.001(19)," I reviewed the statutory definition of sexual conduct and sought to determine whether a book challenger had or could possibly assert that the book contained such sexual conduct. For this category, I attempted to determine whether it could be plausibly argued or alleged by a challenger that the books at issue contain a description of sexual content or conduct that could be possibly

---

[1] Not every book has an entry for each topic and some of the pages use slightly varying categories: "Summary" or "Description" for example, or "Content" or "Content (characters or themes)").

considered a violation of F.S. 847.001(19).  For certain books, when I could not determine the content from the challenge forms or the Book Looks entry, I conducted further research by searching Google (usually searching for the name of the book and "sexual conduct"). I also read many of the passages listed in the challenge forms, Book Looks, and researched on Google.  My analysis was not whether the book at issue actually had content that violated FS 847.001(19), but whether anyone could plausibly make that claim using the broadest possible interpretation of the statute, in my professional opinion.

16.     In addition, I reviewed PEN America's internal documents, the challenge forms, the Amazon listings for various books, and other publicly available materials to analyze whether the books at issue contained themes of LGBTQ, Race, or Sexual Assault, to help determine the viewpoint that was being discriminated against by the School Board's actions.

17.     The entries set out in the rows for Removed or Restricted; PEN America Standing (Organizational and/or Associational); and On Book Looks are factual and do not represent my thoughts, mental impressions or analyses of the books at issue in the litigation.

18.     The entries set out in the following rows of the Book Pages document represent my own thoughts, mental impressions and analyses of the books at issue in the litigation: Challenge Form information; Summary; Content; Accolades;

Author Identity; Audience; Sexual Conduct under 847.001(19); and Viewpoint Discrimination.

19. I worked on the Book Pages during the week leading up to the deposition under supervision, sharing initial tracking and analysis with PEN America's counsel, Lynn Oberlander. I completed the Book Pages on July 31, 2024, the night before Ms. Lopez' deposition. I sent a copy to Ms. Oberlander at 10:20 p.m. that evening.

20. The Book Pages contains information pulled from numerous sources, both internal that have already been produced to defense counsel and external, publicly available sources. Ms. Lopez and I looked at various spreadsheets and book tracking sources to prepare for her deposition, much of which is also compiled in the Book Pages. However, it is critical to remember that the Book Pages also contains PEN America's in-house counsel's analysis of the books. At no point prior to the deposition did I review the Book Pages document in detail with Ms. Lopez.

21. Because I did not even finish the Book Pages until the night before Ms. Lopez' deposition, Ms. Lopez did not spend significant time with this document nor did we go over it in detail. It was simply a resource that I wanted her to be able to access to refresh her recollection about the individual books, if necessary.

22.     I believe there was a misunderstanding with our counsel, Lynn Oberlander, when she produced the Book Pages document. I believe she thought the document was simply a compilation of previously produced or publicly available documents, but it in fact contained attorney work product.

23.     As soon as the Book Pages document was presented by defense counsel, Ms. Oberlander saw what she believed was an error in some of the information about a book, and asked me about it. We then took a short recess and my supervisor, Katie Blankenship, and I alerted Ms. Oberlander that the Book Pages document contained attorney work product and needed to be clawed back. Ms. Oberlander then immediately informed defense counsel and requested to claw back the document.

I certify under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge. Executed in New York County, New York, this 21st day of August 2024.

/s/ *Diane Brinkley*
Diane Elizabeth Brinkley