# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | | |
|---|---|---|
| PEN AMERICAN CENTER, INC., SARAH BRANNEN, LINDSAY DURTSCHI, on behalf of herself and her minor children, BENJAMIN GLASS, on behalf of himself and his minor child, GEORGE M. JOHNSON, DAVID LEVITHAN, KYLE LUKOFF, ANN NOVAKOWSKI, on behalf of herself and her minor child, PENGUIN RANDOM HOUSE LLC, SEAN PARKER, on behalf of himself and his minor child, ASHLEY HOPE PÉREZ, ERICA ROY, on behalf of herself and her minor children, CHRISTOPHER SCOTT SATTERWHITE, on behalf of himself and his minor child, and CARIN SMITH, on behalf of herself and her minor children, | : : : : : : : : : : : : : : : : : : : | Case No. 3:23-CV-10385-TKW-ZCB<br><br>JURY TRIAL DEMANDED |
| *Plaintiffs*, | : : : | |
| v. | : : | |
| ESCAMBIA COUNTY SCHOOL BOARD, | : : : : | |
| *Defendant*. | : | |

## PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT ESCAMBIA COUNTY SCHOOL BOARD

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiffs

PEN American Center, Inc., Sarah Brannen, Lindsay Durtschi, Benjamin Glass,

George M. Johnson, David Levithan, Kyle Lukoff, Ann Novakowski, Penguin

Random House LLC, Sean Parker, Ashley Hope Pérez, Erica Roy, Christopher Scott

Satterwhite, and Carin Smith, by and through their attorneys, hereby request that Defendant answer the following Interrogatories. Written responses under oath are due within thirty (30) days of service of these Interrogatories. Responses are to be served via email and/or hard copy to the undersigned counsel.

Each Interrogatory is subject to the Instructions and Definitions preceding the specific requests.

## DEFINITIONS

The following definitions shall apply to each of the Interrogatories set forth below.

1. "You" or "Your" means the party responding to this Interrogatory; any of the party's officers, agents, assigns, employees, insurers, subsidiaries, successors, and predecessors; and anyone acting or purporting to act on the party's behalf, except for legal counsel.

2. "Defendant" means the Escambia County School Board.

3. "School Board" means and refers to the five-member governing body of the School District, elected from geographic districts within Escambia County, including both current and former members during the Relevant Time Period.

4. "School District" means the Escambia County School District.

5. Unless specifically and individually identified, "Plaintiff" or "Plaintiffs" refers to all of the Plaintiffs in this action.

6.     "Amended Complaint" means the Amended Complaint Plaintiffs filed in this action.

7.     "Communicate" or "Communication" means any transmission of Documents or information between Persons or agencies, whether oral, written or otherwise, active or automated, including but not limited to memoranda, letters, telecopies, facsimiles, e-mails, text messages, voicemails, electronic transmissions, meetings, discussions, conversations, or telephone calls.

8.     "Describe" means to state all knowledge that You have regarding the subject matter of the Interrogatory in full detail including but not limited to:

  (a) the identity of the Person(s) originating the statement, correspondence, Document, or Communication;

  (b) the identity of the Person(s) to whom the statement, correspondence, Document, or Communication was given;

  (c) when and where the statement, correspondence, Document, or Communication was given;

  (d) the date the statement, correspondence, Document, or Communication was given;

  (e) whether the statement, correspondence, Document, or Communication was oral or in writing;

(f)   if the statement, correspondence, or Communication was oral, whether a recording was made, and if so, the nature of the recording and the identity of the Person who has custody of it;

(g)   if the statement, correspondence, Document, or Communication was written, whether it was signed by the Person making it;

(h)   if the statement, correspondence, or Communication was oral, a detailed summary of its contents; and

(i)   the identity of any Person who has custody of any such statement, correspondence, Document, or Communication that was reduced to writing or otherwise recorded.

9.   "Document" includes but is not limited to the original, drafts and all non-identical versions or copies (whether different from originals by reason of notations made on such copies or otherwise) of all written, electronic or graphic material, however produced or reproduced, in Your possession, custody or control or the possession, custody, or control of Your attorney, including but not limited to writings, forms, memoranda, letters, notes, correspondence, studies, reports, drawings, graphs, charts, records, photographs, sound or mechanical recordings or tapes, telecopies, facsimiles, e-mail, text messages, voicemails, computer printouts, information stored on computer systems, database queries and responses, and other data compilations from which information can be obtained or translated, if necessary

through the use of detection devices, into reasonably usable form, in the broadest understanding of the term "Documents" in the Federal Rules of Civil Procedure. Without limiting the term "control," a Document is deemed to be within Your control if You have ownership, possession, or custody of the Document, or the right to secure the Document or a copy thereof from any Persons having physical control thereof.

10.    "Identify," when used in connection with a natural Person, means to state his, her, or their:

    (a)    full name and any aliases;

    (b)    residence address and phone number;

    (c)    business address and phone number;

    (d)    employer, title, and job description at the time of the event in question; and

    (e)    present or last known employment and job description.

11.    "Identify," when used in connection with an entity other than a natural Person, means to state the following:

    (a)    the full name of the entity;

    (b)    the legal form of the entity (e.g., corporation, partnership, committee);

(c)     a brief description of the nature and business purpose of the

entity; and

(d)     the present or last known address of the entity's principal

office, principal place of business, and other places of business.

12.     "Identify," when used in connection with an event or occurrence, means

to state the following:

(a)     the date of the event or occurrence;

(b)     the Person(s) involved in the event or occurrence; and

(c)     the subject matter of the event or occurrence.

13.     "Identify," when used in connection with a Document, means to state

the following:

(a)     the date the Document was prepared;

(b)     the author(s) of the Document;

(c)     the identity of the addressees of the Document;

(d)     the identities of the Persons or entities that received copies of

the Document;

(e)     the subject matter and substance of the Document;

(f)     a description of the Document (e.g., memorandum, letter, etc.);

and

(g)     the name and address of the custodian of the Document.

14.     The words "or," "and," "all," "every," "any," "each," "one or more," "including," and similar words of guidance, are intended merely as such, and should not be construed as words of limitation. The words "or" and "and" shall include each other whenever possible to expand, not restrict, the scope of the Interrogatory. The word "including" shall not be used to limit any general category or description that precedes it. The words "all," "every," "any," "each," and "one or more" shall include each other whenever possible to expand, not to restrict, the scope of the Interrogatory.

15.     "Person" or "Persons" includes a natural person, individual, corporation, proprietorship, partnership, association, agency (including government agencies), School Board, School District, or any other entity.

16.     "Reading Material" means text-based or image-based content, including but not limited to books, published or produced in any printed, electronic, or digital format.

17.     "Book Challenge" means and refers to any challenge or petition submitted by any Person with the aim of removing or restricting access to any Reading Material in any School District library, including, but not limited to, submitting the School District's "Request for Reconsideration of Educational Media" form.

18.    "Book Restriction" means and refers to any actions undertaken by the School District, including by You, to restrict access (short of complete removal) to any Reading Material in any School District library, permanently or temporarily, at any time during the Relevant Time Period.  Similarly, "Restricted Access" means any limitation on access to Reading Material in any School District library short of complete removal.

19.    "Book Removal" means and refers to any actions undertaken by the School District, including by You, to remove (or completely bar access to) any Reading Material from any School District library, permanently or temporarily, at any time during the Relevant Time Period.

20.    "HB 1069" means the act of the Florida legislature numbered House Bill 1069, as enacted on May 17, 2023 and collected at Florida Laws Ch. 2023-105.

21.    "HB 1557" means the act of the Florida legislature numbered House Bill 1557, as enacted on March 28, 2022 and collected at Florida Laws Ch. 2022-22.

22.    "HB 7" means the act of the Florida legislature numbered House Bill 7, as enacted on April 22, 2022 and collected at Florida Laws Ch. 2022-72.

23.    "Policy or Practice" includes any official or unofficial policy, practice, procedure, protocol, or custom, whether mandatory or discretionary, formal or informal, written or unwritten.

24.     The "Relevant Time Period" for each Interrogatory is May 23, 2022, through the present unless otherwise stated in an individual Interrogatory.

## **INSTRUCTIONS**

1.     These Interrogatories are directed to You pursuant to the Federal Rules of Civil Procedure and the Local Rules of this Court. You are directed to answer each of them separately, under oath and to serve a copy of your answers upon the attorneys for Plaintiff within thirty (30) days.

2.     The Interrogatories are deemed continuing in nature. If additional facts, Documents, information, or witnesses become known to you, supplementary answers must be served promptly on Plaintiffs' counsel.

3.     If in answering these Interrogatories you encounter any ambiguities construing a question, instruction or definition, set forth the matter deemed ambiguous and the construction used when answering.

4.     State whether the answer is within the personal knowledge of the Person(s) answering the Interrogatory and, if not, Identify each Person known to have personal knowledge of the answer.

5.     The use of a verb in any tense shall be construed to include the use of the verb in all other tenses whenever necessary to bring into the scope of the specification all responses, which might otherwise be construed as outside the scope.

9

6. These Interrogatories require the provision of all responsive information in Defendant's possession, custody, or control, or known to be available to Defendant, regardless of whether such information is possessed directly by Defendant's agents, advisors, officials, employees, representatives, consultants, successors-in-interest, and other Persons or entities acting on their behalf, subject to their control, or in any other way related to them.

7. If You object to any Interrogatory or any subpart thereof on the grounds that it calls for disclosure of information that You claim is privileged, or on any other grounds, then answer such Interrogatory or subpart as follows:

(a) the type of Communication, Document, or information at issue (e.g., oral, written, or electronic) and the date thereof;

(b) the name, current or last known home and business addresses and the telephone numbers thereto, the field or position, occupation, and employer of each of the participants in such Communication, Document, or information or of those individuals who prepared, produced, or reproduced, or who were the recipients of, such Communication, Document, or information;

    (c)    a description of the Communication, Document, or information sufficient to Identify it without revealing the information for which privilege is claimed;

    (d)    a description of the subject matter of the Communication, Document, or information in sufficient detail to allow the Court to adjudicate the validity of the claim of privilege;

    (e)    each and every fact and legal basis upon which Defendant claims any such privilege; and

    (f)    the Interrogatory or part thereof to which the Communication, Document, or information relates.

8.    Each Interrogatory is to be answered separately and as completely as possible. The omission of any name, fact, or other item of information from the answers shall be deemed a representation that such name, fact, or item is not known to You or counsel at the time of the service of Your answer to the Interrogatory.

9.    Unless otherwise indicated, these Interrogatories refer to the time, place, and circumstances of the occurrence(s) mentioned or complained of in the Complaint.

10.    In responding to these Interrogatories, transcribe each Interrogatory or sub-part and, after each, provide its answer.

11.    If, in lieu of or in addition to answering an Interrogatory, You produce a database and other data or reports, that material should be produced in a native format (such as a Microsoft Excel file or tab-delineated text file) that can be processed and/or sorted using standard spreadsheet or database software including Microsoft Access and Microsoft Excel.

12.    Throughout these Interrogatories, including, but not limited to, the definition of terms, words used in the singular include the plural, and vice versa.

13.    In construing these Interrogatories, Defendant shall apply the broadest construction permitted under the Federal Rules of Civil Procedure, so as to produce the most comprehensive response.

## **INTERROGATORIES**

**Interrogatory No. 1:**     Identify each member of the School Board.

**Interrogatory No. 2:**     For each member of the School Board, describe their training and experience to evaluate the appropriateness of Reading Materials in School District libraries, as well as the number (and grade-year, if applicable) of their children who attended or currently attend school in the School District.

**Interrogatory No. 3:**     Identify the last known address, phone number, email address, and any other contact information for former School District Superintendent Tim Smith and former School District Coordinator of Library Media Services Michelle White.

12

**Interrogatory No. 4:**    Please state whether the information provided on the spreadsheet identified in Paragraph 66 of the Amended Complaint is accurate, and, if not, indicate the inaccurate information on the spreadsheet and provide the changes needed to make it accurate.

**Interrogatory No. 5:**    Describe the School District's Reading Material acquisition Policy or Practice for School District libraries, including the Person(s) who determines (a) which Reading Materials the School District will purchase, (b) the factors considered in choosing which Reading Materials to purchase, (c) the records kept about Reading Material acquisitions, and (d) how requests to purchase Reading Materials are handled.

**Interrogatory No. 6:**    For each of the Reading Materials subject to a Book Challenge, Book Removal, or Book Restriction, Identify (a) the date the School District first acquired the Reading Material, (b) the date the Reading Material was first available in School District libraries, (c) the Person(s) who decided to purchase the Reading Material, and (d) the reasons for acquiring the Reading Material. This interrogatory extends beyond the Relevant Time Period, to the extent that the Reading Materials at issue were acquired before May 23, 2022.

**Interrogatory No. 7:**    List all Reading Materials in each School District library, from January 1, 2022 to the present.

**Interrogatory No. 8:**     For each Reading Material subject to a Book Restriction in the School District, Identify and Describe (a) the Person(s) who submitted a Book Challenge, (b) the Person(s) who made the decision to subject that Reading Material to Restricted Access, (c) the reasons for subjecting that Reading Material to Restricted Access, (d) each School District library where access to the Reading Material is restricted or has been previously restricted, (e) how the Reading Material is maintained in each School District library where access to the Reading Material is or was restricted, and (f) the actions students must take to access the restricted Reading Material.

**Interrogatory No. 9:**     For each Reading Material subject to a Book Removal, Identify (a) each School District library that has removed the Reading Material, (b) the date such removal took place, (c) each member of the School Board who read the Reading Material in its entirety prior to the Book Removal, and (d) each member of the School Board who read the complete board appeal packet for that Reading Material, including reports of the school and district review committees prior to the Book Removal.

**Interrogatory No. 10:**     For *The Bluest Eye* by Toni Morrison and *The Nowhere Girls* by Amy Reed, Describe how student access to those particular Reading Materials is and has been managed within School District libraries.

**Interrogatory No. 11:**    Identify and Describe any and all Policies or Practices—written or unwritten—that have been in place to govern which Reading Materials subject to a Book Challenge are subjected to Restricted Access during the pendency of the Book Challenge review.

**Interrogatory No. 12:**    Describe all steps the School Board has thus far taken to implement HB 1069 with respect to Reading Materials in School District libraries.

**Interrogatory No. 13:**    Describe all steps the School Board has thus far taken to implement HB 1557 with respect to Reading Materials in School District libraries, including whether the School Board has adopted a position as to whether HB 1557 applies to Reading Materials in School District libraries, and, if so, what that position is.

**Interrogatory No. 14:**    Describe all steps the School Board has thus far taken to implement HB 7 with respect to Reading Materials in School District libraries, including whether the School Board has adopted a position as to whether HB 7 applies to Reading Materials in School District libraries, and, if so, what that position is.

Respectfully submitted,

15

Dated:  October 16, 2023

/s/ Shalini Goel Agarwal

Lynn B. Oberlander*
**BALLARD SPAHR LLP**
1675 Broadway, 19th Floor
New York, NY  10019-5820
Telephone: 212.223.0200
Facsimile: 212.223.1942

Paul J. Safier*
Shawn F. Summers*
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA  19103
Telephone: 215.864.8500
Facsimile: 215.864.8999

Kirsten Fehlan*
**BALLARD SPAHR LLP**
999 Peachtree Street NE, Suite 1600
Atlanta, GA 30309-4421
Telephone: 678.420.9300
Facsimile: 678.420.9301

Shalini Goel Agarwal (FBN 90843)
Kristy Parker*
**PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
Telephone: 202.579.4582
Facsimile: 929.777.8428

John Langford*
**PROTECT DEMOCRACY PROJECT**
82 Nassau Street, #601
New York, NY 10038
Telephone: 202.579.4582
Facsimile: 929.777.8428

*Admitted pro hac vice

16

*Attorneys for Plaintiffs PEN American Center, Inc., Sarah Brannen, Lindsay Durtschi, on behalf of herself and her minor children, Benjamin Glass, on behalf of himself and his minor child, George M. Johnson, David Levithan, Kyle Lukoff, Ann Novakowski, on behalf of herself and her minor child, Penguin Random House LLC, Sean Parker, on behalf of himself and his minor child, Ashley Hope Pérez, Erica Roy, on behalf of herself and her minor children, Christopher Scott Satterwhite, on behalf of himself and his minor child, and Carin Smith, on behalf of herself and her minor children*

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2023, I served a true and correct copy of the foregoing on counsel of record for Defendant via email.

Dated:  October 16, 2023                    */s/ Shalini Goel Agarwal*
                                             Shalini Goel Agarwal

Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

| | |
|---|---|
| PEN AMERICAN CENTER, INC., : | |
| SARAH BRANNEN, LINDSAY : | |
| DURTSCHI, on behalf of herself and her : | Case No. 3:23-CV-10385-TKW- |
| minor children, BENJAMIN GLASS, on : | ZCB |
| behalf of himself and his minor child, : | |
| GEORGE M. JOHNSON, DAVID : | JURY TRIAL DEMANDED |
| LEVITHAN, KYLE LUKOFF, ANN : | |
| NOVAKOWSKI, on behalf of herself and : | |
| her minor child, PENGUIN RANDOM : | |
| HOUSE LLC, SEAN PARKER, on behalf : | |
| of himself and his minor child, ASHLEY : | |
| HOPE PÉREZ, ERICA ROY, on behalf of : | |
| herself and her minor children, : | |
| CHRISTOPHER SCOTT : | |
| SATTERWHITE, on behalf of himself and : | |
| his minor child, and CARIN SMITH, on : | |
| behalf of herself and her minor children, : | |
| : | |
| *Plaintiffs*, : | |
| : | |
| v. : | |
| : | |
| ESCAMBIA COUNTY SCHOOL : | |
| BOARD, : | |
| : | |
| *Defendant*. | |

**PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF
DOCUMENTS TO DEFENDANT ESCAMBIA COUNTY SCHOOL BOARD**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiffs

PEN American Center, Inc., Sarah Brannen, Lindsay Durtschi, Benjamin Glass,

George M. Johnson, David Levithan, Kyle Lukoff, Ann Novakowski, Penguin

Random House LLC, Sean Parker, Ashley Hope Pérez, Erica Roy, Christopher Scott

Satterwhite, and Carin Smith, by and through their attorneys, hereby request that Defendant produce documents and things in response to the following Requests, in accordance with the following Definitions and Instructions. Written responses under oath are due within thirty (30) days of service of these Requests.

Unless otherwise agreed, production is to be made electronically or, for hard copy documents, at the law office of Ballard Spahr LLP, 1675 Broadway, 19th Floor, New York, NY 10019, within thirty (30) days of service.

## DEFINITIONS

The following definitions shall apply to each of the Requests set forth below.

1.      "You" or "Your" means the party responding to this Request; any of the party's officers, agents, assigns, employees, insurers, subsidiaries, successors, and predecessors; and anyone acting or purporting to act on the party's behalf, except for legal counsel.

2.      "Defendant" means the Escambia County School Board.

3.      "School Board" means and refers to the five-member governing body of the School District, elected from geographic districts within Escambia County, including both current and former members during the Relevant Time Period.

4.      "School District" means the Escambia County School District.

5.      Unless specifically and individually identified, "Plaintiff" or "Plaintiffs" refers to all of the Plaintiffs in this action.

6.  "Amended Complaint" means the Amended Complaint Plaintiffs filed in this action.

7.  "Communicate" or "Communication" means any transmission of Documents or information between Persons or agencies, whether oral, written or otherwise, active or automated, including but not limited to memoranda, letters, telecopies, facsimiles, e-mails, text messages, voicemails, electronic transmissions, meetings, discussions, conversations, or telephone calls.

8.  "Document" includes but is not limited to the original, drafts and all non-identical versions or copies (whether different from originals by reason of notations made on such copies or otherwise) of all written, electronic or graphic material, however produced or reproduced, in Your possession, custody or control or the possession, custody, or control of Your attorney, including but not limited to writings, forms, memoranda, letters, notes, correspondence, studies, reports, drawings, graphs, charts, records, photographs, sound or mechanical recordings or tapes, telecopies, facsimiles, e-mail, text messages, voicemails, computer printouts, information stored on computer systems, database queries and responses, and other data compilations from which information can be obtained or translated, if necessary through the use of detection devices, into reasonably usable form, in the broadest understanding of the term "Documents" in the Federal Rules of Civil Procedure. Without limiting the term "control," a Document is deemed to be within Your

control if You have ownership, possession, or custody of the Document, or the right to secure the Document or a copy thereof from any Persons having physical control thereof.

9. The words "or," "and," "all," "every," "any," "each," "one or more," "including," and similar words of guidance, are intended merely as such, and should not be construed as words of limitation. The words "or" and "and" shall include each other whenever possible to expand, not restrict, the scope of the Request. The word "including" shall not be used to limit any general category or description that precedes it. The words "all," "every," "any," "each," and "one or more" shall include each other whenever possible to expand, not to restrict, the scope of the Request.

10. "Person" or "Persons" includes a natural person, individual, corporation, proprietorship, partnership, association, agency (including government agencies), School Board, School District, or any other entity.

11. "Baggett" means Vicki Baggett, the Northview High School language arts teacher identified in Plaintiffs' Amended Complaint.

12. "Reading Material" means text-based or image-based content, including but not limited to books, published or produced in any printed, electronic, or digital format.

13. "Book Challenge" means and refers to any challenge or petition submitted by any Person with the aim of removing or restricting access to any

4

Reading Material in any School District library, including, but not limited to, submitting the School District's "Request for Reconsideration of Educational Media" form.

14.    "Book Restriction" means and refers to any actions undertaken by the School District, including by You, to restrict access (short of complete removal) to any Reading Material in any School District library, permanently or temporarily, at any time during the Relevant Time Period.  Similarly, "Restricted Access" means any limitation on access to Reading Material in any School District library short of complete removal.

15.    "Book Removal" means and refers to any actions undertaken by the School District, including by You, to remove (or completely bar access to) any Reading Material from any School District library, permanently or temporarily, at any time during the Relevant Time Period.

16.    "HB 1069" means the act of the Florida legislature numbered House Bill 1069, as enacted on May 17, 2023 and collected at Florida Laws Ch. 2023-105.

17.    "HB 1557" means the act of the Florida legislature numbered House Bill 1557, as enacted on March 28, 2022 and collected at Florida Laws Ch. 2022-22.

18.    "HB 7" means the act of the Florida legislature numbered House Bill 7, as enacted on April 22, 2022 and collected at Florida Laws Ch. 2022-72.

5

19.    "Moms for Liberty" means the organization of that name identified and described in Plaintiffs' Amended Complaint, including any local chapter thereof, wherever located.

20.    "Policy or Practice" includes any official or unofficial policy, practice, procedure, protocol, or custom, whether mandatory or discretionary, formal or informal, written or unwritten.

21.    The "Relevant Time Period" for each Request is May 23, 2022 through the present unless otherwise stated in an individual Request.

## <u>INSTRUCTIONS</u>

1.    These Requests are intended to elicit as much information as possible concerning the issues, and to the extent any Request could be interpreted in more than one way, You should employ the interpretation of the Request most likely to encompass and elicit the greatest amount of information possible.

2.    You shall produce such Documents as kept in the ordinary course, *see* Fed. R. Civ. P. 34, and without any rearrangement. In addition, You should provide the Documents in such a way that they can be correlated to the Request or Requests to which the Documents are responsive, and identify the Bates number for all such Documents in Your response.

3.    You shall produce all responsive Documents and things that are in Your possession or control, or that of Your agents, employees, representatives, attorneys,

or their associated attorneys, investigators, or any other representatives. Each Request calls not only for all Documents known to You and Your agents, employees, representatives, investigators, and attorneys, but also for all Documents available by reasonable inquiry and due diligence, including inquiries to other Persons. If You are aware of Documents responsive to any Request herein, but do not have possession of them, You should identify each such Document, the present custodian's name, address, telephone number, title, and employer, and any other Persons who have seen or had possession of such Document.

4.  If, despite the exercise of due diligence, You are unable to produce any Document requested herein, You should so state and respond to the Request to the extent possible, specifying the reasons for Your inability to answer the remainder, and stating whatever information You have concerning the unanswered portions.

5.  With respect to any Document requested herein that You refuse to produce, You should provide the following information:

>   (a)  Identify the Document, including its title or heading, its date, its authors, its addressees or recipients, its subject matter, the individual or source from which You obtained it, and its present location and the identity of the custodian;

>   (b)  State whether Your objection or refusal is related to the entire Document or a portion thereof;

(c)     If Your objection or refusal goes to part of the Document, specify the part(s) of the Document to which Your objection or refusal is directed;

(d)     Specify the factual basis for Your objection or refusal, if any; and

(e)     Specify the legal grounds for Your objection or refusal, if any.

6.     You are under a continuing obligation to respond to the Requests set forth herein. If You subsequently discover additional Documents that are responsive hereto, You shall promptly produce such Documents to Plaintiffs within fifteen (15) days of such discovery.

## DOCUMENT REQUESTS

**Request No. 1:**     All Documents and/or Communications to, from, or copying any member of the School Board, the School Superintendent, and/or the Coordinator of Media Services concerning any actual or prospective Book Challenge. This Request extends beyond the Relevant Time Period to the extent that any responsive Documents and/or Communications pre-date it.

**Request No. 2:**     All Documents and/or Communications to, from, or copying any member of the School Board, the School Superintendent, and/or the Coordinator of Media Services concerning any actual or prospective Book

8

Restriction. This Request extends beyond the Relevant Time Period to the extent that any responsive Documents and/or Communications pre-date it.

**Request No. 3:**    All Documents and/or Communications to, from, or copying any member of the School Board, the School Superintendent, and/or the Coordinator of Media Services concerning any actual or prospective Book Removal. This Request extends beyond the Relevant Time Period to the extent that any responsive Documents and/or Communications pre-date it.

**Request No. 4:**    All Documents and/or Communications concerning any procedures, including any Policies or Practices, in the School District for adjudicating Book Challenges, including, but not limited to, Documents and/or Communications concerning whether Reading Materials subject to a Book Challenge will be subjected to Restricted Access during the pendency of the review process, and, if so, what Reading Materials will be subjected to such Restricted Access.

**Request No. 5:**    All Documents and/or Communications concerning any procedures, including any Policies or Practices, as to (a) how Reading Materials subject to a Book Restriction must be handled in the School District and (b) the steps students and parents must take to access such Reading Materials.

**Request No. 6:**    All Documents and/or Communications describing the District Review Committee set up by the School District to evaluate Book

9

Challenges, including (a) how the committee is constituted, (b) who is eligible to join the committee, (c) the duties of the committee members, (d) the factors the committee must consider in adjudicating Book Challenges, and (e) any requirements for written explanation of the committee's decisions.

**Request No. 7:**    All Documents and/or Communications describing any school-level review committee formed in response to or to evaluate Book Challenges, including (a) how the committee is constituted, (b) who is eligible to join the committee, (c) the duties of the committee members, (d) the factors the committee must consider in adjudicating Book Challenges, and (e) any requirements for written explanation of the committee's decisions.

**Request No. 8:**    All Documents and/or Communications concerning any meeting of the School Board, or of any subset or committee thereof, relating to School District library Reading Materials, including meeting minutes, presentations, audio and video recordings, and any other Documents and/or Communications prepared, reviewed, sent, received, and/or distributed in or in preparations for any such meetings.

**Request No. 9:**    All Documents and/or Communications describing the School Board's process for evaluating Book Challenges, including (a) the duties of the School Board members, (b) the factors the School Board must consider in

adjudicating Book Challenges, and (c) any requirements for written explanation of the School Board's decisions.

**Request No. 10:**    All Documents and/or Communications from, to, or copying the State of Florida, including any official, employee, or agent thereof, concerning HB 1069, HB 7, or HB 1557, and their application to Book Challenges, Book Restrictions, and Book Removals, including those statutes' interpretation or implementation by You or the School District with respect to school libraries.

**Request No. 11:**    All Documents and/or Communications in the custody of the School Board relating to HB 1069, including but not limited to Documents and Communications relating to the implementation or interpretation thereof with respect to School District libraries, or any proposed changes or amendments thereto.

**Request No. 12:**    All Documents and/or Communications concerning objections received by the School District pursuant to section 6 of HB 1069 (amending section 1006.28(2)(a)(2), Florida Statutes) with respect to School District libraries.

**Request No. 13:**    All Documents and/or Communications concerning the removal or discontinuation of any Reading Material pursuant to section 6 of HB 1069 (amending section 1006.28(2)(a)(2), Florida Statutes) with respect to School District libraries.

**Request No. 14:**    All Documents and/or Communications concerning the School Board's reporting requirements pursuant to section 6 of HB 1069 (amending section 1006.28(2)(e)(3), Florida Statutes), including but not limited to a list identifying with respect to School District libraries (a) each Reading Material for which the School District received an objection pursuant to subparagraph (a)(2); (b) each Reading Material that was removed or discontinued; and (c) each Reading Material that was not removed or discontinued and the rationale for not removing or discontinuing the Reading Material.

**Request No. 15:**    All Documents and/or Communications to, from, or copying the State of Florida, including any official, employee, or agent thereof, concerning any Book Challenge, Book Restriction, or Book Removal.

**Request No. 16:**    All Documents and/or Communications to, from, or copying any member of the School Board, the School Superintendent, and/or the Coordinator of Media Services concerning any training program developed and completed by any School District library personnel involved in the selection of Reading Materials.

**Request No. 17:**    All Documents and/or Communications to, from, or copying any member of the School Board, the School Superintendent, and/or the Coordinator of Media Services concerning School District library Reading Materials (including any Book Challenge, Book Restriction, or Book Removal)

12

from, to, including, and/or concerning Baggett. This Request extends beyond the Relevant Time Period to the extent that any responsive Documents and/or Communications pre-date it.

**Request No. 18:**     All Documents and/or Communications to, from, or copying any member of the School Board, the School Superintendent, and/or the Coordinator of Media Services concerning School District library Reading Materials (including any Book Challenge, Book Restriction, or Book Removal) from, to, including, and/or concerning Moms for Liberty and/or any member or agent of Moms for Liberty. This Request extends beyond the Relevant Time Period to the extent that any responsive Documents and/or Communications pre-date it.

**Request No. 19:**     All Documents and/or Communications to, from, or copying any member of the School Board, the School Superintendent, and/or the Coordinator of Media Services concerning any Plaintiff.

**Request No. 20:**     All non-privileged Documents and/or Communications concerning any advice provided to the School Board, or any individual School Board member, as to the legally permissible bases on which Reading Materials can be removed from School District libraries.

**Request No. 21:**     All Documents and/or Communications concerning School District library Reading Materials (including any Book Challenge, Book

Restriction, or Book Removal) from, to, including, and/or concerning former School District Superintendent Tim Smith.

**Request No. 22:**    All Documents and/or Communications describing the reasons for the termination of former School District Superintendent Tim Smith.

**Request No. 23:**    Documents and/or Communications showing the occupational and educational background for each current and former member who served on the School Board, including but not limited to each current and former School Board member's curriculum vitae.

**Request No. 24:**    All Documents and/or Communications concerning the original purchase/acquisition of all the Reading Materials for School District libraries subject to a Book Challenge, Book Restriction, or Book Removal, including Reading Materials by the Author Plaintiffs. This Request extends beyond the Relevant Time Period to the extent that the Reading Material purchases/acquisitions pre-date it.

**Request No. 25:**    All non-privileged Documents upon which You have relied or intend to rely, in whole or in part, directly or indirectly, in connection with any dispositive motion made by You in this action.

**Request No. 26:**    All non-privileged Documents upon which You have relied or intend to rely, in whole or in part, directly or indirectly, in connection with any Answer made by You in this action.

14

**Request No. 27:**    All reports of any expert retained by You to testify at trial in this action.

**Request No. 28:**    All Documents shown to, submitted to, received from, and/or reviewed by any expert retained to testify at trial in this action.

**Request No. 29:**    All Documents subject to disclosure pursuant to Federal Rule of Civil Procedure 26(a)(2)(A), (B), and (C).

**Request No. 30:**    All Documents that You intend to introduce as exhibits at trial in this action.

**Request No. 31:**    All Documents identified in response to any Interrogatories served on You by Plaintiffs.

**Request No. 32:**    All Documents produced to the plaintiffs in *Parnell, et al., v. School Board of Lake County, Florida, et al.,* Case No. 4:23-cv-414-AW-MAF (N.D. Fla. filed Sept. 19, 2023) ("*Parnell*"), pursuant to Report of Planning Conf. for Prelim. Inj. Hr'g., *Parnell*, 4:23-cv-414-AW-MAF, ECF 105 (N.D. Fla. Oct. 4, 2023), and Order Regarding Disc. and Prelim. Inj. Hr'g. Procedures, *Parnell*, 4:23-cv-414-AW-MAF, ECF 107 (N.D. Fla. Oct. 5, 2023).

**Request No. 33:**    All other non-privileged Documents within Your custody, possession, or control and upon which You intend to rely in whole or in part, directly or indirectly, in connection with any claim or defense related to the above-captioned action.

Respectfully submitted,

Dated: October 16, 2023

/s/ *Shalini Goel Agarwal*

Lynn B. Oberlander*
**BALLARD SPAHR LLP**
1675 Broadway, 19th Floor
New York, NY  10019-5820
Telephone: 212.223.0200
Facsimile: 212.223.1942

Paul J. Safier*
Shawn F. Summers*
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA  19103
Telephone: 215.864.8500
Facsimile: 215.864.8999

Kirsten Fehlan*
**BALLARD SPAHR LLP**
999 Peachtree Street NE, Suite 1600
Atlanta, GA 30309-4421
Telephone: 678.420.9300
Facsimile: 678.420.9301

Shalini Goel Agarwal (FBN 90843)
Kristy Parker*
**PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
Telephone: 202.579.4582
Facsimile: 929.777.8428

John Langford*
**PROTECT DEMOCRACY PROJECT**
82 Nassau Street, #601
New York, NY 10038
Telephone: 202.579.4582
Facsimile: 929.777.8428

16

*Admitted pro hac vice*

*Attorneys for Plaintiffs PEN American Center, Inc., Sarah Brannen, Lindsay Durtschi, on behalf of herself and her minor children, Benjamin Glass, on behalf of himself and his minor child, George M. Johnson, David Levithan, Kyle Lukoff, Ann Novakowski, on behalf of herself and her minor child, Penguin Random House LLC, Sean Parker, on behalf of himself and his minor child, Ashley Hope Pérez, Erica Roy, on behalf of herself and her minor children, Christopher Scott Satterwhite, on behalf of himself and his minor child, and Carin Smith, on behalf of herself and her minor children*

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2023, I served a true and correct copy of the foregoing on counsel of record for Defendant via email.

Dated: October 16, 2023                    /s/ *Shalini Goel Agarwal*
                                           Shalini Goel Agarwal

# Exhibit 3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

PEN AMERICAN CENTER, INC.,
SARAH BRANNEN, LINDSAY
DURTSCHI, on behalf of herself and
her minor children, BENJAMIN
GLASS, on behalf of himself and his
minor child, GEORGE M.
JOHNSON, DAVID LEVITHAN,
KYLE LUKOFF, ANN
NOVAKOWSKI, on behalf of herself
and her minor child, PENGUIN
RANDOM HOUSE LLC, SEAN
PARKER, on behalf of himself and
his minor child, ASHLEY HOPE
PÉREZ, ERICA ROY, on behalf of
herself and her minor children,          CASE NO.:  3:23-CV-10385-TKW-ZCB
CHRISTOPHER SCOTT
SATTERWHITE, on behalf of
himself and his minor child, and
CARIN SMITH on behalf of herself
and her minor children,

       Plaintiffs,

vs.

ESCAMBIA COUNTY SCHOOL
BOARD,

       Defendant.

                       /

## DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST INTERROGATORIES

The Escambia County School Board ("Board") hereby responds to Plaintiffs'

First Set of Interrogatories, served on October 16, 2023, as follows:

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

The Board incorporates these objections to Plaintiffs' "Instructions" and "Definitions" into each specific response to Plaintiffs' Interrogatories listed below:

1.      The Board objects to the "Instructions" to the extent they purport to modify or alter the Board's obligations to respond as more fully set forth by the Federal Rules of Civil Procedure and/or are more burdensome than the requirements of the Federal Rules of Civil Procedure.

2.      The Board objects to the definitions of "Communicate" and "Communication" as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case and/or this stage of the proceedings given they purport to extend to any communications between "Persons"—itself an overly broad, vague, and ambiguous definition given it encompasses every employee of the Board as well as "any other entity"—and "agencies," itself an undefined term that is similarly vague and ambiguous. The Board also objects to the definition of "Communicate" and "Communication" because they purport to include oral communications regardless of whether such oral communications are documented or otherwise recorded in some manner. Rule 34 authorizes discovery of documents and things, and there is no requirement to produce oral communications as broadly defined by Plaintiffs.

2

3.     The Board objects to the definition of "Document" as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case and/or this stage of the proceedings. Additionally, the Board objects to the inclusion of e-mails in the definition of "Document," and state that non-objectionable e-mails will be produced in response to those requests that seek "Communication[s]."

4.     The Board objects to Plaintiffs' definition of "[a]nd" and "or" to "include each other whenever possible to expand, not restrict, the scope of the Interrogatory," as this is vague, ambiguous, and confusing depending on the particular context of the request.

5.     The Board objects to the definition of the term "Reading Material" as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case and/or this stage of the proceedings. Specifically, this term purports to include any form of "text-based or image-based content," including books in both physical and digital format. This lawsuit concerns decisions made concerning books contained in the Board's school libraries and media centers. It does not extend to decisions concerning curriculum, textbooks, third-party vendors the Board contracts with, or classroom libraries. Yet, Plaintiffs' definition of "Reading Material" would sweep in every book in every school within the Escambia County School District—including textbooks, books in classroom libraries, books students bring in from home, etc.—and more. Such a definition goes far beyond the parameters of this case.

3

The Board will therefore provide Responses concerning the "Relevant Books." For the purposes of the Board's Responses, "Relevant Books" shall, per the allegations of the Amended Complaint, [D.E. 27], be defined as: (1) books published by the Publisher Plaintiff; (2) books authored by one of the Author Plaintiffs; (3) books the Parent Plaintiffs allege their children wanted to read; (4) books written by authors who are members of Plaintiff PEN American Center, Inc.; and (5) *The Perks of Being a Wallflower*, *Lucky*, and *The Nowhere Girls*.

6.      The Board objects to the definition of the terms "Book Challenge," "Book Restriction," and "Book Removal" as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case and/or this stage of the proceedings. Specifically, these terms purport to include any challenges to any Reading Material which, as defined, includes textbooks, curriculum items, classroom libraries, etc. Challenges, restrictions, or removals by the Board of particular Reading Material that are not related to the allegations in the Amended Complaint, i.e., not purportedly motivated by the ideological grounds as identified in the Amended Complaint, are not proportional to the needs of this case. Reading Material may be challenged, restricted, or removed for a variety of reasons, *e.g.*, § 1006.28(2)(a)2.b.(I)–(II), Fla. Stat., many of which are not proportional to the needs of this case. The Board will therefore provide Responses concerning challenges, restrictions, and removals of the "Relevant Books."

4

7.    The Board objects to the definition of the terms "Policy or Practice" as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case and/or this stage of the proceedings. As defined, these terms refer to any actions taken—whether official or unofficial, approved or unapproved, mandatory or discretionary—by any individual within the Escambia County School District. The Board formally promulgates policies in accordance with Florida law, and generally delegates authority to the Superintendent or his/her designee for the creation of procedures. Plaintiffs' definition ignores the statutory framework within which the Board operates, is vague and ambiguous, and purports to sweep in activity that cannot be considered Board action or reasonably traced back to the Board nor can it be considered proportional to the needs of this case given the breadth and size of the Escambia County School District ("District").

## **INTERROGATORIES**

### **INTERROGATORY NO. 1:**

Identify each member of the School Board.

### **RESPONSE:**

Kevin Adams, Paul H. Fetsko, David Williams, Patty Hightower, Bill Slayton.

### **INTERROGATORY NO. 2:**

For each member of the School Board, describe their training and experience to evaluate the appropriateness of Reading Materials in School District libraries, as

well as the number (and grade-year, if applicable) of their children who attended or

currently attend school in the School District.

**RESPONSE:**

As elected constitutional officers, Board members receive four hours of ethics

training annually which addresses, at a minimum, section 8, Article II of the Florida

Constitution, the Code of Ethics for Public Officers and Employees, and the public

records and public meetings laws of Florida. Beyond this, the Board objects to this

Interrogatory as being overly broad in scope, unduly burdensome, and not

proportional to the needs of the case. Specifically, Plaintiffs' overly broad definition

of "Reading Materials" would sweep in any training the Board members receive

concerning curriculum and classroom materials. As would the extension of this

Interrogatory to "School District libraries"—which, among other things, would

include classroom libraries not subject to the allegations in this case—goes beyond

the parameters of this lawsuit.

As for the subpart of this Interrogatory, the Board objects to the extent it blurs

the line between the Board members' role as constitutional officers and in their

individual capacities as parents. The Board members are not sued or named in their

individual capacity, and even if they were they would be entitled to qualified

immunity from suit as well as legislative immunity and privilege relating to any

discovery concerning claims against them in their individual capacity for legislative

6

actions, such as those being challenged in this suit. As such, any discovery aimed at the Board members' familial relations is overly broad and not proportional to the needs of this case. Moreover, discovery aimed at which of the Board members' children "attended" school within the District is overly broad and ambiguous to the extent it sweeps in children who may have attended school within the District prior to the implementation of the statutes and policies at issue in this suit. Accordingly, any information regarding Board members' children who "attended" school prior to the implementation of the laws and policies being challenged are not proportional to the needs of this case.

Beyond this, see below:

Kevin Adams: three children.

Paul H. Fetsko: three children.

David Williams: two children.

Patty Hightower: two children.

Bill Slayton: two children.

**INTERROGATORY NO. 3:**

Identify the last known address, phone number, email address, and any other contact information for former School District Superintendent Tim Smith and former School District Coordinator of Library Media Services Michelle White.

7

**RESPONSE:**

All correspondence for Tim Smith and Michelle White may be directed to the undersigned counsel.

**INTERROGATORY NO. 4:**

Please state whether the information provided on the spreadsheet identified in Paragraph 66 of the Amended Complaint is accurate, and, if not, indicate the inaccurate information on the spreadsheet and provide the changes needed to make it accurate.

**RESPONSE:**

The Board objects to this Interrogatory as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case. Specifically, the spreadsheet referred to in Paragraph 66 of the Amended Complaint lists over 200 books, many of which are not relevant or subject to the allegations in this lawsuit. The Board is producing documents concerning the "Relevant Books," i.e., those with connections to the allegations in the Amended Complaint. To that end, the spreadsheet is accurate concerning the Relevant Books.

**INTERROGATORY NO. 5:**

Describe the School District's Reading Material acquisition Policy or Practice for School District libraries, including the Person(s) who determines (a) which Reading Materials the School District will purchase, (b) the factors considered in

choosing which Reading Materials to purchase, (c) the records kept about Reading Material acquisitions, and (d) how requests to purchase Reading Materials are handled.

**RESPONSE:**

The Board has the duty to provide, inter alia, a program of school library media services for all public schools in the district, including school library media centers, or school library media centers open to the public, and, in addition such traveling or circulating libraries as may be needed for the proper operation of the district school system. § 1006.28(2)(d), Fla. Stat. To that end, the Board's Policies are publicly available at:

https://go.boarddocs.com/fl/escambia/Board.nsf/goto?open&id=C7KP3X5EC33A#
and hereby incorporated by reference into this Response. Specifically, Policies 4.06, 5.02, and 5.07 concern Educational Media Materials, Purchasing and Inventories, and Property Records, respectively. Beyond this, the Board objects to this Interrogatory as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case. Reading Material, as defined, concerns textbooks, workbooks, curriculum items, etc. These are not proportional to the needs of this case as Plaintiffs' allegations concern actions undertaken regarding the Board's school libraries and media centers. Policies relating to, for example, curriculum materials are beyond the parameters of Plaintiffs' allegations.

9

**INTERROGATORY NO. 6:**

For each of the Reading Materials subject to a Book Challenge, Book Removal, or Book Restriction, Identify (a) the date the School District first acquired the Reading Material, (b) the date the Reading Material was first available in School District libraries, (c) the Person(s) who decided to purchase the Reading Material, and (d) the reasons for acquiring the Reading Material. This interrogatory extends beyond the Relevant Time Period, to the extent that the Reading Materials at issue were acquired before May 23, 2022.

**RESPONSE:**

The Board incorporates its objections to the terms "Reading Materials," and "Book Challenge, Book Removal, or Book Restriction" herein as if fully set forth. Beyond this, the Board objects given the lack of temporal scope of this Interrogatory. Taken to its extreme, this request extends to the beginning of time. The Board's Response thus only extends to the Relevant Time Period and only extends to the Relevant Books. To that end, the Board incorporates by reference the records being contemporaneously produced regarding the Relevant Books.

**INTERROGATORY NO. 7:**

List all Reading Materials in each School District library, from January 1, 2022 to the present.

**RESPONSE:**

The Board objects to this Interrogatory as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As phrased and as defined per Plaintiffs' Definitions, this would include virtually all materials in the District's school libraries, media centers, and classroom libraries, as well as all material available through its electronic catalogues, partnerships with third-party vendors that allow District students to access their reading catalogues, etc. All told, this would incorporate more than 440,000 unique titles, the vast majority of which have no relation or connection to the issues material to this lawsuit. The Board incorporates by reference the list of Relevant Books, records for which are being produced contemporaneously.

**INTERROGATORY NO. 8:**

For each Reading Material subject to a Book Restriction in the School District, Identify and Describe (a) the Person(s) who submitted a Book Challenge, (b) the Person(s) who made the decision to subject that Reading Material to Restricted Access, (c) the reasons for subjecting that Reading Material to Restricted Access, (d) each School District library where access to the Reading Material is restricted or has been previously restricted, (e) how the Reading Material is maintained in each School District library where access to the Reading Material is or was restricted, and (f) the actions students must take to access the restricted

11

Reading Material.

**RESPONSE:**

The Board objects to this Interrogatory as being overly broad in scope, unduly

burdensome, and not proportional to the needs of this case, and reiterates its previous

objections to the term "Reading Material" and "Book Restriction." To that end, the

Board incorporates by reference the records being contemporaneously produced

regarding the Relevant Books.

**INTERROGATORY NO. 9:**

For each Reading Material subject to a Book Removal, Identify (a) each

School District library that has removed the Reading Material, (b) the date such

removal took place, (c) each member of the School Board who read the Reading

Material in its entirety prior to the Book Removal, and (d) each member of the

School Board who read the complete board appeal packet for that Reading Material,

including reports of the school and district review committees prior to the Book

Removal.

**RESPONSE:**

The Board objects to this Interrogatory as being overly broad in scope, unduly

burdensome, and not proportional to the needs of this case, and reiterates its previous

objections to the term "Reading Material" and "Book Removal." To that end, the

Board incorporates by reference the records being contemporaneously produced regarding the Relevant Books.

**INTERROGATORY NO. 10:**

For *The Bluest Eye* by Toni Morrison and *The Nowhere Girls* by Amy Reed, Describe how student access to those particular Reading Materials is and has been managed within School District libraries.

**RESPONSE:**

These books are currently available as a self-selected library material for 11th and 12th grade students. Beyond this, the Board incorporates by reference the records being contemporaneously produced for these books.

**INTERROGATORY NO. 11:**

Identify and Describe any and all Policies or Practices—written or unwritten—that have been in place to govern which Reading Materials subject to a Book Challenge are subjected to Restricted Access during the pendency of the Book Challenge review.

**RESPONSE:**

The Board objects to this Interrogatory to the extent it conflates the materials which are subject to a challenge with materials whose access have been restricted, whether they be the subject of a proper challenge or not. The Board considers all challenges to library materials in accordance with Florida law, *e.g.*, § 1006.28, Fla.

13

Stat., and Board Policy 4.06, which are incorporated herein by reference. The Board

further objects to the extent this Interrogatory calls for identification and description

of purported "unwritten" policies. The Board formally promulgates policies in

accordance with Florida law, which are publicly available at:

https://go.boarddocs.com/fl/escambia/Board.nsf/goto?open&id=C7KP3X5EC33A#

and hereby incorporated by reference into this Response.

**INTERROGATORY NO. 12:**

Describe all steps the School Board has thus far taken to implement HB 1069

with respect to Reading Materials in School District libraries.

**RESPONSE:**

The Board objects to this Interrogatory as being overly broad in scope, unduly

burdensome, and not proportional to the needs of this case. As defined, Reading

Materials extends to all textbooks, curriculum items, classroom libraries, etc. This

case concerns the District's school libraries and media centers. Beyond changes

made that do not relate to the issues relevant to this lawsuit and are beyond the scope

of the Amended Complaint, the Board has modified its written policies to reflect

changes within the law.

**INTERROGATORY NO. 13:**

Describe all steps the School Board has thus far taken to implement HB 1557

with respect to Reading Materials in School District libraries, including whether the

14

School Board has adopted a position as to whether HB 1557 applies to Reading Materials in School District libraries, and, if so, what that position is.

**RESPONSE:**

The Board objects to this Interrogatory as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As defined, Reading Materials extends to all textbooks, curriculum items, classroom libraries, etc. This case concerns the District's school libraries and media centers. Because HB 1557 only concerns classroom instruction, none.

As to the subpart of this Interrogatory, the Board has not adopted an official position on HB 1557.

**INTERROGATORY NO. 14:**

Describe all steps the School Board has thus far taken to implement HB 7 with respect to Reading Materials in School District libraries, including whether the School Board has adopted a position as to whether HB 7 applies to Reading Materials in School District libraries, and, if so, what that position is.

**RESPONSE:**

The Board objects to this Interrogatory as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As defined, Reading Materials extends to all textbooks, curriculum items, classroom libraries, etc. This

case concerns the District's school libraries and media centers. As relates the District's school libraries and media centers, none.

As to the subpart of this Interrogatory, the Board has not adopted an official position on HB 7.

## VERIFICATION OF INTERROGATORY ANSWERS

I, Shenna Payne, verify under penalty of perjury that the foregoing responses to interrogatories are true and correct based on reasonable inquiry and the best of my knowledge, information and belief.

ESCAMBIA COUNTY SCHOOL BOARD

By: _____

Shenna Payne, Deputy Superintendent
Authorized Agent

# Exhibit 4

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

PEN AMERICAN CENTER, INC.,
SARAH BRANNEN, LINDSAY
DURTSCHI, on behalf of herself and
her minor children, BENJAMIN
GLASS, on behalf of himself and his
minor child, GEORGE M.
JOHNSON, DAVID LEVITHAN,
KYLE LUKOFF, ANN
NOVAKOWSKI, on behalf of herself
and her minor child, PENGUIN
RANDOM HOUSE LLC, SEAN
PARKER, on behalf of himself and
his minor child, ASHLEY HOPE
PÉREZ, ERICA ROY, on behalf of          CASE NO.:  3:23-CV-10385-TKW-ZCB
herself and her minor children,
CHRISTOPHER SCOTT
SATTERWHITE, on behalf of
himself and his minor child, and
CARIN SMITH on behalf of herself
and her minor children,

      Plaintiffs,

vs.

 ESCAMBIA COUNTY SCHOOL
BOARD,

      Defendant.

_____ /

## DEFENDANT'S RESPONSE TO
## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION

The Escambia County School Board ("Board") hereby responds to Plaintiffs'

First Request for Production, served on October 16, 2023, as follows:

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

The Board incorporates these objections to Plaintiffs' "Instructions" and "Definitions" into each specific response to Plaintiffs' Requests for Production listed below:

1.    The Board objects to the "Instructions" to the extent they purport to modify or alter the Board's obligations to respond as more fully set forth by the Federal Rules of Civil Procedure and/or are more burdensome than the requirements of the Federal Rules of Civil Procedure.

2.    The Board objects to the definitions of "Communicate" and "Communication" as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case and/or this stage of the proceedings given they purport to extend to any communications between "Persons"—itself an overly broad, vague, and ambiguous definition given it encompasses every employee of the Board as well as "any other entity"—and "agencies," itself an undefined term that is similarly vague and ambiguous. The Board also objects to the definition of "Communicate" and "Communication" because they purport to include oral communications regardless of whether such oral communications are documented or otherwise recorded in some manner. Rule 34 authorizes discovery of documents and things, and there is no requirement to produce oral communications as broadly

2

defined by Plaintiffs.

3.    The Board objects to the definition of "Document" as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case and/or this stage of the proceedings. Additionally, the Board objects to the inclusion of e-mails in the definition of "Document," and state that non-objectionable e-mails will be produced in response to those requests that seek "Communication[s]."

4.    The Board objects to Plaintiffs' definition of "[a]nd" and "or" to mean "and/or", as this is vague, ambiguous and confusing depending on the particular context of the request.

5.    The Board objects to the definition of the term "Reading Material" as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case and/or this stage of the proceedings. Specifically, this term purports to include any form of "text-based or image-based content," including books in both physical and digital format. This lawsuit concerns decisions made concerning books contained in the Board's school libraries and media centers. It does not extend to decisions concerning curriculum, textbooks, third-party vendors the Board contracts with, or classroom libraries. Yet, Plaintiffs' definition of "Reading Material" would sweep in every book in every school within the Escambia County School District—including textbooks, books in classroom libraries, books students bring in from home, etc.—and more. Such a definition goes far beyond the parameters of this case.

The Board will therefore provide Responses concerning the "Relevant Books." For the purposes of the Board's Responses, "Relevant Books" shall, per the allegations of the Amended Complaint, [D.E. 27], be defined as: (1) books published by the Publisher Plaintiff; (2) books authored by one of the Author Plaintiffs; (3) books the Parent Plaintiffs allege their children wanted to read; (4) books written by authors who are members of Plaintiff PEN American Center, Inc.; and (5) *The Perks of Being a Wallflower*, *Lucky*, and *The Nowhere Girls*.

6.    The Board objects to the definition of the terms "Book Challenge," "Book Restriction," and "Book Removal" as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case and/or this stage of the proceedings. Specifically, these terms purport to include any challenges to any Reading Material which, as defined, includes textbooks, curriculum items, classroom libraries, etc. Challenges, restrictions, or removals by the Board of particular Reading Material that are not related to the allegations in the Amended Complaint, i.e., not purportedly motivated by the ideological grounds as identified in the Amended Complaint, are not proportional to the needs of this case. Reading Material may be challenged, restricted, or removed for a variety of reasons, *e.g.*, § 1006.28(2)(a)2.b.(I)–(II), Fla. Stat., many of which are not proportional to the needs of this case. The Board will therefore provide Responses concerning challenges, restrictions, and removals of the "Relevant Books."

4

7.     The Board objects to the definition of the terms "Policy or Practice" as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case and/or this stage of the proceedings. As defined, these terms refer to any actions taken—whether official or unofficial, approved or unapproved, mandatory or discretionary—by any individual within the Escambia County School District. The Board formally promulgates policies in accordance with Florida law, and generally delegates authority to the Superintendent or his/her designee for the creation of procedures. Plaintiffs' definition ignores the statutory framework within which the Board operates, is vague and ambiguous, and purports to sweep in activity that cannot be considered Board action or reasonably traced back to the Board nor can it be considered proportional to the needs of this case given the breadth and size of the Escambia County School District ("District").

8.     The Board objects to Plaintiffs' requirements that the Board supplement these responses within 15 days. Rule 26(e) merely requires a party supplement their responses "in a timely manner." The Board will comply with relevant Federal Rules of Civil Procedure.

9.     The Board objects to the extent Plaintiffs' Requests would include documents from charter schools. Plaintiffs have not identified any actions taken pursuant to any school libraries or media centers in any charter schools in the District, and the production of documents from charter schools would therefore be

unduly burdensome and not proportional to the needs of this case.

## REQUEST FOR PRODUCTION NO. 1:

All Documents and/or Communications to, from, or copying any member of the School Board, the School Superintendent, and/or the Coordinator of Media Services concerning any actual or prospective Book Challenge. This Request extends beyond the Relevant Time Period to the extent that any responsive Documents and/or Communications pre-date it.

## RESPONSE:

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As phrased, this Request would extend to the beginning of time. Moreover, the term "prospective" is overly broad, vague, ambiguous, and not defined. As written, a resident of Escambia County or a parent of a child at one of the Board's schools could have—since the creation of the District—formulated a "prospective" challenge to any material within the District. Asking the Board to locate records regarding such prospective contemplations or considerations is not probative to the issues in the case and would disproportionately burden the Board's ability to deliver educational services.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books.

**REQUEST FOR PRODUCTION NO. 2:**

All Documents and/or Communications to, from, or copying any member of the School Board, the School Superintendent, and/or the Coordinator of Media Services concerning any actual or prospective Book Restriction. This Request extends beyond the Relevant Time Period to the extent that any responsive Documents and/or Communications pre-date it.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As phrased, this Request would extend to the beginning of time. Moreover, the term "prospective" is overly broad, vague, ambiguous, and not defined. As written, a librarian at one of the Board's schools could have—since the creation of the District—formulated a "prospective" restriction to any material within the District. Asking the Board to locate records regarding such prospective contemplations or considerations is not probative to the issues in the case and would disproportionately burden the Board's ability to deliver educational services.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books.

7

**REQUEST FOR PRODUCTION NO. 3:**

All Documents and/or Communications to, from, or copying any member of the School Board, the School Superintendent, and/or the Coordinator of Media Services concerning any actual or prospective Book Removal. This Request extends beyond the Relevant Time Period to the extent that any responsive Documents and/or Communications pre-date it.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As phrased, this Request would extend to the beginning of time. Moreover, the term "prospective" is overly broad, vague, ambiguous, and not defined. As written, a librarian at one of the Board's schools could have—since the creation of the District—formulated a "prospective" removal of any material within the District. Asking the Board to locate records regarding such prospective contemplations or considerations is not probative to the issues in the case and would disproportionately burden the Board's ability to deliver educational services.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books.

8

## REQUEST FOR PRODUCTION NO. 4:

All Documents and/or Communications concerning any procedures, including any Policies or Practices, in the School District for adjudicating Book Challenges, including, but not limited to, Documents and/or Communications concerning whether Reading Materials subject to a Book Challenge will be subjected to Restricted Access during the pendency of the review process, and, if so, what Reading Materials will be subjected to such Restricted Access.

## RESPONSE:

The Board's considers challenges to materials within its libraries pursuant to Florida law, *e.g.*, § 1006.28, Fla. Stat., and its policies which are publicly available at:

https://go.boarddocs.com/fl/escambia/Board.nsf/goto?open&id=C7KP3X5EC33A# and incorporated herein. Specifically, Board Policy 4.06 governs challenges to materials in the Board's school libraries/media centers, as well as restriction and removal of these materials.

Additionally, the request is overly broad and unduly burdensome as to scope because the Board has not identified a method by which to locate responsive documents on a District-wide basis. Accordingly, the Request would require the Board to search records on a school-by-school basis for its 65 schools to determine

9

whether any "Policy or Practice," which as defined includes both official and unofficial actions by District staff, purportedly exists.

## REQUEST FOR PRODUCTION NO. 5:

All Documents and/or Communications concerning any procedures, including any Policies or Practices, as to (a) how Reading Materials subject to a Book Restriction must be handled in the School District and (b) the steps students and parents must take to access such Reading Materials.

## RESPONSE:

The Board's considers challenges to materials within its libraries pursuant to Florida law, *e.g.*, § 1006.28, Fla. Stat., and its policies which are publicly available at:

https://go.boarddocs.com/fl/escambia/Board.nsf/goto?open&id=C7KP3X5EC33A# and incorporated herein. Specifically, Board Policy 4.06 governs challenges to materials in the Board's school libraries/media centers, as well as restriction and removal of these materials.

Additionally, the request is overly broad and unduly burdensome as to scope because the Board has not identified a method by which to locate responsive documents on a District-wide basis. Accordingly, the Request would require the Board to search records on a school-by-school basis for its 65 schools to determine

10

whether any "Policy or Practice," which as defined includes both official and unofficial actions by District staff, purportedly exists.

## REQUEST FOR PRODUCTION NO. 6:

All Documents and/or Communications describing the District Review Committee set up by the School District to evaluate Book Challenges, including (a) how the committee is constituted, (b) who is eligible to join the committee, (c) the duties of the committee members, (d) the factors the committee must consider in adjudicating Book Challenges, and (e) any requirements for written explanation of the committee's decisions.

## RESPONSE:

The Board considers challenges to materials within its libraries pursuant to Florida law, *e.g.*, § 1006.28, Fla. Stat., and its policies which are publicly available at:

https://go.boarddocs.com/fl/escambia/Board.nsf/goto?open&id=C7KP3X5EC33A# and incorporated herein. Specifically, Board Policy 4.06 governs challenges to materials in the Board's school libraries/media centers, as well as restriction and removal of these materials.

## REQUEST FOR PRODUCTION NO. 7:

All Documents and/or Communications describing any school-level review committee formed in response to or to evaluate Book Challenges, including (a) how

11

the committee is constituted, (b) who is eligible to join the committee, (c) the duties of the committee members, (d) the factors the committee must consider in adjudicating Book Challenges, and (e) any requirements for written explanation of the committee's decisions.

**RESPONSE:**

There are no school-level review committees formed in response to or to evaluate Book Challenges.

Therefore none.

**REQUEST FOR PRODUCTION NO. 8:**

All Documents and/or Communications concerning any meeting of the School Board, or of any subset or committee thereof, relating to School District library Reading Materials, including meeting minutes, presentations, audio and video recordings, and any other Documents and/or Communications prepared, reviewed, sent, received, and/or distributed in or in preparations for any such meetings.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As phrased and per Plaintiffs' Definitions, this Request would implicate virtually every single meeting of the Board given the term Reading Materials includes library materials, curriculum materials, textbooks, classroom libraries, etc. This case is about the specific Relevant

Books which were either restricted or removed from the District's school libraries and media centers. The Board will produce records concerning the Board meetings at which the Board considered challenges to the Relevant Books and at which the Relevant Books were restricted, and/or removed.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books.

## REQUEST FOR PRODUCTION NO. 9:

All Documents and/or Communications describing the School Board's process for evaluating Book Challenges, including (a) the duties of the School Board members, (b) the factors the School Board must consider in adjudicating Book Challenges, and (c) any requirements for written explanation of the School Board's decisions.

## RESPONSE:

The Board The Board considers challenges to materials within its libraries pursuant to Florida law, *e.g.*, § 1006.28, Fla. Stat., and its policies which are publicly available at:

https://go.boarddocs.com/fl/escambia/Board.nsf/goto?open&id=C7KP3X5EC33A# and incorporated herein. Specifically, Board Policy 4.06 governs challenges to materials in the Board's school libraries/media centers, as well as restriction and removal of these materials.

13

**REQUEST FOR PRODUCTION NO. 10:**

All Documents and/or Communications from, to, or copying the State of Florida, including any official, employee, or agent thereof, concerning HB 1069, HB 7, or HB 1557, and their application to Book Challenges, Book Restrictions, and Book Removals, including those statutes' interpretation or implementation by You or the School District with respect to school libraries.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As defined, this Request seek materials "concerning" HB 1069, 7, and 1557 "*and*" their application related to various "Reading Material" which have either been challenged, restricted, or removed, thereby extending the Request to all textbooks, curriculum items, classroom libraries, etc. This case concerns the District's school libraries and media centers. The cited bills either do not concern these or encompass far broader topics than just these limited features of the case and thus are not proportional to the needs of this matter and would impose an undue burden on the Board. Documents and/or Communications that extend beyond school libraries and media centers are not proportional to the needs of this case.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books. The Board is agreeable to meet and confer with

14

Plaintiffs' counsel regarding appropriate custodians and search terms for email searches.

## REQUEST FOR PRODUCTION NO. 11:

All Documents and/or Communications in the custody of the School Board relating to HB 1069, including but not limited to Documents and Communications relating to the implementation or interpretation thereof with respect to School District libraries, or any proposed changes or amendments thereto.

## RESPONSE:

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. This case concerns the District's school libraries and media centers. This Request seeks all documents relating to HB 1069 "including but not limited to" its implementation with respect to the District's libraries—which on its own would encompass both school and classroom libraries, the latter of which is not at issue in this matter. The cited bill concerns far broader topics that are not proportional to the needs of this case and would impose an undue burden on the Board.

Moreover, the term "proposed changes or amendments" is overly broad, vague, ambiguous, and not defined. As written, a librarian at one of the Board's schools could have formulated a "proposed" change to evaluating material within the District, pursuant to HB 1069. Asking the Board to locate records regarding such

15

hypothetical contemplations or considerations is not probative to the issues in the case and would disproportionately burden the Board's ability to deliver educational services.

Beyond this, because of its similarity to Request No. 10, the Board reiterates and restates its Response herein.

## REQUEST FOR PRODUCTION NO. 12:

All Documents and/or Communications concerning objections received by the School District pursuant to section 6 of HB 1069 (amending section 1006.28(2)(a)(2), Florida Statutes) with respect to School District libraries.

## RESPONSE:

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. This case concerns the District's school libraries and media centers; the cited section of the referenced bill concerns broader topics that are not proportional to the needs of this case and would impose an undue burden on the Board.

Moreover, this Request is duplicative and subsumed within that requested by Request No. 11.

To the extent "objections"—which is not defined as a term—is to be interpreted in line with Plaintiffs' Definitions, challenges, restrictions, or removals by the Board of particular Reading Material that are not related to the allegations in

16

the Amended Complaint, i.e., not purportedly motivated by the ideological grounds as identified in the Amended Complaint, are not proportional to the needs of this case. Reading Material may be challenged, restricted, or removed for a variety of reasons, *e.g.*, § 1006.28(2)(a)2.b.(I)–(II), Fla. Stat., many of which are not proportional to the needs of this case.

Beyond this, because of its similarity to Request No. 10, the Board reiterates and restates its Response herein.

## REQUEST FOR PRODUCTION NO. 13:

All Documents and/or Communications concerning the removal or discontinuation of any Reading Material pursuant to section 6 of HB 1069 (amending section 1006.28(2)(a)(2), Florida Statutes) with respect to School District libraries.

## RESPONSE:

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. This case concerns the District's school libraries and media centers; the cited section of the referenced bill concerns broader topics that are not proportional to the needs of this case and would impose an undue burden on the Board.

Moreover, this Request is duplicative and subsumed within that requested by Request No. 11.

17

To the extent "removal or discontinuation"—which are not defined as terms—are to be interpreted in line with Plaintiffs' Definitions, challenges, restrictions, or removals by the Board of particular Reading Material that are not related to the allegations in the Amended Complaint, i.e., not purportedly motivated by the ideological grounds as identified in the Amended Complaint, are not proportional to the needs of this case. Reading Material may be challenged, restricted, or removed for a variety of reasons, *e.g.*, § 1006.28(2)(a)2.b.(I)–(II), Fla. Stat., many of which are not proportional to the needs of this case. Moreover, books may be removed or discontinued for a variety of reasons, many of which are not proportional to the needs of this case.

Beyond this, because of its similarity to Request No. 10, the Board reiterates and restates its Response herein.

**REQUEST FOR PRODUCTION NO. 14:**

All Documents and/or Communications concerning the School Board's reporting requirements pursuant to section 6 of HB 1069 (amending section 1006.28(2)(e)(3), Florida Statutes), including but not limited to a list identifying with respect to School District libraries (a) each Reading Material for which the School District received an objection pursuant to subparagraph (a)(2); (b) each Reading Material that was removed or discontinued; and (c) each Reading Material that was

not removed or discontinued and the rationale for not removing or discontinuing the Reading Material.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. This case concerns the District's school libraries and media centers; the cited section of the referenced bill concerns broader topics that are not proportional to the needs of this case and would impose an undue burden on the Board.

Moreover, this Request is duplicative and subsumed within that requested by Request No. 11.

To the extent "objection" and "removed or discontinued"—which are not defined as terms—are to be interpreted in line with Plaintiffs' Definitions, challenges, restrictions, or removals by the Board of particular Reading Material that are not related to the allegations in the Amended Complaint, i.e., not purportedly motivated by the ideological grounds as identified in the Amended Complaint, are not proportional to the needs of this case. Reading Material may be challenged, restricted, or removed for a variety of reasons, *e.g.*, § 1006.28(2)(a)2.b.(I)–(II), Fla. Stat., many of which are not proportional to the needs of this case. Moreover, books may be removed or discontinued for a variety of reasons, many of which are not proportional to the needs of this case.

Beyond this, because of its similarity to Request No. 10, the Board reiterates and restates its Response herein.

## REQUEST FOR PRODUCTION NO. 15:

All Documents and/or Communications to, from, or copying the State of Florida, including any official, employee, or agent thereof, concerning any Book Challenge, Book Restriction, or Book Removal.

## RESPONSE:

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As defined, this Request would extend to all Reading Material, which extends to all textbooks, curriculum items, classroom libraries, etc. This case concerns the District's school libraries and media centers. All Documents and/or Communications to/from/copying the State of Florida and its officials, employees, agents, etc. and the Board would thus capture documents not proportional to the needs of this case and impose an undue burden on the Board.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books. The Board is agreeable to meet and confer with Plaintiffs' counsel regarding appropriate custodians and search terms for email searches.

**REQUEST FOR PRODUCTION NO. 16:**

All Documents and/or Communications to, from, or copying any member of the School Board, the School Superintendent, and/or the Coordinator of Media Services concerning any training program developed and completed by any School District library personnel involved in the selection of Reading Materials.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As defined, this Request would extend to any "training program"—an undefined term—related to all Reading Material, which extends to all textbooks, curriculum items, classroom libraries, etc. This case concerns the District's school libraries and media centers. This Request therefore imposes an undue burden on the Board.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books and documents the Board has located regarding pertinent training. The Board is agreeable to meet and confer with Plaintiffs' counsel regarding appropriate custodians and search terms for email searches.

**REQUEST FOR PRODUCTION NO. 17:**

All Documents and/or Communications to, from, or copying any member of the School Board, the School Superintendent, and/or the Coordinator of Media Services concerning School District library Reading Materials (including any Book

Challenge, Book Restriction, or Book Removal) from, to, including, and/or concerning Baggett. This Request extends beyond the Relevant Time Period to the extent that any responsive Documents and/or Communications pre-date it.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As phrased, this Request would extend to the beginning of time. Moreover, the Board objects to the term "concerning" as overly broad, vague, and not defined. As written, a member of the Board could have written an email "concerning" Baggett and "concerning" any of the hundreds of thousands of Reading Materials in the Board's custody that is entirely unrelated to the needs of this case. This Request therefore imposes an undue burden on the Board.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books. The Board is agreeable to meet and confer with The Board is agreeable to meet and confer with Plaintiffs' counsel regarding appropriate custodians and search terms for email searches.

**REQUEST FOR PRODUCTION NO. 18:**

All Documents and/or Communications to, from, or copying any member of the School Board, the School Superintendent, and/or the Coordinator of Media Services concerning School District library Reading Materials (including any Book

Challenge, Book Restriction, or Book Removal) from, to, including, and/or concerning Moms for Liberty and/or any member or agent of Moms for Liberty. This Request extends beyond the Relevant Time Period to the extent that any responsive Documents and/or Communications pre-date it.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As phrased, this Request would extend to the beginning of time. Moreover, the Board objects to the term "concerning" as overly broad, vague, and not defined. As written, a member of the Board could have written an email "concerning" Moms for Liberty—or any of its agents—and "concerning" any of the hundreds of thousands of Reading Materials in the Board's custody that is entirely unrelated to the needs of this case. This Request therefore imposes an undue burden on the Board.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books. The Board is agreeable to meet and confer with Plaintiffs' counsel regarding appropriate custodians and search terms for email searches.

**REQUEST FOR PRODUCTION NO. 19:**

All Documents and/or Communications to, from, or copying any member of the School Board, the School Superintendent, and/or the Coordinator of Media Services concerning any Plaintiff.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. The Board objects to the term "concerning" as overly broad, vague, and not defined. As written, a member of the Board could have written an email "concerning" any of the ten students who are parties to this suit that is entirely unrelated to the needs of this case. This Request therefore imposes an undue burden on the Board.

Moreover, the Board objects to this Request to the extent it calls for material protected by the attorney-client privilege and the work product doctrine.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books. The Board is agreeable to meet and confer with Plaintiffs' counsel regarding appropriate custodians and search terms for email searches.

**REQUEST FOR PRODUCTION NO. 20:**

All non-privileged Documents and/or Communications concerning any advice provided to the School Board, or any individual School Board member, as to

the legally permissible bases on which Reading Materials can be removed from School District libraries.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As defined, this Request would extend to the bases by which all Reading Material—which extends to all textbooks, curriculum items, classroom libraries, etc.—could be removed. This case concerns the District's school libraries and media centers. This Request therefore imposes an undue burden on the Board.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books and public meeting YouTube links for meetings where Relevant Books were removed or restricted, which can be found at: https://www.youtube.com/watch?v=Jg03jUggUEU&list=PLkuTAI1Za_y4DWZFL I57Kuze0qetQ0031.

The Board is agreeable to meet and confer with Plaintiffs' counsel regarding appropriate custodians and search terms for email searches.

**REQUEST FOR PRODUCTION NO. 21:**

All Documents and/or Communications concerning School District library Reading Materials (including any Book Challenge, Book Restriction, or Book

Removal) from, to, including, and/or concerning former School District Superintendent Tim Smith.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. Tim Smith was the former Superintendent for the District, and therefore he would have sent hundreds, possibly thousands, of emails related to the District's Reading Material, which as defined, would extend to all textbooks, curriculum items, classroom libraries, etc. This case concerns the District's school libraries and media centers. Thus, this Request would impose an undue burden on the Board and would include documents not proportional to the needs of this case.

Moreover, the Board objects to the term "concerning" as overly broad, vague, and not defined. As written, a member of the Board could have written an email "concerning" Reading Materials and "concerning" Tim Smith that is entirely unrelated to the needs of this case.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books. The Board is agreeable to meet and confer with Plaintiffs' counsel regarding appropriate custodians and search terms for email searches.

**REQUEST FOR PRODUCTION NO. 22:**

All Documents and/or Communications describing the reasons for the termination of former School District Superintendent Tim Smith.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. This case concerns the District's school libraries and media centers. The decision to terminate the former Superintendent does not concern these and therefore this Request would impose an undue burden on the Board and include documents not proportional to the needs of this case.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books and public meeting YouTube links for meetings where Mr. Smith was terminated, which can be found at:

https://www.youtube.com/watch?v=qkIgSE9LOIM&list=PLkuTAI1Za_y4DWZF LI57Kuze0qetQ0031&index=29.

The Board is agreeable to meet and confer with Plaintiffs' counsel regarding appropriate custodians and search terms for email searches.

**REQUEST FOR PRODUCTION NO. 23:**

Documents and/or Communications showing the occupational and educational background for each current and former member who served on the

27

School Board, including but not limited to each current and former School Board member's curriculum vitae.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. This case concerns the District's school libraries and media centers. The Board members are elected constitutional officials, and the occupational and educational background of individual Board members is not related to the needs of this case and therefore this Request would impose an undue burden on the Board. The Board also objects to the extent this Request blurs the line between the Board members' role as constitutional officers and their individual capacities. The Board members are not sued or named in their individual capacity, and even if they were they would be entitled to qualified immunity from suit as well as legislative immunity and privilege relating to any discovery concerning claims against them in their individual capacity for legislative actions, such as those being challenged in this suit. As such, any discovery aimed at the Board members in this respect is overly broad and not proportional to the needs of this case. The Board also objects to the extent this Request calls for documents related to Board members not serving on the Board at the time any of the Relevant Books were restricted or removed. Former Board members' occupational and

educational backgrounds have no bearing on the issues and this matter and thus would impose an undue burden on the Board.

## REQUEST FOR PRODUCTION NO. 24:

All Documents and/or Communications concerning the original purchase/acquisition of all the Reading Materials for School District libraries subject to a Book Challenge, Book Restriction, or Book Removal, including Reading Materials by the Author Plaintiffs. This Request extends beyond the Relevant Time Period to the extent that the Reading Material purchases/acquisitions pre-date it.

## RESPONSE:

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As phrased, this Request would extend to the beginning of time. Accordingly, this Request calls for purchase/acquisition documents related to any Reading Materials that have ever been challenged, restricted, or removed since the creation of the District. Asking the Board to locate records regarding such remote-in-time actions is not probative to the issues in the case and would disproportionately burden the Board's ability to deliver educational services.

Additionally, the request is overly broad and unduly burdensome as to scope because the Board not identified a method by which to locate responsive documents

on a District-wide basis. Accordingly, the request would require the Board to search records on a school-by-school basis for its 65 schools.

The Board has the duty to provide, inter alia, a program of school library media services for all public schools in the district, including school library media centers, or school library media centers open to the public, and, in addition such traveling or circulating libraries as may be needed for the proper operation of the district school system. § 1006.28(2)(d), Fla. Stat. To that end, the Board's Policies are publicly available at: https://go.boarddocs.com/fl/escambia/Board.nsf/goto?open&id=C7KP3X5EC33A# and hereby incorporated by reference into this Response. Specifically, Policies 4.06, 5.02, and 5.07 concern Educational Media Materials, Purchasing and Inventories, and Property Records, respectively.

Moreover, the Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case as Reading Material, as defined, concerns textbooks, workbooks, curriculum items, etc. These are not proportional to the needs of this case as Plaintiffs' allegations concern actions undertaken regarding the Board's school libraries and media centers.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books. The Board is agreeable to meet and confer with

Plaintiffs' counsel regarding appropriate custodians and search terms for email searches.

**REQUEST FOR PRODUCTION NO. 25:**

All non-privileged Documents upon which You have relied or intend to rely, in whole or in part, directly or indirectly, in connection with any dispositive motion made by You in this action.

**RESPONSE:**

The Board objects to this Request as premature. The Board did not rely upon privileged materials in preparing its dispositive Motion to Dismiss, which was based entirely on legally dispositive issues.

The Board has not yet determined whether it will be preparing subsequent dispositive motions, nor has it relied on any documents, privileged or otherwise, in its determinations related to its as-yet unfiled or contemplated motions. If the Board determines to file such dispositive motion(s), all non-privileged documents will be produced either in accordance with the Court's orders, the Board's discovery obligations, and/or as exhibits/attachments/documents in support of the dispositive motion(s).

Therefore none.

**REQUEST FOR PRODUCTION NO. 26:**

All non-privileged Documents upon which You have relied or intend to rely, in whole or in part, directly or indirectly, in connection with any Answer made by You in this action.

**RESPONSE:**

The Board objects to this Request as premature. The Board has not yet prepared or filed any Answer in this matter, nor has it relied on any documents, privileged or otherwise, in its determinations related to its as-yet unfiled or contemplated Answer.

Therefore none.

**REQUEST FOR PRODUCTION NO. 27:**

All reports of any expert retained by You to testify at trial in this action.

**RESPONSE:**

The Board objects to this Request as premature. The Board has not retained any experts in this matter.

Therefore none.

**REQUEST FOR PRODUCTION NO. 28:**

All Documents shown to, submitted to, received from, and/or reviewed by any expert retained to testify at trial in this action.

**RESPONSE:**

The Board objects to this Request as premature. The Board has not retained any experts in this matter, nor has it submitted, received, or reviewed any documents regarding any experts.

Therefore none.

**REQUEST FOR PRODUCTION NO. 29:**

All Documents subject to disclosure pursuant to Federal Rule of Civil Procedure 26(a)(2)(A), (B), and (C).

**RESPONSE:**

*See* the Board's Initial Disclosures and other documents more fully described and produced herein.

**REQUEST FOR PRODUCTION NO. 30:**

All Documents that You intend to introduce as exhibits at trial in this action.

**RESPONSE:**

The Board objects to this Request as premature. The Board will disclose all trial exhibits in conformity with the Court's exhibit disclosure requirements or when required by federal law.

Therefore none.

**REQUEST FOR PRODUCTION NO. 31:**

All Documents identified in response to any Interrogatories served on You by Plaintiffs.

**RESPONSE:**

*See* the Board's Responses to Plaintiffs' Interrogatories and other documents more fully described and produced herein.

**REQUEST FOR PRODUCTION NO. 32:**

All Documents produced to the plaintiffs in *Parnell, et al., v. School Board of Lake County, Florida, et al.,* Case No. 4:23-cv-414-AW-MAF (N.D. Fla. filed Sept. 19, 2023) ("*Parnell*"), pursuant to Report of Planning Conf. for Prelim. Inj. Hr'g., *Parnell*, 4:23-cv-414-AW-MAF, ECF 105 (N.D. Fla. Oct. 4, 2023), and Order Regarding Disc. and Prelim. Inj. Hr'g. Procedures, *Parnell*, 4:23-cv-414-AW-MAF, ECF 107 (N.D. Fla. Oct. 5, 2023).

**RESPONSE:**

The Board has produced these documents.

**REQUEST FOR PRODUCTION NO. 33:**

All other non-privileged Documents within Your custody, possession, or control and upon which You intend to rely in whole or in part, directly or indirectly, in connection with any claim or defense related to the above-captioned action.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case.

Beyond this, *see* the documents more fully described and produced herein.

Respectfully submitted,

s/ J. David Marsey
J. DAVID MARSEY
Florida Bar No.:  0010212
Email:  dmarsey@rumberger.com
s/ Nicole Sieb Smith
NICOLE SIEB SMITH
Florida Bar No.:  0017056
Email:  nsmith@rumberger.com
JEFFREY J. GROSHOLZ
Florida Bar No. 1018568
Email:  jgrosholz@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
101 North Monroe Street
Suite 1050
Tallahassee, FL  32301
Tel:  850.222.6550
Fax:  850.222.8783
Tel:  850.222.6550
Fax:  850.222.8783
Attorneys for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on DATE, I electronically furnished the foregoing to the following: **Shalini Goel Agarwal at shalini.agarwal@protectdemocracy.org,** Lynn B. Oberlander at **oberlanderl@ballardspahr.com, Paul J. Safier at safierp@ballardspahr.com, Shawn F. Summers at summerss@ballardspahr.com, Kristy Parker at kristy.parker@protectdemocracy.org,** and **John Langford at john.langford@protectdemocracy.org (Counsel for Plaintiffs)**.

/s J. David Marsey

J. DAVID MARSEY
Florida Bar No.:  0010212
E-mail:  dmarsey@rumberger.com
NICOLE SIEB SMITH
Florida Bar No.:  0017056
E-mail:  nsmith@rumberger.com
JEFFREY J. GROSHOLZ
Florida Bar No.:  1018568
E-mail:  jgrosholz@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
101 North Monroe Street
Suite 1050
Tallahassee, Florida 32301
Tel:  850.222.6550
Fax:  850.222.8783
Attorneys for Defendant

18483300.v1

Exhibit 5

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

PEN AMERICAN CENTER, INC.,
SARAH BRANNEN, LINDSAY
DURTSCHI, on behalf of herself and
her minor children, BENJAMIN
GLASS, on behalf of himself and his
minor child, GEORGE M.
JOHNSON, DAVID LEVITHAN,
KYLE LUKOFF, ANN
NOVAKOWSKI, on behalf of herself
and her minor child, PENGUIN
RANDOM HOUSE LLC, SEAN
PARKER, on behalf of himself and
his minor child, ASHLEY HOPE
PÉREZ, ERICA ROY, on behalf of
herself and her minor children,          CASE NO.: 3:23-CV-10385-TKW-ZCB
CHRISTOPHER SCOTT
SATTERWHITE, on behalf of
himself and his minor child, and
CARIN SMITH on behalf of herself
and her minor children,

      Plaintiffs,

vs.

ESCAMBIA COUNTY SCHOOL
BOARD,

      Defendant.

_____ /

**DEFENDANT'S SUPPLEMENTAL RESPONSE TO**
**PLAINTIFF'S FIRST REQUEST FOR PRODUCTION**

The Escambia County School Board ("Board") hereby supplements its

responses to Plaintiffs' First Request for Production, served on October 16, 2023, as follows:

## **OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS**

The Board incorporates these objections to Plaintiffs' "Instructions" and "Definitions" into each specific response to Plaintiffs' Requests for Production listed below:

1.      The Board objects to the "Instructions" to the extent they purport to modify or alter the Board's obligations to respond as more fully set forth by the Federal Rules of Civil Procedure and/or are more burdensome than the requirements of the Federal Rules of Civil Procedure.

2.      The Board objects to the definitions of "Communicate" and "Communication" as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case and/or this stage of the proceedings given they purport to extend to any communications between "Persons"—itself an overly broad, vague, and ambiguous definition given it encompasses every employee of the Board as well as "any other entity"—and "agencies," itself an undefined term that is similarly vague and ambiguous. The Board also objects to the definition of "Communicate" and "Communication" because they purport to include oral communications regardless of whether such oral communications are documented or otherwise recorded in some manner. Rule 34 authorizes discovery of documents

2

and things, and there is no requirement to produce oral communications as broadly defined by Plaintiffs.

3.     The Board objects to the definition of "Document" as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case and/or this stage of the proceedings. Additionally, the Board objects to the inclusion of e-mails in the definition of "Document," and state that non-objectionable e-mails will be produced in response to those requests that seek "Communication[s]."

4.     The Board objects to Plaintiffs' definition of "[a]nd" and "or" to mean "and/or", as this is vague, ambiguous and confusing depending on the particular context of the request.

5.     The Board objects to the definition of the term "Reading Material" as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case and/or this stage of the proceedings. Specifically, this term purports to include any form of "text-based or image-based content," including books in both physical and digital format. This lawsuit concerns decisions made concerning books contained in the Board's school libraries and media centers. It does not extend to decisions concerning curriculum, textbooks, third-party vendors the Board contracts with, or classroom libraries. Yet, Plaintiffs' definition of "Reading Material" would sweep in every book in every school within the Escambia County School District—including textbooks, books in classroom libraries, books students bring in from

home, etc.—and more. Such a definition goes far beyond the parameters of this case.

The Board will therefore provide Responses concerning the "Relevant Books." For the purposes of the Board's Responses, "Relevant Books" shall, per the allegations of the Amended Complaint, [D.E. 27], be defined as: (1) books published by the Publisher Plaintiff; (2) books authored by one of the Author Plaintiffs; (3) books the Parent Plaintiffs allege their children wanted to read; (4) books written by authors who are members of Plaintiff PEN American Center, Inc.; and (5) *The Perks of Being a Wallflower*, *Lucky*, and *The Nowhere Girls*.

6.      The Board objects to the definition of the terms "Book Challenge," "Book Restriction," and "Book Removal" as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case and/or this stage of the proceedings. Specifically, these terms purport to include any challenges to any Reading Material which, as defined, includes textbooks, curriculum items, classroom libraries, etc. Challenges, restrictions, or removals by the Board of particular Reading Material that are not related to the allegations in the Amended Complaint, i.e., not purportedly motivated by the ideological grounds as identified in the Amended Complaint, are not proportional to the needs of this case. Reading Material may be challenged, restricted, or removed for a variety of reasons, *e.g.*, § 1006.28(2)(a)2.b.(I)–(II), Fla. Stat., many of which are not proportional to the needs of this case. The Board will therefore provide Responses concerning challenges,

4

restrictions, and removals of the "Relevant Books."

7.    The Board objects to the definition of the terms "Policy or Practice" as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case and/or this stage of the proceedings. As defined, these terms refer to any actions taken—whether official or unofficial, approved or unapproved, mandatory or discretionary—by any individual within the Escambia County School District. The Board formally promulgates policies in accordance with Florida law, and generally delegates authority to the Superintendent or his/her designee for the creation of procedures. Plaintiffs' definition ignores the statutory framework within which the Board operates, is vague and ambiguous, and purports to sweep in activity that cannot be considered Board action or reasonably traced back to the Board nor can it be considered proportional to the needs of this case given the breadth and size of the Escambia County School District ("District").

8.    The Board objects to Plaintiffs' requirements that the Board supplement these responses within 15 days. Rule 26(e) merely requires a party supplement their responses "in a timely manner." The Board will comply with relevant Federal Rules of Civil Procedure.

9.    The Board objects to the extent Plaintiffs' Requests would include documents from charter schools. Plaintiffs have not identified any actions taken pursuant to any school libraries or media centers in any charter schools in the

District, and the production of documents from charter schools would therefore be unduly burdensome and not proportional to the needs of this case.

**<u>SUPPLEMENTAL DEFINITIONS:</u>**

Pursuant to the Parties' agreement, "Reading Material" is defined to only mean those materials contained within the District's school libraries.

"Relevant Books" shall mean the list of books provided by Plaintiffs on February 16, 2024 which are removed, remain under restricted access, or are otherwise unavailable to students as of the date of the Board's response. If a particular Relevant Book returns to circulation, the Board shall cease producing material relating to it.

The "Relevant Time Period" shall be from January 1, 2022, until July 1, 2023. If the District considered the status of a Relevant Book after the Relevant Time Period, the Relevant Time Period shall be extended through present only for those discovery requests that pertain specifically to the Relevant Books. The Board otherwise objects to responding to requests that seek documents for the time period before the Relevant Time Period, as such requests are not proportional or material to the claims and defenses in the lawsuit. The amendments to the State laws at issue in this case, and which form the basis for the Board's relevant policies and practices regarding library materials, took effect on July 1, 2022. Because the Relevant Time Period encompasses the period of time from January 1, 2022 through July 1, 2022,

the Board is providing Plaintiffs with discovery responses pertaining to the six-months leading up to the passage of the subject legislation. The District further objects to providing discovery for the period of time after July 1, 2023, given the allegations in the Complaint, which make clear Plaintiffs are challenging actions by the Board that occurred prior to July 1, 2023, [D.E. 27 at ¶ 69 n.4].

Pursuant to the Parties' conferral, the Board construes "Policy" to mean formal policy as approved and promulgated by the Board. "Practice" shall mean actions taken by leadership of the District, including the Superintendent or his or her designee, pursuant to the direction of the Board for the purpose of implementing the Board's Policies.

The ESI searches are limited to the parties' agreed-upon custodians and search terms.

## REQUEST FOR PRODUCTION NO. 1:

All Documents and/or Communications to, from, or copying any member of the School Board, the School Superintendent, and/or the Coordinator of Media Services concerning any actual or prospective Book Challenge. This Request

extends beyond the Relevant Time Period to the extent that any responsive Documents and/or Communications pre-date it.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As phrased, this Request would extend to the beginning of time. Moreover, the term "prospective" is overly broad, vague, ambiguous, and not defined. As written, a resident of Escambia County or a parent of a child at one of the Board's schools could have—since the creation of the District—formulated a "prospective" challenge to any material within the District. Asking the Board to locate records regarding such prospective contemplations or considerations is not probative to the issues in the case and would disproportionately burden the Board's ability to deliver educational services.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books.

**SUPPLEMENTAL RESPONSE:**

The Board will produce responsive documents for these custodians for the redefined Relevant Books concerning actual Book Challenges during the redefined Relevant Time Period.

**REQUEST FOR PRODUCTION NO. 2:**

All Documents and/or Communications to, from, or copying any member of the School Board, the School Superintendent, and/or the Coordinator of Media Services concerning any actual or prospective Book Restriction. This Request extends beyond the Relevant Time Period to the extent that any responsive Documents and/or Communications pre-date it.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As phrased, this Request would extend to the beginning of time. Moreover, the term "prospective" is overly broad, vague, ambiguous, and not defined. As written, a librarian at one of the Board's schools could have—since the creation of the District—formulated a "prospective" restriction to any material within the District. Asking the Board to locate records regarding such prospective contemplations or considerations is not probative to the issues in the case and would disproportionately burden the Board's ability to deliver educational services.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books.

**SUPPLEMENTAL RESPONSE:**

The Board will produce responsive documents for these custodians for the redefined Relevant Books concerning actual Book Restrictions during the redefined Relevant Time Period.

**REQUEST FOR PRODUCTION NO. 3:**

All Documents and/or Communications to, from, or copying any member of the School Board, the School Superintendent, and/or the Coordinator of Media Services concerning any actual or prospective Book Removal. This Request extends beyond the Relevant Time Period to the extent that any responsive Documents and/or Communications pre-date it.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As phrased, this Request would extend to the beginning of time. Moreover, the term "prospective" is overly broad, vague, ambiguous, and not defined. As written, a librarian at one of the Board's schools could have—since the creation of the District—formulated a "prospective" removal of any material within the District. Asking the Board to locate records regarding such prospective contemplations or considerations is not probative to the issues in the case and would disproportionately burden the Board's ability to deliver educational services.

10

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books.

**SUPPLEMENTAL RESPONSE:**

The Board will produce responsive documents for these custodians for the redefined Relevant Books concerning actual Book Removals during the redefined Relevant Time Period.

**REQUEST FOR PRODUCTION NO. 4:**

All Documents and/or Communications concerning any procedures, including any Policies or Practices, in the School District for adjudicating Book Challenges, including, but not limited to, Documents and/or Communications concerning whether Reading Materials subject to a Book Challenge will be subjected to Restricted Access during the pendency of the review process, and, if so, what Reading Materials will be subjected to such Restricted Access.

**RESPONSE:**

The Board's considers challenges to materials within its libraries pursuant to Florida law, *e.g.*, § 1006.28, Fla. Stat., and its policies which are publicly available at:

https://go.boarddocs.com/fl/escambia/Board.nsf/goto?open&id=C7KP3X5EC33A# and incorporated herein. Specifically, Board Policy 4.06 governs challenges to

11

materials in the Board's school libraries/media centers, as well as restriction and removal of these materials.

Additionally, the request is overly broad and unduly burdensome as to scope because the Board has not identified a method by which to locate responsive documents on a District-wide basis. Accordingly, the Request would require the Board to search records on a school-by-school basis for its 65 schools to determine whether any "Policy or Practice," which as defined includes both official and unofficial actions by District staff, purportedly exists.

**SUPPLEMENTAL RESPONSE:**

The Board will produce responsive documents for the redefined Relevant Books concerning restricted access for books that were actually challenged during the redefined Relevant Time Period pursuant to the redefined Policies and Practices.

**REQUEST FOR PRODUCTION NO. 5:**

All Documents and/or Communications concerning any procedures, including any Policies or Practices, as to (a) how Reading Materials subject to a Book

12

Restriction must be handled in the School District and (b) the steps students and parents must take to access such Reading Materials.

**RESPONSE:**

The Board's considers challenges to materials within its libraries pursuant to Florida law, *e.g.*, § 1006.28, Fla. Stat., and its policies which are publicly available at: https://go.boarddocs.com/fl/escambia/Board.nsf/goto?open&id=C7KP3X5EC33A# and incorporated herein. Specifically, Board Policy 4.06 governs challenges to materials in the Board's school libraries/media centers, as well as restriction and removal of these materials.

Additionally, the request is overly broad and unduly burdensome as to scope because the Board has not identified a method by which to locate responsive documents on a District-wide basis. Accordingly, the Request would require the Board to search records on a school-by-school basis for its 65 schools to determine whether any "Policy or Practice," which as defined includes both official and unofficial actions by District staff, purportedly exists.

**SUPPLEMENTAL RESPONSE:**

The Board will produce responsive documents for the redefined Relevant Books concerning actual Book Restrictions during the redefined Relevant Time Period pursuant to the redefined Policies and Practices.

13

## REQUEST FOR PRODUCTION NO. 6:

All Documents and/or Communications describing the District Review Committee set up by the School District to evaluate Book Challenges, including (a) how the committee is constituted, (b) who is eligible to join the committee, (c) the duties of the committee members, (d) the factors the committee must consider in adjudicating Book Challenges, and (e) any requirements for written explanation of the committee's decisions.

## RESPONSE:

The Board considers challenges to materials within its libraries pursuant to Florida law, *e.g.*, § 1006.28, Fla. Stat., and its policies which are publicly available at:

https://go.boarddocs.com/fl/escambia/Board.nsf/goto?open&id=C7KP3X5EC33A# and incorporated herein. Specifically, Board Policy 4.06 governs challenges to materials in the Board's school libraries/media centers, as well as restriction and removal of these materials.

## SUPPLEMENTAL RESPONSE:

The Board will produce responsive documents for the redefined Relevant Books concerning the District Review Committee during the redefined Relevant Time Period pursuant to the redefined Policies and Practices.

14

**REQUEST FOR PRODUCTION NO. 7:**

All Documents and/or Communications describing any school-level review committee formed in response to or to evaluate Book Challenges, including (a) how the committee is constituted, (b) who is eligible to join the committee, (c) the duties of the committee members, (d) the factors the committee must consider in adjudicating Book Challenges, and (e) any requirements for written explanation of the committee's decisions.

**RESPONSE:**

There are no school-level review committees formed in response to or to evaluate Book Challenges.

Therefore none.

**REQUEST FOR PRODUCTION NO. 8:**

All Documents and/or Communications concerning any meeting of the School Board, or of any subset or committee thereof, relating to School District library Reading Materials, including meeting minutes, presentations, audio and video recordings, and any other Documents and/or Communications prepared, reviewed, sent, received, and/or distributed in or in preparations for any such meetings.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As phrased and per

15

Plaintiffs' Definitions, this Request would implicate virtually every single meeting of the Board given the term Reading Materials includes library materials, curriculum materials, textbooks, classroom libraries, etc. This case is about the specific Relevant Books which were either restricted or removed from the District's school libraries and media centers. The Board will produce records concerning the Board meetings at which the Board considered challenges to the Relevant Books and at which the Relevant Books were restricted, and/or removed.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books.

## REQUEST FOR PRODUCTION NO. 9:

All Documents and/or Communications describing the School Board's process for evaluating Book Challenges, including (a) the duties of the School Board members, (b) the factors the School Board must consider in adjudicating Book Challenges, and (c) any requirements for written explanation of the School Board's decisions.

## RESPONSE:

The Board The Board considers challenges to materials within its libraries pursuant to Florida law, *e.g.*, § 1006.28, Fla. Stat., and its policies which are publicly available at:

16

https://go.boarddocs.com/fl/escambia/Board.nsf/goto?open&id=C7KP3X5EC33A# and incorporated herein. Specifically, Board Policy 4.06 governs challenges to materials in the Board's school libraries/media centers, as well as restriction and removal of these materials.

**SUPPLEMENTAL RESPONSE:**

The Board will produce responsive documents for the redefined Relevant Books concerning the process for actual book challenges during the redefined Relevant Time Period pursuant to the redefined Policies and Practices.

**REQUEST FOR PRODUCTION NO. 10:**

All Documents and/or Communications from, to, or copying the State of Florida, including any official, employee, or agent thereof, concerning HB 1069, HB 7, or HB 1557, and their application to Book Challenges, Book Restrictions, and Book Removals, including those statutes' interpretation or implementation by You or the School District with respect to school libraries.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As defined, this Request seek materials "concerning" HB 1069, 7, and 1557 "*and*" their application related to various "Reading Material" which have either been challenged, restricted, or removed, thereby extending the Request to all textbooks, curriculum items,

classroom libraries, etc. This case concerns the District's school libraries and media centers. The cited bills either do not concern these or encompass far broader topics than just these limited features of the case and thus are not proportional to the needs of this matter and would impose an undue burden on the Board. Documents and/or Communications that extend beyond school libraries and media centers are not proportional to the needs of this case.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books. The Board is agreeable to meet and confer with Plaintiffs' counsel regarding appropriate custodians and search terms for email searches.

## SUPPLEMENTAL RESPONSE:

The Board maintains its objections that given the allegations in the Complaint, which make clear Plaintiffs are challenging actions by the Board that occurred prior to July 1, 2023, [D.E. 27 at ¶ 69 n.4], HB 1069 has no applicability to this matter and any discovery related to it is not proportional to the needs of the case. The Board also maintains its objection that the cited bills either do not concern library materials or encompass far broader topics than just these limited features of the case and thus are not proportional to the needs of this matter and would impose an undue burden on the Board. Additionally, pursuant to the parties' discussions during their conferrals, the request for communications with the custodian, "State of Florida,

18

including any official, employee, or agent thereof," generally, are overly broad and unduly burdensome and not proportional to the needs of this case.

## REQUEST FOR PRODUCTION NO. 11:

All Documents and/or Communications in the custody of the School Board relating to HB 1069, including but not limited to Documents and Communications relating to the implementation or interpretation thereof with respect to School District libraries, or any proposed changes or amendments thereto.

## RESPONSE:

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. This case concerns the District's school libraries and media centers. This Request seeks all documents relating to HB 1069 "including but not limited to" its implementation with respect to the District's libraries—which on its own would encompass both school and classroom libraries, the latter of which is not at issue in this matter. The cited bill concerns far broader topics that are not proportional to the needs of this case and would impose an undue burden on the Board.

Moreover, the term "proposed changes or amendments" is overly broad, vague, ambiguous, and not defined. As written, a librarian at one of the Board's schools could have formulated a "proposed" change to evaluating material within the District, pursuant to HB 1069. Asking the Board to locate records regarding such

hypothetical contemplations or considerations is not probative to the issues in the case and would disproportionately burden the Board's ability to deliver educational services.

Beyond this, because of its similarity to Request No. 10, the Board reiterates and restates its Response herein.

**SUPPLEMENTAL RESPONSE:**

None; the Board maintains its objections. Although the Board does not agree to perform independent searches for HB 1069, documents regarding the subject of this request may be subsumed within responsive documents to other non-objectionable requests.

**REQUEST FOR PRODUCTION NO. 12:**

All Documents and/or Communications concerning objections received by the School District pursuant to section 6 of HB 1069 (amending section 1006.28(2)(a)(2), Florida Statutes) with respect to School District libraries.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. This case concerns the District's school libraries and media centers; the cited section of the referenced bill concerns broader topics that are not proportional to the needs of this case and would impose an undue burden on the Board.

Moreover, this Request is duplicative and subsumed within that requested by Request No. 11.

To the extent "objections"—which is not defined as a term—is to be interpreted in line with Plaintiffs' Definitions, challenges, restrictions, or removals by the Board of particular Reading Material that are not related to the allegations in the Amended Complaint, i.e., not purportedly motivated by the ideological grounds as identified in the Amended Complaint, are not proportional to the needs of this case. Reading Material may be challenged, restricted, or removed for a variety of reasons, *e.g.*, § 1006.28(2)(a)2.b.(I)–(II), Fla. Stat., many of which are not proportional to the needs of this case.

Beyond this, because of its similarity to Request No. 10, the Board reiterates and restates its Response herein.

## SUPPLEMENTAL RESPONSE:

None; the Board maintains its objections. Although the Board does not agree to perform independent searches for section 6 of HB 1069, documents regarding the subject of this request may be subsumed within responsive documents to other non-objectionable requests.

## REQUEST FOR PRODUCTION NO. 13:

All Documents and/or Communications concerning the removal or discontinuation of any Reading Material pursuant to section 6 of HB 1069

(amending section 1006.28(2)(a)(2), Florida Statutes) with respect to School District libraries.

**<u>RESPONSE:</u>**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. This case concerns the District's school libraries and media centers; the cited section of the referenced bill concerns broader topics that are not proportional to the needs of this case and would impose an undue burden on the Board.

Moreover, this Request is duplicative and subsumed within that requested by Request No. 11.

To the extent "removal or discontinuation"—which are not defined as terms— are to be interpreted in line with Plaintiffs' Definitions, challenges, restrictions, or removals by the Board of particular Reading Material that are not related to the allegations in the Amended Complaint, i.e., not purportedly motivated by the ideological grounds as identified in the Amended Complaint, are not proportional to the needs of this case. Reading Material may be challenged, restricted, or removed for a variety of reasons, *e.g.*, § 1006.28(2)(a)2.b.(I)–(II), Fla. Stat., many of which are not proportional to the needs of this case. Moreover, books may be removed or discontinued for a variety of reasons, many of which are not proportional to the needs of this case.

Beyond this, because of its similarity to Request No. 10, the Board reiterates and restates its Response herein.

**SUPPLEMENTAL RESPONSE:**

None; the Board maintains its objections. Although the Board does not agree to perform independent searches for section 6 of HB 1069, documents regarding the subject of this request may be subsumed within responsive documents to other non-objectionable requests.

**REQUEST FOR PRODUCTION NO. 14:**

All Documents and/or Communications concerning the School Board's reporting requirements pursuant to section 6 of HB 1069 (amending section 1006.28(2)(e)(3), Florida Statutes), including but not limited to a list identifying with respect to School District libraries (a) each Reading Material for which the School District received an objection pursuant to subparagraph (a)(2); (b) each Reading Material that was removed or discontinued; and (c) each Reading Material that was not removed or discontinued and the rationale for not removing or discontinuing the Reading Material.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. This case concerns the District's school libraries and media centers; the cited section of the referenced bill

concerns broader topics that are not proportional to the needs of this case and would impose an undue burden on the Board.

Moreover, this Request is duplicative and subsumed within that requested by Request No. 11.

To the extent "objection" and "removed or discontinued"—which are not defined as terms—are to be interpreted in line with Plaintiffs' Definitions, challenges, restrictions, or removals by the Board of particular Reading Material that are not related to the allegations in the Amended Complaint, i.e., not purportedly motivated by the ideological grounds as identified in the Amended Complaint, are not proportional to the needs of this case. Reading Material may be challenged, restricted, or removed for a variety of reasons, *e.g.*, § 1006.28(2)(a)2.b.(I)–(II), Fla. Stat., many of which are not proportional to the needs of this case. Moreover, books may be removed or discontinued for a variety of reasons, many of which are not proportional to the needs of this case.

Beyond this, because of its similarity to Request No. 10, the Board reiterates and restates its Response herein.

**<u>SUPPLEMENTAL RESPONSE:</u>**

None; the Board maintains its objections. Although the Board does not agree to perform independent searches for section 6 of HB 1069, documents regarding the

subject of this request may be subsumed within responsive documents to other non-objectionable requests.

## REQUEST FOR PRODUCTION NO. 15:

All Documents and/or Communications to, from, or copying the State of Florida, including any official, employee, or agent thereof, concerning any Book Challenge, Book Restriction, or Book Removal.

## RESPONSE:

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As defined, this Request would extend to all Reading Material, which extends to all textbooks, curriculum items, classroom libraries, etc. This case concerns the District's school libraries and media centers. All Documents and/or Communications to/from/copying the State of Florida and its officials, employees, agents, etc. and the Board would thus capture documents not proportional to the needs of this case and impose an undue burden on the Board.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books. The Board is agreeable to meet and confer with Plaintiffs' counsel regarding appropriate custodians and search terms for email searches.

## SUPPLEMENTAL RESPONSE:

25

Pursuant to the parties' discussions during their conferrals, the request for communications with the custodian, "State of Florida, including any official, employee, or agent thereof," generally, are overly broad and unduly burdensome and not proportional to the needs of this case. To the extent such searches are technically feasible, responsive documents will be produced.

## REQUEST FOR PRODUCTION NO. 16:

All Documents and/or Communications to, from, or copying any member of the School Board, the School Superintendent, and/or the Coordinator of Media Services concerning any training program developed and completed by any School District library personnel involved in the selection of Reading Materials.

## RESPONSE:

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As defined, this Request would extend to any "training program"—an undefined term—related to all Reading Material, which extends to all textbooks, curriculum items, classroom libraries, etc. This case concerns the District's school libraries and media centers. This Request therefore imposes an undue burden on the Board.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books and documents the Board has located regarding

pertinent training. The Board is agreeable to meet and confer with Plaintiffs' counsel regarding appropriate custodians and search terms for email searches.

**SUPPLEMENTAL RESPONSE:**

The Board will produce responsive documents for the redefined Relevant Time Period concerning trainings approved by the District and or the Florida Department of Education regarding selecting the redefined Reading Material.

**REQUEST FOR PRODUCTION NO. 17:**

All Documents and/or Communications to, from, or copying any member of the School Board, the School Superintendent, and/or the Coordinator of Media Services concerning School District library Reading Materials (including any Book Challenge, Book Restriction, or Book Removal) from, to, including, and/or concerning Baggett. This Request extends beyond the Relevant Time Period to the extent that any responsive Documents and/or Communications pre-date it.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As phrased, this Request would extend to the beginning of time. Moreover, the Board objects to the term "concerning" as overly broad, vague, and not defined. As written, a member of the Board could have written an email "concerning" Baggett and "concerning" any of the hundreds of thousands of Reading Materials in the Board's custody that is

entirely unrelated to the needs of this case. This Request therefore imposes an undue burden on the Board.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books. The Board is agreeable to meet and confer with The Board is agreeable to meet and confer with Plaintiffs' counsel regarding appropriate custodians and search terms for email searches.

**SUPPLEMENTAL RESPONSE:**

The Board will produce responsive documents during the redefined Relevant Time Period for these custodians concerning Baggett and the redefined Relevant Books.

**REQUEST FOR PRODUCTION NO. 18:**

All Documents and/or Communications to, from, or copying any member of the School Board, the School Superintendent, and/or the Coordinator of Media Services concerning School District library Reading Materials (including any Book Challenge, Book Restriction, or Book Removal) from, to, including, and/or concerning Moms for Liberty and/or any member or agent of Moms for Liberty. This Request extends beyond the Relevant Time Period to the extent that any responsive Documents and/or Communications pre-date it.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As phrased, this Request would extend to the beginning of time. Moreover, the Board objects to the term "concerning" as overly broad, vague, and not defined. As written, a member of the Board could have written an email "concerning" Moms for Liberty—or any of its agents—and "concerning" any of the hundreds of thousands of Reading Materials in the Board's custody that is entirely unrelated to the needs of this case. This Request therefore imposes an undue burden on the Board.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books. The Board is agreeable to meet and confer with Plaintiffs' counsel regarding appropriate custodians and search terms for email searches.

**SUPPLEMENTAL RESPONSE:**

The Board will produce responsive documents for these custodians during the redefined Relevant Time Period concerning "Moms for Liberty" and the redefined Relevant Books. The Board has no knowledge of to the identity of each member or agent of Moms for Liberty.

**REQUEST FOR PRODUCTION NO. 19:**

All Documents and/or Communications to, from, or copying any member of the School Board, the School Superintendent, and/or the Coordinator of Media Services concerning any Plaintiff.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. The Board objects to the term "concerning" as overly broad, vague, and not defined. As written, a member of the Board could have written an email "concerning" any of the ten students who are parties to this suit that is entirely unrelated to the needs of this case. This Request therefore imposes an undue burden on the Board.

Moreover, the Board objects to this Request to the extent it calls for material protected by the attorney-client privilege and the work product doctrine.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books. The Board is agreeable to meet and confer with Plaintiffs' counsel regarding appropriate custodians and search terms for email searches.

**SUPPLEMENTAL RESPONSE:**

The Board will produce responsive documents during the redefined Relevant Time Period for these custodians concerning Plaintiffs and the redefined Relevant Books.

**REQUEST FOR PRODUCTION NO. 20:**

All non-privileged Documents and/or Communications concerning any advice provided to the School Board, or any individual School Board member, as to the legally permissible bases on which Reading Materials can be removed from School District libraries.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As defined, this Request would extend to the bases by which all Reading Material—which extends to all textbooks, curriculum items, classroom libraries, etc.—could be removed. This case concerns the District's school libraries and media centers. This Request therefore imposes an undue burden on the Board.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books and public meeting YouTube links for meetings where Relevant Books were removed or restricted, which can be found at: https://www.youtube.com/watch?v=Jg03jUggUEU&list=PLkuTAI1Za_y4DWZFLI57Kuze0qetQ0031.

The Board is agreeable to meet and confer with Plaintiffs' counsel regarding appropriate custodians and search terms for email searches.

**SUPPLEMENTAL RESPONSE:**

31

The Board will produce responsive documents during the redefined Relevant Time Period using the School Board Members as custodians concerning non-privileged advice regarding the removal of the redefined Relevant Books.

## REQUEST FOR PRODUCTION NO. 21:

All Documents and/or Communications concerning School District library Reading Materials (including any Book Challenge, Book Restriction, or Book Removal) from, to, including, and/or concerning former School District Superintendent Tim Smith.

## RESPONSE:

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. Tim Smith was the former Superintendent for the District, and therefore he would have sent hundreds, possibly thousands, of emails related to the District's Reading Material, which as defined, would extend to all textbooks, curriculum items, classroom libraries, etc. This case concerns the District's school libraries and media centers. Thus, this Request would impose an undue burden on the Board and would include documents not proportional to the needs of this case.

Moreover, the Board objects to the term "concerning" as overly broad, vague, and not defined. As written, a member of the Board could have written an email

"concerning" Reading Materials and "concerning" Tim Smith that is entirely unrelated to the needs of this case.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books. The Board is agreeable to meet and confer with Plaintiffs' counsel regarding appropriate custodians and search terms for email searches.

**SUPPLEMENTAL RESPONSE:**

The Board will produce responsive documents during the redefined Relevant Time Period for these custodians concerning former School District Superintendent Tim Smith and the redefined Relevant Books.

**REQUEST FOR PRODUCTION NO. 22:**

All Documents and/or Communications describing the reasons for the termination of former School District Superintendent Tim Smith.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. This case concerns the District's school libraries and media centers. The decision to terminate the former Superintendent does not concern these and therefore this Request would impose an

undue burden on the Board and include documents not proportional to the needs of this case.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books and public meeting YouTube links for meetings where Mr. Smith was terminated, which can be found at:

https://www.youtube.com/watch?v=qkIgSE9LOIM&list=PLkuTAI1Za_y4DWZF LI57Kuze0qetQ0031&index=29.

The Board is agreeable to meet and confer with Plaintiffs' counsel regarding appropriate custodians and search terms for email searches.

**SUPPLEMENTAL RESPONSE:**

None; the Board maintains its objections and response.

**REQUEST FOR PRODUCTION NO. 23:**

Documents and/or Communications showing the occupational and educational background for each current and former member who served on the School Board, including but not limited to each current and former School Board member's curriculum vitae.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. This case concerns the District's school libraries and media centers. The Board members are elected

34

constitutional officials, and the occupational and educational background of individual Board members is not related to the needs of this case and therefore this Request would impose an undue burden on the Board. The Board also objects to the extent this Request blurs the line between the Board members' role as constitutional officers and their individual capacities. The Board members are not sued or named in their individual capacity, and even if they were they would be entitled to qualified immunity from suit as well as legislative immunity and privilege relating to any discovery concerning claims against them in their individual capacity for legislative actions, such as those being challenged in this suit. As such, any discovery aimed at the Board members in this respect is overly broad and not proportional to the needs of this case. The Board also objects to the extent this Request calls for documents related to Board members not serving on the Board at the time any of the Relevant Books were restricted or removed. Former Board members' occupational and educational backgrounds have no bearing on the issues and this matter and thus would impose an undue burden on the Board.

## REQUEST FOR PRODUCTION NO. 24:

All Documents and/or Communications concerning the original purchase/acquisition of all the Reading Materials for School District libraries subject to a Book Challenge, Book Restriction, or Book Removal, including Reading

Materials by the Author Plaintiffs. This Request extends beyond the Relevant Time Period to the extent that the Reading Material purchases/acquisitions pre-date it.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As phrased, this Request would extend to the beginning of time. Accordingly, this Request calls for purchase/acquisition documents related to any Reading Materials that have ever been challenged, restricted, or removed since the creation of the District. Asking the Board to locate records regarding such remote-in-time actions is not probative to the issues in the case and would disproportionately burden the Board's ability to deliver educational services.

Additionally, the request is overly broad and unduly burdensome as to scope because the Board not identified a method by which to locate responsive documents on a District-wide basis. Accordingly, the request would require the Board to search records on a school-by-school basis for its 65 schools.

The Board has the duty to provide, inter alia, a program of school library media services for all public schools in the district, including school library media centers, or school library media centers open to the public, and, in addition such traveling or circulating libraries as may be needed for the proper operation of the

district school system. § 1006.28(2)(d), Fla. Stat. To that end, the Board's Policies are publicly available at:

https://go.boarddocs.com/fl/escambia/Board.nsf/goto?open&id=C7KP3X5EC33A# and hereby incorporated by reference into this Response. Specifically, Policies 4.06, 5.02, and 5.07 concern Educational Media Materials, Purchasing and Inventories, and Property Records, respectively.

Moreover, the Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case as Reading Material, as defined, concerns textbooks, workbooks, curriculum items, etc. These are not proportional to the needs of this case as Plaintiffs' allegations concern actions undertaken regarding the Board's school libraries and media centers.

Beyond this, *see* documents based on Relevant Books and materials/agenda for meetings involving those books. The Board is agreeable to meet and confer with Plaintiffs' counsel regarding appropriate custodians and search terms for email searches.

**SUPPLEMENTAL RESPONSE:**

The Board agrees to make reasonable efforts to search for purchase records regarding the redefined Relevant Books; however, per the parties' conferrals, such records are beyond the District's retention period and they are not searchable electronically.

37

## REQUEST FOR PRODUCTION NO. 25:

All non-privileged Documents upon which You have relied or intend to rely, in whole or in part, directly or indirectly, in connection with any dispositive motion made by You in this action.

## RESPONSE:

The Board objects to this Request as premature. The Board did not rely upon privileged materials in preparing its dispositive Motion to Dismiss, which was based entirely on legally dispositive issues.

The Board has not yet determined whether it will be preparing subsequent dispositive motions, nor has it relied on any documents, privileged or otherwise, in its determinations related to its as-yet unfiled or contemplated motions. If the Board determines to file such dispositive motion(s), all non-privileged documents will be produced either in accordance with the Court's orders, the Board's discovery obligations, and/or as exhibits/attachments/documents in support of the dispositive motion(s).

Therefore none.

## REQUEST FOR PRODUCTION NO. 26:

All non-privileged Documents upon which You have relied or intend to rely, in whole or in part, directly or indirectly, in connection with any Answer made by You in this action.

38

**RESPONSE:**

The Board objects to this Request as premature. The Board has not yet prepared or filed any Answer in this matter, nor has it relied on any documents, privileged or otherwise, in its determinations related to its as-yet unfiled or contemplated Answer.

Therefore none.

**REQUEST FOR PRODUCTION NO. 27:**

All reports of any expert retained by You to testify at trial in this action.

**RESPONSE:**

The Board objects to this Request as premature. The Board has not retained any experts in this matter.

Therefore none.

**REQUEST FOR PRODUCTION NO. 28:**

All Documents shown to, submitted to, received from, and/or reviewed by any expert retained to testify at trial in this action.

**RESPONSE:**

The Board objects to this Request as premature. The Board has not retained any experts in this matter, nor has it submitted, received, or reviewed any documents regarding any experts.

Therefore none.

**REQUEST FOR PRODUCTION NO. 29:**

All Documents subject to disclosure pursuant to Federal Rule of Civil Procedure 26(a)(2)(A), (B), and (C).

**RESPONSE:**

*See* the Board's Initial Disclosures and other documents more fully described and produced herein.

**REQUEST FOR PRODUCTION NO. 30:**

All Documents that You intend to introduce as exhibits at trial in this action.

**RESPONSE:**

The Board objects to this Request as premature. The Board will disclose all trial exhibits in conformity with the Court's exhibit disclosure requirements or when required by federal law.

Therefore none.

**REQUEST FOR PRODUCTION NO. 31:**

All Documents identified in response to any Interrogatories served on You by Plaintiffs.

**RESPONSE:**

*See* the Board's Responses to Plaintiffs' Interrogatories and other documents more fully described and produced herein.

**REQUEST FOR PRODUCTION NO. 32:**

All Documents produced to the plaintiffs in *Parnell, et al., v. School Board of Lake County, Florida, et al.,* Case No. 4:23-cv-414-AW-MAF (N.D. Fla. filed Sept. 19, 2023) ("*Parnell*"), pursuant to Report of Planning Conf. for Prelim. Inj. Hr'g., *Parnell*, 4:23-cv-414-AW-MAF, ECF 105 (N.D. Fla. Oct. 4, 2023), and Order Regarding Disc. and Prelim. Inj. Hr'g. Procedures, *Parnell*, 4:23-cv-414-AW-MAF, ECF 107 (N.D. Fla. Oct. 5, 2023).

**RESPONSE:**

The Board has produced these documents.

**REQUEST FOR PRODUCTION NO. 33:**

All other non-privileged Documents within Your custody, possession, or control and upon which You intend to rely in whole or in part, directly or indirectly, in connection with any claim or defense related to the above-captioned action.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case.

Beyond this, *see* the documents more fully described and produced herein.


Respectfully submitted,

/s Nicole Sieb Smith
J. DAVID MARSEY
Florida Bar No.:  0010212
E-mail:  dmarsey@rumberger.com

41

NICOLE SIEB SMITH
Florida Bar No.:  0017056
E-mail:  nsmith@rumberger.com
JEFFREY J. GROSHOLZ
Florida Bar No.:  1018568
E-mail:  jgrosholz@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
101 North Monroe Street, Suite 1050
Tallahassee, Florida 32301
Tel:  850.222.6550
Fax:  850.222.8783
and

SAMANTHA DUKE
Florida Bar No. 0091403
Email:  sduke@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
300 S. Orange Ave., Suite 300
Orlando, Florida 32801
Tel:  407.872.7300
Fax: 407.841.2133

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been furnished by
e-mail to Shalini Goel Agarwal at shalini.agarwal@protectdemocracy.org,
scott.welder@protectdemocracy.org;    Kristy    L.    Parker    at
kristy.parker@protectdemocracy.org;    John    Thomas    Langford    at
john.langford@protectdemocracy.org;    Lynn    B.    Oberlander    at
oberlanderl@ballardspahr.com;  Paul  J.  Safier  at  safierp@ballardspahr.com,
relyear@ballardspahr.com,  tranp@ballardspahr.com;  Shawn  F.  Summers  at

42

summerss@ballardspahr.com;          Kirsten          Elizabeth          Fehlan          at

fehlank@ballardspahr.com  (Counsel  for  Plaintiffs);  Rachel  Elise  Fugate  at

rfugate@shullmanfugate.com,                         aalbright@shullmanfugate.com,

kbrown@shullmanfugate.com (Counsel for Defendant Calvert, et al.); Clarence

William  Phillips  at  cphillips@cov.com;  Jayni  Foley  Hein  at  jhein@cov.com;

Nicholas  Eli  Baer  at  nbaer@cov.com;  and  Robert  C.  Buschel  at  buschel@bglaw-

pa.com,  BG.J6R6@case.tinygnomes.com  (Counsel  for  Defendants  Florida  State

Conference NAACP and Equality Florida Action, Inc.); and Bridget K. O'Hickey at

bridget.ohickey@myfloridalegal.com;          Henry          C.          Whitaker          at

henry.whitaker@myfloridalegal.com,  jenna.hodges@myfloridalegal.com;  Daniel

W.  Bell  at  daniel.bell@myfloridalegal.com  and  David  M.  Costello  at

david.costello@myfloridalegal.com (Counsel State of Florida, amicus curiae), this

__15th ___ day of March, 2024.

s/ Nicole Sieb Smith
J. DAVID MARSEY
Florida Bar No.:  0010212
E-mail:  dmarsey@rumberger.com
NICOLE SIEB SMITH
Florida Bar No.:  0017056
E-mail:  nsmith@rumberger.com
JEFFREY J. GROSHOLZ
Florida Bar No.:  1018568
E-mail:  jgrosholz@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
101 North Monroe Street, Suite 1050

Tallahassee, Florida 32301
Tel:  850.222.6550
Fax:  850.222.8783
and

SAMANTHA DUKE
Florida Bar No. 0091403
Email:  sduke@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
300 S. Orange Ave., Suite 300
Orlando, Florida 32801
Tel:  407.872.7300
Fax: 407.841.2133

Attorneys for Defendants

44

# Exhibit 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

PEN AMERICAN CENTER, INC.,
SARAH BRANNEN, LINDSAY
DURTSCHI, on behalf of herself and
her minor children, BENJAMIN
GLASS, on behalf of himself and his
minor child, GEORGE M. JOHNSON,
DAVID LEVITHAN, KYLE LUKOFF,
ANN NOVAKOWSKI, on behalf of
herself and her minor child, PENGUIN
RANDOM HOUSE LLC, SEAN
PARKER, on behalf of himself and his
minor child, ASHLEY HOPE PÉREZ,
ERICA ROY, on behalf of herself and
her minor children, and
CHRISTOPHER SCOTT
SATTERWHITE, on behalf of himself
and his minor child,

              *Plaintiffs*,

      v.

ESCAMBIA COUNTY SCHOOL
BOARD,

              *Defendant*.

Case No. 3:23-CV-10385-TKW-ZCB

JURY TRIAL DEMANDED

## PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT ESCAMBIA COUNTY SCHOOL BOARD

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure,

Plaintiffs PEN American Center, Inc., Sarah Brannen, Lindsay Durtschi, Benjamin

Glass, George M. Johnson, David Levithan, Kyle Lukoff, Ann Novakowski,

Penguin Random House LLC, Sean Parker, Ashley Hope Pérez, Erica Roy, and

Christopher Scott Satterwhite, by and through their attorneys, hereby request that Defendant produce documents and things in response to the following Requests, in accordance with the following Definitions and Instructions.  Written responses under oath are due within thirty (30) days of service of these Requests.

Unless otherwise agreed, production is to be made electronically or, for hard copy documents, at the law office of Ballard Spahr LLP, 1675 Broadway, 19th Floor, New York, NY 10019, within thirty (30) days of service.

## DEFINITIONS

The following definitions shall apply to each of the Requests set forth below.

1.    "You" or "Your" means the party responding to this Request; any of the party's officers, agents, assigns, employees, insurers, subsidiaries, successors, and predecessors; and anyone acting or purporting to act on the party's behalf, except for legal counsel.

2.    "Defendant" means the Escambia County School Board.

3.    "School Board" means and refers to the five-member governing body of the School District, elected from geographic districts within Escambia County, including both current and former members during the Relevant Time Period.

4.    "School District" means the Escambia County School District.

5.    Unless specifically and individually identified, "Plaintiff" or "Plaintiffs" refers to all of the Plaintiffs in this action.

2

6.      "Amended Complaint" means the Amended Complaint Plaintiffs filed in this action.

7.      "Communicate" or "Communication" means any transmission of Documents or information between Persons or agencies, whether oral, written or otherwise, active or automated, including but not limited to memoranda, letters, telecopies, facsimiles, e-mails, text messages, voicemails, electronic transmissions, meetings, discussions, conversations, or telephone calls.

8.      "Document" includes but is not limited to the original, drafts and all non-identical versions or copies (whether different from originals by reason of notations made on such copies or otherwise) of all written, electronic or graphic material, however produced or reproduced, in Your possession, custody or control or the possession, custody, or control of Your attorney, including but not limited to writings, forms, memoranda, letters, notes, correspondence, studies, reports, drawings, graphs, charts, records, photographs, sound or mechanical recordings or tapes, telecopies, facsimiles, e-mail, text messages, voicemails, computer printouts, information stored on computer systems, database queries and responses, and other data compilations from which information can be obtained or translated, if necessary through the use of detection devices, into reasonably usable form, in the broadest understanding of the term "Documents" in the Federal Rules of Civil Procedure. Without limiting the term "control," a Document is deemed to be

3

within Your control if You have ownership, possession, or custody of the Document, or the right to secure the Document or a copy thereof from any Persons having physical control thereof.

9.      The words "or," "and," "all," "every," "any," "each," "one or more," "including," and similar words of guidance, are intended merely as such, and should not be construed as words of limitation. The words "or" and "and" shall include each other whenever possible to expand, not restrict, the scope of the Request. The word "including" shall not be used to limit any general category or description that precedes it. The words "all," "every," "any," "each," and "one or more" shall include each other whenever possible to expand, not to restrict, the scope of the Request.

10.     "Person" or "Persons" includes a natural person, individual, corporation, proprietorship, partnership, association, agency (including government agencies), School Board, School District, or any other entity.

11.     "Baggett" means Vicki Baggett, the Northview High School language arts teacher identified in Plaintiffs' Amended Complaint.

12.     "Reading Material" means text-based or image-based content, including but not limited to books, published or produced in any printed, electronic, or digital format.

13.     "Book Challenge" means and refers to any challenge or petition submitted by any Person with the aim of removing or restricting access to any Reading Material in any School District library, including, but not limited to, submitting the School District's "Request for Reconsideration of Educational Media" form.

14.     "Book Restriction" means and refers to any actions undertaken by the School District, including by You, to restrict access (short of complete removal) to any Reading Material in any School District library, permanently or temporarily, at any time during the Relevant Time Period.  Similarly, "Restricted Access" means any limitation on access to Reading Material in any School District library short of complete removal.

15.     "Book Removal" means and refers to any actions undertaken by the School District, including by You, to remove (or completely bar access to) any Reading Material from any School District library, permanently or temporarily, at any time during the Relevant Time Period.

16.     "Restricted or Removed Books" includes any individual book title or combination of book titles from the list of book titles located in the spreadsheet titled, "PEN et al. v. Escambia County School Board – Restricted and Removed Books DMFIRM_411297846(1).XLSX," provided as an attachment to a

5

correspondence email dated February, 16, 2024, and sent to counsel for Defendant via electronic mail.

17.     "HB 1069" means the act of the Florida legislature numbered House Bill 1069, as enacted on May 17, 2023 and collected at Florida Laws Ch. 2023-105.

18.     "HB 1557" means the act of the Florida legislature numbered House Bill 1557, as enacted on March 28, 2022 and collected at Florida Laws Ch. 2022-22.

19.     "HB 7" means the act of the Florida legislature numbered House Bill 7, as enacted on April 22, 2022 and collected at Florida Laws Ch. 2022-72.

20.     "Moms for Liberty" means the organization of that name identified and described in Plaintiffs' Amended Complaint, including any local chapter thereof, wherever located.

21.      "Policy or Practice" includes any official or unofficial policy, practice, procedure, protocol, or custom, whether mandatory or discretionary, formal or informal, written or unwritten.

22.     The "Relevant Time Period" for each Request is May 23, 2022 through the present unless otherwise stated in an individual Request.

23.     "Reconsideration Spreadsheet" means the Document accessible at the following hyperlink:

6

https://docs.google.com/spreadsheets/d/1hv6Wtu55zY3t5bmbksY2ie7Q-L3zAQdjrtaFh4duLC4/edit#gid=0 (also hyperlinked in the ECPS Library Consideration Flowchart/Library Collection Flowchart and displayed as "District Challenged Books"), including the initial Version of that Document, and all subsequent Versions. Requests related to the Reconsideration Spreadsheet do not encompass a request for all Documents hyperlinked to the Reconsideration Spreadsheet; any such request for Documents hyperlinked to the Reconsideration Spreadsheet will be made separately.

24.    "Version" means the iteration of the Reconsideration Spreadsheet made available after (1) any revisions, edits, additions, or deletions to the information available in columns C through P for each title listed in the Reconsideration Spreadsheet; (2) the addition of any title; (3) the deletion of any title; and (4) the addition of any tabs (e.g., the "Resolved challenges" tab available in the current Version).

## <u>INSTRUCTIONS</u>

1.    These Requests are intended to elicit as much information as possible concerning the issues, and to the extent any Request could be interpreted in more than one way, You should employ the interpretation of the Request most likely to encompass and elicit the greatest amount of information possible.

7

2.      You shall produce such Documents as kept in the ordinary course, *see* Fed. R. Civ. P. 34, and without any rearrangement. In addition, You should provide the Documents in such a way that they can be correlated to the Request or Requests to which the Documents are responsive, and identify the Bates number for all such Documents in Your response.

3.      You shall produce all responsive Documents and things that are in Your possession or control, or that of Your agents, employees, representatives, attorneys, or their associated attorneys, investigators, or any other representatives. Each Request calls not only for all Documents known to You and Your agents, employees, representatives, investigators, and attorneys, but also for all Documents available by reasonable inquiry and due diligence, including inquiries to other Persons.  If You are aware of Documents responsive to any Request herein, but do not have possession of them, You should identify each such Document, the present custodian's name, address, telephone number, title, and employer, and any other Persons who have seen or had possession of such Document.

4.      If, despite the exercise of due diligence, You are unable to produce any Document requested herein, You should so state and respond to the Request to the extent possible, specifying the reasons for Your inability to answer the remainder, and stating whatever information You have concerning the unanswered portions.

8

5.     With respect to any Document requested herein that You refuse to produce, You should provide the following information:

      (a)     Identify the Document, including its title or heading, its date, its authors, its addressees or recipients, its subject matter, the individual or source from which You obtained it, and its present location and the identity of the custodian;

      (b)     State whether Your objection or refusal is related to the entire Document or a portion thereof;

      (c)     If Your objection or refusal goes to part of the Document, specify the part(s) of the Document to which Your objection or refusal is directed;

      (d)     Specify the factual basis for Your objection or refusal, if any; and

      (e)     Specify the legal grounds for Your objection or refusal, if any.

6.     You are under a continuing obligation to respond to the Requests set forth herein. If You subsequently discover additional Documents that are responsive hereto, You shall promptly produce such Documents to Plaintiffs within fifteen (15) days of such discovery.

## DOCUMENT REQUESTS

**Request No. 34:**    A copy of every version of the "challenge form" the School District has circulated or made available to the public for purposes of permitting individuals to challenge the inclusion of particular books in School District Libraries.

**Request No. 35:**    The first Version of the Reconsideration Spreadsheet that was made publicly available.

**Request No. 36:**    The Version of the Reconsideration Spreadsheet that was made publicly available on July 24, 2023, and referenced in the Amended Complaint. (*See* Am. Compl., Dkt. 27 at ¶ 66.)

**Request No. 37:**    All Versions of the Reconsideration Spreadsheet that were made publicly available, from July 24, 2023, to the present.

**Request No. 38:**    All Communications with any other school district in the State of Florida, including any school board or individual school board member, concerning the Restricted or Removed Books.

**Request No. 39:**    All Communications with any other school district in the State of Florida, including any school board or individual school board member, concerning any procedures, including any Policies or Practices, for adjudicating Book Challenges.

**Request No. 40:**    All Communications with any other school district in the State of Florida, including any school board or individual school board member, concerning the School Board's process for evaluating Book Challenges, including (a) the duties of the School Board members, (b) the factors the School Board must consider in adjudicating Book Challenges, and (c) any requirements for written explanation of the School Board's decisions.

**Request No. 41:**    All Communications with any other school district in the State of Florida, including any school board or individual school board member, concerning HB 1069, HB 7, or HB 1557, and their application to Book Challenges, Book Restrictions, Book Removals, or the Restricted or Removed Books, including those statutes' interpretation or implementation by You or the School District with respect to school libraries.

**Request No. 42:**    All Communications with any other school district in the State of Florida, including any school board or individual school board member, concerning HB 1069, including but not limited to Documents and Communications relating to the implementation or interpretation thereof with respect to school libraries, or any proposed changes or amendments thereto.

**Request No. 43:**    All Communications with any school district in the State of Florida, including any school board or individual school board member, concerning the removal or discontinuation of any Reading Material pursuant to

11

section 6 of HB 1069 (amending section 1006.28(2)(a)(2), Florida Statutes) with

respect to school libraries.

**Request No. 44:** All Communications with any school district in the State

of Florida, including any school board or individual school board member,

concerning the School Board's reporting requirements pursuant to section 6 of HB

1069 (amending section 1006.28(2)(e)(3), Florida Statutes), including but not

limited to a list identifying with respect to school libraries (a) each Reading

Material for which the School District received an objection pursuant to

subparagraph (a)(2); (b) each Reading Material that was removed or discontinued;

and (c) each Reading Material that was not removed or discontinued and the

rationale for not removing or discontinuing the Reading Material.

Dated: June 13, 2024                     Respectfully submitted,

*/s/ Paul J. Safier*

Lynn B. Oberlander (*pro hac vice*)
**BALLARD SPAHR LLP**
1675 Broadway, 19th Floor
New York, NY 10019-5820
Telephone: (212) 223-0200
Facsimile: (212) 223-1942

Paul J. Safier (*pro hac vice*)
Facundo Bouzat*
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103

12

Telephone: (215) 864-8500
Facsimile: (215) 864-8999

Kirsten Fehlan (*pro hac vice*)
**BALLARD SPAHR LLP**
999 Peachtree Street, Suite 1600
Atlanta, GA 30309
Telephone: (678) 420-3000
Facsimile: (678) 420-9401

Shalini Goel Agarwal (FBN 90843)
Ori Lev (*pro hav vice*)
**PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
Telephone: (202) 579-4582
Facsimile: (929) 777-8428

*\*Pro hac vice* forthcoming

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 13, 2024, I caused a true and correct copy of the foregoing Plaintiffs' Second Set of Requests for Production of Documents to Defendant Escambia County School Board to be served on counsel of record for all parties via e-mail.

Dated: June 13, 2024                         */s/ Paul J. Safier*
                                                                Paul J. Safier

Exhibit 7

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

PEN AMERICAN CENTER, INC.,
SARAH BRANNEN, LINDSAY
DURTSCHI, on behalf of herself and
her minor children, BENJAMIN
GLASS, on behalf of himself and his
minor child, GEORGE M.
JOHNSON, DAVID LEVITHAN,
KYLE LUKOFF, ANN
NOVAKOWSKI, on behalf of herself
and her minor child, PENGUIN
RANDOM HOUSE LLC, SEAN
PARKER, on behalf of himself and
his minor child, ASHLEY HOPE
PÉREZ, ERICA ROY, on behalf of        CASE NO.:  3:23-CV-10385-TKW-ZCB
herself and her minor children, and
CHRISTOPHER SCOTT
SATTERWHITE, on behalf of
himself and his minor child,

      Plaintiffs,

vs.

  ESCAMBIA COUNTY SCHOOL
  BOARD,

      Defendant.

_____ /

## DEFENDANT, ESCAMBIA COUNTY SCHOOL BOARD'S
## RESPONSE TO PLAINTIFFS' SECOND REQUEST FOR PRODUCTION

     Defendant, Escambia County School Board, hereby responds to Plaintiffs'

Second Request for Production, served June 13, 2024, as follows:

## <u>OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS</u>

The Board incorporates these objections to Plaintiffs' "Instructions" and "Definitions" into each specific response to Plaintiffs' Requests for Production listed below:

1.      The Board objects to the "Instructions" to the extent they purport to modify or alter the Board's obligations to respond as more fully set forth by the Federal Rules of Civil Procedure and/or are more burdensome than the requirements of the Federal Rules of Civil Procedure.

2.      The Board objects to the definitions of "Communicate" and "Communication" as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case and/or this stage of the proceedings given they purport to extend to any communications between "Persons"—itself an overly broad, vague, and ambiguous definition given it encompasses every employee of the Board as well as "any other entity"—and "agencies," itself an undefined term that is similarly vague and ambiguous. The Board also objects to the definition of "Communicate" and "Communication" because they purport to include oral communications regardless of whether such oral communications are documented or otherwise recorded in some manner. Rule 34 authorizes discovery of documents and things, and there is no requirement to produce oral communications as broadly defined by Plaintiffs.

2

3.     The Board objects to the definition of "Document" as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case and/or this stage of the proceedings. Additionally, the Board objects to the inclusion of e-mails in the definition of "Document," and state that non-objectionable e-mails will be produced in response to those requests that seek "Communication[s]."

4.     The Board objects to Plaintiffs' definition of "[a]nd" and "or" to mean "and/or", as this is vague, ambiguous and confusing depending on the particular context of the request.

5.     The Board objects to the definition of the term "Reading Material" as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case and/or this stage of the proceedings. Specifically, this term purports to include any form of "text-based or image-based content," including books in both physical and digital format. This lawsuit concerns decisions made concerning books contained in the Board's school libraries and media centers. It does not extend to decisions concerning curriculum, textbooks, third-party vendors the Board contracts with, or classroom libraries. Yet, Plaintiffs' definition of "Reading Material" would sweep in every book in every school within the Escambia County School District— including textbooks, books in classroom libraries, books students bring in from home, etc.—and more. Such a definition goes far beyond the parameters of this case.

Pursuant to the Parties' agreement, "Reading Material" is defined to only mean those materials contained within the District's school libraries.

6. The Board objects to the definition of the terms "Book Challenge," "Book Restriction," and "Book Removal" as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case and/or this stage of the proceedings. Specifically, these terms purport to include any challenges to any Reading Material which, as defined, includes textbooks, curriculum items, classroom libraries, etc. Challenges, restrictions, or removals by the Board of particular Reading Material that are not related to the allegations in the Amended Complaint, i.e., not purportedly motivated by the ideological grounds as identified in the Amended Complaint, are not proportional to the needs of this case. Reading Material may be challenged, restricted, or removed for a variety of reasons, *e.g.*, § 1006.28(2)(a)2.b.(I)–(II), Fla. Stat., many of which are not proportional to the needs of this case.

7. The Board objects to the definition of the terms "Policy or Practice" as being overly broad in scope, unduly burdensome, and not proportional to the needs of the case and/or this stage of the proceedings. As defined, these terms refer to any actions taken—whether official or unofficial, approved or unapproved, mandatory or discretionary—by any individual within the Escambia County School District. The Board formally promulgates policies in accordance with Florida law, and

generally delegates authority to the Superintendent or his/her designee for the creation of procedures. Plaintiffs' definition ignores the statutory framework within which the Board operates, is vague and ambiguous, and purports to sweep in activity that cannot be considered Board action or reasonably traced back to the Board nor can it be considered proportional to the needs of this case given the breadth and size of the Escambia County School District ("District"). Pursuant to the Parties' conferral, the Board construes "Policy" to mean formal policy as approved and promulgated by the Board. "Practice" shall mean actions taken by leadership of the District, including the Superintendent or his or her designee, pursuant to the direction of the Board for the purpose of implementing the Board's Policies.

8.    The Board objects to Plaintiffs' requirements that the Board supplement these responses within 15 days. Rule 26(e) merely requires a party supplement their responses "in a timely manner." The Board will comply with relevant Federal Rules of Civil Procedure.

9.    The Board objects to the extent Plaintiffs' Requests would include documents from charter schools. Plaintiffs have not identified any actions taken pursuant to any school libraries or media centers in any charter schools in the District, and the production of documents from charter schools would therefore be unduly burdensome and not proportional to the needs of this case.

10.     The Board objects to the term "Book Restriction" to the extent it includes materials outside of the parties agreed-upon list provided by Plaintiffs on February 16, 2024.

11.     The Board objects to the term "Book Removal" to the extent it includes materials outside of the parties agreed-upon list provided by Plaintiffs on February 16, 2024.

12.     The Board objects to the term "Restricted or Removed Books" to the extent it includes materials outside of the parties agreed-upon list provided by Plaintiffs on February 16, 2024. If a particular "Restricted or Removed Book" returns to circulation, the Board shall cease producing material relating to it.

13.     The ESI searches are limited to the parties' agreed-upon custodians and search terms.

**REQUEST FOR PRODUCTION NO. 34:**

A copy of every version of the "challenge form" the School District has circulated or made available to the public for purposes of permitting individuals to challenge the inclusion of particular books in School District Libraries.

**RESPONSE:**

The material objection form effective November 2023 is publicly available

on the District website at:

https://docs.google.com/document/d/1mWhJsNCIX_o8HE2qxeBtyNBr0QLnCmis

AvpBHh11PVo/edit

6

To the extent other versions exist, they will be produced.

**REQUEST FOR PRODUCTION NO. 35:**

The first Version of the Reconsideration Spreadsheet that was made publicly available.

**RESPONSE:**

The spreadsheet produced contemporaneously with this response was the first version created and, upon information and belief, it was also the first made publicly available.

**REQUEST FOR PRODUCTION NO. 36:**

The Version of the Reconsideration Spreadsheet that was made publicly available on July 24, 2023, and referenced in the Amended Complaint. (See Am. Compl., Dkt. 27 at ¶ 66.)

**RESPONSE:**

See spreadsheet produced contemporaneously with this response.

**REQUEST FOR PRODUCTION NO. 37:**

All Versions of the Reconsideration Spreadsheet that were made publicly available, from July 24, 2023, to the present.

**RESPONSE:**

See spreadsheets produced contemporaneously with this response.

**REQUEST FOR PRODUCTION NO. 38:**

All Communications with any other school district in the State of Florida, including any school board or individual school board member, concerning the Restricted or Removed Books.

7

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As phrased, the request would include all employees, agents and officials of the Escambia County School Board along with all employees, agents and officials of Florida's 67 school districts. The Board also objects to producing communications through the present, as such time period extends far beyond the stated scope of Plaintiffs' Amended Complaint. Additionally, to the extent such communications exist for the agreed-upon custodians, they would have been previously produced.

**REQUEST FOR PRODUCTION NO. 39:**

All Communications with any other school district in the State of Florida, including any school board or individual school board member, concerning any procedures, including any Policies or Practices, for adjudicating Book Challenges.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As phrased, the request would include all employees, agents and officials of the Escambia County School Board along with all employees, agents and officials of Florida's 67 school districts. Further, the Board objects to producing communications that do not pertain to the Restricted or Removed Books. Moreover, other school districts' Policies or Practices for adjudicating Book Challenges is not material to the claims and defenses of this

8

case. The Board also objects to producing communications through the present, as such time period extends far beyond the stated scope of Plaintiffs' Amended Complaint.  Additionally, to the extent such communications exist for the agreed-upon custodians regarding the Restricted or Removed Books, they would have been previously produced.

## REQUEST FOR PRODUCTION NO. 40:

All Communications with any other school district in the State of Florida, including any school board or individual school board member, concerning the School Board's process for evaluating Book Challenges, including (a) the duties of the School Board members, (b) the factors the School Board must consider in adjudicating Book Challenges, and (c) any requirements for written explanation of the School Board's decisions.

## RESPONSE:

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As phrased, the request would include all employees, agents and officials of the Escambia County School Board along with all employees, agents and officials of Florida's 67 school districts. Further, the Board objects to producing communications that do not pertain to the Restricted or Removed Books. The Board also objects to producing communications through the present, as such time period extends far beyond the stated scope of Plaintiffs' Amended Complaint. [D.E. 27 at ¶ 69 n.4] Additionally, to the extent such communications exist for the agreed-upon custodians regarding the Restricted or Removed Books, they would have been previously produced.

9

**REQUEST FOR PRODUCTION NO. 41:**

All Communications with any other school district in the State of Florida, including any school board or individual school board member, concerning HB 1069, HB 7, or HB 1557, and their application to Book Challenges, Book Restrictions, Book Removals, or the Restricted or Removed Books, including those statutes' interpretation or implementation by You or the School District with respect to school libraries.

**RESPONSE:**

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As phrased, the request would include all employees, agents and officials of the Escambia County School Board along with all employees, agents and officials of Florida's 67 school districts. Further, the Board objects to producing communications that do not pertain to the Restricted or Removed Books. As defined, this Request seeks materials "concerning" HB 1069, 7, and 1557 "and" their application to "Book Challenges, Book Restrictions, Book Removals, or the Restricted or Removed Books." The cited bills either do not concern these topics or encompass far broader topics than just these limited features of the case and thus are not proportional to the needs of this matter and would impose an undue burden on the Board. The Board also objects that, given the allegations in the Amended Complaint, which make clear Plaintiffs are challenging actions by the Board that occurred prior to July 1, 2023, [D.E. 27 at ¶ 69 n.4], HB 1069 has no applicability to this matter and any discovery related to it is not proportional to the needs of the case. Moreover, other school districts'

10

application, interpretation or implementation of these bills is not material to the claims and defenses of this case. The Board also objects to producing communications through the present, as such time period extends far beyond the stated scope of Plaintiffs' Amended Complaint.

## REQUEST FOR PRODUCTION NO. 42:

All Communications with any other school district in the State of Florida, including any school board or individual school board member, concerning HB 1069, including but not limited to Documents and Communications relating to the implementation or interpretation thereof with respect to school libraries, or any proposed changes or amendments thereto.

## RESPONSE:

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As phrased, the request would include all employees, agents and officials of the Escambia County School Board along with all employees, agents and officials of Florida's 67 school districts. Further, the Board objects to producing documents and communications that do not pertain to the Restricted or Removed Books. The Board also objects that, given the allegations in the Amended Complaint, which make clear Plaintiffs are challenging actions by the Board that occurred prior to July 1, 2023, [D.E. 27 at ¶ 69 n.4], HB 1069 has no applicability to this matter and any discovery related to it is not proportional to the needs of the case. Moreover, other school districts' interpretation or implementation of this bill is not material to the claims and defenses of this case.

The Board also objects to producing documents and communications through the present, as such time period extends far beyond the stated scope of Plaintiffs' Amended Complaint.

## REQUEST FOR PRODUCTION NO. 43:

All Communications with any school district in the State of Florida, including any school board or individual school board member, concerning the removal or discontinuation of any Reading Material pursuant to section 6 of HB 1069 (amending section 1006.28(2)(a)(2), Florida Statutes) with respect to school libraries.

## RESPONSE:

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As phrased, the request would include all employees, agents and officials of the Escambia County School Board along with all employees, agents and officials of Florida's 67 school districts. Further, the Board objects to producing communications that do not pertain to the Restricted or Removed Books. The Board also objects that, given the allegations in the Amended Complaint, which make clear Plaintiffs are challenging actions by the Board that occurred prior to July 1, 2023, [D.E. 27 at ¶ 69 n.4], HB 1069 has no applicability to this matter and any discovery related to it is not proportional to the needs of the case. Moreover, other school districts' removal or discontinuation of library books pursuant to this bill is not material to the claims and defenses of this case. The Board also objects to producing communications through the present, as

such time period extends far beyond the stated scope of Plaintiffs' Amended Complaint.

## REQUEST FOR PRODUCTION NO. 44:

All Communications with any school district in the State of Florida, including any school board or individual school board member, concerning the School Board's reporting requirements pursuant to section 6 of HB 1069 (amending section 1006.28(2)(e)(3), Florida Statutes), including but not limited to a list identifying with respect to school libraries (a) each Reading Material for which the School District received an objection pursuant to subparagraph (a)(2); (b) each Reading Material that was removed or discontinued; and (c) each Reading Material that was not removed or discontinued and the rationale for not removing or discontinuing the Reading Material.

## RESPONSE:

The Board objects to this Request as being overly broad in scope, unduly burdensome, and not proportional to the needs of this case. As phrased, the request would include all employees, agents and officials of the Escambia County School Board along with all employees, agents and officials of Florida's 67 school districts. Further, the Board objects to producing communications that do not pertain to the Restricted or Removed Books. The Board also objects that, given the allegations in the Amended Complaint, which make clear Plaintiffs are challenging actions by the Board that occurred prior to July 1, 2023, [D.E. 27 at ¶ 69 n.4], HB 1069 has no applicability to this matter and any discovery related to it is not proportional to the needs of the case. Moreover, to the extent this Requests can be interpreted as including such information, the Board objects that other school districts' reporting

13

requirements pursuant to this bill is not material to the claims and defenses of this case. The Board also objects to producing communications through the present, as such time period extends far beyond the stated scope of Plaintiffs' Amended Complaint.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true copy of the foregoing has been furnished by e-mail to Shalini Goel Agarwal at shalini.agarwal@protectdemocracy.org, scott.welder@protectdemocracy.org; Kristy L. Parker at kristy.parker@protectdemocracy.org; John Thomas Langford at john.langford@protectdemocracy.org; Lynn B. Oberlander at oberlanderl@ballardspahr.com; Paul J. Safier at safierp@ballardspahr.com, relyear@ballardspahr.com, tranp@ballardspahr.com; Kirsten Elizabeth Fehlan at fehlank@ballardspahr.com (Counsel for Plaintiffs), this 15th day of July, 2024.

<div style="margin-left:35%">

s/ Nicole Sieb Smith
J. DAVID MARSEY
Florida Bar No.: 0010212
E-mail: dmarsey@rumberger.com
NICOLE SIEB SMITH
Florida Bar No.: 0017056
E-mail: nsmith@rumberger.com
JEFFREY J. GROSHOLZ
Florida Bar No.: 1018568
E-mail: jgrosholz@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
101 North Monroe Street, Suite 1050

</div>

Tallahassee, Florida 32301
Tel:  850.222.6550
Fax:  850.222.8783
and

SAMANTHA DUKE
Florida Bar No. 0091403
Email:  sduke@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
300 S. Orange Ave., Suite 300
Orlando, Florida 32801
Tel:  407.872.7300
Fax: 407.841.2133

Attorneys for Defendants

# Exhibit 8

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

PEN AMERICAN CENTER, INC.,
SARAH BRANNEN, BENJAMIN
GLASS, on behalf of himself and his
minor child, GEORGE M.
JOHNSON, DAVID LEVITHAN,
KYLE LUKOFF, ANN
NOVAKOWSKI, on behalf of herself
and her minor child, PENGUIN
RANDOM HOUSE LLC, SEAN
PARKER, on behalf of himself and
his minor child, ASHLEY HOPE
PÉREZ, and CHRISTOPHER                    CASE NO.:  3:23-CV-10385-TKW-ZCB
SCOTT SATTERWHITE, on behalf
of himself and his minor child,

     Plaintiffs,

vs.

ESCAMBIA COUNTY SCHOOL
BOARD,

     Defendant.

_____ /

**<u>DEFENDANT'S FIRST REQUEST FOR ADMISSIONS</u>**

Pursuant to Federal Rule of Civil Procedure 36, **Defendant, Escambia County School Board**, serves its First Request for Admissions to **Plaintiff, Pen American Center, Inc.**, to admit or deny the following in writing within thirty (30) days from the date hereof.

1.    Admit *10 Things I Can See From Here* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

2.    Admit *10 Things I Can See From Here* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

3.    Admit *A Lesson in Vengeance* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

4.    Admit *A Lesson in Vengeance* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

5.    Admit *Ace of Spades* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

6.    Admit *Ace of Spades* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

7.    Admit *After* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

8.    Admit *After* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

9.    Admit *All the Things We Do in the Dark* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

10.    Admit *All the Things We Do in the Dark* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

11.    Admit ***Almost Perfect*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

12.    Admit ***Almost Perfect*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

13.    Admit ***Angus, Thongs and Full-Frontal Snogging*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

14.    Admit ***Angus, Thongs and Full-Frontal Snogging*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

15.    Admit ***Art of Racing in the Rain*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

16.    Admit ***Art of Racing in the Rain*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

17.    Admit ***Assassination Classroom v 3*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

18.    Admit ***Assassination Classroom v 3*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

19.    Admit ***Bear Town: Book 1*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

20.    Admit ***Bear Town: Book 1*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

21.     Admit ***Beautiful*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

22.     Admit ***Beautiful*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

23.     Admit ***Beloved*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

24.     Admit ***Beloved*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

25.     Admit ***Beyond Magenta*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

26.     Admit ***Beyond Magenta*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

27.     Admit ***Boy Girl Boy*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

28.     Admit ***Boy Girl Boy*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

29.     Admit ***Boy Toy*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

30.     Admit ***Boy Toy*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

31.    Admit ***Breathless*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

32.    Admit ***Breathless*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

33.    Admit ***Bumped*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

34.    Admit ***Bumped*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

35.    Admit ***Burned*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

36.    Admit ***Burned*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

37.    Admit ***Chosen*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

38.    Admit ***Chosen*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

39.    Admit ***City of Thieves*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

40.    Admit ***City of Thieves*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

41.     Admit ***Clockwork Princess*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

42.     Admit ***Clockwork Princess*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

43.     Admit ***Collateral*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

44.     Admit ***Collateral*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

45.     Admit ***Concrete Rose*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

46.     Admit ***Concrete Rose*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

47.     Admit ***Crank*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

48.     Admit ***Crank*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

49.     Admit ***Crescent City: House of Earth and Blood*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

50.     Admit ***Crescent City: House of Earth and Blood*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

51.    Admit ***Damsel*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

52.    Admit ***Damsel*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

53.    Admit ***Darius the Great Deserves Better*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

54.    Admit ***Darius the Great Deserves Better*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

55.    Admit ***Dead Until Dark*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

56.    Admit ***Dead Until Dark*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

57.    Admit ***Deogratias: A Tale of Rwanda*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

58.    Admit ***Deogratias: A Tale of Rwanda*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

59.    Admit ***Dime*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

60.    Admit ***Dime*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

61.    Admit *Doing It* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

62.    Admit *Doing It* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

63.    Admit *Eleanor and Park* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

64.    Admit *Eleanor and Park* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

65.    Admit *Empire of Storms* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

66.    Admit *Empire of Storms* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

67.    Admit *Extremely Loud and Incredibly Close* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

68.    Admit *Extremely Loud and Incredibly Close* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

69.    Admit *Fade* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

70.    Admit *Fade* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

71.    Admit *Finding Cinderella* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

72.    Admit *Finding Cinderella* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

73.    Admit *Flamer* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

74.    Admit *Flamer* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

75.    Admit *Forever* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

76.    Admit *Forever* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

77.    Admit *Foul is Fair* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

78.    Admit *Foul is Fair* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

79.    Admit *From Blood and Ash* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

80.    Admit *From Blood and Ash* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

81.     Admit **Girl in Pieces** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

82.     Admit **Girl in Pieces** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

83.     Admit **Girl Made of Stars** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

84.     Admit **Girl Made of Stars** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

85.     Admit **Go Ask Alice** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

86.     Admit **Go Ask Alice** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

87.     Admit **Graceling** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

88.     Admit **Graceling** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

89.     Admit **Grit** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

90.     Admit **Grit** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

91.     Admit *Guyaholic* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

92.     Admit *Guyaholic* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

93.     Admit *Hear These Voices: Youth at the Edge of the Millennium* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

94.     Admit *Hear These Voices: Youth at the Edge of the Millennium* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

95.     Admit *Home After Dark: A Novel* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

96.     Admit *Home After Dark: A Novel* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

97.     Admit *Home Body* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

98.     Admit *Home Body* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

99.     Admit *I am Not Your Perfect Mexican Daughter* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

100.    Admit ***I am Not Your Perfect Mexican Daughter*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

101.    Admit ***I Never*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

102.    Admit ***I Never*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

103.    Admit ***Identical*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

104.    Admit ***Identical*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

105.    Admit ***I'll Give You the Sun*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

106.    Admit ***I'll Give You the Sun*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

107.    Admit ***Infandous*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

108.    Admit ***Infandous*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

109.    Admit ***It*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

110.   Admit *It* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

111.   Admit *It Ends with Us* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

112.   Admit *It Ends with Us* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

113.   Admit *Jesus Land: A Memoir* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

114.   Admit *Jesus Land: A Memoir* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

115.   Admit *Kingdom of Ash* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

116.   Admit *Kingdom of Ash* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

117.   Admit *Kingdom of Flesh and Fire* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

118.   Admit *Kingdom of Flesh and Fire* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

119.   Admit *L8r G8r* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

120.    Admit *L8r G8r* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

121.    Admit *Lady Midnight* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

122.    Admit *Lady Midnight* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

123.    Admit *Last Night* at the Telegraph Club depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

124.    Admit *Last Night* at the Telegraph Club does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

125.    Admit *Leah on the Offbeat* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

126.    Admit *Leah on the Offbeat* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

127.    Admit *Lessons from a Dead Girl* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

128.    Admit *Lessons from a Dead Girl* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

129.    Admit *Lexicon* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

130.    Admit *Lexicon* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

131.    Admit *Life is Funny* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

132.    Admit *Life is Funny* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

133.    Admit *Little and Lion* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

134.    Admit *Little and Lion* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

135.    Admit *Living Dead Girl* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

136.    Admit *Living Dead Girl* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

137.    Admit *Lush* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

138.    Admit *Lush* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

139.    Admit *Man O'War* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

140.    Admit *Man O'War* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

141.    Admit *Me and Earl and the Dying Girl* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

142.    Admit *Me and Earl and the Dying Girl* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

143.    Admit *Middlesex* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

144.    Admit *Middlesex* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

145.    Admit *Midnight Lie* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

146.    Admit *Midnight Lie* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

147.    Admit *Milk and Honey* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

148.    Admit *Milk and Honey* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

149.    Admit *Monday's Not Coming* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

150.   Admit *Monday's Not Coming* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

151.   Admit *More Happy Than Not* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

152.   Admit *More Happy Than Not* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

153.   Admit *My Dark Vanessa* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

154.   Admit *My Dark Vanessa* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

155.   Admit *My Friend Dahmer: A Graphic Novel* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

156.   Admit *My Friend Dahmer: A Graphic N*ovel does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

157.   Admit *Nineteen Minutes* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

158.   Admit *Nineteen Minutes* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

159.   Admit *Oryx and Crake* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

160.    Admit *Oryx and Crake* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

161.    Admit *Out of Darkness* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

162.    Admit *Out of Darkness* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

163.    Admit *Rainbow Boys* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

164.    Admit *Rainbow Boys* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

165.    Admit *Ramona Blue* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

166.    Admit *Ramona Blue* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

167.    Admit *Ready or Not (All-American Girl Series)* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

168.    Admit *Ready or Not (All-American Girl Series)* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

169.    Admit *Red Hood* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

170.    Admit **Red Hood** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

171.    Admit **Red, White and Royal Blue** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

172.    Admit **Red, White and Royal Blue** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

173.    Admit **Relish: My Life in the Kitchen** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

174.    Admit **Relish: My Life in the Kitchen** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

175.    Admit **Rumble** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

176.    Admit **Rumble** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

177.    Admit **Scars** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

178.    Admit **Scars** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

179.    Admit **Simon vs The Homo Sapiens Agenda** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

180. Admit ***Simon vs The Homo Sapiens Agenda*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

181. Admit ***Slaughterhouse Five*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

182. Admit ***Slaughterhouse Five*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

183. Admit ***Sloppy Firsts*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

184. Admit ***Sloppy Firsts*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

185. Admit ***Smoke*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

186. Admit ***Smoke*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

187. Admit ***Sold*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

188. Admit ***Sold*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

189. Admit ***Speak*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

190.    Admit ***Speak*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

191.    Admit ***Stealing Heaven*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

192.    Admit ***Stealing Heaven*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

193.    Admit ***Super Mutant Magic Academy*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

194.    Admit ***Super Mutant Magic Academy*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

195.    Admit The Carnival ***at Bray*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

196.    Admit ***The Carnival at Bray*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

197.    Admit ***The Duff*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

198.    Admit ***The Duff*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

199.    Admit ***The Facts in the Case of the Departure of Miss Finch*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

200.    Admit ***The Facts in the Case of the Departure of Miss Finch*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

201.    Admit ***The Female of the Species*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

202.    Admit ***The Female of the Species*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

203.    Admit ***The Freedom Writers Diary*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

204.    Admit ***The Freedom Writers Diary*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

205.    Admit ***The Glass Castle*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

206.    Admit ***The Glass Castle*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

207.    Admit ***The God of Small Things*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

208.    Admit ***The God of Small Things*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

209.   Admit *The Handmaid's Tale* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

210.   Admit *The Handmaid's Tale* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

211.   Admit *The Handmaid's Tale*, *graphic novel* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

212.   Admit *The Handmaid's Tale*, *graphic novel* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

213.   Admit *The Hate U Give* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

214.   Admit *The Hate U Give* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

215.   Admit *The Haters* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

216.   Admit *The Haters* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

217.   Admit *The House of Spirits* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

218.   Admit *The House of Spirits* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

219.   Admit *The Infinite Moment of Us* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

220.   Admit *The Infinite Moment of Us* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

221.   Admit *The Kingdom of Little Wounds* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

222.   Admit *The Kingdom of Little Wounds* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

223.   Admit *The Kite Ru*nner depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

224.   Admit *The Kite Runner* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

225.   Admit *The Music of What Happens* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

226.   Admit *The Music of What Happens* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

227.   Admit *The Poet X* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

228.   Admit *The Poet X* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

229.    Admit *The Sun and Her Flowers* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

230.    Admit *The Sun and Her Flowers* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

231.    Admit *The Truth About Alice* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

232.    Admit *The Truth About Alice* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

233.    Admit *The Upside of Unrequited* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

234.    Admit *The Upside of Unrequited* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

235.    Admit *The Watchmen* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

236.    Admit *The Watchmen* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

237.    Admit *The Year of the Flood* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

238.    Admit *The Year of the Flood* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

239.   Admit *Thirteen Reasons Why* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

240.   Admit *Thirteen Reasons Why* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

241.   Admit *Tilt* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

242.   Admit *Tilt* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

243.   Admit *Tower of Dawn* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

244.   Admit *Tower of Dawn* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

245.   Admit *Triangles* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

246.   Admit *Triangles* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

247.   Admit *Tricks* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

248.   Admit *Tricks* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

249.  Admit *Two Boys Kissing* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

250.  Admit *Two Boys Kissing* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

251.  Admit *Unravel Me* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

252.  Admit *Unravel Me* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

253.  Admit *Vanishing Acts* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

254.  Admit *Vanishing Acts* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

255.  Admit *Water for Elephants* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

256.  Admit *Water for Elephants* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

257.  Admit *We are Not Yet Equal* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

258.  Admit *We are Not Yet Equal* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

259.    Admit *We are the Ants* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

260.    Admit *We are the Ants* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

261.    Admit *What Girls Are Made Of* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

262.    Admit *What Girls Are Made Of* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

263.    Admit *Where I End and You Begin* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

264.    Admit *Where I End and You Begin* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

265.    Admit *White Knight* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

266.    Admit *White Knight* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

267.    Admit *Wicked: The Life and Times of the Wicked Witch of the West* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

268.    Admit *Wicked: The Life and Times of the Wicked Witch of the West* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

269.    Admit *Without Merit* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

270.    Admit *Without Merit* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

271.    Admit *Yolk* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

272.    Admit *Yolk* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

273.    Admit *Zahra's Paradise* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

274.    Admit *Zahra's Paradise* does not depict or describe sexuabribril conduct, as defined by section 847.001(19), Florida Statutes.

Respectfully submitted,

/s *Samantha Duke*
J. DAVID MARSEY
Florida Bar No.:  0010212
E-mail:  dmarsey@rumberger.com
NICOLE SIEB SMITH
Florida Bar No.:  0017056
E-mail:  nsmith@rumberger.com

JEFFREY J. GROSHOLZ
Florida Bar No.:  1018568
E-mail:  jgrosholz@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
101 North Monroe Street, Suite 1050
Tallahassee, Florida 32301
Tel:  850.222.6550
Fax:  850.222.8783
and

SAMANTHA DUKE
Florida Bar No. 0091403
Email:  sduke@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
300 S. Orange Ave., Suite 300
Orlando, Florida 32801
Tel:  407.872.7300
Fax: 407.841.2133

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been furnished by e-mail to Shalini Goel Agarwal at shalini.agarwal@protectdemocracy.org, scott.welder@protectdemocracy.org; Kristy L. Parker at kristy.parker@protectdemocracy.org; John Thomas Langford at john.langford@protectdemocracy.org; Lynn B. Oberlander at oberlanderl@ballardspahr.com; Paul J. Safier at safierp@ballardspahr.com, relyear@ballardspahr.com, tranp@ballardspahr.com; Kirsten Elizabeth Fehlan at fehlank@ballardspahr.com; and Ori Lev at ori.lev@protectdemocracy.org (Counsel for Plaintiffs) this 6th day of September, 2024.

s/ *Samantha Duke*

J. DAVID MARSEY
Florida Bar No.:  0010212
E-mail:  dmarsey@rumberger.com
NICOLE SIEB SMITH
Florida Bar No.:  0017056
E-mail:  nsmith@rumberger.com
JEFFREY J. GROSHOLZ
Florida Bar No.:  1018568
E-mail:  jgrosholz@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
101 North Monroe Street, Suite 1050
Tallahassee, Florida 32301
Tel:  850.222.6550
Fax:  850.222.8783
and

SAMANTHA DUKE
Florida Bar No. 0091403
Email:  sduke@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
300 S. Orange Ave., Suite 300
Orlando, Florida 32801
Tel:  407.872.7300
Fax: 407.841.2133

Attorneys for Defendants

Exhibit 9

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

PEN AMERICAN CENTER, INC.,
SARAH BRANNEN, BENJAMIN
GLASS, on behalf of himself and his
minor child, GEORGE M.
JOHNSON, DAVID LEVITHAN,
KYLE LUKOFF, ANN
NOVAKOWSKI, on behalf of herself
and her minor child, PENGUIN
RANDOM HOUSE LLC, SEAN
PARKER, on behalf of himself and
his minor child, ASHLEY HOPE            CASE NO.:  3:23-CV-10385-TKW-ZCB
PÉREZ, and CHRISTOPHER
SCOTT SATTERWHITE, on behalf
of himself and his minor child,

     Plaintiffs,

vs.

ESCAMBIA COUNTY SCHOOL
BOARD,

     Defendant.

_____ /

## DEFENDANT'S FIRST REQUEST FOR ADMISSIONS

Pursuant to Federal Rule of Civil Procedure 36, **Defendant, Escambia County School Board**, serves its First Request for Admissions to **Plaintiff, Penguin Random House, LLC**, to admit or deny the following in writing within thirty (30) days from the date hereof.

1.    Admit ***10 Things I Can See From Here*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

2.    Admit ***10 Things I Can See From Here*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

3.    Admit ***A Lesson in Vengeance*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

4.    Admit ***A Lesson in Vengeance*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

5.    Admit ***After*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

6.    Admit ***After*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

7.    Admit ***Amost Perfect*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

8.    Admit ***Almost Perfect*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

9.    Admit ***Beloved*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

10.    Admit ***Beloved*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

11.    Admit ***Breathless*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

12.    Admit ***Breathless*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

13.    Admit ***City of Thieves*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

14.    Admit ***City of Thieves*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

15.    Admit ***Darius the Great Deserves Better*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

16.    Admit ***Darius the Great Deserves Better*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

17.    Admit ***Dead Until Dark*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

18.    Admit ***Dead Until Dark*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

19.    Admit ***Girl in Pieces*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

20.    Admit ***Girl in Pieces*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

21.     Admit ***Hear These Voices: Youth at the Edge of the Millennium***
depicts or describes sexual conduct, as defined by section 847.001(19), Florida
Statutes.

22.     Admit ***Hear These Voices: Youth at the Edge of the Millennium***
does not depict or describe sexual conduct, as defined by section 847.001(19),
Florida Statutes.

23.     Admit ***I am Not Your Perfect Mexican Daughter*** depicts or describes
sexual conduct, as defined by section 847.001(19), Florida Statutes.

24.     Admit ***I am Not Your Perfect Mexican Daughter*** does not depict or
describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

25.     Admit ***I'll Give You the Sun*** depicts or describes sexual conduct, as
defined by section 847.001(19), Florida Statutes.

26.     Admit ***I'll Give You the Sun*** does not depict or describe sexual
conduct, as defined by section 847.001(19), Florida Statutes.

27.     Admit ***Last Night at the Telegraph Club*** depicts or describes sexual
conduct, as defined by section 847.001(19), Florida Statutes.

28.     Admit ***Last Night at the Telegraph Club*** does not depict or describe
sexual conduct, as defined by section 847.001(19), Florida Statutes.

29.     Admit ***Lexicon*** depicts or describes sexual conduct, as defined by
section 847.001(19), Florida Statutes.

30.     Admit ***Lexicon*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

31.     Admit ***Man O'War*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

32.     Admit ***Man O'War*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

33.     Admit ***Oryx and Crake*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

34.     Admit ***Oryx and Crake*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

35.     Admit ***Slaughterhouse Five*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

36.     Admit ***Slaughterhouse Five*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

37.     Admit ***Sloppy Firsts*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

38.     Admit ***Sloppy Firsts*** does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

39.     Admit ***The Freedom Writers Diary*** depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

40.     Admit *The Freedom Writers Diary* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

41.     Admit *The God of Small Things* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

42.     Admit *The God of Small Things* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

43.     Admit *The Handmaid's Tale* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

44.     Admit *The Handmaid's Tale* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

45.     Admit *The Handmaid's Tale*, *graphic novel* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

46.     Admit *The Handmaid's Tale, graphic novel* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

47.     Admit *The House of Spirits* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

48.     Admit *The House of Spirits* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

49.     Admit *The Kite Runner* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

50.    Admit *The Kite Runner* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

51.    Admit *The Year of the Flood* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

52.    Admit *The Year of the Flood* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

53.    Admit *Thirteen Reasons Why* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

54.    Admit *Thirteen Reasons Why* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

55.    Admit *Two Boys Kissing* depicts or describes sexual conduct, as defined by section 847.001(19), Florida Statutes.

56.    Admit *Two Boys Kissing* does not depict or describe sexual conduct, as defined by section 847.001(19), Florida Statutes.

Respectfully submitted,

/s *Samantha Duke*
J. DAVID MARSEY
Florida Bar No.:  0010212
E-mail:  dmarsey@rumberger.com
NICOLE SIEB SMITH
Florida Bar No.:  0017056
E-mail:  nsmith@rumberger.com
JEFFREY J. GROSHOLZ
Florida Bar No.:  1018568

7

E-mail:  jgrosholz@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
101 North Monroe Street, Suite 1050
Tallahassee, Florida 32301
Tel:  850.222.6550
Fax:  850.222.8783
and

SAMANTHA DUKE
Florida Bar No. 0091403
Email:  sduke@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
300 S. Orange Ave., Suite 300
Orlando, Florida 32801
Tel:  407.872.7300
Fax: 407.841.2133

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been furnished by e-mail to Shalini Goel Agarwal at shalini.agarwal@protectdemocracy.org, scott.welder@protectdemocracy.org; Kristy L. Parker at kristy.parker@protectdemocracy.org; John Thomas Langford at john.langford@protectdemocracy.org; Lynn B. Oberlander at oberlanderl@ballardspahr.com; Paul J. Safier at safierp@ballardspahr.com, relyear@ballardspahr.com, tranp@ballardspahr.com; Kirsten Elizabeth Fehlan at fehlank@ballardspahr.com; and Ori Lev at ori.lev@protectdemocracy.org (Counsel for Plaintiffs) this 6th day of September, 2024.

s/ *Samantha Duke*

J. DAVID MARSEY
Florida Bar No.: 0010212
E-mail: dmarsey@rumberger.com
NICOLE SIEB SMITH
Florida Bar No.: 0017056
E-mail: nsmith@rumberger.com
JEFFREY J. GROSHOLZ
Florida Bar No.: 1018568
E-mail: jgrosholz@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
101 North Monroe Street, Suite 1050
Tallahassee, Florida 32301
Tel: 850.222.6550
Fax: 850.222.8783
and

SAMANTHA DUKE
Florida Bar No. 0091403
Email: sduke@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
300 S. Orange Ave., Suite 300
Orlando, Florida 32801
Tel: 407.872.7300
Fax: 407.841.2133

Attorneys for Defendants

Exhibit 10

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF FLORIDA
 2                     PENSACOLA DIVISION

 3              Case No. 3:23-CV-10385-TKS-ZCB

 4   PEN AMERICAN CENTER, INC.,
     SARAH BRANNEN, BENJAMIN GLASS,
 5   on behalf of himself and his
     minor child, GEORGE M. JOHNSON,
 6   DAVID LEVITHAN, KYLE LUKOFF,
     ANN NOVAKOWSKI, on behalf of
 7   herself and her minor child,
     PENGUIN RANDOM HOUSE LLC, SEAN
 8   PARKER, on behalf of himself
     and his minor child, ASHLEY
 9   HOPE PEREZ, and CHRISTOPHER
     SCOTT SATTERWHITE, on behalf of
10   himself and his minor child,

11        Plaintiffs,
     vs.
12
     ESCAMBIA COUNTY SCHOOL BOARD,
13
          Defendant.
14

15              DEPOSITION OF BRADLEY VINSON
     30(b)(6) Witness for Escambia County School Board
16              and in her Individual Capacity

17                      Volume 1

18          Taken on Behalf of the Plaintiffs

19   DATE TAKEN:     Thursday, August 22, 2024

20   TIME:          9:04 a.m. - 5:34 p.m. CDT

21   PLACE:         Anchor Court Reporting
                    229 South Baylen Street
22                  Pensacola, Florida 32502

23

24   Examination of the witness stenographically taken by:
          SUSAN D. WASILEWSKI, RPR, CRR, CMRS, CRC, FPR
25             ~ Realtime Systems Administrator ~
```

```
 1              APPEARANCES IN PENSACOLA, FLORIDA

 2

 3     Counsel for Plaintiffs:

 4        PROTECT DEMOCRACY

 5        BY:  ORI LEV, ESQUIRE

 6             ori.lev@protectdemocracy.org

 7        2020 Pennsylvania Avenue NW, Suite 163

 8        Washington, DC 20006-1811

 9        Telephone:  (850) 860-9344

10

11

12     Counsel for Defendant:

13        RUMBERGER KIRK & CALDWELL, P.A.

14        BY:  NICOLE SMITH, ESQUIRE

15             nsmith@rumberger.com

16        101 North Monroe Street, Suite 1050

17        Tallahassee, Florida 32801

18        Telephone:  (850) 222-6550

19

20

21             ALSO PRESENT IN PENSACOLA, FLORIDA

22        ELLINOR HEYWOOD, Protect Democracy

23        SUSAN WASILEWSKI, Court Reporter

24

25
```

```
 1                   APPEARANCES BY ZOOM

 2

 3      Counsel for Plaintiffs:

 4         BALLARD SPAHR LLP

 5         BY:  FACUNDO BOUZAT, ESQUIRE  (8/22/2024)

 6              bouzatf@ballardspahr.com

 7         1735 Market Street, 51st Floor

 8         Philadelphia, Pennsylvania 19103

 9         Telephone:  (215) 864-8500

10

11         BALLARD SPAHR LLP

12         BY:  LYNN OBERLANDER, ESQUIRE  (8/23/2024)

13              oberlanderl@ballardspahr.com

14         1675 Broadway, 19th Floor

15         New York, New York 10019-5820

16         Telephone:  (212) 223-0200

17

18         PROTECT DEMOCRACY

19         BY:  SHALINI GOEL ARGARWAL, ESQUIRE

20              shalini.agarwal@protectdemocracy.org

21         2020 Pennsylvania Avenue NW, Suite 163

22         Washington, DC 20006-1811

23         Telephone:  (850) 860-9344

24

25
```

```
 1                    APPEARANCES BY ZOOM

 2

 3      Counsel for Defendant:

 4          RUMBERGER KIRK & CALDWELL, P.A.

 5          BY:  JEFFREY J. GROSHOLZ, ESQUIRE

 6               jgrosholz@rumberger.com

 7          101 North Monroe Street, Suite 1050

 8          Tallahassee, Florida 32801

 9          Telephone:  (850) 222-6550

10

11          RUMBERGER KIRK & CALDWELL, P.A.

12          BY:  SAMANTHA DUKE, ESQUIRE

13               sduke@rumberger.com

14          300 South Orange Avenue, Suite 1400

15          Orlando, Florida 32801

16          Telephone:  (407) 872-7300

17

18

19                  ALSO PRESENT BY ZOOM

20          ELLEN D. ODOM, Escambia County School Board

21          CARLIE C. DUQUETTE, Rumberger Kirk

22

23

24

25
```

```
 1                    I  N  D  E  X

 2                      Volume 1

 3               Thursday, August 22, 2024

 4   WITNESS                                      PAGE

 5   Called by the Plaintiffs:

 6   BRADLEY VINSON

 7        Direct Examination by Mr. Lev...............   9

 8                  E  X  H  I  B  I  T  S

 9               (Attached to transcript)

10    BRADLEY VINSON DEPOSITION EXHIBITS           PAGE

11   Exhibit 1   Plaintiffs' Revised Notice of Rule      15
                 30(b)(6) Deposition if the Escambia
12               County School Board

13   Exhibit 2   Plaintiffs' Notice of Deposition of     16
                 Bradley Vinson
14
     Exhibit 3   Excel Spreadsheet - Restricted Books    21
15               Tab and Removed Books Tab

16   Exhibit 4   Declaration of Bradley Vinson           22

17   Exhibit 5   ECPS 22-23 Reconsiderations (website)   26
                 Current Challenges
18
     Exhibit 6   District Materials Review Committee     60
19               Packet
                 Title:  The Bluest Eye
20
     Exhibit 7   BoardDocs:  Agenda Item Details         66
21               Meeting of Feb 20, 2023
                 Title:  All Boys Aren't Blue
22
     Exhibit 8   Spreadsheet to Track Challenges         75
23               Bates Number E-ECSD_0039348

24   Exhibit 9   ECPS Library Collection                 79
                 Reconsideration Flowchart
25
```

```
 1                    E X H I B I T S

 2              (Attached to transcript)

 3     BRADLEY VINSON DEPOSITION EXHIBITS            PAGE

 4     Exhibit 10   Spreadsheet:  Website Destiny HB 1069   94
                    Storage Further Review
 5                  May 21, 2024

 6     Exhibit 11   HB1069 Training Meeting (2023-07-17      106
                    14:02 GMT-5) Transcript
 7                  E-ECSD 0066577 through 66594

 8     Exhibit 12   Presentation:  Textbooks, Library        107
                    Books, Restricted Books, Stored
 9                  Books, Banned Books
                    E-ECSD 0057845 through 57861
10
       Exhibit 13   Coffee Crew Members, Agenda, and         133
11                  Minutes (notes)
                    E-ECSD 0049201 and 49217
12
       Exhibit 14   E-mail - Subject:  HB 1069 Storage       153
13                  titles update
                    E-ECSD 0050012 and 13
14
       Exhibit 15   E-mail - Subject:  After by Amy Efaw     159
15                  E-ECSD 0059643

16     Exhibit 16   Spreadsheet:  Media Services title       167
                    reviews by media specialists for
17                  HB 1069

18     Exhibit 17   Spreadsheet:  ECSD001922 At Issue        174
                    Titles Formal Challenge District in
19                  Destiny 2024.xlsx

20     Exhibit 18   Policy 4.06                              188
                    Adopted 06/26/90
21                  Last Revised 12/16/14
                    ECSD001350 through 1367
22
       Exhibit 19   Declaration of Ori Lev                   189
23                  Policy 4.06
                    Adopted 06/26/90
24                  Last Revised 12/19/22

25
```

```
 1                    E X H I B I T S

 2              (Attached to transcript)

 3    BRADLEY VINSON DEPOSITION EXHIBITS            PAGE

 4    Exhibit 20  E-mail - Subject:  Book Review    222
                  Meeting Information - March 9
 5                ECSD_0026478

 6    Exhibit 21  Presentation:  Library Media and  223
                  Instructional Materials Training
 7
      Exhibit 22  E-mail - Subject:  Please advise  231
 8                E-ECSD 0066960

 9    Exhibit 23  Board Appeal Packet:  All Boys Aren't  237
                  Blue
10                February 20, 2023

11    Exhibit 24  State Defendants' Second Motion to  245
                  Dismiss and Incorporated Memorandum
12                of Law

13    Exhibit 25  E-mail - Subject:  Press Release -  261
                  Follow Up
14                E-ECSD 0042816 and 42817

15    Exhibit 26  ECPS News Release                 262
                  E-ECSD 0067219 and 67220
16
      Exhibit 27  E-mail - Subject:  Request for    266
17                District Review:  The Perks of Being
                  a Wallflower
18                E-ECSD 0020224 and 20225

19    Exhibit 28  E-mail - Subject:  New challenges  277
                  E-ECSD 0039346 and 39347
20
      Exhibit 29  E-mail - Subject:  New challenged  280
21                titles and updates to access to
                  challenged titles
22                E-ECSD 0052717 through 52719

23    Exhibit 30  E-mail - Subject:  Please review   284
                  E-ECSD 0025054 through 25055
24
      Exhibit 31  Florida Statute 847.001           285
25
```

```
 1                    E X H I B I T S

 2              (Attached to transcript)

 3    BRADLEY VINSON DEPOSITION EXHIBITS              PAGE

 4    Exhibit 32   Access to Titles During            287
                   Reconsideration Policy and Procedure
 5                 E-ECSD 0042819 through 42821

 6    Exhibit 33   E-mail - Subject:  Library Advisory  291
                   Committee
 7                 E-ECSD 0050343

 8    Exhibit 34   E-mail - Subject:  Book bans and    292
                   Florida laws
 9                 E-ECSD 0067517

10    Exhibit 35   PEN v Escambia Response to          302
                   Interrogatory 8 Spreadsheet
11
      Exhibit 36   Defendant's Supplemental Response to  308
12                 Plaintiff's First Interrogatories

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Bradley Vinson, Volume 1

1          THEREUPON, the following proceedings were

2     had and taken at 9:04 a.m. CDT:

3          THE COURT REPORTER:  Would you raise your

4          right hand?

5          Do you solemnly swear or affirm the

6          testimony you're about to give will be the truth,

7          the whole truth, and nothing but the truth?

8          THE WITNESS:  I do.

9          THE COURT REPORTER:  Thank you.

10         BRADLEY VINSON, 30(b)(6) Witness for the

11    Escambia County School Board, and in her Individual

12    Capacity, called as a witness by the Plaintiffs,

13    having been first duly sworn, testified as follows:

14                    DIRECT EXAMINATION

15    BY MR. LEV:

16         Q.   Good morning, Ms. Vinson.  My name is Ori

17    Lev.  I'm an attorney for the plaintiffs in this

18    case.  Can you please state and spell your name for

19    the record?

20         A.   My name is Bradley, and it's B-r-a-d-l-e-y,

21    Vinson, V-i-n-s-o-n.

22         Q.   And have you ever been deposed before?

23         A.   No, I have not.

24         Q.   I'm going to go over some basic

25    instructions.  I'm assuming your attorney has gone

Deposition of Bradley Vinson, Volume 1

```
 1   over those with you as well, but just so we're on
 2   the same page.  The first is to please wait until
 3   I'm done asking my questions before you start
 4   answering so we're not talking over each other, and
 5   I'll try to do the same.  That way the court
 6   reporter won't get mad at us.  We'll have a cleaner
 7   record.
 8          The second is to please give verbal answers
 9   only, so no head shakes or nods or "uh-huhs" or
10   "ung-ughs."  Do you understand that?
11      A.   Yes.
12      Q.   If you don't understand a question that I
13   ask, then please ask me for clarification.  If you
14   go ahead and answer, I'm going to assume that you
15   understood the question.  Does that make sense?
16      A.   Yes.
17      Q.   Okay.  We'll take regular breaks but if at
18   any point you need a break, just say so and once you
19   answer whatever question is pending, we'll be happy
20   to take a break when you need it.  Okay?
21      A.   Thank you.
22      Q.   Do you understand that you are under oath
23   and that you are required to testify truthfully in
24   the same way as if you were in the courtroom?
25      A.   Yes.
```

Deposition of Bradley Vinson, Volume 1

1     Q.    Okay.  Have you taken any drugs or alcohol

2  that might impair your ability to testify truthfully

3  today?

4     A.    No.

5     Q.    Is there any other reason that you might be

6  unable to testify truthfully today?

7     A.    No.

8     Q.    Okay.  Have you ever been convicted of a

9  crime?

10    A.    No.

11    Q.    Have you ever been a party in a civil

12  lawsuit?

13    A.    No.

14    Q.    Okay.  And have you ever testified in court

15  before?

16    A.    No.

17    Q.    Okay.  All right.  With that, I'm going to

18  jump into the -- oh, I'm sorry.  Can we get

19  the -- actually, before that, I see you have a stack

20  of documents that you brought with you.  Can you

21  tell me what those are, please?

22    A.    Yes.  So we have here the deposition notice,

23  my declaration with the exhibits, I have here some

24  relevant Florida statutes.

25    Q.    And which ones are those, please?

1      A.   I have 1006.28, and then I also have

2  847.001, for definitions, and 847.012.

3      Q.   Okay.  Thank you.

4      A.   And I also have the materials review SOP

5  that was created by Michelle White.

6      Q.   Does that have a Bates stamp number on the

7  bottom?  Could you read that, please?

8      A.   Yes, it's E-ECSD_0021674.

9      Q.   Go ahead.  I'm sorry.

10     A.   I also have the Coffee Crew agenda and

11  minutes.  The Coffee Crew was our meeting of high

12  school media specialists.

13     Q.   Could I trouble you to read the Bates number

14  on that one as well?

15     A.   E-ECSD_0026886.

16     Q.   Okay.  Thank you.

17     A.   And then there is also the Coffee Crew

18  Junior minutes and agenda, and that is our middle

19  school media specialists meeting.

20     Q.   And the Bates number on that?

21     A.   E-ECSD_0026903.

22     Q.   Okay.  Thank you.

23     A.   I have here versions of our policy over

24  time.  It did change in December of 2022, and then

25  again in relation to HB 1069 in the summer of 2023.

Deposition of Bradley Vinson, Volume 1

1      Q.   So how many different versions of the policy

2   do you have there?

3      A.   I believe I have two versions here, but let

4   me double-check what all we've got.  One is one that

5   was just marked by our lawyers with an identifying

6   little box to help keep track of which version was

7   which.

8      Q.   Okay.

9           MR. LEV:  And the document the witness has

10          handed me is not Bates stamped and indicates that

11          it is the present version of Policy 4.06 that is

12          materially identical to the version adopted in

13          June 2023 aside from some formatting.

14      Q.   Okay.  Thank you.

15      A.   Similar to that one, we also have a redlined

16   version showing the changes.  Actually, prior to

17   that December 2022 change, these were changes

18   related to HB 1467 that required the school district

19   to adopt library media materials policy.

20      Q.   And I'm just -- the record will reflect this

21   is a document that appears to have been filed in a

22   prior litigation, Case Number 5:23-cv-00381-VJD-PRL

23   and it is Document 80-3.

24           Do you know if that was filed in the Parnell

25   litigation?

Deposition of Bradley Vinson, Volume 1

1    A.    I do not.

2    Q.    Okay.

3    A.    Let's see.  That's versions of the policy,

4  and then that's the redlined edition, and then this

5  was the changes in the emergency rule adoption

6  related to HB 1069.

7    Q.    Okay.  That is the version adopted on

8  June 20th, 2023?

9    A.    Yes.

10    Q.    Okay.  Okay.

11    A.    Okay.

12    Q.    So you have three versions there:  The

13  version that existed before December 2022; the

14  version from December 2022 through the summer of

15  2023; and then the current version that was adopted

16  on June 20th, 2023?

17    A.    That's correct.  All right.  And then I also

18  have a packet of e-mails and documents that Michelle

19  White sent out related to book challenges and

20  library media material training.  There are stamps

21  on the bottom of these as well.  Would you like

22  those numbers?

23    Q.    Have those all been produced in this

24  litigation?

25        MS. SMITH:  Yes.  Do you want her to

Deposition of Bradley Vinson, Volume 1

```
1        identify the first and last page?
2            MR. LEV:  Are they sequential?
3            MS. SMITH:  They are.
4        Q.   Then yes, please.
5        A.   E-ECSD_0027086.
6        Q.   And the last page is?
7        A.   The same before, 0027180 -- oh, I'm sorry.
8    I missed a couple pages.  182 is the last page here.
9        Q.   All right.
10       A.   And then I also have a spreadsheet, which I
11   understand we were a little overdue in producing, I
12   think it fell off my radar, but these are the titles
13   at issue and the owning libraries and date of
14   acquisition and current status.
15       Q.   And that's the document that was produced
16   yesterday in response to Interrogatory Number 6,
17   correct?
18       A.   Uh-huh.
19       Q.   Okay.
20      (Vinson Exhibit 1 was marked for identification.)
21   BY MR. LEV:
22       Q.   I'm going to show you what has been marked
23   as Exhibit 1.  This is the 30(b)(6) deposition
24   notice.  I take it you've seen this document since
25   you brought a copy with you.
```

```
 1        A.    Yes.
 2        Q.    Okay.  And you are the school board's
 3   designee to testify as to all of the topics listed
 4   here other than Topic Number 1; is that correct?
 5        A.    That's correct.
 6             MS. SMITH:  Subject to our objections that
 7        we filed in this lawsuit.
 8   BY MR. LEV:
 9        Q.    If you'd just put that aside for one moment,
10   we're going to come back to it.
11      (Vinson Exhibit 2 was marked for identification.)
12   BY MR. LEV:
13        Q.    I'm showing you what's been marked Exhibit
14   Number 2.  This is a notice of deposition of you in
15   your individual capacity.  Have you seen this notice
16   before?
17        A.    In my individual capacity?
18        Q.    Yes.
19        A.    I don't know if I remember seeing this.
20        Q.    Okay.  It was served on your counsel for the
21   school district and it is intended to take -- it
22   allows us to ask questions of you not as a
23   representative of the school board but as an
24   individual.
25        A.    Okay.
```

Deposition of Bradley Vinson, Volume 1

```
 1      Q.   Okay?  The questions I ask today are all in
 2   your capacity as a representative of the school
 3   board unless I specify otherwise.  Do you understand
 4   that?
 5      A.   Yes.
 6      Q.   Okay.  So if I say you, I'm really talking
 7   about the school board unless I'm telling you that
 8   I'm talking about you, Bradley Vinson, in your
 9   individual capacity.  Does that make sense?
10      A.   That makes sense.
11      Q.   Can you tell me what you did to prepare for
12   today's deposition?
13      A.   I reviewed our policy and statute and our
14   librarians' training that are relevant to the
15   HB 1069 reviews, and I met with our lawyers.
16      Q.   Okay.  The policy is Policy 4.06?
17      A.   Yes.
18      Q.   Any other policies that you reviewed?
19      A.   No.
20      Q.   Okay.  You said the statute.  What statute
21   were you referring to?
22      A.   The statutes -- the early learning code that
23   were changed with the passage of HB 1069 and
24   HB 1467.
25      Q.   Okay.  Any other statute?
```

Deposition of Bradley Vinson, Volume 1

```
1        A.    Not in depth, no.
2        Q.    Okay.  You said you reviewed librarian
3   trainings?
4        A.    Yes.
5        Q.    What trainings are you referring to?
6        A.    When we met with our media specialists at
7   the beginning of the last school year, in order to
8   discuss how we would review books for HB 1069
9   compliance.
10       Q.    So this is training that was provided in the
11  summer and fall of 2023?
12       A.    Yes.
13       Q.    And it related to the 1069 review?
14       A.    Yes.
15       Q.    Okay.  Any other trainings that you reviewed
16  in preparation?
17       A.    I reviewed Michelle White's SOP that is
18  here, and I have recently viewed the State's library
19  media training from the Florida Department of
20  Education.
21       Q.    Okay.  And did you review the e-mails from
22  Michelle White that you brought with you today?
23       A.    The e-mails -- it's really just the one
24  e-mail and then the documents that are attached.  I
25  did briefly review those.
```

Deposition of Bradley Vinson, Volume 1

```
 1        Q.    I'm sorry.  Can I see that stack of
 2   documents that you brought?
 3        A.    The whole stack?
 4        Q.    Well, the Michelle White e-mail stack.
 5        A.    Sure.
 6        Q.    Thank you.
 7        A.    You're welcome.
 8        Q.    Okay.  Did you speak with anyone other than
 9   your lawyers to prepare for the deposition?
10        A.    Ellen Odom, our counsel, school district
11   counsel.
12        Q.    Okay.  Anyone else?
13        A.    To prepare for the deposition?  No.
14        Q.    Okay.
15        A.    Well, actually, I did discuss it briefly
16   with Linda Sweeting.  She is my media specialist
17   TSA.
18        Q.    What is a TSA?
19        A.    Teacher on special assignment.
20        Q.    And what did you discuss with Ms. Sweeting?
21        A.    Just the fact that I would be here and that
22   I was reviewing our HB 1069 training and taking time
23   to produce the spreadsheet.  We discussed that a
24   little bit just to be sure that -- we did find a few
25   things that we need to follow up on as we were
```

Deposition of Bradley Vinson, Volume 1

1    producing that report, so...

2       Q.   What things did you find that you needed to

3    follow up on?

4       A.   So there are certain things that we do at

5    the district level in order to properly denote the

6    status of these books, and that is we assign this

7    category at the district level for formal challenge,

8    and then we also make sure that the circ type will

9    allow for student circulation.  So the HB 1069 circ

10   type "HB 1069 Storage" does not allow for student

11   circulation, but the "Challenge" circ type does, so

12   those are fine, but the sublocations are the

13   responsibility of the individual media specialists,

14   and when I pulled this report I realized that some

15   of them still need to update that sublocation, but

16   that does not affect circulation of the book itself.

17      Q.   Okay.  Did you identify any other things

18   that needed to be done when you spoke with -- I'm

19   sorry, I forgot her name already.

20      A.   Linda Sweeting.

21      Q.   Ms. Sweeting, yes.

22      A.   No.

23      Q.   Did you discuss the substantive responses

24   for -- let me start again.

25           Other than telling Ms. Sweeting what you

Deposition of Bradley Vinson, Volume 1

```
 1    were doing, did you have substantive discussions

 2    with her about the topics of the deposition to

 3    inform yourself?

 4        A.   No, no.

 5        Q.   Okay.  Anybody else you talked to about --

 6    in preparing for the deposition today?

 7        A.   No.

 8        Q.   Okay.  You have used the phrase "titles at

 9    issue," I believe, in referring to the document

10    responsive to the Interrogatory Number 6.  If I talk

11    about books at issue or titles at issue, will you

12    understand I'm talking about the list of books that

13    Plaintiffs have identified as our issue in this

14    lawsuit?

15        A.   Yes.

16        Q.   Okay.

17      (Vinson Exhibit 3 was marked for identification.)

18    BY MR. LEV:

19        Q.   I'm going to show you what's been marked as

20    Exhibit 3.  This is in fact that list.  Does this

21    look familiar to you?

22        A.   Yes.

23        Q.   So when we talk about books at issue or

24    titles at issue, we're talking about this list of

25    books?
```

Deposition of Bradley Vinson, Volume 1

```
 1        A.    Yes.
 2        Q.    Thank you.  I'm going to show you Exhibit 4,
 3   which is the declaration that you filed in this
 4   lawsuit.
 5      (Vinson Exhibit 4 was marked for identification.)
 6            MS. HEYWOOD:  I'm sorry.  It's not stapled.
 7            MS. SMITH:  The Holiday Inn Express didn't
 8        provide that service?
 9            MS. HEYWOOD:  Here's your copy.
10            I'm sorry I don't have a copy for you.
11            MS. SMITH:  I can use mine.
12   BY MR. LEV:
13        Q.    So Paragraphs 3 to 15 of this declaration
14   set forth your work and educational history.
15        A.    Yes.
16        Q.    Is that an accurate description of your work
17   and educational history?
18        A.    Yes.
19        Q.    Okay.  That's great.  That saves us a little
20   bit of time.
21            MS. SMITH:  I figured that would help.
22        Q.    When you -- you received a master's degree
23   in library sciences, correct?
24        A.    Yes.
25        Q.    Can you tell me what you learned as part of
```

1    that master's degree at a high level?

2         MS. SMITH:  Objection; form.

3    A.    It's been a minute.

4         MS. SMITH:  Go ahead.

5    A.    Okay.  I learned about the history of

6    libraries in general, I learned about the specific

7    goals of a librarian, including collection

8    development and catalog management and readers'

9    advisory.  I did take at least one course in

10   children's literature, and -- I don't know, I'd have

11   to keep digging in my memory to think of exactly

12   what we covered.

13   Q.    That's fair.  You mentioned collection

14   development.  Can you tell me what you learned about

15   how a librarian goes around putting together a

16   library collection?

17   A.    It's an ongoing process.  It's something

18   that is developed over time and you have to know

19   your audience in order to provide what they need.

20   In a school setting, for example, that would be both

21   educational materials and reading for pleasure.

22        You have to regularly survey the

23   stakeholders in order to know what their needs are,

24   so you would talk with teachers and administrators

25   and students and parents and get feedback on the

Deposition of Bradley Vinson, Volume 1

1    kinds of things that should be a part of the library

2    collection.

3        Q.   Are there --

4        A.   And you have to manage your budget.

5        Q.   Are there particular goals for -- I think

6    you mentioned goals as one of the things you

7    learned.  What are the goals of a library?

8        A.   Well, each library may have individual goals

9    and there are all different kind of libraries.  Our

10   goals are laid forth in our policy.  If you like, I

11   can refer to that.

12       Q.   We will get to that, so that's helpful that

13   that is a reflection of the school district's goals.

14   Was part of your training about having library

15   collections that are diverse and inclusive?

16       A.   Yes, diversity and inclusiveness are an

17   important part of a library collection.  It should

18   represent the world in order to provide an

19   age-appropriate window to the world for readers.

20       Q.   And you just mentioned the word "windows."

21   Are you familiar with the concept of windows,

22   mirrors and sliding doors?

23       A.   I think I became familiar with it through

24   Michelle White.  She shared that in some of her

25   training presentations.

Deposition of Bradley Vinson, Volume 1

1      Q.    Okay.  It was not part of your educational

2  experience?

3      A.    I don't remember it specifically from my

4  library school days.

5      Q.    And what do you understand that concept to

6  be?

7      A.    That books provide ways for readers to

8  engage with ideas outside of their own experience,

9  and they may just be looking at those ideas or they

10  may begin to engage with those ideas themselves, or

11  they may recognize something in themselves that they

12  had not previously recognized.

13      Q.    And is that a concept that the Escambia

14  County School District seeks to implement in its

15  school libraries, the windows, mirrors, and sliding

16  glass doors?

17      A.    I would not say it's spelled out in our

18  policy exactly.

19      Q.    That's different than what I asked, though.

20      A.    Could you rephrase your question?

21      Q.    Sure.  Do you think that your policy

22  reflects similar concepts to the one you just

23  described as windows, mirrors and sliding glass

24  doors in terms of benefits to students?

25      A.    I think that it may be one of the

Deposition of Bradley Vinson, Volume 1

```
1    considerations that our media specialists use in
2    practice.
3       (Vinson Exhibit 5 was marked for identification.)
4    BY MR. LEV:
5       Q.   You've been handed Exhibit 5.  Do you
6    recognize this document?
7       A.   Yes.
8       Q.   And can you tell us what it is?
9       A.   This is our Reconsiderations Spreadsheet,
10   which is publicly available on our website, and it
11   is how we track our challenges and where we are in
12   the process with each of those challenges, and make
13   it transparent for the public.
14      Q.   Great.  And the document is in three parts.
15   The first part is the tab from the spreadsheet that
16   is current challenges, and the second two parts are
17   the resolved challenges tab, but because of the
18   number of columns built in there, it's been printed
19   in three parts.
20      A.   Okay.
21      Q.   Do you see how that works?
22      A.   Yes, I do.
23      Q.   Okay.  Great.  And is this still the
24   spreadsheet that the school district uses to track
25   challenges even though it's called 2022-2023
```

1   reconsiderations?

2       A.   Yes, it is still our spreadsheet for current

3   challenges.

4       Q.   Okay.  And can you tell me what it means

5   that a book appears on one of the tabs of this

6   spreadsheet?

7           MS. SMITH:  Objection; form.  Just which

8       spreadsheet?  Which tab are you referring to?

9   BY MR. LEV:

10      Q.   Well, it's one spreadsheet.  I'm talking

11  generally.  If a book appears on any tab of the

12  spreadsheet, what does that represent?

13          MS. SMITH:  You can answer if you

14      understand.

15      A.   If I understand correctly, so if it appears

16  on the current challenges tab of the spreadsheet, it

17  is a book that we have received a challenge for and

18  it is one that has not yet been resolved through a

19  decision of the District Materials Review Committee

20  or upon appeal to the board where relevant, and then

21  the current -- the resolved challenges tab, these

22  are the books that had received a challenge but have

23  been through the review process and have a decision

24  made related to their status in our collection.

25      Q.   And that decision would either be a decision

1    of the board or a decision of the District Materials

2    Review Committee if it's not appealed to the board?

3           MS. SMITH:  Objection; form.  Go ahead.

4    A.    Will you repeat your question, please?

5    Q.    Sure.  For a challenge to be considered

6    resolved, it means either that the board has made a

7    decision on the challenge or that a District

8    Materials Review Committee has made a decision on

9    the challenge and that decision was not appealed to

10   the board; is that correct?

11   A.    That's correct.

12   Q.    Okay.  When is a book moved from one tab to

13   the other?

14   A.    So I would move a book from one tab to the

15   other once the time period has passed for an appeal

16   or when a decision has been made by the board.

17   Q.    Okay.

18   A.    Does that make sense?

19   Q.    It does.  And you said you individually,

20   Bradley Vinson, do that?

21   A.    Yes.

22   Q.    Has that been true since you've been in your

23   current role as Coordinator of Media Services?

24   A.    Yes.

25   Q.    And prior to that was it Michelle White who

Deposition of Bradley Vinson, Volume 1

1    would do that?

2        A.    Michelle White did not actually have a

3    resolved challenged tab.  She kept everything in a

4    single spreadsheet and I created the resolved

5    challenges tab just to be sure that as we were

6    working through our HB 1069 review, we recognized

7    that these had already had an age-level decision

8    made either through the actions of the District

9    Materials Review Committee or the board.

10       Q.    And so when did you create that resolved

11   challenges tab?

12       A.    I cannot remember off the top of my head.  I

13   would have to look back at my version history.

14       Q.    Is that something you would be able to do if

15   we booted up your laptop?

16       A.    I think so.

17       Q.    Let's save that for when we boot up your

18   laptop.

19             It would have been -- well, would it -- you

20   referenced this was in the context of 1069.

21       A.    Uh-huh.  So fall of 2023 would be a rough

22   estimate.

23       Q.    Okay.  And at that point in time, you moved

24   books that had already been resolved to that

25   resolved challenges tab?

1      A.    Correct.

2      Q.    Okay.  And both of these tabs have the same

3  column headings, correct?

4      A.    They should.

5      Q.    Okay.  And do the column headings mean the

6  same things in each tab?

7      A.    I believe so, yes.

8      Q.    Okay.  That was my assumption.  I just

9  wanted to confirm.  I just wanted to go through each

10  of the columns to make sure we understand what they

11  represent.

12      A.    Okay.

13      Q.    The column that says "Level (ES, MS, HS),"

14  what does that represent?

15      A.    ES is elementary school, MS is middle

16  school, and HS is high school.

17      Q.    And what does it mean if something has one

18  of those indicators for the book?

19      A.    It means that it is present in a collection

20  at that level.

21      Q.    Okay.  Present prior to the challenge?

22      A.    Yes.

23      Q.    Okay.  So is this a reflection of what the

24  appropriate age level of the book is, or just the

25  schools in which the book -- school level at which

1    the book is present at the time of the challenge?

2         MS. SMITH:  Objection; form.  Go ahead.

3    A.   It is school level where the book was

4    present at the time of the challenge.

5    Q.   Okay.  And "Decision," which is only filled

6    in on the completed resolved challenges tab, can you

7    tell me what that column includes?

8    A.   So the decision reflects either the district

9    committee decision, if there was no appeal to the

10   board, or it reflects the board's decision upon

11   appeal.

12   Q.   Okay.  And I see various entries here.

13   There is "Restricted."

14   A.   Uh-huh.

15   Q.   What does restricted mean?

16   A.   In this case it tells you below that the

17   title may not be used as a novel study.

18   Q.   So you were just looking at the first entry

19   for "Perks of Being a Wallflower," but restricted

20   appears throughout.  What does it mean as a broader

21   category?  When is something labelled restricted on

22   this tab?

23   A.   Restricted would mean that certain

24   limitations are placed on the usage of the book.  In

25   some cases it may be that it can only be accessed by

1    certain grade levels or it would only be accessed

2    for certain uses.

3        Q.    Okay.  And what does removed mean?

4        A.    Removed means that it would no longer be

5    present in our libraries.

6        Q.    In any school library?

7        A.    In any Escambia County school library.

8        Q.    And retained?

9        A.    Retained means that it would be kept in any

10    level that our policy determines is appropriate.

11        Q.    Does it mean -- would that be the same as

12    any level at which the book had been present at the

13    time the challenge was filed?

14        A.    Could you repeat the question?

15        Q.    Sure.  You said it would be retained at any

16    level at which the policy would deem it appropriate,

17    and I'm asking if that's the same thing as the

18    levels at which the book was present at the time the

19    challenge was filed?

20        A.    I could imagine a case where a book had to

21    be removed from a collection where it was present at

22    the time that a challenge was filed but needed to be

23    removed to be in compliance with our policy, as is

24    the case with "All American Boys."

25        Q.    So that's a book that had been in elementary

1    schools but shouldn't have been because it was a YA

2    title?

3        A.   In a single elementary school but should not

4    have been, correct.

5        Q.   But because it's being retained as -- in

6    middle schools for YA opt-in and in high school

7    libraries, that would be considered retained?

8        A.   Yes, but it's tricky.

9        Q.   Can you think of any other example where the

10   level at which the book would be retained is

11   determined by your policy as opposed to the outcome

12   of the challenge?  I'm trying to understand that

13   distinction.

14       A.   We don't have any other resolved challenges

15   where this applies, I don't believe.

16       Q.   Okay.  So otherwise, the book is in all the

17   levels that it had been in before with the exception

18   of "All American Boys"?

19       A.   If it was retained.

20       Q.   Yes.  Thank you.

21       A.   Yes.

22       Q.   Okay.  The full heading which is not

23   appearing on this printout of the "Decision" column

24   says:  Decision, Restricted or Removed Titles also

25   removed from AR Quizzes.

1              What does that mean, restricted or removed

2       titles also removed from AR quizzes?

3          A.   So an AR quiz is a quiz that a student can

4       take to show that they read the book with a series

5       of comprehension questions, and they can earn points

6       for reading incentives in schools that implement a

7       program for that.

8          Q.   And so if a book has been restricted, it's

9       removed from all AR quizzes, including those grade

10      levels at which it has been -- the book physically

11      has been retained?

12         A.   I'm sorry.  Could you repeat the question?

13         Q.   Sure.  If you have a book that is restricted

14      to certain grade levels, is it available for AR

15      quizzes for those grade levels, or it's been removed

16      from all AR quizzes?

17         A.   So our practice has actually been to allow

18      access to a quiz from a different audience level

19      book with parental permission, but this is a fluid

20      practice, and AR is not something that is a part of

21      our policy, so this is something that is just in

22      practice, but, as an example, we recently had a

23      fifth grade student wish to take an AR quiz on a

24      young adult book, and we do not have young adult

25      books in our elementary collections, but we had the

Deposition of Bradley Vinson, Volume 1

```
 1   media specialist confer with the parent and

 2   temporarily allow access to that quiz for that

 3   student and then remove the access again for general

 4   use.

 5       Q.   Okay.  And if I have a book -- do AR quizzes

 6   apply in high school, too?  Do high school students

 7   take them?

 8       A.   Generally, no.  We have AR in our elementary

 9   schools and a couple of our middle schools, but I

10   don't know of any high schools that are utilizing AR

11   at this time.

12       Q.   And so if you have a book, for example, like

13   "Drama," that's been restricted to middle school and

14   high school circulation, would "Drama" be available

15   for an AR quiz in middle school even though it's

16   restricted?

17       A.   With parental permission, yes, it could be

18   arranged.

19       Q.   I see.  So it is removed from the general AR

20   quiz population even though it's available to that

21   student age population, but a parent could authorize

22   it, correct?

23       A.   Could you repeat that?

24            MS. SMITH:  Form.

25       Q.   Sure.  So "Drama" was restricted to middle
```

1  schools and high schools, correct?

2     A.   Correct.

3     Q.   But "Drama" would not be generally available

4  to middle school students for an AR quiz without

5  parental permission, correct?

6     A.   I would need to log into the program to be

7  sure about that one.

8     Q.   Okay.  I guess I'm -- okay.  And that would

9  be true -- I would have the same question for the

10 other books that were restricted to middle school

11 and high school because the heading of this column

12 said that restricted books were removed from AR

13 quizzes.

14        You don't know how that's handled for books

15 that were restricted to middle school and high

16 school?

17    A.   We worked with the vendor, the company that

18 provides AR, that's Renaissance.  A representative

19 from the company helped us in removing the quizzes

20 for young adult books, but I would need to go on a

21 case-by-case basis to be sure that a book that is

22 not a young adult book had its access removed.

23    Q.   Okay.

24    A.   And our media specialists, as I mentioned in

25 our case with the fifth grade student, do have the

Deposition of Bradley Vinson, Volume 1

1    ability to turn on that access for that book, so I

2    might even have to go at a school level on a

3    case-by-case basis to double-check those.

4        Q.   Okay.  So let's keep looking at the tabs --

5    I mean the columns on the spreadsheet.  The column

6    that is labeled "Restricted Access Yes/No During

7    Review Process," what does that reflect?

8        A.   At this time -- is your question about the

9    current?

10       Q.   Let's start with the current.  Thank you for

11   that clarification.  I appreciate it.

12       A.   Sure.  The current access would be

13   restricted if it is a book that we have determined

14   contains sexual conduct as defined through HB 1069.

15       Q.   And as of what date would that be true, that

16   the restrictions reflected on the spreadsheet mean

17   that a book has been restricted because it contains

18   sexual conduct under 1069?

19           MS. SMITH:  Objection; form.

20       Q.   Actually, let me withdraw that question.

21           You said that currently, if there is a Y in

22   this column, a book is restricted because it has

23   been determined that it contains sexual conduct

24   under HB 1069?

25       A.   At least one media specialist has determined

1    that it may contain sexual conduct under HB 1069.

2        Q.    Okay.  May contain?

3        A.    Correct.

4        Q.    Okay.  At what point did this column begin

5    to reflect that as opposed -- sorry.  Let me start

6    again.

7            What did this column used to mean?

8        A.    So before HB 1069 -- and to clarify, HB 1069

9    required us to remove access to any book that was

10   challenged on the basis of containing sexual conduct

11   within five days of receiving that challenge.  Prior

12   to that we had a section at each library where one

13   of these titles would appear, that was a restricted

14   section, and if something was restricted, then

15   permission could be provided to a student from the

16   parent on a title-specific basis or on a broader

17   restricted access permission form.

18       Q.    And at that time, the way you tracked

19   whether a particular book was or was not restricted

20   because of the challenge was in this column; is that

21   right?

22       A.    At that time, yes.

23       Q.    So a Y in this column before HB 1069 meant

24   the book was restricted because of the challenge,

25   correct?

1    A.    Could you repeat the question?

2    Q.    I'm trying to understand what it meant to

3  have a Y or an N in this column before 1069.

4    A.    If it had a Y, it meant that the access was

5  restricted and it was permission only before 1069.

6    Q.    And the access was restricted because of the

7  challenge, correct?

8    A.    By the time that I came into this position,

9  not everything was restricted, so I could not speak

10  to exactly what steps were taken to restrict access

11  to those books prior to HB 1069.

12    Q.    Well, let's -- you've told me that today,

13  this column, if it has a yes, that means the book is

14  restricted because somebody has determined that it

15  may contain sexual conduct under 1069, correct?

16    A.    Correct.

17    Q.    That has not always been the meaning of this

18  column, correct?

19    A.    Correct.

20    Q.    What was the meaning of this column prior to

21  it meaning that a book may contain sexual conduct

22  under 1069?

23    A.    Access was restricted through -- Michelle

24  White would have restricted access to some of these

25  but I would need to look at prior versions to speak

1    to the reason why anything was restricted.

2        Q.   I'm not asking about any specific book.  I'm

3    trying to understand the spreadsheet, which is one

4    of the topics you are designated to testify to.

5        A.   Yes.

6        Q.   My understanding had been that a Y in the

7    spreadsheet before 1069 meant that through whatever

8    process that we'll talk about later, the district

9    decided that that book, which was challenged, was

10   going to have restricted access until the challenge

11   was decided; is that correct, is that what the

12   spreadsheet meant then?

13           MS. SMITH:  Form.

14       A.   Could you repeat the question?

15       Q.   Yeah.  Before 1069, the district had a

16   policy that varied over time but that certain books

17   were restricted when they were challenged until the

18   challenge was resolved; is that correct?

19           MS. SMITH:  Form.

20       A.   It may be that certain books were restricted

21   for a period of time, but we would receive e-mails

22   from Michelle White indicating what should be

23   restricted and what should not be restricted, and at

24   times that changed prior to HB 1069.

25       Q.   Prior to HB 1069, I'm asking you as a

1    representative of the school board, one of the

2    topics you're supposed to be testifying about is

3    both restricted access process and the spreadsheet,

4    and I'm trying to understand during that time before

5    1069 if the district had made a decision to restrict

6    the book because it was challenged, would that be

7    reflected on the spreadsheet with a Y?

8        A.   If the district made a decision to restrict

9    a book, would that be reflected in this column with

10   a Y?

11       Q.   Correct.

12       A.   Yes.

13       Q.   Okay.  That's what a Y meant before 1069,

14   was that the district was restricting this book

15   based on the challenge until the challenge was

16   resolved or the policy was changed, correct?

17       A.   In an effort to be in compliance with

18   Florida law, yes.

19       Q.   Okay.  What Florida law were you trying to

20   be in compliance with at that time?

21       A.   I believe HB 1467 has -- may I refer to it?

22       Q.   Please.

23       A.   Do I have that one printed out?  It talks

24   about age appropriateness.

25            MS. SMITH:  I think all your laws are in

1        this clip here.

2        A.    This is the current law, 1006.40(3)(c).

3    That's what I may not have printed out, but I

4    believe that is the one that indicates that it must

5    be age appropriate and for an audience with the

6    ability to comprehend.

7        Q.    And so is it your testimony that whenever a

8    book was restricted after it was challenged, that

9    was done to comply with Florida law that required

10   age appropriateness?

11       A.    I -- Michelle White, in consultation with

12   Tim Smith, would have been making decisions in order

13   to comply with Florida law.

14       Q.    And you're -- as a representative of the

15   school board, those decisions were made to comply

16   with HB 1467?

17       A.    That would be the first law that I believe

18   that -- that required that.

19       Q.    Were there other laws that required that

20   before HB 1069?

21            MS. SMITH:   Form.

22       A.    1069 or 1467?

23       Q.    Were there other laws that required that

24   these books be restricted pending review prior to

25   the passage of HB 1069?

1       A.   I may need a copy of 1467, I'm sorry, just

2   to be sure that I'm referring to something that was

3   not a part of 1069.

4       MS. SMITH:  I think this is all your laws

5     that you have.

6       THE WITNESS:  That's all I have printed out

7     right now.

8       Q.   We can get you a copy of 1467.  Let's come

9   back -- I'll come back to 1467.

10      A.   Okay.

11      Q.   I'm still stuck on this "Restricted Access

12  Y/No During Review Process," because my

13  understanding until 10 minutes ago was that a Y in

14  this column meant that the book was restricted

15  because of a book challenge, and that the Y meant it

16  was restricted while that challenge was pending.  I

17  just want to make sure I understand your testimony

18  so far.

19      When the spreadsheet started and this column

20  was first introduced -- do you know when this column

21  was introduced?

22      A.   I believe it would have been during the fall

23  of 2022, but I would need to refer to my versions to

24  be sure.

25      Q.   Okay.  That's your laptop?

Deposition of Bradley Vinson, Volume 1

```
 1        A.    Yes.
 2        Q.    Okay.  Why don't we go ahead and take a
 3   break and boot up your laptop.
 4             MS. SMITH:  Do you want to go off the record
 5        for that?
 6             MR. LEV:  Yeah.
 7           (Recess from 9:50 a.m. until 10:01 a.m.)
 8   BY MR. LEV:
 9        Q.    Ms. Vinson, you, during the break, pulled
10   out your laptop and logged on, right?
11        A.    That's correct.
12        Q.    What document are you looking at now?
13        A.    I have the Reconsiderations Spreadsheet up.
14        Q.    This is the same version that is publically
15   available but you're accessing it as the owner of
16   the document; is that correct?
17        A.    That's correct.
18        Q.    There is nothing on that spreadsheet that's
19   visible that's different than what I would see if I
20   logged in?
21        A.    I have the ability to look at the edit
22   history, but what is there is what is available to
23   the public to see.
24        Q.    Great.  Okay.  And I ask that while you have
25   your laptop open, you not access any other materials
```

1    unless we discuss that.  Okay?

2        A.   Okay.

3        Q.   So can you tell me when the Restricted

4    Access Y/No -- sorry -- when the Restricted Access

5    Y/N During Review Process column was added to this

6    spreadsheet?

7        A.   Let's see.  I'm looking at the edit history

8    of this column and I'm going back to the initial

9    creation of text in this cell and, actually, as I'm

10   going back, I will note that it has been something

11   that has changed over time.  It has been fluid as

12   the district developed their practice.

13       Q.   What do you mean it changed over time?  What

14   changed over time?

15       A.   So I'm almost back to the first one.  All

16   right.  No more edit history.  So October 25th,

17   2022, Michelle White indicated just the words

18   "Restricted Access."

19       Q.   As the column heading?

20       A.   As the column heading.

21       Q.   Okay.

22       A.   But October 27th, 2022, it was updated to

23   say:  Restricted access yes/no TBD, remain in

24   restricted access until a decision has been made.

25       Q.   Okay.  And then can you read me the

1    subsequent histories?

2        A.    October 31st, 2022:  Restricted access

3    yes/no TBD, remain in restricted access until a

4    decision has been made, D-decision.

5            I don't know that I ever saw a D in that

6    column but it looks like at one point she intended

7    to put one.

8        Q.    And is your understanding during this time

9    period that if it said TBD, that meant a decision

10   hadn't been made but the book would be restricted

11   pending that decision on a restriction?

12       A.    The book would not be restricted until there

13   was a Y in that column.  TBD meant that it was to be

14   determined.

15       Q.    Can you read that heading again from

16   October 27, 2022?

17       A.    Restricted access, yes/no -- or I'm sorry,

18   Y/N, TBD, and then a hyphen, remain in restricted

19   access until a decision has been made.

20       Q.    So I would read that if it says TBD, the

21   book will remain in restricted access until a

22   decision has been made about whether or not it

23   should be restricted.  Are you telling me that I'm

24   incorrect?

25           MS. SMITH:  Objection; form.

1      Q.   You can answer.

2      A.   I actually could not say.  It was fluid at

3  the time.  I know that there were -- there was a

4  press release, I believe, around this time, or maybe

5  right before, where they said that all books would

6  be restricted, but then they walked that back.  It

7  could be related to that.  It was all very fluid

8  while they were still receiving these challenges and

9  developing what the practice and then the policy

10  would be.

11      Q.   So as you sit here today, you're unable to

12  tell me what a TBD in that column at that time

13  period would have meant in terms of whether or not a

14  book that said TBD was or was not restricted?

15      MS. SMITH:  Objection; misstates testimony.

16  You can answer.

17      A.   My interpretation is that if it is in

18  restricted access, it would remain in restricted

19  access until a decision had been made.

20      Q.   Well, my question is if I look at a

21  spreadsheet from October 27, 2022, and it says TBD

22  for a book, does that mean that book is restricted

23  or is unrestricted?

24      A.   My interpretation of it would be TBD meant

25  that it was not yet restricted.

Deposition of Bradley Vinson, Volume 1

1    Q.    Okay.

2    A.    But none of them are TBD now.

3    Q.    Now, in 2024?

4    A.    Correct.

5    Q.    I'm sorry.  You were going through the --

6    can you continue the edit history of that column for

7    me, please?

8    A.    Yes.  Do you have October 31st?

9    Q.    I think so.

10   A.    Okay.  And then it was not edited again

11   until April 14th, and it looks like it just went

12   back and removed that D-decision, maybe because she

13   was recording that in another column.  That just

14   says --

15   Q.    April 14th, 2023?

16   A.    Correct.  And it says:  Restricted access,

17   Y/N, TBD, remain in restricted access until a

18   decision has been made.

19   Q.    Okay.

20   A.    And then I actually -- then later that day

21   she edited it again to say:  Restricted access, Y/N

22   during review process, TBD-remain in restricted

23   access until a decision has been made.

24   Q.    Okay.

25   A.    And then again later that same day:

Deposition of Bradley Vinson, Volume 1

1    Restricted access, Y/N during review process, TBD,

2    remain in restricted access until a decision has

3    been made.

4            I'm trying to see what the change was.

5        Q.    That's okay.  You can keep going to the next

6    date.

7        A.    April 17th, the TBD drops out.  April 17th,

8    2023, it says:  Restricted access, Y/N during review

9    process, Y-title also removed from AR quizzes.

10       Q.    Okay.

11       A.    April 17th, so later the same day:

12   Restricted access, Y/N during review process,

13   Y-title also removed from AR quizzes.

14           She corrected the spelling of quizzes.

15           April 17th, 2023, then she dropped the AR

16   quizzes.  It just said:  Restricted access, Y/N

17   during review process.

18           And then again -- I'm trying to see what she

19   corrected because it's later that same day.  It

20   looks the same to me.  I'm not sure if there was

21   spacing.

22       Q.    Okay.

23       A.    And then Linda Sweeting made an edit

24   June 17th, during review process, and it says just:

25   Restricted access, Y/N during review process.

Deposition of Bradley Vinson, Volume 1

1      Q.    Okay.

2      A.    So again, I'm not sure what the change is

3   unless they were something to do with spacing.

4      Q.    And is that the last edit?

5      A.    June 17th, Linda Sweeting, it looks like --

6   oh, I see.  She deleted it probably by mistake and

7   then she put it back in.  That's what it was

8   June 17th.  That's the last one.

9      Q.    June 17th of 2023?

10     A.    Correct.

11     Q.    So from October 25th --

12     A.    Actually, I'm sorry.  No, she must have

13  deleted it over the summer by mistake and then put

14  it back in, that's all it was, of 2024.

15     Q.    So the June 17th date is 2024?

16     A.    Yes.  Linda Sweeting's edit is 2024.

17     Q.    So from October 25th, 2022, until the end of

18  June of 2023 -- that's prior to the implementation

19  of HB 1069, correct?  It went into effect July 1st,

20  2023.

21     A.    Yes.

22     Q.    So from that time period, October of 2022 to

23  the end of June of 2023 --

24     A.    Yes.

25     Q.    -- what did it mean to have a Y in that

1  column?

2     A.   It meant that access to that title was

3  restricted.

4     Q.   Without regard to 1069, which hadn't been

5  passed, correct?

6     A.   Correct.

7     Q.   At what point did a Y in that column mean --

8  begin to mean that at least one media specialist had

9  determined that a book may contain sexual conduct

10  under HB 1069?

11     A.   We began to review these titles under the

12  HB 1069 lens in June and July of 2023, and we would

13  make changes where appropriate if we determined that

14  sexual conduct was present in the book.

15     Q.   So from the beginning of the 1069 review, if

16  one or more media specialists identified a book that

17  was also being challenged as maybe containing sexual

18  content --

19     A.   Conduct.

20     Q.   -- conduct, and that book had not previously

21  been restricted, had a no in the column we're

22  talking about, you would change that to a Y as a

23  result of that 1069 review; is that correct?

24     A.   If it applied, yes.

25     Q.   It applies if a media specialist identified

1    it as may have sexual conduct, correct?

2        A.    Correct.

3        Q.    Okay.  And so today, looking at the

4    spreadsheet, one can't tell whether the Y -- well,

5    let me take that back.

6            I think you testified earlier that

7    everything that has a Y there today is because it

8    has been identified as a book that may contain

9    sexual conduct under 1069?

10       A.    Everything that has a Y today has been found

11   by at least one media specialist to contain sexual

12   conduct and that is why it is restricted.

13       Q.    I want to be really specific because you've

14   said this two different ways.  It's been found by

15   one media specialist to contain sexual conduct under

16   1069, or it's been found by one media specialist who

17   determined that it may contain sexual conduct under

18   1069?

19       A.    May contain.

20       Q.    Okay.  And who updated that column from June

21   of 2023, when you started your 1069 review, until

22   today, whose responsibility was that?

23       A.    I would update that column.

24       Q.    For that entire time period it was you?

25       A.    From June of 2023 to the present, yes.

1    Q.   Okay.  And if we wanted to see when a book's

2    status changed from a Y to an N or back to a -- you

3    know, back and forth, we would undertake the process

4    you just took in the header but you do that in a

5    particular cell and you could see who changed the

6    status and on what date it was changed?

7    A.   Yes.

8    Q.   That just involved clicking in the cell and

9    looking at show edit history?

10   A.   Yes.

11   Q.   Okay.  And if a book had a Y and was changed

12   to a no, how was that communicated to the media

13   specialists so they know to take that book out of

14   the restricted sections of their libraries?

15        MS. SMITH:  Objection; form.  Time period

16     that we're asking about?

17   Q.   At any time period that a book may have

18   changed from a Y to an N in that column from the

19   origination of the spreadsheet until today, how

20   would a media specialist be informed?

21   A.   During Michelle White's tenure, she would

22   have e-mailed media specialists if the status of one

23   of these books changed, the restricted status.

24        Then when I came into the position, this was

25   at the same time as the relevance of HB 1069, and so

Deposition of Bradley Vinson, Volume 1

1    at that time we were communicating to our media

2    specialists that they would need to review the list

3    and check the status there, and if it happened after

4    school started, after August of 2023, generally we

5    would change these after a meeting of our Coffee

6    Crew.  So it was a meeting where the relevant media

7    specialists were usually present and we would

8    discuss it in the meeting.

9        Q.   And would then a follow-up e-mail still be

10   sent to all media specialists, or no?

11       A.   I would have to refer back to my e-mail to

12   be sure.  We would -- either I or Linda Sweeting

13   would send an e-mail to any media specialists who

14   were not present who had a copy of the book or --

15   well, no, we would send it to the list of either

16   high school media specialists or middle school media

17   specialists or elementary as appropriate.

18       Q.   Okay.  Is there any follow-up to ensure that

19   if a book went from a Y to an N in that column, that

20   the media specialists did in fact remove the book

21   from the restricted access of their libraries?

22       A.   By follow-up, what do you mean exactly?

23       Q.   Please confirm that you have moved this book

24   back into general circulation and a tracking of

25   those responses or some other way to confirm that

1  the book had actually been moved out of restricted

2  status?

3      A.   I don't have an actual confirmation that

4  they moved the physical location of the books.  I

5  would go into Destiny and check the circulation type

6  for those books and ensure that they had changed to

7  challenge, which is a circulating -- circulation

8  type.

9      Q.   And you would do that as a matter of course

10 any time that a book went from Y to N?

11     A.   Yes.

12     Q.   And do you know if Michelle White did

13 anything similar?

14     A.   I do not know if she had time to complete

15 those actions herself.

16     Q.   Okay.  What does "YA opt-in MS" mean in the

17 Restricted Access column?

18     A.   So our middle schools have YA books but they

19 are only available for circulation to students who

20 have received parental permission to access those

21 young adult books, because they do have more mature

22 themes, and so if something is available to the YA

23 opt-in MS collection, it is something that would

24 only be available to the subset of students who have

25 that permission.

Deposition of Bradley Vinson, Volume 1

1        Q.    And that is true for any YA book in a middle

2    school, whether or not it has been challenged,

3    correct?

4        A.    Correct.

5        Q.    And who determines what a YA book is?

6        A.    We tend to refer to professional reviews for

7    that, so School Library Journal or Publisher's

8    Weekly or Kirkus Reviews, for example, will have a

9    recommended audience level range, and then we tend

10   to review those and then determine that it is a

11   young adult book.

12       Q.    How does recommended audience range, though,

13   interact with young adult?  Because I imagine there

14   are books with a recommended audience range of

15   grades 6 to 8, for example, that aren't young adult

16   and some that are young adult, so I'm not following

17   how the recommended audience translates to YA.

18       A.    In those cases, we do tend to go with our

19   Follett recommendations.  Follett is the company

20   that runs our cataloging platform, Destiny, and they

21   have a full catalog of titles, and then we will sort

22   of aggregate those professional reviews to determine

23   if something is lower elementary, upper elementary,

24   middle grades, or young adult, and in some cases the

25   professional reviews do not fully agree.  You will

Deposition of Bradley Vinson, Volume 1

1    find something that is recommended for grades 7

2    through 10 but it could be recommended by a

3    different professional reviewer for grades 9 through

4    12.  There's subjectivity there.

5        Q.   Okay.  Turning back to the spreadsheet,

6    Column F, "Date Challenge Submitted, do you know

7    what that represents?  Because it is not the date on

8    the challenge form itself.

9        A.   I treat it as the date that the challenge is

10   submitted, as best I can.

11       Q.   Meaning the date that you received it?

12       A.   There may have been a short period of time

13   at the beginning of the time that I took my position

14   where I put in the date as a date of receipt of the

15   challenge, but it is either the date that a

16   challenge was submitted or the date of communicating

17   that receipt has been made.

18       Q.   And you're saying the date the challenge is

19   submitted, you're using that as shorthand for the

20   date on the form?

21       A.   The date that the form would have been sent.

22       Q.   Okay.  Column G, "Challenge Document," has a

23   link to a form.  Those are the actual challenge

24   forms that were submitted for each of those books,

25   correct?

Deposition of Bradley Vinson, Volume 1

```
 1        A.    That's correct.

 2        Q.    Column H, "Professional Reviews," can you

 3    tell me what those are?

 4        A.    In many cases those professional reviews are

 5    the ones that have been copied from Follett's

 6    Titlewave listing for that title, so whenever one of

 7    those major reviewing agencies has a review

 8    available, they have compiled it there.

 9            So then either Michelle White, or in some

10    cases someone assisting her, compiled those reviews

11    into the reviews link.

12        Q.    Would it always be just what was in

13    Titlewave or was Michelle or were you or Michelle or

14    somebody else aggregating other reviews?

15        A.    To my knowledge, it's what's in Titlewave.

16        Q.    Okay.  And some of these, but not all, have

17    a link for NCTE Rationale.

18        A.    I believe that stands for the National

19    Council of Teachers of English, so that would be

20    their recommendations if you were to use this book

21    in instruction or for a novel study.

22        Q.    I see.  And those were included even though

23    these challenges related to library collections,

24    correct?

25        A.    Correct.
```

Deposition of Bradley Vinson, Volume 1

1    Q.    Okay.  And why were they only sometimes

2    included?

3    A.    I could not speak to that.  I'm not sure.

4    Q.    Under "District Committee Decision" -- and

5    this is probably helpful -- well, let's look first

6    at the current challenges tab.  There are only a few

7    entries that have district committee information

8    meeting, and then a link to documents under them.

9    Do you see that?

10   A.    I do.

11   Q.    And what are the documents that are linked

12   there?

13   A.    The documents are the documents that

14   Michelle White provided to the District Materials

15   Review Committee in order to aid them in beginning

16   the process of reviewing those titles.

17   Q.    And that's the full set of documents that a

18   District Material Review Committee would have

19   received; is that correct?

20   A.    To the best of my knowledge, yes.

21   Q.    And if we look at the resolved challenges

22   tab, for those where there has been a board

23   decision -- I'm sorry.  For -- in all instances, I

24   think, there is -- there are a couple entries.

25   There is a link to documents following a meeting

Deposition of Bradley Vinson, Volume 1

1    decision, and then there is a link to another set of

2    documents that appear to be from the decision

3    meeting.  Do you see that?

4        A.   Yes.

5        Q.   Okay.  The first link, the documents that

6    follow a committee information meeting entry in that

7    column, are those the same documents we were just

8    discussing, the packet of information that was

9    provided to the committee?

10       A.   Yes.

11       Q.   Okay.  And that would be the full set of

12   documents they were provided, correct?

13       A.   Correct.

14       Q.   Okay.  The second link, sometimes it comes

15   after committee decision meeting, sometimes it comes

16   after committee voted, there is a link to documents.

17   What are those documents?

18       A.   Those -- let me pull up one of them just to

19   be sure.

20       Q.   I can give you -- I'll provide you an

21   exhibit, if you want.

22       A.   Okay.

23     (Vinson Exhibit 6 was marked for identification.)

24          MS. HEYWOOD:  There you are.  Sorry.

25   BY MR. LEV:

1    Q.    You've been handed Exhibit 6, which is the

2    committee decision pack that was linked for "The

3    Bluest Eye."

4    A.    Yes.

5    Q.    After it says, "Committee voted that the

6    title be available in high school ECPS libraries,"

7    and there is a link to the word "Documents" in the

8    spreadsheet.

9          So what do these documents represent?

10    A.    So Michelle White compiles the comments from

11    the committee regarding the titles, indicated which

12    grade levels were indicated by committee members as

13    far as which grade levels the work would be suitable

14    for, more comments from the committee, which would

15    have been made during the second meeting of the

16    committee, which is after they have read the book,

17    and then she would have compiled the ballots, and

18    you can see that she indicates that the complainant

19    would be informed by certified mail from the

20    Assistant Superintendent of Curriculum and

21    Instruction.

22          MS. SMITH:  Counsel, just for the record,

23        this doesn't have a Bates stamp.  Are you

24        representing that you clicked on the hyperlink

25        where it says "Documents" for "The Bluest Eye"

1    under the heading District Committee Decision?

2        MR. LEV:  Yes, the second link that says

3    "Documents" after it says "Committee voted that

4    the title be available in high school ECPS public

5    libraries."

6        MS. SMITH:  Thank you.

7        MR. LEV:  We clicked on that and this is

8    what we got.

9    A.    So there is documentation here that the

10   committee is comprised of the members that our

11   policy indicates and the level of the book, and then

12   it says, of course, the committee vote, is that

13   Number 3.

14   Q.    And these were all compiled by Michelle

15   White?

16   A.    Yes.

17   Q.    You said the comments were compiled based on

18   statements at the meeting.  Is that correct or are

19   these comments that the committee members submitted

20   in writing before the second meeting?

21   A.    I've not actually managed a District

22   Materials Review Committee myself.  I would have to

23   go back and look through Michelle White's records to

24   determine to be sure of whether or not these

25   comments were made in the meeting or whether she may

1    have collected them through another way.

2        Q.   So you don't know as you sit here today?

3        A.   I don't know.

4        Q.   Okay.  Is this the only record of the

5    committee's deliberation and decision?

6        A.   To the best of my knowledge, yes.

7        Q.   The rest of the columns in the spreadsheet

8    are only filled in on the resolved challenges tab,

9    so I'm just going to look at that tab going forward.

10       A.   Okay.

11       Q.   I'm sorry.  Before we do that, on the

12   current challenges tab, where the district committee

13   decision is blank, that means there was no District

14   Materials Review Committee convened, correct?

15       A.   Correct.  They had one meeting but not a

16   second meeting.

17       Q.   I'm sorry.  Where it's blank there was no

18   committee, correct?  Like "Ace of Spades," there is

19   nothing there.

20       A.   Correct.  There was not a committee formed

21   for "Ace of Spades."

22       Q.   For the other ones on the current

23   challenges, where there is a single entry that says

24   "District Committee Information Meeting," they had

25   the first meeting but not the second meeting?

1    A.    Correct.

2    Q.    Okay.  On the resolved challenges tab, Board

3    Appeal Submitted and Date, I understand that to mean

4    if an appeal was submitted to the board, it tells

5    you that and what date it was, and if that column is

6    blank, there was no appeal to the board from the

7    committee; is that correct?

8    A.    That's correct.

9    Q.    Okay.

10    MS. SMITH:  I don't want to interrupt you,

11    Counsel, but just so you know, there were

12    nonpublic documents that were produced to you for

13    each District Material Review Committee, so you

14    have that.  She's not able to give you Bates

15    stamp numbers.  If you need us to find out, we

16    can look into that.  I believe there were some

17    ballots and other materials that were produced

18    that were not linked on the spreadsheet.

19    MR. LEV:  Thank you.

20    BY MR. LEV:

21    Q.    Under Board Appeal Submitted and Date, there

22    is a link to a document under those.

23    A.    Yes.

24    Q.    What is that document?

25    A.    That document is the appeal document that --

Deposition of Bradley Vinson, Volume 1

1    if I could double-check, I believe it should also be

2    the same document that would have been uploaded to

3    BoardDocs in relation to the meeting where this book

4    would be considered.

5        Q.   BoardDocs is where the board records are

6    maintained?

7        A.   That's correct.

8        Q.   Okay.  I'm sorry.  I am accessing the public

9    version of the spreadsheet while we talk so we can

10   be on the same page, literally as well as

11   figuratively.  So if you look at -- let's look at

12   one of these board appeal documents.  Let's look at

13   "All Boys Aren't Blue."

14       A.   Okay.

15       Q.   That first document under Appeal Submitted,

16   what is that?

17            I should note there are two links.  If you

18   click on the documents under Appeal Submitted, the

19   first is a PDF which appears to be the challenger's

20   additional information submitted to the board; is

21   that correct?

22       A.   For the appeal, yes, the challenger

23   submitted this to appeal the decision on "All Boys

24   Aren't Blue."

25       Q.   And the second document, the second link

Deposition of Bradley Vinson, Volume 1

1    there takes you to BoardDocs, correct?

2        A.    Correct.

3        Q.    And on the left you have a series of entries

4    because the committee considered a series of issues

5    that day, and the board considered a series of

6    issues that day.  If you click on the second one

7    that says they considered a citizen's challenge to

8    "All Boys Aren't Blue" by George M. Johnson, do you

9    see that?

10       A.    I do.

11       Q.    2B, that then takes me to a page called

12   "Agenda Item Details," correct?

13       A.    Correct.

14       Q.    Okay.  And I'm handing you Exhibit 7, which

15   is a printout of this page you were just looking at

16   online.

17     (Vinson Exhibit 7 was marked for identification.)

18   BY MR. LEV:

19       Q.    Does this -- there are two documents.  One

20   says "All Boys Aren't Blue - Board Appeal.pdf."

21   That is the challenger's additional information

22   submitted?

23       A.    Yes.

24       Q.    And then there is a "Board Appeal Community

25   Input_All Boys Aren't Blue as a High School Library

1    Book (Responses) - Google Sheets."  Do you see that?

2        A.    I do.

3        Q.    What is that?

4        A.    This is a compilation of comments that

5    Michelle White collected related to this particular

6    title.

7        Q.    How were those comments collected by

8    Michelle White?

9        A.    So I couldn't tell you exactly where they

10   came from since it's not indicated here, but she did

11   have, at one time, a way for the public, members of

12   the public, to submit their comments on individual

13   titles, which would have been in Column N, Community

14   Input Forms, and then she also would reach out to

15   the Library Advisory Council or media specialists at

16   the schools where the book was part of the

17   collection and ask if they had any comments.  So

18   those may also have been included in this comment

19   compilation.

20       Q.    But you're not sure what the comment

21   compilation is?

22           MS. SMITH:  Objection; misstates testimony.

23   You can answer.

24       A.    No, I'm not sure.

25       Q.    Okay.  If we go back to our spreadsheet, the

1    next column is -- well, before I do that, I'm sorry,

2    would this be true for all of these appeals that had

3    a board decision under Board Appeal and Submitted

4    Date, that we would have a link to the appeal

5    document and where it says word "agenda" -- sorry.

6         Let me ask, where it says Board Agenda and

7    Documents, we would have a link to this additional

8    community input, is that what those documents --

9    A.    It looks like we do not always have a link

10   to those additional community comments.  For

11   example, "Drama" only has the appeal document linked

12   there, so I don't see the compilation of community

13   comments on that one, for example.

14   Q.    I see.  Most of them don't have that, but

15   where they have a second document, that's what that

16   second document is?

17   A.    Yes.

18   Q.    Okay.

19   A.    And we could review the BoardDocs for those

20   if you would like to, to see if it was linked in the

21   BoardDocs and we failed to link it in the

22   spreadsheet.

23   Q.    Instead of taking the time to do that, if it

24   was linked in the BoardDocs, that would mean the

25   board received those documents?

Deposition of Bradley Vinson, Volume 1

1     A.    Yes.

2     Q.    Okay.  And if it's not linked in the

3  BoardDocs, it means the board did not receive those

4  documents, correct?

5     A.    Correct.

6     Q.    Okay.  And so we can rely on the BoardDocs

7  page as reflective of all of the information made

8  available to the board in the context of a

9  particular book challenge, correct?

10    A.    Yes, that should be the case.

11    Q.    Okay.  If we come back to the spreadsheet,

12 Board Committee Members, I take it this is the

13 actual members of the school board who were involved

14 in the decision on a book?

15    A.    That's correct.

16    Q.    There was no committee of the board, it was

17 the board itself?

18    A.    It was the board itself.

19    Q.    Okay.  And then in the Board Decision

20 column, we have for each book two documents linked,

21 and I assume that if are you on your computer,

22 you're still only on the Reconsiderations

23 Spreadsheet, correct?

24    A.    Correct.

25    Q.    Okay.  Can you tell me what those two links

Deposition of Bradley Vinson, Volume 1

```
 1    are under Board Decision?
 2        A.    Which one are you looking at?
 3        Q.    I'm really looking at -- I'm assuming the
 4    answer is the same for every book but if that's not
 5    the case, please tell me, but let's look at "All
 6    Boys Aren't Blue."
 7        A.    Those appear -- they may look like two links
 8    but they go to a single BoardDocs -- the single
 9    BoardDocs agenda item.
10        Q.    Okay.  The agenda item from the meeting
11    where the challenge was considered?
12        A.    Where the appeal was considered.
13        Q.    Okay.  And that BoardDocs page, which I
14    guess it looks like it's the same page we were
15    looking at before, correct?
16        A.    Correct.
17            MS. HEYWOOD:  It's the same as Exhibit 7.
18            MR. LEV:  Yeah.  Okay.
19        A.    I actually just got a notification on my
20    watch.  Do you-all mind that I answer my child to
21    indicate that we did feed the dog this morning?
22        Q.    I do not mind.
23        A.    Thank you.
24            MR. LEV:  Yeah, let's go off the record for
25        just two minutes.
```

Deposition of Bradley Vinson, Volume 1

```
1              (Recess from 10:40 a.m. until 10:41 a.m.)

2    BY MR. LEV:

3        Q.   So if you look at Exhibit 7, which is that

4    same board document, this reflects the board's

5    decision with respect to an appeal at the bottom,

6    right, Motion & Voting?

7        A.   That's correct.

8        Q.   And that's going to be the case for all of

9    these books, that the BoardDocs link is going to

10   show us the board's final decision, correct?

11       A.   Correct.

12       Q.   And that's the official record of the

13   board's decision?

14       A.   Yes.

15       Q.   And does this reflect all of the board's

16   findings regarding the books at issue?

17            MS. SMITH:  Objection; form.

18       A.   To my knowledge, they discussed these in

19   open meetings and everything was recorded on this

20   agenda, so yes, it reflects -- could you repeat the

21   question?

22       Q.   Sure.  My question is if this reflects all

23   of the board's findings with respect to, in this

24   case, "All Boys Aren't Blue"?

25            MS. SMITH:  Same objection.
```

Deposition of Bradley Vinson, Volume 1

1    A.    I don't know what their findings would be.

2    Q.    Where else would their findings be

3    reflected?

4    A.    There is nowhere else where their findings

5    would be reflected, except in reviewing the meeting

6    video itself.

7    Q.    Okay.  So whatever the full record of the

8    board's consideration is, the meeting video, this

9    document from BoardDocs is reflecting their final

10   decision; is that correct?

11   A.    That's correct.

12   Q.    Okay.  Going back to the spreadsheet,

13   Column N says:  Community input forms have been

14   discontinued, the public can share documents

15   directly with the ECPS School Board or during public

16   forum if the title is appealed to the school board.

17         Did I read that correctly?

18   A.    Yes.

19   Q.    Do you know when community input forms were

20   discontinued?

21   A.    I don't know an exact date for that.

22   Q.    Do you know an approximate date?

23   A.    I would guess spring of 2023.

24   Q.    Do you know why they were discontinued?

25   A.    I don't know the exact reason.  I have had

1  conversations with Ellen Odom that indicated that

2  the forms were not being used as intended, that they

3  may have become a platform for attacks made on media

4  specialists.

5      Q.   Do you know if the forms that were submitted

6  for the books at issue have been produced in this

7  case?

8          THE WITNESS:  Have the forms been produced

9      in this case?

10     Q.   You don't know?

11     A.   The community input forms?

12     Q.   Yes.

13     A.   I don't believe that I produced the

14  community input forms.  Someone else may have who

15  had access to Michelle White's drive.

16     Q.   And that's where they would be maintained?

17     A.   Yes.

18     Q.   Okay.  And those forms, while this process

19  existed, were provided to the board members?

20     A.   Community input forms, while they were being

21  collected, would have been provided to the board

22  members.

23     Q.   And the heading says the public can share

24  comments directly with the ECPS School Board.  How

25  would the public do that?

1      A.   They would call or e-mail them, members of
2   the board.
3      Q.   The next column is School Committee Decision
4   and it's only filled in for "Perks of Being a
5   Wallflower."  What does that column represent?
6      A.   In this case -- and I don't have personal
7   knowledge of the school committees and how they were
8   performed and organized and run, but "Perks of Being
9   a Wallflower" being the first one and not being
10  challenged on the basis of being a library book, I
11  believe that the initial committee was formed at the
12  school level for this book's decision.
13     Q.   Did you spend any time in preparing for
14  today's deposition looking into the school committee
15  formation process?
16     A.   I did not find much information about the
17  school committee decision process.
18     Q.   That wasn't exactly my question.  Did you
19  spend time looking into it?
20     A.   I spent a little time looking for it.
21     Q.   Did you speak to anybody about it?
22     A.   No.
23     Q.   Okay.  Who created this spreadsheet
24  originally?
25     A.   This spreadsheet was created by Michelle

Deposition of Bradley Vinson, Volume 1

1    White.

2    Q.   And do you know when she first created it?

3    A.   Let me look at my version history.

4    Q.   You can set that aside for the moment.  Do

5    you know when this spreadsheet was first created?

6    A.   The first date that I show a version for

7    this spreadsheet was September 6th, 2022.

8    Q.   This is the public version that you're

9    looking at, correct?

10   A.   It is the history of the public version.

11   Q.   And September 6th, 2022?

12   A.   Yes.

13   Q.   Okay.  Do you know if there was a nonpublic

14   version of the spreadsheet that predated the public

15   version?

16   A.   I do not know if she had another version of

17   this spreadsheet that was not made public.

18      (Vinson Exhibit 8 was marked for identification.)

19   BY MR. LEV:

20   Q.   Okay.  Can you take a look at -- I'm sorry,

21   I've got the --

22   A.   Yeah.

23   Q.   -- at Exhibit 8?  This is a document that

24   was produced in discovery.  It doesn't have a Bates

25   number on it, I believe because it was produced in

Deposition of Bradley Vinson, Volume 1

```
 1   native form, but it's Bates Number E-ECSD_0039348.
 2          Have you ever seen this document before?
 3      A.   I don't recall seeing this document.
 4      Q.   Our understanding from Michelle White is
 5   that this is an internal spreadsheet that she had
 6   started to track the challenges.
 7      A.   Okay.
 8      Q.   Does that refresh your recollection?
 9          MS. SMITH:  Objection; form.
10      A.   I don't recall her showing me this specific
11   sheet but I could look.  If asked to look, I could
12   probably search by drive to see if I have access to
13   this.  I don't recall seeing a sheet where it said
14   "Order Information, 10 Stocked."
15      Q.   Okay.  Do you know why Michelle White
16   created this?
17      A.   I do not.
18      Q.   Do you know if the school board or the
19   superintendent were involved in its creation?
20      A.   I don't know.
21      Q.   Okay.  Do you know why certain cells that
22   appear on this spreadsheet were not included in the
23   public version of the spreadsheet -- sorry, certain
24   columns?
25      A.   I would be speculating if I indicated why
```

Deposition of Bradley Vinson, Volume 1

1    certain columns are here.  The "10 Stocked," I don't

2    know if that means that these were books she was

3    trying to acquire for the committees to use, because

4    I know that we do have 10 nonlibrary copies of some

5    of these books in order for the District Materials

6    Review Committees to have access to a copy of the

7    book that's not one of our library copies,

8    especially where we only have a limited number of

9    library copies.

10       Q.   Do you know what the column "Reason" means

11   on this spreadsheet, where that information came

12   from?

13       A.   It appears to be pulled from the form but I

14   would need to check them on a case-by-case basis to

15   verify.

16       Q.   Did you spend any time in preparing for this

17   deposition looking into the history of the

18   Reconsiderations Spreadsheet and how it was

19   developed?

20       A.   I looked at some of the versions when we

21   produced those but I didn't do additional research

22   into how it was developed.

23       Q.   Okay.  Did you talk to anybody about the

24   history of the Reconsiderations Spreadsheet in

25   preparation for this deposition?

1          MS. SMITH:  Outside of counsel.

2     Q.   Outside of counsel.  Did you talk to anybody

3  outside of counsel about the history of the

4  Reconsiderations Spreadsheet in preparation for this

5  deposition?

6     A.   No.

7     Q.   Okay.  Do you know if the superintendent has

8  provided any input into what the public version of

9  the Reconsiderations Spreadsheet should and should

10 not contain?

11    A.   Do you mean Tim Smith?

12    Q.   Let's start with Tim Smith.

13    A.   Okay.  I do not know how much involvement

14 the superintendent had in determining what would be

15 part of the public version of the spreadsheet.

16    Q.   Do you know if the board had any input into

17 what would be part of the public version of the

18 spreadsheet?

19    A.   I do not know if the board had any input

20 into what would be part of the public version of the

21 spreadsheet.

22    Q.   Has Keith Leonard had any input into what is

23 part of the public version of the spreadsheet?

24    A.   No.

25    Q.   Have you received any feedback or

Deposition of Bradley Vinson, Volume 1

```
 1    instructions from the board or the superintendent

 2    about the spreadsheet since you became the

 3    Coordinator of Media Services?

 4        A.    No.

 5              MR. LEV:  Let's refer to the flowchart.

 6         (Vinson Exhibit 9 was marked for identification.)

 7    BY MR. LEV:

 8        Q.    I'm showing you Exhibit 9.

 9              MR. LEV:  Did you get one?

10              MS. SMITH:  Not yet.  Thank you.

11        Q.    Do you recognize this document?

12        A.    I do.

13        Q.    Okay.  So we printed this from the ECPS

14    website and the caption is ECPS Library Collection

15    Reconsideration Flowchart.

16              This is on the district's website, correct?

17        A.    That's correct.

18        Q.    And on the right there is a box that says

19    "District Challenged Books" and there is a hyperlink

20    there and that links to the Reconsiderations

21    Spreadsheet we were just talking about, correct?

22        A.    Correct.

23        Q.    And the box on the left that says "HB 1069

24    Books pulled for further review by Media

25    Specialists," that links to a spreadsheet that's
```

Deposition of Bradley Vinson, Volume 1

```
 1   called "Website Destiny HB 1069 Storage Further

 2   Review," correct?

 3       A.   Correct.

 4       Q.   And who created this document?

 5       A.   So I devised this layout and then Linda

 6   Sweeting made it look better.

 7       Q.   When was this created?

 8       A.   I would say fall of 2023, but I would have

 9   to look back in my notes to see more specifically.

10       Q.   If I had an e-mail from around December of

11   2023 with a draft of this, would that sound right to

12   you?

13       A.   That's about right.

14       Q.   Why was it created?

15       A.   In an effort to be more transparent with the

16   public about our HB 1069 review.  That is because in

17   our full library collection in Destiny, you actually

18   cannot see the books if you are a member of the

19   public, you cannot see the books that have been

20   pulled for HB 1069 review because of their

21   circulation type and its attributes.  It is

22   something that is hidden from student view so that

23   students will not be able to place holds on the

24   books that are not available, but we wanted to make

25   sure that it was transparent to the public what
```

1    those books were that were still being reviewed.

2        Q.    And the middle box, "Full Library

3    Collection," that takes you to Destiny, correct?

4        A.    Correct, or it should.

5        Q.    Fair enough.  And the box at the top that

6    says "Books returned to ES+, MS+, or HS" that has a

7    hyperlink, that takes you to the spreadsheet Media

8    Services Titles Reviewed by Media Specialists for HB

9    1069, correct?

10       A.    Correct.

11       Q.    So can you walk me through this and explain

12   what this spreadsheet represents?

13       A.    So our full library collection could be

14   accessed here.  These are the books that are

15   available to students.  If it is a book that is not

16   available to students, it would appear here on the

17   HB 1069 list.  Initially, that was just a report we

18   pulled and it would include all of the books that

19   were restricted under HB 1069, including the

20   challenged book that had been marked as such, and

21   those can be marked by any media specialist as he or

22   she performs their review, and it was a later date,

23   I would need to refer to the spreadsheet, when I was

24   able to pull the report and indicate which ones were

25   the challenged books as a subset of those, but they

Deposition of Bradley Vinson, Volume 1

1    are all reflected there in that spreadsheet.

2        Q.   So everything on that spreadsheet, your

3    pointing to the left box, HB 1069 Books pulled for

4    further review by Media Specialists.  Everything

5    that's in that box is not available for students to

6    check out because of HB 1069, correct?

7        A.   It's a constantly changing list because

8    every media specialist can make the change to those

9    items, but the date of the tab that you are viewing.

10   That is the most recent date, is the most up-to-date

11   version of that report that's available.

12       Q.   Okay.  And it looks like there is two arrows

13   flowing out of that box.

14       A.   Yes.

15       Q.   So books returned to ES, MS or high school,

16   the arrow to the top, what does that reflect?

17       A.   So when we meet with our high school or

18   middle school media specialists, that was a process

19   that we began to do in October of 2023, we discussed

20   some of these titles.  We would prioritize those

21   that we owned more copies of just because it would

22   affect the circulation for more locations, and we

23   would review the professional reviews.  If any of

24   our media specialists had read the book themselves,

25   then they could indicate exactly where we had areas

Deposition of Bradley Vinson, Volume 1

1    of concern as regards sexual conduct being present

2    in the book, and then we would determine what the

3    appropriate age level audience was in general and

4    then return those books to those collections, or we

5    would hold it for further review with community

6    input from other community stakeholders.

7        Q.   So the holding it is the circle on the

8    bottom left, "Books stored for review based on

9    Community Standards and/or by a committee"?

10       A.   Yes.

11       Q.   And the ones that you returned would go back

12   into general circulation?

13       A.   The spreadsheet here will indicate where

14   they are appropriate to circulate.

15       Q.   Okay.  The spreadsheet is the books returned

16   to ES, MS or high school, is what you are pointing

17   to?

18       A.   Yes.

19       Q.   And books stored for review based on

20   community standards and/or by a committee, what

21   are -- what community standards?  What does that

22   refer to?

23       A.   We had initially thought that there was

24   potential to develop some sort of task force, if you

25   will, that would help us develop guidelines to make

Deposition of Bradley Vinson, Volume 1

```
 1   it possible to determine the age level that each
 2   book would be appropriate for, but we have not yet
 3   been able to form any sort of task force of that
 4   nature, and so we hope to resume our committee
 5   review process soon.
 6       Q.   And the committee review is going to be the
 7   District Materials Review Committees?
 8       A.   Yes.
 9       Q.   And is the idea that you're going to have a
10   District Material Review Committee for every one of
11   the books that is on that spreadsheet of books that
12   are pulled for further review?
13       A.   We will continue to be reviewing the books
14   that are on the HB 1069 list with our groups of
15   media specialists.  We actually have some of our
16   first meetings for this school year set up.  The
17   ones that we are unable to make a determination on
18   are usually indicated on this books returned to ES+,
19   MS+ or high school.  There are some in there that we
20   say recommend for community review.
21           So it would go through the media specialists
22   first, and then if we find that we are unable to
23   reach a determination without further input from the
24   community, then it would go to a committee at some
25   point.
```

Deposition of Bradley Vinson, Volume 1

1      Q.    Understood.  So it's really everything in

2   that bottom circle that's going to go to a District

3   Materials Review Committee?  The bottom circle that

4   says "Books stored for review based on Community

5   Standards and/or by a committee," that reflects the

6   books that are going to go to a District Materials

7   Review Committee?

8          MS. SMITH:  Objection; form.

9      A.    So they will go to some sort of committee or

10   Library Advisory Council for input.

11      Q.    Has a decision been made about what -- who

12   is going to make a decision on those books and how?

13      A.    So we have actually started our returning

14   some of the young adult books that were pulled for

15   HB 1069 review, to send them to the schools for them

16   to collect input from their Library Advisory

17   Councils.  We are still holding onto the books that

18   are indicated as being for an adult audience.

19      Q.    So all young adult titles are going to go to

20   middle schools for Library Advisory Council input

21   and decision about their 1069 status?

22      A.    To the owning schools, which would be high

23   schools or possibly middle schools.

24      Q.    Okay.  And those decisions are going to be

25   the final decision with respect to those books?

1      A.    Unless we receive an objection to them.

2      Q.    Which would be a book challenge?

3      A.    Which would be a book challenge.

4      Q.    I see.  So that's the young adult part, the

5   books that were pulled for further review?

6      A.    Yes.

7      Q.    And is there a timeline for that process to

8   be completed for the young adult books?

9      A.    I don't have a timeline specifically.  I

10   think I would roughly say over the course of the

11   next four months or so.  Some of our Library

12   Advisory Councils only meet three times a year, so

13   they have a lot of other things that they need to

14   review and...

15      Q.    So there is no deadline for this review of

16   the YA titles to be completed?

17      A.    I do not have a deadline that I have set

18   out.

19      Q.    Okay.  What about are there any elementary

20   or books that are sort of for below young adult that

21   are in this stored for community review bucket?

22      A.    We have a few.

23      Q.    And what is the plan for those books?

24      A.    Oh, I'm sorry.  We have a few that are on

25   the HB 1069 list.  We have not held any for further

Deposition of Bradley Vinson, Volume 1

1  community standards or committee review at this

2  time.

3      Q.   So there aren't any of the younger books.

4  We talked about the young adult books.  Am I correct

5  that the only other books that have been stored for

6  review are the adult books, is that --

7      A.   Could you repeat the question?  I'm sorry.

8      Q.   Sure.  I'm trying to understand the full

9  universe of the books stored for further review.

10  There aren't any elementary or books for readers

11  below young adult, you told me, on that list?

12      A.   Not at this time, no.  We still need to go

13  to the HB 1069 list and review the elementary titles

14  that are there with our elementary media

15  specialists.

16      Q.   And you told me for the books that have been

17  pulled for further review, you told me what the plan

18  is for the young adult titles?

19      A.   Yes.

20      Q.   What is the plan for the other books that

21  have been pulled for further review?

22      A.   We need to take a harder look at the adult

23  books in our district office and look at the reviews

24  of those, and then, ideally, we would return the

25  majority of those, if not all of those, in the same

Deposition of Bradley Vinson, Volume 1

1    fashion that we are doing with the young adult books

2    that we still have on that list.

3        Q.    What does that mean, take a harder look at

4    the district office at those books?  What does that

5    process entail?

6        A.    We'll just need to look at the professional

7    reviews of those books and determine if the content

8    seems appropriate for that age level audience.

9        Q.    Who is the we who will be making that

10   decision?

11       A.    Linda Sweeting and I will be looking at

12   those reviews and possibly reading those books, but

13   we also have a list of books that we have asked

14   media specialists to volunteer to read the books

15   thoroughly and provide input as well.

16       Q.    How many books in total are we talking about

17   that are on that list that are not of the young

18   adult?

19       A.    I would have to do some digging to give you

20   a figure.

21       Q.    Can you give me an order of magnitude, tens,

22   hundreds?

23       A.    There are hundreds of adult books that we

24   still have, yes.

25       Q.    And you and Ms. Sweeting are going to be the

Deposition of Bradley Vinson, Volume 1

```
1   decision-makers for all of them?
2       A.   We'll still consult with our media
3   specialists.
4       Q.   But you will be the ultimate decision-makers
5   for these hundreds of books as you decide whether
6   and, if so, to where to return them to the shelf?
7       A.   We would go to a committee with community
8   stakeholders before any decision to remove a book
9   would be made.  We are deciding if we can return the
10  book.
11      Q.   Okay.  So you and Ms. Sweeting will decide
12  whether the book can be returned, and if you are not
13  comfortable making a decision that it be returned,
14  it will then go to a District Materials Review
15  Committee?
16      A.   Yes.
17      Q.   And is there a timeline for this process to
18  take place?
19      A.   I don't have a timeline at this time but we
20  do need to get through the challenged books as well,
21  so it's a process.
22      Q.   And I take it if there is no timeline, there
23  is no deadline by which this process is intended to
24  be completed at this time?
25      A.   At this time, we just continue to work at
```

1   it.  With HB 1467, we have treated this as a

2   selection process for these books.  Some of these

3   books were added well before our current media

4   specialists and certainly before these laws, like

5   HB 1069 had certain requirements.  So they are --

6   our media specialists are learning the contents of

7   their collections through this process and ensuring

8   that these are the materials that should be made

9   available to students.

10      Q.   And am I correct that this box, "HB 1069

11   Books pulled for further review by media

12   specialists," that initially that was the entire

13   library collection?

14      A.   Initially, the entire library collection was

15   under review, yes, in July of 2023.

16      Q.   Okay.

17      A.   But I didn't pull a report for that.

18      Q.   And you have, in the upper right and bottom

19   right and bottom left corners of this spreadsheet,

20   circles that say "Books removed by District

21   decision," "Books removed by Board decision," "Books

22   removed by Committee decision."

23         "Books removed by Board decision" I assume

24   is a decision of the board to remove the book on the

25   right as a result of a challenge, on the left as a

Deposition of Bradley Vinson, Volume 1

1    result of the 1069 review?

2        A.   So, no, it would need to go through a

3    committee again, and then if it were appealed, I

4    could envision it going to the board.

5        Q.   Let's start with the right side of the

6    column.  Sorry.  For the challenged books, committee

7    decision is District Materials Review Committees

8    that we've been talking about?

9        A.   Yes.

10       Q.   Okay.  What does "District decision" on the

11   right mean?

12       A.   So after HB 1069, we incorporated in our

13   policy that the superintendent, in consultation with

14   the Coordinator of Media Services, that's me, could

15   make a decision to bypass the committee process for

16   any books that we determined would likely not be

17   found to be age appropriate by the District

18   Materials Review Committee.

19       Q.   Have you and the superintendent made any

20   such decisions?

21       A.   We have not at this time.

22       Q.   Okay.  Would any such decision be appealable

23   to the board?

24       A.   I don't think that we have in our pol -- let

25   me refer to our policy.  I'm sorry.

1      Q.   If it's not in the policy, would it be

2   appealable?

3      A.   Let me refer to the policy.  Just a moment.

4      Q.   Okay.  Why don't we save it.  When we look

5   at the policy I can ask you about that.

6      A.   Okay.

7      Q.   What about on the left side, we have books

8   stored for the community to review, which we just

9   talked about, but there is three possible outcomes

10  there.  "Books removed by District decision," what

11  would that refer to in that context of the 1069

12  review?

13     A.   In this case, again, I would consult with

14  the superintendent to make a decision to remove any

15  of these books for being age inappropriate.

16     Q.   So that further review -- we talked about

17  you and Ms. Sweeting making these decisions.  You

18  said you wouldn't make removal decisions but this

19  does enable you and the superintendent to make a

20  removal decision without going to a committee?

21     A.   It does.

22     Q.   That has not happened, though?

23     A.   It has not.

24     Q.   And the committee decision would be if you

25  and Ms. Sweeting have not returned the book, have

1    not decided to remove it, you would send it to a

2    committee for review like we were just talking

3    about?

4        A.    Yes.

5        Q.    And that committee's decision could be

6    appealed to the board?

7        A.    Yes.  I think that would fall more like the

8    alignment of the challenged books at that point, if

9    we have a District Materials Review Committee.

10       Q.    Okay.  But that -- the policy doesn't speak

11   to this process, correct?

12       A.    Correct.

13       Q.    Okay.  But you believe it would work in the

14   same way as the challenge process?

15       A.    Yes.

16       Q.    And the same people who would be entitled to

17   appeal a committee decision on a challenged book

18   would be entitled to appeal it to the board?

19       A.    Yes.

20       Q.    Sorry.  Let me rephrase that.

21            The same people who would be entitled to

22   appeal a committee decision regarding a challenged

23   book, those are the same people that would be

24   entitled to appeal a committee decision regarding

25   the 1069 review to the board?

1    A.   If we have sent a book on for a committee

2  review, I would just sort of move it over into that

3  lane and treat it like a challenged book.

4    Q.   Okay.  If a committee votes to remove a

5  book, is that decision appealable to the board in

6  either the challenge or 1069 process?

7        MS. SMITH:  Objection; form.

8    A.   I would want to refer to our policy to be

9  sure.

10   Q.   Okay.

11       MR. LEV:  Should we take a quick break?

12       THE WITNESS:  Sure.

13       MS. SMITH:  Sure.

14     (Recess from 11:10 a.m. until 11:16 a.m.)

15    (Vinson Exhibit 10 was marked for identification.)

16  BY MR. LEV:

17   Q.   I want to talk a little bit more about the

18  1069 review process that we started discussing with

19  the spreadsheet, so I'm going to give you

20  Exhibit 10.  Do you recognize this document?

21       MS. HEYWOOD:  It's a part of it.

22   A.   Right.  It looks like one of the tabs of our

23  HB 1069 spreadsheet, and I guess it would be one of

24  the more recent ones because it looks like you do

25  have the highlights of the challenged titles, copies

1    of the challenged titles.

2        Q.   Okay.  And that is indeed what this is.  We

3    printed this from the website and it is the most

4    recent tab dated May 21, 2024.

5        A.   Okay.

6        Q.   And so what is this list of books on this

7    tab for May 21, 2024?  These are books that what?

8        A.   These are books that at least one media

9    specialist has indicated may contain sexual conduct

10   and has pulled for further review.

11       Q.   And if one media specialist identifies a

12   book, is it pulled just at that media specialist's

13   library or is it pulled at all of the school

14   libraries in the district?

15       A.   It is pulled only at that media specialist's

16   library; however, if we meet with our Coffee Crews,

17   our group of high school media specialists or middle

18   school media specialists and discuss the book and

19   determine that as a group we think that it should be

20   reviewed further, if we pull it for community

21   review, then we do go in and mark those to pull them

22   at any sites where we have them.

23       Q.   Okay.  And if a media specialist, in

24   reviewing his or her library, identifies a book as

25   potentially containing sexual conduct, what do they

1    do to notify you of that?

2        A.    They are able to change the circulation type

3    in Destiny and they change it to HB 1069 Storage and

4    then when I run this report, it pulls everything in

5    HB 1069 Storage.

6        Q.    And the media specialist just changes the

7    circulation type at their school?

8        A.    Correct.

9        Q.    And what report are you talking about that

10   you run?

11       A.    I run a report in Destiny.  It's a created

12   report that just pulls the information based on that

13   circulation type as a limiter.

14       Q.    So you get a report of all the books that

15   are HB 1069 circulation type?

16       A.    Yes.

17       Q.    And by looking at that report, are you able

18   to know if a book has been pulled at only one

19   library as opposed to all of the libraries where

20   it's present?

21       A.    I -- when I pull the report, I am able to

22   see the owning school library of those copies, and

23   so on the back end I can see how many schools may

24   have pulled this for review.

25       Q.    Okay.  But let's say four schools have --

Deposition of Bradley Vinson, Volume 1

1    let's just look.  The first entry on here is "#2

2    Flawless : a pretty little liars novel."  Pretend

3    there is four schools have this book.

4        A.   Okay.

5        Q.   A media specialist at one of the schools

6    decides he or she thinks it should be on the 1069

7    list and changes the circulation type at their

8    school.  When you run your report, you're only going

9    to see the entry to that one school, correct?

10       A.   Correct.

11       Q.   Will it be evident to you that three other

12   schools also have this book but haven't restricted

13   it?

14       A.   Not in the report, not unless I search for

15   the title in Destiny's full catalog.

16       Q.   Is that something that you do, is look for

17   books that one school has restricted but others

18   haven't?

19       A.   We do that; however, there are certain

20   things that we are not able to do in Destiny

21   comparing one site to another.  We actually have a

22   report that runs the Destiny catalog data through

23   Focus that does allow us to see at any one school if

24   another school has marked a book a different way.

25       Q.   And is that a report that you run on a

Deposition of Bradley Vinson, Volume 1

1    regular basis?

2        A.    We have run it.  I would not say it's a

3    regular basis because we get sidetracked by our

4    other many responsibilities.

5        Q.    Okay.

6        A.    And that's not something that we had in the

7    beginning of our HB 1069 process.  We actually had

8    to work with our IT staff to develop a way to do

9    that.

10       Q.    Okay.  When was that developed?

11       A.    I would have to look back at my notes.

12       Q.    Approximately?

13       A.    Approximately late fall 2023, early winter

14   2024.

15       Q.    Let's turn back to your declaration, which

16   is Exhibit 4.

17       A.    Okay.

18       Q.    You can probably set aside the laptop for

19   now, if that's going to make your life easier.

20       A.    Okay.

21       Q.    And I'd like you to turn to Paragraph 26.

22       A.    Okay.

23       Q.    And you say:  In response to HB 1467 and

24   HB 1069, Escambia County Public Schools undertook

25   the review of its entire collection.

1          What was the role of HB 1467 in causing this

2     review?

3          A.    HB 1467 requires that a Certified Media

4     Specialist who has completed the library media

5     training from the Florida Department of Education

6     has selected the materials in the library.

7          Q.    And the school district interpreted this as

8     requiring a review of all books in the library for

9     that purpose?

10         A.    With HB 1069, we did feel that it was

11    important to look through the lens of HB 1069 at our

12    collection again because it seemed so broad in its

13    scope.

14         Q.    But that didn't happen when HB 1467 was

15    passed in 2022, did it?

16         A.    There was not a complete review.  Michelle

17    White indicated that if we had books that were

18    intended for higher audience levels, that we should

19    review those carefully and examine them for age

20    appropriateness.

21         Q.    And the Paragraph 26 of your declaration

22    continues.  It says:  All titles were initially

23    considered pulled for review during summer 2023.

24         What did that mean, that all titles were

25    considered pulled for review?

1    A.    That we would not circulate something until

2    a media specialist had indicated that it was clear

3    of anything covered under HB 1069 that would limit

4    circulation.

5    Q.    So everything was -- this was in the summer,

6    so school libraries were closed?

7    A.    Yes.

8    Q.    And when school libraries reopened, the only

9    books available for students to check out are those

10   that had been reviewed and returned to circulation,

11   correct?

12   A.    Yes.

13   Q.    Okay.  Paragraph 27 describes training that

14   was given to media specialists in identifying sexual

15   conduct as defined by legislation, using

16   professional and other tools, other review tools, to

17   identify where sexual conduct may be present in each

18   title, and reinforcing usage of professional reviews

19   in order to aid in determining the appropriate

20   audience level for each title.

21        Who provided that training?

22   A.    I provided that training.

23   Q.    And how was it provided?

24   A.    We created a slideshow with the information

25   from the legislation and any relevant parts of our

Deposition of Bradley Vinson, Volume 1

1  policy and met with media specialists who were

2  available before the beginning of their contract

3  hours.  It was in July, I can't remember the date

4  off the top of my head, but before they would have

5  come back for the teacher's preservice days.

6        And then we did have to do a few makeup

7  trainings for people who were not available during

8  that summer period of time.

9    Q.  And did all media specialists ultimately

10  take the training?

11    A.  In July and August, yes.

12    Q.  Okay.  And your declaration says the

13  training, quote:  Was about reinforcing usage of

14  professional reviews in order to aid in determining

15  the appropriate audience level for each title.

16        What does that mean?

17    A.  We just reiterated that young adult books

18  should not be present in elementary collections.  We

19  encouraged them to be aware of which of their books

20  were considered for each of those bands, grade

21  bands, if you will.  Lower elementary is typically K

22  through 2, upper elementary would be 3 through 5.

23  Middle grades can bridge, like, fourth grade or

24  fifth grade or sixth grade up to, say, eighth or

25  ninth grade, typically, and then the young adult

Deposition of Bradley Vinson, Volume 1

```
 1    books are typically primarily recommended for high
 2    school collections.
 3        Q.   I'm sorry.  I was asking about the usage of
 4    professional reviews, the training reinforced usage
 5    of professional reviews in order to aid in
 6    determining the appropriate audience levels.  So you
 7    just talked to me about the audience level but how
 8    were professional reviews used in that?
 9        A.   So we would refer to Titlewave.  We talked
10    to the media specialists and how they can find that
11    information for each title and then they could make
12    a more informed decision with that information.
13        Q.   Okay.  What did the training tell the media
14    specialists about what 1069 covers in terms of
15    sexual conduct that is, you know, the subject of the
16    statute?
17        A.   We provided the definition in 847 -- may I
18    pull up the definition?
19        Q.   Sure.  I don't need you to read it but yes.
20    You provided the statutory definition?
21        A.   Yes.
22        Q.   Okay.  But did you provide more detail?  For
23    example, if a book said "we slept together," would
24    that constitute sexual conduct under HB 1069?
25        A.   That was a little more subjective.  We did
```

Deposition of Bradley Vinson, Volume 1

1    not cover an example like that, I don't believe.

2        Q.   What is the district's interpretation of a

3    book that says something like "we slept together,"

4    would that be a description or depiction of sexual

5    conduct that's covered by 1069?

6            MS. SMITH:  Objection to the extent it calls

7        for a legal conclusion, but go ahead.

8        A.   "We slept together" kind of depends on the

9    context.

10       Q.   Well, what does that mean, it depends on the

11   context?

12       A.   I mean maybe they slept side by side.  I

13   would need to read within the context of the book.

14       Q.   Okay.  Fair enough.  "We slept together"

15   where the context --

16       A.   Is advanced --

17       Q.   -- suggests that they engaged in sexual

18   intercourse but there is no description of the

19   sexual intercourse or body parts, but a reference to

20   having had sex either by, you know, saying "we

21   together," "we had sex"?

22       A.   We would interpret that likely to mean that

23   it was an off-screen occasion of sexual conduct and

24   in that case it was not something that we would

25   immediately pull for review from a high school

1  collection or a middle school young adult

2  collection.  I would not think that we would find

3  that statement in a lower grade level band.

4      Q.  You say you wouldn't immediately pull for

5  review, but everything was pulled for review.

6      A.  I'm sorry.

7      Q.  Everything was pulled for review.  The

8  question is what's going back on the shelves.

9      A.  I would not pull it for further review.  I

10 would not keep it out for further review.  I'm

11 sorry.

12     Q.  And is that true for, you know, a reference

13 to a rape having occurred without any explicit

14 depiction of the rape, but --

15     A.  So our interpretation of that initially was

16 very broad, and that is because of the language of

17 the statute, where it indicated that if a sexual

18 assault had occurred or may occur --

19     Q.  You can pull up the definition, if you'd

20 like, so you're not doing this blind.

21     A.  I can pull it up.

22         THE WITNESS:  This is 1069 right here.

23     Q.  I think you want 847.001 now.

24     A.  19.

25     Q.  Correct.

Deposition of Bradley Vinson, Volume 1

```
 1              MS. SMITH:  The statute is still together.
 2       Q.   You and I both know this way too well.
 3       A.   Sexual conduct means -- do you want me to
 4    read all of it or just the relevant?
 5       Q.   No.  I'm just trying to understand if a book
 6    is talking -- is making clear that a rape has
 7    occurred but hasn't described the physical act of
 8    rape --
 9       A.   It actually doesn't say sexual assault.  It
10    says sexual battery, but it says:  Any act or
11    conduct which constitutes sexual battery or
12    simulates that sexual battery is being or will be
13    committed.
14              That seemed very broad to us and we actually
15    interpreted that, in the beginning, in a very broad
16    sense.  Over time there were other books that we
17    encountered in our reviews where we decided that
18    that was not our interpretation, to consider that
19    sexual conduct under that definition, but I can't
20    think of an example off the top of my head.
21       Q.   Did you go back after that interpretation
22    evolved to look at prior decisions that had been
23    made?
24       A.   We have done that for some titles but not
25    every title.
```

Deposition of Bradley Vinson, Volume 1

1    Q.   Is there some systematic way by which you

2   track that?

3    A.   You mean where we are going back to look at

4   those?

5    Q.   Yeah.  Like how you would know if you have a

6   title that you've restricted based --

7    A.   Based on the sexual battery that may be

8   committed?

9    Q.   Yeah.  Is that something that's even

10  tracked?

11   A.   We didn't track that specific reason.

12   Q.   What, if anything, did your training say

13  about the existence of homosexual characters in a

14  book?

15   A.   We did not cover that.

16   Q.   Would that be -- what about transgender

17  characters, did your training cover that?

18   A.   No, it did not.

19   Q.   I'm going to give you --

20       MS. HEYWOOD:  Here, that's for her.

21  (Vinson Exhibit 11 was marked for identification.)

22  BY MR. LEV:

23   Q.   So Exhibit 11 is a document that was

24  produced Bates stamped E-ECSD_0066577, and at the

25  top it says "HB1069 training meeting (2023-07-17..."

Deposition of Bradley Vinson, Volume 1

```
 1   there is a time stamp, and then it says
 2   "transcript."
 3       A.   Uh-huh.
 4       Q.   Is this a transcript of the training we were
 5   just discussing?
 6       A.   Yes.
 7       Q.   Okay.  Virtually every entry on here seems
 8   to suggest that you are speaking.  In some context
 9   that seems like it's probably not the case.  Do you
10   know who else was presenting with you?
11       A.   Linda Sweeting and I would have been sitting
12   side by side and the microphone was my microphone
13   picking us up.
14       Q.   Okay.  And do you know how this transcript
15   was prepared?
16       A.   I imagine it is just the automatically
17   generated transcript from the Google Meet.
18           MS. HEYWOOD:  Here is Exhibit 12.
19     (Vinson Exhibit 12 was marked for identification.)
20   BY MR. LEV:
21       Q.   Exhibit 12 is a document Bates stamped
22   E-ECSD 0057845.  That was also produced.  Is this
23   the slideshow that was used in the training?
24       A.   No.  This was the slideshow that I presented
25   at the admin conference to principals.
```

Deposition of Bradley Vinson, Volume 1

```
1        Q.    Okay.   When was that?

2        A.    Late July of 2023.

3        Q.    And what was the -- it covered 1069 or what

4    was the presentation about?

5        A.    It was about -- it covered the 1069 review

6    but also we talked about -- let me review this just

7    a moment.

8             We talked about our policy and at that time

9    we did still have restricted books in our libraries

10   that were not necessarily the HB 1069 books.

11       Q.    And those were books that were restricted

12   based on the challenge?

13       A.    Prior -- yes, prior to my time in my

14   position.

15       Q.    Okay.   Do you know if the slideshow from the

16   1069 training was produced?

17       A.    I thought that it would be but I cannot

18   verify.

19       Q.    Okay.   Fair enough.

20            MS. SMITH:   Are you talking about the

21       training that was referenced in the transcript?

22            MR. LEV:   Yes.   Yeah.   We obviously guessed

23       wrong.

24            MS. SMITH:   There is so many documents, I

25       can't say off the top of my head.
```

Deposition of Bradley Vinson, Volume 1

```
 1   BY MR. LEV:
 2       Q.   Let's look at the transcript.  So July 17th,
 3   this is when it was first provided to those who
 4   could make it?
 5       A.   Yes, I believe so.
 6       Q.   Okay.  And if you look at Page 592 at the
 7   end, there's a reference to it being provided again
 8   the following day.  I can't find it right off my
 9   head.
10       A.   This would likely be the first one.
11       Q.   Does that sound right, you did it two days
12   in a row?
13       A.   Yes.
14       Q.   Okay.  In your declaration you had indicated
15   that three books, "Ace of Spades," "More Happy Than
16   Not" -- sorry, four books, "Ace of Spades," "More
17   Happy Than Not," "Speak," and "The Hate U Give," had
18   all been identified as containing sexual conduct on
19   or before July 17th, when the district's first
20   HB 1069 report was filed.  Is that -- you're welcome
21   to look at your declaration.  I can show you those
22   paragraphs where you indicated that about those
23   books, but my question is so those four books had
24   been identified before this training was conducted,
25   correct?
```

Deposition of Bradley Vinson, Volume 1

1    A.   In June and July, before this training was

2    conducted, Linda Sweeting and I were both reviewing

3    the books that were on the challenged list to see if

4    HB 1069 applied.

5    Q.   Okay.  And did you review all of the books

6    that were on the challenge list?

7    A.   I would have to look back at each one just

8    to determine the exact date, if we made it through

9    the whole list before this training.

10    Q.   Okay.  Did you and Linda Sweeting ultimately

11    make it through the whole list of challenged books?

12    A.   Yes, I believe we did, but again, some

13    things, like the sexual assault definition, our

14    understanding of that shifted a little over time.

15    We did start to revisit some of the books again in

16    spring of 2024 with our Coffee Crew, but it's an

17    ongoing process.

18    Q.   Review some of the books on the challenge

19    list?

20    A.   Yes.

21    Q.   Am I understanding you correctly that with

22    respect to books on the challenge list, those were

23    all reviewed by you and Linda Sweeting?

24    A.   Initially.

25    Q.   And to the extent that there is a Y in that

1    Restricted Access column today, that's because you

2    and Linda Sweeting determined that the book may

3    contain sexual conduct and should be restricted?

4        A.    I would need to review individual books just

5    to say 100 percent yes.

6        Q.    Well, why is that?  Who -- how else could a

7    Y have ended up there if you are telling me that the

8    two of you are the ones who reviewed all the

9    challenged books?

10       A.    If a media specialist went and reviewed it

11   after they had received the training, they might

12   have added something to the HB 1069 list.  That

13   would be an N turning to a Y in some cases, but that

14   would be something that if they indicated that they

15   found sexual conduct present, then we would discuss

16   and change if we reached a consensus.

17       Q.    Who is the we would discuss?

18       A.    Media specialists of the relevant grade

19   level.

20       Q.    At the Coffee Crew?

21       A.    Yes.

22       Q.    So for restricted books, you and Linda -- I

23   just want to make sure I understand this and tell me

24   if I've got this right.  You and Linda Sweeting

25   reviewed the challenged books beginning in June of

1    2023, before this training and continuing after this

2    training, and you reviewed all of them and some of

3    them you determined may contain sexual conduct and

4    were indicated as restricted on the Reconsiderations

5    Spreadsheet because of that, correct?

6        A.    Could you repeat the question?

7        Q.    Sure.  You and Linda Sweeting reviewed all

8    of the challenged books, correct?

9        A.    Correct.

10       Q.    For 1069?

11       A.    Correct.

12       Q.    And if you and Linda Sweeting determined

13   that any of those books may contain sexual conduct,

14   you changed them to a Y on the Reconsiderations

15   Spreadsheet, correct?

16       A.    Yes, if it wasn't a Y already.

17       Q.    Fair enough.  And you also then ensured that

18   they were in fact restricted in all of the libraries

19   that had those titles, if they weren't already

20   restricted, correct?

21       A.    We had those media specialists, librarians,

22   send us those titles for storage.

23       Q.    And what about those books that were already

24   a Y on the restricted -- on the Reconsiderations

25   Spreadsheet that you reviewed and said, whoa, this

Deposition of Bradley Vinson, Volume 1

1    also may contain sexual conduct, what happened to

2    those books in the libraries that contained them?

3        A.   So if it was already a Y and we determined

4    that it may have sexual conduct?

5        Q.   Yes.

6        A.   We would ask for those to be sent to us as

7    well because they would be -- we shifted their

8    circulation type to HB 1069 Storage.

9        Q.   There were no longer an ability to opt in to

10   check those out, correct?

11       A.   If it contained sexual conduct, correct.

12       Q.   That may contain sexual conduct?

13       A.   That may contain sexual conduct.

14       Q.   So at the end of that process there may have

15   been -- well, there were.  There were some books on

16   the challenge -- challenged books on the

17   Reconsiderations Spreadsheet that had a no in that

18   column were restricted even after you and Linda

19   Sweeting reviewed them?

20       A.   Yes.

21       Q.   And it could be that a media specialist

22   reviewed a book, either before you had gotten to it

23   or after you had gotten to it and determined it

24   wasn't restricted, a media specialist could have

25   reviewed a challenged book and flagged it as

Deposition of Bradley Vinson, Volume 1

1    having -- that it may have sexual conduct, correct?

2        A.   Yes.

3        Q.   And what would have happened then and how

4    would you have -- how would that have translated

5    into a Y on the Reconsiderations Spreadsheet, if it

6    wasn't already?

7        A.   So their copy, if they flag it by changing

8    that circulation type, would immediately not be

9    available for circulation.  I would need to review

10   the list to see if there are anywhere a single media

11   specialist flagged it in that way just to make sure

12   that we haven't -- that -- let me back up.  I'm

13   sorry.

14            If a media specialist flagged it, I would

15   need to go in and check to see if others owned it

16   but did not flag it.  It's something that sometimes

17   our media specialists would bring up in

18   conversation, but Linda Sweeting would usually

19   determine the agendas and that was with books that

20   we were aware of that were in our office, and I

21   could see that if a single media specialist flagged

22   it, it might not necessarily reach our level.

23       Q.   Okay.  And how is it that you know now that

24   every one of the Ys on the Reconsiderations

25   Spreadsheet, every one of the ones that has a Y in

Deposition of Bradley Vinson, Volume 1

1    the Restricted Access column, has in fact been

2    identified as may contain sexual conduct?

3        A.   I would just need to review it again, but

4    we've gone through it and we have checked and could

5    always stand to check again with so many titles.

6        Q.   But I just -- I mean, you were very clear on

7    that earlier, that if it has a Y today, that means

8    it may contain sexual conduct, and then you told me

9    you and Linda Sweeting reviewed all those books, so

10   those two things adds up, but then you said maybe a

11   media specialist could have caused this also.

12           I'm just wondering, has there been some

13   comprehensive review of those titles in the

14   connection with this lawsuit, for example, that you

15   said every one of these is restricted under 1069?

16           MS. SMITH:  Objection; form.  You can answer

17       if you understand.

18       A.   Could you repeat the question?

19       Q.   Never mind.  I'll just move on.

20           Going back to your declaration, you talked

21   about this HB 1069 report in July 17th of 2023.

22   What is that 1069 report?

23           MS. SMITH:  Objection; form.

24       A.   Can you tell me exactly where we're talking

25   about?

Deposition of Bradley Vinson, Volume 1

```
 1        Q.   Absolutely.  I'm sorry.  If you look at --
 2   look at Paragraph 43, for example, of your
 3   declaration.  You make reference to the Escambia
 4   County Public Schools first HB 1069 report.
 5        A.   Correct.
 6        Q.   What is that HB 1069 report that you're
 7   referring to there?
 8        A.   So that would be the first time that we
 9   pulled the titles from Destiny with HB 1069 Storage
10   as a limiter, so those would be books that Linda
11   Sweeting or I had marked as may contain sexual
12   conduct.
13        Q.   And were you running these reports on a
14   regular basis?
15        A.   It was a somewhat irregular basis.
16        Q.   Okay.  Were you providing them to anybody?
17        A.   At the time, no.  Media specialists would
18   have access to it but no one outside of that.
19        Q.   Okay.  So when you say the first HB 1069
20   report in July of 2023, that's just the first time
21   you ran this report out of Destiny?
22        A.   Yes.
23        Q.   Okay.  I thought this was some sort of
24   reporting to the State or something, but it's not?
25        A.   No.
```

Deposition of Bradley Vinson, Volume 1

1      Q.   Okay.  I take it those reports aren't posted

2  publicly?

3      A.   At the time they were not.

4      Q.   Are they now?

5      A.   Well, now we provide the HB 1069 that's

6  linked out of the flowchart.

7      Q.   Okay.  And is that --

8      A.   That started, I believe, in December of

9  2023, that we started sharing that.

10     Q.   And there are lots of tabs in that

11  spreadsheet with different dates, correct?

12     A.   Correct.

13     Q.   How is each of those tabs generated?  Is it

14  just run out of Destiny?

15     A.   I run the report in Destiny and then I do

16  limit the columns that I share to the public so that

17  it does not show what the individual school site is.

18     Q.   Why is that?

19     A.   I have media specialists who have received

20  various negative comments in relation to books in

21  their collections, and I do this out of hope that I

22  can protect them from some of that backlash.

23     Q.   Okay.  And so each of those dated tabs

24  reflect the report run out of Destiny as of that

25  date that has an HB 1069 -- for all the books that

Deposition of Bradley Vinson, Volume 1

1    have an HB 1069 circulation type, correct?

2        A.    Correct.

3        Q.    And so, therefore, each of those tabs, the

4    most recent tab is sort of comprehensive as of its

5    date?

6        A.    Yes.

7        Q.    If books have gone back into circulation,

8    they wouldn't appear on that tab, correct?

9        A.    Correct.

10       Q.    Okay.  And it shows an entry for every copy

11   of a book in question, correct, like a separate

12   line?  If there is five copies of a book that have

13   been restricted, it's going to show you that book

14   five times?

15       A.    Correct.

16       Q.    Okay.  And there's no way to tell from the

17   publicly available version of the spreadsheet

18   whether that reflects all of the copies that the

19   school district owns or just some of the copies that

20   are in school libraries, correct?

21       A.    You would have to cross-reference it with

22   Destiny.

23       Q.    Okay.  If we can turn back to the training

24   that you gave and look at page 66578, in the

25   fourth -- have I got the wrong page?  I'm sorry.

Deposition of Bradley Vinson, Volume 1

```
 1   This is going to be tough.
 2            It's the fourth full paragraph above the
 3   number 10.  It says:  We will be working in tandem
 4   with this process that we're discussing today.
 5   We'll be working with representatives from the
 6   district and hopefully gathering input from school
 7   board representatives and from teachers and admins
 8   and students to help develop community standards.
 9   That could help us determine what the age
10   appropriate levels are for these materials, but that
11   is a process that is still being developed.
12        A.   That was the community standards process
13   that we hoped to develop, maybe to form a task force
14   to develop, but we were unable to do so.
15        Q.   That is no longer in the works, correct?
16        A.   Correct.
17        Q.   Okay.  And if we go to the next page and you
18   look at the fourth full paragraph, it says:  So here
19   is the definition of sexual conduct that I already
20   read out loud.  Now, there is another section of the
21   statute that describes sexually oriented material
22   and we've included this because we found that the
23   definition here can actually be more useful in the
24   content that is sexual in nature in graphic novels.
25   And nonfiction.  And nonfiction.  Thank you.  And
```

Deposition of Bradley Vinson, Volume 1

1  so -- (garbled) -- but the important part for me --

2  because we do want to err on the side of caution.  I

3  encourage you to be familiar with these definitions

4  as well, and if you find material with those -- that

5  content, it would also need to be pulled.

6       So you were instructing teachers to pull

7  books not just based on the definition of sexual

8  conduct in this statute, but also another part of

9  the statute that describes sexually oriented

10 material?

11      MS. SMITH:  Objection; form.

12      Q.   You can answer.

13      A.   Okay.  So this -- I believe that this is

14 showing up twice because Linda Sweeting was speaking

15 and then I was speaking at some point, but we were

16 referring to -- give me just a moment.

17      Q.   Yep.

18      A.   I might need to do a little more digging to

19 be able to answer specifically what language we were

20 referring to.

21      Q.   But it was --

22      A.   It might have been this sexually oriented

23 material, Number 21.

24      Q.   You were instructing the media specialists

25 that they should be looking to that definition in

Deposition of Bradley Vinson, Volume 1

1  addition to the definition of sexual conduct,

2  correct?

3      A.   We did have that included in that initial

4  training just to try to help them identify in a

5  visual representation what might be considered

6  sexual conduct.

7      Q.   And you told them that they should err on

8  the side of caution meaning when in doubt, pull the

9  book?

10     A.   Correct, and that's per our library media

11 training from the State of Florida.

12     Q.   Okay.  If we look further down in the

13 training on that same page, 66579, the third

14 paragraph from the bottom, in the middle it says:

15 So, for example, one of you has a book and you've

16 already switched it.  If I go in and I see copies at

17 another location, I will go in and I will change the

18 circ type for that to HB 1069 and then I will

19 periodically, once or twice a week, send you a new

20 list that will look like this, that will show you

21 the books that need to be pulled.

22          Do you see that?

23     A.   I do.

24     Q.   I understood this to mean that if a media

25 specialist switched the circulation type of a book

Deposition of Bradley Vinson, Volume 1

1    in Destiny for their library to HB 1069, you would

2    go in and do the same for copies in other libraries.

3    Is that -- did I misunderstand that?

4        A.    That was something we were considering doing

5    but it was a fluid process at the time.  I was

6    looking to relieve the burden from our media

7    specialists from having to go in and actually mark

8    every single book, but, ultimately, this was not

9    something that we did unless a media specialist

10   asked us to do so.  If that media specialist

11   indicated that he or she trusted the review of a

12   fellow media specialist, then we went in and did it

13   in those cases.

14       Q.    Okay.

15       A.    But we ultimately did not do it across the

16   board at the beginning of the process.

17       Q.    Have you ever done it across the board?

18       A.    When we have met and then had the

19   determination with our Coffee Crews, we have gone in

20   and changed some following those.

21       Q.    Okay.  And with respect to challenged books,

22   has that ever happened, like are the challenged

23   books -- and we talked about this a little bit.

24   When you and Linda Sweeting, if you determined that

25   a challenged book may contain sexual conduct, did

Deposition of Bradley Vinson, Volume 1

1    you change that at all the schools?

2        A.    We did -- we did change that at all the

3    schools, but we do -- we have periodically brought

4    up at least some of those titles for discussion with

5    the relevant groups of media specialists as well.

6        Q.    Understand.  I'm trying to understand the

7    scope of the potential of having a book that is --

8    the same titled restricted in one library and

9    unrestricted in another, and it sounds like that's

10   possible in the general flow of things because you

11   don't go in and change it for everybody for

12   circulation type?

13       A.    Correct.

14       Q.    But for the challenged books, it seems to me

15   like it was a more centralized process that was run

16   by you and Linda Sweeting, and if you made that

17   determination, it would have applied across all of

18   the holdings for the challenged books?

19       A.    That is correct.

20       Q.    Okay.  Let's go to Page 66586 for a

21   moment -- actually, I'm sorry.  Yeah, let's go to

22   66586, and then if you look at the third paragraph

23   from the bottom, you say:  Anyone on staff who can

24   help you pull items.  I think that saying this has

25   sexual conduct and sending it for review is

Deposition of Bradley Vinson, Volume 1

1    something that anyone can assist you with, but then

2    it does need to be a Certified Media Specialist who

3    then says these are ready to check out.

4         Do you see that?

5    A.    Uh-huh.

6    Q.    And so I understand that to mean that

7    anybody can pull a book from circulation because it

8    may have sexual conduct, but only media specialists

9    can return it to circulation; is that correct?

10   A.    A certified media specialist had to select

11   the material to circulate, yes.

12   Q.    But anybody could -- do they need to be a

13   Certified Media Specialist to pull it in the first

14   instance?

15   A.    Well, in the first instance everything was

16   pulled.

17   Q.    So what are you talking about there then?

18   Who would be pulling?  That's a fair point.

19   A.    There were some people who -- some teachers

20   or clerks who assisted the media specialists in

21   their review, but they would have made any decisions

22   on pulling things for further review in consultation

23   with the media specialist.

24   Q.    So what you're referring to here is all the

25   books have been pulled, the media specialist are

Deposition of Bradley Vinson, Volume 1

1   each looking at their collection to see what can go

2   back to circulation, and what you're saying is if

3   you want to send it back to circulation, the media

4   specialist has to sign off; if you want to send it

5   on for further review and it will stay restricted,

6   that doesn't have to be a media specialist?

7       A.   We did have other people besides media

8   specialists helping with that and, yes, they could

9   send it on for further review.

10      Q.   Okay.  So if we go to 66582, at the very

11  bottom it says:  If it's got people touching other

12  people's parts or showing naked parts, it has to be

13  pulled.  There is no consideration for art forms for

14  the work as a whole.  That then becomes part of what

15  has to be reviewed through the board policy.

16           So am I correct in interpreting that as when

17  media specialists are reviewing their collection to

18  see what can go back in circulation, they were not

19  considering the book as a whole, it's age

20  appropriateness as a whole, they were simply focused

21  on is there any entry here that may meet the

22  definition of sexual conduct, and if so, it gets

23  sent off for further review?

24      A.   Our HB 1069 indicated that if there was

25  sexual conduct and it was not age appropriate, that

Deposition of Bradley Vinson, Volume 1

1   it should be something that is not provided.  So we

2   did indicate, without looking at the book as a

3   whole, if there was a portion of the book that did

4   represent or portray sexual conduct, then we did

5   pull it for further review.

6       Q.   How did -- your answer differed from this in

7   that you referenced age appropriate or grade level

8   appropriateness.  How -- was that baked into this

9   process when media specialists were reviewing

10  titles, or were they just saying this has, you know,

11  people touching other people's parts, I have to send

12  it for other review?

13      A.   The initial net that we cast was to identify

14  where sexual conduct was present, and then we worked

15  over time to determine if those titles were age

16  appropriate for the collections where they were, and

17  that's a process that's still ongoing.  That's part

18  of the further review.

19      Q.   And that's true for the challenged books as

20  well, the ones that are restricted, no determination

21  has been made as to the age appropriateness of those

22  books, just that they may contain sexual conduct?

23      A.   If we've had the opportunity to discuss it

24  with our Coffee Crew, we may have changed one or two

25  of them for age appropriateness, but I'd have to

Deposition of Bradley Vinson, Volume 1

```
 1    look back at my notes to see which ones exactly.
 2        Q.    But anyone that is listed as a Y in the
 3    Restricted Access column would not have had that
 4    determination made yet, correct?
 5            MS. SMITH:  Objection; form.
 6        A.    What do you mean?
 7        Q.    For the challenged books that have a Y in
 8    the Restricted Access column, no age appropriateness
 9    determination has been made under HB 1069, correct?
10        A.    We have not determined that it is age
11    appropriate for our collections at this time if it
12    has a Y in the Restricted Access column.
13        Q.    You haven't determined that it's not age
14    appropriate either, you just have not made any
15    determination?
16        A.    Any determination, correct.
17        Q.    Okay.  If you go to the top of 66583, in the
18    third paragraph after the 00:30 mark, you say:  I
19    would read the summary in Destiny.  I would look for
20    the professional reviews and I would check Common
21    Sense Media and Book Looks but I wouldn't read the
22    whole book to get that information.
23            What was the role that Book Looks played in
24    this review?
25        A.    We would utilize Book Looks if we needed to
```

Deposition of Bradley Vinson, Volume 1

```
 1   see specific passages where sexual conduct might be

 2   present.

 3       Q.   Because they identify those?

 4       A.   Because they do identify those, yes.

 5       Q.   And a few paragraphs down do you say --

 6   you're talking about Book Looks, if you look at the

 7   next paragraph, and then the paragraph after that

 8   you say:  If it's a 4 or 5, you're going to be

 9   pulling it.

10           So the guidance was if Book Looks has rated

11   a book as 4 or 5, it's going to be pulled for

12   further review?

13       A.   I would have to look at their ratings just

14   to be sure, but I believe a 4 or a 5 in Book Looks

15   does indicate that explicit sexual content is

16   present, but we would also read the passages to

17   verify that that is the case.

18       Q.   Does that tell you to do that here?

19       A.   I would need to look through this whole

20   transcript.  Give me just a moment.

21           They pulled the pages and you can read

22   through and see what it is that they've pulled it

23   for and the reasons that they give it the rating.

24       Q.   And if you continue there, right where you

25   were reading, it says:  If they say we had sex
```

Deposition of Bradley Vinson, Volume 1

1    yesterday, that's not sexual conduct.

2        A.    That's off-screen.

3        Q.    If it says "he reached down to my pants and

4    unbuttoned the top button and then put his hand on

5    my thigh," it's out.

6            What part of the definition of sexual

7    conduct does that putting hand down -- reached down

8    to my -- does that statement violate?

9            MS. SMITH:    Objection; form.

10           MR. LEV:    That's a fair objection.

11       Q.    "He reached down to my pants and unbuttoned

12   the top button and then put his hand on my thigh,"

13   can you tell me which part of the definition of

14   sexual conduct that meets?

15       A.    I would question the transcript here and I

16   would say it might actually read "he reached down my

17   pants" and not "down to my pants," and then that

18   would be actual physical contact with a person's

19   clothed or unclothed genitals, pubic area, buttocks

20   or, if such a person is female, breasts, with the

21   intent to arouse or gratify a sexual desire of

22   either party.

23       Q.    I see.  Okay.  Just one moment.  I'll cut a

24   lot of this out.

25           7851 -- no, that makes no sense.  57851 --

Deposition of Bradley Vinson, Volume 1

1    does that make sense?  No, that doesn't either.

2    I've clearly garbled something in my notes.

3            Let's go to -- back to your declaration.  In

4    Paragraph 27 you talk about a media specialist being

5    able to change the status of a book in their

6    collection.  That's the circulation status in

7    Destiny?

8        A.    That's correct.

9        Q.    Okay.

10       A.    Circulation type.

11       Q.    Circulation type.  Thank you.  And you refer

12   here to the potential presence of sexual conduct and

13   the need for further review.  What does the

14   potential presence of sexual conduct mean?

15       A.    In some cases the media specialist may be

16   relying on some indication in the professional

17   reviews and they have not actually found the passage

18   in the book itself.

19       Q.    I see.  So it's a, hey, this might have it,

20   so let's pull it to err on the side of caution?

21       A.    Yes.

22       Q.    Okay.  And then in Paragraph 28 you say:

23   Media specialists began meeting with high school

24   media specialists on a weekly basis in October 2023

25   in order to begin discussing books that had been

Deposition of Bradley Vinson, Volume 1

1    marked as needing further review under HB 1069.

2          Is this a reference to the Coffee Crew?

3       A.    Yes.

4       Q.    And when you say media specialists began

5    meeting with high school media specialists, who was

6    in these meetings?

7       A.    Escambia County Public School media

8    specialists, that would be me and Linda Sweeting.

9       Q.    And then the high school media specialists?

10      A.    Yes.

11      Q.    And did all of the high school media

12   specialists attend these Coffee Crew meetings?

13      A.    As many as could.  It was not always all of

14   them.  There was one who usually had other

15   obligations and was often unable to attend.  There

16   were two or three of them that I think were present

17   for every meeting, but I would have to review to

18   see.

19      Q.    How many high school media specialists are

20   there?

21      A.    We have seven.

22      Q.    And you attended all of these Coffee Crew

23   meetings?

24      A.    There may have been a couple where Linda ran

25   the meeting and I was unable to be present.

Deposition of Bradley Vinson, Volume 1

1    Q.    When you were there, how many people were

2    there counting yourself and Linda?

3    A.    Counting us?

4    Q.    Yeah.

5    A.    Fivish, six maybe.

6    Q.    Okay.  And was there a requirement that the

7    media specialists have to have read the books that

8    you were discussing?

9    A.    We did not require them to have read the

10   whole book.

11   Q.    And how did you all make decisions?  Was it

12   by vote or discussion and you and Linda made the

13   decision?  What was --

14   A.    We were not following Robert's Rules of

15   Order.  We discussed and reached a consensus.  We

16   have a fairly comfortable group and if someone felt

17   that something could be age appropriate, they seemed

18   to feel comfortable speaking up about that and then

19   we would discuss it further.

20   Q.    And were there any instances where there was

21   disagreement at the end and you just had to call it

22   one way or the other?

23   A.    No, I can't think of any instances where we

24   did not reach a consensus.

25   Q.    That's impressive.

Deposition of Bradley Vinson, Volume 1

```
 1        A.   Well, I will say if we didn't reach a
 2   consensus, we sent it on for community review.
 3        Q.   Ah, okay.  Fair enough.  I just want to get
 4   through this section and then we'll break for lunch.
 5   Are you okay continuing?
 6        A.   Uh-huh.
 7        Q.   Okay.
 8            MS. HEYWOOD:  This is Exhibit 13.
 9      (Vinson Exhibit 13 was marked for identification.)
10            MS. HEYWOOD:  I think I have one for you,
11        Nicole.
12            MS. SMITH:  Thank you.  Appreciate it.
13   BY MR. LEV:
14        Q.   So this is a document Bates stamped on the
15   first page E-ECSD 0049201 and it goes through
16   0049217, Coffee Crew Members, Agenda, and Minutes
17   (notes).
18            Is this the same document you had brought
19   with you this morning?
20        A.   Yes.
21        Q.   Okay.  And what is this document?
22        A.   These are the agenda, minutes and notes from
23   the meetings that we held on -- mostly a weekly
24   basis.  Well, I can't say weekly basis but on a
25   regular basis with our high school media specialists
```

Deposition of Bradley Vinson, Volume 1

1    to discuss titles that were on our HB 1069 list.

2         Q.   If you look at the second to last page, it

3    says Tuesday October 31st.  Is that when these

4    meetings started?

5         A.   Yes.

6         Q.   The document, the first page, it says

7    Tuesday, March 5th, 2023.  I assume that's supposed

8    to be 2024.

9         A.   I think it is, yes.

10        Q.   Okay.  Yeah.  If you go through here, there

11   is a page 49209, there is a January 16th, 2023.

12        A.   But that would be 2024.

13        Q.   And everything in date after that should be

14   2024?

15        A.   Yes, that's correct.

16        Q.   And has the Coffee Crew for high school met

17   since March 5th, 2023 [sic]?

18        A.   I believe we did have an additional meeting

19   after that.

20        Q.   And this document is comprehensive, it

21   includes the notes and agenda for all of the

22   meetings through the March 5th date of the high

23   school Coffee Crew, correct?

24        A.   Correct.

25        Q.   Okay.  Who prepared this document?  Who took

Deposition of Bradley Vinson, Volume 1

1    the notes?

2        A.    Linda Sweeting would usually take the notes.

3        Q.    Okay.  And can you explain to me, like, how

4    I would read it and identify what decisions were

5    made?

6        A.    So do you want to take one of the particular

7    meeting dates as an example?

8        Q.    Let's take March 5th, 2023.

9        A.    2024 though.

10       Q.    2024, yes.

11       A.    So you can see the date that we met and the

12   time.  We would have a link to our spreadsheets.  I

13   want to say that one of them is that ES+, MS+, high

14   school to return spreadsheets, and then our

15   classroom library shopping.  So we have a selection

16   of donated books at the district level that we

17   welcome them to ask us to send them as free books

18   that they can add to their collections or give to

19   their teachers for classroom libraries, and then you

20   can see we discussed the topics that are listed

21   there.

22       Q.    What is -- on the spreadsheet links one of

23   them says "reading list" above the classroom library

24   shopping.

25       A.    We do have a list where we have asked media

1    specialists or others to volunteer to read the books

2    in their entirety to help us better make a

3    determination.

4        Q.    And that tracks who has signed up for which

5    book?

6        A.    Yes.

7        Q.    And is it -- okay.

8        A.    And it's hard to get people to sign up.

9        Q.    Let's -- it seems like a bad meeting to

10   focus on.  Let's look at the next one, February

11   27th.

12       A.    So you can see the books that we had on our

13   list to review.  So it's the author and if there

14   were multiple titles by that author, like the

15   Suzanne Young titles, you can see them listed under

16   that heading.

17            And alongside the title, if it was just one

18   title, or alongside the author, we would put

19   recommendations after our discussion.  That was the

20   notes that we kept, is what the determination was.

21       Q.    And so looking at this, Sarah Shepard,

22   Flawless, Recommended for high school, does that

23   mean that that book would then have been released

24   for circulation in high school libraries?

25       A.    Yes.

Deposition of Bradley Vinson, Volume 1

1    Q.   And would that be a final decision as to

2    whether -- I don't know if this book -- what if this

3    book had been present in middle school libraries?

4    A.   So where we say recommended for high school,

5    we are not telling the middle school librarians that

6    they cannot have it.  We actually -- earlier on, the

7    high school media specialists stated that they did

8    not feel comfortable making the determination for

9    the middle school media specialists.  So they might

10   say recommended for high school but that was not a

11   final determination for those young adult

12   collections in middle schools.  We wanted those

13   decisions to be made by those middle school media

14   specialists.

15   Q.   Is that a separate Coffee Crew?

16   A.   Yes, that's Coffee Crew Junior.

17   Q.   Okay.  And so "Flawless" would get changed,

18   for example, after this meeting?  Would you go in

19   and change its circulation status for high schools?

20   A.   Yes.  If we had high school copies that were

21   HB 1069, we would change those back to their regular

22   circulation type.

23   Q.   And you would send the books physically back

24   to the libraries?

25   A.   If we have them in our possession, yes.

Deposition of Bradley Vinson, Volume 1

1    Q.    You would do this?

2    A.    Linda Sweeting usually handles that.

3    Q.    That was done after each Coffee Crew

4    meeting?

5    A.    Yes.

6    Q.    And was the books reviewed for 1069

7    spreadsheet updated as well to indicate those books

8    had been reviewed?

9    A.    So the books pulled for HB 1069, you said?

10    Q.    I'm sorry.  If we look at the flowchart --

11    let's see who can find it first.

12        MS. SMITH:  Good job.

13    Q.    The very top.

14    A.    This one?

15    Q.    Books returned to elementary school, middle

16    school, or high school, that spreadsheet.

17    A.    So Linda would typically take whatever that,

18    you know, recommendation was here and put it in the

19    column for that recommendation there.

20    Q.    Okay.  And I see -- so just looking at

21    "Flawless," recommended for high school, that's your

22    decision.  All of the rest of this was in the

23    document before the meeting, the author, the book,

24    and then from the publisher and the recommended

25    grade levels from the publisher?

```
 1       A.   Linda would compile that information prior
 2   to the meeting.
 3       Q.   Okay.  If you go down to the first meeting,
 4   there's a bunch of entries that say MSYA.
 5       A.   That was when we were still including middle
 6   schools, before the high school media specialists
 7   indicated that they would rather leave that to the
 8   middle school media specialists.
 9       Q.   But in those cases, were those decisions
10   then implemented and the books were returned to the
11   young adult sections of the middle schools in the
12   same process we just discussed?
13       A.   I would need to check with Linda to see how
14   they communicated that to the middle schools.  Yeah,
15   I would need to check on that.
16       Q.   But those books also would have been updated
17   on that spreadsheet of return to middle --
18       A.   Yes.
19       Q.   Okay.  What about entries that say "store
20   for community review"?
21       A.   We held onto those and we would actually, at
22   that point, go in and pull any copies that we did
23   not already have.
24       Q.   I see.  So if there were copies that were
25   still circulating because a media specialist hadn't
```

1    flagged copies at their school, you would now change

2    the circulation type and pull those books?

3        A.   Yes.

4        Q.   And that would go to the further review we

5    talked about earlier when you were looking at the

6    flowchart, that will be you and Ms. Sweeting or

7    potentially a committee?

8        A.   At the time, we envisioned it as being

9    either a community standards informed process or it

10   would go to a District Materials Review Committee,

11   yes.

12       Q.   Okay.  But that's the process we spoke about

13   earlier in terms of further review?

14       A.   Yes.

15       Q.   Okay.  If you go, for example, to Page

16   49213, and the third diamond from the bottom, "The

17   Lovely Bones," by Alice Seabold, it says:  Table

18   discussion until larger group, suggest reading to

19   discuss in January, two to three people per book.

20            What does that mean in this specific case

21   and more generally, like, the process that that's

22   reflecting?

23       A.   So we were not -- we did not feel like we

24   could make a decision without reading the book in

25   its entirety, and we added it to the need to read

Deposition of Bradley Vinson, Volume 1

```
 1   list.
 2       Q.   I see.  And because this content -- the
 3   decisions you-all were making at the Coffee Crew
 4   were the decisions about not just does it contain
 5   sexual conduct, but what is the appropriate grade
 6   level or age group level of the book?
 7       A.   Correct, and I believe that's an adult book.
 8       Q.   And so any time we see, you know, suggest
 9   reading to discuss or something like that, that
10   means it was added to the spreadsheet for someone to
11   volunteer to read it?
12       A.   Yes.
13       Q.   Okay.  And there's no deadline on those
14   books getting read, correct?
15       A.   Correct.
16       Q.   If you go to 49212, the prior page, you'll
17   see an entry at the very top:  Media Services to
18   further review for Recommended for HS or move to
19   Community Review.
20            What does that mean when it says Media
21   Services to further review?
22       A.   It means our department would further review
23   it.
24       Q.   What is your department?
25       A.   Linda Sweeting and myself.
```

Deposition of Bradley Vinson, Volume 1

1    Q.   I see.  So sort of the committee is

2    deferring to you to decide whether to release it to

3    high schools or send it on for further review?

4    A.   Yes.

5    Q.   If you look at 49210, under "Save for next

6    week," there are some entries or one entry that

7    says:  From the form: 13+ but this note was

8    concerning.

9         What is that note referring to, from the

10   form?

11   A.   I imagine that's referring to the challenge

12   form but I would need to cross-reference to

13   double-check.

14   Q.   That seems unlikely to me only because if

15   you look down further, you see:  From the form: 14+

16   JLG indicates strong sexual content?

17        But is that -- you still think that is a

18   reference to a challenge form?

19        MS. SMITH:  Objection; form.

20   A.   I'm not sure.

21   Q.   Okay.  Do you know what JLG is?

22   A.   That's Junior Library Guild.

23   Q.   What is that?

24   A.   That's a book vendor.  They provide curated

25   collections to libraries, so they say they have

Deposition of Bradley Vinson, Volume 1

```
1    librarians on staff who will make the

2    recommendations of what is sent and you actually

3    don't select -- I mean you can, I think you can

4    select specific titles but, generally, they will

5    send you a group of, you know, recommended graphic

6    novels, for example, each month if you have their

7    service.

8        Q.   And when it says "JLG indicates strong

9    sexual content," this is in their catalog, they

10   describe the books?

11       A.   They have some, yeah, identifying

12   information.

13       Q.   I see.  If you go to 49208, in the middle of

14   the page it says:  Return all graphic novels for

15   media specialists to review for sexual conduct now

16   that there is a better understanding of the law and

17   its requirements.

18            And if you look in the prior page, this is

19   from January 30th, 2024.  What is that referring to?

20   What is the better understanding of the law and its

21   requirements?

22       A.   I think we were referring to our developing

23   understanding of the sexual battery piece, sexual

24   battery that is occurring or may occur.  I think

25   that there were things that our media specialists
```

1  sent because they depicted some sort of unwanted

2  touch, but as we came to understand, that unwanted

3  touch did not necessarily constitute sexual battery.

4      Q.    And why was then -- why was it graphic

5  novels that were being sent back for review based on

6  this?

7      A.    I would have to go back and look at my notes

8  to determine.  It may just be that that was a

9  subsection of the books that were sent to us

10  where -- you know, sometimes the media specialists

11  would include sticky notes showing certain pages,

12  and I think maybe we were encountering that

13  particular interpretation of HB 1069, and so at that

14  point we sent those back for that reevaluation.

15      Q.    And if we turn to 49207, almost near the

16  bottom it says:  "Unravel Me" and "Defy Me" - both

17  are formally challenged.

18          What does that mean?

19      A.    They are books that have received a

20  challenge that are in our Reconsiderations

21  Spreadsheet.

22      Q.    And why was this relevant to the Coffee

23  Crew's determination?

24      A.    We wanted to look at all of the books in the

25  series in our discussion, so we had media

1    specialists who had pulled some of those other

2    titles from the same series and we thought that if

3    we were going to discuss all of those titles, we

4    might as well include the full set.

5        Q.   Was the fact that the book was formally

6    challenged, did that have any impact on the

7    determination you were making?

8        A.    No.  I think it was just something we wanted

9    to be aware of, that it would still need to go

10   through the process before a final determination was

11   made.

12       Q.   But if you reviewed a book that was formally

13   challenged and thought it was age appropriate for

14   high school under 1069, would you release it to high

15   school while the broader challenge to the book was

16   pending?

17       A.    Could you repeat the question?

18       Q.    Sure.  So let's take a hypothetical book

19   that's been challenged, and in your Coffee Club you

20   review that book and you say, "Well, it contains

21   sexual conduct but it's age appropriate for high

22   school."  So if it weren't a challenged book, in

23   that circumstance, as we've discussed, you would

24   have released that book to high school circulation,

25   correct?

1     A.   If we received a challenge on it, it's

2  because there is someone in the community who

3  believes it is not age appropriate.  So if it

4  contains sexual conduct and we had a challenge, we

5  would keep it restricted.

6     Q.   Okay.

7     A.   In this case.

8     Q.   So if we have the same book, you-all would

9  look at it, you would say this is appropriate for

10  high school, you're applying 1069, you would say

11  we're going to release it to the high schools,

12  change the status in Destiny, send back the books,

13  like we talked about, correct?

14     A.   Can you repeat that?

15     Q.   Sure.

16     A.   I'm sorry, just to be sure I understand

17  which books we're talking about.

18     Q.   You have a book, it is not on the challenge

19  list, it is discussed at Coffee Crew, you say yes,

20  this book does contain sexual conduct but it's age

21  appropriate for high school, you note your --

22     A.   Recommended for high school or MSYA opt-in,

23  et cetera.

24     Q.   Right.  And then that book would go back

25  onto the high school shelves, correct?

Deposition of Bradley Vinson, Volume 1

1    A.   That HB 1069 review book that is not

2    formally challenged, that we determined was age

3    appropriate, yes, could go back on the shelf.

4    Q.   Would go back on the shelves, correct?

5    A.   Would go back on the shelves.

6    Q.   Okay.  That same exact book, same exact

7    determination that you-all have made, that it's

8    appropriate for high school, if it was challenged,

9    would not go back on the shelves, correct?

10    MS. SMITH:  Objection; form.

11    A.   If it was challenged and indicated sexual

12    anything, if it indicated that their challenge was

13    based on the sexual situations or sexual content in

14    the book, then we did err on the side of caution and

15    keep it restricted, I believe.  I would need to

16    double-check all of my --

17    Q.   Well, this is a pretty key point.  I'm going

18    to ask you to check this during your break because

19    it's a core issue here.

20    A.   Sure.

21    Q.   And so when you said to me -- when you

22    testified earlier this morning that every book on

23    that Reconsiderations Spreadsheet that has a Y under

24    the Restricted Column is restricted because of 1069,

25    that would include books that the Coffee Crew

Deposition of Bradley Vinson, Volume 1

1    determined were age appropriate for some age group

2    but continues to restrict because of the pending

3    challenge, correct?

4         MS. SMITH:  Objection; form.

5    A.   I'm going to need you to repeat it for me.

6    Sorry.

7    Q.   When you told me this morning that every

8    book on the Reconsiderations Spreadsheet that has a

9    Y in the Restricted Access column is restricted

10   because of 1069 -- do you remember that testimony?

11   A.   Because it contains sexual conduct, yes.

12   Q.   Right.  Because it contains sexual conduct,

13   right?

14   A.   Uh-huh.  Yes.

15   Q.   Some of those books, however, although they

16   contain sexual conduct, the Coffee Crew has

17   determined are age appropriate for some age group

18   but they remain restricted because of the challenge,

19   correct?

20        MS. SMITH:  Objection; form.

21   A.   I would need to look back at them.  The

22   Coffee Crew, if they determined that something could

23   be -- I would need to look at the individual titles

24   in question, because if it has sexual conduct and

25   it's challenged, those books remained restricted.

Deposition of Bradley Vinson, Volume 1

1          I can't think of an example where something
2    had sexual conduct and we unrestricted it.
3         Q.   I understand, but can you think of an
4    example where something had sexual conduct, you
5    determined that it had sexual conduct but was age
6    appropriate for high school students or some subset
7    of high school students or for any age group, that's
8    the question?
9         A.   Is it challenged or is it an HB 1069 review
10   book?
11        Q.   Well, there are lots of -- all of the
12   challenged books are both, right?  It was challenged
13   but it's still undergoing HB 1069 review.
14        A.   But it is a subset.
15        Q.   Okay.  For that subset of books, it was
16   challenged, okay, it was challenged because of
17   something sexual, you, the Coffee Crew, reviews the
18   book, you determine that it is age appropriate for
19   high school, it contains sexual conduct and it's age
20   appropriate for high school, would that be
21   restricted or not?
22        MS. SMITH:  Form.
23        A.   I can't think of an example of a book that
24   contains sexual conduct.  I would need to go through
25   and check.

Deposition of Bradley Vinson, Volume 1

```
 1       Q.   So let's go to 49205.  Are you okay to keep

 2   going?  I know we've been going for a while.

 3            MS. SMITH:  Do you need a lunch break?

 4            THE WITNESS:  I'm okay.

 5            MS. SMITH:  How much longer do you think you

 6       have on this section?

 7            MR. LEV:  Well --

 8            MS. SMITH:  It looks like a lot.

 9            MR. LEV:  Yeah.

10            MS. SMITH:  I feel like you're getting tired

11       here.

12            MR. LEV:  Can we do this one last piece and

13       then we'll break for lunch?

14            MS. SMITH:  Yes.  And I'm sorry, Ori, which

15       Bates number did you just call out?

16            MR. LEV:  49205.

17            MS. SMITH:  Okay.

18   BY MR. LEV:

19       Q.   So you see the -- it says:  "The Hate U

20   Give" by Angie Thomas, High School for

21   sure/Challenged for Middle School.

22       A.   I do see that.

23       Q.   Okay.  And it's a little hard to tell from

24   the printing but based on what you've testified, I

25   am understanding "HS for sure/Challenged for middle
```

1  school," does that reflect the committee's

2  commission?

3      A.   I'm actually not sure what "HS for sure"

4  means in this case.  I would need to review the

5  challenge form for "The Hate U Give."  Can I do

6  that?

7      Q.   Sure.  Let's do that.  So we're all going to

8  the Reconsiderations Spreadsheet.

9      A.   So we interpreted the challenge for "The

10  Hate U Give" to only be a challenge to the book

11  being present in middle school collections, which it

12  indicates on the challenge form, and so we

13  interpreted that as because it's challenged at the

14  middle school level, and we did find that it

15  contains sexual conduct, that we needed to restrict

16  access at the middle school level even though it did

17  not -- it said age inappropriate, it did not say

18  sexual conduct, but it said age inappropriate.

19      Q.   Did you make a determination as to whether

20  "The Hate U Give" was -- even though you determined

21  it contained sexual conduct, did you make a

22  determination at the Coffee Crew as to whether it

23  was age appropriate for middle school or not?

24      A.   I think we determined that it should be

25  restricted for middle school because of the sexual

Deposition of Bradley Vinson, Volume 1

```
 1    conduct.
 2        Q.   Because of the sexual conduct or because of
 3    the challenge?  That's really my question.
 4        A.   Because of the sexual conduct.
 5        Q.   So you thought this is age inappropriate for
 6    middle school?
 7        A.   We thought that there was a question of it
 8    and so it should be reviewed further.
 9        Q.   Uh-huh.  And if you had thought that it was
10    age appropriate for middle school, would you have
11    continued to restrict it because of the challenge?
12        A.   The challenge does say age inappropriate.  I
13    don't know.  I'm not entirely certain if I would
14    continue to restrict it or not.  I'm sorry.
15        Q.   You run the Coffee Crews, right?
16        A.   I was present for most meetings, yes.
17        Q.   You are running the process?
18        A.   Uh-huh.
19        Q.   I'm trying to understand what the policy,
20    and I don't mean an official adopted policy, but the
21    actual policy you're implementing in these meetings
22    as with respect to challenged books and if the fact
23    of a challenge has any impact on whether that book
24    goes back to the shelf or not.
25        A.   So it's challenged and it does contain
```

Deposition of Bradley Vinson, Volume 1

1    sexual conduct, we found that to be the case, and so

2    we are restricting it for the pendency of the

3    challenge process for the challenged level of middle

4    schools.

5            MR. LEV:  Okay.  All right.  Why don't we

6        break for lunch.

7        (Recess from 12:36 p.m. until 1:36 p.m.)

8    BY MR. LEV:

9        Q.   Ms. Vinson, I'll just remind you that you

10   are still under oath.

11       A.   Yes.

12       Q.   How many hours would you estimate you spent

13   preparing for today's deposition?

14       A.   To include time spent in meetings with the

15   lawyers, our lawyers?

16       Q.   Yes.

17       A.   Okay.  Easily 25.

18       Q.   And how many of those were hours spent in

19   meetings with your lawyers, would you estimate?

20       A.   At least 12.

21       Q.   Okay.

22           MR. LEV:  Can we show Exhibit 14?

23     (Vinson Exhibit 14 was marked for identification.)

24   BY MR. LEV:

25       Q.   I'm giving you what's been marked

1    Exhibit 14, Bates stamped E-ECSD 0050012.  It's an

2    e-mail from you dated January 10th, 2024.  Do you

3    recognize this?

4        A.    I do.

5        Q.    What was the context that caused you to send

6    this e-mail out?

7        A.    So after I had shared the HB 1069 list on

8    our website in December, there were some news

9    articles or posts made regarding the books that were

10   on that list, and I sent this out to our media

11   specialists to try to alleviate some of the concerns

12   that they were having related to that media

13   scrutiny.

14       Q.    The media scrutiny was over the number of

15   books that had been made unavailable to students in

16   school libraries?

17       A.    Yes, yes.

18       Q.    And in the second full paragraph it says:

19   As we have been moving forward in our review

20   process, we have come to a better understanding of

21   the requirements of the legislation.

22             Is that the same better understanding that

23   we've discussed earlier regarding sexual battery?

24       A.    Yes.

25       Q.    And there is a paragraph that says:  We have

Deposition of Bradley Vinson, Volume 1

1    been pulling books for media specialists' collective

2    review from books here in our office, but there are

3    large number of books still marked as "Available" in

4    the 1069 report.

5         What does that mean?

6    A.    It means that the media specialists had not

7    yet sent the physical copy to our office.

8    Q.    It had been marked as HB 1069 in Destiny but

9    you hadn't received the physical copy?

10   A.    Correct.

11   Q.    Okay.  And then later in the paragraph it

12   says:  If a book is on this list and you still have

13   it located at your school, the more appropriate

14   circulation type for it is "YA or Adult to Review

15   Storage."

16        That confused me.

17   A.    That would be for their nonfiction books.

18   In some cases some of them had nonfiction books that

19   we didn't have specifically sexual conduct concerns

20   for those particular titles, it was something that

21   they held out of circulation because it had an

22   audience level of young adult or adult and they were

23   reviewing it before they could put it back on their

24   shelves, but rather than denote that it might

25   contain sexual conduct by having it in HB 1069, we

Deposition of Bradley Vinson, Volume 1

1    were recommending that those that were just being

2    reviewed for that audience level be in a different

3    circulation type to be sure that we knew which we

4    could expect to receive at our office and which they

5    were still looking at through the age appropriate

6    lens only.

7        Q.    Understood.  Thank you.  Let's go back to

8    your declaration, if you have that before you, and

9    in Paragraph 29 you say:  Through this process, over

10   180 titles/series have been released to circulation

11   in the middle school to YA opt-in collections and/or

12   high schools, while some others have been held for

13   further review.

14          Do you see that?

15       A.    I do.

16       Q.    Okay.  And the process that you're talking

17   about here is essentially the Coffee Crew process,

18   correct?

19       A.    That's correct.

20       Q.    And did any of those 180 titles that you're

21   referring to here contain sexual conduct?

22       A.    I would need to review the list to see the

23   specific titles.

24       Q.    Okay.  And what list would you review?

25       A.    The one that is linked at the top of the

1    flowchart, the books returned to ES+, MS+ or HS.

2        Q.   I see.  That's the list that should have 180

3    titles or series --

4        A.   Released to circulation, yes.

5        Q.   In Paragraph 30 you say:  Titles alleged to

6    contain sexual conduct as defined by Florida law

7    have required additional time to complete their

8    HB 1069 review and have remained out of circulation

9    until each titles' review may occur.

10           What does titles alleged to contain sexual

11   conduct mean?

12       A.   That's the titles that have been pulled

13   because a media specialist indicated sexual conduct

14   might be present.

15       Q.   Okay.

16       A.   So the HB 1069 circulation type books.

17       Q.   And have any of the reviews that you

18   reference in this paragraph occurred?  These, I

19   believe -- let me back up.  You say they required

20   additional -- you talk about the 180 books that have

21   been released and then you say:  Titles alleged to

22   contain sexual conduct have remained out of

23   circulation until the review can occur.

24       A.   I mean those initial 180 titles or series

25   were also initially on the HB 1069 list.

Deposition of Bradley Vinson, Volume 1

1    Q.   Well, everything was initially on the
2  HB 1069 list.
3    A.   Everything was initially on the HB 1069
4  list, but through our more in-depth review in the
5  Coffee Crew process, we determined that the
6  instances that occurred in those books did not
7  constitute sexual conduct or we determined -- I
8  would need to look at specific examples but there
9  may have been references to sexual activity but we
10  determined that it was not sexual conduct.
11    Q.   Okay.  That's the 180 titles?
12    A.   Or series, yes.
13    Q.   In Paragraph 30 you talk about books that
14  are alleged to contain sexual conduct, meaning a
15  media specialist has flagged that they may, and
16  additional time and input is needed to determine if
17  the titles are suited to student needs, et cetera,
18  and it says:  And they have remained out of
19  circulation until each title's review may occur.
20         I'm assuming that review, each title's
21  review is referring to the pulled for community
22  review process we discussed earlier that's going to
23  go to these --
24    A.   It's a multistep process for these.  My
25  interpretation or my intent with titles alleged to

Deposition of Bradley Vinson, Volume 1

1    contain sexual conduct is those books that are

2    within the HB 1069 review list, and the process of

3    Coffee Crew reviewing those books that has so far

4    yielded 180 titles or series that have had decisions

5    made regarding their age appropriateness or taking a

6    deeper look at the content of the books, those are

7    part of that full list and it's just a fluid process

8    as we continue to work our way through the list.

9        Q.   Let me ask it this way.  The books you're

10   referring to in Paragraph 30 of your declaration,

11   are those books that are still before the Coffee

12   Crew for review, or are those books that are at the

13   community review process after they've been through

14   Coffee Crew, or both?

15       A.   Let me reread my paragraph.

16           I do consider this paragraph to refer to

17   everything that is still on the list, we are just

18   working our way through it and it's still taking

19   additional time to work our way through it.

20       Q.   Okay.  Thank you.

21           MS. HEYWOOD:  This is Exhibit 15.

22     (Vinson Exhibit 15 was marked for identification.)

23   BY MR. LEV:

24       Q.   This is a document marked E-ECSD 0059643

25   marked Exhibit 15, and it's an e-mail exchange

Deposition of Bradley Vinson, Volume 1

1    between Stefany Tompkins and Linda Sweeting.  Have

2    you seen this before?

3        A.   I don't recall seeing this particular

4    e-mail.

5        Q.   So in the bottom e-mail Linda Sweeting is

6    e-mailing and she says:  I was doing some Destiny

7    clean-up, I noticed that you had sent "After" in to

8    us for HB 1069 Storage.  Do you remember

9    what alerted you to sexual conduct?  We had marked

10   it Challenge, not Storage, so I'm wondering what I

11   missed.

12            Do you know what Ms. Sweeting means when she

13   says "we had marked it Challenge, not Storage"?

14       A.   What she would mean is that the circulation

15   type was Challenge and not Storage, and that would

16   have been in our initial summer review, when we were

17   looking at professional reviews for this book.  We

18   didn't read the book thoroughly, so when we marked

19   it for challenge rather than storage, it's possible

20   that we missed something that was considered sexual

21   conduct and then this media specialist may have

22   identified something that triggered her to change it

23   to HB 1069 Storage.

24       Q.   And challenge meant the book was subject to

25   a book challenge?

Deposition of Bradley Vinson, Volume 1

1       A.    Yes.

2       Q.    Okay.  And Ms. Tompkins responds:  I know it

3  is on Book Looks as a 2, so maybe early on in the

4  process I thought it needed to be pulled?

5            Was a 2 on Book Looks a basis to pull a book

6  for further review?

7       A.    No, we would not have indicated that.

8       Q.    Okay.  Is there any document that exists

9  that memorializes the 1069 review process that we've

10  been discussing, explains that books were initially

11  pulled, how they were reviewed and returned, the

12  Coffee Crew process, the forthcoming community

13  review process?  Is that written down anywhere?

14      A.    I don't have any sort of master document for

15  that process.

16      Q.    Okay.

17      A.    The full process.

18      Q.    Okay.  Let's turn back to your declaration

19  and turn to Paragraph 32, please.  It says:  If any

20  sexual conduct, as defined by Florida law, is found

21  in a book that has received a request for

22  reconsideration, i.e., a book challenge, the title

23  is removed from circulation until the appropriate

24  audience level can be determined.

25            And then the next page of the paragraph

Deposition of Bradley Vinson, Volume 1

1    continues:  The appropriate audience level in some

2    cases has been determined by a group of media

3    specialists and the book has been returned to

4    circulation for the duration of the challenge

5    process.

6            So this is harkening back to our prior

7    discussion.  Is your declaration accurate, that

8    there are challenged books that contain sexual

9    conduct that the Coffee Crew has released back to

10   circulation for the duration of the challenge

11   process?

12       A.   This is something that is part of our --

13   part of what we needed to look at very carefully,

14   and that, in part, is because at the time that the

15   majority of the books at issue, the challenge forms

16   were received for these, HB 1069 was not in effect,

17   and so it may be that something was marked as age

18   inappropriate but there was not a box to check that

19   said "this contains sexual conduct and that is why I

20   am challenging it."

21           So we've just had to look at those as a

22   group.

23       Q.   That didn't really answer my question,

24   though.  The sentence in your declaration says that

25   the audience level in some cases has been determined

1    by a group of media specialists and the book has

2    been returned to circulation for the duration of the

3    challenge process.

4         My question is is it in fact the case that

5    there are challenged books that have sexual conduct

6    where the Coffee Club has determined the appropriate

7    audience level and returned the book to circulation?

8         A.   Let me look at my list to see if one of

9    these jogs my memory for a specific --

10        Q.   Okay.  This is the list of the books at

11   issue?

12        A.   The reconsiderations lists.

13        Q.   Okay.  Great.

14        A.   Or would you like the books at issue?

15        Q.   No, you can look at the reconsiderations

16   list, that's fine.  That's more appropriate.

17        A.   So the question is have we, as a group,

18   determined that the audience -- that one of our

19   audience levels might be appropriate for a book that

20   contains sexual conduct, is that --

21        Q.   And returned it to circulation for that

22   audience level?

23        A.   And returned it to circulation.  Let's see.

24   I'm looking through the list to see which ones are

25   currently in circulation.  May I refer to the forms

Deposition of Bradley Vinson, Volume 1

1    in the -- on the website to refresh my memory on

2    some of these titles?

3         Q.    Sure.

4         A.    Okay.

5         Q.    You're just going to the Reconsiderations

6    Spreadsheet and clicking on the challenge forms?

7         A.    Yes, that's correct.

8               Sorry, I'm still going through my titles

9    here.

10         Q.    Are you checking every book?

11         A.    I'm checking the books that have -- that

12    currently do not have restricted access.

13         Q.    And can I ask where you are on the list?

14         A.    I was looking at "Melissa (George)."  It's

15    line 43 in the current challenges tab.

16         Q.    So in the interest of time, I think I'm

17    going to move us on.

18         A.    Okay.

19         Q.    Through that, you have not identified such a

20    book but you haven't had a chance to review the

21    rest?

22         A.    That's accurate.

23         Q.    Okay.  All right.  If you could turn back

24    to -- you can close your laptop -- back to

25    Exhibit 10, which is a copy of the 1069 review

Deposition of Bradley Vinson, Volume 1

```
 1   spreadsheet.
 2       A.   Okay.
 3       Q.   And I don't know that you are going to need
 4   to look at it.  When was this spreadsheet created?
 5       A.   The 1069 spreadsheet?
 6       Q.   Yeah, the one with update tabs showing the
 7   books that are unrestricted.
 8       A.   Sorry, I'm going to need to find it.  Let me
 9   put things in order to help us keep track here.
10            (Discussion off the record.)
11            THE WITNESS:  I found it.
12            MS. SMITH:  Your question isn't as to the
13        main tab, though, correct?
14            MR. LEV:  No.  It's as to when the
15        spreadsheet itself was created.
16       A.   I might need to go in and look but I would
17   say it would have been in the fall of 2023.
18       Q.   Is the first date on the tab when it was
19   created?
20       A.   This is the -- well, this is the website
21   version.  There is an internal version that shows
22   more information, so it would have been, yes,
23   November or December of 2023.
24       Q.   Okay.  And what additional information -- I
25   know you mentioned the internal version shows the
```

Deposition of Bradley Vinson, Volume 1

```
 1   schools at which the books at issue were kept.

 2       A.   Yes.

 3       Q.   What other additional information is on that

 4   internal version that's not on the public version?

 5       A.   The circulation type, the categories, both

 6   the site level categories that have been applied and

 7   the district level categories that are applied, the

 8   barcode, the author, the current status of the

 9   materials, so whether it's available or it's checked

10   out.  I'd have to refresh my memory by looking at it

11   for any others.

12       Q.   Okay.  Who updates both the internal

13   spreadsheet and the publicly available one?

14       A.   I do that.

15       Q.   And when do you decide to make a new tab of

16   the publicly available spreadsheet available?

17       A.   When I have time.  I try to do it on a

18   monthly basis but it's something that I have fallen

19   behind on for the last couple of months.

20       Q.   So the last tab is May 21st, 2024, so

21   presumably -- well, let me ask a different question.

22            Is the internal spreadsheet kept updated on

23   a continuous basis as decisions are made?

24       A.   No.  The internal spreadsheet is just a

25   reflection of when I run the report in Destiny.
```

Deposition of Bradley Vinson, Volume 1

1    Q.   I see.  Okay.  So Destiny is kept up-to-date

2    but the spreadsheet, you update the internal and the

3    external at the same time?

4    A.   Yes.

5    Q.   So, presumably, the information in Destiny

6    is different than the information that's currently

7    on the public spreadsheet which has a most recent

8    date tab of May 21st?

9    A.   Yes.

10   Q.   Okay.

11    (Vinson Exhibit 16 was marked for identification.)

12   BY MR. LEV:

13   Q.   I'm going to show you what's been marked

14   Exhibit 16, and do you recognize this?

15   A.   I do.

16   Q.   Okay.  And this is the spreadsheet that is

17   linked at the top of that flowchart, correct?

18   A.   That's correct.

19   Q.   Okay.  And it is available on the Escambia

20   County School Board website, correct?

21   A.   That's the Escambia County School District

22   website.

23   Q.   Okay.  Thank you.  Its caption there is

24   "Media Services titles reviewed by media specialists

25   for HB 1069," correct?

Deposition of Bradley Vinson, Volume 1

```
 1        A.   Correct.
 2        Q.   And this spreadsheet reflects those books
 3   that -- well, what books are included in this
 4   spreadsheet?
 5        A.   These would be books that we discussed in
 6   our Coffee Crew that were initially on our HB 1069
 7   list that we found we could return to circulation.
 8   This would not include books that were subject to a
 9   challenge.
10        Q.   Even if those books were returned to
11   circulation?
12        A.   I think that we reflected that change in
13   status in the Restricted column in the
14   Reconsiderations Spreadsheet.
15        Q.   I see.  And so if --
16        A.   Unless it was part of a series, which I
17   would need to just double-check.
18        Q.   Okay.  But if it's not part of a series, and
19   it's subject to a challenge, and it was released to
20   a population, that would show up on the
21   Reconsiderations Spreadsheet, the Restricted Access
22   column would change to a no?
23        A.   Uh-huh.
24        Q.   Or no for some level?
25        A.   Uh-huh.
```

Deposition of Bradley Vinson, Volume 1

```
1        Q.    But it wouldn't appear on this spreadsheet
2   that's Exhibit 16?
3        A.    It -- I believe that is correct.
4        Q.    Okay.
5        A.    But it's -- this is maintained by Linda
6   Sweeting, so before I would say absolutely, I would
7   want to double-check it.
8        Q.    Okay.  And does this -- a single -- unlike
9   the 1069 spreadsheet that shows books that are
10  currently restricted, this seems to have only one
11  entry per book, correct?
12       A.    Correct.
13       Q.    And so does that mean that if a book appears
14  on here, it should be available in all the school
15  libraries in which it exists or existed before the
16  1069 review?
17       A.    If a book appears here and it has been
18  not -- if it has not been held for community review,
19  then yes, it should be available.
20       Q.    I see.  And so the Recommended Grade Level
21  column on the right, that shows where the book
22  should be available or if it was pulled for
23  community review?
24       A.    Yes.
25       Q.    Okay.
```

1    A.    Now, I will say that if someone was not in

2  attendance at the meeting, Linda Sweeting would

3  share out those decisions from the Coffee Crew

4  agenda, minutes, notes, with media specialists and

5  if it was not a book that we had in our possession,

6  it was up to them to be sure that all of the

7  settings in Destiny were marked accordingly.

8    Q.    Okay.  This only reflects outcomes of the

9  Coffee Crew meetings, it does not reflect an

10  individual media specialist reviewing books in their

11  library and putting them back on the shelf, that's

12  not really part of this process, correct?

13    A.    Correct.

14    Q.    Okay.  What does the Audience column

15  represent?  Where is that information pulled from?

16    A.    That is what Titlewave indicates the

17  recommended audience level based on professional

18  reviews that are collated, aggregated, I guess.

19    Q.    Is that what the -- because the next column

20  seems to be recommendations as listed in Titlewave.

21  Is that also the "Audience?" column?

22    A.    It is the information that feeds into that

23  audience level, yes.  Those are the professional

24  reviews and their recommendations for other grade

25  levels or ages, or from the publisher.

Deposition of Bradley Vinson, Volume 1

1      Q.   I guess -- so just taking, you know, the

2    third -- the second entry, "Twilight Series" by

3    Stephanie Meyers, audience is YA, and then the next

4    column says:  Booklist grades 9-10, SLJ grades 9 &

5    up.

6            Who determined the YA?  Is that somebody in

7    Escambia County who interpreted the Titlewave to

8    mean YA or that's something that actually comes from

9    Titlewave?

10     A.   That comes from Titlewave.

11     Q.   Okay.  There is a column that says "Voting

12   results: Majority Votes."

13           What does that reflect?

14     A.   That reflects what we discussed in the

15   Coffee Crew meeting on that date and what we

16   determined should be done with that particular

17   title.

18     Q.   And you told me earlier that you in fact did

19   not vote but decided things by consensus; is that

20   correct?

21     A.   Yes.

22     Q.   So this is just -- it is not in fact a

23   majority vote, it's a consensus decision?

24     A.   It's a consensus decision.

25     Q.   Okay.  And recommended grade level is the

Deposition of Bradley Vinson, Volume 1

1    Coffee Crew's decision?

2        A.    Yes.

3        Q.    Okay.  And if you look at the last entries,

4    you start getting some weird things.

5        A.    Some weird dates there?

6        Q.    Yes.

7        A.    I don't know what happened there.  I imagine

8    what happened there is maybe Linda Sweeting clicked

9    on that one box and then dragged down thinking that

10   it would copy that date into those columns, those

11   cells immediately below, but what it did is it

12   increased them sequentially.

13       Q.    So that was going to be my question, if it's

14   fair to interpret any year listed here that's after

15   2024 as actually being 2024?

16       A.    Yes.

17       Q.    Okay.

18       A.    Not 2031, or whatever you may see.  We'll

19   fix that.

20       Q.    Do you know how frequently Linda Sweeting

21   updates this spreadsheet?

22       A.    I think that she tries to update it

23   following in the -- either the day following the

24   meeting or the day immediately after the meeting

25   date.  If she is out of the office, it might happen

Deposition of Bradley Vinson, Volume 1

1    later.

2        Q.    Okay.  And if we have identified a number of

3    books that at one point had appeared on one of the

4    tabs of the 1069 spreadsheet, the 1069 restricted

5    spreadsheet, that are not on the most recent tab of

6    that spreadsheet but they are not on here, that is

7    because they are challenged, so they wouldn't be

8    added to this even though they're no longer subject

9    to 1069 restriction; is that correct?

10       A.    So the media specialists are able to change

11   that status back.  That's one way that a book might

12   fall off the list besides the consensus that we

13   reach in the Coffee Crew meetings.  I will say that

14   when we discuss these books that have been pulled,

15   we do let our media specialists know that if they

16   have pulled something that they later learned or

17   maybe by reading the book determined that sexual

18   conduct actually is not present in the book, they

19   can change it back.

20       Q.    I see.  And that wouldn't be reflected here

21   because it's not a Coffee Crew decision?

22       A.    Correct.

23       Q.    Okay.  Thank you.

24            MR. LEV:  Let's show you -- can we mark this

25       17, Ellinor?

Deposition of Bradley Vinson, Volume 1

```
 1    (Vinson Exhibit 17 was marked for identification.)
 2   BY MR. LEV:
 3       Q.   I'm showing you what's been marked as
 4   Exhibit 17 and it's Bates stamped ECSD 001922 and it
 5   is the spreadsheet that was produced yesterday in
 6   response to Interrogatory Number 6.  You brought
 7   with you a larger color copy that might be easier to
 8   read, so feel free to look at that as opposed to the
 9   exhibit, if that's easier.
10       A.   I will.
11       Q.   You created this document?
12       A.   I did.
13       Q.   And you did so by running some kind of
14   search in Destiny?
15       A.   I ran a report in Destiny limiting the books
16   in our catalog to those that had this category
17   Formal Challenge District, which we have gone
18   through and applied to every book that is on our
19   current challenges spreadsheet.
20           And then the yellow highlights, I took the
21   titles at issue cells that you provided, and I
22   copied them and highlighted them yellow and then
23   sorted them with this to be sure that I was
24   addressing all of those titles and none of the
25   additional titles that are also formally challenged
```

Deposition of Bradley Vinson, Volume 1

```
 1    at the district level.
 2        Q.   I see.  And did you choose which columns to
 3    include in this report, or is that just sort of
 4    automatic?
 5        A.   I did choose the columns to include.  I
 6    did -- I would need to refer back.  I think I
 7    created this after talking with Carlie Duquette on
 8    the phone.
 9            MS. SMITH:  Don't -- don't testify to any
10        communications.
11            THE WITNESS:  Okay.
12        Q.   Don't tell me about what you talked about
13    but the fact that you spoke with her is fine.  But
14    that's how you chose the columns, is in the course
15    of a discussion with your counsel?
16        A.   Yes.
17        Q.   Okay.  And you told us what the yellow
18    highlighting is.  There is some orange highlighting.
19    That appears to be books that are lost or weeded; is
20    that correct?
21        A.   Yes.
22        Q.   And I would assume that for any book on
23    here, this reflects all of the copies of those books
24    within the Escambia County School District library
25    collections?
```

Deposition of Bradley Vinson, Volume 1

```
1    A.    Yes.
2    Q.    Okay.  And so if I wanted to know, for
3  example, how many copies of "Allegedly" existed in
4  the school district library collection, I could look
5  here and I'd know that there are two, one at Booker
6  T. Washington and one at West Florida High School of
7  Advanced Technology?
8    A.    That's correct.
9    Q.    Okay.  What does "Category - Site" reflect?
10  I'll note that a lot of those cells are blank and
11  some say reviewed for 1069.
12    A.    So "Reviewed for HB 1069" is a category that
13  we have asked our media specialists to apply when
14  they have reviewed a book and determined that it
15  does not contain sexual conduct and they can
16  circulate it.
17    Q.    I see.  So "Category - Site" means a
18  specific site has entered that category for that
19  book?
20    A.    Yes.
21    Q.    And so it can differ by site?
22    A.    Yes.
23    Q.    And so let's look at "After," for example,
24  where many of the entries say "Reviewed for HB 1069"
25  and the entries for Pine Forest High School are
```

1    blank, so that means that the other school media

2    specialists had each reviewed this book

3    independently and determined it should remain

4    available?

5        A.    Yes.

6        Q.    And then what about Pine Forest High School,

7    why is this available there?

8        A.    The media specialist there has a lot of

9    other responsibilities and it is likely that she has

10    not had time to go through and add that site

11    category for her -- for all of her books.

12        Q.    But you believe that she have reviewed it?

13        A.    I do not know if she has reviewed it

14    herself.

15        Q.    But there wasn't some broader decision about

16    that book?

17        A.    I would want to -- I don't remember a

18    broader decision about that book but I would maybe

19    want to refer to my Coffee Crew agenda just to be

20    sure we didn't discuss it.

21        Q.    If there was a broader decision, where would

22    you find that on the spreadsheet?  How would you

23    know, oh, the Coffee Crew has cleared this?

24        A.    I would need to refer to the Coffee Crew

25    agenda.

Deposition of Bradley Vinson, Volume 1

1      Q.   So it wouldn't be evident on the face of

2   this spreadsheet?

3      A.   No.

4      Q.   Okay.  Some of the "Category - Site" entries

5   say things other than review for HB 1069.  For

6   example, if you skip down to "George," a couple of

7   them say "LBGTQIA."  What does that mean?

8      A.   That's a category that that specific site

9   has assigned.

10     Q.   That's a category that exists in Destiny?

11     A.   No.  Each media specialist has the ability

12  to create categories for their own site.

13     Q.   Is there any guidance on that?

14     A.   Not that I'm aware of.

15     Q.   Okay.  Do you know why a media specialist

16  would create a category LBGTQIA?

17     A.   Perhaps to feature it, make it available to

18  those who are interested in reading those books.

19     Q.   Okay.  You explained "Category - District"

20  is something that -- is how you keep track of the

21  challenged books, correct?

22     A.   Correct.

23     Q.   And "Circulation Type" is what we spoke

24  about earlier today, that's where if a book has

25  been -- has not been released to circulation, it

1    remains in HB 1069 Storage?

2        A.    Correct.

3        Q.    So all of the books were HB 1069 Storage in

4    the summer of '23 and then slowly they get released

5    and that status changes?

6        A.    It was more of a physical limiting of the

7    entire collections, and then librarians would

8    release the books section by section to circulate.

9    So we didn't make everybody change the circ type for

10   every single book initially, but as they opened up

11   section by section in their libraries, they would

12   mark anything that they pulled for further review

13   HB 1069 Storage, while the other items could just

14   remain in their traditional locations.

15       Q.    I see.  And have all of those reviews been

16   completed, meaning the books that were pulled in the

17   summer of 2023 and that were reviewed section by

18   section, have those been all done so everything is

19   either back on the shelf or marked HB 1069 Storage?

20       A.    All of the elementaries are done and the

21   majority of the middle and high schools are done,

22   but I would not say that every high school is done.

23       Q.    So there may be additional books that

24   actually aren't on the shelves that aren't marked

25   HB 1069 Storage because they haven't been looked at,

1    they are just pulled from that initial pull?

2        A.    Yes.

3        Q.    Okay.  Other than formal challenge, what are

4    the other kind of options that are available to

5    choose from under "Category - District"?

6        A.    I believe there are two other categories

7    that have been created at the district level but I

8    don't utilize them.  I would need to check in

9    Destiny to remind myself of what they are.

10       Q.    Okay.  And under "Circulation Type," we have

11   HB 1069 Storage, I see some entries that say

12   "Challenge."

13       A.    Yes.

14       Q.    What does that mean?

15       A.    Challenge means that it is a book that is

16   allowed to circulate for the pendency of the

17   challenge review process.

18       Q.    Okay.  And "Challenge (Young Adult)"?

19       A.    So that is where the book is a challenge but

20   because it is at a middle school, we have to denote

21   somehow that it is a young adult book, because they

22   will have challenges that are young adult books and

23   challenges that are not young adult books, so we

24   still need to limit their circulation to those

25   students who have opted into young adult.

Deposition of Bradley Vinson, Volume 1

1    Q.   And "Regular" under circulation type?

2    A.   So that would be their regular circulation

3    type for their fiction books.  That's something we

4    just need to clean up.  It's probably something that

5    as she -- that particular media specialist was

6    reviewing those books, she probably had a batch

7    process that was applying that category site that

8    says reviewed for HB 1069, and was also changing the

9    circulation type in the same action, and she just

10   may not have realized that she was scanning a

11   challenged book at the same time and changed it.

12   Q.   Got it.  "Better Nate Than Ever" under

13   circulation type is listed as fourth grade and up.

14   That just means it's available for fourth grade and

15   up?

16   A.   I want to actually ask that media specialist

17   about that.  That's not a district level decision,

18   that's something that they do at that school.

19   Q.   I'm sorry.  That they do at that school

20   meaning the school can decide that on its own?

21   A.   Schools do have different physical locations

22   for their books that are sometimes geared towards

23   different audience levels.  You might have your

24   picture books in one area, your fiction books in

25   another area.  For example, your nonfiction books

1    that are easier to read might be closer to the

2    picture books, whereas the ones that go more

3    in-depth that are meant for a higher level reader

4    would be in a separate section.

5        Q.   There is one entry here for "The Upside of

6    Unrequited" that says "Restricted Title" under

7    circulation type.  What does that mean?

8        A.   Give me just a second to find that one.  You

9    said it says "Restricted Title" in circulation type?

10       Q.   Yep, at the bottom of Page 22.  Well, on my

11   printout.

12       A.   That's different from my printout.  Oh,

13   that's Warrington Middle School.  That's a closed

14   site.  That library is no longer open.

15       Q.   I see.  Okay.

16       A.   So it was never changed from restricted

17   under the previous procedures.

18       Q.   And "Status" is everything that's --

19   "Status" is checked out, available, or lost, seem to

20   be the entries I saw.  Is that correct?

21       A.   Yeah, those are the typical statuses.

22       Q.   Okay.  And if it's HB 1069 Storage, is the

23   status supposed to say "Checked Out"?

24       A.   So if it's HB 1069, when we receive it in

25   our office we actually check it out to an HB 1069

Deposition of Bradley Vinson, Volume 1

```
1   Storage user.
2       Q.   I see.
3       A.   That's how we know if something has been
4   received.  If it says it's still available, then we
5   know that they have not sent it yet.
6       Q.   That's the e-mail we looked at earlier
7   about --
8       A.   Yes.
9       Q.   Got it.  Okay.  Some of these under
10  "Sublocation" say "Restricted."  Do you know what
11  that means?
12      A.   So that denotes the physical location of the
13  item.  So when we have something -- let's see if we
14  can find an example.
15      Q.   First entry has it but...
16      A.   The first entry?
17      Q.   "10 Things I Can See From Here" at Booker T.
18  Washington High School.
19      A.   So likely she just didn't change the
20  sublocation for that one because it was HB 1069
21  Storage.  If it was something that was challenged,
22  we have instructed the media specialists that they
23  should change that physical sublocation marker back
24  to the traditional location.  So I would be curious
25  to see -- so see "Allegedly," the first copy at
```

1    Washington?

2        Q.    Uh-huh.

3        A.    It's challenged, so it's not in storage, it

4    should be available, and that's just something that

5    the individual media specialist needs to go back and

6    clean up.

7        Q.    And does having that sublocation listed as

8    restricted have any impact on a students's ability

9    to check that book out?

10       A.    It does not.

11       Q.    That wouldn't pop up or do something if they

12   came to the circulation desk?

13       A.    The circulation is governed by the

14   circulation type.

15       Q.    Okay.  And so challenged circulation type

16   you can check out?

17       A.    Yes.

18       Q.    Okay.  And before 1069, and we're going to

19   talk about this later in more detail, but there was

20   a period where books that were challenged were --

21   some or all were subject to restriction, placed in

22   restricted access.  You're aware of that?

23       A.    Yes.

24       Q.    What would the circulation type have been

25   for a book that was challenged but subject to

Deposition of Bradley Vinson, Volume 1

1  restricted access where a parent had to opt you in

2  to read the book?

3      A.   I believe that circulation type would have

4  been restricted.

5      Q.   And that would pop up at checkout?

6      A.   Yes.

7      Q.   And the circulation type for a book that was

8  challenged but was not subject to restriction would

9  have been?

10     A.   Challenged.

11     Q.   Okay.  And that would not pop up and stop

12  you from checking out a book?

13     A.   Correct.

14     Q.   Okay.  The orange books that have been

15  weeded, there are five of them that were weeded in

16  February or April of 2023, and it says "reason

17  unknown" and they are "Dead Until Dark," "From Blood

18  and Ash," "Kingdom of Flesh and Fire," "My Friend

19  Dahmer," and "The Carnival at Bray."

20         Can you explain what that means, "weeded,

21  reason unknown"?

22     A.   So we've only recently gotten the ability to

23  mark a reason for weeding a book.  So Destiny has

24  had regular updates and it's only a more recent

25  version of our cataloging software that allows us to

Deposition of Bradley Vinson, Volume 1

1    record a reason.  So the librarian, the media

2    specialist, has to select from a dropdown the reason

3    that they are removing it, and also the disposal

4    method, what they intend to do with the book now

5    that it's gone.

6         Before that, if something was weeded, there

7    was no indication of whether it was weeded for

8    condition, it was weeded because it could not be

9    located during an inventory.  It could have been

10   weeded for any number of reasons in our policy.

11   Q.   And that Destiny update didn't happen until

12   after April 21, 2023?

13   A.   That was just this spring of 2024, I

14   believe.

15   Q.   Okay.  Was there a way to mark it weeded

16   before that and you just couldn't pick the reason?

17   A.   Correct.

18   Q.   Okay.

19   A.   That's how I know that it was weeded on that

20   date.

21   Q.   There are also a number of books that were

22   lost in some cases years earlier --

23   A.   Yes.

24   Q.   -- and then were weeded in 2022 or 2023.

25   What caused those books to be weeded as opposed to

Deposition of Bradley Vinson, Volume 1

1    replaced?

2        A.    We don't often replace much older books.

3    That's because of our budget constraints.

4        Q.    Did the fact that these books were subject

5    to challenge have any impact on the decision to weed

6    them?

7        A.    Not to my knowledge.  These were weeded by

8    individual media specialists and I don't know what

9    their reason was.

10       Q.    Do you know why that weeding would have

11   started in September of 2022 for books that had been

12   lost in 2012 or 2015?

13       A.    It may have been that the media specialist

14   went looking for the book because of the challenge

15   to see if they could locate it and then they were

16   unable to locate it, they might have weeded it.

17       Q.    Okay.  I think we can put this aside for

18   now.  Are you okay to continue?

19       A.    Yes.

20       Q.    Okay.  So I want to talk briefly -- I want

21   to talk about Policy 4.06.

22       A.    Okay.

23       Q.    I know you brought some versions with you.

24   I'm going to give you some marked exhibit versions.

25       A.    Okay.

Deposition of Bradley Vinson, Volume 1

1      Q.    Three of them, so we're on the same page.

2            MR. LEV:  Can I get the redlined policy?

3            MS. HEYWOOD:  This is 18.

4       (Vinson Exhibit 18 was marked for identification.)

5   BY MR. LEV:

6      Q.    So Exhibit 18 is a document marked

7   ECSD001350 at the bottom and it has markings at the

8   top from a different case.  I believe it's the same

9   markings as one of the versions that you brought

10  with you.  Does this look familiar?

11     A.    This looks familiar.  Is that what you mean?

12     Q.    Yes, this document.

13     A.    Yeah.

14     Q.    And in the upper right there is an

15  explanation, which I think you pointed out to me

16  this morning on your version, that says:

17  Policy 4.06, the version which was in effect until

18  December 19, 2022 (the crossed out redlined

19  version), and the version in effect from

20  December 19, 2022, until June 20th, 2023 (the

21  redline additions).

22            Right?

23     A.    Yes, I see that.

24     Q.    So I wanted to confirm my understanding that

25  all the crossed out text on Page 1 and 2, that is

 1   what Policy 4.06 was until December 19th, 2022,

 2   correct?

 3       A.   Correct.

 4       Q.   And on December 19th, 2022, all the rest of

 5   this text was adopted as Policy 4.06, correct?

 6       A.   Correct.

 7       Q.   Okay.  So this document shows us what it was

 8   before and after December 19th, 2022?

 9       A.   Yes.

10       Q.   Okay.

11           MR. LEV:  And then if we could look at M.

12      No, I don't want M.  Sorry.  Just N.  Thank you.

13     (Vinson Exhibit 19 was marked for identification.)

14           MS. HEYWOOD:  Here's 19.

15   BY MR. LEV:

16       Q.   Do you have before you Exhibit 19?

17       A.   Yes.

18       Q.   Okay.  And this is -- you know what, if you

19   turn to the third page of the exhibit -- okay.  This

20   was filed in this case as an exhibit to my

21   declaration, but if you turn to the third page --

22           MS. SMITH:  Hers is different than mine.

23           MS. HEYWOOD:  Oh, sorry.  Yours is the same.

24      I just took off the first three pages.

25           MS. SMITH:  Do you want the exhibit to

1          include the declaration?

2               MR. LEV:  I'm happy to have the exhibit not

3          include the declaration.  Honestly, I think it

4          might be simpler.

5                    (Discussion off the record.)

6     BY MR. LEV:

7          Q.   So you now have Exhibit 19 before you, which

8     is a version of Policy 4.06, correct?

9          A.   Correct.

10         Q.   Okay.  This is a version that we

11    downloaded -- I downloaded from the BoardDocs

12    website as of -- as the version that was adopted in

13    September of 2023.

14         A.   This is the version that was adopted

15    September 2023?  Because it says -- it says

16    something otherwise.

17         Q.   Well, because it says last revised

18    12/19/2022?

19         A.   Correct.

20         Q.   Correct.  That was the prior revision date.

21    Like, if you look at the version that was -- well,

22    all I can tell you is this is the version that I

23    downloaded from the BoardDocs website as of that

24    date.

25              If you would like, I can --

1           MR. LEV:  Can we get Exhibit M also?

2           Just for the record, I went to the BoardDocs

3       September 19, 2023 board meeting link and clicked

4       on the document that is captioned

5       "4.06_Approved.pdf."

6       A.    So this would have been in relation to the

7   emergency rule adoption and changes to policy after

8   HB 1069.

9       Q.    Correct, but this is the version in

10  September.

11      A.    Okay.

12      Q.    Just so we're on the same page, in the

13  June 20th, the board, on an emergency basis, adopted

14  a revised version of 4.06, correct?

15      A.    Correct.

16      Q.    And then they formally adopted that on

17  September 19th, 2023, correct?

18      A.    Correct.

19      Q.    The versions from June 20th and

20  September 19th are identical, correct?

21      A.    They should be, yes.

22      Q.    Okay.  And in each case the policy was

23  effective as of July 1, 2023?

24      A.    Yes.

25      Q.    Okay.  So if I refer to this as the July 1

Deposition of Bradley Vinson, Volume 1

1  version of the policy, the 2023 version of the

2  policy, you'll know what I'm talking about?

3      A.    I should.

4      Q.    Okay.  Are you comfortable with that?

5          MS. SMITH:  Do you need to look -- I don't

6      know.  Do you need to look at it or --

7      Q.    I'm happy to show you the version that the

8  school district produced in this case, this version

9  of the policy.  The reason I want to use this one is

10  because you will see it has some redline in it that

11  shows the changes that were made in 2023.

12      A.    Uh-huh.  Give me just a moment to flip

13  through it.

14      Q.    Please take your time.  Make sure you're

15  comfortable that this is the version from that date.

16  I'm also happy to pull up on my computer to show you

17  where I pulled it from.

18          MS. SMITH:  Ori, I don't know if you said it

19      for the record, but just so we're clear,

20      Exhibit 19 is Document Entry 87-1 but only pages

21      26 through 93, correct?

22          MR. LEV:  Correct.

23          THE WITNESS:  It's not through 93.  It's

24      through 43.

25          MS. SMITH:  Thank you.  26 through 43.

Deposition of Bradley Vinson, Volume 1

```
 1              MR. LEV:  Yes, and this had been filed as
 2        Exhibit 8 to my declaration in this lawsuit.
 3              MS. SMITH:  Exhibit A to your declaration?
 4              THE WITNESS:  8.
 5              MR. LEV:  8.
 6              MS. SMITH:  Thank you.
 7              MR. LEV:  That is what that heading on the
 8        top represents.
 9              THE WITNESS:  Yes.
10              MS. SMITH:  For posterity, we will get it
11        straight.
12        A.   Yes, I'm comfortable using this.  To my
13     recollection, this matches what my understanding is
14     of the policy.
15        Q.   And if you have any question, you brought
16     with you a version of the currents policy, so you
17     can always double-check if you have any -- as we go
18     through any of this.
19        A.   Okay.
20        Q.   So 18 shows us pre-December 2022, and then
21     December 2022 through July 1 of 2023?
22        A.   Uh-huh.
23        Q.   And then 19 shows us the changes that were
24     made to be effective July 1, 2023?
25        A.   Yes.
```

1    Q.   Great.  Okay.  And I believe you just

2    testified that the 2023 version was adopted in light

3    of HB 1069, correct?

4    A.   Correct.

5    Q.   Okay.  What is the purpose of Policy 4.06?

6    A.   To govern our instructional materials, usage

7    and adoption, and to ensure that we are

8    incorporating Florida statutes as required, and to

9    also provide guidance for our media center

10   collections and maintenance.

11   Q.   And does the policy reflect the school

12   board's views as to the issues that it addresses?

13   A.   What do you mean by that question?

14        MS. SMITH:  Objection; form.

15   Q.   Well, it describes various things, for

16   example, the purpose of a library.  Does this

17   reflect the school board's views as to the issues

18   that it talks about?

19   A.   This is adopted by the school board, so I

20   would say that the school board is aware of and

21   agrees with the statements that are present.

22   Q.   Okay.  Section 1, and I'm looking at

23   Exhibit 19 right now, defines the term

24   "instructional materials."  Does that definition

25   include library books?

Deposition of Bradley Vinson, Volume 1

```
 1      A.    No.

 2      Q.    Okay.  And that isn't redlined at all, so it

 3   appears to be the same definition that had been in

 4   effect from December of --

 5      A.    And it comes from Florida statute.

 6      Q.    Okay.  I'd like to talk about --

 7            MR. LEV:  Can we take a five-minute break?

 8            MS. SMITH:  Yes.

 9            THE WITNESS:  We can do that.

10            (Recess from 2:34 p.m. until 2:40 p.m.)

11   BY MR. LEV:

12      Q.    I'd like to talk a little bit about the book

13   challenge process from early 2022 to the present.

14   Okay?

15      A.    (Nodding head.)

16      Q.    So I'm going to ask a series of questions

17   and if there has been a difference in that time

18   period, please let me know.

19      A.    Okay.

20      Q.    Who can challenge a book that is in the

21   Escambia County Public School library?

22      A.    A parent or a resident of Escambia County.

23      Q.    Okay.  And has that been true throughout the

24   time period we're talking about?

25      A.    Yes.
```

Deposition of Bradley Vinson, Volume 1

1    Q.   And how is that challenge made?

2    A.   So -- over the course of time or currently?

3    Q.   From let's start back in early 2022 and then

4    tell me if it's changed since then.

5    A.   Early 2022, before we had a process lined --

6    outlined in our policy, they might have submitted a

7    challenge to a media specialist or a principal at

8    the school that owned the material, but as we

9    developed our policy, it became -- we began

10   receiving the challenges to the materials at the

11   district level, and currently they are addressed to

12   me.

13   Q.   When did that change, that they became

14   addressed to the Coordinator of Media Services?

15   A.   That would have been in fall of 2022.

16   Q.   Okay.  And -- okay.  We're going to come

17   back to that in a moment.

18        And so it went from informal policy -- was

19   there a requirement at some time that the challenge

20   be provided to the principal of the school where the

21   book was?

22   A.   I believe that would have been the case,

23   yes.

24   Q.   Okay.  And then in the fall of 2022 it

25   became the policy to submit those challenges

1    directly to the Coordinator of Media Services?

2        A.    It became the practice.

3        Q.    Okay.  And that's been the case since then?

4        A.    Yes.

5        Q.    Okay.  And the challenge form that's made

6    available to individuals who want to file a

7    challenge, has that always been on the district's

8    website since 2022?

9        A.    So our district website has changed.  We

10   actually are hosted by a different company at this

11   point in time, so I cannot tell you the exact date

12   that Michelle White made that challenge form

13   available on the website, but for the duration of my

14   time in this position, it has been available on the

15   website.

16       Q.    Okay.  And is it submitted electronically or

17   somebody prints it out and then mails it in or

18   brings it in physically?

19       A.    I have received them by e-mail.

20       Q.    Okay.  Is there any requirement for the

21   challenger to read or attest to having read the book

22   that they are challenging?

23       A.    May I refer to the form or --

24       Q.    Sure.  Would that be on the form?

25       A.    I do think that it is stated on the form but

Deposition of Bradley Vinson, Volume 1

1    I would want to be sure.

2        Q.    And if it were not stated on prior

3    iterations of the form, would that mean that there

4    was no such requirement at that time?

5        A.    That would be accurate.

6        Q.    Okay.  And is there any guidance that has

7    been given to potential challengers of the public

8    about permissible or impermissible bases for book

9    challenges?

10       A.    Our policy, let's look at our policy.

11       Q.    I believe it's Section 10, under Challenged

12   Materials.

13       A.    I believe this first part is actually also

14   addressing it:  Any material used in a classroom,

15   made available in a school library, classroom

16   library, or included on a reading list that

17   contains content that is pornographic or prohibited

18   under Florida Statute 847.012, is not suited to

19   student needs and their ability to comprehend the

20   material presented, or is inappropriate for the

21   grade level and age group for which the material is

22   used.

23            A parent or resident could proffer evidence

24   to the district school board that that is the case,

25   and materials found to violate those criteria would

Deposition of Bradley Vinson, Volume 1

1    be discontinued for any grade level or age group for

2    which such use is inappropriate to unsuitable.

3        Q.    So that language you read is the -- those

4    are the permissible bases for a challenge to a book

5    in a library?

6        A.    Yes.

7        Q.    Okay.  Any other guidance provided to the

8    public about what would be a permissible or

9    impermissible basis to challenge a book?

10        A.    Let's check that Section 10.

11        Q.    Let me ask it a different way.  Is there

12    anything other than what's in the policy that would

13    be provided to the public about permissible or

14    impermissible bases for a challenge?

15        A.    No.  It would all be outlined in our the

16    policy.

17        Q.    Okay.  Is there any guidance given to

18    potential challengers or the public about how the

19    First Amendment applies in the library school

20    context?

21        A.    No, I don't -- well, I don't believe we have

22    provided guidance of that nature.  I might want to

23    look back through some of Michelle's documentation

24    just to be sure that she didn't have any mention of

25    it in her new legislation FAQ.

Deposition of Bradley Vinson, Volume 1

1    Q.    Would that be FAQ that would be posted on

2    the district's website?

3    A.    Yes.

4    Q.    Has the school district ever put out -- by

5    ever, I mean from 2022 to the present -- any sort of

6    statement about its commitment to the First

7    Amendment?

8    A.    Not in my recollection.

9    Q.    Okay.  Is the challenge process memorialized

10   anywhere other than in Policy 4.06?

11   A.    You -- for what purpose?

12   Q.    Is there another document that lays out the

13   policy or procedures to follow when a book is

14   challenged?

15   A.    I know we have a reconsideration SOP but it

16   is in alignment with the policy.

17   Q.    And do you know if that's been produced?

18   A.    I think it has.

19   MS. SMITH:  Yes.

20   Q.    Okay.  Any other document other than that?

21   A.    Not that I have accessed.

22   Q.    Are you aware of any other document?

23   A.    No.

24   Q.    Okay.  So let's look at Exhibit 18, which is

25   the earlier version of the policy, and I think we've

Deposition of Bradley Vinson, Volume 1

1    established that the stricken language was the

2    entirety of the policy before December of 2022,

3    correct?

4        A.    Correct.

5        Q.    Okay.  And with respect to challenges, all

6    that it says is the first paragraph:  Interested

7    citizens may challenge materials being used in a

8    school according to procedures established by the

9    Board and published in the Challenged Materials

10   document on the Media Services website.

11            Did I read that correctly?

12       A.    Yes.

13       Q.    Were such procedures established by the

14   board?

15       A.    I mean, it states that they would have been.

16   I am not familiar with what those procedures would

17   have been at that time.

18       Q.    Do you know if they were ever in fact

19   established by the board?

20       A.    I do not know if prior to the December 2022

21   policy the board had -- I do not know of the board

22   establishing any such procedures.

23       Q.    Okay.  And are you aware of any Challenged

24   Materials document that was published on the Media

25   Services website before December of 2022?

Deposition of Bradley Vinson, Volume 1

```
 1      A.    I don't remember seeing one.

 2      Q.    Okay.  And --

 3      A.    Well, prior to December 2022?

 4      Q.    Yes.

 5      A.    Was the Reconsiderations Spreadsheet

 6   available?  I would need --

 7      Q.    Okay.  So other than the Reconsiderations

 8   Spreadsheet?

 9      A.    Other than that, no.

10      Q.    Okay. Fair enough.  So the first challenge,

11   I believe, on the Reconsiderations Spreadsheet is

12   from May of 2022.

13      A.    I believe that's correct.

14      Q.    And do you know how that challenge would

15   have been handled in light of this very cursory

16   policy that we're looking at?

17      A.    I know on our Reconsiderations Spreadsheet

18   it indicates that there was a school advisory or

19   some sort of school review committee, but I was not

20   familiar with it at the time, that would have been

21   responsible for the initial review of that book that

22   was then appealed.

23      Q.    And that was "Perks of Being a Wallflower"?

24      A.    Yes.

25      Q.    And that's the only book that has a school
```

Deposition of Bradley Vinson, Volume 1

1    review committee entry on the Reconsiderations

2    Spreadsheet, correct?

3        A.   I believe that's correct.

4        Q.   We then come into the fall of 2022 and there

5    are a large number of challenges submitted by Vicki

6    Baggett and others, correct?

7        A.   Correct.

8        Q.   What policy governed those challenges?  And

9    in particular, was it the December policy that

10   wasn't yet adopted, was it being used, or were those

11   challenges handled in some other way?

12       A.   I think they adopted that practice as they

13   went along because they did not have a stated

14   process in the policy.

15       Q.   Okay.  So when Vicki Baggett submitted her

16   challenge, what was the process since they didn't

17   have a stated process yet?  To whom was she supposed

18   to submit her challenges and who was supposed to

19   make a decision on the challenges?

20       A.   So without further guidance, then what is in

21   that policy at the time.  She would likely have

22   needed to submit her challenges to the principal at

23   the school where that library was or the media

24   specialist at that school, but I also interpret this

25   to mean she could have submitted it to the Media

Deposition of Bradley Vinson, Volume 1

1    Services department since it does denote that there

2    would be some responsibility for it there as well.

3         Q.    Do you know that she, in fact, submitted 99

4    challenges directly to the superintendent?

5         A.    I do -- I am aware of that.

6         Q.    And do you know why that was permitted to

7    happen?

8         A.    No, I don't know.

9         Q.    Okay.  And what was the policy in place,

10   again, before the adoption of Policy 4.06 in

11   December of 2022, what was the policy in terms of

12   the process that was supposed to be followed with

13   respect to her challenges?

14        A.    This was the policy.

15        Q.    Well, I understand, but that doesn't tell

16   me -- that tells me what the written policy was.

17   What was the district's practice for how to handle

18   the challenges filed in the fall of 2022?

19        A.    I think that Michelle White was having to

20   work out that practice as she was receiving all of

21   those challenges.  She would have wanted to relieve

22   some of the burden from the media specialists with

23   such a large number of challenges being received,

24   and so that may be why those challenges ended up

25   coming in centrally rather than to those individual

Deposition of Bradley Vinson, Volume 1

```
1    schools.
2        Q.   Do you know why the school review committees
3    were discontinued?
4        A.   No, I don't know.
5        Q.   Do you know if what became in the December
6    version of Policy 4.06 was implemented in the fall
7    of 2022, before it was formally adopted by the
8    school board to handle the changes that were coming
9    in?
10       A.   I can look at the pieces and see if I know
11   of any of those things that were being utilized in
12   practice.
13       Q.   Okay.  Are you turning to Section 10?
14       A.   I am.  This is very thick paper.
15            MS. SMITH:  I was going to comment that,
16       too.
17       Q.   If we're looking at this -- let me -- on
18   Page 1363 --
19       A.   You're skipping ahead.
20       Q.   Go ahead.  I'm sorry.  I was in Section 10.
21   I didn't know where you were.
22       A.   I was looking at the whole media center
23   section just to see if there was any other language
24   related to the responsibilities of the media
25   specialist.
```

Deposition of Bradley Vinson, Volume 1

1    Q.   So the question is how the district was

2  handling challenges, what the process was to handle

3  a book challenge --

4    A.   Yes.

5    Q.   -- before the adoption of this policy in

6  December of 2022, and whether in fact this was

7  being -- this policy was being implemented prior to

8  its official adoption or not.

9    A.   Any parent, guardian or resident of the

10  county of the school district may raise objections

11  to resources used despite the fact that individuals

12  selecting such resources were duly qualified to make

13  these selections and observed the criteria for

14  selecting resources.

15         So that is something that was happening

16  already.  I do not know if a statement had been made

17  prior to that where it indicates the School District

18  of Escambia County supports the principles of

19  freedom of speech, if you are looking at 10(A)(1).

20    Q.   Let me ask the question in a different way,

21  because I do want to go through this policy, but who

22  made the decision -- the book challenges that were

23  filed in the fall of 2022 ultimately were funneled

24  to District Materials Review Committees, correct?

25    A.   The -- not all of them have been seen by

Deposition of Bradley Vinson, Volume 1

1    District Materials Review Committees, but yes.

2        Q.    But they are all going to be subject to that

3    process, correct?

4        A.    Correct.

5        Q.    And that's the process that's established in

6    this policy?

7        A.    Correct.

8        Q.    Okay.  Even though it wasn't written down in

9    August, September, October of 2022 as an official

10   policy, correct?

11       A.    Correct.

12       Q.    When was the first District Materials Review

13   Committee convened?

14       A.    I would need to refer to my notes for that.

15       Q.    Okay.  Would you be able to tell from the

16   Reconsiderations Spreadsheet?

17       A.    Yes.

18       Q.    Okay.  And that would just -- you would look

19   under the -- where would you look there?

20       A.    The District Committee Decision column,

21   which is Column I --

22       Q.    Yeah.

23       A.    -- indicates when they met.

24       Q.    Okay.  And so you and I are both looking at

25   this online, and I see meetings in September of

Deposition of Bradley Vinson, Volume 1

1    2022, seems to be the earliest one, correct?

2        A.    "The Perks of Being a Wallflower" meeting?

3        Q.    Yep.

4        A.    Yes.

5        Q.    And then we have other meetings that begin

6    in December of 2022, shortly after this policy was

7    adopted?

8        A.    I'm reviewing the dates.  There was a

9    "Tango" meeting November 28th, 2022.

10       Q.    Okay.  So another meeting before the policy?

11       A.    Before the policy was adopted, as well as

12   "Draw Me a Star."

13       Q.    Okay.  But those early challenges were

14   ultimately funneled into the same process that was

15   adopted formally in December of 2022?

16       A.    Yes.

17       Q.    Okay.  When the policy was adopted, do you

18   know if the school district coordinated or consulted

19   with other Florida school districts about how to

20   handle book challenges?

21       A.    I am aware that Michelle White had some

22   conversations through her attendance at conferences

23   like FAME, but I don't know the content of those

24   conversations or if she also e-mailed them.

25       Q.    Do you know if there was any coordination or

Deposition of Bradley Vinson, Volume 1

1    consultation with the Florida Department of

2    Education or the Governor's office in developing

3    this policy?

4        A.    I don't know.

5        Q.    Do you know if Vicki Baggett had a say in

6    the content of the policy that was adopted in

7    December of 2022?

8        A.    I don't know.

9        Q.    If you turn to Exhibit 18 and Section

10   10(A)(3) -- actually, I'm sorry, let's look at

11   Exhibit 19.  I apologize.  That's Page 38 on the

12   top, 38 of 93, if that helps you.

13       A.    Yes.

14       Q.    It says:  No parent, guardian or resident of

15   a county has the right to determine the reading,

16   viewing or listening resources for students other

17   than their own children.

18            What does that provision mean?

19       A.    It means that no one person can determine

20   that another -- the student who is not in their

21   family may not have access to material.

22       Q.    And how is that effectuated in practice?

23       A.    We have a way that parents and guardians can

24   determine what their own students' access to library

25   materials should be, but the intent is that they

1    would not be also making that determination for

2    students who are not in their family.

3       Q.   And you see that language is not redlined

4    here, so that was in the December 2022 version of

5    the policy as well, correct?

6       A.   Yes.

7       Q.   Okay.  And if you go to Section 10(A)(4) --

8    sorry, 10(A)(4)(b), which had been (c) under the

9    prior version, but it says:  All other challenged

10   material will remain in circulation during the

11   pendency of the review process.  Parents may at any

12   time opt their children out of all materials

13   currently under review which remain in circulation.

14      A.   Yes.

15      Q.   How were parents informed of that right?

16      A.   We have done callouts indicating that

17   parents have the ability to limit their students'

18   access to library materials, and they have the

19   ability to make a note in Focus that indicates what

20   they would want to opt their child out of accessing.

21      Q.   Do you know how many parents opted their

22   children out of challenged materials that weren't

23   restricted?

24      A.   Off the top of my head, I don't know a

25   number.  There are a handful.

1    Q.    Okay.  If we look at 10(B)(3)(d), so on

2    Page 40 of this Exhibit 19 --

3    A.    Yes.

4    Q.    I'm sorry.  Current Section (e), it says:

5    Information regarding the challenge will be posted

6    On the Media Services website for additional public

7    input.

8         How was that accomplished?  Was that just

9    the Reconsiderations Spreadsheet or is that done in

10   some other way?

11   A.    It would be something that we would link

12   through the Reconsiderations Spreadsheet, and we are

13   investigating ways to institute that again with some

14   sort of statement that indicates that that is not a

15   means to make any personal attacks.

16   Q.    Meaning that what you're -- you're currently

17   still posting the information on the Media Services

18   website regarding the challenge?

19   A.    Yes.

20   Q.    The public input you're looking to

21   reinstate?

22   A.    Correct.

23   Q.    I see.  And how do members of the public

24   provide input now if they want to?

25   A.    They can call or e-mail or come to our

Deposition of Bradley Vinson, Volume 1

1    school board meetings or call or e-mail our school

2    board members.

3        Q.    Who else would they call or e-mail?

4        A.    The superintendent possibly.

5        Q.    I see.  They would just know this, there is

6    no direction to the public as to how to provide that

7    input?

8        A.    I don't have any direction on providing that

9    input in that way.

10       Q.    Okay.

11       A.    I will say that school board members in

12    meetings have said please feel free to reach out to

13    us, our contact information is available.

14       Q.    Okay.  Further down that page, what's now

15    Section (f), what had been Section (e), starts

16    talking about District Materials Review Committees.

17       A.    Yes.

18       Q.    And it says -- I'm going to refer to them as

19    DMRCs.

20       A.    Okay.

21       Q.    Is that okay?

22       A.    Yes.

23       Q.    You'll know what I'm referring to?

24       A.    Uh-huh.

25       Q.    A DMRC shall be appointed by the Assistant

Deposition of Bradley Vinson, Volume 1

```
 1    Superintendent of Curriculum and Instruction.
 2             That hasn't happened, has it?
 3        A.   Not at this time but, initially, when
 4    Michelle White was still actively helping with the
 5    process for District -- DMRCs, Mr. Marcanio would
 6    have been that person.
 7        Q.   Was he the one who appointed members to the
 8    DMRCs or did Michelle White do that?
 9        A.   The policy states that he was responsible
10    for that.  I don't know if he would have also shared
11    that responsibility with her.
12        Q.   Okay.  And the policy says that the
13    committees will be comprised of five or more members
14    to include community members, school administrators,
15    teachers, parents/guardians, and media specialists
16    of the same levels of schools containing the title.
17             Was that in fact the composition of the
18    DMRCs that were held?
19        A.   To the best of my knowledge, yes.
20        Q.   And if a title was in both a middle school
21    and a high school or both elementary school and
22    middle school, how would that be implemented?
23        A.   I'm not sure.
24        Q.   Do you know how members of the DMRCs were
25    recruited?
```

Deposition of Bradley Vinson, Volume 1

1    A.    I do not know.

2    Q.    Did DMRCs ever use -- I'm sorry.  If you

3    look at Section 10(B)(3)(g), again on Page 40 here,

4    current Subparagraph (g), it says:  The District

5    Materials Review Committee reserves the right to use

6    outside expertise if necessary to help in its

7    decision making.

8         Do you see that?

9    A.    I do.

10    Q.    Do you know if any DMRC ever used outside

11    expertise in its decision-making?

12    A.    Not to my knowledge.

13    Q.    Are all of the DMRCs that have been convened

14    since 2022 reflected on the Reconsiderations

15    Spreadsheet?

16    A.    Yes.

17    Q.    At the very bottom of that page it talks

18    about:  School Library Councils of the same levels

19    of school containing the title in question shall be

20    given the opportunity to provide input for the DMRC

21    to consider.

22    A.    Yes.

23    Q.    Can you describe that process to me?

24    A.    The coordinator would send out an e-mail to

25    the media specialist at each of those schools

Deposition of Bradley Vinson, Volume 1

1    inviting the media specialist to invite the LAC to

2    leave comments for the books in question.

3        Q.    The media specialist at the schools where

4    those titles were held?  You said the coordinator --

5        A.    Yes.

6        Q.    -- would send e-mails to the media

7    specialist.  I'm trying to understand which media

8    specialist.

9        A.    The media specialist where that title was

10   held.

11       Q.    And how frequently do the LACs meet?

12       A.    It varies.  They are required to meet at

13   least three times a year but I know some media

14   specialists try to have them meet on at least a

15   monthly basis.

16       Q.    And who sits on the LAC?

17       A.    The LAC is a way of getting community

18   stakeholder input, and it is in our policy.  Let me

19   refer to that to be sure I give you the exact

20   makeup.

21            So I'm on Page 36 at the top, Number 2:

22   Each new title purchased to be available to students

23   through a district library/media center

24   and classroom library must be presented to the

25   school's Library Advisory Council for input.  The

1    Library Advisory Council shall be comprised of at

2    least the school's media specialist, two teachers,

3    one parent and one community member.  The principal

4    will ensure the committee is representative of the

5    school community.

6        Q.   Does every school have an LAC?

7        A.   Yes.

8        Q.   Do you know if the LACs were provided any

9    guidance or instruction with respect to what kind of

10   input they should be provided on the book

11   challenges?

12       A.   They are encouraged to review professional

13   reviews for the titles that are being considered for

14   selection, and they are expected to complete the

15   library media training from the State of Florida.

16       Q.   When they are asked for input on a pending

17   book challenge?

18       A.   On a pending book challenge.  I'm sorry,

19   could you repeat the question?

20       Q.   Sure.  When the LACs are asked for input on

21   a pending book challenge, are they provided any

22   guidance or instruction as to the nature of the

23   input that they should be providing?  What are they

24   being asked?

25       A.   I believe there was --

Deposition of Bradley Vinson, Volume 1

1      Q.    Other than "What do you think of this?"

2      A.    I believe there was a list of questions that

3  Michelle White would ask, but I would need to refer

4  to one of the packets to see the questions.

5      Q.    What packet are you referring to?  Where

6  would we find that?

7      A.    District Materials Review Committee packets.

8      Q.    The packet of materials that was provided to

9  the committee?

10     A.    I think the questions are actually in the

11  decision packets, because the questions are there

12  along with the answers from --

13     Q.    From the LACs?

14     A.    -- from the DMRCs, but I believe she's

15  provided those same questions to the LACs.

16     Q.    I see.  Okay.  If you turn to Page 41, I'm

17  looking at Section 10(B)(3)(j), which used to be

18  10(B)(3)(h), but hasn't changed in the September

19  2022 or 2023 versions of the policy, it talks about

20  the DMRCs and it says:  In the deliberations of

21  challenged materials, the DMRC shall consider the

22  educational philosophy of the school district, the

23  professional opinions of other teachers of the same

24  subject, and other competent authorities, reviews of

25  the materials by reputable bodies, input from school

Deposition of Bradley Vinson, Volume 1

```
 1   Library Advisory Councils of the same levels of
 2   schools containing the title, the teacher's own
 3   stated objectives in using the materials, public
 4   input, and the objection of the complainant.
 5           I want to go through some of these things
 6   they're supposed to consider.  What is the
 7   educational philosophy of the school district that
 8   they are supposed to consider?
 9      A.    That's a good question.  I would need to
10   refer to other documents, I think, to be able to
11   answer that question.
12      Q.    How would DMRC members know what the
13   educational philosophy of the school district is if
14   you don't know sitting here?
15      A.    I would want to look at the packets that she
16   provided them to be sure.
17      Q.    Okay.  Other than those packets, that's the
18   only place they would be informed about that,
19   correct?
20      A.    Yes.
21      Q.    Okay.  It also says they are supposed to
22   consider the professional opinions of other teachers
23   of the same subject and other competent authorities.
24           What does that mean in the context of a
25   challenge to a library book?
```

Deposition of Bradley Vinson, Volume 1

1      A.   I feel this is conflating challenges to

2  library books and challenges to instructional

3  materials.

4      Q.   So it seems not really relevant to the

5  library books, correct?

6      A.   That would be my interpretation, yes.

7      Q.   Reviews of the material by reputable bodies,

8  that is something the DMRCs considered, was reviews,

9  correct?

10     A.   The professional reviews, yes.

11     Q.   And what reviews were considered reputable

12  bodies for these purposes?

13     A.   So School Library Journal, Publisher's

14  Weekly, Kirkus, I would need to refresh my memory on

15  others, Booklist.

16     Q.   Book Looks?

17     A.   Booklist.

18     Q.   I'm asking about Book Looks also.

19     A.   No, Book Looks would not have been one of

20  them.

21     Q.   Moms for Liberty?

22     A.   I don't believe that would have been

23  considered either.

24     Q.   Okay.  And then it says public input is

25  something that the DMRCs were supposed to consider.

Deposition of Bradley Vinson, Volume 1

```
 1   How did they get public input?
 2       A.   So at the time there was a column where
 3   Michelle White had a Google form linked where the
 4   public could go in and provide input on specific
 5   titles.
 6       Q.   That public input process that was
 7   discontinued, correct?
 8       A.   Yes.
 9       Q.   And how were the DMRCs to get public input
10   once that process was discontinued?
11       A.   We have not resumed DMRCs at this -- at the
12   time, so...
13       Q.   So that process was discontinued only after
14   the last DMRC met?
15       A.   I don't know the exact dates.
16       Q.   Okay.  And how did the DMRCs operate?  Can
17   you tell me about the process?  How many meetings --
18   how many meetings went through?
19       A.   There were two meetings.  At the initial
20   meeting Michelle White would provide the members of
21   the committee with a packet that included
22   information about the book and the challenge form,
23   and she had a script and they would go over the
24   school district's policy and any relevant statutes,
25   as well as information from the library media
```

Deposition of Bradley Vinson, Volume 1

1    training.

2          And then the committees would have copies of

3    the books.  So after the first meeting they have

4    copies of the book and are expected to read the

5    books in their entirety.

6          And then for their second meeting, they

7    would reconvene and she had a list of questions that

8    they would respond to, and then they would cast a

9    ballot indicating what they thought the appropriate

10   age level/grade level was for that title, if it was

11   to be retained at any level in our collections.

12        Q.   And the materials, the packet they were

13   provided, that's the material that's linked on the

14   Reconsiderations Spreadsheet?

15        A.   Yes.

16        Q.   Okay.  And why were DMRC members required to

17   read the book in its entirety?

18        A.   To be able to have a thorough understanding

19   of its value.

20        Q.   Were they provided any training or

21   instruction other than what was in the packet and

22   the link to the training that -- let me go a

23   different way.

24             MR. LEV:  Can we see Exhibit O and P?

25             MS. HEYWOOD:  Do you want to start with

1      Exhibit O?

2            MR. LEV:  Sure.

3            MS. HEYWOOD:  Exhibit 20.

4            THE WITNESS:  Thank you.

5      (Vinson Exhibit 20 was marked for identification.)

6    BY MR. LEV:

7      Q.   So I'm showing you what's been marked as

8    Exhibit 20, which is Bates stamped ECSD 0026478, and

9    this is an e-mail exchange between you and Michelle

10   White about the books "Better Nate Than Ever" and

11   "Born Ready."  Did you serve on the District

12   Materials Review Committees for those books?

13     A.   I served on that committee but we only met

14   once.

15     Q.   Because then the process was suspended?

16     A.   Correct.

17     Q.   And is the e-mail here the standard e-mail

18   Michelle would send to DMRC members?

19     A.   To the best of my knowledge, yes.

20     Q.   Okay.  There is a link here to the Florida

21   Department of Education training.  Is that the

22   training that all DMRC members were supposed to

23   watch?

24     A.   Yes.

25     Q.   Other than that training and the packet that

Deposition of Bradley Vinson, Volume 1

1    the DMRCs received, did they receive any other

2    training or instruction?

3        A.    No.

4      (Vinson Exhibit 21 was marked for identification.)

5    BY MR. LEV:

6        Q.    I am showing you Exhibit 21.  This is a

7    document that we downloaded from the Florida

8    Department of Education website.  It's titled

9    Library Media and Instructional Materials Training.

10          MR. LEV:  Can we go off the record for one

11       second.

12               (Discussion off the record.)

13    BY MR. LEV:

14       Q.    This was downloaded August 6th, 2024.  Is

15    this the training that is linked to in that e-mail

16    that we just looked at, Exhibit 20?

17       A.    Give me just a moment to review it.

18       Q.    Absolutely.

19       A.    So I will say that the Department of

20    Education has updated this training this year and

21    they did vote to make changes.  I want to say in May

22    or June, their May or June meeting, and they did

23    update the slides.  I feel like this may be the

24    updated training.

25       Q.    Do you though know parts of this were

Deposition of Bradley Vinson, Volume 1

1    updated?

2        A.   I think Slides 12 and 13 possibly, but I

3    would need to look at them side by side to be sure.

4        Q.   Okay.  Well, Slide 12 and 13 seem to be just

5    statutory excerpts, but maybe I'm wrong.  Do Slides

6    12 and 13 appears to be statutory excerpts?

7        A.   Yes.

8        Q.   So that seems unlikely to have been updated,

9    correct?

10       A.   Well, the fact that it's included in the

11   training may be what was updated.

12       Q.   I see.  You believe that those slides may

13   not have been included previously?

14       A.   I would want to go back and confirm.

15       Q.   And how would you go back and confirm?

16   Where would you look to see the prior version of the

17   training?

18       A.   I actually was not able to find the prior

19   version online.  I was considering e-mailing the

20   representative at the Department of Education to

21   request a copy of the prior training.

22       Q.   Okay.  I was unable to find that version

23   either.

24       A.   Right.

25       Q.   Though I did -- the link on that e-mail, I

1  believe, is still live to a YouTube presentation, so

2  that is the link that the DMRCs would have watched,

3  correct?

4      A.   Yes.

5      Q.   Okay.  Other than the updates this year,

6  though, this in general was the training that was

7  provided?

8      A.   Yes.

9      Q.   It might have had some fewer or extra

10  slides, verbiage changes, but it was this,

11  essentially?

12      A.   Yes.

13      Q.   Okay.  And I believe this training also

14  states that districts should err on the side of

15  caution with regards to material that's potentially,

16  at the time, in violation -- potentially in

17  violation of 847.012?

18      A.   Yes.

19      Q.   Were the DMRCs ever informed whether HB 7

20  applies to library books?

21      A.   Not to my knowledge.

22      Q.   Do you know if the DMRCs were ever informed

23  about whether HB 1557 applied to library books?

24      A.   Not to my knowledge.

25      Q.   So when you say not to your knowledge, you

Deposition of Bradley Vinson, Volume 1

1    don't know if they were informed one way or the

2    other or you don't think they were informed one way

3    or the other, or you think they were?

4        A.    The guidance from the State was unclear.  I

5    believe that Michelle White's interpretation was

6    that HB 1557 did not apply to self-selected library

7    materials, but that was not something that the State

8    ever made abundantly clear in communications until a

9    later settlement.

10        Q.    And do you know what the DMRCs were told

11    about the applicability of HB 1557 to library

12    materials?

13        A.    I don't know.

14        Q.    Okay.  And do you know what, if anything,

15    the DMRCs were told about the applicability of HB 7

16    to library books?

17        A.    I don't know.

18        Q.    Okay.  Do you know why copies of HB 7 and

19    HB 1557 -- sorry, let me start over.

20            Do you know why copies of HB 7 or HB 1557

21    were included in packets of materials provided to

22    DMRC members?

23        A.    I don't know.

24        Q.    Do you know what, if anything, they were

25    told about those statutes?

Deposition of Bradley Vinson, Volume 1

```
1        A.   I don't know.

2             MR. LEV:  Okay.  Let's take another

3        five-minute break.

4             (Recess from 3:22 p.m. until 3:29 p.m.)

5   BY MR. LEV:

6        Q.   When were the District Materials Review

7   Committees paused?

8        A.   I believe that was in March of 2023, but I

9   would need to just double-check.

10       Q.   Okay.  Can we -- and do you know why they

11  were paused?

12       A.   It was communicated during a board meeting

13  that there were concerns about a possible disconnect

14  between the decisions being reached by the DMRCs and

15  then the decisions being reached by the board.

16  There was a question as to why an entire committee

17  might vote one way while the board might vote

18  another way.

19       Q.   And my understanding is that the committees

20  are going to be reconstituted soon?

21       A.   Yes.

22       Q.   Has that concern about the disconnect

23  between the committees and the board been addressed?

24       A.   The superintendent has proposed that our

25  committee members who are parents or community
```

Deposition of Bradley Vinson, Volume 1

1    members will actually apply to each board member to

2    serve on these committees, and so a representative

3    who has gone through an application with each board

4    member would serve in those roles on each committee.

5        Q.   And so if I were a parent and wanted to

6    serve on a committee, I would apply to a single

7    board member or I would apply to all of them and

8    they would collectively appoint me?  What is the

9    proposal?

10       A.   You would apply to your board member, your

11   district.

12       Q.   And my board member would choose from among

13   the applicants of those individuals that he or she

14   wanted to serve on a DMRC?

15       A.   I don't know how each individual board

16   member will select from their pool of applicants.

17       Q.   But how would the -- how would the DMRCs

18   then be staffed?  Like --

19       A.   The Assistant Superintendent of Curriculum

20   and Instruction would pull, you know, a community

21   member from each board member or a parent from each

22   board member.

23       Q.   So that they would be much larger because

24   each board member would have the community member, a

25   parent representation, and each DMRC?

1    A.   It would go to an eight-member committee,

2  yes.

3    Q.   A representative from each board member and

4  who would the other three members be?

5    A.   It would be a media specialist and an

6  administrator of the school level, and I need to

7  double-check that third one.  May I double-check?

8    Q.   Please.

9    A.   It is a teacher.  I just wanted to confirm.

10    Q.   Okay.  And so the proposal is that going

11  forward, each DMRC would have a representative of

12  each board member, a teacher, a media specialist,

13  and an administrator?

14    A.   Yes.

15    Q.   And has that proposal been adopted by the

16  board or has it been adopted as a final decision by

17  the school district?

18    A.   It was presented by the board and I know

19  that the board members have been receiving

20  applications.

21    Q.   So your understanding is it is being put

22  into place?

23    A.   It is being put into practice, place.

24    Q.   Is there a plan for when the next District

25  Materials Review Committee will be held?

1    A.    I've been very, very busy with our science

2    textbook adoption and coordinating textbooks for the

3    beginning of the school year, and I know our

4    Assistant Superintendent of Curriculum and

5    Instruction has also been very busy; however, we do

6    hope that we will be able to start lining up some

7    meeting times.  Maybe September would be a

8    reasonable expectation for some of our first

9    meetings.

10    Q.    And what books are going to be addressed at

11    those first meetings?  What's the order of priority

12    for these DMRCs?

13    A.    The first ones that we will address will be

14    the ones that were paused or the ones that we have

15    copies of for the review committees already.  So

16    some books we have copies of but others we have not

17    yet acquired copies of for the review committee's

18    use.

19    Q.    And these are review committees that are

20    going to be considering the challenged books,

21    correct?

22    A.    Correct.

23    Q.    Is that going to be the priority before the

24    review committees are formed to consider the books

25    that were held for community review as part of the

Deposition of Bradley Vinson, Volume 1

```
1    1069 review process?
2         A.   Yes.  The challenged books will take
3    priority over those that we held for community
4    review.
5         Q.   Okay.
6      (Vinson Exhibit 22 was marked for identification.)
7    BY MR. LEV:
8         Q.   I'm going to show you Exhibit 22, which is
9    Bates stamped E-ECSD 0066960, and it's an e-mail
10   exchange between Michelle White and Vicki Baggett
11   from April of 2023.
12        A.   Okay.
13        Q.   And this is shortly after the committees
14   were suspended, and if you look at the second
15   paragraph, it says:  We put a pause on evaluating
16   titles challenged for CRT, sexuality, and alternate
17   genders (HB 7 and HB 1557) until the ECSD School
18   Board gives clear guidance on whether or not these
19   bills apply to self-selected library materials and
20   not just instruction as the bills are written.
21             Was that another reason that the District
22   Materials Review Committees were suspended?
23        A.   I'm not -- I'm not sure.
24        Q.   Do you know if the Escambia County School
25   Board ever gave clear guidance as to whether or not
```

Deposition of Bradley Vinson, Volume 1

1    HB 7 and HB 1557 apply to library materials?

2        A.    The State did not give clear guidance and so

3    the board also did not have clear guidance.

4        Q.    So there is still not clear guidance as of

5    today?

6        A.    The settlement that we referred to when we

7    made sure that some of our books that were

8    challenged on the basis of HB 1557 has provided the

9    most clear guidance from the State thus far, and

10   that is how we were able to unrestrict those titles.

11       Q.    What is that guidance, as you understand it?

12       A.    That it does -- that HB 1557 does not apply

13   to self-selected library materials.

14       Q.    Okay.  I'd like to talk about the board's

15   process for deciding challenges, and if we can go

16   back to Exhibit 19, which is Policy 4.06, it's sort

17   of the current version showing the redlines to the

18   December 2022 version.

19           Turn to Page 39.  This is Section 10(B).  It

20   says:  Procedures for Reconsideration of Materials.

21           Do you see that?

22       A.    Yes.

23       Q.    And then, actually, Page 42, we're at

24   10(B)(4):  These procedures shall be followed for an

25   appeal to the School Board if the complainant

Deposition of Bradley Vinson, Volume 1

```
 1    disagrees with the decision by the District

 2    Materials Review Committee.

 3            Do you see that?

 4        A.    I do.

 5        Q.    Section 10(B)(4) governing the board's -- so

 6    Section 10(B)(4) governs how the board reviews

 7    appeals, correct?

 8        A.    Yes.  The board reviewing the appeals is

 9    included in this section.

10        Q.    Okay.  And the only difference between the

11    2023 version of this section and the 2022 version is

12    the addition of Subparagraph (i) in 2023, correct?

13        A.    Which was required through HB 1069.

14        Q.    Okay.  Have these procedures been followed

15    for all of the board's reviews of appeals of book

16    challenges?

17        A.    To the best of my knowledge, yes.

18        Q.    Okay.  So Heading 4 talks about an appeal if

19    the complainant disagrees with the decision by the

20    District Materials Review Committee.  Is the

21    complainant the only person who is able to appeal a

22    DMRC decision to the board?

23        A.    That is my interpretation of this policy.

24        Q.    Okay.  So a parent or a community member or

25    a DMRC member who lost in the vote, for example, if
```

Deposition of Bradley Vinson, Volume 1

1    the DMRC decided to restrict the vote, there is

2    nobody who can appeal to say it shouldn't be

3    restricted, the DMRC decision is final?

4        A.    It stands for one year, but yes.

5        Q.    Okay.  Has the board issued any written

6    instructions regarding how it will assess book

7    challenge appeals?

8        A.    I have not seen any board instructions on

9    how they would do this.

10        Q.    Okay.  Was the board provided any guidance

11    about how to assess grade level or age group

12    appropriateness in deciding the book challenge

13    appeal?

14        A.    My understanding is that the board members

15    did view the library media training, and so there

16    are references to professional reviews, referring to

17    professional reviews for guidance on the age level

18    that would be appropriate.  I do not know if

19    additional guidance was provided.

20        Q.    Do you know if the board was provided any

21    guidance about how to assess a book's literary,

22    artistic, political, or scientific value?

23        A.    I do not know if they were provided

24    guidance.

25        Q.    Do you know if the board was provided any

Deposition of Bradley Vinson, Volume 1

1    guidance or training on the First Amendment and the

2    prohibition on viewpoint discrimination in deciding

3    a book challenge appeal?

4        A.   I don't know if they were provided such

5    guidance.

6        Q.   Policy 4.06 itself does not set forth any

7    standard to be applied by the board when deciding a

8    book challenge appeal, does it?

9        A.   Could you repeat that question?

10        Q.   I'm asking whether the policy itself sets

11    forth the standard that the board is supposed to be

12    applying when it's deciding a book challenge appeal?

13        A.   The standard that the board should be

14    applying?

15        Q.   Yeah.

16        MS. SMITH:  Objection; form.

17        A.   I mean, it definitely outlines, you know,

18    the purpose of the library media materials and our

19    approach to, you know, the fact that we don't have

20    things that are not factual, you know, our reasons.

21    There's a general standard that is set by the policy

22    itself, which is how the media specialists will make

23    selections, but beyond that there is not something

24    specific to the appeal process that the board is

25    expected to follow.

1    Q.   Okay.  And so when a board member is voting

2    on whether or not to remove or restrict a book, are

3    he or she just making a decision sort of whatever

4    they think is right in the abstract?

5         MS. SMITH:  Objection; outside the scope.

6    Q.   You can answer.

7    A.   I don't know why the board would vote one

8    way or the other.

9    Q.   Do you know the motivations of the board

10   members and the votes they've taken on book removals

11   and restrictions?

12        MS. SMITH:  Objection; outside the scope.

13   A.   I do not know the motivations of the

14   individual board members.

15   Q.   Okay.  Is all of the material that's

16   provided to the board linked on that BoardDocs?

17   A.   Yes.

18   Q.   Okay.  So let's take a look at one of the

19   packets that was given to the board for one of the

20   books at issue, "All Boys Aren't Blue," so can we

21   see.

22        MS. HEYWOOD:  Here you go.

23        THE WITNESS:  I was going to pull it up on

24     my computer.

25           (Discussion off the record.)

```
 1      (Vinson Exhibit 23 was marked for identification.)

 2   BY MR. LEV:

 3      Q.   So before we look at Exhibit 23, the

 4   Reconsiderations Spreadsheet, if you want to take a

 5   look at it in hard copy or on your laptop -- and

 6   let's just look at "All Boys Aren't Blue" since

 7   that's the exhibit we're looking at.  I just want to

 8   make sure we're all on the same page.  Under Board

 9   Decision, right, there is a link there and it takes

10   you to the BoardDocs website, correct?

11      A.   Correct.

12      Q.   And if you -- you see two documents.  That

13   takes us to an agenda items details page, which I

14   think we looked at earlier.

15      A.   Yes.

16      Q.   And that records the motion and the vote at

17   the bottom as what to the board's decision

18   ultimately was, correct?

19      A.   Correct.

20      Q.   And I believe we discussed that the only

21   other information we have regarding this vote is

22   whatever is on the video from the board's meeting

23   when they discussed this book, correct?

24      A.   That's correct.

25      Q.   Do you know if the board members discussed
```

Deposition of Bradley Vinson, Volume 1

1   any of these challenges outside of the -- with each

2   other out -- any board member discussed these

3   challenges with any other board member?

4        MS. SMITH:  Objection.  Sorry.  Outside the

5      scope.  Were you done?

6      Q.   I'm going to start again and let her object

7   and then you can answer.

8      A.   I don't know of any board member discussions

9   that were out of the sunshine.

10     Q.   Meaning you're not aware of any board member

11  discussions about any of the book challenges outside

12  of the board meetings where the challenges were

13  discussed?

14       MS. SMITH:  Objection; scope.

15     A.   I'm not aware of any discussions between the

16  board members regarding these challenges outside of

17  the board meetings.

18     Q.   Thank you.  So back to the BoardDocs thing,

19  we have -- there are two documents linked there, one

20  is "All Boys Aren't Blue Board Appeal.pdf," and that

21  is what Exhibit 23 is.

22     A.   Are you on the reconsiderations or the

23  BoardDocs?

24     Q.   I'm on the BoardDocs.

25     A.   Okay.  I'm following you there.

1    Q.    I went from the reconsiderations to the

2  BoardDocs.

3    A.    To the BoardDocs.

4    Q.    Right, it linked me to the BoardDocs.  And

5  on the BoardDocs agenda item details page, when you

6  are on the left side, when you click on the --

7  Section B to consider a citizen's challenge to "All

8  Boys Aren't Blue," there are two links.  The first

9  one says "All Boys Aren't Blue Board Appeal.pdf,"

10  correct?

11    A.    Yes.

12    Q.    That document, if you link on it, is what

13  Exhibit 23 is?

14    A.    Yes.

15    Q.    Okay.  And so am I correct that this is the

16  material that was provided to the board in advance

17  of its meeting on this challenge?

18    A.    Yes.

19    Q.    And that would be true for all of the

20  challenged books?

21    A.    Yes.

22    Q.    And do you know how far in advance of the

23  meeting this information is provided to the board?

24    A.    At least seven days.

25    Q.    Okay.  So now we're going to look at the

Deposition of Bradley Vinson, Volume 1

1  exhibit, so you can probably put your laptop away

2  for a moment.

3          Who compiled this material?

4      A.    That would have been Michelle White, but I'm

5  not aware of whether or not she may have had someone

6  assisting her in compiling the documents.

7      Q.    Okay.  And that was true for all of the book

8  decisions that actually made it to the board?

9      A.    Yes.

10     Q.    Okay.  Is she the one who decided what would

11  be included in these packets?

12     A.    Yes.

13     Q.    Okay.  And is this representative of the

14  categories of materials that were provided with

15  respect to all of the books that went to the board?

16     A.    To the best of my knowledge, yes.

17     Q.    Okay.  So the first -- there's four or five

18  categories on this table of contents on the first

19  page of Exhibit 23, and the first one is called

20  "Appeals" and the first entry there is:  Appeal to

21  the School Board.

22          And this is the complainant's actual appeal

23  of the District Materials Review Committee decision,

24  correct?

25     A.    Correct.

Deposition of Bradley Vinson, Volume 1

1    Q.    And then we have the District Materials

2    Review Committee documents themselves that we've

3    looked at before, correct?

4    A.    Yes.

5    Q.    The Request for Reconsideration is the

6    actual original challenge to the book?

7    A.    Yes.

8    Q.    What is Additional Input for the Committee's

9    Consideration?

10    A.    That would have been the public input or

11    input from the LACs that she collected.

12    Q.    Are you sure or is this additional input

13    from the complainant?  Because if you look on

14    Page 14 of 62, it says "Complainant input as noted

15    in submitted list #1."  Or is it -- I see, it's

16    both.

17        Look through it and see if you know what

18    this is reflecting.

19    A.    You mean look through -- okay.  So --

20    Q.    Pages 14 through 30 of this packet --

21    A.    14 to 30.

22    Q.    -- which are the additional input for

23    committee consideration.

24    A.    So then that looks like it's the appeal and

25    then there's a communication from the principal

Deposition of Bradley Vinson, Volume 1

```
1    asking for applicants for the District Review

2    Committees.  I don't know why that's there.

3          And then starting on Page 18, this looks

4    like -- well, that does not look like it's from the

5    community.  That looks like it's from the book.

6      Q.   Well, it looks like the complainant or

7    another member of the community providing excerpts

8    from the book, correct?

9      A.   Correct.  Additional input for committee

10   consideration...

11     Q.   I will notice that later down in the table

12   of contents there is a separate entry for community

13   input, and on the BoardDocs page there was a

14   separate link for community input.

15     A.   So this must just be the complainant's

16   additional input.

17     Q.   Okay.  Then we have a section about relevant

18   Florida Statutes, correct?

19     A.   Yes.

20     Q.   That starts at Page 31.  Why is -- go to

21   Page 31.  Why is the legislative guide on HB 7

22   provided in connection with this appeal?

23     A.   I am not sure.  Maybe it was just her

24   practice to include this.

25     Q.   Was that statute applicable or relevant to
```

Deposition of Bradley Vinson, Volume 1

1    the determination of the appeals?

2        A.   These individual freedom tenets put forth, I

3    don't know if she thought that those needed to be

4    included for consideration.  I'm not sure.

5        Q.   Okay.  Why is -- why are excerpts from

6    HB 1557 included in this packet to the board?

7        A.   Perhaps -- I'm really not sure.

8        Q.   Okay.  It's your understanding that HB 1557

9    does not apply to library materials, correct?

10       A.   Even this statement here says classroom

11   instruction, but that is my current understanding of

12   it, yes.

13       Q.   Okay.  The next entry on Page 33 -- I'm

14   skipping over a couple statutes that are in fact

15   relevant.  Well, I guess, before I skip over, there

16   is excerpts from 847.012 and 847.001, correct?

17       A.   Correct.

18       Q.   And then there's an excerpt from the Florida

19   Department of Education rule --

20       A.   Yes.

21       Q.   -- about required instruction planning and

22   reporting.  Do you know why this would be included

23   in the packet to the board?

24       A.   I don't know, unless it was just something

25   she included in general.

Deposition of Bradley Vinson, Volume 1

1      Q.   But the board was not considering

2  instruction with respect to these challenges,

3  correct?

4      A.   Correct, but they would have been

5  considering instruction with "Perks."  It could be

6  that she included it in her first packet and then --

7  I'd have to look back at that packet to see.

8      Q.   Okay.  But not at issue in any of the other

9  packets -- instruction is not at issue in any of the

10  other packets, correct?

11      A.   Correct.

12      Q.   And then on the next page you have an

13  e-mail, the top of which says:  HB 1557

14  Clarification in State's Motion to Dismiss.

15          And there is an e-mail with a bunch of

16  quotes, and then attached to that is an excerpt from

17  a State defendant's motion to dismiss and memorandum

18  of law.  Do you see that?

19      A.   I do.

20      Q.   Is this what you were referring to as the

21  guidance the State in the context of a settlement

22  that HB 1557 does not apply to library books?

23      A.   No, this is not the settlement I was

24  referring to.  It was a more recent settlement in

25  spring of this year.

Deposition of Bradley Vinson, Volume 1

1      Q.    Okay.  Do you -- does anything in here

2   actually say to the board that HB 1557 does not

3   apply to library books?

4      A.    May I have a moment to read over it?

5      Q.    Please.

6      A.    Some of these statements are similar to the

7   other HB 1557 settlement that I'm familiar with.

8      Q.    Like what?

9      A.    Do we have that?

10     Q.    Well, you identified things that are

11  familiar, so what jumped out at you that made you

12  say that?

13     A.    I feel like I -- well, I remember it saying

14  the statute does not prohibit intervention against

15  LGBTQ bullying, as an example.

16     Q.    Okay.  Does anything in here says HB 1557

17  does not apply to library looks?

18     A.    I don't see that directly stated.

19     Q.    Okay.  I'm going to show you Exhibit 24.

20    (Vinson Exhibit 24 was marked for identification.)

21  BY MR. LEV:

22     Q.    This is a document that was filed in the

23  case called Cousins vs. Grady.  It was a State of

24  Florida, as a defendant, motion to dismiss.  If you

25  look at the very top of the first page, you can see

Deposition of Bradley Vinson, Volume 1

```
 1   it was filed on December 16th, 2022.

 2       A.   Yes.

 3       Q.   Okay.  If you turn to Page 8 of this

 4   document --

 5       A.   It's this thick paper, I'm sorry.

 6       Q.   They have to find a new copy shop.

 7       A.   I'm on Page 8.

 8       Q.   Okay.  And four lines down there is a

 9   sentence that reads:  But the statute regulates only

10   "classroom instruction," not the availability of

11   library looks.

12            Correct?

13       A.   I see that.

14       Q.   So in December of 2022, the State of Florida

15   had made a very clear statement that HB 1557 does

16   not regulate the availability of library books,

17   correct?

18            MS. SMITH:  Objection; form.

19       A.   I see that.

20       Q.   Okay.  Do you know why the school board was

21   not informed of the State's straightforward

22   statement that HB 1557 does not apply to library

23   books?

24            MS. SMITH:  Objection; form.

25       A.   I don't know what the status of their access
```

Deposition of Bradley Vinson, Volume 1

1    to this information was.

2        Q.    My question was do you know why they weren't

3    informed of this?

4            MS. SMITH:  Same objection.

5        A.    I don't know.  They might have been

6    informed.  I don't know.

7        Q.    Well, I think you told me that all the

8    material they were provided with respect to these

9    book challenges was included in these packets.

10   Correct?

11           MS. SMITH:  Objection; form.

12       A.    To the best of my knowledge from the Media

13   Services office, but I --

14       Q.    Was the board -- I believe one of the topics

15   you testified to was the board's handling of book

16   challenges.  Was the board provided other

17   information in connection with its handling of

18   appeals to book challenges other than the packets

19   that we've been talking about?

20       A.    I don't know if they were made aware of this

21   specifically.

22       Q.    Were they provided any other information

23   other than the packets we're talking about?

24           MS. SMITH:  Form.  Are you asking just about

25       written materials or generally?

Deposition of Bradley Vinson, Volume 1

1    Q.   I'm asking generally whether the board was

2    provided any other information regarding the book

3    challenges other than the materials linked on the

4    BoardDocs website that we've been talking about?

5    A.   So for specific challenges, they receive the

6    information that are linked -- that's linked on the

7    BoardDocs, individual agenda items.  I do not know

8    if they were provided any broader guidance from

9    general counsel or Media Services.

10   Q.   Okay.  And I believe you -- well, have you

11   been provided any guidance that HB 1557 does not

12   apply to library books?

13   A.   I have asked about that status and it was

14   only with the more recent settlement that, in

15   meeting with our superintendent and general counsel,

16   we determined that we did not need to restrict those

17   items that had been challenged on the basis of

18   HB 1557.

19   Q.   Okay.  Do you know when that was?

20   A.   April of 2024.

21   Q.   Okay.  Thank you.  Going back to the board

22   packet, the rest of the material that was provided

23   to the board as we continue through the table of

24   contents, there's an excerpt from Policy 4.06,

25   correct?

Deposition of Bradley Vinson, Volume 1

 1     A.   Give me just a moment.  Pages 40 to 49?

 2     Q.   Yes.

 3     A.   Yes.

 4     Q.   Okay.  There's an excerpt on "The Value of

 5  Young Adult Literature."  Do you know what this is

 6  and why it was provided to the board, on Pages 50 to

 7  52?

 8     A.   So this would just be to better explain what

 9  young adult literature is to those who were

10  completing reviews of young adult books.

11     Q.   Okay.  And what is YALSA?

12     A.   I can't remember actually.  I mean, it's

13  Young Adult but I would have to remind myself of

14  what that stands for.

15     Q.   Okay.  And then there's a collection of

16  professional reviews on Page 53 and the ones listed

17  here are from Booklist, Kirkus, Publishers Weekly

18  Annex, and School Library Journal, correct?

19     A.   It's Young Adult Library Services

20  Association.  Sorry.

21     Q.   That was the answer to the prior question?

22     A.   That was the answer, yes.

23     Q.   Okay.

24     A.   I'm sorry.  Could you repeat this most

25  recent question?

Deposition of Bradley Vinson, Volume 1

1    Q.   Just looking at Page 53 -- well --

2    A.   These reviews look like they were copied

3    from Titlewave.

4    Q.   Okay.  I see.  And would that be all of the

5    sources of reviews that are contained in Titlewave?

6    A.   At the time that this was pulled, yes.

7    Sometimes it fluctuates.

8    Q.   And was that -- it might fluctuate by book

9    as well?

10    A.   Yes.

11    Q.   And was that the practice, to include

12    whatever reviews were in Titlewave in the materials

13    that were provided to the board?

14    A.   I believe that was her practice, yes.

15    Q.   Okay.  And then there is a page for the

16    school Library Advisory Council input?

17    A.   Yes.

18    Q.   And I see in this case there is a couple

19    different school Library Advisory Councils that have

20    filled out this form.

21    A.   Yes.

22    Q.   Okay.  And this is, like, a standard form

23    that was provided to the school Library Advisory

24    Councils at the schools where the books have been on

25    the shelves?

Deposition of Bradley Vinson, Volume 1

1    A.   Yes.  One thing I will mention here, though,

2   is this is something that was provided to the

3   members of the school Library Advisory Council.  I

4   don't think that Michelle had a way of denoting

5   whether this was something that the council

6   discussed and provided answers to as a body, or if

7   these are the answers of an individual member of the

8   LAC.

9    Q.   I see.  So if we're looking at Page 55 and

10   it says name of school, Northview, you're saying you

11   don't know if this reflects the entire committee's

12   input or just a member's input?

13    A.   Yes, that's correct.

14    Q.   Okay.  And then on Page 58 we have a

15   community input document that has comments by, in

16   this case, two people.  Do you know where this

17   community input comes from?

18    A.   This looks like it would have come from that

19   community input form that would have been linked

20   within the Reconsiderations Spreadsheet.

21    Q.   Okay.  And if we go back to the BoardDocs

22   page for this on your laptop -- are you there?

23    A.   I'm there.

24    Q.   For "All Boys Aren't Blue," do you see the

25   second link there?  It says:  Board Appeal Community

Deposition of Bradley Vinson, Volume 1

```
1    Input, "All Boys Aren't Blue" as a high school

2    library book, responses, Google sheets.

3         A.   I do see that.

4         Q.   How is that -- what is that then?  Because

5    it's not the same as the --

6         A.   This is different.

7         Q.   -- community input that we see on Page 58 of

8    the board packet.

9         A.   I don't have an explanation for that.  I'm

10   sorry.

11        Q.   So they were provided two different

12   collections of community input, you're not sure

13   where they came from?

14        A.   Correct.

15        Q.   Okay.  And understanding that the reviews

16   and the library council input and the community

17   input would be different for different books, and

18   obviously the appeal documents at the top are going

19   to be different for the different books --

20        A.   Sorry.  Can I go back to that last question?

21        Q.   Yeah.

22        A.   I will say that at the top it just says

23   "Community Input," and then this one says "Board

24   Appeal Community Input."  I wonder if she had a

25   separate additional form upon appeal and collected
```

```
 1   additional comments.
 2        Q.   Okay.  But you're speculating, you don't
 3   really know?
 4        A.   I don't really know, but they are different
 5   but they are related to the same book.
 6        Q.   Is this -- the question I was starting to
 7   ask is this is the structure for all the board
 8   appeal packets, correct, they all have this same
 9   information directed to the specific book where it's
10   book-specific information, correct?
11        A.   Correct.
12        Q.   Okay.
13             MR. LEV:  Can we get W?
14                  (Discussion off the record.)
15   BY MR. LEV:
16        Q.   Maybe we can just, since we're using our
17   laptops, maybe we can just do this online.
18             If we go back to the Reconsiderations
19   Spreadsheet --
20        A.   Yes.
21        Q.   -- and if we go to the -- I'm sorry.  Give
22   me a moment and I'll find the document I'm looking
23   for.
24             If you go to the District Materials Review
25   Committee for "All Boys Aren't Blue" under Column I,
```

Deposition of Bradley Vinson, Volume 1

1    and the committee information meeting, the document

2    packet that was linked there --

3        A.   The committee information meeting documents?

4        Q.   Yes.

5        A.   Okay.

6        Q.   And that opens up a document that's called

7    "DMRC Packet All Boys Aren't Blue.pdf," correct?

8        A.   In theory.  My computer is catching up with

9    me.  There it is.

10       Q.   Okay.

11       A.   I see it.

12       Q.   Okay.  And so this is the packet of

13   materials that was provided to the District

14   Materials Review Committee, correct?

15       A.   Correct.

16       Q.   And it looks like it is essentially the same

17   as what is provided to the board with the exception

18   that there isn't an appeal to the board or a

19   decision from District Materials Review Committee,

20   correct?

21       A.   Correct.

22       Q.   All the same statutes, rules, policy, Young

23   Adult Literature excerpt, professional reviews,

24   community input, correct?

25       A.   Correct.

Deposition of Bradley Vinson, Volume 1

1    Q.   Okay.  And that would have been true for all

2    of the DMRCs, they would have also received packets

3    following the same structure, correct?

4    A.   Correct.

5    Q.   If we've go back to Exhibit 19, which is

6    Policy 4.06 -- and we're still in the very end there

7    about the board process in Section 10(B)(4).

8    A.   Which page number is that?

9    Q.   42.

10   A.   Okay.

11   Q.   And it says, 10(B)(4)(e), it says:  The

12   Board reserves the right to use outside expertise if

13   necessary to help in its decision making.

14        Has the board ever used such outside

15   expertise?

16   A.   Not to my knowledge.

17   Q.   Okay.  Is there any requirement that the

18   board members read the books, the challenged books

19   that they are deciding on?

20   A.   I don't see that there is a requirement in

21   our policy.

22   Q.   You aware of any such requirement outside of

23   your policy?

24   A.   I'm not aware of a requirement.

25   Q.   Do you know if all of the board members have

Deposition of Bradley Vinson, Volume 1

```
 1    read all of the books that they have voted on since
 2    2022?
 3            MS. SMITH:  Objection; outside the scope.
 4        A.    In the meetings that I have watched or
 5    attended, the board members indicated that they had
 6    read the materials.
 7        Q.    Is the extent of your knowledge based on
 8    having watched those meetings, or have you had other
 9    discussions about that question?
10            MS. SMITH:  Scope.  Go ahead.
11        A.    That's the extent of my knowledge.
12        Q.    Okay.  Were you involved in responding to
13    the interrogatories regarding the board members'
14    reading of these books in this case?
15        A.    I don't believe so.
16        Q.    Okay.
17            MS. SMITH:  Scope.
18        Q.    Does the board make any findings when it
19    decides on a challenge appeal?
20            MS. SMITH:  Objection; form.
21        A.    I don't know what findings you would be
22    referring to.
23        Q.    Well, sometimes a body will -- a legislative
24    or other body might make -- a judicial body might
25    make a finding about "I find that this book contains
```

```
1   sexual conduct," "I determine that this book is
2   extremely violent and I don't think it's appropriate
3   for a particular age group because of X, Y, or Z."
4          Do they make any kind of findings like that?
5          MS. SMITH:  Sorry.  Form and scope.  Go
6      ahead.
7      A.   As a body, no, I don't know of any findings.
8   In the meetings that I attended or watched, they had
9   a member make a motion and the motion generally just
10  indicated whether they would retain the book and if
11  that would be at only specific grade levels, or if
12  they would remove the book, and then there would be
13  a second.  There would be some discussion but I
14  would not call the discussion findings.
15         And then they would vote.
16     Q.   Okay.  Are you aware of any protections
17  against the board making decisions based on
18  viewpoint discrimination?
19         MS. SMITH:  Objection; form, scope.
20     A.   Could you repeat the question or rephrase
21  it?
22     Q.   Sure.  Are you aware if there are any
23  protections to keep the board from making decisions
24  based on viewpoint discrimination?
25         MS. SMITH:  Same objection.
```

Deposition of Bradley Vinson, Volume 1

1     A.    If there are any --

2     Q.    Protections in place.

3     A.    -- protections in place that would prevent

4     the board from making a decision based on viewpoint

5     discrimination?  I don't know of any protections

6     laid out beyond our policy, just having certain

7     guidelines.

8     Q.    Okay.  Do you know what the board's practice

9     is regarding communicating with constituents

10    regarding book challenges?

11    A.    I do not know what their practice is.

12    Q.    Okay.

13          MS. SMITH:  Scope to the last one.

14          MR. LEV:  Is it 4:15?

15          MS. SMITH:  Yes.

16    A.    Time flies.

17    Q.    When you're having fun.  You left out that

18    last part.  I won't take that personally.

19          Are you good to continue going?

20    A.    I'm okay.

21    Q.    Okay.  I want to talk about the practice of

22    restricting access to books that have been

23    challenged.

24          What was the practice in 2022 when a book

25    was challenged?  Was access to it restricted or not?

Deposition of Bradley Vinson, Volume 1

1    Walk me through those changes as you know them.

2        A.    So I was not in this position at the time

3    and some of my knowledge is related to

4    communications I would receive from Michelle White

5    regarding access to specific books.

6              Initially, in the fall of 2022, there was a

7    press release indicating that the challenged books

8    would all be restricted, but shortly after that some

9    of the books were not restricted.  Now, this would

10   all be during that time when the policy was being

11   developed and before we had our December policy that

12   indicated that some materials would remain in

13   circulation for the pendency of the challenge

14   process.

15             I would have to go look at specific titles

16   to see which ones were restricted or not at any

17   given time.

18       Q.    Do you have Exhibit 1 there, which is the

19   30(b)(6) notice of deposition?

20       A.    I do.

21       Q.    Okay.  Lucky you.  Take a look at Topic 15:

22   All policies or practices that have been in place

23   regarding which reading materials subject to a book

24   challenge are subjected to restricted access during

25   the pendency of the book challenge review.

Deposition of Bradley Vinson, Volume 1

```
 1        A.    My Number 15 -- hold on.

 2        Q.    You might have been reading the definitions.

 3        A.    I was reading the definitions, I think.

 4   Give me just a moment.

 5              All policies or practices that have been in

 6   place regarding which reading materials subject to a

 7   book challenge are subjected to restricted access

 8   during the pendency of the book challenge review.

 9              Okay.

10        Q.    Can you tell me what you did to prepare for

11   today's deposition with respect to that topic?

12        A.    I did look back through some of my e-mails

13   just to refresh my memory on what was restricted and

14   when.  Again, those were e-mails I was receiving as

15   an elementary media specialist.  And I also looked

16   at the versions of the spreadsheet to see which

17   materials had changes in their access.

18        Q.    Did you review any other documents regarding

19   the changes to restricted access of challenged

20   books?

21        A.    Changes to restricted access?  E-mails, the

22   reconsiderations versions.

23              I don't recall but give me just a moment to

24   think it through.

25              The policy, I reviewed the policy.
```

1    Q.   Did you talk to anybody about what the

2    policy and practice was in terms of restricting

3    access to challenged books in preparation for

4    today's deposition?

5         MS. SMITH:  Outside of counsel?

6    A.   Outside of counsel, no.

7    Q.   In the spring and summer of 2022, if a book

8    was challenged, was access to it restricted?

9    A.   I do not know what the practice would have

10   been at that time.

11   Q.   Okay.

12        MR. LEV:  Can we get X?

13        MS. HEYWOOD:  25.

14     (Vinson Exhibit 25 was marked for identification.)

15   BY MR. LEV:

16   Q.   I'm showing you Exhibit 25, Bates stamped

17   E-ECSD 0042816.  This is an e-mail from Steve

18   Marcanio from September 30th, 2022, with subject

19   "Press Release - Follow Up."

20        Have you seen this before?

21   A.   I don't recall seeing this one.

22   Q.   Okay.  In the e-mail Mr. Marcanio says:

23   Principals, please share --

24        Well, the e-mail says:  Please see below

25   information from Michelle White.  Principals, please

Deposition of Bradley Vinson, Volume 1

```
 1   share the following information with your media
 2   specialists:  Media Specialists, the school district
 3   is implementing a restricted access policy to titles
 4   during the reconsideration process.  Please watch
 5   the video and review the process document linked
 6   below.  Then meet with your school administration to
 7   create a plan to implement the requirements.
 8            Do you recall receiving this e-mail as a
 9   media specialist, the e-mail that's within this
10   document as a media specialist on or about
11   September 30th, 2022?
12       A.   I remember that my principal forwarded this
13   information to me.
14       Q.   Okay.
15       A.   But not this specific e-mail.
16       Q.   Okay.  When I asked you generally about the
17   practice of restricting access to challenged
18   materials, you referenced a press release.  Is this
19   the press -- this e-mail referencing the same press
20   release you were talking about?
21       A.   Yes, it is.
22       Q.   Okay.
23            MS. HEYWOOD:  Exhibit 26.
24      (Vinson Exhibit 26 was marked for identification.)
25   BY MR. LEV:
```

Deposition of Bradley Vinson, Volume 1

```
1      Q.   Okay.  Exhibit 26 is Bates stamped

2    E-ECSD 0067219.  Is this the press release you were

3    preferring to?

4      A.   Yes.

5      Q.   It's dated September 26, 2022, correct?

6      A.   Correct.

7      Q.   Do you know if prior to the issuance of this

8    press release, books that had been challenged were

9    restricted or not?

10     A.   I do not know of any books that were

11   restricted for a challenge prior to this.

12     Q.   Okay.  So prior to this, books that were

13   challenged were not restricted, correct?

14     A.   I don't know of books that were challenged

15   prior to this, so I don't know if I could speak to

16   their status.

17     Q.   Okay.  This makes it very challenging to

18   conduct this deposition since you don't have the

19   requisite knowledge, but we'll do our best.

20         MS. SMITH:  Ask the questions and then we

21     can take it as it comes.

22     Q.   This press release states that the district

23   is in the process of refining the policies and

24   procedures for library media collection development

25   and for reviewing titles submitted for
```

1    reconsideration -- hang on a second.

2         MS. SMITH:  I was just going to say, Ori, if

3       you need her to refer to the spreadsheet, the

4       live access, she can do that.

5         MR. LEV:  No.  My questions are about the

6       practices, not about the specific books in place,

7       as the topic of the deposition said.

8    BY MR. LEV:

9       Q.   Is it your understanding that after this

10   press release was issued, all challenged books were

11   subject to restricted access?

12      A.   For a period of time, yes.

13      Q.   Okay.  Do you know whether anything happened

14   to the books that had been challenged prior to the

15   issuance of this press release in terms of their

16   restricted access?

17        MS. SMITH:  Objection; form.

18      A.   I would need to know what the specific books

19   are -- were and research them.

20      Q.   Okay.  So you don't know how the school

21   district implemented this press release with respect

22   to books that had already been challenged as of

23   September 26, 2022, correct?

24        MS. SMITH:  Objection; form.

25      A.   The press release does have information here

Deposition of Bradley Vinson, Volume 1

1    but this is all the information I would have.

2        Q.   So you don't know how the school district

3    handled books that had been challenged prior to

4    December 26, 2022, in light of this press release,

5    correct?

6             MS. SMITH:   Form.

7        A.   I know they would have handled it at the

8    school level.  I do not have knowledge of how it

9    operated in practice prior to 2022.

10       Q.   Prior to September 30th, 2022?

11       A.   Yes.

12       Q.   What happened as of the issuance of this

13   press release?  What was then the practice with

14   respect to any books that were then subsequently

15   challenged in terms of whether students had access

16   to them or not?

17            MS. SMITH:   Form.

18       A.   So after they were -- went through a period

19   of time when they were all initially placed in

20   restricted access, there came a point when Michelle

21   White, in consultation with the superintendent,

22   unrestricted access to some of them.

23       Q.   Okay.  So I want to break that down.  They

24   were all -- all the books were subject to restricted

25   access with the implementation of this new policy as

Deposition of Bradley Vinson, Volume 1

```
 1   adopted by the press release, correct?
 2       A.   Practice, yes.
 3            MS. SMITH:  Objection; form.
 4       Q.   Do you know why this practice was adopted?
 5       A.   I do not.
 6       Q.   Do you know who made the decision to
 7   restrict all challenged books?
 8       A.   My understanding is the superintendent made
 9   that decision.
10       Q.   Okay.  Do you know if the board was
11   consulted or involved with that decision?
12       A.   I do not know.
13       Q.   Do you know if any board member pushed for
14   this decision?
15            MS. SMITH:  Objection; form, scope.
16       A.   I do not know.
17       Q.   Do you know if any board member advocated
18   for this decision?
19            MS. SMITH:  Same objection.
20       A.   I do not know.
21            MR. LEV:  Let me see Z.
22            MS. HEYWOOD:  Exhibit 27.
23     (Vinson Exhibit 27 was marked for identification.)
24   BY MR. LEV:
25       Q.   I'm showing you Exhibit 27, which is Bates
```

1    stamped E-ECSD 0020224.  It's an e-mail exchange at

2    the top between Kevin Adams and Timothy Smith.

3    Mr. Adams was a school board member, correct?

4        A.   Yes.

5        Q.   And Mr. Smith is the superintendent,

6    correct?

7        A.   Correct.

8        Q.   This is dated August 11th, 2022, correct?

9        A.   Correct.

10       Q.   Okay.  And at the bottom of the e-mail chain

11   you see an e-mail from Ms. Baggett to Mr. Adams and

12   other individuals, correct?

13       A.   I do see that.

14       Q.   Okay.  And the top e-mail from Mr. Adams

15   says:  Superintendent, as discussed, you have the

16   statutory authority to take the books out of

17   circulation until they are reviewed by a committee.

18   I would appreciate quick action to ensure our

19   students do not have access to inappropriate

20   materials.

21            Do you know what statutory authority

22   Mr. Adams is referring to?

23            MS. SMITH:  Objection; scope.

24       A.   No.

25       Q.   Okay.  Do you know if Mr. Smith was

Deposition of Bradley Vinson, Volume 1

1    responding to Mr. Adams' request when he adopted the

2    practice of restricting all challenged books?

3        A.    I do not know.

4            MS. SMITH:  Form; scope.

5        Q.    How were parents and students notified of

6    this change?

7        A.    Notified of the change in restricted access?

8        Q.    Yes, notified that all challenged books

9    would now be restricted?

10       A.    The press release.

11       Q.    Any other way?

12       A.    Not to my knowledge.

13       Q.    Okay.  Is that typically how the school

14   communicates with parents, is via press releases?

15           MS. SMITH:  Objection; form, scope.

16       A.    If it's a districtwide communication, yes.

17       Q.    You don't send letters home to parents about

18   important issues?

19           MS. SMITH:  Form; scope.

20       A.    We do at times but that's handled usually at

21   the school level.

22       Q.    Okay.  You mentioned that this policy of

23   restricting -- while this policy was in place, what

24   did it mean that all challenged books were subject

25   to restricted access in terms of the students'

Deposition of Bradley Vinson, Volume 1

```
1    ability to check out a book that's subjected to

2    restricted access?

3              MS. SMITH:  Objection; form.  Go ahead.

4        A.    At the time that it was implemented,

5    students would not have access to those materials

6    unless they had been granted permission by a parent

7    or guardian.

8        Q.    And the way students and parents and

9    guardians would know that is if they were aware of

10   the press release that went out?

11             MS. SMITH:  Objection; form.

12       A.    In practice, if a student requested a book

13   that was restricted, they would be given -- they

14   would be given by the media specialist one of the

15   permission forms to take home, and if they brought

16   that back signed, then they could have access to

17   that book they had requested.

18       Q.    And that was the practice that was

19   implemented at the beginning of -- at the end of

20   September, beginning of October, when this new

21   practice -- the practice of granting opt-in access

22   to the restricted books started right away with the

23   restriction of the books?

24       A.    I would need to look back at my e-mails to

25   be sure it was early, very early in the process.
```

Deposition of Bradley Vinson, Volume 1

```
 1       Q.   And those are e-mails you would have
 2  received as a media specialist?
 3       A.   Yes.
 4       Q.   Okay.  Did you review any of these e-mails
 5  in preparation for today's deposition?
 6       A.   Not as thoroughly as I could have.
 7       Q.   Okay.  How long did this policy of
 8  subjecting any challenged books to restricted access
 9  last?
10       A.   I would need to look back at my e-mails.  I
11  do not think it was very long, maybe a month.
12       Q.   Do you know what caused the change in the
13  practice to not restrict all books that were
14  challenged?
15       A.   I do not know specifically what led to the
16  change.
17       Q.   Was it the fact that the Bible was
18  challenged and restricted under that practice?
19       A.   That's a possibility that I have heard
20  discussed but I don't know if that was actually the
21  case.
22       Q.   Did you inquire as to why this practice
23  changed in preparing for this deposition?
24       A.   Outside of counsel?  No.
25       Q.   Do you know who made the decision to change
```

1    the practice of restricting all challenged books?

2        A.   I think that decision would have -- that's

3    speculation but I think the superintendent and

4    Michelle White would have made that decision.

5        Q.   But you don't know that?

6        A.   I don't know that.

7        Q.   Do you know if the board was involved or

8    consulted in this change?

9        A.   I do not know.

10       Q.   Do you know if the board pushed for this

11   change?

12       A.   I do not know.

13           MS. SMITH:   Form.

14       Q.   So when this -- and you don't know exactly

15   when the change happened, correct?

16       A.   Not without referring to e-mails.

17       Q.   Yeah.  And those aren't -- that isn't in the

18   stack of documents you brought with you today,

19   correct, those e-mails you had referred to?

20       A.   No, they're not in my e-mails.

21       Q.   Okay.  What was the new practice then?  We

22   had a practice you don't know about up until the end

23   of September of 2022.

24       A.   Correct.

25       Q.   In September of 2022 there was a practice of

Deposition of Bradley Vinson, Volume 1

1    restricting any book that was subject to a

2    challenge?

3        A.    Uh-huh.

4        Q.    Correct?

5        A.    Correct.

6        Q.    At some point that practice changed to yet

7    another practice, and what was that practice?

8        A.    If a book was taken out of the restricted

9    section, then we made it circulation type Challenge,

10    and we were instructed to keep it in the traditional

11    location on the library shelves and circulate as

12    normal.

13        Q.    Sorry.  Let me try to ask my question in a

14    different way.  What was the new practice with

15    respect to whether or not a book that has been

16    challenged would be restricted?

17            MS. SMITH:  Objection; form.

18        A.    I don't know what reasons Michelle White, in

19    conjunction -- in coordination with Tim Smith,

20    applied in order to restrict access to some books

21    but not others.

22        Q.    That was the practice, that some challenged

23    books were restricted and some others were not

24    restricted?

25        A.    That's correct.

1    Q.   Okay.  But you don't know the rhyme or

2    reason of which were or were not restricted?

3    A.   It was very fluid at the time.  I don't know

4    what conversations were taking place or what reasons

5    were utilized.

6    Q.   Do you know if the standard for restricting

7    access to challenged books at that time, and I'm

8    going to call it the fall of 2023, after the Bible

9    challenge --

10   A.   2022?

11   Q.   I'm sorry, the fall of 2022, thank you,

12   after the Bible challenge.  Do you know if the

13   standard being applied was 847.012?

14   A.   That was -- that was likely part of it.

15   Q.   Okay.  But you don't know?

16   A.   Correct.

17   Q.   Do you know if a book was challenged and had

18   an allegation of explicit sexual conduct at that

19   time, if it would have been subject to restriction?

20   A.   It would not be subject to restriction in

21   the same way that it would be post HB 1069, but I

22   think it would depend on the audience level of the

23   book.

24   Q.   Okay.  During this time period, post Bible

25   challenge, fall 2022, if a book was subject to

Deposition of Bradley Vinson, Volume 1

1    restriction, was it available to students through a

2    parental opt-in?

3        A.    At that time, yes.

4        Q.    Okay.  Do you know if a book that referred

5    to a sexual assault having occurred would be subject

6    to restriction at that time?

7        A.    I would have to look at individual books and

8    their history.

9        Q.    I'm asking about the policy and practice

10    being applied by Michelle White and Tim Smith at the

11    time.  Do you know if under their policy and

12    practice they would have restricted a book that was

13    challenged because it references sexual assault?

14        MS. SMITH:  Objection; form as to policy.

15        A.    I don't know if that was their practice.

16        Q.    Do you know if their practice and policy was

17    to restrict books challenged because of "sexual

18    content"?

19        MS. SMITH:  Objection to form as to policy.

20        A.    I don't know if that would have been one of

21    the considerations.

22        Q.    Do you know if a book challenged on the

23    basis of "sexual nudity" would have been restricted

24    at that time?

25        A.    I don't know.

Deposition of Bradley Vinson, Volume 1

1    Q.   Do you know if a book challenged on the

2    basis of "rape; incest" would have been restricted

3    at the time?

4    A.   Without looking at the specific book, I

5    don't know.

6    Q.   Do you know if a book challenged on the

7    basis of "sexual obscenities" would have been

8    restricted at that time?

9    A.   I don't know.

10    Q.   Do you know if a book challenged on the

11    basis of "sexual activities" would have been

12    restricted at that time?

13    A.   I don't know.

14    Q.   Do you know if a book challenged using the

15    word "sexual" in any context would have been

16    restricted at that time?

17    A.   I don't know.

18    Q.   Do you know if a book challenged on the

19    basis of "LGBTQ explicit graphic story line" would

20    have been challenged at that time?

21    A.   I don't know.

22    Q.   Do you know if a book challenged on

23    the basis of "LGBTQ themes" would have been

24    restricted at that time?

25    A.   I don't know.

Deposition of Bradley Vinson, Volume 1

1      Q.   Do you know if a book challenged based on

2   alternate sexualities would have been restricted at

3   that time?

4      A.   I don't know.

5      Q.   Do you know if a book challenged on the

6   basis of LGBTQ content and agenda would have been

7   restricted at that time?

8      A.   I don't know.

9      Q.   Do you know if a book challenged on the

10  basis of gay agenda would have been restricted at

11  that time?

12     A.   I don't know.

13     Q.   Do you know if a book challenged on the

14  basis of indoctrination of LGBTQ would have been

15  challenged at that time?

16     A.   I don't know.

17     Q.   Okay.  Sorry.  Nicole had asked us to go

18  with the scope of your knowledge, so I'm just

19  testing it.

20     A.   And I think it was something that Michelle

21  considered on a case-by-case basis.  She didn't have

22  a list of "if this, then this."

23     Q.   So you think she had a standardless approach

24  to just making ad hoc decisions on these?

25     A.   I don't know what all she took into

Deposition of Bradley Vinson, Volume 1

1    consideration.

2       Q.   Okay.

3            MR. LEV:  Let's take a look at CC.

4            MS. HEYWOOD:  This will be Exhibit 28.

5       (Vinson Exhibit 28 was marked for identification.)

6    BY MR. LEV:

7       Q.   So you've been handed Exhibit 28, which is

8    Bates stamped E-ECSD 0039346.  Have you seen this

9    document before?

10      A.   I have not.

11      Q.   Okay.  This is an e-mail exchange between

12   Tim Smith and Michelle White, correct?

13      A.   Correct.

14      Q.   And you see that at the top e-mail Ms. White

15   is -- and this is from October 24th, 2022, correct?

16      A.   Correct.

17      Q.   And at the very bottom, actually, do you see

18   an e-mail from October 16th, 2022?

19      A.   Yes.

20      Q.   And it is to Dr. Smith and it says:  10 new

21   challenges were submitted Friday afternoon.

22           It goes on with some information and says:

23   I recommend all but two of these new titles be

24   placed in the restricted area until further review.

25           Correct?

Deposition of Bradley Vinson, Volume 1

1    A.    That is what it says.

2    Q.    Does that refresh your recollection as to

3    when the policy of restricting everything ended?

4    Sorry.

5          Does that refresh your recollection as to

6    when the policy or practice of restricting all

7    challenged books ended?

8    A.    I would still need to go back and look at

9    other e-mails because this is a recommendation but

10   it's not a change.

11   Q.    Okay.  In response Mr. Smith says:  Thanks

12   for the information.  I would like to discuss the

13   Rumble as I believe there is implied language

14   although not as graphic as the others.  I agree with

15   your recommendations for the other nine books.

16         Do you know what he's referring to when he's

17   talking about implied language?

18   A.    I do not.

19   Q.    And then Michelle White says:  I have placed

20   a Y/N for all of the titles.  Please provide your

21   input and I will send out the list and instructions

22   to the schools.

23         Do you know what that is referring to?

24   A.    That would be her informing all of the media

25   specialists of the restricted status of those titles

Deposition of Bradley Vinson, Volume 1

1  on her list and instructions on what we were to do

2  with them based on whether they were restricted or

3  not.

4      Q.   And so does that refresh your recollection

5  as to when the practice of restricting all

6  challenged books changed?

7      A.   It was around this time but I would still

8  need to look back at the communications received.

9      Q.   Okay.  Is it your understanding -- what

10  happened to the books that had been restricted under

11  the restrict everything practice?  Were they

12  reviewed and -- for a determination as to whether

13  they should continue to be restricted?

14      A.   I don't know what her process was for going

15  through those books, but over time many of them did

16  shift.

17      Q.   Okay.  But you don't know -- do you know

18  what standard was applied to determine whether those

19  books should be unrestricted?

20      A.   I do not know.

21      Q.   Do you know the time frame during which that

22  review happened to determine whether those books

23  should be unrestricted?

24      A.   We were receiving e-mails that changed the

25  status from around this time of October forward, and

```
1    I would have to review my e-mail to see how far
2    forward those e-mails were coming in.
3        Q.   Okay.
4            MR. LEV:  Can we see DD?
5            MS. HEYWOOD:  This is Exhibit 29.
6      (Vinson Exhibit 29 was marked for identification.)
7    BY MR. LEV:
8        Q.   Exhibit 29 is the document Bates stamped
9    E-ECSD 0052717 to 2719.  This is an e-mail from
10   Michelle White dated October 26, 2022, on top and
11   forwarding an e-mail from her below dated
12   October 25th, 2022.  Have you ever seen this
13   document?
14       A.   Yes.
15       Q.   And you saw it when you received it from
16   Michelle White when you were a media specialist?
17       A.   That's correct.
18       Q.   Okay.  And the e-mail at the bottom on
19   October 25th says:  Please read below for two
20   important updates.  The ECPS Board's advertised
21   policy regarding the Reconsideration of Educational
22   Media has made a change to the restricted access of
23   titles under reconsideration.
24            Is this reflective of the end of the
25   restrict all practice?
```

Deposition of Bradley Vinson, Volume 1

```
 1        A.   Yes, I believe so.

 2        Q.   Okay.  And if you continue reading that, it

 3    then seems to be quoting some sort of policy.  It

 4    says:  Restricted Access:  The purpose of the school

 5    library media center's Restricted Section will be to

 6    house books currently under appeal for possible

 7    violation of Section 847.012 FS.  These are noted

 8    with Y in the Restricted Access column.

 9    Parents/Guardians will be given the opportunity to

10    opt-in if they wish for their students to have

11    access to titles housed in the Restricted Section as

12    they are being reviewed.

13             Did I read that correctly?

14        A.   Yes.

15        Q.   Okay.  And then it says:  Remain on shelves:

16    Titles not under appeal for possible violation of

17    Section 847.012 FS will remain on the shelves and

18    open circulation.  These are noted with N in the

19    Restricted Access column.

20             Correct?

21        A.   Correct.

22        Q.   Okay.  Do you know if Michelle White and Tim

23    Smith are purporting to apply Section 847.012 in

24    determining which books should or should not be

25    restricted at this time period?
```

Deposition of Bradley Vinson, Volume 1

```
 1      A.   That is what is stated.
 2      Q.   Okay.  But outside of this e-mail, you don't
 3   know what they were actually doing?
 4      A.   Could I review 847.012?
 5      Q.   Sure.
 6      A.   Okay.
 7      Q.   Do you have that in the documents you
 8   brought?
 9      A.   I think so, somewhere.
10           MS. SMITH:  I think it's -- that got
11      separated.
12      A.   Some of these things are not stapled, so
13   that's not --
14      Q.   I might have a copy as well.
15           MS. HEYWOOD:  Here we go.  I have copies.
16           MR. LEV:  Thank you.
17           MS. SMITH:  You found it.
18              (Discussion off the record.)
19   BY MR. LEV:
20      Q.   Are you still looking for it?
21      A.   I have it.
22      Q.   Okay.  So 847.012 of the Florida Statutes
23   that you were just reviewing --
24      A.   Yes.
25      Q.   -- talks about material that shouldn't be
```

Deposition of Bradley Vinson, Volume 1

1    provided to minors and requires that that material

2    be harmful to minors to fall within its purview,

3    correct?

4        A.    Correct.

5        Q.    And do you know the definition of "harmful

6    to minors"?

7            MS. SMITH:  Objection; form, calls for a

8        legal opinion.

9        A.    I would want to refresh my memory before

10   restating it, but I'm familiar with it.

11       Q.    And it's set forth in 847.001, correct?

12       A.    Correct.

13       Q.    And I will tell you that -- do you recall

14   that one of the prongs of being harmful to minors is

15   that the material needs to lack any serious

16   literary, artistic, political, or scientific value?

17       A.    I've seen that with the term "for minors"

18   added at the end in some instances, but yes.

19       Q.    Okay.  I had asked you if you knew, based on

20   Exhibit 29, whether Tim Smith and Michelle White

21   were in fact applying 847.012 as the criteria in

22   which they decided whether or not to restrict a

23   challenged book.

24       A.    That was indicated, yes.

25       Q.    I know it was indicated, but do you know

Deposition of Bradley Vinson, Volume 1

```
 1  whether or not that is in fact what they were doing?
 2      A.   I do not know if that was the only criteria
 3  being utilized.
 4      Q.   Okay.
 5           MR. LEV:  Can we see EE?
 6           MS. HEYWOOD:  Here's Exhibit 30.
 7    (Vinson Exhibit 30 was marked for identification.)
 8  BY MR. LEV:
 9      Q.   Exhibit 30 is Bates stamped E-ECSD 0025054
10  and 5055, and the second page is an e-mail from
11  Vicki Baggett to Dr. Smith and the school board and
12  the top of this is an e-mail exchange between
13  Michelle White and Tim Smith, and at the very top
14  Mr. Smith says:  Michelle --
15           He wants to see two additional books
16  restricted and he says:  Two books also need to be
17  added to the restricted section in high school based
18  on applying HB 847.012 and HB 847.001.  Those two
19  books are "Absolute True Diary" and "13 Reasons
20  Why."
21           Correct?
22      A.   That is what it states.
23      Q.   "Absolute True Diary" is the "Absolutely
24  True Diary of a Part-Time Indian"?
25      A.   Yes.
```

Deposition of Bradley Vinson, Volume 1

1    Q.   And the reason I was asking, you had just

2  refreshed your recollection on what 847.012

3  provides, and I think you agree that it requires

4  materials to be harmful to minors for them to be

5  subject to 847.012, correct?

6    A.   Correct.

7         MR. LEV:  Can we see 847.001?

8         MS. HEYWOOD:  Do you want to introduce it as

9    an exhibit?

10        MR. LEV:  Sure.

11   (Vinson Exhibit 31 was marked for identification.)

12        MS. HEYWOOD:  This is Exhibit 31.

13 BY MR. LEV:

14   Q.   That's Florida Statutes Section 847.001, and

15 at the very bottom on the first page and onto the

16 top of the second page is the definition of harmful

17 to minors?

18   A.   Yes.

19   Q.   And you see that it means certain sexual

20 content and then there is an (a), (b) and a (c):

21 Taken as a whole, is with without serious literary,

22 artistic, political, or scientific value for minors.

23        Correct?

24   A.   Correct.

25   Q.   Are you familiar with the book "Absolutely

Deposition of Bradley Vinson, Volume 1

1   True Diary of a Part-Time Indian"?

2       A.    I haven't read it myself but I know of it.

3       Q.    In fact, that book went through a District

4   Materials Review Committee, correct?

5       A.    That's correct.

6       Q.    It's currently unrestricted, correct?

7       A.    It had a decision reached, so it is not in

8   restriction.

9       Q.    Okay.  Is it your understanding that that

10  book has serious literary, artistic, political, or

11  scientific value?

12          MS. SMITH:  Objection; form.

13      A.    I would agree it has literary and political

14  and historical value, yes.

15      Q.    For minors?

16          MS. SMITH:  Form.

17      Q.    Would you agree with that, it has literary

18  value for minors?

19      A.    For some minors, yes.

20      Q.    Okay.  Do you know if Michelle White or Tim

21  were considering the literary, artistic, political,

22  or scientific value of the books they were

23  reviewing?

24      A.    I do not know if they made that

25  consideration.

Deposition of Bradley Vinson, Volume 1

1      Q.   Okay.  But Mr. Smith was, in fact,

2   indicating that the "Absolutely True Diary of a

3   Part-Time Indian" should be restricted under Section

4   847.012, although ultimately the school district has

5   determined that it is appropriate for inclusion in

6   the schools, correct?

7           MS. SMITH:  Objection; form.

8      A.   This is -- I would need to look back at my

9   notes, but this was possibly before the period of

10  time when we had that YA opt-in collection, so --

11  and it is -- I believe it is a young adult book, and

12  so the question may have been should it be available

13  to all middle schoolers or middle schoolers who have

14  opted in for access to young adult materials.

15     Q.   But if you look at Exhibit 30, he's talking

16  about restricting it in high schools based on

17  applying 847.012, so that wouldn't explain --

18     A.   That wouldn't apply there, so you are

19  correct.

20          MR. LEV:  FF.

21    (Vinson Exhibit 32 was marked for identification.)

22          MS. HEYWOOD:  This is Exhibit 32.

23  BY MR. LEV:

24     Q.   This is a document -- Exhibit 32 is a

25  document Bates stamped E-ECSD 0042819 to 2821 and

1    it's titled "Access to Titles During Reconsideration

2    Policy and Procedure."

3            Have you seen this document before?

4    A.    Yes.

5    Q.    And what is it?

6    A.    It just outlines what we are to do with

7    restricted books and makes sure that we are all

8    following the same process in regards to these

9    materials as noted in that Restricted Access column.

10   Q.    And so under "Roles and Responsibilities"

11   for the Coordinator of Media Services, it requires

12   that the Coordinator of Media Services make some

13   changes in Destiny?

14   A.    Yes.

15   Q.    And so that would be changes districtwide?

16   A.    Yes.

17   Q.    Okay.

18   A.    Now, let me point out here, this is not

19   outlining the Coordinator of Media Services making a

20   change to specific books.  This was the Coordinator

21   of Media Services adding that as a circulation type

22   and as a sublocation, and then Challenge circulation

23   type so that media specialists would be able to

24   change that circulation type.

25   Q.    I see.  And so the media specialists on

1    Page 2 are responsible for then changing the

2    circulation type for the books in their library that

3    are subject to restricted access?

4        A.    That's correct.

5        Q.    As well as placing those titles physically

6    in a restricted section of the library?

7        A.    Yes.

8        Q.    Okay.  Do you know if -- and this document

9    says "Media Services, 9-29-22, updated 10-25-22."

10           Do you know what the updates to this were,

11    how it evolved?

12        A.    I do not know.  I would have to look back

13    and see if I have access to an earlier version of

14    this.

15        Q.    Okay.  Do you know when Michelle White and

16    Tim Smith, when making decisions about which books

17    to subject to restricted access, whether they were

18    basing their decisions on the challenge form alone

19    or whether they were basing their decisions on the

20    content of the book itself beyond the challenge

21    form?

22        A.    I know Michelle White would look at the

23    books and the contents of the books as much as she

24    was able.

25        Q.    In fact, to make a determination whether the

```
 1    book had serious literary, artistic, political, or

 2    scientific value for minors, one would have to

 3    consider the book as a whole, correct?

 4         MS. SMITH:  Form.

 5    A.   That is correct.

 6    Q.   Do you know if HB 1557 was a factor in

 7    making restricted access decisions?

 8    A.   I do not know.

 9    Q.   Did you review any documents in preparation

10    for today's deposition regarding that issue?

11    A.   Beyond the challenge forms themselves and

12    the list of books that were restricted or not

13    restricted at various times, I did not review

14    additional documents.

15    Q.   Did you review the documents that had been

16    filed in connection with the preliminary injunction

17    regarding this issue?

18    A.   What do you mean?

19    Q.   There was a preliminary injunction filed in

20    this lawsuit in which certain exhibits were

21    submitted to the court discussing what appears to be

22    a policy of restricting books under HB 1557.

23    A.   I don't remember it saying specifically

24    that.

25    Q.   Okay.
```

```
 1            MR. LEV:  Can we get HH?  Actually, let's do

 2       GG.

 3     (Vinson Exhibit 33 was marked for identification.)

 4            MS. HEYWOOD:  This is Exhibit 33.

 5            THE WITNESS:  Thank you.

 6   BY MR. LEV:

 7       Q.   This is Exhibit 33.  It's Bates stamped

 8   E-ECSD 0050343 and it's an e-mail exchange between

 9   Heather Barrow Stafford and a number of individuals

10   with the subject Re: Library Advisory Committee.

11            Have you seen this before?

12       A.   I have not.

13       Q.   Do you know who Heather Barrow Stafford is?

14       A.   She was a media specialists with the

15   district prior to me becoming the coordinator.

16       Q.   I'm sorry.  Can you say that again?

17       A.   She was a media specialist in the district

18   at this point in time but is no longer a media

19   specialist with the district.

20       Q.   Got it.  Thank you.  And the e-mail that's

21   dated December 1st at the top says:  So, around half

22   of the challenged books have been moved back on the

23   shelves, because the initial complaint had to do

24   with disliking content (BLM, police brutality,

25   et cetera) which is harder to classify as
```

Deposition of Bradley Vinson, Volume 1

1    inappropriate.  The books still being kept in the

2    restricted area are there due to a concern about

3    sexual conduct, which follows the pornographic line

4    in the new law.

5          Do you know what new law she's talking

6    about?

7          MS. SMITH:  Objection; form.

8      A.   I'm not sure what she's referring to there.

9      Q.   Okay.  And do you agree with her that the

10   books that have been unrestricted because they were

11   only challenged for things like BLM, police

12   brutality, et cetera, had been restricted because of

13   the viewpoint in those books?

14         MS. SMITH:  Objection; form, scope.

15     A.   I do not know.

16     Q.   Okay.  And you don't know also if the books

17   that remained restricted were restricted because of

18   sexual content, correct?

19     A.   Correct.

20         MR. LEV:  Now let's do HH.

21     (Vinson Exhibit 34 was marked for identification.)

22         MS. HEYWOOD:  This is Exhibit 34.

23   BY MR. LEV:

24     Q.   So Exhibit 34 is Bates stamped

25   E-ECSD 0067517 and it's an e-mail exchange between

Deposition of Bradley Vinson, Volume 1

1    Eesha Pendharkar at Education Week, who appears to

2    be a reporter, and Michelle White, correct?

3        A.    Yes.

4        Q.    It's dated April 27, 2023, and Michelle is

5    responding to a question about how Florida's three

6    laws, HB 1557, HB 7, and HB 1467, impacted the

7    district's decision to form a restricted section

8    that requires parental approval, and Michelle

9    responds that:  Books that are challenged for

10   content that may be in violation of 847.012

11   (pornography harmful to minors) are restricted until

12   the review is completed.

13        Is it your understanding that the district

14   understood the limitations of 847.012 and

15   pornography to be one in the same?

16        MS. SMITH:  Form.

17        A.    I do not.  I don't know if I can speak to

18   that understanding.

19        Q.    And then Michelle notes again in April 2023:

20   Books that are challenged based on HB 1557 are

21   restricted in elementary schools.

22        Does that refresh your recollection as to

23   whether HB 1557 impacted the district's practice

24   with respect to restricted access to books?

25        A.    She did have some books marked as restricted

1    that did not contain sexual conduct and that may be

2    in relation to the confusion regarding whether or

3    not HB 1557 applied to library books or just

4    instructional materials.

5        Q.    But you don't know, you are surmising?

6        A.    I am surmising.

7        Q.    I'd like to take a look at Paragraph 23 of

8    your declaration.

9        A.    Where could it be?

10           MS. SMITH:  It was Exhibit 4.  It's kind of

11       thick.

12           MS. HEYWOOD:  They are all kind of thick.

13           MS. SMITH:  Good point.  Aha, I found it.

14       A.    Which paragraph did you indicate?

15       Q.    Paragraph 23.

16       A.    23.  Okay.

17       Q.    Your declaration there talks about Policy

18    4.06 having been amended several times, and then the

19    last sentence of Paragraph 23 says:  At no time did

20    the section of Policy 4.06 applying to library

21    and media center materials reference House Bill

22    1557, which only concerns classroom instruction.

23           Did I read that correctly?

24       A.    You did.

25       Q.    I'm going to ask you some questions -- well,

Deposition of Bradley Vinson, Volume 1

1    so at this point the school district does understand

2    that HB 1557 does not concern library materials?

3            MS. SMITH:   Form.

4        A.   Yes.

5        Q.   That is its official policy and practice, is

6    that HB 1557 does not apply to library materials?

7        A.   That is our practice.

8        Q.   Okay.  I'm going to ask you some questions

9    in your personal capacity.

10       A.   Okay.

11       Q.   You submitted this declaration in connection

12   with the preliminary injunction filed in this case,

13   correct?

14       A.   Correct.

15       Q.   In that preliminary injunction there were

16   some allegations that, in fact, the district was

17   restricting books based on challenges under HB 1557.

18   Were you aware of that?

19       A.   There were some titles that were restricted

20   and it appeared to me that they were restricted

21   because of HB 1557 before other lawsuits made it

22   more clear what the State's intention of HB 1557

23   was, to only have it apply to instructional

24   materials.

25       Q.   When you submitted this declaration, were

1  you aware that one of the allegations of fact that

2  was made in the preliminary injunction motion was

3  that the district had in fact restricted books under

4  HB 1557?  I'm asking at the time you submitted this,

5  did you know that that was an issue that had been

6  raised in the preliminary injunction motion?

7        MS. SMITH:  Objection; form.  Just for

8     clarity, that includes Mr. Lev's declaration,

9     that's what he's referring to as the

10    preliminary injunction motion.

11    A.   Is there something I can refer back to so

12 that I can refresh my memory?

13    Q.   Not that I have with me.

14    A.   Okay.

15    Q.   You as you sit here today, I mean without --

16 I don't have anything to refresh your recollection,

17 so do you remember if you were aware that the

18 question of whether books were restricted under 1557

19 was an issue in the preliminary injunction motion?

20    A.   I just wish I could remember exactly what

21 the preliminary injunction motion said.

22    Q.   Do you know why you included this statement

23 about 1557 in your declaration?

24    A.   Because it was not a part of our process,

25 but there were some books that I unrestricted that

Deposition of Bradley Vinson, Volume 1

1    were challenged on the basis related to HB 1557.

2        Q.    Do you think it would misleading to flag

3    that 1557 wasn't referenced in Policy 4.06 if it was

4    in fact a basis for restriction in the district's

5    practice?

6            MS. SMITH:  Objection; form.

7        A.    I would have to look at the books on a case

8    by case basis and they -- if that was the practice,

9    it was not applied consistently, in my experience.

10       Q.    Do you think when Michelle White responded

11   to a reporter that books are restricted in

12   elementary schools under 1557, she just chose to

13   give a reporter inaccurate information?

14           MS. SMITH:  Objection; calls for

15       speculation.

16       A.    I don't know.

17       Q.    Okay.  Did the board have any role -- this

18   is before HB 1069.  So from October of 2022 until

19   July of 2023, when this restricted access -- well,

20   let me take a step back.

21           So my understanding is that after the school

22   district rescinded the practice of restricting all

23   challenged books, there was this case-by-case

24   determination and Tim Smith and Michelle White made

25   a decision as to whether a challenged book should or

1    should not be restricted, correct?

2        A.    Correct.

3        Q.    And did that practice remain the practice

4    until July 1st of 2023?

5        A.    That practice remained the practice until I

6    took the position June 8th of 2023.

7        Q.    Okay.  What happened on -- what changed

8    then?

9        A.    Michelle White left the position and I came

10    into the position.

11        Q.    Fair enough.  So as of -- you got me there.

12            And from June 8, 2023, when you came into

13    the position, were you then -- when you came into

14    the position, was Tim Smith still the

15    superintendent?

16        A.    No.

17        Q.    Keith Leonard was?

18        A.    Correct.

19        Q.    Were there any book challenges filed between

20    the time you came into the position and July 1st,

21    2023?

22        A.    There were book challenges filed and at that

23    time HB 1069 had already been signed into law and I

24    knew that students would not have access to their

25    collections until August, so I believe as soon as I

1    started receiving challenges that alleged sexual

2    conduct, I was applying the restricted status based

3    on that allegation of sexual conduct in those

4    challenges.

5        Q.    Okay.  So then the rule reverted back to

6    everything is restricted?

7        A.    If there is --

8              MS. SMITH:  Form.

9        A.    If the form indicated that there was sexual

10   conduct present.

11       Q.    Okay.  And do you recall if you received any

12   challenges in that time period that didn't allege

13   sexual conduct?

14       A.    May I refer to my sheet?

15       Q.    Sure.

16       A.    Okay.

17       Q.    You're looking at the Reconsiderations

18   Spreadsheet?

19       A.    Give me a chance to pull it up.

20              So "Friends Forever" was a tricky one for

21   us, and that is one that we received a challenge on

22   July 27th, because that was one of those instances

23   where it was an unwanted touch.  There is an adult

24   who touches a minor female and we interpreted that

25   as that is not appropriate and that is -- we

Deposition of Bradley Vinson, Volume 1

1    wondered if it was -- we interpreted it as being

2    covered by HB 1069 and it was challenged at that

3    elementary level, so that is where we restricted it.

4        Q.    Okay.

5        A.    Other than that -- let's see.  I think we're

6    forward of the titles at issue.

7        Q.    Okay.  But your practice then, when you came

8    in, was any book that in your opinion the challenge

9    form alleged sexual conduct was challenged pending

10   review and, otherwise, it would not be challenged

11   pending review?

12       A.    If it was not something that contained

13   sexual conduct -- you know, for example, "Bathe the

14   Cat" or "Oliver Button is a Sissy," we did not

15   restrict those.

16       Q.    Did the board have any role in determining

17   which books should or should not be restricted from

18   that fall of 2022, when it started to be a

19   book-by-book decision, until you came into your

20   role?

21       A.    Not to my knowledge.

22       Q.    Okay.  Did the practice of restricting books

23   based on HB 1557 in elementary schools end at some

24   point?

25       A.    So I did send out -- can you repeat the

Deposition of Bradley Vinson, Volume 1

```
 1   question just to be sure I'm --
 2       Q.   Yep.  Whether the practice of restricting
 3   challenged books in elementary schools that had been
 4   challenged under HB 1557, whether that practice
 5   ended at some point?
 6       A.   So I sent out an e-mail in regards to that
 7   Northern District settlement related to HB 1557.  I
 8   unrestricted access to those books in April of 2024.
 9       Q.   Okay.  So you went in -- and who made that
10   decision as to which of the books should be
11   unrestricted?
12       A.   I made that decision in consultation with
13   general counsel and our superintendent.
14       Q.   Okay.  Was the board involved in those
15   decisions at all?
16       A.   No.
17       Q.   Was the board involved in the sort of bigger
18   picture decision, not on a book-by-book basis, but
19   to unrestrict books that had been restricted under
20   1557?
21       A.   No.
22       Q.   Okay.  Are those the books that you
23   reference in your declaration?  You list 20 books
24   that were unrestricted.
25       A.   Yes.
```

Deposition of Bradley Vinson, Volume 1

1    Q.   Were those all books that fall in this

2  bucket of HB 1557 challenged books?

3    A.   Yes.

4    Q.   None of those were books that were

5  unrestricted because of the 1069 clearance process?

6    A.   Correct.

7    Q.   Okay.

8    A.   Although that is relevant.  I mean, we would

9  not provide them if they had sexual conduct.

10   Q.   Okay.

11       MS. SMITH:  Ori, we're going to be at seven

12    hours at about 5:30, just for the --

13       MR. LEV:  How much time do I have left?

14          (Discussion off the record.)

15   (Vinson Exhibit 35 was marked for identification.)

16  BY MR. LEV:

17   Q.   So I've handed you what's been marked

18  Exhibit 36.  Are you --

19       MS. HEYWOOD:  No, Exhibit 35.

20   Q.   I'm sorry, Exhibit 35.  Are you familiar

21  with this document?

22   A.   I'm trying to remember if I -- I think I'll

23  need to refresh my memory on it.  I think I have

24  seen it.

25   Q.   Okay.  I can tell you this was produced in

1    response to interrogatories that the plaintiffs had

2    promulgated to the board and it asked for, with

3    respect to each restricted book, who submitted the

4    challenge, who made the decision to subject the book

5    to restricted access, the reason for subjecting the

6    book to restricted access, and the identity of each

7    library the book is or was restricted.

8        A.    The reason as stated on the challenge form?

9        Q.    Well, the interrogatory asked for the

10   reason.  Okay?

11       A.    Okay.

12       Q.    This is what we received in response.

13       A.    I see.

14       Q.    Okay.  You previewed one of my questions.

15   Were you involved in preparing this chart?

16       A.    Yes.

17       Q.    Okay.  And under who decided to subject

18   reading materials to restricted, every single entry

19   says Coordinator of Media Services/Superintendent.

20   Correct?

21       A.    That is what it says, yes.

22       Q.    And is it your testimony that every single

23   restriction decision was made by Michelle White and

24   Tim Smith or Michelle White and Keith Leonard, as

25   the case may be?

1      A.    Or myself and Keith Leonard.

2      Q.    Or yourself and Keith Leonard?

3      A.    Although I will say some of these I made the

4  decision and the superintendent could consult with

5  me if he felt otherwise.

6      Q.    But that's not specified on here?

7      A.    No.

8      Q.    And do you know if some of these Michelle

9  White made the decision?

10     A.    Independently, I couldn't say if it was --

11     Q.    So what was the thinking in just sticking

12  the same answer on everything when it wasn't

13  actually applicable to everything?

14         MS. SMITH:  Objection; form.

15     A.    I don't have documentation of which ones

16  were made solely by the Media Services Coordinator

17  and which ones the superintendent provided input on.

18     Q.    But you know which ones you made yourself?

19     A.    Yes.

20     Q.    Okay.  How many of those do you think you

21  made yourself, just roughly?

22     A.    Let's see.  I think I would have to

23  cross-reference.  Maybe a third -- wait, no.  I

24  would have to cross-reference to give you a rough

25  number; a quarter of them.

Deposition of Bradley Vinson, Volume 1

1    Q.   And how would you determine that?  Would it

2    just be your memory or you would cross-reference

3    some document?

4    A.   I would go back and I would look at the

5    history of the cell on the spreadsheet to see which

6    ones I had changed, but this is to make them

7    restricted and not all of them are restricted at

8    this time.

9    Q.   I guess I'm confused.  I'm assuming that you

10   made the change in the cell to make them restricted.

11   The question is who decided to restricted them.  Was

12   it you or you and Mr. Leonard?

13   A.   And my confusion is that some of these are

14   ones where I went back and I changed the status, so

15   I didn't restrict it, I unrestricted some of these,

16   and that's where I'm having trouble as I'm trying to

17   calculate how many I had some decision-making on.

18   Q.   Let's focus on the restriction and not the

19   unrestriction.

20   A.   Okay.

21   Q.   Were you involved in decisions to restrict

22   any of these books?

23   A.   What was the latest date of these?

24   Q.   It would have gone through I think July

25   23rd --

Deposition of Bradley Vinson, Volume 1

```
 1              MS. HEYWOOD:  Yes.
 2      Q.   -- 26th, something like that.
 3              MS. SMITH:  2023.
 4      Q.   2023.
 5      A.   Of 2023?
 6      Q.   Yeah.
 7      A.   So the majority of these initial decisions
 8   would have been made by Michelle White, and then
 9   I'll need to go through and just cross-reference to
10   see which ones I might have shifted to a restricted
11   status.
12      Q.   Again, my question is about the decision to
13   restrict, not the implementation in the spreadsheet.
14      A.   But the spreadsheet -- we make the change in
15   the spreadsheet when we make the decision to
16   restrict.
17      Q.   I understand, but would that tell you if you
18   made that decision alone or in consultation with
19   Keith Leonard?
20      A.   It would jog my memory.
21      Q.   I see.  If we said could you please
22   supplement this to accurately reflect who made the
23   decision to restrict, that's the process you would
24   make to jog your memory?
25      A.   Yes.
```

Deposition of Bradley Vinson, Volume 1

1      Q.    Okay.

2            MS. SMITH:   Form.

3      Q.    The interrogatory that this was responding

4   to asked to identify the reason for subjecting the

5   book to restricted access.  Is the information

6   provided in Column C the reason that the book was

7   subjected to restricted access?

8            MS. SMITH:   Form.

9      A.    May I review them?

10     Q.    Sure.

11     A.    Okay.  And also, can you clarify which time

12  period we're talking about, or do we need to do that

13  on a case-by-case basis?

14     Q.    The time period is the date whenever these

15  books were subjected to restricted access.  I can

16  tell you it would have been between the summer and

17  fall of 2022 and July of -- well, I don't actually

18  know that.

19           MS. SMITH:   I would say subject to the

20       objections and the defined time period in the

21       responses to interrogatories, Ori.

22     Q.    Well, each of these books, we believe, was

23  at some point subjected to restricted access, and

24  the interrogatory asked why was it subjected to

25  restricted access and the time period is whenever

Deposition of Bradley Vinson, Volume 1

```
1   that decision was made to restrict the book at

2   issue.

3        MS. SMITH:  Objection; misstates the

4      responses to interrogatories.

5        MR. LEV:  Okay.  I wasn't --

6   Q.   Anyways, I don't know if that's helpful to

7   you.

8        MS. SMITH:  I just want to -- it's not for

9      her.  I just want to preserve the record that in

10     our responses to interrogatories we laid out how

11     we were responding, so that's a bit of an unfair

12     question for the witness, but you can proceed.

13       MR. LEV:  Okay.  I'm going to -- we'll mark

14     this as 36, please.

15    (Vinson Exhibit 36 was marked for identification.)

16  BY MR. LEV:

17  Q.   While we're doing this, my question to you

18  still stands.  Is the information in Column C the

19  reason for subjecting each of the books listed to

20  restricted access?

21       MS. SMITH:  Objection; form.

22  A.   The reason in Column C is the reason this

23  book was challenged as stated on the challenge form

24  from the complainant.

25  Q.   Okay.  Is that also the reason that the book
```

1    was subjected to restricted access in every

2    instance?

3        A.    If it contained sexual activities and it is

4    currently restricted, yes.  I cannot speak to the

5    conversations that took place between Michelle White

6    and possibly Tim Smith regarding restricting access

7    to the others.

8        Q.    So you don't know if the reasons listed in

9    Column C were the reasons for restricting access to

10   the challenged book, correct?

11       A.    Correct.

12           MS. SMITH:  Objection; form.

13       Q.    Okay.

14       A.    It was prior to HB 1069.  I don't know what

15   their specific reasons were and I think it would be

16   possibly different on a case-by-case basis.

17           MR. LEV:  Okay.  Can we find the --

18           MS. HEYWOOD:  Exhibit 18?

19           MR. LEV:  No.  I'm looking for the

20       deposition notice again.  I think it's Exhibit 1.

21           MS. HEYWOOD:  Yes.

22           MS. SMITH:  She's got it.

23           MR. LEV:  You know what, in the interest of

24       time I'm going to come back to that.

25   BY MR. LEV:

Deposition of Bradley Vinson, Volume 1

1    Q.   Let's look back at Policy 4.06, the redlined

2    version, if we can find it.

3         MS. HEYWOOD:  It's Exhibit 18.

4         MR. LEV:  Thank you.

5    A.   You said it was 14?

6    Q.   18.

7    A.   18.  I'm sorry.  Let me check and see if 19

8    is where my other pages go.  I believe it is.  Give

9    me just a second to find 18.  18 is marked at the

10   bottom.

11        I have it.

12   Q.   Okay.  And if we go to Section 10(A)(4)(c)

13   -- if I can find the page, I will tell you where it

14   is.  It is Page 18 of 21 there.

15   A.   I'm there.

16   Q.   Okay.  Actually, so let's look at

17   10(A)(4)(a) on Page 17.  It says that material

18   challenged on the basis that it contains content

19   that's pornographic or prohibited under 847.012

20   shall be restricted, correct?

21   A.   Correct.

22   Q.   I believe you have testified that you don't

23   know if that was the practice that Tim Smith and

24   Michelle White were implementing, correct?

25   A.   I don't know if that was the only item that

Deposition of Bradley Vinson, Volume 1

```
 1    they considered.
 2        Q.   Okay.  And then 10(A)(4)(b) at the bottom of
 3    the page says:  The Superintendent, in consultation
 4    with the Coordinator of Media Services, shall retain
 5    the right to make a determination that a challenge
 6    lacks sufficient facts to support a preliminary
 7    finding that the material contains content that is
 8    pornographic under 847.012.  In such case, the
 9    challenged material will remain in circulation.
10            So the way this is set up is if the basis of
11    the challenge is 847.012, they're going to restrict
12    it unless the superintendent determines --
13        A.   That that doesn't apply.
14        Q.   You're right, it seems facially not to
15    implicate 847.012.  Do you know if that is what Tim
16    Smith and Michelle White were doing or if they were
17    looking at the challenge form or if they were in
18    fact considering other materials regarding the book,
19    such as the book itself or reviews of the book?
20        A.   So in order to make that determination, that
21    a challenge lacks sufficient facts to support a
22    preliminary finding, I think they had to examine the
23    material, the book.
24        Q.   Do you know if they ever made that sort of
25    preliminary determination?
```

Deposition of Bradley Vinson, Volume 1

1    A.   I don't know specifically if they did on a

2    particular title.

3    Q.   Okay.  And then 10(B)(3) on the next page --

4    under 10(B) it talks about procedures for

5    reconsiderations and it says the following

6    procedures will be observed if a complaint is made,

7    and under 10(B)(3)(c) it says:  The availability of

8    the challenged materials is changed to "Restricted

9    Status" in the Library Catalog and placed in an area

10   not accessible by students.

11        Would that have been limited, though, to the

12   material challenged under 847.012, or was that

13   applicable to all challenges?

14   A.   This would be the items that were

15   restricted.

16   Q.   Okay.

17   A.   So all challenges included some things that

18   were restricted and some things that circulated as

19   normal but with the circulation type Challenge.

20   Q.   Okay.  Although it doesn't say it in the

21   policy, it would only apply to those that were

22   subject to restriction pursuant to practice?

23   A.   Yes.

24        MR. LEV:  Okay.  Let's stop there for the

25   day.

Deposition of Bradley Vinson, Volume 1

1              THEREUPON, the deposition of BRADLEY VINSON,

2    Volume 1, taken at the instance of the Plaintiffs,

3    was recessed at 5:34 p.m. CDT.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of Bradley Vinson, Volume 1

1          CERTIFICATE OF REPORTER OATH

2

3    STATE OF FLORIDA

4    COUNTY OF ESCAMBIA

5         I, Susan D. Wasilewski, Registered

6    Professional Reporter, Certified Realtime Reporter,

7    Certified Manager of Reporting Services, Certified

8    Realtime Captioner, Florida Professional Reporter,

9    and Notary Public in and for the State of Florida at

10   large, hereby certify that the witness named herein

11   appeared before me on Thursday, August 22, 2024, and

12   was duly sworn.

13         WITNESS my hand and official seal this

14   28th of August, 2024.

15

16

17   *Susan Wasilewski*_____

18        SUSAN D. WASILEWSKI, RPR, CRR, CMRS, CRC, FPR

19        NOTARY PUBLIC - STATE OF FLORIDA

20        MY COMMISSION NO. HH 438399

21        EXPIRES:  10-23-27

22

23

24

25

Deposition of Bradley Vinson, Volume 1

```
1                   CERTIFICATE OF REPORTER
2    STATE OF FLORIDA
3    COUNTY OF ESCAMBIA
4          I, Susan D. Wasilewski, Registered
5    Professional Reporter, Certified Realtime Reporter,
6    Certified Manager of Reporting Services, Certified
7    Realtime Captioner, and Florida Professional
8    Reporter, do hereby certify that I was authorized to
9    and did stenographically report the examination of
10   the witness named herein; that a review of the
11   transcript was requested; and that the foregoing
12   transcript is a true record of my stenographic
13   notes.
14          I FURTHER CERTIFY that I am not related to
15   or an employee of any of the parties, nor am I
16   related to or an employee of any of the parties'
17   attorneys or counsel connected with this action, nor
18   am I financially interested in the outcome of this
19   action.
20          DATED THIS 28th of August, 2024.
21
22    Susan Wasilewski _____
23    SUSAN D. WASILEWSKI, RPR, CRR, CMRS, CRC, FPR
24
25
```

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF FLORIDA
 2                       PENSACOLA DIVISION

 3             Case No. 3:23-CV-10385-TKS-ZCB

 4  PEN AMERICAN CENTER, INC.,
    et al.,

 5
        Plaintiffs,
 6  vs.

 7  ESCAMBIA COUNTY SCHOOL BOARD,

 8        Defendant.

 9  IN RE:  Deposition of Bradley Vinson, 30(b)(6) Witness
              for Escambia County School Board, and in her
10            Individual Capacity - Volume 1
              Taken:  Thursday, August 22, 2024
11

12  TO:  NICOLE SMITH, ESQUIRE
         nsmith@rumberger.com
13

14  Dear Ms. Smith:

15          The referenced transcript has been completed
    and awaits review and signing of the errata sheet.
16
            Thank you for agreeing to handle the reading
17  and signing process.  Today's date is August 28,
    2024.  Please complete the reading and signing by
18  September 30, 2024.

19          The original transcript of this deposition
    has been delivered to Attorney Ori Lev, and the
20  errata sheet, once completed, should be forwarded to
    Attorney Ori Lev.
21

22          Thank you.

23

24  _____
    Susan Wasilewski, RPR, CRR, CMRS, CRC, FPR
25  Anchor Court Reporting
```

AnchorReporters@aol.com
(850) 432-2511

```
 1                    ERRATA SHEET - Volume 1

 2   DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES ON THIS PAGE

 3    IN RE:   Pen American Center, Inc., et al., vs. Escambia
                County School Board
 4    CASE NO.:  3:23-CV-10385-TKS-ZCB

 5    Deposition of:  Bradley Vinson, 30(b)(6) Witness
                       for Escambia County School Board, and
 6                     in her Individual Capacity - Volume 1
      Taken:  Thursday, August 22, 2024
 7
      PAGE #/LINE #    CHANGE                     REASON
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21    Under penalties of perjury, I declare that I have

22    read the foregoing document and that the facts

23    stated in it are true.

24
       _____   _____
25    BRADLEY VINSON                      DATE
```

Deposition of Bradley Vinson, Volume 1

**#**

**#1** [1] - 241:15
**#2** [1] - 97:1

**'**

**'23** [1] - 179:4

**/**

**/LINE** [1] - 317:7

**0**

**001922** [1] - 174:4
**0020224** [2] - 7:18, 267:1
**0025054** [2] - 7:23, 284:9
**0026478** [1] - 222:8
**0027180** [1] - 15:7
**0039346** [2] - 7:19, 277:8
**0042816** [2] - 7:14, 261:17
**0042819** [2] - 8:5, 287:25
**0049201** [2] - 6:11, 133:15
**0049217** [1] - 133:16
**0050012** [2] - 6:13, 154:1
**0050343** [2] - 8:7, 291:8
**0052717** [2] - 7:22, 280:9
**0057845** [2] - 6:9, 107:22
**0059643** [2] - 6:15, 159:24
**0066577** [1] - 6:7
**0066960** [2] - 7:8, 231:9
**0067219** [2] - 7:15, 263:2
**0067517** [2] - 8:9, 292:25
**00:30** [1] - 127:18
**06/26/90** [2] - 6:20, 6:23

**1**

**1** [18] - 1:17, 5:2, 5:11, 15:20, 15:23, 16:4, 188:25, 191:23, 191:25, 193:21, 193:24, 194:22, 259:18, 309:20, 313:2, 316:10, 317:1, 317:6
**10** [16] - 6:4, 43:13, 57:2, 76:14, 77:1, 77:4, 94:15, 94:20, 119:3, 164:25, 183:17, 198:11, 199:10, 205:13, 205:20, 277:20
**10(A)(1)** [1] - 206:19
**10(A)(3** [1] - 209:10

**10(A)(4** [1] - 210:7
**10(A)(4)(a** [1] - 310:17
**10(A)(4)(b** [2] - 210:8, 311:2
**10(A)(4)(c** [1] - 310:12
**10(B** [1] - 312:4
**10(B)** [1] - 232:19
**10(B)(3** [1] - 312:3
**10(B)(3)(c** [1] - 312:7
**10(B)(3)(d** [1] - 211:1
**10(B)(3)(g** [1] - 214:3
**10(B)(3)(h** [1] - 217:18
**10(B)(3)(j** [1] - 217:17
**10(B)(4** [3] - 232:24, 233:5, 233:6
**10(B)(4)** [1] - 255:7
**10(B)(4)(e** [1] - 255:11
**10-23-27** [1] - 314:21
**10-25-22** [1] - 289:9
**100** [1] - 111:5
**10019-5820** [1] - 3:15
**1006.28** [1] - 12:1
**1006.40(3)(c)** [1] - 42:2
**101** [2] - 2:16, 4:7
**1050** [2] - 2:16, 4:7
**106** [1] - 6:6
**1069** [168] - 6:4, 6:12, 6:17, 12:25, 14:6, 17:15, 17:23, 18:8, 18:13, 19:22, 20:9, 20:10, 29:6, 29:20, 37:14, 37:18, 37:24, 38:1, 38:8, 38:23, 39:3, 39:5, 39:11, 39:15, 39:22, 40:7, 40:15, 40:24, 40:25, 41:5, 41:13, 42:20, 42:22, 42:25, 43:3, 50:19, 51:4, 51:10, 51:12, 51:15, 51:23, 52:9, 52:16, 52:18, 52:21, 53:25, 79:23, 80:1, 80:16, 80:20, 81:9, 81:17, 81:19, 82:3, 82:6, 84:14, 85:15, 85:21, 86:25, 87:13, 90:5, 90:10, 91:1, 91:12, 92:11, 93:25, 94:6, 94:18, 94:23, 96:3, 96:5, 96:15, 97:6, 98:7, 98:24, 99:10, 99:11, 100:3, 102:14, 102:24, 103:5, 104:22, 108:3, 108:5, 108:10, 108:16, 109:20, 110:4, 111:12, 112:10, 113:8, 115:15, 115:21, 115:22, 116:4, 116:6, 116:9, 116:19, 117:5, 117:25, 118:1, 121:18, 122:1, 125:24, 127:9, 131:1, 134:1, 137:21, 138:6, 138:9,

144:13, 145:14, 146:10, 147:1, 147:24, 148:10, 149:9, 149:13, 154:7, 155:4, 155:8, 155:25, 157:8, 157:16, 157:25, 158:2, 158:3, 159:2, 160:8, 160:23, 161:9, 162:16, 164:25, 165:5, 167:25, 168:6, 169:9, 169:16, 173:4, 173:9, 176:11, 176:12, 176:24, 178:5, 179:1, 179:3, 179:13, 179:19, 179:25, 180:11, 181:8, 182:22, 182:24, 182:25, 183:20, 184:18, 191:8, 194:3, 231:1, 233:13, 273:21, 297:18, 298:23, 300:2, 302:5, 309:14
**107** [1] - 6:8
**10:01** [1] - 44:7
**10:40** [1] - 71:1
**10:41** [1] - 71:1
**10th** [1] - 154:2
**11** [3] - 6:6, 106:21, 106:23
**11:10** [1] - 94:14
**11:16** [1] - 94:14
**11th** [1] - 267:8
**12** [9] - 6:8, 57:4, 107:18, 107:19, 107:21, 153:20, 224:2, 224:4, 224:6
**12/16/14** [1] - 6:21
**12/19/2022** [1] - 190:18
**12/19/22** [1] - 6:24
**12:36** [1] - 153:7
**13** [9] - 6:10, 6:13, 133:8, 133:9, 142:7, 224:2, 224:4, 224:6, 284:19
**133** [1] - 6:10
**1363** [1] - 205:18
**1367** [1] - 6:21
**14** [9] - 6:12, 142:15, 153:22, 153:23, 154:1, 241:14, 241:20, 241:21, 310:5
**1400** [1] - 4:14
**1467** [14] - 13:18, 17:24, 41:21, 42:16, 42:22, 43:1, 43:8, 43:9, 90:1, 98:23, 99:1, 99:3, 99:14, 293:6
**14:02** [1] - 6:6
**14th** [2] - 48:11, 48:15
**15** [8] - 5:11, 6:14, 22:13, 159:21, 159:22, 159:25, 259:21, 260:1
**153** [1] - 6:12
**1557** [43] - 225:23, 226:6, 226:11, 226:19, 226:20,

231:17, 232:1, 232:8, 232:12, 243:6, 243:8, 244:13, 244:22, 245:2, 245:7, 245:16, 246:15, 246:22, 248:11, 248:18, 290:6, 290:22, 293:6, 293:20, 293:23, 294:3, 294:22, 295:2, 295:6, 295:17, 295:21, 295:22, 296:4, 296:18, 296:23, 297:1, 297:3, 297:12, 300:23, 301:4, 301:7, 301:20, 302:2
**159** [1] - 6:14
**16** [5] - 5:13, 6:16, 167:11, 167:14, 169:2
**163** [2] - 2:7, 3:21
**167** [1] - 6:16
**1675** [1] - 3:14
**16th** [3] - 134:11, 246:1, 277:18
**17** [5] - 6:18, 173:25, 174:1, 174:4, 310:17
**1735** [1] - 3:7
**174** [1] - 6:18
**17th** [12] - 49:7, 49:11, 49:15, 49:24, 50:5, 50:8, 50:9, 50:15, 109:2, 109:19, 115:21
**18** [15] - 6:20, 188:3, 188:4, 188:6, 193:20, 200:24, 209:9, 242:3, 309:18, 310:3, 310:6, 310:7, 310:9, 310:14
**180** [7] - 156:10, 156:20, 157:2, 157:20, 157:24, 158:11, 159:4
**182** [1] - 15:8
**188** [1] - 6:20
**189** [1] - 6:22
**19** [17] - 6:22, 104:24, 188:18, 188:20, 189:13, 189:14, 189:16, 190:7, 191:3, 192:20, 193:23, 194:23, 209:11, 211:2, 232:16, 255:5, 310:7
**19103** [1] - 3:8
**19th** [6] - 3:14, 189:1, 189:4, 189:8, 191:17, 191:20
**1:36** [1] - 153:7
**1st** [4] - 50:19, 291:21, 298:4, 298:20

**2**

**2** [9] - 5:13, 16:11, 16:14, 101:22, 161:3, 161:5, 188:25, 215:21, 289:1

**20** [8] - 5:21, 7:4, 7:10, 222:3, 222:5, 222:8, 223:16, 301:23
**20006-1811** [2] - 2:8, 3:22
**2012** [1] - 187:12
**2015** [1] - 187:12
**2020** [2] - 2:7, 3:21
**2022** [79] - 12:24, 13:17, 14:13, 14:14, 43:23, 45:17, 45:22, 46:2, 46:16, 47:21, 50:17, 50:22, 75:7, 75:11, 99:15, 186:24, 187:11, 188:18, 188:20, 189:1, 189:4, 189:8, 193:20, 193:21, 195:13, 196:3, 196:5, 196:15, 196:24, 197:8, 200:5, 201:2, 201:20, 201:25, 202:3, 202:12, 203:4, 204:11, 204:18, 205:7, 206:6, 206:23, 207:9, 208:1, 208:6, 208:9, 208:15, 209:7, 210:4, 214:14, 217:19, 232:18, 233:11, 246:1, 246:14, 256:2, 258:24, 259:6, 261:7, 261:18, 262:11, 263:5, 264:23, 265:4, 265:9, 265:10, 267:8, 271:23, 271:25, 273:10, 273:11, 273:25, 277:15, 277:18, 280:10, 280:12, 297:18, 300:18, 307:17
**2022-2023** [1] - 26:25
**20225** [1] - 7:18
**2023** [70] - 5:21, 7:10, 12:25, 13:13, 14:8, 14:15, 14:16, 18:11, 29:21, 48:15, 49:8, 49:15, 50:9, 50:18, 50:20, 50:23, 51:12, 52:21, 52:25, 54:4, 72:23, 80:8, 80:11, 82:19, 90:15, 98:13, 99:23, 108:2, 112:1, 115:21, 116:20, 117:9, 130:24, 134:7, 134:11, 134:17, 135:8, 165:17, 165:23, 179:17, 185:16, 186:12, 186:24, 188:20, 190:13, 190:15, 191:3, 191:17, 191:23, 192:1, 192:11, 192:21, 193:24, 194:2, 217:19, 227:8, 231:11, 233:11, 233:12, 273:8, 293:4, 293:19, 297:19, 298:4, 298:6, 298:12, 298:21, 306:3,

306:4, 306:5
**2023-07-17** [1] - 6:6
**2023-07-17..** [1] - 106:25
**2024** [32] - 1:19, 5:3, 6:5, 48:3, 50:14, 50:15, 50:16, 95:4, 95:7, 98:14, 110:16, 134:8, 134:12, 134:14, 135:9, 135:10, 143:19, 154:2, 166:20, 172:15, 186:13, 223:14, 248:20, 301:8, 314:11, 314:14, 315:20, 316:10, 316:17, 316:18, 317:6
**2024.xlsx** [1] - 6:19
**2031** [1] - 172:18
**20th** [5] - 14:8, 14:16, 188:20, 191:13, 191:19
**21** [10] - 5:14, 6:5, 7:6, 95:4, 95:7, 120:23, 186:12, 223:4, 223:6, 310:14
**212** [1] - 3:16
**215** [1] - 3:9
**21st** [2] - 166:20, 167:8
**22** [10] - 1:19, 5:3, 5:16, 7:7, 182:10, 231:6, 231:8, 314:11, 316:10, 317:6
**22-23** [1] - 5:17
**222** [1] - 7:4
**222-6550** [2] - 2:18, 4:9
**223** [1] - 7:6
**223-0200** [1] - 3:16
**229** [1] - 1:21
**23** [10] - 7:9, 237:1, 237:3, 238:21, 239:13, 240:19, 294:7, 294:15, 294:16, 294:19
**231** [1] - 7:7
**237** [1] - 7:9
**23rd** [1] - 305:25
**24** [3] - 7:11, 245:19, 245:20
**245** [1] - 7:11
**24th** [1] - 277:15
**25** [5] - 7:13, 153:17, 261:13, 261:14, 261:16
**25055** [1] - 7:23
**25th** [5] - 45:16, 50:11, 50:17, 280:12, 280:19
**26** [13] - 5:17, 7:15, 98:21, 99:21, 192:21, 192:25, 262:23, 262:24, 263:1, 263:5, 264:23, 265:4, 280:10
**261** [1] - 7:13
**262** [1] - 7:15
**266** [1] - 7:16
**26th** [1] - 306:2
**27** [9] - 7:16, 46:16,

47:21, 100:13, 130:4, 266:22, 266:23, 266:25, 293:4
**2719** [1] - 280:9
**277** [1] - 7:19
**27th** [3] - 45:22, 136:11, 299:22
**28** [6] - 7:19, 130:22, 277:4, 277:5, 277:7, 316:17
**280** [1] - 7:20
**2821** [1] - 287:25
**284** [1] - 7:23
**285** [1] - 7:24
**287** [1] - 8:4
**28th** [3] - 208:9, 314:14, 315:20
**29** [6] - 7:20, 156:9, 280:5, 280:6, 280:8, 283:20
**291** [1] - 8:6
**292** [1] - 8:8
**2:34** [1] - 195:10
**2:40** [1] - 195:10
**2B** [1] - 66:11

## 3

**3** [6] - 5:14, 21:17, 21:20, 22:13, 62:13, 101:22
**30** [1] - 7:23, 157:5, 158:13, 159:10, 241:20, 241:21, 284:6, 284:7, 284:9, 287:15, 316:18
**30(b)(6** [7] - 1:15, 5:11, 9:10, 15:23, 259:19, 316:9, 317:5
**300** [1] - 4:14
**302** [1] - 8:10
**308** [1] - 8:11
**30th** [4] - 143:19, 261:18, 262:11, 265:10
**31** [5] - 7:24, 242:20, 242:21, 285:11, 285:12
**31st** [3] - 46:2, 48:8, 134:3
**32** [5] - 8:4, 161:19, 287:21, 287:22, 287:24
**32502** [1] - 1:22
**32801** [3] - 2:17, 4:8, 4:15
**33** [5] - 8:6, 243:13, 291:3, 291:4, 291:7
**34** [4] - 8:8, 292:21, 292:22, 292:24
**35** [4] - 8:10, 302:15, 302:19, 302:20
**36** [5] - 8:11, 215:21, 302:18, 308:14, 308:15

**38** [2] - 209:11, 209:12
**39** [1] - 232:19
**39347** [1] - 7:19
**3:22** [1] - 227:4
**3:23-CV-10385-TKS-ZCB** [3] - 1:3, 316:3, 317:4
**3:29** [1] - 227:4

## 4

**4** [9] - 5:16, 22:2, 22:5, 98:16, 128:8, 128:11, 128:14, 233:18, 294:10
**4.06** [22] - 6:20, 6:23, 13:11, 17:16, 187:21, 188:17, 189:1, 189:5, 190:8, 191:14, 194:5, 200:10, 204:10, 205:6, 232:16, 235:6, 248:24, 255:6, 294:18, 294:20, 297:3, 310:1
**4.06_Approved.pdf** [1] - 191:5
**40** [3] - 211:2, 214:3, 249:1
**407** [1] - 4:16
**41** [1] - 217:16
**42** [2] - 232:23, 255:9
**42817** [1] - 7:14
**42821** [1] - 8:5
**43** [4] - 116:2, 164:15, 192:24, 192:25
**438399** [1] - 314:20
**49** [1] - 249:1
**49205** [2] - 150:1, 150:16
**49207** [1] - 144:15
**49208** [1] - 143:13
**49209** [1] - 134:11
**49210** [1] - 142:5
**49212** [1] - 141:16
**49213** [1] - 140:16
**49217** [1] - 6:11
**4:15** [1] - 258:14

## 5

**5** [7] - 5:17, 26:3, 26:5, 101:22, 128:8, 128:11, 128:14
**50** [1] - 249:6
**5055** [1] - 284:10
**51st** [1] - 3:7
**52** [1] - 249:7
**52719** [1] - 7:22
**53** [2] - 249:16, 250:1
**55** [1] - 251:9
**57851** [1] - 129:25

**57861** [1] - 6:9
**58** [2] - 251:14, 252:7
**592** [1] - 109:6
**5:23-cv-00381-VJD-PRL** [1] - 13:22
**5:30** [1] - 302:12
**5:34** [2] - 1:20, 313:3
**5th** [4] - 134:7, 134:17, 134:22, 135:8

## 6

**6** [7] - 5:18, 15:16, 21:10, 56:15, 60:23, 61:1, 174:6
**60** [1] - 5:18
**62** [1] - 241:14
**66** [1] - 5:20
**66578** [1] - 118:24
**66579** [1] - 121:13
**66582** [1] - 125:10
**66583** [1] - 127:17
**66586** [2] - 123:20, 123:22
**66594** [1] - 6:7
**67220** [1] - 7:15
**6th** [3] - 75:7, 75:11, 223:14

## 7

**7** [14] - 5:20, 57:1, 66:14, 66:17, 70:17, 71:3, 225:19, 226:15, 226:18, 226:20, 231:17, 232:1, 242:21, 293:6
**75** [1] - 5:22
**7851** [1] - 129:25
**79** [1] - 5:24

## 8

**8** [11] - 5:22, 8:10, 56:15, 75:18, 75:23, 193:2, 193:4, 193:5, 246:3, 246:7, 298:12
**8/22/2024** [1] - 3:5
**8/23/2024** [1] - 3:12
**80-3** [1] - 13:23
**847** [1] - 102:17
**847.001** [8] - 7:24, 12:2, 104:23, 243:16, 283:11, 284:18, 285:7, 285:14
**847.012** [23] - 12:2, 198:18, 225:17, 243:16, 273:13, 281:7, 281:17, 281:23, 282:4, 282:22,

283:21, 284:18, 285:2, 285:5, 287:4, 287:17, 293:10, 293:14, 310:19, 311:8, 311:11, 311:15, 312:12
**850** [4] - 2:9, 2:18, 3:23, 4:9
**860-9344** [2] - 2:9, 3:23
**864-8500** [1] - 3:9
**87-1** [1] - 192:20
**872-7300** [1] - 4:16
**8th** [1] - 298:6

## 9

**9** [7] - 5:7, 5:24, 7:4, 57:3, 79:6, 79:8, 171:4
**9-10** [1] - 171:4
**9-29-22** [1] - 289:9
**93** [3] - 192:21, 192:23, 209:12
**94** [1] - 6:4
**99** [1] - 204:3
**9:04** [2] - 1:20, 9:2
**9:50** [1] - 44:7

## A

**a.m** [8] - 1:20, 9:2, 44:7, 71:1, 94:14
**ability** [12] - 11:2, 37:1, 42:6, 44:21, 113:9, 178:11, 184:8, 185:22, 198:19, 210:17, 210:19, 269:1
**able** [21] - 29:14, 64:14, 80:23, 81:24, 84:3, 96:2, 96:17, 96:21, 97:20, 120:19, 130:5, 173:10, 207:15, 218:10, 221:18, 224:18, 230:6, 232:10, 233:21, 288:23, 289:24
**Absolute** [1] - 284:19
**absolute** [1] - 284:23
**absolutely** [3] - 116:1, 169:6, 223:18
**Absolutely** [3] - 284:23, 285:25, 287:2
**abstract** [1] - 236:4
**abundantly** [1] - 226:8
**access** [102] - 7:21, 34:18, 35:2, 35:3, 36:22, 37:1, 37:12, 38:9, 38:17, 39:4, 39:6, 39:10, 39:23, 39:24, 40:10, 41:3, 44:25, 45:23, 45:24, 46:2, 46:3, 46:17, 46:19, 46:21, 47:18, 47:19,

48:16, 48:17, 48:21, 48:23, 49:1, 49:2, 49:8, 49:12, 49:16, 49:25, 51:2, 54:21, 55:20, 73:15, 76:12, 77:6, 116:18, 151:16, 164:12, 184:22, 185:1, 209:21, 209:24, 210:18, 246:25, 258:22, 258:25, 259:5, 259:24, 260:7, 260:17, 260:19, 260:21, 261:3, 261:8, 262:3, 262:17, 264:4, 264:11, 264:16, 265:15, 265:20, 265:22, 265:25, 267:19, 268:7, 268:25, 269:2, 269:5, 269:16, 269:21, 270:8, 272:20, 273:7, 280:22, 281:11, 287:14, 289:3, 289:13, 289:17, 290:7, 293:24, 297:19, 298:24, 301:8, 303:5, 303:6, 307:5, 307:7, 307:15, 307:23, 307:25, 308:20, 309:1, 309:6, 309:9
**Access** [19] - 8:4, 37:6, 43:11, 45:4, 45:18, 55:17, 111:1, 115:1, 127:3, 127:8, 127:12, 148:9, 168:21, 281:4, 281:8, 281:19, 288:1, 288:9
**accessed** [4] - 31:25, 32:1, 81:14, 200:21
**accessible** [1] - 312:10
**accessing** [3] - 44:15, 65:8, 210:20
**accomplished** [1] - 211:8
**according** [1] - 201:8
**accordingly** [1] - 170:7
**accurate** [4] - 22:16, 162:7, 164:22, 198:5
**accurately** [1] - 306:22
**Ace** [4] - 63:18, 63:21, 109:15, 109:16
**acquire** [1] - 77:3
**acquired** [1] - 230:17
**acquisition** [1] - 15:14
**act** [2] - 105:7, 105:10
**action** [4] - 181:9, 267:18, 315:17, 315:19
**actions** [2] - 29:8, 55:15
**actively** [1] - 213:4
**activities** [2] - 275:11, 309:3
**activity** [1] - 158:9
**actual** [1] - 55:3, 57:23, 69:13, 129:18, 152:21, 240:22, 241:6

**ad** [1] - 276:24
**Adams** [5] - 267:2, 267:3, 267:11, 267:14, 267:22
**Adams'** [1] - 268:1
**add** [2] - 135:18, 177:10
**added** [8] - 45:5, 90:3, 111:12, 140:25, 141:10, 173:8, 283:18, 284:17
**adding** [1] - 288:21
**addition** [2] - 121:1, 233:12
**Additional** [1] - 241:8
**additional** [24] - 65:20, 66:21, 68:7, 68:10, 77:21, 134:18, 157:7, 157:20, 158:16, 159:19, 165:24, 166:3, 174:25, 179:23, 211:6, 234:19, 241:12, 241:22, 242:9, 242:16, 252:25, 253:1, 284:15, 290:14
**additions)** [1] - 188:21
**address** [1] - 230:13
**addressed** [4] - 196:11, 196:14, 227:23, 230:10
**addresses** [1] - 194:12
**addressing** [2] - 174:24, 198:14
**adds** [1] - 115:10
**admin** [1] - 107:25
**administration** [1] - 262:6
**administrator** [2] - 229:6, 229:13
**Administrator** [1] - 1:25
**administrators** [2] - 23:24, 213:14
**admins** [1] - 119:7
**adopt** [1] - 13:19
**Adopted** [2] - 6:20, 6:23
**adopted** [24] - 13:12, 14:7, 14:15, 152:20, 189:5, 190:12, 190:14, 194:19, 203:10, 203:12, 205:7, 208:7, 208:11, 208:15, 208:17, 209:6, 229:15, 229:16, 266:1, 266:4, 268:1
**adoption** [7] - 14:5, 191:7, 194:7, 204:10, 206:5, 206:8, 230:2
**adult** [41] - 34:24, 36:20, 36:22, 55:21, 56:11, 56:13, 56:15, 56:16, 56:24, 85:14, 85:18, 85:19, 86:4, 86:8, 86:20, 87:4, 87:6, 87:11, 87:18, 87:22, 88:1, 88:18,

88:23, 101:17, 101:25, 104:1, 137:11, 139:11, 141:7, 155:22, 180:21, 180:22, 180:23, 180:25, 249:9, 249:10, 287:11, 287:14, 299:23
**Adult** [6] - 155:14, 180:18, 249:5, 249:13, 249:19, 254:23
**advance** [2] - 239:16, 239:22
**advanced** [1] - 103:16
**Advanced** [1] - 176:7
**advertised** [1] - 280:20
**advise** [1] - 7:7
**Advisory** [14] - 8:6, 67:15, 85:10, 85:16, 85:20, 86:12, 215:25, 216:1, 218:1, 250:16, 250:19, 250:23, 251:3, 291:10
**advisory** [2] - 23:9, 202:18
**advocated** [1] - 266:17
**affect** [2] - 20:16, 82:22
**affirm** [1] - 9:5
**afternoon** [1] - 277:21
**age** [53] - 24:19, 29:7, 30:24, 35:21, 41:24, 42:5, 42:10, 83:3, 84:1, 88:8, 91:17, 92:15, 99:19, 119:9, 125:19, 125:25, 126:7, 126:15, 126:21, 126:25, 127:8, 127:10, 127:13, 132:17, 141:6, 145:13, 145:21, 146:3, 146:20, 147:2, 148:1, 148:17, 149:5, 149:7, 149:18, 149:19, 151:17, 151:18, 151:23, 152:5, 152:10, 152:12, 156:5, 159:5, 162:17, 198:21, 199:1, 221:10, 234:11, 234:17, 257:3
**age-appropriate** [1] - 24:19
**age-level** [1] - 29:7
**agencies** [1] - 58:7
**agenda** [16] - 12:10, 12:18, 68:5, 70:9, 70:10, 71:20, 133:22, 134:21, 170:4, 177:19, 177:25, 237:13, 239:5, 248:7, 276:6, 276:10
**Agenda** [5] - 5:20, 6:10, 66:12, 68:6, 133:16
**agendas** [1] - 114:19
**ages** [1] - 170:25
**aggregate** [1] - 56:22
**aggregated** [1] - 170:18

**aggregating** [1] - 58:14
**ago** [1] - 43:13
**agree** [6] - 56:25, 278:14, 285:3, 286:13, 286:17, 292:9
**agreeing** [1] - 316:16
**agrees** [1] - 194:21
**aha** [1] - 294:13
**ahead** [12] - 10:14, 12:9, 23:4, 28:3, 31:2, 44:2, 103:7, 205:19, 205:20, 256:10, 257:6, 269:3
**aid** [4] - 59:15, 100:19, 101:14, 102:5
**al** [2] - 316:4, 317:3
**alcohol** [1] - 11:1
**alerted** [1] - 160:9
**Alice** [1] - 140:17
**alignment** [2] - 93:8, 200:16
**allegation** [2] - 273:18, 299:3
**allegations** [2] - 295:16, 296:1
**allege** [1] - 299:12
**alleged** [7] - 157:5, 157:10, 157:21, 158:14, 158:25, 299:1, 300:9
**Allegedly** [2] - 176:3, 183:25
**alleviate** [1] - 154:11
**allow** [5] - 20:9, 20:10, 34:17, 35:2, 97:23
**allowed** [1] - 180:16
**allows** [2] - 16:22, 185:25
**almost** [2] - 45:15, 144:15
**alone** [2] - 289:18, 306:18
**alongside** [2] - 136:17, 136:18
**ALSO** [2] - 2:21, 4:19
**alternate** [2] - 231:16, 276:2
**amended** [1] - 294:18
**Amendment** [3] - 199:19, 200:7, 235:1
**AMERICAN** [2] - 1:4, 316:4
**American** [3] - 32:24, 33:18, 317:3
**Amy** [1] - 6:14
**Anchor** [2] - 1:21, 316:25
**and..** [1] - 86:14
**Angie** [1] - 150:20
**ANN** [1] - 1:6
**Annex** [1] - 249:18
**answer** [19] - 10:14,

10:19, 27:13, 47:1, 47:16, 67:23, 70:4, 70:20, 115:16, 120:12, 120:19, 126:6, 162:23, 218:11, 236:6, 238:7, 249:21, 249:22, 304:12
**answering** [1] - 10:4
**answers** [4] - 10:8, 217:12, 251:6, 251:7
**anyways** [1] - 308:6
**apologize** [1] - 209:11
**appeal** [37] - 27:20, 28:15, 31:9, 31:11, 64:4, 64:6, 64:25, 65:12, 65:22, 65:23, 68:4, 68:11, 70:12, 71:5, 93:17, 93:18, 93:22, 93:24, 232:25, 233:18, 233:21, 234:2, 234:13, 235:3, 235:8, 235:12, 235:24, 240:22, 241:24, 242:22, 252:18, 252:25, 253:8, 254:18, 256:19, 281:6, 281:16
**Appeal** [10] - 7:9, 64:3, 64:21, 65:15, 65:18, 66:24, 68:3, 240:20, 251:25, 252:24
**Appeal.pdf** [3] - 66:20, 238:20, 239:9
**appealable** [1] - 91:22, 92:2, 94:5
**appealed** [6] - 28:2, 28:9, 72:16, 91:3, 93:6, 202:22
**Appeals** [1] - 240:20
**appeals** [7] - 68:2, 233:7, 233:8, 233:15, 234:7, 243:1, 247:18
**appear** [7] - 38:13, 60:2, 70:7, 76:22, 81:16, 118:8, 169:1
**APPEARANCES** [3] - 2:1, 3:1, 4:1
**appeared** [3] - 173:3, 295:20, 314:11
**appearing** [1] - 33:23
**applicability** [2] - 226:11, 226:15
**applicable** [3] - 242:25, 304:13, 312:13
**applicants** [3] - 228:13, 228:16, 242:1
**application** [1] - 228:3
**applications** [1] - 229:20
**applied** [14] - 51:24, 110:4, 123:17, 166:6, 166:7, 174:18, 225:23, 235:7, 272:20, 273:13, 274:10, 279:18, 294:3,

Deposition of Bradley Vinson, Volume 1

297:9
**applies** [4] - 33:15, 51:25, 199:19, 225:20
**apply** [22] - 35:6, 176:13, 226:6, 228:1, 228:6, 228:7, 228:10, 231:19, 232:1, 232:12, 243:9, 244:22, 245:3, 245:17, 246:22, 248:12, 281:23, 287:18, 295:6, 295:23, 311:13, 312:21
**applying** [9] - 146:10, 181:7, 235:12, 235:14, 283:21, 284:18, 287:17, 294:20, 299:2
**appoint** [1] - 228:8
**appointed** [2] - 212:25, 213:7
**appreciate** [3] - 37:11, 133:12, 267:18
**approach** [2] - 235:19, 276:23
**appropriate** [49] - 24:19, 30:24, 32:10, 32:16, 42:5, 51:13, 54:17, 83:3, 83:14, 84:2, 88:8, 91:17, 100:19, 101:15, 102:6, 119:10, 125:25, 126:7, 126:16, 127:11, 127:14, 132:17, 141:5, 145:13, 145:21, 146:3, 146:9, 146:21, 147:3, 147:8, 148:1, 148:17, 149:6, 149:18, 149:20, 151:23, 152:10, 155:13, 156:5, 161:23, 162:1, 163:6, 163:16, 163:19, 221:9, 234:18, 257:2, 287:5, 299:25
**appropriateness** [10] - 41:24, 42:10, 99:20, 125:20, 126:8, 126:21, 126:25, 127:8, 159:5, 234:12
**approval** [1] - 293:8
**approximate** [1] - 72:22
**April** [13] - 48:11, 48:15, 49:7, 49:11, 49:15, 185:16, 186:12, 231:11, 248:20, 293:4, 293:19, 301:8
**AR** [19] - 33:25, 34:2, 34:3, 34:9, 34:14, 34:16, 34:20, 34:23, 35:5, 35:8, 35:10, 35:15, 35:19, 36:4, 36:12, 36:18, 49:9, 49:13, 49:15
**area** [6] - 129:19, 181:24, 181:25, 277:24, 292:2, 312:9

**areas** [1] - 82:25
**ARGARWAL** [1] - 3:19
**arouse** [1] - 129:21
**arranged** [1] - 35:18
**arrow** [1] - 82:16
**arrows** [1] - 82:12
**art** [1] - 125:13
**articles** [1] - 154:9
**artistic** [6] - 234:22, 283:16, 285:22, 286:10, 286:21, 290:1
**Ash** [1] - 185:18
**ASHLEY** [1] - 1:8
**aside** [5] - 13:13, 16:9, 75:4, 98:18, 187:17
**assault** [5] - 104:18, 105:9, 110:13, 274:5, 274:13
**assess** [3] - 234:6, 234:11, 234:21
**assign** [1] - 20:6
**assigned** [1] - 178:9
**assignment** [1] - 19:19
**assist** [1] - 124:1
**Assistant** [4] - 61:20, 212:25, 228:19, 230:4
**assisted** [1] - 124:20
**assisting** [2] - 58:10, 240:6
**Association** [1] - 249:20
**assume** [5] - 10:14, 69:21, 90:23, 134:7, 175:22
**assuming** [4] - 9:25, 70:3, 158:20, 305:9
**assumption** [1] - 30:8
**Attached** [4] - 5:9, 6:2, 7:2, 8:2
**attached** [2] - 18:24, 244:16
**attacks** [2] - 73:3, 211:15
**attend** [2] - 131:12, 131:15
**attendance** [2] - 170:2, 208:22
**attended** [3] - 131:22, 256:5, 257:8
**attest** [1] - 197:21
**attorney** [2] - 9:17, 9:25
**Attorney** [2] - 316:19, 316:20
**attorneys** [1] - 315:17
**attributes** [1] - 80:21
**Audience** [2] - 170:14, 170:21
**audience** [29] - 23:19, 34:18, 42:5, 56:9, 56:12, 56:14, 56:17, 83:3, 85:18, 88:8, 99:18, 100:20, 101:15, 102:6,

102:7, 155:22, 156:2, 161:24, 162:1, 162:25, 163:7, 163:18, 163:19, 163:22, 170:17, 170:23, 171:3, 181:23, 273:22
**August** [14] - 1:19, 5:3, 54:4, 101:11, 207:9, 223:14, 267:8, 298:25, 314:11, 314:14, 315:20, 316:10, 316:17, 317:6
**author** [5] - 136:13, 136:14, 136:18, 138:23, 166:8
**authorities** [2] - 217:24, 218:23
**authority** [2] - 267:16, 267:21
**authorize** [1] - 35:21
**authorized** [1] - 315:8
**automatic** [1] - 175:4
**automatically** [1] - 107:16
**availability** [2] - 246:10, 246:16, 312:7
**available** [50] - 26:10, 34:14, 35:14, 35:20, 36:3, 44:15, 44:22, 55:19, 55:22, 55:24, 58:8, 61:6, 62:4, 69:8, 80:24, 81:15, 81:16, 82:5, 82:11, 90:9, 100:9, 101:2, 101:7, 114:9, 118:17, 166:9, 166:13, 166:16, 167:19, 169:14, 169:19, 169:22, 177:4, 177:7, 178:17, 180:4, 181:14, 182:19, 183:4, 184:4, 197:6, 197:13, 197:14, 198:15, 202:6, 212:13, 215:22, 274:1, 287:12
**Available** [1] - 155:3
**Avenue** [3] - 2:7, 3:21, 4:14
**awaits** [1] - 316:15
**aware** [22] - 101:19, 114:20, 145:9, 178:14, 184:22, 194:20, 200:22, 201:23, 204:5, 208:21, 238:10, 238:15, 240:5, 247:20, 255:22, 255:24, 257:16, 257:22, 269:9, 295:18, 296:1, 296:17

B

**backlash** [1] - 117:22
**bad** [1] - 136:9
**Baggett** [6] - 203:6,

102:4, 155:22, 156:2,
203:15, 209:5, 231:10, 267:11, 284:11
**baked** [1] - 126:8
**BALLARD** [2] - 3:4, 3:11
**ballot** [1] - 221:9
**ballots** [2] - 61:17, 64:17
**band** [1] - 104:3
**bands** [2] - 101:20, 101:21
**Banned** [1] - 6:9
**bans** [1] - 8:8
**barcode** [1] - 166:8
**Barrow** [2] - 291:9, 291:13
**based** [27] - 41:15, 62:17, 83:8, 83:19, 85:4, 96:12, 106:6, 106:7, 108:12, 120:7, 144:5, 147:13, 150:24, 170:17, 256:7, 257:17, 257:24, 258:4, 276:1, 279:2, 283:19, 284:17, 287:16, 293:20, 295:17, 299:2, 300:23
**bases** [3] - 198:8, 199:4, 199:14
**basic** [1] - 9:24
**basing** [2] - 289:18, 289:19
**basis** [40] - 36:21, 37:3, 38:10, 38:16, 74:10, 77:14, 98:1, 98:3, 116:14, 116:15, 130:24, 133:24, 133:25, 161:5, 166:18, 166:23, 191:13, 199:9, 215:15, 232:8, 248:17, 274:23, 275:2, 275:7, 275:11, 275:19, 275:23, 276:6, 276:10, 276:14, 276:21, 297:1, 297:4, 297:8, 301:18, 307:13, 309:16, 310:18, 311:10
**batch** [1] - 181:6
**Bates** [26] - 5:23, 12:6, 12:13, 12:20, 13:10, 61:23, 64:14, 75:24, 76:1, 106:24, 107:21, 133:14, 150:15, 154:1, 174:4, 222:8, 231:9, 261:16, 263:1, 266:25, 277:8, 280:8, 284:9, 287:25, 291:7, 292:24
**Bathe** [1] - 300:13
**battery** [8] - 105:10, 105:11, 105:12, 106:7, 143:23, 143:24, 144:3, 154:23
**Baylen** [1] - 1:21
**became** [7] - 24:23, 79:2,

196:9, 196:13, 196:25, 197:2, 205:5
**become** [1] - 73:3
**becomes** [1] - 125:14
**becoming** [1] - 291:15
**began** [5] - 51:11, 82:19, 130:23, 131:4, 196:9
**begin** [5] - 25:10, 38:4, 51:8, 130:25, 208:5
**beginning** [12] - 18:7, 51:15, 57:13, 59:15, 98:7, 101:2, 105:15, 111:25, 122:16, 230:3, 269:19, 269:20
**Behalf** [1] - 1:18
**behalf** [4] - 1:5, 1:6, 1:8, 1:9
**behind** [1] - 166:19
**believes** [1] - 146:3
**below** [8] - 31:16, 86:20, 87:11, 172:11, 261:24, 262:6, 280:11, 280:19
**benefits** [1] - 25:24
**BENJAMIN** [1] - 1:4
**best** [9] - 57:10, 59:20, 63:6, 213:19, 222:19, 233:17, 240:16, 247:12, 263:19
**better** [8] - 80:6, 136:2, 143:16, 143:20, 154:20, 154:22, 181:12, 249:8
**Better** [1] - 222:10
**between** [16] - 160:1, 222:9, 227:14, 227:23, 231:10, 233:10, 238:15, 267:2, 277:11, 284:12, 291:8, 292:25, 298:19, 307:16, 309:5
**beyond** [4] - 235:23, 258:6, 289:20, 290:11
**Bible** [4] - 270:17, 273:8, 273:12, 273:24
**bigger** [1] - 301:17
**Bill** [1] - 294:21
**bills** [2] - 231:19, 231:20
**bit** [6] - 19:24, 22:20, 94:17, 122:23, 195:12, 308:11
**blank** [5] - 63:13, 63:17, 64:6, 176:10, 177:1
**blind** [1] - 104:20
**BLM** [2] - 291:24, 292:11
**Blood** [1] - 185:17
**Blue** [17] - 5:21, 7:9, 65:13, 65:24, 66:8, 66:20, 66:25, 70:6, 71:24, 236:20, 237:6, 238:20, 239:8, 239:9, 251:24, 252:1, 253:25
**Blue.pdf** [1] - 254:7

**Bluest** [3] - 5:19, 61:3, 61:25
**board** [149] - 16:23, 17:3, 17:7, 27:20, 28:1, 28:2, 28:6, 28:10, 28:16, 29:9, 31:10, 41:1, 42:15, 59:22, 64:4, 64:6, 65:5, 65:12, 65:20, 66:5, 68:3, 68:25, 69:3, 69:8, 69:13, 69:16, 69:17, 69:18, 71:4, 72:16, 73:19, 73:21, 74:2, 76:18, 78:16, 78:19, 79:1, 90:24, 91:4, 91:23, 93:6, 93:18, 93:25, 94:5, 119:7, 122:16, 122:17, 125:15, 191:3, 191:13, 194:19, 194:20, 198:24, 201:14, 201:19, 201:21, 205:8, 212:1, 212:2, 212:11, 227:12, 227:15, 227:17, 227:23, 228:1, 228:3, 228:7, 228:10, 228:12, 228:15, 228:21, 228:22, 228:24, 229:3, 229:12, 229:16, 229:18, 229:19, 232:3, 233:6, 233:8, 233:22, 234:5, 234:8, 234:10, 234:14, 234:20, 234:25, 235:7, 235:11, 235:13, 235:24, 236:1, 236:7, 236:9, 236:14, 236:16, 236:19, 237:25, 238:2, 238:3, 238:8, 238:10, 238:12, 238:16, 238:17, 239:16, 239:23, 240:8, 240:15, 243:6, 243:23, 244:1, 245:2, 246:20, 247:14, 247:16, 248:1, 248:21, 248:23, 249:6, 250:13, 252:8, 253:7, 254:17, 254:18, 255:7, 255:14, 255:18, 255:25, 256:5, 256:13, 256:18, 257:17, 257:23, 258:4, 266:10, 266:13, 266:17, 267:3, 271:7, 271:10, 284:11, 297:17, 300:16, 301:14, 301:17, 303:2
**BOARD** [2] - 1:12, 316:7
**Board** [33] - 1:15, 4:20, 5:12, 7:9, 9:11, 64:2, 64:21, 66:20, 66:24, 68:3, 68:6, 69:12, 69:19, 70:1, 72:15, 73:24, 90:21, 90:23, 167:20, 201:9, 231:18, 231:25, 232:25, 237:8, 238:20, 239:9, 240:21, 251:25, 252:23, 255:12, 316:9,

317:3, 317:5
**Board's** [1] - 280:20
**board's** [17] - 16:2, 31:10, 71:4, 71:10, 71:13, 71:15, 71:23, 72:8, 194:12, 194:17, 232:14, 233:5, 233:15, 237:17, 237:22, 247:15, 258:8
**BoardDocs** [30] - 5:20, 65:3, 65:5, 66:1, 68:19, 68:21, 68:24, 69:3, 69:6, 70:8, 70:9, 70:13, 71:9, 72:9, 190:11, 190:23, 191:2, 236:16, 237:10, 238:18, 238:23, 238:24, 239:2, 239:3, 239:4, 239:5, 242:13, 248:4, 248:7, 251:21
**bodies** [3] - 217:25, 219:7, 219:12
**body** [6] - 103:19, 251:6, 256:23, 256:24, 257:7
**Bones** [1] - 140:17
**Book** [14] - 7:4, 8:8, 67:1, 127:21, 127:23, 127:25, 128:6, 128:10, 128:14, 161:3, 161:5, 219:16, 219:18, 219:19
**book** [312] - 14:19, 20:16, 27:5, 27:11, 27:17, 28:12, 28:14, 30:18, 30:24, 30:25, 31:1, 31:3, 31:24, 32:12, 32:18, 32:20, 32:25, 33:10, 33:16, 34:4, 34:8, 34:10, 34:13, 34:19, 34:24, 35:5, 35:12, 36:21, 36:22, 37:1, 37:13, 37:17, 37:22, 38:9, 38:19, 38:24, 39:13, 39:21, 40:2, 40:9, 41:6, 41:9, 41:14, 42:8, 43:14, 43:15, 46:10, 46:12, 46:21, 47:14, 47:22, 51:9, 51:14, 51:16, 51:20, 52:8, 53:11, 53:13, 53:17, 54:14, 54:19, 54:20, 54:23, 55:1, 55:10, 56:1, 56:5, 56:11, 58:20, 61:16, 62:11, 65:3, 67:16, 69:9, 69:14, 69:20, 70:4, 74:10, 77:7, 81:15, 81:20, 82:24, 83:2, 84:2, 86:2, 86:3, 89:8, 89:10, 89:12, 90:24, 92:25, 93:17, 93:23, 94:1, 94:3, 94:5, 95:12, 95:18, 95:24,

96:18, 97:3, 97:12, 97:24, 102:23, 103:3, 103:13, 105:5, 106:14, 111:2, 113:22, 113:25, 118:11, 118:12, 118:13, 121:9, 121:15, 121:25, 122:8, 122:25, 123:7, 124:7, 125:19, 126:2, 126:3, 127:22, 128:11, 130:5, 130:18, 132:10, 136:5, 136:23, 137:2, 137:3, 138:23, 140:19, 140:24, 141:6, 141:7, 142:24, 145:5, 145:12, 145:15, 145:18, 145:20, 145:22, 145:24, 146:8, 146:18, 146:20, 146:24, 147:1, 147:6, 147:14, 147:22, 148:8, 149:10, 149:18, 149:23, 151:10, 152:23, 155:12, 160:17, 160:18, 160:24, 160:25, 161:5, 161:21, 161:22, 162:3, 163:1, 163:7, 163:19, 164:10, 164:20, 169:11, 169:13, 169:17, 169:21, 170:5, 173:11, 173:17, 173:18, 174:18, 175:22, 176:14, 176:19, 177:2, 177:16, 177:18, 178:24, 179:10, 180:15, 180:19, 180:21, 181:11, 184:9, 184:25, 185:2, 185:7, 185:12, 185:23, 186:4, 187:14, 195:12, 195:20, 196:21, 197:21, 198:8, 199:4, 199:9, 200:13, 202:21, 202:25, 206:3, 206:22, 208:20, 216:10, 216:17, 216:18, 216:21, 218:25, 220:22, 221:4, 221:17, 233:15, 234:6, 234:12, 235:3, 235:8, 235:12, 236:2, 236:10, 237:23, 238:11, 240:7, 241:6, 242:5, 242:8, 247:9, 247:15, 247:18, 248:2, 250:8, 252:2, 253:5, 253:9, 253:10, 256:25, 257:1, 257:10, 257:12, 258:10, 258:24, 259:23, 259:25, 260:7, 260:8, 261:7, 269:1, 269:12, 269:17, 272:1, 272:8, 272:15, 273:17, 273:23, 273:25, 274:4, 274:12, 274:22, 275:1, 275:4, 275:6, 275:10, 275:14, 275:18, 275:22, 276:1, 276:5, 276:9, 276:13, 283:23,

285:25, 286:3, 286:10, 287:11, 289:20, 290:1, 290:3, 297:25, 298:19, 298:22, 300:8, 300:19, 301:18, 303:3, 303:4, 303:6, 303:7, 307:5, 307:6, 308:1, 308:23, 308:25, 309:10, 311:18, 311:19, 311:23
**book's** [3] - 53:1, 74:12, 234:21
**book-by-book** [2] - 300:19, 301:18
**book-specific** [1] - 253:10
**Booker** [2] - 176:5, 183:17
**booklist** [1] - 171:4
**Booklist** [3] - 219:15, 219:17, 249:17
**books** [342] - 18:8, 20:6, 21:11, 21:12, 21:23, 21:25, 25:7, 27:22, 29:24, 34:25, 36:10, 36:12, 36:14, 36:20, 39:11, 40:16, 40:20, 42:24, 47:5, 53:23, 55:4, 55:6, 55:18, 55:21, 56:14, 57:24, 71:9, 71:16, 73:6, 77:2, 77:5, 80:18, 80:19, 80:24, 81:1, 81:14, 81:18, 81:25, 82:15, 83:4, 83:15, 83:19, 84:11, 84:13, 84:18, 85:6, 85:12, 85:14, 85:17, 85:25, 86:5, 86:8, 86:20, 86:23, 87:3, 87:4, 87:5, 87:6, 87:9, 87:10, 87:16, 87:20, 87:23, 88:1, 88:4, 88:7, 88:12, 88:13, 88:14, 88:16, 88:23, 89:5, 89:20, 90:2, 90:3, 90:23, 91:6, 91:16, 92:7, 92:10, 92:15, 93:8, 95:6, 95:7, 95:8, 96:14, 97:17, 99:8, 99:17, 100:9, 101:17, 101:19, 102:1, 105:16, 108:9, 108:10, 108:11, 109:15, 109:16, 109:23, 110:3, 110:5, 110:11, 110:15, 110:18, 110:22, 111:4, 111:9, 111:22, 111:25, 112:8, 112:13, 112:23, 113:2, 113:15, 113:16, 114:19, 115:9, 116:10, 117:20, 117:25, 118:7, 120:7, 121:21, 122:21, 122:23, 123:14, 123:18, 124:25,

126:19, 126:22, 127:7, 130:25, 132:7, 135:16, 135:17, 136:1, 136:12, 137:23, 138:6, 138:7, 138:9, 138:15, 139:10, 139:16, 140:2, 141:14, 143:10, 144:9, 144:19, 144:24, 146:12, 146:17, 147:25, 148:15, 148:25, 149:12, 149:15, 152:22, 154:9, 154:15, 155:1, 155:2, 155:3, 155:17, 155:18, 157:1, 157:16, 157:20, 158:6, 158:13, 159:1, 159:3, 159:6, 159:9, 159:11, 159:12, 161:10, 162:8, 162:15, 163:5, 163:10, 163:14, 164:11, 165:7, 166:1, 168:2, 168:3, 168:5, 168:8, 168:10, 169:9, 170:10, 173:3, 173:14, 174:15, 175:19, 175:23, 177:11, 178:18, 178:21, 179:3, 179:8, 179:16, 179:23, 180:22, 180:23, 181:3, 181:6, 181:22, 181:24, 181:25, 182:2, 184:20, 185:14, 186:21, 186:25, 187:2, 187:4, 187:11, 194:25, 215:2, 219:2, 219:5, 221:3, 221:5, 222:10, 222:12, 225:20, 225:23, 226:16, 230:10, 230:16, 230:20, 230:24, 231:2, 232:7, 236:20, 239:20, 240:15, 244:22, 245:3, 246:16, 246:23, 248:12, 249:10, 250:24, 252:17, 252:19, 255:18, 256:1, 256:14, 258:22, 259:5, 259:7, 259:9, 260:20, 261:3, 263:8, 263:10, 263:12, 263:14, 264:6, 264:10, 264:14, 264:18, 264:22, 265:3, 265:14, 265:24, 266:7, 267:16, 268:2, 268:8, 268:24, 269:22, 269:23, 270:8, 270:13, 271:1, 272:20, 272:23, 273:7, 274:7, 274:17, 278:7, 278:15, 279:6, 279:10, 279:15, 279:19, 279:22, 281:6, 281:24, 284:15, 284:16, 284:19, 286:22, 288:7, 288:20, 289:2, 289:16, 289:23, 290:12, 290:22, 291:22, 292:1, 292:10, 292:13, 292:16, 293:9, 293:20,

293:24, 293:25, 294:3, 295:17, 296:3, 296:18, 296:25, 297:7, 297:11, 297:23, 300:17, 300:22, 301:3, 301:8, 301:10, 301:19, 301:22, 301:23, 302:1, 302:2, 302:4, 305:22, 307:15, 307:22, 308:19

**Books** [16] - 5:14, 5:15, 6:8, 6:9, 79:19, 79:24, 81:6, 82:3, 83:8, 85:4, 90:11, 90:20, 90:21

**boot** [2] - 29:17, 44:3

**booted** [1] - 29:15

**Born** [1] - 222:11

**bottom** [24] - 12:7, 14:21, 71:5, 83:8, 85:2, 85:3, 90:18, 90:19, 121:14, 123:23, 125:11, 140:16, 144:16, 160:5, 182:10, 188:7, 214:17, 237:17, 267:10, 277:17, 280:18, 285:15, 310:10, 311:2

**BOUZAT** [1] - 3:5

bouzatf@ballardspahr. com [1] - 3:6

**box** [11] - 13:6, 79:18, 79:23, 81:2, 81:5, 82:3, 82:5, 82:13, 90:10, 162:18, 172:9

**Boys** [20] - 5:21, 7:9, 32:24, 33:18, 65:13, 65:23, 66:8, 66:20, 66:25, 70:6, 71:24, 236:20, 237:6, 238:20, 239:8, 239:9, 251:24, 252:1, 253:25, 254:7

**BRADLEY** [10] - 1:15, 5:6, 5:10, 6:3, 7:3, 8:3, 9:10, 9:20, 313:1, 317:25

**Bradley** [7] - 5:13, 5:16, 9:20, 17:8, 28:20, 316:9, 317:5

**BRANNEN** [1] - 1:4

**Bray** [1] - 185:19

**break** [13] - 10:18, 10:20, 44:3, 44:9, 94:11, 133:4, 147:18, 150:3, 150:13, 153:6, 195:7, 227:3, 265:23

**breaks** [1] - 10:17

**breasts** [1] - 129:20

**bridge** [1] - 101:23

**briefly** [3] - 18:25, 19:15, 187:20

**bring** [1] - 114:17

**brings** [1] - 197:18

**broad** [4] - 99:12, 104:16, 105:14, 105:15

**broader** [7] - 31:20, 38:16, 145:15, 177:15, 177:18, 177:21, 248:8

**Broadway** [1] - 3:14

**brought** [13] - 11:20, 15:25, 18:22, 19:2, 123:3, 133:18, 174:6, 187:23, 188:9, 193:15, 269:15, 271:18, 282:8

**brutality** [2] - 291:24, 292:12

**bucket** [2] - 86:21, 302:2

**budget** [2] - 24:4, 187:3

**built** [1] - 26:18

**bullying** [1] - 245:15

**bunch** [2] - 139:4, 244:15

**burden** [1] - 122:6, 204:22

**busy** [2] - 230:1, 230:5

**but..** [1] - 183:15

**buttocks** [1] - 129:19

**Button** [1] - 300:14

**button** [2] - 129:4, 129:12

**BY** [63] - 2:5, 2:14, 3:1, 3:5, 3:12, 3:19, 4:1, 4:5, 4:12, 4:19, 9:15, 15:21, 16:8, 16:12, 21:18, 22:12, 26:4, 27:9, 44:8, 60:25, 64:20, 66:18, 71:2, 75:19, 79:7, 94:16, 106:22, 107:20, 109:1, 133:13, 150:18, 153:8, 153:24, 159:23, 167:12, 174:2, 188:5, 189:15, 190:6, 195:11, 222:6, 223:5, 223:13, 227:5, 231:7, 237:2, 245:21, 253:15, 261:15, 262:25, 264:8, 266:24, 277:6, 280:7, 282:19, 284:8, 285:13, 287:23, 291:6, 292:23, 302:16, 308:16, 309:25

**bypass** [1] - 91:15

---

### C

**calculate** [1] - 305:17

**CALDWELL** [3] - 2:13, 4:4, 4:11

**callouts** [1] - 210:16

**cannot** [7] - 29:12, 80:18, 80:19, 108:17, 137:6, 197:11, 309:4

**Capacity** [4] - 1:16, 9:12,

316:10, 317:6

**capacity** [5] - 16:15, 16:17, 17:2, 17:9, 295:9

**caption** [2] - 79:14, 167:23

**captioned** [1] - 191:4

**Captioner** [2] - 314:8, 315:7

**carefully** [1] - 99:19, 162:13

**Carlie** [1] - 175:7

**CARLIE** [1] - 4:21

**Carnival** [1] - 185:19

**CASE** [1] - 317:4

**case** [54] - 1:3, 9:18, 31:16, 32:20, 32:24, 36:21, 36:25, 37:3, 69:10, 70:5, 71:8, 71:24, 73:7, 73:9, 74:6, 77:14, 92:13, 103:24, 107:9, 128:17, 140:20, 146:7, 151:4, 153:1, 163:4, 188:8, 189:20, 191:22, 192:8, 196:22, 197:3, 198:24, 245:23, 250:18, 251:16, 256:14, 270:21, 276:21, 295:12, 297:7, 297:8, 297:23, 303:25, 307:13, 309:16, 311:8, 316:3

**Case** [1] - 13:22

**case-by-case** [7] - 36:21, 37:3, 77:14, 276:21, 297:23, 307:13, 309:16

**cases** [13] - 31:25, 56:18, 56:24, 58:4, 58:10, 111:13, 122:13, 130:15, 139:9, 155:18, 162:2, 162:25, 186:22

**cast** [2] - 126:13, 221:8

**Cat** [1] - 300:14

**catalog** [6] - 23:8, 56:21, 97:15, 97:22, 143:9, 174:16

**Catalog** [1] - 312:9

**cataloging** [1] - 56:20, 185:25

**catching** [1] - 254:8

**categories** [7] - 166:5, 166:6, 166:7, 178:12, 180:6, 240:14, 240:18

**category** [10] - 20:7, 31:21, 174:16, 176:12, 176:18, 177:11, 178:8, 178:10, 178:16, 181:7

**Category** [5] - 176:9, 176:17, 178:4, 178:19, 180:5

**caused** [4] - 115:11, 154:5, 186:25, 270:12

**causing** [1] - 99:1

**caution** [5] - 120:2, 121:8, 130:20, 147:14, 225:15

**CC** [1] - 277:3

**CDT** [3] - 1:20, 9:2, 313:3

**cell** [5] - 45:9, 53:5, 53:8, 305:5, 305:10

**cells** [4] - 76:21, 172:11, 174:21, 176:10

**center** [4] - 194:9, 205:22, 215:23, 294:21

**CENTER** [2] - 1:4, 316:4

**Center** [1] - 317:3

**center's** [1] - 281:5

**centralized** [1] - 123:15

**centrally** [1] - 204:25

**certain** [17] - 20:4, 31:23, 32:1, 32:2, 34:14, 40:16, 40:20, 76:21, 76:23, 77:1, 90:5, 97:19, 144:11, 152:13, 258:6, 285:19, 290:20

**certainly** [1] - 90:4

**CERTIFICATE** [2] - 314:1, 315:1

**certified** [2] - 61:19, 124:10

**Certified** [9] - 99:3, 124:2, 124:13, 314:6, 314:7, 315:5, 315:6

**certify** [2] - 314:10, 315:8

**CERTIFY** [1] - 315:14

**cetera** [4] - 146:23, 158:17, 291:25, 292:12

**chain** [1] - 267:10

**Challenge** [6] - 6:18, 20:11, 57:6, 57:22, 160:10, 160:13, 160:15, 174:17, 180:12, 180:18, 272:9, 288:22, 312:19

**challenge** [134] - 20:7, 27:17, 27:22, 28:5, 28:7, 28:9, 30:21, 31:1, 31:4, 32:13, 32:19, 32:22, 33:12, 38:11, 38:20, 38:24, 39:7, 40:10, 40:18, 41:15, 43:15, 43:16, 55:7, 57:8, 57:9, 57:15, 57:16, 57:18, 57:23, 66:7, 69:9, 70:11, 86:2, 86:3, 90:25, 93:14, 94:6, 108:12, 110:6, 110:18, 110:22, 113:16, 142:11, 142:18, 144:20, 145:15, 146:1, 146:4, 146:18, 147:12, 148:3, 148:18, 151:5, 151:9, 151:10, 151:12, 152:3,

152:11, 152:12, 152:23, 153:3, 160:19, 160:24, 160:25, 161:22, 162:4, 162:10, 162:15, 163:3, 164:6, 168:9, 168:19, 180:3, 180:15, 180:17, 180:19, 187:5, 187:14, 195:13, 195:20, 196:1, 196:7, 196:19, 197:5, 197:7, 197:12, 199:4, 199:9, 199:14, 200:9, 201:7, 202:10, 202:14, 203:16, 206:3, 211:5, 211:18, 216:17, 216:18, 216:21, 218:25, 220:22, 234:7, 234:12, 235:3, 235:8, 235:12, 239:7, 239:17, 241:6, 256:19, 259:13, 259:24, 259:25, 260:7, 260:8, 263:11, 272:2, 273:9, 273:12, 273:25, 289:18, 289:20, 290:11, 299:21, 300:8, 303:4, 303:8, 308:23, 311:5, 311:11, 311:17, 311:21

**Challenged** [4] - 79:19, 198:11, 201:9, 201:23

**challenged** [141] - 7:20, 7:21, 29:3, 38:10, 40:9, 40:17, 41:6, 42:8, 51:17, 56:2, 74:10, 81:20, 81:25, 89:20, 91:6, 93:8, 93:17, 93:22, 94:3, 94:25, 95:1, 110:3, 110:11, 111:9, 111:25, 112:8, 113:16, 113:25, 122:21, 122:22, 122:25, 123:14, 123:18, 126:19, 127:7, 144:17, 145:6, 145:13, 145:19, 145:22, 147:2, 147:8, 147:11, 148:25, 149:9, 149:12, 149:16, 151:13, 152:22, 152:25, 153:3, 162:8, 163:5, 173:7, 174:25, 178:21, 181:11, 183:21, 184:3, 184:15, 184:20, 184:25, 185:8, 185:10, 200:14, 210:9, 210:22, 217:21, 230:20, 231:2, 231:16, 232:8, 239:20, 248:17, 255:18, 258:23, 258:25, 259:7, 260:19, 261:3, 261:8, 262:17, 263:8, 263:13, 263:14, 264:10, 264:14, 264:22, 265:3, 265:15, 266:7, 268:2, 268:8, 268:24, 270:8, 270:14, 270:18, 271:1, 272:16, 272:22,

Deposition of Bradley Vinson, Volume 1

273:7, 273:17, 274:13, 274:17, 274:22, 275:1, 275:6, 275:10, 275:14, 275:18, 275:20, 275:22, 276:1, 276:5, 276:9, 276:13, 276:15, 278:7, 279:6, 283:23, 291:22, 292:11, 293:9, 293:20, 297:1, 297:23, 297:25, 300:2, 300:9, 300:10, 301:3, 301:4, 302:2, 308:23, 309:10, 310:18, 311:9, 312:8, 312:12
**challenger** [2] - 65:22, 197:21
**challenger's** [2] - 65:19, 66:21
**challengers** [2] - 198:7, 199:18
**Challenges** [2] - 5:17, 5:22
**challenges** [74] - 7:19, 14:19, 26:11, 26:12, 26:16, 26:17, 26:25, 27:3, 27:16, 27:21, 29:5, 29:11, 29:25, 31:6, 33:14, 47:8, 58:23, 59:6, 59:21, 63:8, 63:12, 63:23, 64:2, 76:6, 164:15, 174:19, 180:22, 180:23, 196:10, 196:25, 198:9, 201:5, 203:5, 203:8, 203:11, 203:18, 203:19, 203:22, 204:4, 204:13, 204:18, 204:21, 204:23, 204:24, 206:2, 206:22, 208:13, 208:20, 216:11, 219:1, 219:2, 232:15, 233:16, 238:1, 238:3, 238:11, 238:12, 238:16, 244:2, 247:9, 247:16, 247:18, 248:3, 248:5, 258:10, 277:21, 295:17, 298:19, 298:22, 299:1, 299:4, 299:12, 312:13, 312:17
**challenging** [3] - 162:20, 197:22, 263:17
**chance** [2] - 164:20, 299:19
**CHANGE** [1] - 317:7
**change** [42] - 12:24, 13:17, 49:4, 50:2, 51:22, 54:5, 82:8, 96:2, 96:3, 111:16, 121:17, 123:1, 123:2, 123:11, 130:5, 137:19, 137:21, 140:1, 146:12, 160:22, 168:12, 168:22, 173:10, 173:19, 179:9, 183:19, 183:23,

196:13, 268:6, 268:7, 270:12, 270:16, 270:25, 271:8, 271:11, 271:15, 278:10, 280:22, 288:20, 288:24, 305:10, 306:14
**changed** [30] - 17:23, 40:24, 41:16, 45:11, 45:13, 45:14, 53:2, 53:5, 53:6, 53:11, 53:18, 53:23, 55:6, 112:14, 122:20, 126:24, 137:17, 181:11, 182:16, 196:4, 197:9, 217:18, 270:23, 272:6, 279:6, 279:24, 298:7, 305:6, 305:14, 312:8
**changes** [19] - 13:16, 13:17, 14:5, 51:13, 96:6, 97:7, 179:5, 191:7, 192:11, 193:23, 205:8, 223:21, 225:10, 259:1, 260:17, 260:19, 260:21, 288:13, 288:15
**CHANGES** [1] - 317:2
**changing** [4] - 82:7, 114:7, 181:8, 289:1
**characters** [2] - 106:13, 106:17
**chart** [1] - 303:15
**check** [33] - 13:4, 37:3, 54:3, 55:5, 65:1, 77:14, 82:6, 100:9, 113:10, 114:15, 115:5, 124:3, 127:20, 139:13, 139:15, 142:13, 147:16, 147:18, 149:25, 162:18, 168:17, 169:7, 180:8, 182:25, 184:9, 184:16, 193:17, 199:10, 227:9, 229:7, 269:1, 310:7
**checked** [3] - 115:4, 166:9, 182:19
**Checked** [1] - 182:23
**checking** [3] - 164:10, 164:11, 185:12
**checkout** [1] - 185:5
**child** [6] - 1:5, 1:7, 1:8, 1:10, 70:20, 210:20
**children** [3] - 209:17, 210:12, 210:22
**children's** [1] - 23:10
**choose** [4] - 175:2, 175:5, 180:5, 228:12
**chose** [2] - 175:14, 297:12
**CHRISTOPHER** [1] - 1:9
**circ** [5] - 20:8, 20:9, 20:11, 121:18, 179:9
**circle** [3] - 83:7, 85:2, 85:3

**circles** [1] - 90:20
**circulate** [7] - 83:14, 100:1, 124:11, 176:16, 179:8, 180:16, 272:11
**circulated** [1] - 312:18
**circulating** [2] - 55:7, 139:25
**circulation** [86] - 20:9, 20:11, 20:16, 35:14, 54:24, 55:5, 55:7, 55:19, 80:21, 82:22, 83:12, 96:2, 96:7, 96:13, 96:15, 97:7, 100:4, 100:10, 113:8, 114:8, 114:9, 118:1, 118:7, 121:25, 123:12, 124:7, 124:9, 125:2, 125:3, 125:18, 130:6, 130:10, 130:11, 136:24, 137:19, 137:22, 140:2, 145:24, 155:14, 155:21, 156:3, 156:10, 157:4, 157:8, 157:16, 157:23, 158:19, 160:14, 161:23, 162:4, 162:10, 163:2, 163:7, 163:21, 163:23, 163:25, 166:5, 168:7, 168:11, 178:25, 180:24, 181:1, 181:2, 181:9, 181:13, 182:7, 182:9, 184:12, 184:13, 184:14, 184:15, 184:24, 185:3, 185:7, 210:10, 210:13, 259:13, 267:17, 272:9, 281:18, 288:21, 288:22, 288:24, 289:2, 311:9, 312:19
**Circulation** [2] - 178:23, 180:10
**circumstance** [1] - 145:23
**citizen's** [2] - 66:7, 239:7
**citizens** [1] - 201:7
**civil** [1] - 11:11
**Clarification** [1] - 244:14
**clarification** [2] - 10:13, 37:11
**clarify** [2] - 38:8, 307:11
**clarity** [1] - 296:8
**classify** [1] - 291:25
**classroom** [9] - 135:15, 135:19, 135:23, 198:14, 198:15, 215:24, 243:10, 246:10, 294:22
**clean** [3] - 160:7, 181:4, 184:6
**clean-up** [1] - 160:7
**cleaner** [1] - 10:6
**clear** [13] - 100:2, 105:6, 115:6, 192:19, 226:8, 231:18, 231:25, 232:2,

232:3, 232:4, 232:9, 246:15, 295:22
**clearance** [1] - 302:5
**cleared** [1] - 177:23
**clearly** [1] - 130:2
**clerks** [1] - 124:20
**click** [3] - 65:18, 66:6, 239:6
**clicked** [4] - 61:24, 62:7, 172:8, 191:3
**clicking** [2] - 53:8, 164:6
**clip** [1] - 42:1
**close** [1] - 164:24
**closed** [2] - 100:6, 182:13
**closer** [1] - 182:1
**clothed** [1] - 129:19
**Club** [2] - 145:19, 163:6
**CMRS** [4] - 1:24, 314:18, 315:22, 316:24
**code** [1] - 17:22
**Coffee** [47] - 6:10, 12:10, 12:11, 12:17, 54:5, 95:16, 110:16, 111:20, 122:19, 126:24, 131:2, 131:12, 131:22, 133:16, 134:16, 134:23, 137:15, 137:16, 138:3, 141:3, 144:22, 145:19, 146:19, 147:25, 148:16, 148:22, 149:17, 151:22, 152:15, 156:17, 158:5, 159:3, 159:11, 159:14, 161:12, 162:9, 163:6, 168:6, 170:3, 170:9, 171:15, 172:1, 173:13, 173:21, 177:19, 177:23, 177:24
**collated** [1] - 170:18
**collect** [1] - 85:16
**collected** [6] - 63:1, 67:5, 67:7, 73:21, 241:11, 252:25
**collection** [25] - 23:7, 23:13, 23:16, 24:2, 24:17, 27:24, 30:19, 32:21, 55:23, 67:17, 80:17, 81:13, 90:13, 90:14, 98:25, 99:12, 104:1, 104:2, 125:1, 125:17, 130:6, 176:4, 249:15, 263:24, 287:10
**Collection** [3] - 5:24, 79:14, 81:3
**collections** [21] - 24:15, 34:25, 58:23, 83:4, 90:7, 101:18, 102:2, 117:21, 126:16, 127:11, 135:18, 137:12, 142:25, 151:11, 156:11, 175:25, 179:7, 194:10, 221:11, 252:12,

298:25
**collective** [1] - 155:1
**collectively** [1] - 228:8
**color** [1] - 174:7
**Column** [10] - 57:6, 67:13, 72:13, 147:24, 207:21, 253:25, 307:6, 308:18, 308:22, 309:9
**column** [68] - 30:3, 30:5, 30:13, 31:7, 33:23, 36:11, 37:5, 37:22, 38:4, 38:7, 38:20, 38:23, 39:3, 39:13, 39:18, 39:20, 41:9, 43:14, 43:19, 43:20, 45:5, 45:8, 45:19, 45:20, 46:6, 46:13, 47:12, 48:6, 48:13, 51:1, 51:7, 51:21, 52:20, 52:23, 53:18, 54:19, 55:17, 57:22, 58:2, 60:7, 64:5, 68:1, 69:20, 74:3, 74:5, 77:10, 91:6, 111:1, 113:18, 115:1, 127:3, 127:8, 127:12, 138:19, 148:9, 168:13, 168:22, 169:21, 170:14, 170:19, 170:21, 171:4, 171:11, 207:20, 220:2, 281:8, 281:19, 288:9
**columns** [11] - 26:18, 30:10, 37:5, 63:7, 76:24, 77:1, 117:16, 172:10, 175:2, 175:5, 175:14
**comfortable** [7] - 89:13, 132:16, 132:18, 137:8, 192:4, 192:15, 193:12
**coming** [3] - 204:25, 205:8, 280:2
**comment** [3] - 67:18, 67:20, 205:15
**comments** [16] - 61:10, 61:14, 62:17, 62:19, 62:25, 67:4, 67:7, 67:12, 67:17, 68:10, 68:13, 73:24, 117:20, 215:2, 251:15, 253:1
**COMMISSION** [1] - 314:20
**commission** [1] - 151:2
**commitment** [1] - 200:6
**committed** [2] - 105:13, 106:8
**committee** [61] - 31:9, 59:7, 60:6, 60:9, 60:15, 60:16, 61:2, 61:11, 61:12, 61:14, 61:16, 62:10, 62:12, 62:19, 63:12, 63:18, 63:20, 64:7, 66:4, 69:16, 74:11, 74:14, 74:17, 83:9,

83:20, 84:4, 84:6, 84:24, 85:5, 85:9, 87:1, 89:7, 91:3, 91:6, 91:15, 92:20, 92:24, 93:2, 93:17, 93:22, 93:24, 94:1, 94:4, 140:7, 142:1, 202:19, 203:1, 216:4, 217:9, 220:21, 222:13, 227:16, 227:25, 228:4, 228:6, 229:1, 241:23, 242:9, 254:1, 254:3, 267:17
**Committee** [40] - 5:18, 8:6, 27:19, 28:2, 28:8, 29:9, 59:4, 59:15, 59:18, 61:5, 62:1, 62:3, 62:22, 63:14, 63:24, 64:13, 69:12, 74:3, 84:10, 85:3, 85:7, 89:15, 90:22, 91:18, 93:9, 140:10, 207:13, 207:20, 214:5, 217:7, 229:25, 233:2, 233:20, 240:23, 241:2, 253:25, 254:14, 254:19, 286:4, 291:10
**committee's** [5] - 63:5, 93:5, 151:1, 230:17, 251:11
**Committee's** [1] - 241:8
**committees** [12] - 74:7, 77:3, 205:2, 213:13, 221:2, 227:19, 227:23, 228:2, 230:15, 230:19, 230:24, 231:13
**Committees** [10] - 77:6, 84:7, 91:7, 206:24, 207:1, 212:16, 222:12, 227:7, 231:22, 242:2
**Common** [1] - 127:20
**communicated** [3] - 53:12, 139:14, 227:12
**communicates** [1] - 268:14
**communicating** [3] - 54:1, 57:16, 258:9
**communication** [2] - 241:25, 268:16
**communications** [4] - 175:10, 226:8, 259:4, 279:8
**Community** [1] - 66:24, 67:13, 83:9, 85:4, 141:19, 251:25, 252:23, 252:24
**community** [51] - 68:8, 68:10, 68:12, 72:13, 72:19, 73:11, 73:14, 73:20, 83:5, 83:6, 83:20, 83:21, 84:20, 84:24, 86:21, 87:1, 89:7, 92:8, 95:20, 119:8, 119:12,

133:2, 139:20, 140:9, 146:2, 158:21, 159:13, 161:12, 169:18, 169:23, 213:14, 215:17, 216:3, 216:5, 227:25, 228:20, 228:24, 230:25, 231:3, 233:24, 242:5, 242:7, 242:12, 242:14, 251:15, 251:17, 251:19, 252:7, 252:12, 252:16, 254:24
**company** [4] - 36:17, 36:19, 56:19, 197:10
**comparing** [1] - 97:21
**competent** [2] - 217:24, 218:23
**compilation** [4] - 67:4, 67:19, 67:21, 68:12
**compile** [1] - 139:1
**compiled** [6] - 58:8, 58:10, 61:17, 62:14, 62:17, 240:3
**compiles** [1] - 61:10
**compiling** [1] - 240:6
**complainant** [8] - 61:18, 218:4, 232:25, 233:19, 233:21, 241:13, 242:6, 308:24
**Complainant** [1] - 241:14
**complainant's** [2] - 240:22, 242:15
**complaint** [2] - 291:23, 312:6
**complete** [5] - 55:14, 99:16, 157:7, 216:14, 316:17
**completed** [9] - 31:6, 86:8, 86:16, 89:24, 99:4, 179:16, 293:12, 316:15, 316:20
**completing** [1] - 249:10
**compliance** [4] - 18:9, 32:23, 41:17, 41:20
**comply** [3] - 42:9, 42:13, 42:15
**composition** [1] - 213:17
**comprehend** [2] - 42:6, 198:19
**comprehension** [1] - 34:5
**comprehensive** [3] - 115:13, 118:4, 134:20
**comprised** [3] - 62:10, 213:13, 216:1
**computer** [4] - 69:21, 192:16, 236:24, 254:8
**concept** [3] - 24:21, 25:5, 25:13
**concepts** [1] - 25:22
**concern** [4] - 83:1,

227:22, 292:2, 295:2
**concerning** [1] - 142:8
**concerns** [4] - 154:11, 155:19, 227:13, 294:22
**conclusion** [1] - 103:7
**condition** [1] - 186:8
**conduct** [113] - 37:14, 37:18, 37:23, 38:1, 38:10, 39:15, 39:21, 51:9, 51:14, 51:19, 51:20, 52:1, 52:9, 52:12, 52:15, 52:17, 83:1, 95:9, 95:25, 100:15, 100:17, 102:15, 102:24, 103:5, 103:23, 105:3, 105:11, 105:19, 109:18, 111:3, 111:15, 112:3, 112:13, 113:1, 113:4, 113:11, 113:12, 113:13, 114:1, 115:2, 115:8, 116:12, 119:19, 120:8, 121:1, 121:6, 122:25, 123:25, 124:8, 125:22, 125:25, 126:4, 126:14, 126:22, 128:1, 129:1, 129:7, 129:14, 130:12, 130:14, 141:5, 143:15, 145:21, 146:4, 146:20, 148:11, 148:12, 148:16, 148:24, 149:2, 149:4, 149:5, 149:19, 149:24, 151:15, 151:18, 151:21, 152:1, 152:2, 152:4, 153:1, 155:19, 155:25, 156:21, 157:6, 157:11, 157:13, 157:22, 158:7, 158:10, 158:14, 159:1, 160:9, 160:21, 161:20, 162:9, 162:19, 163:5, 163:20, 173:18, 176:15, 257:1, 263:18, 273:18, 292:3, 294:1, 299:2, 299:3, 299:10, 299:13, 300:9, 300:13, 302:9
**conducted** [2] - 109:24, 110:2
**confer** [1] - 35:1
**conference** [1] - 107:25
**conferences** [1] - 208:22
**confirm** [7] - 30:9, 54:23, 54:25, 188:24, 224:14, 224:15, 229:9
**confirmation** [1] - 55:3
**conflating** [1] - 219:1
**confused** [2] - 155:16, 305:9
**confusion** [2] - 294:2, 305:13
**conjunction** [1] - 272:19
**connected** [1] - 315:17

**connection** [5] - 115:14, 242:22, 247:17, 290:16, 295:11
**consensus** [8] - 111:16, 132:15, 132:24, 133:2, 171:19, 171:23, 171:24, 173:12
**consider** [11] - 105:18, 159:16, 214:21, 217:21, 218:6, 218:8, 218:22, 219:25, 230:24, 239:7, 290:3
**Consideration** [1] - 241:9
**consideration** [6] - 72:8, 125:13, 241:23, 243:4, 277:1, 286:25
**consideration..** [1] - 242:10
**considerations** [2] - 26:1, 274:21
**considered** [19] - 28:5, 33:7, 65:4, 66:4, 66:5, 66:7, 70:11, 70:12, 99:23, 99:25, 101:20, 121:5, 160:20, 216:13, 219:8, 219:11, 219:23, 276:21, 311:1
**considering** [8] - 122:4, 125:19, 224:19, 230:20, 244:1, 244:5, 286:21, 311:18
**consistently** [1] - 297:9
**constantly** [1] - 82:7
**constituents** [1] - 258:9
**constitute** [3] - 102:24, 144:3, 158:7
**constitutes** [1] - 105:11
**constraints** [1] - 187:3
**consult** [3] - 89:2, 92:13, 304:4
**consultation** [8] - 42:11, 91:13, 124:22, 209:1, 265:21, 301:12, 306:18, 311:3
**consulted** [3] - 208:18, 266:11, 271:8
**contact** [2] - 129:18, 212:13
**contain** [16] - 38:1, 38:2, 39:15, 39:21, 51:9, 52:8, 52:11, 52:15, 52:17, 52:19, 78:10, 95:9, 111:3, 112:3, 112:13, 113:1, 113:12, 113:13, 115:2, 115:8, 116:11, 122:25, 126:22, 141:4, 146:20, 148:16, 152:25, 155:25, 156:21, 157:6, 157:10, 157:22, 158:14,

159:1, 162:8, 176:15, 294:1
**contained** [6] - 113:2, 113:11, 151:21, 250:5, 300:12, 309:3
**containing** [7] - 38:10, 51:17, 95:25, 109:18, 213:16, 214:19, 218:2
**contains** [16] - 37:14, 37:17, 37:23, 145:20, 146:4, 148:11, 148:12, 149:19, 149:24, 151:15, 162:19, 163:20, 198:17, 256:25, 310:18, 311:7
**content** [22] - 51:18, 88:7, 119:24, 120:5, 128:15, 141:2, 142:16, 143:9, 147:13, 159:6, 198:17, 208:23, 209:6, 274:18, 276:6, 285:20, 289:20, 291:24, 292:18, 293:10, 310:18, 311:7
**contents** [5] - 90:6, 240:18, 242:12, 248:24, 289:23
**context** [13] - 29:20, 69:8, 92:11, 103:9, 103:11, 103:13, 103:15, 107:8, 154:5, 199:20, 218:24, 244:21, 275:15
**continue** [11] - 48:6, 84:13, 89:25, 128:24, 152:14, 159:8, 187:18, 248:23, 258:19, 279:13, 281:2
**continued** [1] - 152:11
**continues** [3] - 99:22, 148:2, 162:1
**continuing** [2] - 112:1, 133:5
**continuous** [1] - 166:23
**contract** [1] - 101:2
**convened** [3] - 63:14, 207:13, 214:13
**conversation** [1] - 114:18
**conversations** [5] - 73:1, 208:22, 208:24, 273:4, 309:5
**convicted** [1] - 11:8
**coordinated** [1] - 208:18
**coordinating** [1] - 230:2
**coordination** [2] - 208:25, 272:19
**coordinator** [3] - 214:24, 215:4, 291:15
**Coordinator** [12] - 28:23, 79:3, 91:14, 196:14, 197:1, 288:11, 288:12, 288:19, 288:20, 303:19,

Deposition of Bradley Vinson, Volume 1

304:16, 311:4
**copied** [3] - 58:5, 174:22, 250:2
**copies** [25] - 77:4, 77:7, 77:9, 82:21, 94:25, 96:22, 118:12, 118:18, 118:19, 121:16, 122:2, 137:20, 139:22, 139:24, 140:1, 175:23, 176:3, 221:2, 221:4, 226:18, 226:20, 230:15, 230:16, 230:17, 282:15
**copy** [19] - 15:25, 22:9, 22:10, 43:1, 43:8, 54:14, 77:6, 114:7, 118:10, 155:7, 155:9, 164:25, 172:10, 174:7, 183:25, 224:21, 237:5, 246:6, 282:14
**core** [1] - 147:19
**corners** [1] - 90:19
**correct** [309] - 14:17, 15:17, 16:4, 16:5, 22:23, 28:10, 28:11, 30:1, 30:3, 33:4, 35:22, 36:1, 36:2, 36:5, 38:3, 38:25, 39:7, 39:15, 39:16, 39:18, 39:19, 40:11, 40:18, 41:11, 41:16, 44:11, 44:16, 44:17, 48:4, 48:16, 50:10, 50:19, 51:5, 51:6, 51:23, 52:1, 52:2, 56:3, 56:4, 57:25, 58:1, 58:24, 58:25, 59:19, 60:12, 60:13, 62:18, 63:14, 63:15, 63:18, 63:20, 64:1, 64:7, 64:8, 65:7, 65:21, 66:1, 66:2, 66:12, 66:13, 69:4, 69:5, 69:9, 69:15, 69:23, 69:24, 70:15, 70:16, 71:7, 71:10, 71:11, 72:10, 72:11, 75:9, 79:16, 79:17, 79:21, 79:22, 80:2, 80:3, 81:3, 81:4, 81:9, 81:10, 82:6, 87:4, 90:10, 93:11, 93:12, 96:8, 97:9, 97:10, 100:11, 104:25, 109:25, 112:5, 112:8, 112:9, 112:11, 112:15, 112:20, 113:10, 113:11, 114:1, 116:5, 117:11, 117:12, 118:1, 118:2, 118:8, 118:9, 118:11, 118:15, 118:20, 119:15, 119:16, 121:2, 121:10, 123:13, 123:19, 124:9, 125:16, 127:4, 127:9, 127:16, 130:8, 134:15, 134:23,

134:24, 141:7, 141:14, 141:15, 145:25, 146:13, 146:25, 147:4, 147:9, 148:3, 148:19, 155:10, 156:18, 156:19, 164:7, 165:13, 167:17, 167:18, 167:20, 167:25, 168:1, 169:3, 169:11, 169:12, 170:12, 170:13, 171:20, 173:9, 173:22, 175:20, 176:8, 178:21, 178:22, 179:2, 182:20, 185:13, 186:17, 189:2, 189:3, 189:5, 189:6, 190:8, 190:9, 190:19, 190:20, 191:9, 191:14, 191:15, 191:17, 191:18, 191:20, 192:21, 192:22, 194:3, 194:4, 201:3, 201:4, 202:13, 203:2, 203:3, 203:6, 203:7, 206:24, 207:3, 207:4, 207:7, 207:10, 207:11, 208:1, 210:5, 211:22, 218:19, 219:5, 219:9, 220:7, 222:16, 224:9, 225:3, 230:21, 230:22, 233:7, 233:12, 237:10, 237:11, 237:18, 237:19, 237:23, 237:24, 239:10, 239:15, 240:24, 240:25, 241:3, 242:8, 242:9, 242:18, 243:9, 243:16, 243:17, 244:3, 244:4, 244:10, 244:11, 246:12, 246:17, 247:10, 248:25, 249:18, 251:13, 252:14, 253:8, 253:10, 253:11, 254:7, 254:14, 254:15, 254:20, 254:21, 254:24, 254:25, 255:3, 255:4, 263:5, 263:6, 263:13, 264:23, 265:5, 266:1, 267:3, 267:6, 267:7, 267:8, 267:9, 267:12, 271:15, 271:19, 271:24, 272:4, 272:5, 272:25, 273:16, 277:12, 277:13, 277:15, 277:16, 277:25, 280:17, 281:20, 281:21, 283:3, 283:4, 283:11, 283:12, 284:21, 285:5, 285:6, 285:23, 285:24, 286:4, 286:5, 286:6, 287:6, 287:19, 289:4, 290:3, 290:5, 292:18, 292:19, 293:2, 295:13, 295:14, 298:1, 298:2, 298:18, 302:6, 303:20, 309:10, 309:11, 310:20, 310:21, 310:24

**corrected** [2] - 49:14, 49:19
**correctly** [6] - 27:15, 72:17, 110:21, 201:11, 281:13, 294:23
**Council** [8] - 58:19, 67:15, 85:10, 85:20, 215:25, 216:1, 250:16, 251:3
**council** [2] - 251:5, 252:16
**Councils** [6] - 85:17, 86:12, 214:18, 218:1, 250:19, 250:24
**Counsel** [5] - 2:3, 2:12, 3:3, 4:3, 64:11
**counsel** [15] - 16:20, 19:10, 19:11, 61:22, 78:1, 78:2, 78:3, 175:15, 248:9, 248:15, 261:5, 261:6, 270:24, 301:13, 315:17
**counting** [2] - 132:2, 132:3
**COUNTY** [4] - 1:12, 314:4, 315:3, 316:7
**county** [2] - 206:10, 209:15
**County** [20] - 1:15, 4:20, 5:12, 9:11, 25:14, 32:7, 98:24, 116:4, 131:7, 167:20, 167:21, 171:7, 175:24, 195:21, 195:22, 206:18, 231:24, 316:9, 317:3, 317:5
**couple** [8] - 15:8, 35:9, 59:24, 131:24, 166:19, 178:6, 243:14, 250:18
**course** [6] - 23:9, 55:9, 62:12, 86:10, 175:14, 196:2
**court** [3] - 10:5, 11:14, 290:21
**COURT** [4] - 1:1, 9:3, 9:9, 316:1
**Court** [3] - 1:21, 2:23, 316:25
**courtroom** [1] - 10:24
**Cousins** [1] - 245:23
**cover** [3] - 103:1, 106:15, 106:17
**covered** [6] - 23:12, 100:3, 103:5, 108:3, 108:5, 300:2
**covers** [1] - 102:14
**CRC** [4] - 1:24, 314:18, 315:22, 316:24
**create** [4] - 29:10, 178:12, 178:16, 262:7
**created** [18] - 12:5, 29:4,

74:23, 74:25, 75:2, 75:5, 76:16, 80:4, 80:7, 80:14, 96:11, 100:24, 165:4, 165:15, 165:19, 174:11, 175:7, 180:7
**creation** [2] - 45:9, 76:19
**Crew** [40] - 6:10, 12:10, 12:11, 12:17, 54:6, 110:16, 111:20, 126:24, 131:2, 131:12, 131:22, 133:16, 134:16, 134:23, 137:15, 137:16, 138:3, 141:3, 146:19, 147:25, 148:16, 148:22, 149:17, 151:22, 156:17, 158:5, 159:3, 159:12, 159:14, 161:12, 162:9, 168:6, 170:3, 170:9, 171:15, 173:13, 173:21, 177:19, 177:23, 177:24
**Crew's** [2] - 144:23, 172:1
**Crews** [3] - 95:16, 122:19, 152:15
**crime** [1] - 11:9
**criteria** [4] - 198:25, 206:13, 283:21, 284:2
**cross** [6] - 118:21, 142:12, 304:23, 304:24, 305:2, 306:9
**cross-reference** [6] - 118:21, 142:12, 304:23, 304:24, 305:2, 306:9
**crossed** [2] - 188:18, 188:25
**CRR** [4] - 1:24, 314:18, 315:22, 316:24
**CRT** [1] - 231:16
**curated** [1] - 142:24
**curious** [1] - 183:24
**Current** [1] - 5:17
**current** [22] - 14:15, 15:14, 26:16, 27:2, 27:16, 27:21, 28:23, 37:9, 37:10, 37:12, 42:2, 59:6, 63:12, 63:22, 90:3, 164:15, 166:8, 174:19, 211:4, 214:4, 232:17, 243:11
**currents** [1] - 193:16
**Curriculum** [4] - 61:20, 213:1, 228:19, 230:4
**cursory** [1] - 202:15
**cut** [1] - 129:23

---

**D**

---

**D-decision** [2] - 46:4, 48:12

**Dahmer** [1] - 185:19
**Dark** [1] - 185:17
**data** [1] - 97:22
**date** [44] - 15:13, 37:15, 49:6, 50:15, 53:6, 57:7, 57:9, 57:11, 57:14, 57:15, 57:16, 57:18, 57:20, 57:21, 64:5, 72:21, 72:22, 75:6, 81:22, 82:9, 82:10, 101:3, 110:8, 117:25, 118:5, 134:13, 134:22, 135:11, 165:18, 167:1, 167:8, 171:15, 172:10, 172:25, 186:20, 190:20, 190:24, 192:15, 197:11, 305:23, 307:14, 316:17
**DATE** [2] - 1:19, 317:25
**Date** [4] - 57:6, 64:3, 64:21, 68:4
**dated** [9] - 95:4, 117:23, 154:2, 263:5, 267:8, 280:10, 280:11, 291:21, 293:4
**DATED** [1] - 315:20
**dates** [5] - 117:11, 135:7, 172:5, 208:8, 220:15
**DAVID** [1] - 1:6
**days** [5] - 25:4, 38:11, 101:5, 109:11, 239:24
**DC** [2] - 2:8, 3:22
**DD** [1] - 280:4
**Dead** [1] - 185:17
**deadline** [4] - 86:15, 86:17, 89:23, 141:13
**Dear** [1] - 316:14
**December** [34] - 12:24, 13:17, 14:13, 14:14, 80:10, 117:8, 154:8, 165:23, 188:18, 188:20, 189:1, 189:4, 189:8, 193:20, 193:21, 195:4, 201:2, 201:20, 201:25, 202:3, 203:9, 204:11, 205:5, 206:6, 208:6, 208:15, 209:7, 210:4, 232:18, 246:1, 246:14, 259:11, 265:4, 291:21
**decide** [5] - 89:5, 89:11, 142:2, 166:15, 181:20
**decided** [10] - 40:9, 40:11, 93:1, 105:17, 171:19, 234:1, 240:10, 283:22, 303:17, 305:11
**decides** [2] - 97:6, 256:19
**deciding** [7] - 89:9, 232:15, 234:12, 235:2, 235:7, 235:12, 255:19
**decision** [126] - 27:19,

Deposition of Bradley Vinson, Volume 1

27:23, 27:25, 28:1, 28:7, 28:8, 28:9, 28:16, 29:7, 31:8, 31:9, 31:10, 33:24, 41:5, 41:8, 45:24, 46:4, 46:9, 46:11, 46:19, 46:22, 47:19, 48:12, 48:18, 48:23, 49:2, 59:23, 60:1, 60:2, 60:15, 61:2, 63:5, 63:13, 65:23, 68:3, 69:14, 71:5, 71:10, 71:13, 72:10, 74:12, 74:17, 85:11, 85:12, 85:21, 85:25, 88:10, 89:1, 89:4, 89:8, 89:13, 90:21, 90:22, 90:23, 90:24, 91:7, 91:10, 91:15, 91:22, 92:10, 92:14, 92:20, 92:24, 93:5, 93:17, 93:22, 93:24, 94:5, 102:12, 132:13, 137:1, 138:22, 140:24, 171:23, 171:24, 172:1, 173:21, 177:15, 177:18, 177:21, 181:17, 187:5, 203:19, 206:22, 214:7, 214:11, 217:11, 229:16, 233:1, 233:19, 233:22, 234:3, 236:3, 237:17, 240:23, 254:19, 255:13, 258:4, 266:6, 266:9, 266:11, 266:14, 266:18, 270:25, 271:2, 271:4, 286:7, 293:7, 297:25, 300:19, 301:10, 301:12, 301:18, 303:4, 303:23, 304:4, 304:9, 305:17, 306:12, 306:15, 306:18, 306:23, 308:1
**Decision** [9] - 31:5, 33:23, 59:4, 62:1, 69:19, 70:1, 74:3, 207:20, 237:9
**decision-makers** [2] - 89:1, 89:4
**decision-making** [2] - 214:11, 305:17
**decisions** [30] - 42:12, 42:15, 85:24, 91:20, 92:17, 92:18, 105:22, 124:21, 132:11, 135:4, 137:13, 139:9, 141:3, 141:4, 159:4, 166:23, 170:3, 227:14, 227:15, 240:8, 257:17, 257:23, 276:24, 289:16, 289:18, 289:19, 290:7, 301:15, 305:21, 306:7
**Declaration** [2] - 5:16, 6:22
**declaration** [28] - 11:23,

22:3, 22:13, 98:15, 99:21, 101:12, 109:14, 109:21, 115:20, 116:3, 130:3, 156:8, 159:10, 161:18, 162:7, 162:24, 189:21, 190:1, 190:3, 193:2, 193:3, 294:8, 294:17, 295:11, 295:25, 296:8, 296:23, 301:23
**declare** [1] - 317:21
**deem** [1] - 32:16
**deeper** [1] - 159:6
**Defendant** [4] - 1:13, 2:12, 4:3, 316:8
**defendant** [1] - 245:24
**Defendant's** [1] - 8:11
**defendant's** [1] - 244:17
**Defendants'** [1] - 7:11
**deferring** [1] - 142:2
**defined** [5] - 37:14, 100:15, 157:6, 161:20, 307:20
**defines** [1] - 194:23
**definitely** [1] - 235:17
**definition** [18] - 102:17, 102:18, 102:20, 104:19, 105:19, 110:13, 119:19, 119:23, 120:7, 120:25, 121:1, 125:22, 129:6, 129:13, 194:24, 195:3, 283:5, 285:16
**definitions** [4] - 12:2, 120:3, 260:2, 260:3
**Defy** [1] - 144:16
**degree** [2] - 22:22, 23:1
**deleted** [2] - 50:6, 50:13
**deliberation** [1] - 63:5
**deliberations** [1] - 217:20
**delivered** [1] - 316:19
**DEMOCRACY** [2] - 2:4, 3:18
**Democracy** [1] - 2:22
**denote** [4] - 20:5, 155:24, 180:20, 204:1
**denotes** [1] - 183:12
**denoting** [1] - 251:4
**department** [3] - 141:22, 141:24, 204:1
**Department** [8] - 18:19, 99:5, 209:1, 222:21, 223:8, 223:19, 224:20, 243:19
**depicted** [1] - 144:1
**depiction** [1] - 103:4, 104:14
**deposed** [1] - 9:22
**Deposition** [4] - 5:11, 5:13, 316:9, 317:5
**deposition** [24] - 11:22,

15:23, 16:14, 17:12, 19:9, 19:13, 21:2, 21:6, 74:14, 77:17, 77:25, 78:5, 153:13, 259:19, 260:11, 261:4, 263:18, 264:7, 270:5, 270:23, 290:10, 309:20, 313:1, 316:19
**DEPOSITION** [5] - 1:15, 5:10, 6:3, 7:3, 8:3
**depth** [3] - 18:1, 158:4, 182:3
**describe** [2] - 143:10, 214:23
**described** [2] - 25:23, 105:7
**describes** [4] - 100:13, 119:21, 120:9, 194:3
**description** [3] - 22:16, 103:4, 103:18
**designated** [1] - 40:4
**designee** [1] - 16:3
**desire** [1] - 129:21
**desk** [1] - 184:12
**despite** [1] - 206:11
**Destiny** [34] - 6:4, 6:19, 55:5, 56:20, 80:1, 80:17, 81:3, 96:3, 96:11, 97:20, 97:22, 116:9, 116:21, 117:14, 117:15, 117:24, 118:22, 122:1, 127:19, 130:7, 146:12, 155:8, 160:6, 166:25, 167:1, 167:5, 170:7, 174:14, 174:15, 178:10, 180:9, 185:23, 186:11, 288:13
**Destiny's** [1] - 97:15
**detail** [2] - 102:22, 184:19
**details** [2] - 237:13, 239:5
**Details** [2] - 5:20, 66:12
**determination** [27] - 84:17, 84:23, 122:19, 123:17, 126:20, 127:4, 127:9, 127:15, 127:16, 136:3, 136:20, 137:8, 137:11, 144:23, 145:7, 145:10, 147:7, 151:19, 151:22, 210:1, 243:1, 279:12, 289:25, 297:24, 311:5, 311:20, 311:25
**determine** [21] - 56:10, 56:22, 62:24, 83:2, 84:1, 88:7, 95:19, 110:8, 114:19, 119:9, 126:15, 144:8, 149:18, 158:16, 209:15, 209:19, 209:24, 257:1, 279:18, 279:22, 305:1

**determined** [40] - 33:11, 37:13, 37:23, 37:25, 39:14, 46:14, 51:9, 51:13, 52:17, 91:16, 111:2, 112:3, 112:12, 113:3, 113:23, 122:24, 127:10, 127:13, 147:2, 148:1, 148:17, 148:22, 149:5, 151:20, 151:24, 158:5, 158:7, 158:10, 161:24, 162:2, 162:25, 163:6, 163:18, 171:6, 171:16, 173:17, 176:14, 177:3, 248:16, 287:5
**determines** [3] - 32:10, 56:5, 311:12
**determining** [6] - 78:14, 100:19, 101:14, 102:6, 281:24, 300:16
**develop** [6] - 83:24, 83:25, 98:8, 119:8, 119:13, 119:14
**developed** [8] - 23:18, 45:12, 77:19, 77:22, 98:10, 119:11, 196:9, 259:11
**developing** [3] - 47:9, 143:22, 209:2
**development** [3] - 23:8, 23:14, 263:24
**devised** [1] - 80:5
**diamond** [1] - 140:16
**Diary** [5] - 284:19, 284:23, 284:24, 286:1, 287:2
**differ** [1] - 176:21
**differed** [1] - 126:6
**difference** [2] - 195:17, 233:10
**different** [31] - 13:1, 24:9, 25:19, 34:18, 44:19, 52:14, 57:3, 97:24, 117:11, 156:2, 166:21, 167:6, 181:21, 181:23, 182:12, 188:8, 189:22, 197:10, 199:11, 206:20, 221:23, 250:19, 252:6, 252:11, 252:17, 252:19, 253:4, 272:14, 309:16
**digging** [3] - 23:11, 88:19, 120:18
**Digital** [1] - 5:7
**DIRECT** [1] - 9:14
**directed** [1] - 253:9
**direction** [2] - 212:6, 212:8
**directly** [5] - 72:15, 73:24, 197:1, 204:4, 245:18

**disagreement** [1] - 132:21
**disagrees** [2] - 233:1, 233:19
**disconnect** [2] - 227:13, 227:22
**discontinued** [8] - 72:14, 72:20, 72:24, 199:1, 205:3, 220:7, 220:10, 220:13
**discovery** [1] - 75:24
**discrimination** [4] - 235:2, 257:18, 257:24, 258:5
**discuss** [18] - 18:8, 19:15, 19:20, 20:23, 45:1, 54:8, 95:18, 111:15, 111:17, 126:23, 132:19, 134:1, 140:19, 141:9, 145:3, 173:14, 177:20, 278:12
**discussed** [20] - 19:23, 71:18, 82:19, 132:15, 135:20, 139:12, 145:23, 146:19, 154:23, 158:22, 168:5, 171:14, 237:20, 237:23, 237:25, 238:2, 238:13, 251:6, 267:15, 270:20
**discussing** [6] - 60:8, 94:18, 107:5, 119:4, 130:25, 132:8, 161:10, 290:21
**Discussion** [7] - 165:10, 190:5, 223:12, 236:25, 253:14, 282:18, 302:14
**discussion** [9] - 123:4, 132:12, 136:19, 140:18, 144:25, 162:7, 175:15, 257:13, 257:14
**discussions** [5] - 21:1, 238:8, 238:11, 238:15, 256:9
**disliking** [1] - 291:24
**dismiss** [2] - 244:17, 245:24
**Dismiss** [2] - 7:11, 244:14
**disposal** [1] - 186:3
**distinction** [1] - 33:13
**DISTRICT** [4] - 1:1, 1:1, 316:1, 316:1
**District** [58] - 5:18, 6:18, 7:17, 25:14, 27:19, 28:1, 28:7, 29:8, 59:4, 59:14, 59:18, 62:1, 62:21, 63:13, 63:24, 64:13, 77:5, 79:19, 84:7, 84:10, 85:2, 85:6, 89:14, 90:20, 91:7, 91:10, 91:17,

Deposition of Bradley Vinson, Volume 1

92:10, 93:9, 140:10, 167:21, 174:17, 175:24, 178:19, 180:5, 206:17, 206:24, 207:1, 207:12, 207:20, 212:16, 213:5, 214:4, 217:7, 222:11, 227:6, 229:24, 231:21, 233:1, 233:20, 240:23, 241:1, 242:1, 253:24, 254:13, 254:19, 286:3, 301:7

**district** [54] - 13:18, 16:21, 19:10, 20:5, 20:7, 26:24, 31:8, 40:8, 40:15, 41:5, 41:8, 41:14, 45:12, 59:7, 63:12, 87:23, 88:4, 95:14, 99:7, 118:19, 119:6, 135:16, 166:7, 175:1, 176:4, 180:7, 181:17, 192:8, 196:11, 197:9, 198:24, 200:4, 206:1, 206:10, 208:18, 215:23, 217:22, 218:7, 218:13, 228:11, 229:17, 262:2, 263:22, 264:21, 265:2, 287:4, 291:15, 291:17, 291:19, 293:13, 295:1, 295:16, 296:3, 297:22

**district's** [11] - 24:13, 79:16, 103:2, 109:19, 197:7, 200:2, 204:17, 220:24, 293:7, 293:23, 297:4

**districts** [2] - 208:19, 225:14

**districtwide** [2] - 268:16, 288:15

**diverse** [1] - 24:15

**diversity** [1] - 24:16

**DIVISION** [2] - 1:2, 316:2

**DMRC** [18] - 212:25, 214:10, 214:20, 217:21, 218:12, 220:14, 221:16, 222:18, 222:22, 226:22, 228:14, 228:25, 229:11, 233:22, 233:25, 234:1, 234:3, 254:7

**DMRCs** [24] - 212:19, 213:5, 213:8, 213:18, 213:24, 214:2, 214:13, 217:14, 217:20, 219:8, 219:25, 220:9, 220:11, 220:16, 223:1, 225:2, 225:19, 225:22, 226:10, 226:15, 227:14, 228:17, 230:12, 255:2

**DO** [1] - 317:2

**document** [70] - 13:9, 13:21, 15:15, 15:24,

21:9, 26:6, 26:14, 44:12, 44:16, 64:22, 64:24, 64:25, 65:2, 65:15, 65:25, 68:5, 68:11, 68:15, 68:16, 71:4, 72:9, 75:23, 76:2, 76:3, 79:11, 80:4, 94:20, 106:23, 107:21, 133:14, 133:18, 133:21, 134:6, 134:20, 134:25, 138:23, 159:24, 161:8, 161:14, 174:11, 188:6, 188:12, 189:7, 191:4, 200:12, 200:20, 200:22, 201:10, 201:24, 223:7, 239:12, 245:22, 246:4, 251:15, 253:22, 254:1, 254:6, 262:5, 262:10, 277:9, 280:8, 280:13, 287:24, 287:25, 288:3, 289:8, 302:21, 305:3, 317:22

**Document** [3] - 13:23, 57:22, 192:20

**documentation** [3] - 62:9, 199:23, 304:15

**documents** [40] - 11:20, 14:18, 18:24, 19:2, 59:8, 59:11, 59:13, 59:17, 59:25, 60:2, 60:5, 60:7, 60:12, 60:16, 60:17, 61:9, 64:12, 65:12, 65:18, 66:19, 68:8, 68:25, 69:4, 69:20, 72:14, 108:24, 218:10, 237:12, 238:19, 240:6, 241:2, 252:18, 254:3, 260:18, 271:18, 282:7, 290:9, 290:14, 290:15

**Documents** [4] - 61:7, 61:25, 62:3, 68:7

**dog** [1] - 70:21

**donated** [1] - 135:16

**done** [14] - 10:3, 20:18, 42:9, 105:24, 122:17, 138:3, 171:16, 179:18, 179:20, 179:21, 179:22, 210:16, 211:9, 238:5

**doors** [3] - 24:22, 25:16, 25:24

**double** [1] - 13:4, 37:3, 65:1, 142:13, 147:16, 168:17, 169:7, 193:17, 227:9, 229:7

**double-check** [11] - 13:4, 37:3, 65:1, 142:13, 147:16, 168:17, 169:7, 193:17, 227:9, 229:7

**doubt** [1] - 121:8

**down** [18] - 121:12, 128:5, 129:3, 129:7,

129:11, 129:16, 129:17, 139:3, 142:15, 161:13, 172:9, 178:6, 207:8, 212:14, 242:11, 246:8, 265:23

**downloaded** [5] - 190:11, 190:23, 223:7, 223:14

**Dr** [2] - 277:20, 284:11

**draft** [1] - 80:11

**dragged** [1] - 172:9

**Drama** [5] - 35:13, 35:14, 35:25, 36:3, 68:11

**Draw** [1] - 208:12

**drive** [2] - 73:15, 76:12

**dropdown** [1] - 186:2

**dropped** [1] - 49:15

**drops** [1] - 49:7

**drugs** [1] - 11:1

**due** [1] - 292:2

**DUKE** [1] - 4:12

**duly** [3] - 9:13, 206:12, 314:12

**DUQUETTE** [1] - 4:21

**Duquette** [1] - 175:7

**duration** [4] - 162:4, 162:10, 163:2, 197:13

**During** [5] - 8:4, 37:6, 43:12, 45:5, 288:1

**during** [26] - 41:4, 43:22, 44:9, 46:8, 48:22, 49:1, 49:8, 49:12, 49:17, 49:24, 49:25, 53:21, 61:15, 72:15, 99:23, 101:7, 147:18, 186:9, 210:10, 227:12, 259:10, 259:24, 260:8, 262:4, 273:24, 279:21

---

## E

**E-ECSD** [29] - 6:7, 6:9, 6:11, 6:13, 6:15, 7:8, 7:14, 7:15, 7:18, 7:19, 7:22, 7:23, 8:5, 8:7, 8:9, 107:22, 133:15, 154:1, 159:24, 231:9, 261:17, 263:2, 267:1, 277:8, 280:9, 284:9, 287:25, 291:8, 292:25

**E-ECSD_0021674** [1] - 12:8

**E-ECSD_0026886** [1] - 12:15

**E-ECSD_0026903** [1] - 12:21

**E-ECSD_0027086** [1] - 15:5

**E-ECSD_0039348** [2] -

5:23, 76:1

**E-ECSD_0066577** [1] - 106:24

**e-mail** [51] - 18:24, 19:4, 54:9, 54:11, 54:13, 74:1, 80:10, 154:2, 154:6, 159:25, 160:4, 160:5, 183:6, 197:19, 211:25, 212:1, 212:3, 214:24, 222:9, 222:17, 223:15, 224:25, 231:9, 244:13, 244:15, 261:17, 261:22, 261:24, 262:8, 262:9, 262:15, 262:19, 267:1, 267:10, 267:11, 267:14, 277:11, 277:14, 277:18, 280:1, 280:9, 280:11, 280:18, 282:2, 284:10, 284:12, 291:8, 291:20, 292:25, 301:6

**E-mail** [1] - 6:12, 6:14, 7:4, 7:7, 7:13, 7:16, 7:19, 7:20, 7:23, 8:6, 8:8

**e-mailed** [2] - 53:22, 208:24

**e-mailing** [2] - 160:6, 224:19

**e-mails** [18] - 14:18, 18:21, 18:23, 40:21, 215:6, 260:12, 260:14, 260:21, 269:24, 270:1, 270:4, 270:10, 271:16, 271:19, 271:20, 278:9, 279:24, 280:2

**earliest** [1] - 208:1

**early** [9] - 17:22, 98:13, 161:3, 195:13, 196:3, 196:5, 208:13, 269:25

**earn** [1] - 34:5

**easier** [4] - 98:19, 174:7, 174:9, 182:1

**easily** [1] - 153:17

**ECPS** [10] - 5:17, 5:24, 7:15, 61:6, 62:4, 72:15, 73:24, 79:13, 79:14, 280:20

**ECSD** [32] - 6:7, 6:9, 6:11, 6:13, 6:15, 7:8, 7:14, 7:15, 7:18, 7:19, 7:22, 7:23, 8:5, 8:7, 8:9, 107:22, 133:15, 154:1, 159:24, 174:4, 222:8, 231:9, 231:17, 261:17, 263:2, 267:1, 277:8, 280:9, 284:9, 287:25, 291:8, 292:25

**ECSD001350** [2] - 6:21, 188:7

**ECSD001922** [1] - 6:18

**ECSD_0021674** [1] -

12:8

**ECSD_0026478** [1] - 7:5

**ECSD_0026886** [1] - 12:15

**ECSD_0026903** [1] - 12:21

**ECSD_0027086** [1] - 15:5

**ECSD_0039348** [2] - 5:23, 76:1

**ECSD_0066577** [1] - 106:24

**edit** [8] - 44:21, 45:7, 45:16, 48:6, 49:23, 50:4, 50:16, 53:9

**edited** [2] - 48:10, 48:21

**edition** [1] - 14:4

**Education** [9] - 18:20, 99:5, 209:2, 222:21, 223:8, 223:20, 224:20, 243:19, 293:1

**educational** [7] - 22:14, 22:17, 23:21, 25:1, 217:22, 218:7, 218:13

**Educational** [1] - 280:21

**EE** [1] - 284:5

**Eesha** [1] - 293:1

**Efaw** [1] - 6:14

**effect** [5] - 50:19, 162:16, 188:17, 188:19, 195:4

**effective** [2] - 191:23, 193:24

**effectuated** [1] - 209:22

**effort** [2] - 41:17, 80:15

**eight** [1] - 229:1

**eight-member** [1] - 229:1

**eighth** [1] - 101:24

**either** [19] - 27:25, 28:6, 29:8, 31:8, 54:12, 54:15, 57:15, 58:9, 94:6, 103:20, 113:22, 127:14, 129:22, 130:1, 140:9, 172:23, 179:19, 219:23, 224:23

**electronically** [1] - 197:16

**elementaries** [1] - 179:20

**elementary** [23] - 30:15, 32:25, 33:3, 34:25, 35:8, 54:17, 56:23, 86:19, 87:10, 87:13, 87:14, 101:18, 101:21, 101:22, 138:15, 213:21, 260:15, 293:21, 297:12, 300:3, 300:23, 301:3

**ELLEN** [1] - 4:20

**Ellen** [2] - 19:10, 73:1

**Ellinor** [1] - 173:25
**ELLINOR** [1] - 2:22
**emergency** [3] - 14:5, 191:7, 191:13
**employee** [2] - 315:15, 315:16
**enable** [1] - 92:19
**encountered** [1] - 105:17
**encountering** [1] - 144:12
**encourage** [1] - 120:3
**encouraged** [2] - 101:19, 216:12
**end** [12] - 50:17, 50:23, 96:23, 109:7, 113:14, 132:21, 255:6, 269:19, 271:22, 280:24, 283:18, 300:23
**ended** [5] - 111:7, 204:24, 278:3, 278:7, 301:5
**engage** [2] - 25:8, 25:10
**engaged** [1] - 103:17
**English** [1] - 58:19
**ensure** [5] - 54:18, 55:6, 194:7, 216:4, 267:18
**ensured** [1] - 112:17
**ensuring** [1] - 90:7
**entail** [1] - 88:5
**ENTER** [1] - 317:2
**entered** [1] - 176:18
**entire** [7] - 52:24, 90:12, 90:14, 98:25, 179:7, 227:16, 251:11
**entirely** [1] - 152:13
**entirety** [5] - 136:2, 140:25, 201:2, 221:5, 221:17
**entitled** [4] - 93:16, 93:18, 93:21, 93:24
**entries** [13] - 31:12, 59:7, 59:24, 66:3, 139:4, 139:19, 142:6, 172:3, 176:24, 176:25, 178:4, 180:11, 182:20
**Entry** [1] - 192:20
**entry** [20] - 31:18, 60:6, 63:23, 97:1, 97:9, 107:7, 118:10, 125:21, 141:17, 142:6, 169:11, 171:2, 182:5, 183:15, 183:16, 203:1, 240:20, 242:12, 243:13, 303:18
**envision** [1] - 91:4
**envisioned** [1] - 140:8
**err** [5] - 120:2, 121:7, 130:20, 147:14, 225:14
**errata** [2] - 316:15, 316:20

**ERRATA** [1] - 317:1
**ES** [8] - 30:13, 30:15, 81:6, 82:15, 83:16, 84:18, 135:13, 157:1
**ESCAMBIA** [4] - 1:12, 314:4, 315:3, 316:7
**escambia** [1] - 317:3
**Escambia** [20] - 1:15, 4:20, 5:11, 8:10, 9:11, 25:13, 32:7, 98:24, 116:3, 131:7, 167:19, 167:21, 171:7, 175:24, 195:21, 195:22, 206:18, 231:24, 316:9, 317:5
**especially** [1] - 77:8
**ESQUIRE** [8] - 2:5, 2:14, 3:5, 3:12, 3:19, 4:5, 4:12, 316:12
**essentially** [3] - 156:17, 225:11, 254:16
**established** [5] - 201:1, 201:8, 201:13, 201:19, 207:5
**establishing** [1] - 201:22
**estimate** [3] - 29:22, 153:12, 153:19
**et** [6] - 146:23, 158:17, 291:25, 292:12, 316:4, 317:3
**evaluating** [1] - 231:15
**evidence** [1] - 198:23
**evident** [2] - 97:11, 178:1
**evolved** [1] - 105:22, 289:11
**exact** [8] - 72:21, 72:25, 110:8, 147:6, 197:11, 215:19, 220:15
**exactly** [11] - 23:11, 25:18, 39:10, 54:22, 67:9, 74:18, 82:25, 115:24, 127:1, 271:14, 296:20
**Examination** [2] - 1:24, 5:7
**EXAMINATION** [1] - 9:14
**examination** [1] - 315:9
**examine** [2] - 99:19, 311:22
**example** [30] - 23:20, 33:9, 34:22, 35:12, 56:8, 56:15, 68:11, 68:13, 102:23, 103:1, 105:20, 115:14, 116:2, 121:15, 135:7, 137:18, 140:15, 143:6, 149:1, 149:4, 149:23, 176:3, 176:23, 178:6, 181:25, 183:14, 194:16, 233:25, 245:15, 300:13

**examples** [1] - 158:8
**Excel** [1] - 5:14
**except** [1] - 72:5
**exception** [2] - 33:17, 254:17
**excerpt** [5] - 243:18, 244:16, 248:24, 249:4, 254:23
**excerpts** [5] - 224:5, 224:6, 242:7, 243:5, 243:16
**exchange** [8] - 159:25, 222:9, 231:10, 267:1, 277:11, 284:12, 291:8, 292:25
**exhibit** [10] - 60:21, 174:9, 187:24, 189:19, 189:20, 189:25, 190:2, 237:7, 240:1, 285:9
**Exhibit** [151] - 5:11, 5:13, 5:14, 5:16, 5:17, 5:18, 5:20, 5:22, 5:24, 6:4, 6:6, 6:8, 6:10, 6:12, 6:14, 6:16, 6:18, 6:20, 6:22, 7:4, 7:6, 7:7, 7:9, 7:11, 7:13, 7:15, 7:16, 7:19, 7:20, 7:23, 7:24, 8:4, 8:6, 8:8, 8:10, 8:11, 15:20, 15:23, 16:11, 16:13, 21:17, 21:20, 22:2, 22:5, 26:3, 26:5, 60:23, 61:1, 66:14, 66:17, 70:17, 71:3, 75:18, 75:23, 79:6, 79:8, 94:15, 94:20, 98:16, 106:21, 106:23, 107:18, 107:19, 107:21, 133:8, 133:9, 153:22, 153:23, 154:1, 159:21, 159:22, 159:25, 164:25, 167:11, 167:14, 169:2, 174:1, 174:4, 188:4, 188:6, 189:13, 189:16, 190:7, 191:1, 192:20, 193:2, 193:3, 194:23, 200:24, 209:9, 209:11, 211:2, 221:24, 222:1, 222:3, 222:5, 222:8, 223:4, 223:6, 223:16, 231:6, 231:8, 232:16, 237:1, 237:3, 238:21, 239:13, 240:19, 245:19, 245:20, 255:5, 259:18, 261:14, 261:16, 262:23, 262:24, 263:1, 266:22, 266:23, 266:25, 277:4, 277:5, 277:7, 280:5, 280:6, 280:8, 283:20, 284:6, 284:7, 284:9, 285:11, 285:12, 287:15, 287:21,

287:22, 287:24, 291:3, 291:4, 291:7, 292:21, 292:22, 292:24, 294:10, 302:15, 302:18, 302:19, 302:20, 308:15, 309:18, 309:20, 310:3
**exhibits** [2] - 11:23, 290:20
**EXHIBITS** [4] - 5:10, 6:3, 7:3, 8:3
**existed** [4] - 14:13, 73:19, 169:15, 176:3
**existence** [1] - 106:13
**exists** [3] - 161:8, 169:15, 178:10
**expect** [1] - 156:4
**expectation** [1] - 230:8
**expected** [3] - 216:14, 221:4, 235:25
**experience** [3] - 25:2, 25:8, 297:9
**expertise** [4] - 214:6, 214:11, 255:12, 255:15
**EXPIRES** [1] - 314:21
**explain** [5] - 81:11, 135:3, 185:20, 249:8, 287:17
**explained** [1] - 178:19
**explains** [1] - 161:10
**explanation** [2] - 188:15, 252:9
**explicit** [4] - 104:13, 128:15, 273:18, 275:19
**Express** [1] - 22:7
**extent** [4] - 103:6, 110:25, 256:7, 256:11
**external** [1] - 167:3
**extra** [1] - 225:9
**extremely** [1] - 257:2
**Eye** [3] - 5:19, 61:3, 61:25

**F**

**face** [1] - 178:1
**facially** [1] - 311:14
**fact** [31] - 19:21, 21:20, 54:20, 112:18, 115:1, 145:5, 152:22, 163:4, 171:18, 171:22, 175:13, 187:4, 201:18, 204:3, 206:6, 206:11, 213:17, 224:10, 235:19, 243:14, 270:17, 283:21, 284:1, 286:3, 287:1, 289:25, 295:16, 296:1, 296:3, 297:4, 311:18
**factor** [1] - 290:6
**facts** [3] - 311:6, 311:21,

317:22
**factual** [1] - 235:20
**FACUNDO** [1] - 3:5
**failed** [1] - 68:21
**fair** [11] - 23:13, 81:5, 103:14, 108:19, 112:17, 124:18, 129:10, 133:3, 172:14, 202:10, 298:11
**fairly** [1] - 132:16
**fall** [22] - 18:11, 29:21, 43:22, 80:8, 93:7, 98:13, 165:17, 173:12, 196:15, 196:24, 203:4, 204:18, 205:6, 206:23, 259:6, 273:8, 273:11, 273:25, 283:2, 300:18, 302:1, 307:17
**fallen** [1] - 166:18
**FAME** [1] - 208:23
**familiar** [13] - 21:21, 24:21, 24:23, 120:3, 188:10, 188:11, 201:16, 202:20, 245:7, 245:11, 283:10, 285:25, 302:20
**family** [2] - 209:21, 210:2
**FAQ** [2] - 199:25, 200:1
**far** [4] - 43:18, 61:13, 159:3, 232:9, 239:22, 280:1
**fashion** [1] - 88:1
**feature** [1] - 178:17
**Feb** [1] - 5:21
**February** [3] - 7:10, 136:10, 185:16
**feed** [1] - 70:21
**feedback** [2] - 23:25, 78:25
**feeds** [1] - 170:22
**fell** [1] - 15:12
**fellow** [1] - 122:12
**felt** [2] - 132:16, 304:5
**female** [2] - 129:20, 299:24
**few** [6] - 19:24, 59:6, 86:22, 86:24, 101:6, 128:5
**fewer** [1] - 225:9
**FF** [1] - 287:20
**fiction** [2] - 181:3, 181:24
**fifth** [3] - 34:23, 36:25, 101:24
**figuratively** [1] - 65:11
**figure** [1] - 88:20
**figured** [1] - 22:21
**file** [1] - 197:6
**filed** [19] - 13:21, 13:24, 16:7, 22:3, 32:13, 32:19, 32:22, 109:20, 189:20, 193:1, 204:18, 206:23,

Deposition of Bradley Vinson, Volume 1

245:22, 246:1, 290:16, 290:19, 295:12, 298:19, 298:22
**filled** [4] - 31:5, 63:8, 74:4, 250:20
**final** [8] - 71:10, 72:9, 85:25, 137:1, 137:11, 145:10, 229:16, 234:3
**financially** [1] - 315:18
**findings** [10] - 71:16, 71:23, 72:1, 72:2, 72:4, 256:18, 256:21, 257:4, 257:7, 257:14
**fine** - 20:12, 163:16, 175:13
**Fire** [1] - 185:18
**first** [54] - 9:13, 10:2, 15:1, 26:15, 31:18, 42:17, 43:20, 45:15, 59:5, 60:5, 63:25, 65:15, 65:19, 74:9, 75:2, 75:5, 75:6, 84:16, 84:22, 97:1, 109:3, 109:10, 109:19, 116:4, 116:8, 116:19, 116:20, 124:13, 124:15, 133:15, 134:6, 138:11, 139:3, 165:18, 183:15, 183:16, 183:25, 189:24, 198:13, 201:6, 202:10, 207:12, 221:3, 230:8, 230:11, 230:13, 239:8, 240:17, 240:18, 240:19, 240:20, 244:6, 245:25, 285:15
**First** [4] - 8:12, 199:19, 200:6, 235:1
**five** [8] - 38:11, 118:12, 118:14, 185:15, 195:7, 213:13, 227:3, 240:17
**five-minute** [2] - 195:7, 227:3
**fivish** [1] - 132:5
**fix** [1] - 172:19
**flag** [3] - 114:7, 114:16, 297:2
**flagged** [6] - 113:25, 114:11, 114:14, 114:21, 140:1, 158:15
**Flawless** [4] - 97:2, 136:22, 137:17, 138:21
**Flesh** [1] - 185:18
**flies** [1] - 258:16
**flip** [1] - 192:12
**Floor** [2] - 3:7, 3:14
**FLORIDA** [7] - 1:1, 2:1, 2:21, 314:3, 314:19, 315:2, 316:1
**Florida** [34] - 1:22, 2:17, 4:8, 4:15, 7:24, 8:8, 11:24, 18:19, 41:18,

41:19, 42:9, 42:13, 99:5, 121:11, 157:6, 161:20, 176:6, 194:8, 195:5, 198:18, 208:19, 209:1, 216:15, 222:20, 223:7, 242:18, 243:18, 245:24, 246:14, 282:22, 285:14, 314:8, 314:9, 315:7
**Florida's** [1] - 293:5
**flow** [1] - 123:10
**Flowchart** [2] - 5:24, 79:15
**flowchart** [6] - 79:5, 117:6, 138:10, 140:6, 157:1, 167:17
**flowing** [1] - 82:13
**fluctuate** [1] - 250:8
**fluctuates** [1] - 250:7
**fluid** [7] - 34:19, 45:11, 47:2, 47:7, 122:5, 159:7, 273:3
**Focus** [2] - 97:23, 210:19
**focus** [1] - 136:10, 305:18
**focused** [1] - 125:20
**Follett** [2] - 56:19
**Follett's** [1] - 58:5
**follow** [9] - 19:25, 20:3, 54:9, 54:18, 54:22, 60:6, 200:13, 235:25
**Follow** [2] - 7:13, 261:19
**follow-up** [3] - 54:9, 54:18, 54:22
**followed** [3] - 204:12, 232:24, 233:14
**following** [13] - 9:1, 56:16, 59:25, 109:8, 122:20, 132:14, 172:23, 238:25, 255:3, 262:1, 288:8, 312:5
**follows** [6] - 9:13, 292:3
**FOR** [2] - 1:1, 316:1
**force** [3] - 83:24, 84:3, 119:13
**foregoing** [2] - 315:11, 317:22
**Forest** [2] - 176:25, 177:6
**Forever** [1] - 299:20
**forgot** [1] - 20:19
**form** [102] - 23:2, 27:7, 28:3, 31:2, 35:24, 37:19, 38:17, 40:13, 40:19, 42:21, 46:25, 53:15, 57:8, 57:20, 57:21, 57:23, 71:17, 76:1, 76:9, 77:13, 84:3, 85:8, 94:7, 115:16, 115:23, 119:13, 120:11, 127:5, 129:9,

142:7, 142:10, 142:12, 142:15, 142:18, 142:19, 147:10, 148:4, 148:20, 149:22, 151:5, 151:12, 194:14, 197:5, 197:12, 197:23, 197:24, 197:25, 198:3, 220:3, 220:22, 235:16, 246:18, 246:24, 247:11, 247:24, 250:20, 250:22, 251:19, 252:25, 256:20, 257:5, 259:19, 264:17, 264:24, 265:6, 265:17, 266:3, 266:15, 268:4, 268:15, 268:19, 269:3, 269:11, 271:13, 272:17, 274:14, 274:19, 283:7, 286:12, 286:16, 287:7, 289:18, 289:21, 290:4, 292:7, 292:14, 293:7, 293:16, 295:3, 296:7, 297:6, 299:8, 299:9, 300:9, 300:9, 303:8, 304:14, 307:2, 307:8, 308:21, 308:23, 309:12, 311:17
**formal** [2] - 20:7, 180:3
**Formal** [2] - 6:18, 174:17
**formally** [8] - 144:17, 145:5, 145:12, 147:2, 174:25, 191:16, 205:7, 208:15
**formation** [1] - 74:15
**formatting** [1] - 13:13
**formed** [3] - 63:20, 74:11, 230:24
**forms** [16] - 57:24, 72:13, 72:19, 73:2, 73:5, 73:8, 73:11, 73:14, 73:18, 73:20, 125:13, 162:15, 163:25, 164:6, 269:15, 290:11
**Forms** [1] - 67:14
**forth** [7] - 22:14, 24:10, 53:3, 235:6, 235:11, 243:2, 283:11
**forthcoming** [1] - 161:12
**forum** [1] - 72:16
**forward** [6] - 63:9, 154:19, 229:11, 279:25, 280:2, 300:6
**forwarded** [2] - 262:12, 316:20
**forwarding** [1] - 280:11
**four** [7] - 86:11, 96:25, 97:3, 109:16, 109:23, 240:17, 246:8
**fourth** [6] - 101:23, 118:25, 119:2, 119:18, 181:13, 181:14
**FPR** [4] - 1:24, 314:18,

315:22, 316:24
**frame** [1] - 279:21
**free** [3] - 135:17, 174:8, 212:12
**freedom** [2] - 206:19, 243:2
**frequently** [1] - 172:20, 215:11
**Friday** [1] - 277:21
**Friend** [1] - 185:18
**Friends** [1] - 299:20
**FS** [2] - 281:7, 281:17
**full** [15] - 33:22, 56:21, 59:17, 60:11, 72:7, 80:17, 81:13, 87:8, 97:15, 119:2, 119:18, 145:4, 154:18, 159:7, 161:17
**Full** [1] - 81:2
**fully** [1] - 56:25
**fun** [1] - 258:17
**funneled** [2] - 206:23, 208:14
**FURTHER** [1] - 315:14

---

### G

**garbled** [2] - 120:1, 130:2
**gathering** [1] - 119:6
**gay** [1] - 276:10
**geared** [1] - 181:22
**genders** [1] - 231:17
**general** [13] - 23:6, 35:3, 35:19, 54:24, 83:3, 83:12, 123:10, 225:6, 235:21, 243:25, 248:9, 248:15, 301:13
**generally** [10] - 27:11, 35:8, 36:3, 54:4, 140:21, 143:4, 247:25, 248:1, 257:9, 262:16
**generated** [2] - 107:17, 117:13
**genitals** [1] - 129:19
**GEORGE** [1] - 1:5
**George** [2] - 66:8, 178:6
**George)** [1] - 164:14
**GG** [1] - 291:2
**given** [9] - 100:14, 198:7, 199:17, 214:20, 236:19, 259:17, 269:13, 269:14, 281:9
**glass** [2] - 25:16, 25:23
**GLASS** [1] - 1:4
**GMT-5** [1] - 6:6
**goals** [7] - 23:7, 24:5, 24:6, 24:7, 24:8, 24:10, 24:13

**GOEL** [1] - 3:19
**Google** [4] - 67:1, 107:17, 220:3, 252:2
**govern** [1] - 194:6
**governed** [2] - 184:13, 203:8
**governing** [1] - 233:5
**Governor's** [1] - 209:2
**governs** [1] - 233:6
**Grade** [1] - 169:20
**grade** [26] - 32:1, 34:9, 34:14, 34:15, 34:23, 36:25, 61:12, 61:13, 101:20, 101:23, 101:24, 101:25, 104:3, 111:18, 126:7, 138:25, 141:5, 170:24, 171:25, 181:13, 181:14, 198:21, 199:1, 234:11, 257:11
**grades** [7] - 56:15, 56:24, 57:1, 57:3, 101:23, 171:4
**Grady** [1] - 245:23
**granted** [1] - 269:6
**granting** [1] - 269:21
**graphic** [6] - 119:24, 143:5, 143:14, 144:4, 275:19, 278:14
**gratify** [1] - 129:21
**great** [6] - 22:19, 26:14, 26:23, 44:24, 163:13, 194:1
**GROSHOLZ** [1] - 4:5
**group** [17] - 95:17, 95:19, 132:16, 140:18, 141:6, 143:5, 148:1, 148:17, 149:7, 162:2, 162:22, 163:1, 163:17, 198:21, 199:1, 234:11, 257:3
**groups** [2] - 84:14, 123:5
**guardian** [3] - 206:9, 209:14, 269:7
**guardians** [2] - 209:23, 269:9
**guess** [8] - 36:8, 70:14, 72:23, 94:23, 170:18, 171:1, 243:15, 305:9
**guessed** [1] - 108:22
**guidance** [28] - 128:10, 178:13, 194:9, 198:6, 199:7, 199:17, 199:22, 203:20, 216:9, 216:22, 226:4, 231:18, 231:25, 232:2, 232:3, 232:4, 232:9, 232:11, 234:10, 234:17, 234:19, 234:21, 234:24, 235:1, 235:5, 244:21, 248:8, 248:11
**guide** [1] - 242:21

Deposition of Bradley Vinson, Volume 1

**guidelines** [2] - 83:25, 258:7
**Guild** [1] - 142:22

## H

**half** [1] - 291:21
**hand** [5] - 9:4, 129:4, 129:7, 129:12, 314:13
**handed** [5] - 13:10, 26:5, 61:1, 277:7, 302:17
**handful** [1] - 210:25
**handing** [1] - 66:14
**handle** [5] - 204:17, 205:8, 206:2, 208:20, 316:16
**handled** [6] - 36:14, 202:15, 203:11, 265:3, 265:7, 268:20
**handles** [1] - 138:2
**handling** [3] - 206:2, 247:15, 247:17
**hang** [1] - 264:1
**happy** [4] - 10:19, 190:2, 192:7, 192:16
**Happy** [2] - 109:15, 109:17
**hard** [3] - 136:8, 150:23, 237:5
**harder** [3] - 87:22, 88:3, 291:25
**harkening** [1] - 162:6
**harmful** [6] - 283:2, 283:5, 283:14, 285:4, 285:16, 293:11
**Hate** [5] - 109:17, 150:19, 151:5, 151:10, 151:20
**HB** [171] - 6:4, 6:12, 6:17, 12:25, 13:18, 14:6, 17:15, 17:23, 17:24, 18:8, 19:22, 20:9, 20:10, 29:6, 37:14, 37:24, 38:1, 38:8, 38:23, 39:11, 40:24, 40:25, 41:21, 42:16, 42:20, 42:25, 50:19, 51:10, 51:12, 53:25, 79:23, 80:1, 80:16, 80:20, 81:8, 81:17, 81:19, 82:3, 82:6, 84:14, 85:15, 86:25, 87:13, 90:1, 90:5, 90:10, 91:12, 94:23, 96:3, 96:5, 96:15, 98:7, 98:23, 98:24, 99:1, 99:3, 99:10, 99:11, 99:14, 100:3, 102:24, 108:10, 109:20, 110:4, 111:12, 113:8, 115:21, 116:4, 116:6, 116:9, 116:19, 117:5, 117:25, 118:1, 121:18, 122:1, 125:24, 127:9, 131:1, 134:1, 137:21, 138:9, 144:13, 147:1, 149:9, 149:13, 154:7, 155:8, 155:25, 157:8, 157:16, 157:25, 158:2, 158:3, 159:2, 160:8, 160:23, 162:16, 167:25, 168:6, 176:12, 176:24, 178:5, 179:1, 179:3, 179:13, 179:19, 179:25, 180:11, 181:8, 182:22, 182:24, 182:25, 183:20, 191:8, 194:3, 225:19, 225:23, 226:6, 226:11, 226:15, 226:18, 226:19, 226:20, 231:17, 232:1, 232:8, 232:12, 233:13, 242:21, 243:6, 243:8, 244:13, 244:22, 245:2, 245:7, 245:16, 246:15, 246:22, 248:11, 248:18, 273:21, 284:18, 290:6, 290:22, 293:6, 293:20, 293:23, 294:3, 295:2, 295:6, 295:17, 295:21, 295:22, 296:4, 297:1, 297:18, 298:23, 300:2, 300:23, 301:4, 301:7, 302:2, 309:14
**HB1069** [2] - 6:6, 106:25
**head** [8] - 10:9, 29:12, 101:4, 105:20, 108:25, 109:9, 195:15, 210:24
**header** [1] - 53:4
**heading** [9] - 33:22, 36:11, 45:19, 45:20, 46:15, 62:1, 73:23, 136:16, 193:7
**Heading** [1] - 233:18
**headings** [2] - 30:3, 30:5
**heard** [1] - 270:19
**Heather** [2] - 291:9, 291:13
**held** [12] - 86:25, 133:23, 139:21, 155:21, 156:12, 169:18, 213:18, 215:4, 215:10, 229:25, 230:25, 231:3
**help** [11] - 13:6, 22:21, 83:25, 119:8, 119:9, 121:4, 123:24, 136:2, 165:9, 214:6, 255:13
**helped** [1] - 36:19
**helpful** [3] - 24:12, 59:5, 308:6
**helping** [1] - 125:8, 213:4
**helps** [1] - 209:12
**hereby** [2] - 314:10, 315:8
**herein** [1] - 314:10, 315:10
**herself** [3] - 1:7, 55:15, 177:14
**HEYWOOD** [35] - 2:22, 22:6, 22:9, 60:24, 70:17, 94:21, 106:20, 107:18, 133:8, 133:10, 159:21, 188:3, 189:14, 189:23, 221:25, 222:3, 236:22, 261:13, 262:23, 266:22, 277:4, 280:5, 282:15, 284:6, 285:8, 285:12, 287:22, 291:4, 292:22, 294:12, 302:19, 306:1, 309:18, 309:21, 310:3
**HH** [3] - 291:1, 292:20, 314:20
**hidden** [1] - 80:22
**high** [63] - 12:11, 23:1, 30:16, 33:6, 35:6, 35:10, 35:14, 36:1, 36:11, 36:15, 54:16, 61:6, 62:4, 82:15, 82:17, 83:16, 84:19, 85:22, 95:17, 102:1, 103:25, 130:23, 131:5, 131:9, 131:11, 131:19, 133:25, 134:16, 134:22, 135:13, 136:22, 136:24, 137:4, 137:7, 137:10, 137:19, 137:20, 138:16, 138:21, 139:6, 142:3, 145:14, 145:21, 145:24, 146:10, 146:11, 146:21, 146:22, 146:25, 147:8, 149:6, 149:7, 149:19, 149:20, 156:12, 179:21, 179:22, 213:21, 252:1, 284:17, 287:16
**High** [6] - 66:25, 150:20, 176:6, 176:25, 177:6, 183:18
**higher** [2] - 99:18, 182:3
**highlighted** [1] - 174:22
**highlighting** [2] - 175:18
**highlights** [2] - 94:25, 174:20
**himself** [3] - 1:5, 1:8, 1:10
**historical** [1] - 286:14
**histories** [1] - 46:1
**history** [16] - 22:14, 22:17, 23:5, 29:13, 44:22, 45:7, 45:16, 48:6, 53:9, 75:3, 75:10, 77:17, 77:24, 78:3, 274:8, 305:5
**hoc** [1] - 276:24
**hold** [2] - 83:5, 260:1
**holding** [2] - 83:7, 85:17
**holdings** [1] - 123:18
**holds** [1] - 80:23
**Holiday** [1] - 22:7
**home** [2] - 268:17, 269:15
**homosexual** [1] - 106:13
**Honestly** [1] - 190:3
**hope** [3] - 84:4, 117:21, 230:6
**HOPE** [1] - 1:9
**hoped** [1] - 119:13
**hopefully** [1] - 119:6
**hosted** [1] - 197:10
**hours** [4] - 101:3, 153:12, 153:18, 302:12
**house** [1] - 281:6
**HOUSE** [1] - 1:7
**House** [1] - 294:21
**housed** [1] - 281:11
**HS** [7] - 30:13, 30:16, 81:6, 141:18, 150:25, 151:3, 157:1
**huhs** [1] - 10:9
**hundreds** [2] - 88:22, 88:23, 89:5
**hyperlink** [3] - 61:24, 79:19, 81:7
**hyphen** [1] - 46:18
**hypothetical** [1] - 145:18

## I

**i.e** [1] - 161:22
**idea** [1] - 84:9
**ideally** [1] - 87:24
**ideas** [3] - 25:8, 25:9, 25:10
**identical** [2] - 13:12, 191:20
**identification** [36] - 15:20, 16:11, 21:17, 22:5, 26:3, 60:23, 66:17, 75:18, 79:6, 94:15, 106:21, 107:19, 133:9, 153:23, 159:22, 167:11, 174:1, 188:4, 189:13, 222:5, 223:4, 231:6, 237:1, 245:20, 261:14, 262:24, 266:23, 277:5, 280:6, 284:7, 285:11, 287:21, 291:3, 292:21, 302:15, 308:15
**identified** [21] - 21:13, 51:16, 51:25, 52:8, 109:18, 109:24, 115:2, 160:22, 164:19, 173:2, 245:10
**identifies** [2] - 95:11, 95:24
**identify** [9] - 15:1, 20:17, 100:17, 121:4, 126:13, 128:3, 128:4, 135:4, 307:4
**identifying** [3] - 13:5, 100:14, 143:11
**identity** [1] - 303:6
**imagine** [5] - 32:20, 56:13, 107:16, 142:11, 172:7
**immediately** [5] - 103:25, 104:4, 114:8, 172:11, 172:24
**impact** [4] - 145:6, 152:23, 184:8, 187:5
**impacted** [2] - 293:6, 293:23
**impair** [1] - 11:2
**impermissible** [3] - 198:8, 199:9, 199:14
**implement** [3] - 25:14, 34:6, 262:7
**implementation** [3] - 50:18, 265:25, 306:13
**implemented** [7] - 139:10, 205:6, 206:7, 213:22, 264:21, 269:4, 269:19
**implementing** [3] - 152:21, 262:3, 310:24
**implicate** [1] - 311:15
**implied** [2] - 278:13, 278:17
**important** [5] - 24:17, 99:11, 120:1, 268:18, 280:20
**impressive** [1] - 132:25
**IN** [6] - 1:1, 2:1, 2:21, 316:1, 316:9, 317:3
**in-depth** [2] - 158:4, 182:3
**inaccurate** [1] - 297:13
**inappropriate** [10] - 92:15, 151:17, 151:18, 152:5, 152:12, 162:18, 198:20, 199:2, 267:19, 292:1
**Inc** [1] - 317:3
**INC** [2] - 1:4, 316:4
**incentives** [1] - 34:6
**incest** [1] - 275:2
**include** [14] - 81:18, 144:11, 145:4, 147:25, 153:14, 168:8, 175:3, 175:5, 190:1, 190:3, 194:25, 213:14, 242:24, 250:11

**included** [22] - 58:22, 59:2, 67:18, 76:22, 119:22, 121:3, 168:3, 198:16, 220:21, 224:10, 224:13, 226:21, 233:9, 240:11, 243:4, 243:6, 243:22, 243:25, 244:6, 247:9, 296:22, 312:17
**includes** - 31:7, 134:21, 296:8
**including** [4] - 23:7, 34:9, 81:19, 139:5
**inclusion** [1] - 287:5
**inclusive** [1] - 24:15
**inclusiveness** [1] - 24:16
**Incorporated** [1] - 7:11
**incorporated** [1] - 91:12
**incorporating** [1] - 194:8
**incorrect** [1] - 46:24
**increased** [1] - 172:12
**indeed** [1] - 95:2
**independently** [2] - 177:3, 304:10
**Indian** [3] - 284:24, 286:1, 287:3
**indicate** [8] - 70:21, 81:24, 82:25, 83:13, 126:2, 128:15, 138:7, 294:14
**indicated** [29] - 45:17, 61:11, 61:12, 67:10, 73:1, 76:25, 84:18, 85:18, 95:9, 99:17, 100:2, 104:17, 109:14, 109:22, 111:14, 112:4, 122:11, 125:24, 139:7, 147:11, 147:12, 157:13, 161:7, 256:5, 257:10, 259:12, 283:24, 283:25, 299:9
**indicates** [13] - 13:10, 42:4, 61:18, 62:11, 142:16, 143:8, 151:12, 170:16, 202:18, 206:17, 207:23, 210:19, 211:14
**indicating** [5] - 40:22, 210:16, 221:9, 259:7, 287:2
**indication** [2] - 130:16, 186:7
**indicators** [1] - 30:18
**individual** [20] - 16:15, 16:17, 16:24, 17:9, 20:13, 24:8, 67:12, 111:4, 117:17, 148:23, 170:10, 184:5, 187:8, 204:25, 228:15, 236:14, 243:2, 248:7, 251:7, 274:7

**Individual** [4] - 1:16, 9:11, 316:10, 317:6
**individually** [1] - 28:19
**individuals** [5] - 197:6, 206:11, 228:13, 267:12, 291:9
**indoctrination** [1] - 276:14
**inform** [1] - 21:3
**informal** [1] - 196:18
**information** [48] - 59:7, 60:6, 60:8, 65:20, 66:21, 69:7, 74:16, 77:11, 96:12, 100:24, 102:11, 102:12, 127:22, 139:1, 143:12, 165:22, 165:24, 166:3, 167:5, 167:6, 170:15, 170:22, 211:5, 211:17, 212:13, 220:22, 220:25, 237:21, 239:23, 247:1, 247:17, 247:22, 248:2, 248:6, 253:9, 253:10, 254:1, 254:3, 261:25, 262:1, 262:13, 264:25, 265:1, 277:22, 278:12, 297:13, 307:5, 308:18
**Information** [3] - 7:4, 63:24, 76:14
**informed** [13] - 53:20, 61:19, 102:12, 140:9, 210:15, 218:18, 225:19, 225:22, 226:1, 226:2, 246:21, 247:3, 247:6
**informing** [1] - 278:24
**initial** [11] - 45:8, 74:11, 121:3, 126:13, 157:24, 160:16, 180:1, 202:21, 220:19, 291:23, 306:7
**injunction** [9] - 290:16, 290:19, 295:12, 295:15, 296:2, 296:6, 296:10, 296:19, 296:21
**Inn** [1] - 22:7
**Input** [5] - 67:14, 241:8, 252:1, 252:23, 252:24
**input** [59] - 68:8, 72:13, 72:19, 73:11, 73:14, 73:20, 78:8, 78:16, 78:19, 78:22, 83:6, 84:23, 85:10, 85:16, 85:20, 88:15, 119:6, 158:16, 211:7, 211:20, 211:24, 212:7, 212:9, 214:20, 215:18, 215:25, 216:10, 216:16, 216:20, 216:23, 217:25, 218:4, 219:24, 220:1, 220:4, 220:6, 220:9, 241:10, 241:11, 241:12, 241:14,

241:22, 242:9, 242:13, 242:14, 242:16, 250:16, 251:12, 251:15, 251:17, 251:19, 252:7, 252:12, 252:16, 252:17, 254:24, 278:21, 304:17
**Input_All** [1] - 66:25
**inquire** [1] - 270:22
**instance** [4] - 124:14, 124:15, 309:2, 313:2
**instances** [5] - 59:23, 132:20, 132:23, 158:6, 283:18, 299:22
**instead** [1] - 68:23
**institute** [1] - 211:13
**instructed** [2] - 183:22, 272:10
**instructing** [2] - 120:6, 120:24
**instruction** [13] - 58:21, 216:9, 216:22, 221:21, 223:2, 231:20, 243:11, 243:21, 244:2, 244:5, 244:9, 246:10, 294:22
**Instruction** [4] - 61:21, 213:1, 228:20, 230:5
**Instructional** [2] - 7:6, 223:9
**instructional** [5] - 194:6, 194:24, 219:2, 294:4, 295:23
**instructions** [6] - 9:25, 79:1, 234:6, 234:8, 278:21, 279:1
**intend** [1] - 186:4
**intended** [5] - 16:21, 46:6, 73:2, 89:23, 99:18
**intent** [3] - 129:21, 158:25, 209:25
**intention** [1] - 295:22
**interact** [1] - 56:13
**intercourse** [2] - 103:18, 103:19
**interest** [2] - 164:16, 309:23
**interested** [3] - 178:18, 201:6, 315:18
**internal** [8] - 76:5, 165:21, 165:25, 166:4, 166:12, 166:22, 166:24, 167:2
**interpret** [3] - 103:22, 172:14, 203:24
**interpretation** [11] - 47:17, 47:24, 103:2, 104:15, 105:18, 105:21, 144:13, 158:25, 219:6, 226:5, 233:23
**interpreted** [7] - 99:7, 105:15, 151:9, 151:13,

171:7, 299:24, 300:1
**interpreting** [1] - 125:16
**Interrogatories** [1] - 8:12
**interrogatories** [5] - 256:13, 303:1, 307:21, 308:4, 308:10
**Interrogatory** [4] - 8:10, 15:16, 21:10, 174:6
**interrogatory** [3] - 303:9, 307:3, 307:24
**interrupt** [1] - 64:10
**intervention** [1] - 245:14
**introduce** [1] - 285:8
**introduced** [2] - 43:20, 43:21
**inventory** [1] - 186:9
**investigating** [1] - 211:13
**invite** [1] - 215:1
**inviting** [1] - 215:1
**involved** [10] - 53:8, 69:13, 76:19, 256:12, 266:11, 271:7, 301:14, 301:17, 303:15, 305:21
**involvement** [1] - 78:13
**irregular** [1] - 116:15
**issuance** [3] - 263:7, 264:15, 265:12
**Issue** [1] - 6:18
**issue** [24] - 15:13, 21:9, 21:11, 21:13, 21:23, 21:24, 71:16, 73:6, 147:19, 162:15, 163:11, 163:14, 166:1, 174:21, 236:20, 244:8, 244:9, 290:10, 290:17, 296:5, 296:19, 300:6, 308:2
**issued** [2] - 234:5, 264:10
**issues** [5] - 66:4, 66:6, 194:12, 194:17, 268:18
**IT** [1] - 98:8
**item** [5] - 70:9, 70:10, 183:13, 239:5, 310:25
**Item** [2] - 5:20, 66:12
**items** [7] - 82:9, 123:24, 179:13, 237:13, 248:7, 248:17, 312:14
**iterations** [1] - 198:3
**itself** [12] - 20:16, 57:8, 69:17, 69:18, 72:6, 130:18, 165:15, 235:6, 235:10, 235:22, 289:20, 311:19

**J**

**January** [4] - 134:11, 140:19, 143:19, 154:2

**JEFFREY** [1] - 4:5
**jgrosholz@rumberger.com** [1] - 4:6
**JLG** [3] - 142:16, 142:21, 143:8
**job** [1] - 138:12
**jog** [2] - 306:20, 306:24
**jogs** [1] - 163:9
**JOHNSON** [1] - 1:5
**Johnson** [1] - 66:8
**Journal** [3] - 56:7, 219:13, 249:18
**judicial** [1] - 256:24
**July** [21] - 50:19, 51:12, 90:15, 101:3, 101:11, 108:2, 109:2, 109:19, 110:1, 115:21, 116:20, 191:23, 191:25, 193:21, 193:24, 297:19, 298:4, 298:20, 299:22, 305:24, 307:17
**jump** [1] - 11:18
**jumped** [1] - 245:11
**June** [22] - 13:13, 14:8, 14:16, 49:24, 50:5, 50:8, 50:9, 50:15, 50:18, 50:23, 51:12, 52:20, 52:25, 110:1, 111:25, 188:20, 191:13, 191:19, 223:22, 298:6, 298:12
**Junior** [2] - 12:18, 137:16, 142:22

**K**

**keep** [12] - 13:6, 23:11, 37:4, 49:5, 104:10, 146:5, 147:15, 150:1, 165:9, 178:20, 257:23, 272:10
**Keith** [6] - 78:22, 298:17, 303:24, 304:1, 304:2, 306:19
**kept** [7] - 29:3, 32:9, 136:20, 166:1, 166:22, 167:1, 292:1
**Kevin** [1] - 267:2
**key** [1] - 147:17
**kind** [8] - 24:9, 103:8, 174:13, 180:4, 216:9, 257:4, 294:10, 294:12
**kinds** [1] - 24:1
**Kingdom** [1] - 185:18
**KIRK** [3] - 2:13, 4:4, 4:11
**Kirk** [1] - 4:21
**Kirkus** [3] - 56:8, 219:14, 249:17
**knowledge** [24] - 58:15, 59:20, 63:6, 71:18, 74:7,

187:7, 213:19, 214:12, 222:19, 225:21, 225:24, 225:25, 233:17, 240:16, 247:12, 255:16, 256:7, 256:11, 259:3, 263:19, 265:8, 268:12, 276:18, 300:21

**KYLE** [1] - 1:6

---

L

---

**labeled** [1] - 37:6
**labelled** [1] - 31:21
**LAC** [5] - 215:1, 215:16, 215:17, 216:6, 251:8
**lack** [1] - 283:15
**lacks** [2] - 311:6, 311:21
**LACs** [6] - 215:11, 216:8, 216:20, 217:13, 217:15, 241:11
**laid** [3] - 24:10, 258:6, 308:10
**lane** [1] - 94:3
**language** [8] - 104:16, 120:19, 199:3, 201:1, 205:23, 210:3, 278:13, 278:17
**laptop** [11] - 29:15, 29:18, 43:25, 44:3, 44:10, 44:25, 98:18, 164:24, 237:5, 240:1, 251:22
**laptops** [1] - 253:17
**large** [4] - 155:3, 203:5, 204:23, 314:10
**larger** [3] - 140:18, 174:7, 228:23
**last** [18] - 15:1, 15:6, 15:8, 18:7, 50:4, 50:8, 134:2, 150:12, 166:19, 166:20, 172:3, 190:17, 220:14, 252:20, 258:13, 258:18, 270:9, 294:19
**Last** [2] - 6:21, 6:24
**late** [2] - 98:13, 108:2
**latest** [1] - 305:23
**law** [14] - 41:18, 41:19, 42:2, 42:9, 42:13, 42:17, 143:16, 143:20, 157:6, 161:20, 244:18, 292:4, 292:5, 298:23
**Law** [1] - 7:12
**laws** [7] - 8:8, 41:25, 42:19, 42:23, 43:4, 90:4, 293:6
**lawsuit** [7] - 11:12, 16:7, 21:14, 22:4, 115:14, 193:2, 290:20
**lawsuits** [1] - 295:21

**lawyers** [6] - 13:5, 17:15, 19:9, 153:15, 153:19
**layout** [1] - 80:5
**lays** [1] - 200:12
**LBGTQIA** [2] - 178:7, 178:16
**learned** [6] - 22:25, 23:5, 23:6, 23:14, 24:7, 173:16
**learning** [2] - 17:22, 90:6
**least** [11] - 23:9, 37:25, 51:8, 52:11, 95:8, 123:4, 153:20, 215:13, 215:14, 216:2, 239:24
**leave** [2] - 139:7, 215:2
**led** [1] - 270:15
**left** [11] - 66:3, 79:23, 82:3, 83:8, 90:19, 90:25, 92:7, 239:6, 258:17, 298:9, 302:13
**legal** [2] - 103:7, 283:8
**legislation** [4] - 100:15, 100:25, 154:21, 199:25
**legislative** [2] - 242:21, 256:23
**lens** [3] - 51:12, 99:11, 156:6
**Leonard** [7] - 78:22, 298:17, 303:24, 304:1, 304:2, 305:12, 306:19
**letters** [1] - 268:17
**LEV** [110] - 2:5, 9:15, 13:9, 15:2, 15:21, 16:8, 16:12, 21:18, 22:12, 26:4, 27:9, 44:6, 44:8, 60:25, 62:2, 62:7, 64:19, 64:20, 66:18, 70:18, 70:24, 71:2, 75:19, 79:5, 79:7, 79:9, 94:11, 94:16, 106:22, 107:20, 108:22, 109:1, 129:10, 133:13, 150:7, 150:9, 150:12, 150:16, 150:18, 153:5, 153:8, 153:22, 153:24, 159:23, 165:14, 167:12, 173:24, 174:2, 188:2, 188:5, 189:11, 189:15, 190:2, 190:6, 191:1, 192:22, 193:1, 193:5, 193:7, 195:7, 195:11, 221:24, 222:2, 222:6, 223:5, 223:10, 223:13, 227:2, 227:5, 231:7, 237:2, 245:21, 253:13, 253:15, 258:14, 261:12, 261:15, 262:25, 264:5, 264:8, 266:21, 266:24, 277:3, 277:6, 280:4, 280:7, 282:16, 282:19, 284:5, 284:8, 285:7,

285:10, 285:13, 287:20, 287:23, 291:1, 291:6, 292:20, 292:23, 302:13, 302:16, 308:5, 308:13, 308:16, 309:17, 309:19, 309:23, 309:25, 310:4, 312:24
**Lev** [4] - 6:22, 9:17, 316:19, 316:20
**Lev's** [1] - 296:8
**Lev.............** [1] - 5:7
**level** [62] - 20:5, 20:7, 23:1, 29:7, 30:20, 30:24, 30:25, 31:3, 32:10, 32:12, 32:16, 33:10, 34:18, 37:2, 56:9, 62:11, 74:12, 83:3, 84:1, 88:8, 100:20, 101:15, 102:7, 104:3, 111:19, 114:22, 126:7, 135:16, 141:6, 151:14, 151:16, 153:3, 155:22, 156:2, 161:24, 162:1, 162:25, 163:7, 163:22, 166:6, 166:7, 168:24, 170:17, 170:23, 171:25, 175:1, 180:7, 181:17, 182:3, 196:11, 198:21, 199:1, 221:10, 221:11, 229:6, 234:11, 234:17, 265:8, 268:21, 273:22, 300:3
**Level** [2] - 30:13, 169:20
**level/grade** [1] - 221:10
**levels** [19] - 32:1, 32:18, 33:17, 34:10, 34:14, 34:15, 61:12, 61:13, 99:18, 102:6, 119:10, 138:25, 163:19, 170:25, 181:23, 213:16, 214:18, 218:1, 257:11
**LEVITHAN** [1] - 1:6
**LGBTQ** [5] - 245:15, 275:19, 275:23, 276:6, 276:14
**liars** [1] - 97:2
**Liberty** [1] - 219:21
**librarian** [4] - 18:2, 23:7, 23:15, 186:1
**librarians** [4] - 112:21, 137:5, 143:1, 179:7
**librarians'** [1] - 17:14
**libraries** [27] - 15:13, 23:6, 24:9, 25:15, 32:5, 33:7, 53:14, 54:21, 61:6, 62:5, 95:14, 96:19, 100:6, 100:8, 108:9, 112:18, 113:2, 118:20, 122:2, 135:19, 136:24, 137:3, 137:24, 142:25, 154:16, 169:15, 179:11

**Library** [27] - 5:24, 6:8, 7:6, 8:6, 56:7, 66:25, 67:15, 79:14, 81:2, 85:10, 85:16, 85:20, 86:11, 142:22, 214:18, 215:25, 216:1, 218:1, 219:13, 223:9, 249:18, 249:19, 250:16, 250:19, 250:23, 251:3, 312:9
**library** [86] - 13:19, 14:20, 18:18, 22:23, 23:16, 24:1, 24:7, 24:8, 24:14, 24:17, 25:4, 32:6, 32:7, 38:12, 58:23, 74:10, 77:7, 77:9, 80:17, 81:13, 90:13, 90:14, 95:13, 95:16, 95:24, 96:19, 96:22, 99:4, 99:6, 99:8, 121:10, 122:1, 123:8, 135:15, 135:23, 170:11, 175:24, 176:4, 182:14, 194:16, 194:25, 195:21, 198:15, 198:16, 199:5, 199:19, 203:23, 209:24, 210:18, 215:24, 216:15, 218:25, 219:2, 219:5, 220:25, 225:20, 223:23, 226:16, 226:1, 226:16, 231:19, 232:1, 232:13, 234:15, 235:18, 243:9, 244:22, 245:3, 245:17, 246:11, 246:16, 246:22, 248:12, 252:2, 252:16, 263:24, 272:11, 281:5, 289:2, 289:6, 291:10, 294:3, 294:20, 295:2, 295:6, 303:7
**library/media** [1] - 215:23
**life** [1] - 98:19
**light** [3] - 194:2, 202:15, 265:4
**likely** [7] - 91:16, 103:22, 109:10, 177:9, 183:19, 203:21, 273:14
**limit** [4] - 100:3, 117:16, 180:24, 210:17
**limitations** [2] - 31:24, 293:14
**limited** [2] - 77:8, 312:11
**limiter** [2] - 96:13, 116:10
**limiting** [2] - 174:15, 179:6
**Linda** [40] - 19:16, 20:20, 49:23, 50:5, 50:16, 54:12, 80:5, 88:11, 107:11, 110:2, 110:10, 110:23, 111:2, 111:22, 111:24, 112:7, 112:12,

113:18, 114:18, 115:9, 116:10, 120:14, 122:24, 123:16, 131:8, 131:24, 132:2, 132:12, 135:2, 138:2, 138:17, 139:1, 139:13, 141:25, 160:1, 160:5, 169:5, 170:2, 172:8, 172:20
**line** [4] - 118:12, 164:15, 275:19, 292:3
**lined** [1] - 196:5
**lines** [1] - 246:8
**lining** [1] - 230:6
**link** [29] - 57:23, 58:11, 58:17, 59:8, 59:25, 60:1, 60:5, 60:14, 60:16, 61:7, 62:2, 64:22, 65:25, 68:4, 68:7, 68:9, 68:21, 71:9, 135:12, 191:3, 211:11, 221:22, 222:20, 224:25, 225:2, 237:9, 239:12, 242:14, 251:25
**linked** [23] - 59:11, 61:2, 64:18, 68:11, 68:20, 68:24, 69:2, 69:20, 117:6, 156:25, 167:17, 220:3, 221:13, 223:15, 236:16, 238:19, 239:4, 248:3, 248:6, 251:19, 254:2, 262:5
**links** [1] - 65:17, 69:25, 70:7, 79:20, 79:25, 135:22, 239:8
**list** [60] - 21:12, 21:20, 21:24, 54:2, 54:15, 81:17, 82:7, 84:14, 86:25, 87:11, 87:13, 88:2, 88:13, 88:17, 95:6, 97:7, 110:3, 110:6, 110:9, 110:11, 110:19, 110:22, 111:12, 114:10, 121:20, 134:1, 135:23, 135:25, 136:13, 141:1, 146:19, 154:7, 154:10, 155:12, 156:22, 156:24, 157:2, 157:25, 158:2, 158:4, 159:2, 159:7, 159:8, 159:17, 163:8, 163:10, 163:16, 163:24, 164:13, 168:7, 173:12, 198:16, 217:2, 221:7, 241:15, 276:22, 278:21, 279:1, 290:12, 301:23
**listed** [11] - 16:3, 127:2, 135:20, 136:15, 170:20, 172:14, 181:13, 184:7, 249:16, 308:19, 309:8
**listening** [1] - 209:16
**listing** [1] - 58:6
**lists** [1] - 163:12

Deposition of Bradley Vinson, Volume 1

**literally** [1] - 65:10
**literary** [8] - 234:21, 283:16, 285:21, 286:10, 286:13, 286:17, 286:21, 290:1
**literature** [2] - 23:10, 249:9
**Literature** [2] - 249:5, 254:23
**litigation** [3] - 13:22, 13:25, 14:24
**live** [2] - 225:1, 264:4
**LLC** [1] - 1:7
**LLP** [2] - 3:4, 3:11
**locate** [2] - 187:15, 187:16
**located** [2] - 155:13, 186:9
**location** [5] - 55:4, 121:17, 183:12, 183:24, 272:11
**locations** [3] - 82:22, 179:14, 181:21
**log** [1] - 36:6
**logged** [2] - 44:10, 44:20
**look** [120] - 21:21, 29:13, 39:25, 44:21, 47:20, 59:5, 59:21, 62:23, 63:9, 64:16, 65:11, 65:12, 70:5, 70:7, 71:3, 75:3, 75:20, 76:11, 80:6, 80:9, 87:22, 87:23, 88:3, 88:6, 92:4, 97:1, 97:16, 98:11, 99:11, 105:22, 106:3, 109:2, 109:6, 109:21, 110:7, 116:1, 116:2, 118:24, 119:18, 121:12, 121:20, 123:22, 127:1, 127:19, 128:6, 128:13, 128:19, 134:2, 136:10, 138:10, 142:5, 142:15, 143:18, 144:7, 144:24, 146:9, 148:21, 148:23, 158:8, 159:6, 162:13, 162:21, 163:8, 163:15, 165:4, 165:16, 172:3, 174:8, 176:4, 176:23, 188:10, 189:11, 190:21, 192:5, 192:6, 198:10, 199:23, 200:24, 205:10, 207:18, 207:19, 209:10, 211:1, 214:3, 218:15, 224:3, 224:16, 231:14, 236:18, 237:3, 237:5, 237:6, 239:25, 241:13, 241:17, 241:19, 242:4, 244:7, 245:25, 250:2, 259:15, 259:21, 260:12, 269:24, 270:10, 274:7, 277:3, 278:8, 279:8,

287:8, 287:15, 289:12, 289:22, 294:7, 297:7, 305:4, 310:1, 310:16
**looked** [7] - 77:20, 179:25, 183:6, 223:16, 237:14, 241:3, 260:15
**looking** [48] - 25:9, 31:18, 37:4, 44:12, 45:7, 52:3, 53:9, 66:15, 70:2, 70:3, 70:15, 74:14, 74:19, 74:20, 75:9, 77:17, 88:11, 96:17, 120:25, 122:6, 125:1, 126:2, 136:21, 138:20, 140:5, 156:5, 160:17, 163:24, 164:14, 166:10, 187:14, 194:22, 202:16, 205:17, 205:22, 206:19, 207:24, 211:20, 217:17, 237:7, 250:1, 251:9, 253:22, 275:4, 282:20, 299:17, 309:19, 311:17
**looks** [19] - 46:6, 48:11, 49:20, 50:5, 68:9, 70:14, 82:12, 94:22, 94:24, 150:8, 188:11, 241:24, 242:3, 242:5, 242:6, 245:17, 246:11, 251:18, 254:16
**Looks** [1] - 127:21, 127:23, 127:25, 128:6, 128:10, 128:14, 161:3, 161:5, 219:16, 219:18, 219:19
**lost** [5] - 175:19, 182:19, 186:22, 187:12, 233:25
**loud** [1] - 119:20
**Lovely** [1] - 140:17
**lower** [3] - 56:23, 101:21, 104:3
**lucky** [1] - 259:21
**LUKOFF** [1] - 1:6
**lunch** [4] - 133:4, 150:3, 150:13, 153:6
**LYNN** [1] - 3:12

**M**

**mad** [1] - 10:6
**magnitude** [1] - 88:21
**mail** [63] - 6:12, 6:14, 7:4, 7:7, 7:13, 7:16, 7:19, 7:20, 7:23, 8:6, 8:8, 18:24, 19:4, 54:9, 54:11, 54:13, 61:19, 74:1, 80:10, 154:2, 154:6, 159:25, 160:4, 160:5, 183:6, 197:19, 211:25, 212:1, 212:3,

214:24, 222:9, 222:17, 223:15, 224:25, 231:9, 244:13, 244:15, 261:17, 261:22, 261:24, 262:8, 262:9, 262:15, 262:19, 267:1, 267:10, 267:11, 267:14, 277:11, 277:14, 277:18, 280:1, 280:9, 280:11, 280:18, 282:2, 284:10, 284:12, 291:8, 291:20, 292:25, 301:6
**mailed** [2] - 53:22, 208:24
**mailing** [2] - 160:6, 224:19
**mails** [19] - 14:18, 18:21, 18:23, 40:21, 197:17, 215:6, 260:12, 260:14, 260:21, 269:24, 270:1, 270:4, 270:10, 271:16, 271:19, 271:20, 278:9, 279:24, 280:2
**main** [1] - 165:13
**maintained** [3] - 65:6, 73:16, 169:5
**maintenance** [1] - 194:10
**major** [1] - 58:7
**majority** [6] - 87:25, 162:15, 171:12, 171:23, 179:21, 306:7
**makers** [2] - 89:1, 89:4
**makeup** [2] - 101:6, 215:20
**manage** [1] - 24:4
**managed** [1] - 62:21
**management** [1] - 23:8
**Manager** [2] - 314:7, 315:6
**Marcanio** [3] - 213:5, 261:18, 261:22
**March** [6] - 7:4, 134:7, 134:17, 134:22, 135:8, 227:8
**mark** [8] - 95:21, 122:7, 127:18, 173:24, 179:12, 185:23, 186:15, 308:13
**marked** [65] - 13:5, 15:20, 15:22, 16:11, 16:13, 21:17, 21:19, 22:5, 26:3, 60:23, 66:17, 75:18, 79:6, 81:20, 81:21, 94:15, 97:24, 106:21, 107:19, 116:11, 131:1, 133:9, 153:23, 153:25, 155:3, 155:8, 159:22, 159:24, 159:25, 160:9, 160:13, 160:18, 162:17, 167:11, 167:13, 170:7, 174:1, 174:3,

179:19, 179:24, 187:24, 188:4, 188:6, 189:13, 222:5, 222:7, 223:4, 231:6, 237:1, 245:20, 261:14, 262:24, 266:23, 277:5, 280:6, 284:7, 285:11, 287:21, 291:3, 292:21, 293:25, 302:15, 302:17, 308:15, 310:9
**marker** [1] - 183:23
**Market** [1] - 3:7
**markings** [2] - 188:7, 188:9
**master** [1] - 161:14
**master's** [2] - 22:22, 23:1
**matches** [1] - 193:13
**Material** [3] - 59:18, 64:13, 84:10
**material** [28] - 14:20, 119:21, 120:4, 120:10, 120:23, 124:11, 196:8, 198:14, 198:20, 198:21, 209:21, 210:10, 219:7, 221:13, 225:15, 236:15, 239:16, 240:3, 247:8, 248:22, 282:25, 283:1, 283:15, 310:17, 311:7, 311:9, 311:23, 312:12
**materially** [1] - 13:12
**materials** [56] - 12:4, 13:19, 23:21, 44:25, 64:17, 90:8, 99:6, 119:10, 166:9, 194:6, 194:24, 196:10, 198:25, 201:7, 209:25, 210:12, 210:18, 210:22, 217:8, 217:21, 217:25, 218:3, 219:3, 221:12, 226:7, 226:21, 226:21, 231:19, 232:1, 232:13, 235:18, 240:14, 243:9, 247:25, 248:3, 250:12, 254:13, 256:6, 259:12, 259:23, 260:6, 260:17, 262:18, 267:20, 269:5, 285:4, 287:14, 288:9, 294:4, 294:21, 295:2, 295:6, 295:24, 303:18, 311:18, 312:8
**Materials** [41] - 5:18, 7:6, 27:19, 28:1, 28:8, 29:9, 59:14, 62:22, 63:14, 77:5, 84:7, 85:3, 85:6, 89:14, 91:7, 91:18, 93:9, 140:10, 198:12, 201:9, 201:24, 206:24, 207:1, 207:12, 212:16, 214:5, 217:7, 222:12, 223:9, 227:6, 229:25, 231:22,

232:20, 233:2, 233:20, 240:23, 241:1, 253:24, 254:14, 254:19, 286:4
**matter** [1] - 55:9
**mature** [1] - 55:21
**mean** [64] - 30:5, 30:17, 31:15, 31:20, 31:23, 32:3, 32:11, 34:1, 37:5, 37:16, 38:7, 45:13, 47:22, 50:25, 51:7, 51:8, 54:22, 55:16, 64:3, 68:24, 78:11, 88:3, 91:11, 99:24, 101:16, 103:10, 103:12, 103:22, 106:3, 115:6, 121:24, 124:6, 127:6, 130:14, 136:23, 140:20, 141:20, 143:3, 144:18, 152:20, 155:5, 157:11, 157:24, 160:14, 169:13, 171:8, 178:7, 180:14, 182:7, 188:11, 194:13, 198:3, 200:5, 201:15, 203:25, 209:18, 218:24, 235:17, 241:19, 249:12, 268:24, 290:18, 296:15, 302:8
**meaning** [10] - 39:17, 39:20, 39:21, 57:11, 121:8, 158:14, 179:16, 181:20, 211:16, 238:10
**means** [26] - 27:4, 28:6, 30:19, 32:4, 32:9, 39:13, 63:13, 69:3, 77:2, 77:10, 105:3, 115:7, 141:10, 141:22, 151:4, 155:6, 160:12, 176:17, 177:1, 180:15, 181:14, 183:11, 185:20, 209:19, 211:15, 285:19
**meant** [15] - 38:23, 39:2, 39:4, 40:7, 40:12, 41:13, 43:14, 43:15, 46:9, 46:13, 47:13, 47:24, 51:2, 160:24, 182:3
**media** [178] - 6:16, 6:16, 12:12, 12:19, 13:19, 14:20, 18:6, 18:19, 19:16, 20:13, 26:1, 35:1, 36:24, 37:25, 51:8, 51:16, 51:25, 52:11, 52:15, 52:16, 53:12, 53:20, 53:22, 54:1, 54:6, 54:10, 54:13, 54:16, 54:20, 67:15, 73:3, 81:21, 82:8, 82:18, 82:24, 84:15, 84:21, 87:14, 88:14, 89:2, 90:3, 90:6, 90:11, 95:8, 95:11, 95:12, 95:15, 95:17, 95:18, 95:23, 96:6, 97:5,

Deposition of Bradley Vinson, Volume 1

99:4, 100:2, 100:14, 101:1, 101:9, 102:10, 102:13, 111:10, 111:18, 112:21, 113:21, 113:24, 114:10, 114:14, 114:17, 114:21, 115:11, 117:19, 120:24, 121:10, 121:24, 122:6, 122:9, 122:10, 122:12, 123:5, 124:8, 124:10, 124:20, 124:23, 124:25, 125:3, 125:6, 125:7, 125:17, 126:9, 130:4, 130:15, 130:23, 130:24, 131:4, 131:5, 131:7, 131:9, 131:11, 131:19, 132:7, 133:25, 135:25, 137:7, 137:9, 137:13, 139:6, 139:8, 139:25, 141:17, 143:15, 143:25, 144:10, 144:25, 154:10, 154:12, 154:14, 155:1, 155:6, 157:13, 158:15, 160:21, 162:2, 163:1, 167:24, 170:4, 170:10, 173:10, 173:15, 176:13, 177:1, 177:8, 178:11, 178:15, 181:5, 181:16, 183:22, 184:5, 186:1, 187:8, 187:13, 194:9, 196:7, 203:23, 204:22, 205:22, 205:24, 213:15, 214:25, 215:1, 215:3, 215:6, 215:7, 215:9, 215:13, 216:2, 216:15, 220:25, 229:5, 229:12, 234:15, 235:18, 235:22, 260:15, 262:1, 262:9, 262:10, 263:24, 269:14, 270:2, 278:24, 280:16, 281:5, 288:23, 288:25, 291:14, 291:17, 291:18, 294:21
**Media** [35] - 7:6, 28:23, 79:3, 79:24, 81:7, 81:8, 82:4, 91:14, 99:3, 116:17, 124:2, 124:13, 127:21, 141:20, 167:24, 196:14, 197:1, 201:10, 201:24, 203:25, 211:6, 211:17, 223:9, 247:12, 248:9, 262:2, 280:22, 288:11, 288:12, 288:19, 288:21, 289:9, 303:19, 304:16, 311:4
**Meet** [1] - 107:17
**meet** [8] - 82:17, 86:12, 95:16, 125:21, 215:11, 215:12, 215:14, 262:6
**Meeting** [4] - 5:21, 6:6, 7:4, 63:24

**meeting** [55] - 12:11, 12:19, 54:5, 54:6, 54:8, 59:8, 59:25, 60:3, 60:6, 60:15, 61:15, 62:18, 62:20, 62:25, 63:15, 63:16, 63:25, 65:3, 70:10, 72:5, 72:8, 106:25, 130:23, 131:5, 131:17, 131:25, 134:18, 135:7, 136:9, 137:18, 138:4, 138:23, 139:2, 139:3, 170:2, 171:15, 172:24, 191:3, 208:2, 208:9, 208:10, 220:20, 221:3, 221:6, 223:22, 227:12, 230:7, 237:22, 239:17, 239:23, 248:15, 254:1, 254:3
**meetings** [28] - 71:19, 84:16, 131:6, 131:12, 131:23, 133:23, 134:4, 134:22, 152:16, 152:21, 153:14, 153:19, 170:9, 173:13, 207:25, 208:5, 212:1, 212:12, 220:17, 220:18, 220:19, 230:9, 230:11, 238:12, 238:17, 256:4, 256:8, 257:8
**meets** [1] - 129:14
**Melissa** [1] - 164:14
**member** [29] - 80:18, 216:3, 228:1, 228:4, 228:7, 228:10, 228:12, 228:16, 228:21, 228:22, 228:24, 229:1, 229:3, 229:12, 233:24, 233:25, 236:1, 238:2, 238:3, 238:8, 238:10, 242:7, 251:7, 257:9, 266:13, 266:17, 267:3
**member's** [1] - 251:12
**members** [34] - 61:12, 62:10, 62:19, 67:11, 69:13, 73:19, 73:22, 74:1, 211:23, 212:2, 212:11, 213:7, 213:13, 213:14, 213:24, 218:12, 220:20, 221:16, 222:18, 222:22, 226:22, 227:25, 228:1, 229:4, 229:19, 234:14, 236:10, 236:14, 237:25, 238:16, 251:3, 255:18, 255:25, 256:5
**Members** [3] - 6:10, 69:12, 133:16
**members'** [1] - 256:13
**memorandum** [1] - 244:17
**Memorandum** [1] - 7:11
**memorialized** [1] - 200:9

**memorializes** [1] - 161:9
**memory** [12] - 23:11, 163:9, 164:1, 166:10, 219:14, 260:13, 283:9, 296:12, 302:23, 305:2, 306:20, 306:24
**mention** [2] - 199:24, 251:1
**mentioned** [6] - 23:13, 24:6, 24:20, 36:24, 165:25, 268:22
**met** [9] - 17:15, 18:6, 101:1, 122:18, 134:16, 135:11, 207:23, 220:14, 222:13
**method** [1] - 186:4
**Meyers** [1] - 171:3
**Michelle** [74] - 12:5, 14:18, 18:17, 18:22, 19:4, 24:24, 28:25, 29:2, 39:23, 40:22, 42:11, 45:17, 53:21, 55:12, 58:9, 58:13, 59:14, 61:10, 62:14, 62:23, 67:5, 67:8, 73:15, 74:25, 76:4, 76:15, 99:16, 197:12, 204:19, 208:21, 213:4, 213:8, 217:3, 220:3, 220:20, 222:9, 222:18, 226:5, 231:10, 240:4, 251:4, 259:4, 261:25, 265:20, 271:4, 272:18, 274:10, 276:20, 277:12, 278:19, 280:10, 280:16, 281:22, 283:20, 284:13, 284:14, 286:20, 289:15, 289:22, 293:2, 293:4, 293:8, 293:19, 297:10, 297:24, 298:9, 303:23, 303:24, 304:8, 306:8, 309:5, 310:24, 311:16
**Michelle's** [1] - 199:23
**microphone** [2] - 107:12
**Middle** [2] - 150:21, 182:13
**middle** [50] - 12:18, 30:15, 33:6, 35:9, 35:13, 35:15, 35:25, 36:4, 36:10, 36:15, 54:16, 55:18, 56:1, 56:24, 81:2, 82:18, 85:20, 85:23, 95:17, 101:23, 104:1, 121:14, 137:3, 137:5, 137:9, 137:12, 137:13, 138:15, 139:5, 139:8, 139:11, 139:14, 139:17, 143:13, 150:25, 151:11, 151:14, 151:16, 151:23, 151:25, 152:6, 152:10,

153:3, 156:11, 179:21, 180:20, 213:20, 213:22, 287:13
**might** [36] - 11:2, 11:5, 37:2, 111:11, 114:22, 120:18, 120:22, 121:5, 128:1, 129:16, 130:19, 137:9, 145:4, 155:24, 157:14, 163:19, 165:16, 172:25, 173:11, 174:7, 181:23, 182:1, 187:16, 190:4, 196:6, 199:22, 225:9, 227:17, 247:5, 250:8, 256:24, 260:2, 282:14, 306:10
**mind** [3] - 70:20, 70:22, 115:19
**mine** [2] - 22:11, 189:22
**minor** [5] - 1:5, 1:7, 1:8, 1:10, 299:24
**minors** [13] - 283:1, 283:2, 283:6, 283:14, 283:17, 285:4, 285:17, 285:22, 286:15, 286:18, 286:19, 290:2, 293:11
**minute** [3] - 23:3, 195:7, 227:3
**minutes** [6] - 12:11, 12:18, 43:13, 70:25, 133:22, 170:4
**Minutes** [2] - 6:11, 133:16
**mirrors** [3] - 24:22, 25:15, 25:23
**misleading** [1] - 297:2
**missed** [3] - 15:8, 160:11, 160:20
**misstates** [3] - 47:15, 67:22, 308:3
**mistake** [2] - 50:6, 50:13
**misunderstand** [1] - 122:3
**moment** [17] - 16:9, 75:4, 92:3, 108:7, 120:16, 123:21, 128:20, 129:23, 192:12, 196:17, 223:17, 240:2, 245:4, 249:1, 253:22, 260:4, 260:23
**moms** [1] - 219:21
**Monroe** [2] - 2:16, 4:7
**month** [2] - 143:6, 270:11
**monthly** [2] - 166:18, 215:15
**months** [2] - 86:11, 166:19
**morning** [6] - 9:16, 70:21, 133:19, 147:22, 148:7, 188:16

**most** [10] - 68:14, 82:10, 95:3, 118:4, 152:16, 167:7, 173:5, 232:9, 249:24
**mostly** [1] - 133:23
**Motion** [3] - 7:11, 71:6, 244:14
**motion** [10] - 237:16, 244:17, 245:24, 257:9, 296:2, 296:6, 296:10, 296:19, 296:21
**motivations** [2] - 236:9, 236:13
**move** [5] - 28:14, 94:2, 115:19, 141:18, 164:17
**moved** [6] - 28:12, 29:23, 54:23, 55:1, 55:4, 291:22
**moving** [1] - 154:19
**MR** [109] - 9:15, 13:9, 15:2, 15:21, 16:8, 16:12, 21:18, 22:12, 26:4, 27:9, 44:6, 44:8, 60:25, 62:2, 62:7, 64:19, 64:20, 66:18, 70:18, 70:24, 71:2, 75:19, 79:5, 79:7, 79:9, 94:11, 94:16, 106:22, 107:20, 108:22, 109:1, 129:10, 133:13, 150:7, 150:9, 150:12, 150:16, 150:18, 153:5, 153:8, 153:22, 153:24, 159:23, 165:14, 167:12, 173:24, 174:2, 188:2, 188:5, 189:11, 189:15, 190:2, 190:6, 191:1, 192:22, 193:1, 193:5, 193:7, 195:7, 195:11, 221:24, 222:2, 222:6, 223:5, 223:10, 223:13, 227:2, 227:5, 231:7, 237:2, 245:21, 253:13, 253:15, 258:14, 261:12, 261:15, 262:25, 264:5, 264:8, 266:21, 266:24, 277:3, 277:6, 280:4, 280:7, 282:16, 282:19, 284:5, 284:8, 285:7, 285:10, 285:13, 287:20, 287:23, 291:1, 291:6, 292:20, 292:23, 302:13, 302:16, 308:5, 308:13, 308:16, 309:17, 309:19, 309:23, 309:25, 310:4, 312:24
**MS** [182] - 14:25, 15:3, 16:6, 22:6, 22:7, 22:9, 22:11, 22:21, 23:2, 23:4, 27:7, 27:13, 28:3, 30:13, 30:15, 31:2, 35:24,

37:19, 40:13, 40:19, 41:25, 42:21, 43:4, 44:4, 46:25, 47:15, 53:15, 55:16, 55:23, 60:24, 61:22, 62:6, 64:10, 67:22, 70:17, 71:17, 71:25, 76:9, 78:1, 79:10, 81:6, 82:15, 83:16, 84:19, 85:8, 94:7, 94:13, 94:21, 103:6, 105:1, 106:20, 107:18, 108:20, 108:24, 115:16, 115:23, 120:11, 127:5, 129:9, 133:8, 133:10, 133:12, 135:13, 138:12, 142:19, 147:10, 148:4, 148:20, 149:22, 150:3, 150:5, 150:8, 150:10, 150:14, 150:17, 157:1, 159:21, 165:12, 175:9, 188:3, 189:14, 189:22, 189:23, 189:25, 192:5, 192:18, 192:25, 193:3, 193:6, 193:10, 194:14, 195:8, 200:19, 205:15, 221:25, 222:3, 235:16, 236:5, 236:12, 236:22, 238:4, 238:14, 246:18, 246:24, 247:4, 247:11, 247:24, 256:3, 256:10, 256:17, 256:20, 257:5, 257:19, 257:25, 258:13, 258:15, 261:5, 261:13, 262:23, 263:20, 264:2, 264:17, 264:24, 265:6, 265:17, 266:3, 266:15, 266:19, 266:22, 267:23, 268:4, 268:15, 268:19, 269:3, 269:11, 271:13, 272:17, 274:14, 274:19, 277:4, 280:5, 282:10, 282:15, 282:17, 283:7, 284:6, 285:8, 285:12, 286:12, 286:16, 287:7, 287:22, 290:4, 291:4, 292:7, 292:14, 292:22, 293:16, 294:10, 294:12, 294:13, 295:3, 296:7, 297:6, 297:14, 299:8, 302:11, 302:19, 304:14, 306:1, 306:3, 307:2, 307:8, 307:19, 308:3, 308:8, 308:21, 309:12, 309:18, 309:21, 309:22, 310:3
**MSYA** [2] - 139:4, 146:22
**multiple** [1] - 136:14
**multistep** [1] - 158:24
**must** [4] - 42:4, 50:12, 215:24, 242:15
**MY** [1] - 314:20

## N

**naked** [1] - 125:12
**name** [5] - 9:16, 9:18, 9:20, 20:19, 251:10
**named** [2] - 314:10, 315:10
**Nate** [2] - 181:12, 222:10
**National** [1] - 58:18
**native** [1] - 76:1
**nature** [4] - 84:4, 119:24, 199:22, 216:22
**NCTE** [1] - 58:17
**near** [1] - 144:15
**necessarily** [3] - 108:10, 114:22, 144:3
**necessary** [2] - 214:6, 255:13
**need** [78] - 10:18, 10:20, 19:25, 20:15, 23:19, 36:6, 36:20, 39:25, 43:1, 43:23, 54:2, 64:15, 77:14, 81:23, 86:13, 87:12, 87:22, 88:6, 89:20, 91:2, 102:19, 103:13, 111:4, 114:9, 114:15, 115:3, 120:5, 120:18, 121:21, 124:2, 124:12, 128:19, 130:13, 139:13, 139:15, 140:25, 142:12, 145:9, 147:15, 148:5, 148:21, 148:23, 149:24, 150:3, 151:4, 156:22, 158:8, 165:3, 165:8, 165:16, 168:17, 175:6, 177:24, 180:8, 180:24, 181:4, 192:5, 192:6, 202:6, 207:14, 217:3, 218:9, 219:14, 224:3, 227:9, 229:6, 248:16, 264:3, 264:18, 269:24, 270:10, 278:8, 279:8, 284:16, 287:8, 302:23, 306:9, 307:12
**needed** [10] - 20:2, 20:18, 32:22, 127:25, 151:15, 158:16, 161:4, 162:13, 203:22, 243:3
**needing** [1] - 131:1
**needs** [5] - 23:23, 158:17, 184:5, 198:19, 283:15
**negative** [1] - 117:20
**net** [1] - 126:13
**never** [2] - 115:19, 182:16
**new** [14] - 7:19, 121:19, 166:15, 199:25, 215:22, 246:6, 265:25, 269:20,

271:21, 272:14, 277:20, 277:23, 292:4, 292:5
**New** [3] - 3:15, 7:20
**News** [1] - 7:15
**news** [1] - 154:8
**next** [15] - 49:5, 68:1, 74:3, 86:11, 119:17, 128:7, 136:10, 142:5, 161:25, 170:19, 171:3, 229:24, 243:13, 244:12, 312:3
**Nicole** [2] - 133:11, 276:17
**NICOLE** [2] - 2:14, 316:12
**nine** [1] - 278:15
**ninth** [1] - 101:25
**NO** [2] - 314:20, 317:4
**nobody** [1] - 234:2
**none** [3] - 48:2, 174:24, 302:4
**nonfiction** [5] - 119:25, 155:17, 155:18, 181:25
**nonlibrary** [1] - 77:4
**nonpublic** [2] - 64:12, 75:13
**normal** [2] - 272:12, 312:19
**North** [2] - 2:16, 4:7
**NORTHERN** [2] - 1:1, 316:1
**Northern** [1] - 301:7
**Northview** [1] - 251:10
**NOT** [1] - 317:2
**Notary** [1] - 314:9
**NOTARY** [1] - 314:19
**note** [7] - 45:10, 65:17, 142:7, 142:9, 146:21, 176:10, 210:19
**noted** [4] - 241:14, 281:7, 281:18, 288:9
**notes** [17] - 6:11, 80:9, 98:11, 127:1, 130:2, 133:22, 134:21, 135:1, 135:2, 136:20, 144:7, 144:11, 170:4, 207:14, 287:9, 293:19, 315:13
**notes)** [1] - 133:17
**nothing** [3] - 9:7, 44:18, 63:19
**Notice** [2] - 5:11, 5:13
**notice** [7] - 11:22, 15:24, 16:14, 16:15, 242:11, 259:19, 309:20
**noticed** [1] - 160:7
**notification** [1] - 70:19
**notified** [3] - 268:5, 268:7, 268:8
**notify** [1] - 96:1
**NOVAKOWSKI** [1] - 1:6

**novel** [3] - 31:17, 58:21, 97:2
**novels** [4] - 119:24, 143:6, 143:14, 144:5
**November** [2] - 165:23, 208:9
**nowhere** [1] - 72:4
**nsmith@rumberger. com** [2] - 2:15, 316:12
**nudity** [1] - 274:23
**Number** [12] - 5:23, 13:22, 15:16, 16:4, 16:14, 21:10, 62:13, 76:1, 120:23, 174:6, 215:21, 260:1
**number** [19] - 12:6, 12:13, 12:20, 26:18, 75:25, 77:8, 119:3, 150:15, 154:14, 155:3, 173:2, 186:10, 186:21, 203:5, 204:23, 210:25, 255:8, 291:9, 304:25
**numbers** [2] - 14:22, 64:15
**NW** [2] - 2:7, 3:21

## O

**OATH** [1] - 314:1
**oath** [2] - 10:22, 153:10
**OBERLANDER** [1] - 3:12
**oberlanderl@ ballardspahr.com** [1] - 3:13
**object** [2] - 238:6
**objection** [65] - 23:2, 27:7, 28:3, 31:2, 37:19, 46:25, 47:15, 53:15, 67:22, 71:17, 71:25, 76:9, 85:8, 86:1, 94:7, 103:6, 115:16, 115:23, 120:11, 127:5, 129:9, 129:10, 142:19, 147:10, 148:4, 148:20, 194:14, 218:4, 235:16, 236:5, 236:12, 238:4, 238:14, 246:18, 246:24, 247:4, 247:11, 256:3, 256:20, 257:19, 257:25, 264:17, 264:24, 266:3, 266:15, 266:19, 267:23, 268:15, 269:3, 269:11, 272:17, 274:14, 274:19, 283:7, 286:12, 287:7, 292:7, 292:14, 296:7, 297:6, 297:14, 304:14, 308:3, 308:21, 309:12
**objections** [3] - 16:6, 206:10, 307:20

**objectives** [1] - 218:3
**obligations** [1] - 131:15
**obscenities** [1] - 275:7
**observed** [2] - 206:13, 312:6
**obviously** [2] - 108:22, 252:18
**occasion** [2] - 103:23
**occur** [5] - 104:18, 143:24, 157:9, 157:23, 158:19
**occurred** [6] - 104:13, 104:18, 105:7, 157:18, 158:6, 274:5
**occurring** [1] - 143:24
**October** [21] - 45:16, 45:22, 46:2, 46:16, 47:21, 48:8, 50:11, 50:17, 50:22, 82:19, 130:24, 134:3, 207:9, 269:20, 277:15, 277:18, 279:25, 280:10, 280:12, 280:19, 297:18
**Odom** [2] - 19:10, 73:1
**ODOM** [1] - 4:20
**OF** [10] - 1:1, 1:15, 314:1, 314:3, 314:4, 314:19, 315:1, 315:2, 315:3, 316:1
**off-screen** [2] - 103:23, 129:2
**office** [10] - 87:23, 88:4, 114:20, 155:2, 155:7, 156:4, 172:25, 182:25, 209:2, 247:13
**official** [6] - 71:12, 152:20, 206:8, 207:9, 295:5, 314:13
**often** [1] - 131:15, 187:2
**older** [1] - 187:2
**Oliver** [1] - 300:14
**ON** [2] - 317:2
**once** [6] - 10:18, 28:15, 121:19, 220:10, 222:14, 316:20
**one** [132] - 12:14, 13:4, 13:15, 16:9, 18:23, 23:9, 24:6, 25:22, 25:25, 27:5, 27:10, 27:18, 28:12, 28:14, 30:17, 36:7, 37:25, 38:12, 40:3, 41:1, 41:23, 42:4, 45:15, 46:6, 46:7, 50:8, 51:8, 51:16, 52:4, 52:11, 52:15, 52:16, 53:22, 58:6, 60:18, 63:15, 65:12, 66:6, 66:19, 67:11, 68:13, 70:2, 74:9, 77:7, 79:9, 84:10, 94:22, 94:23, 95:8, 95:11,

96:18, 97:5, 97:9, 97:17, 97:21, 97:23, 109:10, 110:7, 114:24, 114:25, 115:15, 116:18, 121:15, 123:8, 126:24, 129:23, 131:14, 132:22, 133:10, 135:6, 135:13, 135:22, 136:10, 136:17, 138:14, 142:6, 150:12, 156:25, 163:8, 163:18, 165:6, 166:13, 169:10, 172:9, 173:3, 173:11, 176:5, 176:6, 181:24, 182:5, 182:8, 183:20, 188:9, 192:9, 202:1, 208:1, 209:19, 213:7, 216:3, 217:4, 219:19, 223:10, 226:1, 226:2, 227:17, 229:7, 234:4, 236:7, 236:18, 236:19, 238:19, 239:9, 240:10, 240:19, 247:14, 251:1, 252:23, 258:13, 261:21, 269:14, 274:20, 283:14, 290:2, 293:15, 296:1, 299:20, 299:21, 299:22, 303:14

**ones** [24] - 11:25, 58:5, 63:22, 81:24, 83:11, 84:17, 94:24, 111:8, 114:25, 126:20, 127:1, 163:24, 182:2, 230:13, 230:14, 249:16, 259:16, 304:15, 304:17, 304:18, 305:6, 305:14, 306:10

**ongoing** [3] - 23:17, 110:17, 126:17

**online** [4] - 66:16, 207:25, 224:19, 253:17

**open** [4] - 44:25, 71:19, 182:14, 281:18

**opened** [1] - 179:10

**opens** [1] - 254:6

**operate** [1] - 220:16

**operated** [1] - 265:9

**opinion** [2] - 283:8, 300:8

**opinions** [2] - 217:23, 218:22

**opportunity** [3] - 126:23, 214:20, 281:9

**opposed** [5] - 33:11, 38:5, 96:19, 174:8, 186:25

**opt** [13] - 33:6, 55:16, 55:23, 113:9, 146:22, 156:11, 185:1, 210:12, 210:20, 269:21, 274:2, 281:10, 287:10

**opt-in** [9] - 33:6, 55:16, 55:23, 146:22, 156:11,

269:21, 274:2, 281:10, 287:10

**opted** [3] - 180:25, 210:21, 287:14

**options** [1] - 180:4

**orange** [2] - 175:18, 185:14

**Orange** [1] - 4:14

**Order** [2] - 76:14, 132:15

**order** [17] - 18:7, 20:5, 23:19, 23:23, 24:18, 42:12, 59:15, 77:5, 88:21, 100:19, 101:14, 102:5, 130:25, 165:9, 230:11, 272:20, 311:20

**organized** [1] - 74:8

**Ori** [9] - 6:22, 9:16, 150:14, 192:18, 264:2, 302:11, 307:21, 316:19, 316:20

**ORI** [1] - 2:5

**ori.lev@ protectdemocracy.org** [1] - 2:6

**oriented** [3] - 119:21, 120:9, 120:22

**original** [2] - 241:6, 316:19

**originally** [1] - 74:24

**origination** [1] - 53:19

**Orlando** [1] - 4:15

**otherwise** [5] - 17:3, 33:16, 190:16, 300:10, 304:5

**outcome** [2] - 33:11, 315:18

**outcomes** [2] - 92:9, 170:8

**outlined** [2] - 196:6, 199:15

**outlines** [2] - 235:17, 288:6

**outlining** [1] - 288:19

**outside** [21] - 25:8, 78:1, 78:2, 78:3, 116:18, 214:6, 214:10, 236:5, 236:12, 238:1, 238:4, 238:11, 238:16, 255:12, 255:14, 255:22, 256:3, 261:5, 261:6, 270:24, 282:2

**overdue** [1] - 15:11

**own** [6] - 25:8, 178:12, 181:20, 209:17, 209:24, 218:2

**owned** [3] - 82:21, 114:15, 196:8

**owner** [1] - 44:15

**owning** [3] - 15:13, 85:22, 96:22

**owns** [1] - 118:19

---

## P

**P.A** [3] - 2:13, 4:4, 4:11

**p.m** [8] - 1:20, 153:7, 195:10, 227:4, 313:3

**pack** [1] - 61:2

**Packet** [3] - 5:19, 7:9, 254:7

**packet** [17] - 14:18, 60:8, 217:5, 217:8, 220:21, 221:12, 221:21, 222:25, 241:20, 243:6, 243:23, 244:6, 244:7, 248:22, 252:8, 254:2, 254:12

**packets** [15] - 217:4, 217:7, 217:11, 218:15, 218:17, 226:21, 236:19, 240:11, 244:9, 244:10, 247:9, 247:18, 247:23, 253:8, 255:2

**Page** [28] - 109:6, 123:20, 140:15, 182:10, 188:25, 205:18, 209:11, 211:2, 214:3, 215:21, 217:16, 232:19, 232:23, 241:14, 242:3, 242:20, 242:21, 243:13, 246:3, 246:7, 249:16, 250:1, 251:9, 251:14, 252:7, 289:1, 310:14, 310:17

**page** [44] - 10:2, 15:1, 15:6, 15:8, 65:10, 66:11, 66:15, 69:7, 70:13, 70:14, 118:24, 118:25, 119:17, 121:13, 133:15, 134:2, 134:6, 134:11, 141:16, 143:14, 143:18, 161:25, 188:1, 189:19, 189:21, 191:12, 212:14, 214:17, 237:8, 237:13, 239:5, 240:19, 242:13, 244:12, 245:25, 250:15, 251:22, 255:8, 284:10, 285:15, 285:16, 310:13, 311:3, 312:3

**PAGE** [7] - 5:4, 5:10, 6:3, 7:3, 8:3, 317:2, 317:7

**Pages** [2] - 241:20, 249:6

**pages** [7] - 15:8, 128:21, 144:11, 189:24, 192:20, 249:1, 310:8

**pants** [1] - 129:3, 129:11, 129:17

**paper** [2] - 205:14, 246:5

**Paragraph** [14] - 98:21, 99:21, 100:13, 116:2,

130:4, 130:22, 156:9, 157:5, 158:13, 159:10, 161:19, 294:7, 294:15, 294:19

**paragraph** [17] - 119:2, 119:18, 121:14, 123:22, 127:18, 128:7, 154:18, 154:25, 155:11, 157:18, 159:15, 159:16, 161:25, 201:6, 231:15, 294:14

**Paragraphs** [1] - 22:13

**paragraphs** [2] - 109:22, 128:5

**parent** [14] - 35:1, 35:21, 38:16, 185:1, 195:22, 198:23, 206:9, 209:14, 216:3, 228:5, 228:21, 228:25, 233:24, 269:6

**parental** [6] - 34:19, 35:17, 36:5, 55:20, 274:2, 293:8

**parents** [11] - 23:25, 209:23, 210:11, 210:15, 210:17, 210:21, 227:25, 268:5, 268:14, 268:17, 269:8

**parents/guardians** [2] - 213:15, 281:9

**PARKER** [1] - 1:8

**Parnell** [1] - 13:24

**part** [33] - 22:25, 24:1, 24:14, 24:17, 25:1, 26:15, 34:20, 43:3, 67:16, 78:15, 78:17, 78:20, 78:23, 86:4, 94:21, 120:1, 120:8, 125:14, 126:17, 129:6, 129:13, 159:7, 162:12, 162:13, 162:14, 168:16, 168:18, 170:12, 198:13, 230:25, 258:18, 273:14, 296:24

**Part** [3] - 284:24, 286:1, 287:3

**Part-Time** [3] - 284:24, 286:1, 287:3

**particular** [14] - 24:5, 38:19, 53:5, 67:5, 69:9, 135:6, 144:13, 155:20, 160:3, 171:16, 181:5, 203:9, 257:3, 312:2

**parties** [1] - 315:15

**parties'** [1] - 315:16

**parts** [9] - 26:14, 26:16, 26:19, 100:25, 103:19, 125:12, 126:11, 223:25

**party** [2] - 11:11, 129:22

**passage** [3] - 17:23, 42:25, 130:17

**passages** [2] - 128:1,

128:16

**passed** [3] - 28:15, 51:5, 99:15

**pause** [1] - 231:15

**paused** [3] - 227:7, 227:11, 230:14

**PDF** [1] - 65:19

**PEN** [3] - 1:4, 8:10, 316:4

**pen** [1] - 317:3

**penalties** [1] - 317:21

**pendency** [6] - 153:2, 180:16, 210:11, 259:13, 259:25, 260:8

**Pendharkar** [1] - 293:1

**pending** [11] - 10:19, 42:24, 43:16, 46:11, 145:16, 148:2, 216:16, 216:18, 216:21, 300:9, 300:11

**PENGUIN** [1] - 1:7

**Pennsylvania** [3] - 2:7, 3:8, 3:21

**PENSACOLA** [4] - 1:2, 2:1, 2:21, 316:2

**Pensacola** [1] - 1:22

**people** [12] - 93:16, 93:21, 93:23, 101:7, 124:19, 125:7, 125:11, 126:11, 132:1, 136:8, 140:19, 251:16

**people's** [2] - 125:12, 126:11

**per** [3] - 121:10, 140:19, 169:11

**percent** [1] - 111:5

**PEREZ** [1] - 1:9

**performed** [1] - 74:8

**performs** [1] - 81:22

**perhaps** [2] - 178:17, 243:7

**period** [23] - 28:15, 40:21, 46:9, 47:13, 50:22, 52:24, 53:15, 53:17, 57:12, 101:8, 184:20, 195:18, 195:24, 264:12, 265:18, 273:24, 281:25, 287:9, 299:12, 307:12, 307:14, 307:20, 307:25

**periodically** [2] - 121:19, 123:3

**perjury** [1] - 317:21

**Perks** [7] - 7:17, 31:19, 74:4, 74:8, 202:23, 208:2, 244:5

**permissible** [4] - 198:8, 199:4, 199:8, 199:13

**permission** [10] - 34:19, 35:17, 36:5, 38:15, 38:17, 39:5, 55:20,

Deposition of Bradley Vinson, Volume 1

55:25, 269:6, 269:15
**permitted** [1] - 204:6
**person** [4] - 129:20, 209:19, 213:6, 233:21
**person's** [1] - 129:18
**personal** [3] - 74:6, 211:15, 295:9
**personally** [1] - 258:18
**Philadelphia** [1] - 3:8
**philosophy** [3] - 217:22, 218:7, 218:13
**phone** [1] - 175:8
**phrase** [1] - 21:8
**physical** [9] - 55:4, 105:7, 129:18, 155:7, 155:9, 179:6, 181:21, 183:12, 183:23
**physically** [4] - 34:10, 137:23, 197:18, 289:5
**pick** [1] - 186:16
**picking** [1] - 107:13
**picture** [3] - 181:24, 182:2, 301:18
**piece** [2] - 143:23, 150:12
**pieces** [1] - 205:10
**Pine** [2] - 176:25, 177:6
**PLACE** [1] - 1:21
**place** [14] - 80:23, 89:18, 204:9, 218:18, 229:22, 229:23, 258:2, 258:3, 259:22, 260:6, 264:6, 268:23, 273:4, 309:5
**placed** [6] - 31:24, 184:21, 265:19, 277:24, 278:19, 312:9
**placing** [1] - 289:5
**Plaintiff's** [1] - 8:12
**plaintiffs** [2] - 9:17, 303:1
**Plaintiffs** [9] - 1:11, 1:18, 2:3, 3:3, 5:5, 9:12, 21:13, 313:2, 316:5
**Plaintiffs'** [2] - 5:11, 5:13
**plan** [5] - 86:23, 87:17, 87:20, 229:24, 262:7
**planning** [1] - 243:21
**platform** [2] - 56:20, 73:3
**played** [1] - 127:23
**pleasure** [1] - 23:21
**point** [23] - 10:18, 29:23, 38:4, 46:6, 51:7, 84:25, 93:8, 120:15, 124:18, 139:22, 144:14, 147:17, 173:3, 197:11, 265:20, 272:6, 288:18, 291:18, 294:13, 295:1, 300:24, 301:5, 307:23
**pointed** [1] - 188:15
**pointing** [2] - 82:3, 83:16

**points** [1] - 34:5
**pol** [1] - 91:24
**police** [2] - 291:24, 292:11
**policies** [4] - 17:18, 259:22, 260:5, 263:23
**Policy** [23] - 6:20, 6:23, 8:4, 13:11, 17:16, 187:21, 188:17, 189:1, 189:5, 190:8, 194:5, 200:10, 204:10, 205:6, 232:16, 235:6, 248:24, 255:6, 288:2, 294:17, 294:20, 297:3, 310:1
**policy** [109] - 12:23, 13:1, 13:19, 14:3, 17:13, 17:16, 24:10, 25:18, 25:21, 32:10, 32:16, 32:23, 33:11, 34:21, 40:16, 41:16, 47:9, 62:11, 91:13, 91:25, 92:1, 92:3, 92:5, 93:10, 94:8, 101:1, 108:8, 125:15, 152:19, 152:20, 152:21, 186:10, 188:2, 191:7, 191:22, 192:1, 192:2, 192:9, 193:14, 193:16, 194:11, 196:6, 196:9, 196:18, 196:25, 198:10, 199:12, 199:16, 200:13, 200:16, 200:25, 201:2, 201:21, 202:16, 203:8, 203:9, 203:14, 203:21, 204:9, 204:11, 204:14, 204:16, 206:5, 206:7, 206:21, 207:6, 207:10, 208:6, 208:10, 208:11, 208:17, 209:3, 209:6, 210:5, 213:9, 213:12, 215:18, 217:19, 220:24, 233:23, 235:10, 235:21, 254:22, 255:21, 255:23, 258:6, 259:10, 259:11, 260:25, 261:2, 262:3, 265:25, 268:22, 268:23, 270:7, 274:9, 274:11, 274:14, 274:16, 274:19, 278:3, 278:6, 280:21, 281:3, 290:22, 295:5, 312:21
**political** [7] - 234:22, 283:16, 285:22, 286:10, 286:13, 286:21, 290:1
**pool** [1] - 228:16
**pop** [3] - 184:11, 185:5, 185:11
**population** [3] - 35:20, 35:21, 168:20
**pornographic** [4] - 198:17, 292:3, 310:19,

311:8
**pornography** [2] - 293:11, 293:15
**portion** [1] - 126:3
**portray** [1] - 126:4
**position** [12] - 39:8, 53:24, 57:13, 108:14, 197:14, 259:2, 298:6, 298:9, 298:10, 298:13, 298:14, 298:20
**possession** [2] - 137:25, 170:5
**possibility** [1] - 270:19
**possible** [7] - 84:1, 92:9, 123:10, 160:19, 227:13, 281:6, 281:16
**possibly** [7] - 85:23, 88:12, 212:4, 224:2, 287:9, 309:6, 309:16
**post** [2] - 273:21, 273:24
**posted** [3] - 117:1, 200:1, 211:5
**posterity** [1] - 193:10
**posting** [1] - 211:17
**posts** [1] - 154:9
**potential** [6] - 83:24, 123:7, 130:12, 130:14, 198:7, 199:18
**potentially** [4] - 95:25, 140:7, 225:15, 225:16
**practice** [68] - 26:2, 34:17, 34:20, 34:22, 45:12, 47:9, 197:2, 203:12, 204:17, 204:20, 205:12, 209:22, 229:23, 242:24, 250:11, 250:14, 258:8, 258:11, 258:21, 258:24, 261:2, 261:9, 262:17, 265:9, 265:13, 266:2, 266:4, 268:2, 269:12, 269:18, 269:21, 270:13, 270:18, 270:22, 271:1, 271:21, 271:22, 271:25, 272:6, 272:7, 272:14, 272:22, 274:9, 274:12, 274:15, 274:16, 278:6, 279:5, 279:11, 280:25, 293:23, 295:5, 295:7, 297:5, 297:8, 297:22, 298:3, 298:5, 300:7, 300:22, 301:2, 301:4, 310:23, 312:22
**practices** [3] - 259:22, 260:5, 264:6
**pre** [1] - 193:20
**pre-December** [1] - 193:20
**predated** [1] - 75:14
**preferring** [1] - 263:3
**preliminary** [12] -

290:16, 290:19, 295:12, 295:15, 296:2, 296:6, 296:10, 296:19, 296:21, 311:6, 311:22, 311:25
**preparation** [6] - 18:16, 77:25, 78:4, 261:3, 270:5, 290:9
**prepare** [4] - 17:11, 19:9, 19:13, 260:10
**prepared** [2] - 107:15, 134:25
**preparing** [6] - 21:6, 74:13, 77:16, 153:13, 270:23, 303:15
**presence** [2] - 130:12, 130:14
**present** [32] - 13:11, 30:19, 30:21, 31:1, 31:4, 32:5, 32:12, 32:18, 32:21, 51:14, 52:25, 54:7, 54:14, 83:1, 96:20, 100:17, 101:18, 111:15, 126:14, 128:2, 128:16, 131:16, 131:25, 137:3, 151:11, 152:16, 157:14, 173:18, 194:21, 195:13, 200:5, 299:10
**PRESENT** [2] - 2:21, 4:19
**Presentation** [2] - 6:8, 7:6
**presentation** [2] - 108:4, 225:1
**presentations** [1] - 24:25
**presented** [4] - 107:24, 198:20, 215:24, 229:18
**presenting** [1] - 107:10
**preserve** [1] - 308:9
**preservice** [1] - 101:5
**Press** [2] - 7:13, 261:19
**press** [18] - 47:4, 259:7, 262:18, 262:19, 263:2, 263:8, 263:22, 264:10, 264:15, 264:21, 264:25, 265:4, 265:13, 266:1, 268:10, 268:14, 269:10
**presumably** [2] - 166:21, 167:5
**pretend** [1] - 97:2
**pretty** [2] - 97:2, 147:17
**prevent** [1] - 258:3
**previewed** [1] - 303:14
**previous** [1] - 182:17
**previously** [3] - 25:12, 51:20, 224:13

**principals** [3] - 107:25, 261:23, 261:25
**principles** [1] - 206:18
**printed** [6] - 26:18, 41:23, 42:3, 43:6, 79:13, 95:3
**printing** [1] - 150:24
**printout** [4] - 33:23, 66:15, 182:11, 182:12
**prints** [1] - 197:17
**prioritize** [1] - 82:20
**priority** [3] - 230:11, 230:23, 231:3
**Procedure** [2] - 8:4, 288:2
**Procedures** [1] - 232:20
**procedures** [11] - 182:17, 200:13, 201:8, 201:13, 201:16, 201:22, 232:24, 233:14, 263:24, 312:4, 312:6
**proceed** [1] - 308:12
**proceedings** [1] - 9:1
**process** [105] - 23:17, 26:12, 27:23, 40:8, 41:3, 48:22, 49:1, 49:9, 49:12, 49:17, 49:24, 49:25, 53:3, 59:16, 73:18, 74:15, 74:17, 82:18, 84:5, 86:7, 88:5, 89:17, 89:21, 89:23, 90:2, 90:7, 91:15, 93:11, 93:14, 94:6, 94:18, 98:7, 110:17, 113:14, 119:4, 119:11, 119:12, 122:5, 122:16, 123:15, 126:9, 126:17, 139:12, 140:9, 140:12, 140:21, 145:10, 152:17, 153:3, 154:20, 156:9, 156:16, 156:17, 158:5, 158:22, 158:24, 159:2, 159:7, 159:13, 161:4, 161:9, 161:12, 161:13, 161:15, 161:17, 162:5, 162:11, 163:3, 170:12, 180:17, 181:7, 195:13, 196:5, 200:9, 203:14, 203:16, 203:17, 204:12, 206:2, 207:3, 207:5, 208:14, 210:11, 213:5, 214:23, 220:6, 220:10, 220:13, 220:17, 222:15, 231:1, 232:15, 235:24, 255:7, 259:14, 262:4, 262:5, 263:23, 269:25, 279:14, 288:8, 296:24, 302:5, 306:23, 316:17
**Process** [3] - 37:7, 43:12, 45:5

**produce** [1] - 19:23
**produced** [17] - 14:23, 15:15, 64:12, 64:17, 73:6, 73:8, 73:13, 75:24, 75:25, 77:21, 106:24, 107:22, 108:16, 174:5, 192:8, 200:17, 302:25
**producing** [2] - 15:11, 20:1
**professional** [26] - 56:6, 56:22, 56:25, 57:3, 58:4, 82:23, 88:6, 100:16, 100:18, 101:14, 102:4, 102:5, 102:8, 127:20, 130:16, 160:17, 170:17, 170:23, 216:12, 217:23, 218:22, 219:10, 234:16, 234:17, 249:16, 254:23
**Professional** [5] - 58:2, 314:6, 314:8, 315:5, 315:7
**proffer** [1] - 198:23
**program** [2] - 34:7, 36:6
**prohibit** [1] - 245:14
**prohibited** [2] - 198:17, 310:19
**prohibition** [1] - 235:2
**promulgated** [1] - 303:2
**prongs** [1] - 283:14
**properly** [1] - 20:5
**proposal** [3] - 228:9, 229:10, 229:15
**proposed** [1] - 227:24
**Protect** [1] - 2:22
**PROTECT** [2] - 2:4, 3:18
**protect** [1] - 117:22
**protections** [5] - 257:16, 257:23, 258:2, 258:3, 258:5
**provide** [17] - 22:8, 23:19, 24:18, 25:7, 60:20, 88:15, 102:22, 117:5, 142:24, 194:9, 211:24, 212:6, 214:20, 220:4, 220:20, 278:20, 302:9
**provided** [61] - 18:10, 38:15, 59:14, 60:9, 60:12, 73:19, 73:21, 78:8, 100:21, 100:22, 100:23, 102:17, 102:20, 109:3, 109:7, 126:1, 174:21, 196:20, 199:7, 199:13, 199:22, 216:8, 216:10, 216:21, 217:8, 217:15, 218:16, 221:13, 221:20, 225:7, 226:21, 232:8, 234:10, 234:19, 234:20, 234:23, 234:25, 235:4, 236:16, 239:16,

239:23, 240:14, 242:22, 247:8, 247:16, 247:22, 248:2, 248:8, 248:11, 248:22, 249:6, 250:13, 250:23, 251:2, 251:6, 252:11, 254:13, 254:17, 283:1, 304:17, 307:6
**provides** [2] - 36:18, 285:3
**providing** [4] - 116:16, 212:8, 216:23, 242:7
**provision** [1] - 209:18
**pubic** [1] - 129:19
**public** [41] - 26:13, 44:23, 62:4, 65:8, 67:11, 67:12, 72:14, 72:15, 73:23, 73:25, 75:8, 75:10, 75:14, 75:17, 76:23, 78:8, 78:15, 78:17, 78:20, 78:23, 80:16, 80:19, 80:25, 117:16, 166:4, 167:7, 198:7, 199:8, 199:13, 199:18, 211:6, 211:20, 211:23, 212:6, 218:3, 219:24, 220:1, 220:4, 220:6, 220:9, 241:10
**Public** [5] - 98:24, 116:4, 131:7, 195:21, 314:9
**PUBLIC** [1] - 314:19
**publically** [1] - 44:14
**publicly** [5] - 26:10, 117:2, 118:17, 166:13, 166:16
**published** [2] - 201:9, 201:24
**publisher** [3] - 138:24, 138:25, 170:25
**Publisher's** [2] - 56:7, 219:13
**Publishers** [1] - 249:17
**pull** [27] - 60:18, 81:24, 90:17, 95:20, 95:21, 96:21, 102:18, 103:25, 104:4, 104:9, 104:19, 104:21, 120:6, 121:8, 123:24, 124:7, 124:13, 126:5, 130:20, 139:22, 140:2, 161:5, 180:1, 192:16, 228:20, 236:23, 299:19
**pulled** [47] - 20:14, 44:9, 77:13, 79:24, 80:20, 81:18, 82:3, 84:12, 85:14, 86:5, 87:17, 87:21, 90:11, 95:10, 95:12, 95:13, 95:15, 96:18, 96:24, 99:23, 99:25, 104:5, 104:7, 116:9, 120:5, 121:21,

124:16, 124:25, 125:13, 128:11, 128:21, 128:22, 138:9, 145:1, 157:12, 158:21, 161:4, 161:11, 169:22, 170:15, 173:14, 173:16, 179:12, 179:16, 180:1, 192:17, 250:6
**pulling** [4] - 124:18, 124:22, 128:9, 155:1
**pulls** [2] - 96:4, 96:12
**purchased** [1] - 215:22
**purporting** [1] - 281:23
**purpose** [6] - 99:9, 194:5, 194:16, 200:11, 235:18, 281:4
**purposes** [1] - 219:12
**pursuant** [1] - 312:22
**purview** [1] - 283:2
**pushed** [2] - 266:13, 271:10
**put** [18] - 16:9, 46:7, 50:7, 50:13, 57:14, 129:4, 129:12, 136:18, 138:18, 155:23, 165:9, 187:17, 200:4, 229:21, 229:23, 231:15, 240:1, 243:2
**putting** [3] - 23:15, 129:7, 170:11

## Q

**qualified** [1] - 206:12
**quarter** [1] - 304:25
**questions** [16] - 10:3, 16:22, 17:1, 34:5, 195:16, 217:2, 217:4, 217:10, 217:11, 217:15, 221:7, 263:20, 264:5, 294:25, 295:8, 303:14
**quick** [2] - 94:11, 267:18
**quiz** [8] - 34:3, 34:18, 34:23, 35:2, 35:15, 35:20, 36:4
**Quizzes** [1] - 33:25
**quizzes** [11] - 34:2, 34:9, 34:15, 34:16, 35:5, 36:13, 36:19, 49:9, 49:13, 49:14, 49:16
**quote** [1] - 101:13
**quotes** [1] - 244:16
**quoting** [1] - 281:3

## R

**radar** [1] - 15:12
**raise** [2] - 9:3, 206:10
**raised** [1] - 296:6

**ran** [3] - 116:21, 131:24, 174:15
**RANDOM** [1] - 1:7
**range** [3] - 56:9, 56:12, 56:14
**rape** [5] - 104:13, 104:14, 105:6, 105:8, 275:2
**rated** [1] - 128:10
**rather** [4] - 139:7, 155:24, 160:19, 204:25
**rating** [1] - 128:23
**ratings** [1] - 128:13
**Rationale** [1] - 58:17
**Re** [1] - 291:10
**RE** [2] - 316:9, 317:3
**reach** [7] - 67:14, 84:23, 114:22, 132:24, 133:1, 173:13, 212:12
**reached** [9] - 111:16, 129:3, 129:7, 129:11, 129:16, 132:15, 227:14, 227:15, 286:7
**read** [45] - 12:7, 12:13, 34:4, 45:25, 46:15, 46:20, 61:16, 72:17, 82:24, 88:14, 102:19, 103:13, 105:4, 119:20, 127:19, 127:21, 128:16, 128:21, 129:16, 132:7, 132:9, 135:4, 136:1, 140:25, 141:11, 141:14, 160:18, 174:8, 182:1, 185:2, 197:21, 199:3, 201:11, 221:4, 221:17, 245:4, 255:18, 256:1, 256:6, 280:19, 281:13, 286:2, 294:23, 317:22
**reader** [1] - 182:3
**readers** [3] - 24:19, 25:7, 87:10
**readers'** [1] - 23:8
**reading** [21] - 23:21, 34:6, 88:12, 128:25, 135:23, 140:18, 140:24, 141:9, 173:17, 178:18, 198:16, 209:15, 256:14, 259:23, 260:2, 260:3, 260:6, 281:2, 303:18, 316:16, 316:17
**reads** [1] - 246:9
**ready** [1] - 124:3
**Ready** [1] - 222:11
**realized** [2] - 20:14, 181:10
**really** [12] - 17:6, 18:23, 52:13, 70:3, 85:1, 152:3, 162:23, 170:12, 219:4, 243:7, 253:3, 253:4
**Realtime** [5] - 1:25,

314:6, 314:8, 315:5, 315:7
**REASON** [1] - 317:7
**reason** [24] - 11:5, 40:1, 72:25, 106:11, 185:16, 185:21, 185:23, 186:1, 186:2, 186:16, 187:9, 192:9, 231:21, 273:2, 285:1, 303:5, 303:8, 303:10, 307:4, 307:6, 308:19, 308:22, 308:25
**Reason** [1] - 77:10
**reasonable** [1] - 230:8
**reasons** [8] - 128:23, 186:10, 235:20, 272:18, 273:4, 309:8, 309:9, 309:15
**Reasons** [1] - 284:19
**receipt** [2] - 57:14, 57:17
**receive** [8] - 40:21, 69:3, 86:1, 156:4, 182:24, 223:1, 248:5, 259:4
**received** [26] - 22:22, 27:17, 27:22, 55:20, 57:11, 59:19, 68:25, 78:25, 111:11, 117:19, 144:19, 146:1, 155:9, 161:21, 162:16, 183:4, 197:19, 204:23, 223:1, 255:2, 270:2, 279:8, 280:15, 299:11, 299:21, 303:12
**receiving** [9] - 38:11, 47:8, 196:10, 204:20, 229:19, 260:14, 262:8, 279:24, 299:1
**recent** [10] - 82:10, 94:24, 95:4, 118:4, 167:7, 173:5, 185:24, 244:24, 248:14, 249:25
**recently** [3] - 18:18, 34:22, 185:22
**Recess** [6] - 44:7, 71:1, 94:14, 153:7, 195:10, 227:4
**recessed** [1] - 313:3
**recognize** [6] - 25:11, 26:6, 79:11, 94:20, 154:3, 167:14
**recognized** [2] - 25:12, 29:6
**recollection** [9] - 76:8, 193:13, 200:8, 278:2, 278:5, 279:4, 285:2, 293:22, 296:16
**recommend** [2] - 84:20, 277:23
**recommendation** [3] - 138:18, 138:19, 278:9
**recommendations** [7] -

Deposition of Bradley Vinson, Volume 1

56:19, 58:20, 136:19, 143:2, 170:20, 170:24, 278:15
**Recommended** [3] - 136:22, 141:18, 169:20
**recommended** [15] - 56:9, 56:12, 56:14, 56:17, 57:1, 57:2, 102:1, 137:4, 137:10, 138:21, 138:24, 143:5, 146:22, 170:17, 171:25
**recommending** [1] - 156:1
**Reconsideration** [7] - 5:24, 8:4, 79:15, 232:20, 241:5, 280:21, 288:1
**reconsideration** [5] - 161:22, 200:15, 262:4, 264:1, 280:23
**Reconsiderations** [36] - 5:17, 26:9, 44:13, 69:22, 77:18, 77:24, 78:4, 78:9, 79:20, 112:4, 112:14, 112:24, 113:17, 114:5, 114:24, 144:20, 147:23, 148:8, 151:8, 164:5, 168:14, 168:21, 202:5, 202:7, 202:11, 202:17, 203:1, 207:16, 211:9, 211:12, 214:14, 221:14, 237:4, 251:20, 253:18, 299:17
**reconsiderations** [7] - 27:1, 163:12, 163:15, 238:22, 239:1, 260:22, 312:5
**reconstituted** [1] - 227:20
**reconvene** [1] - 221:7
**record** [72] - 9:19, 10:7, 13:20, 44:4, 61:22, 63:4, 70:24, 71:12, 72:7, 165:10, 186:1, 190:5, 191:2, 192:19, 223:10, 223:12, 236:25, 253:14, 282:18, 302:14, 308:9, 315:12
**recorded** [1] - 71:19
**recording** [1] - 48:13
**records** [3] - 62:23, 65:5, 237:16
**recruited** [1] - 213:25
**redline** [2] - 188:21, 192:10
**redlined** [7] - 13:15, 14:4, 188:2, 188:18, 195:2, 210:3, 310:1
**redlines** [1] - 232:17
**reevaluation** [1] - 144:14
**refer** [29] - 24:11, 41:21,

43:23, 54:11, 56:6, 79:5, 81:23, 83:22, 91:25, 92:3, 92:11, 94:8, 102:9, 130:11, 159:16, 163:25, 175:6, 177:19, 177:24, 191:25, 197:23, 207:14, 212:18, 215:19, 217:3, 218:10, 264:3, 296:11, 299:14
**reference** [15] - 103:19, 104:12, 109:7, 116:3, 118:21, 131:2, 142:12, 142:18, 157:18, 294:21, 301:23, 304:23, 304:24, 305:2, 306:9
**referenced** [6] - 29:20, 108:21, 126:7, 262:18, 297:3, 316:15
**references** [3] - 158:9, 234:16, 274:13
**referencing** [1] - 262:19
**referred** [2] - 232:6, 271:19, 274:4
**referring** [28] - 17:21, 18:5, 21:9, 27:8, 43:2, 116:7, 120:16, 120:20, 124:24, 142:9, 142:11, 143:19, 143:22, 156:21, 158:21, 159:10, 212:23, 217:5, 234:16, 244:20, 244:24, 256:22, 267:22, 271:16, 278:16, 278:23, 292:8, 296:9
**refining** [1] - 263:23
**reflect** [13] - 13:20, 37:7, 38:5, 71:15, 82:16, 117:24, 151:1, 170:9, 171:13, 176:9, 194:11, 194:17, 306:22
**reflected** [9] - 37:16, 41:7, 41:9, 72:3, 72:5, 82:1, 168:12, 173:20, 214:14
**reflecting** [3] - 72:9, 140:22, 241:18
**reflection** [3] - 24:13, 30:23, 166:25
**reflective** [2] - 69:7, 280:24
**reflects** [13] - 25:22, 31:8, 31:10, 71:4, 71:20, 71:22, 85:5, 118:18, 168:2, 170:8, 171:14, 175:23, 251:11
**refresh** [13] - 76:8, 164:1, 166:10, 219:14, 260:13, 278:2, 278:5, 279:4, 283:9, 293:22, 296:12, 296:16, 302:23
**refreshed** [1] - 285:2

**regard** [1] - 51:4
**regarding** [26] - 61:11, 71:16, 93:22, 93:24, 154:9, 154:23, 159:5, 211:5, 211:18, 234:6, 237:21, 238:16, 248:2, 256:13, 258:9, 258:10, 259:5, 259:23, 260:6, 260:18, 280:21, 290:10, 290:17, 294:2, 309:6, 311:18
**regards** [4] - 83:1, 225:15, 288:8, 301:6
**Registered** [2] - 314:5, 315:4
**regular** [8] - 10:17, 98:1, 98:3, 116:14, 133:25, 137:21, 181:2, 185:24
**Regular** [1] - 181:1
**regularly** [1] - 23:22
**regulate** [1] - 246:16
**regulates** [1] - 246:9
**reinforced** [1] - 102:4
**reinforcing** [2] - 100:18, 101:13
**reinstate** [1] - 211:21
**reiterated** [1] - 101:17
**related** [16] - 13:18, 14:6, 14:19, 18:13, 27:24, 47:7, 58:23, 67:5, 154:12, 205:24, 253:5, 259:3, 297:1, 301:7, 315:14, 315:16
**relation** [5] - 12:25, 65:3, 117:20, 191:6, 294:2
**release** [20] - 47:4, 142:2, 145:14, 146:11, 179:8, 259:7, 262:18, 262:20, 263:2, 263:8, 263:22, 264:10, 264:15, 264:21, 264:25, 265:4, 265:13, 266:1, 268:10, 269:10
**Release** [3] - 7:13, 7:15, 261:19
**released** [9] - 136:23, 145:24, 156:10, 157:4, 157:21, 162:9, 168:19, 178:25, 179:4
**releases** [1] - 268:14
**relevance** [1] - 53:25
**relevant** [15] - 11:24, 17:14, 27:20, 54:6, 100:25, 105:4, 111:18, 123:5, 144:22, 219:4, 220:24, 242:17, 242:25, 243:15, 302:8
**relieve** [2] - 122:6, 204:21
**rely** [1] - 69:6

**relying** [1] - 130:16
**remain** [18] - 45:23, 46:3, 46:18, 46:21, 47:18, 48:17, 48:22, 49:2, 148:18, 177:3, 179:14, 210:10, 210:13, 259:12, 281:15, 281:17, 298:3, 311:9
**remained** [6] - 148:25, 157:8, 157:22, 158:18, 292:17, 298:5
**remains** [1] - 179:1
**remember** [15] - 16:19, 25:3, 29:12, 101:3, 148:10, 160:8, 177:17, 202:1, 245:13, 249:12, 262:12, 290:23, 296:17, 296:20, 302:22
**remind** [3] - 153:9, 180:9, 249:13
**removal** [2] - 92:18, 92:20
**removals** [1] - 236:10
**remove** [10] - 35:3, 38:9, 54:20, 89:8, 90:24, 92:14, 93:1, 94:4, 236:2, 257:12
**Removed** [2] - 5:15, 33:24
**removed** [21] - 32:3, 32:4, 32:21, 32:23, 33:25, 34:1, 34:2, 34:9, 34:15, 35:19, 36:12, 36:22, 48:12, 49:9, 49:13, 90:20, 90:21, 90:22, 90:23, 92:10, 161:23
**removing** [2] - 36:19, 186:3
**Renaissance** [1] - 36:18
**reopened** [1] - 100:8
**repeat** [18] - 28:4, 32:14, 34:12, 35:23, 39:1, 40:14, 71:20, 87:7, 112:6, 115:18, 145:17, 146:14, 148:5, 216:19, 235:9, 249:24, 257:20, 300:25
**rephrase** [3] - 25:20, 93:20, 257:20
**replace** [1] - 187:2
**replaced** [1] - 187:1
**report** [31] - 20:1, 20:14, 81:17, 81:24, 82:11, 90:17, 96:4, 96:9, 96:11, 96:12, 96:14, 96:17, 96:21, 97:8, 97:14, 97:22, 97:25, 109:20, 115:21, 115:22, 116:4, 116:6, 116:20, 116:21,

117:15, 117:24, 155:4, 166:25, 174:15, 175:3, 315:9
**Reporter** [7] - 2:23, 314:6, 314:8, 315:5, 315:8
**REPORTER** [4] - 9:3, 9:9, 314:1, 315:1
**reporter** [4] - 10:6, 293:2, 297:11, 297:13
**Reporting** [4] - 1:21, 314:7, 315:6, 316:25
**reporting** [2] - 116:24, 243:22
**reports** [2] - 116:13, 117:1
**represent** [8] - 24:18, 27:12, 30:11, 30:14, 61:9, 74:5, 126:4, 170:15
**representation** [2] - 121:5, 228:25
**representative** [11] - 16:23, 17:2, 36:18, 41:1, 42:14, 216:4, 224:20, 228:2, 229:3, 229:11, 240:13
**representatives** [2] - 119:5, 119:7
**representing** [1] - 61:24
**represents** [3] - 57:7, 81:12, 193:8
**reputable** [3] - 217:25, 219:7, 219:11
**Request** [2] - 7:16, 241:5
**request** [3] - 161:21, 224:21, 268:1
**requested** [3] - 269:12, 269:17, 315:11
**require** [1] - 132:9
**required** [14] - 10:23, 13:18, 38:9, 42:9, 42:18, 42:19, 42:23, 157:7, 157:19, 194:8, 215:12, 221:16, 233:13, 243:21
**requirement** [8] - 132:6, 196:19, 197:20, 198:4, 255:17, 255:20, 255:22, 255:24
**requirements** [5] - 90:5, 143:17, 143:21, 154:21, 262:7
**requires** [5] - 99:3, 283:1, 285:3, 288:11, 293:8
**requiring** [1] - 99:8
**requisite** [1] - 263:19
**reread** [1] - 159:15
**rescinded** [1] - 297:22
**research** [2] - 77:21,

264:19
**reserves** [2] - 214:5, 255:12
**resident** [4] - 195:22, 198:23, 206:9, 209:14
**resolved** [16] - 26:17, 27:18, 27:21, 28:6, 29:3, 29:4, 29:10, 29:24, 29:25, 31:6, 33:14, 40:18, 41:16, 59:21, 63:8, 64:2
**resources** [4] - 206:11, 206:12, 206:14, 209:16
**respect** [18] - 71:5, 71:23, 85:25, 110:22, 122:21, 152:22, 201:5, 204:13, 216:9, 240:15, 244:2, 247:8, 260:11, 264:21, 265:14, 272:15, 293:24, 303:3
**respond** [1] - 221:8
**responded** [1] - 297:10
**responding** [5] - 256:12, 268:1, 293:5, 307:3, 308:11
**responds** [2] - 161:2, 293:9
**Response** [2] - 8:10, 8:11
**response** [6] - 15:16, 98:23, 174:6, 278:11, 303:1, 303:12
**responses** [6] - 20:23, 54:25, 252:2, 307:21, 308:4, 308:10
**Responses** [1] - 67:1
**responsibilities** [3] - 98:4, 177:9, 205:24
**Responsibilities** [1] - 288:10
**responsibility** [4] - 20:13, 52:22, 204:2, 213:11
**responsible** [3] - 202:21, 213:9, 289:1
**responsive** [1] - 21:10
**rest** [5] - 63:7, 138:22, 164:21, 189:4, 248:22
**restating** [1] - 283:10
**restrict** [25] - 39:10, 41:5, 41:8, 148:2, 151:15, 152:11, 152:14, 234:1, 236:2, 248:16, 266:7, 270:13, 272:20, 274:17, 279:11, 280:25, 283:22, 300:15, 305:15, 305:21, 306:13, 306:16, 306:23, 308:1, 311:11
**restricted** [209] - 31:15, 31:19, 31:21, 31:23,

34:1, 34:8, 34:13, 35:13, 35:16, 35:25, 36:10, 36:12, 36:15, 37:13, 37:17, 37:22, 38:13, 38:14, 38:17, 38:19, 38:24, 39:5, 39:6, 39:9, 39:14, 39:23, 39:24, 40:1, 40:10, 40:17, 40:20, 40:23, 41:3, 42:8, 42:24, 43:14, 43:16, 45:23, 45:24, 46:2, 46:3, 46:10, 46:12, 46:17, 46:18, 46:21, 46:23, 47:6, 47:14, 47:18, 47:22, 47:25, 48:16, 48:17, 48:21, 48:22, 49:1, 49:2, 49:8, 49:12, 49:16, 49:25, 51:3, 51:21, 52:12, 53:14, 53:23, 54:21, 55:1, 81:19, 97:12, 97:17, 106:6, 108:9, 108:11, 111:3, 111:22, 112:4, 112:18, 112:20, 112:24, 113:18, 113:24, 115:15, 118:13, 123:8, 125:5, 126:20, 146:5, 147:15, 147:24, 148:9, 148:18, 148:25, 149:21, 151:25, 164:12, 169:10, 173:4, 182:16, 184:8, 184:22, 185:1, 185:4, 210:23, 234:3, 258:25, 259:8, 259:9, 259:16, 259:24, 260:7, 260:13, 260:19, 260:21, 261:8, 262:3, 263:9, 263:11, 263:13, 264:11, 264:16, 265:20, 265:24, 268:7, 268:9, 268:25, 269:2, 269:13, 269:22, 270:8, 270:18, 272:8, 272:16, 272:23, 272:24, 273:2, 274:12, 274:23, 275:2, 275:8, 275:12, 275:16, 275:24, 276:2, 276:7, 276:10, 277:24, 278:25, 279:2, 279:10, 279:13, 280:22, 281:4, 281:25, 284:16, 284:17, 287:3, 288:7, 289:3, 289:6, 289:17, 290:7, 290:12, 290:13, 292:2, 292:12, 292:17, 293:7, 293:11, 293:21, 293:24, 293:25, 295:19, 295:20, 296:3, 296:18, 297:11, 297:19, 298:1, 299:2, 299:6, 300:3, 300:17, 301:19, 303:3, 303:5, 303:6, 303:7, 303:18, 305:7, 305:10,

305:11, 306:10, 307:5, 307:7, 307:15, 307:23, 307:25, 308:20, 309:1, 309:4, 310:20, 312:15, 312:18
**Restricted** [28] - 5:14, 6:8, 31:13, 33:24, 37:6, 43:11, 45:3, 45:4, 45:18, 55:17, 111:1, 115:1, 127:3, 127:8, 127:12, 147:24, 148:9, 168:13, 168:21, 182:6, 182:9, 183:10, 281:5, 281:8, 281:11, 281:19, 288:9, 312:8
**restricting** [21] - 41:14, 153:2, 258:22, 261:2, 262:17, 268:2, 268:23, 271:1, 272:1, 273:6, 278:3, 278:6, 279:5, 287:16, 290:22, 295:17, 297:22, 300:22, 301:2, 309:6, 309:9
**restriction** [14] - 46:11, 173:9, 184:21, 185:8, 269:23, 273:19, 273:20, 274:1, 274:6, 286:8, 297:4, 303:23, 305:18, 312:22
**restrictions** [2] - 37:16, 236:11
**result** [3] - 51:23, 90:25, 91:1
**results** [1] - 171:12
**resume** [1] - 84:4
**resumed** [1] - 220:11
**retain** [2] - 257:10, 311:4
**retained** [9] - 32:8, 32:9, 32:15, 33:5, 33:7, 33:10, 33:19, 34:11, 221:11
**return** [9] - 83:4, 87:24, 89:6, 89:9, 124:9, 135:14, 139:17, 143:14, 168:7
**returned** [19] - 81:6, 82:15, 83:11, 83:15, 84:18, 89:12, 89:13, 92:25, 100:10, 138:15, 139:10, 157:1, 161:11, 162:3, 163:2, 163:7, 163:21, 163:23, 168:10
**returning** [1] - 85:13
**reverted** [1] - 299:5
**Review** [48] - 5:18, 6:4, 7:4, 7:17, 27:19, 28:2, 28:8, 29:9, 37:7, 43:12, 45:5, 59:15, 59:18, 62:22, 63:14, 64:13, 77:6, 80:2, 84:7, 84:10, 85:3, 85:7, 89:14, 91:7,

91:18, 93:9, 140:10, 141:19, 155:14, 206:24, 207:1, 207:12, 212:16, 214:5, 217:7, 222:12, 227:6, 229:25, 231:22, 233:2, 233:20, 240:23, 241:2, 242:1, 253:24, 254:14, 254:19, 286:4
**review** [176] - 7:23, 12:4, 18:8, 18:13, 18:21, 18:25, 27:23, 29:6, 42:24, 48:22, 49:1, 49:8, 49:12, 49:17, 49:24, 49:25, 51:11, 51:15, 51:23, 52:21, 54:2, 56:10, 58:7, 68:19, 79:24, 80:16, 80:20, 81:22, 82:4, 82:23, 83:5, 83:8, 83:19, 84:5, 84:6, 84:12, 84:20, 85:4, 85:15, 86:5, 86:14, 86:15, 86:21, 87:1, 87:6, 87:9, 87:13, 87:17, 87:21, 90:11, 90:15, 91:1, 92:8, 92:12, 92:16, 93:2, 93:25, 94:2, 94:18, 95:10, 95:21, 96:24, 98:25, 99:2, 99:8, 99:16, 99:19, 99:23, 99:25, 100:16, 103:25, 104:5, 104:7, 104:9, 104:10, 108:5, 108:6, 110:5, 110:18, 111:4, 114:9, 115:3, 115:13, 122:11, 123:25, 124:21, 124:22, 125:5, 125:9, 125:23, 126:5, 126:12, 126:18, 127:24, 128:12, 130:13, 131:1, 131:17, 133:2, 136:13, 139:20, 140:4, 140:13, 141:18, 141:21, 141:22, 142:3, 143:15, 144:5, 145:20, 147:1, 149:9, 149:13, 151:4, 154:19, 155:2, 156:13, 156:22, 156:24, 157:8, 157:9, 157:23, 158:4, 158:19, 158:20, 158:21, 158:22, 159:2, 159:12, 159:13, 160:16, 161:6, 161:9, 161:13, 164:20, 164:25, 169:16, 169:18, 169:23, 178:5, 179:12, 180:17, 202:19, 202:21, 203:1, 205:2, 210:11, 210:13, 216:12, 223:17, 230:15, 230:17, 230:19, 230:24, 230:25, 231:1, 231:4, 259:25, 260:8, 260:18, 262:5, 270:4, 277:24, 279:22, 280:1,

282:4, 290:9, 290:13, 290:15, 293:12, 300:10, 300:11, 307:9, 315:10, 316:15
**reviewed** [38] - 17:13, 17:18, 18:2, 18:15, 18:17, 81:1, 95:20, 100:10, 110:23, 111:8, 111:10, 111:25, 112:2, 112:7, 112:25, 113:19, 113:22, 113:25, 115:9, 125:15, 138:6, 138:8, 145:12, 152:8, 156:2, 161:11, 167:24, 176:11, 176:14, 177:2, 177:12, 177:13, 179:17, 181:8, 260:25, 267:17, 279:12, 281:12
**Reviewed** [3] - 81:8, 176:12, 176:24
**reviewer** [1] - 57:3
**reviewing** [18] - 19:22, 58:7, 59:16, 72:5, 84:13, 95:24, 110:2, 125:17, 126:9, 155:23, 159:3, 170:10, 181:6, 208:8, 233:8, 263:25, 282:23, 286:23
**reviews** [45] - 6:16, 17:15, 56:6, 56:22, 56:25, 58:4, 58:10, 58:11, 58:14, 82:23, 87:23, 88:7, 88:12, 100:18, 101:14, 102:4, 102:5, 102:8, 105:17, 127:20, 130:17, 149:17, 157:17, 160:17, 170:18, 170:24, 179:15, 216:13, 217:24, 219:7, 219:8, 219:10, 219:11, 233:6, 233:15, 234:16, 234:17, 249:10, 249:16, 250:2, 250:5, 250:12, 252:15, 254:23, 311:19
**Reviews** [2] - 56:8, 58:2
**revised** [2] - 190:17, 191:14
**Revised** [3] - 5:11, 6:21, 6:24
**revision** [1] - 190:20
**revisit** [1] - 110:15
**rhyme** [1] - 273:1
**Robert's** [1] - 132:14
**role** [6] - 28:23, 99:1, 127:23, 297:17, 300:16, 300:20
**Roles** [1] - 288:10
**roles** [1] - 228:4
**rough** [2] - 29:21, 304:24
**roughly** [2] - 86:10,

304:21
**row** [1] - 109:12
**RPR** [4] - 1:24, 314:18, 315:22, 316:24
**rule** [4] - 14:5, 191:7, 243:19, 299:5
**Rule** [1] - 5:11
**Rules** [1] - 132:14
**rules** [1] - 254:22
**RUMBERGER** [3] - 2:13, 4:4, 4:11
**Rumberger** [1] - 4:21
**Rumble** [1] - 278:13
**run** [13] - 74:8, 96:4, 96:10, 96:11, 97:8, 97:25, 98:2, 117:14, 117:15, 117:24, 123:15, 152:15, 166:25
**running** [3] - 116:13, 152:17, 174:13
**runs** [2] - 56:20, 97:22

## S

**SAMANTHA** [1] - 4:12
**SARAH** [1] - 1:4
**Sarah** [1] - 136:21
**SATTERWHITE** [1] - 1:9
**save** [2] - 29:17, 92:4
**Save** [1] - 142:5
**saves** [1] - 22:19
**saw** [3] - 46:5, 182:20, 280:15
**scanning** [1] - 181:10
**school** [197] - 12:12, 12:19, 13:18, 16:2, 16:21, 16:23, 17:2, 17:7, 18:7, 19:10, 23:20, 26:24, 30:15, 30:16, 30:25, 31:3, 32:6, 32:7, 33:3, 33:6, 35:6, 35:13, 35:14, 35:15, 36:4, 36:10, 36:11, 36:15, 36:16, 37:2, 41:1, 42:15, 54:4, 54:16, 56:2, 61:6, 62:4, 69:13, 72:16, 74:7, 74:12, 74:14, 74:17, 76:18, 82:15, 82:17, 82:18, 83:16, 84:16, 84:19, 95:13, 95:17, 95:18, 96:7, 96:22, 97:8, 97:9, 97:17, 97:23, 97:24, 99:7, 100:6, 100:8, 102:2, 103:25, 104:1, 117:17, 118:19, 118:20, 119:6, 120:23, 131:5, 131:9, 131:11, 131:19, 133:25, 134:16,

134:23, 135:14, 136:22, 136:24, 137:3, 137:4, 137:5, 137:7, 137:9, 137:10, 137:13, 137:20, 138:15, 138:16, 138:21, 139:6, 139:8, 140:1, 145:14, 145:15, 145:22, 145:24, 146:10, 146:21, 146:22, 146:25, 147:8, 149:6, 149:7, 149:19, 149:20, 151:1, 151:11, 151:14, 151:16, 151:23, 151:25, 152:6, 152:10, 154:16, 155:13, 156:11, 169:14, 176:4, 177:1, 179:22, 180:20, 181:18, 181:19, 181:20, 192:8, 194:11, 194:17, 194:19, 194:20, 196:8, 196:20, 198:15, 198:24, 199:19, 200:4, 201:8, 202:18, 202:19, 202:25, 203:23, 203:24, 205:2, 205:8, 206:10, 208:18, 208:19, 212:1, 212:11, 213:14, 213:20, 213:21, 213:22, 214:18, 214:19, 216:5, 216:6, 217:22, 217:25, 218:7, 218:13, 220:24, 229:6, 229:17, 230:3, 246:20, 250:16, 250:19, 250:23, 251:3, 251:10, 252:1, 262:2, 262:6, 264:20, 265:2, 265:8, 267:3, 268:13, 268:21, 281:4, 284:11, 284:17, 287:4, 295:1, 297:21
**SCHOOL** [2] - 1:12, 316:7
**School** [32] - 1:15, 4:20, 5:12, 9:11, 25:14, 56:7, 66:25, 72:15, 73:24, 74:3, 131:7, 150:20, 150:21, 167:20, 167:21, 175:24, 176:6, 176:25, 177:6, 182:13, 183:18, 195:21, 206:17, 219:13, 231:17, 231:24, 232:25, 240:21, 249:18, 316:9, 317:3, 317:5
**school's** [2] - 215:25, 216:2
**schoolers** [2] - 287:13
**schools** [48] - 30:25, 33:1, 33:6, 34:6, 35:9, 35:10, 36:1, 55:18, 67:16, 85:15, 85:20, 85:22, 85:23, 96:23, 96:25, 97:3, 97:5, 97:12, 123:1, 123:3, 137:12,

137:19, 139:6, 139:11, 139:14, 142:3, 146:11, 153:4, 156:12, 166:1, 179:21, 181:21, 205:1, 213:16, 214:25, 215:3, 218:2, 250:24, 278:22, 287:6, 287:16, 293:21, 297:12, 300:23, 301:3
**Schools** [2] - 98:24, 116:4
**science** [1] - 230:1
**sciences** [1] - 22:23
**scientific** [6] - 234:22, 283:16, 285:22, 286:11, 286:22, 290:2
**scope** [19] - 99:13, 123:7, 236:5, 236:12, 238:5, 238:14, 256:3, 256:10, 256:17, 257:5, 257:19, 258:13, 266:15, 267:23, 268:4, 268:15, 268:19, 276:18, 292:14
**SCOTT** [1] - 1:9
**screen** [2] - 103:23, 129:2
**script** [1] - 220:23
**scrutiny** [2] - 154:13, 154:14
**sduke@rumberger. com** [1] - 4:13
**Seabold** [1] - 140:17
**seal** [1] - 314:13
**SEAN** [1] - 1:7
**search** [3] - 76:12, 97:14, 174:14
**Second** [1] - 7:11
**second** [26] - 10:8, 26:16, 60:14, 61:15, 62:2, 62:20, 63:16, 63:25, 65:25, 66:6, 68:15, 68:16, 134:2, 154:18, 171:2, 182:8, 221:6, 223:11, 231:14, 251:25, 257:13, 264:1, 284:10, 285:16, 310:9
**section** [22] - 38:12, 38:14, 119:20, 133:4, 150:6, 179:8, 179:11, 179:17, 179:18, 182:4, 205:23, 233:5, 233:9, 233:11, 242:17, 272:9, 284:17, 289:6, 293:7, 294:20
**Section** [24] - 194:22, 198:11, 199:10, 205:13, 205:20, 209:9, 210:7, 211:4, 212:15, 214:3, 217:17, 232:19, 233:6, 239:7, 255:7, 281:5, 281:7, 281:11, 281:17,

281:23, 285:14, 287:3, 310:12
**sections** [2] - 53:14, 139:11
**see** [141] - 11:19, 14:3, 19:1, 26:21, 31:12, 35:19, 44:19, 44:23, 45:7, 49:4, 49:18, 50:6, 53:1, 53:5, 58:22, 59:9, 60:3, 61:18, 66:9, 67:1, 68:12, 68:14, 68:20, 76:12, 80:9, 80:18, 80:19, 86:4, 96:22, 96:23, 97:9, 97:23, 110:3, 114:10, 114:15, 114:21, 121:16, 121:22, 124:4, 125:1, 125:18, 127:1, 128:1, 128:22, 129:23, 130:19, 131:18, 135:11, 135:20, 136:12, 136:15, 138:11, 138:20, 139:13, 139:24, 141:2, 141:8, 141:17, 142:1, 142:15, 143:13, 150:19, 150:22, 156:14, 156:22, 157:2, 163:8, 163:23, 163:24, 167:1, 168:15, 169:20, 172:18, 173:20, 175:2, 176:17, 179:15, 180:11, 182:15, 183:2, 183:13, 183:25, 187:15, 188:23, 192:10, 205:10, 205:23, 207:25, 210:3, 211:23, 212:5, 214:8, 217:4, 217:16, 221:24, 224:12, 224:16, 232:21, 233:3, 236:21, 237:12, 241:15, 241:17, 244:7, 244:18, 245:18, 245:25, 246:13, 246:19, 250:4, 250:18, 251:9, 251:24, 252:3, 252:7, 254:11, 255:20, 259:16, 260:16, 261:24, 266:21, 267:11, 267:13, 277:14, 277:17, 280:1, 280:4, 284:5, 284:15, 285:7, 285:19, 288:25, 289:13, 300:5, 303:13, 304:22, 305:5, 306:10, 306:21, 310:7
**See** [1] - 183:17
**seeing** [6] - 16:19, 76:3, 76:13, 160:3, 202:1, 261:21
**seeks** [1] - 25:14
**seem** [2] - 182:19, 224:4
**select** [5] - 124:10, 143:3, 143:4, 186:2, 228:16
**selected** [4] - 99:6,

226:6, 231:19, 232:13
**selecting** [2] - 206:12, 206:14
**selection** [3] - 90:2, 135:15, 216:14
**selections** [2] - 206:13, 235:23
**self** [3] - 226:6, 231:19, 232:13
**self-selected** [3] - 226:6, 231:19, 232:13
**send** [22] - 54:13, 54:15, 85:15, 93:1, 112:22, 121:19, 125:3, 125:4, 125:9, 126:11, 135:17, 137:23, 142:3, 143:5, 146:12, 154:5, 214:24, 215:6, 222:18, 268:17, 278:21, 300:25
**sending** [1] - 123:25
**sense** [7] - 10:15, 17:9, 17:10, 28:18, 105:16, 129:25, 130:1
**Sense** [1] - 127:21
**sent** [17] - 14:19, 54:10, 57:21, 94:1, 113:6, 125:23, 133:2, 143:2, 144:1, 144:5, 144:9, 144:14, 154:10, 155:7, 160:7, 183:5, 301:6
**sentence** [3] - 162:24, 246:9, 294:19
**separate** [4] - 118:11, 137:15, 182:4, 242:12, 242:14, 252:25
**separated** [1] - 282:11
**September** [22] - 75:7, 75:11, 187:11, 190:13, 190:15, 191:3, 191:10, 191:17, 191:20, 207:9, 207:25, 217:18, 230:7, 261:18, 262:11, 263:5, 264:23, 265:10, 269:20, 271:23, 271:25, 316:18
**sequential** [1] - 15:2
**sequentially** [1] - 172:12
**series** [13] - 34:4, 66:3, 66:4, 66:5, 144:25, 145:2, 157:3, 157:24, 158:12, 159:4, 168:16, 168:18, 195:16
**Series** [1] - 171:2
**serious** [4] - 283:15, 285:21, 286:10, 290:1
**serve** [5] - 222:11, 228:2, 228:4, 228:6, 228:14
**served** [2] - 16:20, 222:13
**service** [2] - 22:8, 143:7
**Services** [27] - 6:16,

28:23, 79:3, 81:8, 91:14,
141:17, 141:21, 167:24,
196:14, 197:1, 201:10,
201:25, 204:1, 211:6,
211:17, 247:13, 248:9,
249:19, 288:11, 288:12,
288:19, 288:21, 289:9,
304:16, 311:4, 314:7,
315:6
**Services/**
**Superintendent** [1] -
303:19
**set** [13] - 22:14, 59:17,
60:1, 60:11, 75:4, 84:16,
86:17, 98:18, 145:4,
235:6, 235:21, 283:11,
311:10
**sets** [1] - 235:10
**setting** [1] - 23:20
**settings** [1] - 170:7
**settlement** [8] - 226:9,
232:6, 244:21, 244:23,
244:24, 245:7, 248:14,
301:7
**seven** [3] - 131:21,
239:24, 302:11
**several** [1] - 294:18
**sex** [3] - 103:20, 103:21,
128:25
**sexual** [143] - 37:14,
37:18, 37:23, 38:1,
38:10, 39:15, 39:21,
51:9, 51:14, 51:17, 52:1,
52:9, 52:11, 52:15,
52:17, 83:1, 95:9, 95:25,
100:14, 100:17, 102:15,
102:24, 103:4, 103:17,
103:19, 103:23, 104:17,
105:3, 105:9, 105:10,
105:11, 105:12, 105:19,
106:7, 109:18, 110:13,
111:3, 111:15, 112:3,
112:13, 113:1, 113:4,
113:11, 113:12, 113:13,
114:1, 115:2, 115:8,
116:11, 119:19, 119:24,
120:7, 121:1, 121:6,
122:25, 123:25, 124:8,
125:22, 125:25, 126:4,
126:14, 126:22, 128:1,
128:15, 129:1, 129:6,
129:14, 129:21, 130:12,
130:14, 141:5, 142:16,
143:9, 143:15, 143:23,
144:3, 145:21, 146:4,
146:20, 147:11, 147:13,
148:11, 148:12, 148:16,
148:24, 149:2, 149:4,
149:5, 149:17, 149:19,
149:24, 151:15, 151:18,

151:21, 151:25, 152:2,
152:4, 153:1, 154:23,
155:19, 155:25, 156:21,
157:6, 157:10, 157:13,
157:22, 158:7, 158:9,
158:10, 158:14, 159:1,
160:9, 160:20, 161:20,
162:8, 162:19, 163:5,
163:20, 173:17, 176:15,
257:1, 273:18, 274:5,
274:13, 274:17, 274:23,
275:7, 275:11, 275:15,
285:19, 292:3, 292:18,
294:1, 299:1, 299:3,
299:9, 299:13, 300:9,
300:13, 302:9, 309:3
**sexualities** [1] - 276:2
**sexuality** [1] - 231:16
**sexually** [3] - 119:21,
120:9, 120:22
**shakes** [1] - 10:9
**SHALINI** [1] - 3:19
**shalini.agarwal@**
**protectdemocracy.org**
[1] - 3:20
**shall** [7] - 212:25,
214:19, 216:1, 217:21,
232:24, 310:20, 311:4
**share** [6] - 72:14, 73:23,
117:16, 170:3, 261:23,
262:1
**shared** [3] - 24:24,
154:7, 213:10
**sharing** [1] - 117:9
**SHEET** [1] - 317:1
**sheet** [5] - 76:11, 76:13,
299:14, 316:15, 316:20
**sheets** [1] - 252:2
**Sheets** [1] - 67:1
**shelf** [5] - 89:6, 147:3,
152:24, 170:11, 179:19
**shelves** [12] - 104:8,
146:25, 147:4, 147:5,
147:9, 155:24, 179:24,
250:25, 272:11, 281:15,
281:17, 291:23
**Shepard** [1] - 136:21
**shift** [1] - 279:16
**shifted** [3] - 110:14,
113:7, 306:10
**shop** [1] - 246:6
**shopping** [2] - 135:15,
135:24
**short** [1] - 57:12
**shorthand** [1] - 57:19
**shortly** [3] - 208:6,
231:13, 259:8
**show** [9] - 15:22, 21:19,
22:2, 34:4, 53:9, 71:10,
75:6, 109:21, 117:17,

118:13, 121:20, 153:22,
167:13, 168:20, 173:24,
192:7, 192:16, 231:8,
245:19
**showing** [14] - 13:16,
16:13, 76:10, 79:8,
120:14, 125:12, 144:11,
165:6, 174:3, 222:7,
223:6, 232:17, 261:16,
266:25
**shows** [9] - 118:10,
165:21, 165:25, 169:9,
169:21, 189:7, 192:11,
193:20, 193:23
**sic** [1] - 134:17
**side** [14] - 91:5, 92:7,
103:12, 107:12, 120:2,
121:8, 130:20, 147:14,
224:3, 225:14, 239:6
**sidetracked** [1] - 98:3
**sign** [2] - 125:4, 136:8
**signed** [3] - 136:4,
269:16, 298:23
**signing** [3] - 316:15,
316:17, 316:17
**similar** [4] - 13:15,
25:22, 55:13, 245:6
**simpler** [1] - 190:4
**simply** [1] - 125:20
**simulates** [1] - 105:12
**single** [13] - 29:4, 33:3,
63:23, 70:8, 114:10,
114:21, 122:8, 169:8,
179:10, 228:6, 303:18,
303:22
**Sissy** [1] - 300:14
**sit** [3] - 47:11, 63:2,
296:15
**Site** [3] - 176:9, 176:17,
178:4
**site** [10] - 97:21, 117:17,
166:6, 176:18, 176:21,
177:10, 178:8, 178:12,
181:7, 182:14
**sites** [1] - 95:22
**sits** [1] - 215:16
**sitting** [2] - 107:11,
218:14
**situations** [1] - 147:13
**six** [1] - 132:5
**sixth** [1] - 101:24
**skip** [2] - 178:6, 243:15
**skipping** [2] - 205:19,
243:14
**slept** [6] - 102:23, 103:3,
103:8, 103:12, 103:14,
103:20
**Slide** [1] - 224:4
**slides** [3] - 223:23,
224:12, 225:10

**Slides** [2] - 224:2, 224:5
**slideshow** [4] - 100:24,
107:23, 107:24, 108:15
**sliding** [3] - 24:22,
25:15, 25:23
**SLJ** [1] - 171:4
**slowly** [1] - 179:4
**Smith** [25] - 42:12,
78:11, 78:12, 267:2,
267:5, 267:25, 272:19,
274:10, 277:12, 277:20,
278:11, 281:23, 283:20,
284:11, 284:13, 284:14,
287:1, 289:16, 297:24,
298:14, 303:24, 309:6,
310:23, 311:16, 316:14
**SMITH** [140] - 2:14,
14:25, 15:3, 16:6, 22:7,
22:11, 22:21, 23:2, 23:4,
27:7, 27:13, 28:3, 31:2,
35:24, 37:19, 40:13,
40:19, 41:25, 42:21,
43:4, 44:4, 46:25, 47:15,
53:15, 61:22, 62:6,
64:10, 67:22, 71:17,
71:25, 76:9, 78:1, 79:10,
85:8, 94:7, 94:13, 103:6,
105:1, 108:20, 108:24,
115:16, 115:23, 120:11,
127:5, 129:9, 133:12,
138:12, 142:19, 147:10,
148:4, 148:20, 149:22,
150:3, 150:5, 150:8,
150:10, 150:14, 150:17,
165:12, 175:9, 189:22,
189:25, 192:5, 192:18,
192:25, 193:3, 193:6,
193:10, 194:14, 195:8,
200:19, 205:15, 235:16,
236:5, 236:12, 238:4,
238:14, 246:18, 246:24,
247:4, 247:11, 247:24,
256:3, 256:10, 256:17,
256:20, 257:5, 257:19,
257:25, 258:13, 258:15,
261:5, 263:20, 264:2,
264:17, 264:24, 265:6,
265:17, 266:3, 266:15,
266:19, 267:23, 268:4,
268:15, 268:19, 269:3,
269:11, 271:13, 272:17,
274:14, 274:19, 282:10,
282:17, 283:7, 286:12,
286:16, 287:7, 290:4,
292:7, 292:14, 293:16,
294:10, 294:13, 295:3,
296:7, 297:6, 297:14,
299:8, 302:11, 304:14,
306:3, 307:2, 307:8,
307:19, 308:3, 308:8,

308:21, 309:12, 309:22,
316:12
**so..** [2] - 20:1, 220:12
**software** [1] - 185:25
**solely** [1] - 304:16
**solemnly** [1] - 9:5
**someone** [7] - 58:10,
73:14, 132:16, 141:10,
146:2, 170:1, 240:5
**sometimes** [8] - 59:1,
60:14, 60:15, 114:16,
144:10, 181:22, 250:7,
256:23
**somewhat** [1] - 116:15
**somewhere** [1] - 282:9
**soon** [3] - 84:5, 227:20,
298:25
**SOP** [2] - 12:4, 18:17,
200:15
**sorry** [68] - 11:18, 12:9,
15:7, 19:1, 20:19, 22:6,
22:10, 34:12, 38:5, 43:1,
45:4, 46:17, 48:5, 50:12,
59:23, 60:24, 63:11,
63:17, 65:8, 68:1, 68:5,
75:20, 76:23, 86:24,
87:7, 91:6, 91:25, 93:20,
102:3, 104:6, 104:11,
109:16, 114:13, 116:1,
118:25, 123:21, 138:10,
146:16, 148:6, 150:14,
152:14, 164:8, 165:8,
181:19, 189:12, 189:23,
205:20, 209:10, 210:8,
211:4, 214:2, 216:18,
226:19, 238:4, 246:5,
249:20, 249:24, 252:10,
252:20, 253:21, 257:5,
272:13, 273:11, 276:17,
278:4, 291:16, 302:20,
310:7
**sort** [20] - 56:21, 83:24,
84:3, 85:9, 86:20, 94:2,
116:23, 118:4, 142:1,
144:1, 161:14, 175:3,
200:5, 202:19, 211:14,
232:16, 236:3, 281:3,
301:17, 311:24
**sorted** [1] - 174:23
**sound** [2] - 80:11,
109:11
**sounds** [1] - 123:9
**sources** [1] - 250:5
**South** [2] - 1:21, 4:14
**spacing** [2] - 49:21, 50:3
**Spades** [4] - 63:18,
63:21, 109:15, 109:16
**SPAHR** [2] - 3:4, 3:11
**speaking** [4] - 107:8,
120:14, 120:15, 132:18

Deposition of Bradley Vinson, Volume 1

**special** [1] - 19:19
**Specialist** [3] - 99:4, 124:2, 124:13
**specialist** [68] - 19:16, 35:1, 37:25, 51:8, 51:25, 52:11, 52:15, 52:16, 53:20, 81:21, 82:8, 95:9, 95:11, 95:23, 96:6, 97:5, 100:2, 111:10, 113:21, 113:24, 114:11, 114:14, 114:21, 115:11, 121:25, 122:9, 122:10, 122:12, 124:10, 124:23, 124:25, 125:4, 125:6, 130:4, 130:15, 139:25, 157:13, 158:15, 160:21, 170:10, 177:8, 178:11, 178:15, 181:5, 181:16, 184:5, 186:2, 187:13, 196:7, 203:24, 205:25, 214:25, 215:1, 215:3, 215:7, 215:8, 215:9, 216:2, 229:5, 229:12, 260:15, 262:9, 262:10, 269:14, 270:2, 280:16, 291:17, 291:19
**specialist's** [2] - 95:12, 95:15
**Specialists** [4] - 79:25, 81:8, 82:4, 262:2
**specialists** [90] - 6:16, 12:12, 12:19, 18:6, 20:13, 26:1, 36:24, 51:16, 53:13, 53:22, 54:2, 54:7, 54:10, 54:13, 54:16, 54:17, 54:20, 67:15, 73:4, 82:18, 82:24, 84:15, 84:21, 87:15, 88:14, 89:3, 90:4, 90:6, 90:12, 95:17, 95:18, 100:14, 101:1, 101:9, 102:10, 102:14, 111:18, 112:21, 114:17, 116:17, 117:19, 120:24, 122:7, 123:5, 124:8, 124:20, 125:8, 125:17, 126:9, 130:23, 130:24, 131:4, 131:5, 131:8, 131:9, 131:12, 131:19, 132:7, 133:25, 136:1, 137:7, 137:9, 137:14, 139:6, 139:8, 143:15, 143:25, 144:10, 145:1, 154:11, 155:6, 162:3, 163:1, 167:24, 170:4, 173:10, 173:15, 176:13, 177:2, 183:22, 187:8, 204:22, 213:15, 215:14, 235:22, 262:2, 278:25, 288:23, 288:25, 291:14

**specialists'** [1] - 155:1
**specific** [28] - 23:6, 38:16, 40:2, 52:13, 76:10, 106:11, 128:1, 140:20, 143:4, 156:23, 158:8, 163:9, 176:18, 178:8, 220:4, 235:24, 248:5, 253:9, 253:10, 257:11, 259:5, 259:15, 262:15, 264:6, 264:18, 275:4, 288:20, 309:15
**specifically** [9] - 25:3, 80:9, 86:9, 120:19, 155:19, 247:21, 270:15, 290:23, 312:1
**specified** [1] - 304:6
**specify** [1] - 17:3
**speculating** [2] - 76:25, 253:2
**speculation** [2] - 271:3, 297:15
**speech** [1] - 206:19
**spell** [1] - 9:18
**spelled** [1] - 25:17
**spelling** [1] - 49:14
**spend** [3] - 74:13, 74:19, 77:16
**spent** [4] - 74:20, 153:12, 153:14, 153:18
**Spreadsheet** [41] - 5:14, 5:22, 6:4, 6:16, 6:18, 8:10, 26:9, 44:13, 69:23, 77:18, 77:24, 78:4, 78:9, 79:21, 112:5, 112:15, 112:25, 113:17, 114:5, 114:25, 144:21, 147:23, 148:8, 151:8, 164:6, 168:14, 168:21, 202:5, 202:8, 202:11, 202:17, 203:2, 207:16, 211:9, 211:12, 214:15, 221:14, 237:4, 251:20, 253:19, 299:18
**spreadsheet** [96] - 15:10, 19:23, 26:15, 26:24, 27:2, 27:6, 27:8, 27:10, 27:12, 27:16, 29:4, 37:5, 37:16, 40:3, 40:7, 40:12, 41:3, 41:7, 43:19, 44:18, 45:6, 47:21, 52:4, 53:19, 57:5, 61:8, 63:7, 64:18, 65:9, 67:25, 68:22, 69:11, 72:12, 74:23, 74:25, 75:5, 75:7, 75:14, 75:17, 76:5, 76:22, 76:23, 77:11, 78:15, 78:18, 78:21, 78:23, 79:2, 79:25, 81:7, 81:12, 81:23, 82:1, 82:2, 83:13,

83:15, 84:11, 90:19, 94:19, 94:23, 117:11, 118:17, 135:22, 138:7, 138:16, 139:17, 141:10, 165:1, 165:4, 165:5, 165:15, 166:13, 166:16, 166:22, 166:24, 167:2, 167:7, 167:16, 168:2, 168:4, 169:1, 169:9, 172:21, 173:4, 173:5, 173:6, 174:5, 174:19, 177:22, 178:2, 260:16, 264:3, 305:5, 306:13, 306:14, 306:15
**spreadsheets** [2] - 135:12, 135:14
**spring** [5] - 72:23, 110:16, 186:13, 244:25, 261:7
**stack** [5] - 11:19, 19:1, 19:3, 19:4, 271:18
**staff** [3] - 98:8, 123:23, 143:1
**staffed** [1] - 228:18
**Stafford** [2] - 291:9, 291:13
**stakeholder** [1] - 215:18
**stakeholders** [3] - 23:23, 83:6, 89:8
**stamp** [4] - 12:6, 61:23, 64:15, 107:1
**stamped** [17] - 13:10, 106:24, 107:21, 133:14, 154:1, 174:4, 222:8, 231:9, 261:16, 263:1, 267:1, 277:8, 280:8, 284:9, 287:25, 291:7, 292:24
**stamps** [1] - 14:20
**stand** [1] - 115:5
**standard** [9] - 222:17, 235:7, 235:11, 235:13, 235:21, 250:22, 273:6, 273:13, 279:18
**standardless** [1] - 276:23
**Standards** [2] - 83:9, 85:5
**standards** [6] - 83:20, 83:21, 87:1, 119:8, 119:12, 140:9
**stands** [4] - 58:18, 234:4, 249:14, 308:18
**stapled** [2] - 22:6, 282:12
**Star** [1] - 208:12
**start** [13] - 10:3, 20:24, 37:10, 38:5, 78:12, 91:5, 110:15, 172:4, 196:3, 221:25, 226:19, 230:6,

238:6
**started** [13] - 43:19, 52:21, 54:4, 76:6, 85:13, 94:18, 117:8, 117:9, 134:4, 187:11, 269:22, 299:1, 300:18
**starting** [2] - 242:3, 253:6
**starts** [2] - 212:15, 242:20
**STATE** [3] - 314:3, 314:19, 315:2
**State** [13] - 7:11, 116:24, 121:11, 216:15, 226:4, 226:7, 232:2, 232:9, 244:17, 244:21, 245:23, 246:14, 314:9
**state** [1] - 9:18
**State's** [4] - 18:18, 244:14, 246:21, 295:22
**statement** [9] - 104:3, 129:8, 200:6, 206:16, 211:14, 243:10, 246:15, 246:22, 296:22
**statements** [3] - 62:18, 194:21, 245:6
**STATES** [2] - 1:1, 316:1
**states** [5] - 201:15, 213:9, 225:14, 263:22, 284:22
**Status** [3] - 182:18, 182:19, 312:9
**status** [27] - 15:14, 20:6, 27:24, 53:2, 53:6, 53:22, 53:23, 54:3, 55:2, 85:21, 130:5, 130:6, 137:19, 146:12, 166:8, 168:13, 173:11, 179:5, 182:23, 246:25, 248:13, 263:16, 278:25, 279:25, 299:2, 305:14, 306:11
**statuses** [1] - 182:21
**Statute** [2] - 7:24, 198:18
**statute** [14] - 17:13, 17:20, 17:25, 102:16, 104:17, 105:1, 119:21, 120:8, 120:9, 195:5, 242:25, 245:14, 246:9
**Statutes** [3] - 242:18, 282:22, 285:14
**statutes** [7] - 11:24, 17:22, 194:8, 220:24, 226:25, 243:14, 254:22
**statutory** [5] - 102:20, 224:5, 224:6, 267:16, 267:21
**stay** [1] - 125:5
**Stefany** [1] - 160:1
**stenographic** [1] - 315:12

**stenographically** [2] - 1:24, 315:9
**step** [1] - 297:20
**Stephanie** [1] - 171:3
**steps** [1] - 39:10
**Steve** [1] - 261:17
**sticking** [1] - 304:11
**sticky** [1] - 144:11
**still** [43] - 20:15, 26:23, 27:2, 43:11, 47:8, 54:9, 69:22, 81:1, 85:17, 87:12, 88:2, 88:24, 89:2, 105:1, 108:9, 119:11, 126:17, 139:5, 139:25, 142:17, 145:9, 149:13, 153:10, 155:3, 155:12, 156:5, 159:11, 159:17, 159:18, 164:8, 180:24, 183:4, 211:17, 213:4, 225:1, 232:4, 255:6, 278:8, 279:7, 282:20, 292:1, 298:14, 308:18
**Stocked** [2] - 76:14, 77:1
**stop** [2] - 185:11, 312:24
**storage** [3] - 112:22, 160:19, 184:3
**Storage** [23] - 6:4, 6:12, 20:10, 80:1, 96:3, 96:5, 113:8, 116:9, 155:15, 160:8, 160:10, 160:13, 160:15, 160:23, 179:1, 179:3, 179:13, 179:19, 179:25, 180:11, 182:22, 183:1, 183:21
**store** [1] - 139:19
**stored** [7] - 83:8, 83:19, 85:4, 86:21, 87:5, 87:9, 92:8
**Stored** [1] - 6:8
**story** [1] - 275:19
**straight** [1] - 193:11
**straightforward** [1] - 246:21
**Street** [4] - 1:21, 2:16, 3:7, 4:7
**stricken** [1] - 201:1
**strong** [2] - 142:16, 143:8
**structure** [2] - 253:7, 255:3
**stuck** [1] - 43:11
**student** [13] - 20:9, 20:10, 34:3, 34:23, 35:3, 35:21, 36:25, 38:15, 80:22, 158:17, 198:19, 209:20, 269:12
**students** [29] - 23:25, 25:24, 35:6, 36:4, 55:19, 55:24, 80:23, 81:15, 81:16, 82:5, 90:9, 100:9,

Deposition of Bradley Vinson, Volume 1

119:8, 149:6, 149:7, 154:15, 180:25, 209:16, 210:2, 215:22, 265:15, 267:19, 268:5, 269:5, 269:8, 274:1, 281:10, 298:24, 312:10
**students'** [3] - 209:24, 210:17, 268:25
**students's** [1] - 184:8
**study** [2] - 31:17, 58:21
**Subject** [11] - 6:12, 6:14, 7:4, 7:7, 7:13, 7:16, 7:19, 7:20, 7:23, 8:6, 8:8
**subject** [32] - 16:6, 102:15, 160:24, 168:8, 168:19, 173:8, 184:21, 184:25, 185:8, 187:4, 207:2, 217:24, 218:23, 259:23, 260:6, 261:18, 264:11, 265:24, 268:24, 272:1, 273:19, 273:20, 273:25, 274:5, 285:5, 289:3, 289:17, 291:10, 303:4, 303:17, 307:19, 312:22
**subjected** [8] - 259:24, 260:7, 269:1, 307:7, 307:15, 307:23, 307:24, 309:1
**subjecting** [4] - 270:8, 303:5, 307:4, 308:19
**subjective** [1] - 102:25
**subjectivity** [1] - 57:4
**Sublocation** [1] - 183:10
**sublocation** [5] - 20:15, 183:20, 183:23, 184:7, 288:22
**sublocations** [1] - 20:12
**submit** [4] - 67:12, 196:25, 203:18, 203:22
**Submitted** [6] - 57:6, 64:3, 64:21, 65:15, 65:18, 68:3
**submitted** [24] - 57:10, 57:16, 57:19, 57:24, 62:19, 64:4, 65:20, 65:23, 66:22, 73:5, 196:6, 197:16, 203:5, 203:15, 203:25, 204:3, 241:15, 263:25, 277:21, 290:21, 295:11, 295:25, 296:4, 303:3
**Subparagraph** [2] - 214:4, 233:12
**subsection** [1] - 144:9
**subsequent** [1] - 46:1
**subsequently** [1] - 265:14
**subset** [5] - 55:24, 81:25, 149:6, 149:14,

149:15
**substantive** [2] - 20:23, 21:1
**sufficient** [2] - 311:6, 311:21
**suggest** [3] - 107:8, 140:18, 141:8
**suggests** [1] - 103:17
**suitable** [1] - 61:13
**Suite** [5] - 2:7, 2:16, 3:21, 4:7, 4:14
**suited** [2] - 158:17, 198:18
**summary** [1] - 127:19
**summer** [12] - 12:25, 14:14, 18:11, 50:13, 99:23, 100:5, 101:8, 160:16, 179:4, 179:17, 261:7, 307:16
**sunshine** [1] - 238:9
**Superintendent** [5] - 61:20, 213:1, 228:19, 230:4, 311:3
**superintendent** [22] - 76:19, 78:7, 78:14, 79:1, 91:13, 91:19, 92:14, 92:19, 204:4, 212:4, 227:24, 248:15, 265:21, 266:8, 267:5, 267:15, 271:3, 298:15, 301:13, 304:4, 304:17, 311:12
**supplement** [1] - 306:22
**Supplemental** [1] - 8:11
**support** [2] - 311:6, 311:21
**supports** [1] - 206:18
**supposed** [12] - 41:2, 134:7, 182:23, 203:17, 203:18, 204:12, 218:6, 218:8, 218:21, 219:25, 222:22, 235:11
**sure/Challenged** [2] - 150:21, 150:25
**surmising** [1] - 294:5, 294:6
**survey** [1] - 23:22
**SUSAN** [4] - 1:24, 2:23, 314:18, 315:22
**Susan** [3] - 314:5, 315:4, 316:24
**suspended** [3] - 222:15, 231:14, 231:22
**Suzanne** [1] - 136:15
**swear** [1] - 9:5
**Sweeting** [41] - 19:16, 19:20, 20:20, 20:21, 20:25, 49:23, 50:5, 54:12, 80:6, 88:11, 88:25, 89:11, 92:17, 92:25, 107:11, 110:2,

110:10, 110:23, 111:2, 111:24, 112:7, 112:12, 113:19, 114:18, 115:9, 116:11, 120:14, 122:24, 123:16, 131:8, 135:2, 138:2, 140:6, 141:25, 160:1, 160:5, 160:12, 169:6, 170:2, 172:8, 172:20
**Sweeting's** [1] - 50:16
**switched** [2] - 121:16, 121:25
**sworn** [2] - 9:13, 314:12
**systematic** [1] - 106:1
**Systems** [1] - 1:25

---

## T

**Tab** [2] - 5:15
**tab** [33] - 26:15, 26:17, 27:8, 27:11, 27:16, 27:21, 28:12, 28:14, 29:3, 29:5, 29:11, 29:25, 30:6, 31:6, 31:22, 59:6, 59:22, 63:8, 63:9, 63:12, 64:2, 82:9, 95:4, 95:7, 118:4, 118:8, 164:15, 165:13, 165:18, 166:15, 166:20, 167:8, 173:5
**table** [4] - 140:17, 240:18, 242:11, 248:23
**tabs** [10] - 27:5, 30:2, 37:4, 94:22, 117:10, 117:13, 117:23, 118:3, 165:6, 173:4
**TAKEN** [1] - 1:19
**talks** [8] - 41:23, 194:18, 214:17, 217:19, 233:18, 282:25, 294:17, 312:4
**Tallahassee** [2] - 2:17, 4:8
**tandem** [1] - 119:3
**Tango** [1] - 208:9
**task** [3] - 83:24, 84:3, 119:13
**TBD** [15] - 45:23, 46:3, 46:9, 46:13, 46:18, 46:20, 47:12, 47:14, 47:21, 47:24, 48:2, 48:17, 48:22, 49:1, 49:7
**TBD-remain** [1] - 48:22
**teacher** [3] - 19:19, 229:9, 229:12
**teacher's** [2] - 101:5, 218:2
**Teachers** [1] - 58:19
**teachers** [9] - 23:24, 119:7, 120:6, 124:19, 135:19, 213:15, 216:2,

217:23, 218:22
**Technology** [1] - 176:7
**Telephone** [7] - 2:9, 2:18, 3:9, 3:16, 3:23, 4:9, 4:16
**temporarily** [1] - 35:2
**tend** [3] - 56:6, 56:9, 56:18
**tenets** [1] - 243:2
**tens** [1] - 88:21
**tenure** [1] - 53:21
**term** [2] - 194:23, 283:17
**terms** [9] - 25:24, 47:13, 102:14, 140:13, 204:11, 261:2, 264:15, 265:15, 268:25
**testified** [8] - 9:13, 11:14, 52:6, 147:22, 150:24, 194:2, 247:15, 310:22
**testify** [6] - 10:23, 11:2, 11:6, 16:3, 40:4, 175:9
**testifying** [1] - 41:2
**testimony** [7] - 9:6, 42:7, 43:17, 47:15, 67:22, 148:10, 303:22
**testing** [1] - 276:19
**text** [3] - 45:9, 188:25, 189:5
**textbook** [1] - 230:2
**Textbooks** [1] - 6:8
**textbooks** [1] - 230:2
**THE** [21] - 1:1, 1:1, 9:3, 9:8, 9:9, 43:6, 73:8, 94:12, 104:22, 150:4, 165:11, 175:11, 192:23, 193:4, 193:9, 195:9, 222:4, 236:23, 291:5, 316:1, 316:1
**themes** [2] - 55:22, 275:23
**themselves** [5] - 25:10, 25:11, 82:24, 241:2, 290:11
**theory** [1] - 254:8
**therefore** [1] - 118:3
**THEREUPON** [2] - 9:1, 313:1
**they've** [3] - 128:22, 159:13, 236:10
**thick** [4] - 205:14, 246:5, 294:11, 294:12
**thigh** [2] - 129:5, 129:12
**thinking** [2] - 172:9, 304:11
**thinks** [1] - 97:6
**third** [9] - 121:13, 123:22, 127:18, 140:16, 171:2, 189:19, 189:21, 229:7, 304:23

**THIS** [2] - 315:20, 317:2
**Thomas** [1] - 150:20
**thorough** [1] - 221:18
**thoroughly** [3] - 88:15, 160:18, 270:6
**three** [14] - 14:12, 26:14, 26:19, 86:12, 92:9, 97:11, 109:15, 131:16, 140:19, 188:1, 189:24, 215:13, 229:4, 293:5
**throughout** [2] - 31:20, 195:23
**Thursday** [5] - 1:19, 5:3, 314:11, 316:10, 317:6
**Tim** [17] - 42:12, 78:11, 78:12, 272:19, 274:10, 277:12, 281:22, 283:20, 284:13, 286:20, 289:16, 297:24, 298:14, 303:24, 309:6, 310:23, 311:15
**TIME** [1] - 1:20
**timeline** [5] - 86:7, 86:9, 89:17, 89:19, 89:22
**Timothy** [1] - 267:2
**tired** [1] - 150:10
**title** [31] - 6:16, 31:17, 33:2, 38:16, 49:9, 49:13, 51:2, 58:6, 61:6, 62:4, 67:6, 72:16, 97:15, 100:18, 100:20, 101:15, 102:11, 105:25, 106:6, 136:17, 136:18, 161:22, 171:17, 213:16, 213:20, 214:19, 215:9, 215:22, 218:2, 221:10, 312:2
**Title** [4] - 5:19, 5:21, 182:6, 182:9
**title's** [2] - 158:19, 158:20
**title-specific** [1] - 38:16
**titled** [3] - 123:8, 223:8, 288:1
**titles** [75] - 6:13, 7:21, 7:21, 15:12, 21:8, 21:11, 21:24, 34:2, 38:13, 51:11, 56:21, 59:16, 61:11, 67:13, 82:20, 85:19, 86:16, 87:13, 87:18, 94:25, 95:1, 99:22, 99:24, 105:24, 112:19, 112:22, 115:5, 115:13, 116:9, 123:4, 126:10, 126:15, 134:1, 136:14, 136:15, 143:4, 145:2, 145:3, 148:23, 155:20, 156:20, 156:23, 157:3, 157:5, 157:10, 157:12, 157:21, 157:24, 158:11, 158:17, 158:25, 159:4, 164:2, 164:8,

167:24, 174:21, 174:24, 174:25, 215:4, 216:13, 220:5, 231:16, 232:10, 259:15, 262:3, 263:25, 277:23, 278:20, 278:25, 280:23, 281:11, 281:16, 289:5, 295:19, 300:6
**Titles** [5] - 6:18, 8:4, 33:24, 81:8, 288:1
**titles'** [1] - 157:9
**titles/series** [1] - 156:10
**Titlewave** [12] - 58:6, 58:13, 58:15, 102:9, 170:16, 170:20, 171:7, 171:9, 171:10, 250:3, 250:5, 250:12
**TO** [1] - 316:12
**today** [20] - 11:3, 11:6, 17:1, 18:22, 21:6, 39:12, 47:11, 52:3, 52:7, 52:10, 52:22, 53:19, 63:2, 111:1, 115:7, 119:4, 178:24, 232:5, 271:18, 296:15
**Today's** [1] - 316:17
**today's** [7] - 17:12, 74:14, 153:13, 260:11, 261:4, 270:5, 290:10
**together** [7] - 23:15, 102:23, 103:3, 103:8, 103:14, 103:21, 105:1
**Tompkins** [2] - 160:1, 161:2
**took** [8] - 53:4, 57:13, 134:25, 174:20, 189:24, 276:25, 298:6, 309:5
**tools** [2] - 100:16
**top** [31] - 29:12, 81:5, 82:16, 101:4, 105:20, 106:25, 108:25, 127:17, 129:4, 129:12, 138:13, 141:17, 156:25, 167:17, 188:8, 193:8, 209:12, 210:24, 215:21, 244:13, 245:25, 252:18, 252:22, 267:2, 267:14, 277:14, 280:10, 284:12, 284:13, 285:16, 291:21
**topic** [2] - 260:11, 264:7
**Topic** [2] - 16:4, 259:21
**topics** [6] - 16:3, 21:2, 40:4, 41:2, 135:20, 247:14
**total** [1] - 88:16
**touch** [3] - 144:2, 144:3, 299:23
**touches** [1] - 299:24
**touching** [2] - 125:11, 126:11
**tough** [1] - 119:1

**towards** [1] - 181:22
**track** [8] - 13:6, 26:11, 26:24, 76:6, 106:2, 106:11, 165:9, 178:20
**Track** [1] - 5:22
**tracked** [2] - 38:18, 106:10
**tracking** [1] - 54:24
**tracks** [1] - 136:4
**traditional** [3] - 179:14, 183:24, 272:10
**Training** [3] - 6:6, 7:6, 223:9
**training** [50] - 14:20, 17:14, 18:10, 18:19, 19:22, 24:14, 24:25, 99:5, 100:13, 100:21, 100:22, 101:10, 101:13, 102:4, 102:13, 106:12, 106:17, 106:25, 107:4, 107:23, 108:16, 108:21, 109:24, 110:1, 110:9, 111:11, 112:1, 112:2, 118:23, 121:4, 121:11, 121:13, 216:15, 221:1, 221:20, 221:22, 222:21, 222:22, 222:25, 223:2, 223:15, 223:20, 223:24, 224:11, 224:17, 224:21, 225:6, 225:13, 234:15, 235:1
**trainings** [4] - 18:3, 18:5, 18:15, 101:7
**transcript** [16] - 5:9, 6:2, 7:2, 8:2, 107:2, 107:4, 107:14, 107:17, 108:21, 109:2, 128:20, 129:15, 315:11, 315:12, 316:15, 316:19
**Transcript** [1] - 6:6
**TRANSCRIPT** [1] - 317:2
**transgender** [1] - 106:16
**translated** [1] - 114:4
**translates** [1] - 56:17
**transparent** [3] - 26:13, 80:15, 80:25
**treat** [2] - 57:9, 94:3
**treated** [1] - 90:1
**tricky** [2] - 33:8, 299:20
**tries** [1] - 172:22
**triggered** [1] - 160:22
**trouble** [2] - 12:13, 305:16
**true** [13] - 28:22, 36:9, 37:15, 56:1, 68:2, 104:12, 126:19, 195:23, 239:19, 240:7, 255:1, 315:12, 317:23
**True** [5] - 284:19, 284:23, 284:24, 286:1,

287:2
**trusted** [1] - 122:11
**truth** [3] - 9:6, 9:7
**truthfully** [3] - 10:23, 11:2, 11:6
**try** [6] - 10:5, 121:4, 154:11, 166:17, 215:14, 272:13
**trying** [15] - 33:12, 39:2, 40:3, 41:4, 41:19, 49:4, 49:18, 77:3, 87:8, 105:5, 123:6, 152:19, 215:7, 302:22, 305:16
**TSA** [2] - 19:17, 19:18
**Tuesday** [2] - 134:3, 134:7
**turn** [14] - 37:1, 98:15, 98:21, 118:23, 144:15, 161:18, 161:19, 164:23, 189:19, 189:21, 209:9, 217:16, 232:19, 246:3
**turning** [3] - 57:5, 111:13, 205:13
**twice** [2] - 120:14, 121:19
**Twilight** [1] - 171:2
**two** [30] - 13:3, 26:16, 52:14, 65:17, 66:19, 69:20, 69:25, 70:7, 70:25, 82:12, 109:11, 111:8, 115:10, 126:24, 131:16, 140:19, 176:5, 180:6, 216:2, 220:19, 237:12, 238:19, 239:8, 251:16, 252:11, 277:23, 280:19, 284:15, 284:16, 284:18
**Type** [2] - 178:23, 180:10
**type** [44] - 20:8, 20:10, 20:11, 55:5, 55:8, 80:21, 96:2, 96:7, 96:13, 96:15, 97:7, 113:8, 114:8, 118:1, 121:18, 121:25, 123:12, 130:10, 130:11, 137:22, 140:2, 155:14, 156:3, 157:16, 160:15, 166:5, 179:9, 181:1, 181:3, 181:9, 181:13, 182:7, 182:9, 184:14, 184:15, 184:24, 185:3, 185:7, 272:9, 288:21, 288:23, 288:24, 289:2, 312:19
**typical** [1] - 182:21
**typically** [5] - 101:21, 101:25, 102:1, 138:17, 268:13

## U

**ughs** [1] - 10:10
**uh-huhs** [1] - 10:9
**ultimate** [1] - 89:4
**ultimately** [8] - 101:9, 110:10, 122:8, 122:15, 206:23, 208:14, 237:18, 287:4
**unable** [9] - 11:6, 47:11, 84:17, 84:22, 119:14, 131:15, 131:25, 187:16, 224:22
**unavailable** [1] - 154:15
**unbuttoned** [2] - 129:4, 129:11
**unclear** [1] - 226:4
**unclothed** [1] - 129:19
**under** [68] - 10:22, 37:18, 37:24, 38:1, 39:15, 39:22, 51:10, 51:11, 52:9, 52:15, 52:17, 59:4, 59:8, 62:1, 64:21, 64:22, 65:15, 65:18, 68:3, 70:1, 81:19, 90:15, 100:3, 102:24, 105:19, 115:15, 127:9, 131:1, 136:15, 142:5, 145:14, 147:23, 153:10, 180:5, 180:10, 181:1, 181:12, 182:6, 182:17, 183:9, 198:11, 198:18, 207:19, 210:8, 210:13, 237:8, 253:25, 270:18, 274:11, 279:10, 280:23, 281:6, 281:16, 287:3, 288:10, 290:22, 295:17, 296:3, 296:18, 297:12, 301:4, 301:19, 303:17, 310:19, 311:8, 312:4, 312:7, 312:12
**Under** [1] - 317:21
**undergoing** [1] - 149:13
**understood** [5] - 10:15, 85:1, 121:24, 156:7, 293:14
**undertake** [1] - 53:3
**undertook** [1] - 98:24
**unfair** [1] - 308:11
**ung** [1] - 10:10
**ung-ughs** [1] - 10:10
**UNITED** [2] - 1:1, 316:1
**universe** [1] - 87:9
**unknown** [2] - 185:17, 185:21
**unless** [11] - 17:3, 17:7, 45:1, 50:3, 86:1, 97:14, 122:9, 168:16, 243:24, 269:6, 311:12

**unlike** [1] - 169:8
**unlikely** [2] - 142:14, 224:8
**unravel** [1] - 144:16
**Unrequited** [1] - 182:6
**unrestrict** [2] - 232:10, 301:19
**unrestricted** [15] - 47:23, 123:9, 149:2, 165:7, 265:22, 279:19, 279:23, 286:6, 292:10, 296:25, 301:8, 301:11, 301:24, 302:5, 305:15
**unrestriction** [1] - 305:19
**unsuitable** [1] - 199:2
**unwanted** [3] - 144:1, 144:2, 299:23
**Up** [2] - 7:13, 261:19
**up** [49] - 19:25, 20:3, 29:15, 29:17, 44:3, 44:13, 54:9, 54:18, 54:22, 60:18, 82:10, 84:16, 101:24, 102:18, 104:19, 104:21, 107:13, 111:7, 114:12, 114:17, 115:10, 120:14, 123:4, 132:18, 136:4, 136:8, 157:19, 160:7, 167:1, 168:20, 170:6, 171:5, 179:10, 181:4, 181:13, 181:15, 184:6, 184:11, 185:5, 185:11, 192:16, 204:24, 230:6, 236:23, 254:6, 254:8, 271:22, 299:19, 311:10
**up-to-date** [2] - 82:10, 167:1
**update** [8] - 6:13, 20:15, 52:23, 165:6, 167:2, 172:22, 186:11, 223:23
**updated** [11] - 45:22, 52:20, 138:7, 139:16, 166:22, 223:20, 223:24, 224:1, 224:8, 224:11, 289:9
**updates** [7] - 7:21, 166:12, 172:21, 185:24, 225:5, 280:20, 289:10
**uploaded** [1] - 65:2
**upper** [4] - 56:23, 90:18, 101:22, 188:14
**Upside** [1] - 182:5
**usage** [6] - 31:24, 100:18, 101:13, 102:3, 102:4, 194:6
**useful** [1] - 119:23
**user** [1] - 183:1
**uses** [2] - 26:24, 32:2
**utilize** [2] - 127:25, 180:8

Deposition of Bradley Vinson, Volume 1

utilized [3] - 205:11, 273:5, 284:3
utilizing [1] - 35:10

V

V-i-n-s-o-n [1] - 9:21
value [9] - 221:19, 234:22, 283:16, 285:22, 286:11, 286:14, 286:18, 286:22, 290:2
Value [1] - 249:4
varied [1] - 40:16
varies [1] - 215:12
various [4] - 31:12, 117:20, 194:15, 290:13
vendor [2] - 36:17, 142:24
verbal [1] - 10:8
verbiage [1] - 225:10
verify [3] - 77:15, 108:18, 128:17
version [64] - 13:6, 13:11, 13:12, 13:16, 14:7, 14:13, 14:14, 14:15, 29:13, 44:14, 65:9, 75:3, 75:6, 75:8, 75:10, 75:14, 75:15, 75:16, 76:23, 78:8, 78:15, 78:17, 78:20, 78:23, 82:11, 118:17, 165:21, 165:25, 166:4, 185:25, 188:16, 188:17, 188:19, 190:8, 190:10, 190:12, 190:14, 190:21, 190:22, 191:9, 191:14, 192:1, 192:7, 192:8, 192:15, 193:16, 194:2, 200:25, 205:6, 210:4, 210:9, 224:16, 224:19, 224:22, 232:17, 232:18, 233:11, 289:13, 310:2
versions [15] - 12:23, 13:1, 13:3, 14:3, 14:12, 39:25, 43:23, 77:20, 187:23, 187:24, 188:9, 191:19, 217:19, 260:16, 260:22
via [1] - 268:14
Vicki [5] - 203:5, 203:15, 209:5, 231:10, 284:11
video [4] - 72:6, 72:8, 237:22, 262:5
view [2] - 80:22, 234:15
viewed [1] - 18:18
viewing [2] - 82:9, 209:16
viewpoint [5] - 235:2, 257:18, 257:24, 258:4,

292:13
views [2] - 194:12, 194:17
VINSON [9] - 1:15, 5:6, 5:10, 6:3, 7:3, 8:3, 9:10, 313:1, 317:25
Vinson [46] - 5:13, 5:16, 9:16, 9:21, 15:20, 16:11, 17:8, 21:17, 22:5, 26:3, 28:20, 44:9, 60:23, 66:17, 75:18, 79:6, 94:15, 106:21, 107:19, 133:9, 153:9, 153:23, 159:22, 167:11, 174:1, 188:4, 189:13, 222:5, 223:4, 231:6, 237:1, 245:20, 261:14, 262:24, 266:23, 277:5, 280:6, 284:7, 285:11, 287:21, 291:3, 292:21, 302:15, 308:15, 316:9, 317:5
violate [2] - 129:8, 198:25
violation [5] - 225:16, 225:17, 281:7, 281:16, 293:10
violent [1] - 257:2
virtually [1] - 107:7
visible [1] - 44:19
visual [1] - 121:5
Volume [6] - 1:17, 5:2, 313:2, 316:10, 317:1, 317:6
volunteer [3] - 88:14, 136:1, 141:11
vote [13] - 62:12, 132:12, 171:19, 171:23, 223:21, 227:17, 233:25, 234:1, 236:7, 237:16, 237:21, 257:15
voted [4] - 60:16, 61:5, 62:3, 256:1
Votes [1] - 171:12
votes [2] - 94:4, 236:10
voting [1] - 236:1
Voting [2] - 71:6, 171:11
vs [4] - 1:11, 245:23, 316:6, 317:3

W

wait [2] - 10:2, 304:23
walk [2] - 81:11, 259:1
walked [1] - 47:6
Wallflower [6] - 7:17, 31:19, 74:5, 74:9, 202:23, 208:2
wants [1] - 284:15
Warrington [1] - 182:13

Washington [5] - 2:8, 3:22, 176:6, 183:18, 184:1
Wasilewski [3] - 314:5, 315:4, 316:24
WASILEWSKI [4] - 1:24, 2:23, 314:18, 315:22
watch [3] - 70:20, 222:23, 262:4
watched [4] - 225:2, 256:4, 256:8, 257:8
ways [3] - 25:7, 52:14, 211:13
website [24] - 5:17, 26:10, 79:14, 79:16, 95:3, 154:8, 164:1, 165:20, 167:20, 167:22, 190:12, 190:23, 197:8, 197:9, 197:13, 197:15, 200:2, 201:10, 201:25, 211:6, 211:18, 223:8, 237:10, 248:4
Website [2] - 6:4, 80:1
weed [1] - 187:5
weeded [14] - 175:19, 185:15, 185:20, 186:6, 186:7, 186:8, 186:10, 186:15, 186:19, 186:24, 186:25, 187:7, 187:16
weeding [2] - 185:23, 187:10
Week [1] - 293:1
week [2] - 121:19, 142:6
Weekly [3] - 56:8, 219:14, 249:17
weekly [3] - 130:24, 133:23, 133:24
weird [2] - 172:4, 172:5
welcome [3] - 19:7, 109:20, 135:17
West [1] - 176:6
whereas [1] - 182:2
White [60] - 12:5, 14:19, 18:22, 19:4, 24:24, 28:25, 29:2, 39:24, 40:22, 42:11, 45:17, 55:12, 58:9, 59:14, 61:10, 62:15, 67:5, 67:8, 75:1, 76:4, 76:15, 99:17, 197:12, 204:19, 208:21, 213:4, 213:8, 217:3, 220:3, 220:20, 222:10, 231:10, 240:4, 259:4, 261:25, 265:21, 271:4, 272:18, 274:10, 277:12, 278:19, 280:10, 280:16, 281:22, 283:20, 284:13, 286:20, 289:15, 289:22, 293:2, 297:10, 297:24, 298:9, 303:23, 303:24,

304:9, 306:8, 309:5, 310:24, 311:16
white [1] - 277:14
White's [5] - 18:17, 53:21, 62:23, 73:15, 226:5
whoa [1] - 112:25
whole [4] - 9:7, 19:3, 110:9, 110:11, 125:14, 125:19, 125:20, 126:3, 127:22, 128:19, 132:10, 205:22, 285:21, 290:3
window [1] - 24:19
windows [4] - 24:20, 24:21, 25:15, 25:23
winter [1] - 98:13
wish [3] - 34:23, 281:10, 296:20
withdraw [1] - 37:20
WITNESS [17] - 5:4, 9:8, 43:6, 73:8, 94:12, 104:22, 150:4, 165:11, 175:11, 192:23, 193:4, 193:9, 195:9, 222:4, 236:23, 291:5, 314:13
Witness [4] - 1:15, 9:10, 316:9, 317:5
witness [6] - 1:24, 9:12, 13:9, 308:12, 314:10, 315:10
wonder [1] - 252:24
wondered [1] - 300:1
wondering [2] - 115:12, 160:10
word [4] - 24:20, 61:7, 68:5, 275:15
words [1] - 45:17
works [2] - 26:21, 119:15
world [2] - 24:18, 24:19
WRITE [1] - 317:2
writing [1] - 62:20
written [6] - 161:13, 204:16, 207:8, 231:20, 234:5, 247:25

Y

Y-title [2] - 49:9, 49:13
Y/N [10] - 45:5, 46:18, 48:17, 48:21, 49:1, 49:8, 49:12, 49:16, 49:25, 278:20
Y/No [2] - 43:12, 45:4
YA [15] - 33:1, 33:6, 55:16, 55:18, 55:22, 56:1, 56:5, 56:17, 86:16, 155:14, 156:11, 171:3, 171:6, 171:8, 287:10
YALSA [1] - 249:11

year [10] - 18:7, 84:16, 86:12, 172:14, 215:13, 223:20, 225:5, 230:3, 234:4, 244:25
years [1] - 186:22
yellow [3] - 174:20, 174:22, 175:17
yes/no [3] - 45:23, 46:3, 46:17
Yes/No [1] - 37:6
yesterday [3] - 15:16, 129:1, 174:5
yielded [1] - 159:4
York [2] - 3:15
you-all [4] - 70:20, 141:3, 146:8, 147:7
Young [6] - 136:15, 180:18, 249:5, 249:13, 249:19, 254:22
young [34] - 34:24, 36:20, 36:22, 55:21, 56:11, 56:13, 56:15, 56:16, 56:24, 85:14, 85:19, 86:4, 86:8, 86:20, 87:4, 87:11, 87:18, 88:1, 88:17, 101:17, 101:25, 104:1, 137:11, 139:11, 155:22, 180:21, 180:22, 180:23, 180:25, 249:9, 249:10, 287:11, 287:14
younger [1] - 87:3
yourself [5] - 21:3, 132:2, 304:2, 304:18, 304:21
YouTube [1] - 225:1
Ys [1] - 114:24

Z

ZOOM [3] - 3:1, 4:1, 4:19

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF FLORIDA
 2                      PENSACOLA DIVISION

 3             Case No. 3:23-CV-10385-TKS-ZCB

 4   PEN AMERICAN CENTER, INC.,
     SARAH BRANNEN, BENJAMIN GLASS,
 5   on behalf of himself and his
     minor child, GEORGE M. JOHNSON,
 6   DAVID LEVITHAN, KYLE LUKOFF,
     ANN NOVAKOWSKI, on behalf of
 7   herself and her minor child,
     PENGUIN RANDOM HOUSE LLC, SEAN
 8   PARKER, on behalf of himself
     and his minor child, ASHLEY
 9   HOPE PEREZ, and CHRISTOPHER
     SCOTT SATTERWHITE, on behalf of
10   himself and his minor child,

11        Plaintiffs,
     vs.
12
     ESCAMBIA COUNTY SCHOOL BOARD,
13
          Defendant.
14

15              DEPOSITION OF BRADLEY VINSON
     30(b)(6) Witness for Escambia County School Board
16              and in her Individual Capacity

17                         Volume 2

18          Taken on Behalf of the Plaintiffs

19   DATE TAKEN:     Friday, August 23, 2024

20   TIME:          9:04 a.m. - 5:34 p.m. CDT

21   PLACE:         Anchor Court Reporting
                    229 South Baylen Street
22                  Pensacola, Florida 32502

23

24   Examination of the witness stenographically taken by:
         SUSAN D. WASILEWSKI, RPR, CRR, CMRS, CRC, FPR
25            ~ Realtime Systems Administrator ~
```

```
 1              APPEARANCES IN PENSACOLA, FLORIDA

 2

 3     Counsel for Plaintiffs:

 4        PROTECT DEMOCRACY

 5        BY:  ORI LEV, ESQUIRE

 6             ori.lev@protectdemocracy.org

 7        2020 Pennsylvania Avenue NW, Suite 163

 8        Washington, DC 20006-1811

 9        Telephone:  (850) 860-9344

10

11

12     Counsel for Defendant:

13        RUMBERGER KIRK & CALDWELL, P.A.

14        BY:  NICOLE SMITH, ESQUIRE

15             nsmith@rumberger.com

16        101 North Monroe Street, Suite 1050

17        Tallahassee, Florida 32801

18        Telephone:  (850) 222-6550

19

20

21            ALSO PRESENT IN PENSACOLA, FLORIDA

22        ELLINOR HEYWOOD, Protect Democracy

23        SUSAN WASILEWSKI, Court Reporter

24

25
```

```
 1                    APPEARANCES BY ZOOM

 2

 3      Counsel for Plaintiffs:

 4          BALLARD SPAHR LLP

 5          BY:  FACUNDO BOUZAT, ESQUIRE  (8/22/2024)

 6               bouzatf@ballardspahr.com

 7          1735 Market Street, 51st Floor

 8          Philadelphia, Pennsylvania 19103

 9          Telephone:  (215) 864-8500

10

11          BALLARD SPAHR LLP

12          BY:  LYNN OBERLANDER, ESQUIRE  (8/23/2024)

13               oberlanderl@ballardspahr.com

14          1675 Broadway, 19th Floor

15          New York, New York 10019-5820

16          Telephone:  (212) 223-0200

17

18          PROTECT DEMOCRACY

19          BY:  SHALINI GOEL ARGARWAL, ESQUIRE

20               shalini.agarwal@protectdemocracy.org

21          2020 Pennsylvania Avenue NW, Suite 163

22          Washington, DC 20006-1811

23          Telephone:  (850) 860-9344

24

25
```

```
 1                    APPEARANCES BY ZOOM

 2

 3     Counsel for Defendant:

 4         RUMBERGER KIRK & CALDWELL, P.A.

 5         BY:  JEFFREY J. GROSHOLZ, ESQUIRE

 6              jgrosholz@rumberger.com

 7         101 North Monroe Street, Suite 1050

 8         Tallahassee, Florida 32801

 9         Telephone:  (850) 222-6550

10

11         RUMBERGER KIRK & CALDWELL, P.A.

12         BY:  SAMANTHA DUKE, ESQUIRE

13              sduke@rumberger.com

14         300 South Orange Avenue, Suite 1400

15         Orlando, Florida 32801

16         Telephone:  (407) 872-7300

17

18

19                 ALSO PRESENT BY ZOOM

20         ELLEN D. ODOM, Escambia County School Board

21         CARLIE C. DUQUETTE, Rumberger Kirk

22

23

24

25
```

```
1                      I  N  D  E  X

2                        Volume 2

3                  Friday, August 23, 2024

4    WITNESS                                          PAGE

5    Called by the Plaintiffs:

6    BRADLEY VINSON

7          Direct Examination by Mr. Lev............... 325

8          Cross-examination by Ms. Smith.............. 633

9          Redirect Examination by Mr. Lev............. 636

10         Reross-examination by Ms. Smith............. 639

11         Redirect Examination by Mr. Lev............. 640

12

13                     E X H I B I T S

14                 (Attached to transcript)

15    BRADLEY VINSON DEPOSITION EXHIBITS              PAGE

16   Exhibit 37       Reconsideration Spreadsheet pages    360
                      E-ECSD 001872 and 1873
17
     Exhibit 38       Parent/Guardian Permission for       363
18                    Student to Access a Restricted
                      Title
19
     Exhibit 39       BoardDocs:  Agenda Item Details      367
20                    Meeting of Nov 01, 2022
                      Title:  The Perks of Being a
21                    Wallflower

22   Exhibit 40       BoardDocs:  Agenda Item Details      379
                      Meeting of Feb 20, 2023
23                    Title:  And Tango Makes Three

24   Exhibit 41       BoardDocs:  Agenda Item Details      382
                      Meeting of Feb 20, 2023
25                    Title:  When Aidan Became a Brother
```

```
 1                    E X H I B I T S

 2              (Attached to transcript)

 3    BRADLEY VINSON DEPOSITION EXHIBITS              PAGE

 4    Exhibit 42     BoardDocs:  Agenda Item Details   388
                     Meeting of Mar 20, 2023
 5                   Title:  Drama

 6    Exhibit 43     BoardDocs:  Agenda Item Details   395
                     Meeting of Mar 20, 2023
 7                   Title:  New Kid

 8    Exhibit 44     BoardDocs:  Agenda Item Details   400
                     Meeting of Mar 20, 2023
 9                   Title:  The Bluest Eye

10    Exhibit 45     BoardDocs:  Agenda Item Details   409
                     Meeting of Mar 20, 2023
11                   Title:  The Nowhere Girls

12    Exhibit 46     BoardDocs:  Agenda Item Details   413
                     Meeting of Apr 13, 2023
13                   Title:  Push

14    Exhibit 47     BoardDocs:  Agenda Item Details   417
                     Meeting of Apr 13, 2023
15                   Title:  Lucky

16    Exhibit 48     Spreadsheet:  EXH - 130 Books     420
                     Currently Listed as Restricted -
17                   8-19-24.xlsx

18    Exhibit 49     Spreadsheet:  EXH - 29 Books      471
                     Currently Listed as Unrestricted
19                   - 8-19-24.xlsx

20    Exhibit 50     Innovation Specialist Policies    503
                     and Procedures Manual
21
      Exhibit 51     K-12 Library Access Form          515
22                   E-ECSD 066367

23    Exhibit 52     E-mail - Subject:  Press Release  516
                     - ECPS announces Restricted
24                   Section for Books Under Review
                     E-ECSD 0066359 through 66364
25
```

```
 1                    E X H I B I T S

 2              (Attached to transcript)

 3    BRADLEY VINSON DEPOSITION EXHIBITS              PAGE

 4    Exhibit 53        Access to School Library       517
                        Collections Document
 5                      E-ECSD 0065348

 6    Exhibit 54        E-mail - Subject:  Age         553
                        Appropriate
 7                      E-ECSD 0067489 and 67490

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              THEREUPON, the following proceedings were

2     had and taken at 9:04 a.m. CDT:

3              THE COURT REPORTER:  Would you raise your

4         right hand?

5              Do you solemnly swear or affirm the

6         testimony you're about to give will be the truth,

7         the whole truth, and nothing but the truth?

8              THE WITNESS:  I do.

9              THE COURT REPORTER:  Thank you.

10             BRADLEY VINSON, 30(b)(6) Witness for

11    Escambia County School Board, and in her Individual

12    Capacity, called as a witness by the Plaintiffs,

13    having been first duly sworn, continued to testify

14    as follows:

15                     DIRECT EXAMINATION

16    BY MR. LEV:

17       Q.   Good morning, Ms. Vinson.

18       A.   Good morning.

19       Q.   Have you brought anything to the deposition

20    today that you hadn't brought yesterday?

21       A.   No.

22       Q.   Okay.  So I'm going to dive right in.

23       A.   Okay.

24       Q.   If you could take a look at Exhibit 18,

25    please, this is the copy -- this is a version of
```

1    Policy 4.06 that was in effect as of December 2022,

2    correct?

3        A.    Correct.

4        Q.    And if you take a look at Section

5    10(B)(3)(c), that's on the page that's Bates stamped

6    1364 at the bottom, and we were discussing yesterday

7    when we left off that this paragraph about changing

8    the availability of challenge material to restricted

9    status only applied to challenge material that was

10   going to be restricted, correct?

11       A.    Yes.

12       Q.    Okay.  And the second sentence here says:

13   Parent/guardians may grant permission for their

14   student to check out their material by completing

15   the Permission to Access Restricted Materials form

16   located in the Media Services website and submitting

17   the completed form to the student's school

18   administrator.

19           Correct?

20       A.    Correct.

21       Q.    Can you tell me how that process worked?

22       A.    It would work as described, but I will also

23   say that in my individual media center, I could also

24   receive the form and mark the student's record

25   accordingly.

Deposition of Bradley Vinson, Volume 2

1          Q.   Do you know if that was true across the

2     district, who would receive the form?

3          A.   I would have to refer back to e-mails from

4     Michelle White at the time, but, yes, I recall that

5     she did give us instruction, as media specialists,

6     to be able to receive that form, distribute that

7     form and receive that form.

8          Q.   Do you know how that form was distributed to

9     parents?

10          A.   I distributed it upon request.  I do not

11     know if the same was true of every school.

12          Q.   Okay.  Were parents able to opt in -- did

13     they opt in to a specific title or did they opt in

14     to all restricted titles?

15          A.   I believe the first form that was available

16     was for specific titles, and then a form was made

17     available where parents could opt in to all titles,

18     and this was also available on the website.

19          Q.   And what website was that?

20          A.   The school district website, the Media

21     Services page.

22          Q.   Was it available on individual school

23     websites?

24          A.   I cannot confirm that it was consistently

25     available on school websites, but it -- I can't

Deposition of Bradley Vinson, Volume 2

1    confirm that it was on all school websites.

2        Q.    Was it on some school websites?

3        A.    Yes.

4        Q.    And before July 1st, 2023, if a parent opted

5    in to all restricted books, would their students

6    have access to all restricted books, or was there a

7    category of restricted books that weren't available

8    to opt in?

9        A.    Before HB 1069, before July of 2023, a

10   parent who opted in to give their student access to

11   all restricted books was granting access to all

12   restricted books at that site.

13       Q.    And after HB 1069, if a parent opted in to

14   -- for their child to have access to restricted

15   books, what would that cover?

16       A.    After HB 1069, I would need to confirm with

17   media specialists to see if there were any students

18   receiving access to restricted books.  The books

19   that we pulled for sexual conduct were not available

20   at that time.

21       Q.    I'm trying to understand what the district's

22   policy and practice was once HB 1069 was passed.  If

23   I was a parent who had opted in for my child to have

24   access to all restricted books, let's say before

25   July 1st of 2023, what books would my child have

1    access to after July 1st, 2023?

2        A.    There were a few books at the beginning of

3    the school year in 2023 that were still in a

4    restricted access that sexual conduct did not apply

5    to, and so they could still utilize that form and

6    access those materials that did not contain sexual

7    conduct through that process.

8        Q.    How -- if I was a student who had been

9    granted opt-in access by my parent and I came to the

10   library at my school and wanted to check out all of

11   the books on the restricted list, how would the

12   librarian know which book I could and could not

13   check out after July 1st, 2023?

14       A.    They would have still had restricted as a

15   circulation type, so the librarian could have

16   searched for those books and limited it to that

17   circulation type.

18       Q.    So books that had a restricted circulation

19   type were available, but books that had an HB 1069

20   Storage circulation type were not available for

21   students with opt-in access, is that what you're

22   saying?

23       A.    Yes.

24       Q.    Okay.  And then that status would change

25   over time as the circulation type changed over time?

Deposition of Bradley Vinson, Volume 2

1    The specific books they could access would change

2    over time as the circulation type changed over time?

3        A.    The circulation type would change if the

4    restricted access changed.

5        Q.    If it was determined that a book either was

6    unrestricted or was subject to 1069?

7        A.    Correct.

8        Q.    Was the opt-in form ever e-mailed to all

9    parents?

10       A.    I do not recall it being e-mailed to all

11   parents.  I just know that it was available on the

12   website.

13       Q.    Okay.  You had mentioned yesterday that

14   in -- I believe in April of 2024, you unrestricted

15   books that had been restricted under HB 1557; is

16   that correct?

17       A.    That's accurate.

18       Q.    Okay.  Had you unrestricted any other books

19   in your tenure as Coordinator of Media Services

20   other than the ones you unrestricted in April of

21   2024?

22       A.    I would need to go back and look at them on

23   a case-by-case basis to be sure.

24       Q.    And you would do that by looking at the

25   Reconsiderations Spreadsheet and clicking in the

1   restricted access column and the edit history to see

2   when it was changed?

3       A.   Yes.

4       Q.   Okay.  Let's take a look at Exhibit 19,

5   please, and this is the current version of Policy

6   4.06, correct?

7       A.   Correct.

8       Q.   It's showing the redlines that were -- the

9   changes that were adopted in June of 2023.  You can

10  flip through it to refresh your recollection about

11  it.

12      A.   Yes.  It's just odd that the adopted date is

13  wrong there.

14      Q.   Well, the adopted date shows the date that

15  the policy was originally adopted in 1990, so it

16  shows the --

17      A.   And then the revision of 12/19.  I see what

18  you mean.

19      Q.   Which was the prior --

20      A.   Sorry.

21      Q.   -- last revision.

22      A.   Correct.

23      Q.   So let's turn to Section 10(A)(4) and that

24  begins at the bottom of Page 38.  At the top it says

25  Page 38 of 93.

```
 1            So this is a section -- the Subsection 4

 2    is captioned "Access to Materials Under Review," and

 3    then 10(A)(4)(a) says:  Any material challenged on

 4    the basis that it contains content that is

 5    pornographic or prohibited under FS 847.012 or

 6    depicts or describes sexual conduct as defined in

 7    FS 847.01 (19) unless such materials were a

 8    course -- and some other exceptions listed.

 9            And then it goes on to say that:  Books

10    challenged on that basis will be placed in a

11    restricted area within five days of receipt of the

12    objection and remain unavailable to students of that

13    school until a decision has been made by the

14    superintendent, in consultation with the Coordinator

15    of Media Services, District Materials Review

16    Committee or board.

17            Correct?

18       A.   Correct.

19       Q.   So this is implementing the statutory

20    provision that a book challenged for containing

21    depictions or descriptions of sexual conduct needs

22    to be removed from the shelves within five days,

23    correct?

24       A.   Correct.

25       Q.   And the school board decided to apply that
```

Deposition of Bradley Vinson, Volume 2

```
1    provision -- let me start again.
2           And it says the book is going to remain
3    restricted until a decision has been made, and it
4    goes on to identify who might make the decision.
5    What is the decision that sentence is referring to?
6       A.   The decision would be whether or not to
7    retain the material at any level.
8       Q.   So it's a decision on the challenge itself,
9    not a decision as to whether it should -- not a
10   decision as to whether it contains materials subject
11   to 1069, for example?
12      A.   If we've placed it in that restricted access
13   area, then the decision of whether or not 1069
14   applies has already been made.
15      Q.   Okay.  So it will remain there until the
16   decision on the challenge is made?
17      A.   Yes.
18      Q.   Okay.  And who makes that decision?  And I'm
19   just trying to understand the grammar of the
20   sentence, because it says:  The superintendent, in
21   consultation with the Coordinator of Media Services,
22   District Materials Review Committee or board.
23          And so is it saying that it's always the
24   superintendent in consultation with one of those
25   bodies, or it's three options, either the
```

Deposition of Bradley Vinson, Volume 2

1    superintendent in consultation with the Coordinator

2    of Media Services, or a DMRC, or the board?

3         MS. SMITH:  Objection; form.

4    A.    It's three options.

5    Q.    Okay.  And if you look right below that in

6    the document you're looking at, you see the

7    stricken -- what had been Paragraph B in the prior

8    version of the policy, and that was the paragraph

9    that allowed the superintendent to make a

10   determination that a challenge lacked sufficient

11   facts to support a preliminary finding that

12   materials contained content that, in that case, was

13   pornographic or prohibited under 847.012.

14        Do you see that?

15   A.    Yes.

16   Q.    Okay.  And so this is a provision that was

17   stricken in July of 2023, correct?

18   A.    Correct.

19   Q.    Why was that change made?

20   A.    Because the language in House Bill 1069 does

21   not give you the right to allow those materials to

22   remain in circulation if they've been challenged on

23   that basis.

24   Q.    The language in House Bill 1069 doesn't

25   specify who needs to make a decision as to the

Deposition of Bradley Vinson, Volume 2

1    challenge, does it?

2        A.    I would need to refer back to it to be sure.

3        Q.    Okay.  Do you know if the language in House

4    Bill 1069 says anything about whether a school

5    district can make a determination as to the --

6    whether a challenge on its face is ridiculous or,

7    sorry, lacks sufficient facts to support a finding

8    of sexual conduct?

9            MS. SMITH:  Object to form.

10       A.    I would need to refer back to it.

11       Q.    Okay.  So under this policy, if a parent

12   challenged "Goodnight Moon" as containing sexual

13   conduct, that book would have to removed from

14   library shelves and remain removed until the

15   challenge to that book was finally determined by the

16   school district, correct?

17       A.    May I refer to the language of the statute?

18       Q.    No.  I'm asking you about the policy now.

19           MS. SMITH:  The witness can refer to the

20       language if she needs, Mr. Lev.

21   BY MR. LEV:

22       Q.    I'm asking you about the policy.

23           MR. LEV:  And let me see if she needs to

24       refer to the statute.

25       A.    Will you repeat the question?

1    Q.    I absolutely will repeat the question.

2    A.    Okay.

3    Q.    Under this policy, if a challenge came in to

4    the book "Goodnight Moon" and alleged that that book

5    contained depictions or descriptions of sexual

6    conduct, the school district would remove that book

7    from all library shelves and it would remain removed

8    until a final determination of that book challenge,

9    correct?

10    A.    That is the way this policy reads.

11    Q.    Is that the way the policy is, in fact,

12    applied as well?

13    A.    I don't know that we've had an instance

14    where we've had to apply the policy in that way.

15    Q.    Has the district ever made a determination

16    that a challenge that alleged sexual conduct was --

17    lacked sufficient facts such that you didn't need to

18    apply the policy because it seemed facially

19    ludicrous?

20          MS. SMITH:  Objection; form.

21    A.    I would have to look back at my different

22    reconsiderations that we've received just to be able

23    to answer that question.

24    Q.    Okay.  So you don't know, as you sit here

25    today, if there's ever been a case where somebody

1    alleged sexual conduct and the district decided to

2    put the book back on the shelf because -- before a

3    final decision was made on the challenge?

4          MS. SMITH:  Objection; form.

5      A.    May I look back at my forms?

6      Q.    My concern is only one about time.  That's

7    the reason I'm not wanting you to spend time

8    flipping through forms and eating up our questioning

9    time.

10     A.    Okay.

11     Q.    So from your memory, you don't -- well, let

12   me ask it two different ways.

13          As you sit here today, and without the

14   benefit of looking at your forms, are you aware of

15   any instance in which the school district put a book

16   that was challenged for containing sexual conduct,

17   put such a book back on the shelf before the final

18   challenge to the book was resolved?

19     A.    I would want to look at my form because I'm

20   thinking of one book that I think references the

21   word "sex" in some way, but it does not say sexual

22   conduct, and I did not restrict that book because I

23   did not find that there was sexual conduct present.

24     Q.    Okay.  So that would be an instance where

25   the determination was "I don't think" -- that you

Deposition of Bradley Vinson, Volume 2

1   didn't think the challenge triggered 1069 on its

2   face, that it wasn't an allegation of sexual

3   conduct?

4       A.    But I would want to refer to the form just

5   to be sure of how the box for that --

6       Q.    Do you know what book it is you're thinking

7   of?

8       A.    It was "Fairy Tale."

9       Q.    Great.  So let's look at the form, then,

10  please.  And you're going to be looking at the

11  Reconsiderations Spreadsheet?

12      A.    That's correct.

13      Q.    Okay.  And I'm not trying to trick you by

14  not having you look at the form.  It's really about

15  the timing.

16      A.    So the challenger changed -- under Section

17  3, basis for objection, they changed the color of

18  some of the areas that they indicated.  They did not

19  change the color of the material as pornographic,

20  but they did change the color of the material as

21  prohibited under 847.012.

22          They did not change the color of the

23  material depicts or describes sexual conduct, and

24  then changed the color of the last two bases for

25  objection.

1          And then you see that there is, "What

2     brought this material to your attention?"  This book

3     contains pictures of a mother shamelessly stripping

4     to her underwear in front of two juvenile boys.  It

5     also contains pictures of her in nonsexual nudity

6     having conversations with her child.  And this book

7     contains a preface about the master-disciple

8     relationship in relation to the parent bathing with

9     children or minors.

10          And I determined that sexual conduct was not

11     present, as defined in the statute, in this book,

12     and I did not restrict it.

13     Q.   Okay.  That's very helpful.  Are you aware

14     of any -- do you recall any other instances in which

15     a form alleged -- here it didn't allege sexual

16     conduct, but it did allege --

17     A.   847.012 violation.

18     Q.   -- 847.012.  Are you aware of any other

19     challenges where the allegation invoked either

20     sexual conduct or 847.012 and the book was not

21     restricted?

22     A.   Off the top of my head, I am not sure.  And

23     some of our forms were submitted prior to HB 1069,

24     so it would be even harder to discern if that was

25     the basis for their challenge.

Deposition of Bradley Vinson, Volume 2

1      Q.   And for the forms that were submitted prior

2   to that, how did the school district determine

3   whether the challenge fell under the terms of this

4   new policy that, you know, the challenge was, in the

5   words of the policy, challenged on the basis that it

6   either violates 847.012 or contains sexual conduct?

7      A.   I spent some time looking back at the

8   earlier challenges and what was restricted and when

9   or what was unrestricted, and it's been very hard

10  for me to determine a consistent practice.  It's

11  been very hard for me to determine how Michelle

12  White made that decision.

13     Q.   And are you aware of any written document

14  that lays out the approach the school district was

15  going to take or Michelle White and Tim Smith were

16  taking in making those determinations?

17     A.   I am not aware of such a document.

18     Q.   And when you looked at the challenge for --

19  I'm sorry, the book we were just looking at --

20     A.   "Fairy Tale?

21     Q.   "Fairy Tale."  Thank you.  When you were

22  looking at challenge for "Fairy Tale," how did you

23  go about determining that even though the objector

24  had highlighted the basis of her objection as being

25  847.012, this book need not be restricted pending

1  review?

2      A.   I looked again at the definition of sexual

3  conduct, and I looked through the book to determine

4  if that was present, and I did not see the

5  definition -- the actions and the definition of

6  sexual conduct present in that material.

7      Q.   And so you looked at the book itself?

8      A.   Yes.

9      Q.   Okay.  And was that your general practice

10  once you -- when you became the Coordinator of Media

11  Services, it became your role to determine whether

12  or not to restrict challenged books, correct?

13      A.   Correct.

14      Q.   And was that your general practice in making

15  that determination, was to -- what I'm hearing you

16  say is look at the challenge form and then look at

17  the book to see whether the book, in fact, contains

18  the material that falls under 847.012 or sexual

19  conduct?

20      A.   I did not always have access to a copy of

21  the book, so sometimes I did rely on excerpts that

22  were included in the challenge form, or I would look

23  up the book in, say, Google Books online.

24      Q.   And just for clarity, when I say "contains

25  sexual conduct," I mean contains descriptions of

Deposition of Bradley Vinson, Volume 2

```
1    sexual conduct as described in HB 1069.  Is that how
2    you've understood my reference to "contains sexual
3    conduct"?
4        A.   Yes.
5        Q.   And when you considered a challenge under --
6    that alleged a book contained sexual conduct, were
7    you considering the entire book and its literary,
8    political, artistic or scientific value, or you were
9    solely focused on whether there was any
10   single provision in the book that might meet the
11   definition of the term "sexual conduct"?
12           MS. SMITH:  Objection; form.
13       A.   My reading of HB 1069 indicates that we
14   cannot take the work as a whole when we consider
15   sexual conduct, whether or not it is present.
16       Q.   And so when you were making these decisions,
17   you were not considering the work as a whole,
18   correct?
19       A.   Correct.
20       Q.   Okay.  And do you know whether Michelle
21   White and Tim Smith, when they were making decisions
22   and restrictions, were considering the work as a
23   whole?
24           MS. SMITH:  Objection.
25       Q.   Let me back up for a second.  I'm sorry.  I
```

Deposition of Bradley Vinson, Volume 2

```
1    withdraw that.
2            What date did you start as Coordinator of
3    Media Services?
4        A.    June 8th, 2023.
5        Q.    So do you know whether, when Michelle
6    White -- when Michelle White and Tim Smith were
7    making decisions on book challenges, HB 1069 was not
8    the law, correct?
9        A.    Correct.
10       Q.    And under 847.012, you need to consider the
11   political -- sorry -- the literary, artistic,
12   political, or scientific value of the book to
13   minors, correct?
14       A.    As a whole, yes.
15       Q.    Okay.  Do you know if Michelle White and Tim
16   Smith were considering the book as a whole when they
17   were making decisions on whether or not to restrict
18   books?
19       A.    I have not found -- no, I don't know.
20       Q.    Okay.  If we look back at Exhibit 19, at the
21   top of Page 39 of 93 there, among the language
22   that's stricken, is the sentence that says:
23   Parent/guardians may grant permission for their
24   student to check out the material by completing the
25   Permission to Access Restricted Materials form.
```

Deposition of Bradley Vinson, Volume 2

```
 1            So that's the opt-in process we have been
 2   talking about, correct?
 3      A.    Correct.
 4      Q.    Why was that opt-in provision stricken from
 5   Policy 4.06?
 6      A.    Because HB 1069 does not permit us to
 7   circulate the books that have been restricted based
 8   on sexual conduct.
 9      Q.    How is that consistent with the principle
10   that parents have the right to determine what books
11   their children have access to, which we talked about
12   yesterday?
13      A.    It's consistent with the law.
14            MS. SMITH:  Object to form.
15      A.    It's consistent with the law.
16      Q.    If you turn the page, you see the July
17   2023 -- the 2023 edits to Policy 4.06 added what is
18   now Paragraph (d).  Do you see that new language
19   there?
20      A.    I do.
21      Q.    And that provides that the superintendent
22   retains the right to make a determination that the
23   challenge to a title under 847.012 or -- because it
24   contains sexual conduct, that such a challenge
25   provides sufficient evidence to remove the title
```

 1   without review by the DMRC or the board.

 2        Do you see that?

 3   A.    That is what it says.

 4   Q.    Okay.  Why did the school district decide

 5   to, on the one hand, remove the superintendent's

 6   ability to determine that a challenge lacked -- was

 7   facially insufficient to register -- sorry.

 8        Why did the school district delete the --

 9   let me start one more time.

10        Why did the district decide that the

11   superintendent no longer had the right to make a

12   determination that a challenge lacked sufficient

13   facts to support a challenge under 847.012 or sexual

14   conduct, but at the same time granted him the right

15   to decide without a DMRC and without the board to

16   actually remove a book based solely on the

17   challenge?

18        MS. SMITH:  Objection; form, scope.

19        And before you answer, Ms. Oberlander, could

20     you mute your microphone, please, or we can do

21     it.  And, Ms. Odom, can -- Ms. Odom and

22     Ms. Oberlander, can you please mute your

23     microphones.

24            (Discussion off the record.)

25   BY MR. LEV:

Deposition of Bradley Vinson, Volume 2

```
1        Q.    Do you need the question repeated?

2        A.    No.

3        Q.    Okay.

4        A.    So the portion of the policy that indicated

5    that the superintendent could retain the right to

6    make the determination that the challenge lacks

7    sufficient facts based on the fact that the material

8    would be pornographic or prohibited under 847.012

9    was removed in response to House Bill 1069 requiring

10   removal of those books from circulation.

11           And then the addition of the superintendent

12   being able to make a determination was added to

13   allow for removal of any books that the Coordinator

14   of Media Services and the superintendent deemed

15   likely to meet those definitions, and it would not

16   need a District Materials Review Committee to

17   determine that.

18       Q.    Has that provision ever been utilized to

19   make a final decision on a challenged book?

20       A.    We have not utilized it.

21       Q.    Is there any process or criteria written

22   down about how this provision could or would be

23   utilized?

24       A.    Not at this time.

25       Q.    Is there any plan to promulgate such
```

Deposition of Bradley Vinson, Volume 2

1    procedures or guidelines?

2          MS. SMITH:  Form.

3      A.   There's not a written plan.  There's -- it's

4    just ideas of a plan.

5      Q.   Have you had discussions about such a plan?

6      A.   We intend to meet and have discussions about

7    some of the challenges that we've received for adult

8    materials.

9      Q.   You say "we."  Who's the "we" in that

10   statement?

11     A.   The superintendent and I will be meeting.

12     Q.   At a recent school board workshop the

13   superintendent indicated that he and you might be

14   making some decisions.  And is that what he was

15   referring to?

16     A.   Yes, that's what he's referring to.

17         MS. SMITH:  Objection; form for the last

18     one.  Thank you.

19     Q.   So you and the superintendent intend to sit

20   down and review the book -- the pending book

21   challenges to see if any of those challenges should

22   be granted without a DMRC's or school board review

23   based on your assessment that the book either is

24   prohibited under 847.012 or contains sexual conduct

25   under HB 1069?

Deposition of Bradley Vinson, Volume 2

```
 1              MS. SMITH:  Form.
 2        A.   And would be age inappropriate or outside of
 3   the students' ability to comprehend the material
 4   presented.  So we do not have a final process in
 5   place for this, but we have discussed the
 6   possibility of these decisions being a
 7   recommendation that we present to the board for
 8   approval.
 9        Q.   Okay.  And I take it from your answer that
10   that process -- unlike the decision to restrict
11   books, that process would, in fact, consider the
12   entire work as a whole?
13        A.   Yes.
14        Q.   With regard both to 847.012 and sexual
15   conduct under HB 1069, correct?
16        A.   Correct.
17        Q.   Okay.  And you would be making an assessment
18   with respect to 1069 as to whether you believe that
19   the book is appropriate for certain age groups or
20   grade level, correct?
21        A.   Correct.
22        Q.   And would this process only apply where the
23   recommendation or decision is to remove the title,
24   which is what the language of the policy is, or --
25        A.   The language of the policy is only for
```

1    removing a title.  To retain a title, it would need

2    to go before the District Materials Review

3    Committee.

4        Q.   What's the rationale for having that sort of

5    bifurcated process that allows for expedited removal

6    but does not allow for expedited resolution that

7    keeps the book in some or all grade levels?

8            MS. SMITH:  Objection; form, scope.

9            Go ahead.

10       A.   If we are keeping the material, selecting to

11   keep the material, then we would want community

12   input possible through the District Materials Review

13   Committee process.

14       Q.   But you don't think such community input is

15   necessary if you're deciding to remove the material?

16           MS. SMITH:  Form.

17       A.   Yes.

18       Q.   You being the board, or a representative of

19   the board, you don't believe that community input is

20   necessary if you're deciding to remove the material?

21           MS. SMITH:  Form; scope.

22       A.   We don't have a process in place for this

23   way of removing materials yet, so, yes, it would be

24   ideal to have community input.

25       Q.   In your discussions about the process that

Deposition of Bradley Vinson, Volume 2

1    you're contemplating, have you discussed a way to

2    have community input before you make a decision to

3    remove a title?

4        A.    Yes.

5        Q.    And what would that look like?  What kind of

6    discussions -- what are the ideas you've been

7    discussing about having community input?

8        A.    One way would be to reinstitute the public

9    input form in the Reconsiderations Spreadsheet with

10   that disclaimer that that is meant to be addressing

11   comments only to the book itself and its value.

12       Q.    And then that would be something that you

13   would consider with the superintendent in making any

14   removal decisions?

15       A.    We would certainly review that community

16   input as part of our decision.

17       Q.    As part of your discussions, have you

18   discussed how you would inform the community that

19   you are going to be reviewing certain books for

20   expedited removal decisions and that they could

21   provide input on that?

22            MS. SMITH:  Objection; form.

23       A.    We have not yet discussed that.

24       Q.    Do you know by when you intend to make a

25   decision on instituting a process for this expedited

1    removal process?

2            MS. SMITH:   Form.

3        A.   I do not know.

4        Q.   You don't have a target date by which you

5    want to have this up and running?

6        A.   Sometime this school year possibly, but I

7    could not speak more specifically than that.

8        Q.   The superintendent --

9        A.   Busy time.

10       Q.   The superintendent hasn't directed you to do

11   this by a date certain?

12       A.   No.

13       Q.   Has the superintendent directed you to get

14   the District Materials Review Committees up and

15   running by any specific date?

16       A.   Not by a specific date, but we aim to do so

17   soon.

18       Q.   Okay.  And has the superintendent directed

19   you to complete review of the pending book

20   challenges by any specific date?

21       A.   No.

22       Q.   And then if we look back at Exhibit 19,

23   Section 10(A)(4)(b) -- give me one second.  I'm

24   sorry.

25            So, yeah, sorry.  Page 39 of 93,

Deposition of Bradley Vinson, Volume 2

1    10(A)(4)(b), new (b), used to be 10(A)(4)(c).

2        A.    Yes.

3        Q.    It says:  All other challenged material will

4    remain in circulation during pendency of the review

5    process.

6              Has that, in fact, been the case since

7    July 1st, 2023, that all other challenged material,

8    that is material that isn't restricted for the

9    reasons we've been discussing, has remained in

10   circulation during the pendency of the review

11   process?

12       A.    For a period of time at the beginning of the

13   2023-2024 school year, some of the challenged

14   material that remained in circulation was based on

15   permission only until I unrestricted those titles.

16       Q.    Okay.  These are the unrestricted titles we

17   were talking about earlier --

18       A.    Correct.

19       Q.    -- from April of 2024?

20       A.    Correct.

21       Q.    Okay.  And those titles were restricted, but

22   they were not restricted for reasons --

23       A.    From circulation completely.

24       Q.    But they were in restricted status for

25   reasons other than 847.012 or HB 1069?

Deposition of Bradley Vinson, Volume 2

```
 1              MS. SMITH:  Form.
 2      A.    I could not see a consistent reason for the
 3   periods of time that they were restricted or not
 4   restricted.  I began to inquire about their
 5   restricted status in the beginning of the school
 6   year, and I think I have an e-mail dated September
 7   of 2023 asking about that status.
 8              But it was not until the State's settlement
 9   in spring of 2024 that we found it abundantly clear
10   that the State did not intend for those materials to
11   be restricted in libraries.
12      Q.    When you -- you said you had an e-mail in
13   September of 2023.  Who was that e-mail to or from?
14      A.    That would have been to Ellen Odom, our
15   counsel.
16      Q.    Okay.  Inquiring about books that you saw
17   that were restricted that you didn't understand the
18   basis for the restriction?
19      A.    Correct.
20              MS. SMITH:  Just let me instruct you, if
21       these communications were part of this lawsuit,
22       don't testify about that, please.
23              THE WITNESS:  Okay.
24   BY MR. LEV:
25      Q.    What prompted your outreach to Ms. Odom?
```

1    Let me rephrase that.

2        How did you identify these books that were

3    restricted that you didn't understand why they were

4    restricted?

5        A.   We were going through the HB 1069 process at

6    the time, and books that were restricted for sexual

7    conduct we were removing from circulation, but these

8    were books where I did not find sexual conduct

9    present, and so it left us with two types of

10   restricted books and I wanted to clean it up.

11       Q.   And as part of that 1069 process, were you

12   looking specifically at the challenged books as a

13   group, if I recall correctly from yesterday?

14       A.   What do you mean by that?

15       Q.   Whether you, at some point in that spring of

16   2023 -- I'm sorry -- in the fall of 2023, looked at

17   the list of challenged books and said, okay, what

18   are we doing with these books for purposes of

19   HB 1069, or did those books just come up randomly in

20   the process you had otherwise set up in the Coffee

21   Crews and so forth?

22       MS. SMITH:  Form.

23       A.   Did books randomly come up?  Which books are

24   you referring to?

25       Q.   I'm trying to understand whether you

1    specifically focused on restricted books -- I'm

2    sorry -- on challenged books in the fall of 2023.

3    When you were developing your HB 1069 process, did

4    you treat challenged books as a group to be dealt

5    with, or were they just dealt with just like all the

6    other books in the libraries?

7        MS. SMITH:  Form.

8    A.    It was a very busy time.  We were trying to

9    support our middle school and high school media

10   specialists in reviewing their collections to make

11   as much of their collections available to circulate

12   as possible through the process of reviewing for

13   HB 1069.

14        Looking at the Reconsiderations Spreadsheet,

15   we were, in June and July, trying to make those

16   determinations of whether sexual conduct was

17   present, and then I think I was circling back to

18   those things that were still restricted where we had

19   indicated sexual conduct was not present.

20   Q.    So did you look -- you did this through the

21   lens of looking at the Reconsiderations Spreadsheet?

22   A.    Yes.

23   Q.    Okay.  And you circled back in the fall of

24   2023, and it sounds like that wasn't because of this

25   lawsuit, that was because of your general review of

1    the Reconsiderations Spreadsheet for purposes of

2    HB 1069, correct?

3        A.    Yes.

4        Q.    And you started raising questions then about

5    certain books and why they were restricted?

6        A.    Yes.

7        Q.    And did you have discussions with anybody

8    other than Ms. Odom about that issue?

9        A.    I don't recall having discussions with

10    anyone besides Ms. Odom or Ms. Linda Sweeting.

11        Q.    Okay.  And did you have any discussions with

12    the superintendent or Mr. Marcanio?

13        A.    Mr. Marcanio was already retired by that

14    point.

15        Q.    With the superintendent or Mr. Marcanio's

16    replacement?

17        A.    Denny Wilson?  No, not at that time.  Later

18    we did discuss it with the superintendent.  I think

19    those conversations would have started in the spring

20    of 2024.

21        Q.    Right before you ultimately unrestricted the

22    books?

23        A.    Within a couple of months of that time.

24        Q.    I see.  And would those be conversations in

25    e-mails?

Deposition of Bradley Vinson, Volume 2

1      A.    In person.

2      Q.    Okay.  And can you tell me about your

3   conversations with Ms. Sweeting about this?

4      A.    Ms. Sweeting and I were discussing these and

5   in some cases looking back at them to determine when

6   they had been restricted and to see if we could

7   discern why they were restricted.

8            We were aware that Ms. Odom and Michelle

9   White had both indicated that HB 1557 did not apply

10  to self-selected library materials in board

11  meetings, and we did not want to unrestrict them

12  without understanding what the purpose of their

13  restriction was initially, but we started having

14  those conversations.

15     Q.    And did you ultimately understand what the

16  purpose of their restriction was?

17           MS. SMITH:  Form.

18     A.    No.

19     Q.    And why did you then decide to unrestrict

20  them in the spring of 2024?

21     A.    Because they did not contain sexual conduct,

22  and if they had LGBTQ content, HB 1557 did not apply

23  to self-selected library materials.

24     Q.    But why -- you knew all of that in the fall

25  of 2023, when you first identified these books as an

Deposition of Bradley Vinson, Volume 2

```
1    area of inquiry.  Why did it take another eight or
2    nine months to unrestrict them?
3              MS. SMITH:  Form.
4        A.    I never felt like there was clear
5    communication from the State that stated that, that
6    I had seen at that time.
7        Q.    And the settlement you referred to provided
8    you with that?
9        A.    Yes.
10       Q.    And you had never been provided with a copy
11   of the exhibit I showed you yesterday, where the
12   State clearly stated that HB 1557 did not apply to
13   library materials in December of 2022?
14             MS. SMITH:  Objection; form.
15       A.    I don't recall seeing that.
16       Q.    When you made the decision to unrestrict
17   this, who -- did somebody else have to approve that
18   decision, or were you --
19       A.    I discussed it with the superintendent.
20       Q.    And did he concur with your view?
21       A.    Yes.
22       Q.    Did you discuss it with the board?
23       A.    No.
24       Q.    Did you discuss it with any board member?
25       A.    No.
```

Deposition of Bradley Vinson, Volume 2

```
 1      Q.   What is your understanding of whether HB 7

 2    applies to library books?

 3      A.   I don't -- we don't have HB 7 in our policy.

 4    I know that Michelle White included it in some

 5    materials for some of the statements that are

 6    present there, but -- could you repeat the question?

 7    I'm sorry.

 8      Q.   What your understanding is whether HB 7

 9    applies to library books.

10      A.   I would need to read it very carefully.  I

11    feel like there are parts of our policy that align

12    with it when we talk about things being factual and

13    unbiased.

14      Q.   Okay.  In your discussions about

15    unrestricting these books, did HB 1557 come up?

16      A.   Unrestricting --

17      Q.   The books we were talking about, the books

18    that were unrestricted in September -- in April of

19    2024 that you started talking about in September of

20    2023.  In those discussions with Linda Sweeting or

21    others, did HB 1557 come up?

22      A.   Yes.

23      Q.   Okay.  Did HB 7 come up in those

24    discussions?

25      A.   No.
```

1          MR. LEV:  Okay.  Can we get, yeah, KK.

2      (Vinson Exhibit 37 was marked for identification.)

3          MS. HEYWOOD:  This is Exhibit 37.

4    BY MR. LEV:

5      Q.   So I'm giving you what's been identified as

6    Exhibit 37 and I will tell you these are printouts

7    from two different versions of the Reconsiderations

8    Spreadsheet that we were provided in discovery.  The

9    first page is from April 1st, 2024, at 2:11 p.m.,

10   and the second page is from April 1st, 2024, at

11   9:38 a.m.

12          MS. SMITH:  Ori, just for the record, that's

13       counsel's handwritten writing at the top of

14       Exhibit 37?

15          MR. LEV:  It is.

16          MS. SMITH:  Thank you.

17          MR. LEV:  It is.  We could get the Bates

18       numbers of the two versions of the spreadsheet

19       that we pulled this from.

20   BY MR. LEV:

21      Q.   I'm showing you this, Ms. Vinson, because it

22   shows the change in restricted status of three

23   books, "Speak," "The Hate U Give," and "Lady

24   Midnight," which had not been restricted as of the

25   morning of April 1st on the spreadsheet and were

1    restricted as of the afternoon of April 1st on the

2    spreadsheet.

3            Do you see that?

4        A.    Yes.

5        Q.    Okay.  Did you make those changes to

6    restrict those three books on April 1st?

7        A.    Yes.

8        Q.    In your declaration you indicated that each

9    of these three books had not been restricted as a

10    result of the challenge to the books but only as a

11    result of the 1069 review process, correct?

12       A.    Correct.

13       Q.    Okay.  You also had indicated that these

14   books were identified as containing -- possibly

15   containing sexual conduct in July or August of 2023,

16   and I'm trying to understand why it was not until

17   April 1st of 2024 that the spreadsheet was updated

18   to reflect that.

19       A.    That was really my error.  They had been

20   pulled for 1069 and I just hadn't made the change.

21       Q.    Had the process generally, though, been in

22   place in July and August of 2023 that if a book was

23   pulled for 1069, the Reconsiderations Spreadsheet

24   would be updated to reflect that with a Y?

25       A.    Not automatically.

Deposition of Bradley Vinson, Volume 2

1      Q.   I understand.  But was that your general

2   practice then -- you said this was your mistake,

3   which suggested to me that at the time, what you

4   were trying to do -- you're human, but what you were

5   trying to do was that if a book was pulled for 1069,

6   you would update the spreadsheet in a more timely

7   manner; is that correct?

8      A.   Yes.  Yes.

9      Q.   Okay.  As distinct from, "Oh, we weren't

10   doing that, I caught up with it all in December" or

11   something, but that's not your testimony.  It was

12   you were trying to do it in realtime beginning in

13   the summer of 2023, you were -- your goal was to

14   update the Reconsiderations Spreadsheet as you made

15   decisions on 1069, correct?

16      A.   Correct.

17      Q.   Are you aware of other challenged books

18   that -- you know, I'm going to hold that question.

19         MS. SMITH:  Ori, Ellinor was kind enough to

20      pull the Bates numbers.  Do you want to read them

21      into the record so we all have them?

22         MR. LEV:  Sure.  So for Exhibit 37, the

23      first page is Bates Number ECSD001873, and the

24      second page is ECSD001872, and each of those

25      pages are excerpts from those Bates numbers for

```
 1        the three books identified.
 2              MS. SMITH:  Thank you.
 3              MR. LEV:  Thank you.
 4              Can we look at L?
 5      (Vinson Exhibit 38 was marked for identification.)
 6    BY MR. LEV:
 7        Q.   So Exhibit 38 is a document we downloaded
 8    from the Escambia County School District's website.
 9              Do you recognize this document?
10        A.   I do.
11        Q.   And what is it?
12        A.   This is the permission form for parents to
13    grant access for their students to access restricted
14    titles.
15        Q.   Okay.  And this is posted on the Media
16    Services web page?
17        A.   Yes.
18        Q.   And I believe you said it may have been
19    posted on some school web pages as well, but not all
20    schools?
21        A.   I could not confirm that it was all schools.
22        Q.   But this is the form we were talking about
23    earlier?
24        A.   Yes.
25        Q.   And it has a date at the bottom.  It says
```

Deposition of Bradley Vinson, Volume 2

1    9/29/22, update 8/2/23.

2          I understand that that means the form was

3    created in September of 2022.

4      A.   Yes.

5      Q.   Do you know how it's changed from September

6    of 2022 until its update in August of 2023?

7      A.   I do not know.  I could look back and see if

8    I have access to the version history.

9      Q.   Okay.  Do you know how many parents have

10   completed opt-in forms?

11     A.   No, I do not.  I don't know.

12     Q.   How would you determine that if you were to

13   try to answer that question?

14     A.   We would need to ask all of the individual

15   media specialists who maintain those records at each

16   individual school.

17     Q.   Okay.  Do you have a sense of the order of

18   magnitude of that number?

19          MS. SMITH:  Form.

20     A.   No.

21     Q.   Do you need a break or can we keep going?

22     A.   I'm okay.

23     Q.   Okay.  So can you pull out Exhibit 26 from

24   that stack, please?

25     A.   I can try.

1    MS. SMITH:  What is it, Ori?

2    MR. LEV:  It's the press release from

3    September 26, 2022.

4    BY MR. LEV:

5    Q.  So we looked at this yesterday.  This was

6    the press release the school district issued when it

7    began restricting all challenged books, correct?

8    A.  Correct.

9    Q.  And the top of Page 2 reads:  The school

10   board has the authority to remove books from its

11   libraries; however, it cannot do so simply because

12   it disagrees with the message of a book or it

13   offends the personal morals of an individual.

14   Through the review process, if the school board

15   determines that a particular book is pornographic or

16   obscene, is not suited to students' needs and their

17   ability to comprehend the material presented, is

18   inappropriate for the grade level and age group for

19   which the material is used, or is factually

20   inaccurate or misleading, it can direct removal of

21   such book.

22       Did I read that correctly?

23   A.  You did.

24   Q.  Okay.  Does that accurately reflect the

25   board's understanding of the scope of its authority

1    to remove books from libraries or restrict ages at

2    which books can be accessed?

3         MS. SMITH:  Form; scope.

4    A.   Yes.

5    Q.   Do you know if board members were trained on

6    the scope and what was and was not a permissible

7    reason to remove or restrict access to a book?

8         MS. SMITH:  Form; scope.

9    A.   I think there was a response to an

10   interrogatory that I was reviewing, and I cannot

11   remember exactly what it said, but I know that the

12   school board members did attend some training and

13   have been made familiar with statutes and our

14   policy.

15   Q.   Do you know if they received training on the

16   bases on which a book can be removed and cannot be

17   removed that I just read?

18        MS. SMITH:  Form; scope.

19   A.   I -- at this time, this was not part of the

20   adopted policy.  I would refer back to the policy.

21   Q.   The question was if you know whether they

22   received training on what's set forth in this

23   paragraph I just read.

24        MS. SMITH:  Same objection.

25   A.   I cannot verify that they received training

Deposition of Bradley Vinson, Volume 2

1  on these specific things.

2    Q.   The DMRCs were required to explain the

3  reasons for their decision for removing a book?

4    A.   They were not required to explain their

5  reasons.  They had discussions and they answered

6  questions, but then they cast their ballots.

7    Q.   Okay.  I'd like to walk through each of what

8  we refer to as the removed books which have either

9  been removed completely or removed from some grade

10  levels.  So we can set aside Exhibit 26.  You can

11  set it aside.

12    (Vinson Exhibit 39 was marked for identification.)

13        MS. HEYWOOD:  This is Exhibit 39.

14  BY MR. LEV:

15    Q.   Exhibit 39 is the agenda items details

16  that -- for the book "Perks of Being a Wallflower"?

17    A.   Yes.

18    Q.   And so this is from the -- I forgot the name

19  of the -- the BoardDocs.  This is from the BoardDocs

20  website and it's what's linked to from the

21  Reconsiderations Spreadsheet, correct?

22    A.   Correct.

23    Q.   And this accurately reflects the action the

24  board took with respect to the challenge to "The

25  Perks of Being a Wallflower," correct?

Deposition of Bradley Vinson, Volume 2

1      A.   To the challenge regarding whether "Perks of

2   Being a Wallflower" could be used as a twelfth grade

3   optional novel study, yes.

4      Q.   And then the second and third pages of this

5   are just the table of contents from the document

6   that is linked on the first page, "Perks of Being a

7   Wallflower" board appeal, and it's the table of

8   contents of that packet we went through yesterday,

9   correct?

10      A.   Correct.

11      Q.   And so this reflects all the material that

12   the board was provided with regard to this

13   challenge, correct?

14      A.   Correct.

15      Q.   Okay.  And the school board meeting from

16   November 1st, 2022, which is available online, that

17   reflects the board's discussion of this issue with

18   regard to "Perks of Being a Wallflower"?

19      A.   Yes.

20      Q.   Okay.  Is there any other record other than

21   that meeting or the documents that were part of the

22   packet that we're talking about that are part of the

23   official record of the board's decision?

24          MS. SMITH:  Objection; scope.

25          Go ahead.

Deposition of Bradley Vinson, Volume 2

1      A.    I don't know of any other record.

2      Q.    Okay.  Do you know if each board member read

3    "The Perks of Being a Wallflower" in its entirety?

4          MS. SMITH:  Objection; scope.

5      A.    My understanding is that they did.

6      Q.    And that understanding is based on?

7      A.    Their statements.

8      Q.    At the board meeting?

9      A.    I'm also thinking of the interrogatory

10    response as well, which may have been collected by

11    Ellen Odom as well.

12      Q.    Not statements to you, but you're basing

13    this on the interrogatory response?

14      A.    Yes.

15      Q.    Okay.  And do you know if each board member

16    read the entirety of the appeal packet prior to the

17    meeting?

18      A.    My understanding is that they did.

19      Q.    And how do you know that?

20      A.    That's, again, I think a response to the

21    interrogatory.

22          MS. SMITH:  And scope for that last

23      question.

24      Q.    Okay.  So that's what you're basically

25    referring -- whatever the interrogatory says is what

Deposition of Bradley Vinson, Volume 2

```
1    you know?

2        A.   Yes.

3        Q.   Okay.  Do you know what criteria the board

4    applied in making its decision on "The Perks of

5    Being a Wallflower"?

6            MS. SMITH:  Objection; outside the scope.

7        A.   Beyond comments that they may have made

8    during the meeting itself, no, I know of no other

9    motivations.

10       Q.   Thank you.

11           MR. LEV:  Nicole, can you explain your scope

12       objection?

13           MS. SMITH:  Yes.  I had conversations with

14       Paul Safier of your office to ask him if the

15       reasons or the motivations of the board were part

16       of this deposition, and he stated that they were

17       not, that they were intentionally excluded from

18       the depo notice, and so that's the basis for my

19       objection.

20           MR. LEV:  Okay.  And you believe that

21       objection applies to questions about whether the

22       board members read the book and read the packet?

23           MS. SMITH:  If they go to -- well, I think

24       that's outside of the scope as well.  If you can

25       point me to what topic you believe they're part
```

1    of -- that was separate, but any questions as to

2    why the board did what they did.

3         MR. LEV:  Well, the identity of the removed

4    books and the process leading to their removal,

5    the school board's policy or practice and process

6    for evaluating book challenges, including any

7    school board criteria for making book removal

8    decisions.

9         MS. SMITH:  Right.  So I think process

10   questions are fair, but questions as to

11   individual board members, I'm going to maintain

12   my -- the reasons and what they based it on.

13        MR. LEV:  Okay.

14        MS. SMITH:  I'm just preserving my objection

15   there.

16        MR. LEV:  Understood.  I just wanted to

17   understand it.  We can agree to disagree.

18        MS. SMITH:  Sure.

19   BY MR. LEV:

20   Q.   Do you know what the basis was for the

21   board's decision to restrict the book to twelfth

22   grade optional novel study?

23        MS. SMITH:  Objection; scope.

24   A.   Could you repeat that question?

25   Q.   Do you know the basis for the board's

Deposition of Bradley Vinson, Volume 2

```
1    decision?

2        A.    I do not.

3        Q.    Do you know the motivation of any of the

4    board members?

5            MS. SMITH:  Objection; scope.

6        A.    I do not.

7        Q.    Do you know if -- did the board make any

8    findings regarding the reason for its decision?

9            MS. SMITH:  Form.

10        A.    Beyond comments that they may have made

11    during that public meeting, no, I do not.

12        Q.    Did the board determine that the book was

13    pornographic or obscene in violation of FS 847.012?

14            MS. SMITH:  Objection; outside the scope,

15        form.

16        A.    That was not part of this determination.

17        Q.    Did the board determine that the book was

18    unsuited to student needs and their ability to

19    comprehend the material presented?

20            MS. SMITH:  Objection; scope.

21        A.    That was not part of this determination.

22        Q.    Did the board determine that the book was

23    inappropriate for the grade level and age group for

24    which the material had been used?

25            MS. SMITH:  Objection; scope.
```

Deposition of Bradley Vinson, Volume 2

1       A.    That, I am not sure of.

2       Q.    Did the board determine that the book was

3  factually inaccurate or misleading?

4           MS. SMITH:  Objection; scope.

5       A.    Not to my knowledge.

6       Q.    Did the board consult any material about the

7  book other than what was provided in the appeal

8  packet prior to the meeting?

9           MS. SMITH:  Objection; scope.

10      A.    Not to my knowledge.

11      Q.    Do you know?  You said not to your

12 knowledge.  Do you have a basis for knowing whether

13 or not they consulted anything other than the appeal

14 packet?

15      A.    No.

16      Q.    Okay.  Do you know if any board member

17 communicated with the challenger about the book

18 prior to the board meeting?

19           MS. SMITH:  Scope.

20      A.    I don't know about the actions of the

21 individual board members or what their e-mails may

22 have contained.

23      Q.    Okay.  Do you know if any of the board

24 members communicated with each other about the

25 challenge prior to the board meeting?

```
 1              MS. SMITH:  Scope.
 2        A.    That would have been out of the sunshine.  I
 3   do not know of any such communication.
 4        Q.    Do you know if any board member communicated
 5   with the superintendent or the Coordinator of Media
 6   Services about the challenge to the book prior to
 7   the board meeting?
 8              MS. SMITH:  Scope.
 9        A.    I don't know.
10        Q.    Was there any other forum in which the board
11   or any individual board member expressed particular
12   concerns about the book and why they voted to
13   restrict it?
14              MS. SMITH:  Could you repeat the question?
15        I'm sorry.
16        Q.    Are you aware -- was there any -- let me
17   start again.
18              Was there any other forum in which any
19   individual board member expressed particular
20   concerns about this book?
21              MS. SMITH:  Form.
22        A.    Not to my knowledge.
23              MR. LEV:  Okay.  Next.
24              MS. HEYWOOD:  We're going to reuse Exhibit 7
25        and 23.
```

Deposition of Bradley Vinson, Volume 2

```
 1   BY MR. LEV:
 2       Q.   Exhibit 7 is the agenda items details page
 3   for the challenge to "All Boys Aren't Blue," and
 4   Exhibit 23 is the table of contents for the appeal
 5   packet from the challenge to "All Boys Aren't Blue."
 6       A.   Yes.
 7       Q.   Okay.  And Exhibit 7 accurately reflects the
 8   action that the board took with respect to the
 9   challenge to "All Boys Aren't Blue"?
10       A.   Yes.
11       Q.   Which was to remove the book from all
12   libraries?
13       A.   Yes.
14       Q.   Okay.  And then it links to two documents,
15   the board -- "All Boys Aren't Blue" board appeal and
16   the community input document, correct?
17       A.   Yes.
18       Q.   And those were the only documents that were
19   provided to the board in connection with this
20   appeal?
21       A.   Yes.
22       Q.   And Exhibit 23 shows the material that was
23   provided to the board as part of that appeal packet,
24   correct?
25       A.   Correct.
```

1    Q.    Okay.  And the board meeting held on

2    February 20th, 2023, would reflect the board's

3    deliberations and decisions about this challenge?

4    A.    Correct.

5    Q.    Did each board member read "All Boys Aren't

6    Blue" in its entirety prior to the meeting?

7        MS. SMITH:  Objection; scope.

8    A.    From the response to the interrogatory, yes.

9    Q.    Okay.  Did each board member review the

10   entirety of the appeal packet provided prior to the

11   meeting?

12       MS. SMITH:  Scope.

13   A.    I don't know.

14   Q.    Okay.  The board was provided with excerpts

15   from HB 7 and HB 1557 as part of the packet of

16   materials it was given, correct?

17   A.    Correct.

18   Q.    What criteria did the board apply in making

19   its decision?

20       MS. SMITH:  Objection; scope.

21   A.    I don't know.

22   Q.    What was the basis for the board's decision

23   to remove the book from all libraries?

24       MS. SMITH:  Scope.

25   A.    Beyond the comments that were made there, I

Deposition of Bradley Vinson, Volume 2

```
1    don't know.
2        Q.   Okay.  Do you know what the motivation of
3    any of the board members was who voted to restrict
4    this book -- remove this book?
5            MS. SMITH:  Objection; scope.
6        A.   No.
7        Q.   Okay.  Did the board make any findings
8    regarding its reasons for its decision?
9            MS. SMITH:  Scope.
10       A.   Outside of the comments made during the
11   board meeting, no, I know of no others.
12       Q.   Did the board determine that the book was
13   pornographic or obscene in violation of FS 847.012?
14           MS. SMITH:  Scope.
15       A.   That was not part of what the board voted
16   on.
17       Q.   Did the board determine that the book was
18   not suited to student needs and their ability to
19   comprehend the material presented?
20           MS. SMITH:  Scope.
21       A.   I don't know their motivations individually,
22   and their action that they took together was to
23   remove the material.
24       Q.   Did the board determine that the book was
25   factually inaccurate or misleading?
```

```
 1              MS. SMITH:  Scope.
 2      A.    Not to my knowledge.
 3      Q.    Did any board member consult any material
 4  about the book other than what was provided in the
 5  appeal packet prior to the meeting?
 6              MS. SMITH:  Scope.
 7      A.    Not to my knowledge.
 8      Q.    Did any board member communicate with the
 9  challenger, the person who challenged the book,
10  prior to the meeting?
11              MS. SMITH:  Scope.
12      A.    I don't -- I don't know.
13      Q.    Did any board member communicate with any
14  other board member about the challenge prior to the
15  meeting?
16              MS. SMITH:  Scope.
17      A.    Not to my knowledge.
18      Q.    Did any board member communicate with the
19  superintendent or Coordinator of Media Services
20  about the challenge to the book prior to the
21  meeting?
22              MS. SMITH:  Scope.
23      A.    Not to my knowledge.
24      Q.    And was there any other forum in which the
25  board or individual member -- sorry.  Was there any
```

Deposition of Bradley Vinson, Volume 2

1    other forum in which -- I'm going to try it a third

2    time.

3           Was there any other forum in which any

4    individual board member expressed particular concern

5    about the book?

6           MS. SMITH:  Form; scope.

7       A.    Not to my knowledge.

8      (Vinson Exhibit 40 was marked for identification.)

9           MS. HEYWOOD:  Exhibit 40.

10          THE WITNESS:  Thank you.

11          MS. SMITH:  Thank you.

12   BY MR. LEV:

13      Q.    Exhibit 40 is the agenda items detail form

14   for the challenge to "And Tango Makes Three."

15      A.    Yes.

16      Q.    And, again, this is from the BoardDocs

17   website, and this reflects the board's decision to

18   remove "And Tango Makes Three" from all school

19   libraries?

20      A.    That's correct.

21      Q.    And the two documents linked here were all

22   of the material provided to the board for it to make

23   that decision?

24      A.    That's correct.

25      Q.    And the second page is the table of contents

```
1    for that -- the first of the linked documents, the
2    appeal packet that shows the material the board was
3    provided, correct?
4        A.   Correct.
5        Q.   And the board meeting of February 20th,
6    2023, reflects the board's deliberations about this
7    challenge and its decision?
8        A.   Yes.
9        Q.   Okay.  Did each board member read "And Tango
10   Makes Three" in its entirety prior to the meeting?
11            MS. SMITH:  Scope.
12       A.   Yes.
13       Q.   That's based on the interrogatory response?
14       A.   And also from viewing the meeting.
15       Q.   Okay.  Did each board member review the
16   entirety of the appeal packet prior to the meeting?
17            MS. SMITH:  Scope.
18       A.   To the best of my knowledge, yes.
19       Q.   Is that based on the interrogatory response?
20       A.   Yes.
21       Q.   And the board was provided with excerpts
22   from HB 7 and HB 1557 as part of the materials for
23   this appeal, correct?
24       A.   Correct.
25       Q.   What criteria did the board apply in making
```

1  its decision to remove "And Tango Makes Three" from

2  Escambia County Public School libraries?

3          MS. SMITH:  Scope.

4      A.   I don't know.

5      Q.   What was the basis for its decision to

6  remove the book from all school libraries?

7          MS. SMITH:  Scope.

8      A.   Beyond the comments made during that

9  meeting, I don't know.

10     Q.   Did any board member consult any material

11 about the book other than what was provided in the

12 appeal packet and the community input form prior to

13 the meeting?

14         MS. SMITH:  Scope.

15     A.   Could you repeat that question?

16     Q.   Whether any board member consulted any other

17 material about the book other than what was provided

18 in the documents linked here?

19     A.   Not to my knowledge.

20         MS. SMITH:  Scope.

21     Q.   Did any board member communicate with the

22 challenger of the book prior to the meeting?

23         MS. SMITH:  Scope.

24     A.   Not to my knowledge.

25     Q.   Did any board member communicate with any

Deposition of Bradley Vinson, Volume 2

1    other board member about the challenge prior to the

2    meeting?

3            MS. SMITH:  Scope.

4       A.   Not to my knowledge.

5       Q.   Did any board member communicate with the

6    superintendent or the Coordinator of Media Services

7    about the challenge to the book prior to the

8    meeting?

9            MS. SMITH:  Scope.

10      A.   Not that I'm aware.

11      Q.   You said not that you're aware of?

12      A.   Not to my knowledge.

13      Q.   Okay.  And is that different than "I don't

14   know"?

15      A.   If they communicated, I don't know.  No,

16   it's not different.

17      Q.   Okay.  I'm just trying to understand if

18   there's -- you're trying to convey something

19   different in that verbiage.

20           And was there any other forum in which any

21   individual board member expressed concerns about

22   "And Tango Makes Three"?

23      A.   Not to my knowledge.

24           MS. SMITH:  Form.

25     (Vinson Exhibit 41 was marked for identification.)

```
 1   BY MR. LEV:
 2       Q.   Exhibit 41 is the agenda item details form
 3   for the challenge to "When Aidan Became a Brother"
 4   and then the table of contents and the appeal
 5   packet?
 6       A.   Yes.
 7       Q.   And the agenda items detail form reflects
 8   the board's decision to remove "When Aidan Became a
 9   Brother" from all schools, correct?
10       A.   Correct.
11       Q.   And it has two documents linked there, and
12   those are the only documents and materials provided
13   to the board in connection with this appeal,
14   correct?
15       A.   Correct.
16       Q.   And the second page shows us what was
17   provided as part of that first linked document,
18   correct?
19       A.   Correct.
20       Q.   And the school board meeting of February 20,
21   2023, reflects the board deliberation and decision
22   on "When Aidan Became a Brother"?
23       A.   Yes.
24       Q.   Did each school board member read the book
25   in its entirety prior to the meeting?
```

Deposition of Bradley Vinson, Volume 2

```
1              MS. SMITH:  Scope.
2       A.    Yes.
3       Q.    Is that based on the interrogatory?
4       A.    Based on the interrogatory.
5       Q.    Did each school board member review the
6   entirety of the appeal packet provided prior to the
7   meeting?
8              MS. SMITH:  Scope.
9       A.    To the best of my knowledge, yes.
10      Q.    Is that based on the interrogatory?
11      A.    Yes.
12      Q.    Okay.  And the board was provided with
13  excerpts of HB 7 and HB 1557 as part of the
14  materials it was provided, correct?
15      A.    Correct.  I'll also point out that it does
16  show Michelle White had included that HB 1557
17  clarification in the packet.
18      Q.    Yes.  And we looked at that yesterday, and I
19  believe I asked you if it said anywhere in there
20  that HB 1557 did not apply to library materials, and
21  my recollection is that you reviewed the document
22  and could not identify any such statement.
23             MS. SMITH:  Form.
24      A.    Correct.
25      Q.    Okay.  What criteria did the board apply in
```

Deposition of Bradley Vinson, Volume 2

```
 1   deciding to remove "When Aidan Became a Brother"
 2   from all school libraries?
 3          MS. SMITH:  Scope.
 4      A.   I'm sorry.  Could you repeat the question?
 5      Q.   What criteria did the board apply when it
 6   made its decision to remove the book?
 7      A.   I don't know.
 8      Q.   And what was the basis for its decision?
 9          MS. SMITH:  Scope.
10      A.   I will point out the books that we've been
11   discussing, this was a very long board meeting.  I
12   don't know if you viewed it in its entirety, but
13   there were members of the public who also gave
14   comments that would have been in addition to the
15   packet.  So the board may have also been considering
16   those comments in their deliberations.
17      Q.   Thank you.  And that's true for -- all of
18   the board meetings had public comments?
19      A.   Correct.
20      Q.   But do you know the basis for its decision
21   to remove the book?
22          MS. SMITH:  Scope.
23      A.   Beyond the comments they made in that
24   meeting, no, I do not know.
25      Q.   Okay.  And do you know what the motivation
```

1  of any of the board members was who voted to remove

2  this book?

3        MS. SMITH:  Scope.

4     A.   No, I don't know.

5     Q.   Okay.  Did the board make any findings

6  regarding the reason for its decision to remove the

7  book?

8        MS. SMITH:  Form.

9     A.   Beyond the comments that they made during

10 that meeting, no, I don't know of any others.

11    Q.   Did the board determine that the book was

12 pornographic or obscene or in violation of

13 FS 847.012?

14       MS. SMITH:  Scope.

15    A.   No.

16    Q.   Okay.  Did the board determine that the book

17 was unsuited to students' needs and their ability to

18 comprehend the material presented?

19       MS. SMITH:  Scope.

20    A.   As a board, that was not their finding.  I

21 indicate review of individual comments for further

22 information on that one.

23    Q.   Did the board determine that the book was

24 inappropriate for the grade level and age group for

25 which it had been available?

Deposition of Bradley Vinson, Volume 2

```
 1              MS. SMITH:  Scope.
 2      A.   As a board, that was not detailed in their
 3   motion and in their vote, but I would again refer
 4   you to the comments from the meeting if you need
 5   further --
 6      Q.   Okay.  Did the board determine that the book
 7   was factually inaccurate or misleading?
 8              MS. SMITH:  Scope.
 9      A.   Not to my knowledge.
10      Q.   Do you know if the board -- any board member
11   consulted any material about the book other than
12   what was provided in the appeal packet prior to the
13   meeting?
14              MS. SMITH:  Scope.
15      A.   At least one of them referred to a
16   conversation that she had that would have been
17   outside of the comments packet or outside of the
18   public forum, but I don't know of any other.
19      Q.   Okay.  Did any board member communicate with
20   the challenger of the book prior to the meeting?
21              MS. SMITH:  Scope.
22      A.   Not to my knowledge.
23      Q.   Did any board member communicate with any
24   other board member about the challenge prior to the
25   meeting?
```

1          MS. SMITH:  Scope.

2     A.    Not to my knowledge.

3     Q.    Did any board member communicate with the

4  superintendent or the coordinator of Media Services

5  about the challenge to the book prior to the

6  meeting?

7          MS. SMITH:  Scope.

8     A.    Not to my knowledge.

9     Q.    And was there any other forum in which any

10  board member expressed particular concerns about the

11  book prior to the meeting?

12          MS. SMITH:  Form.

13     A.    Not to my knowledge.

14          MS. HEYWOOD:  Exhibit 42.

15    (Vinson Exhibit 42 was marked for identification.)

16  BY MR. LEV:

17     Q.    So Exhibit 42 is the agenda item details for

18  the board meeting to consider a challenge to

19  "Drama," and then the second and third pages are the

20  table of contents of the board appeal packet that

21  was provided to the board.

22          And this agenda item details reflects the

23  board's decision to remove "Drama" from elementary

24  schools?

25     A.    It does reflect that, although the motion

Deposition of Bradley Vinson, Volume 2

```
 1    was to retain it in middle and high school
 2    libraries.
 3        Q.   Right.  But before that motion, it had been
 4    available -- before the challenge, the book had been
 5    available in elementary schools as well, correct?
 6        A.   That's correct.
 7        Q.   And so the impact of the board's decision
 8    was to remove it from elementary schools, correct?
 9        A.   Correct.
10        Q.   So elementary school students cannot check
11    this book out at their school library, correct?
12        A.   That is correct, but we do have the
13    possibility of doing an interlibrary loan, which is
14    something that I have -- could be arranged with
15    parental permission from another collection.
16        Q.   So is interlibrary loan generally available
17    for students in the school district?
18        A.   It has not been something that has been
19    district managed, but in practice, librarians will
20    send e-mails to each other to request items that
21    they do not have in their own collections.  I am
22    hoping to develop that as more of a
23    district-encouraged practice.
24        Q.   Okay.  And so that means that if I'm a
25    student at a middle school and I want to check out a
```

Deposition of Bradley Vinson, Volume 2

1  particular book but it's not stocked in the shelves

2  of my middle school, but it's stocked in the shelves

3  of another middle school, I ask a librarian for it

4  and he or she could arrange for it to be transferred

5  over and I could check the book out?

6      A.   Correct.

7          MS. SMITH:  Form.

8      Q.   And is that typically limited to books of

9  the same school level?  Like, if I'm in middle

10 school, can I get an interlibrary book from a high

11 school?

12     A.   So that's where I think that we need some

13 district guidelines to be in place.  In practice, if

14 I requested a book for an elementary student that

15 was from a higher level collection, I received

16 parental permission to do so and I made sure that

17 the parent was aware of what the book was.

18         Since this is not an adopted district

19 practice, I think that things of that nature should

20 be formalized.

21     Q.   Okay.  You said "I."  When you were a media

22 specialist in elementary school, that's what you

23 did?

24     A.   That is what I did, yes.

25     Q.   And others may do that or may not?

1    A.    Correct.

2    Q.    And some might do an interlibrary loan

3  without parental permission, and some just might not

4  do it at all with respect to higher level?

5    A.    Since there's not a formal district process

6  in place, yes.

7    Q.    Okay.  So back to our Exhibit 42, the second

8  page reflects the information that was provided to

9  the school board in considering this appeal,

10  correct?

11    A.    Correct.

12    Q.    And the school board meeting of March 20th,

13  2023, would reflect the school board's deliberation

14  and decision on this challenge, correct?

15    A.    Correct.

16    Q.    And did each board member read "Drama" in

17  its entirety prior to the meeting?

18        MS. SMITH:  Scope.

19    A.    Based on the interrogatory, yes.

20    Q.    Did each board member review the entirety of

21  the appeal packet provided prior to the meeting?

22        MS. SMITH:  Scope.

23    A.    To the best of my knowledge, yes.

24    Q.    Is that based on the interrogatory?

25    A.    Yes.

Deposition of Bradley Vinson, Volume 2

1    Q.    Okay.  And the board was provided with

2    excerpts of HB 7 and HB 1557 as part of the

3    materials it was provided?

4    A.    Correct.

5    Q.    What criteria did the board apply in

6    deciding to remove "Drama" from elementary schools?

7         MS. SMITH:  Scope.

8    A.    Beyond comments in the meeting, I don't

9    know.

10   Q.    Okay.  What was the basis for the board's

11   decision to remove "Drama" from elementary schools?

12        MS. SMITH:  Scope.

13   A.    I don't know.

14   Q.    Do you know what the motivation of any of

15   the board members was who voted to remove "Drama"

16   from elementary schools?

17        MS. SMITH:  Scope.

18   A.    I do not know.

19   Q.    Did the board make any findings regarding

20   the reasons for its decision?

21        MS. SMITH:  Scope; form.

22   A.    No, not -- I mean, beyond comments at the

23   meetings, no, I don't know of any.

24   Q.    Did the board determine that "Drama" was

25   pornographic or obscene or in violation of

1    FS 847.012?

2            MS. SMITH:  Scope.

3        A.   No.

4        Q.   Did the board determine that the book was

5    not suited to students' needs and their ability to

6    comprehend the material presented?

7            MS. SMITH:  Scope.

8        A.   I don't know.

9        Q.   If they would have made such a

10   determination, would it be reflected -- where would

11   it be reflected?

12           MS. SMITH:  Scope.

13       A.   It would not be reflected if it was not

14   here.

15       Q.   Okay.  Did the board determine that the book

16   was inappropriate for the grade level and age group

17   in elementary schools?

18           MS. HEYWOOD:  Scope.

19       A.   I could speculate, based on the fact that

20   they retained it in middle and high school, that

21   they considered it inappropriate for elementary

22   school.

23       Q.   But you're just speculating?

24       A.   I am.

25       Q.   Did the board determine that the book was

```
 1    factually inaccurate or misleading?

 2            MS. SMITH:  Scope.

 3        A.   Not to my knowledge.

 4        Q.   Did any board member consult any material

 5    about the book other than what was provided in the

 6    appeal packet prior to the meeting?

 7            MS. SMITH:  Scope.

 8        A.   Not to my knowledge.

 9        Q.   Did any board member communicate with the

10    challenger to the book prior to the meeting?

11            MS. SMITH:  Scope.

12        A.   Not to my knowledge.

13        Q.   Did any board member communicate with any

14    other board member about the challenge to the book

15    prior to the meeting?

16            MS. SMITH:  Scope.

17        A.   Not to my knowledge.

18        Q.   Did any board member communicate with the

19    superintendent or the Coordinator of Media Services

20    about the book prior to the meeting?

21            MS. SMITH:  Scope.

22        A.   Not to my knowledge.

23        Q.   And was there any other forum in which an

24    individual board member expressed concerns about the

25    book?
```

Deposition of Bradley Vinson, Volume 2

```
 1            MS. SMITH:  Form.
 2       A.   Not that I know of.
 3            MS. SMITH:  Mr. Lev, I'm trying to shorten
 4       my objections to not interrupt you.  If I say
 5       "scope," is that fine, rather than me saying
 6       "objection; outside the scope"?
 7            MR. LEV:  Yeah.  You've been doing that both
 8       days and much appreciated and understood.
 9            MS. SMITH:  Sure.
10            MR. LEV:  So, yes, that is quite clear.
11     (Vinson Exhibit 43 was marked for identification.)
12            MS. SMITH:  And just wait a beat, so -- I
13       think Susan knows it by now.
14            THE WITNESS:  Sorry.
15                 (Discussion off the record.)
16     BY MR. LEV:
17       Q.   All right.  Exhibit 43 is the agenda item
18     details page for the board's decision on the
19     challenge to "New Kid."  And was "New Kid" available
20     in elementary schools prior to the challenge?
21       A.   Yes, it was.
22       Q.   And was the result of the board's decision
23     that it was no longer available in elementary
24     schools?
25       A.   Correct.
```

Deposition of Bradley Vinson, Volume 2

1     Q.   And does the agenda item details reflect the

2   board's action taken on the appeal of "New Kid"?

3     A.   Yes.  I'm trying to just figure out this

4   amend motion.  I would want to review and see if

5   there was something that shifted in their language,

6   but, yes, that reflects what occurred during the

7   meeting.

8     Q.   Okay.  And the second and third pages

9   reflect the information that was provided to the

10  board as part of the board appeal that's linked on

11  the agenda item details, correct?

12    A.   Correct.

13    Q.   And that was all of the material that was

14  provided to the board in considering this appeal?

15    A.   Correct.

16    Q.   Okay.  And the school board meeting of

17  March 20th, 2023, reflects the board's deliberation

18  and decision on the appeal of the challenge to "New

19  Kid"?

20    A.   Yes.  That was another long one.

21    Q.   I'm aware.  Did each board member read "New

22  Kid" in its entirety prior to the meeting?

23         MS. SMITH:  Scope.

24    A.   Yes, I believe they did.

25    Q.   Is that based on the interrogatory?

Deposition of Bradley Vinson, Volume 2

```
 1      A.   Yes.

 2      Q.   Okay.

 3      A.   But there is one in the interrogatory, and I

 4 cannot remember which title it was, where at least

 5 one board member read excerpts.

 6      Q.   Okay.

 7      A.   I might need to refer to that just to be

 8 sure I remember.

 9      Q.   So is it fair to say that you don't have any

10 knowledge of whether the board members read the

11 books other than the response to the interrogatory,

12 and that we should rely on that as the district's

13 testimony?

14      A.   The response tothe interrogatory or their

15 statements during the meeting, because I know some

16 meetings I watched, they did state that they read

17 the book.

18      Q.   Okay.  Fair enough.

19           MS. SMITH:  Preserving my objection to that.

20      Q.   Fair enough.  And I'm going to stop asking

21 that question on the understanding that your answer

22 in each case will be essentially to refer to the

23 interrogatory and the board meeting.

24      A.   That's correct.

25      Q.   Okay.  Great.  Is that the same with respect
```

1    to whether the board members reviewed the entirety

2    of the appeal packet?

3        A.    Yes.

4        Q.    You don't have knowledge other than what's

5    in the interrogatory or stated in the board meeting?

6        A.    That is accurate.

7            MS. SMITH:  And I'll just preserve my

8        objection there, too.

9        Q.    Okay.  And the board was provided with

10    excerpts of HB 7 and HB 1557 in considering the

11    appeal of the challenge to "New Kid," correct?

12        A.    That was part of the packet.

13        Q.    Okay.  What criteria did the board apply in

14    deciding to remove "New Kid" from elementary

15    schools?

16            MS. SMITH:  Scope.

17        A.    I don't know.

18        Q.    What was the basis for its decision to

19    remove "New Kid" from elementary schools?

20            MS. SMITH:  Scope.

21        A.    I don't know.

22        Q.    Did -- do you know what the motivation of

23    any individual board member was who voted to remove

24    "New Kid" from elementary schools?

25            MS. SMITH:  Scope.

Deposition of Bradley Vinson, Volume 2

1      A.   Outside of comments made during the board

2   meeting, no, I don't.

3      Q.   Did the board make any findings regarding

4   its decision to remove "New Kid" from elementary

5   schools?

6           MS. SMITH:  Scope; form.

7      A.   Not to my knowledge.

8      Q.   Okay.  Did the board determine that the book

9   was pornographic or obscene or in violation of

10  FS 847.012?

11     A.   No.

12          MS. SMITH:  Scope.

13     Q.   Did the board determine that the book was

14  not suited to student needs and their ability to

15  comprehend the material presented?

16          MS. SMITH:  Scope.

17     A.   I don't know.

18     Q.   Did the board determine that "New Kid" was

19  inappropriate for elementary school grade level or

20  age group?

21          MS. SMITH:  Scope.

22     A.   Based on their vote, I would say that the

23  board did determine that it was not appropriate for

24  elementary collections.

25     Q.   You're just speculating based on the outcome

1    of the vote?

2         A.    Yes.

3         Q.    Okay.  Did the board determine that the book

4    was factually inaccurate or misleading?

5              MS. SMITH:  Scope.

6         A.    Not to my knowledge.

7         Q.    Did the board consult any material about

8    "New Kid" other than the appeal packet that was

9    provided to it?

10             MS. SMITH:  Scope.

11        A.    Not to my knowledge.

12        Q.    Did any board member communicate with the

13   challenger, any other board member, or the

14   superintendent or the Coordinator of Media Services

15   about the book prior to the board meeting?

16             MS. SMITH:  Scope.

17        A.    Not to my knowledge.  You combined them all.

18        Q.    I finally realized that might be a quicker

19   way since you have the same answer.  Slow learner.

20             MS. HEYWOOD:  44.

21     (Vinson Exhibit 44 was marked for identification.)

22             MS. HEYWOOD:  I'm sorry.  We don't have the

23        table of contents, but I have the agenda items,

24        just so you know.  It's still there.

25   BY MR. LEV:

Deposition of Bradley Vinson, Volume 2

1       Q.    Exhibit 44 is the agenda item details page

2   for the board's consideration of the challenge to

3   "The Bluest Eye," and the second page -- second and

4   third pages are the table of contents to the appeal

5   packet that was provided to the board.

6       A.    That is correct.

7       Q.    And the agenda item accurately reflects the

8   board's decision to remove "The Bluest Eye" from all

9   Escambia County Public School libraries, correct?

10      A.    That is correct.

11      Q.    Okay.  And prior to the challenge, the book

12  was available in certain high schools in Escambia

13  County Public School libraries, correct?

14      A.    That's correct.

15      Q.    Okay.  And the appeals packet that's linked

16  on the agenda item details page and the table of

17  contents, which is the second and third pages of

18  Exhibit 44, that is all of the information that was

19  provided to the school board for its consideration

20  of this appeal, correct?

21      A.    Correct.

22      Q.    And the board meeting of March 20th, 2023,

23  that's available online, reflects the school board's

24  deliberation and decision regarding the challenge to

25  "The Bluest Eye"?

1    A.    Yes.

2    Q.    I'm going to skip the questions about

3    reading the book and the packet based on your prior

4    statement that applies broadly.

5          And the board was provided with excerpts of

6    HB 7 and HB 1557 in considering this challenge,

7    correct?

8    A.    Correct.

9    Q.    What criteria did the board apply in

10   deciding to remove "The Bluest Eye" from all

11   Escambia County Public School libraries?

12         MS. SMITH:  Form.

13   A.    I don't know.

14   Q.    What was the basis for the board's decision

15   to remove "The Bluest Eye" from all Escambia County

16   Public School libraries?

17         MS. SMITH:  Scope.

18   A.    Beyond comments made during the board

19   meeting, I don't know.

20   Q.    Do you know the motivation of any of the

21   board members who voted to remove the book from

22   Escambia County Public School libraries?

23         MS. SMITH:  Scope.

24   A.    Beyond comments, I don't know their

25   individual motivations.

Deposition of Bradley Vinson, Volume 2

1    Q.   Did the board make any findings regarding

2    its decision to remove "The Bluest Eye"?

3         MS. SMITH:  Scope, and also form for the

4    last two.  It wasn't removed.  It was just

5    restricted.

6         MR. LEV:  No, "The Bluest Eye" was removed.

7         MS. SMITH:  It was restricted to certain

8    grades.

9         THE WITNESS:  Can we review the sheet?

10        MS. SMITH:  Oh, is that what it says?

11   A.   It was the other one that was restricted

12   to eleventh and twelfth.  Is that right?  Hang on.

13   May I refer to my Reconsiderations Spreadsheet?

14   Q.   Sure.

15   A.   Thank you.

16        MS. SMITH:  Let me look at that to be sure.

17   I'm sorry.  I should have caught that.  Sorry

18   about that.

19        MR. LEV:  That's okay.

20        MS. SMITH:  So we're on the same page.

21        MR. LEV:  The Reconsiderations Spreadsheet

22   does not reflect what the board document shows.

23        THE WITNESS:  I should have caught that as

24   well.

25        MS. SMITH:  Am I crazy?  I thought it was --

Deposition of Bradley Vinson, Volume 2

1          THE WITNESS:  We may need to review the
2     board meeting.
3          MS. SMITH:  I think it was eleventh and
4     twelfth grade.
5          MR. LEV:  We're still on the record,
6     correct?
7          MS. SMITH:  Uh-huh.
8          THE WITNESS:  Yes, it is eleventh and
9     twelfth grade, is what I have recorded.  Give me
10    just a moment.
11         MR. LEV:  Go off the record for a moment.
12       (Recess from 10:35 a.m. until 10:53 a.m.)
13         MR. LEV:  So what I'd like to do is take
14    away that Exhibit 44, which was printed without
15    expanding the full motion and voting part.
16         THE WITNESS:  Correct.
17         MR. LEV:  And we will work with what's
18    online and we will provide the court reporter
19    with a PDF of that.  Okay?  I'll walk through
20    what that is.
21         MS. SMITH:  Okay.
22  BY MR. LEV:
23    Q.   So as we discussed when we were off the
24  record, if you link from the Reconsiderations
25  Spreadsheet to "The Bluest Eye" and you link under

1    board decision, it takes you to BoardDocs and you

2    see an agenda item details page there.

3        A.    Yes.

4        Q.    And under motion and voting, if you expand

5    "view all motions," you can see the full record of

6    what happened at the meeting in terms of motions,

7    correct?

8        A.    Correct.

9        Q.    And the motion that passed was to redistrict

10   "The Bluest Eye" to eleventh and twelfth graders,

11   correct?

12       A.    That's correct.

13       Q.    And that reflects the school district's

14   decision with respect to the challenge to "The

15   Bluest Eye," correct?

16       A.    Correct.

17       Q.    And if you click on the board appeal "Bluest

18   Eye" information packet that's linked there, that

19   takes you to the packet of material that was

20   provided to the board, correct?

21       A.    Correct.

22       Q.    And so Exhibit 42, which we will provide in

23   hard copy, will be the agenda item details with the

24   motion and voting expanded, as well as the table of

25   contents to the board materials -- and, yes,

Deposition of Bradley Vinson, Volume 2

1    Exhibit 44 and not Exhibit 42.

2           MR. LEV:   Thank you.

3       Q.   Okay?

4       A.   Okay.

5       Q.   How would the decision to limit the book for

6    eleventh and twelfth graders be implemented as a

7    practical matter?

8       A.   So each school that has a copy would need to

9    determine -- they have the description to determine

10   how they will implement it, whether or not they will

11   put a label on the book and interfile it in the

12   regular part of the collection, their fiction

13   collection, for example, or if they will create a

14   separate section of the library or shelf in the

15   library for these materials.  And the -- the item

16   has attributes that will limit the circulation to

17   eleventh and twelfth grade students only.

18      Q.   I'm sorry.  Can you repeat that last

19   sentence about attributes?

20      A.   In this case, I believe it's the circulation

21   type which governs how it circulates, and we have a

22   circulation type for eleventh and twelfth grade.

23      Q.   I see.  So it would be both physically

24   marked or removed and noted in Destiny that it's

25   restricted to eleventh and twelfth grade?

Deposition of Bradley Vinson, Volume 2

```
1        A.   That's correct.

2        Q.   Okay.  Okay.  In the agenda item details

3   that we were looking at online, I think we said that

4   reflects the board's final action, and the school

5   board meeting of March 20th, 2023, would reflect the

6   board deliberation on "The Bluest Eye"?

7        A.   That's correct.

8        Q.   And the board was provided excerpts of HB 7

9   and HB 1557 in making its decision to restrict "The

10  Bluest Eye" to eleventh and twelfth graders,

11  correct?

12       A.   That was part of the information packet,

13  yes.

14       Q.   Okay.  What criteria did the board apply in

15  deciding to restrict "The Bluest Eye" to eleventh

16  and twelfth grade?

17            MS. SMITH:  Scope.

18       A.   I don't know.

19       Q.   What was the basis of its decision to

20  restrict "The Bluest Eye" to eleventh and twelfth

21  grade?

22            MS. SMITH:  Scope.

23       A.   Beyond their comments, I don't know.

24       Q.   Do you know the motivation of any of the

25  board members who voted -- of any of the board
```

1    members to restrict the book to eleventh and twelfth

2    grade?

3              MS. SMITH:  Scope.

4         A.   Beyond their comments, I don't know.

5         Q.   Did the board make any findings regarding

6    the reason for its decision to restrict "The Bluest

7    Eye" to eleventh and twelfth grade?

8              MS. SMITH:  Form; scope.

9         A.   Not to my knowledge.

10        Q.   Did the board determine that "The Bluest

11   Eye" was pornographic or obscene or in violation of

12   FS 847.012?

13             MS. SMITH:  Scope.

14        A.   I don't know.

15        Q.   Did the board decide the book was unsuited

16   to student needs and their ability to comprehend the

17   material presented?

18             MS. SMITH:  Scope.

19        A.   I don't know.

20        Q.   Did the board determine that "The Bluest

21   Eye" was inappropriate for grade levels or age

22   groups under eleventh or twelfth grade?

23             MS. SMITH:  Scope.

24        A.   That was part of the motion.  The board made

25   a determination that it would be appropriate for

1   eleventh and twelfth graders.

2        Q.    Did they make a determination it would be

3   inappropriate for younger ages?

4            MS. SMITH:  Scope.

5        A.    It follows.

6        Q.    That's implied?

7        A.    It's implied.

8        Q.    Did the board determine that the book was

9   factually inaccurate or misleading?

10           MS. SMITH:  Scope.

11       A.    I don't know.

12       Q.    Did any board member consult any material

13  about "The Bluest Eye" other than the material

14  provided in the information -- in the appeal packet?

15           MS. SMITH:  Scope.

16       A.    Not to my knowledge.

17       Q.    Did any board member communicate with the

18  challenger or any other board member, the

19  superintendent, or the Coordinator of Media Services

20  about the book prior to the meeting?

21           MS. SMITH:  Scope.

22       A.    Not to my knowledge.

23       Q.    Okay.

24           MS. HEYWOOD:  This is Exhibit 45.

25     (Vinson Exhibit 45 was marked for identification.)

1    BY MR. LEV:

2        Q.    And this is -- Exhibit 45 is the agenda item

3    details page and the table of contents for the

4    appeals packet with the challenge to "The Nowhere

5    Girls," correct?

6        A.    Correct.

7        Q.    And the agenda item details package

8    accurately reflects the board's decision to restrict

9    "The Nowhere Girls" to eleventh and twelfth grade

10   only?

11       A.    Yes.

12       Q.    And the information provided to the board

13   was only the appeal packet that's linked from the

14   agenda item details, correct?

15       A.    That's correct.

16       Q.    And the table of contents, which is the

17   second and third pages of the exhibit, reflects what

18   that packet contained, correct?

19       A.    That's correct.

20       Q.    And the board meeting on March 20th, 2023,

21   would reflect the full extent of the board's

22   deliberation and decision regarding the challenge to

23   "The Nowhere Girls"?

24       A.    That's correct.

25       Q.    And the board was provided with excerpts of

1    HB 7 and HB 1557 as part of the materials it was

2    given for its consideration of the challenge to "The

3    Nowhere Girls," correct?

4        A.   Yes.

5        Q.   What criteria did the board apply in

6    deciding to restrict "The Nowhere Girls" to eleventh

7    and twelfth grade?

8            MS. SMITH:  Scope.

9        A.   I don't know.

10       Q.   What was the basis of the board's decision

11   to restrict "The Nowhere Girls" to eleventh and

12   twelfth grade?

13           MS. SMITH:  Scope.

14       A.   Beyond their comments, I don't know.

15       Q.   Do you know the motivation of any of the

16   board members who voted to restrict "The Nowhere

17   Girls" to eleventh and twelfth grade?

18           MS. SMITH:  Scope.

19       A.   I do not.

20       Q.   Did the board make any findings regarding

21   the reasons for its decision to restrict "The

22   Nowhere Girls" to eleventh and twelfth grade?

23           MS. SMITH:  Form; scope.

24       A.   Beyond their comments in the meeting, no.

25       Q.   Did the board determine that "The Nowhere

Deposition of Bradley Vinson, Volume 2

```
1   Girls" was pornographic or obscene or in violation
2   of FS 847.012?
3           MS. SMITH:  Scope.
4       A.   Not to my knowledge.
5       Q.   Did the board determine that "The Nowhere
6   Girls" was not suited to student needs and their
7   ability to comprehend the material presented?
8           MS. SMITH:  Scope.
9       A.   Not to my knowledge.
10      Q.   Did the board determine that "The Nowhere
11  Girls" was inappropriate for particular grade levels
12  or age groups?
13          MS. SMITH:  Scope.
14      A.   Based on what the motion was to retain it
15  for eleventh and twelfth grade only, I would again
16  assume that they found it to be inappropriate below
17  those grade levels.
18      Q.   Did the board determine that "The Nowhere
19  Girls" was factually inaccurate or misleading?
20          MS. SMITH:  Scope.
21      A.   Not to my knowledge.
22      Q.   And did any board members consult any
23  materials other than the appeal packet that was
24  provided to them prior to the meeting regarding "The
25  Nowhere Girls"?
```

Deposition of Bradley Vinson, Volume 2

```
 1            MS. SMITH:  Scope.
 2       A.   Not to my knowledge.
 3       Q.   And did any board member communicate with
 4   the challenger, any other board member, the
 5   superintendent, or the Coordinator of Media Services
 6   about the book prior to the meeting?
 7            MS. SMITH:  Scope.
 8       A.   Not to my knowledge.
 9            MS. HEYWOOD:  Exhibit 46.
10     (Vinson Exhibit 46 was marked for identification.)
11   BY MR. LEV:
12       Q.   So Exhibit 46 is the agenda item details
13   from the board meeting considering the challenge to
14   "Push" and then the table of contents for the appeal
15   documents that were provided to the board.  And does
16   the agenda item details accurately reflect the
17   board's decision to remove "Push" from all Escambia
18   County Public School libraries?
19       A.   I'm confirming by going online to the
20   reconsiderations page and linking to the agenda just
21   to double-check the motion and voting.
22       Q.   Understood.
23       A.   And, yes, that's the only motion there.
24       Q.   Okay.  And the table of contents, which is
25   Page 2 of Exhibit 46, reflects the materials that
```

Deposition of Bradley Vinson, Volume 2

1    were provided to the board as part of the appeals

2    packet, correct?

3         A.    That's correct.

4         Q.    And those are the only materials provided to

5    the board, correct?

6         A.    Yes.

7         Q.    And the board meeting of April 13th, 2023,

8    would reflect the full extent of the board's

9    deliberation and decision regarding the challenge to

10   "Push"?

11        A.    Yes.

12        Q.    Okay.  And the board was provided with

13   excerpts of HB 7 and HB 1557 as part of the

14   materials for its consideration of this challenge to

15   "Push," correct?

16        A.    Correct.

17        Q.    And what criteria did the board apply in

18   deciding to remove "Push" from all Escambia County

19   Public School libraries?

20             MS. SMITH:  Scope.

21        A.    I don't know.

22        Q.    What was the basis for the board's decision

23   to remove "Push" from all Escambia County Public

24   School libraries?

25             MS. SMITH:  Scope.

```
1        A.   I don't know.

2        Q.   What was the motivation of the board members

3   who voted to remove "Push" from all Escambia County

4   Public School libraries?

5            MS. SMITH:  Scope.

6        A.   Beyond their comments in the meeting, I

7   don't know.

8        Q.   And did the board make any findings

9   regarding its decision -- regarding its reason for

10  removing "Push" from all Escambia County Public

11  School libraries?

12           MS. SMITH:  Form; scope.

13       A.   Beyond those comments, I don't know.

14       Q.   Did the board determine that "Push" was

15  pornographic or obscene or in violation of

16  FS 847.012?

17           MS. SMITH:  Scope.

18       A.   I don't know.

19       Q.   Did the board determine that the book was

20  not suited to student needs and their ability to

21  comprehend the material presented?

22           MS. SMITH:  Scope.

23       A.   I don't know.

24       Q.   Did the board determine that the book was

25  inappropriate for any grade levels or age groups?
```

Deposition of Bradley Vinson, Volume 2

```
 1              MS. SMITH:  Scope.
 2      A.   I would say that they determined it was not
 3  appropriate for any grade levels in the fact that
 4  they removed it.
 5      Q.   Okay.  Did the board determine that the book
 6  was factually inaccurate or misleading?
 7              MS. SMITH:  Scope.
 8      A.   Not to my knowledge.
 9      Q.   And did any board member consult any
10  material about "Push" other than what was provided
11  in the appeal packet prior to the meeting?
12              MS. SMITH:  Scope.
13      A.   Not to my knowledge.
14      Q.   And did any board member communicate with
15  the challenger, any other board member, the
16  superintendent, or the Coordinator of Media Services
17  about the appeal prior to the meeting?
18              MS. SMITH:  Scope.
19      A.   Not to my knowledge.
20      Q.   And I just want to clarify again, when you
21  say "not to my knowledge," it's the same thing as "I
22  don't know"?
23      A.   Yes.
24      Q.   Okay.
25              MS. HEYWOOD:  47.
```

```
 1      (Vinson Exhibit 47 was marked for identification.)
 2    BY MR. LEV:
 3      Q.    And Exhibit 47 is the agenda items details
 4    page for the board's consideration of the challenge
 5    to "Lucky" and the table of contents for the appeal
 6    packet that was provided to the board in connection
 7    with that appeal, correct?
 8      A.    Correct.
 9      Q.    And does the agenda item details page
10    accurately reflect the board's decision to remove
11    "Lucky" from all Escambia County Public School
12    libraries?
13      A.    Yes.
14      Q.    And Page 2 of Exhibit 47 accurately reflects
15    all of the materials that were provided to the board
16    in connection with its consideration of the
17    challenge to "Lucky," correct?
18      A.    Yes.
19      Q.    And the school board meeting of April 13th,
20    2023, would reflect the board's full deliberation
21    and decision regarding the challenge to "Lucky"?
22      A.    Yes.
23      Q.    Okay.  And the board was provided with
24    excerpts of HB 7 and HB 1557 as part of the material
25    in connection with its decision -- in connection
```

1  with its consideration to the challenge to "Lucky,"

2  correct?

3      A.    Correct.

4      Q.    What criteria did the board apply in

5  deciding to remove "Lucky" from all Escambia County

6  Public School libraries?

7          MS. SMITH:  Scope.

8      A.    I don't know.

9      Q.    And what was the basis for the board's

10  decision to remove "Lucky" from all Escambia County

11  Public School libraries?

12          MS. SMITH:  Scope.

13      A.    Beyond their comments made during the

14  meeting, I don't know.

15      Q.    And what was the -- do you know what the

16  motivation was of any of the board members who voted

17  to remove this book from Escambia County Public

18  School libraries?

19          MS. SMITH:  Scope.

20      A.    I don't know.

21      Q.    Okay.  Did the board make any findings

22  regarding the reason for its decision to remove

23  "Lucky" from all Escambia County Public School

24  libraries?

25          MS. SMITH:  Form; scope.

Deposition of Bradley Vinson, Volume 2

1    A.    No, not to my knowledge.

2    Q.    Did the board determine that "Lucky" was

3    pornographic or obscene or in violation of

4    FS 847.012?

5         MS. SMITH:  Scope.

6    A.    The board's action was to remove it, but I

7    don't know if that was their reason.

8    Q.    Okay.  Did the board determine that the book

9    was not suited to student needs and their ability to

10   comprehend the material presented?

11        MS. SMITH:  Scope.

12   A.    I don't know.

13   Q.    Did the board determine that "Lucky" was

14   inappropriate for grade levels or age groups for

15   which it was available?

16        MS. SMITH:  Scope.

17   A.    Again, I would say I think they considered

18   it not appropriate for all grade levels and that is

19   why they voted to remove it.

20   Q.    And you're just -- okay.

21        And did the board determine that the book

22   was factually inaccurate or misleading?

23        MS. SMITH:  Scope.

24   A.    I don't know.

25   Q.    Did any board member consult any material

Deposition of Bradley Vinson, Volume 2

```
1   about "Lucky" other than the information provided in

2   the appeal packet prior to the board meeting?

3           MS. SMITH:  Scope.

4       A.  Not that I know of.

5       Q.  Did any board member communicate with the

6   challenger, any other board member, the

7   superintendent, or the Coordinator of Media Services

8   about "Lucky" prior to the meeting?

9           MS. SMITH:  Scope.

10      A.  I don't know.

11          MR. LEV:  Okay.  Do you want to break for

12      lunch now, or do you want to keep going?

13          MS. SMITH:  That is up to the witness.

14          THE WITNESS:  Breaking early might mean we

15      miss a rush.  I don't know.  I'm fine with --

16          MR. LEV:  I'm fine.  It's a natural breaking

17      point.

18          MS. SMITH:  Are you good with that?

19          THE WITNESS:  Sure.

20          MS. SMITH:  Yeah.

21              (Discussion off the record.)

22          MR. LEV:  Okay.  So we'll keep going.

23     (Vinson Exhibit 48 was marked for identification.)

24   BY MR. LEV:

25      Q.  So I'm handing you what's been marked
```

1    Exhibit 48.

2        A.    Okay.

3        Q.    And this is a download of the

4    Reconsiderations Spreadsheet on August 19th, 2024,

5    that was filtered to only include those books that

6    have a Y in the Restricted Access During Review

7    Process column.

8        A.    Okay.

9        Q.    Wasn't there one that had a separate -- give

10    me one second.

11        A.    And it's also been sorted by title.

12            MS. HEYWOOD:  Yes.

13            MR. LEV:  Yes.  Can we go off the record for

14    one second?

15                (Discussion off the record.)

16    BY MR. LEV:

17        Q.    So Exhibit 48 is a copy of the

18    Reconsiderations Spreadsheet from August 19 sorted,

19    as you say, alphabetically by title and then

20    filtered to only show those books that are current

21    challenges and have a Y in this restricted access

22    column, correct?

23        A.    Correct.

24        Q.    Okay.  And so all of these books are

25    currently restricted and students cannot check them

Deposition of Bradley Vinson, Volume 2

```
1   out; is that correct?
2       A.   I believe that is correct.  I'd love to
3   double-check but, yes, that should be correct.
4       Q.   What would you be double-checking, though?
5       A.   I would need to double-check their status in
6   Destiny just to be sure that no one had changed
7   anything contrary to what's shown as -- what should
8   be the status in the spreadsheet.
9       Q.   Okay.  And I believe you testified yesterday
10  that all of the books that are currently restricted
11  are, in fact, restricted because they may contain
12  sexual conduct and therefore are not available for
13  checkout on an opt-in basis; is that correct?
14      A.   That's correct.
15      Q.   And in your declaration you had identified
16  some books that had been restricted -- had not been
17  restricted as a result of a book challenge but were
18  then marked restricted as a result of the 1069
19  review process, correct?
20          MS. SMITH:  Do you need to review your
21      declaration?
22      A.   I would review --
23      Q.   It's Exhibit 4 here.
24          MS. SMITH:  Exhibit 4.
25  BY MR. LEV:
```

Deposition of Bradley Vinson, Volume 2

1     Q.    And so if you take a look at Paragraphs 48

2     and 49, for example, you indicated that "Lady

3     Midnight" would have circulated as normal at the

4     time of the challenge, but after it was identified

5     as a book that may contain sexual conduct it was

6     pulled from circulation, correct?

7     A.    That is correct.

8     Q.    And you say the same thing about "Speak" and

9     "The Hate U Give"?

10    A.    Yes.

11    Q.    Okay.  Are there other books on Exhibit 48

12    that, like those books that we just talked about,

13    not restricted based on the challenge but only

14    became restricted because of the 1069 review

15    process?

16    A.    I would want to look at them one by one but,

17    yes, there were likely other books that were not

18    restricted that we restricted through the 1069

19    review.

20    Q.    And how would you determine that by looking

21    through them one by one?

22    A.    I would double-check when we changed this

23    restricted access column.

24    Q.    So you would click on that cell -- this is

25    what you were doing yesterday -- and look at the

Deposition of Bradley Vinson, Volume 2

```
 1   edit history?
 2       A.   Yes.
 3       Q.   And what would that tell you?  I mean, if
 4   you saw -- would you be looking for who made the
 5   change or would you be looking for the date the
 6   change was made?
 7            MS. SMITH:  Form.
 8       A.   I would -- what are you asking me?
 9       Q.   I'm trying to understand, if I asked you to
10   go through each book and tell me whether it was
11   restricted because of the challenge or only because
12   of the 1069 review process, what it is you would
13   actually be looking for when you clicked on that
14   edit history, how it would tell you.  When you go to
15   the spreadsheet and click in that cell, it's not
16   going to say restricted only because of 1069.  It's
17   just going to give you a date and who changed it,
18   correct?
19       A.   It only tells me if it was restricted or not
20   restricted, and prior to the time that I took my
21   position, I could not find a consistent way that
22   some of these restrictions were applied.  So there
23   may have been things that were restricted or not
24   restricted, but I don't know the specific reason
25   that they were restricted or not restricted.
```

1          MS. SMITH:  Listen to his question

2     carefully.

3          THE WITNESS:  Sorry.

4   BY MR. LEV:

5     Q.   So I was asking -- we've -- I think we've

6   established, but tell me if we haven't, there were

7   books that were subject to restricted access because

8   of the challenge to the book, correct?

9     A.   Yes.

10    Q.   Before 1069 even existed, there were books

11  that were restricted access, correct?

12    A.   Yes.

13    Q.   And there are books, including, at least

14  according to your testimony, "Lady Midnight,"

15  "Speak," and "The Hate U Give," that had not been --

16  had been challenged but not restricted, and then

17  their status became restricted only as a result of

18  the 1069 review process, correct?

19    A.   Correct.

20    Q.   Okay.  I'm trying to understand how one

21  would determine, for each book on here, whether it

22  was restricted originally because of the challenge

23  to the book or if it was only restricted as part of

24  the 1069 review process.  You told me you would have

25  to go through one by one and look at the

1    spreadsheet, I believe the edit history of the

2    restricted access column; is that correct?

3           MS. SMITH:  Form.

4      A.   I would -- can you repeat the question?  I'm

5    sorry.

6      Q.   So do you understand the concept -- the

7    difference between books that were restricted

8    because of a challenge and books that were only

9    restricted because of the 1069 review?

10     A.   When you say restricted because of a

11   challenge, some books were restricted and some books

12   were not.

13     Q.   I understand.  So some books were

14   restricted -- they were challenged and then they

15   were restricted in light of the challenge.  That's

16   what I mean by restricted because of the challenge.

17     A.   Okay.

18     Q.   I mean, you understand that?  Do you agree

19   there is a category of books that had been

20   restricted because they were challenged?

21     A.   They were restricted because the Coordinator

22   of Media Services made a determination that there

23   was a component of the challenge that indicated it

24   should be restricted, is my understanding.

25     Q.   But it was all triggered by the challenge.

Deposition of Bradley Vinson, Volume 2

1    The Coordinator of Media Services wasn't just

2    generally reviewing books in the library and

3    restricting them, she was making decisions about

4    challenged books.  This one should be restricted,

5    this one shouldn't be restricted.  Correct?

6       A.   Correct, but the fact of the challenge was

7    not what made it be restricted.  It was a

8    determination that was made upon receipt of the

9    challenge.

10      Q.   And you don't know the basis for those

11   determinations and you couldn't determine the rhyme

12   and reason for those determinations, correct?

13      A.   Correct.

14      Q.   So for shorthand, okay --

15      A.   Yes.

16      Q.   -- I'm referring to those as books that were

17   restricted as a result of the challenge because the

18   challenge is what triggered the process for the

19   consideration of whether to restrict the book or

20   not.  Okay?

21      A.   Yes.

22      Q.   There weren't any other restrictions of

23   books at the time, right?  There weren't

24   unchallenged books -- were there any books that

25   hadn't been challenged that had restricted access?

Deposition of Bradley Vinson, Volume 2

1    A.   I believe around the same time that these

2    challenges were being received, that was also the

3    time that we started separating the young adult

4    books in middle school collections.  So do you

5    consider that a restricted access?

6    Q.   Understood.  Okay.  There was a category of

7    young adult books.  The policy was made to limit

8    young adult books only to opt-in, correct?

9    A.   Correct.

10   Q.   Okay.  And I believe we're going to get to

11   that later.  Do you remember when that was adopted?

12   A.   I would have to refresh my memory on exact

13   dates.

14   Q.   Other than that sort of categorical

15   restriction of young adult books to opt-in status,

16   were there any other restrictions of books that were

17   not challenged?

18   A.   No.

19   Q.   Okay.  So the books that I'm going to refer

20   to as restricted because of the challenge are books

21   that the challenge triggered a determination to

22   restrict.  In some cases the challenge didn't result

23   in restriction, in some cases it did, correct?

24   A.   Correct.

25   Q.   Okay.  Those books are reflected on the

1    spreadsheet, correct?

2        A.    Correct.

3        Q.    Okay.  This spreadsheet also includes books

4    that were only restricted as a result of the 1069

5    review, correct?

6        A.    Correct.

7        Q.    Okay.  I want to know which -- for every

8    book -- if I wanted to know for every book on here

9    which category it falls into, that is it was

10   restricted because of the challenge, or it wasn't

11   restricted until the 1069 review and was only

12   restricted as a result of the 1069 review, what

13   would you do to determine that?

14       A.    I would look at the date.

15       Q.    The date of what?

16       A.    Of when that restricted access status was

17   changed.

18       Q.    From an N to a Y?

19       A.    Yes.

20       Q.    And what would that tell you?  What dates

21   would you be looking for?

22       A.    I would be looking for June and July of 2023

23   as the dates when we began restricting access based

24   on that 1069 review.

25       Q.    And what about -- so is it -- anything that

1    was restricted from June of 2023 after, you would

2    say was restricted only because of the 1069 review?

3        A.   Yes.

4        Q.   Okay.  So that would just involve you

5    clicking into each cell, looking for the date, and

6    then you'd be able to say this book was restricted

7    because of the challenge, this book wasn't

8    restricted until the 1069 review, correct?

9        A.   Correct.

10       Q.   There are 130 books on this list that -- in

11   Exhibit 48.  Do you have a sense of approximately

12   how many of them were only restricted because of the

13   1069 review?

14            MS. SMITH:  Form.

15       A.   I would need go back and review them.

16       Q.   Okay.  So let's just take a look at some of

17   the books here.

18       A.   Okay.

19       Q.   "Almost Perfect," do you know why that book

20   was restricted?

21       A.   I would need to review it.  It's a lot of

22   books to keep track of.

23       Q.   Okay.  So do you want to -- you can go ahead

24   and open your laptop, if you would like, to look at

25   the Reconsiderations Spreadsheet.  Is that what

Deposition of Bradley Vinson, Volume 2

```
1    would help you know why it was restricted?

2         A.    I would probably also need to look at

3    information.  I could check the reviews and see if

4    that jogs my memory, but we also referred to

5    sometimes comments in the media or the book

6    itself in order to make these determinations.

7         Q.    Well, most of these determinations or many

8    of these -- let me say it that way.  Many of these

9    determinations were not made by you.  They were made

10   by Michelle White and Tim Smith, correct?

11             MS. SMITH:   Form.

12        A.    I would need to check the date to see when

13   it was restricted.

14        Q.    So if I wanted to understand why "Almost

15   Perfect" was restricted -- let's go through that

16   process.  I just want to see what it would entail

17   and what you can tell me.

18        A.    What process are we going through?

19        Q.    I want to know why "Almost Perfect" was

20   restricted.  You said you'd need to consult some

21   information, so please go ahead and do that and just

22   tell me what you're consulting.

23        A.    I'll look at the reviews and let's see where

24   we get from there.

25        Q.    Why don't we start with looking at the date
```

Deposition of Bradley Vinson, Volume 2

1    that it was restricted.

2       A.   Okay.

3          MS. SMITH:  Which one are we doing, "Almost

4       Perfect"?

5          MR. LEV:  Uh-huh.

6       A.   If it was one -- well, let's check that

7    date.  If I didn't have to make a change, you won't

8    see a change.  October 20 -- let's go back.  That's

9    actually one where Michelle White first put in TBD,

10   which -- I did research some of my e-mails last

11   night.  She did indicate that TBD was to remain

12   restricted until a determination was made, so that's

13   a correction from yesterday.

14      Q.   Thank you.

15      A.   And then October 27th she put a Y, 2022.

16      Q.   Okay.

17      A.   And that is the last edit to that cell.

18      Q.   Okay.  So this was a book that was

19   restricted because of the challenge, correct?

20      A.   But we reviewed all of these books, and so

21   we affirmed that restriction through our HB 1069

22   review process.  So there's not an edit there but we

23   would have reviewed it over the course of our

24   HB 1069 review.

25      Q.   Okay.  But originally this book was

Deposition of Bradley Vinson, Volume 2

1    restricted because of the challenge?

2        A.    Yes.

3        Q.    Okay.  Do you know why it was restricted?

4        A.    I do not.

5        Q.    Okay.  Is there anything you would do to

6    determine why it was restricted?

7        A.    I could ask Michelle White.

8        Q.    Okay.  But looking at the reviews wouldn't

9    help you because there's no memory to jog because

10   you weren't involved in this?

11       A.    In the initial restriction, no, but we did

12   affirm that it should be restricted under HB 1069.

13       Q.    And did you reach out to Michelle White in

14   preparing for this deposition?

15       A.    No.

16       Q.    Okay.  And I take it that for any book that

17   was originally restricted by Michelle White, as

18   evidenced by the edit history in the Restricted

19   Access column, you would not be able to tell me why

20   the book was restricted, correct?

21       A.    That's correct.

22       Q.    Okay.

23       A.    And I don't know if it would have been

24   Michelle White's decision alone or if this would

25   have been in coordination with Superintendent Smith.

1    Q.   Okay.  So you don't know why and you don't

2    know who made the decision?

3    A.   Correct.

4    Q.   Okay.  And the ones that you would be able

5    to explain are the ones where the Y was changed in

6    June 2023 or later by you because those would be

7    reflective of 1069 review decisions that you were

8    involved in?

9    A.   I can affirm 1069 decisions, yes.

10    Q.   And explain them?

11    A.   Yes.

12    Q.   And --

13    A.   With a little research at times because it's

14    a lot of titles.

15    Q.   Understood.  Understood.  Fair enough.

16         And in preparing for today's deposition,

17    what, if anything, did you do to prepare to discuss

18    the basis for the restriction or restricted books?

19    A.   I looked back at e-mails from Michelle

20    White.  I reviewed our policy.  But even in looking

21    at e-mails, there were times that we received

22    e-mails that indicated some titles should be

23    restricted and other titles would not be restricted,

24    and I could not tell that a consistent process was

25    being applied.

1    Q.   And so those e-mails don't actually tell you

2    why any books were restricted, they just tell you

3    which are and which aren't?

4    A.   They just tell me that they are.

5    Q.   Right.  So that's the information you have

6    on the spreadsheet?

7    A.   That is the information that I have.

8    Q.   Is "Almost Perfect" on the website HB 1069

9    Storage for further review spreadsheet?

10   A.   May I review this?

11   Q.   Yes.

12       MS. SMITH:  You can look at anything you

13   need.

14       THE WITNESS:  Thank you.

15 BY MR. LEV:

16   Q.   Can you flag what exhibit you're looking at?

17   A.   So this -- I don't have the exhibit number

18   on it but there is my color copy of one of your

19   exhibits.

20       MS. HEYWOOD:  Is that in response to --

21       MR. LEV:  Rog 6.

22       MS. HEYWOOD:  Rog 6?

23       MR. LEV:  Yeah.

24       MS. HEYWOOD:  Give me one second.  That

25   would be Exhibit 35.

Deposition of Bradley Vinson, Volume 2

```
 1            MR. LEV:  No.

 2            MS. HEYWOOD:  Sorry, 17.

 3            MR. LEV:  17, yeah.

 4  BY MR. LEV:

 5      Q.  So you're looking at Exhibit 17, your

 6  version of Exhibit 17.  Go ahead.

 7      A.  So "Almost Perfect," we only had one copy in

 8  Destiny and it had been marked lost from being

 9  checked out to a student on 6/1/2015, which, based

10  on that date, was likely as part of the inventory

11  that it was marked lost and -- but it had been

12  checked out, and then it was weeded on 9/28/22 but

13  had not been in the possession of the library for at

14  least seven years.

15      Q.  So that is why it's not appearing on the

16  1069 Storage?

17      A.  Correct.

18      Q.  Okay.

19      A.  There was no physical copy to be stored.

20      Q.  And nobody has bothered to clean up the

21  Reconsiderations Spreadsheet to somehow resolve

22  these pending challenges to books that the district

23  no longer owns?

24      A.  We have not developed a process -- I would

25  be hesitant to say that we would dismiss a challenge
```

Deposition of Bradley Vinson, Volume 2

1    based on not possessing the book because I would

2    expect that books might start disappearing, and then

3    if you wanted to add the book back, you know, what

4    do you do with the fact that you received a

5    challenge that was unresolved?  I'm not sure of how

6    that process would look.

7        Q.    Okay.  Let's take a look at -- give me one

8    second.  Take a look at "Ready or Not."  Okay.  And

9    if you look at Exhibit 48, that is listed as a book

10   that is restricted access during the review process,

11   correct?

12       A.    Just a moment.

13           MS. SMITH:  What title is that?

14           MR. LEV:  "Ready or Not."

15   BY MR. LEV:

16       Q.    And before you can get to it in Exhibit 17,

17   can you do me a favor and tell me when "Ready or

18   Not" was restricted by looking at your magic edit

19   history?

20       A.    Give me just a moment here.  "Ready or

21   Not" -- can we check our Coffee Crew on that one?

22   Because I'm wondering if that's an error on the

23   spreadsheet.

24       Q.    Can you answer my question first?  When was

25   "Ready or Not" restricted?

1      A.   Okay.  Let's go back and look at it.

2  Michelle White had a Y added -- that was the last

3  edit on October 27th, 2022, after having been TBD

4  for two days.

5      Q.   So that was restricted as a result of the

6  challenge, correct?

7      A.   Correct.

8      Q.   And that, if you look at the website,

9  Destiny HB 1069 Storage, "Ready or Not" does not

10 appear on the most recent tab of that spreadsheet.

11     A.   That's why I would like to review the Coffee

12 Crew to see if we discussed it, because we currently

13 have those all listed as circ type Challenge, which

14 indicates that we met and discussed and determined

15 that it was age appropriate in those high school

16 collections or that it did not contain sexual

17 conduct that was not age appropriate.

18     Q.   So I'm just -- I'm looking at Exhibit 17

19 that you're also looking at, and I just want to make

20 sure I understand -- I'm following what you're

21 saying.  You see -- Exhibit 17 is a printout from

22 Destiny, correct?

23     A.   Correct.

24     Q.   And you're seeing that the book "Ready or

25 Not" is listed under "Category - Site" as reviewed

Deposition of Bradley Vinson, Volume 2

1  for HB 1069 in all instances, correct?

2      A.    Yes.

3      Q.    And is that what is telling you that you

4  believe that the Coffee Crew would have reviewed

5  this book and determined that it did not contain

6  sexual conduct under 1069?

7      A.    I was actually first looking at the circ

8  type being Challenge rather than HB 1069 Storage.

9      Q.    Okay.  But both of those things are

10  indications of that?  What is the difference?  I

11  mean, what does it mean that it says "Reviewed for

12  HB 1069" in "Category - Site"?

13      A.    Reviewed for 1069 is when the media

14  specialist at that site goes in and indicates that

15  they have completed a review of that book for

16  HB 1069 and found that they could select it for

17  their collection and allow it to circulate.

18      Q.    Would they have done that before or after

19  the Coffee Crew decision?

20      A.    Likely after, but I would need to probably

21  discuss with them and confirm.

22      Q.    And then the Challenge -- the circ type

23  Challenge would be something that you would have --

24  who would have changed that?  I'm sorry.  I think

25  you told me this yesterday but I don't remember.

Deposition of Bradley Vinson, Volume 2

1    Who would have changed the circ type to Challenge?

2        A.    From HB 1069 Storage to Challenge?

3        Q.    Yes.

4        A.    Linda Sweeting and I are able to do that,

5    but the media specialists are also able to do that,

6    and if this was a Coffee Crew decision, they may

7    have gone in and done it themselves.

8        Q.    "They"?

9        A.    The media specialists for high schools.

10       Q.    And refreshing my recollection, I just want

11   to make sure I have this right, initially all the

12   books were pulled for 1069 review?

13       A.    Yes.

14       Q.    The media specialists cleared -- reviewed

15   their collections in chunks and put books back that

16   they had no questions about, and then the books that

17   they didn't put back got an HB 1069 Storage

18   circulation type, correct?

19       A.    Correct.

20       Q.    And those are the books that the Coffee Crew

21   is reviewing, and if the Coffee Crew determines that

22   the book does not contain sexual conduct under 1069,

23   the circulation type is then changed to either

24   Challenge, if it's a challenged book, or just

25   Regular, something else?

Deposition of Bradley Vinson, Volume 2

```
1        A.   We do focus primarily on those books that

2   they were circulating and have the ability to review

3   and select to return without going through the

4   challenge process, but I will say that sometimes the

5   challenged books come into the Coffee Crew

6   discussions if they're part of a series, which I

7   believe is the case with this title.

8             MR. LEV:   Sorry.  Can you read back the

9        first part of her answer?  I had a hard time

10        following it.

11             (The answer was read by the reporter.)

12             THE WITNESS:   The HB 1069 books.

13   BY MR. LEV:

14        Q.   I don't understand.  I'm sorry.  What is it

15   that you're first focusing on?

16        A.   In our Coffee Crew discussions, the books

17   that we have prioritized discussing and reviewing as

18   a group have been the books that were pulled for a

19   further review in HB 1069, and that did not

20   necessarily include the challenged books, but

21   occasionally it did.

22        Q.   Did it exclude the challenged books or it

23   just was whatever happened to be pulled?

24        A.   So initially we were trying to look at

25   titles where we had more copies of the books so that
```

1   we would have a greater impact in returning those

2   books to circulation.

3       Q.   Whether challenged or not?

4       A.   In the first few meetings it was definitely

5   books from the HB 1069 list, and it would only be

6   pulled in, if it was challenged, if it was part of a

7   series that we were considering.

8       Q.   I guess I'm confused, because why -- if I'm

9   a librarian and I'm going through my collection and

10  I've put books aside for further review by the

11  Coffee Crew that I have questions about, wouldn't

12  some of those books be challenged books?  Is there a

13  reason there wouldn't be any challenged books among

14  them?

15      A.   So the challenged books, in many cases, most

16  cases, we had already, in our central office, taken

17  a look at for HB 1069 over the summer before the

18  media specialists returned.

19      Q.   So you looked at all the books on the

20  Reconsiderations Spreadsheet over that summer and

21  determined whether or not they contained sexual

22  conduct under 1069?

23      A.   Yes.

24      Q.   And those that did you noted as HB 1069

25  Storage in Destiny?

Deposition of Bradley Vinson, Volume 2

```
1        A.    Yes.
2        Q.    And you either maintained or marked them as
3   restricted on the Reconsiderations Spreadsheet?
4        A.    Yes.
5        Q.    And those that you didn't find sexual
6   conduct for are the ones we were talking about
7   earlier that you then, in April, unrestricted?
8        A.    Could you repeat that?  I'm sorry.
9        Q.    Yeah.  You said you'd looked at all the
10  books on the Reconsiderations Spreadsheet through a
11  1069 lens, right?
12       A.    Yes.
13       Q.    The ones where you didn't find sexual
14  conduct either were already unrestricted and I
15  presume you left them unrestricted, correct?
16       A.    Correct.
17       Q.    And the ones that you didn't find sexual
18  conduct and were restricted are the ones we talked
19  about earlier that you unrestricted in April of
20  2024, correct?
21       A.    Correct.
22       Q.    Okay.  And so for the most part, the Coffee
23  Crew discussions didn't address the challenged books
24  because they'd been separately reviewed already?
25       A.    Correct, for HB 1069.
```

1    Q.    Yes.   Thank you.   Okay.

2          So going back to Exhibit 17 and "Ready or

3    Not," it sounds like it might be a mistake that this

4    book is listed as restricted on the Reconsiderations

5    Spreadsheet?

6    A.    Yes, it might be a mistake.   I would need

7    to -- I would bring it up at our Coffee Crew to

8    discuss.

9    Q.    Would you bring it up or would you look back

10   at your Coffee Crew agenda to see if it had already

11   been discussed?

12   A.    I would check the agenda first, yes, but if

13   I don't see it on the agenda, then I would bring it

14   up.

15   Q.    Okay.   Just give me a moment.   I'm sorry.

16         Take a look at Exhibit 17.   That's the

17   spreadsheet you have.

18   A.    Oh, yeah.

19   Q.    Yeah, the same one.   There's an entry for

20   "The Handmaid's Tale, graphic novel" in yellow, but

21   there's no actual entry for "The Handmaid's Tale,

22   graphic novel" at any school.   Does that mean the

23   district does not own any copy of that book?

24   A.    The title is exactly the same, but if you

25   look at the author, there's one with a different

Deposition of Bradley Vinson, Volume 2

1    author.  That's the adaptor of the graphic novel.

2       Q.   I see.  Okay.

3            Can we take a look at "Finding Cinderella"?

4            So this is marked as restricted on the

5    Reconsiderations Spreadsheet that you have as -- but

6    does not appear on the HB 1069 list.

7       A.   I would need to check Destiny on that one.

8    Because it is checked out, I'm wondering if it is

9    one of those that has been checked out to a student

10   since prior to the challenge's receipt.

11      Q.   And why wouldn't that appear on the HB 1069

12   spreadsheet if that were the case?

13      A.   What do you mean?

14      Q.   I'm trying to understand.  This book is --

15   well, let me back up.

16           Has a determination been made that "Finding

17   Cinderella" contains sexual conduct under 1069?

18      A.   I would need to look back at our notes.

19   Again, that may be one that -- I would want to check

20   Destiny.

21      Q.   What would you check in Destiny, because

22   this is a printout from Destiny?

23      A.   Right.  But I'm saying that I don't know if

24   this book is actually -- has been physically on our

25   campuses for -- I don't know what period of time,

Deposition of Bradley Vinson, Volume 2

```
1   and so, I mean, having it still say restricted here,

2   it -- we should change it to either HB 1069 Storage

3   or Challenge, yes; however, I'm wondering if we

4   missed it because we have no physical copies

5   present.

6       Q.   I see.  And if you look at "Finding

7   Cinderella" on your laptop on the Reconsiderations

8   Spreadsheet, can you see when it was first

9   restricted?

10      A.   I can.  The only edit to that one is

11  Michelle White added a Y on December 14th of 2022.

12      Q.   So that was a book that was restricted

13  because of the challenge, correct?

14      A.   Correct.

15      Q.   And you had testified earlier that all of

16  the books that are still restricted are subject to

17  1069, but you're not sure about this one?

18          MS. SMITH:  Form.

19      A.   Correct.

20      Q.   Okay.

21          MS. SMITH:  Did you say 12/14/22?

22          THE WITNESS:  Yes, 12/14/22.

23  BY MR. LEV:

24      Q.   Okay.  I just want to walk through a few of

25  these books.  Let's look at "Slaughterhouse Five."
```

Deposition of Bradley Vinson, Volume 2

1      A.   Okay.

2      Q.   Can you tell me when that was first

3  restricted?

4      A.   Yes.  Michelle White added the Y

5  October 27th, 2022.

6      Q.   And do you know why it was restricted?

7      A.   At that time, no, I do not.

8      Q.   Okay.  "The Freedom Writers Diary," same

9  questions, when and why?

10     A.   Michelle White added a Y October 27th, 2022.

11  I do not know why.

12     Q.   And both of those books, therefore, were

13  restricted based on the challenge to the book, as we

14  discussed earlier?

15     A.   Yes.

16     Q.   Okay.  And has a determination been made

17  that "Slaughterhouse Five" and "The Freedom Writers

18  Diary" contain sexual conduct or may contain sexual

19  conduct under Section 1069?

20     A.   Yes.

21     Q.   And so are they still -- okay.  And

22  "Concrete Rose," can you tell me when that was first

23  restricted?

24     A.   Michelle White added a Y January 19th, 2023.

25     Q.   So that was restricted due to the book

Deposition of Bradley Vinson, Volume 2

```
1    challenge, correct?

2         A.    Correct.

3         Q.    And do you know why it was restricted?

4         A.    On the basis of the challenge, but beyond --

5    I don't know why her -- why she chose to restrict

6    it.

7         Q.    Okay.  And has a determination been made

8    that "Concrete Rose" may contain sexual conduct

9    under 1069?

10        A.    Yes.

11        Q.    Okay.  "Out of Darkness"?

12        A.    Michelle White added a Y October 27th, 2022.

13        Q.    So that was restricted due to the challenge,

14   correct?

15        A.    Correct.

16        Q.    You don't know why?

17        A.    Correct.

18        Q.    And has a determination been made that "Out

19   of Darkness" may contain sexual conduct under 1069?

20        A.    I'm fairly certain that, yes, we have made

21   that determination.  I would want to refresh my

22   memory on reviews for more specifics.

23        Q.    If it's marked as currently restricted on

24   the Reconsiderations Spreadsheet, is that indicative

25   that "Out of Darkness" has had a determination made
```

Deposition of Bradley Vinson, Volume 2

1    that it may contain sexual conduct?

2        A.    May I refer to whichever exhibit number this

3    is?

4        Q.    17.

5        A.    17.    Just having found that "Ready or Not"

6    was in error, I just want to double-check with a

7    title I'm less familiar with.

8        Q.    Understood.

9        A.    Yes, "Out of Darkness" is in HB 1069

10   Storage.

11       Q.    And so that means it was Coffee Crew

12   reviewed and determined that it may contain sexual

13   conduct?

14       A.    It does not mean that it's been Coffee Crew

15   reviewed, but it means that a media specialist

16   marked it for HB 1069 finding evidence that there

17   may be sexual conduct.

18       Q.    Okay.    And then there's only one copy.    I

19   see.    Okay.

20           "The Handmaid's Tale," can you tell me when

21   that was restricted?

22       A.    Sure, yes.    Give me just a moment.    I'm

23   looking right now at the novel, the cell for -- Line

24   64 on the Reconsiderations Spreadsheet.    Michelle

25   White added a Y October 27th, 2022.

Deposition of Bradley Vinson, Volume 2

```
1        Q.   So that was restricted due to the challenge,
2   correct?
3        A.   Correct.
4        Q.   And what about the graphic novel?
5        A.   Let's go to that one.
6             Same date, October 27th, 2022, Michelle
7   White added a Y.
8        Q.   Okay.  So also restricted due to the
9   challenge, correct?
10       A.   Correct.
11       Q.   And you don't know the reason that she chose
12  to restrict those books, correct?
13       A.   Correct.
14       Q.   And has a determination been made with
15  respect to the novel and the graphic novel that it
16  may contain sexual conduct under 1069?
17       A.   Yes.
18       Q.   And the way I would know that, if I -- I --
19  there's two ways I could know that.  One is your
20  testimony that everything that's currently
21  restricted has that determination, but we've
22  identified a few errors in the Reconsiderations
23  Spreadsheet in that regard?
24       A.   Right.
25       Q.   The way you would confirm that is you would
```

Deposition of Bradley Vinson, Volume 2

1   look at Exhibit 17, and if it says HB 1069 Storage

2   under circ type for all of the copies of the book,

3   that would mean that that determination has been

4   made with respect to all the copies of the book?

5       A.   Yes, but an individual media specialist

6   might have marked it -- well, in this case, because

7   it's on the challenge sheet, we did mark all of

8   them.

9       Q.   Okay.  But that's how I know if the --

10  that's the sort of way to double-check whether the

11  Reconsiderations Spreadsheet Y is accurately

12  reflecting the possibility of sexual conduct, is if

13  it says HB 1069 Storage under circ type, then

14  there's --

15      A.   Yes.

16      Q.   -- been a determination that it may contain

17  sexual conduct?

18      A.   A media specialist has actively made that

19  change after determining that there may be sexual

20  conduct.

21      Q.   Okay.  Can you tell me when "The Kite

22  Runner" was restricted?

23      A.   Michelle White added a Y October 27th, 2022.

24      Q.   So that was restricted due to the challenge,

25  correct?

1   A. Correct.

2   Q. "Oryx and Crake"?

3   A. October 27th, 2022, Michelle White made that

4 change.

5   Q. So restricted due to the challenge, correct?

6   A. Correct.

7   Q. "The Year of the Flood"?

8   A. December 14th, 2022, Michelle White added a

9 Y.

10   Q. So that was restricted due to the challenge,

11 right?

12   A. Due to the challenge, correct.

13   Q. "Last Night at the Telegraph Club"?

14   A. Now, that one I do remember was in an

15 elementary school when it should not have been

16 because it's against our policy to have young adult

17 or adult fiction of that nature in our elementary

18 collections, but the Y was added February 10th, 2023

19 by Michelle White.

20   Q. So that would have been restricted due to

21 the challenge, correct?

22   A. Correct.

23   Q. "Almost Perfect"?

24   A. Michelle White added a Y on October 27th,

25 2022.

```
 1        Q.    So that was restricted due to the challenge,
 2   correct?
 3        A.    Correct.
 4        Q.    "Beloved"?
 5        A.    Michelle White added a Y October 27th, 2022.
 6        Q.    So that was restricted due to the challenge,
 7   correct?
 8        A.    Correct.
 9        Q.    "Breathless"?
10        A.    October 27th, 2022, Michelle White added a
11   Y.
12        Q.    So that was restricted due to the challenge,
13   correct?
14        A.    Correct.
15        Q.    "City of Thieves"?
16        A.    Michelle White added a Y October 27th, 2022.
17        Q.    So that was restricted due to the challenge,
18   correct?
19        A.    Correct.
20        Q.    "Darius the Great Deserves Better"?
21        A.    Michelle White added a Y October 27th, 2022.
22        Q.    So that was restricted due to the challenge,
23   correct?
24        A.    Correct.
25        Q.    "Hear the Voices"?
```

1    A.    "Hear These Voices"?

2    Q.    Probably, yes.

3    A.    Michelle White added a Y October 27th, 2022.

4    Q.    So that was restricted due to the challenge,

5    correct?

6    A.    Yes.

7    Q.    "Youth at the Edge of the Millennium"?

8    A.    Michelle White added a Y October 27th, 2022.

9    Q.    Okay.  "Lexicon"?  Oh, I'm sorry.  "Youth at

10   the Edge of the Millennium" was restricted due to

11   the challenge, correct?

12   A.    Correct.

13   Q.    "Lexicon"?

14   A.    Michelle White added a Y October 27th, 2022.

15   Q.    And that was restricted due to the

16   challenge, correct?

17   A.    Correct.

18   Q.    "Sloppy Firsts"?

19   A.    Michelle White added a Y October 27th, 2022.

20   Q.    That was restricted due to the challenge,

21   correct?

22   A.    Correct.

23   Q.    "The God of Small Things"?

24   A.    Michelle White added a Y October 27th, 2022.

25   Q.    So that was restricted due to the challenge,

Deposition of Bradley Vinson, Volume 2

```
1    correct?

2        A.   Correct.

3        Q.   "The House of Spirits"?

4        A.   I hope that I haven't overwritten something

5    here by trying to jump around in our public

6    spreadsheet.

7             MS. SMITH:  Undo.

8        A.   Undo.  I know I have it here because I've

9    seen it recently.  There it is.  It's right there.

10   Okay.  I just couldn't find it for some reason.

11   That was weird.

12            Michelle White added a Y October 27th, 2022.

13       Q.   Okay.  So that was restricted because of the

14   challenge, correct?

15       A.   Correct.

16       Q.   "Thirteen Reasons Why"?

17       A.   This one has two edits.  Do you want to know

18   the dates of those?

19       Q.   Yes, please.

20       A.   Okay.  So initially, on October 27th, 2022,

21   Michelle White had an N, but she replaced the N with

22   a Y on November 7th, 2022.

23       Q.   So that was restricted due to the challenge?

24       A.   Yes.

25            MS. SMITH:  Sorry.  What was the second
```

Deposition of Bradley Vinson, Volume 2

1      date?

2             THE WITNESS:  November 7th, 2022.

3      Q.   "Girl in Pieces"?

4      A.   Michelle White added a Y October 27th, 2022.

5      Q.   So that was restricted due to the challenge?

6      A.   Correct.

7      Q.   "Freedom Writers Diary"?

8      A.   October 27th, 2022, Michelle White added a

9   Y.

10     Q.   So that was restricted due to the challenge,

11  correct?

12     A.   Correct.

13     Q.   "I'll Give You the Sun"?

14     A.   December 14th, 2022, Michelle White added a

15  Y.

16     Q.   So that was restricted due to the challenge,

17  correct?

18     A.   Correct.

19     Q.   "A Lesson in Vengeance"?

20     A.   February 10th, 2023, Michelle White added a

21  Y.

22     Q.   That was restricted due to the challenge?

23     A.   Correct.

24     Q.   "I Am Not Your Perfect Mexican Daughter"?

25     A.   April 27th, 2023, Michelle White added a Y.

1      Q.   So that was restricted due to the challenge,

2  correct?

3      A.   Correct.

4      Q.   "Man O' War"?

5      A.   May 23rd, 2023, Michelle White added a Y.

6      Q.   So that was restricted due to the challenge?

7      A.   Correct.

8      Q.   "10 Things I Can See From Here"?

9      A.   July 3rd, 2023, I added a Y.

10     Q.   So do you know if that was restricted as a

11  result of the challenge or because of the 1069

12  review?

13     A.   Let me look at the form.

14          MR. LEV:  I'm sorry, what was that date?

15          THE COURT REPORTER:  July 3rd, 2023.

16          MR. LEV:  Thank you.

17     A.   The challenge indicated that there was

18  sexual conduct present, so it's a combination of the

19  challenge being received and we also found that

20  sexual conduct was present.

21     Q.   Okay.  And this was right after the

22  challenge was received, so this is sort of within

23  the five-day window of determining whether a

24  challenge is based on sexual conduct in removing the

25  book?

```
 1        A.    Correct.

 2        Q.    Okay.  Great.  Thank you.

 3              "All the Things We Do in the Dark"?

 4        A.    Michelle White added a Y October 27th, 2022.

 5        Q.    Okay.  So that was restricted due to the

 6   challenge, correct?

 7        A.    Correct.

 8        Q.    "Art of Racing in the Sun"?

 9        A.    "Art of Racing in the Rain"?

10        Q.    Yes.  I guess I was being optimistic.  "Art

11   of Racing in the Rain."  Thank you.

12        A.    Michelle White added a Y October 27th, 2022.

13        Q.    So that was restricted because of the

14   challenge, correct?

15        A.    Correct.

16        Q.    "Beyond Magenta"?

17        A.    October 27th, 2022, Michelle White added a

18   Y.

19        Q.    So that was restricted because of the

20   challenge correct?

21        A.    Correct.

22        Q.    "Forever"?

23        A.    October 27th, 2022, Michelle White added a

24   Y.

25        Q.    So that was restricted because of the
```

Deposition of Bradley Vinson, Volume 2

1    challenge, correct?

2        A.    Correct.

3        Q.    "Milk and Honey"?

4        A.    October 27th, 2022, Michelle White added a

5    Y.

6        Q.    So that was restricted because of the

7    challenge, correct?

8        A.    Correct.

9        Q.    "Nineteen Minutes"?

10       A.    October 27th, 2022, Michelle White added a

11   Y.

12       Q.    So that was restricted because of the

13   challenge, correct?

14       A.    Correct.

15       Q.    "Speak"?

16       A.    So we do have multiple edits for "Speak."

17       Q.    Okay.

18       A.    Do you want us to go back to the way it was

19   first entered?

20       Q.    Yes, please.

21       A.    Okay.  Just a moment, because there are

22   multiple edits.  All right.  Initially, on

23   October 25th, 2022, it was TBD, Michelle White.

24       Q.    And so that means it was then restricted at

25   that time?

1      A.    Yes.

2      Q.    Okay.

3      A.    October 27th, 2022, Michelle White changed

4   it to N.

5      Q.    Okay.

6      A.    February 8th, 2023, Michelle White replaced

7   the N with MS YA opt-in, HS N.

8      Q.    And that means it's a young adult opt-in for

9   middle school, but there's no restriction in high

10   school, correct?

11      A.    That's correct.

12      Q.    Okay.

13      A.    Same day, she -- looks like she was trying

14   to determine exactly how to record that because she

15   replaced that statement with YA section, MS N HS.

16      Q.    Okay.

17      A.    Which means the same thing.

18      Q.    Okay.  Okay.

19      A.    Same day.  Now it says YA section opt-in, MS

20   N HS.

21      Q.    Okay.

22      A.    Do you want me to skip some of these that

23   are all the same?

24      Q.    If they're all the same iterations of the MS

25   YA opt-in and not restricted in high school.

Deposition of Bradley Vinson, Volume 2

```
1        A.    But then April 1st I made the edit.
2   April 1st, 2024, I changed it to a Y.
3        Q.    And what was the basis for that?
4        A.    That we found sexual conduct present and
5   questioned -- may I review the form?
6        Q.    Yes, please.  Thank you for letting me know
7   you were doing that.
8        A.    Sure.  The form -- the form indicates
9   antirape, but this was a form that was received
10  before HB 1069.  It also indicates graphic content,
11  but our media specialist found that sexual conduct,
12  a sexual assault is present in the work, and we
13  determined to restrict it based on that.
14       Q.    Was that a Coffee Crew determination?
15       A.    I would need to look back at my notes to be
16  sure.
17       Q.    And if we looked at that Coffee Crew agenda,
18  if that was there, that would indicate it was a
19  Coffee Crew decision, and if it's not referenced in
20  those agendas, then it would be the individual media
21  specialist's decisions?
22       A.    Yes.
23       Q.    And if we look at Exhibit 17 for "Speak,"
24  there are quite a number of copies of this book and
25  they all say HB 1069 Storage?
```

Deposition of Bradley Vinson, Volume 2

1     A.   Yes.

2     Q.   So either each of the media specialists at

3  those schools individually determined that the book

4  may contain sexual conduct or the Coffee Crew

5  determined that and it was applied across the board,

6  correct?

7     A.   Correct.

8     Q.   Okay.  And you don't recall as we sit here

9  whether it was a Coffee Crew discussion?

10    A.   I would want to refer to my notes, to the

11 Coffee Crew agenda.

12    Q.   And that's the notes you would refer to?

13    A.   Yes.

14    Q.   Okay.

15    A.   I would also -- I have my declaration here

16 as well.  I would check the date on when we added it

17 to the HB 1069 Storage list.

18    Q.   I don't think you indicate that.

19    A.   Huh?

20    Q.   I don't believe that you indicate that in

21 your declaration.  It's Paragraph 57 and on, if you

22 want to look at it.

23        Yeah, it does say at least one media

24 specialist did it before July 17th of 2023?

25    A.   So then that likely would have been myself

1    or Linda Sweeting.

2        Q.    Okay.  As part of the review of challenged

3    books for 1069?

4        A.    Yes, yes.

5        Q.    And that would have applied to all the

6    copies in all the libraries?

7        A.    Yes.

8        Q.    Okay.  And is that what --

9        A.    So editing it on the spreadsheet is

10   something I must have missed in that process because

11   it really would have been restricted from that date

12   forward.

13       Q.    Got it.  It just wasn't reflected on the

14   Reconsiderations Spreadsheet?

15       A.    Yes.

16       Q.    And when -- your declaration, in Paragraph

17   59, it says:  The title was pulled from circulation

18   at the time.  This title remains in storage.

19           That meant all the copies of the book?

20       A.    Correct.

21       Q.    Almost done with this exercise.  "Red, White

22   and Royal Blue"?

23       A.    Michelle White added a Y on October 25th,

24   2022.

25       Q.    So that book was restricted due to the

1   challenge, correct?

2       A.   Correct.

3       Q.   And "The Female of the Species"?

4       A.   December 14th, 2022, Michelle White added a

5   Y.

6       Q.   So that book was restricted due to the

7   challenge, correct?

8       A.   Correct.

9       Q.   Okay.  So for all of these books that we've

10  now discussed that you've identified Michelle White

11  having entered a Y in the restricted access column

12  of the Reconsiderations Spreadsheet before June of

13  2023 that were restricted because of the challenge,

14  I just want to confirm, you don't know the basis for

15  the decision to restrict any of those books?

16      A.   I know what -- no, I don't know -- I don't

17  know if a consistent process was applied.

18      Q.   Okay.  And you don't know if it was a

19  decision made by Michelle White, or Michelle White

20  in consultation with Tim Smith, or Tim Smith?

21      A.   Correct.

22      Q.   Could it have been anybody else who made the

23  decision to restrict the book other than Michelle

24  White and Tim Smith?

25      A.   Not to my knowledge.

1    Q.   And you don't know whether the decision was

2    based on the challenge form or the contents of the

3    book itself?

4    A.   Correct.

5    Q.   And you don't know if whoever made the

6    decision actually read the book?

7    A.   Correct.

8    Q.   And do you know whether any board member

9    voiced an opinion as to whether any of those books

10   should be restricted?

11        MS. SMITH:   Form; scope.

12   A.   I don't know that the board members were

13   ever involved in any of the restrictions to books.

14   Q.   And the questions I just asked you about

15   your knowledge about the basis for the restriction

16   and who made the decision, I assume those answers

17   are the same for any book that was restricted by

18   Michelle White?

19   A.   Yes.

20   Q.   Let me rephrase that.  Any book where the

21   Reconsiderations Spreadsheet shows Michelle White

22   entered the Y or changed the entry to a Y?

23   A.   Yes.

24   Q.   Okay.  And until July 1st, 2023, could

25   parents -- that's okay.

1           After July 1st, 2023, for those books that

2     were listed as restricted on the Reconsiderations

3     Spreadsheet, many of which predated your review of

4     them, could parents opt in to them if -- into access

5     for those books if they weren't on the 1069 list?

6          A.    Yes.

7          Q.    Okay.  But once the book was on the 1069

8     list and changed to HB restricted access, that

9     opt-in process no longer applied to the book,

10    correct?

11         A.    Yes.

12         Q.    And for all of these 130 books on the

13    Reconsiderations Spreadsheet that have a Y in the

14    Restricted Access column, what is the next step in

15    the process?

16              MS. SMITH:  You're referring to Exhibit 48?

17              MR. LEV:  I am.  Thank you.

18         A.    The next step in the process for these, the

19    superintendent and I will evaluate them ourselves

20    and discuss them to determine if there are any that

21    we would like to explore -- the process that doesn't

22    exist yet, but the process that we do have in our

23    policy where we could possibly remove some of these

24    challenged books before they go to a District

25    Materials Review Committee.

Deposition of Bradley Vinson, Volume 2

```
1        Q.    Okay.

2        A.    If we determine that we would not remove it,

3    then it would go to the District Materials Review

4    Committee.  We will need to be forming those, along

5    with the Assistant Superintendent of Curriculum and

6    Instruction, and those are publicly noticed

7    meetings, so setting the dates and coordinating is a

8    process we need to begin to work on.

9              And then I would examine the packets that

10   Michelle White had been utilizing and evaluate

11   whether or not -- what changes we would need to

12   make, because there are changes with the legislation

13   since that time, and assemble packets for the books

14   that we would like to review and get started on

15   committee work and review work.

16       Q.    And the decision of what to include in the

17   District Materials Review Committee packets is

18   yours?

19       A.    In consultation with Ellen Odom and the

20   superintendent, yes.

21       Q.    And have you begun that process of

22   considering what information to include in the

23   District Materials Review Committee packets?

24       A.    Not in depth, no.  I mean, I'm familiar with

25   those review packets but I haven't begun that
```

Deposition of Bradley Vinson, Volume 2

```
1   process yet.
2       Q.   Okay.  And I think we spoke earlier about
3   the composition of the District Materials Review
4   Committee being different because it will be bigger
5   and it will include members nominated or appointed
6   by each of the board members.
7           What other changes, if any, will there be to
8   the composition or operation of the District
9   Materials Review Committees from the way they
10  operated previously?
11      A.   One other change that the superintendent
12  proposed is that we would -- if there were a tie
13  vote, then the tiebreaker vote would be the vote of
14  the board appointees, the five members who are the
15  board appointees.
16      Q.   Okay.  Any other changes to how the
17  committees will operate?
18      A.   We have not discussed any other changes.
19      Q.   Okay.
20      A.   Well, there's one thing that I proposed,
21  that we allow online attendance in some way to
22  facilitate scheduling, because I've heard that
23  scheduling was very challenging.
24      Q.   Simply doing it by Zoom?
25      A.   Right.
```

Deposition of Bradley Vinson, Volume 2

```
 1        Q.   And as of today, none of the -- you have not
 2   yet reviewed any of the books with the
 3   superintendent for purposes of the -- I'm going to
 4   call it expedited removal process?
 5        A.   Correct.
 6        Q.   In fact, you don't even have that -- know
 7   what that process will look like?
 8        A.   Correct.
 9        Q.   And you're going to do that before you have
10   a DMRC for any of the books because you don't want
11   to have a DMRC if you're going to remove it?
12        A.   I would certainly consider it.  I don't know
13   if that process has to be in place before we can
14   move forward with at least some DMRC meetings.  I
15   think there are some of these that the
16   superintendent and I would agree we would like to
17   retain, so we would send them to committee.
18        Q.   And none of the DMRCs have yet been formed,
19   correct?
20        A.   Correct.
21        Q.   And, therefore, none of the meetings have
22   been scheduled?
23        A.   Correct.
24        Q.   Okay.  You helpfully noted earlier today the
25   correction to your testimony from yesterday about
```

1    what TBD means.

2        A.    Yes.

3        Q.    Are there any other corrections to make to

4    your testimony based on the materials you reviewed

5    last night or otherwise?

6        A.    I can't think of anything that we haven't

7    covered through other questions.

8        Q.    Okay.  And what materials did you review

9    last night?

10       A.    I looked back through e-mails, I looked at

11   the -- I looked at some of the histories of the

12   items, I looked at the response with the

13   interrogatories again.

14       Q.    Exhibit 17?

15       A.    No.  I'm sorry.

16           MS. SMITH:  The interrogatories.

17   BY MR. LEV:

18       Q.    Oh, the interrogatories.

19       A.    Yes.

20       Q.    Okay.  When you say some of the history of

21   the items, what do you mean?

22       A.    The history of the -- like, looking at that

23   restricted access and when we restricted access to

24   some of these titles.

25       Q.    I see.  Okay.

Deposition of Bradley Vinson, Volume 2

1    A.    And I think that covers my preparation.

2    Q.    What e-mails did you review?

3    A.    Some e-maild from Michelle White from 2022.

4    Q.    E-mails that you received as a media

5    specialist?

6    A.    Yes.

7    Q.    Okay.

8         MS. SMITH:  Are we at a good breaking point?

9         (Recess from 12:13 p.m. until 1:09 p.m.)

10   BY MR. LEV:

11   Q.    Okay.  Ms. Vinson, I'll just remind you

12   you're still under oath.

13   A.    Yes.

14   Q.    Okay.

15        MR. LEV:  Can I get the next exhibit,

16    please?

17        MS. HEYWOOD:  Yes, 49.  Here you are.

18     (Vinson Exhibit 49 was marked for identification.)

19   BY MR. LEV:

20   Q.    So Exhibit 49 is a copy of the

21   Reconsiderations Spreadsheet from August 19th, 2024,

22   filtered for entries in restricted access that are

23   basically anything but a Y, so either a no, an N, or

24   a YA opt-in MS, N high school.  I think those are

25   the two options.  Right?

Deposition of Bradley Vinson, Volume 2

1     A.    Yes.

2     Q.    Okay.  And so that means that these books,

3  although they have been challenged, are currently

4  available to all students to check out from their

5  schools other than the ones that say YA opt-in, in

6  which case there needs to be an opt-in form; is that

7  correct?

8     A.    If we still have a copy in our catalog or an

9  available copy.  I will point out that "Flor Fights

10  Back," for example, is a book that was only

11  available on myON, which is no longer a

12  district-funded purchase.  Individual schools -- we

13  just did not have the budget for it.  But individual

14  schools are -- some of them are finding availability

15  of budget funds to have that.  I have not checked

16  the status of that book this year.

17     Q.    Okay.  myON?

18     A.    myON.  It's a service offered by

19  Renaissance, which is the same company that does the

20  accelerated reader program.

21     Q.    And so is that eBooks?

22     A.    They are eBooks, and they also have an audio

23  component for many of the books.

24     Q.    But if there is a physical copy that's

25  available or an online copy that is available, then

1    the book is available to be checked out without

2    restriction if it's listed here, with the exception

3    of the YA opt-ins; is that correct?

4        A.    May I refresh my memory on a couple of these

5    that I just, off the top of my head, I cannot say?

6        Q.    Yeah.  Tell me which ones you're refreshing

7    your recollection on.

8        A.    I want to double-check "Stealing Heaven,"

9    because I don't have a solid idea of that one.

10       Q.    And you are looking at Exhibit 17 to refresh

11   your recollection.  Okay.

12       A.    So "Stealing Heaven" is challenged, so

13   that's correct.

14       Q.    And it's unrestricted other than it's YA

15   opt-in status in middle school?

16       A.    Correct.

17       Q.    Okay.

18       A.    And then I guess we should double-check -- I

19   want to double-check "After."  Okay.  "After" is

20   correct.

21            And I think this is accurate.  I think this

22   is accurate, yes.

23       Q.    Meaning Exhibit 49, the books listed here

24   are available for students to check out without

25   restriction unless they're YA opt-in, in which case

Deposition of Bradley Vinson, Volume 2

1    they need parental opt-in?

2        A.    Correct.

3        Q.    Okay.  In your declaration in Paragraph 34,

4    you identify 20 books that had been unrestricted and

5    returned to circulation.

6        A.    Yes.

7        Q.    These are the ones we've spoken about

8    earlier that you couldn't discern why they had been

9    restricted.  They did not contain sexual conduct and

10   so you unrestricted them in April of 2024; is that

11   correct?

12       A.    That's correct.

13       Q.    Okay.  So there are nine books on here that

14   are not on your declaration that are challenged

15   books that are --

16           MS. SMITH:  What is "here"?  What are you

17       looking at?

18           MR. LEV:  I'm sorry.

19   BY MR. LEV:

20       Q.    There are nine books on Exhibit 49, right,

21   that are challenged books unrestricted that you did

22   not include in your declaration.  So let's just go

23   through those quickly and maybe you can tell me if

24   they had ever been restricted.

25       A.    Would you like me to get onto my computer

Deposition of Bradley Vinson, Volume 2

1    for that?

2        Q.   Yes, please.  Thank you.

3        A.   Are we going through title by title?

4        Q.   It will just be nine titles, but yes.

5        A.   Okay.

6        Q.   "After"?

7        A.   Give my computer just a moment.

8                 (Discussion off the record.)

9        A.   Okay.  The first entry for that was

10   April 3rd, 2023.  Michelle White entered an N and

11   then later the same day replaced the N with YA

12   opt-in MS, N HS.

13       Q.   And by April of 2023, the district had

14   already adopted the YA opt-in policy, do you know?

15       A.   May I refer to the policy?  I know that that

16   was our practice but may I refer to the policy?

17       Q.   I'm sorry.  Was that -- that was the

18   practice by April of 2023?

19       A.   Yes.

20       Q.   And when you say may you refer to the

21   policy, were you going to look at Policy 4.06?

22       A.   Yes.

23       Q.   Okay.  And whether that was in the December

24   2022 version or only the July 2023 version?

25       A.   Well, just to confirm that it is in the

Deposition of Bradley Vinson, Volume 2

1    policy -- yes.

2        Q.    Sure.  So let's take a look at -- I think

3    you probably want to look at -- I think it's 19.

4    Yeah, I think you want to look at 19 because that's

5    going to show you the version from December 2022 and

6    then the changes made in 2023.

7        A.    Okay.  Yes.  It is present.  Parents of

8    middle school students grades six through eight

9    shall also have the opportunity to opt in for their

10   students to have access to the young adult section.

11           And that's on Page 34 of 93.

12       Q.    Thank you.

13       A.    Yes.

14       Q.    Okay.  We're going to come back to that in a

15   little bit, but -- so it's present in the policy and

16   it was present in the policy that was adopted in

17   December of 2022?

18       A.    Yes.

19       Q.    Okay.  And that was the practice April of

20   2023 as well?

21       A.    Yes.

22       Q.    Okay.  So other than being subjected to the

23   YA opt-in, was "After" ever restricted as a result

24   of the challenge?

25       A.    Not that I can see.

1    Q.   Okay.  What about "Allegedly"?

2    A.   So initially Michelle White had marked that

3    a Y for restriction on October 27th, 2022, and then

4    I replaced the Y with an N April 2nd, 2024.

5    Q.   So was "Allegedly" part of that process we

6    talked about of unrestricting books in April of

7    2024?

8    A.   May I refer to my list?

9    Q.   Yes.  It's Paragraph 34 of the declaration

10   lists, those 20 books.

11   A.   I think "Allegedly" -- I want to check my

12   Coffee Crew.  It may be one we discussed in Coffee

13   Crew and determined that there was not sexual

14   conduct as defined by statute.

15   Q.   So it was different from --

16   A.   It was different from this process.  It's

17   not on this list.

18   Q.   Okay.  But also unrestricted by you in

19   April?

20   A.   Correct.

21   Q.   Okay.  What about "Assassination Classroom V

22   3"?

23   A.   Give me just a moment on that one.

24        MS. SMITH:  What was that title?

25        THE WITNESS:  "Assassination Classroom

```
 1        Volume 3."
 2             MS. SMITH:  I feel like I've heard these
 3        titles.
 4                  (Discussion off the record.)
 5        A.   We're specifically looking at Volume 3, not
 6   any other volumes?
 7        Q.   When I look at -- does the school district
 8   have any other volumes?
 9        A.   We do.
10        Q.   Okay.  What is the status of those -- let's
11   look at Volume 3 first, and then we can --
12        A.   Okay.  So let me go back.  Volume 3 was
13   initially entered by Michelle White February 10th,
14   2023, and it says Y ES/MS -- I'm sorry -- Y ES/MS, N
15   HS.
16             And then moving forward, I replaced the Y
17   ES/MS, N HS with YA opt-in MS, N HS on April 1st,
18   2024.
19        Q.   And what led to that change?
20        A.   I may have identified that it was a young
21   adult book first off and I thought that that should
22   be reflected there, but I would need to refer to my
23   notes to see if there were any other considerations
24   there.
25        Q.   What notes would you be referring to?
```

Deposition of Bradley Vinson, Volume 2

1       A.   I might look at Coffee Crew to see if we

2   discussed that series.

3       Q.   Okay.  Anywhere else you'd look?

4       A.   May I check Exhibit 17 for the current

5   status of that just to be sure that it's reflected

6   in Destiny?

7       Q.   Sure.  Yes.

8       A.   Yeah, we have that listed as challenged, so

9   that's accurate there.

10          I would just double-check and see if we

11  discussed it in Coffee Crew.

12      Q.   Okay.  But my understanding is that

13  "Assassination Classroom Volume 3" was restricted in

14  elementary schools and middle schools beginning on

15  February 10th, 2023, and remained restricted until

16  April 1st of 2024, when it was not available in

17  elementary schools at all and subject to the YA

18  opt-in process for middle schools, correct?

19      A.   May I -- I'm pulling up the form.  I don't

20  know that --

21      Q.   The challenge form?

22      A.   The challenge form.  I'm not sure that

23  "Assassination Classroom Volume 3" was ever even

24  present in an elementary school.  The form indicates

25  it was at Beulah Middle and Pensacola High School.

1      Q.    Okay.

2      A.    And I would need to check Destiny or the

3   Destiny reading log to see if it was ever present

4   elsewhere.

5      Q.    And you said that the form indicates it was

6   present in a middle school.  Exhibit 17 only lists

7   one copy of the title currently, correct?

8      A.    Correct.

9      Q.    Could that be because the middle school copy

10   doesn't have Volume 3 and that was how this was

11   sorted in the title?

12      A.    Are you talking about Exhibit 49?

13      Q.    No.  I'm sorry.  I'm talking about

14   Exhibit 17 that lists only one copy of

15   "Assassination Classroom" -- I'm sorry, yeah.

16          So if we look at Exhibit 17 and you look up

17   "Assassination Classroom," the only entry for that

18   is "Assassination Classroom V 3," correct?

19      A.    That is correct.

20      Q.    Okay.  And it lists one copy of that book?

21      A.    Yes.

22      Q.    Okay.  Is it possible that there was another

23   copy of that book in a middle school that is not

24   appearing on Exhibit 17 because of the way you

25   pulled this report from Destiny that was limited to

1    Volume 3 being listed in the title?

2        A.    All copies of Volume 3 that are currently in

3    Destiny should be reflected here.  So that middle

4    school copy, I would assume and could check if I

5    were to look in Destiny or the reading log, I would

6    assume that that middle school no longer has that

7    copy, that it may have been weeded.

8        Q.    Okay.

9        A.    But I will say, in my process of creating

10   this spreadsheet, I only checked to see what copies

11   were weeded if there were no copies present.

12       Q.    Okay.  That's helpful.  Thank you.  And when

13   we started this discussion of "Assassination" -- so

14   Volume 3 of "Assassination Classroom" you believe

15   likely was never in any elementary schools to begin

16   with?

17       A.    Correct.

18       Q.    And has essentially been subject to an

19   opt-in in the middle school from February 10th of

20   2023 to the present?

21       A.    Yes.

22       Q.    Okay.  And by February 10th, 2023, was it

23   the district's policy and practice to require any

24   young adult novels to be opt-in?

25       A.    That would be part of our adopted policy in

1    December of 2022.

2        Q.    And was it also the practice by February of

3    2023?

4        A.    Yes, it would have been the practice by

5    then.

6        Q.    Okay.  So if this book had been identified

7    as a young adult novel, it would have been subject

8    to that opt-in policy?

9        A.    Yes.

10       Q.    Okay.

11       A.    And I will also say that "Assassination

12   Classroom Volume 3" is the only one that's included

13   on Exhibit 17 because it was the only one that was

14   included on what was produced to me as the titles

15   that you had at issue.

16       Q.    Understood.  And are there -- if you look at

17   the Reconsiderations Spreadsheet, though, are there

18   other copies of "Assassination Classroom" that have

19   been challenged?

20       A.    Volumes 1 through 7 are listed.

21       Q.    I see.  That's interesting.

22             And when I look at the Reconsiderations

23   Spreadsheet, it indicates that Volumes 2 through 6

24   are all YA opt-in in middle school, not restricted

25   in high school, correct?

```
 1        A.   Correct.

 2             MS. SMITH:  Objection; scope.

 3        Q.   And when I look at "Assassination Classroom"

 4   Volumes 1 and 7, they are listed as restricted

 5   access?

 6        A.   Correct.

 7             MS. SMITH:  Scope.

 8        Q.   Do you know if those entries with respect to

 9   "Assassination Classroom" Volume 1 and 7 are

10   accurate?

11             MS. SMITH:  Scope.

12        A.   May I check the dates?

13        Q.   Yes, please.

14        A.   So initially, Michelle White entered these

15   on February 10th, 2023, with Y ES/MS, N HS, and then

16   I changed that on April 1st.  It looks like I made

17   multiple edits on that days.  Let's see here.  I

18   replaced it with Y HS, which I would need to confirm

19   because I think there was only a copy at a high

20   school, and then I replaced the Y HS with Y because

21   it's restricted wherever we have it.  So April 1st,

22   2024, I made that change.

23        Q.   And what about Volume 7?

24             MS. SMITH:  Objection; scope.

25        A.   Those were -- that one was indicated the
```

1    same way from Michelle White, and I made the changes

2    on that same April 1st, 2024 date to Y, and if I

3    recall correctly, this was in relation to HB 1069

4    review.

5         Q.    From the Coffee Crew or --

6         A.    I would need to check.

7         Q.    If it wasn't from the Coffee Crew, it might

8    have been from your review with --

9         A.    Linda Sweeting.

10        Q.    -- with Linda Sweeting of the challenged

11   books?

12        A.    Yes.

13        Q.    And it could be that you had made that

14   decision earlier but just were updating --

15        A.    Hadn't recorded it properly.  Sorry.

16        Q.    And it seems like April 1st was a day when

17   you were updating the Reconsiderations Spreadsheet?

18        A.    I was making my corrections, yes.

19        Q.    Okay.  What about "Eleanor and Park," can

20   you tell me whether that had been restricted at some

21   point?  It's currently listed on Exhibit 49 as YA

22   opt-in middle school, no high school.

23        A.    Let's see.  Initially, Michelle White had

24   TBD on October 25th, 2022, and then changed that to

25   N on October 27th, 2022, changed it again on

Deposition of Bradley Vinson, Volume 2

```
 1    November 7th, 2022 to YA section MS, N HS, and then
 2    February 8th changed it to YA opt-in MS, N HS.
 3        Q.   Okay.
 4        A.   Which is the current status.
 5        Q.   Okay.  So it would have been restricted for
 6    two days?
 7        A.   Yes.
 8        Q.   And otherwise subject to opt-in at the
 9    middle school level?
10        A.   Yes.
11        Q.   Okay.  What about "Flor Fights Back"?
12        A.   That's the one that was on myON only.
13        Q.   When would it have been -- was it ever
14    restricted, though?
15        A.   I'm looking at the edit history and
16    initially it was entered by Michelle White, May 8th,
17    2023, with Y ES, N MS/HS, and then after that, April
18    1st, I replaced that with N ES MS HS.
19        Q.   April 1st of 2024?
20        A.   Of 2024, yes.
21        Q.   Okay.
22        A.   And then I replaced that again on April 1st,
23    later that same day, with just N.
24        Q.   So this is another book that you
25    unrestricted --
```

Deposition of Bradley Vinson, Volume 2

```
 1        A.    Yes.

 2        Q.    -- on April 21st, 2024.  What led to that

 3   being unrestricted?

 4        A.    Was that included in my declaration of the

 5   titles?

 6        Q.    It is not.

 7        A.    It is not?

 8        Q.    Yeah.  I'm only asking you about the ones

 9   that aren't.

10        A.    I may not have included it in that

11   communication because it was in myON, and there were

12   not actions that those that I communicated that to

13   would have needed to take.  It was all in myON, so

14   that was something that I could manage at the

15   district level and then the spreadsheet is there to

16   report the decision.

17        Q.    Okay.

18        A.    I don't know if I maybe overlooked it as

19   well.

20        Q.    Okay.  When you -- you referred to your

21   communication.  Was there a communication that went

22   out listing these 20 books as being unrestricted?

23        A.    I did send out an e-mail, yes.

24        Q.    When you prepared your declaration, were you

25   relying on that e-mail to come up with the list of
```

Deposition of Bradley Vinson, Volume 2

```
1    books in Paragraph 34?

2         A.   Yes.

3         Q.   And when was myON discontinued districtwide?

4         A.   So the district determined in spring of 2024

5    that the budget was not available to make that

6    purchase at the district level.  It's very expensive

7    across all schools.  It was actually a Title I

8    decision, the Title I department.  And then

9    individual schools, some of them are choosing to

10   subscribe to that service this year.

11        Q.   Okay.  And the decision in the spring of

12   2024, was myON available through the end of the

13   school year?

14        A.   Yes.

15        Q.   Okay.  There's an entry on the

16   Reconsiderations Spreadsheet that says "George."  Is

17   that the same as "Melissa (George)" that's listed in

18   Paragraph 34 of your declaration?

19        A.   Yes.

20        Q.   Okay.

21        A.   And we don't have any copies listed in our

22   catalog with the -- you know, the publication

23   release title "Melissa."  Everything that was ever

24   "Melissa (George)" is how it appears in our catalog.

25        Q.   It appears as "George"?
```

Deposition of Bradley Vinson, Volume 2

1       A.    It appears as "George," yes.

2       Q.    Okay.  So that was part of that unrestricted

3   process.  Okay.

4             "Girl Made of Stars," had that been

5   restricted at some point?

6       A.    Give me just a moment, I can check.  Do you

7   want me to go through all the edit history?  There

8   are a few edits.

9       Q.    Sure.

10      A.    Okay.  Michelle White entered it on

11  May 11th, 2023 as N, but on the same day replaced

12  that N with Y ES, YA opt-in MS, N HS.  May I check

13  and see if this was in -- may I look on the form and

14  see if it was part of an elementary collection?

15      Q.    Yeah.  I'm looking at Exhibit 17, and there

16  are two entries, both in high school.

17      A.    Right.  So --

18      Q.    Okay.

19      A.    -- that would explain, I believe, some of

20  the future edits on that one.  Give me just a moment

21  to get back to where I was.

22      Q.    Do any of those -- rather than reading each

23  one, do any of them reflect a restriction at the

24  high school level?

25      A.    July 1st of 2024, I replaced it with a Y but

Deposition of Bradley Vinson, Volume 2

1    the same day I changed it back, so that was probably

2    a typo.

3        Q.    Okay.  Any other restrictions at the high

4    school level reflected there?

5        A.    At the high school level, no.

6        Q.    Okay.  And is there any reason to think this

7    title was available in middle schools?

8        A.    No.

9        Q.    I know we talked about "Stealing Heaven."  I

10   can't remember what we said about it but can you

11   tell me if that was ever restricted?

12       A.    It was initially entered by Michelle White

13   on May 8th, 2023, with N, but the N was replaced the

14   same day with Y ES, YA opt-in MS, and N HS, which

15   seems to be similar to the other one, because I

16   don't think this was something that was ever in an

17   elementary school.

18            And then April 1st of 2024, I replaced that

19   with YA opt-in MS, N HS, and that was the final

20   edit, and that was just cleaning it up because the

21   elementary school was not relevant.

22       Q.    Understood.  That wasn't a book that was

23   ever in the elementary schools?

24       A.    Correct.

25       Q.    Okay.  What about "The One Summer"?

1       A.    "This One Summer"?

2       Q.    "This One Summer," yes.  Sorry.

3       A.    Initially, Michelle White entered this

4  October 25th, 2022, with TBD, and then on

5  October 27th, 2022 changed it to Y, and then I made

6  the edit April 5th, 2024, from Y to N.

7       Q.    Okay.  So this book was restricted from

8  October 25th, 2022, until April 5th of 2024,

9  correct?

10      A.    Correct.

11      Q.    And do you know why you unrestricted it?

12      A.    Is that part of my declaration list?

13      Q.    It is not.

14      A.    It is not.  I would need to review my Coffee

15  Crew agenda to see if we discussed it there.

16      Q.    Do you know if from July 1, 2023, until it

17  was unrestricted in April of 2024, the book would

18  have been available to students whose parents had

19  opted in to restricted titles?

20      A.    I would need to check my HB 1069 Storage

21  list and see if it was ever on that list.  If it was

22  on the HB 1069 Storage list, it would not have been

23  available, but if it was not, the challenge

24  restricted access that stood before, it would depend

25  on whether a media specialist had marked it for

```
1   HB 1069 Storage.
2       Q.   And if it hadn't been marked, it would be
3   available for opt-in?
4       A.   Yes.
5       Q.   Like books had been before July of 2023?
6       A.   Yes, that's correct.
7       Q.   Okay.  What about "Two Boys Kissing," has
8   that ever been restricted?
9       A.   That was initially entered by Michelle White
10  October 27th, 2022 as -- I'm sorry -- on the 25th,
11  2022, as TBD, and then it says also TBD on the 27th,
12  but I don't know why it shows up as an edit.  And
13  then December 9th, 2022, Michelle White changed the
14  TBD to a Y, and then April 2nd, 2024, I changed the
15  Y to an N.
16      Q.   That was April 2nd of 2024?
17      A.   Yes.
18      Q.   Okay.  This book is not included on your
19  declaration.  Do you recall the process that led it
20  to being unrestricted?
21      A.   I think it might -- it would have involved
22  an HB 1069 deeper look to determine if sexual
23  conduct was present.
24      Q.   And would that have been part of the Coffee
25  Crew?
```

Deposition of Bradley Vinson, Volume 2

1     A.   It might have been, but I would want to

2   check my notes.

3     Q.   And if it's not listed in the Coffee Crew,

4   it would have been something that you would have

5   determined separately as part of the review of the

6   challenged books?

7     A.   Yes.

8     Q.   Okay.  But it wasn't changed to unrestricted

9   status until April of 2024, correct?

10    A.   Correct.

11    Q.   Okay.

12    A.   And that's the status here.  Again, I would

13  want to double-check the HB 1069 Storage tabs to see

14  if any other media specialists at any point had

15  marked it HB 1069 Storage for a period of time.

16    Q.   Which would determine whether it was

17  available for opt-in access or not?

18    A.   Yes.

19    Q.   Okay.  Okay.  So I'd like to talk about --

20  give me one moment to see where I am.

21         I want to talk about the district's reading

22  material acquisition -- reading material acquisition

23  policy and process.

24    A.   Okay.

25    Q.   So can you describe that process to me as it

Deposition of Bradley Vinson, Volume 2

1    has existed from 2022 to the present?

2       A.   So individual media specialists familiarize

3    themselves with their collections, they collect

4    input from the teachers and administrators and

5    students on their campuses to determine what types

6    of materials they may need to purchase for any given

7    year, and then within the limitations of their

8    budget, they try to meet those expectations while

9    also referring to professional reviews and making

10   determinations of what the best selections for their

11   collection would be, and --

12      Q.   And I'm sorry to interrupt, but I am

13   interested in library materials.  I think I said

14   reading materials generally, but talk about library

15   materials.

16      A.   And a lot of the -- prior to the adoption of

17   the 2022 December policy, many of the considerations

18   that are listed in our policy were practiced.

19      Q.   Okay.

20      A.   So, you know, first consideration being

21   given to reader interest in support of standards,

22   what the academic needs are and requests, and

23   then -- I'm on Page 36 of Exhibit 19.

24      Q.   Thank you.

25      A.   Due to HB 1467, we were also required to

1    present the selections that the media specialist

2    wished to add to the collection to a Library

3    Advisory Council, which is our way of collecting the

4    required community stakeholder input.

5        Q.   Okay.

6        A.   So you can see that council is comprised of

7    at least the school's media specialist, two

8    teachers, one parent, and one community member.  The

9    principal would also always be aware of what these

10   selections are.  The principal is involved in

11   ensuring that the Library Advisory Council

12   guidelines are followed, and all of the orders that

13   the media specialist puts in actually go through the

14   principal for a final approval.

15       Q.   Okay.  And so let's talk about the period

16   before the adoption of Policy -- the amendment of

17   Policy 4.06 in December of 2022.

18            So earlier in 2022, setting aside the

19   Library Advisory Council, everything you described,

20   was that how all things operated before the policy

21   was adopted?

22       A.   Yes.

23       Q.   Including it was the media specialist's

24   decision, but things ran through the principal?

25       A.    All -- I believe that's governed by

Deposition of Bradley Vinson, Volume 2

1  purchasing.  Any of their purchases would need to go

2  through the principal for an approval.

3      Q.   Okay.  And the Library Advisory Council

4  component was added when?

5      A.   It was in response to the passage of

6  HB 1467, and it was added to the policy, if I'm not

7  mistaken, in December of 2022.

8      Q.   Okay.  And has the policy, as it's written,

9  been followed in practice in terms of the

10  acquisition of library materials since December of

11  2022?

12         MS. SMITH:  Objection; form.

13      A.   To the best of my knowledge, yes.

14      Q.   Okay.  What education or training is

15  required to be a media specialist?

16      A.   So the State has a certification process.

17  You have to be certified as a teacher, which you can

18  do through education or through alternative means,

19  and there is a department of alternative ways of

20  certifying, and then you also have an exam that's

21  related to getting your K through 12 media

22  specialist certification.

23      Q.   And is that exam -- is there training before

24  that exam related to library sciences?

25      A.   There are recommended reading materials but

Deposition of Bradley Vinson, Volume 2

```
 1    not training for that exam, no.
 2        Q.   And does the exam cover the kinds of
 3    principles you learned when you got your degree in
 4    library sciences?
 5        A.   It does.
 6        Q.   But there's not a requirement that media
 7    specialists have a degree in library sciences?
 8        A.   There is not a requirement that we have that
 9    degree.
10        Q.   Do you know if Escambia County media
11    specialists all have a degree in library sciences?
12        A.   No, not all media specialists do.  Some of
13    them come from a teaching background.
14        Q.   Okay.  Do you know why media specialists --
15    why individuals have to pass the exam that covers
16    these library science principles in order to be
17    certified as a media specialist?
18        MS. SMITH:  Objection; scope.
19        A.   To demonstrate that they are familiar with
20    the principles of running a library and can follow
21    these types of guidelines.
22        Q.   Okay.  And I believe you were looking at
23    Page 36 of the acquisition policy -- sorry, Page
24    36 --
25        A.   36 and 37.
```

Deposition of Bradley Vinson, Volume 2

```
1      Q.    -- 36 of Exhibit 19.

2      A.    Yes.

3      Q.    Where it lays out the factors that were

4   considered in acquisition decisions?

5      A.    These are, yes, the factors, and they

6   continue on.

7      Q.    On to Page 37?

8      A.    Yes.

9      Q.    Okay.  And were these factors, in fact, in

10  practice and used in making acquisition decisions at

11  the district?

12         MS. SMITH:  Objection; form.

13     A.    We do encourage the use of these -- this in

14  our policy as the reasons for our media specialists

15  making the selections that they do.

16     Q.    Do you know if all of the books at issue

17  were acquired in accordance with the policy or the

18  practice that you described that preceded the

19  policy?

20         MS. SMITH:  Objection; form.

21     A.    I do not know.  Many of the books at issue

22  were acquired before we had that policy in place.

23     Q.    Right.  But you told me that even before the

24  policy was in place, the practice was the same,

25  correct?
```

```
1        A.    Yes.
2        Q.    How -- give me one second.
3              MR. LEV:  Can we get Exhibit 35 for a
4        moment?  Sorry.  And do we have the copy we can
5        show Ms. Vinson?
6              MS. HEYWOOD:  Yes.
7              MR. LEV:  I'm sorry.  I chose the wrong
8        exhibit.  I'm sorry.
9              MS. HEYWOOD:  Which one do you want?
10             (Discussion off the record.)
11             THE WITNESS:  Exhibit 17.
12             MR. LEV:  It is Exhibit 17.  I'm sorry.
13   BY MR. LEV:
14       Q.    So when we went over Exhibit 17 yesterday, I
15   don't know that we discussed the Date Acquired
16   column.
17       A.    I don't think we did.
18       Q.    Okay.  Can you tell me what that column --
19   the date on that column represents?
20       A.    The date on that column is the day that that
21   copy was added to the Destiny catalog.
22       Q.    I see.  When it's added, it's added at a
23   particular location?
24       A.    Yes.
25       Q.    Okay.  And is there any way to know if these
```

Deposition of Bradley Vinson, Volume 2

```
 1  books were purchased by the school district as

 2  opposed to having been donated to the library?

 3      A.   No, there's not a way -- well, there would

 4  not have been a formalized expectation that everyone

 5  recorded how these were purchased.  There is the

 6  capability in Destiny of indicating your funding

 7  source.

 8          I know that in practice at my elementary

 9  school, I would utilize it if I had a purchase that

10  was grant funded in order to follow up with that

11  project, but, otherwise, I would not use it, and we

12  did not receive instruction from the district level

13  on how to implement usage of that.

14      Q.   Okay.  In your experience as a media

15  specialist, what percent of the books in the school

16  library were purchased as opposed to donated to the

17  school?

18          MS. SMITH:  Objection; form.

19      A.   In my experience?

20      Q.   Yes.

21      A.   A very rough number, it's hard to know.  So

22  when I came into my library, I would say about a

23  quarter of the collection was inherited from a

24  closed school library, Edgewater.  It still had the

25  labels from Edgewater, and Edgewater, when it
```

1   closed, the collection had just been distributed, so

2   I don't know the origin, you know, how those were

3   selected initially.

4       And then of my own titles, in any given year

5   I would say maybe only about five percent might have

6   been donated.

7       Q.   Okay.  And was there a process for screening

8   donated books?  How was it determined if a donated

9   book would end up in the school library?

10      A.   The media specialist would review that book,

11  check professional reviews, check the recommended

12  age level audience, determine if it was one that

13  would be beneficial to add to the collection, if it

14  met the needs of the students or the faculty,

15  because we do also have limited space.  So sometimes

16  even if it's a donation that's free, we don't have

17  the shelf space to justify adding it just because

18  it's free.

19      Q.   So is it fair to say that the same criteria

20  applied to accepting a donated book for the library

21  as applied to purchasing the book, other than the

22  budgetary criteria?

23      MS. SMITH:  Objection; form.

24      A.   Could you repeat the question?  I'm sorry.

25      Q.   Yeah.  I'm asking if it's fair to say that

1    the same criteria applied to the decision to accept

2    a donated book and include it in a library

3    collection as applied to the decision to purchase a

4    book for the library collection, other than the

5    budgetary consideration that obviously is in play

6    for a purchase but not a donation?

7         MS. SMITH:  Objection; form.

8    A.    Yes.

9    Q.    Okay.  So let's take a look at Exhibit 19,

10   which you are referring to, and if you take a look

11   at -- sorry.

12        If you look at the bottom of Page 33 of 93

13   in Exhibit 19, there's a section called Purpose of

14   the Library/Media Center and Classroom Library.

15   A.    Yes.

16   Q.    And does that accurately set forth the

17   district's view of what the purpose of a media

18   center -- or let me rephrase that -- the purpose of

19   the materials in a media center?

20   A.    There are many reasons given here and I do

21   think that they accurately reflect the purpose of

22   our media centers.

23   Q.    Okay.  Talk to me about weeding and what

24   that is and how it is accomplished in the Escambia

25   County Public School libraries.

Deposition of Bradley Vinson, Volume 2

```
1        A.    Weeding is something that we do have some

2   mention of in our policy.  Let's go back to the same

3   Exhibit 19, Discontinuation of Library Media

4   Materials.

5        Q.    What page are you on?

6        A.    Page 37 and 38.

7        Q.    Thank you.  And that's Section 9(D) of the

8   policy, correct?

9        A.    Yes.

10       Q.    Okay.

11       A.    And these reasons would have been the

12   reasons in practice before this policy was adopted

13   as well, but you can see condition of material, if

14   it's worn or damaged; duplication of seldom used

15   materials; if it's obsolete or inaccurate; if the

16   content is inappropriate based on the age interest

17   level; if it's not circulating; if it's something

18   that has been superseded by the next edition of a

19   serial material.

20            It could be if it's no longer aligned to

21   State academic standards or relevant to the

22   curriculum, or we could remove it pursuant to the

23   challenge process.

24       Q.    Okay.  I've heard reference to two different

25   acronyms with respect to weeding, MUSTY and CREW.
```

Deposition of Bradley Vinson, Volume 2

```
 1        A.    Yes.

 2        Q.    Are you familiar with those?

 3        A.    Yes.

 4        Q.    Does the district use one or the other?

 5        A.    MUSTY would be the one we would refer to, I

 6   think.  I believe that I've received e-mails from

 7   Michelle White, and I may have also referred to it

 8   in training.

 9        Q.    What is the difference between MUSTY and

10   CREW?

11        A.    I would need to refresh my memory on CREW.

12             MS. HEYWOOD:  Exhibit 50.

13      (Vinson Exhibit 50 was marked for identification.)

14   BY MR. LEV:

15        Q.    We can do that.

16        A.    Okay.

17             MS. HEYWOOD:  This is it but it doesn't have

18        the first two pages.

19             MS. SMITH:  I'm sure you'll describe what it

20        is because I don't know what this is.

21             MS. HEYWOOD:  Yes, we'll describe what it

22        is.

23   BY MR. LEV:

24        Q.    This is a document we downloaded from the

25   school district's website, and it's tiled Innovation
```

1    Specialist Policies and Procedures Manual.

2         Are you familiar with this document?

3    A.    Yes.

4    Q.    What is it?

5    A.    This is just a procedures manual developed

6    by Michelle White to help guide media specialists

7    and provide a reference for common tasks.

8    Q.    So this was -- this is a media specialist --

9    it says innovation specialist but this is really for

10   media specialists?

11   A.    Yes.

12   Q.    And is it still in effect, still effective?

13   A.    It is still on our website.  We know that

14   it's something we would like to update.

15   Q.    And what would you like to update in it?

16   A.    Well, for one, we need to refer to -- I

17   mean, the date here, 8/31/20, but then there's 2022

18   here as well.  So I think HB 1069 needs to be

19   properly included.  That would be my initial

20   necessary edit.

21   Q.    Okay.  If you turn to Page 11, and the pages

22   are numbered in the bottom left, there's an entry on

23   weeding.

24   A.    Yes.

25   Q.    And then a link that says:  Weeding with the

Deposition of Bradley Vinson, Volume 2

1    CREW Method.

2        A.    Uh-huh.

3        Q.    Does that refresh your recollection as to

4    whether Escambia uses the CREW method or the MUSTY

5    method to weed books?

6        A.    It is there but I will say this is an older

7    document and I have had more recent trainings with

8    my media specialists where I refer to MUSTY rather

9    than CREW.

10       Q.    Trainings that you've been conducting as the

11   Coordinator of Media Services?

12       A.    Yes.

13       Q.    And when you were a media specialist, were

14   you told to weed your collection using MUSTY or

15   CREW?

16       A.    I do remember MUSTY, so it may be that MUSTY

17   was used in trainings but wasn't recorded in this

18   document.

19       Q.    Okay.  If we go back to Exhibit 19 --

20       A.    Okay.

21       Q.    The policy, on Page 34 of 93, there's a

22   description of the Objectives of Selection.

23       A.    Yes.

24       Q.    Does that accurately reflect the objectives

25   of the book selection process for school libraries?

Deposition of Bradley Vinson, Volume 2

1    A.    Yes.

2    Q.    Okay.  And then if we go to -- on Page 33 of

3    93, this is sort of an introductory paragraph to

4    Section 9.

5    A.    Yes.

6    Q.    And in that second full paragraph, towards

7    the end, it says:  Books that are selected must be

8    free of pornography and material prohibited under

9    FS 847.012.

10         How was that provision implemented in the

11    acquisition of books for a school library?

12         MS. SMITH:  Objection; form, library.

13    A.    What time period are you referring to?

14    Q.    Let's stick with the -- well, what time

15    period are you familiar with?

16    A.    I'm most familiar with the current time

17    period, but I also was making selections before in

18    elementary school.  I would never consider adding

19    books that might fall into this for an elementary

20    school.

21    Q.    So your experience as a media specialist

22    didn't involve application of this because you were

23    in elementary school?

24    A.    Yes.

25    Q.    Okay.  So from the 2022 period forward, how

Deposition of Bradley Vinson, Volume 2

```
 1   was this provision implemented in acquiring books

 2   for Escambia County Public Schools?

 3       A.   It was just to be a consideration for the

 4   media specialist who was making selections, and that

 5   media specialist was expected to examine

 6   professional reviews and be aware of the content of

 7   the materials that they wanted to order.

 8       Q.   Okay.  Are you aware of any books in

 9   Escambia County Public Schools that are prohibited

10   under FS 847.012?

11           MS. SMITH:  Form.

12       A.   Could you rephrase the question?

13       Q.   Sure.  Let me take a step back just to make

14   sure we're on the same page.

15           847.012 is the statute that prohibits

16   providing materials that are harmful to a minor,

17   correct?

18       A.   Correct.

19       Q.   And part of that definition is that the

20   materials lack serious political, artistic,

21   literary, or scientific value for minors, correct?

22       A.   Correct.

23       Q.   And my question is if you're aware of any

24   books in the Escambia County libraries that you've

25   come across that you believe violate 847.012?
```

1    A.    Taken as a whole, I am not aware of any

2    material that would violate 847.012, but I do think

3    that there's a part of that definition that is

4    subjective.

5    Q.    Well, what part of that definition is

6    subjective?

7    A.    The -- whether or not it has value.  We have

8    objectors who have submitted forms where they have

9    indicated that they see no value in the material.

10    Q.    I understand.  But as a Certified Media

11    Specialist and someone with a degree in library

12    science, you haven't encountered any books that you

13    believe violate that statute, correct?

14    A.    For minors, are we including for minors?

15    Q.    Yes.  I believe the statute talks about

16    books that lack any political, literary, artistic,

17    or scientific value for minors.

18    A.    I've not made a determination on any books

19    that they met those requirements.

20    Q.    Okay.  In the book acquisition process, is

21    there some separate definition of pornography that's

22    different than the material that's prohibited under

23    847.012?

24         MS. SMITH:  Objection; form.

25    A.    There's a dictionary definition that's

1   included in our library media training.

2       Q.   And is that the definition that is used in

3   assessing whether a book is prohibited under this

4   provision of the policy?

5           MS. SMITH:  Form.

6       A.   It is a definition that might be used, but I

7   would hope that also our media specialists could

8   refer to the statute, the language in the statute.

9       Q.   Has the district -- to your knowledge, has

10  the district rejected any proposals to purchase any

11  books since 2022 because they would be prohibited

12  under 847.012?

13      A.   The district has not made such an action.

14      Q.   Have any individual schools in the district

15  rejected a proposal to purchase a book for a school

16  library because it would violate 847.012?

17          MS. SMITH:  Form; scope.

18      A.   I would need to survey all of the principals

19  and media specialists to see if there were such a

20  book that had been proposed for inclusion in the

21  collection but then denied by either the media

22  specialist or the principal.  I don't know of any.

23      Q.   Would you expect to know if that happened in

24  your role as Coordinator of Media Services?

25          MS. SMITH:  Form.

Deposition of Bradley Vinson, Volume 2

```
 1        A.    I would expect to know.
 2        Q.    Okay.  Further down on Page 33, right before
 3   Subsection A, it says:  Upon written request, the
 4   district shall provide access to any materials or
 5   books specified in the request that is maintained in
 6   the school library and classroom library and is
 7   available for review.
 8              And "classroom library" was added in 2023?
 9        A.    Correct.
10              (Discussion off the record.)
11   BY MR. LEV:
12        Q.    What is the purpose of that provision?
13        A.    If we had a parent or community member who
14   wished to review a book that we have, we would make
15   it available for their review.
16        Q.    And that's any book that you have or just a
17   book that's being proposed for purchase?
18        A.    Any book that we have.
19        Q.    Okay.  So parents, pursuant to this
20   provision, can get a copy of a book that's
21   maintained in an Escambia County Public School
22   library, correct?
23        A.    Yes.
24              MS. SMITH:  Objection; form.
25        A.    Yes.
```

Deposition of Bradley Vinson, Volume 2

```
 1        Q.   Did you understand my question?

 2        A.   That parents could get access to a book

 3   that's maintained in an Escambia County library if

 4   it is available, which it indicates there, yes.

 5        Q.   Available meaning it's not checked out or

 6   hasn't been weeded?

 7        A.   Or isn't lost or damaged or --

 8        Q.   Okay.

 9        A.   Yeah.

10        Q.   Great.

11             MS. SMITH:  Form.

12        Q.   The bottom of Page 33, under the Purpose of

13   the Library, 9(A)(3) says that one of the purposes

14   shall be to meet the personal needs and interests of

15   students.

16             And then it goes on to say:  Including

17   materials that -- and there's a list of the kinds of

18   materials that a collection should have at the top

19   of Page 34, correct?

20        A.   Correct.

21        Q.   Okay.  And it says -- Subsection (b) there

22   says materials that:  Represent the many religious,

23   racial, ethnic, linguistic, and cultural groups in

24   our society and reflect their contributions to the

25   heritage and culture of our civilization.
```

Deposition of Bradley Vinson, Volume 2

1            Why is that factor included in the policy?

2       A.   It's important to have a collection that has

3    that representation available for students.

4       Q.   Why is it important?

5       A.   So that they have a broader understanding of

6    the world.

7       Q.   And a couple paragraphs down it says that

8    the collection should also:  Provide education media

9    that reflect differing and/or opposing viewpoints.

10            Why is that provision included in the

11   policy?

12      A.   To support the development of critical

13   thinking.

14      Q.   Do Escambia County Public School libraries

15   contain books that reflect different and opposing

16   viewpoints on topics?

17      A.   Yes.

18      Q.   Are the viewpoints that are expressed in the

19   books in Escambia County Public School libraries the

20   viewpoints of the Escambia County Public Schools or

21   the board?

22            MS. SMITH:  Form.

23      A.   Not necessarily.

24      Q.   Are books selected for the library based on

25   their viewpoint?

Deposition of Bradley Vinson, Volume 2

1          MS. SMITH:  Form.

2     A.    I would not say so.

3     Q.    Okay.  Section 9(b) on Page 34 says that:

4  Parents have the right to determine what they

5  believe is and is not appropriate reading material

6  for their students.  Parents will be given the

7  opportunity to choose open access, limited access,

8  or no access to the library/media center and

9  classroom library collection.

10         Did I read that correctly?

11    A.    Yes.

12    Q.    Okay.  What is open access, limited access,

13 and no access?

14    A.    Open access would mean that the student has

15 the permission of their parent to check out any book

16 in that school's library or read a book in that

17 school's classroom library collection, and that is

18 the default setting, so if a parent does not make an

19 election, then it's, by default, open access.

20         Or a parent can select limited access, in

21 which case they need to indicate how the access

22 should be limited.  Limited access also denies

23 access to the online reading platforms, like myON,

24 or to the classroom library collection where that is

25 outside of where the media specialist can monitor to

Deposition of Bradley Vinson, Volume 2

```
1    be sure that the limited access restrictions are

2    being followed.

3            And no access just means that that student

4    would not be allowed access to the library

5    collections.

6        Q.   Okay.  Why is open access the default level

7    of access?

8        A.   That is what our collections generally have

9    and it is the access that most of our families

10   choose.

11       Q.   Okay.  If a family chooses limited access or

12   no access, how long does that designation last?

13       A.   As long as that student's information in our

14   student information system and the parent hasn't

15   made a change.

16       Q.   Okay.  So parents who want to limit their

17   children's access to library books can do so

18   completely or in a tailored way -- completely

19   through a no access designation or in a tailored way

20   through a limited access designation, correct?

21       A.   That's correct.

22       Q.   And that applies to all books in the

23   library?

24       A.   That's correct.

25            MR. LEV:  Okay.  Can we get the --
```

Deposition of Bradley Vinson, Volume 2

```
1        A.    I will additionally -- may I add to that?

2        Q.    Please.

3        A.    My guidance to media specialists with

4   limited access is that even if there is a note

5   available, I have informed the media specialists

6   that they should make contact with that parent to be

7   sure that they understand what the note means and to

8   make further notes for themselves in order to meet

9   the expectation of the parent.

10       Q.    The goal there is just to make sure you know

11  what limits the parent is seeking to impose so you

12  can effectuate them?

13       A.    Exactly.

14       Q.    Okay.

15            MS. HEYWOOD:  Exhibit 51.

16     (Vinson Exhibit 51 was marked for identification.)

17  BY MR. LEV:

18       Q.    So I'm showing you Exhibit 51 which has been

19  Bates stamped E-ECSD 0066367.

20       A.    Yes.

21       Q.    And it is captioned "K to 12 Library Access

22  Form."

23            Is this the form that a family would use to

24  indicate if they want unlimited, limited, or no

25  access for their student?
```

Deposition of Bradley Vinson, Volume 2

```
 1      A.   Yes.
 2      Q.   Okay.  And unlimited access -- we discussed
 3   this previously.  Unlimited access would also allow
 4   a student to access books through the interlibrary
 5   loan process, correct?
 6           MS. SMITH:  Form.
 7      A.   That is a process that we have not fully
 8   developed at the district level, but yes.
 9      Q.   Okay.
10           MR. LEV:  Can we see --
11           MS. HEYWOOD:  Exhibit 52.
12     (Vinson Exhibit 52 was marked for identification.)
13   BY MR. LEV:
14      Q.   Exhibit 52 is a document Bates stamped
15   E-ECSD 0066359 through 66366 and is a series of
16   e-mail exchanges between a various number of people,
17   including Michelle White.
18      A.   Yes.
19      Q.   Okay.  And give me a moment.
20           MR. LEV:  Oh, yeah, I'm sorry.
21      Q.   We can set aside 52.  That was the wrong
22   document.
23           MS. HEYWOOD:  Apologies.
24               (Discussion off the record.)
25      A.   Do you still need the access form out, 51?
```

1    Q.   I don't think so.

2         MS. HEYWOOD:   53.

3    (Vinson Exhibit 53 was marked for identification.)

4    BY MR. LEV:

5    Q.   Exhibit 53 is a document marked E-ECSD

6    0065348.  Do you recognize this document?

7    A.   Yes. I recognize the language in the

8    document.  I'm not sure where it was pulled from.

9    Q.   At the bottom of the document -- I mean, it

10   was produced to us, so I'm not sure where it was

11   pulled from either.

12   A.   Okay.

13   Q.   It appears to be informing, I assume,

14   parents -- and I'm reading the first sentence:

15   Escambia County Public Schools has implemented a new

16   process that allows parents to choose their

17   student's level of access to school library

18   collections through the Focus Parent Portal.

19        And that:  Beginning May 1st, 2023, parents

20   may log into the Focus Parent Portal and complete

21   the K through 12 Library Access Form.

22        And then it goes on to say:  Parents may

23   select unlimited, limited, or no access.

24        Correct?

25   A.   Correct.

Deposition of Bradley Vinson, Volume 2

1      Q.   Is the Library Access Form this is referring

2  to Exhibit 51 that we were looking at?

3      A.   That is the form as it appears in Focus.

4      Q.   Okay.  Which is what this is referring to,

5  correct?

6      A.   Correct.

7      Q.   Okay.

8      A.   I do think we have a paper edition of the

9  form with the same language.

10      Q.   I see.  Okay.  Did this notice that I'm --

11  Exhibit 53 go out to parents in some way?

12      A.   This is on our website.  I would need to

13  refer back to my e-mails but I know that we

14  discussed having some sort of press release at the

15  beginning of the 2023-2024 school year, because it

16  had been a new process at the end of the previous

17  year and we weren't sure if people were familiar

18  with it.

19          I know some schools included it in their

20  initial packet of forms that they sent home with

21  students, but I could not tell you for sure without

22  going back to look at those communications to

23  determine how else it was distributed.

24      Q.   Okay.  And I --

25      A.   Oh, and there's also a video in the Focus

1    how-tos for parents that shows parents walking

2    through how to make that -- this selection as well

3    as the YA opt-in.

4        Q.   Okay.  And is it correct, as stated on this

5    form, that this process of unlimited, limited, and

6    no access began in May of 2023?

7        A.   Yes.

8        Q.   Okay.  And the second paragraph here says:

9    Unlimited library access is the default access and

10   means that the students may have full access to

11   check out grade- and age-appropriate books that are

12   available at their grade -- and then in parentheses,

13   elementary, middle, high, close parentheses --

14   school library to include same grade level

15   interlibrary loan as well as classroom libraries.

16       A.   Yes.

17       Q.   The policy is that, in fact, unlimited

18   access provides students access to same grade level

19   interlibrary loan, correct?

20          MS. SMITH:  Objection; form.

21       A.   The practice is.  I would not call this

22   policy.

23       Q.   Okay.  The practice is?

24       A.   Yes.

25       Q.   Okay.  Great.  Do you know, in the 2023-2024

1  school year, how many parents chose limited access

2  for their child or children?

3      A.   It was not a large number.  I would say all

4  together it averaged around 100, including limited

5  library access and no access, for the district.

6      Q.   Okay.  And how many students are there in

7  the district?

8      A.   Approximately 37,000.  I think it might be a

9  little lower right now.

10     Q.   Okay.  And if we go back to -- you can set

11  Exhibit 52, or whatever it was, aside.

12     A.   53.

13     Q.   53.  If we go back to Exhibit 19 -- and

14  we're back on Page 34 of 93 and in Section 9(b) of

15  the policy.

16     A.   Yes.

17     Q.   And the second paragraph there talks about

18  the YA opt-in process for middle school, correct?

19     A.   Correct.

20     Q.   And so this was adopted as part of the

21  December 2022 policy, correct?

22     A.   Correct.

23     Q.   Okay.  Why was this section added then?

24     A.   Which section do you mean?

25     Q.   The paragraph about YA opt-in for middle

Deposition of Bradley Vinson, Volume 2

```
 1    school.  You know what?  Let me ask you a different
 2    question first.
 3        A.   Okay.
 4        Q.   When was the YA opt-in for middle school --
 5    which -- let me take it even a step further back.
 6             If I say YA opt-in for middle school, I'm
 7    referring to the policy and practice of requiring
 8    parents to opt in to allow their children to have
 9    access to young adult titles in middle school.
10        A.   Yes.
11        Q.   Okay.  You're familiar with that?
12        A.   Yes.
13        Q.   Okay.  When did the YA opt-in process begin?
14        A.   I recall hearing about it first in fall of
15    2022, that we started to look at those young adult
16    books, but I could not tell you exactly the dates
17    without doing a little more research.
18        Q.   Okay.  Was the practice of requiring YA
19    opt-in in middle schools implemented prior to the
20    adoption of Policy 4.06 in December of 2022?
21             MS. SMITH:  Form.
22        A.   Again, I would want to talk to some
23    individual media specialists about their history
24    with their collections to understand their practice
25    better.  I do know that some of them had collections
```

```
 1   where their YA materials were meant for eighth grade

 2   checkout only, for example.

 3       Q.   But that was not a broad policy, that all YA

 4   literature would require parental opt-in, correct?

 5       A.   Correct.  That was a practice that would

 6   have been determined at individual schools.

 7       Q.   Did you do anything in preparing for this

 8   deposition to look into the history of the YA opt-in

 9   implementation?

10       A.   Beyond seeing where it is in the policy and,

11   you know, encountering it in those restricted access

12   changes where it was, you know, a YA opt-in

13   restriction, no, I did not do additional digging on

14   that subject.

15       Q.   Okay.  And do you know why this was adopted

16   as a policy in December of 2022, the YA opt-in

17   process?

18       A.   I do not know.

19       Q.   Do you know who suggested that this process

20   be adopted?

21           MS. SMITH:  Form; scope.

22       A.   I do not know.

23       Q.   Okay.

24           MR. LEV:  Can we see --

25               (Discussion off the record.)
```

Deposition of Bradley Vinson, Volume 2

```
 1              MS. HEYWOOD:  Back to 52.

 2       A.    Back to 52?

 3       Q.    Who knew?  Apparently Ellinor.

 4              MS. SMITH:  We're looking at 52?

 5              MR. LEV:  Yes.

 6   BY MR. LEV:

 7       Q.    So on the bottom of the first page is an

 8   e-mail from Michelle White dated October 31st, 2022.

 9   We don't know who it was sent to but she's

10   responding to an e-mail from Lucy Molham.

11       A.    Or Molham Lucy.

12       Q.    Or Molham Lucy.  Do you know who that person

13   is?

14       A.    No, I do not.

15       Q.    Okay.  I think it is Molham Lucy, though.

16              And she appears to be talking about how to

17   structure the YA opt-in form.  In fact, it says:

18   Below is the young adult opt-in form for middle

19   school only.

20       A.    Yes.

21       Q.    Does this refresh your recollection as to

22   when the YA opt-in process was implemented?

23       A.    That's fall of 2022, which was my

24   recollection, but, again, I'm not sure of a specific

25   date when this practice was implemented.
```

1    Q.   Okay.  Was this practice implemented in

2  response to the book challenges that were received

3  in the fall of 2022?

4        MS. SMITH:  Objection; form.

5    A.   I'm not sure.

6    Q.   And for the 2022-2023 school year, how many

7  parents of middle school students opted in to the YA

8  opt-in?

9        MS. SMITH:  Form; scope.

10    A.   I would need to run a report for that to

11  determine that figure.

12    Q.   Where would you run that report from?

13    A.   In the school information system in Focus.

14    Q.   And would --

15    A.   Do you only want the numbers for '22-'23?

16  I've looked at it for '23-'24.

17    Q.   That was my next question.

18    A.   Okay.

19    Q.   How many parents opted into the YA opt-in

20  process for the '23-'24 school year?

21    A.   I actually would probably need to run the

22  report again.  One thing that throws my numbers and

23  my estimation off is that we do have a number of

24  parents who go into Focus and select the open

25  access, the default, and that inflates the total on

Deposition of Bradley Vinson, Volume 2

```
 1   my report.  So I would need to separate out that

 2   total from those who just selected that YA opt-in

 3   access.

 4       Q.   So if a parent goes into Focus and selects

 5   unlimited access -- is that what it was called?

 6       A.   Or open access, unlimited access, uh-huh,

 7   unlimited.

 8       Q.   Okay.  If a parent selects unlimited access

 9   and does not separately select the YA opt-in, and

10   that's a parent who has a middle school student,

11   does that middle school student have access to young

12   adult literature?

13       A.   If the parent has not selected the YA

14   opt-in, which I believe appears as a checkbox in

15   Focus, then no, that student would not have access

16   to the YA opt-in collection.

17       Q.   Even if the parent selected unlimited

18   access?

19       A.   Correct.

20       Q.   So I'm a little confused.  You were saying

21   your numbers were inflated because of the unlimited

22   access meaning -- can you explain that?

23       A.   So my recollection of the last time that I

24   ran the report, it gives me all results.  Now, if

25   it's the default and the parent has not made any
```

1    active selections, a student does not appear in the

2    report.

3             I think the last time I ran the report, it

4    was between 1,100 and 1,200 responses, but typically

5    I am looking most closely at the limited access or

6    the no access, which is why I can give you a round

7    figure for those, whereas all of the rest in that

8    report are either there because the parent selected

9    YA opt-in or because the parent selected unlimited

10   access actively.

11       Q.    And may not have selected YA opt-in?

12       A.    Right.

13       Q.    I see.  Okay.

14       A.    And some of those are high school or

15   elementary students who don't even have that option.

16       Q.    Okay.  So you don't -- okay.  I understand.

17   And so you don't -- you would need to run a report

18   focused on that to know how many selected YA opt-in

19   for middle school?

20       A.    Yes, to give you the best figure.

21       Q.    Okay.  Got it.  If we go back to Exhibit 19,

22   Section 9(C) on Page 34 -- I'll wait for you to be

23   able to read along.

24       A.    I'm there.

25       Q.    Okay.  It states:  It is the duty of the

1    district to provide a wide range of materials of

2    different levels of difficulty, with diversity of

3    appeal, and representing different points of view,

4    taking into account the varied interests, abilities,

5    and maturity levels of the pupils being served.

6           Does that accurately represent the

7    district's view of its policy and the objectives of

8    the selection process?

9       A.    Yes.

10      Q.    And why is that included in this policy?

11      A.    Because it is important to do those things.

12      Q.    Why is it important to do those things?

13      A.    So we can meet the needs of students with,

14   you know, varied interests and abilities, give them

15   information about the world that's beyond their

16   experience.

17      Q.    And the next sentence says:  The utilization

18   of any specific item in educational media does not

19   necessarily mean that the school or the district

20   advocates or endorses the contents of the item.

21          Why is that provision in here?

22      A.    Because we are not endorsing the contents of

23   the books.  Something being present doesn't mean

24   that it is our message.

25      Q.    Okay.  And then at the bottom of Page 34 it

Deposition of Bradley Vinson, Volume 2

```
1   says, immediately following the sentence I was

2   reading:  To this end, the school board and the

3   district affirms that school library media centers

4   and classroom libraries shall...

5        And then there's an enumerated list of

6   things they shall do, and on the next page it says,

7   Number 4:  Provide education media that provides

8   differing and/or opposing viewpoints.

9        Does the school district do that?

10  A.   Yes.

11  Q.   Okay.  Why does it do that?

12  A.   As I answered before, to help students

13  develop critical thinking and to understand there

14  are differing viewpoints on certain subjects.

15  Q.   Does it do so because -- well, okay.

16       And then it continues, Number 5, that it:

17  Shall provide materials which reflect the ideas and

18  beliefs of the many ethnic, religious, and political

19  groups that have contributed to the American and

20  world heritage and culture.

21       Why is it important that the district do

22  that?

23  A.   I feel like -- what's the word for "because

24  it is important"?  It's there because that is

25  important, to have a collection that reflects all of
```

Deposition of Bradley Vinson, Volume 2

```
 1   those -- the different ideas and beliefs from all of
 2   these different cultures and groups.
 3       Q.   Why is that particularly important in the
 4   library context?
 5       A.   The library is where students are able to
 6   explore and, in an age-appropriate fashion, open the
 7   doors to information that they maybe don't have
 8   access to elsewhere.
 9       Q.   Okay.  And then at the bottom of Page 35, in
10   Section 9(E) -- actually, at the top of Page 36 in
11   Section 9(E)(1) it says:  Each book made available
12   to students through a district library/media center,
13   classroom library --
14           I'm going to skip some parts but it says:
15   must be selected by a school district employee who
16   holds a valid educational media specialist
17   certificate regardless of whether the book is
18   purchased, donated, or otherwise made available to
19   students.
20           Why is that the school district's policy?
21       A.   That's the school district's policy because
22   it's required by House Bill 1467.
23       Q.   Was this the school district's policy before
24   the December 2022 revisions to Policy 4.06?
25       A.   I would want to look at that version of the
```

Deposition of Bradley Vinson, Volume 2

```
1    policy --
2        Q.   That was a really short version.
3        A.   -- to refresh my memory.
4        Q.   It didn't say it there, so let me ask it
5    differently.
6             Was that the practice before the revisions
7    to 4.06?
8             MS. SMITH:  Objection; form.
9        A.   That would have been the practice for the
10   majority of materials, but I could envision a
11   scenario where a principal might say, "Hey, let's
12   add this book, it was just given to me and it
13   supports what they're learning in third grade."
14            So, yes, the practice would generally be a
15   Certified Media Specialist.  Does this include the
16   piece about the training from the DOE?
17       Q.   It requires a valid educational media
18   specialist certificate, so presumably that's
19   subsumed.
20       A.   Right.  But there was a period of time when
21   I don't believe that the system was in place for
22   media specialists to be certified when we did also
23   have books added to our collections that are still
24   in our collections.
25       Q.   Okay.  The bottom of Page 36, and this is
```

1    Section 9(C) -- no, that's wrong.

2         9(E)(3)(c) says:  In the selection of

3    educational media, special consideration is given to

4    the following:

5         And then there's an enumerated list that

6    continues on the next page.

7    A.    Which page are you on?

8    Q.    I was at the bottom of 36.

9    A.    Okay.

10   Q.    And then the top of 37 lists the factors

11   that should be considered, right?

12   A.    You said we're in 9 -- wait.  We're in

13   9(E)(3)(c)?

14   Q.    Correct.

15   A.    Okay.

16   Q.    Yeah.

17   A.    Yes.

18   Q.    And it says:  In the selection of

19   educational media, special consideration is give to

20   the following:

21        And then there's an enumerated list of

22   factors to consider.

23   A.    Yes.

24   Q.    And you can see at the top of Page 37 -- and

25   this is reflected in the redline -- that in the July

1    2023 version of the policy they deleted the

2    following consideration, which said:  Profanity:

3    The fact that profanity appears in media does not

4    automatically disqualify a selection.  Care is taken

5    to exclude media using profanity in a lewd or

6    detrimental manner.

7          Do you know why that provision was stricken

8    from the policy in July of 2023?

9       A.   I don't know specifically.  If I were to --

10   I would probably want to ask Michelle White, but it

11   may have been in relation to the lewd profanity

12   being something that would be covered under the

13   HB 1069 requirements that required the removal of

14   books based on -- those objections based on sexual

15   conduct.

16      Q.   Profanity is not the same thing as sexual

17   conduct, though.

18      A.   But lewd profanity may appear in a context.

19   I'm not sure --

20      Q.   Okay.

21      A.   -- is the best answer.

22      Q.   How does the district consider books that

23   contain profanity under the current version of the

24   policy that does not contain that provision?

25      A.   Profanity alone is not a reason to make a

Deposition of Bradley Vinson, Volume 2

```
 1   selection or deselect a book.
 2      Q.   Okay.  And then at the bottom of that list
 3   there's a new factor that was thrown in -- I'm
 4   sorry -- that was added to the policy that says:
 5   Race, sexuality, gender identify --
 6           I believe that's supposed to be gender
 7   identity.
 8      A.   Does it say that in our current policy,
 9   identify?
10      Q.   I downloaded this from the BoardDocs.
11      A.   That looks like a typo.
12      Q.   Yeah.  I'm going to read it again and I'm
13   going to correct the typo in my reading.
14           Race, sexuality, gender identity, profanity,
15   drugs/alcohol, and violence; selection will be based
16   on community standards as established by the board.
17   In the absence of standards, professional reviews
18   will be consulted.
19           Has the board established any community
20   standards for the consideration of these issues in
21   the selection of books?
22      A.   No.
23      Q.   Okay.  And are professional reviews
24   consulted in the selection of books?
25      A.   Yes.
```

Deposition of Bradley Vinson, Volume 2

```
1        Q.   And are they consulted specifically with

2   respect to questions of race, sexuality, gender

3   identity, profanity, drugs/alcohol, and violence?

4        A.   When those topics are present, media

5   specialists are encouraged to look at the

6   professional review's recommended audience levels.

7        Q.   Okay.  What does race mean in this context?

8   What is a book about race?

9             MS. SMITH:  Objection; form.

10       A.   A book about race.  I don't know.

11       Q.   Is a book that has all white characters a

12  book about race?

13            MS. SMITH:  Objection; form.

14       A.   No, I would not necessarily state that.

15       Q.   Is a book that has all black characters a

16  book about race?

17            MS. SMITH:  Form.

18       A.   I would need to look at individual books to

19  know what the contents of the book was.

20       Q.   I guess I'm trying to understand what this

21  means when it says race -- in the absence of

22  community standards, race will be -- this is a list

23  of special considerations to be given to the

24  following:  Race.  In the absence of standards,

25  professional reviews will be consulted.
```

Deposition of Bradley Vinson, Volume 2

```
 1            What does that mean, that special
 2   consideration is to be given to race?
 3            MS. SMITH:  Form.
 4       A.   I'm not sure how I would necessarily apply
 5   that in practice.
 6       Q.   Do you know how it is applied in practice in
 7   the school district?
 8       A.   Beyond recommending that media specialists
 9   look at professional reviews.
10       Q.   But that's a general requirement, to look at
11   professional reviews, correct?
12       A.   Correct.
13       Q.   Is there something particular about giving
14   special consideration to race in professional
15   reviews?
16       A.   No.  I don't know of a -- something that's
17   used in practice here.
18       Q.   Okay.  What does it mean that special
19   consideration is given to sexuality in selecting
20   books?
21            MS. SMITH:  Form.
22       A.   Again, I think it would be a matter of is it
23   addressed in an age-appropriate way?
24       Q.   Is a book about a biological male who
25   presents as a male a book about gender identity?
```

Deposition of Bradley Vinson, Volume 2

```
1              MS. SMITH:  Form; scope.
2      A.   I don't know without reading the book.
3      Q.   What would -- okay.  I'm sorry.  I think we
4  were talking about sexuality.
5      A.   We were.
6      Q.   I apologize.  So is a book about a
7  heterosexual married couple that has a family a book
8  about sexuality?
9              MS. SMITH:  Form; scope.
10     A.   It sounds -- I would have to look at
11  individual books to know what they're about.
12     Q.   What would constitute a book about sexuality
13  that would warrant special consideration?
14     A.   I would have to look on a case-by-case
15  basis.
16             MS. SMITH:  Form.
17     A.   I'm really not sure.
18     Q.   How are your media specialists applying this
19  policy that requires special consideration of race
20  and sexuality?
21     A.   I don't know.
22             MS. SMITH:  Form.
23     A.   I don't know if it's something that comes up
24  in their selection process.
25     Q.   Is there any training about what this
```

Deposition of Bradley Vinson, Volume 2

1    provision of the policy means that's provided to any

2    media specialists?

3        A.    I don't have training related to this

4    particular part of the policy.

5        Q.    Is there any training provided to ensure

6    that the special consideration that's given to

7    sexuality and gender identity does not result in a

8    viewpoint discriminatory selection of library books?

9            MS. SMITH:    Form; scope.

10       A.    Could you repeat that question?

11       Q.    Is there any training or guidance provided

12   to media specialists to ensure that the special

13   consideration that is given to sexuality and gender

14   identity and race does not result in viewpoint

15   discriminatory library purchase decisions?

16           MS. SMITH:    Form; scope.

17       A.    So I'm reflecting back on trainings that I

18   have provided, and I currently have shared the

19   settlement that I also shared out by e-mail in April

20   of 2024 as a way for media specialists to feel

21   comfortable with the communication from the State

22   that HB 1557 does not apply to self-selected library

23   materials.  That's a communication that I've had

24   with them and it has come up in our trainings.

25           Beyond that, I don't have additional

Deposition of Bradley Vinson, Volume 2

```
 1   guidance or training.

 2       Q.   Okay.

 3            MS. SMITH:  Can we take a comfort break?

 4            MR. LEV:  Sure.

 5            (Recess from 2:43 p.m. until 2:51 p.m.)

 6   BY MR. LEV:

 7       Q.   A few final questions in Exhibit 19.

 8       A.   Okay.

 9       Q.   If you look at Section 9(C)(3)(iv) [sic] on

10   Page 37 --

11       A.   Yes.

12       Q.   -- it talks about -- these are just to

13   remind you of things that special consideration

14   should be given to in the selection of educational

15   media?

16       A.   Yes.

17       Q.   And there's an entry on sex in the second

18   paragraph that says:  No book or other materials

19   containing pornography shall be used or be available

20   in the district as prohibited by Section 847.012 FS.

21       A.   Yes.

22       Q.   I read that to mean that the district

23   interprets pornography to be synonymous with what is

24   prohibited by Section 847.012, since it's saying

25   pornography as prohibited by Section 847.012.  Is
```

Deposition of Bradley Vinson, Volume 2

1    that a correct understanding of the district's view

2    of what the statutes prohibit?

3          MS. SMITH:  Form, calls for a legal

4       speculation.

5          MR. LEV:  I'm sorry, what was the second

6       part?

7          MS. SMITH:  Calls for a legal conclusion.

8       A.   Calls for a legal conclusion.

9       Q.   I'm asking you what the district's view is

10   as to -- as reflected in this policy.

11      A.   My view is containing pornography, the way

12   it reads, is as being prohibited by Section 847.012.

13      Q.   So that Section 847, what it prohibits is

14   pornography, that's what pornography is?

15      A.   I would want to refer to the statute just to

16   be sure that I'm understanding clearly.

17      Q.   Okay.  And then there's a sentence added to

18   this Subsection (iv) that was added in 2023,

19   presumably in light of HB 1069, that talks about

20   sexual conduct, correct?

21      A.   Yes.

22      Q.   Okay.  What was the district's policy --

23   what was the district's practice with respect to the

24   acquisition of books that contained description or

25   depictions of sexual conduct prior to July 1st,

```
 1   2023?
 2           MS. SMITH:  Form.
 3       A.   Sexual conduct was not something that we
 4   were considering as it's defined in that Florida
 5   statute that is referenced there for the HB 1069
 6   edition, but you can see there the fact of sexual
 7   incidents appearing in media did not automatically
 8   disqualify them.  That was the policy prior to that.
 9       Q.   And what is -- was that the practice prior
10   to that, too, that the inclusion of sexual --
11   depictions or description of sexual conduct in a
12   book would not disqualify a book from being
13   purchased?
14           MS. SMITH:  Form.
15       A.   I would -- I am not sure.  The practice --
16   could you repeat that question just to make sure I
17   understand?
18       Q.   Yeah.  I'm trying to understand what the --
19   I see the words on the page, I know what the policy
20   was before and after July 1st, 2023.
21       A.   Right.
22       Q.   I'm trying to understand the practice before
23   July 1st, 2023 with respect to books that contained
24   depictions or descriptions of sexual conduct.  What
25   was the practice in terms of how that impacted a big
```

Deposition of Bradley Vinson, Volume 2

```
1    book purchase decision?

2        A.    The encouraged practice would have been to

3    have media specialists review professional reviews,

4    if they couldn't review the material itself, where

5    more mature themes are present.  I could not tell

6    you for sure how every media specialist applied

7    that.

8        Q.    Okay.  And the review of the professional

9    reviews or the material itself was for what purpose?

10   What was the media specialist seeking to ascertain

11   in doing that?

12       A.    What themes are touched on within the book,

13   whether or not a reviewing agency recommended the

14   purchase of the book, and the recommended audience

15   level.

16       Q.    Okay.  And did that practice change with

17   respect to acquisition of books that contained

18   depictions or descriptions of sexual conduct after

19   July 1st, 2023?

20       A.    Sometimes the professional reviews did not

21   indicate the presence of sexual conduct that we were

22   able to identify through crowd-sourced means or by

23   examining the book itself, or through other review

24   sites, like Common Sense Media.  So the professional

25   reviews would still be consulted but they might not
```

Deposition of Bradley Vinson, Volume 2

1  give us a full enough picture to make the

2  determination of whether sexual conduct was present.

3      Q.   So after July 1st, when seeking to acquire

4  books, you were looking beyond professional reviews

5  so you could ascertain whether or not sexual conduct

6  was present in the book?

7      A.   Ideally, yes.

8      Q.   And if sexual conduct was present in the

9  book, what impact would that have on the purchasing

10  decision?

11      A.   It would be something that a media

12  specialist would need to pay close attention to and

13  be sure to gather input from the LAC regarding that

14  particular title.  Could you repeat the question?  I

15  feel like I haven't fully answered it.

16          MR. LEV:  Could you read it back, please?

17          THE COURT REPORTER:  Sure.

18      (The question was read by the reporter.)

19      A.   And the media specialists would just need to

20  pay extra careful attention to that recommended

21  audience level.  In some cases a recommended

22  audience level is more of a spectrum than just a

23  cut-and-dry this works for this age level, and so

24  they would just need to be sure that if we're

25  talking about a young adult book, for example, that

Deposition of Bradley Vinson, Volume 2

1    it's not a young adult book that's actually aimed

2    more at the 19- to 22-year-olds.

3        Q.   Does the district still purchase books that

4    contain depictions or descriptions of sexual

5    conduct?

6        A.   The district has purchased at least one that

7    we received a challenge to, yes.

8        Q.   Since July 1st of 2023?

9        A.   Yes.

10       Q.   Is that a book that you believe contains

11   depictions or descriptions of sexual conduct?

12       A.   Yes, but it is a young adult book.

13       Q.   Okay.  What is the relevance of that?

14       A.   So if we are relying solely on professional

15   reviews, those professional reviews indicate that

16   the sexual conduct present in that book would be

17   appropriate for a young adult audience, which would

18   include high school students typically, but we are

19   finding that not everyone can agree on what the

20   appropriate age levels are for some of the content

21   found in young adult books.

22       Q.   Who is the not everyone who can agree?

23       A.    Not all media specialists agree, not all

24   community stakeholders agree.

25       Q.    Is there a requirement that the community

Deposition of Bradley Vinson, Volume 2

```
1    all agree that a book is appropriate for a
2    particular audience before it can be acquired for an
3    Escambia County Public School library?
4        A.    We collect input.  I imagine if a media
5    specialist proposed the inclusion of a book that had
6    controversial mature content and all of the members
7    of the LAC expressed objections to it, I imagine
8    that that would make the media specialist possibly
9    change their mind on whether or not to acquire that
10   particular book.
11       Q.    What about if a few members of the community
12   expressed concern about a particular intended
13   purchase, would that be a reason to not purchase the
14   book?
15       A.    That would not be a reason alone.
16       Q.    I was confused by the not everyone can
17   agree, which was suggesting to me that everyone
18   needed to agree before a book could be purchased --
19       A.    No, I'm sorry.
20       Q.    -- for a particular audience.
21       A.    Sorry to give that impression.
22       Q.    Okay.  Okay.  I think we can put aside
23   Exhibit 19.
24       A.    Aha, I got it in the right order the first
25   try.
```

1      Q.   Did the school board have a view as to

2   whether HB 1557 was applicable to school libraries

3   at any time between 2022 and the present?

4          MS. SMITH:   Form.

5      A.   The school board as a body did not express a

6   view regarding HB 1557 applying to self-selected

7   library materials.

8      Q.   To date they still have not?

9      A.   To date.

10     Q.   Did the superintendent have a view as to the

11   applicability of HB 1557 to library books from 2022

12   to the present?

13         MS. SMITH:   Form.

14     A.   I don't know.

15     Q.   Did Michelle White have a view as to the

16   applicability of HB 1557 to library books?

17     A.   Her statements in meetings indicated that

18   her interpretation of the bill was that it did not

19   apply to self-selected library materials.

20     Q.   And yet she appears to have restricted books

21   based on challenges under HB 1557, correct?

22     A.   Either she or Tim Smith did so.

23     Q.   Okay.  Did the school board have a few from

24   2022 to the present as to the applicability of HB 7

25   to library books?

1   A.   There was no board motion related to HB 7

2   that I'm aware of.

3   Q.   Has the board, in nonmotion, otherwise

4   expressed its views as to the applicability of HB 7

5   to library books?

6        MS. SMITH:  Form.

7   A.   I do not remember individual members of the

8   board making comments related to HB 7, but I would

9   need to review meetings to be sure.

10  Q.   Did the superintendent have a view as to the

11  applicability of HB 7 to school library books from

12  2022 to the present?

13  A.   I don't know.

14  Q.   Do you know if Michelle White had a view as

15  to the applicability of HB 7 to school library

16  books?

17  A.   I don't recall.

18  Q.   Do you have a view as to the applicability

19  of HB 7 to school library books?

20       MS. SMITH:  Form; scope.

21  A.   I generally have not needed to consider HB 7

22  specifically in relation to library books.

23  Q.   Okay.  Are you aware of -- well, did the

24  board or the superintendent or the Coordinator of

25  Media Services communicate with each other

1    regarding -- amongst any of these three bodying, and

2    I can break this down to multiple questions if you

3    want, but the board, the superintendent, and the

4    Coordinator of Media Services, have communications

5    about whether or not HB 1557 applied to library

6    books?

7         MS. SMITH:  Form.

8    A.   I don't know what the specific

9    communications were.  My understanding is that it

10   may have been discussed between Michelle White and

11   the superintendent just based on the fact that they

12   were making decisions that appeared to be related to

13   1557 but, again, were not applied consistently.

14   This is just me supposing then.

15        Individual board members, I would need to

16   review the meetings specifically but --

17   Q.   I'm talking about communications between

18   board members and the superintendent.  That wouldn't

19   necessarily be at the meetings, would it?

20        MS. SMITH:  Form.

21   A.   Right, but I'm not aware of outside of the

22   board meetings, no.

23   Q.   You don't know?

24   A.   I don't know.

25   Q.   Okay.  How did the passage of HB 1557 impact

Deposition of Bradley Vinson, Volume 2

```
1    the book challenge process?

2            MS. SMITH:  Form; scope.

3        A.   I'm not sure.

4        Q.   How did the passage of HB 1557 impact

5    substantive decisions made regarding book

6    challenges?

7            MS. SMITH:  Form; scope.

8        A.   I'm not sure.

9        Q.   How did the passage of HB 7 impact the book

10   challenge process?

11           MS. SMITH:  Form; scope.

12       A.   I don't know.

13       Q.   And how did the passage of HB 7 impact

14   substantive decisions made with regard to challenged

15   books?

16           MS. SMITH:  Form; scope.

17       A.   I don't know.

18       Q.   Did the school district take any actions to

19   disabuse Vicki Baggett or any other challengers of

20   the view that HB 1557 or HB 7 applied to library

21   books?

22           MS. SMITH:  Form.

23       A.   Did the district or the board or just, you

24   know, individuals, did we communicate with Vicki

25   Baggett, is that what you're asking?
```

Deposition of Bradley Vinson, Volume 2

```
 1        Q.   Yes.
 2        A.   I need to refer back to my e-mails.  I
 3   believe there was a time when she questioned
 4   something that was unrestricted and I clarified the
 5   point, and I believe that was in relation to HB
 6   1557.
 7        Q.   You clarified to her that it did not apply
 8   to library books and that's why the challenged book
 9   was unrestricted?
10        A.   Correct.
11        Q.   Do you recall what book that was in relation
12   to?
13        A.   I believe that was in relation to the ones
14   that were unrestricted in April, but I would need to
15   check my e-mail to be sure.
16        Q.   Fair enough.  But is your recollection that
17   it was not about just one book but about the
18   group -- a group of books?
19        A.   I would want to double-check my e-mail.
20        Q.   Would those e-mails have been produced?
21             MS. SMITH:  Form.
22        A.   I'm not sure.
23        Q.   Okay.
24        A.   I think -- well, I'm not sure.
25        Q.   Do you know if anybody from the school
```

Deposition of Bradley Vinson, Volume 2

```
 1   district communicated with any Florida State agency

 2   regarding how to handle book challenges?

 3          MS. SMITH:  Form; scope.

 4      A.   I don't know what Michelle White's

 5   communications were with agents from -- the Florida

 6   Department of Education, is that what you mean?

 7      Q.   Either the Florida Department of Education

 8   or the Governor's office.

 9      A.   Right.  I don't know.  I'm not privy to what

10   her e-mails would have been or what responses she

11   received.  I have sent e-mails asking for

12   clarification of some things but I would need to

13   refer back to my e-mails to see exactly what I was

14   asking about because this was earlier in the time

15   that I came into this position, but I do not believe

16   I received responses.

17      Q.   Your communications were all in your role as

18   Coordinator of Media Services?

19      A.   Those communications to agents of the

20   Department of Education, yes.

21      Q.   Is that who you communicated to, is the

22   Department of Education?

23      A.   Yes.

24      Q.   You didn't communicate with the Governor's

25   office?
```

```
 1      A.   No.

 2      Q.   Any other State agency?

 3      A.   No.

 4      Q.   Did you ever communicate with other school

 5   districts about how they handled book challenges?

 6      A.   I have attended the FAME conference and the

 7   FATEMA conference, and at FAME we also had a FASM

 8   meeting, which is the Florida Association of

 9   Supervisors of Media, and book challenges did come

10   up there.

11      Q.   Outside of those conferences, have you

12   consulted with other school districts about how to

13   handle book challenges?

14      A.   Not in my recollection, no.

15      Q.   Do you know if Michelle White consulted with

16   other school districts about how to handle book

17   challenges?

18           MS. SMITH:  Form; scope.

19      A.   I recall seeing some e-mails but I can't

20   remember who they were addressed to or from.

21      Q.   Do you know if Tim Smith or Keith Leonard

22   consulted with other school districts about how to

23   handle book challenges?

24           MS. SMITH:  Form; scope.

25      A.   I don't know.
```

1    Q.   Do you know if Tim Smith or Keith Leonard

2    consulted with the Florida Department of Education

3    or the Governor's office about book challenges?

4         MS. SMITH:   Form; scope.

5    A.   I know someone from the State level

6    contacted Keith Leonard in regards to my specific

7    material objection report and when it would be

8    submitted this year, and my interpretation of when

9    it was expected is that it would need to be received

10   after June 30th and I had not -- I had not yet

11   submitted it and it was right before June 30th, but

12   I was waiting until June 30th to see if I received

13   any more objections, so I know that he must have

14   talked to someone at the State level who was looking

15   for that objection report, but then we submitted it

16   in the beginning of June -- July.  Sorry.

17   Q.   Are you aware of any other communications

18   between Tim Smith or Keith Leonard and the Florida

19   Department of Education or the Governor's office?

20        MS. SMITH:   Form; scope.

21   A.   I'm not aware of those conversations.

22   Q.   Okay.  Do you know if any of the individual

23   board members communicated with the Florida

24   Department of Education or the Governor's office

25   about book challenges?

Deposition of Bradley Vinson, Volume 2

```
1              MS. SMITH:  Form; scope.

2       A.   I do not know.

3       Q.   Do you know if any of the individual board

4  members communicated with other school districts

5  about the handling of book challenges?

6              MS. SMITH:  Form; scope.

7       A.   I do not know.

8              MS. HEYWOOD:  Exhibit 54.

9              THE WITNESS:  Thank you.

10   (Vinson Exhibit 54 was marked for identification.)

11  BY MR. LEV:

12      Q.   I'm showing you what's been marked as

13  Exhibit 54 and Bates stamped E-ECSD 0067489, and

14  this is an e-mail from -- exchanged between Michelle

15  White and Amber Baumbach.

16      A.   Yes.

17      Q.   B-a-u-m-b-a-c-h, at the Florida Department

18  of Education, correct?

19      A.   Correct.

20      Q.   Have you seen this before?

21      A.   Yes.

22      Q.   In what context have you seen this before?

23      A.   In my e-mail.

24      Q.   You're not on this e-mail, so I'm just

25  wondering how you have seen this before?
```

1    A.    I am cc'd on this e-mail.

2    Q.    You are.  I'm sorry.

3    A.    That's okay.

4    Q.    Okay.  Do you know what Michelle is asking

5    about in the e-mail in the bottom of the first page

6    that says:  Did the Age of Appropriate committee

7    create a rule we could use when choosing library and

8    instructional materials?

9    A.    I'm not sure exactly what she's referring to

10   there, no, and I don't know that we ever received a

11   response, and I do not believe that Amber Baumbach

12   is currently in that department at this time.

13   Q.    Do you know what the Age of Appropriate

14   committee is?

15   A.    No.

16   Q.    Did you have any discussion with Michelle

17   about this e-mail that she cc'd you on?

18   A.    No.

19   Q.    Did you ever follow up on this mail with the

20   Department of Education?

21   A.    Not this particular e-mail, no.

22   Q.    Did you follow up with another e-mail that

23   has anything to do with this?

24   A.    No.

25   Q.    Okay.  And I think you told me just a couple

1  minutes ago that you think you have sent inquiries

2  to the Florida Department of Education relating to

3  book challenges but you haven't received a response?

4      A.   Yes, or related to HB 1069.  I would have to

5  look back in my e-mails to see exactly what I was

6  questioning them about.

7      Q.   Fair enough.  We talked earlier about the 20

8  books that you unrestricted in April of 2024 and

9  then there was a handful of others that you also

10  unrestricted at that time, potentially through a

11  separate process.

12      A.   Correct.

13      Q.   Did the superintendent have any role in that

14  decision to unrestrict those books?

15      A.   I did meet with him and discuss that that

16  was my proposal for how we move forward with those

17  books in relation to that settlement.

18      Q.   Those 20 books that are referenced in your

19  declaration?

20      A.   Yes.

21      Q.   And when was that meeting?

22      A.   It would have been shortly before I sent the

23  e-mail.

24      Q.   And before you unrestricted them?

25      A.   Yes.

Deposition of Bradley Vinson, Volume 2

1    Q.   And what was his -- tell me about that

2  meeting.   What was his position, what was discussed?

3    A.   We discussed the settlement, we read through

4  some of the statements from the State, and we

5  reviewed what the books were in question, and he

6  ultimately was supportive of taking that action.

7    Q.   Had you proposed unrestricting any other

8  books other than the ones that were ultimately

9  unrestricted?

10    A.   I did not discuss unrestricting other books.

11  I don't recall discussing unrestricting other books

12  related to 1069 with the superintendent

13  specifically.

14    Q.   And the books that you did discuss with the

15  superintendent, you were proposing to unrestrict

16  them?

17    A.   Yes.

18    Q.   And were all of those books that you were

19  proposing to unrestrict unrestricted?

20    A.   Yes.

21    Q.   Okay.  Did the superintendent make any

22  recommendations to the board regarding any of the

23  removal -- regarding any of the book challenge

24  appeals that went to the board?

25       MS. SMITH:  Form.  Which superintendent are

Deposition of Bradley Vinson, Volume 2

1    we talking about?

2        MR. LEV:  Whoever was in the role at the

3    time of the appeals.

4    A.   The appeals all took place during the time

5  Tim Smith was there.

6    Q.   Did Tim Smith ever make any recommendations

7  to the board regarding the appeals of book

8  challenges?

9    A.   Can we review those agenda items just to see

10 how it was listed?

11   Q.   Sure.

12   A.   Okay.

13   Q.   If we can figure out what exhibit number

14 they are.

15   A.   It's around 45, maybe before.

16       MS. HEYWOOD:  Should be 39 to 47.  We may

17    have some here.

18   A.   So recommended action there was to decide on

19 "Perks," recommended action was to decide.

20   Q.   Do you read the recommended action in those

21 agenda items as meaning a recommendation from the

22 superintendent, is that what that means?

23   A.   Yes.

24   Q.   Okay.  You know that, that's what it means?

25   A.   That's my understanding of how these are

1    presented.

2           MS. SMITH:   Form.

3       Q.   Okay.  All the board actions are a

4    recommendation from the superintendent as to what to

5    be done?

6       A.   Yes.

7       Q.   Okay.

8       A.   I will say that, you know, in times of, say,

9    a textbook adoption, the recommended action is to

10   adopt, whereas this does not have language that

11   seems to favor either retaining or removing these

12   books.  It just says decide.

13      Q.   Excellent.

14      A.   Decide.  Decide.  Sorry, I'm just

15   double-checking that they all just indicate decide,

16   which is a neutral way that they would have been

17   presented.

18      Q.   Understood.

19      A.   Decide.  Decide.  And that's it.

20      Q.   So the answer is that as reflected in the

21   agenda items, there was no formal recommendation

22   from Tim Smith to the school board regarding how to

23   handle any of the book challenge appeals that the

24   board has decided?

25      A.   Correct.

Deposition of Bradley Vinson, Volume 2

1    Q.   Do you know if Tim Smith provided

2    recommendations to any of the school board members

3    regarding those appeals outside of this formal

4    process?

5          MS. SMITH:  Form; scope.

6    A.    I do not.

7    Q.    You do not know?

8    A.    I do not know.

9    Q.    Okay.  Tell me how, if at all, the role of

10   Coordinator of Media Services has changed since

11   you've taken it over from Michelle White.

12   A.    I have help.  To have a media specialists

13   TSA is an absolutely necessary addition.  There are

14   a lot of responsibilities in this role, and I know

15   that Michelle White had various people assisting her

16   who were working outside of their job capacity, but

17   it's a role that needs another person to support and

18   perform the tasks that are necessary.

19   Q.    Have your responsibilities differed from

20   hers in the role?  Have the role responsibilities

21   changed?

22         MS. SMITH:  Form.

23   A.    In some ways we divide out some of the work

24   with my focus being a little heavier with the

25   instructional materials, the textbooks, textbook

```
 1    adoptions, and she will assist as needed but that

 2    responsibility is more mine.

 3         There have been some trainings or media

 4    specialist support that she provides and then she

 5    will consult with me if necessary, but that's a

 6    rough splitting of some of those responsibilities.

 7    Q.   She is?

 8    A.   Linda Sweeting, my media specialist TSA.

 9    Q.   Who is primarily responsible for handling

10    the book challenge process and the 1069 review

11    process?

12    A.   So I created the training related to that

13    and led those trainings; however, we divide this one

14    up somewhat because Linda Sweeting manages the

15    Coffee Crew agenda, and sends out communications

16    related to those decisions, and helps manage the

17    physical movement of the books in relation to those

18    decisions.

19    Q.   And which one of you is responsible for

20    updating the Reconsiderations Spreadsheet, the 1069

21    spreadsheet, and Destiny?

22    A.   Primarily I handle updating the

23    spreadsheets, the publicly available spreadsheets,

24    except for the Return to ES+, MS+, and HS.  That one

25    is primarily updated by Linda Sweeting, but she and
```

Deposition of Bradley Vinson, Volume 2

```
 1    I have the ability to edit any of those.

 2         Q.   And who is primarily responsible for

 3    updating Destiny?

 4         A.   Everybody updates Destiny who is a media

 5    specialist.

 6         Q.   With respect to the Coffee Crew decisions,

 7    who among you or Linda has that responsibility?

 8         A.   Linda and I divide that responsibility or

 9    those media specialists who have those items in

10    their collection would also be capable and sometimes

11    responsible for making those changes in Destiny.

12         Q.   I believe you said that Ms. Sweeting puts

13    together the agendas for the Coffee Crew?

14         A.   Yes.

15         Q.   What are those agendas based on?  How does

16    she decide which books you are going to be

17    discussing at a particular Coffee Crew meeting?

18         A.   Again, we try to cover the ones where more

19    copies were available or copies were available in

20    more libraries first.

21         Q.   So that was a process where she or you would

22    look in Destiny and among the books that had a 1069

23    Storage category and see the ones that appeared many

24    times or at multiples schools and say let's start

25    with these?
```

Deposition of Bradley Vinson, Volume 2

1      A.   We would pull that report and look at those

2  in the report that do appear multiple times when

3  sorted by title and see where they were available

4  and then start adding books to the agenda based on

5  that.

6          We also invited the high school media

7  specialists to request that titles be added.  So if

8  they wanted to consider something sooner than later,

9  we would honor that request and include it in the

10 agenda.

11     Q.   And how far along are you on the high school

12 Coffee Crew process?

13     A.   We have addressed -- I mean, that's a good

14 question.  So, you know, I'd say we have more to do

15 but there -- like I mentioned earlier, there are

16 some that are young adult books that we are

17 returning to those high school media specialists to

18 receive feedback from their LACs.

19     Q.   Okay.  And then after that feedback is

20 gotten from the LACs, what's going to happen with

21 respect to those books?  Are they going to come back

22 to the Coffee Crew?

23     A.   If they want it to come back to the Coffee

24 Crew, it can, or if they want to make a selection or

25 deselection for their library, they also have that

Deposition of Bradley Vinson, Volume 2

1    ability.

2        Q.   So they can decide "I am going to restrict

3    this book in my library"?

4        A.   They could decide to weed the book if it's

5    one that never circulates as well.  They wouldn't

6    restrict it.

7        Q.   I guess I'm trying to understand the scope

8    of their authority.  If they -- I presume that the

9    result of this process with respect to a book that

10   may contain sexual conduct is either it doesn't

11   contain sexual conduct after closer review, option

12   1; option 2, it does contain sexual conduct and we

13   think it is appropriate for some or all of the grade

14   levels in high school; option 3, it does contain

15   sexual conduct and I don't believe it's appropriate

16   for any of the grade levels in high school.

17            Is that a fair description of the

18   possibilities?

19            MS. SMITH:  Form.

20       A.   Will you repeat that just to be sure we're

21   covering everything?

22       Q.   Sure.  It doesn't contain sexual conduct.

23       A.   Okay.

24       Q.   It contains sexual conduct and is

25   appropriate for one or more of the grade levels in

1    high school.

2        A.    Yes.

3        Q.    It contains sexual conduct and is not

4    appropriate for any of the grade levels in high

5    school.

6        A.    Uh-huh.

7        Q.    To me, that seems like the full universe of

8    options with regard to the decision on sexual

9    conduct.

10           MS. SMITH:   Form.

11       A.    Or they may look at it and say this is a

12   book we've had for 15 years and it's checked out

13   three times and we don't need to spend the time

14   reviewing it because I would normally have weeded it

15   by this point, if I had more time.

16       Q.    Okay.  Okay.  So of those four options now,

17   are the media specialists -- can they make any of

18   those decisions on their own?

19       A.    Yes, in their libraries they can make those

20   decisions.

21       Q.    So they can keep the book for everybody,

22   keep the book for some grade levels, and what if

23   they are in what I call category 3, they think the

24   book is not age or grade level appropriate for any

25   grade in their school, what would they do then?

1      A.   If they think it is not appropriate for

2  their collection, they can deselect it.

3      Q.   What does that mean?

4      A.   They could weed it.  They could remove it.

5      Q.   That it would be removed for that reason?

6      A.   In that school.

7      Q.   In that school.  And is there any effort

8  made to ensure some sort of consistency across

9  schools?  So if you've got one media specialist who

10  thinks this book is not appropriate for anybody and

11  another one who thinks it's appropriate for everyone

12  in their school, do you try to resolve those

13  inconsistencies or it's let a thousand flowers

14  bloom?

15      A.   Let a thousand flowers bloom sounds really

16  nice.  Sorry.

17           At this point, ultimately, that Certified

18  Media Specialist in that school, after receiving

19  feedback from their Library Advisory Council, who is

20  familiar with that school's needs, they can make

21  that decision independently.

22           We don't have a system in place for those

23  books -- say if a media specialist did not select

24  it, at that point in the process, there is not a

25  process that would apply that individual decision

1    across the district at this time.

2        Q.    And if it was being deselected and weeded,

3    then the book would be handled just like any other

4    weeded book in terms of physically getting rid of

5    it?

6        A.    Yes.

7        Q.    And do you get some sort of report on this

8    or just whatever you pull out of Destiny?

9        A.    I can pull the weeding log to see what was

10    weeded and I can see the reasons that were recorded

11    now.

12        Q.    Okay.  And so coming back to the question of

13    where you are in the high school Coffee Crew

14    process, you've got a bunch of young adult books

15    that have been sent back to media specialists to get

16    input from their Library Advisory Councils?

17        A.    Yes.

18        Q.    And those might come back to the Coffee

19    Crew?

20        A.    Yes.

21        Q.    Are there other high school books still

22    pending Coffee Crew review?

23        A.    I do think there is at least one high school

24    where the HB 1069 review is not complete, so,

25    theoretically, there could be individual titles that

Deposition of Bradley Vinson, Volume 2

1    that high school holds that could come up and be

2    added to the list that needs to be considered.

3        Q.   So that means one high school where the

4    entire collection was pulled and it hasn't -- some

5    of it is still pulled from that initial pull, no one

6    has reviewed it to say it may contain or may not

7    contain sexual conduct?

8        A.   Yes.

9        Q.   And what high school is that?

10       A.   Pine Forest.

11       Q.   Other than that, is there anything left to

12   do on the high school Coffee Crew review?

13       A.   On the Coffee Crew review or on the

14   individual media specialists HB 1069 review?

15       Q.   The 1069 review process for library books.

16   Thank you.

17       A.   I would want to double-check with those

18   media specialists and see if they are all

19   comfortable saying that they are complete with their

20   process.

21       Q.   Okay.  And where is the middle school 1069

22   review process at?  I know you referenced a middle

23   school Coffee Crew having started.

24       A.   It started but we have had fewer meetings

25   than the high school group and would benefit from

Deposition of Bradley Vinson, Volume 2

1    more meetings and more conversations with them and

2    looking at their titles and their needs.

3        Q.    So the middle schools, like the other

4    schools, I assume, pulled all the books in the

5    summer of 2023?

6        A.    Uh-huh.

7        Q.    Each media specialist then reviewed their

8    collection and returned those that they felt

9    comfortable did not contain sexual conduct to the

10   shelves?

11       A.    Yes.

12       Q.    And has that been completed at all middle

13   schools or are there any outliers there like there

14   is in high school?

15       A.    I would want to confer with each of them to

16   see if they considered their entire review complete

17   because some of them may have young adult books that

18   they would still like to complete their review of.

19       Q.    Okay.  And then there are the books that

20   they didn't return to the shelves.  Are those all

21   coming to some sort of Coffee Crew type decision, or

22   are they being further assessed by each individual

23   media specialist?

24       A.    If it's not something that's in HB 1069

25   Storage, it's still under the purview of that

Deposition of Bradley Vinson, Volume 2

1    individual media specialist.

2        Q.   If I'm a media specialist in a middle school

3    and I've gone through the process and I've returned

4    whatever books I've returned to the shelf, wouldn't

5    what's left be HB 1069 Storage?  And then the

6    question is whether it's checked out or not and sent

7    to you?

8            MS. SMITH:  Form.

9        A.   It's not marked HB 1069 Storage.  They are

10   unknown.  They are not reviewed yet.

11       Q.   Well, but -- so let's say I have a middle

12   school library with 10 books and I took them all off

13   the shelf in the summer of 2023, and I've looked

14   through all 10 of them and I put six back on the

15   shelf because they have nothing to do with sex.

16       A.   Okay.

17       Q.   I have four books that may contain sexual

18   conduct under the statute.  What would be -- would

19   those books not be marked -- how would those books

20   appear in Destiny right now?

21       A.   They would possibly still appear with their

22   regular location, or they may say young adult or

23   adult to review.

24       Q.   And what would cause that to be changed to

25   HB 1069 Storage is if there is a decision that it

Deposition of Bradley Vinson, Volume 2

1    needs post Coffee Crew review?  Well, let me think.

2    What would cause it -- when would the -- would it be

3    changed to HB 1069 Storage for those four books?

4        A.   So if someone suspected or believed that

5    sexual conduct was present in the book, they would

6    then actively change the circulation type to HB 1069

7    Storage.

8        Q.   I guess I'm confused, because in my

9    understanding of how this worked, I pulled my 10

10   books, I've looked through them all, I've completed

11   that review.

12       A.   Okay.

13       Q.   Six of them I said are clear and are back in

14   the shelves, and the other four, by definition, are

15   books that I had some --

16       A.   If you looked at all 10 books, then you

17   would have changed those four, if you had some

18   question.

19       Q.   Yeah, that's my hypothetical.  I finished

20   that initial review and I've sorted my world into

21   things that are back on the shelf and the other

22   category, I believe, was may contain sexual conduct,

23   that second category.  I completed my review and

24   that's when I changed it to 1069 Storage in Destiny?

25           MS. SMITH:  Form.

Deposition of Bradley Vinson, Volume 2

1      A.   If you have reason to believe the individual
2   titles have sexual conduct present.
3      Q.   Okay.  And then what happens?  I, as a media
4   specialist, can decide it has sexual conduct but
5   it's appropriate for a YA opt-in; is that right?
6           MS. SMITH:  Form.
7      A.   An individual media specialist could make
8   that determination in their deeper review of that
9   book.
10     Q.   Okay.  Or I could say I'd like to send this
11  to the Coffee Crew?
12     A.   Yes.
13     Q.   Okay.  How many books are in this category
14  of initial review from the middle school media
15  specialist, didn't get sent back to the shelves
16  because they might have sexual conduct?
17          MS. SMITH:  Form.
18     A.   I just think there are some selections, like
19  Pine Forest, where that initial review is not
20  complete.
21     Q.   Okay.
22     A.   That's where I'm running into an issue.
23     Q.   Okay.
24     A.   I would also reference Bellview Middle
25  School.  The media specialist there was out for a

1    portion of the year and I know did not have time to

2    complete the review of the young adult section.

3        Q.   Okay.  So there is a number of middle

4    schools where over a year later, the review of the

5    initial pull is not even complete?

6        MS. SMITH:   Form.

7        A.   The review of their thousands of books is

8    not complete, yes.

9        Q.   Okay.  And then there are the schools where

10   the review is complete and there's books that have

11   been identified as potentially subject to HB 1069?

12       A.   Yes.

13       Q.   And do you have any idea how many books are

14   in that category?

15       A.   Those are the books that are on our HB 1069

16   list.

17       Q.   Oh, okay.  And they would say HB 1069

18   Storage in Destiny?

19       A.   Yes.

20       Q.   Okay.  And what is the process, then, for

21   those books that are on the 1069 list for middle

22   schools, that are on the 1069 list for middle

23   schools, what's next for them?

24       A.   At any point a media specialist who would

25   like to reevaluate their decision on putting that

Deposition of Bradley Vinson, Volume 2

1    book in the HB 1069 Storage could take a deeper look

2    at the book and determine that they do think it's

3    appropriate for circulation.  If it were challenged

4    after that point, it would go through the different

5    challenge process, or we can bring it to the Coffee

6    Crews and discuss as a group in order to make a

7    determination with feedback from the other media

8    specialists.

9        Q.   So if it's not reevaluated by the media

10   specialist who pulled it and it's not challenged,

11   it's going to go into this Coffee Crew process?

12       A.   Correct.

13       Q.   And how often is the middle school Coffee

14   Crew actually meeting?  I know you said you wish it

15   were meeting more but how frequently has it been

16   meeting?

17       A.   I think I missed some meetings yesterday

18   while I was here, but I think that they did find a

19   time that would work for the majority of them on a

20   weekly basis.

21       Q.   When did the middle school Coffee Crew begin

22   meeting?

23       A.   Spring of 2024.

24       Q.   Do you know how many meetings it's had since

25   then?

1    A.   I would say three or four, but I would want

2  to refer back to that agenda just to see.  I know at

3  at least one of them we only had one other media

4  specialist who was able to attend besides myself and

5  Linda Sweeting.

6    Q.   Do you know if those middle school Coffee

7  Crew agendas were produced in this litigation?

8    A.   Coffee Crew Junior?

9    Q.   Coffee Crew Junior.

10   A.   They should have been.

11   Q.   And is there any timeline for completion of

12  the middle school Coffee Crew review?

13   A.   I don't have a timeline for completion.

14   Q.   If you had to estimate, how long do you

15  think it's going to take you to get through those

16  books, the middle school books with the 1069 review,

17  what would your estimate be?

18       MS. SMITH:  Form.

19   A.   Ideally, we could complete that in this

20  school year.

21   Q.   And is your anticipation that the middle

22  school Coffee Crew is going to operate in the same

23  way as the high school Coffee Crew in that in some

24  instances you will make decisions, in some instances

25  you are going to say the book needs further

1    community input and it will be sent for a DMRC

2    process?

3        A.    An additional option would be if they

4    determine the -- they think it's too mature for

5    their collections, individually or as a whole, they

6    could offer it to the high school media specialist

7    to move up to the next level collection to be more

8    age appropriate.

9        Q.    Okay.  But you anticipate that some of these

10   are going to go into the DMRC process that we talked

11   about for the high school Coffee Crews?

12       A.    It's a possibility.

13       Q.    Okay.  You don't have any of those yet for

14   middle schools?

15       A.    No, I don't think so.

16       Q.    And what about the elementary school

17   collections, are those all done in terms of HB 1069

18   review?

19       A.    Those are done in terms of HB 1069 review.

20   We have a small number of titles that are elementary

21   titles that are still on our HB 1069 Storage list

22   that are middle grades books where it's questionable

23   whether you would consider the references to sexual

24   conduct appropriate for an elementary audience.

25   Certainly you wouldn't consider the ones I'm

1    thinking of appropriate for, say, a second grader.

2    The question is would you return it to fourth or

3    fifth grades.

4         Q.   So what's the process for making that

5    determination of what happens to those books?

6         A.   We'll need to have meetings with the

7    elementary media specialists and gather input from

8    them.

9         Q.   Sort of an elementary Coffee Crew?

10        A.   Baby Coffee Crew.

11        Q.   And how many books are in --

12        A.   Again, I think it's fewer than 10 titles.

13        Q.   Okay.  Okay.  You said that.

14        A.   Uh-huh.

15        Q.   Okay.  And I'm pretty sure we covered this,

16   I just want to make sure.  When challenges come in

17   now, are you the individual who decides whether the

18   book should be restricted pending review?

19        A.   I am the individual who determines the

20   restricted status, yes.

21        Q.   And what criteria are you applying to

22   determine if a booking should be restricted?

23        A.   I read through the passages that are

24   included in the form.  If I can refer to the book as

25   well to confirm the existence of those passages, I

1   do.  I will look at professional reviews or --

2   generally, that's sufficient to make the

3   determination, because the information that's been

4   included on the form lately usually does have sexual

5   conduct within those passages.

6       Q.   And your assessment is is there a

7   description or depiction of sexual conduct as

8   defined by the statute.  If there is, the book is

9   restricted?

10      A.   Yes.

11      Q.   Without regard to age group, age level or

12  grade level appropriateness and without regards to

13  its literary merit as well, correct?

14      A.   I leave those decisions to the District

15  Materials Review Committee.

16      Q.   Okay.  We are nearing the end.

17              (Discussion off the record.)

18  BY MR. LEV:

19      Q.   Let's take a look at your declaration again,

20  Exhibit 4.  Let's take a look at Paragraph 62.  This

21  is where you're talking about the book "The Hate U

22  Give."

23      A.   Yes.

24      Q.   And your declaration states that Escambia

25  County Public Schools owns 39 copies of "The Hate U

1  Give" at 10 different middle and high schools,

2  correct?

3      A.    Correct.

4      Q.    Where did you pull that information from?

5      A.    From Destiny.

6      Q.    Okay.  If I look at Exhibit 17 -- well, let

7  me just -- and then it goes on to say -- and I think

8  we talked about this earlier in the context of a

9  different book, but if you look at Paragraph 65, it

10  says that at least one media specialist indicated

11  "The Hate U Give" may contain sexual conduct and

12  that the title was pulled from circulation at that

13  time, and I think you told me the title means all of

14  the copies of the book were pulled from circulation?

15      A.    Correct.

16      Q.    So now let's look at Exhibit 17 and the

17  entry for "The Hate U Give."  Exhibit 17 is also

18  pulled from Destiny, correct?

19      A.    Yes.

20      Q.    And so if I'm looking at pages -- well, I'm

21  looking at the actual exhibit Pages 18 or 19 but you

22  can see the entries in your thing.  When I counted

23  these entries this morning, I counted 51 copies of

24  "The Hate U Give."  You are welcome to count those

25  rows if you'd like.

Deposition of Bradley Vinson, Volume 2

1      A.    I don't know if I do want to.

2      Q.    I think I did it on the electronic version

3  but you are welcome to double-check my math.

4      A.    I will point out that some of those are

5  Warrington Middle School, which is a closed site,

6  and I would not have included those in my

7  declaration.

8      Q.    Okay.  And those are four copies?

9      A.    No.  I see -- one two three four five six

10  seven eight nine ten eleven -- I see 11 copies.

11      Q.    Actually, I see more than that.  There is

12  some at the top also.  The reason I had said four

13  was the top four entries are Warrington Middle

14  School, oddly.

15      A.    I have the packets here confused.  I'm

16  sorry.  Warrington Middle.  Do you see Warrington

17  Elementary?  It should not be present in Warrington

18  Elementary.

19      Q.    The first two entries for "The Hate U Give"

20  are from Warrington -- the first four entries are

21  from Warrington Middle School.

22      A.    Okay.  So those are also closed, yes, and it

23  must be that those are on a separate record.  Do you

24  see how the capitalization is different?  So they're

25  sorted differently.  Oh, and it looks like they were

1  also possibly audio books, based on the call number.

2      Q.   So you would have not counted the books at

3  Warrington Middle School because it's closed?

4      A.   Correct.

5      Q.   But those are still books that are owned by

6  Escambia County Public Schools, aren't they?

7      A.   Yes and no.  So for a long period of time

8  after the charter school took over and it became

9  Warrington Prep, we did not have any access to those

10  materials and they attested that the library was

11  closed and they had different library materials for

12  students.

13         More recently, and I would have to look back

14  at my calendar to see exactly when we did it, they

15  did allow us -- I think a question came up about the

16  access, the status of one of the books that's owned

17  by Warrington Middle.  We asked our Director of

18  Alternative Schools, Kerry Coots, to see if we could

19  obtain those materials so that we could sort through

20  them properly, and we were able to go in and

21  retrieve a large number of them.

22         Some of them were not in condition that we

23  could take them back at that point.  They were in

24  very bad condition.

25      Q.   I see.

1    A.    They had been put in a locker room.

2    Q.    And I take it you don't know specifically

3    the condition of "The Hate U Give" from Warrington

4    Middle School but you just didn't count those copies

5    for purposes of your declaration?

6    A.    Because they're not available in any way for

7    students.  They're currently in storage at the

8    warehouse or they are still in the locker room at

9    Warrington Prep.

10   Q.    Okay.  And so if I take out the 12 copies at

11   Warrington Middle School, at the bottom of the list

12   I'm left with 39 copies, which does include the two

13   copies at the top which I'm guessing you didn't

14   notice were at Warrington.

15   A.    Okay.

16   Q.    And if I look at the circulation type for

17   the copies of "The Hate U Give," I see copies at

18   Pensacola High School and West Florida High School

19   of Advanced Technology, they have a circulation type

20   of Challenge, and that means those are not

21   restricted?

22   A.    Uh-huh.

23   Q.    And that's because they are in the high

24   school?

25   A.    Correct.

Deposition of Bradley Vinson, Volume 2

1      Q.    And if I go down, there's another copy with

2   a lower case capitalization at West Florida High

3   School of Advanced Technology that lists HB 1069

4   Storage.

5      A.    I see that.  I would need to refer to

6   Destiny to double-check the status of that

7   particular one.

8      Q.    What would you look for in Destiny?  Because

9   this came out of Destiny just a couple days ago.

10      A.    I would look to see who it's checked out to.

11   It could be that it's checked out to a student and

12   has been missing for some period of time and so we

13   just didn't catch it to change it to Challenge

14   because it was not something that would circulate

15   because it is missing.

16      Q.    And if we go to the Reconsiderations

17   Spreadsheet, "The Hate U Give" under Level, it just

18   says middle school, and restricted access says Y.  I

19   think we talked about this earlier today or

20   yesterday.  You said it was only challenged in the

21   middle school but --

22      A.    May I review the form?

23      Q.    Yes, please.

24      A.    The form does state middle schools, so we

25   interpreted this as a challenge to the book being

Deposition of Bradley Vinson, Volume 2

1  present in middle school collections.

2      Q.   Okay.  And the Reconsiderations Spreadsheet,

3  that is only addressing that and is not reflecting

4  the fact that the book is present in high schools

5  and unrestricted in high schools; is that correct?

6      A.   Correct.

7      Q.   Okay.  And it is in fact unrestricted in

8  high schools?

9      A.   That is how it appears in Destiny, yes.

10      Q.   Okay.  And it is, in fact, all copies are

11  restricted in all of the middle schools that it is

12  available at?

13      A.   Yes.  That was also something that I know at

14  least one media specialist, middle school media

15  specialist, alerted us to passages where sexual

16  conduct was present, and again, this is a form that

17  we received before HB 1069, but the fact that there

18  is sexual conduct present and the farm indicated age

19  inappropriate, we interpreted that as it needed to

20  be restricted.

21      Q.   Okay.  And if we go back to your

22  declaration, in Paragraph 66 you indicate that

23  you've reviewed "The Hate U Give" and concur with

24  the media specialist who indicated it contains

25  sexual conduct as defined by -- and you say this

Deposition of Bradley Vinson, Volume 2

```
 1   section of Florida statutes, and then you attached
 2   an exhibit and it says examples of the sexual
 3   conduct can be found in Exhibit 7.
 4        I was wondering if you could tell me which
 5   aspects -- there are several pages there in
 6   Exhibit 7 from "The Hate U Give" -- you believe
 7   contains sexual conduct as defined by statute.
 8   A.   Can you tell me what the number is at the
 9   top of the page for where you are looking?
10   Q.   Sure.  It's 93 is the Exhibit 7 marker.  I
11   guess, before you start, in a lot of these exhibits
12   there is little, like, sticky notes tabbed on the
13   book.  Are those supposed to indicate the location
14   in the other exhibits where the sexual conduct is
15   found, or not?
16   A.   I would need to look at the book and
17   double-check those sticky notes before I could
18   confirm that.
19   Q.   Okay.  All right.  So if you can read for me
20   the specific provisions of "The Hate U Give" that
21   you determined constitute sexual conduct as defined
22   by Florida Statute, I'd appreciate it.
23   A.   "Fooling around isn't new for us and when
24   Chris slipped his hand in my shorts, I didn't think
25   anything of it.  Then he got me going and I really
```

1    wasn't thinking at all, for real.  My thought

2    process went out the door, and right as I was at

3    that moment, he stopped, reached into his pocket and

4    pulled out a condom."

5        Q.    Okay.  And do we have a copy of 847.01?

6             MS. SMITH:  We did at some point.

7        A.    I've got it.

8        Q.    So can you -- I'm just wanting to understand

9    the interpretive process that the district is

10   applying.  That section you read meets which part of

11   the definition of sexual conduct?

12       A.    The definition of sexual conduct where it

13   says actual physical contact with a person's clothes

14   or unclothed genitals, pubic area, buttocks.

15       Q.    Okay.  So putting his hand down my pants is

16   conduct with the genitals?

17       A.    Yes.

18       Q.    Okay.

19       A.    That is my reading of it.

20       Q.    Okay.  Is there other sexual conduct in this

21   excerpt here?  You've got the rest of that page.

22       A.    I think that was the only one that I had

23   included, but let me look and see what this other

24   page is.

25             It's this portion at the bottom of Page 376:

Deposition of Bradley Vinson, Volume 2

1    "He kisses me back and soon we're making out like

2    it's the only thing we know how to do.  It's not

3    enough.  My hands travel below his chest and he's

4    bulging in more than his arms.  I start unzipping

5    his jeans."

6        Q.   So that, you think, meets part of the same

7    part of the definition we talked about earlier,

8    touching genitals?

9        A.   Yes, clothed or unclothed.

10       Q.   Okay.  Anything else?

11       A.   Let's see.  Oh, and then on the next page:

12   "I slipped my hand in his pants heading for the

13   bulge."

14       Q.   Okay.  Anything else?

15       A.   I don't know if I would have included the

16   other parts there as an instance of sexual conduct.

17       Q.   What other parts are you unsure of?

18       A.   "I untangle myself out of Chris's arms."

19   That's not clear what's going on.  They are just

20   sleeping and waking up and they were tangled up.

21       Q.   Okay.  Thank you.

22       A.   Sure.

23       Q.   And if we take a look at your declaration,

24   Paragraph 57 indicates that there are -- that the

25   school district owns 24 copies of "Speak" and five

Deposition of Bradley Vinson, Volume 2

```
 1   copies of the graphic novel.
 2        A.   Yes.
 3        Q.   And again, if I go to Exhibit 17 and I look
 4   up "Speak," I get different numbers but close.  I
 5   counted 26 copies and six copies of the graphic
 6   novel.  Is there an explanation for that
 7   discrepancy?
 8        A.   I'm sorry, can you repeat the numbers that
 9   you found?
10        Q.   I counted 26 copies of the regular novel,
11   and six copies of the graphic novel.
12        A.   We're a little off here because there are
13   three at Warrington Middle School of the regular one
14   and two at Warrington Middle of the graphic novel.
15   Do you need me to count them again?
16        Q.   So that would explain the graphic novels
17   as -- well, it doesn't really add up.  The graphic
18   novels are easy to count.
19        A.   Right.
20        Q.   So is this -- is Exhibit 17 an accurate
21   depiction of the number of books the County owns if
22   we don't count the ones from Warrington Middle
23   School?
24        A.   Exhibit 17 is the most recent, so, yes, this
25   would be the more accurate representation of how
```

Deposition of Bradley Vinson, Volume 2

1    many copies are in Destiny.

2        Q.   And are all of the copies of "Speak," the

3    novel and the graphic novel, restricted?

4        A.   Yes.

5        Q.   Under 1069 currently?

6        A.   Yes.

7        Q.   Okay.  Similarly, "Where I End and You

8    Begin," there was a slight discrepancy in the

9    novel -- in the numbers.  Actually, a larger

10   discrepancy.

11            Your declaration, at Paragraph 73, talks

12   about 14 copies of "Where I End and You Begin," and

13   I counted 28 copies, eight of which were indicated

14   having been lost.

15       A.   Which paragraph are we in in the

16   declaration?

17       Q.   73.

18       A.   That could just be my error.  I'm not sure.

19   I would have to look in Destiny to confirm, but the

20   Exhibit 17 figures represent what's in Destiny.

21       Q.   So this would be the accurate count of

22   "Where I End and You Begin"?

23       A.   Yes.

24       Q.   But they are all restricted under 1069

25   currently?

Deposition of Bradley Vinson, Volume 2

```
1       A.   Correct.
2       Q.   Okay.  And just to confirm, when you say in
3   your declaration about the other books that the
4   title was pulled from circulation and the title
5   remains in storage, you mean all copies of that
6   book, correct?
7       A.   Yes, correct.
8       Q.   Okay.  Can we pull out Exhibit 1?  So I just
9   want to go through this and understand what steps
10  you took to prepare for today's deposition regarding
11  some of these topics that were noticed for the
12  deposition.  Okay?
13           Topic 2:  The creation, maintenance and
14  meaning of the spreadsheet identified in
15  Paragraph 66 of the amended complaint, or any prior
16  or subsequent version of that document.
17           That's the Reconsiderations Spreadsheet?
18      A.   Yes.
19      Q.   Can you tell me what you did to prepare for
20  this deposition to be prepared to testify as to that
21  topic?
22      A.   I looked at the version history of the
23  Reconsiderations Spreadsheet and just tried to
24  familiarize myself with the changes that occurred
25  over time.
```

Deposition of Bradley Vinson, Volume 2

```
 1        Q.   Did you take any steps to determine if there
 2   had been prior nonpublic versions of that document?
 3        A.   No, I did not take those steps, and I do not
 4   have access to Michelle White's drive beyond things
 5   that she shared with me actively before she left.
 6        Q.   Did you seek access to her drive in
 7   preparation for this deposition regarding any
 8   topics?
 9        A.   I did not seek access to her drive, no.
10        Q.   Okay.  Did you speak to anybody about -- in
11   preparation for testimony on Topic 2?
12             MS. SMITH:  Outside of your attorneys,
13        please.
14        A.   Outside of attorneys, no.
15        Q.   And just to clarify, if you spoke to
16   somebody and they were in a meeting with you and
17   your attorneys, you can still identify that person.
18   So was there anybody other than an attorney you
19   spoke with?
20             MS. SMITH:  No, I would still give the same
21        instruction if it discloses the subject of what
22        we discussed within an attorney-client meeting.
23        Q.   Did you speak --
24             MR. LEV:  I'm going to ask the question so
25        we can make a clear record.  Okay?
```

Deposition of Bradley Vinson, Volume 2

```
1              MS. SMITH:  Yeah, ask it again.  Go ahead.
2    BY MR. LEV:
3         Q.   Did you speak with anybody in preparation
4    for your testimony regarding Topic 2 other than your
5    attorneys but including anybody you spoke with while
6    your attorneys were present?  I'm only asking a
7    yes-or-no question.
8         A.   Yes.
9              MS. SMITH:  Hold on.
10        Q.   Let her make her objections.
11             MS. SMITH:  I'm instructing you not to
12        answer on the basis of work product privilege and
13        attorney-client privilege to the extent that your
14        response would necessarily reveal communications
15        that occurred in a privileged setting.
16             MR. LEV:  I just want to clarify, Nicole.
17        My question is a yes-or-no question, whether
18        there was anybody other than your attorneys.
19        You're saying to answer to say was there anybody
20        else present is itself a work product --
21        protected by work protect privilege?
22             MS. SMITH:  If I'm understanding your
23        question to be about whether certain topics were
24        discussed within the context of a privileged
25        setting, yes, her answer yes or no would
```

Deposition of Bradley Vinson, Volume 2

```
 1        necessarily reveal that a specific topic was

 2        discussed during a privileged meeting.

 3             MR. LEV:  Okay.  I think that's outrageous

 4        but that's okay.

 5             MS. SMITH:  Maybe you can ask it a different

 6        way.

 7   BY MR. LEV:

 8        Q.   Well, I can try this.  In any of your prep

 9   sessions with your lawyers for this deposition, was

10   anybody present other than you and your lawyers?

11        A.   Yes.

12        Q.   Okay.  Who was present at any of those prep

13   sessions?  Can you identify those people?

14             MS. SMITH:  You can answer that.

15        A.   Brian Johnson.

16        Q.   Who is that?

17        A.   He is with the school district.  He is

18   involved with IT and I believe was responsible for

19   providing e-mails.

20        Q.   Anybody else?

21             MS. SMITH:  He's just asking about

22        preparation sessions for this depo, not -- if I'm

23        understanding, you're just asking about meetings

24        in preparation.

25        Q.   Any preparation meetings for this
```

1    deposition.

2        A.    Besides Ellen Odom, I don't know of anyone

3    else.

4        Q.    Okay.  So the only people you talked to in

5    preparing for this deposition with regard to all the

6    topics were your attorneys, Ellen Odom, and Brian

7    Johnson?

8        A.    Yes, I believe that's an accurate statement.

9        Q.    Okay.  Did you speak to any board members in

10    preparing for this deposition?

11        A.    No.

12        Q.    Did you speak to Keith Leonard in preparing

13    for this deposition?

14        A.    Not in preparing for the deposition.

15        Q.    Did you speak to Tim Smith in preparing for

16    the deposition?

17        A.    No.

18        Q.    Did you speak to Michelle White in preparing

19    for the deposition?

20        A.    No.

21        Q.    Okay.  Can you tell me what you did to

22    prepare to testify with respect to Topic 3 of the

23    deposition notice, which is the creation,

24    maintenance, and meaning of the flowchart that we

25    talked about, as well as the spreadsheets that are

Deposition of Bradley Vinson, Volume 2

```
 1   linked there?
 2       A.    That was my flowchart.  In preparing for
 3   this deposition I did not talk to anyone
 4   specifically but that was a flowchart that I created
 5   with assistance from Linda Sweeting.
 6       Q.    So did you do anything to prepare or you
 7   just assumed your knowledge of the flowchart and the
 8   spreadsheets linked there, you knew that
 9   information?
10       A.    I reviewed some of the spreadsheets.  I
11   reviewed the spreadsheets there in preparation for
12   the meeting.
13       Q.    For the deposition?
14       A.    For the deposition.  Sorry.
15       Q.    What did you do to prepare for Topic 4
16   regarding the school district's reading material
17   acquisition policy or practice, and it contains four
18   subparts?
19       A.    I reviewed our policy, I reviewed versions
20   of our policy, and I relied on my own knowledge.
21       Q.    Okay.  What did you do to prepare for
22   Topic 5, which is about any school level review
23   committee formed in response to or to evaluate book
24   challenges, including the MRCs and school materials
25   review committees?
```

Deposition of Bradley Vinson, Volume 2

```
1        A.   I searched -- I searched through what was

2   available to me in my drive, and I know it says any

3   school level review committee but it also includes

4   the DMRCs, so I was looking through our

5   documentation related to book challenges and

6   reviewed the District Materials Review Committees'

7   -- their restriction SOP and links from that to the

8   different documentation that Michelle White

9   maintained, and --

10       Q.   Did you do anything to -- I'm sorry.  I

11  didn't mean to cut you off.

12       A.   And looked back at the spreadsheet, at the

13  committee meeting dates, just to familiarize myself

14  with how they operated, you know, at the first

15  meeting and then the second meeting.

16       Q.   Did you -- going back to Topic 2, did you

17  speak with Brian Johnson about -- in preparation for

18  Topic 2?  Give your attorney a chance to object if

19  she wants to.

20            MS. SMITH:  You can answer.

21       Q.   Did you speak with Brian Johnson in

22  preparation for Topic 2?

23       A.   I think it was through a conversations with

24  Brian Johnson where we realized how we could look at

25  the version histories of the whole spreadsheet and
```

1    we could look at the individual cell histories,

2    which I was familiar but I hadn't been utilizing the

3    version history of the whole spreadsheet before that

4    conversation with him.

5        Q.   Okay.  Did you talk with Brian Johnson in

6    preparation for your testimony regarding Topic 3?

7        A.   No.

8        Q.   Did you talk to Brian Johnson in preparation

9    for your testimony regarding any of the other

10   topics?  I can ask them one by one if you prefer

11   but --

12       A.   No.  My understanding is that he provided

13   e-mails and so it probably would have been good for

14   me to see what e-mails were provided so that I could

15   have reviewed those more thoroughly, but no, I don't

16   think that I actually talked to him about that.

17       Q.   Did you review materials that were produced

18   by the school board in this litigation in

19   preparation for the deposition?

20       A.   Can you tell me which ones we're referring,

21   what we're referring to?

22            MS. SMITH:  The thousands upon thousands of

23       documents?  No, Ori.

24       Q.   Did you review any e-mails that were

25   produced in this litigation in preparation for this

Deposition of Bradley Vinson, Volume 2

```
 1   deposition?
 2        A.   I do not remember seeing the full list of
 3   e-mails that were provided for this.
 4        Q.   And I wouldn't expect you to have reviewed
 5   the full list.  Did you review any e-mails that had
 6   been produced in the course of the litigation?
 7        A.   I think only if they were e-mails that I was
 8   included on.
 9        Q.   Okay.  Did you review Michelle White's
10   deposition transcript in preparing for this
11   deposition?
12        A.   Yes, I did.
13        Q.   And did you review the exhibits to her
14   deposition in preparing for this deposition?
15        A.   I do not think that I had access to the
16   exhibits in her deposition.  No, wait.
17             THE WITNESS:  Do I have access?
18        A.   I'm trying to remember.  I'm sorry.
19        Q.   I'm happy to go off the record if you'd
20   like.
21        A.   I'm trying to remember if I remember seeing
22   the exhibits at the end.  Okay.  If I had the
23   exhibits at the end, I don't recall them well enough
24   to speak to them.
25             MS. SMITH:  That's fine.  We can have her
```

Deposition of Bradley Vinson, Volume 2

```
 1        answer the question.
 2            MR. LEV:  Let's go off the record for a
 3        second.
 4                (Discussion off the record.)
 5            (Recess from 4:05 p.m. until 4:09 p.m.)
 6   BY MR. LEV:
 7        Q.   Ms. Vinson, we were discussing what
 8   documents you had reviewed in preparation for this
 9   deposition and I had asked you if you had reviewed
10   the exhibits to Michelle White's deposition.
11        A.   Yes.  And I'm sorry, I had -- I only was
12   able to read through that deposition once and I
13   think that I got confused about what was included
14   there, but the exhibits were provided to me and I
15   was able to review them.
16        Q.   Okay.  Did you read any other deposition
17   transcripts in preparation for this deposition?
18        A.   No.
19        Q.   Okay.  And I just want to go back, because I
20   had also asked you earlier if you reviewed any of
21   the e-mails that were produced in this litigation in
22   preparation for this deposition, and you had
23   indicated you hadn't.  I didn't know if there was
24   any clarification to that or not.
25        A.   Again, the e-mails that were provided to me
```

1    or if e-mails were included, we might have

2    discussed, you know.

3        Q.   E-mails that were provided to you meaning

4    e-mails that you were a recipient or sender of?

5        A.   Yes.

6        Q.   Or e-mails that were, for example, part of

7    the Michelle White deposition, but, otherwise, you

8    did not review any e-mails in preparation for

9    today's deposition?

10       A.   Correct.

11       Q.   Okay.  And going back to the topic-by-topic

12   questions, with respect to Topic 5, what did you do

13   to prepare with regard to School Materials Review

14   Committees?

15       A.   That was where I went back and I looked

16   through the documentation that Michelle White had

17   maintained and linked out from the Reconsiderations

18   page, and if I had e-mails, I took a look at those

19   as well, and...

20       Q.   Okay.  When you say the documentation

21   Michelle White maintained, you mean the publicly

22   available information that's linkable from the

23   Reconsiderations Spreadsheet, or something else?

24       A.   Yes, it is part of those packets that's

25   available from the spreadsheet.

Deposition of Bradley Vinson, Volume 2

1    Q.    And you said you looked at your e-mails.

2  What does that mean?  What e-mails did you look at

3  or how did you search your e-mails in preparation

4  for this Topic Number 5 and the School Materials

5  Review Committee specifically?

6    A.    If I had e-mails related to review

7  committees, I just took a quick look at those.

8    Q.    How would you identify if you had those?

9  Did you search your e-mail somehow?

10    A.    I would search my e-mail, yes.

11    Q.    You did that?

12    A.    Yes.  And I also mentioned the

13  reconsideration SOP, I took a look at that, and

14  looked at the things that are linked out from that

15  from Michelle White's documentation.

16    Q.    And did you talk to anybody in preparation

17  for your testimony on Topic 5?

18        MS. SMITH:  Outside of your lawyers.

19    A.    Outside of counsel?

20    Q.    Outside of counsel.

21    A.    No.

22    Q.    Okay.  What about Topic 6, the school

23  board's policy or practice, and process, for

24  evaluating book challenges, including any school

25  board criteria for making book removal or

1    book restriction decisions and any plans and

2    timelines for evaluating the book challenges, what

3    did you do to prepare for your testimony on Topic 6?

4        A.    I reviewed the policy in relation to book

5    challenges, I read through HB 1467 again, which was

6    what led to the school board adopting this policy,

7    and I think that this also involved looking at those

8    District Materials Review processes and packets.

9        Q.    Anything else?

10       A.    No.

11       Q.    Did you talk to anybody outside of counsel

12   in preparation for your testimony on Topic 6?

13       A.    No.

14       Q.    Okay.  Did you do anything in particular to

15   prepare for testimony regarding the school board

16   criteria for making book removal or book restriction

17   decisions?

18       A.    That would be part of our policy.  Beyond

19   that, I do not know that we have any criteria that

20   are available in a document.

21       Q.    Are there any criteria for the school board

22   making book removal or book restriction decisions in

23   the policy?

24       A.    It may be something that you could interpret

25   as being part of the selection, where our selection

 1   indicates that it should be age-appropriate

 2   material, for example.

 3       Q.   Okay.  What did you do to prepare for your

 4   testimony regarding Topic 7, communications with the

 5   State of Florida or any agency or department thereof

 6   regarding book challenges, book restrictions, book

 7   removal, et cetera?

 8       A.   I was relying on my memory for that one and

 9   my memory was that I asked a question and I did not

10   necessarily receive a response, so I did not search

11   back for that.

12       Q.   Did you take any steps to determine whether

13   any other employees of the school district or school

14   board had such communications with the State of

15   Florida or an agency or department of the State of

16   Florida?

17       A.   I did not take those steps.

18       Q.   Did you talk to anybody in preparing for

19   your testimony on Topic 7?

20       A.   No.

21       Q.   Okay.  What steps did you take -- I think we

22   can skip Number 8.

23            What steps did you take regarding your

24   testimony with respect to Topic Number 9, the

25   identify of the restricted or removed books that

Deposition of Bradley Vinson, Volume 2

1   have been removed and the process leading to their

2   removal?

3       A.   Again, this goes back to reviewing those

4   District Materials Review packets to be familiar

5   with those that were restricted or removed, and then

6   also just being generally familiar with the titles

7   on the spreadsheet on the Current Challenges tab as

8   well.

9       Q.   Did you talk to anybody in preparation for

10  your testimony on Topic 9?

11      A.   Outside of counsel, no.

12      Q.   Did you review any other documents other

13  than those publicly available records in preparation

14  for your testimony on Topic 9?

15      A.   No.

16      Q.   Okay.  And are the answers for Topic 10 the

17  same as for Topic 9 in terms of the scope of

18  preparation, who you spoke to and the documents you

19  reviewed, the difference is only --

20      A.   Yes.  Restricted or removed, yes.

21      Q.   Same answers?

22      A.   Same answers.

23      Q.   Okay.  And I don't think I asked this but on

24  the communications with the State of Florida on

25  Topic 7, did you review any documents in preparation

Deposition of Bradley Vinson, Volume 2

1    for your testimony on that topic?  You said you

2    worked off of memory but I didn't ask the specific

3    question.

4        A.   I have recently completed the updated

5    library media training, so that applies and that is

6    from the State of Florida, but that is not

7    a communication with that agency.

8            I reviewed their rule adoption process just

9    to -- I think that was in the process of me trying

10   to find what the previous training was.  I was

11   looking through the documentation related to that

12   training to see if I could find the old version of

13   the training to compare them side by side, so...

14       Q.   Okay.  What about Topic 11, the identity of

15   the restricted or removed books that were previously

16   restricted and which are no longer restricted, what

17   did you do to prepare for your testimony on that

18   topic?

19       A.   Similar to what we were doing here.  I would

20   look at that version history to see what edits were

21   made at what time for individual titles as far as

22   the restricted status in the Reconsiderations

23   Spreadsheet, and then I also looked through my

24   e-mails which I received as a media specialist

25   trying to determine from fall of 2022, if I could,

1  what the process for restricting or what the

2  criteria for restricting those books would have been

3  at that time.

4      Q.   And how did you identify those e-mails to

5  review?

6      A.   I searched for the book titles in my e-mail.

7      Q.   And were you just looking at the 20 book

8  titles that you unrestricted in April or was it a

9  broader search?

10      A.   It was a broader search.  I searched for

11  other titles as well.

12      Q.   And did you speak to anybody in preparation

13  for your testimony on Topic 11?

14      A.   Outside of counsel, no.

15      Q.   Okay.  And did you review any other

16  documents other than what you've just described in

17  preparation for your testimony on Topic 11?

18      A.   Actually, can I go back?  I would have

19  discussed this with Linda Sweeting because she and I

20  would sometimes discuss trying to figure out why

21  something was restricted at some points in time, so

22  I'll amend to say that Linda Sweeting and I have

23  discussed this, not necessarily in preparation for

24  this deposition.

25      Q.   I see.  Did you specifically, though, have

Deposition of Bradley Vinson, Volume 2

```
 1    discussions with Linda Sweeting in preparation for

 2    this deposition, sort of, "Oh, I have this topic I

 3    need to be prepared to speak to"?

 4        A.   No.

 5        Q.   Okay.  When did Linda Sweeting take on her

 6    current role?

 7        A.   Around the same time that I did.

 8        Q.   Okay.  And what was her role prior to that?

 9        A.   She was also an elementary media specialist

10    but also had experience before that working in IT.

11        Q.   Okay.  What about Topic 12, the role of the

12    superintendent with respect to a book challenge,

13    book removal, or book restriction, what did you do

14    to prepare for your testimony on that topic?

15        A.   I reviewed the policy and the -- what's the

16    word I'm looking for?  I'm sorry.  What the policy

17    determines is something that would be in the role of

18    the superintendent.

19             So, as we pointed out earlier, in the

20    earlier versions the superintendent could dismiss

21    those that were frivolous or, in the most recent

22    one, even though we have not utilized it, the

23    superintendent could determine we would remove it in

24    coordination with the Media Services Coordinator.

25             As far as the book restrictions, I did not
```

Deposition of Bradley Vinson, Volume 2

1    have access to e-mails outside of what was produced

2    indicating what the communications would have been

3    between the school superintendent and others, like

4    Michelle White, regarding restrictions.

5        Q.   Did you review any of the e-mail that were

6    produced that related to Tim Smith's involvement in

7    book restrictions?

8        A.   I would need to look back at -- I think I

9    would need to look back at documentation.  Yes, I

10   remember seeing some.

11       Q.   I'm asking about the process you undertook

12   to prepare for this deposition.  You told me you

13   spent 25 hours, approximately, preparing.

14       A.   Yes.

15       Q.   And I'd like to understand whether as part

16   of that process you reviewed e-mails relating to Tim

17   Smith's role with respect to book challenges, book

18   removals, or book restrictions, and you're telling

19   me you don't know as you sit here today whether you

20   reviewed such e-mails or not as part of your

21   preparation?

22            MS. SMITH:  Objection; misstates testimony.

23       A.   I did review at least some e-mails related

24   to this because I remember seeing the press release,

25   which would have been communication from Tim Smith,

Deposition of Bradley Vinson, Volume 2

1  regarding the initial restriction of all of the

2  books that were challenged.

3      Q.   Did you review e-mail between Tim Smith and

4  Michelle White about whether certain books should or

5  should not be restricted pending challenge?

6      A.   In preparation for this?

7      Q.   Yes.

8      A.   I don't recall.  I think I'm -- the e-mails

9  I've seen here in deposition are running together

10 with the e-mails I would have seen in other

11 documentation related to this case.

12     Q.   Did your counsel provide you documents to

13 review in preparation for this deposition?

14     A.   What do you mean by documents?

15     Q.   I'm sort of flabbergasted by the question.

16     A.   I mean, there are documents that have been

17 provided by counsel.

18     Q.   I'm asking specifically in connection with

19 your preparation for this deposition.  Did counsel

20 provide you with documents, whether in physical or

21 electronic forms, paper, pieces of paper that have

22 words on them?

23     A.   Yes.

24     Q.   PDF files, e-mails, spreadsheets.  Did they

25 provide you with any documents --

```
 1        A.    Yes.

 2        Q.    -- in preparation for the deposition?

 3              MS. SMITH:  Don't get flustered by the word

 4        "document."  It doesn't have any specific legal

 5        meaning, so any documents.

 6        A.    Yes.

 7        Q.    Correct.  Did they provide you with

 8    documents to review in connection with Topic 12, the

 9    role of the superintendent?

10              MS. SMITH:  So I'll instruct you if there is

11        documents that you used to refresh your

12        recollection or to prepare for certain topics,

13        feel free to identify them, if you recall.

14        A.    I would need to go back and refresh my

15    memory on e-mails that I've seen between Tim Smith

16    and Michelle White.  I can't remember exactly where

17    they were located.  I'm sorry.

18        Q.    What did you do to prepare for Topic 13, the

19    role of the Coordinator of Media Services with

20    respect to book challenge, book removal or book

21    restrictions?

22        A.    Again, that was part of reviewing the policy

23    and reviewing the documentation related to the book

24    challenges and book restrictions.  I viewed the

25    is -- some of the meetings I viewed again.  I had
```

Deposition of Bradley Vinson, Volume 2

1    attended many of them in my previous role, or I

2    watched them online, but I did watch some of them

3    again to refresh my memory to see the presentations

4    that Michelle White would make regarding the

5    information provided on each book, and, you know,

6    refreshed my memory on her SOP and different ways

7    that she would document the process.

8         Q.   Did you speak to anybody in preparation for

9    your testimony on Topic 13 other than counsel?

10        A.   Outside of counsel, no.

11        Q.   And did you review any e-mails regarding the

12   role of the Coordinator of Media Services regarding

13   book challenges, book removal or book restrictions

14   in preparation for your testimony on Topic 13?

15        A.   Outside of e-mails that I received, no.

16        Q.   Okay.  Topic 14 talks about the book

17   restriction process, who made those decisions, the

18   reasons for those decisions.  Tell me what you did

19   to prepare for your testimony on Topic 14?

20        A.   I again looked back at the versions of the

21   Reconsiderations Spreadsheet.  I reviewed e-mails

22   where I could see when something was restricted or

23   unrestricted.  I looked through some information

24   that I have available related to those restrictions,

25   they were forms that Michelle White generated and

 1   sent out, where she collected the school's response

 2   as to whether or not a book had been restricted or

 3   unrestricted, just to see if I could tell what

 4   criteria were being applied in order to restrict or

 5   not restrict a book.

 6        I don't know outside of what I would try

 7   to -- I could not find a consistent method across

 8   the board for why some things were restricted and

 9   some things were not.

10   Q.  And you said you reviewed e-mails about

11   restrictions.  Those were e-mails you received as a

12   media specialist?

13   A.  Correct.

14   Q.  And what I'm hearing you say now, and from

15   earlier testimony, is your effort to be prepared to

16   speak to the reasons that certain books were subject

17   to restrictions was basically looking at the e-mails

18   you received as a media specialist and the fact that

19   some books were restricted and others weren't and

20   trying to discern from that the reasons for the

21   decisions that had been made; is that correct?

22        MS. SMITH:  Form.

23   A.  I mean, I also viewed board meetings.

24   Q.  The board meetings, though, had nothing to

25   do with the restrictions, right?

Deposition of Bradley Vinson, Volume 2

```
 1       A.   Exactly.  That's what I was getting to, is

 2   that I was looking to see if there may have been

 3   information there that helped me discern the

 4   reasons.

 5       Q.   Okay.  Did you speak to anybody outside of

 6   counsel about -- in preparation for your testimony

 7   on Topic 14?

 8       A.   In preparation for the testimony, no.

 9       Q.   Okay.  Topic 15, all policies or practices

10   that have been in place regarding which reading

11   materials subject to a challenge are subject to

12   restricted access, can you tell me what you did to

13   prepare for your testimony on that topic?

14       A.   Again, I reviewed the policies that changed

15   over time, I reviewed the laws, 1467 and then 1069.

16   For practices, I reviewed that reconsiderations SOP

17   and all of the items that were linked out of there,

18   and again, I could not find documentation for why

19   particular books were put in restricted access, only

20   documentation that they were put in restricted

21   access.

22       Q.   Okay.  Did you talk to anybody in

23   preparation for your testimony on Topic 15 outside

24   of counsel?

25       A.   No.
```

1    Q.   Okay.  Topic 17 talks about Policy 4.06 with

2    respect to book challenges and its changes over

3    time, but it also talks about any policy or practice

4    regarding book challenges that deviated from, was

5    inconsistent with, or supplemented the version of

6    Policy 4.06 in effect at that time.  I really just

7    want to focus on that part of the topic and what you

8    did to prepare to understand whether there were

9    policies or practices that deviated from what was

10   written in 4.06?

11   A.   I mean, this is related to the materials

12   that -- challenges that were received before we had

13   an adopted policy.  Unlike with HB 1069, the policy

14   that was adopted in December of 2022 was not

15   something that we did by an emergency rule adoption,

16   so the restrictions that took place prior to that

17   were practice and not policy.

18   Q.   So what did you do to prepare for your

19   testimony regarding the practices that were

20   inconsistent with, deviated from, or supplemented

21   the written policy in effect at any given time?

22   A.   I think this is all, again, wrapped up in my

23   review of the policies themselves and my examination

24   of the books and the dates that they were restricted

25   or -- yeah.

Deposition of Bradley Vinson, Volume 2

```
1      Q.   Did you speak with anybody in preparation
2    for your testimony on Topic 17?
3      A.   Outside of counsel, no.
4      Q.   Okay.  Almost done.  Can you tell me what
5    you did to prepare for your testimony on Topic 18
6    regarding HB 1069 and its applicability?
7      A.   I reread 1069.
8      Q.   Anything else?
9      A.   Not specifically to that topic.
10     Q.   Okay.  What about -- did you talk to anybody
11   in preparing for your testimony on Topic 18 other
12   than counsel?
13     A.   No.
14     Q.   What did you do to prepare for your
15   testimony on Topic 19 about HB 1557?
16     A.   I did go back and look at my e-mail with the
17   settlement attachment, and then I also, as I
18   mentioned before, was trying to find some
19   consistency as far as the application of 1557.
20   There were titles that I unrestricted in April that
21   I found an e-mail that had some of those titles that
22   were unrestricted and others that remained
23   restricted, and so I just -- I could not find
24   consistent practice in my search through those
25   communications from that time period.
```

1          And then as far as further preparation, I

2     did go back and search for when I sent an e-mail to

3     Ellen Odom asking about some of those books, and

4     that was September of 2023, initially, but did not

5     feel like there was -- I did not have access to

6     communication from the State that clarified it at

7     that point in time, until later.

8          Q.   Did you review any of the materials that

9     have been filed in this litigation regarding -- in

10    preparation for your testimony on Topic 19?

11         MS. SMITH:   Form.

12         A.   I would need to be -- I would need to look

13    through.   There is a lot of materials.   I'm sorry.

14         Q.   We looked at an exhibit in this case that

15    was an e-mail from Michelle White to a reporter

16    where she stated that HB 1557 was the basis for

17    restricting books in elementary school.   Had you

18    reviewed that e-mail in preparation for your

19    testimony on Topic 19?

20         A.   Was that an exhibit in her deposition?

21         MS. SMITH:   I believe it was.

22         Q.   I don't know.

23         A.   I would have to look back and refresh my

24    memory.

25         Q.   Let's see if we can find that e-mail.

Deposition of Bradley Vinson, Volume 2

```
 1              Let's look at Exhibit 34.
 2      A.   I don't have it.
 3      Q.   I think maybe it was in yesterday's exhibit
 4   pile.  Ellinor is grabbing it.
 5      A.   It would go right there.
 6           MS. HEYWOOD:  34.
 7           THE WITNESS:  Thank you.
 8   BY MR. LEV:
 9      Q.   Have you reviewed this e-mail in preparation
10   for your testimony on Topic 19?
11      A.   I don't recall seeing it in preparation but
12   it could just be that my recollection is jumbled
13   after seeing all of these documents.
14      Q.   And can you tell me what you did to prepare
15   for your testimony on Topic 20 regarding HB 7?
16      A.   I did look at HB 7 again, I have it printed
17   out somewhere, but I really didn't see -- in my
18   reading of it, I didn't see how it applied directly.
19      Q.   Okay.  Did you do anything else to prepare
20   for your testimony other than review the statute?
21      A.   For Topic 20?
22      Q.   Yes.
23      A.   Outside of discussion with counsel, no.
24      Q.   Did you talk to anybody else?
25      A.   No.
```

Deposition of Bradley Vinson, Volume 2

1    Q.    Did you review any other documents?

2    A.    Any other documents for Topic 20?

3    Q.    Yeah.

4    A.    I'm sorry.  No.

5    Q.    Yeah.  Sorry.

6          Okay.  Let me ask -- I want to ask you some

7    questions in your individual capacity, so not as a

8    representative of the school board.

9    A.    Okay.

10   Q.    This is Bradley Vinson, person.

11   A.    Person.

12   Q.    How did you feel about taking on the role of

13   Coordinator of Media Services in light of the

14   pending book challenges and the impending going into

15   effect of HB 1069?

16         MS. SMITH:  Form.

17   A.    I had concerns related to the volume of book

18   challenges.  I knew it was a big job but I

19   personally felt supported, you know, both at home

20   and at work.  I feel like there are individuals

21   around me that were supportive and I knew that there

22   would also be the media specialists TSA position to

23   support, which was something that Michelle White did

24   not have.

25   Q.    Were you concerned at all about the

Deposition of Bradley Vinson, Volume 2

1    district's approach to its handling of book

2    challenges prior to your assuming that role?

3            MS. SMITH:  Form.

4        A.  Was I concerned about the district's

5    approach to handling book challenges?

6        Q.  Yeah.

7        A.  I wasn't sure how we would reach a consensus

8    when it seems like we have members of the public,

9    you know, coming before the board and speaking very

10   strongly one way, and others speaking very strongly

11   another way.  I wondered how we would reach

12   consensus.

13       Q.  It's interesting to me that you use the word

14   "consensus" and you used a similar word earlier.  Is

15   that the goal, to reach consensus?

16           MS. SMITH:  Form.

17       A.  Consensus in an ideal world is a nice thing.

18   Certainly we'll need to reach, you know, some sort

19   of conclusion.

20       Q.  Were you concerned when you took the role

21   about the school board's views and approach to book

22   restrictions and challenges?

23           MS. SMITH:  Form.

24       A.  I was seeing movement to -- away from

25   completely removing materials towards the more

1    nuanced approach of restricting the access to

2    materials to what was considering an age-appropriate

3    audience and I saw that as a positive development.

4        Q.    Where did you see that movement?  What made

5    you see that, like what specifically?

6        A.    I'm referring to I believe it was the March

7    meeting, where they had four titles to consider and

8    rather than removing those titles completely, they

9    looked very carefully at those items and determined

10   the appropriate age level audience, which, yes, it

11   did entail removing them from some collections but

12   they were ultimately retained by the school

13   district.

14       Q.    Okay.  Are you troubled by the length of

15   time that the challenge books that are still

16   restricted have been unavailable to students?

17       A.    I am ready to resume the review process.

18   The pause was something that happened before I took

19   my position, and so getting to a point of consensus

20   within the district, where we could say here's a way

21   to move forward and to unpause and to get moving on

22   these was something that was a positive for me.

23       Q.    How many years have you been a librarian?

24       A.    In the school library or public library, or

25   just in general?

1    Q.   In general.

2    A.   In general.  So I started -- I mean, I

3  worked in a public library in a part-time capacity

4  as a teenager, straight out of high school, in my

5  local public library.  I worked in the academic

6  library when I was at Florida State University, and

7  then I began work, again, since 1999.  So I've been

8  in libraries since 1999 in a paid capacity.  Before

9  that I had been a volunteer.  I received my master's

10  in 2006, so I was in a professional librarian

11  capacity after that.

12    Q.   Okay.  Do you think it's harmful for

13  students to have books about people who are like

14  them be removed from their libraries?

15        MS. SMITH:  Objection; form.

16    A.   Can you rephrase that question so I can

17  understand what you're talking about specifically?

18    Q.   Whether you think it's harmful for students

19  to not have access to books about people like them,

20  their race, their ethnicity, their sexual identity,

21  their family situation?

22        MS. SMITH:  Form.

23    A.   I do find it valuable for students to have

24  access to books that reflect their own experiences.

25    Q.   And if we -- with respect to the challenges

Deposition of Bradley Vinson, Volume 2

```
 1    that have been decided by the board and are at issue
 2    in this lawsuit, if you were a board member and the
 3    book "All Boys Aren't Blue" was presented to you,
 4    what would your decision have been about whether
 5    that book should remain in high schools?
 6         MS. SMITH:  Objection; form.
 7    A.    I would want to read that book for myself
 8    and I have not read it in its entirety before I
 9    could make a determination.
10    Q.    But you've told me that you make all sorts
11    of determinations in the course of your current job
12    about age appropriateness based on professional
13    reviews and the like.
14    A.    Yes.
15    Q.    Okay.  Have you read the materials that were
16    compiled for the board meeting about "All Boys
17    Aren't Blue"?
18    A.    Yes.
19    Q.    And based on those materials, do you support
20    the decision to remove the title from high school
21    libraries or do you think that it should have
22    remained available for students in high school
23    libraries, recognizing that parents always had the
24    opportunity to restrict their students' access?
25         MS. SMITH:  Form.
```

Deposition of Bradley Vinson, Volume 2

```
 1        A.   I'm not sure how I would have voted as it

 2   stood.  I do think that the book would be

 3   inappropriate for younger audience levels.  I think

 4   that it touches on mature themes that I would not

 5   find appropriate in an elementary or a middle school

 6   collection.  I would really have to question its

 7   inclusion in a high school collection and I think

 8   that knowing what I know, I would want to read the

 9   book myself.

10        Q.   What about "The Bluest Eye," have you read

11   that book?

12        A.   I have not.

13        Q.   Have you reviewed the material that was

14   provided to the board about "The Bluest Eye"?

15        A.   Yes.

16        Q.   And based on that, do you think that the

17   book should be limited to only eleventh and twelfth

18   grade students, or should be available to high

19   school students more generally, recognizing that

20   parents can always restrict access if they so

21   desire?

22             MS. SMITH:  Form.

23        A.   I would want, again, to read the book myself

24   to make that determination.  It's tough to determine

25   the appropriate age level, and just like our
```

1    professional reviews have different recommendations,

2    I think I would want to look at the book more

3    closely if it were up to me alone to make that

4    determination.

5        Q.   Have you read "And Tango Makes Three"?

6        A.   Yes.

7        Q.   And what do you think about the board's

8    decision to remove that book from elementary school

9    libraries?

10           MS. SMITH:  Form.

11       A.   What do I think about the decision?

12       Q.   Yeah.

13       A.   I tend to think of "And Tango Makes Three"

14   as a book that would be appropriate in an elementary

15   collection.

16       Q.   Okay.  Have you read "Drama"?

17       A.   Yes.

18       Q.   And what do you think about the board's

19   decision to keep that book out of, I believe,

20   elementary schools?

21           MS. SMITH:  Form.

22       A.   That is a book that I actually had in my

23   collection and it features middle school characters,

24   so I can understand their decision to have it be a

25   middle school book or higher but, again, I had

Deposition of Bradley Vinson, Volume 2

```
1   selected it for my own selection and it was a book
2   that I knew fourth and fifth graders read in my
3   school and enjoyed, and they saw it as a window into
4   that next step, where they were headed.
5         Now, I will also note some of my students
6   were a little bit older.  You know, we had some
7   students who had been retained, and so a fifth
8   grader might be the age of a middle schooler at my
9   school.
10   Q.   Have you read "Lucky"?
11   A.   No, I have not.
12   Q.   Have you reviewed the board materials --
13   A.   Yes.
14   Q.   -- that were provided about "Lucky"?
15   A.   Yes.
16   Q.   And based on that, how do you feel about the
17   board's decision to remove that book from all
18   schools?
19         MS. SMITH:  Form.
20   A.   If I recall correctly, that is an adult
21   book.  Correct?  I would need to maybe look at the
22   packet one more time just to be sure, but I would
23   want to read that one, and knowing that it touches
24   on sensitive subject matter, I would just approach
25   it very carefully in the selection process.
```

```
 1        Q.   Have you read "New Kid"?

 2        A.   Yes.

 3        Q.   And what did you think about the decision to

 4   remove "New Kid" from elementary schools?

 5             MS. SMITH:  Form.

 6        A.   I would put that in the same category as

 7   "Drama."  It was a book that I had in my collection,

 8   that I selected in my collection, that my older

 9   students saw as a window into middle school.

10        Q.   Okay.  When you say you had it and selected

11   it for your collection, I take it that means that

12   you viewed it as appropriate for your elementary

13   school library collection?

14        A.   For my older students, yes.

15        Q.   Yeah.  Okay.  Have you read "Push"?

16        A.   No, I have not read "Push."

17        Q.   Have you reviewed the board materials?

18        A.   Yes.

19        Q.   And what do you think about the board's

20   decision to remove "Push" from all public school

21   libraries in Escambia County?

22             MS. SMITH:  Form.

23        A.   Again, that's one where, from the materials

24   I've reviewed, I would not consider it appropriate

25   for our lower level collections.  It's one that,
```

1    again, I would take a look at very carefully before

2    selecting and if I selected it, it would likely be

3    for the older high school students.

4        Q.   It's only available in high schools,

5    correct?

6        A.   Correct.

7        Q.   Have you read "The Nowhere Girls"?

8        A.   No, I have a copy in my car and I just

9    haven't started it yet.

10       Q.   I'm in the middle of it.

11       A.   Oh, are you?

12       Q.   Have you read the board materials about it?

13       A.   Yes.

14       Q.   Have you talked to others about that book,

15   other media specialists?

16       A.   No.

17       Q.   Based on the board materials that you've

18   read about that book, how do you feel about

19   restricting it to a eleventh and twelfth grade

20   level?

21           MS. SMITH:  Form.

22       A.   Again, I have the book to read and I would

23   want to read it before making a determination.

24       Q.   But given what you know about it from the

25   materials that you did read, the reviews that you

Deposition of Bradley Vinson, Volume 2

```
 1   otherwise relied on in your capacity as a librarian,
 2   does that feel like a correct -- an appropriate
 3   decision, or that it would be more appropriate to
 4   have it available for high school students
 5   generally?
 6            MS. SMITH:  Form.
 7       A.   I would need to look at it more carefully to
 8   make that determination.  Eleventh and twelfth grade
 9   seems like a decent decision and I know that there
10   will be differences of opinion, there may be a
11   range, but I would want to read the book if I were
12   to make a different recommendation.
13       Q.   Have you read "When Aidan Became a Brother"?
14       A.   Yes.
15       Q.   And how do you feel about the board's
16   decision to remove that book from all libraries?
17            MS. SMITH:  Form.
18       A.   I personally found that to be -- you know,
19   the character is a younger student, so it was
20   something that fit in an elementary collection
21   because those are the age students who would benefit
22   from having access to that material.
23       Q.   Did you have that book in your collection
24   when you were a librarian?
25       A.   Yes, I did.
```

Deposition of Bradley Vinson, Volume 2

```
1       Q.   So you thought it was appropriate at that
2   point in time for elementary school?
3       A.   Yes, I did.
4       Q.   How do you think the process can be
5   improved, the book challenge decision-making process
6   that we've spent two days talking about here?
7            MS. SMITH:   Form.
8       A.   More staff hours dedicated to it would
9   certainly help.  I'm pulled in a lot of different
10  directions, as is Linda Sweeting, because it is a
11  large volume of challenges, and then also HB 1069
12  presented, you know, an additional review hurdle for
13  our media specialists.  I am hopeful that the
14  proposal from our superintendent to bring in members
15  of our District Materials Review Committees from the
16  board members, from schools that apply to the board
17  members, I'm hopeful that that will help alleviate
18  the concerns that were expressed about the
19  disconnect between the District Materials Review
20  Committees in the past and the board's decisions,
21  but it's a -- we have yet to see that.
22      Q.   Do you think that the appropriate level of
23  information is being provided -- has been provided
24  to the board to enable them to make an informed
25  decision about these appeals?
```

Deposition of Bradley Vinson, Volume 2

```
 1              MS. SMITH:  Form.
 2      A.    I think they have the library media
 3   training, they have the packets, they have the
 4   books, they have educational experience.  I would
 5   need to look at all of their qualifications.  I know
 6   at least the majority of them have educational
 7   experience.
 8              I think, you know, again, I will need to
 9   review the packets and there may be things that
10   changed since the last time we had a District
11   Materials Review Committee that I may need to
12   include in those packets.
13      Q.    Do you think it would be helpful for them to
14   have views from media specialists at the level of
15   schools where these books are located to understand
16   their perspective on the value or importance of the
17   particular books at issue?
18              MS. SMITH:  Form.
19      A.    They do have access to that information.  So
20   there is a media specialist serving on that District
21   Materials Review Committee of that level of school,
22   and then the LACs from those schools that have that
23   book at that level are able to provide input and
24   those LACs include media specialists.  So there is
25   already a process in place where they can receive
```

1    comments from the media specialists.

2        Q.    The DMRC media specialist, though, that's

3    just one industry on that DMRC form.  There is no

4    way to know that, oh, the elementary school media

5    specialists, you know, think that "When Aidan

6    Becomes a Brother" is a great book to have in

7    elementary school and is age appropriate.  That

8    doesn't exist now, does it?

9        A.    No, it doesn't exit now.

10       Q.    Do you think that would be helpful?

11            MS. SMITH:  Form.

12       A.    I don't know.  I don't know.  I think that

13   we do want community feedback as well.  Yes, I mean,

14   the media specialists are selecting these books, so

15   if a media specialist selected it and it is present

16   to be objected to, then the board can assume that

17   the media specialist is in support of retaining the

18   book, but it's the additional community input that

19   we need to resolve the objection.

20       Q.    Do you think that most of the members of the

21   public who have commented on these books at the

22   board meetings have read the books?

23            MS. SMITH:  Form.

24       A.    I don't know.  I know some of them have,

25   based on their comments, but I could not attest to

Deposition of Bradley Vinson, Volume 2

1    whether or not they had all read them.

2        Q.   I realize I skipped the "Perks of Being a

3    Wallflower" when I was asking you about your views

4    of the board's decision.  Have you read that book?

5        A.   I've seen the movie but I haven't read the

6    book.  I've reviewed the packet.

7        Q.   Okay.  Based on having seen the movie and

8    having reviewed the packet, do you think that book

9    should have been limited to twelfth grade for a

10   novel study?

11        MS. SMITH:  Form.

12        A.   I mean, it was an optional novel study.  You

13   know, we -- whenever we have a novel study, our

14   permission form for the novel study includes the

15   option for a parent to opt their child out of

16   participating.  In my personal capacity, I tend to

17   think that that would cover, you know, the need to

18   meet the expectations of those parents.

19        Q.   There's no need to restrict it because

20   everyone is going to get notice of it and can opt

21   out if they don't want to read it?

22        MS. SMITH:  Form.

23        A.   For a novel study, yes.

24        MR. LEV:  I think that I have no more

25   questions for you.  Thank you very much for your

Deposition of Bradley Vinson, Volume 2

```
 1        time.

 2             Nicole, I am going to keep the deposition

 3        open because I do not believe --

 4             MS. SMITH:  We're not done.  I have

 5        questions.

 6             MR. LEV:  Okay.  I'm just going to tell you

 7        from my perspective I'm not done either because I

 8        don't think the witness was appropriately

 9        prepared for some of our topics, including, but

10        not limited to, the questions about book

11        restrictions.

12             MS. SMITH:  I understand.  I think we should

13        plan a meet-and-confer because I think we feel

14        the same about your 30(b)(6), so we'll go back

15        and forth on that.

16                  (Discussion off the record.)

17             MR. LEV:  I don't have any problem with you

18        asking questions but I just want to make sure

19        that that's your view as well and that any

20        deposition that is noticed by any party, any

21        other party, can take questions at that

22        deposition whether it's been cross-noticed or

23        not.

24             MS. SMITH:  Oh, I think the practice and the

25        rules provide as long as it's within the scope,
```

Deposition of Bradley Vinson, Volume 2

```
1        anybody can ask questions.
2            MS. HEYWOOD:  I just wanted to make sure we
3        were on the same page.
4            MS. SMITH:  Yeah, I think that -- I don't
5        want to get into specifics of the federal rules,
6        there are certain limitations as to how it can be
7        recorded and things like that but, generally,
8        Ori, I would agree, but we're having a fight
9        about that in the other case.
10           MR. LEV:  That's why I checked.  I wanted to
11       make sure we weren't being set up for a fight in
12       here.
13           MS. SMITH:  No, I don't think in this case
14       we have that issue at all.
15           THE WITNESS:  Are we off the record?
16           MR. LEV:  Off the record.
17           (Recess from 4:59 p.m. until 5:34 p.m.)
18                    CROSS-EXAMINATION
19   BY MS. SMITH:
20       Q.  All right.  Ms. Vinson, I just had a few
21   follow-up questions for you today.  So Counsel had
22   asked you some questions about "Perks of Being a
23   Wallflower."  My question is do you know, is that
24   book available in Escambia County high school
25   libraries?
```

1    A.    Yes, it is currently available in libraries.

2  The challenge to that was on the basis of its use as

3  an optional novel study for twelfth grade.

4    Q.    Okay.  Counsel asked you questions about

5  interlibrary loans.  Do you remember that?

6    A.    Yes.

7    Q.    Okay.  Is there any formal policy that the

8  board has adopted regarding interlibrary loans?

9    A.    No, there is no formal policy there.  It was

10  just a practice that I know took place between some

11  librarians but I couldn't even say if it was all

12  librarians.

13    Q.    You testified earlier regarding the

14  district's practice for acquiring library books

15  prior to the implementation of the December 2022

16  board Policy 4.06.  Do you remember that part of

17  your testimony?

18    A.    Yes.

19    Q.    Okay.  And what was the basis for the answer

20  when you were describing what the practice was?

21    A.    Reflecting back, I do think that my basis

22  for answering that question was my own experience

23  and my own best practices, and I don't know that I

24  could really say that all media specialists were

25  employing those same practices during that period of

Deposition of Bradley Vinson, Volume 2

```
 1   time.
 2        Q.   Okay.  You testified a few times today when
 3   Counsel asked you about whether the district had
 4   timelines for completing either the 1069 reviews or
 5   resolving book challenges.  Do you remember that
 6   part of your testimony?
 7        A.   Yes.  Yes.
 8        Q.   Okay.  And, generally, you said there was
 9   not a timeline or a deadline.  Do you remember that
10   part of your testimony?
11        A.   Yes.
12        Q.   Why is that?
13        A.   I did say that.  You know, this actually
14   speaks to when I said I could use more staff hours.
15   I have a lot of other responsibilities that pull me
16   away from this issue.  For example, I know that I've
17   received e-mails during my time preparing for the
18   deposition or here related to textbooks, and it is
19   our responsibility to provide the instructional
20   materials that our students need.  This is the time
21   that they need it and that's something that always
22   takes precedence over issues and other
23   responsibilities that I have in this time.
24             I'm actually responsible for ordering
25   textbooks and making sure that we have textbooks at
```

1    our different schools for our 36,000-plus students,

2    and in some cases I'm even called upon by our

3    charter schools for information about what textbooks

4    we have adopted because some of them do follow the

5    books that we have adopted and need to order those.

6            There's questions of dual enrollment, a lot

7    of responsibilities that take precedence at various

8    times of the year, especially the beginning of the

9    year.  So the beginning of this school year and also

10   the beginning of last school year, when I was

11   getting up to speed on that process, which I was

12   less familiar with, I was spending a lot of time

13   with instructional materials, making sure that our

14   students had what they needed and that our teachers

15   had what they needed to teach.

16        MS. SMITH:  That's all the questions I have

17      here.

18        MR. LEV:  I have a few follow-ups to the

19      follow-ups.

20        MS. SMITH:  Okay.

21                REDIRECT EXAMINATION

22   BY MR. LEV:

23   Q.  With respect to interlibrary loans, do you

24   remember we looked at the opt-in form that allowed

25   parents to select full access, limited access, or no

Deposition of Bradley Vinson, Volume 2

1    access?

2        A.    Yes.

3        Q.    And that form, under full access, indicated

4    that full access included interlibrary loans,

5    correct?

6        A.    At the same grade level that that student is

7    in, yes.

8        Q.    Right.  Do you know why that statement was

9    included in that form?

10        A.    Just because a parent would not necessarily

11    think that a book from a higher level collection was

12    included in that open access.  Books from a higher

13    level may have more mature themes than the parents

14    are aware of.

15        Q.    But why did the form reference the

16    availability of interlibrary loans?

17        A.    Again, I don't know of a district practice

18    related to interlibrary loans, I just know that

19    occasionally some of us would e-mail each other to

20    get books.  So it was a practice that, you know,

21    some of us utilized but I don't know that there was

22    any sort of document governing what that should look

23    like.

24        Q.    Do you know who decided to reference

25    interlibrary loans in the form that went out to

Deposition of Bradley Vinson, Volume 2

1    parents to choose their library access and state

2    that that was part of full access?

3        A.   I think that form was created by Michelle

4    White, so I would say Michelle White, but I don't

5    know that for certain.

6        Q.   Okay.  You said that your testimony about

7    the practice of acquiring books before 2022 was

8    based on your experiences and your best practices.

9    At that time period, what was the requirement, if

10   you know, for media specialists in Escambia County

11   Public Schools in terms of education or

12   certification?

13        MS. SMITH:  Form.

14        A.   I did have to take a test to become

15   certified as a media specialist for K through 12 in

16   the state of Florida.  So in 2014, when I began

17   working in the school district, I know that that

18   exam was required.

19        Q.   And that exam included questions about

20   building a library collection?

21        A.   There would have been questions related to

22   collection development but I would have to look at

23   the -- it's been a minute since I took it.  I would

24   have to look at the exam to tell you exactly what it

25   covered.

Deposition of Bradley Vinson, Volume 2

```
 1          MR. LEV:  Understood.  I don't have anything
 2      further.  Thank you.
 3                      RECROSS-EXAMINATION
 4  BY MS. SMITH:
 5      Q.   Just one follow-up question, Ms. Vinson:  Do
 6  you know when the State of Florida began requiring a
 7  test for media specialists to become certified?
 8      A.   I actually do not know the date of that.  I
 9  have not found that in what I searched for online.
10      Q.   Okay.  So in looking at Exhibit 17, is it
11  fair to say that you don't know whether that
12  requirement would have existed in the state of
13  Florida at the time for all of these books in
14  looking at their acquisition date?
15      A.   Some of these books were acquired before
16  2014, so again, not having found that specific date,
17  I could not say that these were all added by someone
18  who took that exam.
19      Q.   Prior to implementation of House Bill 1467,
20  do you know of any requirement that a media
21  specialist had to review a book before it was added
22  to a school's library collection in this county?
23      A.   I do not know of such a requirement prior to
24  HB 146 and our policy adopted in December of 2022.
25          MS. SMITH:  Okay.  Thank you.
```

```
 1                  REDIRECT EXAMINATION
 2   BY MR. LEV:
 3      Q.   One last question:  Is it your understanding
 4   that at least since 2014 in Escambia County, media
 5   specialists had to take the test that you were
 6   referring to to be a media specialist?
 7      A.   Yes, that's my understanding.
 8           MR. LEV:  Okay.  Thank you.
 9           MS. SMITH:  I'm done.
10           MR. LEV:  I'm done, too.
11           THEREUPON, the deposition of BRADLEY VINSON,
12   Volume 2, taken at the instance of the Plaintiffs,
13   was concluded at 5:42 p.m. CDT.
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              CERTIFICATE OF REPORTER OATH

 2

 3   STATE OF FLORIDA

 4   COUNTY OF ESCAMBIA

 5          I, Susan D. Wasilewski, Registered

 6   Professional Reporter, Certified Realtime Reporter,

 7   Certified Manager of Reporting Services, Certified

 8   Realtime Captioner, Florida Professional Reporter,

 9   and Notary Public in and for the State of Florida at

10   large, hereby certify that the witness named herein

11   appeared before me on Friday, August 23, 2024, and

12   was duly sworn.

13          WITNESS my hand and official seal this

14   28th of August, 2024.

15

16

17     Susan Wasilewski         _____

18     SUSAN D. WASILEWSKI, RPR, CRR, CMRS, CRC, FPR

19     NOTARY PUBLIC - STATE OF FLORIDA

20     MY COMMISSION NO. HH 438399

21     EXPIRES:  10-23-27

22

23

24

25
```

```
 1              CERTIFICATE OF REPORTER

 2   STATE OF FLORIDA

 3   COUNTY OF ESCAMBIA

 4        I, Susan D. Wasilewski, Registered

 5   Professional Reporter, Certified Realtime Reporter,

 6   Certified Manager of Reporting Services, Certified

 7   Realtime Captioner, and Florida Professional

 8   Reporter, do hereby certify that I was authorized to

 9   and did stenographically report the examination of

10   the witness named herein; that a review of the

11   transcript was requested; and that the foregoing

12   transcript is a true record of my stenographic

13   notes.

14        I FURTHER CERTIFY that I am not related to

15   or an employee of any of the parties, nor am I

16   related to or an employee of any of the parties'

17   attorneys or counsel connected with this action, nor

18   am I financially interested in the outcome of this

19   action.

20        DATED THIS 28th of August, 2024.

21

22   _____

23   SUSAN D. WASILEWSKI, RPR, CRR, CMRS, CRC, FPR

24

25
```

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF FLORIDA
 2                      PENSACOLA DIVISION

 3              Case No. 3:23-CV-10385-TKS-ZCB

 4   PEN AMERICAN CENTER, INC.,
     et al.,
 5
         Plaintiffs,
 6   vs.

 7   ESCAMBIA COUNTY SCHOOL BOARD,

 8        Defendant.

 9   IN RE:  Deposition of Bradley Vinson, 30(b)(6) Witness
               for Escambia County School Board, and in her
10             Individual Capacity - Volume 2
               Taken:  Friday, August 23, 2024
11

12   TO: NICOLE SMITH, ESQUIRE
         nsmith@rumberger.com
13

14   Dear Ms. Smith:

15             The referenced transcript has been completed
     and awaits review and signing of the errata sheet.
16
               Thank you for agreeing to handle the reading
17   and signing process.  Today's date is August 28,
     2024.  Please complete the reading and signing by
18   September 30, 2024.

19             The original transcript of this deposition
     has been delivered to Attorney Ori Lev, and the
20   errata sheet, once completed, should be forwarded to
     Attorney Ori Lev.
21

22             Thank you.
23

24        Susan Wasilewski
          _____
          Susan Wasilewski, RPR, CRR, CMRS, CRC, FPR
25        Anchor Court Reporting
```

AnchorReporters@aol.com
(850) 432-2511

```
 1              ERRATA SHEET - Volume 2

 2   DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES ON THIS PAGE

 3   IN RE:  Pen American Center, Inc., et al., vs. Escambia
                County School Board
 4   CASE NO.:  3:23-CV-10385-TKS-ZCB

 5   Deposition of:  Bradley Vinson, 30(b)(6) Witness
                        for Escambia County School Board, and
 6                      in her Individual Capacity - Volume 2
     Taken:  Friday, August 23, 2024
 7
     PAGE #/LINE #    CHANGE                  REASON
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21   Under penalties of perjury, I declare that I have

22   read the foregoing document and that the facts

23   stated in it are true.

24
     _____    _____
25   BRADLEY VINSON                       DATE
```

Deposition of Bradley Vinson, Volume 2

**'**

**'22-'23** [1] - 524:15
**'23-'24** [2] - 524:16, 524:20

**/**

**/LINE** [1] - 644:7

**0**

**001872** [1] - 322:16
**0065348** [2] - 324:5, 517:6
**0066359** [2] - 323:24, 516:15
**0066367** [1] - 515:19
**0067489** [2] - 324:7, 553:13
**01** [1] - 322:20
**066367** [1] - 323:22

**1**

**1** [6] - 482:20, 483:4, 483:9, 490:16, 563:12, 589:8
**1,100** [1] - 526:4
**1,200** [1] - 526:4
**10** [8] - 457:8, 569:12, 569:14, 570:9, 570:16, 576:12, 578:1, 603:16
**10(A)(4** [1] - 331:23
**10(A)(4)(a** [1] - 332:3
**10(A)(4)(b** [2] - 351:23, 352:1
**10(A)(4)(c)** [1] - 352:1
**10(B)(3)(c** [1] - 326:5
**10-23-27** [1] - 641:21
**100** [1] - 520:4
**10019-5820** [1] - 320:15
**101** [2] - 319:16, 321:7
**1050** [2] - 319:16, 321:7
**1069** [143] - 328:9, 328:13, 328:16, 328:22, 329:19, 330:6, 333:11, 333:13, 334:20, 334:24, 335:4, 338:1, 339:23, 342:1, 342:13, 343:7, 344:6, 346:9, 347:25, 348:15, 348:18, 352:25, 354:5, 354:11, 354:19, 355:3, 355:13, 356:2, 361:11, 361:20, 361:23, 362:5, 362:15, 422:18,

423:14, 423:18, 424:12, 424:16, 425:10, 425:18, 425:24, 426:9, 429:4, 429:11, 429:12, 429:24, 430:2, 430:8, 430:13, 432:21, 432:24, 433:12, 434:7, 434:9, 435:8, 436:16, 438:9, 439:1, 439:6, 439:8, 439:12, 439:13, 439:16, 440:2, 440:12, 440:17, 440:22, 441:12, 441:19, 442:5, 442:17, 442:22, 442:24, 443:11, 443:25, 445:6, 445:11, 445:17, 446:2, 446:17, 447:19, 448:9, 448:19, 449:9, 449:16, 450:16, 451:1, 451:13, 457:11, 461:10, 461:25, 462:17, 463:3, 466:5, 466:7, 484:3, 490:20, 490:22, 491:1, 491:22, 492:13, 492:15, 504:18, 532:13, 539:19, 540:5, 555:4, 556:12, 560:10, 560:20, 561:22, 566:24, 567:14, 567:15, 567:21, 568:24, 569:5, 569:9, 569:25, 570:3, 570:6, 570:24, 572:11, 572:15, 572:17, 572:21, 572:22, 573:1, 574:16, 575:17, 575:19, 575:21, 582:3, 583:17, 588:5, 588:24, 612:15, 613:13, 614:6, 614:7, 617:15, 628:11, 635:4
**10:35** [1] - 404:12
**10:53** [1] - 404:12
**10th** [7] - 452:18, 456:20, 478:13, 479:15, 481:19, 481:22, 483:15
**11** [5] - 504:21, 579:10, 604:14, 605:13, 605:17
**11th** [1] - 488:11
**12** [7] - 495:21, 515:21, 517:21, 581:10, 606:11, 609:8, 638:15
**12/14/22** [2] - 446:21, 446:22
**12/19** [1] - 331:17
**12:13** [1] - 471:9
**13** [5] - 323:12, 323:14, 609:18, 610:9, 610:14
**130** [3] - 323:16, 430:10, 466:12
**1364** [1] - 326:6
**13th** [2] - 414:7, 417:19
**14** [4] - 588:12, 610:16, 610:19, 612:7

**1400** [1] - 321:14
**146** [1] - 639:24
**1467** [6] - 493:25, 495:6, 529:22, 601:5, 612:15, 639:19
**14th** [4] - 446:11, 452:8, 456:14, 464:4
**15** [3] - 564:12, 612:9, 612:23
**1557** [33] - 330:15, 357:9, 357:22, 358:12, 359:15, 359:21, 376:15, 380:22, 384:13, 384:16, 384:20, 392:2, 398:10, 402:6, 407:9, 411:1, 414:13, 417:24, 537:22, 545:2, 545:6, 545:11, 545:16, 545:21, 547:5, 547:13, 547:25, 548:4, 548:20, 549:6, 614:15, 614:19, 615:16
**163** [2] - 319:7, 320:21
**1675** [1] - 320:14
**17** [35] - 436:2, 436:3, 436:5, 436:6, 437:16, 438:18, 438:21, 444:2, 444:16, 449:4, 449:5, 451:1, 461:23, 470:14, 473:10, 479:4, 480:6, 480:14, 480:16, 480:24, 482:13, 488:15, 498:11, 498:12, 498:14, 578:6, 578:16, 578:17, 587:3, 587:20, 587:24, 588:20, 613:1, 614:2, 639:10
**1735** [1] - 320:7
**17th** [1] - 462:24
**18** [4] - 325:24, 578:21, 614:5, 614:11
**1873** [1] - 322:16
**19** [23] - 331:4, 332:7, 343:20, 351:22, 421:18, 476:3, 476:4, 493:23, 497:1, 501:9, 501:13, 502:3, 505:19, 520:13, 526:21, 538:7, 543:2, 544:23, 578:21, 614:15, 615:10, 615:19, 616:10
**19103** [1] - 320:8
**1990** [1] - 331:15
**1999** [2] - 620:7, 620:8
**19th** [4] - 320:14, 421:4, 447:24, 471:21
**1:09** [1] - 471:9
**1st** [34] - 328:4, 328:25, 329:1, 329:13, 352:7, 360:9, 360:10, 360:25, 361:1, 361:6, 361:17, 368:16, 461:1, 461:2, 465:24, 466:1, 478:17,

479:16, 483:16, 483:21, 484:2, 484:16, 485:18, 485:19, 485:22, 488:25, 489:18, 517:19, 539:25, 540:20, 540:23, 541:19, 542:3, 543:8

**2**

**2** [17] - 318:17, 322:2, 365:9, 413:25, 417:14, 482:23, 563:12, 589:13, 590:11, 591:4, 595:16, 595:18, 595:22, 640:12, 643:10, 644:1, 644:6
**20** [17] - 322:22, 322:24, 323:4, 323:6, 323:8, 323:10, 383:20, 432:8, 474:4, 477:10, 486:22, 555:7, 555:18, 605:7, 616:15, 616:21, 617:2
**20006-1811** [2] - 319:8, 320:22
**2006** [1] - 620:10
**2014** [3] - 638:16, 639:16, 640:4
**2020** [2] - 319:7, 320:21
**2022** [86] - 322:20, 326:1, 358:13, 364:3, 364:6, 365:3, 368:16, 432:15, 438:3, 446:11, 447:5, 447:10, 448:12, 449:25, 450:6, 451:23, 452:3, 452:8, 452:25, 453:5, 453:10, 453:16, 453:21, 454:3, 454:8, 454:14, 454:19, 454:24, 455:12, 455:20, 455:22, 456:2, 456:4, 456:8, 456:14, 458:4, 458:12, 458:17, 458:23, 459:4, 459:10, 459:23, 460:3, 463:24, 464:4, 471:3, 475:24, 476:5, 476:17, 477:3, 482:1, 484:24, 484:25, 485:1, 490:4, 490:5, 490:8, 491:10, 491:11, 491:13, 493:1, 493:17, 494:17, 494:18, 495:7, 495:11, 504:17, 506:25, 509:11, 520:21, 521:15, 521:20, 522:16, 523:8, 523:23, 524:3, 529:24, 545:3, 545:11, 545:24, 546:12, 604:25, 613:14, 634:15, 638:7, 639:24
**2022-2023** [1] - 524:6
**2023** [88] - 322:22, 322:24, 323:4, 323:6,

323:8, 323:10, 323:12, 323:14, 328:4, 328:9, 328:25, 329:1, 329:3, 329:13, 331:9, 334:17, 343:4, 344:17, 352:7, 353:7, 353:13, 354:16, 355:2, 355:24, 357:25, 359:20, 361:15, 361:22, 362:13, 364:6, 376:2, 380:6, 383:21, 391:13, 396:17, 401:22, 407:5, 410:20, 414:7, 417:20, 429:22, 430:1, 434:6, 447:24, 452:18, 456:20, 456:25, 457:5, 457:9, 457:15, 460:6, 462:24, 464:13, 465:24, 466:1, 475:10, 475:13, 475:18, 475:24, 476:6, 476:20, 478:14, 479:15, 481:20, 481:22, 482:3, 483:15, 485:17, 488:11, 489:13, 490:16, 491:5, 510:8, 517:19, 519:6, 532:1, 532:8, 539:18, 540:1, 540:20, 540:23, 541:19, 543:8, 568:5, 569:13, 615:4
**2023-2024** [3] - 352:13, 518:15, 519:25
**2024** [46] - 318:19, 322:3, 330:14, 330:21, 352:19, 353:9, 356:20, 357:20, 359:19, 360:9, 360:10, 361:17, 421:4, 443:20, 461:2, 471:21, 474:10, 477:4, 477:7, 478:18, 479:16, 483:22, 484:2, 485:19, 485:20, 486:2, 487:4, 487:12, 488:25, 489:18, 490:6, 490:8, 490:17, 491:14, 491:16, 492:9, 537:20, 555:8, 573:23, 641:11, 641:14, 642:20, 643:10, 643:17, 643:18, 644:6
**20th** [7] - 376:2, 380:5, 391:12, 396:17, 401:22, 407:5, 410:20
**212** [1] - 320:16
**215** [1] - 320:9
**21st** [1] - 486:2
**22-year-olds** [1] - 543:2
**222-6550** [2] - 319:18, 321:9
**223-0200** [1] - 320:16
**229** [1] - 318:17
**23** [8] - 318:19, 322:3, 374:25, 375:4, 375:22, 641:11, 643:10, 644:6

**23rd** [1] - 457:5
**24** [1] - 586:25
**25** [1] - 607:13
**25th** [6] - 459:23, 463:23, 484:24, 490:4, 490:8, 491:10
**26** [5] - 364:23, 365:3, 367:10, 587:5, 587:10
**27th** [36] - 432:15, 438:3, 447:5, 447:10, 448:12, 449:25, 450:6, 451:23, 452:3, 452:24, 453:5, 453:10, 453:16, 453:21, 454:3, 454:8, 454:14, 454:19, 454:24, 455:12, 455:20, 456:4, 456:8, 456:25, 458:4, 458:12, 458:17, 458:23, 459:4, 459:10, 460:3, 477:3, 484:25, 490:5, 491:10, 491:11
**28** [2] - 588:13, 643:17
**28th** [2] - 641:14, 642:20
**29** [1] - 323:18
**2:11** [1] - 360:9
**2:43** [1] - 538:5
**2:51** [1] - 538:5
**2nd** [3] - 477:4, 491:14, 491:16

---

### 3

**3** [18] - 338:17, 477:22, 478:1, 478:5, 478:11, 478:12, 479:13, 479:23, 480:10, 480:18, 481:1, 481:2, 481:14, 482:12, 563:14, 564:23, 593:22, 596:6
**30** [1] - 643:18
**30(b)(6** [5] - 318:15, 325:10, 632:14, 643:9, 644:5
**300** [1] - 321:14
**30th** [3] - 552:10, 552:11, 552:12
**31st** [1] - 523:8
**325** [1] - 322:7
**32502** [1] - 318:22
**32801** [3] - 319:17, 321:8, 321:15
**33** [4] - 501:12, 506:2, 510:2, 511:12
**34** [13] - 474:3, 476:11, 477:9, 487:1, 487:18, 505:21, 511:19, 513:3, 520:14, 526:22, 527:25, 616:1, 616:6
**35** [3] - 435:25, 498:3,

---

529:9
**36** [8] - 493:23, 496:23, 496:24, 496:25, 497:1, 529:10, 530:25, 531:8
**36,000-plus** [1] - 636:1
**360** [1] - 322:16
**363** [1] - 322:17
**367** [1] - 322:19
**37** [12] - 322:16, 360:2, 360:3, 360:6, 360:14, 362:22, 496:25, 497:7, 502:6, 531:10, 531:24, 538:10
**37,000** [1] - 520:8
**376** [1] - 585:25
**379** [1] - 322:22
**38** [6] - 322:17, 331:24, 331:25, 363:5, 363:7, 502:6
**382** [1] - 322:24
**388** [1] - 323:4
**39** [9] - 322:19, 343:21, 351:25, 367:12, 367:13, 367:15, 557:16, 577:25, 581:12
**395** [1] - 323:6
**3:23-CV-10385-TKS-ZCB** [3] - 318:3, 643:3, 644:4
**3rd** [3] - 457:9, 457:15, 475:10

---

### 4

**4** [6] - 332:1, 422:23, 422:24, 528:7, 577:20, 594:15
**4.06** [13] - 326:1, 331:6, 344:5, 344:17, 475:21, 494:17, 521:20, 529:24, 530:7, 613:1, 613:6, 613:10, 634:16
**40** [4] - 322:22, 379:8, 379:9, 379:13
**400** [1] - 323:8
**407** [1] - 321:16
**409** [1] - 323:10
**41** [3] - 322:24, 382:25, 383:2
**413** [1] - 323:12
**417** [1] - 323:14
**42** [7] - 323:4, 388:14, 388:15, 388:17, 391:7, 405:22, 406:1
**420** [1] - 323:16
**43** [3] - 323:6, 395:11, 395:17
**438399** [1] - 641:20
**44** [7] - 323:8, 400:20,

---

400:21, 401:1, 401:18, 404:14, 406:1
**45** [5] - 323:10, 409:24, 409:25, 410:2, 557:15
**46** [5] - 323:12, 413:9, 413:10, 413:12, 413:25
**47** [6] - 323:14, 416:25, 417:1, 417:3, 417:14, 557:16
**471** [1] - 323:18
**48** [9] - 323:16, 420:23, 421:1, 421:17, 423:1, 423:11, 430:11, 437:9, 466:16
**49** [9] - 323:18, 423:2, 471:17, 471:18, 471:20, 473:23, 474:20, 480:12, 484:21
**4:05** [1] - 598:5
**4:09** [1] - 598:5
**4:59** [1] - 633:17

---

### 5

**5** [5] - 528:16, 594:22, 599:12, 600:4, 600:17
**50** [3] - 323:20, 503:12, 503:13
**503** [1] - 323:20
**51** [7] - 323:21, 515:15, 515:16, 515:18, 516:25, 518:2, 578:23
**515** [1] - 323:21
**516** [1] - 323:23
**517** [1] - 324:4
**51st** [1] - 320:7
**52** [9] - 323:23, 516:11, 516:12, 516:14, 516:21, 520:11, 523:1, 523:2, 523:4
**53** [7] - 324:4, 517:2, 517:3, 517:5, 518:11, 520:12, 520:13
**54** [4] - 324:6, 553:8, 553:10, 553:13
**553** [1] - 324:6
**57** [2] - 462:21, 586:24
**59** [1] - 463:17
**5:34** [2] - 318:20, 633:17
**5:42** [1] - 640:13
**5th** [2] - 490:6, 490:8

---

### 6

**6** [6] - 435:21, 435:22, 482:23, 600:22, 601:3, 601:12
**6/1/2015** [1] - 436:9

---

**62** [1] - 577:20
**633** [1] - 322:8
**636** [1] - 322:9
**639** [1] - 322:10
**64** [1] - 449:24
**640** [1] - 322:11
**65** [1] - 578:9
**66** [2] - 583:22, 589:15
**66364** [1] - 323:24
**66366** [1] - 516:15
**67490** [1] - 324:7

---

### 7

**7** [40] - 359:1, 359:3, 359:8, 359:23, 374:24, 375:2, 375:7, 376:15, 380:22, 384:13, 392:2, 398:10, 402:6, 407:8, 411:1, 414:13, 417:24, 482:20, 483:4, 483:9, 483:23, 545:24, 546:1, 546:4, 546:8, 546:11, 546:15, 546:19, 546:21, 548:9, 548:13, 548:20, 584:3, 584:6, 584:10, 602:4, 602:19, 603:25, 616:15, 616:16
**73** [2] - 588:11, 588:17
**7th** [2] - 455:22, 456:2, 485:1

---

### 8

**8** [1] - 602:22
**8-19-24.xlsx** [2] - 323:17, 323:19
**8/2/23** [1] - 364:1
**8/22/2024** [1] - 320:5
**8/23/2024** [1] - 320:12
**8/31/20** [1] - 504:17
**847** [1] - 539:13
**847.01** [2] - 332:7, 585:5
**847.012** [37] - 332:5, 334:13, 338:21, 339:17, 339:18, 339:20, 340:6, 340:25, 341:18, 343:10, 344:23, 345:13, 346:8, 347:24, 348:14, 352:25, 372:13, 377:13, 386:13, 393:1, 399:10, 408:12, 412:2, 415:16, 419:4, 506:9, 507:10, 507:15, 507:25, 508:2, 508:23, 509:12, 509:16, 538:20, 538:24, 538:25, 539:12
**850** [4] - 319:9, 319:18, 320:23, 321:9

---

**860-9344** [2] - 319:9, 320:23
**864-8500** [1] - 320:9
**872-7300** [1] - 321:16
**8th** [5] - 343:4, 460:6, 485:2, 485:16, 489:13

---

### 9

**9** [6] - 506:4, 531:12, 602:24, 603:10, 603:14, 603:17
**9(A)(3** [1] - 511:13
**9(b** [2] - 513:3, 520:14
**9(C** [2] - 526:22, 531:1
**9(C)(3)(iv** [1] - 538:9
**9(D** [1] - 502:7
**9(E** [1] - 529:10
**9(E)(1** [1] - 529:11
**9(E)(3)(c** [2] - 531:2, 531:13
**9/28/22** [1] - 436:12
**9/29/22** [1] - 364:1
**93** [9] - 331:25, 343:21, 351:25, 476:11, 501:12, 505:21, 506:3, 520:14, 584:10
**9:04** [2] - 318:20, 325:2
**9:38** [1] - 360:11
**9th** [1] - 491:13

---

### A

**a.m** [5] - 318:20, 325:2, 360:11, 404:12
**abilities** [2] - 527:4, 527:14
**ability** [15] - 345:6, 348:3, 365:17, 372:18, 377:18, 386:17, 393:5, 399:14, 408:16, 412:7, 415:20, 419:9, 441:2, 561:1, 563:1
**able** [17] - 327:6, 327:12, 336:22, 346:12, 430:6, 433:19, 434:4, 440:4, 440:5, 526:23, 529:5, 541:22, 574:4, 580:20, 598:12, 598:15, 629:23
**absence** [3] - 533:17, 534:21, 534:24
**absolutely** [2] - 336:1, 559:13
**abundantly** [1] - 353:9
**academic** [3] - 493:22, 502:21, 620:5
**accelerated** [1] - 472:20
**accept** [1] - 501:1

---

Deposition of Bradley Vinson, Volume 2

**accepting** [1] - 500:20
**Access** [12] - 322:18, 323:21, 324:4, 326:15, 332:2, 343:25, 421:6, 433:19, 466:14, 515:21, 517:21, 518:1
**access** [127] - 328:6, 328:10, 328:11, 328:14, 328:18, 328:24, 329:1, 329:4, 329:6, 329:9, 329:21, 330:1, 330:4, 331:1, 333:12, 341:20, 344:11, 363:13, 364:8, 366:7, 421:21, 423:23, 425:7, 425:11, 426:2, 427:25, 428:5, 429:16, 429:23, 437:10, 464:11, 466:4, 466:8, 470:23, 471:22, 476:10, 483:5, 490:24, 492:17, 510:4, 511:2, 513:7, 513:8, 513:12, 513:13, 513:14, 513:19, 513:20, 513:21, 513:22, 513:23, 514:1, 514:3, 514:4, 514:6, 514:7, 514:9, 514:11, 514:12, 514:17, 514:19, 514:20, 515:4, 515:25, 516:2, 516:3, 516:4, 516:25, 517:17, 517:23, 519:6, 519:9, 519:10, 519:18, 520:1, 520:5, 521:9, 522:11, 524:25, 525:3, 525:5, 525:6, 525:8, 525:11, 525:15, 525:18, 525:22, 526:5, 526:6, 526:10, 529:8, 580:9, 580:16, 582:18, 590:4, 590:6, 590:9, 597:15, 597:17, 607:1, 612:12, 612:19, 612:21, 615:5, 619:1, 620:19, 620:24, 621:24, 622:20, 627:22, 629:19, 636:25, 637:1, 637:3, 637:4, 637:12, 638:1, 638:2
**accessed** [1] - 366:2
**accomplished** [1] - 501:24
**accordance** [1] - 497:17
**according** [1] - 425:14
**accordingly** [1] - 326:25
**account** [1] - 527:4
**accurate** [10] - 330:17, 398:6, 473:21, 473:22, 479:9, 483:10, 587:20, 587:25, 588:21, 593:8
**accurately** [13] - 365:24, 367:23, 375:7, 401:7, 410:8, 413:16, 417:10,

417:14, 451:11, 501:16, 501:21, 505:24, 527:6
**acquire** [2] - 542:3, 544:9
**acquired** [4] - 497:17, 497:22, 544:2, 639:15
**Acquired** [1] - 498:15
**acquiring** [3] - 507:1, 634:14, 638:7
**acquisition** [12] - 492:22, 495:10, 496:23, 497:4, 497:10, 506:11, 508:20, 539:24, 541:17, 594:17, 639:14
**acronyms** [1] - 502:25
**action** [14] - 367:23, 375:8, 377:22, 396:2, 407:4, 419:6, 509:13, 556:6, 557:18, 557:19, 557:20, 558:9, 642:17, 642:19
**actions** [5] - 341:5, 373:20, 486:12, 548:18, 558:3
**active** [1] - 526:1
**actively** [4] - 451:18, 526:10, 570:6, 590:5
**actual** [3] - 444:21, 578:21, 585:13
**adaptor** [1] - 445:1
**add** [6] - 437:3, 494:2, 500:13, 515:1, 530:12, 587:17
**added** [55] - 344:17, 346:12, 438:2, 446:11, 447:4, 447:10, 447:24, 448:12, 449:25, 450:7, 451:23, 452:8, 452:18, 452:24, 453:5, 453:10, 453:16, 453:21, 454:3, 454:8, 454:14, 454:19, 454:24, 455:12, 456:4, 456:8, 456:14, 456:20, 456:25, 457:5, 457:9, 458:4, 458:12, 458:17, 458:23, 459:4, 459:10, 462:16, 463:23, 464:4, 495:4, 495:6, 498:21, 498:22, 510:8, 520:23, 530:23, 533:4, 539:17, 539:18, 562:7, 567:2, 639:17, 639:21
**adding** [3] - 500:17, 506:18, 562:4
**addition** [3] - 346:11, 385:14, 559:13
**additional** [5] - 522:13, 537:25, 575:3, 628:12, 630:18
**additionally** [1] - 515:1

**address** [1] - 443:23
**addressed** [3] - 535:23, 551:20, 562:13
**addressing** [2] - 350:10, 583:3
**administrator** [1] - 326:18
**Administrator** [1] - 318:25
**administrators** [1] - 493:4
**adopt** [1] - 558:10
**adopted** [21] - 331:9, 331:12, 331:14, 331:15, 366:20, 390:18, 428:11, 475:14, 476:16, 481:25, 494:21, 502:12, 520:20, 522:15, 522:20, 613:13, 613:14, 634:8, 636:4, 636:5, 639:24
**adopting** [1] - 601:6
**adoption** [6] - 493:16, 494:16, 521:20, 558:9, 604:8, 613:15
**adoptions** [1] - 560:1
**adult** [28] - 347:7, 428:3, 428:7, 428:8, 428:15, 452:16, 452:17, 460:8, 476:10, 478:21, 481:24, 482:7, 521:9, 521:15, 523:18, 525:12, 542:25, 543:1, 543:12, 543:17, 543:21, 562:16, 566:14, 568:17, 569:22, 569:23, 572:2, 624:20
**Advanced** [2] - 581:19, 582:3
**Advisory** [6] - 494:3, 494:11, 494:19, 495:3, 565:19, 566:16
**advocates** [1] - 527:20
**affirm** [3] - 325:5, 433:12, 434:9
**affirmed** [1] - 432:21
**affirms** [1] - 528:3
**afternoon** [1] - 361:1
**age** [33] - 348:2, 348:19, 365:18, 372:23, 386:24, 393:16, 399:20, 408:21, 412:12, 415:25, 419:14, 438:15, 438:17, 500:12, 502:16, 519:11, 529:6, 535:23, 542:23, 543:20, 564:24, 575:8, 577:11, 583:18, 602:1, 619:2, 619:10, 621:12, 622:25, 624:8, 627:21, 630:7
**Age** [3] - 324:6, 554:6, 554:13
**age-appropriate** [5] -

519:11, 529:6, 535:23, 602:1, 619:2
**agency** [6] - 541:13, 550:1, 551:2, 602:5, 602:15, 604:7
**Agenda** [9] - 322:19, 322:22, 322:24, 323:4, 323:6, 323:8, 323:10, 323:12, 323:14
**agenda** [38] - 367:15, 375:2, 379:13, 383:2, 383:7, 388:17, 388:22, 395:17, 396:1, 396:11, 400:23, 401:1, 401:7, 401:16, 405:2, 405:23, 407:2, 410:2, 410:7, 410:14, 413:12, 413:16, 413:20, 417:3, 417:9, 444:10, 444:12, 444:13, 461:17, 462:11, 490:15, 557:9, 557:21, 558:21, 560:15, 562:4, 562:10, 574:2
**agendas** [4] - 461:20, 561:13, 561:15, 574:7
**agents** [2] - 550:5, 550:19
**ages** [2] - 366:1, 409:3
**ago** [2] - 555:1, 582:9
**agree** [11] - 371:17, 426:18, 469:16, 543:19, 543:22, 543:23, 543:24, 544:1, 544:17, 544:18, 633:8
**agreeing** [1] - 643:16
**aha** [1] - 544:24
**ahead** [6] - 349:9, 368:25, 430:23, 431:21, 436:6, 591:1
**Aidan** [7] - 322:25, 383:3, 383:8, 383:22, 385:1, 627:13, 630:5
**aim** [1] - 351:16
**aimed** [1] - 543:1
**al** [2] - 643:4, 644:3
**alerted** [1] - 583:15
**align** [1] - 359:11
**aligned** [1] - 502:20
**allegation** [2] - 338:2, 339:19
**allege** [2] - 339:15, 339:16
**alleged** [5] - 336:4, 336:16, 337:1, 339:15, 342:6
**Allegedly** [3] - 477:1, 477:5, 477:11
**alleviate** [1] - 628:17
**allow** [8] - 334:21, 346:13, 349:6, 439:17,

468:21, 516:3, 521:8, 580:15
**allowed** [3] - 334:9, 514:4, 636:24
**allows** [2] - 349:5, 517:16
**Almost** [7] - 430:19, 431:14, 431:19, 432:3, 435:8, 436:7, 452:23
**almost** [2] - 463:21, 614:4
**alone** [4] - 433:24, 532:25, 544:15, 623:3
**alphabetically** [1] - 421:19
**ALSO** [2] - 319:21, 321:19
**alternative** [2] - 495:18, 495:19
**Alternative** [1] - 580:18
**Amber** [2] - 553:15, 554:11
**amend** [2] - 396:4, 605:22
**amended** [1] - 589:15
**amendment** [1] - 494:16
**American** [2] - 528:19, 644:3
**AMERICAN** [2] - 318:4, 643:4
**Anchor** [2] - 318:21, 643:25
**and..** [1] - 599:19
**ANN** [1] - 318:6
**announces** [1] - 323:23
**answer** [18] - 336:23, 345:19, 348:9, 364:13, 397:21, 400:19, 437:24, 441:9, 441:11, 532:21, 558:20, 591:12, 591:19, 591:25, 592:14, 595:20, 598:1, 634:19
**answered** [3] - 367:5, 528:12, 542:15
**answering** [1] - 634:22
**answers** [4] - 465:16, 603:16, 603:21, 603:22
**anticipate** [1] - 575:9
**anticipation** [1] - 574:21
**antirape** [1] - 461:9
**apologies** [1] - 516:23
**apologize** [1] - 536:6
**appeal** [42] - 368:7, 369:16, 373:7, 373:13, 375:4, 375:15, 375:20, 375:23, 376:10, 378:5, 380:2, 380:16, 380:23, 381:12, 383:4, 383:13, 384:6, 387:12, 388:20, 391:9, 391:21, 394:6,

396:2, 396:10, 396:14, 396:18, 398:2, 398:11, 400:8, 401:4, 401:20, 405:17, 409:14, 410:13, 412:23, 413:14, 416:11, 416:17, 417:5, 417:7, 420:2, 527:3

**appeals** [10] - 401:15, 410:4, 414:1, 556:24, 557:3, 557:4, 557:7, 558:23, 559:3, 628:25

**appear** [8] - 438:10, 445:6, 445:11, 526:1, 532:18, 562:2, 569:20, 569:21

**APPEARANCES** [3] - 319:1, 320:1, 321:1

**appeared** [3] - 547:12, 561:23, 641:11

**appearing** [3] - 436:15, 480:24, 540:7

**applicability** [8] - 545:11, 545:16, 545:24, 546:4, 546:11, 546:15, 546:18, 614:6

**applicable** [1] - 545:2

**application** [2] - 506:22, 614:19

**applied** [20] - 326:9, 336:12, 370:4, 424:22, 434:25, 462:5, 463:5, 464:17, 466:9, 500:20, 500:21, 501:1, 501:3, 535:6, 541:6, 547:5, 547:13, 548:20, 611:4, 616:18

**applies** [7] - 333:14, 359:2, 359:9, 370:21, 402:4, 514:22, 604:5

**apply** [26] - 329:4, 332:25, 336:14, 336:18, 348:22, 357:9, 357:22, 358:12, 376:18, 380:25, 384:20, 384:25, 385:5, 392:5, 398:13, 402:9, 407:14, 411:5, 414:17, 418:4, 535:4, 537:22, 545:19, 549:7, 565:25, 628:16

**applying** [4] - 536:18, 545:6, 576:21, 585:10

**appointed** [1] - 468:5

**appointees** [2] - 468:14, 468:15

**appreciate** [1] - 584:22

**appreciated** [1] - 395:8

**approach** [6] - 340:14, 618:1, 618:5, 618:21, 619:1, 624:24

**Appropriate** [3] - 324:6,

554:6, 554:13

**appropriate** [40] - 348:19, 399:23, 408:25, 416:3, 419:18, 438:15, 438:17, 513:5, 519:11, 529:6, 535:23, 543:17, 543:20, 544:1, 563:13, 563:15, 563:25, 564:4, 564:24, 565:1, 565:10, 565:11, 571:5, 573:3, 575:8, 575:24, 576:1, 602:1, 619:2, 619:10, 622:5, 622:25, 623:14, 625:12, 625:24, 627:2, 627:3, 628:1, 628:22, 630:7

**appropriately** [1] - 632:8

**appropriateness** [2] - 577:12, 621:12

**approval** [3] - 348:8, 494:14, 495:2

**approve** [1] - 358:17

**Apr** [2] - 323:12, 323:14

**April** [47] - 330:14, 330:20, 352:19, 359:18, 360:9, 360:10, 360:25, 361:1, 361:6, 361:17, 414:7, 417:19, 443:7, 443:19, 456:25, 461:1, 461:2, 474:10, 475:10, 475:13, 475:18, 476:19, 477:4, 477:6, 477:19, 478:17, 479:16, 483:16, 483:21, 484:2, 484:16, 485:17, 485:19, 485:22, 486:2, 489:18, 490:6, 490:8, 490:17, 491:14, 491:16, 492:9, 537:19, 549:14, 555:8, 605:8, 614:20

**area** [4] - 332:11, 333:13, 358:1, 585:14

**areas** [1] - 338:18

**ARGARWAL** [1] - 320:19

**arms** [2] - 586:4, 586:18

**arrange** [1] - 390:4

**arranged** [1] - 389:14

**Art** [2] - 458:8, 458:9

**art** [1] - 458:10

**artistic** [4] - 342:8, 343:11, 507:20, 508:16

**ascertain** [2] - 541:10, 542:5

**ASHLEY** [1] - 318:8

**aside** [7] - 367:10, 367:11, 442:10, 494:18, 516:21, 520:11, 544:22

**aspects** [1] - 584:5

**Assassination** [13] - 477:21, 477:25, 479:13,

479:23, 480:15, 480:17, 480:18, 481:13, 481:14, 482:11, 482:18, 483:3, 483:9

**assault** [1] - 461:12

**assemble** [1] - 467:13

**assessed** [1] - 568:22

**assessing** [1] - 509:3

**assessment** [3] - 347:23, 348:17, 577:6

**assist** [1] - 560:1

**assistance** [1] - 594:5

**Assistant** [1] - 467:5

**assisting** [1] - 559:15

**Association** [1] - 551:8

**assume** [7] - 412:16, 465:16, 481:4, 481:6, 517:13, 568:4, 630:16

**assumed** [1] - 594:7

**assuming** [1] - 618:2

**Attached** [3] - 322:14, 323:2, 324:2

**attached** [1] - 584:1

**attachment** [1] - 614:17

**attend** [2] - 366:12, 574:4

**attendance** [1] - 468:21

**attended** [2] - 551:6, 610:1

**attention** [3] - 339:2, 542:12, 542:20

**attest** [1] - 630:25

**attested** [1] - 580:10

**Attorney** [2] - 643:19, 643:20

**attorney** [4] - 590:18, 590:22, 591:13, 595:18

**attorney-client** [2] - 590:22, 591:13

**attorneys** [8] - 590:12, 590:14, 590:17, 591:5, 591:6, 591:18, 593:6, 642:17

**attributes** [2] - 406:16, 406:19

**audience** [12] - 500:12, 534:6, 541:14, 542:21, 542:22, 543:17, 544:2, 544:20, 575:24, 619:3, 619:10, 622:3

**audio** [2] - 472:22, 580:1

**August** [14] - 318:19, 322:3, 361:15, 361:22, 364:6, 421:4, 421:18, 471:21, 641:11, 641:14, 642:20, 643:10, 643:17, 644:6

**author** [2] - 444:25, 445:1

**authority** [3] - 365:10,

365:25, 563:8

**authorized** [1] - 642:8

**automatically** [3] - 361:25, 532:4, 540:7

**availability** [3] - 326:8, 472:14, 637:16

**available** [65] - 327:15, 327:17, 327:18, 327:22, 327:25, 328:7, 328:19, 329:19, 329:20, 330:11, 355:11, 368:16, 386:25, 389:4, 389:5, 389:16, 395:19, 395:23, 401:12, 401:23, 419:15, 422:12, 472:4, 472:9, 472:11, 472:25, 473:1, 473:24, 479:16, 487:5, 487:12, 489:7, 490:18, 490:23, 491:3, 492:17, 510:7, 510:15, 511:4, 511:5, 512:3, 515:5, 519:12, 529:11, 529:18, 538:19, 560:23, 561:19, 562:3, 581:6, 583:12, 595:2, 599:22, 599:25, 601:20, 603:13, 610:24, 621:22, 622:18, 626:4, 627:4, 633:24, 634:1

**Avenue** [3] - 319:7, 320:21, 321:14

**averaged** [1] - 520:4

**awaits** [1] - 643:15

**aware** [23] - 337:14, 339:13, 339:18, 340:13, 340:17, 357:8, 362:17, 374:16, 382:10, 382:11, 390:17, 396:21, 494:9, 507:6, 507:8, 507:23, 508:1, 546:2, 546:23, 547:21, 552:17, 552:21, 637:14

---

**B**

---

**baby** [1] - 576:10

**background** [1] - 496:13

**bad** [1] - 580:24

**Baggett** [2] - 548:19, 548:25

**BALLARD** [2] - 320:4, 320:11

**ballots** [1] - 367:6

**based** [47] - 344:7, 345:16, 346:7, 347:23, 352:14, 369:6, 371:12, 380:13, 380:19, 384:3, 384:4, 384:10, 391:19, 391:24, 393:19, 396:25, 399:22, 399:25, 402:3,

412:14, 423:13, 429:23, 436:9, 437:1, 447:13, 457:24, 461:13, 465:2, 470:4, 502:16, 512:24, 532:14, 533:15, 545:21, 547:11, 561:15, 562:4, 580:1, 621:12, 621:19, 622:16, 624:16, 626:17, 630:25, 631:7, 638:8

**bases** [2] - 338:24, 366:16

**basing** [1] - 369:12

**basis** [38] - 330:23, 332:4, 332:10, 334:23, 338:17, 339:25, 340:5, 340:24, 353:18, 370:18, 371:20, 371:25, 373:12, 376:22, 381:5, 385:8, 385:20, 392:10, 398:18, 402:14, 407:19, 411:10, 414:22, 418:9, 422:13, 427:10, 434:18, 448:4, 461:3, 464:14, 465:15, 536:15, 573:20, 591:12, 615:16, 634:2, 634:19, 634:21

**Bates** [8] - 326:5, 360:17, 362:20, 362:23, 362:25, 515:19, 516:14, 553:13

**bathing** [1] - 339:8

**Baumbach** [2] - 553:15, 554:11

**BAUMBACH** [1] - 553:17

**Baylen** [1] - 318:21

**beat** [1] - 395:12

**became** [5] - 341:10, 341:11, 423:14, 425:17, 580:8

**Became** [2] - 322:25, 383:3, 383:8, 383:22, 385:1, 627:13

**become** [2] - 638:14, 639:7

**Becomes** [1] - 630:6

**began** [7] - 353:4, 365:7, 429:23, 519:6, 620:7, 638:16, 639:6

**Begin** [3] - 588:8, 588:12, 588:22

**begin** [4] - 467:8, 481:15, 521:13, 573:21

**beginning** [11] - 329:2, 352:12, 353:5, 362:12, 479:14, 517:19, 518:15, 552:16, 636:8, 636:9, 636:10

**begins** [1] - 331:24

**begun** [2] - 467:21, 467:25

**Behalf** [1] - 318:18
**behalf** [4] - 318:5, 318:6, 318:8, 318:9
**beliefs** [2] - 528:18, 529:1
**Bellview** [1] - 571:24
**Beloved** [1] - 453:4
**below** [4] - 334:5, 412:16, 523:18, 586:3
**beneficial** [1] - 500:13
**benefit** [3] - 337:14, 567:25, 627:21
**BENJAMIN** [1] - 318:4
**best** [9] - 380:18, 384:9, 391:23, 493:10, 495:13, 526:20, 532:21, 634:23, 638:8
**Better** [1] - 453:20
**better** [1] - 521:25
**between** [14] - 426:7, 503:9, 516:16, 526:4, 545:3, 547:10, 547:17, 552:18, 553:14, 607:3, 608:3, 609:15, 628:19, 634:10
**Beulah** [1] - 479:25
**beyond** [25] - 370:7, 372:10, 376:25, 381:8, 385:23, 386:9, 392:8, 392:22, 402:18, 402:24, 407:23, 408:4, 411:14, 411:24, 415:6, 415:13, 418:13, 448:4, 522:10, 527:15, 535:8, 537:25, 542:4, 590:4, 601:18
**Beyond** [1] - 458:16
**bifurcated** [1] - 349:5
**big** [2] - 540:25, 617:18
**bigger** [1] - 468:4
**bill** [1] - 545:18
**Bill** [6] - 334:20, 334:24, 335:4, 346:9, 529:22, 639:19
**biological** [1] - 535:24
**bit** [2] - 476:15, 624:6
**black** [1] - 534:15
**bloom** [2] - 565:14, 565:15
**Blue** [8] - 375:3, 375:5, 375:9, 375:15, 376:6, 463:22, 621:3, 621:17
**Bluest** [22] - 323:9, 401:3, 401:8, 401:25, 402:10, 402:15, 403:2, 403:6, 404:25, 405:10, 405:15, 405:17, 407:6, 407:10, 407:15, 407:20, 408:6, 408:10, 408:20, 409:13, 622:10, 622:14
**board** [288] - 332:16,

332:25, 333:22, 334:2, 345:1, 345:15, 347:12, 347:22, 348:7, 349:18, 349:19, 357:10, 358:22, 358:24, 365:10, 365:14, 366:5, 366:12, 367:24, 368:7, 368:12, 368:15, 369:2, 369:8, 369:15, 370:3, 370:15, 370:22, 371:2, 371:7, 371:11, 372:4, 372:7, 372:12, 372:17, 372:22, 373:2, 373:6, 373:16, 373:18, 373:21, 373:23, 373:25, 374:4, 374:7, 374:10, 374:11, 374:19, 375:8, 375:15, 375:19, 375:23, 376:1, 376:5, 376:9, 376:14, 376:18, 377:3, 377:7, 377:11, 377:12, 377:15, 377:17, 377:24, 378:3, 378:8, 378:13, 378:14, 378:18, 378:25, 379:4, 379:22, 380:2, 380:5, 380:9, 380:15, 380:21, 380:25, 381:10, 381:16, 381:21, 381:25, 382:1, 382:5, 382:21, 383:13, 383:20, 383:21, 383:24, 384:5, 384:12, 384:25, 385:5, 385:11, 385:15, 385:18, 386:1, 386:5, 386:11, 386:16, 386:20, 386:23, 387:2, 387:6, 387:10, 387:19, 387:23, 387:24, 388:3, 388:10, 388:18, 388:20, 388:21, 391:9, 391:12, 391:16, 391:20, 392:1, 392:5, 392:15, 392:19, 392:24, 393:4, 393:15, 393:25, 394:4, 394:9, 394:13, 394:14, 394:18, 394:24, 396:10, 396:14, 396:16, 396:21, 397:5, 397:10, 397:23, 398:1, 398:5, 398:9, 398:13, 398:23, 399:1, 399:3, 399:8, 399:13, 399:18, 399:23, 400:3, 400:7, 400:12, 400:13, 400:15, 401:5, 401:19, 401:22, 402:5, 402:9, 402:18, 402:21, 403:1, 403:22, 404:2, 405:1, 405:17, 405:20, 405:25, 407:5, 407:6, 407:8, 407:14, 407:25, 408:5, 408:10, 408:15, 408:20, 408:24, 409:8, 409:12, 409:17, 409:18, 410:12, 410:20,

410:25, 411:5, 411:16, 411:20, 411:25, 412:5, 412:10, 412:18, 412:22, 413:3, 413:4, 413:13, 413:15, 414:1, 414:5, 414:7, 414:12, 414:17, 415:2, 415:8, 415:14, 415:19, 415:24, 416:5, 416:9, 416:14, 416:15, 417:6, 417:15, 417:19, 417:23, 418:4, 418:16, 418:21, 419:2, 419:8, 419:13, 419:21, 419:25, 420:2, 420:5, 420:6, 462:5, 465:8, 465:12, 468:6, 468:14, 468:15, 512:21, 528:2, 533:16, 533:19, 545:1, 545:5, 545:23, 546:1, 546:3, 546:8, 546:24, 547:3, 547:15, 547:18, 547:22, 548:23, 552:23, 553:3, 556:22, 556:24, 557:7, 558:3, 558:22, 558:24, 559:2, 593:9, 596:18, 600:25, 601:6, 601:15, 601:21, 602:14, 611:8, 611:23, 611:24, 617:8, 618:9, 621:1, 621:2, 621:16, 622:14, 624:12, 625:17, 626:12, 626:17, 628:16, 628:24, 630:16, 630:22, 634:8, 634:16
**BOARD** [2] - 318:12, 643:7
**Board** [6] - 318:15, 321:20, 325:11, 643:9, 644:3, 644:5
**board's** [44] - 365:25, 368:17, 368:23, 371:5, 371:21, 371:25, 376:2, 376:22, 379:17, 380:6, 383:8, 388:23, 389:7, 391:13, 392:10, 395:18, 395:22, 396:2, 396:17, 401:2, 401:8, 401:23, 402:14, 407:4, 410:8, 410:21, 411:10, 413:17, 414:8, 414:22, 417:4, 417:10, 417:20, 418:9, 419:6, 600:23, 618:21, 623:7, 623:18, 624:17, 625:19, 627:15, 628:20, 631:4
**BoardDocs** [14] - 322:19, 322:22, 322:24, 323:4, 323:6, 323:8, 323:10, 323:12, 323:14, 367:19, 379:16, 405:1, 533:10

**bodies** [1] - 333:25
**body** [1] - 545:5
**bodying** [1] - 547:1
**book** [371] - 329:12, 330:5, 332:20, 333:2, 335:13, 335:15, 336:4, 336:6, 336:8, 337:2, 337:15, 337:17, 337:18, 337:20, 337:22, 338:6, 339:2, 339:6, 339:11, 339:20, 340:19, 340:25, 341:3, 341:7, 341:17, 341:21, 341:23, 342:6, 342:7, 342:10, 343:7, 343:12, 343:16, 345:16, 346:19, 347:20, 347:23, 348:19, 349:7, 350:11, 351:19, 361:22, 362:5, 365:12, 365:15, 365:21, 366:7, 366:16, 367:3, 367:16, 370:22, 371:6, 371:7, 371:21, 372:12, 372:17, 372:22, 373:2, 373:7, 373:17, 374:6, 374:12, 374:20, 375:11, 376:23, 377:4, 377:12, 377:17, 377:24, 378:4, 378:9, 378:20, 379:5, 381:6, 381:11, 381:17, 381:22, 382:7, 383:24, 385:6, 385:21, 386:2, 386:7, 386:11, 386:16, 386:23, 387:6, 387:11, 387:20, 388:5, 388:11, 389:4, 389:11, 390:1, 390:5, 390:10, 390:14, 390:17, 393:4, 393:15, 393:25, 394:5, 394:10, 394:14, 394:20, 394:25, 397:17, 399:8, 399:13, 400:3, 400:15, 401:11, 402:3, 402:21, 406:5, 406:11, 408:1, 408:15, 409:8, 409:20, 413:6, 415:19, 415:24, 416:5, 418:17, 419:8, 419:21, 422:17, 423:5, 424:10, 425:8, 425:21, 425:23, 427:19, 429:8, 430:6, 430:7, 430:19, 431:5, 432:18, 432:25, 433:16, 433:20, 437:1, 437:3, 437:9, 438:24, 439:5, 439:15, 440:22, 440:24, 444:4, 444:23, 445:14, 445:24, 446:12, 447:13, 447:25, 451:2, 451:4, 457:25, 461:24, 462:3, 463:19, 463:25, 464:6, 464:23, 465:3, 465:6, 465:17, 465:20, 466:7,

466:9, 472:10, 472:16, 473:1, 478:21, 480:20, 480:23, 482:6, 485:24, 489:22, 490:7, 490:17, 491:18, 500:9, 500:10, 500:20, 500:21, 501:2, 501:4, 505:25, 508:20, 509:3, 509:15, 509:20, 510:14, 510:16, 510:17, 510:18, 510:20, 511:2, 513:15, 513:16, 524:2, 529:11, 529:17, 530:12, 533:1, 534:8, 534:10, 534:11, 534:12, 534:15, 534:16, 534:19, 535:24, 535:25, 536:2, 536:6, 536:7, 536:12, 538:18, 540:12, 541:1, 541:12, 541:14, 541:23, 542:6, 542:9, 542:25, 543:1, 543:10, 543:12, 543:16, 544:1, 544:5, 544:10, 544:14, 544:18, 548:1, 548:5, 548:9, 549:8, 549:11, 549:17, 550:2, 551:5, 551:9, 551:13, 551:16, 551:23, 552:3, 552:25, 553:5, 555:3, 556:23, 557:7, 558:23, 560:10, 563:3, 563:4, 563:9, 564:12, 564:21, 564:22, 564:24, 565:10, 566:3, 566:4, 570:5, 571:9, 573:1, 573:2, 574:25, 576:18, 576:24, 577:8, 577:21, 578:9, 578:14, 582:25, 583:4, 584:13, 584:16, 589:6, 594:23, 595:5, 600:24, 600:25, 601:1, 601:2, 601:4, 601:16, 601:22, 602:6, 605:6, 605:7, 606:12, 606:13, 606:25, 607:7, 607:17, 607:18, 609:20, 609:23, 609:24, 610:5, 610:13, 610:16, 611:2, 611:5, 613:2, 613:4, 617:14, 617:17, 618:1, 618:5, 618:21, 621:3, 621:5, 621:7, 622:2, 622:9, 622:11, 622:17, 622:23, 623:2, 623:8, 623:14, 623:19, 623:22, 623:25, 624:1, 624:17, 624:21, 625:7, 626:14, 626:18, 626:22, 627:11, 627:16, 627:23, 628:5, 629:23, 630:6, 630:18, 631:4, 631:6, 631:8, 632:10, 633:24, 635:5, 637:11, 639:21

Deposition of Bradley Vinson, Volume 2

**booking** [1] - 576:22
**books** [292] - 328:5, 328:6, 328:7, 328:11, 328:12, 328:15, 328:18, 328:24, 328:25, 329:2, 329:11, 329:16, 329:18, 329:19, 330:1, 330:15, 330:18, 332:9, 341:12, 343:18, 344:7, 344:10, 346:10, 346:13, 348:11, 350:19, 353:16, 354:2, 354:6, 354:8, 354:10, 354:12, 354:17, 354:18, 354:19, 354:23, 355:1, 355:2, 355:4, 355:6, 356:5, 356:22, 357:25, 359:2, 359:9, 359:15, 359:17, 360:23, 361:6, 361:9, 361:10, 361:14, 362:17, 363:1, 365:7, 365:10, 366:1, 366:2, 367:8, 371:4, 385:10, 390:8, 397:11, 421:5, 421:20, 421:24, 422:10, 422:16, 423:11, 423:12, 423:17, 425:7, 425:10, 425:13, 426:7, 426:8, 426:11, 426:13, 426:19, 427:2, 427:4, 427:16, 427:23, 427:24, 428:4, 428:7, 428:8, 428:15, 428:16, 428:19, 428:20, 428:25, 429:3, 430:10, 430:17, 430:22, 432:20, 434:18, 435:2, 436:22, 437:2, 440:12, 440:15, 440:16, 440:20, 441:1, 441:5, 441:12, 441:16, 441:18, 441:20, 441:22, 441:25, 442:2, 442:5, 442:10, 442:12, 442:13, 442:15, 442:19, 443:10, 443:23, 446:16, 446:25, 447:12, 450:12, 463:3, 464:9, 464:15, 465:9, 465:13, 466:1, 466:5, 466:12, 466:24, 467:13, 469:2, 469:10, 472:2, 472:23, 473:23, 474:4, 474:13, 474:15, 474:20, 474:21, 477:6, 477:10, 484:11, 486:22, 487:1, 491:5, 492:6, 497:16, 497:21, 499:1, 499:15, 500:8, 505:5, 506:7, 506:11, 506:19, 507:1, 507:8, 507:24, 508:12, 508:16, 508:18, 509:11, 510:5, 512:15, 512:19, 512:24, 514:17, 514:22, 516:4, 519:11, 521:16,

527:23, 530:23, 532:14, 532:22, 533:21, 533:24, 534:18, 535:20, 536:11, 537:8, 539:24, 540:23, 541:17, 542:4, 543:3, 543:21, 545:11, 545:16, 545:20, 545:25, 546:5, 546:11, 546:16, 546:19, 546:22, 547:6, 548:15, 548:21, 549:8, 549:18, 555:8, 555:14, 555:17, 555:18, 556:5, 556:8, 556:10, 556:11, 556:14, 556:18, 558:12, 560:17, 561:16, 561:22, 562:4, 562:16, 562:21, 565:23, 566:14, 566:21, 567:15, 568:4, 568:17, 568:19, 569:4, 569:12, 569:17, 569:19, 570:3, 570:10, 570:15, 570:16, 571:13, 572:7, 572:10, 572:13, 572:15, 572:21, 574:16, 575:22, 576:5, 576:11, 580:1, 580:2, 580:5, 580:16, 587:21, 589:3, 602:25, 604:15, 605:2, 608:2, 608:4, 611:16, 611:19, 612:19, 613:24, 615:3, 615:17, 619:15, 620:13, 620:19, 620:24, 629:4, 629:15, 629:17, 630:14, 630:21, 630:22, 634:14, 636:5, 637:12, 637:20, 638:7, 639:13, 639:15
**Books** [4] - 323:16, 323:18, 323:24, 341:23
**bothered** [1] - 436:20
**bottom** [16] - 326:6, 331:24, 363:25, 501:12, 504:22, 511:12, 517:9, 523:7, 527:25, 529:9, 530:25, 531:8, 533:2, 554:5, 581:11, 585:25
**BOUZAT** [1] - 320:5
**bouzatf@ballardspahr. com** [1] - 320:6
**box** [1] - 338:5
**Boys** [8] - 375:3, 375:5, 375:9, 375:15, 376:5, 491:7, 621:3, 621:16
**boys** [1] - 339:4
**Bradley** [3] - 617:10, 643:9, 644:5
**BRADLEY** [8] - 318:15, 322:6, 322:15, 323:3, 324:3, 325:10, 640:11, 644:25
**BRANNEN** [1] - 318:4

**break** [4] - 364:21, 420:11, 538:3, 547:2
**breaking** [2] - 420:14, 420:16, 471:8
**breathless** [1] - 453:9
**Brian** [7] - 592:15, 593:6, 595:17, 595:21, 595:24, 596:5, 596:8
**bring** [5] - 444:7, 444:9, 444:13, 573:5, 628:14
**broad** [1] - 522:3
**broader** [3] - 512:5, 605:9, 605:10
**broadly** [1] - 402:4
**Broadway** [1] - 320:14
**Brother** [7] - 322:25, 383:3, 383:9, 383:22, 385:1, 627:13, 630:6
**brought** [3] - 325:19, 325:20, 339:2
**budget** [4] - 472:13, 472:15, 487:5, 493:8
**budgetary** [2] - 500:22, 501:5
**building** [1] - 638:20
**bulge** [1] - 586:13
**bulging** [1] - 586:4
**bunch** [1] - 566:14
**busy** [2] - 351:9, 355:8
**buttocks** [1] - 585:14
**BY** [62] - 319:5, 319:14, 320:1, 320:5, 320:12, 320:19, 321:1, 321:5, 321:12, 321:19, 325:16, 335:21, 345:25, 353:24, 360:4, 360:20, 363:6, 365:4, 367:14, 371:19, 375:1, 379:12, 383:1, 388:16, 395:16, 400:25, 404:22, 410:1, 413:11, 417:2, 420:24, 421:16, 422:25, 424:5, 435:15, 436:4, 437:15, 441:13, 446:23, 470:17, 471:10, 471:19, 474:19, 498:13, 503:14, 503:23, 510:11, 515:17, 516:13, 517:4, 523:6, 538:6, 553:11, 577:18, 591:2, 592:7, 598:6, 616:8, 633:19, 636:22, 639:4, 640:2

---

C

---

**CALDWELL** [3] - 319:13, 321:4, 321:11
**calendar** [1] - 580:14
**campuses** [2] - 445:25, 493:5

**cannot** [10] - 327:24, 342:14, 365:11, 366:10, 366:16, 366:25, 389:10, 397:4, 421:25, 473:5
**capability** [1] - 499:6
**capable** [1] - 561:10
**Capacity** [4] - 318:16, 325:12, 643:10, 644:6
**capacity** [7] - 559:16, 617:7, 620:3, 620:8, 620:11, 627:1, 631:16
**capitalization** [2] - 579:24, 582:2
**captioned** [2] - 332:2, 515:21
**Captioner** [2] - 641:8, 642:7
**car** [1] - 626:8
**care** [1] - 532:4
**careful** [1] - 542:20
**carefully** [6] - 359:10, 425:2, 619:9, 624:25, 626:1, 627:7
**CARLIE** [1] - 321:21
**case** [22] - 318:3, 330:23, 334:12, 336:25, 352:6, 397:22, 406:20, 441:7, 445:12, 451:6, 472:6, 473:25, 513:21, 536:14, 582:2, 608:11, 615:14, 633:9, 633:13, 643:3
**CASE** [1] - 644:4
**case-by-case** [2] - 330:23, 536:14
**cases** [7] - 357:5, 428:22, 428:23, 442:15, 442:16, 542:21, 636:2
**cast** [1] - 367:6
**catalog** [4] - 472:8, 487:22, 487:24, 498:21
**catch** [1] - 582:13
**categorical** [1] - 428:14
**Category** [2] - 438:25, 439:12
**category** [11] - 328:7, 426:19, 428:6, 429:9, 561:23, 564:23, 570:22, 570:23, 571:13, 572:14, 625:6
**caught** [3] - 362:10, 403:17, 403:23
**cc'd** [2] - 554:1, 554:17
**CDT** [3] - 318:20, 325:2, 640:13
**cell** [6] - 423:24, 424:15, 430:5, 432:17, 449:23, 596:1
**center** [5] - 326:23, 501:18, 501:19, 513:8, 529:12

**Center** [2] - 501:14, 644:3
**CENTER** [2] - 318:4, 643:4
**centers** [2] - 501:22, 528:3
**central** [1] - 442:16
**certain** [14] - 348:19, 350:19, 351:11, 356:5, 401:12, 403:7, 448:20, 528:14, 591:23, 608:4, 609:12, 611:16, 633:6, 638:5
**certainly** [5] - 350:15, 469:12, 575:25, 618:18, 628:9
**certificate** [2] - 529:17, 530:18
**CERTIFICATE** [2] - 641:1, 642:1
**certification** [3] - 495:16, 495:22, 638:12
**Certified** [9] - 508:10, 530:15, 565:17, 641:6, 641:7, 642:5, 642:6
**certified** [5] - 495:17, 496:17, 530:22, 638:15, 639:7
**CERTIFY** [1] - 642:14
**certify** [1] - 641:10, 642:8
**certifying** [1] - 495:20
**cetera** [1] - 602:7
**challenge** [164] - 326:8, 326:9, 333:8, 333:16, 334:10, 335:1, 335:6, 335:15, 336:3, 336:8, 336:16, 337:3, 337:18, 338:1, 339:25, 340:3, 340:4, 340:18, 340:22, 341:16, 341:22, 342:5, 344:23, 344:24, 345:6, 345:12, 345:13, 345:17, 346:6, 361:10, 367:24, 368:1, 368:13, 373:25, 374:6, 375:3, 375:5, 375:9, 376:3, 378:14, 378:20, 379:14, 380:7, 382:1, 382:7, 383:3, 387:24, 388:5, 388:18, 389:4, 391:14, 394:14, 395:19, 395:20, 396:18, 398:11, 401:2, 401:11, 401:24, 402:6, 405:14, 410:4, 410:22, 411:2, 413:13, 414:9, 414:14, 417:4, 417:17, 417:21, 418:1, 422:17, 423:4, 423:13, 424:11, 425:8, 425:22, 426:8, 426:11,

Deposition of Bradley Vinson, Volume 2

426:15, 426:16, 426:23, 426:25, 427:6, 427:9, 427:17, 427:18, 428:20, 428:21, 428:22, 429:10, 430:7, 432:19, 433:1, 436:25, 437:5, 438:6, 441:4, 446:13, 447:13, 448:1, 448:4, 448:13, 450:1, 450:9, 451:7, 451:24, 452:5, 452:10, 452:12, 452:21, 453:1, 453:6, 453:12, 453:17, 453:22, 454:4, 454:11, 454:16, 454:20, 454:25, 455:14, 455:23, 456:5, 456:10, 456:16, 456:22, 457:1, 457:6, 457:11, 457:17, 457:19, 457:22, 457:24, 458:6, 458:14, 458:20, 459:1, 459:7, 459:13, 464:1, 464:7, 464:13, 465:2, 476:24, 479:21, 479:22, 490:23, 502:23, 543:7, 548:1, 548:10, 556:23, 558:23, 560:10, 573:5, 582:25, 606:12, 608:5, 609:20, 612:11, 619:15, 628:5, 634:2

**Challenge** [10] - 438:13, 439:8, 439:22, 439:23, 440:1, 440:2, 440:24, 446:3, 581:20, 582:13

**challenge's** [1] - 445:10

**challenged** [51] - 332:3, 332:10, 332:20, 334:22, 335:12, 337:16, 340:5, 341:12, 346:19, 352:3, 352:7, 352:13, 354:12, 354:17, 355:2, 355:4, 362:17, 365:7, 378:9, 425:16, 426:14, 426:20, 427:4, 427:25, 428:17, 440:24, 441:5, 441:20, 441:22, 442:3, 442:6, 442:12, 442:13, 442:15, 443:23, 463:2, 466:24, 472:3, 473:12, 474:14, 474:21, 479:8, 482:19, 484:10, 492:6, 548:14, 549:8, 573:3, 573:10, 582:20, 608:2

**challenger** [11] - 338:16, 373:17, 378:9, 381:22, 387:20, 394:10, 400:13, 409:18, 413:4, 416:15, 420:6

**challengers** [1] - 548:19
**Challenges** [1] - 603:7
**challenges** [46] - 339:19,

340:8, 343:7, 347:7, 347:21, 351:20, 371:6, 421:21, 428:2, 436:22, 524:2, 545:21, 548:6, 550:2, 551:5, 551:9, 551:13, 551:17, 551:23, 552:3, 552:25, 553:5, 555:3, 557:8, 576:16, 594:24, 595:5, 600:24, 601:2, 601:5, 602:6, 607:17, 609:24, 610:13, 613:2, 613:4, 613:12, 617:14, 617:18, 618:2, 618:5, 618:22, 620:25, 628:11, 635:5

**challenging** [1] - 468:23
**chance** [1] - 595:18
**CHANGE** [1] - 644:7
**change** [24] - 329:24, 330:1, 330:3, 334:19, 338:19, 338:20, 338:22, 360:22, 361:20, 424:5, 424:6, 432:7, 432:8, 446:2, 451:19, 452:4, 468:11, 478:19, 483:22, 514:15, 541:16, 544:9, 570:6, 582:13

**changed** [37] - 329:25, 330:2, 330:4, 331:2, 338:16, 338:17, 338:24, 364:5, 422:6, 423:22, 424:17, 429:17, 434:5, 439:24, 440:1, 440:23, 460:3, 461:2, 465:22, 466:8, 483:16, 484:24, 484:25, 485:2, 489:1, 490:5, 491:13, 491:14, 492:8, 559:10, 559:21, 569:24, 570:3, 570:17, 570:24, 612:14, 629:10

**CHANGES** [1] - 644:2
**changes** [13] - 331:9, 361:5, 467:11, 467:12, 468:7, 468:16, 468:18, 476:6, 484:1, 522:12, 561:11, 589:24, 613:2

**changing** [1] - 362:8
**character** [1] - 627:19
**characters** [3] - 534:11, 534:15, 623:23

**charter** [2] - 580:8, 636:3
**check** [50] - 326:14, 329:10, 329:13, 343:24, 389:10, 389:25, 390:5, 413:21, 421:25, 422:3, 422:5, 423:22, 431:3, 431:12, 432:6, 437:21, 444:12, 445:7, 445:19, 445:21, 449:6, 451:10, 462:16, 472:4, 473:8,

473:18, 473:19, 473:24, 477:11, 479:4, 479:10, 480:2, 481:4, 483:12, 484:6, 488:6, 488:12, 490:20, 492:2, 492:13, 500:11, 513:15, 519:11, 549:15, 549:19, 567:17, 579:3, 582:6, 584:17

**checkbox** [1] - 525:14
**checked** [13] - 436:9, 436:12, 445:8, 445:9, 472:15, 473:1, 481:10, 511:5, 564:12, 569:6, 582:10, 582:11, 633:10

**checking** [2] - 422:4, 558:15

**checkout** [2] - 422:13, 522:2

**chest** [1] - 586:3
**child** [10] - 318:5, 318:7, 318:8, 318:10, 328:14, 328:23, 328:25, 339:6, 520:2, 631:15

**children** [4] - 339:9, 344:11, 520:2, 521:8
**children's** [1] - 514:17
**choose** [4] - 513:7, 514:10, 517:16, 638:1
**chooses** [1] - 514:11
**choosing** [2] - 487:9, 554:7

**chose** [4] - 448:5, 450:11, 498:7, 520:1
**Chris** [1] - 584:24
**Chris's** [1] - 586:18
**CHRISTOPHER** [1] - 318:9

**chunks** [1] - 440:15
**Cinderella** [3] - 445:3, 445:17, 446:7
**circ** [6] - 438:13, 439:7, 439:22, 440:1, 451:2, 451:13

**circled** [1] - 355:23
**circling** [1] - 355:17
**circulate** [4] - 344:7, 355:11, 439:17, 582:14
**circulated** [1] - 423:3
**circulates** [2] - 406:21, 563:5

**circulating** [2] - 441:2, 502:17

**circulation** [30] - 329:15, 329:17, 329:18, 329:20, 329:25, 330:2, 330:3, 334:22, 346:10, 352:4, 352:10, 352:14, 352:23, 354:7, 406:16, 406:20, 406:22, 423:6, 440:18, 440:23, 442:2, 463:17,

474:5, 570:6, 573:3, 578:12, 578:14, 581:16, 581:19, 589:4
**City** [1] - 453:15
**civilization** [1] - 511:25
**clarification** [3] - 384:17, 550:12, 598:24
**clarified** [3] - 549:4, 549:7, 615:6
**clarify** [3] - 416:20, 590:15, 591:16
**clarity** [1] - 341:24
**classroom** [8] - 510:6, 510:8, 513:9, 513:17, 513:24, 519:15, 528:4, 529:13
**Classroom** [13] - 477:21, 477:25, 479:13, 479:23, 480:15, 480:17, 480:18, 481:14, 482:12, 482:18, 483:3, 483:9, 501:14
**clean** [2] - 354:10, 436:20
**cleaning** [1] - 489:20
**clear** [6] - 353:9, 358:4, 395:10, 570:13, 586:19, 590:25
**cleared** [1] - 440:14
**clearly** [2] - 358:12, 539:16
**click** [3] - 405:17, 423:24, 424:15
**clicked** [1] - 424:13
**clicking** [2] - 330:25, 430:5
**client** [2] - 590:22, 591:13
**close** [3] - 519:13, 542:12, 587:4
**closed** [6] - 499:24, 500:1, 579:5, 579:22, 580:3, 580:11
**closely** [2] - 526:5, 623:3
**closer** [1] - 563:11
**clothed** [1] - 586:9
**clothes** [1] - 585:13
**Club** [1] - 452:13
**CMRS** [4] - 318:24, 641:18, 642:22, 643:24
**Coffee** [60] - 354:20, 437:21, 438:11, 439:4, 439:19, 440:6, 440:20, 440:21, 441:5, 441:16, 442:11, 443:22, 444:7, 444:10, 449:11, 449:14, 461:14, 461:17, 461:19, 462:4, 462:9, 462:11, 477:12, 479:1, 479:11, 484:5, 484:7, 490:14, 491:24, 492:3, 560:15,

561:6, 561:13, 561:17, 562:12, 562:22, 562:23, 566:13, 566:18, 566:22, 567:12, 567:13, 567:23, 568:21, 570:1, 571:11, 573:5, 573:11, 573:13, 573:21, 574:6, 574:8, 574:9, 574:12, 574:22, 574:23, 575:11, 576:9, 576:10
**collect** [2] - 493:3, 544:4
**collected** [2] - 369:10, 611:1
**collecting** [1] - 494:3
**collection** [43] - 389:15, 390:15, 406:12, 406:13, 439:17, 442:9, 488:14, 493:11, 494:2, 499:23, 500:1, 500:13, 501:3, 501:4, 505:14, 509:21, 511:18, 512:2, 512:8, 513:9, 513:17, 513:24, 525:16, 528:25, 561:10, 565:2, 567:4, 568:8, 575:7, 622:6, 622:7, 623:15, 623:23, 625:7, 625:8, 625:11, 625:13, 627:20, 627:23, 637:11, 638:20, 638:22, 639:22
**collections** [2] - 355:10, 355:11, 389:21, 399:24, 428:4, 438:16, 440:15, 452:18, 493:3, 514:5, 514:8, 517:18, 521:24, 521:25, 530:23, 530:24, 575:5, 575:17, 583:1, 619:11, 625:25
**Collections** [1] - 324:4
**color** [6] - 338:17, 338:19, 338:20, 338:22, 338:24, 435:18
**column** [12] - 331:1, 421:7, 421:22, 423:23, 426:2, 433:19, 464:11, 466:14, 498:16, 498:18, 498:19, 498:20
**combination** [1] - 457:18
**combined** [1] - 400:17
**comfort** [1] - 538:3
**comfortable** [3] - 537:21, 567:19, 568:9
**coming** [3] - 566:12, 568:21, 618:9
**commented** [1] - 630:21
**comments** [30] - 350:11, 370:7, 372:10, 376:25, 377:10, 381:8, 385:14, 385:16, 385:18, 385:23, 386:9, 386:21, 387:4, 387:17, 392:8, 392:22,

Deposition of Bradley Vinson, Volume 2

399:1, 402:18, 402:24, 407:23, 408:4, 411:14, 411:24, 415:6, 415:13, 418:13, 431:5, 546:8, 630:1, 630:25

**COMMISSION** [1] - 641:20

**Committee** [14] - 332:16, 333:22, 346:16, 349:3, 349:13, 466:25, 467:4, 467:17, 467:23, 468:4, 577:15, 600:5, 629:11, 629:21

**committee** [7] - 467:15, 469:17, 554:6, 554:14, 594:23, 595:3, 595:13

**committees** [3] - 468:17, 594:25, 600:7

**Committees** [5] - 351:14, 468:9, 599:14, 628:15, 628:20

**Committees'** [1] - 595:6

**Common** [1] - 541:24

**common** [1] - 504:7

**communicate** [21] - 378:8, 378:13, 378:18, 381:21, 381:25, 382:5, 387:19, 387:23, 388:3, 394:9, 394:13, 394:18, 400:12, 409:17, 413:3, 416:14, 420:5, 546:25, 548:24, 550:24, 551:4

**communicated** [9] - 373:17, 373:24, 374:4, 382:15, 486:12, 550:1, 550:21, 552:23, 553:4

**communication** [10] - 358:5, 374:3, 486:11, 486:21, 537:21, 537:23, 604:7, 607:25, 615:6

**communications** [16] - 353:21, 518:22, 547:4, 547:9, 547:17, 550:5, 550:17, 550:19, 552:17, 560:15, 591:14, 602:4, 602:14, 603:24, 607:2, 614:25

**community** [22] - 349:11, 349:14, 349:19, 349:24, 350:2, 350:7, 350:15, 350:18, 375:16, 381:12, 494:4, 494:8, 510:13, 533:16, 533:19, 534:22, 543:24, 543:25, 544:11, 575:1, 630:13, 630:18

**company** [1] - 472:19

**compare** [1] - 604:13

**compiled** [1] - 621:16

**complaint** [1] - 589:15

**complete** [13] - 351:19, 517:20, 566:24, 567:19, 568:16, 568:18, 571:20, 572:2, 572:5, 572:8, 572:10, 574:19, 643:17

**completed** [9] - 326:17, 364:10, 439:15, 568:12, 570:10, 570:23, 604:4, 643:15, 643:20

**completely** [6] - 352:23, 367:9, 514:18, 618:25, 619:8

**completing** [3] - 326:14, 343:24, 635:4

**completion** [2] - 574:11, 574:13

**component** [3] - 426:23, 472:23, 495:4

**composition** [2] - 468:3, 468:8

**comprehend** [11] - 348:3, 365:17, 372:19, 377:19, 386:18, 393:6, 399:15, 408:16, 412:7, 415:21, 419:10

**comprised** [1] - 494:6

**computer** [2] - 474:25, 475:7

**concept** [1] - 426:6

**concern** [3] - 337:6, 379:4, 544:12

**concerned** [3] - 617:25, 618:4, 618:20

**concerns** [7] - 374:12, 374:20, 382:21, 388:10, 394:24, 617:17, 628:18

**concluded** [1] - 640:13

**conclusion** [2] - 539:7, 539:8, 618:19

**Concrete** [2] - 447:22, 448:8

**concur** [2] - 358:20, 583:23

**condition** [4] - 502:13, 580:22, 580:24, 581:3

**condom** [1] - 585:4

**conduct** [116] - 328:19, 329:4, 329:7, 332:6, 332:21, 335:8, 335:13, 336:6, 336:16, 337:1, 337:16, 337:22, 337:23, 338:3, 338:23, 339:10, 339:16, 339:20, 340:6, 341:3, 341:6, 341:19, 341:25, 342:1, 342:3, 342:6, 342:11, 342:15, 344:8, 344:24, 345:14, 347:24, 348:15, 354:7, 354:8, 355:16, 355:19, 357:21, 361:15, 422:12,

423:5, 438:17, 439:6, 440:22, 442:22, 443:6, 443:14, 443:18, 445:17, 447:18, 447:19, 448:8, 448:19, 449:1, 449:13, 449:17, 450:16, 451:12, 451:17, 451:20, 457:18, 457:20, 457:24, 461:4, 461:11, 462:4, 474:9, 477:14, 491:23, 532:15, 532:17, 539:20, 539:25, 540:3, 540:11, 540:24, 541:18, 541:21, 542:2, 542:5, 542:8, 543:5, 543:11, 543:16, 563:10, 563:11, 563:12, 563:15, 563:22, 563:24, 564:3, 564:9, 567:7, 568:9, 569:18, 570:5, 570:22, 571:2, 571:4, 571:16, 575:24, 577:5, 577:7, 578:11, 583:16, 583:18, 583:25, 584:3, 584:7, 584:14, 584:21, 585:11, 585:12, 585:16, 585:20, 586:16

**conducting** [1] - 505:10

**confer** [2] - 568:15, 632:13

**conference** [2] - 551:6, 551:7

**conferences** [1] - 551:11

**confirm** [13] - 327:24, 328:1, 328:16, 363:21, 439:21, 450:25, 464:14, 475:25, 483:18, 576:25, 584:18, 588:19, 589:2

**confirming** [1] - 413:19

**confused** [6] - 442:8, 525:20, 544:16, 570:8, 579:15, 598:13

**connected** [1] - 642:17

**connection** [8] - 375:19, 383:13, 417:6, 417:16, 417:25, 608:18, 609:8

**consensus** [6] - 618:7, 618:12, 618:14, 618:15, 618:17, 619:19

**consider** [16] - 342:14, 343:10, 348:11, 350:13, 388:18, 428:5, 469:12, 506:18, 531:22, 532:22, 546:21, 562:8, 575:23, 575:25, 619:7, 625:24

**consideration** [23] - 401:2, 401:19, 411:2, 414:14, 417:4, 417:16, 418:1, 427:19, 493:20, 501:5, 507:3, 531:3, 531:19, 532:2, 533:20,

535:2, 535:14, 535:19, 536:13, 536:19, 537:6, 537:13, 538:13

**considerations** [3] - 478:23, 493:17, 534:23

**considered** [7] - 342:5, 393:21, 419:17, 497:4, 531:11, 567:2, 568:16

**considering** [14] - 342:7, 342:17, 342:22, 343:16, 385:15, 391:9, 396:14, 398:10, 402:6, 413:13, 442:7, 467:22, 540:4, 619:2

**consistency** [2] - 565:8, 614:19

**consistent** [10] - 340:10, 344:9, 344:13, 344:15, 353:2, 424:21, 434:24, 464:17, 611:7, 614:24

**consistently** [2] - 327:24, 547:13

**constitute** [2] - 536:12, 584:21

**consult** [11] - 373:6, 378:3, 381:10, 394:4, 400:7, 409:12, 412:22, 416:9, 419:25, 431:20, 560:5

**consultation** [6] - 332:14, 333:21, 333:24, 334:1, 464:20, 467:19

**consulted** [12] - 373:13, 381:16, 387:11, 533:18, 533:24, 534:1, 534:25, 541:25, 551:12, 551:15, 551:22, 552:2

**consulting** [1] - 431:22

**contact** [2] - 515:6, 585:13

**contacted** [1] - 552:6

**contain** [32] - 329:6, 357:21, 422:11, 423:5, 438:16, 439:5, 440:22, 447:18, 448:8, 448:19, 449:1, 449:12, 450:16, 451:16, 462:4, 474:9, 512:15, 532:23, 532:24, 543:4, 563:10, 563:11, 563:12, 563:14, 563:22, 567:6, 567:7, 568:9, 569:17, 570:22, 578:11

**contained** [9] - 334:12, 336:5, 342:6, 373:22, 410:18, 442:21, 539:24, 540:23, 541:17

**containing** [7] - 332:20, 335:12, 337:16, 361:14, 361:15, 538:19, 539:11

**contains** [19] - 332:4,

333:10, 339:3, 339:5, 339:7, 340:6, 341:17, 341:24, 341:25, 342:2, 344:24, 347:24, 445:17, 543:10, 563:24, 564:3, 583:24, 584:7, 594:7

**contemplating** [1] - 350:1

**content** [8] - 332:4, 334:12, 357:22, 461:10, 502:16, 507:6, 543:20, 544:6

**contents** [19] - 368:5, 368:8, 375:4, 379:25, 383:4, 388:20, 400:23, 401:4, 401:17, 405:25, 410:3, 410:16, 413:14, 413:24, 417:5, 465:2, 527:20, 527:22, 534:19

**context** [6] - 529:4, 532:18, 534:7, 553:22, 578:8, 591:24

**continue** [1] - 497:6

**continued** [1] - 325:13

**continues** [2] - 528:16, 531:6

**contrary** [1] - 422:7

**contributed** [1] - 528:19

**contributions** [1] - 511:24

**controversial** [1] - 544:6

**conversation** [2] - 387:16, 596:4

**conversations** [9] - 339:6, 356:19, 356:24, 357:3, 357:14, 370:13, 552:21, 568:1, 595:23

**convey** [1] - 382:18

**coordinating** [1] - 467:7

**coordination** [2] - 433:25, 606:24

**coordinator** [1] - 388:4

**Coordinator** [28] - 330:19, 332:14, 333:21, 334:1, 341:10, 343:2, 346:13, 374:5, 378:19, 382:6, 394:19, 400:14, 409:19, 413:5, 416:16, 420:7, 426:21, 427:1, 505:11, 509:24, 546:24, 547:4, 550:18, 559:10, 606:24, 609:19, 610:12, 617:13

**Coots** [1] - 580:18

**copies** [37] - 441:25, 446:4, 451:2, 451:4, 461:24, 463:6, 463:19, 481:2, 481:10, 481:11, 482:18, 487:21, 561:19, 577:25, 578:14, 578:23,

Deposition of Bradley Vinson, Volume 2

579:8, 579:10, 581:4, 581:10, 581:12, 581:13, 581:17, 583:10, 586:25, 587:1, 587:5, 587:10, 587:11, 588:1, 588:2, 588:12, 588:13, 589:5
**copy** [30] - 325:25, 341:20, 358:10, 405:23, 406:8, 421:17, 435:18, 436:7, 436:19, 444:23, 449:18, 471:20, 472:8, 472:9, 472:24, 472:25, 480:7, 480:9, 480:14, 480:20, 480:23, 481:4, 481:7, 483:19, 498:4, 498:21, 510:20, 582:1, 585:5, 626:8
**Correct** [1] - 517:24
**correct** [347] - 326:2, 326:3, 326:10, 326:19, 326:20, 330:7, 330:16, 331:6, 331:7, 331:22, 332:17, 332:18, 332:23, 332:24, 334:17, 334:18, 335:16, 336:9, 338:12, 341:12, 341:13, 342:18, 342:19, 343:8, 343:9, 343:13, 344:2, 344:3, 348:15, 348:16, 348:20, 348:21, 352:18, 352:20, 353:19, 356:2, 361:11, 361:12, 362:7, 362:15, 362:16, 365:7, 365:8, 367:21, 367:22, 367:25, 368:9, 368:10, 368:13, 368:14, 375:16, 375:24, 375:25, 376:4, 376:16, 376:17, 379:20, 379:24, 380:3, 380:4, 380:23, 380:24, 383:9, 383:10, 383:14, 383:15, 383:18, 383:19, 384:14, 384:15, 384:24, 385:19, 389:5, 389:6, 389:8, 389:9, 389:11, 389:12, 390:6, 391:1, 391:10, 391:11, 391:14, 391:15, 392:4, 395:25, 396:11, 396:12, 396:15, 397:24, 398:11, 401:6, 401:9, 401:10, 401:13, 401:14, 401:20, 401:21, 402:7, 402:8, 404:6, 404:16, 405:7, 405:8, 405:11, 405:12, 405:15, 405:16, 405:20, 405:21, 407:1, 407:7, 407:11, 410:5, 410:6, 410:14, 410:15, 410:18, 410:19, 410:24, 411:3, 414:2, 414:3, 414:5, 414:15, 414:16, 417:7,

417:8, 417:17, 418:2, 418:3, 421:22, 421:23, 422:1, 422:2, 422:3, 422:13, 422:14, 422:19, 423:6, 423:7, 424:18, 425:8, 425:11, 425:18, 425:19, 426:2, 427:5, 427:6, 427:12, 427:13, 428:8, 428:9, 428:23, 428:24, 429:1, 429:2, 429:5, 429:6, 430:8, 430:9, 431:10, 432:19, 433:20, 433:21, 434:3, 436:17, 437:11, 438:6, 438:7, 438:22, 438:23, 439:1, 440:18, 440:19, 443:15, 443:16, 443:20, 443:21, 443:25, 446:13, 446:14, 446:19, 448:1, 448:2, 448:14, 448:15, 448:17, 450:2, 450:3, 450:9, 450:10, 450:12, 450:13, 451:25, 452:1, 452:5, 452:6, 452:12, 452:21, 452:22, 453:2, 453:3, 453:7, 453:8, 453:13, 453:14, 453:18, 453:19, 453:23, 453:24, 454:5, 454:11, 454:12, 454:16, 454:17, 454:21, 454:22, 455:1, 455:2, 455:14, 455:15, 456:6, 456:11, 456:12, 456:17, 456:18, 456:23, 457:2, 457:3, 457:7, 458:1, 458:6, 458:7, 458:14, 458:15, 458:20, 458:21, 459:1, 459:2, 459:7, 459:8, 459:13, 459:14, 460:10, 460:11, 462:6, 462:7, 463:20, 464:1, 464:2, 464:7, 464:8, 464:21, 465:4, 465:7, 466:10, 469:5, 469:8, 469:19, 469:20, 469:23, 472:7, 473:3, 473:13, 473:16, 473:20, 474:2, 474:11, 474:12, 477:20, 479:18, 480:7, 480:8, 480:18, 480:19, 481:17, 482:25, 483:1, 483:6, 489:24, 490:9, 490:10, 491:6, 492:9, 492:10, 497:25, 502:8, 507:17, 507:18, 507:21, 507:22, 508:13, 510:9, 510:22, 511:19, 511:20, 514:20, 514:21, 514:24, 516:5, 517:25, 518:5, 518:6, 519:4, 519:19, 520:18, 520:19, 520:21, 520:22,

522:4, 522:5, 525:19, 531:14, 533:13, 535:11, 535:12, 539:1, 539:20, 545:21, 549:10, 553:18, 553:19, 555:12, 558:25, 573:12, 577:13, 578:2, 578:3, 578:15, 578:18, 580:4, 581:25, 583:5, 583:6, 589:1, 589:6, 589:7, 599:10, 609:7, 611:13, 611:21, 624:21, 626:5, 626:6, 627:2, 637:5
**correction** [2] - 432:13, 469:25
**corrections** [2] - 470:3, 484:18
**correctly** [5] - 354:13, 365:22, 484:3, 513:10, 624:20
**Council** [5] - 494:3, 494:11, 494:19, 495:3, 565:19
**council** [1] - 494:6
**Councils** [1] - 566:16
**Counsel** [6] - 319:3, 319:12, 320:3, 321:3, 633:21, 635:3
**counsel** [18] - 353:15, 600:19, 600:20, 601:11, 603:11, 605:14, 608:12, 608:17, 608:19, 610:9, 610:10, 612:6, 612:24, 614:3, 614:12, 616:23, 634:4, 642:17
**counsel's** [1] - 360:13
**count** [6] - 578:24, 581:4, 587:15, 587:18, 587:22, 588:21
**counted** [6] - 578:22, 578:23, 580:2, 587:5, 587:10, 588:13
**county** [1] - 639:22
**COUNTY** [4] - 318:12, 641:4, 642:3, 643:7
**County** [42] - 318:15, 321:20, 325:11, 363:8, 381:2, 401:9, 401:13, 402:11, 402:15, 402:22, 413:18, 414:18, 414:23, 415:3, 415:10, 417:11, 418:5, 418:10, 418:17, 418:23, 496:10, 501:25, 507:2, 507:9, 507:24, 510:21, 511:3, 512:14, 512:19, 512:20, 517:15, 544:3, 577:25, 580:6, 587:21, 625:21, 633:24, 638:10, 640:4, 643:9, 644:3, 644:5

**couple** [6] - 356:23, 473:4, 512:7, 536:7, 554:25, 582:9
**course** [4] - 332:8, 432:23, 597:6, 621:11
**Court** [3] - 318:21, 319:23, 643:25
**COURT** [4] - 318:1, 323:3, 325:9, 457:15, 542:17, 643:1
**court** [1] - 404:18
**cover** [4] - 328:15, 496:2, 561:18, 631:17
**covered** [4] - 470:7, 532:12, 576:15, 638:25
**covering** [1] - 563:21
**covers** [2] - 471:1, 496:15
**Crake** [1] - 452:2
**crazy** [1] - 403:25
**CRC** [4] - 318:24, 641:18, 642:22, 643:24
**create** [2] - 406:13, 554:7
**created** [4] - 364:3, 560:12, 594:4, 638:3
**creating** [1] - 481:9
**creation** [2] - 589:13, 593:23
**CREW** [7] - 502:25, 503:10, 503:11, 505:1, 505:4, 505:9, 505:15
**Crew** [57] - 437:21, 438:12, 439:4, 439:19, 440:6, 440:20, 440:21, 441:5, 441:16, 442:11, 443:23, 444:7, 444:10, 449:11, 449:14, 461:14, 461:17, 461:19, 462:4, 462:9, 462:11, 477:12, 477:13, 479:1, 479:11, 484:5, 484:7, 490:15, 491:25, 492:3, 560:15, 561:6, 561:13, 561:17, 562:12, 562:22, 562:24, 566:13, 566:19, 566:22, 567:12, 567:13, 567:23, 568:21, 570:1, 571:11, 573:11, 573:14, 573:21, 574:7, 574:8, 574:9, 574:12, 574:22, 574:23, 576:9, 576:10
**Crews** [3] - 354:21, 573:6, 575:11
**criteria** [24] - 346:21, 370:3, 371:7, 376:18, 380:25, 384:25, 385:5, 392:5, 398:13, 402:9, 407:14, 411:5, 414:17, 418:4, 500:19, 500:22,

501:1, 576:21, 600:25, 601:16, 601:19, 601:21, 605:2, 611:4
**critical** [2] - 512:12, 528:13
**Cross** [1] - 322:8
**cross** [1] - 632:22
**CROSS** [1] - 633:18
**Cross-examination** [1] - 322:8
**CROSS-EXAMINATION** [1] - 633:18
**cross-noticed** [1] - 632:22
**crowd** [1] - 541:22
**crowd-sourced** [1] - 541:22
**CRR** [4] - 318:24, 641:18, 642:22, 643:24
**cultural** [1] - 511:23
**culture** [2] - 511:25, 528:20
**cultures** [1] - 529:2
**current** [1] - 331:5, 421:20, 479:4, 485:4, 506:16, 532:23, 533:8, 606:6, 621:11
**Current** [1] - 603:7
**curriculum** [1] - 502:22
**Curriculum** [1] - 467:5
**cut** [2] - 542:23, 595:11
**cut-and-dry** [1] - 542:23

## D

**d)** [1] - 344:18
**damaged** [2] - 502:14, 511:7
**Darius** [1] - 453:20
**Dark** [1] - 458:3
**Darkness** [4] - 448:11, 448:19, 448:25, 449:9
**date** [35] - 331:12, 331:14, 343:2, 351:4, 351:11, 351:15, 351:16, 351:20, 363:25, 424:5, 424:17, 429:14, 429:15, 430:5, 431:12, 431:25, 432:7, 436:10, 450:6, 456:1, 457:14, 462:16, 463:11, 484:2, 498:19, 498:20, 504:17, 523:25, 545:8, 545:9, 639:8, 639:14, 639:16, 643:17
**DATE** [2] - 318:19, 644:25
**Date** [1] - 498:15
**DATED** [1] - 642:20
**dated** [2] - 353:6, 523:8

Deposition of Bradley Vinson, Volume 2

**dates** [9] - 428:13, 429:20, 429:23, 455:18, 467:7, 483:12, 521:16, 595:13, 613:24
**Daughter** [1] - 456:24
**DAVID** [1] - 318:6
**days** [8] - 332:11, 332:22, 395:8, 438:4, 483:17, 485:6, 582:9, 628:6
**DC** [2] - 319:8, 320:22
**deadline** [1] - 635:9
**dealt** [2] - 355:4, 355:5
**Dear** [1] - 643:14
**December** [23] - 326:1, 358:13, 362:10, 446:11, 452:8, 456:14, 464:4, 475:23, 476:5, 476:17, 482:1, 491:13, 493:17, 494:17, 495:7, 495:10, 520:21, 521:20, 522:16, 529:24, 613:14, 634:15, 639:24
**decent** [1] - 627:9
**decide** [17] - 345:4, 345:10, 345:15, 357:19, 408:15, 557:18, 557:19, 558:12, 558:14, 558:15, 558:19, 561:16, 563:2, 563:4, 571:4
**decided** [5] - 332:25, 337:1, 558:24, 621:1, 637:24
**decides** [1] - 576:17
**deciding** [10] - 349:15, 349:20, 385:1, 392:6, 398:14, 402:10, 407:15, 411:6, 414:18, 416:10
**decision** [118] - 332:13, 333:3, 333:4, 333:5, 333:6, 333:8, 333:9, 333:10, 333:13, 333:16, 333:18, 334:25, 337:3, 340:12, 346:19, 348:10, 348:23, 350:2, 350:16, 350:25, 358:16, 358:18, 367:3, 368:23, 370:4, 371:21, 372:1, 372:8, 376:19, 376:22, 377:8, 379:17, 379:23, 380:7, 381:1, 381:5, 383:8, 383:21, 385:6, 385:8, 385:20, 386:6, 388:23, 389:7, 391:14, 392:11, 392:20, 395:18, 395:22, 396:18, 398:18, 399:4, 401:8, 401:24, 402:14, 403:2, 405:1, 405:14, 406:5, 407:9, 407:19, 408:6, 410:8, 410:22,

411:10, 411:21, 413:17, 414:9, 414:22, 415:9, 417:10, 417:21, 417:25, 418:10, 418:22, 433:24, 434:2, 439:19, 440:6, 461:19, 464:15, 464:19, 464:23, 465:1, 465:6, 465:16, 467:16, 484:14, 486:16, 487:8, 487:11, 494:24, 501:1, 501:3, 541:1, 542:10, 555:14, 564:8, 565:21, 565:25, 568:21, 569:25, 572:25, 621:4, 621:20, 623:8, 623:11, 623:19, 623:24, 624:17, 625:3, 625:20, 627:3, 627:9, 627:16, 628:5, 628:25, 631:4
**decision-making** [1] - 628:5
**decisions** [35] - 342:16, 342:21, 343:7, 343:17, 347:14, 348:6, 350:14, 350:20, 362:15, 371:8, 376:3, 427:3, 434:7, 434:9, 461:21, 497:4, 497:10, 537:15, 547:12, 548:5, 548:14, 560:16, 560:18, 561:6, 564:18, 564:20, 574:24, 577:14, 601:1, 601:17, 601:22, 610:17, 610:18, 611:21, 628:20
**declaration** [25] - 361:8, 422:15, 422:21, 462:15, 462:21, 463:16, 474:3, 474:14, 474:22, 477:9, 486:4, 486:24, 487:18, 490:12, 491:19, 555:19, 577:19, 577:24, 579:7, 581:5, 583:22, 586:23, 588:11, 588:16, 589:3
**declare** [1] - 644:21
**dedicated** [1] - 628:8
**deemed** [1] - 346:14
**deeper** [3] - 491:22, 571:8, 573:1
**default** [6] - 513:18, 513:19, 514:6, 519:9, 524:25, 525:25
**Defendant** [4] - 318:13, 319:12, 321:3, 643:8
**defined** [8] - 332:6, 339:11, 477:14, 540:4, 577:8, 583:25, 584:7, 584:21
**definitely** [1] - 442:4
**definition** [15] - 341:2, 341:5, 342:11, 507:19, 508:3, 508:5, 508:21,

508:25, 509:2, 509:6, 570:14, 585:11, 585:12, 586:7
**definitions** [1] - 346:15
**degree** [5] - 496:3, 496:7, 496:9, 496:11, 508:11
**delete** [1] - 345:8
**deleted** [1] - 532:1
**deliberation** [8] - 383:21, 391:13, 396:17, 401:24, 407:6, 410:22, 414:9, 417:20
**deliberations** [3] - 376:3, 380:6, 385:16
**delivered** [1] - 643:19
**Democracy** [1] - 319:22
**DEMOCRACY** [2] - 319:4, 320:18
**demonstrate** [1] - 496:19
**denied** [1] - 509:21
**denies** [1] - 513:22
**Denny** [1] - 356:17
**Department** [10] - 550:6, 550:7, 550:20, 550:22, 552:2, 552:19, 552:24, 553:17, 554:20, 555:2
**department** [5] - 487:8, 495:19, 554:12, 602:5, 602:15
**depiction** [2] - 577:7, 587:21
**depictions** [8] - 332:21, 336:5, 539:25, 540:11, 540:24, 541:18, 543:4, 543:11
**depicts** [2] - 332:6, 338:23
**depo** [2] - 370:18, 592:22
**deposition** [50] - 325:19, 370:16, 433:14, 434:16, 522:8, 589:10, 589:12, 589:20, 590:7, 592:9, 593:1, 593:5, 593:10, 593:13, 593:14, 593:16, 593:19, 593:23, 594:3, 594:13, 594:14, 596:19, 597:1, 597:10, 597:11, 597:14, 597:16, 598:9, 598:10, 598:12, 598:16, 598:17, 598:22, 599:7, 599:9, 605:24, 606:2, 607:12, 608:9, 608:13, 608:19, 609:2, 615:20, 632:2, 632:20, 632:22, 635:18, 640:11, 643:19
**DEPOSITION** [4] - 318:15, 322:15, 323:3,

324:3
**Deposition** [2] - 643:9, 644:5
**depth** [1] - 467:24
**describe** [3] - 492:25, 503:19, 503:21
**described** [5] - 326:22, 342:1, 494:19, 497:18, 605:16
**describes** [2] - 332:6, 338:23
**describing** [1] - 634:20
**description** [6] - 406:9, 505:22, 539:24, 540:11, 563:17, 577:7
**descriptions** [7] - 332:21, 336:5, 341:25, 540:24, 541:18, 543:4, 543:11
**deselect** [2] - 533:1, 565:2
**deselected** [1] - 566:2
**deselection** [1] - 562:25
**Deserves** [1] - 453:20
**designation** [3] - 514:12, 514:19, 514:20
**desire** [1] - 622:21
**Destiny** [36] - 406:24, 422:6, 436:8, 438:9, 438:22, 442:25, 445:7, 445:20, 445:21, 445:22, 479:6, 480:2, 480:3, 480:25, 481:3, 481:5, 498:21, 499:6, 560:21, 561:3, 561:4, 561:11, 561:22, 566:8, 569:20, 570:24, 572:18, 578:5, 578:18, 582:6, 582:8, 582:9, 583:9, 588:1, 588:19, 588:20
**detail** [2] - 379:13, 383:7
**detailed** [1] - 387:2
**details** [20] - 367:15, 375:2, 383:2, 388:17, 388:22, 395:18, 396:1, 396:11, 401:1, 401:16, 405:2, 405:23, 407:2, 410:3, 410:7, 410:14, 413:12, 413:16, 417:3, 417:9
**Details** [9] - 322:19, 322:22, 322:24, 323:4, 323:6, 323:8, 323:10, 323:12, 323:14
**determination** [41] - 334:10, 335:5, 336:8, 336:15, 337:25, 341:15, 344:22, 345:12, 346:6, 346:12, 372:16, 372:21, 393:10, 408:25, 409:2,

426:22, 427:8, 428:21, 432:12, 445:16, 447:16, 448:7, 448:18, 448:21, 448:25, 450:14, 450:21, 451:3, 451:16, 461:14, 508:18, 542:2, 571:8, 573:7, 576:5, 577:3, 621:9, 622:24, 623:4, 626:23, 627:8
**determinations** [9] - 340:16, 355:16, 427:11, 427:12, 431:6, 431:7, 431:9, 493:10, 621:11
**determine** [70] - 340:2, 340:10, 340:11, 341:3, 341:11, 344:10, 345:6, 346:17, 357:5, 364:12, 372:12, 372:17, 372:22, 373:2, 377:12, 377:17, 377:24, 386:11, 386:16, 386:23, 387:6, 392:24, 393:4, 393:15, 393:25, 399:8, 399:13, 399:18, 399:23, 400:3, 406:9, 408:10, 408:20, 409:8, 411:25, 412:5, 412:10, 412:18, 415:14, 415:19, 415:24, 416:5, 419:2, 419:8, 419:13, 419:21, 423:20, 425:21, 427:11, 429:13, 433:6, 460:14, 466:20, 467:2, 491:22, 492:16, 493:5, 500:12, 513:4, 518:23, 524:11, 573:2, 575:4, 576:22, 590:1, 602:12, 604:25, 606:23, 622:24
**determined** [18] - 330:5, 335:15, 339:10, 416:2, 438:14, 439:5, 442:21, 449:12, 461:13, 462:3, 462:5, 477:13, 487:4, 492:5, 500:8, 522:6, 584:21, 619:9
**determines** [4] - 365:15, 440:21, 576:19, 606:17
**determining** [3] - 340:23, 451:19, 457:23
**detrimental** [1] - 532:6
**develop** [2] - 389:22, 528:13
**developed** [3] - 436:24, 504:5, 516:8
**developing** [1] - 355:3
**development** [3] - 512:12, 619:3, 638:22
**deviated** [3] - 613:4, 613:9, 613:20
**Diary** [3] - 447:8, 447:18, 456:7

**dictionary** [1] - 508:25
**differed** [1] - 559:19
**difference** [4] - 426:7, 439:10, 503:9, 603:19
**differences** [1] - 627:10
**different** [31] - 336:21, 337:12, 360:7, 382:13, 382:16, 382:19, 444:25, 468:4, 477:15, 477:16, 502:24, 508:22, 512:15, 521:1, 527:2, 527:3, 529:1, 529:2, 573:4, 578:1, 578:9, 579:24, 580:11, 587:4, 592:5, 595:8, 610:6, 623:1, 627:12, 628:9, 636:1
**differently** [2] - 530:5, 579:25
**differing** [3] - 512:9, 528:8, 528:14
**difficulty** [1] - 527:2
**digging** [1] - 522:13
**direct** [1] - 365:20
**Direct** [1] - 322:7
**DIRECT** [1] - 325:15
**directed** [3] - 351:10, 351:13, 351:18
**directions** [1] - 628:10
**directly** [1] - 616:18
**Director** [1] - 580:17
**disabuse** [1] - 548:19
**disagree** [1] - 371:17
**disagrees** [1] - 365:12
**disappearing** [1] - 437:2
**discern** [5] - 339:24, 357:7, 474:8, 611:20, 612:3
**disciple** [1] - 339:7
**disclaimer** [1] - 350:10
**discloses** [1] - 590:21
**disconnect** [1] - 628:19
**Discontinuation** [1] - 502:3
**discontinued** [1] - 487:3
**discovery** [1] - 360:8
**discrepancy** [3] - 587:7, 588:8, 588:10
**discriminatory** [2] - 537:8, 537:15
**discuss** [12] - 356:18, 358:22, 358:24, 434:17, 439:21, 444:8, 466:20, 555:15, 556:10, 556:14, 573:6, 605:20
**discussed** [28] - 348:5, 350:1, 350:18, 350:23, 358:19, 404:23, 438:12, 438:14, 444:11, 447:14, 464:10, 468:18, 477:12, 479:2, 479:11, 490:15,

498:15, 516:2, 518:14, 547:10, 556:2, 556:3, 590:22, 591:24, 592:2, 599:2, 605:19, 605:23
**discussing** [9] - 326:6, 350:7, 352:9, 357:4, 385:11, 441:17, 556:11, 561:17, 598:7
**discussion** [7] - 368:17, 462:9, 475:8, 478:4, 481:13, 554:16, 616:23
**Discussion** [11] - 345:24, 395:15, 420:21, 421:15, 498:10, 510:10, 516:24, 522:25, 577:17, 598:4, 632:16
**discussions** [16] - 347:5, 347:6, 349:25, 350:6, 350:17, 356:7, 356:9, 356:11, 359:14, 359:20, 359:24, 367:5, 441:6, 441:16, 443:23, 606:1
**dismiss** [2] - 436:25, 606:20
**disqualify** [3] - 532:4, 540:8, 540:12
**distinct** [1] - 362:9
**distribute** [1] - 327:6
**distributed** [4] - 327:8, 327:10, 500:1, 518:23
**District** [20] - 332:15, 333:22, 346:16, 349:2, 349:12, 351:14, 466:24, 467:3, 467:17, 467:23, 468:3, 468:8, 577:14, 595:6, 601:8, 603:4, 628:15, 628:19, 629:10, 629:20
**DISTRICT** [4] - 318:1, 318:1, 643:1, 643:1
**district** [66] - 327:2, 327:20, 335:5, 335:16, 336:6, 336:15, 337:1, 337:15, 340:2, 340:14, 345:4, 345:8, 345:10, 365:6, 389:17, 389:19, 389:23, 390:13, 390:18, 391:5, 436:22, 444:23, 472:12, 475:13, 478:7, 486:15, 487:4, 487:6, 497:11, 499:1, 499:12, 503:4, 509:9, 509:10, 509:13, 509:14, 510:4, 516:8, 520:5, 520:7, 527:1, 527:19, 528:3, 528:9, 528:21, 529:12, 529:15, 532:22, 535:7, 538:20, 538:22, 543:3, 543:6, 548:18, 548:23, 550:1, 566:1, 585:9,

586:25, 592:17, 602:13, 619:13, 619:20, 635:3, 637:17, 638:17
**District's** [1] - 363:8
**district's** [19] - 328:21, 397:12, 405:13, 481:23, 492:21, 501:17, 503:25, 527:7, 529:20, 529:21, 529:23, 539:1, 539:9, 539:22, 539:23, 594:16, 618:1, 618:4, 634:14
**district-encouraged** [1] - 389:23
**district-funded** [1] - 472:12
**districts** [5] - 551:5, 551:12, 551:16, 551:22, 553:4
**districtwide** [1] - 487:3
**dive** [1] - 325:22
**diversity** [1] - 527:2
**divide** [3] - 559:23, 560:13, 561:8
**DIVISION** [2] - 318:2, 643:2
**DMRC** [10] - 334:2, 345:1, 345:15, 469:10, 469:11, 469:14, 575:1, 575:10, 630:2, 630:3
**DMRC's** [1] - 347:22
**DMRCs** [3] - 367:2, 469:18, 595:4
**DO** [1] - 644:2
**Document** [1] - 324:4
**document** [27] - 334:6, 340:13, 340:17, 363:7, 363:9, 368:5, 375:16, 383:17, 384:21, 403:22, 503:24, 504:2, 505:7, 505:18, 516:14, 516:22, 517:5, 517:6, 517:8, 517:9, 589:16, 590:2, 601:20, 609:4, 610:7, 637:22, 644:22
**documentation** [11] - 595:5, 595:8, 599:16, 599:20, 600:15, 604:11, 607:9, 608:11, 609:23, 612:18, 612:20
**documents** [26] - 368:21, 375:14, 375:18, 379:21, 380:1, 381:18, 383:11, 383:12, 413:15, 596:23, 598:8, 603:12, 603:18, 603:25, 605:16, 608:12, 608:14, 608:16, 608:20, 608:25, 609:5, 609:8, 609:11, 616:13, 617:1, 617:2
**DOE** [1] - 530:16

**donated** [8] - 499:2, 499:16, 500:6, 500:8, 500:20, 501:2, 529:18
**donation** [2] - 500:16, 501:6
**done** [11] - 439:18, 440:7, 463:21, 558:5, 575:17, 575:19, 614:4, 632:4, 632:7, 640:9, 640:10
**door** [1] - 585:2
**doors** [1] - 529:7
**double** [18] - 413:21, 422:3, 422:4, 422:5, 423:22, 449:6, 451:10, 473:8, 473:18, 473:19, 479:10, 492:13, 549:19, 558:15, 567:17, 579:3, 582:6, 584:17
**double-check** [16] - 413:21, 422:3, 422:5, 423:22, 449:6, 451:10, 473:8, 473:18, 473:19, 479:10, 492:13, 549:19, 567:17, 579:3, 582:6, 584:17
**double-checking** [2] - 422:4, 558:15
**down** [7] - 346:22, 347:20, 510:2, 512:7, 547:2, 582:1, 585:15
**download** [1] - 421:3
**downloaded** [2] - 363:7, 503:24, 533:10
**Drama** [10] - 323:5, 388:19, 388:23, 391:16, 392:6, 392:11, 392:15, 392:24, 623:16, 625:7
**drive** [4] - 590:4, 590:6, 590:9, 595:2
**drugs/alcohol** [2] - 533:15, 534:3
**dry** [1] - 542:23
**dual** [1] - 636:6
**due** [30] - 447:25, 448:13, 450:1, 450:8, 451:24, 452:5, 452:10, 452:12, 452:20, 453:1, 453:6, 453:12, 453:17, 453:22, 454:4, 454:10, 454:15, 454:20, 454:25, 455:23, 456:5, 456:10, 456:16, 456:22, 457:1, 457:6, 458:5, 463:25, 464:6, 493:25
**DUKE** [1] - 321:12
**duly** [2] - 325:13, 641:12
**duplication** [1] - 502:14
**DUQUETTE** [1] - 321:21
**during** [17] - 352:4,

352:10, 370:8, 372:11, 377:10, 381:8, 386:9, 396:6, 397:15, 399:1, 402:18, 418:13, 437:10, 557:4, 592:2, 634:25, 635:17
**During** [1] - 421:6
**duty** [1] - 526:25

E

**E-ECSD** [9] - 322:16, 323:22, 323:24, 324:5, 324:7, 515:19, 516:15, 517:5, 553:13
**E-mail** [2] - 323:23, 324:6
**e-mail** [33] - 353:6, 353:12, 353:13, 486:23, 486:25, 516:16, 523:8, 523:10, 537:19, 549:15, 549:19, 553:14, 553:23, 553:24, 554:1, 554:5, 554:17, 554:21, 554:22, 555:23, 600:9, 600:10, 605:6, 607:5, 608:3, 614:16, 614:21, 615:2, 615:15, 615:18, 615:25, 616:9, 637:19
**e-maild** [1] - 471:3
**e-mailed** [2] - 330:8, 330:10
**e-mails** [57] - 327:3, 356:25, 373:21, 389:20, 432:10, 434:19, 434:21, 434:22, 435:1, 470:10, 471:2, 471:4, 503:6, 518:13, 549:2, 549:20, 550:10, 550:11, 550:13, 551:19, 555:5, 592:19, 596:13, 596:14, 596:24, 597:3, 597:5, 597:7, 598:21, 598:25, 599:1, 599:3, 599:4, 599:6, 599:8, 599:18, 600:1, 600:2, 600:3, 600:6, 604:24, 605:4, 607:1, 607:16, 607:20, 607:23, 608:8, 608:10, 608:24, 609:15, 610:11, 610:15, 610:21, 611:10, 611:11, 611:17, 635:17
**early** [1] - 420:14
**easy** [1] - 587:18
**eating** [1] - 337:8
**eBooks** [2] - 472:21, 472:22
**ECPS** [1] - 323:23
**ECSD** [9] - 322:16,

323:22, 323:24, 324:5, 324:7, 515:19, 516:15, 517:5, 553:13
**ECSD001872** [1] - 362:24
**ECSD001873** [1] - 362:23
**Edge** [2] - 454:7, 454:10
**Edgewater** [3] - 499:24, 499:25
**edit** [18] - 331:1, 424:1, 424:14, 426:1, 432:17, 432:22, 433:18, 437:18, 438:3, 446:10, 461:1, 485:15, 488:7, 489:20, 490:6, 491:12, 504:20, 561:1
**editing** [1] - 463:9
**edition** [3] - 502:18, 518:8, 540:6
**edits** [8] - 344:17, 455:17, 459:16, 459:22, 483:17, 488:8, 488:20, 604:20
**education** [5] - 495:14, 495:18, 512:8, 528:7, 638:11
**Education** [10] - 550:6, 550:7, 550:20, 550:22, 552:2, 552:19, 552:24, 553:18, 554:20, 555:2
**educational** [8] - 527:18, 529:16, 530:17, 531:3, 531:19, 538:14, 629:4, 629:6
**effect** [5] - 326:1, 504:12, 613:6, 613:21, 617:15
**effective** [1] - 504:12
**effectuate** [1] - 515:12
**effort** [2] - 565:7, 611:15
**eight** [4] - 358:1, 476:8, 579:10, 588:13
**eighth** [1] - 522:1
**either** [21] - 330:5, 333:25, 339:19, 340:6, 347:23, 367:8, 440:23, 443:2, 443:14, 446:2, 462:2, 471:23, 509:21, 517:11, 526:8, 545:22, 550:7, 558:11, 563:10, 632:7, 635:4
**Eleanor** [1] - 484:19
**election** [1] - 513:19
**electronic** [2] - 579:2, 608:21
**elementary** [52] - 388:23, 389:5, 389:8, 389:10, 390:14, 390:22, 392:6, 392:11, 392:16, 393:17,

393:21, 395:20, 395:23, 398:14, 398:19, 398:24, 399:4, 399:19, 399:24, 452:15, 452:17, 479:14, 479:17, 479:24, 481:15, 488:14, 489:17, 489:21, 489:23, 499:8, 506:18, 506:19, 506:23, 519:13, 526:15, 575:16, 575:20, 575:24, 576:7, 576:9, 606:9, 615:17, 622:5, 623:8, 623:14, 623:20, 625:4, 625:12, 627:20, 628:2, 630:4, 630:7
**Elementary** [2] - 579:17, 579:18
**eleven** [1] - 579:10
**eleventh** [24] - 403:12, 404:3, 404:8, 405:10, 406:6, 406:17, 406:22, 406:25, 407:10, 407:15, 407:20, 408:1, 408:7, 408:22, 409:1, 410:9, 411:6, 411:11, 411:17, 411:22, 412:15, 622:17, 626:19, 627:8
**Ellen** [6] - 353:14, 369:11, 467:19, 593:2, 593:6, 615:3
**ELLEN** [1] - 321:20
**Ellinor** [3] - 362:19, 523:3, 616:4
**ELLINOR** [1] - 319:22
**elsewhere** [2] - 480:4, 529:8
**emergency** [1] - 613:15
**employee** [3] - 529:15, 642:15, 642:16
**employees** [1] - 602:13
**employing** [1] - 634:25
**enable** [1] - 628:24
**encountered** [1] - 508:12
**encountering** [1] - 522:11
**encourage** [1] - 497:13
**encouraged** [3] - 389:23, 534:5, 541:2
**end** [8] - 487:12, 500:9, 506:7, 518:16, 528:2, 577:16, 597:22, 597:23
**End** [3] - 588:7, 588:12, 588:22
**endorses** [1] - 527:20
**endorsing** [1] - 527:22
**enjoyed** [1] - 624:3
**enrollment** [1] - 636:6
**ensure** [3] - 537:5, 537:12, 565:8
**ensuring** [1] - 494:11

**entail** [2] - 431:16, 619:11
**ENTER** [1] - 644:2
**entered** [11] - 459:19, 464:11, 465:22, 475:10, 478:13, 483:14, 485:16, 488:10, 489:12, 490:3, 491:9
**entire** [4] - 342:7, 348:12, 567:4, 568:16
**entirety** [14] - 369:3, 369:16, 376:6, 376:10, 380:10, 380:16, 383:25, 384:6, 385:12, 391:17, 391:20, 396:22, 398:1, 621:8
**entries** [8] - 471:22, 483:8, 488:16, 578:22, 578:23, 579:13, 579:19, 579:20
**entry** [9] - 444:19, 444:21, 465:22, 475:9, 480:17, 487:15, 504:22, 538:17, 578:17
**enumerated** [3] - 528:5, 531:5, 531:21
**envision** [1] - 530:10
**errata** [2] - 643:15, 643:20
**ERRATA** [1] - 644:1
**error** [4] - 361:19, 437:22, 449:6, 588:18
**errors** [1] - 450:22
**ES** [5] - 485:17, 485:18, 488:12, 489:14, 560:24
**ES/MS** [4] - 478:14, 478:17, 483:15
**ESCAMBIA** [4] - 318:12, 641:4, 642:3, 643:7
**escambia** [1] - 644:3
**Escambia** [41] - 318:15, 321:20, 325:11, 363:8, 381:2, 401:9, 401:12, 402:11, 402:15, 402:22, 413:17, 414:18, 414:23, 415:3, 415:10, 417:11, 418:5, 418:10, 418:17, 418:23, 496:10, 501:24, 505:4, 507:2, 507:9, 507:24, 510:21, 511:3, 512:14, 512:19, 512:20, 517:15, 544:3, 577:24, 580:6, 625:21, 633:24, 638:10, 640:4, 643:9, 644:5
**especially** [1] - 636:8
**ESQUIRE** [8] - 319:5, 319:14, 320:5, 320:12, 320:19, 321:5, 321:12, 643:12

**essentially** [2] - 397:22, 481:18
**established** [3] - 425:6, 533:16, 533:19
**estimate** [2] - 574:14, 574:17
**estimation** [1] - 524:23
**et** [3] - 602:7, 643:4, 644:3
**ethnic** [2] - 511:23, 528:18
**ethnicity** [1] - 620:20
**evaluate** [3] - 466:19, 467:10, 594:23
**evaluating** [3] - 371:6, 600:24, 601:2
**evidence** [2] - 344:25, 449:16
**evidenced** [1] - 433:18
**exact** [1] - 428:12
**exactly** [12] - 366:11, 444:24, 460:14, 515:13, 521:16, 550:13, 554:9, 555:5, 580:14, 609:16, 612:1, 638:24
**exam** [10] - 495:20, 495:23, 495:24, 496:1, 496:2, 496:15, 638:18, 638:19, 638:24, 639:18
**EXAMINATION** [5] - 325:15, 633:18, 636:21, 639:3, 640:1
**Examination** [4] - 318:24, 322:7, 322:9, 322:11
**examination** [4] - 322:8, 322:10, 613:23, 642:9
**examine** [2] - 467:9, 507:5
**examining** [1] - 541:23
**example** [9] - 333:11, 406:13, 423:2, 472:10, 522:2, 542:25, 599:6, 602:2, 635:16
**examples** [1] - 584:2
**excellent** [1] - 558:13
**except** [1] - 560:24
**exception** [1] - 473:2
**exceptions** [1] - 332:8
**excerpt** [1] - 585:21
**excerpts** [13] - 341:21, 362:25, 376:14, 380:21, 384:13, 392:2, 397:5, 398:10, 402:5, 407:8, 410:25, 414:13, 417:24
**exchanged** [1] - 553:14
**exchanges** [1] - 516:16
**exclude** [2] - 441:22, 532:5
**excluded** [1] - 370:17

**exercise** [1] - 463:21
**EXH** [2] - 323:16, 323:18
**Exhibit** [145] - 322:16, 322:17, 322:19, 322:22, 322:24, 323:4, 323:6, 323:8, 323:10, 323:12, 323:14, 323:16, 323:18, 323:20, 323:21, 323:23, 324:4, 324:6, 325:24, 331:4, 343:20, 351:22, 360:2, 360:3, 360:6, 360:14, 362:22, 363:5, 363:7, 364:23, 367:10, 367:12, 367:13, 367:15, 374:24, 375:2, 375:4, 375:7, 375:22, 379:8, 379:9, 379:13, 382:25, 383:2, 388:14, 388:15, 388:17, 391:7, 395:11, 395:17, 400:21, 401:1, 401:18, 404:14, 405:22, 406:1, 409:24, 409:25, 410:2, 413:9, 413:10, 413:12, 413:25, 417:1, 417:3, 417:14, 420:23, 421:1, 421:17, 422:23, 422:24, 423:11, 430:11, 435:25, 436:5, 436:6, 437:9, 437:16, 438:18, 438:21, 444:2, 444:16, 451:1, 461:23, 466:16, 470:14, 471:18, 471:20, 473:10, 473:23, 474:20, 479:4, 480:6, 480:12, 480:14, 480:16, 480:24, 482:13, 484:21, 488:15, 493:23, 497:1, 498:3, 498:11, 498:12, 498:14, 501:9, 501:13, 502:3, 503:12, 503:13, 505:19, 515:15, 515:16, 515:18, 516:11, 516:12, 516:14, 517:3, 517:5, 518:2, 518:11, 520:11, 520:13, 526:21, 538:7, 544:23, 553:8, 553:10, 553:13, 577:20, 578:6, 578:16, 578:17, 584:3, 584:6, 584:10, 587:3, 587:20, 587:24, 588:20, 589:8, 616:1, 639:10
**exhibit** [13] - 358:11, 410:17, 435:16, 435:17, 449:2, 471:15, 498:8, 557:13, 578:21, 584:2, 615:14, 615:20, 616:3
**exhibits** [2] - 435:19, 584:11, 584:14, 597:13, 597:16, 597:22, 597:23, 598:10, 598:14

Deposition of Bradley Vinson, Volume 2

**EXHIBITS** [3] - 322:15, 323:3, 324:3
**exist** [2] - 466:22, 630:8
**existed** [3] - 425:10, 493:1, 639:12
**existence** [1] - 576:25
**exit** [1] - 630:9
**expand** [1] - 405:4
**expanded** [1] - 405:24
**expanding** [1] - 404:15
**expect** [4] - 437:2, 509:23, 510:1, 597:4
**expectation** [2] - 499:4, 515:9
**expectations** [2] - 493:8, 631:18
**expected** [2] - 507:5, 552:9
**expedited** [5] - 349:5, 349:6, 350:20, 350:25, 469:4
**expensive** [1] - 487:6
**experience** [8] - 499:14, 499:19, 506:21, 527:16, 606:10, 629:4, 629:7, 634:22
**experiences** [2] - 620:24, 638:8
**EXPIRES** [1] - 641:21
**explain** [8] - 367:2, 367:4, 370:11, 434:5, 434:10, 488:19, 525:22, 587:16
**explanation** [1] - 587:6
**explore** [2] - 466:21, 529:6
**express** [1] - 545:5
**expressed** [11] - 374:11, 374:19, 379:4, 382:21, 388:10, 394:24, 512:18, 544:7, 544:12, 546:4, 628:18
**extent** [3] - 410:21, 414:8, 591:13
**extra** [1] - 542:20
**Eye** [22] - 323:9, 401:3, 401:8, 401:25, 402:10, 402:15, 403:2, 403:6, 404:25, 405:10, 405:15, 405:18, 407:6, 407:10, 407:15, 407:20, 408:7, 408:11, 408:21, 409:13, 622:10, 622:14

---

**F**

---

**face** [2] - 335:6, 338:2
**facially** [2] - 336:18, 345:7

**facilitate** [1] - 468:22
**fact** [22] - 336:11, 341:17, 346:7, 348:11, 352:6, 393:19, 416:3, 422:11, 427:6, 437:4, 469:6, 497:9, 519:17, 523:17, 532:3, 540:6, 547:11, 583:4, 583:7, 583:10, 583:17, 611:18
**factor** [2] - 512:1, 533:3
**factors** [5] - 497:3, 497:5, 497:9, 531:10, 531:22
**facts** [6] - 334:11, 335:7, 336:17, 345:13, 346:7, 644:22
**factual** [1] - 359:12
**factually** [10] - 365:19, 373:3, 377:25, 387:7, 394:1, 400:4, 409:9, 412:19, 416:6, 419:22
**faculty** [1] - 500:14
**FACUNDO** [1] - 320:5
**fair** [11] - 371:10, 397:9, 397:18, 397:20, 434:15, 500:19, 500:25, 549:16, 555:7, 563:17, 639:11
**fairly** [1] - 448:20
**Fairy** [4] - 338:8, 340:20, 340:21, 340:22
**fall** [9] - 354:16, 355:2, 355:23, 357:24, 506:19, 521:14, 523:23, 524:3, 604:25
**falls** [2] - 341:18, 429:9
**FAME** [2] - 551:6, 551:7
**familiar** [15] - 366:13, 449:7, 467:24, 496:19, 503:2, 504:2, 506:15, 506:16, 518:17, 521:11, 565:20, 596:2, 603:4, 603:6, 636:12
**familiarize** [2] - 493:2, 589:24, 595:13
**families** [1] - 514:9
**family** [4] - 514:11, 515:23, 536:7, 620:21
**far** [5] - 562:11, 604:21, 606:25, 614:19, 615:1
**farm** [1] - 583:18
**fashion** [1] - 529:6
**FASM** [1] - 551:7
**FATEMA** [1] - 551:7
**favor** [2] - 437:17, 558:11
**features** [1] - 623:23
**Feb** [2] - 322:22, 322:24
**February** [13] - 376:2, 380:5, 383:20, 452:18, 456:20, 460:6, 478:13,

479:15, 481:19, 481:22, 482:2, 483:15, 485:2
**federal** [1] - 633:5
**feedback** [5] - 562:18, 562:19, 565:19, 573:7, 630:13
**fell** [1] - 340:3
**felt** [3] - 358:4, 568:8, 617:19
**Female** [1] - 464:3
**few** [11] - 329:2, 442:4, 446:24, 450:22, 488:8, 538:7, 544:11, 545:23, 633:20, 635:2, 636:18
**fewer** [2] - 567:24, 576:12
**fiction** [2] - 406:12, 452:17
**fifth** [3] - 576:3, 624:2, 624:7
**fight** [2] - 633:8, 633:11
**Fights** [2] - 472:9, 485:11
**figure** [6] - 396:3, 524:11, 526:7, 526:20, 557:13, 605:20
**figures** [1] - 588:20
**filed** [1] - 615:9
**files** [1] - 608:24
**filtered** [3] - 421:5, 421:20, 471:22
**final** [9] - 336:8, 337:3, 337:17, 346:19, 348:4, 407:4, 489:19, 494:14, 538:7
**finally** [2] - 335:15, 400:18
**financially** [1] - 642:18
**findings** [10] - 372:8, 377:7, 386:5, 392:19, 399:3, 403:1, 408:5, 411:20, 415:8, 418:21
**fine** [4] - 395:5, 420:15, 420:16, 597:25
**finished** [1] - 570:19
**first** [34] - 325:13, 327:15, 357:25, 360:9, 362:23, 368:6, 380:1, 383:17, 432:9, 437:24, 439:7, 441:9, 441:15, 442:4, 444:12, 446:8, 447:2, 447:22, 459:19, 475:9, 478:11, 478:21, 493:20, 503:18, 517:14, 521:2, 521:14, 523:7, 544:24, 554:5, 561:20, 579:19, 579:20, 595:14
**Firsts** [1] - 454:18
**fit** [1] - 627:20
**five** [7] - 332:11, 332:22,

457:23, 468:14, 500:5, 579:9, 586:25
**Five** [2] - 446:25, 447:17
**five-day** [1] - 457:23
**flabbergasted** [1] - 608:15
**flag** [1] - 435:16
**flip** [1] - 331:10
**flipping** [1] - 337:8
**Flood** [1] - 452:7
**Floor** [2] - 320:7, 320:14
**Flor** [2] - 472:9, 485:11
**Florida** [30] - 318:22, 319:17, 321:8, 321:15, 540:4, 550:1, 550:5, 550:7, 551:8, 552:2, 552:18, 552:23, 553:17, 555:2, 581:18, 582:2, 584:1, 584:22, 602:5, 602:15, 602:16, 603:24, 604:6, 620:6, 638:16, 639:6, 639:13, 641:8, 641:9, 642:7
**FLORIDA** [7] - 318:1, 319:1, 319:21, 641:3, 641:19, 642:2, 643:1
**flowchart** [4] - 593:24, 594:2, 594:4, 594:7
**flowers** [2] - 565:13, 565:15
**flustered** [1] - 609:3
**Focus** [8] - 517:18, 517:20, 518:3, 518:25, 524:13, 524:24, 525:4, 525:15
**focus** [3] - 441:1, 559:24, 613:7
**focused** [2] - 342:9, 355:1, 526:18
**focusing** [1] - 441:15
**follow** [9] - 496:20, 499:10, 554:19, 554:22, 633:21, 636:4, 636:18, 636:19, 639:5
**follow-up** [2] - 633:21, 639:5
**follow-ups** [2] - 636:18, 636:19
**followed** [3] - 494:12, 495:9, 514:2
**following** [8] - 325:1, 438:20, 441:10, 528:1, 531:4, 531:20, 532:2, 534:24
**follows** [2] - 325:14, 409:5
**fooling** [1] - 584:23
**FOR** [2] - 318:1, 643:1
**foregoing** [2] - 642:11, 644:22

**Forest** [2] - 567:10, 571:19
**Forever** [1] - 458:22
**forgot** [1] - 367:18
**form** [205] - 326:15, 326:17, 326:24, 327:2, 327:6, 327:7, 327:8, 327:15, 327:16, 329:5, 330:8, 334:3, 335:9, 336:20, 337:4, 337:19, 338:4, 338:9, 338:14, 339:15, 341:16, 341:22, 342:12, 343:25, 344:14, 345:18, 347:2, 347:17, 348:1, 349:8, 349:16, 349:21, 350:9, 350:22, 351:2, 353:1, 354:22, 355:7, 357:17, 358:3, 358:14, 363:12, 363:22, 364:2, 364:19, 366:3, 366:8, 366:18, 372:9, 372:15, 374:21, 379:6, 379:13, 381:12, 382:24, 383:2, 383:7, 384:23, 386:8, 388:12, 390:7, 392:21, 395:1, 399:6, 402:12, 403:3, 408:8, 411:23, 415:12, 418:25, 424:7, 426:3, 430:14, 431:11, 446:18, 457:13, 461:5, 461:8, 461:9, 465:2, 465:11, 472:6, 479:19, 479:21, 479:22, 479:24, 480:5, 488:13, 495:12, 497:12, 497:20, 499:18, 500:23, 501:7, 506:12, 507:11, 508:24, 509:5, 509:17, 509:25, 510:24, 511:11, 512:22, 513:1, 515:23, 516:6, 516:25, 518:3, 518:9, 519:5, 519:20, 521:21, 522:21, 523:17, 523:18, 524:4, 524:9, 530:8, 534:9, 534:13, 534:17, 535:3, 535:21, 536:1, 536:9, 536:16, 536:22, 537:9, 537:16, 539:3, 540:2, 540:14, 545:4, 545:13, 546:6, 546:20, 547:7, 547:20, 548:2, 548:7, 548:11, 548:16, 548:22, 549:21, 550:3, 551:18, 551:24, 552:4, 552:20, 553:1, 553:6, 556:25, 558:2, 559:5, 559:22, 563:19, 564:10, 569:8, 570:25, 571:6, 571:17, 572:6, 574:18, 576:24, 577:4, 582:22, 582:24, 583:16, 611:22,

Deposition of Bradley Vinson, Volume 2

615:11, 617:16, 618:3, 618:16, 618:23, 620:15, 620:22, 621:6, 621:25, 622:22, 623:10, 623:21, 624:19, 625:5, 625:22, 626:21, 627:6, 627:17, 628:7, 629:1, 629:18, 630:3, 630:11, 630:23, 631:11, 631:14, 631:22, 636:24, 637:3, 637:9, 637:15, 637:25, 638:3, 638:13
**Form** [4] - 323:21, 515:22, 517:21, 518:1
**formal** [5] - 391:5, 558:21, 559:3, 634:7, 634:9
**formalized** [2] - 390:20, 499:4
**formed** [2] - 469:18, 594:23
**forming** [1] - 467:4
**forms** [10] - 337:5, 337:8, 337:14, 339:23, 340:1, 364:10, 508:8, 518:20, 608:21, 610:25
**forth** [4] - 354:21, 366:22, 501:16, 632:15
**forum** [9] - 374:10, 374:18, 378:24, 379:1, 379:3, 382:20, 387:18, 388:9, 394:23
**forward** [6] - 463:12, 469:14, 478:16, 506:25, 555:16, 619:21
**forwarded** [1] - 643:20
**four** [13] - 564:16, 569:17, 570:3, 570:14, 570:17, 574:1, 579:8, 579:9, 579:12, 579:13, 579:20, 594:17, 619:7
**fourth** [2] - 576:2, 624:2
**FPR** [4] - 318:24, 641:18, 642:22, 643:24
**free** [4] - 500:16, 500:18, 506:8, 609:13
**Freedom** [3] - 447:8, 447:17, 456:7
**frequently** [1] - 573:15
**Friday** [3] - 318:19, 322:3, 641:11, 643:10, 644:6
**frivolous** [1] - 606:21
**front** [1] - 339:4
**FS** [14] - 332:5, 332:7, 372:13, 377:13, 386:13, 393:1, 399:10, 408:12, 412:2, 415:16, 419:4, 506:9, 507:10, 538:20
**full** [15] - 404:15, 405:5,

410:21, 414:8, 417:20, 506:6, 519:10, 542:1, 564:7, 597:2, 597:5, 636:25, 637:3, 637:4, 638:2
**fully** [2] - 516:7, 542:15
**funded** [2] - 472:12, 499:10
**funding** [1] - 499:6
**funds** [1] - 472:15
**FURTHER** [1] - 642:14
**future** [1] - 488:20

G

**gather** [2] - 542:13, 576:7
**gender** [7] - 533:5, 533:6, 533:14, 534:2, 535:25, 537:7, 537:13
**general** [8] - 341:9, 341:14, 355:25, 362:1, 535:10, 619:25, 620:1, 620:2
**generally** [13] - 361:21, 389:16, 427:2, 493:14, 514:8, 530:14, 546:21, 577:2, 603:6, 622:19, 627:5, 633:7, 635:8
**generated** [1] - 610:25
**genitals** [3] - 585:14, 585:16, 586:8
**GEORGE** [1] - 318:5
**George** [5] - 487:16, 487:17, 487:24, 487:25, 488:1
**Girl** [2] - 456:3, 488:4
**Girls** [15] - 323:11, 410:5, 410:9, 410:23, 411:3, 411:6, 411:11, 411:17, 411:22, 412:1, 412:6, 412:11, 412:19, 412:25, 626:7
**given** [17] - 376:16, 411:2, 493:6, 493:21, 500:4, 501:20, 513:6, 530:12, 531:3, 534:23, 535:2, 535:19, 537:6, 537:13, 538:14, 613:21, 626:24
**GLASS** [1] - 318:4
**goal** [3] - 362:13, 515:10, 618:15
**God** [1] - 454:23
**GOEL** [1] - 320:19
**Goodnight** [2] - 335:12, 336:4
**Google** [1] - 341:23
**governed** [1] - 494:25

**governing** [1] - 637:22
**Governor's** [5] - 550:8, 550:24, 552:3, 552:19, 552:24
**governs** [1] - 406:21
**grabbing** [1] - 616:4
**grade** [53] - 348:20, 349:7, 365:18, 367:9, 368:2, 371:22, 372:23, 386:24, 393:16, 399:19, 404:4, 404:9, 406:17, 406:22, 406:25, 407:16, 407:21, 408:2, 408:7, 408:21, 408:22, 410:9, 411:7, 411:12, 411:17, 411:22, 412:11, 412:15, 412:17, 415:25, 416:3, 419:14, 419:18, 519:11, 519:12, 519:14, 519:18, 522:1, 530:13, 563:13, 563:16, 563:25, 564:4, 564:22, 564:24, 564:25, 577:12, 622:18, 626:19, 627:8, 631:9, 634:3, 637:6
**grader** [2] - 576:1, 624:8
**graders** [5] - 405:10, 406:6, 407:10, 409:1, 624:2
**grades** [4] - 403:8, 476:8, 575:22, 576:3
**grammar** [1] - 333:19
**grant** [4] - 326:13, 343:23, 363:13, 499:10
**granted** [3] - 329:9, 345:14, 347:22
**granting** [1] - 328:11
**graphic** [13] - 444:20, 444:22, 445:1, 450:4, 450:15, 461:10, 587:1, 587:5, 587:11, 587:14, 587:16, 587:17, 588:3
**Great** [1] - 453:20
**great** [6] - 338:9, 397:25, 458:2, 511:10, 519:25, 630:6
**greater** [1] - 442:1
**GROSHOLZ** [1] - 321:5
**group** [13] - 354:13, 355:4, 365:18, 372:23, 386:24, 393:16, 399:20, 441:18, 549:18, 567:25, 573:6, 577:11
**groups** [8] - 348:19, 408:22, 412:12, 415:25, 419:14, 511:23, 528:19, 529:2
**guess** [7] - 442:8, 458:10, 473:18, 534:20, 563:7, 570:8, 584:11

**guessing** [1] - 581:13
**guidance** [3] - 515:3, 537:11, 538:1
**guide** [1] - 504:6
**guidelines** [4] - 347:1, 390:13, 494:12, 496:21

H

**hand** [6] - 325:4, 345:5, 584:24, 585:15, 586:12, 641:13
**handful** [1] - 555:9
**handing** [1] - 420:25
**handle** [7] - 550:2, 551:13, 551:16, 551:23, 558:23, 560:22, 643:16
**handled** [2] - 551:5, 566:3
**handling** [4] - 553:5, 560:9, 618:1, 618:5
**Handmaid's** [3] - 444:20, 444:21, 449:20
**hands** [1] - 586:3
**handwritten** [1] - 360:13
**hang** [1] - 403:12
**happy** [1] - 597:19
**hard** [5] - 340:9, 340:11, 405:23, 441:9, 499:21
**harder** [1] - 339:24
**harmful** [3] - 507:16, 620:12, 620:18
**Hate** [15] - 360:23, 423:9, 425:15, 577:21, 577:25, 578:11, 578:17, 578:24, 579:19, 581:3, 581:17, 582:17, 583:23, 584:6, 584:20
**HB** [141] - 328:9, 328:13, 328:16, 328:22, 329:19, 330:15, 339:23, 342:1, 342:13, 343:7, 344:6, 347:25, 348:15, 352:25, 354:5, 354:19, 355:3, 355:13, 356:2, 357:9, 357:22, 358:12, 359:1, 359:3, 359:8, 359:15, 359:21, 359:23, 376:15, 380:22, 384:13, 384:16, 384:20, 392:2, 398:10, 402:6, 407:8, 407:9, 411:1, 414:13, 417:24, 432:21, 432:24, 433:12, 435:8, 438:9, 439:1, 439:8, 439:12, 439:16, 440:2, 440:17, 441:12, 441:19, 442:5, 442:17, 442:24, 443:25, 445:6, 445:11, 446:2, 449:9,

449:16, 451:1, 451:13, 461:10, 461:25, 462:17, 466:8, 484:3, 490:20, 490:22, 491:1, 491:22, 492:13, 492:15, 493:25, 495:6, 504:18, 532:13, 537:22, 539:19, 540:5, 545:2, 545:6, 545:11, 545:16, 545:21, 545:24, 546:1, 546:4, 546:8, 546:11, 546:15, 546:19, 546:21, 547:5, 547:25, 548:4, 548:9, 548:13, 548:20, 549:5, 555:4, 566:24, 567:14, 568:24, 569:5, 569:9, 569:25, 570:3, 570:6, 572:11, 572:15, 572:17, 573:1, 575:17, 575:19, 575:21, 582:3, 583:17, 601:5, 613:13, 614:6, 614:15, 615:16, 616:15, 616:16, 617:15, 628:11, 639:24
**head** [2] - 339:22, 473:5
**headed** [1] - 624:4
**heading** [1] - 586:12
**Hear** [2] - 453:25, 454:1
**heard** [3] - 468:22, 478:2, 502:24
**hearing** [3] - 341:15, 521:14, 611:14
**Heaven** [3] - 473:8, 473:12, 489:9
**heavier** [1] - 559:24
**held** [1] - 376:1
**help** [7] - 431:1, 433:9, 504:6, 528:12, 559:12, 628:9, 628:17
**helped** [1] - 612:3
**helpful** [4] - 339:13, 481:12, 629:13, 630:10
**helpfully** [1] - 469:24
**helps** [1] - 560:16
**hereby** [2] - 641:10, 642:8
**herein** [2] - 641:10, 642:10
**heritage** [2] - 511:25, 528:20
**herself** [1] - 318:7
**hesitant** [1] - 436:25
**heterosexual** [1] - 536:7
**HEYWOOD** [32] - 319:22, 360:3, 367:13, 374:24, 379:9, 388:14, 393:18, 400:20, 400:22, 409:24, 413:9, 416:25, 421:12, 435:20, 435:22, 435:24, 436:2, 471:17, 498:6, 498:9, 503:12,

503:17, 503:21, 515:15, 516:11, 516:23, 517:2, 523:1, 553:8, 557:16, 616:6, 633:2
**HH** [1] - 641:20
**high** [54] - 355:9, 389:1, 390:10, 393:20, 401:12, 438:15, 440:9, 460:9, 460:25, 471:24, 482:25, 483:19, 484:22, 488:16, 488:24, 489:3, 489:5, 519:13, 526:14, 543:18, 562:6, 562:11, 562:17, 563:14, 563:16, 564:1, 564:4, 566:13, 566:21, 566:23, 567:1, 567:3, 567:9, 567:12, 567:25, 568:14, 574:23, 575:6, 575:11, 578:1, 581:23, 583:4, 583:5, 583:8, 620:4, 621:5, 621:20, 621:22, 622:7, 622:18, 626:3, 626:4, 627:4, 633:24
**High** [4] - 479:25, 581:18, 582:2
**higher** [5] - 390:15, 391:4, 623:25, 637:11, 637:12
**highlighted** [1] - 340:24
**himself** [3] - 318:5, 318:8, 318:10
**histories** [3] - 470:11, 595:25, 596:1
**history** [16] - 331:1, 364:8, 424:1, 424:14, 426:1, 433:18, 437:19, 470:20, 470:22, 485:15, 488:7, 521:23, 522:8, 589:22, 596:3, 604:20
**hold** [2] - 362:18, 591:9
**holds** [2] - 529:16, 567:1
**home** [2] - 518:20, 617:19
**Honey** [1] - 459:3
**honor** [1] - 562:9
**hope** [2] - 455:4, 509:7
**HOPE** [1] - 318:9
**hopeful** [2] - 628:13, 628:17
**hoping** [1] - 389:22
**hours** [3] - 607:13, 628:8, 635:14
**House** [7] - 334:20, 334:24, 335:3, 346:9, 455:3, 529:22, 639:19
**HOUSE** [1] - 318:7
**how-tos** [1] - 519:1
**HS** [17] - 460:7, 460:15, 460:20, 475:12, 478:15,

478:17, 483:15, 483:18, 483:20, 485:1, 485:2, 485:18, 488:12, 489:14, 489:19, 560:24
**human** [1] - 362:4
**hurdle** [1] - 628:12
**hypothetical** [1] - 570:19

                I

**idea** [2] - 473:9, 572:13
**ideal** [2] - 349:24, 618:17
**ideally** [2] - 542:7, 574:19
**ideas** [4] - 347:4, 350:6, 528:17, 529:1
**identification** [18] - 360:2, 363:5, 367:12, 379:8, 382:25, 388:15, 395:11, 400:21, 409:25, 413:10, 417:1, 420:23, 471:18, 503:13, 515:16, 516:12, 517:3, 553:10
**identified** [12] - 357:25, 360:5, 361:14, 363:1, 422:15, 423:4, 450:22, 464:10, 478:20, 482:6, 572:11, 589:14
**identify** [13] - 333:4, 354:2, 384:22, 474:4, 533:5, 533:9, 541:22, 590:17, 592:13, 600:8, 602:25, 605:4, 609:13
**identity** [9] - 371:3, 533:7, 533:14, 534:3, 535:25, 537:7, 537:14, 604:14, 620:20
**imagine** [2] - 544:4, 544:7
**immediately** [1] - 528:1
**impact** [7] - 389:7, 442:1, 542:9, 547:25, 548:4, 548:9, 548:13
**impacted** [1] - 540:25
**impending** [1] - 617:14
**implement** [2] - 406:10, 499:13
**implementation** [3] - 522:9, 634:15, 639:19
**implemented** [4] - 406:6, 506:10, 507:1, 517:15, 521:19, 523:22, 523:25, 524:1
**implementing** [1] - 332:19
**implied** [2] - 409:6, 409:7
**importance** [1] - 629:16
**important** [8] - 512:2,

512:4, 527:11, 527:12, 528:21, 528:24, 528:25, 529:3
**impose** [1] - 515:11
**impression** [1] - 544:21
**improved** [1] - 628:5
**IN** [6] - 318:1, 319:1, 319:21, 643:1, 643:9, 644:3
**inaccurate** [11] - 365:20, 373:3, 377:25, 387:7, 394:1, 400:4, 409:9, 412:19, 416:6, 419:22, 502:15
**inappropriate** [16] - 348:2, 365:18, 372:23, 386:24, 393:16, 393:21, 399:19, 408:21, 409:3, 412:11, 412:16, 415:25, 419:14, 502:16, 583:19, 622:3
**INC** [2] - 318:4, 643:4
**Inc** [1] - 644:3
**incidents** [1] - 540:7
**include** [14] - 421:5, 441:20, 467:16, 467:22, 468:5, 474:22, 501:2, 519:14, 530:15, 543:18, 562:9, 581:12, 629:12, 629:24
**included** [26] - 341:22, 359:4, 384:16, 482:12, 482:14, 486:4, 486:10, 491:18, 504:19, 509:1, 512:1, 512:10, 518:19, 527:10, 576:24, 577:4, 579:6, 585:23, 586:15, 597:8, 598:13, 599:1, 637:4, 637:9, 637:12, 638:19
**includes** [3] - 429:3, 595:3, 631:14
**including** [11] - 371:6, 425:13, 494:23, 508:14, 511:16, 516:17, 520:4, 591:5, 594:24, 600:24, 632:9
**inclusion** [4] - 509:20, 540:10, 544:5, 622:7
**inconsistencies** [1] - 565:13
**inconsistent** [2] - 613:5, 613:20
**independently** [1] - 565:21
**indicate** [12] - 386:21, 432:11, 461:18, 462:18, 462:20, 513:21, 515:24, 541:21, 543:15, 558:15, 583:22, 584:13

**indicated** [20] - 338:18, 346:4, 347:13, 355:19, 357:9, 361:8, 361:13, 423:2, 426:23, 434:22, 457:17, 483:25, 508:9, 545:17, 578:10, 583:18, 583:24, 588:13, 598:23, 637:3
**indicates** [11] - 342:13, 438:14, 439:14, 461:8, 461:10, 479:24, 480:5, 482:23, 511:4, 586:24, 602:1
**indicating** [2] - 499:6, 607:2
**indications** [1] - 439:10
**indicative** [1] - 448:24
**individual** [43] - 326:23, 327:22, 364:14, 364:16, 365:13, 371:11, 373:21, 374:11, 374:19, 378:25, 379:4, 382:21, 386:21, 394:24, 398:23, 402:25, 451:5, 461:20, 472:12, 472:13, 487:9, 493:2, 509:14, 521:23, 522:6, 534:18, 536:11, 546:7, 547:15, 552:22, 553:3, 565:25, 566:25, 567:14, 568:22, 569:1, 571:1, 571:7, 576:17, 576:19, 596:1, 604:21, 617:7
**Individual** [4] - 318:16, 325:11, 643:10, 644:6
**individually** [3] - 377:21, 462:3, 575:5
**individuals** [3] - 496:15, 548:24, 617:20
**industry** [1] - 630:3
**inflated** [1] - 525:21
**inflates** [1] - 524:25
**inform** [1] - 350:18
**information** [29] - 386:22, 391:8, 396:9, 401:18, 405:18, 407:12, 409:14, 410:12, 420:1, 431:3, 431:21, 435:5, 435:7, 467:22, 514:13, 514:14, 524:13, 527:15, 529:7, 577:3, 578:4, 594:9, 599:22, 610:5, 610:23, 612:3, 628:23, 629:19, 636:3
**informed** [2] - 515:5, 628:24
**informing** [1] - 517:13
**inherited** [1] - 499:23
**initial** [9] - 433:11, 504:19, 518:20, 567:5, 570:20, 571:14, 571:19,

572:5, 608:1
**Innovation** [2] - 323:20, 503:25
**innovation** [1] - 504:9
**input** [20] - 349:12, 349:14, 349:19, 349:24, 350:2, 350:7, 350:9, 350:16, 350:21, 375:16, 381:12, 493:4, 494:4, 542:13, 544:4, 566:16, 575:1, 576:7, 629:23, 630:18
**inquire** [1] - 353:4
**inquiries** [1] - 555:1
**inquiring** [1] - 353:16
**inquiry** [1] - 358:1
**instance** [3] - 336:13, 337:15, 337:24, 586:16, 640:12
**instances** [4] - 339:14, 439:1, 574:24
**instituting** [1] - 350:25
**instruct** [2] - 353:20, 609:10
**instructing** [1] - 591:11
**Instruction** [1] - 467:6
**instruction** [3] - 327:5, 499:12, 590:21
**instructional** [4] - 554:8, 559:25, 635:19, 636:13
**insufficient** [1] - 345:7
**intend** [4] - 347:6, 347:19, 350:24, 353:10
**intended** [1] - 544:12
**intentionally** [1] - 370:17
**interest** [2] - 493:21, 502:16
**interested** [2] - 493:13, 642:18
**interesting** [2] - 482:21, 618:13
**interests** [3] - 511:14, 527:4, 527:14
**interfile** [1] - 406:11
**interlibrary** [14] - 389:13, 389:16, 390:10, 391:2, 516:4, 519:15, 519:19, 634:5, 634:8, 636:23, 637:4, 637:16, 637:18, 637:25
**interpret** [1] - 601:24
**interpretation** [2] - 545:18, 552:8
**interpreted** [2] - 582:25, 583:19
**interpretive** [1] - 585:9
**interprets** [1] - 538:23
**interrogatories** [3] - 470:13, 470:16, 470:18
**interrogatory** [19] -

366:10, 369:9, 369:13, 369:21, 369:25, 376:8, 380:13, 380:19, 384:3, 384:4, 384:10, 391:19, 391:24, 396:25, 397:3, 397:11, 397:14, 397:23, 398:5

**interrupt** [2] - 395:4, 493:12

**introductory** [1] - 506:3

**inventory** [1] - 436:10

**invited** [1] - 562:6

**invoked** [1] - 339:19

**involve** [2] - 430:4, 506:22

**involved** [7] - 433:10, 434:8, 465:13, 491:21, 494:10, 592:18, 601:7

**involvement** [1] - 607:6

**issue** [10] - 356:8, 368:17, 482:15, 497:16, 497:21, 571:22, 621:1, 629:17, 633:14, 635:16

**issued** [1] - 365:6

**issues** [2] - 533:20, 635:22

**IT** [2] - 592:18, 606:10

**Item** [9] - 322:19, 322:22, 322:24, 323:4, 323:6, 323:8, 323:10, 323:12, 323:14

**item** [21] - 383:2, 388:17, 388:22, 395:17, 396:1, 396:11, 401:1, 401:7, 401:16, 405:2, 405:23, 406:15, 407:2, 410:2, 410:7, 410:14, 413:12, 413:16, 417:9, 527:18, 527:20

**items** [15] - 367:15, 375:2, 379:13, 383:7, 389:20, 400:23, 417:3, 470:12, 470:21, 557:9, 557:21, 558:21, 561:9, 612:17, 619:9

**iterations** [1] - 460:24

**itself** [10] - 333:8, 341:7, 350:11, 370:8, 431:6, 465:3, 541:4, 541:9, 541:23, 591:20

**iv** [1] - 539:18

---

**J**

**January** [1] - 447:24

**jeans** [1] - 586:5

**JEFFREY** [1] - 321:5

jgrosholz@rumberger. **com** [1] - 321:6

---

**job** [3] - 559:16, 617:18, 621:11

**jog** [1] - 433:9

**jogs** [1] - 431:4

**Johnson** [7] - 592:15, 593:7, 595:17, 595:21, 595:24, 596:5, 596:8

**JOHNSON** [1] - 318:5

**July** [30] - 328:4, 328:9, 328:25, 329:1, 329:13, 334:17, 344:16, 352:7, 355:15, 361:15, 361:22, 429:22, 457:9, 457:15, 462:24, 465:24, 466:1, 475:24, 488:25, 490:16, 491:5, 531:25, 532:8, 539:25, 540:20, 540:23, 541:19, 542:3, 543:8, 552:16

**jumbled** [1] - 616:12

**jump** [1] - 455:5

**June** [11] - 331:9, 343:4, 355:15, 429:22, 430:1, 434:6, 464:12, 552:10, 552:11, 552:12, 552:16

**Junior** [2] - 574:8, 574:9

**justify** [1] - 500:17

**juvenile** [1] - 339:4

---

**K**

**K-12** [1] - 323:21

**keep** [9] - 349:11, 364:21, 420:12, 420:22, 430:22, 564:21, 564:22, 623:19, 632:2

**keeping** [1] - 349:10

**keeps** [1] - 349:7

**Keith** [5] - 551:21, 552:1, 552:6, 552:18, 593:12

**Kerry** [1] - 580:18

**Kid** [15] - 323:7, 395:19, 396:2, 396:19, 396:22, 398:11, 398:14, 398:19, 398:24, 399:4, 399:18, 400:8, 625:1, 625:4

**kind** [2] - 350:5, 362:19

**kinds** [2] - 496:2, 511:17

**Kirk** [1] - 321:21

**KIRK** [3] - 319:13, 321:4, 321:11

**kisses** [1] - 586:1

**Kissing** [1] - 491:7

**Kite** [1] - 451:21

**KK** [1] - 360:1

**knowing** [3] - 373:12, 622:8, 624:23

**knowledge** [52] - 373:5, 373:10, 373:12, 374:22,

---

378:2, 378:7, 378:17, 378:23, 379:7, 380:18, 381:19, 381:24, 382:4, 382:12, 382:23, 384:9, 387:9, 387:22, 388:2, 388:8, 388:13, 391:23, 394:3, 394:8, 394:12, 394:17, 394:22, 397:10, 398:4, 399:7, 400:6, 400:11, 400:17, 408:9, 409:16, 409:22, 412:4, 412:9, 412:21, 413:2, 413:8, 416:8, 416:13, 416:19, 416:21, 419:1, 464:25, 465:15, 495:13, 509:9, 594:7, 594:20

**knows** [1] - 395:13

**KYLE** [1] - 318:6

---

**L**

**label** [1] - 406:11

**labels** [1] - 499:25

**LAC** [2] - 542:13, 544:7

**lack** [2] - 507:20, 508:16

**lacked** [4] - 334:10, 336:17, 345:6, 345:12

**lacks** [2] - 335:7, 346:6

**LACs** [4] - 562:18, 562:20, 629:22, 629:24

**Lady** [3] - 360:23, 423:2, 425:14

**language** [14] - 334:20, 334:24, 335:3, 335:17, 335:20, 343:21, 344:18, 348:24, 348:25, 396:5, 509:8, 517:7, 518:9, 558:10

**laptop** [2] - 430:24, 446:7

**large** [4] - 520:3, 580:21, 628:11, 641:10

**larger** [1] - 588:9

**last** [17] - 331:21, 338:24, 347:17, 369:22, 403:4, 406:18, 432:10, 432:17, 438:2, 470:5, 470:9, 514:12, 525:23, 526:3, 629:10, 636:10, 640:3

**Last** [1] - 452:13

**lately** [1] - 577:4

**law** [3] - 343:8, 344:13, 344:15

**laws** [1] - 612:15

**lawsuit** [3] - 353:21, 355:25, 621:2

**lawyers** [3] - 592:9, 592:10, 600:18

---

**lays** [2] - 340:14, 497:3

**leading** [2] - 371:4, 603:1

**learned** [1] - 496:3

**learner** [1] - 400:19

**learning** [1] - 530:13

**least** [15] - 387:15, 397:4, 425:13, 436:14, 462:23, 469:14, 494:7, 543:6, 566:23, 574:3, 578:10, 583:14, 607:23, 629:6, 640:4

**leave** [1] - 577:14

**led** [5] - 478:19, 486:2, 491:19, 560:13, 601:6

**left** [8] - 326:7, 354:9, 443:15, 504:22, 567:11, 569:5, 581:12, 590:5

**legal** [3] - 539:3, 539:7, 539:8, 609:4

**legislation** [1] - 467:12

**length** [1] - 619:14

**lens** [2] - 355:21, 443:11

**Leonard** [5] - 551:21, 552:1, 552:6, 552:18, 593:12

**less** [2] - 449:7, 636:12

**Lesson** [1] - 456:19

**letting** [1] - 461:6

**LEV** [115] - 319:5, 325:16, 335:21, 335:23, 345:25, 353:24, 360:1, 360:4, 360:15, 360:17, 360:20, 362:22, 363:3, 363:6, 365:2, 365:4, 367:14, 370:11, 370:20, 371:3, 371:13, 371:16, 371:19, 374:23, 375:1, 379:12, 383:1, 388:16, 395:7, 395:10, 395:16, 400:25, 403:6, 403:19, 403:21, 404:5, 404:11, 404:13, 404:17, 404:22, 406:2, 410:1, 413:11, 417:2, 420:11, 420:16, 420:22, 420:24, 421:13, 421:16, 422:25, 425:4, 432:5, 435:15, 435:21, 435:23, 436:1, 436:3, 436:4, 437:14, 437:15, 441:8, 441:13, 446:23, 457:14, 457:16, 466:17, 470:17, 471:10, 471:15, 471:19, 474:18, 474:19, 498:3, 498:7, 498:12, 498:13, 503:14, 503:23, 510:11, 514:25, 515:17, 516:10, 516:13, 516:20, 517:4, 522:24, 523:5, 523:6, 538:4, 538:6,

---

539:5, 542:16, 553:11, 557:2, 577:18, 590:24, 591:2, 591:16, 592:3, 592:7, 598:2, 598:6, 616:8, 631:24, 632:6, 632:17, 633:10, 633:16, 636:18, 636:22, 639:1, 640:2, 640:8, 640:10

**Lev** [4] - 335:20, 395:3, 643:19, 643:20

**Lev............** [2] - 322:9, 322:11

**Lev...............** [1] - 322:7

**Level** [1] - 582:17

**level** [47] - 333:7, 348:20, 365:18, 372:23, 386:24, 390:9, 390:15, 391:4, 393:16, 399:19, 485:9, 486:15, 487:6, 488:24, 489:4, 489:5, 499:12, 500:12, 502:17, 514:6, 516:8, 517:17, 519:14, 519:18, 541:15, 542:21, 542:22, 542:23, 552:5, 552:14, 564:24, 575:7, 577:11, 577:12, 594:22, 595:3, 619:10, 622:25, 625:25, 626:20, 628:22, 629:14, 629:21, 629:23, 637:6, 637:11, 637:13

**levels** [19] - 349:7, 367:10, 408:21, 412:11, 412:17, 415:25, 416:3, 419:14, 419:18, 527:2, 527:5, 534:6, 543:20, 563:14, 563:16, 563:25, 564:4, 564:22, 622:3

**LEVITHAN** [1] - 318:6

**lewd** [3] - 532:5, 532:11, 532:18

**lexicon** [2] - 454:9, 454:13

**LGBTQ** [1] - 357:22

**librarian** [8] - 329:12, 329:15, 390:3, 442:9, 619:23, 620:10, 627:1, 627:24

**librarians** [3] - 389:19, 634:11, 634:12

**libraries** [46] - 353:11, 355:6, 365:11, 366:1, 375:12, 376:23, 379:19, 381:2, 381:6, 385:2, 389:2, 401:9, 401:13, 402:11, 402:16, 402:22, 413:18, 414:19, 414:24, 415:4, 415:11, 417:12, 418:6, 418:11, 418:18, 418:24, 463:6, 501:25, 505:25, 507:24, 512:14,

512:19, 519:15, 528:4, 545:2, 561:20, 564:19, 620:8, 620:14, 621:21, 621:23, 623:9, 625:21, 627:16, 633:25, 634:1
**Library** [14] - 323:21, 324:4, 494:2, 494:11, 494:19, 495:3, 501:14, 502:3, 511:13, 515:21, 517:21, 518:1, 565:19, 566:16
**library** [93] - 329:10, 335:14, 336:7, 357:10, 357:23, 358:13, 359:2, 359:9, 384:20, 389:11, 406:14, 406:15, 427:2, 436:13, 493:13, 493:14, 495:10, 495:24, 496:4, 496:7, 496:11, 496:16, 496:20, 499:2, 499:16, 499:22, 499:24, 500:9, 500:20, 501:2, 501:4, 506:11, 506:12, 508:11, 509:1, 509:16, 510:6, 510:8, 510:22, 511:3, 512:24, 513:9, 513:16, 513:17, 513:24, 514:4, 514:17, 514:23, 517:17, 519:9, 519:14, 520:5, 528:3, 529:4, 529:5, 529:13, 537:8, 537:15, 537:22, 544:3, 545:7, 545:11, 545:16, 545:19, 545:25, 546:5, 546:11, 546:15, 546:19, 546:22, 547:5, 548:20, 549:8, 554:7, 562:25, 563:3, 567:15, 569:12, 580:10, 580:11, 604:5, 619:24, 620:3, 620:5, 620:6, 625:13, 629:2, 634:14, 638:1, 638:20, 639:22
**library/media** [2] - 513:8, 529:12
**Library/Media** [1] - 501:14
**light** [3] - 426:15, 539:19, 617:13
**likely** [7] - 346:15, 423:17, 436:10, 439:20, 462:25, 481:15, 626:2
**limit** [4] - 406:5, 406:16, 428:7, 514:16
**limitations** [2] - 493:7, 633:6
**limited** [23] - 329:16, 390:8, 480:25, 500:15, 513:7, 513:12, 513:20, 513:22, 514:1, 514:11, 514:20, 515:4, 515:24,

517:23, 519:5, 520:1, 520:4, 526:5, 622:17, 631:9, 632:10, 636:25
**limits** [1] - 515:11
**Linda** [18] - 356:10, 359:20, 440:4, 463:1, 484:9, 484:10, 560:8, 560:14, 560:25, 561:7, 561:8, 574:5, 594:5, 605:19, 605:22, 606:1, 606:5, 628:10
**Line** [1] - 449:23
**linguistic** [1] - 511:23
**link** [3] - 404:24, 404:25, 504:25
**linkable** [1] - 599:22
**linked** [16] - 367:20, 368:6, 379:21, 380:1, 381:18, 383:11, 383:17, 396:10, 401:15, 405:18, 410:13, 594:1, 594:8, 599:17, 600:14, 612:17
**linking** [1] - 413:20
**links** [2] - 375:14, 595:7
**list** [29] - 329:11, 354:17, 430:10, 442:5, 445:6, 462:17, 466:5, 466:8, 477:8, 477:17, 486:25, 490:12, 490:21, 490:22, 511:17, 528:5, 531:5, 531:21, 533:2, 534:22, 567:2, 572:16, 572:21, 572:22, 575:21, 581:11, 597:2, 597:5
**Listed** [2] - 323:16, 323:18
**listed** [18] - 332:8, 437:9, 438:13, 438:25, 444:4, 466:2, 473:2, 473:23, 479:8, 481:1, 482:20, 483:4, 484:21, 487:17, 487:21, 492:3, 493:18, 557:10
**listen** [1] - 425:1
**listing** [1] - 486:22
**lists** [6] - 477:10, 480:6, 480:14, 480:20, 531:10, 582:3
**literary** [5] - 342:7, 343:11, 507:21, 508:16, 577:13
**literature** [2] - 522:4, 525:12
**litigation** [6] - 574:7, 596:18, 596:25, 597:6, 598:21, 615:9
**LLC** [1] - 318:7
**LLP** [2] - 320:4, 320:11
**loan** [6] - 389:13, 389:16, 391:2, 516:5, 519:15,

519:19
**loans** [7] - 634:5, 634:8, 636:23, 637:4, 637:16, 637:18, 637:25
**local** [1] - 620:5
**located** [3] - 326:16, 609:17, 629:15
**location** [3] - 498:23, 569:22, 584:13
**locker** [2] - 581:1, 581:8
**log** [4] - 480:3, 481:5, 517:20, 566:9
**look** [123] - 325:24, 326:4, 330:22, 331:4, 334:5, 336:21, 337:5, 337:19, 338:9, 338:14, 341:16, 341:22, 343:20, 350:5, 351:22, 355:20, 363:4, 364:7, 403:16, 423:1, 423:16, 423:25, 425:25, 429:14, 430:16, 430:24, 431:2, 431:23, 435:12, 437:6, 437:7, 437:8, 437:9, 438:1, 438:8, 441:24, 442:17, 444:9, 444:16, 444:25, 445:3, 445:18, 446:6, 446:25, 451:1, 457:13, 461:15, 461:23, 462:22, 469:7, 475:21, 476:2, 476:3, 476:4, 478:7, 478:11, 479:1, 479:3, 480:16, 481:5, 482:16, 482:22, 483:3, 488:13, 491:22, 501:9, 501:10, 501:12, 518:22, 521:15, 522:8, 529:25, 534:5, 534:18, 535:9, 535:10, 536:10, 536:14, 538:9, 555:5, 561:22, 562:1, 564:11, 573:1, 577:1, 577:19, 577:20, 578:6, 578:9, 578:16, 580:13, 581:16, 582:8, 582:10, 584:16, 585:23, 586:23, 587:3, 588:19, 595:24, 596:1, 599:18, 600:2, 600:7, 600:13, 604:20, 607:8, 607:9, 614:16, 615:12, 615:23, 616:1, 616:16, 623:2, 624:21, 626:1, 627:7, 629:5, 637:22, 638:22, 638:24
**looked** [30] - 340:18, 341:2, 341:3, 341:7, 354:16, 365:5, 384:18, 434:19, 442:19, 443:9, 461:17, 470:10, 470:11, 470:12, 524:16, 569:13, 570:10, 570:16, 589:22,

595:12, 599:15, 600:1, 600:14, 604:23, 610:20, 610:23, 615:14, 619:9, 636:24
**looking** [54] - 330:24, 334:6, 337:14, 338:10, 340:7, 340:19, 340:22, 354:12, 355:14, 355:21, 357:5, 407:3, 423:20, 424:4, 424:5, 424:13, 429:21, 429:22, 430:5, 431:25, 433:8, 434:20, 435:16, 436:5, 437:18, 438:18, 438:19, 439:7, 449:23, 470:22, 473:10, 474:17, 478:5, 485:15, 488:15, 496:22, 518:2, 523:4, 526:5, 542:4, 552:14, 568:2, 578:20, 578:21, 584:9, 595:4, 601:7, 604:11, 605:7, 606:16, 611:17, 612:2, 639:10, 639:14
**looks** [4] - 460:13, 483:16, 533:11, 579:25
**lost** [4] - 436:8, 436:11, 511:7, 588:14
**love** [1] - 422:2
**lower** [3] - 520:9, 582:2, 625:25
**Lucky** [15] - 323:15, 417:5, 417:11, 417:17, 417:21, 418:1, 418:5, 418:10, 418:23, 419:2, 419:13, 420:1, 420:8, 624:10, 624:14
**Lucy** [4] - 523:10, 523:11, 523:12, 523:15
**ludicrous** [1] - 336:19
**LUKOFF** [1] - 318:6
**lunch** [1] - 420:12
**LYNN** [1] - 320:12

## M

**Magenta** [1] - 458:16
**magic** [1] - 437:18
**magnitude** [1] - 364:18
**mail** [36] - 323:23, 324:6, 353:6, 353:12, 353:13, 486:23, 486:25, 516:16, 523:8, 523:10, 537:19, 549:15, 549:19, 553:14, 553:23, 553:24, 554:1, 554:5, 554:17, 554:19, 554:21, 554:22, 555:23, 600:9, 600:10, 605:6, 607:5, 608:3, 614:16, 614:21, 615:2, 615:15,

615:18, 615:25, 616:9, 637:19
**maild** [1] - 471:3
**mailed** [2] - 330:8, 330:10
**mails** [57] - 327:3, 356:25, 373:21, 389:20, 432:10, 434:19, 434:21, 434:22, 435:1, 470:10, 471:2, 471:4, 503:6, 518:13, 549:2, 549:20, 550:10, 550:11, 550:13, 551:19, 555:5, 592:19, 596:13, 596:14, 596:24, 597:3, 597:5, 597:7, 598:21, 598:25, 599:1, 599:3, 599:4, 599:6, 599:8, 599:18, 600:1, 600:2, 600:3, 600:6, 604:24, 605:4, 607:1, 607:16, 607:20, 607:23, 608:8, 608:10, 608:24, 609:15, 610:11, 610:15, 610:21, 611:10, 611:11, 611:17, 635:17
**maintain** [2] - 364:15, 371:11
**maintained** [7] - 443:2, 510:5, 510:21, 511:3, 595:9, 599:17, 599:21
**maintenance** [2] - 589:13, 593:24
**majority** [3] - 530:10, 573:19, 629:6
**male** [2] - 534:25, 535:25
**Man** [1] - 457:4
**manage** [2] - 486:14, 560:16
**managed** [1] - 389:19
**Manager** [2] - 641:7, 642:6
**manages** [1] - 560:14
**manner** [2] - 362:7, 532:6
**Manual** [2] - 323:20, 504:1
**manual** [1] - 504:5
**Mar** [4] - 323:4, 323:6, 323:8, 323:10
**Marcanio** [2] - 356:12, 356:13
**Marcanio's** [1] - 356:15
**March** [6] - 391:12, 396:17, 401:22, 407:5, 410:20, 619:6
**mark** [2] - 326:24, 451:7
**marked** [36] - 360:2, 363:5, 367:12, 379:8, 382:25, 388:15, 395:11, 400:21, 406:24, 409:25,

Deposition of Bradley Vinson, Volume 2

413:10, 417:1, 420:23, 420:25, 422:18, 436:8, 436:11, 443:2, 445:4, 448:23, 449:16, 451:6, 471:18, 477:2, 490:25, 491:2, 492:15, 503:13, 515:16, 516:12, 517:3, 517:5, 553:10, 553:12, 569:9, 569:19
**marker** [1] - 584:10
**Market** [1] - 320:7
**married** [1] - 536:7
**master** [1] - 339:7
**master's** [1] - 620:9
**master-disciple** [1] - 339:7
**material** [69] - 326:8, 326:9, 326:14, 332:3, 333:7, 338:19, 338:20, 338:23, 339:2, 341:6, 341:18, 343:24, 346:7, 348:3, 349:10, 349:11, 349:15, 349:20, 352:3, 352:7, 352:8, 352:14, 365:17, 365:19, 368:11, 372:19, 372:24, 373:6, 375:22, 377:19, 377:23, 378:3, 379:22, 380:2, 381:10, 381:17, 386:18, 387:11, 393:6, 394:4, 396:13, 399:15, 400:7, 405:19, 408:17, 409:12, 409:13, 412:7, 415:21, 416:10, 417:24, 419:10, 419:25, 492:22, 502:13, 502:19, 506:8, 508:2, 508:9, 508:22, 513:5, 541:4, 541:9, 552:7, 594:16, 602:2, 622:13, 627:22
**materials** [74] - 329:6, 332:7, 333:10, 334:12, 334:21, 347:8, 349:23, 353:10, 357:10, 357:23, 358:13, 359:5, 376:16, 380:22, 383:12, 384:14, 384:20, 392:3, 405:25, 406:15, 411:1, 412:23, 413:25, 414:4, 414:14, 417:15, 470:4, 470:8, 493:6, 493:13, 493:14, 493:15, 495:10, 495:25, 501:19, 502:15, 507:7, 507:16, 507:20, 510:4, 511:17, 511:18, 511:22, 522:1, 527:1, 528:17, 530:10, 537:23, 538:18, 545:7, 545:19, 554:8, 559:25, 580:10, 580:11, 580:19, 594:24, 596:17,

612:11, 613:11, 615:8, 615:13, 618:25, 619:2, 621:15, 621:19, 624:12, 625:17, 625:23, 626:12, 626:17, 626:25, 635:20, 636:13
**Materials** [26] - 326:15, 332:2, 332:15, 333:22, 343:25, 346:16, 349:2, 349:12, 351:14, 466:25, 467:3, 467:17, 467:23, 468:3, 468:9, 502:4, 577:15, 595:6, 599:13, 600:4, 601:8, 603:4, 628:15, 628:19, 629:11, 629:21
**math** [1] - 579:3
**matter** [3] - 406:7, 535:22, 624:24
**mature** [5] - 541:5, 544:6, 575:4, 622:4, 637:13
**maturity** [1] - 527:5
**mean** [41] - 331:18, 341:25, 354:14, 392:22, 420:14, 424:3, 426:16, 426:18, 439:11, 444:22, 445:13, 446:1, 449:14, 451:3, 467:24, 470:21, 504:17, 513:14, 517:9, 520:24, 527:19, 527:23, 534:7, 535:1, 535:18, 538:22, 550:6, 562:13, 565:3, 589:5, 595:11, 599:21, 600:2, 608:14, 608:16, 611:23, 613:11, 620:2, 630:13, 631:12
**meaning** [8] - 473:23, 511:5, 525:22, 557:21, 589:14, 593:24, 599:3, 609:5
**means** [22] - 364:2, 389:24, 449:11, 449:15, 459:24, 460:8, 460:17, 470:1, 472:2, 495:18, 514:3, 515:7, 519:10, 534:21, 537:1, 541:22, 557:22, 557:24, 567:3, 578:13, 581:20, 625:11
**meant** [3] - 350:10, 463:19, 522:1
**Media** [38] - 326:16, 327:20, 330:19, 332:15, 333:21, 334:2, 341:10, 343:3, 346:14, 363:15, 374:5, 378:19, 382:6, 388:4, 394:19, 400:14, 409:19, 413:5, 416:16, 420:7, 426:22, 427:1, 502:3, 505:11, 508:10,

509:24, 530:15, 541:24, 546:25, 547:4, 550:18, 551:9, 559:10, 565:18, 606:24, 609:19, 610:12, 617:13
**media** [139] - 326:23, 327:5, 328:17, 355:9, 364:15, 390:21, 431:5, 439:13, 440:5, 440:9, 440:14, 442:18, 449:15, 451:5, 451:18, 461:11, 461:20, 462:2, 462:23, 471:4, 490:25, 492:14, 493:2, 494:1, 494:7, 494:13, 494:23, 495:15, 495:21, 496:6, 496:10, 496:12, 496:14, 496:17, 497:14, 499:14, 500:10, 501:17, 501:19, 501:22, 504:6, 504:8, 504:10, 505:8, 505:13, 506:21, 507:4, 507:5, 509:1, 509:7, 509:19, 509:21, 512:8, 513:25, 515:3, 515:5, 521:23, 527:18, 528:3, 528:7, 529:16, 530:17, 530:22, 531:3, 531:19, 532:3, 532:5, 534:4, 535:8, 536:18, 537:2, 537:12, 537:20, 538:15, 540:7, 541:3, 541:6, 541:10, 542:11, 542:19, 543:23, 544:4, 544:8, 559:12, 560:3, 560:8, 561:4, 561:9, 562:6, 562:17, 564:17, 565:9, 565:23, 566:15, 567:14, 567:18, 568:7, 568:23, 569:1, 569:2, 571:3, 571:7, 571:14, 571:25, 572:24, 573:7, 573:9, 574:3, 575:6, 576:7, 578:10, 583:14, 583:24, 604:5, 604:24, 606:9, 611:12, 611:18, 617:22, 626:15, 628:13, 629:2, 629:14, 629:20, 629:24, 630:1, 630:2, 630:4, 630:14, 630:15, 630:17, 634:24, 638:10, 638:15, 639:7, 639:20, 640:4, 640:6
**meet** [10] - 342:10, 346:15, 347:6, 493:8, 511:14, 515:8, 527:13, 555:15, 631:18, 632:13
**meet-and-confer** [1] - 632:13
**meeting** [93] - 347:11, 368:15, 368:21, 369:8, 369:17, 370:8, 372:11,

373:8, 373:18, 373:25, 374:7, 376:1, 376:6, 376:11, 377:11, 378:5, 378:10, 378:15, 378:21, 380:5, 380:10, 380:14, 380:16, 381:9, 381:13, 381:22, 382:2, 382:8, 383:20, 383:25, 384:7, 385:11, 385:24, 386:10, 387:4, 387:13, 387:20, 387:25, 388:6, 388:11, 388:18, 391:12, 391:17, 391:21, 392:8, 394:6, 394:10, 394:15, 394:20, 396:7, 396:16, 396:22, 397:15, 397:23, 398:5, 399:2, 400:15, 401:22, 402:19, 404:2, 405:6, 407:5, 409:20, 410:20, 411:24, 412:24, 413:6, 413:13, 414:7, 415:6, 416:11, 416:17, 417:19, 418:14, 420:2, 420:8, 551:8, 555:21, 556:2, 561:17, 573:14, 573:15, 573:16, 573:22, 590:16, 590:22, 592:2, 594:12, 595:13, 595:15, 619:7, 621:16
**Meeting** [9] - 322:20, 322:22, 322:24, 323:4, 323:6, 323:8, 323:10, 323:12, 323:14
**meetings** [24] - 357:11, 385:18, 392:23, 397:16, 442:4, 467:7, 469:14, 469:21, 545:17, 546:9, 547:16, 547:19, 547:22, 567:24, 568:1, 573:17, 573:24, 576:6, 592:23, 592:25, 609:25, 611:23, 611:24, 630:22
**meets** [2] - 585:10, 586:6
**Melissa** [3] - 487:17, 487:23, 487:24
**member** [61] - 358:24, 369:2, 369:15, 373:16, 374:4, 374:11, 374:19, 376:5, 376:9, 378:3, 378:8, 378:13, 378:14, 378:18, 378:25, 379:4, 380:9, 380:15, 381:10, 381:16, 381:21, 381:25, 382:1, 382:5, 382:21, 382:24, 384:5, 387:10, 387:19, 387:23, 387:24, 388:3, 388:10, 391:16, 391:20, 394:4, 394:9, 394:13, 394:14, 394:18, 394:24, 396:21, 397:5,

398:23, 400:12, 400:13, 409:12, 409:17, 409:18, 413:3, 413:4, 416:9, 416:14, 416:15, 419:25, 420:5, 420:6, 465:8, 494:8, 510:13, 621:2
**members** [38] - 366:5, 366:12, 370:22, 371:11, 372:4, 373:21, 373:24, 377:3, 385:13, 386:1, 392:15, 397:10, 398:1, 402:21, 407:25, 408:1, 411:16, 412:22, 415:2, 418:16, 465:12, 468:5, 468:6, 468:14, 544:6, 544:11, 546:7, 547:15, 547:18, 552:23, 553:4, 559:2, 593:9, 618:8, 628:14, 628:16, 628:17, 630:20
**memory** [15] - 337:11, 428:12, 431:4, 433:9, 448:22, 473:4, 503:11, 530:3, 602:8, 602:9, 604:2, 609:15, 610:3, 610:6, 615:24
**mention** [1] - 502:2
**mentioned** [4] - 330:13, 562:15, 600:12, 614:18
**merit** [1] - 577:13
**message** [2] - 365:12, 527:24
**met** [4] - 438:14, 500:14, 508:19
**Method** [1] - 505:1
**method** [3] - 505:4, 505:5, 611:7
**Mexican** [1] - 456:24
**Michelle** [111] - 327:4, 340:11, 340:15, 342:20, 343:5, 343:6, 343:15, 357:8, 359:4, 384:16, 431:10, 432:9, 433:7, 433:13, 433:17, 433:24, 434:19, 438:2, 446:11, 447:4, 447:10, 447:24, 448:12, 449:24, 450:6, 451:23, 452:3, 452:8, 452:19, 452:24, 453:5, 453:10, 453:16, 453:21, 454:3, 454:8, 454:14, 454:19, 454:24, 455:12, 455:21, 456:4, 456:8, 456:14, 456:20, 456:25, 457:5, 458:4, 458:12, 458:17, 458:23, 459:4, 459:10, 459:23, 460:3, 460:6, 463:23, 464:4, 464:10, 464:19, 464:23, 465:18, 465:21, 467:10,

Deposition of Bradley Vinson, Volume 2

471:3, 475:10, 477:2, 478:13, 483:14, 484:1, 484:23, 485:16, 488:10, 489:12, 490:3, 491:9, 491:13, 503:7, 504:6, 516:17, 523:8, 532:10, 545:15, 546:14, 547:10, 550:4, 551:15, 553:14, 554:4, 554:16, 559:11, 559:15, 590:4, 593:18, 595:8, 597:9, 598:10, 599:7, 599:16, 599:21, 600:15, 607:4, 608:4, 609:16, 610:4, 610:25, 615:15, 617:23, 638:3, 638:4

**microphone** [1] - 345:20

**microphones** [1] - 345:23

**middle** [66] - 355:9, 389:1, 389:25, 390:2, 390:3, 390:9, 393:20, 428:4, 460:9, 473:15, 476:8, 479:14, 479:18, 480:6, 480:9, 480:23, 481:3, 481:6, 481:19, 482:24, 484:22, 485:9, 489:7, 519:13, 520:18, 520:25, 521:4, 521:6, 521:9, 521:19, 523:18, 524:7, 525:10, 525:11, 526:19, 567:21, 567:22, 568:3, 568:12, 569:2, 569:11, 571:14, 572:3, 572:21, 572:22, 573:13, 573:21, 574:6, 574:12, 574:16, 574:21, 575:14, 575:22, 578:1, 582:18, 582:21, 582:24, 583:1, 583:11, 583:14, 622:5, 623:23, 623:25, 624:8, 625:9, 626:10

**Middle** [13] - 479:25, 571:24, 579:5, 579:13, 579:16, 579:21, 580:3, 580:17, 581:4, 581:11, 587:13, 587:14, 587:22

**Midnight** [3] - 360:24, 423:3, 425:14

**might** [26] - 333:4, 342:10, 347:13, 391:2, 391:3, 397:7, 400:18, 420:14, 437:2, 444:3, 444:6, 451:6, 479:1, 484:7, 491:21, 492:1, 500:5, 506:19, 509:6, 520:8, 530:11, 541:25, 566:18, 571:16, 599:1, 624:8

**Milk** [1] - 459:3

**Millennium** [2] - 454:7, 454:10

**mind** [1] - 544:9

**mine** [1] - 560:2

**minor** [5] - 318:5, 318:7, 318:8, 318:10, 507:16

**minors** [6] - 339:9, 343:13, 507:21, 508:14, 508:17

**minute** [1] - 638:23

**minutes** [1] - 555:1

**Minutes** [1] - 459:9

**misleading** [10] - 365:20, 373:3, 377:25, 387:7, 394:1, 400:4, 409:9, 412:19, 416:6, 419:22

**miss** [1] - 420:15

**missed** [3] - 446:4, 463:10, 573:17

**missing** [2] - 582:12, 582:15

**misstates** [1] - 607:22

**mistake** [3] - 362:2, 444:3, 444:6

**mistaken** [1] - 495:7

**Molham** [4] - 523:10, 523:11, 523:12, 523:15

**moment** [15] - 404:10, 404:11, 437:12, 437:20, 444:15, 449:22, 459:21, 475:7, 477:23, 488:6, 488:20, 492:20, 498:4, 516:19, 585:3

**monitor** [1] - 513:25

**Monroe** [2] - 319:16, 321:7

**months** [2] - 356:23, 358:2

**Moon** [2] - 335:12, 336:4

**morals** [1] - 365:13

**morning** [4] - 325:17, 325:18, 360:25, 578:23

**most** [10] - 431:7, 438:10, 442:15, 443:22, 506:16, 514:9, 526:5, 587:24, 606:21, 630:20

**mother** [1] - 339:3

**motion** [13] - 387:3, 388:25, 389:3, 396:4, 404:15, 405:4, 405:9, 405:24, 408:24, 412:14, 413:21, 413:23, 546:1

**motions** [2] - 405:5, 405:6

**motivation** [10] - 372:3, 377:2, 385:25, 392:14, 398:22, 402:20, 407:24, 411:15, 415:2, 418:16

**motivations** [4] - 370:9, 370:15, 377:21, 402:25

**move** [4] - 469:14, 555:16, 575:7, 619:21

**movement** [3] - 560:17, 618:24, 619:4

**movie** [2] - 631:5, 631:7

**moving** [2] - 478:16, 619:21

**MR** [114] - 325:16, 335:21, 335:23, 345:25, 353:24, 360:1, 360:4, 360:15, 360:17, 360:20, 362:22, 363:3, 363:6, 365:2, 365:4, 367:14, 370:11, 370:20, 371:3, 371:13, 371:16, 371:19, 374:23, 375:1, 379:12, 383:1, 388:16, 395:7, 395:10, 395:16, 400:25, 403:6, 403:19, 403:21, 404:5, 404:11, 404:13, 404:17, 404:22, 406:2, 410:1, 413:11, 417:2, 420:11, 420:16, 420:22, 420:24, 421:13, 421:16, 422:25, 425:4, 432:5, 435:15, 435:21, 435:23, 436:1, 436:3, 436:4, 437:14, 437:15, 441:8, 441:13, 446:23, 457:14, 457:16, 466:17, 470:17, 471:10, 471:15, 471:19, 474:18, 474:19, 498:3, 498:7, 498:12, 498:13, 503:14, 503:23, 510:11, 514:25, 515:17, 516:10, 516:13, 516:20, 517:4, 522:24, 523:5, 523:6, 538:4, 538:6, 539:5, 542:16, 553:11, 557:2, 577:18, 590:24, 591:2, 591:16, 592:3, 592:7, 598:2, 598:6, 616:8, 631:24, 632:6, 632:17, 633:10, 633:16, 636:18, 636:22, 639:1, 640:2, 640:8, 640:10

**MRCs** [1] - 594:24

**MS** [385] - 334:3, 335:9, 335:19, 336:20, 337:4, 342:12, 342:24, 344:14, 345:18, 347:2, 347:17, 348:1, 349:8, 349:16, 349:21, 350:22, 351:2, 353:1, 353:20, 354:22, 355:7, 357:17, 358:3, 358:14, 360:3, 360:12, 360:16, 362:19, 363:2, 364:19, 365:1, 366:3, 366:8, 366:18, 366:24, 367:13, 368:24, 369:4,

369:22, 370:6, 370:13, 370:23, 371:9, 371:14, 371:18, 371:23, 372:5, 372:9, 372:14, 372:20, 372:25, 373:4, 373:9, 373:19, 374:1, 374:8, 374:14, 374:21, 374:24, 376:7, 376:12, 376:20, 376:24, 377:5, 377:9, 377:14, 377:20, 378:1, 378:6, 378:11, 378:16, 378:22, 379:6, 379:9, 379:11, 380:11, 380:17, 381:3, 381:7, 381:14, 381:20, 381:23, 382:3, 382:9, 382:24, 384:1, 384:8, 384:23, 385:3, 385:9, 385:22, 386:3, 386:8, 386:14, 386:19, 387:1, 387:8, 387:14, 387:21, 388:1, 388:7, 388:12, 388:14, 390:7, 391:18, 391:22, 392:7, 392:12, 392:17, 392:21, 393:2, 393:7, 393:12, 393:18, 394:2, 394:7, 394:11, 394:16, 394:21, 395:1, 395:3, 395:9, 395:12, 396:23, 397:19, 398:7, 398:16, 398:20, 398:25, 399:6, 399:12, 399:16, 399:21, 400:5, 400:10, 400:16, 400:20, 400:22, 402:12, 402:17, 402:23, 403:3, 403:7, 403:10, 403:16, 403:20, 403:25, 404:3, 404:7, 404:21, 407:17, 407:22, 408:3, 408:8, 408:13, 408:18, 408:23, 409:4, 409:10, 409:15, 409:21, 409:24, 411:8, 411:13, 411:18, 411:23, 412:3, 412:8, 412:13, 412:20, 413:1, 413:7, 413:9, 414:20, 414:25, 415:5, 415:12, 415:17, 415:22, 416:1, 416:7, 416:12, 416:18, 416:25, 418:7, 418:12, 418:19, 418:25, 419:5, 419:11, 419:16, 419:23, 420:3, 420:9, 420:13, 420:18, 420:20, 421:12, 422:20, 422:24, 424:7, 425:1, 426:3, 430:14, 431:11, 432:3, 435:12, 435:20, 435:22, 435:24, 436:2, 437:13, 446:18, 446:21, 455:7, 455:25, 460:7, 460:15, 460:19, 460:24, 465:11,

466:16, 470:16, 471:8, 471:17, 471:24, 474:16, 475:12, 477:24, 478:2, 478:17, 483:2, 483:7, 483:11, 483:24, 485:1, 485:2, 485:18, 488:12, 489:14, 489:19, 495:12, 496:18, 497:12, 497:20, 498:6, 498:9, 499:18, 500:23, 501:7, 503:12, 503:17, 503:19, 503:21, 506:12, 507:11, 508:24, 509:5, 509:17, 509:25, 510:24, 511:11, 512:22, 513:1, 515:15, 516:6, 516:11, 516:23, 517:2, 519:20, 521:21, 522:21, 523:1, 523:4, 524:4, 524:9, 530:8, 534:9, 534:13, 534:17, 535:3, 535:21, 536:1, 536:9, 536:16, 536:22, 537:9, 537:16, 538:3, 539:3, 539:7, 540:2, 540:14, 545:4, 545:13, 546:6, 546:20, 547:7, 547:20, 548:2, 548:7, 548:11, 548:16, 548:22, 549:21, 550:3, 551:18, 551:24, 552:4, 552:20, 553:1, 553:6, 553:8, 556:25, 557:16, 558:2, 559:5, 559:22, 560:24, 563:19, 564:10, 569:8, 570:25, 571:6, 571:17, 572:6, 574:18, 585:6, 590:12, 590:20, 591:1, 591:9, 591:11, 591:22, 592:5, 592:14, 592:21, 595:20, 596:22, 597:25, 600:18, 607:22, 609:3, 609:10, 611:22, 615:11, 615:21, 616:6, 617:16, 618:3, 618:16, 618:23, 620:15, 620:22, 621:6, 621:25, 622:22, 623:10, 623:21, 624:19, 625:5, 625:22, 626:21, 627:6, 627:17, 628:7, 629:1, 629:18, 630:11, 630:23, 631:11, 631:22, 632:4, 632:12, 632:24, 633:2, 633:4, 633:13, 633:19, 636:16, 636:20, 638:13, 639:4, 639:25, 640:9

**MS/HS** [1] - 485:17

**multiple** [5] - 459:16, 459:22, 483:17, 547:2, 562:2

**multiples** [1] - 561:24

**must** [5] - 463:10, 506:7,

529:15, 552:13, 579:23
**MUSTY** [8] - 502:25, 503:5, 503:9, 505:4, 505:8, 505:14, 505:16
**mute** [2] - 345:20, 345:22
**MY** [1] - 641:20
**myON** [9] - 472:11, 472:17, 472:18, 485:12, 486:11, 486:13, 487:3, 487:12, 513:23

## N

**name** [1] - 367:18
**named** [2] - 641:10, 642:10
**natural** [1] - 420:16
**nature** [2] - 390:19, 452:17
**nearing** [1] - 577:16
**necessarily** [11] - 441:20, 512:23, 527:19, 534:14, 535:4, 547:19, 591:14, 592:1, 602:10, 605:23, 637:10
**necessary** [6] - 349:15, 349:20, 504:20, 559:13, 559:18, 560:5
**need** [86] - 328:16, 330:22, 335:2, 335:10, 336:17, 340:25, 343:10, 346:1, 346:16, 349:1, 359:10, 364:14, 364:21, 387:4, 390:12, 397:7, 404:1, 406:8, 422:5, 422:20, 430:15, 430:21, 431:2, 431:12, 431:20, 435:13, 439:20, 444:6, 445:7, 445:18, 461:15, 467:4, 467:8, 467:11, 474:1, 478:22, 480:2, 483:18, 484:6, 490:14, 490:20, 493:6, 495:1, 503:11, 504:16, 509:18, 513:21, 516:25, 518:12, 524:10, 524:21, 525:1, 526:17, 534:18, 542:12, 542:19, 542:24, 546:9, 547:15, 549:2, 549:14, 550:12, 552:9, 564:13, 576:6, 582:5, 584:16, 587:15, 606:3, 607:8, 607:9, 609:14, 615:12, 618:18, 624:21, 627:7, 629:5, 629:8, 629:11, 630:19, 631:17, 631:19, 635:20, 635:21, 636:5
**needed** [7] - 486:13,

544:18, 546:21, 560:1, 583:19, 636:14, 636:15
**needs** [26] - 332:21, 334:25, 335:20, 335:23, 365:16, 372:18, 377:18, 386:17, 393:5, 399:14, 408:16, 412:6, 415:20, 419:9, 472:6, 493:22, 500:14, 504:18, 511:14, 527:13, 559:17, 565:20, 567:2, 568:2, 570:1, 574:25
**neutral** [1] - 558:16
**never** [5] - 358:4, 358:10, 481:15, 506:18, 563:5
**New** [17] - 320:15, 323:7, 395:19, 396:2, 396:18, 396:21, 398:11, 398:14, 398:19, 398:24, 399:4, 399:18, 400:8, 625:1, 625:4
**new** [7] - 340:4, 344:18, 352:1, 517:15, 518:16, 533:3, 584:23
**next** [13] - 374:23, 466:14, 466:18, 471:15, 502:18, 524:17, 527:17, 528:6, 531:6, 572:23, 575:7, 586:11, 624:4
**nice** [2] - 565:16, 618:17
**Nicole** [3] - 370:11, 591:16, 632:2
**NICOLE** [2] - 319:14, 643:12
**Night** [1] - 452:13
**night** [3] - 432:11, 470:5, 470:9
**nine** [5] - 358:2, 474:13, 474:20, 475:4, 579:10
**Nineteen** [1] - 459:9
**NO** [2] - 641:20, 644:4
**nobody** [1] - 436:20
**nominated** [1] - 468:5
**none** [3] - 469:1, 469:18, 469:21
**nonmotion** [1] - 546:3
**nonpublic** [1] - 590:2
**nonsexual** [1] - 339:5
**normal** [1] - 423:3
**normally** [1] - 564:14
**North** [2] - 319:16, 321:7
**NORTHERN** [2] - 318:1, 643:1
**NOT** [1] - 644:2
**Notary** [1] - 641:9
**NOTARY** [1] - 641:19
**note** [3] - 515:4, 515:7, 624:5
**noted** [3] - 406:24,

442:24, 469:24
**notes** [11] - 445:18, 461:15, 462:10, 462:12, 478:23, 478:25, 492:2, 515:8, 584:12, 584:17, 642:13
**nothing** [3] - 325:7, 569:15, 611:24
**notice** [5] - 370:18, 518:10, 581:14, 593:23, 631:20
**noticed** [4] - 467:6, 589:11, 632:20, 632:22
**Nov** [1] - 322:20
**NOVAKOWSKI** [1] - 318:6
**novel** [24] - 368:3, 371:22, 444:20, 444:22, 445:1, 449:23, 450:4, 450:15, 482:7, 587:1, 587:6, 587:10, 587:11, 587:14, 588:3, 588:9, 631:10, 631:12, 631:13, 631:14, 631:23, 634:3
**novels** [3] - 481:24, 587:16, 587:18
**November** [4] - 368:16, 455:22, 456:2, 485:1
**Nowhere** [15] - 323:11, 410:4, 410:9, 410:23, 411:3, 411:6, 411:11, 411:16, 411:22, 411:25, 412:5, 412:10, 412:18, 412:25, 626:7
**nsmith@rumberger.
com** [1] - 319:15, 643:12
**nuanced** [1] - 619:1
**nudity** [1] - 339:5
**Number** [6] - 362:23, 528:7, 528:16, 600:4, 602:22, 602:24
**number** [15] - 364:18, 435:17, 449:2, 461:24, 499:21, 516:16, 520:3, 524:23, 557:13, 572:3, 575:20, 580:1, 580:21, 584:8, 587:21
**numbered** [1] - 504:22
**numbers** [9] - 360:18, 362:20, 362:25, 524:15, 524:22, 525:21, 587:4, 587:8, 588:9
**NW** [2] - 319:7, 320:21

## O

**O'** [1] - 457:4
**OATH** [1] - 641:1
**oath** [1] - 471:12

**Oberlander** [2] - 345:19, 345:22
**OBERLANDER** [1] - 320:12
**oberlanderl@
ballardspahr.com** [1] - 320:13
**object** [3] - 335:9, 344:14, 595:18
**objected** [1] - 630:16
**objection** [58] - 332:12, 334:3, 336:20, 337:4, 338:17, 338:25, 340:24, 342:12, 342:24, 345:18, 347:17, 349:8, 350:22, 358:14, 366:24, 368:24, 369:4, 370:6, 370:12, 370:19, 370:21, 371:14, 371:23, 372:5, 372:14, 372:20, 372:25, 373:4, 373:9, 376:7, 376:20, 377:5, 395:6, 397:19, 398:8, 483:2, 483:24, 495:12, 496:18, 497:12, 497:20, 499:18, 500:23, 501:7, 506:12, 508:24, 510:24, 519:20, 524:4, 530:8, 534:9, 534:13, 552:7, 552:15, 607:22, 620:15, 621:6, 630:19
**objections** [5] - 395:4, 532:14, 544:7, 552:13, 591:10
**Objectives** [1] - 505:22
**objectives** [2] - 505:24, 527:7
**objector** [1] - 340:23
**objectors** [1] - 508:8
**obscene** [10] - 365:16, 372:13, 377:13, 386:12, 392:25, 399:9, 408:11, 412:1, 415:15, 419:3
**obsolete** [1] - 502:15
**obtain** [1] - 580:19
**obviously** [1] - 501:5
**occasionally** [2] - 441:21, 637:19
**occurred** [3] - 396:6, 589:24, 591:15
**October** [41] - 432:8, 432:15, 438:3, 447:5, 447:10, 448:12, 449:25, 450:6, 451:23, 452:3, 452:24, 453:5, 453:10, 453:16, 453:21, 454:3, 454:8, 454:14, 454:19, 454:24, 455:12, 455:20, 456:4, 456:8, 458:4, 458:12, 458:17, 458:23, 459:4, 459:10, 459:23,

460:3, 463:23, 477:3, 484:24, 484:25, 490:4, 490:5, 490:8, 491:10, 523:8
**odd** [1] - 331:12
**oddly** [1] - 579:14
**ODOM** [1] - 321:20
**Odom** [12] - 345:21, 353:14, 353:25, 356:8, 356:10, 357:8, 369:11, 467:19, 593:2, 593:6, 615:3
**OF** [10] - 318:1, 318:15, 641:1, 641:3, 641:4, 641:19, 642:1, 642:2, 642:3, 643:1
**offends** [1] - 365:13
**offer** [1] - 575:6
**offered** [1] - 472:18
**office** [7] - 370:14, 442:16, 550:8, 550:25, 552:3, 552:19, 552:24
**official** [2] - 368:23, 641:13
**often** [1] - 573:13
**old** [1] - 604:12
**older** [5] - 505:6, 624:6, 625:8, 625:14, 626:3
**ON** [2] - 644:2
**once** [5] - 328:22, 341:10, 466:7, 598:12, 643:20
**One** [2] - 489:25, 490:1, 490:2
**one** [107] - 333:24, 337:6, 337:20, 345:5, 345:9, 347:18, 350:8, 351:23, 386:22, 387:15, 396:20, 397:3, 397:5, 403:11, 421:9, 421:10, 421:14, 422:6, 423:16, 423:21, 425:20, 425:25, 427:4, 427:5, 432:3, 432:6, 432:9, 435:18, 435:24, 436:7, 437:7, 437:21, 444:19, 444:25, 445:7, 445:9, 445:19, 446:10, 446:17, 449:18, 450:5, 450:19, 452:14, 455:17, 462:23, 468:11, 468:20, 473:9, 477:12, 477:23, 480:7, 480:14, 480:20, 482:12, 482:13, 483:25, 485:12, 488:20, 488:23, 489:15, 492:20, 494:8, 498:2, 498:9, 500:12, 503:4, 503:5, 504:16, 511:13, 524:22, 543:6, 549:17, 560:13, 560:19, 560:24, 563:5, 563:25,

Deposition of Bradley Vinson, Volume 2

565:9, 565:11, 566:23, 567:3, 567:5, 574:3, 578:10, 579:9, 580:16, 582:7, 583:14, 585:22, 587:13, 596:10, 602:8, 606:22, 618:10, 624:22, 624:23, 625:23, 625:25, 630:3, 639:5, 640:3
**ones** [18] - 330:20, 434:4, 434:5, 443:6, 443:13, 443:17, 443:18, 472:5, 473:6, 474:7, 486:8, 549:13, 556:8, 561:18, 561:23, 575:25, 587:22, 596:20
**online** [11] - 341:23, 368:16, 401:23, 404:18, 407:3, 413:19, 468:21, 472:25, 513:23, 610:2, 639:9
**open** [11] - 430:24, 513:7, 513:12, 513:14, 513:19, 514:6, 524:24, 525:6, 529:6, 632:3, 637:12
**operate** [2] - 468:17, 574:22
**operated** [3] - 468:10, 494:20, 595:14
**operation** [1] - 468:8
**opinion** [2] - 465:9, 627:10
**opportunity** [3] - 476:9, 513:7, 621:24
**opposed** [2] - 499:2, 499:16
**opposing** [3] - 512:9, 512:15, 528:8
**opt** [73] - 327:12, 327:13, 327:17, 328:8, 329:9, 329:21, 330:8, 344:1, 344:4, 364:10, 422:13, 428:8, 428:15, 460:7, 460:8, 460:19, 460:25, 466:4, 466:9, 471:24, 472:5, 472:6, 473:3, 473:15, 473:25, 474:1, 475:12, 475:14, 476:9, 476:23, 478:17, 479:18, 481:19, 481:24, 482:8, 482:24, 484:22, 485:2, 485:8, 488:12, 489:14, 489:19, 491:3, 492:17, 519:3, 520:18, 520:25, 521:4, 521:6, 521:13, 521:13, 521:19, 522:4, 522:8, 522:12, 522:16, 523:17, 523:18, 523:22, 524:8, 524:19, 525:2, 525:9, 525:14, 525:16,

526:9, 526:11, 526:18, 571:5, 631:15, 631:20, 636:24
**opt-in** [62] - 329:9, 329:21, 330:8, 344:1, 344:4, 364:10, 422:13, 428:8, 428:15, 460:7, 460:8, 460:19, 460:25, 466:9, 471:24, 472:5, 472:6, 473:15, 473:25, 474:1, 475:12, 475:14, 476:23, 478:17, 479:18, 481:19, 481:24, 482:8, 482:24, 484:22, 485:2, 485:8, 488:12, 489:14, 489:19, 491:3, 492:17, 519:3, 520:18, 520:25, 521:4, 521:6, 521:13, 521:19, 522:4, 522:8, 522:12, 522:16, 523:17, 523:18, 523:22, 524:8, 524:19, 525:2, 525:9, 525:14, 525:16, 526:9, 526:11, 526:18, 571:5, 636:24
**opt-ins** [1] - 473:3
**opted** [7] - 328:4, 328:10, 328:13, 328:23, 490:19, 524:7, 524:19
**optimistic** [1] - 458:10
**option** [6] - 526:15, 563:11, 563:12, 563:14, 575:3, 631:15
**optional** [4] - 368:3, 371:22, 631:12, 634:3
**options** [5] - 333:25, 334:4, 471:25, 564:8, 564:16
**Orange** [1] - 321:14
**order** [10] - 364:17, 431:6, 496:16, 499:10, 507:7, 515:8, 544:24, 573:6, 611:4, 636:5
**ordering** [1] - 635:24
**orders** [1] - 494:12
**Ori** [7] - 360:12, 362:19, 365:1, 596:23, 633:8, 643:19, 643:20
**ORI** [1] - 319:5
**ori.lev@**
**protectdemocracy.org** [1] - 319:6
**origin** [1] - 500:2
**original** [1] - 643:19
**originally** [4] - 331:15, 425:22, 432:25, 433:17
**Orlando** [1] - 321:15
**Oryx** [1] - 452:2
**otherwise** [8] - 354:20, 470:5, 485:8, 499:11,

529:18, 546:3, 599:7, 627:1
**ourselves** [1] - 466:19
**outcome** [2] - 399:25, 642:18
**outliers** [1] - 568:13
**outrageous** [1] - 592:3
**outreach** [1] - 353:25
**outside** [30] - 348:2, 370:6, 370:24, 372:14, 377:10, 387:17, 395:6, 399:1, 513:25, 547:21, 551:11, 559:3, 559:16, 590:12, 590:14, 600:18, 600:19, 600:20, 601:11, 603:11, 605:14, 607:1, 610:10, 610:15, 611:6, 612:5, 612:23, 614:3, 616:23
**overlooked** [1] - 486:18
**overwritten** [1] - 486:18
**own** [9] - 389:21, 444:23, 500:4, 564:18, 594:20, 620:24, 624:1, 634:22, 634:23
**owned** [2] - 580:5, 580:16
**owns** [4] - 436:23, 577:25, 586:25, 587:21

---

**P**

**P.A** [3] - 319:13, 321:4, 321:11
**p.m** [11] - 318:20, 360:9, 471:9, 538:5, 598:5, 633:17, 640:13
**package** [1] - 410:7
**packet** [45] - 368:8, 368:22, 369:16, 370:22, 373:8, 373:14, 375:5, 375:23, 376:10, 376:15, 378:5, 380:2, 380:16, 381:12, 383:5, 384:6, 384:17, 385:15, 387:12, 387:17, 388:20, 391:21, 394:6, 398:2, 398:12, 400:8, 401:5, 401:15, 402:3, 405:18, 405:19, 407:12, 409:14, 410:4, 410:13, 410:18, 412:23, 412:4, 416:11, 417:6, 420:2, 518:20, 624:22, 631:6, 631:8
**packets** [12] - 467:9, 467:13, 467:17, 467:23, 467:25, 579:15, 599:24, 601:8, 603:4, 629:3, 629:9, 629:12

**PAGE** [6] - 322:4, 322:15, 323:3, 324:3, 644:2, 644:7
**page** [37] - 326:5, 327:21, 344:16, 360:9, 360:10, 362:23, 362:24, 363:16, 368:6, 375:2, 379:25, 383:16, 391:8, 395:18, 401:1, 401:3, 401:16, 403:20, 405:2, 410:3, 413:20, 417:4, 417:9, 502:5, 507:14, 523:7, 528:6, 531:6, 531:7, 540:19, 554:5, 584:9, 585:21, 585:24, 586:11, 599:18, 633:3
**Page** [30] - 331:24, 331:25, 343:21, 351:25, 365:9, 413:25, 417:14, 476:11, 493:23, 496:23, 497:7, 501:12, 502:6, 504:21, 505:21, 506:2, 510:2, 511:12, 511:19, 513:3, 520:14, 526:22, 527:25, 529:9, 529:10, 530:25, 531:24, 538:10, 585:25
**Pages** [1] - 578:21
**pages** [13] - 322:16, 362:25, 363:19, 368:4, 388:19, 396:8, 401:4, 401:17, 410:17, 503:18, 504:21, 578:20, 584:5
**paid** [1] - 620:8
**pants** [2] - 585:15, 586:12
**paper** [3] - 518:8, 608:21
**paragraph** [1] - 326:7, 334:8, 366:23, 506:3, 506:6, 519:8, 520:17, 520:25, 538:18, 588:15
**Paragraph** [14] - 334:7, 344:18, 462:21, 463:16, 474:3, 477:9, 487:1, 487:18, 577:20, 578:9, 583:22, 586:24, 588:11, 589:15
**Paragraphs** [1] - 423:1
**paragraphs** [1] - 512:7
**parent** [27] - 328:4, 328:10, 328:13, 328:23, 329:9, 335:11, 339:8, 390:17, 494:8, 510:13, 513:15, 513:18, 513:20, 514:14, 515:6, 515:9, 515:11, 525:4, 525:8, 525:10, 525:13, 525:17, 525:25, 526:8, 526:9, 631:15, 637:10
**Parent** [2] - 517:18,

517:20
**Parent/Guardian** [1] - 322:17
**parent/guardians** [2] - 326:13, 343:23
**parental** [5] - 389:15, 390:16, 391:3, 474:1, 522:4
**parentheses** [2] - 519:12, 519:13
**parents** [35] - 327:9, 327:12, 327:17, 330:9, 330:11, 344:10, 363:12, 364:9, 465:25, 466:4, 476:7, 490:18, 510:19, 511:2, 513:4, 513:6, 514:16, 517:14, 517:16, 517:19, 517:22, 518:11, 519:1, 520:1, 521:8, 524:7, 524:19, 524:24, 621:23, 622:20, 631:18, 636:25, 637:13, 638:1
**Park** [1] - 484:19
**PARKER** [1] - 318:8
**part** [64] - 350:16, 350:17, 353:21, 354:11, 366:19, 368:21, 368:22, 370:15, 370:25, 372:16, 372:21, 375:23, 376:15, 377:15, 380:22, 383:17, 384:13, 392:2, 396:10, 398:12, 404:15, 406:12, 407:12, 408:24, 411:1, 414:1, 414:13, 417:24, 425:23, 436:10, 441:6, 441:9, 442:6, 443:22, 463:2, 477:5, 481:25, 488:2, 488:14, 490:12, 491:24, 492:5, 507:19, 508:3, 508:5, 520:20, 537:4, 539:6, 585:10, 586:6, 586:7, 599:6, 599:24, 601:18, 601:25, 607:15, 607:20, 609:22, 613:7, 620:3, 634:16, 635:6, 635:10, 638:2
**part-time** [1] - 620:3
**participating** [1] - 631:16
**particular** [21] - 365:15, 374:11, 374:19, 379:4, 388:10, 390:1, 412:11, 498:23, 535:13, 537:4, 542:14, 544:2, 544:10, 544:12, 544:20, 554:21, 561:17, 582:7, 601:14, 612:19, 629:17
**particularly** [1] - 529:3
**parties** [1] - 642:15
**parties'** [1] - 642:16

Deposition of Bradley Vinson, Volume 2

**parts** [4] - 359:11, 529:14, 586:16, 586:17
**party** [2] - 632:20, 632:21
**pass** [1] - 496:15
**passage** [5] - 495:5, 547:25, 548:4, 548:9, 548:13
**passages** [4] - 576:23, 576:25, 577:5, 583:15
**passed** [2] - 328:22, 405:9
**past** [1] - 628:20
**Paul** [1] - 370:14
**pause** [1] - 619:18
**pay** [2] - 542:12, 542:20
**pDF** [1] - 608:24
**PDF** [1] - 404:19
**PEN** [2] - 318:4, 643:4
**pen** [1] - 644:3
**penalties** [1] - 644:21
**pendency** [2] - 352:4, 352:10
**pending** [8] - 340:25, 347:20, 351:19, 436:22, 566:22, 576:18, 608:5, 617:14
**PENGUIN** [1] - 318:7
**Pennsylvania** [3] - 319:7, 320:8, 320:21
**PENSACOLA** [4] - 318:2, 319:1, 319:21, 643:2
**Pensacola** [3] - 318:22, 479:25, 581:18
**people** [7] - 516:16, 518:17, 559:15, 592:13, 593:4, 620:13, 620:19
**percent** [2] - 499:15, 500:5
**PEREZ** [1] - 318:9
**Perfect** [6] - 430:19, 431:15, 431:19, 432:4, 435:8, 436:7, 452:23, 456:24
**perform** [1] - 559:18
**period** [14] - 352:12, 445:25, 492:15, 494:15, 506:13, 506:15, 506:17, 506:25, 530:20, 580:7, 582:12, 614:25, 634:25, 638:9
**periods** [1] - 353:3
**perjury** [1] - 644:21
**Perks** [11] - 322:20, 367:16, 367:25, 368:1, 368:6, 368:18, 369:3, 370:4, 557:19, 631:2, 633:22
**permissible** [1] - 366:6
**permission** [9] - 326:13,

343:23, 352:15, 363:12, 389:15, 390:16, 391:3, 513:15, 631:14
**Permission** [1] - 322:17, 326:15, 343:25
**permit** [1] - 344:6
**person** [7] - 357:1, 378:9, 523:12, 559:17, 590:17, 617:10, 617:11
**person's** [1] - 585:13
**personal** [3] - 365:13, 511:14, 631:16
**personally** [2] - 617:19, 627:18
**perspective** [2] - 629:16, 632:7
**Philadelphia** [1] - 320:8
**physical** [6] - 436:19, 446:4, 472:24, 560:17, 585:13, 608:20
**physically** [3] - 406:23, 445:24, 566:4
**picture** [1] - 542:1
**pictures** [2] - 339:3, 339:5
**piece** [1] - 530:16
**pieces** [1] - 608:21
**Pieces** [1] - 456:3
**pile** [1] - 616:4
**Pine** [2] - 567:10, 571:19
**PLACE** [1] - 318:21
**place** [15] - 348:5, 349:22, 361:22, 390:13, 391:6, 469:13, 497:22, 497:24, 530:21, 557:4, 565:22, 612:10, 613:16, 629:25, 634:10
**placed** [2] - 332:10, 333:12
**Plaintiffs** [8] - 318:11, 318:18, 319:3, 320:3, 322:5, 325:12, 640:12, 643:5
**plan** [5] - 346:25, 347:3, 347:4, 347:5, 632:13
**plans** [1] - 601:1
**platforms** [1] - 513:23
**play** [1] - 501:5
**pocket** [1] - 585:3
**point** [23] - 354:15, 356:14, 370:25, 384:15, 385:10, 420:17, 471:8, 472:9, 484:21, 488:5, 492:14, 549:5, 564:15, 565:17, 565:24, 572:24, 573:4, 579:4, 580:23, 585:6, 615:7, 619:19, 628:2
**pointed** [1] - 606:19
**points** [2] - 527:3,

605:21
**policies** [4] - 612:9, 612:14, 613:9, 613:23
**Policies** [2] - 323:20, 504:1
**policy** [100] - 328:22, 331:15, 334:8, 335:11, 335:18, 335:22, 336:3, 336:10, 336:11, 336:14, 336:18, 340:4, 340:5, 346:4, 348:24, 348:25, 359:3, 359:11, 366:14, 366:20, 371:5, 428:7, 434:20, 452:16, 466:23, 475:14, 475:15, 475:16, 475:21, 476:1, 476:15, 476:16, 481:23, 481:25, 482:8, 492:23, 493:17, 493:18, 494:20, 495:6, 495:8, 496:23, 497:14, 497:17, 497:19, 497:22, 497:24, 502:2, 502:8, 502:12, 505:21, 509:4, 512:1, 512:11, 519:17, 519:22, 520:15, 520:21, 521:7, 522:3, 522:10, 522:16, 527:7, 527:10, 529:20, 529:21, 529:23, 530:1, 532:1, 532:8, 532:24, 533:4, 533:8, 536:19, 537:1, 537:4, 539:10, 539:22, 540:8, 540:19, 594:17, 594:19, 594:20, 600:23, 601:4, 601:6, 601:18, 601:23, 606:15, 606:16, 609:22, 613:3, 613:13, 613:17, 613:21, 634:7, 634:9, 639:24
**Policy** [12] - 326:1, 331:5, 344:5, 344:17, 475:21, 494:16, 494:17, 521:20, 529:24, 613:1, 613:6, 634:16
**political** [6] - 342:8, 343:11, 343:12, 507:20, 508:16, 528:18
**pornographic** [14] - 332:5, 334:13, 338:19, 346:8, 365:15, 372:13, 377:13, 386:12, 392:25, 399:9, 408:11, 412:1, 415:15, 419:3
**pornography** [8] - 506:8, 508:21, 538:19, 538:23, 538:25, 539:11, 539:14
**Portal** [2] - 517:18, 517:20
**portion** [3] - 346:4, 572:1, 585:25

**position** [5] - 424:21, 550:15, 556:2, 617:22, 619:19
**positive** [2] - 619:3, 619:22
**possessing** [1] - 437:1
**possession** [1] - 436:13
**possibilities** [1] - 563:18
**possibility** [4] - 348:6, 389:13, 451:12, 575:12
**possible** [3] - 349:12, 355:12, 480:22
**possibly** [6] - 351:6, 361:14, 466:23, 544:8, 569:21, 580:1
**post** [1] - 570:1
**posted** [2] - 363:15, 363:19
**potentially** [2] - 555:10, 572:11
**practical** [1] - 406:7
**practice** [55] - 328:22, 340:10, 341:9, 341:14, 362:2, 371:5, 389:19, 389:23, 390:13, 390:19, 475:16, 475:18, 476:19, 481:23, 482:2, 482:4, 495:9, 497:10, 497:18, 497:24, 499:8, 502:12, 519:21, 519:23, 521:7, 521:18, 521:24, 522:5, 523:25, 524:1, 530:6, 530:9, 530:14, 535:5, 535:6, 535:17, 539:23, 540:9, 540:15, 540:22, 540:25, 541:2, 541:16, 594:17, 600:23, 613:3, 613:17, 614:24, 632:24, 634:10, 634:14, 634:20, 637:17, 637:20, 638:7
**practiced** [1] - 493:18
**practices** [7] - 612:9, 612:16, 613:9, 613:19, 634:23, 634:25, 638:8
**preceded** [1] - 497:18
**precedence** [2] - 635:22, 636:7
**predated** [1] - 466:3
**preface** [1] - 339:7
**prefer** [1] - 596:10
**preliminary** [1] - 334:11
**prep** [2] - 592:8, 592:12
**Prep** [2] - 580:9, 581:9
**preparation** [45] - 471:1, 590:7, 590:11, 591:3, 592:22, 592:24, 592:25, 594:11, 595:17, 595:22, 596:6, 596:8, 596:19, 596:25, 598:8, 598:17, 598:22, 599:8, 600:3,

600:16, 601:12, 603:9, 603:13, 603:18, 603:25, 605:12, 605:17, 605:23, 606:1, 607:21, 608:6, 608:13, 608:19, 609:2, 610:8, 610:14, 612:6, 612:8, 612:23, 614:1, 615:1, 615:10, 615:18, 616:9, 616:11
**prepare** [24] - 434:17, 589:10, 589:19, 593:22, 594:6, 594:15, 594:21, 599:13, 601:3, 601:15, 602:3, 604:17, 606:14, 607:12, 609:12, 609:18, 610:19, 612:13, 613:8, 613:18, 614:5, 614:14, 616:14, 616:19
**prepared** [5] - 486:24, 589:20, 606:3, 611:15, 632:9
**preparing** [16] - 433:14, 434:16, 522:7, 593:5, 593:10, 593:12, 593:14, 593:15, 593:18, 594:2, 597:10, 597:14, 602:18, 607:13, 614:11, 635:17
**presence** [1] - 541:21
**PRESENT** [2] - 319:21, 321:19
**present** [49] - 337:23, 339:11, 341:4, 341:6, 342:15, 348:7, 354:9, 355:17, 355:19, 359:6, 446:5, 457:18, 457:20, 461:4, 461:12, 476:7, 476:15, 476:16, 479:24, 480:3, 480:6, 481:11, 481:20, 491:23, 493:1, 494:1, 527:23, 534:4, 541:5, 542:2, 542:6, 542:8, 543:16, 545:3, 545:12, 545:24, 546:12, 570:5, 571:2, 579:17, 583:1, 583:4, 583:16, 583:18, 591:6, 591:20, 592:10, 592:12, 630:15
**presentations** [1] - 610:3
**presented** [15] - 348:4, 365:17, 372:19, 377:19, 386:18, 393:6, 399:15, 408:17, 412:7, 415:21, 419:10, 558:1, 558:17, 621:3, 628:12
**presents** [1] - 535:25
**preserve** [1] - 398:7
**preserving** [2] - 371:14, 397:19
**press** [4] - 365:2, 365:6,

Deposition of Bradley Vinson, Volume 2

518:14, 607:24
**Press** [1] - 323:23
**presumably** [2] - 530:18, 539:19
**presume** [2] - 443:15, 563:8
**pretty** [1] - 576:15
**previous** [3] - 518:16, 604:10, 610:1
**previously** [3] - 468:10, 516:3, 604:15
**primarily** [4] - 441:1, 560:9, 560:22, 560:25, 561:2
**principal** [7] - 494:9, 494:10, 494:14, 494:24, 495:2, 509:22, 530:11
**principals** [1] - 509:18
**principle** [1] - 344:9
**principles** [3] - 496:3, 496:16, 496:20
**printed** [2] - 404:14, 616:16
**printout** [2] - 438:21, 445:22
**printouts** [1] - 360:6
**prioritized** [1] - 441:17
**privilege** [3] - 591:12, 591:13, 591:21
**privileged** [3] - 591:15, 591:24, 592:2
**privy** [1] - 550:9
**problem** [1] - 632:17
**procedures** [2] - 347:1, 504:5
**Procedures** [2] - 323:20, 504:1
**proceedings** [1] - 325:1
**Process** [1] - 421:7
**process** [121] - 326:21, 329:7, 344:1, 346:21, 348:4, 348:10, 348:11, 348:22, 349:5, 349:13, 349:22, 349:25, 350:25, 351:1, 352:5, 352:11, 354:5, 354:11, 354:20, 355:3, 355:12, 361:11, 361:21, 365:14, 371:4, 371:5, 371:9, 391:5, 422:19, 423:15, 424:12, 425:18, 425:24, 427:18, 431:16, 431:18, 432:22, 434:24, 436:24, 437:6, 437:10, 441:4, 463:10, 464:17, 466:9, 466:15, 466:18, 466:21, 466:22, 467:8, 467:21, 468:1, 469:4, 469:7, 469:13, 477:5, 477:16, 479:18, 481:9, 488:3, 491:19,

492:23, 492:25, 495:16, 500:7, 502:23, 505:25, 508:20, 516:5, 516:7, 517:16, 518:16, 519:5, 520:18, 521:13, 522:17, 522:19, 523:22, 524:20, 527:8, 536:24, 548:1, 548:10, 555:11, 559:4, 560:10, 560:11, 561:21, 562:12, 563:9, 565:24, 565:25, 566:14, 567:15, 567:20, 567:22, 569:3, 572:20, 573:5, 573:11, 575:2, 575:10, 576:4, 585:2, 585:9, 600:23, 603:1, 604:8, 604:9, 605:1, 607:11, 607:16, 610:7, 610:17, 619:17, 624:25, 628:4, 628:5, 629:25, 636:11, 643:17
**processes** [1] - 601:8
**produced** [10] - 482:14, 517:10, 549:20, 574:7, 596:17, 596:25, 597:6, 598:21, 607:1, 607:6
**product** [2] - 591:12, 591:20
**profanity** [10] - 532:2, 532:3, 532:5, 532:11, 532:16, 532:18, 532:23, 532:25, 533:14, 534:3
**Professional** [4] - 641:6, 641:8, 642:5, 642:7
**professional** [21] - 493:9, 500:11, 507:6, 533:17, 533:23, 534:6, 534:25, 535:9, 535:11, 535:14, 541:3, 541:8, 541:20, 541:24, 542:4, 543:14, 543:15, 577:1, 620:10, 621:12, 623:1
**program** [1] - 472:20
**prohibit** [1] - 539:2
**prohibited** [14] - 332:5, 334:13, 338:21, 346:8, 347:24, 506:8, 507:9, 508:22, 509:3, 509:11, 538:20, 538:24, 538:25, 539:12
**prohibits** [2] - 507:15, 539:13
**project** [1] - 499:11
**prompted** [1] - 353:25
**promulgate** [1] - 346:25
**properly** [3] - 484:15, 504:19, 580:20
**proposal** [3] - 509:15, 555:16, 628:14
**proposals** [1] - 509:10
**proposed** [6] - 468:12,

468:20, 509:20, 510:17, 544:5, 556:7
**proposing** [2] - 556:15, 556:19
**protect** [1] - 591:21
**Protect** [1] - 319:22
**PROTECT** [2] - 319:4, 320:18
**protected** [1] - 591:21
**provide** [16] - 350:21, 404:18, 405:22, 504:7, 510:4, 512:8, 527:1, 528:7, 528:17, 608:12, 608:20, 608:25, 609:7, 629:23, 632:25, 635:19
**provided** [66] - 358:7, 358:10, 360:8, 368:12, 373:7, 375:19, 375:23, 376:10, 376:14, 378:4, 379:22, 380:3, 380:21, 381:11, 381:17, 383:12, 383:17, 384:6, 384:12, 384:14, 387:12, 388:21, 391:8, 391:21, 392:1, 392:3, 394:5, 396:9, 396:14, 398:9, 400:9, 401:5, 401:19, 402:5, 405:20, 407:8, 409:14, 410:12, 410:25, 412:24, 413:15, 414:1, 414:4, 414:12, 416:10, 417:6, 417:15, 417:23, 420:1, 537:1, 537:5, 537:11, 537:18, 559:1, 596:12, 596:14, 597:3, 598:14, 598:25, 599:3, 608:17, 610:5, 622:14, 624:14, 628:23
**provides** [5] - 344:21, 344:25, 519:18, 528:7, 560:4
**providing** [2] - 507:16, 592:19
**provision** [17] - 332:20, 333:1, 334:16, 342:10, 344:4, 346:18, 346:22, 506:10, 507:1, 509:4, 510:12, 510:20, 512:10, 527:21, 532:7, 532:24, 537:1
**provisions** [1] - 584:20
**pubic** [1] - 585:14
**public** [12] - 350:8, 372:11, 385:13, 385:18, 387:18, 455:5, 618:8, 619:24, 620:3, 620:5, 625:20, 630:21
**Public** [29] - 381:2, 401:9, 401:13, 402:11, 402:16, 402:22, 413:18,

414:19, 414:23, 415:4, 415:10, 417:11, 418:6, 418:11, 418:17, 418:23, 501:25, 507:2, 507:9, 510:21, 512:14, 512:19, 512:20, 517:15, 544:3, 577:25, 580:6, 638:11, 641:9
**PUBLIC** [1] - 641:19
**publication** [1] - 487:22
**publicly** [4] - 467:6, 560:23, 599:21, 603:13
**pull** [10] - 362:20, 364:23, 562:1, 566:8, 566:9, 567:5, 572:5, 578:4, 589:8, 635:15
**pulled** [25] - 328:19, 360:19, 361:20, 361:23, 362:5, 423:6, 440:12, 441:18, 441:23, 442:6, 463:17, 480:25, 517:8, 517:11, 567:4, 567:5, 568:4, 570:9, 573:10, 578:12, 578:14, 578:18, 585:4, 589:4, 628:9
**pulling** [1] - 479:19
**pupils** [1] - 527:5
**purchase** [15] - 472:12, 487:6, 493:6, 499:9, 501:3, 501:6, 509:10, 509:15, 510:17, 537:15, 541:1, 541:14, 543:3, 544:13
**purchased** [7] - 499:1, 499:5, 499:16, 529:18, 540:13, 543:6, 544:18
**purchases** [1] - 495:1
**purchasing** [3] - 495:1, 500:21, 542:9
**purpose** [7] - 357:12, 357:16, 501:17, 501:18, 501:21, 510:12, 541:9
**Purpose** [2] - 501:13, 511:12
**purposes** [5] - 354:18, 356:1, 469:3, 511:13, 581:5
**pursuant** [2] - 502:22, 510:19
**purview** [1] - 568:25
**Push** [14] - 323:13, 413:14, 413:17, 414:10, 414:15, 414:18, 414:23, 415:3, 415:10, 415:14, 416:10, 625:15, 625:16, 625:20
**put** [15] - 337:2, 337:15, 337:17, 406:11, 432:9, 432:15, 440:15, 440:17, 442:10, 544:22, 569:14,

581:1, 612:19, 612:20, 625:6
**puts** [2] - 494:13, 561:12
**putting** [2] - 572:25, 585:15

---

Q

---

**qualifications** [1] - 629:5
**quarter** [1] - 499:23
**questionable** [1] - 575:22
**questioned** [2] - 461:5, 549:3
**questioning** [2] - 337:8, 555:6
**questions** [30] - 356:4, 367:6, 370:21, 371:1, 371:10, 402:2, 440:16, 442:11, 447:9, 465:14, 470:7, 534:2, 538:7, 547:2, 599:12, 617:7, 631:25, 632:5, 632:10, 632:18, 632:21, 633:1, 633:21, 633:22, 634:4, 636:6, 636:16, 638:19, 638:21
**quick** [1] - 600:7
**quicker** [1] - 400:18
**quickly** [1] - 474:23
**quite** [2] - 395:10, 461:24

---

R

---

**race** [15] - 533:5, 534:2, 534:7, 534:8, 534:10, 534:12, 534:16, 534:21, 534:22, 534:24, 535:2, 535:14, 536:19, 537:14, 620:20
**Race** [1] - 533:14
**racial** [1] - 511:23
**Racing** [2] - 458:8, 458:9, 458:11
**Rain** [2] - 458:9, 458:11
**raise** [1] - 325:3
**raising** [1] - 356:4
**ran** [3] - 494:24, 525:24, 526:3
**RANDOM** [1] - 318:7
**randomly** [2] - 354:19, 354:23
**range** [2] - 527:1, 627:11
**rather** [5] - 395:5, 439:8, 488:22, 505:8, 619:8
**rationale** [1] - 349:4
**RE** [2] - 643:9, 644:3

**reach** [5] - 433:13, 618:7, 618:11, 618:15, 618:18
**reached** [1] - 585:3
**read** [63] - 359:10, 362:20, 365:22, 366:17, 366:23, 369:2, 369:16, 370:22, 376:5, 380:9, 383:24, 391:16, 396:21, 397:5, 397:10, 397:16, 441:8, 441:11, 465:6, 513:10, 513:16, 526:23, 533:12, 538:22, 542:16, 542:18, 556:3, 557:20, 576:23, 584:19, 585:10, 598:12, 598:16, 601:5, 621:7, 621:8, 621:15, 622:8, 622:10, 622:23, 623:5, 623:16, 624:2, 624:10, 624:23, 625:1, 625:15, 625:16, 626:7, 626:12, 626:18, 626:22, 626:23, 626:25, 627:11, 627:13, 630:22, 631:1, 631:4, 631:5, 631:21, 644:22
**reader** [2] - 472:20, 493:21
**reading** [21] - 342:13, 402:3, 480:3, 481:5, 488:22, 492:21, 492:22, 493:14, 495:25, 513:5, 513:23, 517:14, 528:2, 533:13, 536:2, 585:19, 594:16, 612:10, 616:18, 643:16, 643:17
**reads** [3] - 336:10, 365:9, 539:12
**Ready** [9] - 437:8, 437:14, 437:17, 437:20, 437:25, 438:9, 438:24, 444:2, 449:5
**ready** [1] - 619:17
**real** [1] - 585:1
**realize** [1] - 631:2
**realized** [2] - 400:18, 595:24
**really** [13] - 338:14, 361:19, 463:11, 504:9, 530:2, 536:17, 565:15, 584:25, 587:17, 613:6, 616:17, 622:6, 634:24
**realtime** [1] - 362:12
**Realtime** [5] - 318:25, 641:6, 641:8, 642:5, 642:7
**REASON** [1] - 644:7
**reason** [21] - 337:7, 353:2, 366:7, 372:8, 386:6, 408:6, 415:9,

418:22, 419:7, 424:24, 427:12, 442:13, 450:11, 455:10, 489:6, 532:25, 544:13, 544:15, 565:5, 571:1, 579:12
**Reasons** [1] - 455:16
**reasons** [19] - 352:9, 352:22, 352:25, 367:3, 367:5, 370:15, 371:12, 377:8, 392:20, 411:21, 497:14, 501:20, 502:11, 502:12, 566:10, 610:18, 611:16, 611:20, 612:4
**receipt** [3] - 332:11, 427:8, 445:10
**receive** [8] - 326:24, 327:2, 327:6, 327:7, 499:12, 562:18, 602:10, 629:25
**received** [30] - 336:22, 347:7, 366:15, 366:22, 366:25, 390:15, 428:2, 434:21, 437:4, 457:19, 457:22, 461:9, 471:4, 503:6, 524:2, 543:7, 550:11, 550:16, 552:9, 552:12, 554:10, 555:3, 583:17, 604:24, 610:15, 611:11, 611:18, 613:12, 620:9, 635:17
**receiving** [2] - 328:18, 565:18
**recent** [5] - 347:12, 438:10, 505:7, 587:24, 606:21
**recently** [3] - 455:9, 580:13, 604:4
**Recess** [5] - 404:12, 471:9, 538:5, 598:5, 633:17
**recipient** [1] - 599:4
**recognize** [3] - 363:9, 517:6, 517:7
**recognizing** [2] - 621:23, 622:19
**recollection** [13] - 331:10, 384:21, 440:10, 473:7, 473:11, 505:3, 523:21, 523:24, 525:23, 549:16, 551:14, 609:12, 616:12
**recommendation** [6] - 348:7, 348:23, 557:21, 558:4, 558:21, 627:12
**recommendations** [4] - 556:22, 557:6, 559:2, 623:1
**recommended** [11] - 495:25, 500:11, 534:6, 541:13, 541:14, 542:20,

542:21, 557:18, 557:19, 557:20, 558:9
**recommending** [1] - 535:8
**reconsideration** [1] - 600:13
**Reconsideration** [1] - 322:16
**Reconsiderations** [46] - 330:25, 338:11, 350:9, 355:14, 355:21, 356:1, 360:7, 361:23, 362:14, 367:21, 403:13, 403:21, 404:24, 421:4, 421:18, 430:25, 436:21, 442:20, 443:3, 443:10, 444:4, 445:5, 446:7, 448:24, 449:24, 450:22, 451:11, 463:14, 464:12, 465:21, 466:2, 466:13, 471:21, 482:17, 482:22, 484:17, 487:16, 560:20, 582:16, 583:2, 589:17, 589:23, 599:17, 599:23, 604:22, 610:21
**reconsiderations** [3] - 336:22, 413:20, 612:16
**record** [32] - 326:24, 345:24, 360:12, 362:21, 368:20, 368:23, 369:1, 395:15, 404:5, 404:11, 404:24, 405:5, 420:21, 421:13, 421:15, 460:14, 475:8, 478:4, 498:10, 510:10, 516:24, 522:25, 577:17, 579:23, 590:25, 597:19, 598:2, 598:4, 632:16, 633:15, 633:16, 642:12
**recorded** [6] - 404:9, 484:15, 499:5, 505:17, 566:10, 633:7
**records** [2] - 364:15, 603:13
**RECROSS** [1] - 639:3
**RECROSS-EXAMINATION** [1] - 639:3
**Red** [1] - 463:21
**REDIRECT** [2] - 636:21, 640:1
**Redirect** [2] - 322:9, 322:11
**redistrict** [1] - 405:9
**redline** [1] - 531:25
**redlines** [1] - 331:8
**reevaluate** [1] - 572:25
**reevaluated** [1] - 573:9
**refer** [33] - 327:3, 335:2, 335:10, 335:17, 335:19,

335:24, 338:4, 366:20, 367:8, 387:3, 397:7, 397:22, 403:13, 428:19, 449:2, 462:10, 462:12, 475:15, 475:16, 475:20, 477:8, 478:22, 503:5, 504:16, 505:8, 509:8, 513:8, 539:15, 549:2, 550:13, 574:2, 576:24, 582:5
**reference** [6] - 342:2, 502:24, 504:7, 571:24, 637:15, 637:24
**referenced** [5] - 461:19, 540:5, 555:18, 567:22, 643:15
**references** [2] - 337:20, 575:23
**referred** [5] - 358:7, 387:15, 431:4, 486:20, 503:7
**referring** [19] - 333:5, 347:15, 347:16, 354:24, 369:25, 427:16, 466:16, 478:25, 493:9, 501:10, 506:13, 518:1, 518:4, 521:7, 554:9, 596:20, 596:21, 619:6, 640:6
**reflect** [23] - 361:18, 361:24, 365:24, 376:2, 388:25, 391:13, 396:1, 396:9, 403:22, 407:5, 410:21, 413:16, 414:8, 417:10, 417:20, 488:23, 501:21, 505:24, 511:24, 512:9, 512:15, 528:17, 620:24
**reflected** [12] - 393:10, 393:11, 393:13, 428:25, 463:13, 478:22, 479:5, 481:3, 489:4, 531:25, 539:10, 558:20
**reflecting** [4] - 451:12, 537:17, 583:3, 634:21
**reflective** [1] - 434:7
**reflects** [21] - 367:23, 368:11, 368:17, 375:7, 379:17, 380:6, 383:7, 383:21, 388:22, 391:8, 396:6, 396:17, 401:7, 401:23, 405:13, 407:4, 410:8, 410:17, 413:25, 417:14, 528:25
**refresh** [13] - 331:10, 428:12, 448:21, 473:4, 473:10, 503:11, 505:3, 523:21, 530:3, 609:11, 609:14, 610:3, 615:23
**refreshed** [1] - 610:6
**refreshing** [2] - 440:10,

473:6
**regard** [9] - 348:14, 368:12, 368:18, 450:23, 548:14, 564:8, 577:11, 593:5, 599:13
**regarding** [50] - 368:1, 372:8, 377:8, 386:6, 392:19, 399:3, 401:24, 403:1, 408:5, 410:22, 411:20, 412:24, 414:9, 415:9, 417:21, 418:22, 542:13, 545:6, 547:1, 548:5, 550:2, 556:22, 556:23, 557:7, 558:22, 559:3, 589:10, 590:7, 591:4, 594:16, 596:6, 596:9, 601:15, 602:4, 602:6, 602:23, 607:4, 608:1, 610:4, 610:11, 610:12, 612:10, 613:4, 613:19, 614:6, 615:9, 616:15, 634:8, 634:13
**regardless** [1] - 529:17
**regards** [2] - 552:6, 577:12
**register** [1] - 345:7
**Registered** [2] - 641:5, 642:4
**regular** [4] - 406:12, 569:22, 587:10, 587:13
**Regular** [1] - 440:25
**reinstitute** [1] - 350:8
**rejected** [2] - 509:10, 509:15
**related** [25] - 495:21, 495:24, 537:3, 546:1, 546:8, 547:12, 555:4, 556:12, 560:12, 560:16, 595:5, 600:6, 604:11, 607:6, 607:23, 608:11, 609:23, 610:24, 613:11, 617:17, 635:18, 637:18, 638:21, 642:14, 642:16
**relating** [1] - 555:2, 607:16
**relation** [10] - 339:8, 484:3, 532:11, 546:22, 549:5, 549:11, 549:13, 555:17, 560:17, 601:4
**relationship** [1] - 339:8
**Release** [1] - 323:23
**release** [5] - 365:2, 365:6, 487:23, 518:14, 607:24
**relevance** [1] - 543:13
**relevant** [2] - 489:21, 502:21
**relied** [2] - 594:20, 627:1
**religious** [2] - 511:22, 528:18

Deposition of Bradley Vinson, Volume 2

**rely** [2] - 341:21, 397:12
**relying** [3] - 486:25, 543:14, 602:8
**remain** [9] - 332:12, 333:2, 333:15, 334:22, 335:14, 336:7, 352:4, 432:11, 621:5
**remained** [5] - 352:9, 352:14, 479:15, 614:22, 621:22
**remains** [2] - 463:18, 589:5
**remember** [22] - 366:11, 397:4, 397:8, 428:11, 439:25, 452:14, 489:10, 505:16, 546:7, 551:20, 597:2, 597:18, 597:21, 607:10, 607:24, 609:16, 634:5, 634:16, 635:5, 635:9, 636:24
**remind** [2] - 471:11, 538:13
**removal** [20] - 346:10, 346:13, 349:5, 350:14, 350:20, 351:1, 365:20, 371:4, 371:7, 469:4, 532:13, 556:23, 600:25, 601:16, 601:22, 602:7, 603:2, 606:13, 609:20, 610:13
**removals** [1] - 607:18
**remove** [61] - 336:6, 344:25, 345:5, 345:16, 348:23, 349:15, 349:20, 350:3, 365:10, 366:1, 366:7, 375:11, 376:23, 377:4, 377:23, 379:18, 381:1, 381:6, 383:8, 385:1, 385:6, 385:21, 386:1, 386:6, 388:23, 389:8, 392:6, 392:11, 392:15, 398:14, 398:19, 398:23, 399:4, 401:8, 402:10, 402:15, 402:21, 403:2, 413:17, 414:18, 414:23, 415:3, 417:10, 418:5, 418:10, 418:17, 418:22, 419:6, 419:19, 466:23, 467:2, 469:11, 502:22, 565:4, 606:23, 621:20, 623:8, 624:17, 625:4, 625:20, 627:16
**removed** [22] - 332:22, 335:13, 335:14, 336:7, 346:9, 366:16, 366:17, 367:8, 367:9, 371:3, 403:4, 403:6, 406:24, 416:4, 565:5, 602:25, 603:1, 603:5, 603:20, 604:15, 620:14

**removing** [10] - 349:1, 349:23, 354:7, 367:3, 415:10, 457:24, 558:11, 618:25, 619:8, 619:11
**Renaissance** [1] - 472:19
**repeat** [16] - 335:25, 336:1, 359:6, 371:24, 374:14, 381:15, 385:4, 406:18, 426:4, 443:8, 500:24, 537:10, 540:16, 542:14, 563:20, 587:8
**repeated** [1] - 346:1
**rephrase** [5] - 354:1, 465:20, 501:18, 507:12, 620:16
**replaced** [14] - 455:21, 460:6, 460:15, 475:11, 477:4, 478:16, 483:18, 483:20, 485:18, 485:22, 488:11, 488:25, 489:13, 489:18
**replacement** [1] - 356:16
**report** [17] - 480:25, 486:16, 524:10, 524:12, 524:22, 525:1, 525:24, 526:2, 526:3, 526:8, 526:17, 552:7, 552:15, 562:1, 562:2, 566:7, 642:9
**reporter** [4] - 404:18, 441:11, 542:18, 615:15
**REPORTER** [6] - 325:3, 325:9, 457:15, 542:17, 641:1, 642:1
**Reporter** [7] - 319:23, 641:6, 641:8, 642:5, 642:8
**Reporting** [4] - 318:21, 641:7, 642:6, 643:25
**represent** [5] - 511:22, 527:6, 588:20
**representation** [2] - 512:3, 587:25
**representative** [2] - 349:18, 617:8
**representing** [1] - 527:3
**represents** [1] - 498:19
**request** [6] - 327:10, 389:20, 510:3, 510:5, 562:7, 562:9
**requested** [2] - 390:14, 642:11
**requests** [1] - 493:22
**require** [2] - 481:23, 522:4
**required** [8] - 367:2, 367:4, 493:25, 494:4, 495:15, 529:22, 532:13, 638:18

**requirement** [8] - 496:6, 496:8, 535:10, 543:25, 638:9, 639:12, 639:20, 639:23
**requirements** [2] - 508:19, 532:13
**requires** [2] - 530:17, 536:19
**requiring** [4] - 346:9, 521:7, 521:18, 639:6
**reread** [1] - 614:7
**Reross** [1] - 322:10
**Reross-examination** [1] - 322:10
**research** [3] - 432:10, 434:13, 521:17
**resolution** [1] - 349:6
**resolve** [3] - 436:21, 565:12, 630:19
**resolved** [1] - 337:18
**resolving** [1] - 635:5
**respect** [26] - 348:18, 367:24, 375:8, 391:4, 397:25, 405:14, 450:15, 451:4, 483:8, 502:25, 534:2, 539:23, 540:23, 541:17, 561:6, 562:21, 563:9, 593:22, 599:12, 602:24, 606:12, 607:17, 609:20, 613:2, 620:25, 636:23
**responding** [1] - 523:10
**response** [20] - 346:9, 366:9, 369:10, 369:13, 369:20, 376:8, 380:13, 380:19, 397:11, 397:14, 435:20, 470:12, 495:5, 524:2, 554:11, 555:3, 591:14, 594:23, 602:10, 611:1
**responses** [3] - 526:4, 550:10, 550:16
**responsibilities** [7] - 559:14, 559:19, 559:20, 560:6, 635:15, 635:23, 636:7
**responsibility** [4] - 560:2, 561:7, 561:8, 635:19
**responsible** [6] - 560:9, 560:19, 561:2, 561:11, 592:18, 635:24
**rest** [2] - 526:7, 585:21
**restrict** [35] - 337:22, 339:12, 341:12, 343:17, 348:10, 361:6, 366:1, 366:7, 371:21, 374:13, 377:3, 407:9, 407:15, 407:20, 408:1, 408:6, 410:8, 411:6, 411:11,

411:16, 411:21, 427:19, 428:22, 448:5, 450:12, 461:13, 464:15, 464:23, 563:2, 563:6, 611:4, 611:5, 621:24, 622:20, 631:19
**Restricted** [8] - 322:18, 323:16, 323:23, 326:15, 343:25, 421:6, 433:18, 466:14
**restricted** [240] - 326:8, 326:10, 327:14, 328:5, 328:6, 328:7, 328:11, 328:12, 328:14, 328:18, 328:24, 329:4, 329:11, 329:14, 329:18, 330:4, 330:15, 331:1, 332:11, 333:3, 333:12, 339:21, 340:8, 340:25, 344:7, 352:8, 352:21, 352:22, 352:24, 353:3, 353:4, 353:5, 353:11, 353:17, 354:3, 354:4, 354:6, 354:10, 355:1, 355:18, 356:5, 357:6, 357:7, 360:22, 360:24, 361:1, 361:9, 363:13, 403:5, 403:7, 403:11, 406:25, 421:21, 421:25, 422:10, 422:11, 422:16, 422:17, 422:18, 423:13, 423:14, 423:18, 423:23, 424:11, 424:16, 424:19, 424:20, 424:23, 424:24, 424:25, 425:7, 425:11, 425:16, 425:17, 425:22, 425:23, 426:2, 426:7, 426:9, 426:10, 426:11, 426:14, 426:15, 426:16, 426:20, 426:21, 426:24, 427:4, 427:5, 427:7, 427:17, 427:25, 428:5, 428:20, 429:4, 429:10, 429:11, 429:12, 429:16, 430:1, 430:2, 430:6, 430:8, 430:12, 430:20, 431:1, 431:13, 431:15, 431:20, 432:1, 432:12, 432:19, 433:1, 433:3, 433:6, 433:12, 433:17, 433:20, 434:18, 434:23, 435:2, 437:10, 437:18, 437:25, 438:5, 443:3, 443:18, 444:4, 445:4, 446:1, 446:9, 446:12, 446:16, 447:3, 447:6, 447:13, 447:23, 447:25, 448:3, 448:13, 448:23, 449:21, 450:1, 450:8, 450:21, 451:22, 451:24, 452:5, 452:10, 452:20, 453:1,

453:6, 453:12, 453:17, 453:22, 454:4, 454:10, 454:15, 454:20, 454:25, 455:13, 455:23, 456:5, 456:10, 456:16, 456:22, 457:1, 457:6, 457:10, 458:5, 458:13, 458:19, 458:25, 459:6, 459:12, 459:24, 460:25, 463:11, 463:25, 464:6, 464:11, 464:13, 465:10, 465:17, 466:2, 466:8, 470:23, 471:22, 474:9, 474:24, 476:23, 479:13, 479:15, 482:24, 483:4, 483:21, 484:20, 485:5, 485:14, 488:5, 489:11, 490:7, 490:19, 490:24, 491:8, 522:11, 542:20, 576:18, 576:20, 576:22, 577:9, 581:21, 582:18, 583:11, 583:20, 588:3, 588:24, 602:25, 603:5, 603:20, 604:15, 604:16, 604:22, 605:21, 608:5, 610:22, 611:2, 611:8, 611:19, 612:12, 612:19, 612:20, 613:24, 614:23, 619:16
**restricting** [8] - 365:7, 427:3, 429:23, 605:1, 605:2, 615:17, 619:1, 626:19
**restriction** [22] - 353:18, 357:13, 357:16, 428:15, 428:23, 432:21, 433:11, 434:18, 460:9, 465:15, 473:2, 473:25, 477:3, 488:23, 522:13, 595:7, 601:1, 601:16, 601:22, 606:13, 608:1, 610:17
**restrictions** [22] - 342:22, 424:22, 427:22, 428:16, 465:13, 489:3, 514:1, 602:6, 606:25, 607:4, 607:7, 607:18, 609:21, 609:24, 610:13, 610:24, 611:1, 611:17, 611:25, 613:16, 618:22, 632:11
**result** [16] - 361:10, 361:11, 395:22, 422:17, 422:18, 425:17, 427:17, 428:22, 429:4, 429:12, 438:5, 457:11, 476:23, 537:7, 537:14, 563:9
**results** [1] - 525:24
**resume** [1] - 619:17
**retain** [6] - 333:7, 346:5, 349:1, 389:1, 412:14, 469:17

Deposition of Bradley Vinson, Volume 2

**retained** [3] - 393:20, 619:12, 624:7
**retaining** [2] - 558:11, 630:17
**retains** [1] - 344:22
**retired** [1] - 356:13
**retrieve** [1] - 580:21
**Return** [1] - 560:24
**return** [3] - 441:3, 568:20, 576:2
**returned** [5] - 442:18, 474:5, 568:8, 569:3, 569:4
**returning** [2] - 442:1, 562:17
**reuse** [1] - 374:24
**reveal** [2] - 591:14, 592:1
**Review** [25] - 323:24, 332:2, 332:15, 333:22, 346:16, 349:2, 349:12, 351:14, 421:6, 466:25, 467:3, 467:17, 467:23, 468:3, 468:9, 577:15, 595:6, 599:13, 600:5, 601:8, 603:4, 628:15, 628:19, 629:11, 629:21
**review** [133] - 341:1, 345:1, 347:20, 347:22, 350:15, 351:19, 352:4, 352:10, 355:25, 361:11, 365:14, 376:9, 380:15, 384:5, 386:21, 391:20, 396:4, 403:9, 404:1, 422:19, 422:20, 422:22, 423:14, 423:19, 424:12, 425:18, 425:24, 426:9, 429:5, 429:11, 429:12, 429:24, 430:2, 430:8, 430:13, 430:15, 430:21, 432:22, 432:24, 434:7, 435:9, 435:10, 437:10, 438:11, 439:15, 440:12, 441:2, 441:19, 442:10, 457:12, 461:5, 463:2, 466:3, 467:14, 467:15, 467:25, 470:8, 471:2, 484:4, 484:8, 490:14, 492:5, 500:10, 510:7, 510:14, 510:15, 541:3, 541:4, 541:8, 541:23, 546:9, 547:16, 557:9, 560:10, 563:11, 566:22, 566:24, 567:12, 567:13, 567:14, 567:15, 567:22, 568:16, 568:18, 569:23, 570:1, 570:11, 570:20, 570:23, 571:8, 571:14, 571:19, 572:2, 572:4, 572:7, 572:10, 574:12, 574:16, 575:18, 575:19,

576:18, 582:22, 594:22, 594:25, 595:3, 596:17, 596:24, 597:5, 597:9, 597:13, 598:15, 599:8, 600:6, 603:12, 603:25, 605:5, 605:15, 607:5, 607:23, 608:3, 608:13, 609:8, 610:11, 613:23, 615:8, 616:20, 617:1, 619:17, 628:12, 629:9, 639:21, 642:10, 643:15
**review's** [1] - 534:6
**reviewed** [48] - 384:21, 398:1, 432:20, 432:23, 434:20, 438:25, 439:4, 439:13, 440:14, 443:24, 449:12, 449:15, 469:2, 470:4, 556:5, 567:6, 568:7, 569:10, 583:23, 594:10, 594:11, 594:19, 595:6, 596:15, 597:4, 598:8, 598:9, 598:20, 601:4, 603:19, 604:8, 606:15, 607:16, 607:20, 610:21, 611:10, 612:14, 612:15, 612:16, 615:18, 616:9, 622:13, 624:12, 625:17, 625:24, 631:6, 631:8
**Reviewed** [1] - 439:11
**reviewing** [12] - 350:19, 355:10, 355:12, 366:10, 427:2, 440:21, 441:17, 541:13, 564:14, 603:3, 609:22, 609:23
**reviews** [25] - 431:3, 431:23, 433:8, 448:22, 493:9, 500:11, 507:6, 533:17, 533:23, 534:25, 535:9, 535:11, 535:15, 541:3, 541:9, 541:20, 541:25, 542:4, 543:15, 577:1, 621:13, 623:1, 626:25, 635:4
**revision** [2] - 331:17, 331:21
**revisions** [2] - 529:24, 530:6
**rhyme** [1] - 427:11
**rid** [1] - 566:4
**ridiculous** [1] - 335:6
**Rog** [2] - 435:21, 435:22
**role** [22] - 341:11, 509:24, 550:17, 555:13, 557:2, 559:9, 559:14, 559:17, 559:20, 606:6, 606:8, 606:11, 606:17, 607:17, 609:9, 609:19, 610:1, 610:12, 617:12, 618:2, 618:20

**room** [2] - 581:1, 581:8
**Rose** [2] - 447:22, 448:8
**rough** [2] - 499:21, 560:6
**round** [1] - 526:6
**rows** [1] - 578:25
**Royal** [1] - 463:22
**RPR** [4] - 318:24, 641:18, 642:22, 643:24
**rule** [3] - 554:7, 604:8, 613:15
**rules** [2] - 632:25, 633:5
**RUMBERGER** [3] - 319:13, 321:4, 321:11
**Rumberger** [1] - 321:21
**run** [4] - 524:10, 524:12, 524:21, 526:17
**Runner** [1] - 451:22
**running** [5] - 351:5, 351:15, 496:20, 571:22, 608:9
**rush** [1] - 420:15

S

**Safier** [1] - 370:14
**SAMANTHA** [1] - 321:12
**SARAH** [1] - 318:4
**SATTERWHITE** [1] - 318:9
**saw** [5] - 353:16, 424:4, 619:3, 624:3, 625:9
**scenario** [1] - 530:11
**scheduled** [1] - 469:22
**scheduling** [2] - 468:22, 468:23
**SCHOOL** [2] - 318:12, 643:7
**school** [241] - 326:17, 327:11, 327:20, 327:22, 327:25, 328:1, 328:2, 329:3, 329:10, 332:13, 332:25, 335:4, 335:16, 336:6, 337:15, 340:2, 340:14, 345:4, 345:8, 347:12, 347:22, 351:6, 352:13, 353:5, 355:9, 363:19, 364:16, 365:6, 365:9, 365:14, 366:12, 368:15, 371:5, 371:7, 379:18, 381:6, 383:20, 383:24, 384:5, 385:2, 389:1, 389:10, 389:11, 389:17, 389:25, 390:2, 390:3, 390:9, 390:10, 390:11, 390:22, 391:9, 391:12, 391:13, 393:20, 393:22, 396:16, 399:19, 401:19, 401:23, 405:13, 406:8, 407:4, 417:19,

428:4, 438:15, 444:22, 452:15, 460:9, 460:10, 460:25, 471:24, 473:15, 476:8, 478:7, 479:24, 480:6, 480:9, 480:23, 481:4, 481:6, 481:19, 482:24, 482:25, 483:20, 484:22, 485:9, 487:13, 488:16, 488:24, 489:4, 489:5, 489:17, 489:21, 499:1, 499:9, 499:15, 499:17, 499:24, 500:9, 503:25, 505:25, 506:11, 506:18, 506:20, 506:23, 509:15, 510:6, 517:17, 518:15, 519:14, 520:1, 520:18, 521:1, 521:4, 521:6, 521:9, 523:19, 524:6, 524:7, 524:13, 524:20, 525:10, 525:11, 526:14, 526:19, 527:19, 528:2, 528:3, 528:9, 529:15, 529:20, 529:21, 529:23, 535:7, 543:18, 545:1, 545:2, 545:5, 545:23, 546:11, 546:15, 546:19, 548:18, 549:25, 551:4, 551:12, 551:16, 551:22, 553:4, 558:22, 559:2, 562:6, 562:11, 562:17, 563:14, 563:16, 564:1, 564:5, 564:25, 565:6, 565:7, 565:12, 565:18, 566:13, 566:21, 566:23, 567:1, 567:3, 567:9, 567:12, 567:21, 567:23, 567:25, 568:14, 569:2, 569:12, 571:14, 573:13, 573:21, 574:6, 574:12, 574:16, 574:20, 574:22, 574:23, 575:6, 575:11, 575:16, 580:8, 581:24, 582:18, 582:21, 583:1, 583:14, 586:25, 592:17, 594:16, 594:22, 594:24, 595:3, 596:18, 600:22, 600:24, 601:6, 601:15, 601:21, 602:13, 607:3, 615:17, 617:8, 618:21, 619:12, 619:24, 620:4, 621:20, 621:22, 622:5, 622:7, 622:19, 623:8, 623:23, 623:25, 624:3, 624:9, 625:9, 625:13, 625:20, 626:3, 627:4, 628:2, 629:21, 630:4, 630:7, 633:24, 636:9, 636:10, 638:17
**School** [44] - 318:15, 321:20, 324:4, 325:11, 363:8, 381:2, 401:9,

401:13, 402:11, 402:16, 402:22, 413:18, 414:19, 414:24, 415:4, 415:11, 417:11, 418:6, 418:11, 418:18, 418:23, 479:25, 501:25, 510:21, 512:14, 512:19, 544:3, 571:25, 579:5, 579:14, 579:21, 580:3, 581:4, 581:11, 581:18, 582:3, 587:13, 587:23, 599:13, 600:4, 643:9, 644:3, 644:5
**school's** [6] - 494:7, 513:16, 513:17, 565:20, 611:1, 639:22
**schooler** [1] - 624:8
**schools** [61] - 363:20, 363:21, 383:9, 388:24, 389:5, 389:8, 392:6, 392:11, 392:16, 393:17, 395:20, 395:24, 398:15, 398:19, 398:24, 399:5, 401:12, 440:9, 462:3, 472:5, 472:12, 472:14, 479:14, 479:17, 479:18, 481:15, 487:7, 487:9, 489:7, 489:23, 509:14, 518:19, 521:19, 522:6, 561:24, 565:9, 568:3, 568:4, 568:13, 572:4, 572:9, 572:22, 572:23, 575:14, 578:1, 582:24, 583:4, 583:5, 583:8, 583:11, 621:5, 623:20, 624:18, 625:4, 626:4, 628:16, 629:15, 629:22, 636:1, 636:3
**Schools** [8] - 507:2, 507:9, 512:20, 517:15, 577:25, 580:6, 580:18, 638:11
**science** [2] - 496:16, 508:12
**sciences** [4] - 495:24, 496:4, 496:7, 496:11
**scientific** [4] - 342:8, 343:12, 507:21, 508:17
**scope** [162] - 345:18, 349:8, 349:21, 365:25, 366:3, 366:6, 366:8, 366:18, 368:24, 369:4, 369:22, 370:6, 370:11, 370:24, 371:23, 372:5, 372:14, 372:20, 372:25, 373:4, 373:9, 373:19, 374:1, 374:8, 376:7, 376:12, 376:20, 376:24, 377:5, 377:9, 377:14, 377:20, 378:1, 378:6, 378:11, 378:16, 378:22,

379:6, 380:11, 380:17,
381:3, 381:7, 381:14,
381:20, 381:23, 382:3,
382:9, 384:1, 384:8,
385:3, 385:9, 385:22,
386:3, 386:14, 386:19,
387:1, 387:8, 387:14,
387:21, 388:1, 388:7,
391:18, 391:22, 392:7,
392:12, 392:17, 392:21,
393:2, 393:7, 393:12,
393:18, 394:2, 394:7,
394:11, 394:16, 394:21,
395:5, 395:6, 396:23,
398:16, 398:20, 398:25,
399:6, 399:12, 399:16,
399:21, 400:5, 400:10,
400:16, 402:17, 402:23,
403:3, 407:17, 407:22,
408:3, 408:8, 408:13,
408:18, 408:23, 409:4,
409:10, 409:15, 409:21,
411:8, 411:13, 411:18,
411:23, 412:3, 412:8,
412:13, 412:20, 413:1,
413:7, 414:20, 414:25,
415:5, 415:12, 415:17,
415:22, 416:1, 416:7,
416:12, 416:18, 418:7,
418:12, 418:19, 418:25,
419:5, 419:11, 419:16,
419:23, 420:3, 420:9,
465:11, 483:2, 483:7,
483:11, 483:24, 496:18,
509:17, 522:21, 524:9,
536:1, 536:9, 537:9,
537:16, 546:20, 548:2,
548:7, 548:11, 548:16,
550:3, 551:18, 551:24,
552:4, 552:20, 553:1,
553:6, 559:5, 563:7,
603:17, 632:25
**SCOTT** [1] - 318:9
**screening** [1] - 500:7
**sduke@rumberger.**
**com** [1] - 321:13
**seal** [1] - 641:13
**SEAN** [1] - 318:7
**search** [8] - 600:3,
600:9, 600:10, 602:10,
605:9, 605:10, 614:24,
615:2
**searched** [6] - 329:16,
595:1, 605:6, 605:10,
639:9
**second** [30] - 326:12,
342:25, 351:23, 360:10,
362:24, 368:4, 379:25,
383:16, 388:19, 391:7,
396:8, 401:3, 401:17,

410:17, 421:10, 421:14,
435:24, 437:8, 455:25,
498:2, 506:6, 519:8,
520:17, 538:17, 539:5,
570:23, 576:1, 595:15,
598:3
**section** [13] - 332:1,
406:14, 460:15, 460:19,
476:10, 485:1, 501:13,
513:3, 520:23, 520:24,
572:2, 584:1, 585:10
**Section** [19] - 323:24,
326:4, 331:23, 338:16,
351:23, 447:19, 502:7,
506:4, 520:14, 526:22,
529:10, 529:11, 531:1,
538:9, 538:20, 538:24,
538:25, 539:12, 539:13
**See** [1] - 457:8
**see** [102] - 328:17, 331:1,
331:17, 334:6, 334:14,
335:23, 339:1, 341:4,
341:17, 344:16, 344:18,
345:2, 347:21, 353:2,
356:24, 357:6, 361:3,
364:7, 396:4, 405:2,
405:5, 406:23, 431:3,
431:12, 431:16, 431:23,
432:8, 438:12, 438:21,
444:10, 444:13, 445:2,
446:6, 446:8, 449:19,
470:25, 476:25, 478:23,
479:1, 479:10, 480:3,
481:10, 482:21, 483:17,
484:23, 488:13, 488:14,
490:15, 490:21, 492:13,
492:20, 494:6, 498:22,
502:13, 508:9, 509:19,
516:10, 518:10, 522:24,
526:13, 531:24, 540:6,
540:19, 550:13, 552:12,
555:5, 557:9, 561:23,
562:3, 566:9, 566:10,
567:18, 568:16, 574:2,
578:22, 579:9, 579:10,
579:11, 579:16, 579:24,
580:14, 580:18, 580:25,
581:17, 582:5, 582:10,
585:23, 586:11, 596:14,
604:12, 604:20, 605:25,
610:3, 610:22, 611:3,
612:2, 615:25, 616:17,
616:18, 619:4, 619:5,
628:21
**seeing** [11] - 358:15,
438:24, 522:10, 551:19,
597:2, 597:21, 607:10,
607:24, 616:11, 616:13,
618:24
**seek** [2] - 590:6, 590:9

**seeking** [3] - 515:11,
541:10, 542:3
**seldom** [1] - 502:14
**select** [8] - 439:16,
441:3, 513:20, 517:23,
524:24, 525:9, 565:23,
636:25
**selected** [21] - 357:10,
357:23, 500:3, 506:7,
512:24, 525:2, 525:13,
525:17, 526:8, 526:9,
526:11, 526:18, 529:15,
537:22, 545:6, 545:19,
624:1, 625:8, 625:10,
626:2, 630:15
**selecting** [4] - 349:10,
535:19, 626:2, 630:14
**Selection** [1] - 505:22
**selection** [18] - 505:25,
519:2, 527:8, 531:2,
531:18, 532:4, 533:1,
533:15, 533:21, 533:24,
536:24, 537:8, 538:14,
562:24, 601:25, 624:1,
624:25
**selections** [8] - 493:10,
494:1, 494:10, 497:15,
506:17, 507:4, 526:1,
571:18
**selects** [2] - 525:4, 525:8
**self** [5] - 357:10, 357:23,
537:22, 545:6, 545:19
**self-selected** [5] -
357:10, 357:23, 537:22,
545:6, 545:19
**send** [4] - 389:20,
469:17, 486:23, 571:10
**sender** [1] - 599:4
**sends** [1] - 560:15
**Sense** [1] - 541:24
**sense** [2] - 364:17,
430:11
**sensitive** [1] - 624:24
**sent** [11] - 518:20, 523:9,
550:11, 555:1, 555:22,
566:15, 569:6, 571:15,
575:1, 611:1, 615:2
**sentence** [9] - 326:12,
333:5, 333:20, 343:22,
406:19, 517:14, 527:17,
528:1, 539:17
**separate** [7] - 371:1,
406:14, 421:9, 508:21,
525:1, 555:11, 579:23
**separately** [3] - 443:24,
492:5, 525:9
**separating** [1] - 428:3
**September** [5] - 353:6,
353:13, 359:18, 359:19,
364:3, 364:5, 365:3,

615:4, 643:18
**serial** [1] - 502:19
**series** [4] - 441:6, 442:7,
479:2, 516:15
**serious** [1] - 507:20
**served** [1] - 527:5
**service** [2] - 472:18,
487:10
**Services** [34] - 326:16,
327:21, 330:19, 332:15,
333:21, 334:2, 341:11,
343:3, 346:14, 363:16,
374:6, 378:19, 382:6,
388:4, 394:19, 400:14,
409:19, 413:5, 416:16,
420:7, 426:22, 427:1,
505:11, 509:24, 546:25,
547:4, 550:18, 559:10,
606:24, 609:19, 610:12,
617:13, 641:7, 642:6
**serving** [1] - 629:20
**sessions** [3] - 592:9,
592:13, 592:22
**set** [8] - 354:20, 366:22,
367:10, 367:11, 501:16,
516:21, 520:10, 633:11
**setting** [5] - 467:7,
494:18, 513:18, 591:15,
591:25
**settlement** [6] - 353:8,
358:7, 537:19, 555:17,
556:3, 614:17
**seven** [2] - 436:14,
579:10
**several** [1] - 584:5
**sex** [3] - 337:21, 538:17,
569:15
**sexual** [119] - 328:19,
329:4, 329:6, 332:6,
332:21, 335:8, 335:12,
336:5, 336:16, 337:1,
337:16, 337:21, 337:23,
338:2, 338:23, 339:10,
339:15, 339:20, 340:6,
341:2, 341:6, 341:18,
341:25, 342:1, 342:2,
342:6, 342:11, 342:15,
344:8, 344:24, 345:13,
347:24, 348:14, 354:6,
354:8, 355:16, 355:19,
357:21, 361:15, 422:12,
423:5, 438:16, 439:6,
440:22, 442:21, 443:5,
443:13, 443:17, 445:17,
447:18, 448:8, 448:19,
449:1, 449:12, 449:17,
450:16, 451:12, 451:17,
455:17, 457:18, 457:20,
457:24, 461:4, 461:11,
461:12, 462:4, 474:9,

477:13, 491:22, 532:14,
532:16, 539:20, 539:25,
540:3, 540:6, 540:10,
540:11, 540:24, 541:18,
541:21, 542:2, 542:5,
542:8, 543:4, 543:11,
543:16, 563:10, 563:11,
563:12, 563:15, 563:22,
563:24, 564:3, 564:8,
567:7, 568:9, 569:17,
570:5, 570:22, 571:2,
571:4, 571:16, 575:23,
577:4, 577:7, 578:11,
583:15, 583:18, 583:25,
584:2, 584:7, 584:14,
584:21, 585:11, 585:12,
585:20, 586:16, 620:20
**sexuality** [10] - 533:5,
533:14, 534:2, 535:19,
536:4, 536:8, 536:12,
536:20, 537:7, 537:13
**SHALINI** [1] - 320:19
**shalini.agarwal@**
**protectdemocracy.org**
[1] - 320:20
**shall** [6] - 476:9, 510:4,
511:14, 528:6, 528:17,
538:19
**shall..** [1] - 528:4
**shamelessly** [1] - 339:3
**shared** [3] - 537:18,
537:19, 590:5
**SHEET** [1] - 644:1
**sheet** [4] - 403:9, 451:7,
643:15, 643:20
**shelf** [8] - 337:2, 337:17,
406:14, 500:17, 569:4,
569:13, 569:15, 570:21
**shelves** [9] - 332:22,
335:14, 336:7, 390:1,
390:2, 568:10, 568:20,
570:14, 571:15
**shifted** [1] - 396:5
**short** [1] - 530:2
**shorten** [1] - 395:3
**shorthand** [1] - 427:14
**shortly** [1] - 555:22
**shorts** [1] - 584:24
**show** [4] - 384:16,
421:20, 476:5, 498:5
**showed** [1] - 358:11
**showing** [4] - 331:8,
360:21, 515:18, 553:12
**shown** [1] - 422:7
**shows** [10] - 331:14,
331:16, 360:22, 375:22,
380:2, 383:16, 403:22,
465:21, 491:12, 519:1
**sic** [1] - 538:9
**side** [2] - 604:13

Deposition of Bradley Vinson, Volume 2

**signing** [3] - 643:15, 643:17, 643:17
**similar** [3] - 489:15, 604:19, 618:14
**similarly** [1] - 588:7
**simply** [2] - 365:11, 468:24
**single** [1] - 342:10
**sit** [5] - 336:24, 337:13, 347:19, 462:8, 607:19
**Site** [2] - 438:25, 439:12
**site** [3] - 328:12, 439:14, 579:5
**sites** [1] - 541:24
**situation** [1] - 620:21
**six** [6] - 476:8, 569:14, 570:13, 579:9, 587:5, 587:11
**skip** [4] - 402:2, 460:22, 529:14, 602:22
**skipped** [1] - 631:2
**Slaughterhouse** [2] - 446:25, 447:17
**sleeping** [1] - 586:20
**slight** [1] - 588:8
**slipped** [2] - 584:24, 586:12
**Sloppy** [1] - 454:18
**slow** [1] - 400:19
**small** [1] - 575:20
**Small** [1] - 454:23
**SMITH** [342] - 319:14, 334:3, 335:9, 335:19, 336:20, 337:4, 342:12, 342:24, 344:14, 345:18, 347:2, 347:17, 348:1, 349:8, 349:16, 349:21, 350:22, 351:2, 353:1, 353:20, 354:22, 355:7, 357:17, 358:3, 358:14, 360:12, 360:16, 362:19, 363:2, 364:19, 365:1, 366:3, 366:8, 366:18, 366:24, 368:24, 369:4, 369:22, 370:6, 370:13, 370:23, 371:9, 371:14, 371:18, 371:23, 372:5, 372:9, 372:14, 372:20, 372:25, 373:4, 373:9, 373:19, 374:1, 374:8, 374:14, 374:21, 376:7, 376:12, 376:20, 376:24, 377:5, 377:9, 377:14, 377:20, 378:1, 378:6, 378:11, 378:16, 378:22, 379:6, 379:11, 380:11, 380:17, 381:3, 381:7, 381:14, 381:20, 381:23, 382:3, 382:9, 382:24, 384:1, 384:8, 384:23,

385:3, 385:9, 385:22, 386:3, 386:8, 386:14, 386:19, 387:1, 387:8, 387:14, 387:21, 388:1, 388:7, 388:12, 390:7, 391:18, 391:22, 392:7, 392:12, 392:17, 392:21, 393:2, 393:7, 393:12, 394:2, 394:7, 394:11, 394:16, 394:21, 395:1, 395:3, 395:9, 395:12, 396:23, 397:19, 398:7, 398:16, 398:20, 398:25, 399:6, 399:12, 399:16, 399:21, 400:5, 400:10, 400:16, 402:12, 402:17, 402:23, 403:3, 403:7, 403:10, 403:16, 403:20, 403:25, 404:3, 404:7, 404:21, 407:17, 407:22, 408:3, 408:8, 408:13, 408:18, 408:23, 409:4, 409:10, 409:15, 409:21, 411:8, 411:13, 411:18, 411:23, 412:3, 412:8, 412:13, 412:20, 413:1, 413:7, 414:20, 414:25, 415:5, 415:12, 415:17, 415:22, 416:1, 416:7, 416:12, 416:18, 418:7, 418:12, 418:19, 418:25, 419:5, 419:11, 419:16, 419:23, 420:3, 420:9, 420:13, 420:18, 420:20, 422:20, 422:24, 424:7, 425:1, 426:3, 430:14, 431:11, 432:3, 435:12, 437:13, 446:18, 446:21, 455:7, 455:25, 465:11, 466:16, 470:16, 471:8, 474:16, 477:24, 478:2, 483:2, 483:7, 483:11, 483:24, 495:12, 496:18, 497:12, 497:20, 499:18, 500:23, 501:7, 503:19, 506:12, 507:11, 508:24, 509:5, 509:17, 509:25, 510:24, 511:11, 512:22, 513:1, 516:6, 519:20, 521:21, 522:21, 523:4, 524:4, 524:9, 530:8, 534:9, 534:13, 534:17, 535:3, 535:21, 536:1, 536:9, 536:16, 536:22, 537:9, 537:16, 538:3, 539:3, 539:7, 540:2, 540:14, 545:4, 545:13, 546:6, 546:20, 547:7, 547:20, 548:2, 548:7, 548:11, 548:16, 548:22, 549:21, 550:3, 551:18,

551:24, 552:4, 552:20, 553:1, 553:6, 556:25, 558:2, 559:5, 559:22, 563:19, 564:10, 569:8, 570:25, 571:6, 571:17, 572:6, 574:18, 585:6, 590:12, 590:20, 591:1, 591:9, 591:11, 591:22, 592:5, 592:14, 592:21, 595:20, 596:22, 597:25, 600:18, 607:22, 609:3, 609:10, 611:22, 615:11, 615:21, 617:16, 618:3, 618:16, 618:23, 620:15, 620:22, 621:6, 621:25, 622:22, 623:10, 623:21, 624:19, 625:5, 625:22, 626:21, 627:6, 627:17, 628:7, 629:1, 629:18, 630:11, 630:23, 631:11, 631:22, 632:4, 632:12, 632:24, 633:4, 633:13, 633:19, 636:16, 636:20, 638:13, 639:4, 639:25, 640:9, 643:12
**Smith** [22] - 340:15, 342:21, 343:6, 343:16, 431:10, 433:25, 464:20, 464:24, 545:22, 551:21, 552:1, 552:18, 557:5, 557:6, 558:22, 559:1, 593:15, 607:25, 608:3, 609:15, 643:14
**Smith's** [2] - 607:6, 607:17
**Smith.............** [1] - 322:10
**Smith.............** [1] - 322:8
**so..** [1] - 604:13
**society** [1] - 511:24
**solely** [3] - 342:9, 345:16, 543:14
**solemnly** [1] - 325:5
**solid** [1] - 473:9
**someone** [5] - 508:11, 552:5, 552:14, 570:4, 639:17
**sometime** [1] - 351:6
**sometimes** [7] - 341:21, 431:5, 441:4, 500:15, 541:20, 561:10, 605:20
**somewhat** [1] - 560:14
**somewhere** [1] - 616:17
**soon** [2] - 351:17, 586:1
**sooner** [1] - 562:8
**SOP** [4] - 595:7, 600:13, 610:6, 612:16
**sorry** [68] - 331:20, 335:7, 340:19, 342:25, 343:11, 345:7, 351:24,

351:25, 354:16, 355:2, 359:7, 374:15, 378:25, 385:4, 395:14, 400:22, 403:17, 406:18, 425:3, 426:5, 436:2, 439:24, 441:8, 441:14, 443:8, 444:15, 454:9, 455:25, 457:14, 470:15, 474:18, 475:17, 478:14, 480:13, 480:15, 484:15, 490:2, 491:10, 493:12, 496:23, 498:4, 498:7, 498:8, 498:12, 500:24, 501:11, 516:20, 533:4, 536:3, 539:5, 544:19, 544:21, 552:16, 554:2, 558:14, 565:16, 579:16, 587:8, 594:14, 595:10, 597:18, 598:11, 606:16, 609:17, 615:13, 617:4, 617:5
**sort** [15] - 349:4, 428:14, 451:10, 457:22, 506:3, 518:14, 565:8, 566:7, 568:21, 576:9, 580:19, 606:2, 608:15, 618:18, 637:22
**sorted** [6] - 421:11, 421:18, 480:11, 562:3, 570:20, 579:25
**sorts** [1] - 621:10
**sounds** [4] - 355:24, 444:3, 536:10, 565:15
**source** [1] - 499:7
**sourced** [1] - 541:22
**South** [2] - 318:21, 321:14
**space** [2] - 500:15, 500:17
**SPAHR** [2] - 320:4, 320:11
**speaking** [2] - 618:9, 618:10
**speaks** [1] - 635:14
**special** [11] - 531:3, 531:19, 534:23, 535:1, 535:14, 535:18, 536:13, 536:19, 537:6, 537:12, 538:13
**specialist** [64] - 390:22, 439:14, 449:15, 451:5, 451:18, 461:11, 462:24, 471:5, 490:25, 494:1, 494:7, 494:13, 495:15, 495:22, 496:17, 499:15, 500:10, 504:8, 504:9, 505:13, 506:21, 507:4, 507:5, 509:22, 513:25, 529:16, 530:18, 541:6, 541:10, 542:12, 544:5, 544:8, 560:4, 560:8,

561:5, 565:9, 565:23, 568:7, 568:23, 569:1, 569:2, 571:4, 571:7, 571:15, 571:25, 572:24, 573:10, 574:4, 575:6, 578:10, 583:14, 583:15, 583:24, 604:24, 606:9, 611:12, 611:18, 629:20, 630:2, 630:15, 630:17, 638:15, 639:21, 640:6
**Specialist** [5] - 323:20, 504:1, 508:11, 530:15, 565:18
**specialist's** [2] - 461:21, 494:23
**specialists** [56] - 327:5, 328:17, 355:10, 364:15, 440:5, 440:9, 440:14, 442:18, 462:2, 492:14, 493:2, 496:7, 496:11, 496:12, 496:14, 497:14, 504:6, 504:10, 505:8, 509:7, 509:19, 515:3, 515:5, 521:23, 530:22, 534:5, 535:8, 536:18, 537:2, 537:12, 537:20, 541:3, 542:19, 543:23, 559:12, 561:9, 562:7, 562:17, 564:17, 566:15, 567:14, 567:18, 573:8, 576:7, 617:22, 626:15, 628:13, 629:14, 629:24, 630:1, 630:5, 630:14, 634:24, 638:10, 639:7, 640:5
**Species** [1] - 464:3
**specific** [17] - 327:13, 327:16, 330:1, 351:15, 351:16, 351:20, 367:1, 424:24, 523:24, 527:18, 547:8, 552:6, 584:20, 592:1, 604:2, 609:4, 639:16
**specifically** [17] - 351:7, 354:12, 355:1, 478:5, 532:9, 534:1, 546:22, 547:16, 556:13, 581:2, 594:4, 600:5, 605:25, 608:18, 614:9, 619:5, 620:17
**specifics** [2] - 448:22, 633:5
**specified** [1] - 510:5
**specify** [1] - 334:25
**spectrum** [1] - 542:22
**speculate** [1] - 393:19
**speculating** [2] - 393:23, 399:25
**speculation** [1] - 539:4
**speed** [1] - 636:11

Deposition of Bradley Vinson, Volume 2

**spend** [2] - 337:7, 564:13
**spending** [1] - 636:12
**spent** [3] - 340:7, 607:13, 628:6
**Spirits** [1] - 455:3
**splitting** [1] - 560:6
**spoken** [1] - 474:7
**Spreadsheet** [48] - 322:16, 323:16, 323:18, 330:25, 338:11, 350:9, 355:14, 355:21, 356:1, 360:8, 361:23, 362:14, 367:21, 403:13, 403:21, 404:25, 421:4, 421:18, 430:25, 436:21, 442:20, 443:3, 443:10, 444:5, 445:5, 446:8, 448:24, 449:24, 450:23, 451:11, 463:14, 464:12, 465:21, 466:3, 466:13, 471:21, 482:17, 482:23, 484:17, 487:16, 560:20, 582:17, 583:2, 589:17, 589:23, 599:23, 604:23, 610:21
**spreadsheet** [27] - 360:18, 360:25, 361:2, 361:17, 362:6, 422:8, 424:15, 426:1, 429:1, 429:3, 435:6, 435:9, 437:23, 438:10, 444:17, 445:12, 455:6, 463:9, 481:10, 486:15, 560:21, 589:14, 595:12, 595:25, 596:3, 599:25, 603:7
**spreadsheets** [7] - 560:23, 593:25, 594:8, 594:10, 594:11, 608:24
**spring** [7] - 353:9, 354:15, 356:19, 357:20, 487:4, 487:11, 573:23
**stack** [1] - 364:24
**staff** [2] - 628:8, 635:14
**stakeholder** [1] - 494:4
**stakeholders** [1] - 543:24
**stamped** [4] - 326:5, 515:19, 516:14, 553:13
**standards** [7] - 493:21, 502:21, 533:16, 533:17, 533:20, 534:22, 534:24
**Stars** [1] - 488:4
**start** [10] - 333:1, 343:2, 345:9, 374:17, 431:25, 437:2, 561:24, 562:4, 584:11, 586:4
**started** [12] - 356:4, 356:19, 357:13, 359:19, 428:3, 467:14, 481:13, 521:15, 567:23, 567:24,

620:2, 626:9
**state** [6] - 397:16, 534:14, 582:24, 638:1, 638:16, 639:12
**STATE** [3] - 641:3, 641:19, 642:2
**State** [20] - 353:10, 358:5, 358:12, 495:16, 502:21, 537:21, 550:1, 551:2, 552:5, 552:14, 556:4, 602:5, 602:14, 602:15, 603:24, 604:6, 615:6, 620:6, 639:6, 641:9
**State's** [1] - 353:8
**statement** [6] - 347:10, 384:22, 402:4, 460:15, 593:8, 637:8
**statements** [6] - 359:5, 369:7, 369:12, 397:15, 545:17, 556:4
**STATES** [2] - 318:1, 643:1
**states** [2] - 526:25, 577:24
**status** [22] - 326:9, 329:24, 352:24, 353:5, 353:7, 360:22, 422:5, 422:8, 425:17, 428:15, 429:16, 472:16, 473:15, 478:10, 479:5, 485:4, 492:9, 492:12, 576:20, 580:16, 582:6, 604:22
**Statute** [1] - 584:22
**statute** [15] - 335:17, 335:24, 339:11, 477:14, 507:15, 508:13, 508:15, 509:8, 539:15, 540:5, 569:18, 577:8, 584:7, 616:20
**statutes** [3] - 366:13, 539:2, 584:1
**statutory** [1] - 332:19
**Stealing** [3] - 473:8, 473:12, 489:9
**stenographic** [1] - 642:12
**stenographically** [2] - 318:24, 642:9
**step** [5] - 466:14, 466:18, 507:13, 521:5, 624:4
**steps** [7] - 589:9, 590:1, 590:3, 602:12, 602:17, 602:21, 602:23
**stick** [1] - 506:14
**sticky** [2] - 584:12, 584:17
**still** [31] - 329:3, 329:5, 329:14, 355:18, 400:24, 404:5, 446:1, 446:16,

447:21, 471:12, 472:8, 499:24, 504:12, 504:13, 516:25, 530:23, 541:25, 543:3, 545:8, 566:21, 567:5, 568:18, 568:25, 569:21, 575:21, 580:5, 581:8, 590:17, 590:20, 619:15
**stocked** [2] - 390:1, 390:2
**stood** [2] - 490:24, 622:2
**stop** [1] - 397:20
**stopped** [1] - 585:3
**storage** [3] - 463:18, 581:7, 589:5
**Storage** [31] - 329:20, 435:9, 436:16, 438:9, 439:8, 440:2, 440:17, 442:25, 446:2, 449:10, 451:1, 451:13, 461:25, 462:17, 490:20, 490:22, 491:1, 492:13, 492:15, 561:23, 568:25, 569:5, 569:9, 569:25, 570:3, 570:7, 570:24, 572:18, 573:1, 575:21, 582:4
**stored** [1] - 436:19
**straight** [1] - 620:4
**Street** [4] - 318:21, 319:16, 320:7, 321:7
**stricken** [5] - 334:7, 334:17, 343:22, 344:4, 532:7
**stripping** [1] - 339:3
**strongly** [2] - 618:10
**structure** [1] - 523:17
**Student** [1] - 322:18
**student** [2] - 326:14, 328:10, 329:8, 343:24, 372:18, 377:18, 389:25, 390:14, 399:14, 408:16, 412:6, 415:20, 419:9, 436:9, 445:9, 513:14, 514:3, 514:14, 515:25, 516:4, 525:10, 525:11, 525:15, 526:1, 582:11, 627:19, 637:6
**student's** [4] - 326:17, 326:24, 514:13, 517:17
**students** [50] - 328:5, 328:17, 329:21, 332:12, 363:13, 389:10, 389:17, 406:17, 421:25, 472:4, 473:24, 476:8, 476:10, 490:18, 493:5, 500:14, 511:15, 512:3, 513:6, 518:21, 519:10, 519:18, 520:6, 524:7, 526:15, 527:13, 528:12, 529:5, 529:12, 529:19, 543:18,

580:12, 581:7, 619:16, 620:13, 620:18, 620:23, 621:22, 622:18, 622:19, 624:5, 624:7, 625:9, 625:14, 626:3, 627:4, 627:21, 635:20, 636:1, 636:14
**students'** [5] - 348:3, 365:16, 386:17, 393:5, 621:24
**study** [8] - 368:3, 371:22, 631:10, 631:12, 631:13, 631:14, 631:23, 634:3
**subject** [15] - 330:6, 333:10, 425:7, 446:16, 479:17, 481:18, 482:7, 485:8, 522:14, 572:11, 590:21, 611:16, 612:11, 624:24
**Subject** [2] - 323:23, 324:6
**subjected** [1] - 476:22
**subjective** [2] - 508:4, 508:6
**subjects** [1] - 528:14
**submitted** [6] - 339:23, 340:1, 508:8, 552:8, 552:11, 552:15
**submitting** [1] - 326:16
**subparts** [1] - 594:18
**subscribe** [1] - 487:10
**Subsection** [4] - 332:1, 510:3, 511:21, 539:18
**subsequent** [1] - 589:16
**substantive** [2] - 548:5, 548:14
**subsumed** [1] - 530:19
**sufficient** [7] - 334:10, 335:7, 336:17, 344:25, 345:12, 346:7, 577:2
**suggested** [2] - 362:3, 522:19
**suggesting** [1] - 544:17
**Suite** [5] - 319:7, 319:16, 320:21, 321:7, 321:14
**suited** [7] - 365:16, 377:18, 393:5, 399:14, 412:6, 415:20, 419:9
**Summer** [3] - 489:25, 490:1, 490:2
**summer** [5] - 362:13, 442:17, 442:20, 568:5, 569:13
**Sun** [2] - 456:13, 458:8
**sunshine** [1] - 374:2
**Superintendent** [2] - 433:25, 467:5
**superintendent** [57] - 332:14, 333:20, 333:24,

334:1, 334:9, 344:21, 345:11, 346:5, 346:11, 346:14, 347:11, 347:13, 347:19, 350:13, 351:8, 351:10, 351:13, 351:18, 356:12, 356:15, 356:18, 358:19, 374:5, 378:19, 382:6, 388:4, 394:19, 400:14, 409:19, 413:5, 416:16, 420:7, 466:19, 467:20, 468:11, 469:3, 469:16, 545:10, 546:10, 546:24, 547:3, 547:11, 547:18, 555:13, 556:12, 556:15, 556:21, 556:25, 557:22, 558:4, 606:12, 606:18, 606:20, 606:23, 607:3, 609:9, 628:14
**superintendent's** [1] - 345:5
**superseded** [1] - 502:18
**Supervisors** [1] - 551:9
**supplemented** [2] - 613:5, 613:20
**support** [11] - 334:11, 335:7, 345:13, 355:9, 493:21, 512:12, 559:17, 560:4, 617:23, 621:19, 630:17
**supported** [1] - 617:19
**supportive** [2] - 556:6, 617:21
**supports** [1] - 530:13
**supposed** [2] - 533:6, 584:13
**supposing** [1] - 547:14
**survey** [1] - 509:18
**SUSAN** [4] - 318:24, 319:23, 641:18, 642:22
**Susan** [4] - 395:13, 641:5, 642:4, 643:24
**suspected** [1] - 570:4
**swear** [1] - 325:5
**Sweeting** [19] - 356:10, 357:3, 357:4, 359:20, 440:4, 463:1, 484:9, 484:10, 560:8, 560:14, 560:25, 561:12, 574:5, 594:5, 605:19, 605:22, 606:1, 606:5, 628:10
**sworn** [2] - 325:13, 641:12
**synonymous** [1] - 538:23
**system** [4] - 514:14, 524:13, 530:21, 565:22
**Systems** [1] - 318:25

**T**

**tab** [2] - 438:10, 603:7
**tabbed** [1] - 584:12
**table** [15] - 368:5, 368:7, 375:4, 379:25, 383:4, 388:20, 400:23, 401:4, 401:16, 405:24, 410:3, 410:16, 413:14, 413:24, 417:5
**tabs** [1] - 492:13
**tailored** [2] - 514:18, 514:19
**TAKEN** [1] - 318:19
**Tale** [7] - 338:8, 340:20, 340:21, 340:22, 444:20, 444:21, 449:20
**talks** [8] - 508:15, 520:17, 538:12, 539:19, 588:11, 610:16, 613:1, 613:3
**Tallahassee** [2] - 319:17, 321:8
**tangled** [1] - 586:20
**Tango** [8] - 322:23, 379:14, 379:18, 380:9, 381:1, 382:22, 623:5, 623:13
**target** [1] - 351:4
**tasks** [2] - 504:7, 559:18
**TBD** [10] - 432:9, 432:11, 438:3, 459:23, 470:1, 484:24, 490:4, 491:11, 491:14
**teach** [1] - 636:15
**teacher** [1] - 495:17
**teachers** [3] - 493:4, 494:8, 636:14
**teaching** [1] - 496:13
**Technology** [2] - 581:19, 582:3
**teenager** [1] - 620:4
**Telegraph** [1] - 452:13
**Telephone** [7] - 319:9, 319:18, 320:9, 320:16, 320:23, 321:9, 321:16
**ten** [1] - 579:10
**tend** [2] - 623:13, 631:16
**tenure** [1] - 330:19
**term** [1] - 342:11
**terms** [9] - 340:3, 405:6, 495:9, 540:25, 566:4, 575:17, 575:19, 603:17, 638:11
**test** [3] - 638:14, 639:7, 640:5
**testified** [4] - 422:9, 446:15, 634:13, 635:2
**testify** [4] - 325:13,

353:22, 589:20, 593:22
**testimony** [48] - 325:6, 362:11, 397:13, 425:14, 450:20, 469:25, 470:4, 590:11, 591:4, 596:6, 596:9, 600:17, 601:3, 601:12, 601:15, 602:4, 602:19, 602:24, 603:10, 603:14, 604:1, 604:17, 605:13, 605:17, 606:14, 607:22, 610:9, 610:14, 610:19, 611:15, 612:6, 612:8, 612:13, 612:23, 613:19, 614:2, 614:5, 614:11, 614:15, 615:10, 615:19, 616:10, 616:15, 616:20, 634:17, 635:6, 635:10, 638:6
**textbook** [2] - 558:9, 559:25
**textbooks** [5] - 559:25, 635:18, 635:25, 636:3
**THE** [30] - 318:1, 318:1, 325:3, 325:8, 325:9, 353:23, 379:10, 395:14, 403:9, 403:23, 404:1, 404:8, 404:16, 420:14, 420:19, 425:3, 435:14, 441:12, 446:22, 456:2, 457:15, 477:25, 498:11, 542:17, 553:9, 597:17, 616:7, 633:15, 643:1, 643:1
**themes** [4] - 541:5, 541:12, 622:4, 637:13
**themselves** [4] - 440:7, 493:3, 515:8, 613:23
**theoretically** [1] - 566:25
**therefore** [3] - 422:12, 447:12, 469:21
**thereof** [1] - 602:5
**THEREUPON** [2] - 325:1, 640:11
**they've** [1] - 334:22
**Thieves** [1] - 453:15
**thinking** [7] - 337:20, 338:6, 369:9, 512:13, 528:13, 576:1, 585:1
**thinks** [2] - 565:10, 565:11
**third** [8] - 368:4, 379:1, 388:19, 396:8, 401:4, 401:17, 410:17, 530:13
**Thirteen** [1] - 455:16
**THIS** [2] - 642:20, 644:2
**thoroughly** [1] - 596:15
**thousand** [2] - 565:13, 565:15
**thousands** [3] - 572:7, 596:22

**Three** [8] - 322:23, 379:14, 379:18, 380:10, 381:1, 382:22, 623:5, 623:13
**three** [11] - 333:25, 334:4, 360:22, 361:6, 361:9, 363:1, 547:1, 564:13, 574:1, 579:9, 587:13
**thrown** [1] - 533:3
**throws** [1] - 524:22
**tie** [1] - 468:12
**tiebreaker** [1] - 468:13
**tiled** [1] - 503:25
**Tim** [22] - 340:15, 342:21, 343:6, 343:15, 431:10, 464:20, 464:24, 545:22, 551:21, 552:1, 552:18, 557:5, 557:6, 558:22, 559:1, 593:15, 607:6, 607:16, 607:25, 608:3, 609:15
**TIME** [1] - 318:20
**timeline** [3] - 574:11, 574:13, 635:9
**timelines** [2] - 601:2, 635:4
**timely** [1] - 362:6
**timing** [1] - 338:15
**title** [31] - 327:13, 344:23, 344:25, 348:23, 349:1, 350:3, 397:4, 421:11, 421:19, 437:13, 441:7, 444:24, 449:7, 463:17, 463:18, 475:3, 477:24, 480:7, 480:11, 481:1, 487:23, 489:7, 542:14, 562:3, 578:12, 578:13, 589:4, 621:20
**Title** [12] - 322:18, 322:20, 322:23, 322:25, 323:5, 323:7, 323:9, 323:11, 323:13, 323:15, 487:7, 487:8
**titles** [35] - 327:14, 327:16, 327:17, 352:15, 352:16, 352:21, 363:14, 434:14, 434:22, 434:23, 441:25, 470:24, 475:4, 478:3, 482:14, 486:5, 490:19, 500:4, 521:9, 562:7, 566:25, 568:2, 571:2, 575:20, 575:21, 576:12, 603:6, 604:21, 605:6, 605:8, 605:11, 614:20, 614:21, 619:7, 619:8
**TO** [1] - 643:12
**today** [9] - 325:20, 336:25, 337:13, 469:1,

469:24, 582:19, 607:19, 633:21, 635:2
**today's** [3] - 434:16, 589:10, 599:9
**Today's** [1] - 643:17
**together** [6] - 377:22, 520:4, 561:13, 608:9
**took** [17] - 367:24, 375:8, 377:22, 424:20, 557:4, 569:12, 580:8, 589:10, 599:18, 600:7, 600:13, 613:16, 618:20, 619:18, 634:10, 638:23, 639:18
**top** [14] - 331:24, 339:22, 343:21, 360:13, 365:9, 473:5, 511:18, 529:10, 531:10, 531:24, 579:12, 579:13, 581:13, 584:9
**Topic** [48] - 589:13, 590:11, 591:4, 593:22, 594:15, 594:22, 595:16, 595:18, 595:22, 596:6, 599:12, 600:4, 600:17, 600:22, 601:3, 601:12, 602:4, 602:19, 602:24, 603:10, 603:14, 603:16, 603:17, 603:25, 604:14, 605:13, 605:17, 606:11, 609:8, 609:18, 610:9, 610:14, 610:16, 610:19, 612:7, 612:9, 612:23, 613:1, 614:2, 614:5, 614:11, 614:15, 615:10, 615:19, 616:10, 616:15, 616:21, 617:2
**topic** [12] - 370:25, 589:21, 592:1, 599:11, 604:1, 604:18, 606:2, 606:14, 612:13, 613:7, 614:9
**topic-by-topic** [1] - 599:11
**topics** [9] - 512:16, 534:4, 589:11, 590:8, 591:23, 593:6, 596:10, 609:12, 632:9
**tos** [1] - 519:1
**total** [2] - 524:25, 525:2
**tothe** [1] - 397:14
**touched** [1] - 541:12
**touches** [2] - 622:4, 624:23
**touching** [1] - 586:8
**tough** [1] - 622:24
**towards** [2] - 506:6, 618:25
**track** [1] - 430:22
**trained** [1] - 366:5
**training** [21] - 366:12, 366:15, 366:22, 366:25,

495:14, 495:23, 496:1, 503:8, 509:1, 530:16, 536:25, 537:3, 537:5, 537:11, 538:1, 560:12, 604:5, 604:10, 604:12, 604:13, 629:3
**trainings** [1] - 505:7, 505:10, 505:17, 537:17, 537:24, 560:3, 560:13
**transcript** [8] - 322:14, 323:2, 324:2, 597:10, 642:11, 642:12, 643:15, 643:19
**TRANSCRIPT** [1] - 644:2
**transcripts** [1] - 598:17
**transferred** [1] - 390:4
**travel** [1] - 586:3
**treat** [1] - 355:4
**trick** [1] - 338:13
**tried** [1] - 589:23
**triggered** [4] - 338:1, 426:25, 427:18, 428:21
**troubled** [1] - 619:14
**true** [5] - 327:1, 327:11, 385:17, 642:12, 644:23
**truth** [3] - 325:6, 325:7
**try** [9] - 364:13, 364:25, 379:1, 493:8, 544:25, 561:18, 565:12, 592:8, 611:6
**trying** [31] - 328:21, 333:19, 338:13, 354:25, 355:8, 355:15, 361:16, 362:4, 362:5, 362:12, 382:17, 382:18, 395:3, 396:3, 424:9, 425:20, 441:24, 445:14, 455:5, 460:13, 534:20, 540:18, 540:22, 563:7, 597:18, 597:21, 604:9, 604:25, 605:20, 611:20, 614:18
**TSA** [3] - 559:13, 560:8, 617:22
**turn** [3] - 331:23, 346:16, 504:21
**twelfth** [28] - 368:2, 371:21, 403:12, 404:4, 404:9, 405:10, 406:6, 406:17, 406:22, 406:25, 407:10, 407:16, 407:20, 408:1, 408:7, 408:22, 409:1, 410:9, 411:7, 411:12, 411:17, 411:22, 412:15, 622:17, 626:19, 627:8, 631:9, 634:3
**Two** [1] - 491:7
**two** [24] - 337:12, 338:24, 339:4, 354:9, 360:7, 360:18, 375:14, 379:21, 383:11, 403:4,

Deposition of Bradley Vinson, Volume 2

438:4, 450:19, 455:17, 471:25, 485:6, 488:16, 494:7, 502:24, 503:18, 579:9, 579:19, 581:12, 587:14, 628:6

**type** [21] - 329:15, 329:17, 329:19, 329:20, 329:25, 330:2, 330:3, 406:21, 406:22, 438:13, 439:8, 439:22, 440:1, 440:18, 440:23, 451:2, 451:13, 568:21, 570:6, 581:16, 581:19

**types** [3] - 354:9, 493:5, 496:21

**typically** [3] - 390:8, 526:4, 543:18

**typo** [3] - 489:2, 533:11, 533:13

---

**U**

---

**ultimately** [6] - 356:21, 357:15, 556:6, 556:8, 565:17, 619:12

**unavailable** [2] - 332:12, 619:16

**unbiased** [1] - 359:13

**unchallenged** [1] - 427:24

**unclothed** [2] - 585:14, 586:9

**under** [48] - 330:15, 332:5, 334:13, 335:11, 336:3, 338:16, 338:21, 340:3, 341:18, 342:5, 343:10, 344:23, 345:13, 346:8, 347:24, 347:25, 348:15, 404:25, 405:4, 408:22, 433:12, 438:25, 439:6, 440:22, 442:22, 445:17, 447:19, 448:9, 448:19, 450:16, 451:2, 451:13, 471:12, 506:8, 507:10, 508:22, 509:3, 509:12, 511:12, 532:12, 532:23, 545:21, 568:25, 569:18, 582:17, 588:5, 588:24, 637:3

**Under** [3] - 323:24, 332:2, 644:21

**understood** [12] - 342:2, 371:16, 395:8, 413:22, 428:6, 434:15, 449:8, 482:16, 489:22, 558:18, 639:1

**undertook** [1] - 607:11

**underwear** [1] - 339:4

**undo** [2] - 455:7, 455:8

**UNITED** [2] - 318:1, 643:1

**universe** [1] - 564:7

**University** [1] - 620:6

**unknown** [1] - 569:10

**unless** [2] - 332:7, 473:25

**unlike** [2] - 348:10, 613:13

**unlimited** [14] - 515:24, 516:2, 516:3, 517:23, 519:5, 519:9, 519:17, 525:5, 525:6, 525:7, 525:8, 525:17, 525:21, 526:9

**unpause** [1] - 619:21

**unresolved** [1] - 437:5

**unrestrict** [7] - 357:11, 357:19, 358:2, 358:16, 555:14, 556:15, 556:19

**unrestricted** [41] - 330:6, 330:14, 330:18, 330:20, 340:9, 352:15, 352:16, 356:21, 359:18, 443:7, 443:14, 443:15, 443:19, 473:14, 474:4, 474:10, 474:21, 477:18, 485:25, 486:3, 486:22, 488:2, 490:11, 490:17, 491:20, 492:8, 549:4, 549:9, 549:14, 555:8, 555:10, 555:24, 556:9, 556:19, 583:5, 583:7, 605:8, 610:23, 611:3, 614:20, 614:22

**Unrestricted** [1] - 323:18

**unrestricting** [6] - 359:15, 359:16, 477:6, 556:7, 556:10, 556:11

**unsuited** [3] - 372:18, 386:17, 408:15

**unsure** [1] - 586:17

**untangle** [1] - 586:18

**unzipping** [1] - 586:4

**up** [45] - 337:8, 341:23, 342:25, 351:5, 351:14, 354:10, 354:19, 354:20, 354:23, 359:15, 359:21, 359:23, 362:10, 420:13, 436:20, 444:7, 444:9, 444:14, 445:15, 479:19, 480:16, 486:25, 489:20, 491:12, 499:10, 500:9, 536:23, 537:24, 551:10, 554:19, 554:22, 560:14, 567:1, 575:7, 580:15, 586:20, 587:4, 587:17, 613:22, 623:3, 633:11, 633:21, 636:11, 639:5

**update** [6] - 362:6,

362:14, 364:1, 364:6, 504:14, 504:15

**updated** [4] - 361:17, 361:24, 560:25, 604:4

**updates** [1] - 561:4

**updating** [5] - 484:14, 484:17, 560:20, 560:22, 561:3

**ups** [2] - 636:18, 636:19

**usage** [1] - 499:13

**uses** [1] - 505:4

**utilization** [1] - 527:17

**utilize** [2] - 329:5, 499:9

**utilized** [5] - 346:18, 346:20, 346:23, 606:22, 637:21

**utilizing** [2] - 467:10, 596:2

---

**V**

---

**valid** [2] - 529:16, 530:17

**valuable** [1] - 620:23

**value** [8] - 342:8, 343:12, 350:11, 507:21, 508:7, 508:9, 508:17, 629:16

**varied** [2] - 527:4, 527:14

**various** [3] - 516:16, 559:15, 636:7

**Vengeance** [1] - 456:19

**verbiage** [1] - 382:19

**verify** [1] - 366:25

**version** [20] - 325:25, 331:5, 334:8, 364:8, 436:6, 475:24, 476:5, 529:25, 530:2, 532:1, 532:23, 579:2, 589:16, 589:22, 595:25, 596:3, 604:12, 604:20, 613:5

**versions** [6] - 360:7, 360:18, 590:2, 594:19, 606:20, 610:20

**Vicki** [2] - 548:19, 548:24

**video** [1] - 518:25

**view** [17] - 358:20, 405:5, 501:17, 527:3, 527:7, 539:1, 539:9, 539:11, 545:1, 545:6, 545:10, 545:15, 546:10, 546:14, 546:18, 548:20, 632:19

**viewed** [5] - 385:12, 609:24, 609:25, 611:23, 625:12

**viewing** [1] - 380:14

**viewpoint** [3] - 512:25, 537:8, 537:14

**viewpoints** [6] - 512:9, 512:16, 512:18, 512:20,

528:8, 528:14

**views** [4] - 546:4, 618:21, 629:14, 631:3

**VINSON** [8] - 318:15, 322:6, 322:15, 323:3, 324:3, 325:10, 640:11, 644:25

**Vinson** [28] - 325:17, 360:2, 360:21, 363:5, 367:12, 379:8, 382:25, 388:15, 395:11, 400:21, 409:25, 413:10, 417:1, 420:23, 471:11, 471:18, 498:5, 503:13, 515:16, 516:12, 517:3, 553:10, 598:7, 617:10, 633:20, 639:5, 643:9, 644:5

**violate** [4] - 507:25, 508:2, 508:13, 509:16

**violates** [1] - 340:6

**violation** [10] - 371:23, 372:13, 377:13, 386:12, 392:25, 399:9, 408:11, 412:1, 415:15, 419:3

**violence** [2] - 533:15, 534:3

**voiced** [1] - 465:9

**Voices** [2] - 453:25, 454:1

**Volume** [18] - 318:17, 322:2, 478:1, 478:5, 478:11, 479:13, 479:23, 480:10, 481:1, 481:2, 481:14, 482:12, 483:9, 483:23, 640:12, 643:10, 644:1, 644:6

**volume** [3] - 478:12, 617:17, 628:11

**volumes** [1] - 478:6, 478:8, 482:20

**Volumes** [2] - 482:23, 483:4

**volunteer** [1] - 620:9

**vote** [6] - 387:3, 399:22, 400:1, 468:13

**voted** [13] - 374:12, 377:3, 377:15, 386:1, 392:15, 398:23, 402:21, 407:25, 411:16, 415:3, 418:16, 419:19, 622:1

**voting** [4] - 404:15, 405:4, 405:24, 413:21

**vs** [3] - 318:11, 643:6, 644:3

---

**W**

---

**wait** [4] - 395:12, 526:22, 531:12, 597:16

**waiting** [1] - 552:12

**waking** [1] - 586:20

**walk** [3] - 367:7, 404:19, 446:24

**walking** [1] - 519:1

**Wallflower** [10] - 322:21, 367:16, 367:25, 368:2, 368:7, 368:18, 369:3, 370:5, 631:3, 633:23

**wants** [1] - 595:19

**War** [1] - 457:4

**warehouse** [1] - 581:8

**warrant** [1] - 536:13

**Warrington** [17] - 579:5, 579:13, 579:16, 579:17, 579:20, 579:21, 580:3, 580:9, 580:17, 581:3, 581:9, 581:11, 581:14, 587:13, 587:14, 587:22

**Washington** [2] - 319:8, 320:22

**Wasilewski** [3] - 641:5, 642:4, 643:24

**WASILEWSKI** [4] - 318:24, 319:23, 641:18, 642:22

**watch** [1] - 610:2

**watched** [2] - 397:16, 610:2

**ways** [5] - 337:12, 450:19, 495:19, 559:23, 610:6

**web** [2] - 363:16, 363:19

**website** [15] - 326:16, 327:18, 327:19, 327:20, 330:12, 363:8, 367:20, 379:17, 435:8, 438:8, 503:25, 504:13, 518:12

**websites** [4] - 327:23, 327:25, 328:1, 328:2

**weed** [4] - 505:5, 505:14, 563:4, 565:4

**weeded** [8] - 436:12, 481:7, 481:11, 511:6, 564:14, 566:2, 566:4, 566:10

**weeding** [6] - 501:23, 502:1, 502:25, 504:23, 504:25, 566:9

**weekly** [1] - 573:20

**weird** [1] - 455:11

**welcome** [2] - 578:24, 579:3

**West** [2] - 581:18, 582:2

**whereas** [2] - 526:7, 558:10

**whichever** [1] - 449:2

**white** [1] - 534:11

**White** [104] - 327:4, 340:12, 340:15, 342:21,

343:6, 343:15, 357:9, 359:4, 384:16, 431:10, 432:9, 433:7, 433:13, 433:17, 434:20, 438:2, 446:11, 447:4, 447:10, 447:24, 448:12, 449:25, 450:7, 451:23, 452:3, 452:8, 452:19, 452:24, 453:5, 453:10, 453:16, 453:21, 454:3, 454:8, 454:14, 454:19, 454:24, 455:12, 455:21, 456:4, 456:8, 456:14, 456:20, 456:25, 457:5, 458:4, 458:12, 458:17, 458:23, 459:4, 459:10, 459:23, 460:3, 460:6, 463:21, 463:23, 464:4, 464:10, 464:19, 464:24, 465:18, 465:21, 467:10, 471:3, 475:10, 477:2, 478:13, 483:14, 484:1, 484:23, 485:16, 488:10, 489:12, 490:3, 491:9, 491:13, 503:7, 504:6, 516:17, 523:8, 532:10, 545:15, 546:14, 547:10, 551:15, 553:15, 559:11, 559:15, 593:18, 595:8, 599:7, 599:16, 599:21, 607:4, 608:4, 609:16, 610:4, 610:25, 615:15, 617:23, 638:4
**White's** [6] - 433:24, 550:4, 590:4, 597:9, 598:10, 600:15
**whole** [11] - 325:7, 342:14, 342:17, 342:23, 343:14, 343:16, 348:12, 508:1, 575:5, 595:25, 596:3
**wide** [1] - 527:1
**Wilson** [1] - 356:17
**window** [3] - 457:23, 624:3, 625:9
**wish** [1] - 573:14
**wished** [2] - 494:2, 510:14
**withdraw** [1] - 343:1
**Witness** [4] - 318:15, 325:10, 643:9, 644:5
**witness** [7] - 318:24, 325:12, 335:19, 420:13, 632:8, 641:10, 642:10
**WITNESS** [24] - 322:4, 325:8, 353:23, 379:10, 395:14, 403:9, 403:23, 404:1, 404:8, 404:16, 420:14, 420:19, 425:3, 435:14, 441:12, 446:22,

456:2, 477:25, 498:11, 553:9, 597:17, 616:7, 633:15, 641:13
**wondered** [1] - 618:11
**wondering** [5] - 437:22, 445:8, 446:3, 553:25, 584:4
**word** [6] - 337:21, 528:23, 606:16, 609:3, 618:13, 618:14
**words** [3] - 340:5, 540:19, 608:22
**works** [1] - 542:23
**workshop** [1] - 347:12
**world** [5] - 512:6, 527:15, 528:20, 570:20, 618:17
**worn** [1] - 502:14
**wrapped** [1] - 613:22
**WRITE** [1] - 644:2
**Writers** [3] - 447:8, 447:17, 456:7
**writing** [1] - 360:13
**written** [7] - 340:13, 346:21, 347:3, 495:8, 510:3, 613:10, 613:21

## Y

**YA** [45] - 460:7, 460:15, 460:19, 460:25, 471:24, 472:5, 473:3, 473:14, 473:25, 475:11, 475:14, 476:23, 478:17, 479:17, 482:24, 484:21, 485:1, 485:2, 488:12, 489:14, 489:19, 519:3, 520:18, 520:25, 521:4, 521:6, 521:13, 521:18, 522:1, 522:3, 522:8, 522:12, 522:16, 523:17, 523:22, 524:7, 524:19, 525:2, 525:9, 525:13, 525:16, 526:9, 526:11, 526:18, 571:5
**year** [22] - 329:3, 351:6, 352:13, 353:6, 472:16, 487:10, 487:13, 493:7, 500:4, 518:15, 518:17, 520:1, 524:6, 524:20, 552:8, 572:1, 572:4, 574:20, 636:8, 636:9, 636:10
**Year** [1] - 452:7
**years** [3] - 436:14, 564:12, 619:23
**yellow** [1] - 444:20
**yes-or-no** [2] - 591:7, 591:17

**yesterday** [17] - 325:20, 326:6, 330:13, 344:12, 354:13, 358:11, 365:5, 368:8, 384:18, 422:9, 423:25, 432:13, 439:25, 469:25, 498:14, 573:17, 582:20
**yesterday's** [1] - 616:3
**York** [2] - 320:15
**young** [24] - 428:3, 428:7, 428:8, 428:15, 452:16, 460:8, 476:10, 478:20, 481:24, 482:7, 521:9, 521:15, 523:18, 525:11, 542:25, 543:1, 543:12, 543:17, 543:21, 562:16, 566:14, 568:17, 569:22, 572:2
**younger** [3] - 409:3, 622:3, 627:19
**Youth** [2] - 454:7, 454:9

## Z

**Zoom** [1] - 468:24
**ZOOM** [3] - 320:1, 321:1, 321:19

Exhibit 11



**Shalini Agarwal <shalini.agarwal@protectdemocracy.org>**

---

### RE: PEN v. Escambia: Recap of 5/10/24 call [RKC-ACTIVE.FID3715510]

**Smith, Nicole** <nsmith@rumberger.com>                                    Fri, May 24, 2024 at 2:01 PM
To: "ori.lev@protectdemocracy.org" <ori.lev@protectdemocracy.org>, "Oberlander, Lynn" <oberlanderl@ballardspahr.com>,
"Duke, Samantha" <Sduke@rumberger.com>, "Grosholz, Jeffrey" <jgrosholz@rumberger.com>, "Duquette, Carlie"
<cduquette@rumberger.com>
Cc: "Safier, Paul J." <SafierP@ballardspahr.com>, "Fehlan, Kirsten" <FehlanK@ballardspahr.com>, "Bouzat, Facundo"
<bouzatf@ballardspahr.com>, "Fields, Goldie" <fieldsg@ballardspahr.com>, Shalini Agarwal
<shalini.agarwal@protectdemocracy.org>, Ellinor Heywood <ellinor.heywood@protectdemocracy.org>

All – we have not had an opportunity to review each of the books you reference in your email of yesterday.
We are not available for a call today as members of our team are out of the office for the holiday weekend.
Please provide us with a few days/times your team is available next week. In the meantime, below are our
responses in blue to the other issues we've been discussing. Thanks.

**Nicole Sieb Smith**
Attorney at Law
nsmith@rumberger.com | View my online bio

## Rumberger|Kirk

101 North Monroe Street    MAIN  850.222.6550
Suite 1050
Tallahassee, FL 32301

The information in this e-mail message is legally privileged and confidential information. If you have
received this e-mail in error, please delete from any device/media where the message is stored.

---

**From:** ori.lev@protectdemocracy.org <ori.lev@protectdemocracy.org>
**Sent:** Thursday, May 23, 2024 10:22 AM
**To:** Smith, Nicole <nsmith@rumberger.com>; Oberlander, Lynn <oberlanderl@ballardspahr.com>; Duke,
Samantha <Sduke@rumberger.com>; Grosholz, Jeffrey <jgrosholz@rumberger.com>; Duquette, Carlie
<cduquette@rumberger.com>
**Cc:** Safier, Paul J. <SafierP@ballardspahr.com>; Fehlan, Kirsten <FehlanK@ballardspahr.com>; Bouzat,
Facundo <bouzatf@ballardspahr.com>; Fields, Goldie <fieldsg@ballardspahr.com>; Shalini Agarwal
<shalini.agarwal@protectdemocracy.org>; Ellinor Heywood <ellinor.heywood@protectdemocracy.org>;
ori.lev@protectdemocracy.org
**Subject:** Re: PEN v. Escambia: Recap of 5/10/24 call [RKC-ACTIVE.FID3715510]

Nicole,

We are following up on your email below, as well as the (1) list of books that you provided on May
10 that have allegedly been returned to circulation pending resolution of the challenge process and
(2) the hit report on ESI searches that you shared.

1. With respect to the books that you indicated were returned to circulation, we note that many of
those books are still listed as either restricted or simply not showing up in Destiny. We did not look
up every book in every school library, so the list below is necessarily incomplete, but our research
identified the following books being listed in Destiny as Restricted at the following schools:

- GLBTQ (Restricted at Booker T Washington HS);
- Calvin (Restricted at Kingsfield ES)
- Hurricane Child (Restricted at West Pensacola ES and Bellview MS)
- Julian at the Wedding (Restricted at OJ Semmes ES)
- Maiden and Princess (Restricted at OJ Semmes ES)
- Milo Imagines the World (Restricted at OJ Semmes ES and Lincoln Park ES)
- This Would Make a Good Story Someday (Restricted at Lincoln Park ES and West Pensacola ES)
- Too Bright to See (Restricted at Ensley ES)
- Uncle Bobby's Wedding (Restricted at OJ Semmes HS)

In addition, the following books were not appearing in Destiny although we believe they should be on the shelves:

- Better Nate than Ever (No results found in any MS)
- Born Ready: the Story of a Boy Named Penelope (No results found in multiple ES)
- The Mighty Heart of Sunny St James (No results found in multiple ES)
- The Whispers (No results found in multiple ES)

Can you please (a) confirm to us in writing that these books have in fact been returned to circulation without restriction in all the school libraries in which they had been present prior to the challenge, and (b) ensure that Destiny is updated to accurately reflect the status of these books and let us know when that has been completed?

2. We'd also like to set up a time to talk about the hit report. Are you available today or tomorrow?

3. Our responses and follow-up questions to your email below are interlined in green text below each response below.

Best,

Ori


Ori Lev (he/him)

Special Counsel, Protect Democracy

(771) 201-0889 | protectdemocracy.org


*Sign up for our weekly email briefing: ifyoucankeep.it*

---

**From:** Smith, Nicole <nsmith@rumberger.com>
**Date:** Monday, May 20, 2024 at 11:18 AM
**To:** Oberlander, Lynn <oberlanderl@ballardspahr.com>, Duke, Samantha <Sduke@rumberger.com>, Grosholz, Jeffrey <jgrosholz@rumberger.com>, Duquette, Carlie <cduquette@rumberger.com>
**Cc:** Safier, Paul J. <SafierP@ballardspahr.com>, Fehlan, Kirsten <FehlanK@ballardspahr.com>, Bouzat, Facundo <bouzatf@ballardspahr.com>, Fields, Goldie <fieldsg@ballardspahr.com>, Shalini Agarwal <shalini.agarwal@protectdemocracy.org>, ori.lev@protectdemocracy.org <ori.lev@protectdemocracy.org>, Ellinor Heywood <ellinor.heywood@protectdemocracy.org>
**Subject:** RE: PEN v. Escambia: Recap of 5/10/24 call [RKC-ACTIVE.FID3715510]

Lynn and Team, please see my responses below in red. Thanks.

**Nicole Sieb Smith**

Attorney at Law

nsmith@rumberger.com | View my online bio

## Rumberger|Kirk

101 North Monroe Street     MAIN   850.222.6550
Suite 1050
Tallahassee, FL 32301

The information in this e-mail message is legally privileged and confidential information. If you have received this e-mail in error, please delete from any device/media where the message is stored.

---

**From:** Oberlander, Lynn <oberlanderl@ballardspahr.com>
**Sent:** Friday, May 10, 2024 3:25 PM
**To:** Smith, Nicole <nsmith@rumberger.com>; Duke, Samantha <Sduke@rumberger.com>; Grosholz, Jeffrey <jgrosholz@rumberger.com>; Duquette, Carlie <cduquette@rumberger.com>
**Cc:** Safier, Paul J. <SafierP@ballardspahr.com>; Fehlan, Kirsten <FehlanK@ballardspahr.com>; Bouzat, Facundo <bouzatf@ballardspahr.com>; Fields, Goldie <fieldsg@ballardspahr.com>; Shalini Agarwal <shalini.agarwal@protectdemocracy.org>; ori.lev@protectdemocracy.org; Ellinor Heywood <ellinor.heywood@protectdemocracy.org>
**Subject:** PEN v. Escambia: Recap of 5/10/24 call

Hi Everyone,

Just to recap from our meet and confer this morning, here's our understanding of where things stand:

Defendant's Discovery Production

As to the time frame of Defendant's production, it is currently January 1, 2022-July 2023. Plaintiffs had asked for January 1, 2020 to the present.

1. You clarified that Defendant provided documents beyond its time period that relate to the removed and restricted books. Similarly, while Defendant generally objects to producing discovery relating to HB 1069, you have produced such documents where they relate to the removed and restricted books.

2. We reiterated that we are seeking additional documents before 2022 that: reflect the earlier book challenge policies and procedures, book challenges from the earlier timeframe and related documents and communications, communications with Vicki Baggett, and any communications with school board members regarding book challenges.

3. **You agreed to confirm whether there were any challenges in the earlier time period, and agreed to produce earlier board policies and amendments. You refused to search emails during the earlier time period.**

Plaintiffs defined the "Relevant Time Period" for each Request as May 23, 2022 through the present unless otherwise stated in an individual Request.

For precision as to our position, please refer to our definition of "Relevant Time Period" in the Supplemental responses to Plaintiffs' First RPs:

**The "Relevant Time Period" shall be from January 1, 2022, until July 1, 2023. If the District considered the status of a Relevant Book after the Relevant Time Period, the Relevant Time Period shall be extended through present only for those discovery requests that pertain specifically to the Relevant Books. The Board otherwise objects to responding to requests that seek documents for the time period before the Relevant Time Period, as such requests are not proportional or material to the claims and defenses in the lawsuit. The amendments to the State laws at issue in this case, and which form the basis for the Board's relevant policies and practices regarding library materials, took effect on July 1, 2022. Because the Relevant Time Period encompasses the period of time from January 1, 2022 through July 1, 2022, the Board is providing Plaintiffs with discovery responses pertaining to the six-months  leading up to the passage of the subject legislation. The District further objects to providing discovery for the period of time after July 1, 2023, given the allegations in the Complaint, which make clear Plaintiffs are challenging actions by the Board that occurred prior to July 1, 2023, [D.E. 27 at ¶ 69 n.4].**

Plaintiffs specifically asked to confirm whether there were any challenges during the period 1/1/20-1/1/22. Plaintiffs additionally narrowed their request to challenges that went to the Board. We have confirmed there were none. Accordingly, there is no reason to conduct additional document or email searches on this issue.

The District was able to locate clean copies of School Board policy 4.06 that were in effect during this earlier time period, which is the only policy we discussed. It will be produced.

Thank you for confirming that there were no book challenges that went to the Board from 1/1/20 through 1/1/22. Can you please identify the law that you reference in your definition of the Relevant Time Period that went into effect on July 1, 2022, which formed the basis for the Board's policies and practices? The amendments to section 1006.28, Florida Statutes, which took effect July 1, 2022. Also, with respect to the clean copies of School Board policy 4.06 that you reference in your response, can you please let us know when that version of the policy was in effect and when we can expect its production? I believe the effective dates of the version of the policy that the parties needed a clean copy of is 12/16/14-6/19/23. If it has not been produced already, we will get it to you in next week's production. Please let me know if there are other versions that I've missed that you don't have a clean copy of.

As to the communications of school board members, Plaintiffs are seeking texts, emails to and from the school board members' non-work email addresses or phones, and social media messages to the extent that they related to the issues in this case. This would include communications to constituents, the media, other school board members, school board staff, and third parties relating to book removals and restrictions generally or with respect to the particular books at issue.

1. You explained that, as far as you know, the school board members use only their county email address for school board business, and that you generally do not ask school board members to search personal phones or emails. **You also said that you would confirm with them that that is the case.**
2. When we noted that some school board members had communicated by text about the library books issue, **you agreed to look into this.**

As to the Defendant's discovery searches, you all have sent a spreadsheet reflecting the ESI searches you have done and the hit rates for various search terms. You are not planning to do further review of those documents because the yield of responsive documents is low. In terms of the documents Defendant has produced so far, those are based on "hard document" searches. For clarity, can you please let us know what you mean by "hard copy" and what sources/files were searched for these. We are unclear on whether these searches included the Google email and Google drive documents from media specialists at each school.

**Plaintiffs will review your spreadsheet and set up a follow-up meeting on ESI searches**.

Please let us know if you disagree with our understanding of Defendant's searches to date.

We previously asked Board Members, the Superintendent and the District Media Specialist to provide any communications regarding book challenges, removals and restrictions, including if a personal device or Board-issued cell phone was used. Despite that, they are doing another sweep. To be clear, we do not have access to former employees' personal emails and text messages. None of the Board Members (except for Mr. Adams), or the Former Superintendent or District Media Specialist are issued phones by the District. The present Superintendent has a Board-issued phone and Mr. Adams was only recently issued one. Typically, public officials cannot be made to produce their personal communications unless there are grounds to believe that they were using their personal accounts to conduct public business. Our understanding is the only Board member who is reasonably likely to communicate with constituents via text is Ms. Hightower. She has a practice of forwarding all school-district-related text messages to her District email, so they should all be produced in the email data sweep. The particular text message you provided is odd. Ms. Hightower does not locate a copy in her phone. As she noted in the message itself, she was on a cruise, and it may be that through some network error, it was lost; however (1) she is continuing to look for it (and others) and (2) we question whether it is even responsive, as whether we cut ties with the ALA has nothing to do with book challenges. So there is no misunderstanding, we do not agree to ask the thousands of rank and file employees to search their personal accounts, as their statements cannot bind the Board and such searches are not proportional to the needs of this case. We provided the District the text messages Plaintiffs produced in discovery, and asked the District to again confirm whether Board Members, the Superintendent and the District Media Specialist have any communications regarding book challenges, removals and/or restrictions. Should any be located, they will be produced.

To be clear, we are not asking that the Board ask "thousands of rank and file employees to search their personal accounts" for responsive emails and text messages. But we do believe that any responsive communications to, from or copying any member of the School Board, the Superintendent, and the Coordinator of Media Services (which we assume is who you refer to when you say the District Media Specialist) should be produced, whether sent from those individuals' official or personal accounts. We also note that our Requests are not limited to "communications regarding book challenges, removals and restrictions," which you reference in your response above. Rather, our Requests also seek communications regarding a variety of topics, including but not limited to training programs for School District library personnel involved in the selection of reading materials; communications to, from, including, or concerning Vicki Baggett, Moms for Liberty, or any member or agent of Moms for Liberty; communications concerning any Plaintiff, and communications to, from, including or concerning Tim Smith, among other topics. Accordingly, we ask that you confirm with the School Board Members, the Superintendent, and the Coordinator of Media Service/District Media Specialist that they never used their personal accounts to communicate about *any* of the topics set forth in the RFPs seeking communications and either confirm to us that is in fact the case or produce responsive communications.

I think we're on the same page here, but with the caveat that the parties had lengthy meet and confers where we went through each of the RPs (Ori, I don't believe you were a part of these meetings). For example, Defendant did not agree to search for "any member or agent of Moms for Liberty," as we explained to Plaintiffs that the District does not know who these individuals are. We also limited those topics which broadly asked Defendant to search for communications "concerning Tim Smith" or "concerning Vicky Baggett," as they would unreasonably sweep in all aspects of their employment with the District. That is why I used the short-hand "regarding book challenges, removals and/or restrictions." But, yes, to the extent we agreed to produce communications regarding other topics, they will be produced, even if any member of the School Board, the Superintendent, and the Coordinator of Media Services used a personal device/account.

Restricted Books

Thank you for forwarding the list of 20 challenged books that have been returned to circulation pending resolution of the challenge process and for confirming that column E of the ECPS 22-23 Reconsiderations (website) spreadsheet (the "Reconsiderations spreadsheet") accurately reflects whether challenged books are currently restricted pending the challenge. You also said that the school district is working on adding a column to the spreadsheet to indicate the date of any changes to restricted status. You also indicated that the school district is still working on a process to both resolve the pending challenges and otherwise review books for under HB 1069, and were not able to provide a timeline for when that process might start or be resolved. As we discussed, we have several follow-up questions and concerns regarding the restricted books.

First, one of the books you identified as having been returned to circulation, *We Are Not Yet Equal*, is still listed as being partially restricted (opt-in for MS) during the challenge process. Can you please confirm the basis for that restriction (i.e., is it due to the challenge or was that the status of the book prior to the challenge being filed)?

Just flagging that the question above is separate from the question below about the ten books that we ask be returned to the shelves immediately, and is still awaiting a response.

*We Are Not Yet Equal* is a Young Adult (YA) book, which means it is targeted for the reading age 12-18 years old. The District's practice is to require parents of middle-school students to submit an opt-in form if they want their students to read YA books.

Second, we believe that a total of ten books still listed as being restricted during the challenge process (including *We Are Not Yet Equal*) are clearly not subject to HB 1069, which only applies to books challenged on the basis that the book "depicts or describes" "sexual conduct" as the latter term is defined in s. 847.001(19). Based on the challenge forms for the following books, we think it is abundantly clear that the challenge does not trigger the statute. Accordingly, these books should be returned to circulation promptly. **We ask that you let us know if the school district has agreed to return these books to circulation pending the challenge process no later than Friday May 24. If the school district does not agree to do so, we may seek an injunction directing that these books be returned to circulation.** The books at issue are:

1. Ace of Spades
2. Girl Made of Stars
3. Lady Midnight
4. Lessons from a Dead Girl
5. More Happy than Not
6. Speak (note: this book's status appears to have been changed from unrestricted to restricted at some point since the lawsuit was filed)
7. The Hate U Give
8. The Music of What Happens
9. We Are Not Yet Equal (separately discussed above)
10. Where I End and You Begin

We are in the process of reviewing your request/books and will separately provide a response.

Please provide a response by this Friday, May 25.

As we noted on the call, we believe that a number of other books that are currently restricted also do not trigger 1069 and we reserve our rights to challenge the continued restrictions on those and other books. We have identified the above books as those most clearly not meeting the statute's trigger.

Third, you were unwilling to provide information as to whether the books listed on the spreadsheet on the school district's website titled "Website Destiny HB 1069 Storage Further Review" (the "1069 spreadsheet") were currently removed from circulation pending the district's review of those books for sexual conduct. You stated that because the amended complaint does not challenge HB 1069, the status of the books listed on the 1069 spreadsheet is irrelevant to the lawsuit unless there is a potential conflict between the status of a book listed on the Reconsiderations spreadsheet and the 1069 spreadsheet. We have identified four books listed as unrestricted on the Reconsiderations spreadsheet that are also identified on the 1069 spreadsheet:

1. Allegedly (March 8 tab of 1069 spreadsheet),
2. The Absolutely True Diary of a Part-Time Indian (listed as available in HS and restricted to MS opt-in on Resolved Challenges tab of Reconsiderations spreadsheet; April 12 and Mar 8 tabs of 1069 spreadsheet)
3. This One Summer (Mar 8 tab of 1069 spreadsheet)
4. Two Boys Kissing (Mar 8 tab of 1069 spreadsheet)

We ask that for each of the above books, you explain the current status of the book, and what impact, if any, its inclusion on the 1069 spreadsheet has on its availability in school libraries. We also note that many other books at issue in this lawsuit currently appear on the 1069 spreadsheet. Accordingly, we believe we are entitled to understand what it means to be included on that spreadsheet (irrespective of whether a book is otherwise listed as restricted pending the challenge process on the Reconsiderations spreadsheet).  Such factual information is directly relevant to arguments that the school board may make regarding the propriety of judicial relief directing that currently restricted books be returned to circulation. If the district intends to argue that books listed

on the 1069 spreadsheet would be withheld from circulation regardless of the challenge process due to the district's ongoing 1069 review, that is directly relevant to plaintiffs' claims in the case.

As we have explained on numerous meet and confers, Defendants' position is 1069 is not relevant, unless it relates to one of the books at issue in this case. We are reviewing the question of the four above books and will separately respond.

You state that "1069 is not relevant, unless it relates to one of the books at issue in this case." We note that well over 100 of the books at issue in this case appear on the 1069 spreadsheet. In addition to explaining whether the four books above are or are not currently restricted, please also explain what it means for the books at issue in this case to be on the 1069 spreadsheet (which your own response concedes is relevant to the case.)

During our next meet and confer, we will explain to Plaintiffs what we have learned about the books that are on both the Reconsideration Spreadsheet and the 1069 spreadsheet.

Depositions

You would like to calendar depositions of each of the Plaintiffs, as well as each of the students. **Plaintiffs agreed to reach out to the clients and get back to you with dates when they are available for deposition. Plaintiffs are open to depositions of the middle and high school students but will oppose the depositions of the students in elementary school**, as we think it pretty clear that you can get the information you need from depositions of their parents who are the named Plaintiffs in the case on behalf of their kids, or else from declarations by the children. Defendant will insist on deposing all of the children but is open to reasonable restrictions in writing. Plaintiffs propose the following restrictions: that the students have a parent present at the deposition, that the deposition be no more than 1-2 hours in length, that they be limited in scope to the factual issues in the complaint, and that they be done either in zoom or in person based on the preference of the particular student. Plaintiffs will likely seek a protective order as to the elementary students and hope we can come to a resolution on restrictions for the older students.

Likewise, Plaintiffs would like to depose each of the school board members, the decision-makers on the book challenges. **Defendant will oppose these depositions and plans to file motions for a protective order** based on legislative immunity arguments like those it made in *Parnell*. Plaintiffs do not agree that legislative immunity applies, especially where the legal question is about viewpoint discrimination.

**To tee up the protective order arguments, the parties both plan to issue deposition notices.**

Yes, we generally agree with Plaintiffs' description of the parties' positions on depositions. We are agreeable to the terms for the middle and high school students' depositions, as long as Plaintiffs agree that the limitation in scope to "the factual issues in the complaint," will include reasonably related topics and follow-up questions. Please provide us proposed dates this week. Thanks.

We have one further question on the depositions of the elementary school-age children. You said at the meet and confer that you want to depose the children about whether they seek to check out the books listed in the complaint and whether their reading interests as described in the complaint are accurate. We believe these can be addressed through the testimony of the Parent Plaintiffs. So that we have clarity, please describe the nature of the testimony you seek from the children and from the parents, and how the two are distinct.

Defendant at this stage in the proceedings are not required to set forth specific lines of questioning; but, generally, to respond to your question - what a parent thinks their child wants to read and is interested in and what the child actually wants to read and is interested in may be different. Defendant has the right to explore the claims and defenses in the case directly with the students. We refer Plaintiffs to the Judge's comments during the motion to dismiss hearing regarding why he agrees the students' testimony is germane.

Thank you for agreeing to reasonable limitations on the deposition of the older students. We are fine with including "reasonably related follow-up questions" within the permissible scope of questioning, recognizing that it is challenging to identify such follow-up questions in advance. However, if you want to also include "reasonably related topics" beyond the factual allegations of the complaint, please identify the proposed topics so that we can determine whether or not we agree. Doing so will help to minimize disagreements at the deposition.

We will endeavor to provide you with proposed deposition dates for the students this week. Please provide.

We also intend to notice depositions of the School Board Members and the Superintendent for the soonest practicable dates, on the understanding that you will be seeking to quash these depositions so we do not need to confer on dates; please let us know if that is not the case and we can coordinate.

Thank you for the call this morning, and we hope that the weather turns better in Florida and that everyone gets their power back.  We look forward to hearing from you.

**Lynn B. Oberlander**
2024 Pro Bono Honor Roll – Gold

**Ballard Spahr** LLP

1675 Broadway, 19th Floor
New York, NY 10019-5820

646.346.8011 DIRECT
212.223.1942 FAX

347.572.4300 MOBILE | oberlanderl@ballardspahr.com
VCARD

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

www.ballardspahr.com

Exhibit 12

Case 3:23-cv-10385-TKW-ZCB    Document 126-1    Filed 10/04/24    Page 928 of 1008



Ellinor Heywood <ellinor.heywood@protectdemocracy.org>

---

**RE: Documents for PEN 30(b)6 Deposition - NOTICE OF DEFICIENT DISCOVERY RESPONSES [RKC-ACTIVE.FID3715510]**
2 messages

---

**Smith, Nicole** <nsmith@rumberger.com>                                    Mon, Aug 12, 2024 at 6:01 PM
To: "Oberlander, Lynn" <oberlanderl@ballardspahr.com>, "Duke, Samantha" <Sduke@rumberger.com>, "Grosholz, Jeffrey" <jgrosholz@rumberger.com>
Cc: Shalini Agarwal <shalini.agarwal@protectdemocracy.org>, "Fehlan, Kirsten" <FehlanK@ballardspahr.com>, Ellinor Heywood <ellinor.heywood@protectdemocracy.org>, "Relyea, Ryan R." <RelyeaR@ballardspahr.com>, "Bouzat, Facundo" <bouzatf@ballardspahr.com>, "Fields, Goldie" <fieldsg@ballardspahr.com>, "Duquette, Carlie" <cduquette@rumberger.com>, "Moseley, Cayla" <cmoseley@rumberger.com>

I am told by our team that there is no document for ECSD0000090.  When we produced ECSSD00089 originally in Parnell, it was an excel sheet that printed onto 2 pages and cut off some of the info. When we corrected the printing error, it was only one page, so we skipped number 90, as everything else was already numbered. Sorry for the confusion.

**Nicole Sieb Smith**
Attorney at Law
nsmith@rumberger.com | View my online bio

## Rumberger|Kirk

101 North Monroe Street    MAIN  850.222.6550
Suite 1050
Tallahassee, FL 32301

The information in this e-mail message is legally privileged and confidential information. If you have received this e-mail in error, please delete from any device/media where the message is stored.

---

**From:** Oberlander, Lynn <oberlanderl@ballardspahr.com>
**Sent:** Monday, August 12, 2024 5:15 PM
**To:** Smith, Nicole <nsmith@rumberger.com>; Duke, Samantha <Sduke@rumberger.com>; Grosholz, Jeffrey <jgrosholz@rumberger.com>
**Cc:** Shalini Agarwal <shalini.agarwal@protectdemocracy.org>; Ori Lev <ori.lev@protectdemocracy.org>; Fehlan, Kirsten <FehlanK@ballardspahr.com>; Ellinor Heywood <ellinor.heywood@protectdemocracy.org>; Relyea, Ryan R. <RelyeaR@ballardspahr.com>; Bouzat, Facundo <bouzatf@ballardspahr.com>; Fields, Goldie <fieldsg@ballardspahr.com>; Duquette, Carlie <cduquette@rumberger.com>; Moseley, Cayla <cmoseley@rumberger.com>
**Subject:** RE: Documents for PEN 30(b)6 Deposition - NOTICE OF DEFICIENT DISCOVERY RESPONSES [RKC-ACTIVE.FID3715510]

Thank you for clarifying and we have now loaded these into our system.  Our e-discovery team tells me that we are also missing ECSD000090.  Can you let us know if that was pulled for some reason, and/or resend it?  Thank you.

Lynn

---

**From:** Smith, Nicole <nsmith@rumberger.com>
**Sent:** Monday, August 12, 2024 2:41 PM
**To:** Oberlander, Lynn <oberlanderl@ballardspahr.com>; Duke, Samantha <Sduke@rumberger.com>; Grosholz, Jeffrey <jgrosholz@rumberger.com>
**Cc:** Shalini Agarwal <shalini.agarwal@protectdemocracy.org>; Ori Lev <ori.lev@protectdemocracy.org>; Fehlan, Kirsten <FehlanK@ballardspahr.com>; Ellinor Heywood <ellinor.heywood@protectdemocracy.org>; Relyea, Ryan R. <RelyeaR@ballardspahr.com>; Bouzat, Facundo <bouzatf@ballardspahr.com>; Fields, Goldie <fieldsg@ballardspahr.com>; Duquette, Carlie <cduquette@rumberger.com>; Moseley, Cayla <cmoseley@rumberger.com>
**Subject:** RE: Documents for PEN 30(b)6 Deposition - NOTICE OF DEFICIENT DISCOVERY RESPONSES [RKC-ACTIVE.FID3715510]

⚠ **EXTERNAL**

Hi Lynn, regarding the text messages, they were produced as individual PDFs separate from the load file of other ESI, so perhaps that's the confusion. Attached are the two text strings we produced. The filename tells who the custodian is (KL = Keith Leonard). On the same date, we also produced clean versions of the 4.06 policy that Plaintiffs requested. See below which shows the documents were downloaded by Patrick Tran on 6/13/24:

[tranp@ballardspahr.com - RK Documents for PEN 30(b)6 Deposition - NOTICE OF DEFICIENT DISCOVERY RESPONSES [RKC-ACTIVE.FID3715510]

**cduquette@rumberger.com > Escambia - PEN > RSPRP**

---

📕 **ECSD001855** Hightower Texts.pdf

Size —
Downloaded 06/13/2024 3:57:22 pm
User Patrick Tran [tranp@ballardspahr.com] (BallardSpahr, LLP)

📕 **ECSD001847** KL Texts with B Vinson.pdf

Size —
Downloaded 06/13/2024 3:57:11 pm
User Patrick Tran [tranp@ballardspahr.com] (BallardSpahr, LLP)

📕 ECSD001830 _4.06 Educational Media Materials (adopted 09.19.23).pdf

Size —
Downloaded 06/13/2024 3:57:00 pm
User Patrick Tran [tranp@ballardspahr.com] (BallardSpahr, LLP)

📕 ECSD001814 _4.06 Educational Media Materials (prior to 6.20.23).pdf

Size —
Downloaded 06/13/2024 3:56:52 pm
User Patrick Tran [tranp@ballardspahr.com] (BallardSpahr, LLP)

---

**From:** Oberlander, Lynn <oberlanderl@ballardspahr.com>
**Sent:** Monday, August 12, 2024 1:41 PM
**To:** Smith, Nicole <nsmith@rumberger.com>; Duke, Samantha <Sduke@rumberger.com>; Grosholz, Jeffrey <jgrosholz@rumberger.com>
**Cc:** Shalini Agarwal <shalini.agarwal@protectdemocracy.org>; Ori Lev <ori.lev@protectdemocracy.org>; Fehlan, Kirsten <FehlanK@ballardspahr.com>; Ellinor Heywood <ellinor.heywood@protectdemocracy.org>; Relyea, Ryan R. <RelyeaR@ballardspahr.com>; Bouzat, Facundo <bouzatf@ballardspahr.com>; Fields, Goldie <fieldsg@ballardspahr.com>
**Subject:** RE: Documents for PEN 30(b)6 Deposition - NOTICE OF DEFICIENT DISCOVERY RESPONSES [RKC-ACTIVE.FID3715510]

https://www.ballardspahr.com/insights/news/2023/05/ballard-spahr-joins-pen-america-led-coalition-to-challenge-florida-book-ban

---

**From:** Smith, Nicole <nsmith@rumberger.com>
**Sent:** Friday, August 9, 2024 10:36 AM
**To:** Oberlander, Lynn <oberlanderl@ballardspahr.com>; Duke, Samantha <Sduke@rumberger.com>; Grosholz, Jeffrey <jgrosholz@rumberger.com>
**Cc:** Shalini Agarwal <shalini.agarwal@protectdemocracy.org>; Ori Lev <ori.lev@protectdemocracy.org>; Fehlan, Kirsten <FehlanK@ballardspahr.com>; Ellinor Heywood <ellinor.heywood@protectdemocracy.org>; Relyea, Ryan R. <RelyeaR@ballardspahr.com>; Bouzat, Facundo <bouzatf@ballardspahr.com>; Fields, Goldie <fieldsg@ballardspahr.com>
**Subject:** RE: Documents for PEN 30(b)6 Deposition - NOTICE OF DEFICIENT DISCOVERY RESPONSES [RKC-ACTIVE.FID3715510]

⚠ **EXTERNAL**

Thanks, Lynn. Let's do 1:30pm ET on Monday. We will send an invite with the following call-in number:

1. Dial (773) 231-9226

2. Enter the MEETING ID **9998418367** followed by the # sign.

3. When subsequently asked for a Participant ID, press # sign.

9/30/24, 10:58 AM                 RE: Documents for PEN 30(b)6 Deposition - NOTICE OF DEFICIENT DISCOVERY RESPONSES [RKC-ACTIVE.FID3715510]

Case 3:23-cv-10385-TKW-ZCB    Document 126-1    Filed 10/04/24    Page 930 of 1008

**Nicole Sieb Smith**

Attorney at Law

nsmith@rumberger.com | *View my online bio*

---

101 North Monroe Street     MAIN   850.222.6550
Suite 1050
Tallahassee, FL 32301

The information in this e-mail message is legally privileged and confidential information. If you have received this e-mail in error, please delete from any device/media where the message is stored.

---

**From:** Oberlander, Lynn <oberlanderl@ballardspahr.com>
**Sent:** Thursday, August 8, 2024 5:48 PM
**To:** Smith, Nicole <nsmith@rumberger.com>; Duke, Samantha <Sduke@rumberger.com>; Grosholz, Jeffrey <jgrosholz@rumberger.com>
**Cc:** Shalini Agarwal <shalini.agarwal@protectdemocracy.org>; Ori Lev <ori.lev@protectdemocracy.org>; Fehlan, Kirsten <FehlanK@ballardspahr.com>; Ellinor Heywood <ellinor.heywood@protectdemocracy.org>; Relyea, Ryan R. <RelyeaR@ballardspahr.com>; Bouzat, Facundo <bouzatf@ballardspahr.com>; Fields, Goldie <fieldsg@ballardspahr.com>
**Subject:** RE: Documents for PEN 30(b)6 Deposition - NOTICE OF DEFICIENT DISCOVERY RESPONSES [RKC-ACTIVE.FID3715510]

Dear Nicole:

We are available to meet and confer on this request on Monday, at any time except 3-4. Please let me know if there is a time that works for you.  Thank you.

Lynn

---

**From:** Smith, Nicole <nsmith@rumberger.com>
**Sent:** Tuesday, August 6, 2024 5:35 PM
**To:** Oberlander, Lynn <oberlanderl@ballardspahr.com>; Duke, Samantha <Sduke@rumberger.com>; Grosholz, Jeffrey <jgrosholz@rumberger.com>
**Cc:** Shalini Agarwal <shalini.agarwal@protectdemocracy.org>; Ori Lev <ori.lev@protectdemocracy.org>; Fehlan, Kirsten <FehlanK@ballardspahr.com>; Ellinor Heywood <ellinor.heywood@protectdemocracy.org>; Relyea, Ryan R. <RelyeaR@ballardspahr.com>; Bouzat, Facundo <bouzatf@ballardspahr.com>; Fields, Goldie <fieldsg@ballardspahr.com>
**Subject:** RE: Documents for PEN 30(b)6 Deposition - NOTICE OF DEFICIENT DISCOVERY RESPONSES [RKC-ACTIVE.FID3715510]
**Importance:** High

⚠ **EXTERNAL**

Dear Lynn,

[BID12.2PGW-0261.3580 - RE: Documents for PEN 30(b)(6) NOTICE-TRIAL.FID3504124-COVER.PagesPSSE_QK-ROOT.IVE.FID3715510]

Please immediately produce the following documents that PEN's 30(b)(6) witness testified about regarding PEN's alleged diversion of resources and its efforts to oppose book bans, which Plaintiffs should have produced in response to Defendants' RFPs 3-8, 22-25 and/or 44-51:

- Documents regarding grants PEN applied for and/or was awarded in connection with PEN's book ban initiatives for the years 2021-present, including communications and reports (we note only the Annual Report Prepared for Long Ridge Foundation March 1, 2022 - March 31, 2023 was produced and the Escambia calculations spreadsheet referenced such grants);

- Documents regarding gifts PEN applied for and/or was awarded in connection with PEN's book ban initiatives for the years 2021-present, including communications and reports (the Escambia calculations spreadsheet referenced such grants but gifts may have also been used);

- PEN's budgets for the years 2020-present regarding book ban initiatives and any program from which PEN claims resources were diverted;

- Documents showing general operations contributions towards book ban initiatives for the years 2020-present (the Escambia calculations spreadsheet referenced such contributions);

- Documents showing the amounts PEN collected as part of its fundraising against book bans and/or regarding this lawsuit;

- Marketing materials, including social media, regarding this lawsuit.

Given the compressed time frame with the upcoming preliminary injunction hearing, we request Plaintiffs produce such supplemental responses or provide your position on each item by August 13, 2024. Please provide available dates if you believe we require a meet and confer. Unfortunately, with the hearing less than a month away, we will have no choice but to move the court for relief if we cannot promptly resolve these discovery disputes.

Thanks,

Nicole

**Nicole Sieb Smith**

Attorney at Law

nsmith@rumberger.com | View my online bio

101 North Monroe Street    MAIN  850.222.6550
Suite 1050
Tallahassee, FL 32301

The information in this e-mail message is legally privileged and confidential information. If you have received this e-mail in error, please delete from any device/media where the message is stored.

---

**From:** Oberlander, Lynn <oberlanderl@ballardspahr.com>
**Sent:** Thursday, August 1, 2024 3:50 PM
**To:** Smith, Nicole <nsmith@rumberger.com>; Duke, Samantha <Sduke@rumberger.com>; Grosholz, Jeffrey <jgrosholz@rumberger.com>
**Cc:** Shalini Agarwal <shalini.agarwal@protectdemocracy.org>; Ori Lev <ori.lev@protectdemocracy.org>; Fehlan, Kirsten <FehlanK@ballardspahr.com>; Ellinor Heywood <ellinor.heywood@protectdemocracy.org>; Relyea, Ryan R. <RelyeaR@ballardspahr.com>; Bouzat, Facundo <bouzatf@ballardspahr.com>; Fields, Goldie <fieldsg@ballardspahr.com>
**Subject:** RE: Documents for PEN 30(b)6 Deposition

Case 3:23-cv-10385-TKW-ZCB Document 126-1 Filed 10/04/24 Page 932 of 1008

Attached is a Corrected Spreadsheet. Jon's bonus numbers (which had not been included in the total) are removed for clarity; column S is visible; and this contains Lisa Tolin's time. Apologies for the confusion.

---

**From:** Oberlander, Lynn
**Sent:** Thursday, August 1, 2024 11:40 AM
**To:** 'Smith, Nicole' <nsmith@rumberger.com>; 'Duke, Samantha' <Sduke@rumberger.com>; 'Grosholz, Jeffrey' <jgrosholz@rumberger.com>
**Cc:** 'Shalini Agarwal' <shalini.agarwal@protectdemocracy.org>; 'Ori Lev <ori.lev@protectdemocracy.org>; Fehlan, Kirsten <FehlanK@ballardspahr.com>; 'Ellinor Heywood' <ellinor.heywood@protectdemocracy.org>; Relyea, Ryan R. <RelyeaR@ballardspahr.com>; Bouzat, Facundo <bouzatf@ballardspahr.com>; Fields, Goldie <fieldsg@ballardspahr.com>
**Subject:** RE: Documents for PEN 30(b)6 Deposition

The excel spreadsheet will be easier to use than the PDF.

---

**From:** Oberlander, Lynn
**Sent:** Thursday, August 1, 2024 11:39 AM
**To:** Smith, Nicole <nsmith@rumberger.com>; Duke, Samantha <Sduke@rumberger.com>; Grosholz, Jeffrey <jgrosholz@rumberger.com>
**Cc:** Shalini Agarwal <shalini.agarwal@protectdemocracy.org>; Ori Lev <ori.lev@protectdemocracy.org>; Fehlan, Kirsten <FehlanK@ballardspahr.com>; Ellinor Heywood <ellinor.heywood@protectdemocracy.org>; Relyea, Ryan R. <RelyeaR@ballardspahr.com>; Bouzat, Facundo <bouzatf@ballardspahr.com>; Fields, Goldie <fieldsg@ballardspahr.com>
**Subject:** Documents for PEN 30(b)6 Deposition

**Lynn B. Oberlander**
2024 Pro Bono Honor Roll – Gold

**Ballard Spahr**

1675 Broadway, 19th Floor
New York, NY 10019-5820

646.346.8011 DIRECT
212.223.1942 FAX

347.572.4300 MOBILE | oberlanderl@ballardspahr.com
VCARD

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

www.ballardspahr.com

---

**Oberlander, Lynn** <oberlanderl@ballardspahr.com>                                                                    Mon, Aug 12, 2024 at 7:04 PM
To: "Smith, Nicole" <nsmith@rumberger.com>, "Duke, Samantha" <Sduke@rumberger.com>, "Grosholz, Jeffrey" <jgrosholz@rumberger.com>
Cc: Shalini Agarwal <shalini.agarwal@protectdemocracy.org>, Ori Lev <ori.lev@protectdemocracy.org>, "Fehlan, Kirsten" <FehlanK@ballardspahr.com>, Ellinor Heywood <ellinor.heywood@protectdemocracy.org>, "Relyea, Ryan R." <RelyeaR@ballardspahr.com>, "Bouzat, Facundo" <bouzatf@ballardspahr.com>, "Fields, Goldie" <fieldsg@ballardspahr.com>, "Duquette, Carlie" <cduquette@rumberger.com>, "Moseley, Cayla" <cmoseley@rumberger.com>

Thank you.

**From:** Smith, Nicole <nsmith@rumberger.com>
**Sent:** Monday, August 12, 2024 6:01 PM
**To:** Oberlander, Lynn <oberlanderl@ballardspahr.com>; Duke, Samantha <Sduke@rumberger.com>; Grosholz, Jeffrey <jgrosholz@rumberger.com>
**Cc:** Shalini Agarwal <shalini.agarwal@protectdemocracy.org>; Ori Lev <ori.lev@protectdemocracy.org>; Fehlan, Kirsten <FehlanK@ballardspahr.com>; Ellinor Heywood <ellinor.heywood@protectdemocracy.org>; Relyea, Ryan R. <RelyeaR@ballardspahr.com>; Bouzat, Facundo <bouzatf@ballardspahr.com>; Fields, Goldie <fieldsg@ballardspahr.com>; Duquette, Carlie <cduquette@rumberger.com>; Moseley, Cayla <cmoseley@rumberger.com>
**Subject:** RE: Documents for PEN 30(b)6 Deposition - NOTICE OF DEFICIENT DISCOVERY RESPONSES [RKC-ACTIVE.FID3715510]

⚠ **EXTERNAL**

I am told by our team that there is no document for ECSD0000090.  When we produced ECSSD00089 originally in Parnell, it was an excel sheet that printed onto 2 pages and cut off some of the info. When we corrected the printing error, it was only one page, so we skipped number 90, as everything else was already numbered. Sorry for the confusion.

**Nicole Sieb Smith**

Attorney at Law

nsmith@rumberger.com | View my online bio

---

101 North Monroe Street   MAIN  850.222.6550
Suite 1050
Tallahassee, FL 32301

[Quoted text hidden]
[Quoted text hidden]

Exhibit 13



T. SMITH 000004







T. SMITH 000007



T. SMITH 000008



T. SMITH 000009



T. SMITH 000010

Exhibit 14

# Ballard Spahr
LLP

_____

1675 Broadway, 19th Floor
New York, NY 10019-5820
TEL 212.223.0200
FAX 212.223.1942
www.ballardspahr.com

Lynn Oberlander
Tel: 646.346.8011
Fax: 212.223.1942
oberlanderl@ballardspahr.com

January 29, 2024

*Via E-mail (nsmith@rumberger.com; dmarsey@rumberger.com)*

Nicole Sieb Smith, Esq.
J. David Marsey, Esq.
Rumberger, Kirk & Caldwell, P.A.
101 North Monroe Street, Suite 1050
Tallahassee, FL 32301

Re:    *Pen American Center v. Escambia County School Board*, cv. 23-cv-10385;
       Deficiencies in Defendant's Initial Discovery Responses

Dear Counsel:

We write to identify deficiencies in Defendant Escambia County School Board's Responses to Plaintiffs' First Set of Requests for Production (the "RFP Responses") and First Set of Interrogatories (the "Interrogatory Responses").  Plaintiffs request that Defendant promptly supplement its responses to Plaintiffs' discovery requests to remediate these deficiencies.  Where there are issues requiring the parties to meet and confer, we request to do so no later than Friday, February 9, 2024.

## I.    General Objections and Global Deficiencies

Privilege Log

To the extent Defendant intends to withhold or redact, in whole or in part, any Document[1] or Communication on the basis of any claimed privilege or work-product protection, Defendant must log all such Documents and Communications on a privilege log consistent with the requirements of Federal Rule of Civil Procedure 26(b)(5)(A).  However, to avoid spending unnecessary effort logging self-evidently privileged attorney-client correspondence, Plaintiffs propose that privileged Documents or Communications created after Plaintiffs filed this action on May 17, 2023 need not be logged by any party.

_____

[1] Capitalized terms not otherwise defined herein carry the same definitions set forth in Plaintiffs' discovery requests.

Nicole Sieb Smith, Esq.
J. David Marsey, Esq.
January 29, 2024
Page 2

<u>Boilerplate Objections</u>

Throughout its Responses, Defendant repeatedly lodges boilerplate objections stating that Plaintiffs' requests are "overly broad in scope," "unduly burdensome," and/or "not proportional to the needs of this case." *See* RFP Responses No. 1–5, 8, 10–24; Interrogatory Responses No. 2, 4–5, 7–9, 12–14. Unless each such objection is specifically explained, these general, boilerplate objections are inappropriate. *Harvard v. Inch*, No. 4:19-cv-212, 2020 U.S. Dist. LEXIS 26677, at *6 (N.D. Fla. Feb. 7, 2020) ("Boilerplate objections such as 'vague,' 'ambiguous,' 'overly broad,' 'not proportional to the needs of this case,' or 'burdensome,' without an explanation, do not inform this Court or Plaintiffs of the justification underlying Defendants' objections."). Indeed, "[t]he law in the Eleventh Circuit makes clear that boilerplate discovery objections are tantamount to no objection being raised at all." *Id.* at *5 (quotation omitted) (collecting cases); *see also* N.D. Fla. Loc. R. 26.1(C) ("Boilerplate objections are strongly disfavored.").

To the extent Defendant provides any explanation for these objections, it is based in many cases on its misreading of the term "Reading Material" and related attempt to impermissibly cabin discovery to a narrow set of "Relevant Books," as set out in its General Objection No. 5. *See, e.g.*, RFP Responses No. 8, 20, 22; Interrogatory Responses No. 2, 4, 8–9. As discussed below with respect to General Objection No. 5, Defendant's objections to the term "Reading Material" lack merit and there is no basis to limit discovery to Defendant's so-called "Relevant Books." Without more, these objections are "tantamount to no objection being raised at all."

<u>General Objection No. 3</u>

Defendant objects to the inclusion of email in Plaintiffs' definition of "Document" and instead states that it will provide "non-objectionable" emails only in response to "those requests that seek 'Communications.'" *See* RFP Responses, General Objection No. 3; Interrogatory Responses, General Objection No. 3.

Plaintiffs' inclusion of email in the definition of "Document" is consistent with the Federal Rules of Civil Procedure. Under Rule 34(a), Plaintiffs are entitled to the production of all information existing in paper or electronic form, or both, and stored in any medium. *See* Fed. R. Civ. P. 34(a). As the Committee Notes to Rule 34 make clear, email falls squarely within that definition. *See id.*, Committee Notes on Rules—2006 Amendment ("Rule 34(a)(1) is expansive and includes any type of information that is stored electronically. A common example often sought in discovery is electronic communications, such as e-mail."). Please promptly produce any responsive emails that may have been withheld on the basis of General Objection No. 3, and confirm that no such emails will be withheld from future productions.

<u>General Objection No. 5</u>

Defendant objects to the definition of "Reading Material" as overly broad because, in Defendant's reading, it "sweep[s] in every book in every school" in the School District, whether or not in a school library. *See* RFP Responses, General Objection No. 5; Interrogatory Responses, General Objection No. 5. Defendant proposes to instead define a set of "Relevant

Nicole Sieb Smith, Esq.
J. David Marsey, Esq.
January 29, 2024
Page 3

Books"; namely: "(1) books published by the Publisher Plaintiff; (2) books authored by one of the Author Plaintiffs; (3) books the Parent Plaintiffs allege their children wanted to read; (4) books written by authors who are members of Plaintiff PEN American Center, Inc.; and (5) *The Perks of Being a Wallflower*, *Lucky*, and *The Nowhere Girls*." *Id.*

Plaintiffs are happy to stipulate that the term "Reading Material" is meant to encompass books contained (in whatever format) in school libraries and media centers, and does not extend to, *e.g.*, "textbooks," "classroom libraries," or "books students bring in from home." *Id.* However, Defendant's proposed set of "Relevant Books" is too narrow. As Defendant acknowledges in its response, "[t]his lawsuit concerns decisions made concerning books contained in the Board's school libraries and media centers." *Id.* Further, the court has indicated that Plaintiffs have standing to challenge all of the books that have been restricted or removed, as alleged in the complaint. See Tr. of Jan. 10, 2024 Oral Arg. at 113:04–119:17. At a minimum, Defendants must provide discovery as to each removed or restricted books. Beyond that, Documents and Communications related to other books may also contain evidence relevant to Plaintiffs' claims—for example, to the extent they shed light on Defendant's decision-making or motivations. Furthermore, Defendant's production to date does not cover even the narrower set of books included in Defendant's proposed definition. Please promptly produce any responsive Documents or Communications that may have been withheld on the basis of General Objection No. 5, and confirm that no such Documents or Communications will be withheld from future productions.

General Objection No. 6

Defendant objects to the definitions of the terms "Book Challenge," "Book Restriction," and "Book Removal" as "overly broad in scope, unduly burdensome, and not proportional to the needs of the case and/or this stage of the proceedings" based on their incorporation of the objected-to term "Reading Material." *See* RFP Responses No. 6; Interrogatory Responses No. 6.

As discussed above under General Objection No. 5, Defendant's proposed set of "Relevant Books" is too narrow, and in any event Defendant's production to date does not meet even that insufficient standard. Furthermore, Plaintiffs expressly limited their definitions of "Book Challenge," "Book Restriction," and "Book Removal" to "Reading Material *in any School District library*." *See* Pls.' First Set of Requests for Production at 4–5 (emphasis added). Defendant's stated objection that the term "Reading Material" sweeps in materials outside school libraries is facially inapplicable to the terms identified in General Objection No. 6. Please promptly produce any responsive Documents or Communications that may have been withheld on the basis of General Objection No. 6, and confirm that no such Documents or Communications will be withheld from future productions.

General Objection 7

Defendant objects to the definition of the term "Policy or Practice" because it interprets the term to reach any action—"official or unofficial, approved or unapproved, mandatory or discretionary"—taken by "any individual within the Escambia County School District."

Nicole Sieb Smith, Esq.
J. David Marsey, Esq.
January 29, 2024
Page 4

Defendant explains that it "formally promulgates policies in accordance with Florida law" and then delegates the creation of procedures to others, including the Superintendent.  *See* RFP Responses No. 7; Interrogatory Responses No. 7.  Defendant objects that, in its view, Plaintiffs' definition sweeps in action that cannot be "reasonably traced back to the Board."  *Id.*

Defendant's assertion that it merely "formally promulgates policies in accordance with Florida law," leaving the details of implementation to others, illustrates the need for the breadth of Plaintiffs' definition.  Contrary to Defendant's self-characterization, Plaintiffs have amply alleged that Defendant and its members are intimately involved in both the details and the implementation of the School District's book removal policies and practices, whether formal or informal.  *See, e.g.*, Am. Compl. ¶¶ 92, 98–108; *accord Hatcher v. DeSoto Cnty. Sch. Dist. Bd.*, 989 F. Supp. 2d 1232, 1238 (M.D. Fla. 2013) (noting that plaintiff had satisfactorily alleged, based upon defendants' emails, an unwritten policy or practice of banning protest speech at schools); *Robinson v. Sailormen, Inc.*, 2016 WL 11528450, at *6 (N.D. Fla. Nov. 18, 2016) (recognizing defendant's informal policy because "a policy need not be written in a handbook for it to exist").  Nonetheless, Plaintiffs are willing to meet and confer regarding the scope of the term "Policy or Practice," as it relates to the actions of persons other than Defendant or its members.  Plaintiffs request that Defendant provide its availability to meet and confer as soon as possible.

## II.    First Set Of Requests For Production

Requests No. 1–3 (Documents/Communications re: Book Challenges, Book Restrictions, and Book Removals)

Defendant objects to Requests for Production No. 1–3 primarily on the grounds that they are overbroad in time.  While these requests solely concern Documents and Communications involving Defendant, the School Superintendent, or the Coordinator of Media Services—records Defendant should have readily on hand—Plaintiffs agree to limit the time period of these requests to January 1, 2020 through the present.

Defendant's responses to Requests No. 1–3 fail to commit to any additional production by Defendant and seemingly imply that Defendant's existing production is all it will produce in response to these requests.  If so, Defendant's position is untenable.  Defendant's miniscule production—comprising 40 documents *in total* and relating to only a fraction of the books challenged, restricted, or removed—is not close to sufficient to satisfy Defendant's discovery obligations.  Defendant's production also fails to include any emails or other electronic communications responsive to these requests.  As discussed above under General Objection No. 3, Defendant has no basis to withhold these.  Please confirm a date by which Defendant will supplement its production to include all Documents and Communications dating from January 1, 2021 through the present and responsive to Requests No. 1–3.

Requests No. 4–5 (Documents/Communications re: Adjudicating Book Challenges and Handling and Accessing Restricted Books)

Nicole Sieb Smith, Esq.
J. David Marsey, Esq.
January 29, 2024
Page 5

Defendant objects to Requests No. 4 and 5 on the basis that each request is "overly broad and unduly burdensome as to scope because the Board has not identified a method by which to locate responsive documents on a District-wide basis." *See* RFP Responses No. 4–5.

However, Defendant's failure to identify a method by which to locate responsive documents does not release Defendant from its obligation to produce them. Still less does Defendant's unwillingness to even search for highly relevant and responsive documents somehow render Plaintiffs' requests overly broad and unduly burdensome. Nor does Defendant's status as a public body composed of elected officials shield Defendant from producing Documents and Communications that are otherwise available under Florida law. *See* Fla. Stat. 119.07(1)(a). Defendant must produce all Documents and Communications underlying all official acts performed by individual members or as a collective body. In any event, Defendant has not shown how any applicable privilege applies. To the extent Defendant's objection relies on its interpretation of the term "Policy or Practice" to apply to actions not fairly traceable to Defendant, as set out in General Objection No. 7, Plaintiffs are willing to meet and confer regarding the scope of that term. Subject to any amendments arising from that discussion, please confirm a date by which Defendant will supplement its production to include all Documents and Communications responsive to Requests No. 4 and 5.

Requests No. 6 and 9 (Documents/Communications re: District Review Committees and Board Process to Evaluate Book Challenges)

In response to Requests No. 6 and 9, which seek Documents and Communications describing the District Review Committees as well as Defendant's role in evaluating Book Challenges, respectively, Defendant refers Plaintiffs to Board Policy 4.06 but does not indicate whether it is in possession of any other Documents and Communications responsive to Plaintiffs' requests.

Defendant's status as a public body composed of elected officials does not shield Defendant from producing Documents and Communications that are otherwise available under Florida law. *See* Fla. Stat. 119.07(1)(a). Defendant must produce all Documents and Communications underlying Board Policy 4.06—whether from individual members or the collective body. *See Bear v. Escambia Cnty. Bd. of Cnty. Comm'rs*, 2021 U.S. Dist. LEXIS 254448, at *12 (N.D. Fla. Oct. 8, 2021) (compelling production of social media posts and Facebook messages if "created, received, or retained by [the elected official] in the scope of his duties as a commissioner, relates to a County matter or to Underhill's official duties, and was intended to convey information or knowledge."). Defendant's response is therefore incomplete. Please confirm a date by which Defendant will supplement its production to produce all Documents and Communications responsive to Requests No. 6 and 9, or else confirm that it does not possess any.

Requests No. 10–14 (Documents/Communications re: HB 1069, 7, or 1557 and Objections, Removals, or Reporting Pursuant to Section 6 of HB 1069)

In response to Request No. 10, Defendant objects on the grounds that HB 1069, 7, and 1557 "either do not concern or encompass far broader topics" than the school libraries and media centers at issue in this case. *See* RFP Responses No. 10. Defendant also reiterates the objection

Nicole Sieb Smith, Esq.
J. David Marsey, Esq.
January 29, 2024
Page 6

to the term "Reading Material" contained in General Objection No. 5, but states that it "is agreeable to meet and confer with Plaintiffs' counsel regarding appropriate custodians and search terms for email searches." *See id.* Defendant's responses to Requests No. 11–14 incorporate by reference its response to Request No. 10.

Defendant's contention that Documents and Communications relating to HB 1069, 7, and 1557 are outside the scope of the issues in this case is unavailing. Defendant's own website displays a flowchart showing "HB 1069 Books pulled for further review by Media Specialists," and "District Challenged Books," each of which links to a spreadsheet listing books pulled from School District libraries on the asserted grounds of compliance with HB 1069, 7, or 1557. *See* https://www.escambiaschools.org/Page/978. Furthermore, Plaintiffs are in possession of at least one relevant communication from Michelle White as Coordinator of Media Services to Vicki Baggett—produced by Ms. Baggett in response to Plaintiffs' subpoena but notably *not* produced by Defendant, which has produced zero emails to date—in which Ms. White states that the school district "put a pause on evaluating titles challenged" under HB 7, 1557, and 1069 until it receives guidance from Defendant about whether those bills "also apply to self-selected library materials." These requests go to the bases Defendant relied on to restrict access to or remove library books, which is a central issue to this case. And, for the reasons set out above in response to General Objections No. 5 and 6, Defendant's objections to the definition of "Reading Material" (and its incorporation into the definitions of "Book Challenge," "Book Restriction," and "Book Removal") are misguided. Discovery on these questions is therefore proper unless Defendant is able to represent that it has not removed or restricted any book pursuant to HB 1069, HB 7, HB 1557, or related regulation. Nonetheless, Plaintiffs agree to meet and confer regarding appropriate custodians and search terms for email searches, and request that Defendant provide its availability to meet and confer as soon as possible. Plaintiffs will provide Defendant a list of proposed search terms and custodians in advance of the meet and confer.

<u>Requests No. 15–22, 24 (Documents/Communications with the State re: Book Challenges, Restrictions, or Removals; Documents/Communications re: Training Programs, Vicki Baggett, Moms for Liberty, Any Plaintiff, Permissible Bases for Removal of Reading Materials, Tim Smith, termination of Tim Smith, and Original Acquisition of Reading Materials)</u>

In response to Requests No. 15–22 and 24, Defendant raises various objections—including reiterating its objection to the term "Reading Material" and seeking to limit discovery to so-called "Relevant Books," as set out in General Objection No. 5—but states that it "is agreeable to meet and confer with Plaintiffs' counsel regarding appropriate custodians and search terms for email searches." *See* RFP Responses No. 15–22, 24.

For the reasons set out above in response to General Objections No. 5 and 6, Defendant's objections to the definition of "Reading Material" (and its incorporation into the definitions of "Book Challenge," "Book Restriction," and "Book Removal") are not well-founded. Nonetheless, Plaintiffs agree to meet and confer regarding appropriate custodians and search terms for email searches, and request that Defendant provide its availability to meet and confer as soon as possible. Plaintiffs will provide Defendant a list of proposed search terms and custodians in advance of the meet and confer. Further, Plaintiffs agree to limit Request No. 21 to

Nicole Sieb Smith, Esq.
J. David Marsey, Esq.
January 29, 2024
Page 7

all Documents and Communications concerning any Book Challenge, Book Restriction, and/or Book Removal from, to, including and/or concerning Tim Smith.

## III.    First Set Of Interrogatories

Interrogatory No. 4 (Spreadsheet Accuracy)

Interrogatory No. 4 simply asks Defendant to state whether the information provided on the spreadsheet identified in Paragraph 66 of the Amended Complaint—a spreadsheet purportedly maintained and published by the School District—is accurate, and, if not, indicate the inaccuracies and provide the correct information.  Defendant objects to Interrogatory No. 4 on the grounds that some of the books listed in that spreadsheet extend beyond the set of "Relevant Books" contained in Defendant's General Objection No. 5.  *See* Interrogatory Responses No. 4.

As discussed above in response to General Objection No. 5, Defendant has no basis to unilaterally limit the scope of discovery to a narrow set of what it considers to be "Relevant Books."  Defendant's response that the spreadsheet is correct only as to the "Relevant Books" is incomplete and therefore fails to satisfy Defendant's discovery obligations.  *See* Fed. R. Civ. P. 37(a)(4).  Please confirm that Defendant will promptly supplement its Interrogatory Responses to respond to Interrogatory No. 4 in full.

Interrogatories No. 6–10 (Reading Materials Acquisition, Reading Materials List, Book Restriction Details, Book Removal Details, and Books Limited to 11th-12th grades)

Preliminarily, as to Interrogatory No. 6 which seeks information about Defendant's acquisition of Reading Materials subject to Book Challenge, Book Removal, or Book Restriction, the request extends only to the time that Defendant acquired the material at issue, presumably after the beginning of time.  With respect to Interrogatories No. 6–10, Defendant repeatedly "incorporates by reference the records being contemporaneously produced regarding the Relevant Books."  *See* Interrogatory Responses No. 6–10.  As discussed above in response to General Objection No. 5, Defendant has no basis to unilaterally limit the scope of discovery to a narrow set of what it considers to be "Relevant Books."  In addition, Defendant's responses fail to adequately specify the particular documents on which Defendant intends to rely.  It is well established that "'interrogatory responses that direct [the requesting party] to [the opposing party's] document production generally . . . are not an adequate alternative to answering the interrogatories.'"  *C.H. v. Sch. Bd. of Okaloosa Cty.*, No. 3:18-cv-2128, 2020 U.S. Dist. LEXIS 51712, at *11 (N.D. Fla. Mar. 23, 2020) (quoting *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 276 F.R.D. 396, 399 (D.C. Cir. 2011)).  Defendant therefore cannot evade its discovery obligations by "incorporat[ing] by reference" its document production generally.  Please confirm that Defendant will promptly supplement its Interrogatory Responses to respond to Interrogatories No. 6–10 in full, including by, if necessary, identifying the specific documents to which it intends to direct Plaintiffs.

Interrogatory No. 11 (Restricted Access Determinations)

Nicole Sieb Smith, Esq.
J. David Marsey, Esq.
January 29, 2024
Page 8

Defendant objects to Interrogatory No. 11 on the grounds that it "calls for identification and description of purported 'unwritten' policies." Interrogatory Responses No. 11. Defendant does not muster any explanation, not even a boilerplate one, as to why this request is improper; its objection is therefore "tantamount to no objection at all." As discussed above with respect to General Objection No. 7, Plaintiffs have alleged conduct by Defendant and its members that goes far beyond the mere "formal[] promulgat[ion]" of written policies, and there is no basis for Defendant to impose that narrow scope on Plaintiffs' permissible discovery. If there are or were no informal or unwritten policies governing which books were restricted during the pendency of their reviews, Defendant should be able to say so, under penalty of perjury. If such policies do or did exist, Defendant must identify and describe them. Please confirm that Defendant will promptly supplement its Interrogatory Responses to respond to Interrogatory No. 11 in full.

<u>Interrogatory No. 12 (Implementation of HB 1069)</u>

Defendant objects to Interrogatory No. 12 on the grounds that changes made in response to HB 1069 "do not relate to the issues relevant to this lawsuit and are beyond the scope of the Amended Complaint." Interrogatory Responses No. 12. However, Defendant has placed HB 1069 at issue in this case by, to name one example, seeking to dismiss Plaintiffs' Amended Complaint on the grounds that it is effectively mooted by HB 1069. *See* Def.'s Mot. to Dismiss at 9–13. Although the Court rejected this argument, to the extent HB 1069 may serve to potentially limit Plaintiffs' relief—or to the extent Defendant argues that it should—then discovery regarding Defendant's efforts to implement HB 1069 is reasonably calculated to lead to the discovery of admissible evidence. Please confirm that Defendant will promptly supplement its Interrogatory Responses to respond to Interrogatory No. 12 in full.

Very truly yours,

*Lynn Oberlander*

Lynn Oberlander

cc:    Shalini Agarwal, Esq.
       Paul Safier, Esq.
       Shawn Summers, Esq.
       Kirsten Fehlan, Esq.

Exhibit 15

# Ballard Spahr
LLP

‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒
1675 Broadway, 19th Floor
New York, NY 10019-5820
TEL 212.223.0200
FAX 212.223.1942
www.ballardspahr.com

Lynn Oberlander
Tel: 646.346.8011
Fax: 212.223.1942
oberlanderl@ballardspahr.com

August 29, 2024

*Via E-mail (nsmith@rumberger.com)*

Nicole Sieb Smith, Esq.
Rumberger|Kirk
101 North Monroe Street
Suite 1050
Tallahassee, FL 32301

Re:    *PEN American Center, Inc. v. Escambia County School Board*, No. 3:23-cv-10385
      (N.D. Fla) – Deficiencies in Defendant's Discovery Responses

Dear Counsel:

We write in regard to deficiencies in Defendant Escambia County School Board's responses to Plaintiffs' second set of requests for production (and continuing deficiencies in the Board's responses to Plaintiffs' first set of requests for production). The Board has improperly refused to produce any documents or communications that concern its interpretation and application of HB 7, HB 1557, and HB 1069 to the books *at issue in this lawsuit*.

In particular, Plaintiffs requested communications between the Board and other Florida school districts concerning the "application to Book Challenges, Books Restrictions, Book Removals, or the Restricted or Removed Books" of HB 1069, HB 7, and HB 1557. *See* 2nd Set RFP No. 41. Similarly, Plaintiffs requested communications between the Board and Florida school districts concerning the "School Board's reporting requirements pursuant to section 6 of HB 1069." 2nd Set RFP No. 44. And Plaintiffs had previously requested documents concerning the "application to Book Challenges, Book Restrictions, and Book Removals," at issue in the suit, of "HB 1069, HB 7, or HB 1557," including any documents in the custody of the Board and communications with the State of Florida. 1st Set RFP Nos. 10-11; *see also* 1st Set RFP Nos. 12-14; 2nd Set RFP Nos. 41-44.

Defendant's responses reveal it has not searched for documents and communications that concern the interpretation and application of HB 1069, as related to any books at issue in the case. Instead, the Board appears to treat *any* request that mentions HB 1069 as irrelevant because, according to the Board, "HB 1069 has no applicability to this matter." Def.'s

Nicole Sieb Smith, Esq.
August 29, 2024
Page 2

Responses to RFP Nos. 41-44.  The Board's documents regarding its interpretation and application of HB 1069 to the removed and restricted books *at issue in this lawsuit*, including communications with other districts, are squarely within the scope of relevant discovery because Plaintiffs are entitled to understand how HB 1069 impacts the Removed and Restricted books and test the Board's claims to that effect.  Indeed, the Board has itself argued that HB 1069 mooted Plaintiffs' claims because the statute "indisputably applies to the types of books that are the subject of this lawsuit."  Def.'s Mot. to Dismiss at 10, ECF No. 28. And the Board again asserted in its latest court filing that at least some of the books *at issue in this lawsuit* are subject to HB 1069.  Def.'s Opp. to Mot. for Prelim. Injunction at 2-3 (arguing the "books are currently restricted because the District has determined they contain 'sexual conduct' as defined by . . . House Bill 1069").  The declaration of Bradley Vinson attached thereto says Policy 4.06 was amended in light of HB 1069, Vinson Decl. ¶¶ 18-20, and references the "development of training" as to HB 1069, *id.* ¶ 27, as well as meetings between Escambia County media specialists to discuss books "marked as needing further review under HB 1069," *id.* ¶ 28.  Responsive documents and communications reflecting the Board's interpretation and application of HB 1069 to the books in question clearly appear to exist.  As the Board asserts that HB 1069 has impacted the restriction of books at issue in this case, Plaintiffs have the right to discovery to test those assertions.  We also note that the Board did not object to questions regarding the Board's implementation of HB 1069 during the recent 30(b)(6) deposition of the Board, and has thus waived any objection to discovery on this issue on grounds of relevance or "applicability to this matter."

Please let us know whether the Board will continue to refuse to conduct any search for documents responsive to Plaintiffs' 2nd Set RFP Nos. 41-44 and 1st Set RFP Nos. 10-14 on the basis of these objections.  We are available to meet and confer to determine whether we are at impasse.

There is also reason to believe that Defendant has not produced all the responsive communications from the individual board members' personal email accounts, cellphones, and social media accounts. On August 13, 2024, we received a document production from Dr. Tim Smith containing several text messages with Board members. These include text messages between Dr. Smith and Board Chair Kevin Adams (dated August 30, 2022 and October 11, 2022) and between Dr. Smith and Board Member Patricia Hightower (dated October 13, 2022).  See Attachment (Bates Stamped T.Smith 000006-000010).  All of these communications should have been produced by the Board, which agreed to produce responsive communications from Board members' personal devices and personal accounts. The Board's failure to produce these clearly responsive messages from individual Board members casts doubt on the thoroughness of its search for and production of responsive communications from Board members.  Accordingly, please provide the protocol pursuant to which you supervised the search of the Board Members' personal email accounts, cellphones, and social media accounts and explain what measures were taken (and when) to preserve such

Nicole Sieb Smith, Esq.
August 29, 2024
Page 3

documents and communications. Depending on your response, Plaintiffs may need to seek relief from the Court, as the communications of decision-makers in this case about the issue of book challenges, book restrictions, and book removals go to the core of the claims here.

In addition, in your email of July 17, 2024, you referenced certain texts from Ms. Hightower that you said were in the process of review for FERPA compliance. Please provide those as soon as possible.

Sincerely,

*Lynn Oberlander*

Lynn Oberlander


cc:     Shalini Agarwal
        Ori Lev
        Kirsten Fehlan
        Facundo Bouzat
        Goldie Fields
        Matt Kussmaul
        Mike Kilgarriff

# Exhibit 16

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

PEN AMERICAN CENTER, INC.,
SARAH BRANNEN, LINDSAY
DURTSCHI, on behalf of herself and her
minor children, BENJAMIN GLASS, on
behalf of himself and his minor child,
GEORGE M. JOHNSON, DAVID
LEVITHAN, KYLE LUKOFF, ANN
NOVAKOWSKI, on behalf of herself and
her minor child, PENGUIN RANDOM
HOUSE LLC, SEAN PARKER, on behalf
of himself and his minor child, ASHLEY
HOPE PÉREZ, ERICA ROY, on behalf of
herself and her minor children, and
CHRISTOPHER SCOTT
SATTERWHITE, on behalf of himself and
his minor child,

CASE NO.: 3:23-CV-10385-TKW-ZCB

**PLAINTIFFS' REVISED NOTICE
OF RULE 30(B)(6) DEPOSITION
OF THE ESCAMBIA COUNTY
SCHOOL BOARD**

   *Plaintiffs*,

v.

 ESCAMBIA COUNTY SCHOOL
 BOARD,

   *Defendant*.

_____

## <u>PLAINTIFFS' REVISED NOTICE OF RULE 30(B)(6) DEPOSITION OF THE ESCAMBIA COUNTY SCHOOL BOARD</u>

   PLEASE TAKE NOTICE that pursuant to Federal Rule of Civil Procedure,

30(b)(6), Plaintiffs, PEN American Center, Inc., Sarah Brannen, Lindsay Durtschi,

Benjamin Glass, George M. Johnson, David Levithan, Kyle Lukoff, Ann Novakowski, Penguin Random House LLC, Sean Parker, Ashley Hope Pérez, Erica Roy and Christopher Scott Satterwhite (collectively, "Plaintiffs"), by and through their undersigned counsel, will take the deposition by oral examination of Defendant Escambia County School Board (the "School Board") through one or more representatives who shall be designated to testify on the School Board's behalf regarding all information known or reasonably available to the School Board with respect to the subject matter identified in Exhibit A.

The deposition shall commence on July 30-31, 2024 at 10:00 a.m. at the offices of Anchor Court Reporting, 229 South Baylen Street, Pensacola, FL 3502.

The deposition is to continue from day-to-day until such time as it is completed or may be adjourned to be convened at such later date as may be established therefore by those in attendance at such deposition, and is intended for use at trial or other such purposes as authorized by law. You are invited to attend and participate.

PLEASE TAKE FURTHER NOTICE that the deposition will be taken before an officer authorized by law to administer oaths and will be recorded by audio, audiovisual, and stenographic means.

Date: July 3, 2024                          /s/ Ori Lev
                                            Lynn B. Oberlander (*pro hac vice*)
                                            **BALLARD SPAHR LLP**

2

1675 Broadway, 19th Floor
New York, NY 10019-5820
Telephone: 212.223.0200
Facsimile: 213.223.1942

Paul J. Safier (*pro hac vice*)
Facundo Bouzat*
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: 215.864.8500
Facsimile: 214.864.8999

Kirsten Fehlan (*pro hac vice*)
**BALLARD SPAHR LLP**
999 Peachtree Street, Suite 1600
Atlanta, GA 30309
Telephone: 678.420.3000
Facsimile: 678.420.9401

Shalini Goel Agarwal (FBN 90843)
Ori Lev (*pro hac vice*)
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
Telephone: 202.579.4582
Facsimile: 939.777.8428

*Pro hac vice* forthcoming

*Attorneys for Plaintiffs*

## **EXHIBIT A**

### Definitions

1.      "You" or "Your" means the Escambia County School Board; any of its officers, agents, assigns, employees, insurers, subsidiaries, successors, and predecessors; and anyone acting or purporting to act on its behalf, except for legal counsel.

2.      "Defendant" means the Escambia County School Board.

3.      "School Board" means and refers to the five-member governing body of the School District, elected from geographic districts within Escambia County, including both current and former members during the Relevant Time Period.

4.      "School District" means the Escambia County School District.

5.      Unless specifically and individually identified, "Plaintiff" or "Plaintiffs" refers to all of the Plaintiffs in this action.

6.       "Amended Complaint" means the Amended Complaint Plaintiffs filed in this action.

7.      The words "or," "and," "all," "every," "any," "each," "one or more," "including," and similar words of guidance, are intended merely as such, and should not be construed as words of limitation.  The words "or" and "and" shall include each other whenever possible to expand, not restrict, the scope of the Request.  The word "including" shall not be used to limit any general category or description that

precedes it. The words "all," "every," "any," "each," and "one or more" shall include each other whenever possible to expand, not to restrict, the scope of the Request.

8.    "Person" or "Persons" includes a natural person, individual, corporation, proprietorship, partnership, association, agency (including government agencies), School Board, School District, or any other entity.

9.    The "Relevant Time Period" for each Area of Inquiry is May 23, 2022 through the present.

10.    "Reading Material" is defined to only mean those materials contained within the District's school libraries.

11.    "Restricted or Removed Books" shall mean the books included on the spreadsheet titled "PEN et al. v. Escambia County School Board – Restricted and Removed Books DMFIRM_411297846(1).XLSX," provided by Plaintiffs to Defendant's counsel via email on February 16, 2024, as well as any book that have been removed or restricted since that date.

12.    "Book Challenge" means and refers to any challenge or petition submitted by any Person with the aim of removing or restricting access to any Reading Material in any School District library, including, but not limited to, submitting the School District's "Request for Reconsideration of Educational Media" form.

13.    "Book Restriction" or "Restricted" means and refers to any actions undertaken by the School District, including by You, to restrict access (short of complete removal) to any Reading Material in any School District library, permanently or temporarily, at any time during the Relevant Time Period. Similarly, "Restricted Access" means any limitation on access to Reading Material in any School District library short of complete removal. For avoidance of doubt, this definition excludes the books identified in the chart included at Paragraph 105 of the Amended Complaint, including where the book has only been removed for some grades.

14.    "Book Removal" or "Removal" means and refers to any actions undertaken by the School District, including by You, to remove (or completely bar access to) any Reading Material from any School District library, permanently or temporarily, at any time during the Relevant Time Period.

15.    "Policy or Practice" includes any official or unofficial policy, practice, procedure, protocol, or custom, whether mandatory or discretionary, formal or informal, written or unwritten.

16.    "HB 1069" means the act of the Florida legislature numbered House Bill 1069, as enacted on May 17, 2023 and collected at Florida Laws Ch. 2023-105.

17.    "HB 1557" means the act of the Florida legislature numbered House Bill 1557, as enacted on March 28, 2022 and collected at Florida Laws Ch. 2022-22.

18.    "HB 7" means the act of the Florida legislature numbered House Bill 7, as enacted on April 22, 2022 and collected at Florida Laws Ch. 2022-72.

19.    "Reconsideration Spreadsheet" means the Document accessible at the following hyperlink:

https://docs.google.com/spreadsheets/d/1hv6Wtu55zY3t5bmbksY2ie7Q-L3zAQdjrtaFh4duLC4/edit#gid=0 (also hyperlinked in the ECPS Library Consideration Flowchart/Library Collection Flowchart and displayed as "District Challenged Books"), including the initial Version of that Document, and all subsequent Versions.

20.    "Policy Manual 4.06" means Chapter 4, Code 4.06, "Educational Media Materials," of the School Board's Policy Manual, also referred to as "School Board Policy Chapter 4: Instruction – Section 4.06, Educational Media Materials" or "School Board Rule 4.06 Educational Media Materials," including all versions of Policy Manual 4.06 in effect during the Relevant Time Period.

<u>Areas of Inquiry</u>

1.    The training, qualification and experience of each School Board member to evaluate the appropriateness of Reading Materials in School District libraries.

2.      The creation, maintenance and meaning of the spreadsheet identified in Paragraph 66 of the Amended Complaint, or any prior or subsequent version of that document.

3.      The creation, maintenance and meaning of the ECPS Library Collection Reconsideration Flowchart located at: https://www.canva.com/design/DAFxtnANpXI/view?utm_content=DAFxtnANpXI&utm_campaign=designshare&utm_medium=embeds&utm_source=link, including the creation, maintenance and meaning of each of the spreadsheets to which it hyperlinks (including but not limited to the Reconsideration Spreadsheet).

4.      The School District's Reading Material acquisition Policy or Practice for School District libraries, including (a) the Person(s) who determines which Reading Materials the School District will purchase, (b) the factors considered in choosing which Reading Materials to purchase, (c) the records kept about Reading Materials acquisitions, and (d) how requests and decisions to purchase Reading Materials are handled.

5.      Any school-level review committee formed in response to or to evaluate Book Challenges, including the District Materials Review Committees and the School Materials Review Committees, and the Committees' composition, governance and operation.

6.     The School Board's Policy or Practice, and process, for evaluating Book Challenges, including any School Board criteria for making book-removal or book-restriction decisions and any plans and timelines for evaluating the Book Challenges.

7.     Communications with the state of Florida or any agency or department thereof with respect to any Book Challenge, Book Restriction, or Book Removal, or any Policy or Practice or criteria applicable to Book Challenges, Book Restrictions or Book Removals.

8.     Meetings of the School Board, including of any subset committee thereof, related to School District library Reading Materials, Book Challenges, Book Restrictions, or Book Removals.

9.     The identity of the Restricted or Removed Books that have been Removed by the School Board as of the date of the deposition and the process leading to their removal.

10.    The identity of the Restricted or Removed Books that have been Restricted by the School Board, and the process leading to their restriction.

11.    The identity of the Restricted or Removed Books that were previously Restricted by the School Board and which are no longer Restricted as of the date of the deposition, including (a) the Person(s) who made the decision to no longer

Restrict the book, (b) the reasons for no longer Restricting the book, and (c) the process for determining to no longer Restrict the book.

12.     The role of the School Superintendent with respect to a Book Challenge, Book Removal, or Book Restriction, including the Policy or Practice employed.

13.     The role of the Coordinator of Media Services with respect to a Book Challenge, Book Removal, or Book Restriction including the Policy or Practice employed.

14.     With respect to the Reading Materials subject to a Book Restriction in the School District, (a) the Person(s) who made the decision to subject the Reading Material to Restricted Access, (b) the reasons for subjecting that Reading Material to Restricted Access, (c) each School District library where access to the Reading Material is restricted or has been previously been restricted, (d) how the Reading Material is or was restricted, and (e) the actions students must take to access the restricted Reading Material.

15.     All Policies or Practices that have been in place regarding which Reading Materials subject to a Book Challenge are subjected to Restricted Access during the pendency of the Book Challenge review.

7

16.    The challenge form that is used in the School District to challenge the presence of a particular book in School District Libraries, including all iterations of that form and the basis for any changes during the Relevant Time Period.

17.    Policy Manual 4.06 insofar as it relates to the handling of Book Challenges, including all iterations of Policy Manual 4.06 during the Relevant Time Period and the basis for any changes to Policy Manual 4.06 over time, its implementation, and any Policy or Practice regarding Book Challenges that deviated from, was inconsistent with, or supplemented the version of Policy Manual 4.06 in effect at the time.

18.    HB 1069 with respect to Reading Materials in School District libraries.

19.    HB 1557 with respect to Reading Materials in School District libraries

20.    HB 7 with respect to Reading Materials in School District libraries.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 3, 2024, I served via electronic mail a true and correct copy of the foregoing document on counsel of record for Defendant.


Dated: July 3, 2024                                  */s/ Ori Lev*

Exhibit 17

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

PEN AMERICAN CENTER, INC.,
SARAH BRANNEN, LINDSAY
DURTSCHI, on behalf of herself and
her minor children, BENJAMIN
GLASS, on behalf of himself and his
minor child, GEORGE M.
JOHNSON, DAVID LEVITHAN,
KYLE LUKOFF, ANN
NOVAKOWSKI, on behalf of herself
and her minor child, PENGUIN
RANDOM HOUSE LLC, SEAN
PARKER, on behalf of himself and
his minor child, ASHLEY HOPE          CASE NO.:  3:23-CV-10385-TKW-ZCB
PÉREZ, and CHRISTOPHER
SCOTT SATTERWHITE, on behalf
of himself and his minor child,

      Plaintiffs,

vs.

ESCAMBIA COUNTY SCHOOL
BOARD,

      Defendant.

_____ /

**DEFENDANT'S OBJECTIONS TO PLAINTIFFS' NOTICE OF**
**TAKING CORPORATE REPRESENTATIVE DEPOSITION**

      Defendant, Escambia County School Board, serves its objections to Plaintiffs'

Rule 30(b)(6) Notice of Taking Deposition, served on July 3, 2024 (hereinafter

"Notice") and states as follows:

## GENERAL OBJECTIONS

Defendant objects to the Notice to the extent it imposes requirements beyond those required in Federal Rule of Civil Procedure 30.

## OBJECTIONS TO DEFINITIONS

1. Defendant objects to the definition of "Restricted or Removed Books" as over broad and not proportional to the needs of this case because this definition includes books other than those identified by Plaintiffs on February 16, 2024 as the books for which they seek relief in this lawsuit.

2. Defendant objects to the definition of "Book Restriction" or "Restricted" as over broad, vague, and not proportional to the needs of this case as this definition is not limited to the books at issue in this case or restrictions related to challenges made pursuant to Florida Statute Section 1006.28(a)(2).

## OBJECTIONS TO SPECIFIC AREAS OF INQUIRY

**TOPIC 1:** Defendant will produce a representative on this topic.

**TOPIC 2:** Defendant will produce a representative on this topic.

**TOPIC 3**: Defendant will produce a representative to testify regarding the creation, maintenance, and meaning of the ECPS Library Collection Reconsideration Flowchart identified in the area of inquiry; however, Defendant objects to producing a representative regarding the creation, maintenance, and meaning of each of the spreadsheets hyperlinked in that document as overly broad,

irrelevant to the issues in this case, and not proportional to the needs of this case. For example, the at-issue-page links to the Full Library Collection.  The creation, maintenance, and meaning of the Escambia School District Library Collection is irrelevant and overly broad to the issues in this case.

**TOPIC 4:**  Defendant will produce a representative on this topic covering the time up through July 1, 2023. Defendant objects to providing a representative on this topic concerning matters after July 1, 2023 as irrelevant to the issues in this case based on the allegations of the Amended Complaint. *See* Amended Complaint, ¶ 69, n. 4.

**TOPIC 5**:  Defendant will produce a representative on this topic as it relates to the books identified by Plaintiffs on February 16, 2024 as the books at issue. Otherwise, Defendant objects to this request as overly broad and not proportional to the needs of this case to the extent it relates to books other than those books.

**TOPIC 6**:  Defendant will produce a representative on this topic.

**TOPIC 7:**  Consistent with the agreement with respect to document production, Defendant will produce a representative to discuss communications between certain agreed-to Escambia County personnel and the state of Florida or agency or department; however Defendant objects to this area of inquiry as overly broad, unduly burdensome, and not proportional to the extent it seeks communications with the State from non-agreed to custodians.

**TOPIC 8:**  Defendant will produce a representative on this topic as it relates to the books identified by Plaintiffs on February 16, 2024 as the books at issue. Otherwise, Defendant objects to this request as overly broad and not proportional to the needs of this case to the extent it relates to books other than those books.

**TOPIC 9**:  Defendant will produce a representative on this topic as it relates to the books identified by Plaintiffs on February 16, 2024 as the books at issue. Otherwise, Defendant objects to this request as overly broad and not proportional to the needs of this case to the extent it relates to books other than those books.

**TOPIC 10**:  Defendant will produce a representative on this topic as it relates to the books identified by Plaintiffs on February 16, 2024 as the books at issue. Otherwise, Defendant objects to this request as overly broad and not proportional to the needs of this case to the extent it relates to books other than those books.

**TOPIC 11**:  Defendant will produce a representative on this topic as it relates to the books identified by Plaintiffs on February 16, 2024 as the books at issue. Otherwise, Defendant objects to this request as overly broad and not proportional to the needs of this case to the extent it relates to books other than those books.

**TOPIC 12**:  Defendant will produce a representative on this topic as it relates to Book Challenges, Book Removals, and the books identified by Plaintiffs on February 16, 2024 as the books at issue.  Otherwise, Defendant objects to producing a representative as to "Book Restriction" as defined as this request is overly broad

4

and not proportional to the extent it includes restrictions other than those based on a challenge and books other than the agreed-to books.

**TOPIC 13**:  Defendant will produce a representative on this topic as it relates to Book Challenges, Book Removals, and the books identified by Plaintiffs on February 16, 2024 as the books at issue.  Otherwise, Defendant objects to producing a representative as to "Book Restriction" as defined as this request is overly broad and not proportional to the extent it includes restrictions other than those based on a challenge and books other than the agreed-to books.

**TOPIC 14**: Defendant will produce a representative on this topic as it relates to the books identified by Plaintiffs on February 16, 2024 as the books at issue. Otherwise, Defendant objects to this request as overly broad and not proportional to the needs of this case to the extent it relates to books other than those books.

**TOPIC 15**: Defendant will produce a representative on this topic as it relates to the books identified by Plaintiffs on February 16, 2024 as the books at issue. Otherwise, Defendant objects to this request as overly broad and not proportional to the needs of this case to the extent it relates to books other than those books.

**TOPIC 16**:  Defendant will produce a representative on this topic covering the time up through July 1, 2023. Defendant objects to providing a representative on this topic concerning matters after July 1, 2023 as irrelevant to the issues in this case based on the allegations of the Complaint. *See* Amended Complaint, ¶ 69, n. 4.

**<u>TOPIC 17</u>**: Defendant will produce a representative on this topic covering the time up through July 1, 2023 and any post-July 1, 2023 changes which impact the books identified by Plaintiffs on February 16, 2024 as the books at issue. Defendant objects to providing a representative on this topic concerning matters after July 1, 2023 as irrelevant to the issues in this case based on the allegations of the Complaint. *See* Amended Complaint, ¶ 69, n. 4.

**<u>TOPIC 18</u>**: Defendant will produce a representative on this topic as it relates to the books identified by Plaintiffs on February 16, 2024 as the books at issue. Otherwise, Defendant objects to this request as overly broad and not proportional to the needs of this case to the extent it relates to books other than those books.

**<u>TOPIC 19</u>:** Defendant will produce a representative on this topic as it relates to the books identified by Plaintiffs on February 16, 2024 as the books at issue. Otherwise, Defendant objects to this request as overly broad and not proportional to the needs of this case to the extent it relates to books other than those books.

**<u>TOPIC 20</u>:** Defendant will produce a representative on this topic as it relates to the books identified by Plaintiffs on February 16, 2024 as the books at issue. Otherwise, Defendant objects to this request as overly broad and not proportional to the needs of this case to the extent it relates to books other than those books.

Respectfully submitted,

/s *Samantha Duke*

J. DAVID MARSEY
Florida Bar No.:  0010212
E-mail:  dmarsey@rumberger.com
NICOLE SIEB SMITH
Florida Bar No.:  0017056
E-mail:  nsmith@rumberger.com
JEFFREY J. GROSHOLZ
Florida Bar No.:  1018568
E-mail:  jgrosholz@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
101 North Monroe Street, Suite 1050
Tallahassee, Florida 32301
Tel:  850.222.6550
Fax:  850.222.8783
and

SAMANTHA DUKE
Florida Bar No. 0091403
Email:  sduke@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
300 S. Orange Ave., Suite 300
Orlando, Florida 32801
Tel:  407.872.7300
Fax: 407.841.2133

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been furnished by

e-mail to Shalini Goel Agarwal at shalini.agarwal@protectdemocracy.org,

scott.welder@protectdemocracy.org;         Kristy         L.         Parker         at

kristy.parker@protectdemocracy.org; John Thomas Langford at john.langford@protectdemocracy.org; Lynn B. Oberlander at oberlanderl@ballardspahr.com; Paul J. Safier at safierp@ballardspahr.com, relyear@ballardspahr.com, tranp@ballardspahr.com; Kirsten Elizabeth Fehlan at fehlank@ballardspahr.com; and Ori Lev at ori.lev@protectdemocracy.org (Counsel for Plaintiffs) this 16th day of July, 2024.

s/ *Samantha Duke*
J. DAVID MARSEY
Florida Bar No.:  0010212
E-mail:  dmarsey@rumberger.com
NICOLE SIEB SMITH
Florida Bar No.:  0017056
E-mail:  nsmith@rumberger.com
JEFFREY J. GROSHOLZ
Florida Bar No.:  1018568
E-mail:  jgrosholz@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
101 North Monroe Street, Suite 1050
Tallahassee, Florida 32301
Tel:  850.222.6550
Fax:  850.222.8783
and

SAMANTHA DUKE
Florida Bar No. 0091403
Email:  sduke@rumberger.com
RUMBERGER, KIRK & CALDWELL, P.A.
300 S. Orange Ave., Suite 300
Orlando, Florida 32801
Tel:  407.872.7300
Fax: 407.841.2133
Attorneys for Defendants

8

Exhibit 18



Shalini Agarwal <shalini.agarwal@protectdemocracy.org>

---

## RE: PEN America, et al. v. Escambia County School Board - Service of Notices and Subpoenas [RKC-ACTIVE.FID3715510]

**Ori Lev** <ori.lev@protectdemocracy.org>                                    Tue, Oct 1, 2024 at 4:08 PM
To: "Smith, Nicole" <nsmith@rumberger.com>, Shalini Agarwal <shalini.agarwal@protectdemocracy.org>
Cc: Ellinor Heywood <ellinor.heywood@protectdemocracy.org>, "Grosholz, Jeffrey" <jgrosholz@rumberger.com>, "Duke, Samantha" <Sduke@rumberger.com>, "Marsey, David" <dmarsey@rumberger.com>, "Oberlander, Lynn" <oberlanderl@ballardspahr.com>, "Fehlan, Kirsten" <fehlank@ballardspahr.com>, "Bouzat, Facundo" <bouzatf@ballardspahr.com>, "Fields, Goldie" <fieldsg@ballardspahr.com>, "Kussmaul, Matthew" <KussmaulM@ballardspahr.com>, "Kilgarriff, Mike" <kilgarriffm@ballardspahr.com>, Ori Lev <ori.lev@protectdemocracy.org>, "Warren, Catherine J." <warrenc@ballardspahr.com>

Nicole,

Thank you for making time to meet and confer today.  We are happy to hear that you are now willing to (a) produce communications regarding the implementation of HB 1069 and (b) take further steps to identify responsive communications from the Board members' individual accounts and devices.

As you know, we are prepared to move to compel with regard to these issues.  The case management order states that the last day for moving to compel is 30 days before the "end of discovery."  We interpret that to mean 30 days before the end of <u>all</u> discovery (*i.e.*, October 26), not 30 days before the end of fact discovery (*i.e.* today).  We would like to take a few days to see if we can jointly agree on the scope of your proposed steps to comply with these discovery requests, and not move to compel today.  Therefore, **please confirm your agreement by EOD today** that, if we find it necessary to move to compel after continuing our discussions this week or after any subsequent production by the Board, you will not raise any argument that our motion is untimely.  Absent that agreement, we may move now to preserve our right to do so.

Many thanks,

Ori

---

**From:** Smith, Nicole <nsmith@rumberger.com>
**Date:** Monday, September 30, 2024 at 9:40 AM

[Quoted text hidden]

[Quoted text hidden]

# Exhibit 19



Shalini Agarwal <shalini.agarwal@protectdemocracy.org>

---

## RE: PEN America, et al. v. Escambia County School Board - Service of Notices and Subpoenas [RKC-ACTIVE.FID3715510]

**Smith, Nicole** <nsmith@rumberger.com>                    Tue, Oct 1, 2024 at 5:58 PM
To: Ori Lev <ori.lev@protectdemocracy.org>, Shalini Agarwal <shalini.agarwal@protectdemocracy.org>
Cc: Ellinor Heywood <ellinor.heywood@protectdemocracy.org>, "Grosholz, Jeffrey" <jgrosholz@rumberger.com>, "Duke, Samantha" <Sduke@rumberger.com>, "Marsey, David" <dmarsey@rumberger.com>, "Oberlander, Lynn" <oberlanderl@ballardspahr.com>, "Fehlan, Kirsten" <fehlank@ballardspahr.com>, "Bouzat, Facundo" <bouzatf@ballardspahr.com>, "Fields, Goldie" <fieldsg@ballardspahr.com>, "Kussmaul, Matthew" <KussmaulM@ballardspahr.com>, "Kilgarriff, Mike" <kilgarriffm@ballardspahr.com>, "Warren, Catherine J." <warrenc@ballardspahr.com>

Ori,

Just to clarify, we are maintaining our objections as to the 1069 issue but made the offer today to try to reach a compromise. We are prepared to defend against any motion to compel should Plaintiffs proceed with filing.

We had read the order as requiring motions to compel to be filed by today; however, we would not object to the parties having until 10/26/24 (or 30 days before the expert discovery deadline) to file such motions.

**Nicole Sieb Smith**
Attorney at Law
nsmith@rumberger.com | View my online bio

# Rumberger|Kirk

101 North Monroe Street    MAIN  850.222.6550
Suite 1050
Tallahassee, FL 32301

The information in this e-mail message is legally privileged and confidential information. If you have received this e-mail in error, please delete from any device/media where the message is stored.

---

**From:** Ori Lev <ori.lev@protectdemocracy.org>
**Sent:** Tuesday, October 1, 2024 4:08 PM
**To:** Smith, Nicole <nsmith@rumberger.com>; Shalini Agarwal <shalini.agarwal@protectdemocracy.org>
**Cc:** Ellinor Heywood <ellinor.heywood@protectdemocracy.org>; Grosholz, Jeffrey <jgrosholz@rumberger.com>; Duke, Samantha <Sduke@rumberger.com>; Marsey, David <dmarsey@rumberger.com>; Oberlander, Lynn <oberlanderl@ballardspahr.com>; Fehlan, Kirsten <fehlank@ballardspahr.com>; Bouzat, Facundo <bouzatf@ballardspahr.com>; Fields, Goldie <fieldsg@ballardspahr.com>; Kussmaul, Matthew <KussmaulM@ballardspahr.com>; Kilgarriff, Mike <kilgarriffm@ballardspahr.com>; Ori Lev <ori.lev@protectdemocracy.org>; Warren, Catherine J. <warrenc@ballardspahr.com>
**Subject:** Re: PEN America, et al. v. Escambia County School Board - Service of Notices and Subpoenas [RKC-ACTIVE.FID3715510]

Nicole,

Thank you for making time to meet and confer today. We are happy to hear that you are now willing to (a) produce communications regarding the implementation of HB 1069 and (b) take further steps to identify responsive communications from the Board members' individual accounts and devices.

As you know, we are prepared to move to compel with regard to these issues. The case management order states that the last day for moving to compel is 30 days before the "end of discovery." We interpret that to mean 30 days before the end of all discovery (*i.e.*, October 26), not 30 days before the end of fact discovery (*i.e.* today). We would like to take a few days to see if we can jointly agree on the scope of your proposed steps to comply with these discovery requests, and not move to compel today. Therefore, **please confirm your agreement by EOD today** that, if we find it necessary to move to compel after continuing our discussions this week or after any subsequent production by the Board, you will not raise any argument that our motion is untimely. Absent that agreement, we may move now to preserve our right to do so.

Many thanks,

Ori

---

**From:** Smith, Nicole <nsmith@rumberger.com>
**Date:** Monday, September 30, 2024 at 9:40 AM
**To:** Shalini Agarwal <shalini.agarwal@protectdemocracy.org>
**Cc:** Ellinor Heywood <ellinor.heywood@protectdemocracy.org>, Grosholz, Jeffrey <jgrosholz@rumberger.com>, Duke, Samantha <Sduke@rumberger.com>, Marsey, David <dmarsey@rumberger.com>, Ori Lev <ori.lev@protectdemocracy.org>, Oberlander, Lynn <oberlanderl@ballardspahr.com>, Fehlan, Kirsten <fehlank@ballardspahr.com>, Bouzat, Facundo <bouzatf@ballardspahr.com>, Fields, Goldie <fieldsg@ballardspahr.com>, Kussmaul, Matthew <KussmaulM@ballardspahr.com>, Kilgarriff, Mike <kilgarriffm@ballardspahr.com>
**Subject:** RE: PEN America, et al. v. Escambia County School Board - Service of Notices and Subpoenas [RKC-ACTIVE.FID3715510]

Hi Shalini, thanks, we are all safe here. I evacuated once the storm became a CAT 4. We lost power/internet and a few folks lost trees, but all in all Tally was spared. The only available time we have is tomorrow at 11:30 ET. Can your team please circulate the invite? Speak with you then.

**Nicole Sieb Smith**

Attorney at Law

nsmith@rumberger.com  |  View my online bio

**Rumberger|Kirk**

101 North Monroe Street    MAIN  850.222.6550
Suite 1050
Tallahassee, FL 32301

The information in this e-mail message is legally privileged and confidential information. If you have received this e-mail in error, please delete from any device/media where the message is stored.

**From:** Shalini Agarwal <shalini.agarwal@protectdemocracy.org>
**Sent:** Monday, September 30, 2024 8:18 AM
**To:** Smith, Nicole <nsmith@rumberger.com>
**Cc:** Ellinor Heywood <ellinor.heywood@protectdemocracy.org>; Grosholz, Jeffrey <jgrosholz@rumberger.com>; Duke, Samantha <Sduke@rumberger.com>; Marsey, David <dmarsey@rumberger.com>; Ori Lev <ori.lev@protectdemocracy.org>; Oberlander, Lynn <oberlanderl@ballardspahr.com>; Fehlan, Kirsten <fehlank@ballardspahr.com>; Bouzat, Facundo <bouzatf@ballardspahr.com>; Fields, Goldie <fieldsg@ballardspahr.com>; Kussmaul, Matthew <KussmaulM@ballardspahr.com>; Kilgarriff, Mike <kilgarriffm@ballardspahr.com>
**Subject:** Re: PEN America, et al. v. Escambia County School Board - Service of Notices and Subpoenas

Hi Nicole,

I hope you all are doing okay after the storm. So many close calls for Tallahassee, it feels like.

Just bumping this to the top of your inbox, as we'd like to get the meet and confer on the calendar today or tomorrow.

Thanks,

Shalini

Shalini Goel Agarwal (she/her - pronunciation)

Special Counsel, Protect Democracy

protectdemocracy.org | (850) 860-9344

*Sign up for our weekly email briefing: ifyoucankeep.it*

On Wed, Sep 25, 2024 at 5:09 PM Shalini Agarwal <shalini.agarwal@protectdemocracy.org> wrote:

> Dear Nicole,
>
> Understood, and good luck to all of you in getting through the storm.
>
> For our meeting next week, in addition to discussing (1) Mr. Leonard's deposition, we would also like to confer about a couple other items: (2) our unanswered discovery deficiency letter from August 29; and (3) Plaintiffs' proposed motion to amend the complaint.

Our proposed amended complaint would add a claim regarding the Board's indefinite delay in resolving the status of books (within the list of at-issue books Plaintiffs previously provided) restricted pursuant to HB 1069 as a distinct First Amendment injury, based upon new facts we learned from the Board's 30(b)(6) deposition.

We are available to meet Monday 1:00-3:30 and Tuesday 9:00-10:30 and 11:00-12:00. Please let us know when you are available.

In addition to that, we are planning to notice the deposition of Brian Alaback. Will use a placeholder date for now in the deposition notice, but please let us know when he is available.

Best,

Shalini

Shalini Goel Agarwal (she/her - pronunciation)

Special Counsel, Protect Democracy

protectdemocracy.org | (850) 860-9344

*Sign up for our weekly email briefing: ifyoucankeep.it*

On Wed, Sep 25, 2024 at 11:38 AM Smith, Nicole <nsmith@rumberger.com> wrote:

> Hi Shalini – I can confirm the dates and we look forward to receiving the depo notices. Of course this is subject to our MPO arguments for Leonard that we hopefully can resolve. We are preparing to possibly evacuate Tallahassee because of the hurricane. Our office will be closed tomorrow and likely Friday. Please send available dates for a meet and confer next week. Thanks.
>
>
> **Nicole Sieb Smith**
>
> Attorney at Law
>
> nsmith@rumberger.com | View my online bio
>
> **Rumberger|Kirk**
>
> 101 North Monroe Street     MAIN   850.222.6550
> Suite 1050
> Tallahassee, FL 32301

The information in this e-mail message is legally privileged and confidential information. If you have received this e-mail in error, please delete from any device/media where the message is stored.


**From:** Shalini Agarwal <shalini.agarwal@protectdemocracy.org>
**Sent:** Wednesday, September 25, 2024 10:57 AM
**To:** Smith, Nicole <nsmith@rumberger.com>
**Cc:** Ellinor Heywood <ellinor.heywood@protectdemocracy.org>; Grosholz, Jeffrey <jgrosholz@rumberger.com>; Duke, Samantha <Sduke@rumberger.com>; Marsey, David <dmarsey@rumberger.com>; Ori Lev <ori.lev@protectdemocracy.org>; Oberlander, Lynn <oberlanderl@ballardspahr.com>; Fehlan, Kirsten <fehlank@ballardspahr.com>; Bouzat, Facundo <bouzatf@ballardspahr.com>; Fields, Goldie <fieldsg@ballardspahr.com>; Kussmaul, Matthew <KussmaulM@ballardspahr.com>; Kilgarriff, Mike <kilgarriffm@ballardspahr.com>
**Subject:** Re: PEN America, et al. v. Escambia County School Board - Service of Notices and Subpoenas [RKC-ACTIVE.FID3715510]


Bumping again my email from last week as to my questions relating to Mr. Leonard's deposition.


Shalini Goel Agarwal (she/her - pronunciation)

Special Counsel, Protect Democracy

protectdemocracy.org | (850) 860-9344


*Sign up for our weekly email briefing: ifyoucankeep.it*


On Mon, Sep 23, 2024 at 4:08 PM Shalini Agarwal <shalini.agarwal@protectdemocracy.org> wrote:

> Hi Nicole,
>
>
> I'm writing again to follow up on this.
>
>
> My one update is our potential conflict on October 11 was resolved, so we are able to conduct Ms. Payne's deposition that date.  So the proposed schedule is as follows:
>
>
> Marcanio: 10/8
>
> Payne: 10/11
>
> Leonard: 10/17
>
>
> Amended deposition notices are forthcoming.
>
>
> Please also get back to me on my questions relating to Mr. Leonard's deposition so that we can resolve those well in advance of 10/17.

Thanks,

Shalini


Shalini Goel Agarwal (she/her - pronunciation)

Special Counsel, Protect Democracy

protectdemocracy.org | (850) 860-9344


*Sign up for our weekly email briefing: ifyoucankeep.it*


On Wed, Sep 18, 2024 at 8:57 PM Shalini Agarwal <shalini.agarwal@protectdemocracy.org> wrote:

Hi Nicole,


Just getting back to you on the deposition dates:

1. We are fine with moving forward with the Marcanio deposition on 10/8 and will send an amended deposition notice accordingly.
2. For Shenna Payne, does she have any availability the week of 10/14 or 10/21? We have a conflict on 10/11 because of another matter.  It may get resolved but we won't know until next week.
3. For Keith Leonard, we are fine with moving forward on 10/17, although we'd plan to do so via zoom and will send an amended deposition notice accordingly. Is Defendant planning to argue the same apex and legislative privilege arguments it made for Tim Smith and the board members and to seek essentially the same length/scope restrictions that it sought for the board members? And can you all articulate why you think the outcome for Leonard will not just follow whatever the court rules on the pending motions? Please let us know when you're available to meet and confer about this.

Best,

Shalini


Shalini Goel Agarwal (she/her - pronunciation)

Special Counsel, Protect Democracy

protectdemocracy.org | (850) 860-9344


*Sign up for our weekly email briefing: ifyoucankeep.it*


On Tue, Sep 17, 2024 at 4:09 PM Smith, Nicole <nsmith@rumberger.com> wrote:

As a follow up, Ms. Payne's assistant says 10/11 may be possible. Also, Jeff reminded me that Defendant had not pursued our MPO as to Mr. Leonard's deposition based upon Plaintiffs'

representation that they were not proceeding with his deposition. We agree to meet and confer to reach an agreement as to the length and scope of the deposition but we are not waiving our arguments as set forth in the motion. Thanks.

**Nicole Sieb Smith**

Attorney at Law

nsmith@rumberger.com | View my online bio

**Rumberger|Kirk**

101 North Monroe Street    MAIN  850.222.6550
Suite 1050
Tallahassee, FL 32301

The information in this e-mail message is legally privileged and confidential information. If you have received this e-mail in error, please delete from any device/media where the message is stored.

---

**From:** Smith, Nicole
**Sent:** Tuesday, September 17, 2024 3:41 PM
**To:** Ellinor Heywood <ellinor.heywood@protectdemocracy.org>; Grosholz, Jeffrey <jgrosholz@rumberger.com>; Duke, Samantha <Sduke@rumberger.com>; Marsey, David <dmarsey@rumberger.com>
**Cc:** Shalini Agarwal <shalini.agarwal@protectdemocracy.org>; Ori Lev <ori.lev@protectdemocracy.org>; Oberlander, Lynn <oberlanderl@ballardspahr.com>; Fehlan, Kirsten <fehlank@ballardspahr.com>; Bouzat, Facundo <bouzatf@ballardspahr.com>; Fields, Goldie <fieldsg@ballardspahr.com>; Kussmaul, Matthew <KussmaulM@ballardspahr.com>; Kilgarriff, Mike <kilgarriffm@ballardspahr.com>
**Subject:** RE: PEN America, et al. v. Escambia County School Board - Service of Notices and Subpoenas [RKC-ACTIVE.FID3715510]

Dear Shalini,

Our offices have worked well together in this case, so we're not sure why these depositions were unilaterally scheduled. We had held dates for Mr. Marcanio's deposition, previously agreed upon by the parties, which were never followed up on. Of the notices you served on Friday, Mr. Marcanio is available on 10/08. Mr. Leonard is available on 10/4 or 10/17. Ms. Payne is out of town, so we will let you know her availability.

**From:** Ellinor Heywood <ellinor.heywood@protectdemocracy.org>
**Sent:** Friday, September 13, 2024 5:11 PM
**To:** Smith, Nicole <nsmith@rumberger.com>; Grosholz, Jeffrey <jgrosholz@rumberger.com>; Duke, Samantha <Sduke@rumberger.com>; Marsey, David <dmarsey@rumberger.com>
**Cc:** Shalini Agarwal <shalini.agarwal@protectdemocracy.org>; Ori Lev

<ori.lev@protectdemocracy.org>; Oberlander, Lynn <oberlanderl@ballardspahr.com>; Fehlan, Kirsten <fehlank@ballardspahr.com>; Bouzat, Facundo <bouzatf@ballardspahr.com>; Fields, Goldie <fieldsg@ballardspahr.com>; Kussmaul, Matthew <KussmaulM@ballardspahr.com>; Kilgarriff, Mike <kilgarriffm@ballardspahr.com>
**Subject:** PEN America, et al. v. Escambia County School Board - Service of Notices and Subpoenas

Dear Counsel,

On behalf of Shalini Agarwal, please see the attached.

Sincerely,

Ellinor Heywood (hear my name)

*Impact Associate/Paralegal*

Protect Democracy

(771) 233-4580

*Sign up for our weekly email briefing: ifyoucankeep.it*

Exhibit 20

                                    **Shalini Agarwal <shalini.agarwal@protectdemocracy.org>**

---

## RE: Proposed Second Amended Complaint [RKC-ACTIVE.FID3715510]

**Smith, Nicole** <nsmith@rumberger.com>                          Thu, Oct 3, 2024 at 4:14 PM
To: Shalini Agarwal <shalini.agarwal@protectdemocracy.org>, "Duke, Samantha" <Sduke@rumberger.com>, "Grosholz, Jeffrey" <jgrosholz@rumberger.com>, "Marsey, David" <dmarsey@rumberger.com>
Cc: "Oberlander, Lynn" <oberlanderl@ballardspahr.com>, Ori Lev <ori.lev@protectdemocracy.org>, "Kussmaul, Matthew" <KussmaulM@ballardspahr.com>, Ellinor Heywood <ellinor.heywood@protectdemocracy.org>, "Kilgarriff, Mike" <kilgarriffm@ballardspahr.com>, "Petagna, Kristen" <petagnak@ballardspahr.com>, "Bouzat, Facundo" <bouzatf@ballardspahr.com>, "Fields, Goldie" <fieldsg@ballardspahr.com>, "Fehlan, Kirsten" <FehlanK@ballardspahr.com>, "Warren, Catherine J." <warrenc@ballardspahr.com>, "Relyea, Ryan R." <relyear@ballardspahr.com>

Hi Shalini – I am still reviewing the proposed complaint but can tell you that we oppose amending the complaint this late in the game. As we discussed, Defendant does not view this as a new, separate cause of action. To the extent it is a new claim, Defendant is entitled to additional discovery on the new count and other revisions to the complaint. I separately emailed you regarding discovery. We would oppose a dismissal without prejudice as to these authors without the imposition of costs. No objection to the one-week extension for the RFAs. Thanks.

**Nicole Sieb Smith**
Attorney at Law
nsmith@rumberger.com | View my online bio

## Rumberger|Kirk

101 North Monroe Street     MAIN  850.222.6550
Suite 1050
Tallahassee, FL 32301

The information in this e-mail message is legally privileged and confidential information. If you have received this e-mail in error, please delete from any device/media where the message is stored.

**From:** Shalini Agarwal <shalini.agarwal@protectdemocracy.org>
**Sent:** Thursday, October 3, 2024 10:18 AM
**To:** Smith, Nicole <nsmith@rumberger.com>; Duke, Samantha <Sduke@rumberger.com>; Grosholz, Jeffrey <jgrosholz@rumberger.com>; Marsey, David <dmarsey@rumberger.com>
**Cc:** Oberlander, Lynn <oberlanderl@ballardspahr.com>; Ori Lev <ori.lev@protectdemocracy.org>; Kussmaul, Matthew <KussmaulM@ballardspahr.com>; Ellinor Heywood <ellinor.heywood@protectdemocracy.org>; Kilgarriff, Mike <kilgarriffm@ballardspahr.com>; Petagna, Kristen <petagnak@ballardspahr.com>; Bouzat, Facundo <bouzatf@ballardspahr.com>; Fields, Goldie <fieldsg@ballardspahr.com>; Fehlan, Kirsten <FehlanK@ballardspahr.com>; Warren, Catherine J. <warrenc@ballardspahr.com>; Relyea, Ryan R. <relyear@ballardspahr.com>
**Subject:** Re: Proposed Second Amended Complaint

Hi Nicole,

Summarizing and clarifying the asks we have out to you right now:

(1) Please get back to us by tomorrow at 9:30 on the motion to amend.

(2) Please also get back to us by tomorrow at 9:30 as to whether Defendant will agree to our proposal on the discovery disputes.

(3) And please let us know by COB today if Defendant will jointly stipulate to a voluntary dismissal of Brannen and Levithan <u>without prejudice</u>. Unlike the previously dismissed Plaintiffs, we are not planning to dismiss Brannen and Levithan with prejudice, as their books are still subject to challenge and could easily go back to being restricted or even removed.

Apart from that, Plaintiffs are requesting a one-week extension to respond to the RFAs, so our responses would be due on October 14. Are you amenable to that?

Thanks,

Shalini

Shalini Goel Agarwal (she/her - pronunciation)

Special Counsel, Protect Democracy

protectdemocracy.org | (850) 860-9344

*Sign up for our weekly email briefing: ifyoucankeep.it*

On Wed, Oct 2, 2024 at 6:31 PM Shalini Agarwal <shalini.agarwal@protectdemocracy.org> wrote:

> I should add that, along with the amended complaint, we'd propose filing a joint stipulation of dismissal for author plaintiffs Brannen and Levithan because their books are no longer restricted. Please let us know if Defendant will agree to jointly stipulate.
>
> Shalini Goel Agarwal (she/her - pronunciation)
>
> Special Counsel, Protect Democracy
>
> protectdemocracy.org | (850) 860-9344
>
> *Sign up for our weekly email briefing: ifyoucankeep.it*
>
> On Wed, Oct 2, 2024 at 6:28 PM Shalini Agarwal <shalini.agarwal@protectdemocracy.org> wrote:
>
>> Dear Nicole,
>>
>> Please see attached our proposed second amended complaint in redline form, reflecting any changes from the complaint we filed last July. You will see, as we outlined in our meet and confer, that it adds a new third count based on Defendant's delay in resolving the books at issue which are now restricted under HB 1069.

**Please let us know by Friday, 10/4, at 9:30 a.m.** whether Defendant consents to Plaintiffs filing a motion to amend the complaint based on newly learned facts and developments. As we said yesterday, we do not believe this will require any extension of the discovery period or existing case deadlines.


We look forward to hearing from you.


Best,


Shalini


Shalini Goel Agarwal (she/her - pronunciation)

Special Counsel, Protect Democracy

protectdemocracy.org | (850) 860-9344


*Sign up for our weekly email briefing: ifyoucankeep.it*

Exhibit 21

**Protect Democracy**

Shalini Agarwal <shalini.agarwal@protectdemocracy.org>

---

## RE: Proposed Second Amended Complaint [RKC-ACTIVE.FID3715510]

**Shalini Agarwal** <shalini.agarwal@protectdemocracy.org>                                    Fri, Oct 4, 2024 at 9:37 AM
To: "Smith, Nicole " <nsmith@rumberger.com>
Cc: "Duke, Samantha" <Sduke@rumberger.com>, "Grosholz, Jeffrey" <jgrosholz@rumberger.com>, "Marsey, David"
<dmarsey@rumberger.com>, "Oberlander, Lynn" <oberlanderl@ballardspahr.com>, Ori Lev <ori.lev@protectdemocracy.org>,
"Kussmaul, Matthew" <KussmaulM@ballardspahr.com>, Ellinor Heywood <ellinor.heywood@protectdemocracy.org>,
"Kilgarriff, Mike" <kilgarriffm@ballardspahr.com>, "Petagna, Kristen" <petagnak@ballardspahr.com>, "Bouzat, Facundo"
<bouzatf@ballardspahr.com>, "Fields, Goldie" <fieldsg@ballardspahr.com>, "Fehlan, Kirsten" <FehlanK@ballardspahr.com>,
"Warren, Catherine J." <warrenc@ballardspahr.com>, "Relyea, Ryan R." <relyear@ballardspahr.com>

Nicole,

Thank you for your response. Two follow-up asks:

(1) Following up on my email from yesterday, please let us know this morning whether the parties' disagreement on the
search for school board members' personal communications also means that Defendant will no longer search for HB 1069
and other statutes in the emails it has already collected so that Plaintiffs will know what they need to move to compel on.

(2) As to Plaintiffs Brannen and Levithan, as you well know, they are prevailing parties entitled to receive costs from the
Board for the litigation they had to file in order for their books to be returned to the shelves. This is even more clear from
the Board's 30(b)(6) deponent testifying that the Board had no rhyme or reason for deciding whether to restrict challenged
titles (which it did for months) before voluntarily returning *Uncle Bobby's Wedding* and *Two Boys Kissing* to the
shelves. So we will certainly not agree to an imposition of costs as a condition for voluntary dismissal of these Plaintiffs'
claims without prejudice, which is the default.

And as you also know, because their books are still subject to challenge for "containing alternate sexualities" and "LGBTQ
push/indoctrination"—challenges that have not yet been resolved by the Board—Brannen and Levithan have a good
argument that their claims are not moot and capable of repetition yet evading review. Plaintiffs are stipulating to dismissal
of these two plaintiffs' claims in good faith to streamline the case.

Please let us know this morning if any of that changes the Board's position on the proposed voluntary dismissal without
prejudice.

Best,

Shalini

Shalini Goel Agarwal (she/her - pronunciation)
Special Counsel, Protect Democracy
protectdemocracy.org | (850) 860-9344

*Sign up for our weekly email briefing: ifyoucankeep.it*

On Thu, Oct 3, 2024 at 4:16 PM Smith, Nicole <nsmith@rumberger.com> wrote:
[Quoted text hidden]

Exhibit 22



Protect
Democracy

Ellinor Heywood <ellinor.heywood@protectdemocracy.org>

---

### RE: Proposed Second Amended Complaint [RKC-ACTIVE.FID3715510]

**Smith, Nicole** <nsmith@rumberger.com>                                    Fri, Oct 4, 2024 at 11:57 AM
To: Shalini Agarwal <shalini.agarwal@protectdemocracy.org>
Cc: "Duke, Samantha" <Sduke@rumberger.com>, "Grosholz, Jeffrey" <jgrosholz@rumberger.com>, "Marsey, David" <dmarsey@rumberger.com>, "Oberlander, Lynn" <oberlanderl@ballardspahr.com>, Ori Lev <ori.lev@protectdemocracy.org>, "Kussmaul, Matthew" <KussmaulM@ballardspahr.com>, Ellinor Heywood <ellinor.heywood@protectdemocracy.org>, "Kilgarriff, Mike" <kilgarriffm@ballardspahr.com>, "Petagna, Kristen" <petagnak@ballardspahr.com>, "Bouzat, Facundo" <bouzatf@ballardspahr.com>, "Fields, Goldie" <fieldsg@ballardspahr.com>, "Fehlan, Kirsten" <FehlanK@ballardspahr.com>, "Warren, Catherine J." <warrenc@ballardspahr.com>, "Relyea, Ryan R." <relyear@ballardspahr.com>

Shalini – I just received your voicemails. I am tied up today and cannot call. I do not believe that sending me proposed search terms on Wednesday late afternoon, me countering yesterday and Plaintiffs saying that you need to hear from us by noon today or you will file a motion to compel is meeting and conferring in good faith on that issue. We need an opportunity to go back to our client and discuss. Regardless, no, we are not tying the personal device searches to the separate email searches of communications regarding the three laws. We've already agreed to that and have begun the process so I trust Plaintiffs are not filing a motion on that issues where the parties have reached agreement. As for Brannen and Levithan, we certainly disagree that they have prevailed. The Board has already been forced to litigate and expend resources in this litigation regarding their claims; what we don't want to see is that they later come back and file a separate lawsuit on the same issues and the Board is forced to re-litigate. Plaintiffs should dismiss these Plaintiffs with prejudice; otherwise, we oppose the dismissal without prejudice. Thanks.

**Nicole Sieb Smith**
Attorney at Law
nsmith@rumberger.com | View my online bio

## Rumberger|Kirk

101 North Monroe Street     MAIN  850.222.6550
Suite 1050
Tallahassee, FL 32301

The information in this e-mail message is legally privileged and confidential information. If you have received this e-mail in error, please delete from any device/media where the message is stored.

**From:** Shalini Agarwal <shalini.agarwal@protectdemocracy.org>
**Sent:** Friday, October 4, 2024 9:37 AM
**To:** Smith, Nicole <nsmith@rumberger.com>
**Cc:** Duke, Samantha <Sduke@rumberger.com>; Grosholz, Jeffrey <jgrosholz@rumberger.com>; Marsey, David <dmarsey@rumberger.com>; Oberlander, Lynn <oberlanderl@ballardspahr.com>; Ori Lev <ori.lev@protectdemocracy.org>; Kussmaul, Matthew <KussmaulM@ballardspahr.com>; Ellinor Heywood <ellinor.heywood@protectdemocracy.org>; Kilgarriff, Mike <kilgarriffm@ballardspahr.com>; Petagna, Kristen <petagnak@ballardspahr.com>; Bouzat, Facundo <bouzatf@ballardspahr.com>; Fields, Goldie <fieldsg@ballardspahr.com>; Fehlan, Kirsten <FehlanK@ballardspahr.com>; Warren, Catherine J. <warrenc@ballardspahr.com>; Relyea, Ryan R. <relyear@ballardspahr.com>
**Subject:** Re: Proposed Second Amended Complaint [RKC-ACTIVE.FID3715510]

Nicole,

Thank you for your response. Two follow-up asks:

(1) Following up on my email from yesterday, please let us know this morning whether the parties' disagreement on the search for school board members' personal communications also means that Defendant will no longer search for HB 1069 and other statutes in the emails it has already collected so that Plaintiffs will know what they need to move to compel on.

(2) As to Plaintiffs Brannen and Levithan, as you well know, they are prevailing parties entitled to receive costs from the Board for the litigation they had to file in order for their books to be returned to the shelves. This is even more clear from the Board's 30(b)(6) deponent testifying that the Board had no rhyme or reason for deciding whether to restrict challenged titles (which it did for months) before voluntarily returning *Uncle Bobby's Wedding* and *Two Boys Kissing* to the shelves. So we will certainly not agree to an imposition of costs as a condition for voluntary dismissal of these Plaintiffs' claims without prejudice, which is the default.

And as you also know, because their books are still subject to challenge for "containing alternate sexualities" and "LGBTQ push/indoctrination"—challenges that have not yet been resolved by the Board—Brannen and Levithan have a good argument that their claims are not moot and capable of repetition yet evading review. Plaintiffs are stipulating to dismissal of these two plaintiffs' claims in good faith to streamline the case.

Please let us know this morning if any of that changes the Board's position on the proposed voluntary dismissal without prejudice.

Best,

Shalini

Shalini Goel Agarwal (she/her - pronunciation)

Special Counsel, Protect Democracy

protectdemocracy.org | (850) 860-9344

*Sign up for our weekly email briefing: ifyoucankeep.it*

On Thu, Oct 3, 2024 at 4:16 PM Smith, Nicole <nsmith@rumberger.com> wrote:
> Hi Shalini – I am still reviewing the proposed complaint but can tell you that we oppose amending the complaint this late in the game. As we discussed, Defendant does not view this as a new, separate cause of action. To the extent it is a new claim, Defendant is entitled to additional discovery on the new count and other

revisions to the complaint. I separately emailed you regarding discovery. We would oppose a dismissal without prejudice as to these authors without the imposition of costs. No objection to the one-week extension for the RFAs. Thanks.


**Nicole Sieb Smith**

Attorney at Law

nsmith@rumberger.com | View my online bio

# Rumberger|Kirk

101 North Monroe Street    MAIN   850.222.6550
Suite 1050
Tallahassee, FL 32301


The information in this e-mail message is legally privileged and confidential information. If you have received this e-mail in error, please delete from any device/media where the message is stored.

**From:** Shalini Agarwal <shalini.agarwal@protectdemocracy.org>
**Sent:** Thursday, October 3, 2024 10:18 AM
**To:** Smith, Nicole <nsmith@rumberger.com>; Duke, Samantha <Sduke@rumberger.com>; Grosholz, Jeffrey <jgrosholz@rumberger.com>; Marsey, David <dmarsey@rumberger.com>
**Cc:** Oberlander, Lynn <oberlanderl@ballardspahr.com>; Ori Lev <ori.lev@protectdemocracy.org>; Kussmaul, Matthew <KussmaulM@ballardspahr.com>; Ellinor Heywood <ellinor.heywood@protectdemocracy.org>; Kilgarriff, Mike <kilgarriffm@ballardspahr.com>; Petagna, Kristen <petagnak@ballardspahr.com>; Bouzat, Facundo <bouzatf@ballardspahr.com>; Fields, Goldie <fieldsg@ballardspahr.com>; Fehlan, Kirsten <FehlanK@ballardspahr.com>; Warren, Catherine J. <warrenc@ballardspahr.com>; Relyea, Ryan R. <relyear@ballardspahr.com>
**Subject:** Re: Proposed Second Amended Complaint


Hi Nicole,


Summarizing and clarifying the asks we have out to you right now:


(1) Please get back to us by tomorrow at 9:30 on the motion to amend.

(2) Please also get back to us by tomorrow at 9:30 as to whether Defendant will agree to our proposal on the discovery disputes.

(3) And please let us know by COB today if Defendant will jointly stipulate to a voluntary dismissal of Brannen and Levithan without prejudice. Unlike the previously dismissed Plaintiffs, we are not planning to dismiss Brannen and Levithan with prejudice, as their books are still subject to challenge and could easily go back to being restricted or even removed.


Apart from that, Plaintiffs are requesting a one-week extension to respond to the RFAs, so our responses would be due on October 14. Are you amenable to that?


Thanks,


Shalini


Shalini Goel Agarwal (she/her - pronunciation)

Special Counsel, Protect Democracy

protectdemocracy.org | (850) 860-9344


*Sign up for our weekly email briefing: ifyoucankeep.it*


On Wed, Oct 2, 2024 at 6:31 PM Shalini Agarwal <shalini.agarwal@protectdemocracy.org> wrote:

> I should add that, along with the amended complaint, we'd propose filing a joint stipulation of dismissal for author plaintiffs Brannen and Levithan because their books are no longer restricted. Please let us know if Defendant will agree to jointly stipulate.
>
>
> Shalini Goel Agarwal (she/her - pronunciation)
>
> Special Counsel, Protect Democracy
>
> protectdemocracy.org | (850) 860-9344
>
>
> *Sign up for our weekly email briefing: ifyoucankeep.it*

Exhibit 23



Ellinor Heywood <ellinor.heywood@protectdemocracy.org>

---

## RE: Proposed Second Amended Complaint [RKC-ACTIVE.FID3715510]

**Shalini Agarwal** <shalini.agarwal@protectdemocracy.org>                                          Fri, Oct 4, 2024 at 1:03 PM
To: "Smith, Nicole" <nsmith@rumberger.com>
Cc: "Duke, Samantha" <Sduke@rumberger.com>, "Grosholz, Jeffrey" <jgrosholz@rumberger.com>, "Marsey, David" <dmarsey@rumberger.com>, "Oberlander, Lynn"
<oberlanderl@ballardspahr.com>, Ori Lev <ori.lev@protectdemocracy.org>, "Kussmaul, Matthew" <KussmaulM@ballardspahr.com>, Ellinor Heywood
<ellinor.heywood@protectdemocracy.org>, "Kilgarriff, Mike" <kilgarriffm@ballardspahr.com>, "Petagna, Kristen" <petagnak@ballardspahr.com>, "Bouzat, Facundo"
<bouzatf@ballardspahr.com>, "Fields, Goldie" <fieldsg@ballardspahr.com>, "Fehlan, Kirsten" <FehlanK@ballardspahr.com>, "Warren, Catherine J." <warrenc@ballardspahr.com>, "Relyea,
Ryan R." <relyear@ballardspahr.com>

Dear Nicole,

Thanks for your response. We interpret your email to mean that the Board is now open to discussing the parameters and search terms we proposed for School Board Members' personal
communications. We view this as a positive development, as your email yesterday indicated that the Board was not open to producing anything except for what it had already collected
for *Parnell*. In light of that, we will not be moving today to compel discovery from the Board.

**So that we can timely resolve this, please let us know in writing by Tuesday, October 8, which of the parameters and search terms proposed by Plaintiffs that the Board will
agree to.**

**And we would like to set up a meet and confer discussion with you all on Wednesday, October 9, to resolve any disputes about the searches so that Defendant can produce
the requested documents by October 14.** We are available on October 9 at 10:30-11:00, 12:00-1:00, and 2:30-4:00. We understand that the October 14 production date is with the
exception of Kevin Adams' communications as he is out of the country. Depending on the date of his return, the parties will determine a reasonable date for the production of his
communications.

We appreciate your confirmation that any dispute about searches for the School Board Members' personal communications does not affect the Board's agreement to search
communications as to the three laws and will thus not be moving to compel on HB 1069-related documents and information at this time.

As to the dismissal of claims by Plaintiffs Brannen and Levithan, we can agree they will not file future claims regarding the past restriction of their books by Defendant. We are happy to
enter into a stipulation to this effect. However, as their books are still under challenges that need to be resolved by Defendant, they are reserving their rights to bring claims as to any future
restriction or removal of their books, depending on how the Defendant resolves the book challenges. **Please let us know if that resolves our disagreement on the dismissal.**

Best,

Shalini

Shalini Goel Agarwal (she/her - *pronunciation*)
Special Counsel, Protect Democracy
*protectdemocracy.org* | (850) 860-9344

*Sign up for our weekly email briefing: ifyoucankeep.it*

On Fri, Oct 4, 2024 at 11:58 AM Smith, Nicole <nsmith@rumberger.com> wrote:
[Quoted text hidden]

Exhibit 24

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
Pensacola Division

PEN AMERICAN CENTER, INC.,
et al.,
   Plaintiffs,

v.          Case No:  23-CV-10385-TKW-ZCB

ESCAMBIA COUNTY SCHOOL
BOARD,
   Defendant.

_____

VIDEO RECORDED DEPOSITION OF:
**MICHELLE WHITE**

DATE TAKEN: July 22, 2024

TIME:   9:07 a.m. to 5:40 p.m. Central Time

LOCATION: Clark Partington
     125 E. Intendencia Street
     Fourth Floor
     Pensacola, Florida 32502

Reported by:

Melissa A. Odom
RDR, FPR-C, AL-CCR
314 N. Spring Street, Suite A
Pensacola, Florida 32501
acourtrep@gmail.com  850 626-0043

1    I do believe that we asked schools not to use that title until the review

2    was complete, but that was at the end of the school year anyway.  But

3    the process for any challenge at that time was titles were not to be

4    restricted during the review.

11:09:41    5    Q.    So that was for a novel study for, for class.  You said you asked

6    schools not to use that title.  You mean not to use for instruction?

7    A.    Right.

8    Q.    But they were still free to have it in the library?

9    A.    They were free to have in library, they were free to have it in their

11:10:01    10    classroom libraries, just not to use it as a novel study.

11    Q.    Okay.  And then, according to -- so, in this lawsuit we're only,

12    we're focusing on a certain subset of books, ten books that ultimately

13    were removed by the school district after the committee process

14    determined that the books should be available, and as well as a number

11:10:18    15    of books that were restricted.  So I'm just going to talk to you about

16    some of the removed books and when they were challenged.

17         So I have here that for the next school year, August 1st, 2022,

18    the *All Boys Aren't Blue* and *The Bluest Eye* were challenged.  Do you

19    know if those books were placed on restricted access at the time that

11:10:41    20    they were challenged?

21    A.    I don't think so.  I don't know the -- I do not recall the time line of

22    when the superintendent decided to restrict all challenged materials.

23    Q.    And we would, the way you could figure that out is if he made

24    some sort of an announcement about it?

11:11:08    25    A.    It was at a -- there was an announcement.  There was an email

1    that went out instructing schools of what they were responsible to do.

2    There was a Google Form for it to show compliance.  I believe that

3    school board members were made aware.

4    Q.    Okay.  So we'll, I think, turn to the email in a bit, so hopefully,

5    we'll get the time line straight and then compare it to when these

6    particular books were challenged.

7        When the superintendent announced this restricted access

8    policy, was that with respect to any challenge?

9    A.    All challenges.

10   Q.    And the policy was that, any book that was challenged would be

11   on restricted access until the challenge was resolved?

12   A.    Yes.

13   Q.    Okay.  Were particular subject matters given greater scrutiny?

14        MS. SMITH:  Form.

15   A.    At that point in time it was any challenged book was restricted.

16   Q.    Okay.  Do you know why that policy was developed?

17        MS. SMITH:  Form.

18   A.    I remember being in that meeting and the decision, there was a

19   lot of discussion about process and what to do.  And the decision was

20   just to restrict everything.  Rather than pulling out this book versus that

21   book, restrict everything.

22   Q.    And that meeting was a meeting between you and the

23   superintendent?

24   A.    That was me, superintendent, deputy superintendent, Ellen

25   Odom, Mr. Marcanio, and I would imagine Mr. Alaback.

1    Q.    Did you have any kind of reaction to that announcement?

2    A.    It went against best practices and our current policy, but at the

3    end of the day that was their decision and that's what I implemented.

4    Q.    Did you explain that it went against best practices at that

5    meeting?

6    A.    I did.

7    Q.    What was the response?

8    A.    This is how we're going to move forward.

9    Q.    Did folks explain sort of like what is the -- what was motivating

10   that decision at that meeting?

11   A.    I know we were getting a lot of emails from Ms. Baggett about

12   continued access to the materials, and those emails were also being

13   copied to board members so I think there was pressure to restrict the

14   title.  And so the decision was rather than restricting some versus

15   others, restrict all.

16   Q.    Okay.  Did that policy of restricting all books upon being

17   challenged ever change?

18   A.    It did.  There was a challenge to the Bible, and I followed policy,

19   which was restrict all challenged books.  So it was restricted based on

20   policy at that time.  And then there was pushback from the community

21   and board members, and I was asked to not restrict the title.  I said I

22   would not violate our policy without other grounds to treat the Bible

23   differently.

24        Then I did get a phone call with citing a specific statute, the using

25   the Bible as a instruction material, and therefore the Bible did not need

1    to go through a challenge process and could remain on the shelf.

2    Q.    Who was the phone call from?

3    A.    That one was from Sheena Payne.

4    Q.    So Dr. Smith had made that determination?

5

6          MS. SMITH:  Objection; form.

7    A.    When I got the phone call to remove it from restricted access,

8    that was the decision that Dr. Smith had made in consultation with

9    others.

10   Q.    Do you know who else?

11   A.    I do not.

12   Q.    Okay.  And Ms. Payne didn't represent who the others were?

13   A.    No.

14   Q.    Okay.  So apart from the determination --

15   A.    Oh.

16   Q.    Sorry, go ahead.

17   A.    Okay.  So that was, when that decision was made, then that was

18   at a point in time where the policy was under review for adoption by the

19   school board, and the decision was made to not restrict all challenged

20   titles, but to only restrict titles that were challenged for containing

21   materials in violation of the 847.012 and harmful to minors.

22   Q.    Do you know how -- were you given any instruction on how to

23   interpret that?  because I imagine some of the challenge forms didn't

24   say, I'm challenging this because it violates 847.012 or that it's harmful

25   to miners.  How were you to apply that?

70

A.     I was told to use professional judgment and in consultation with
Dr. Smith to make those determinations, based on what was in the
challenge or professional views or my own personal knowledge about a
particular title.

Q.     Okay, so I'm just trying to follow the time line.  So initially was
restrict -- initially it was books not restricted pendency of challenge.
Then it's the challenged book, all the challenge books will be restricted.
Then the determination was the Bible should not be restricted based on
a separate statute.  And then while the policy was under review, they
were to restrict only for 847.012, based on your professional judgment in
consultation with Dr. Smith.

Were there any further changes to that restriction policy after
that?

A.     Not to the policy.

Q.     How about the practice?

A.     When the -- that decision was made to only restrict titles in
violation of the statute, I was directed to go through all of the challenged
books and make a recommendation of whether or not a title is to be
restricted.

I went through all of the titles and I had a list of titles for
restriction based on the complaint.  I had a list of titles unrestricted and
a list of titles that I had my opinion, but I could see where someone else
might think differently.  And I then based on sexual conduct.  And then I
had a list of titles that in elementary school were challenged for sexual
identity, sexual orientation, that I had my recommendation and then

1    asked for Dr. Smith to make his recommendation.

2            He came to my office.  I had physical copies of each of those on

3    the fence, and he made the final decision of where to place them.

4    Some he took copies to read or explore more, others we decided right at

11:19:21    5    that time.  And then that was for at that time when we had multiple titles.

6            From that point forward, if when a challenge was submitted to,

7    because of speed to make decisions and having time to communicate

8    with the superintendent, I would make decisions based on our previous

9    conversations and outcomes and inform him, and then if he wanted to

11:19:49    10    make a change, we could make a change.

11    Q.    Okay.  Were there any changes after that to the restrictions

12    process?

13            MS. SMITH:  Form.

14    A.    Not at that point in time.  When House Bill 1069 passed, and this

11:20:18    15    was just before I left my position, the parents would not have an

16    opportunity to give permission for a child to read a book challenged for

17    violation of 847.012 or sexual conduct in subsection 19.  They could no

18    longer -- we could no longer provide parents an opportunity to give

19    permission to read those books.

11:20:45    20    Q.    Okay.  So going back to your process when you would make a

21    recommendation to Dr. Smith or you all would confer about it, you

22    mentioned that for elementary schools if a -- I guess in terms of those

23    discussions and your recommendation, was that based on a review of

24    the book or based on a review of the challenge?

11:21:10    25    A.    Both.

1    Q.    Okay.  So did you read all these books that were involved in, you

2    know, the many challenges that were submitted?

3    A.    Some I have.  I hadn't read all.  So if I hadn't read it, I had to go

4    based on the challenge and professional reviews.

11:21:28    5    Q.    Okay.  You mention that for books in the elementary school

6    libraries, if the challenge was based on sexual identity or sexual

7    orientation, that that was a separate basis for restriction.  Is that

8    accurate?

9    A.    Yes.

11:21:50    10    Q.    Why is that?

11    A.    At that point in time Dr. Smith was unsure about how, what was

12    the House Bill --

13    Q.    1557?

14    A.    Yeah.

11:22:08    15    -- 1557 applied to self-selected library materials.  I shared

16    documentation released by the state, I shared my own personal

17    opinions, and he made the decision to restrict them pending review.

18    Q.    Okay.  So I take it you disagreed with his determination that they

19    should be restricted?

11:22:24    20    A.    I disagreed that they should be restricted for purely that content.

21    Now if it was age inappropriate, that's different.  But if it simply was

22    because of the characters in the book, then my recommendation was

23    no.

24    Q.    Did you try to get clarification about the application of 1557 to

11:22:44    25    library books?

1    A.    The most clarification we had was the state's response to a

2    lawsuit, and they gave specific definitions for what instruction is, what

3    classroom instruction, and in no way did that response back from the

4    state address library materials.  It was all instruction and it gave very

11:23:10    5    specific definitions of what that was.

6    Q.    And so when you showed that to Dr. Smith, did he then agree

7    that it was okay not to restrict books challenged based on sexual identity

8    or sexual orientation for elementary school libraries?

9    A.    No, he still wanted them restricted.

11:23:27    10    Q.    Did that policy ever change or that practice?

11    A.    No.

12        MS. SMITH:  Objection; form, to the last question.

13    Q.    Okay.

14    A.    It didn't change during my tenure.

11:23:45    15        MS. AGARWAL:  I'm going to take just a couple minutes'

16    break and then we'll come back.

17        VIDEOGRAPHER:  Going off the record.  It is 11:21 a.m.

18        (Recess taken 11:21 a.m. to 11:33 a.m.)

19        VIDEOGRAPHER:  We're back on the record, it is 11:33 a.m.

11:34:40    20    BY MS. AGARWAL:

21    Q.    Ms. White, you had mentioned that you were making

22    recommendations about the restricted, which books should be restricted

23    or not restricted, and ones where you could see an argument for being

24    restricted, even if you didn't necessarily agree.  What was the basis for

11:35:29    25    how you made those determinations?