# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| PEN AMERICAN CENTER, INC., BENJAMIN GLASS, on behalf of himself and his minor child, GEORGE M. JOHNSON, KYLE LUKOFF, ANN NOVAKOWSKI, on behalf of herself and her minor child, PENGUIN RANDOM HOUSE LLC, SEAN PARKER, on behalf of himself and his minor child, ASHLEY HOPE PÉREZ, and CHRISTOPHER SCOTT SATTERWHITE, on behalf of himself and his minor child, <br><br> *Plaintiffs*, <br><br> v. <br><br> ESCAMBIA COUNTY SCHOOL BOARD, <br><br> *Defendant*. | CASE NO.: 3:23-CV-10385-TKW-ZCB <br><br><br> JURY TRIAL DEMANDED |

## <u>SECOND AMENDED COMPLAINT</u>

This lawsuit, on behalf of PEN American Center, Inc. ("PEN America"), select book authors, a book publisher, and a number of parents of students attending public schools in Escambia County (collectively, "Plaintiffs"), challenges the decisions of the Escambia County School Board (the "School Board") to remove and restrict books from public school libraries within the Escambia County School District (the "School District"). The School Board has done so based on its disagreements with the ideas expressed in those books. In every decision to

remove a book, the School Board sided with a challenger expressing openly discriminatory bases for the challenge, overruling in the process the recommendations of review committees at the district level. These restrictions and removals have disproportionately targeted books by or about people of color and/or LGBTQ people, and have prescribed an orthodoxy of opinion that violates the First and Fourteenth Amendment. In addition, the School Board has adopted a policy and practice of indefinitely restricting access to challenged books that may contain depictions or descriptions of sexual conduct, resulting in many books having been unavailable to students—in many cases for two years now. The School Board's failure to adopt and implement a timely and effective process for resolution of the book challenges violates the First Amendment by indefinitely suppressing protected speech and effectively providing a heckler's veto over school library materials.

## I.    INTRODUCTION

1.    The Supreme Court has long recognized that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools," which serve as a "marketplace of ideas." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969). That is because "the Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through

any kind of authoritative selection." *Id.* (cleaned up).

2.     School libraries, where students discover new areas of interest and engage in voluntary inquiry outside the context of required curriculum, are an essential part of this exchange of ideas.

3.     While school administrators concededly "possess significant discretion to determine the content of their school libraries," including determining whether books are age-appropriate, that "discretion may not be exercised in a ***narrowly partisan or political manner***." *Board of Education v. Pico*, 457 U.S. 853, 870 (1982) (emphasis added).  That is because "[o]ur Constitution does not permit the official suppression of ideas." *Id.* at 871.  Accordingly, the First Amendment bars a school district from removing books from school libraries, or restricting access to such books, based on political or ideological disagreement with the ideas they express.

4.     Moreover, in the First Amendment context, "[a] scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 227 (1990).

5.     Plaintiffs bring this lawsuit because that is exactly what is happening in Escambia County.  Books are being ordered removed from libraries, or subject to restricted access within those libraries, based on ideologically-driven efforts to

3

push certain ideas out of schools.  Even though parents can already opt their child out of having access to particular books, the School Board is summarily ordering the district-wide removal of books based on the openly ideological, political, and discriminatory views of a small minority and *against* the recommendations of review committees—composed of parents, teachers, principals, media specialists, and other community members within the School District—that follow a robust review process focused on whether materials are age-appropriate and educational. This disregard for professional deliberation and guidance underscores that the removals are ideological and political, not pedagogical.

6.    In addition, the School Board has failed to set reasonable time limits on deciding whether challenged books contain depictions or descriptions of sexual conduct and, if they do, for what grade levels or age groups such books are appropriate.

7.    As a result, the School Board is depriving students of access to a wide range of viewpoints, and depriving the authors and publishers of the removed and restricted books of the opportunity to engage with readers and disseminate their ideas to their intended audiences.  Such viewpoint discrimination and indefinite delay resulting in the extended suppression of protected speech violates the First Amendment.

8.    Today, Escambia County seeks to remove or limit access to books a small minority views as too "woke."  In the 1970s, schools sought to bar books by Langston Hughes (among others).    Tomorrow, it could be books about Christianity,[1] the country's founders, or our nation's war heroes.  All of these removals run afoul of the First Amendment, which is rightly disinterested in the cause du jour.

9.    The plaintiffs bringing this suit include (a) PEN American Center, a nonprofit member-based organization that represents authors throughout the United States, including authors whose books have been removed from libraries in the School District and authors whose books have been targeted for future removal and have been subjected to indefinite restricted access in the meantime; (b) authors whose books have been removed from or subjected to indefinite restricted access in School District libraries; (c) Penguin Random House LLC ("PRH"), the publisher of many books that have been ordered removed from, or subjected to indefinite restricted access in, School District libraries; and (d) parents of students who attend

---

[1] Notably, the Bible has been subject to challenge in Escambia County public school libraries, although it was not removed because it is authorized as an appropriate educational resource under a separate Florida statute.  But, in other jurisdictions, book challenges had resulted in the removal of the Bible from public school libraries.  *See* Tilda Wilson, A Utah school district has removed the Bible from some schools' shelves, NPR, June 2, 2023, https://www.npr.org/2023/06/02/1179906120/utah-bible-book-challenge.

schools in the School District, who are suing on behalf of both themselves and their minor children for access to removed and indefinitely restricted books.

10.    The plaintiffs have joined together in this lawsuit to vindicate the rights of parents, students, authors, and book publishers to ensure that public school libraries continue to serve all communities and provide spaces dedicated to the exploration and dissemination of a wide variety of ideas, points of view, and experiences, free from viewpoint discrimination and arbitrary and indefinite suppression of speech.

## II.    PARTIES

### A.    **Plaintiffs**

11.    Plaintiff PEN American Center ("PEN America") is a nonprofit membership organization headquartered in New York.  Founded in 1922, PEN America works to ensure that people everywhere have the freedom to create literature, to convey information and ideas, to express their views, and to access the views, ideas, and literatures of others.  PEN America's membership is made up of more than 5,000 novelists, journalists, nonfiction writers, editors, poets, essayists, playwrights, publishers, translators, agents, and other writing professionals. Members of PEN America live in every state in the country.

12.    PEN America operates "Free Expression Programs" that serve to defend writers and journalists and protect free expression rights in the United

States and around the world.  These efforts typically include research and reports, public advocacy, and campaigns on behalf of particular policy issues or individuals.  Topics for these programs have included campus free speech, online harassment, and writers and artists facing political persecution abroad.

13.    PEN America's mission is to unite writers and their allies to celebrate creative expression and defend the liberties that make it possible.  Historically, this has included work to celebrate literature through awards, grants and public programming, offering public support for threatened writers, and seeking to bolster the freedom of expression worldwide.  Since approximately 2021, with the rise of efforts to remove and restrict books in K-12 public school libraries, PEN America began dedicating time to documenting these removals and restrictions; publishing periodic reports on book bans as part of the *Banned in the USA* series; and working with authors and community members to raise public awareness of the harms of educational censorship.   The prolific book removals and restrictions by the Escambia County School Board further pulled PEN America away from other programming.  PEN America's work to address book removals and restrictions has only increased in recent years as many school districts and states have followed Defendant's lead.

14.    PEN America includes among its members many authors whose books have been removed or subject to restricted access within the School District.

7

These include each of the Author Plaintiffs, as well as other award-winning authors such as Margaret Atwood, Judy Blume, Alex Gino, John Green, Khaled Hosseini, Susan Kuklin, and Jodi Picoult.

15.    Plaintiffs George M. Johnson, Kyle Lukoff, and Ashely Hope Pérez (collectively, the "Author Plaintiffs") are each authors whose books have either been removed from libraries within the School District, or are currently targeted for such removal and subject to indefinite restricted access during the review period.

16.    Plaintiff Johnson is a resident of California and Black and non-binary; they are the author of young adult books.  Johnson's book *All Boys Aren't Blue* is a "memoir of growing up Black and gay" in the form of a series of coming-of-age essays.  *All Boys Aren't Blue* was challenged in September 2022.  Despite a unanimous vote by the district review committee in favor of retaining the book in high school libraries, the School Board voted to remove *All Boys Aren't Blue* from all libraries on February 20, 2023.

17.    Plaintiff Lukoff is a Pennsylvania resident.  He is a white, transgender man, and the author of multiple children's books.  Prior to becoming a published author, he was an elementary school librarian.  His book *When Aidan Became a Brother* was challenged in September 2022.  Despite a district review committee recommending 4–1 that the book be retained in libraries at all levels, the School

Board voted to remove *When Aidan Became a Brother* from all libraries on February 20, 2023.

18.    Plaintiff Pérez is a white woman and resident of Ohio.  She is an author of young adult fiction, a former public school teacher of high school English, and, currently, a literature professor at The Ohio State University.  Her book *Out of Darkness*, which was previously generally accessible within high school libraries in the School District, was challenged in late August 2022, and is currently subject to indefinite restricted access pending review of the challenge.  No schedule has been set for the review of *Out of Darkness*.

19.    For each Author Plaintiff, public school libraries are a critical means of reaching their intended audiences and obtaining the broadest possible readership.  Accordingly, it causes serious harm for them, personally and professionally, for their books to be removed from public school libraries or subject to restricted access within such libraries.

20.    Plaintiff PRH is a Delaware Limited Liability Corporation headquartered in New York.  It is a general interest publisher committed to publishing books for everyone.  Two books published by PRH have already been removed from some School District libraries:  *The Bluest Eye* by Toni Morrison and *Push* by Sapphire.

21.     Several more books published by PRH have been targeted for removal and are currently subject to indefinite restricted access pending completion of the review process.  Among such books are: *Beloved* by Toni Morrison, *The Freedom Writers Diary: How a Teacher and 150 Teens Used Writing to Change Themselves and the World Around Them* by Erin Gruwell, *The God of Small Things* by Arundhati Roy, *The Handmaid's Tale* by Margaret Atwood,  *The Kite Runner* by Khaled Hosseini, and *Slaughterhouse-Five* by Kurt Vonnegut.

22.     PRH's mission is to lay the seeds for the future of reading for generations to come by promoting literacy, giving voice to many and varied experiences and stories and fostering empathy and inspiring free and open debate. PRH aims to publish books that provide children with a gateway to the whole world.  Continued inclusion in public school libraries is critical to PRH's mission.

23.     Plaintiffs Benjamin Glass, Ann Novakowski, Sean Parker, and Christopher Scott Satterwhite (collectively, the "Parent Plaintiffs") are parents of students currently attending elementary or high schools in the School District. They bring these claims both on behalf of themselves, as parents who want their children to have access to books that have been removed from, or indefinitely restricted within, their children's or other schools' library, and their minor children, who also want such access.

24.    Plaintiff Glass is white and a Florida resident.  He is the father, next of friend, and general guardian of a ninth grade student at Washington High School in the School District.  In the current school year, his daughter wants to check out specific books from her school library that are currently unavailable because they have been removed or indefinitely restricted.  In addition, Glass wants his child to have access to these books, and others like them, among other reasons, so that she is exposed to the dangers of sexual assault and the importance of consent, and, thus, better prepared to navigate these issues.  He further sees value in her reading about the intersection between stories about minority communities and stories involving sexual assault so that she will appreciate the unique challenges that people from other backgrounds face.

25.    Plaintiff Novakowski is white and a Florida resident.  She is the mother, next of friend, and general guardian of a second grade student at A.K. Suter Elementary School in the School District.  In the current school year, her child wants to check out specific books from her school library that are currently unavailable because they have been removed or indefinitely restricted.  In addition, Novakowski wants her child to have access to these books, and others like them, among other reasons, so that she is presented with different viewpoints and experiences and, thus, better prepared to engage with a wide range of people.

26.     Plaintiff Parker is Black and a Florida resident.  He is the father, next of friend, and general guardian of a ninth grade student at Pine Forest High School in the School District.  In the current school year, his child wants to check out specific books from his school library that are currently unavailable because they have been removed or indefinitely restricted.  In addition, Parker wants his child to have access to these books, and others like them, among other reasons, in order to be exposed to books by and about Black people to help him develop a stronger sense of his cultural identity.

27.     Plaintiff Satterwhite is biracial and a Florida resident.  He is the father, next of friend, and general guardian of an eleventh grade student at Pensacola High School in the School District.  In the current school year, his son wants to check out specific books from his school library that are currently unavailable because they have been removed or indefinitely restricted.  In addition, Satterwhite wants his son to have access to these books, and others like them, so that he can use his school experience to explore Black history and a wide array of other subjects and experiences based on his own interests.

28.     For each Parent Plaintiff, they have a fundamental right to direct their child's upbringing and an interest in public school libraries not removing or indefinitely restricting books by and about people of color and LGBTQ individuals, suggesting that these identities and discussions about them are taboo

and preventing their children from coming across such books in the school library. Accordingly, it causes serious harm for the Parent Plaintiffs' interest in directing their child's education for the Board to remove or restrict these books.

### B.    Defendant

29.    Defendant School Board is the five-member governing body of the School District, elected from geographical districts within Escambia County.

30.    The School Board oversees and manages all schools within the School District, and, by statute, has the capacity to sue and be sued.

## III.    JURISDICTION AND VENUE

31.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the First and Fourteenth Amendments to the United States Constitution, and under 42 U.S.C. § 1983.

32.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because the Defendant resides in this district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## IV.    FACTUAL ALLEGATIONS

### A.    The Unique and Important Function of Public School Libraries

33.    Libraries occupy a unique and important role within public schools. Like schools more generally, school libraries are spaces for learning and the exploration of ideas.  But, unlike a structured classroom setting, libraries afford

13

students opportunities to learn and explore ideas in self-directed ways, guided by their own interests, curiosities, and questions about the world. They provide students with the opportunity to engage with and explore new and unfamiliar perspectives and ideas, as well as to see representations of their own experiences, communities, and ideas.

34.    As the Supreme Court has emphasized, it is fundamental to our understanding of what schools are that "students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding." *Pico*, 457 U.S. at 868. And, "***[t]he school library is the principal locus of such freedom***." *Id.* at 869 (emphasis added). That is because, "in the school library a student can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum. The student learns that a library is a place to test or expand upon ideas presented to him, in or out of the classroom." *Id.* (cleaned up).

35.    Accordingly, public school libraries are crucial spaces for student learning. In libraries, students can explore their own interests, and encounter different ideas and experiences in ways that help prepare them for citizenship in our diverse, democratic society.

36.    The School Board's own Policy Manual reflects this understanding of the role and purpose of school libraries. It provides that one of the "function[s]" of

libraries within the School District "is to contribute to the development of informed and responsible citizens," and that "[i]t is the duty of the [School] District to provide a wide range of materials of different levels of difficulty, with diversity of appeal and representing different points of view taking into account the varied interests, abilities, and maturity levels of the pupils being served." Ex. 1 at 9.

37.    The Policy Manual further provides that "school libraries media centers . . . shall," *inter alia*, "provide education media that reflects differing and/or opposing viewpoints; [and] provide materials which reflect the ideas and beliefs of many ethnic, religious, and political groups that have contributed to . . . American and world heritage and culture." *Id.* at 8-9.

38.    School libraries are also of great importance to book authors and book publishers, especially with regard to books aimed at children and young adults. The right to speak means little without the ability to reach listeners. It is, thus, extraordinarily important to book authors and book publishers that their books continue to be fully accessible in public school libraries. This is especially so with respect to those students who lack easy access to books and learning material outside of school. For such students, public school libraries may be the only way for them to access an author's or publisher's book.

B.    **The Push to Remove Books**

39.    The wave of book removals and restrictions at issue in this lawsuit began on or about May 23, 2022.  On that date, Vicki Baggett, a language arts teacher at the School District's Northview High School, filled out a form for the "Request for the Reconsideration of Educational Media."  This would be the beginning of what turned out to be a widespread—and largely successful—campaign to restrict access to books throughout the School District.

40.    Baggett's efforts have borrowed heavily from, and formed part of, a national campaign to remove books from public school libraries based on ideological objections to their contents, particularly, their exploration of themes related to race and/or LGBTQ identity.

41.    That campaign has been spearheaded by certain national organizations, such as the Florida-based "Moms for Liberty."  Moms for Liberty is a politically conservative organization that is focused on combating what it describes as the "woke" influence in public schools.  The organization shares and disseminates lists of books it finds politically objectionable, and urges individuals to seek the removal of those books from school libraries.

42.    Baggett has since spoken at a Moms for Liberty meeting in neighboring Santa Rosa County about her efforts to remove books in Escambia

County public schools and reportedly "shared tips on how to get content removed."[2]

43.    The subject of the first form Baggett filled out was *The Perks of Being a Wallflower* ("*Wallflower*") by Stephen Chbosky.  Baggett objected to the book's inclusion in classroom sets for potential use as an optional novel for study in high schools.[3]

*44.*    *Wallflower*, based on the author's own experiences growing up in suburban Pittsburgh in the 1980s, deals with common adolescent struggles, including drugs, sexuality, mental illness, and family difficulties, and the characters' personal growth past these challenges.

45.    Baggett would later admit that she had not heard of *Wallflower* prior to her efforts to prevent it from being read in the School District.  It appears that

---

[2]  Romi White, *New Legislation Will Help Local Moms for Liberty More Quickly Remove Pornographic Materials from Schools*, South Santa Rosa News, May 31, 2023, https://ssrnews.com/new-legislation-will-help-local-moms-for-liberty-more-quickly-remove-pornographic-material-from-schools/.

[3] Plaintiffs' claims in this action do not involve, rely on, or challenge any action taken by Defendants with respect to any classroom curricular materials, whether optional or required—including any decisions regarding the inclusion of *Wallflower* in the curriculum.  Plaintiffs' claims are limited solely to the removal of materials from the School District's libraries, and/or the restriction of access to such materials within such libraries.

the book came to her attention only because it was one of the books that has been frequently targeted for removal or restriction in recent years.

46.    Following Baggett's challenge, in July 2022, a panel consisting of Northview leadership, faculty, staff, and a parent reviewed the book, discussed its use, and voted 4–3 to retain *Wallflower* as optional study material, noting that "[t]he concerns raised in the complaint are part of the characters' development throughout the novel.  These concerns do not outweigh the potential discussions and literary value of the novel enough to remove it" from the school.  Ex. 2 at 1.

47.    On July 28, 2022, Baggett appealed the panel's determination with a letter to the School District's Assistant Superintendent for Curriculum and Instruction, copying, among others, the members of the School Board, the superintendent, and the Governor of Florida.  *Id*. at 3-5.

48.    The Assistant Superintendent responded by convening a "district review committee" to review the book, as dictated by the School District's procedures governing book challenges.

49.    On September 21, 2022, the district review committee, consisting of two high school media specialists, two high school teachers, one high school administrator, one parent of a school student, and one community member evaluated the appeal.  This included reviewing the written complaint against the book, and also reviewing materials relating to the book including lesson plans, the

National Council for Teachers of English rationale, relevant state laws, the School District's procedures, the book itself, book reviews, the novel study selection process, justification for use of outside media form, parent opt out letter for novel studies, the complainant's appeal, and community input submitted on the media services website.   After this thorough review, and meeting to discuss these materials, the district materials review committee voted 4–3 to retain *Wallflower* for 12th grade students, citing the same justification as had the Northview panel in July.  Ex. 3.

50.    Baggett then wrote letters to the School District's superintendent, assistant superintendent, and the School Board again protesting the inclusion of *Wallflower*.  Ex. 4.  Baggett explicitly linked her effort to get *Wallflower* removed to removal efforts in other jurisdictions.  She attached to one of her submissions an image showing a section of Plaintiff PEN America's "Index of School Book Bans." The image showed eight nationwide instances in which *Wallflower* had been removed from school libraries, classrooms, or both.  *Id.* at 9.

51.    Baggett's October 4 letter also referenced a "parental book rating" for Wallflower and attached several excerpts from the book.  *Id.* at 2, 4-8.  Although Baggett's letter did not state the source for the "parental book rating," both that rating and the selected excerpts appear to have been taken directly from a report created by a website called Book Looks.org, which comprises hundreds of such

reports about books containing material that the website's operators consider objectionable.

52.    While Book Looks disclaims affiliation with Moms for Liberty, it was founded by a former member of, and uses the same rating criteria as, the Moms for Liberty chapter of Brevard County, Florida.

### C.    One Teacher Adopts Talking Points from National Groups to Get Books Removed from Libraries

53.    On the heels of her initial efforts with respect to *Wallflower*, Baggett broadened her efforts to limit access to reading material considerably, focusing now on school libraries, rather than curriculum.

54.    In August, while the *Wallflower* review process was ongoing, Baggett prepared several lists of books that she targeted for removal.  She ultimately identified 115 such titles (not including *Wallflower*).  She stated that the books "should be evaluated based on explicit sexual content, graphic language, themes, vulgarity and ***political pushes***," noting that she had confirmed the titles were at that time available in School District libraries.

55.    These titles run the gamut from picture books to teen and adult novels, and include both works of fiction and nonfiction.  A substantial portion of the titles on Baggett's lists address LGBTQ themes and/or deal with issues of race or racism.

56.    Like her initial challenge to *Wallflower*, Baggett's subsequent challenges drew heavily from materials that are part of the broader campaign to

single out particular books for removal from libraries.  For instance, in connection with her challenge to Raina Telgemeier's book *Drama*, Baggett submitted a list of quotes from the book relating to one character's identification as gay (which was the sole ground on which she objected to the book).  Each quote is identical to a quote the Book Looks website had identified as objectionable.  The same pattern exists for numerous other books Baggett challenged.  In some instances, typos from the Book Looks website were carried over into her challenges.

57.    In other instances, Baggett's challenges employ the same language previously used as part of parallel book-removal campaigns.  For instance, in her challenge to Mark Weakland's book *When Wilma Rudolph Played Basketball*—a picture book about the childhood of Olympic athlete Wilma Rudolph that includes descriptions of her experiences growing up Black in the segregated South—Baggett objected that the book "opines prejudice based on race."  Ex. 5. The identical objection was included in a challenge form previously submitted in a Texas school district.

58.    The bases for Baggett's challenges are blatantly ideological.  As detailed below, in many instances, her objections to specific books have been couched explicitly in political terms.  In other instances, the challenges have been more subtle, as Baggett has raised concerns about sexually explicit content as a pretext for targeting books by and about people of color and LGBTQ people or

otherwise on topics—such as feminism or sexual assault— that are ideologically based.

59.    By early September 2022, Baggett had shared her list with School District administrators, including members of the School Board, and prepared "Request for Reconsideration of Educational Media" forms for the more than 100 books on her list.

60.    As of October 2, 2024, the total number of books challenged in the School District—by Baggett or someone else—has reached 264.

61.    The School District maintains a publicly available spreadsheet of all library books that have been challenged, which can be found here: https://docs.google.com/spreadsheets/d/1hv6Wtu55zY3t5bmbksY2ie7Q-L3zAQdjr taFh4duLC4/edit#gid=0.

62.    The spreadsheet includes, for each challenged book, links to the original challenge form, and information about where the challenge to the book stands, including whether access to the book is being restricted pending adjudication of the challenge.

63.    Many of the challenged books were published decades ago and have been on library shelves in the School District—and throughout the country—for years without objection or incident.

**D.    In Response to the Onslaught of Challenges, the School Board Changes Its Review Procedures**

64.    Prior to Baggett's challenges, the School Board's policies required that any challenged book remain on library shelves during the pendency of the review process unless and until a decision was made to remove it.

65.    However, in its eagerness to cater to the political objections of Baggett and others, the School Board altered the School District's review policies. Shortly after the wave of challenges began, the then-Chair of the School Board, Kevin Adams, was quoted in local media announcing a plan to short-circuit the review process, saying that he had "asked the superintendent to quarantine or remove from circulation the challenged books until a review consistent with [an unspecified] state statute is conducted."

66.    Around the same time, the School Board's general counsel stated that, although the School Board has the power to remove titles from School District libraries, "*it cannot do so simply because it disagrees with the message of a book or it offends the personal morals of an individual*."

67.    Under the new procedure, any challenged book was automatically subjected to restricted access during the pendency of the review process. Such books were physically moved in each school to the restricted access area of the library/media center. Students were then prohibited from accessing the restricted books without an "opt-in" form signed by the student's parent allowing access to

23

the restricted section, either for all titles or for specific individual titles. This empowered book challengers to ensure that any book they objected to for any reason would automatically be subject to restricted access.

68.     After a challenge to the Bible and concerns about its restriction under the "restrict all challenged books" practice, the School District amended its practice so that not all challenged books were automatically subject to restricted access during the review process. Nonetheless, the School Board instituted two practices that continued to give challengers substantial power to restrict access to books to which they objected. These practices were applied to previously challenged books that had already been restricted to determine which should remain restricted, as well as to subsequently challenged books. This practice was ultimately adopted as the School Board's policy in December 2022.

69.     First, the School Board  automatically restricted access to any book where the challenge could be interpreted as alleging that the book contains content that is pornographic or prohibited under F.S. 847.012.

70.     Florida Statute 847.012 prohibits the sale or distribution to minors of "harmful" material. As applied to books, it incorporates F.S. 847.001, which defines material "harmful to minors" as material that, *inter alia*, "***[p]redominately appeals*** to a prurient, shameful, or morbid interest," *and* "[t]aken as a whole, is ***without serious literary, artistic, political, or scientific value for minors***." Fla.

Stat., § 847.001(7)(a)-(c) (emphases added).  None of the books at issue here qualify as harmful material under this standard.[4]

71.    Despite this statutory language, the School Board has been using F.S. 847.012 as a pretext to restrict access to books that address other topics it finds objectionable.

*72.*    For instance, many books that deal with the topic of sexual assault have been automatically restricted under this policy.  One revealing example is *The Kite Runner* by PEN America member Khaled Hosseini, which is published by Plaintiff PRH.   *The Kite Runner* follows an Afghan boy named Amir into adulthood, including his flight from Afghanistan to the United States after the 1979 Soviet invasion, and his later return to the country under the rule of the Taliban.  One key scene in the novel involves Amir's failure to protect his friend from a sexual assault, and his subsequent guilt and shame over that failure.  The book sold over seven million copies, spent two years on the *New York Times* bestseller list, and was made into a major motion picture in 2007.

*73.*    Baggett challenged *The Kite Runner* based on its depiction of sexual assault, as well as unspecified "horrific language," and stated that the purpose of the book was "[i]ndoctrination."  Ex. 6.  On that basis, *The Kite Runner* was placed

---

[4]  Additionally, F.S. 847.012 expressly exempts material approved for use in schools.  Fla. Stat., § 847.012(5).  It, therefore, cannot be an independent basis for excluding books from a school library.

on restricted access pending completion of the review process.  As of this date, the book does not appear to have been scheduled for committee review.

74.    Another similar example of a book subject to such treatment is *The God of Small Things* by Arundhati Roy, which is also published by Plaintiff PRH. *The God of Small Things* is a novel set in Kerala, India, about young twins Rahel and Estha whose lives are upended when their mother has a secret affair with a lower-caste servant.  This violation of the social order sets off a chain of events leading to the drowning of a young girl, the murder of the servant wrongly implicated in her death by the twins, and years later an incestuous encounter between the guilt-ridden twins.  One pivotal scene in the book is when Estha is molested in a movie theater, and how his trauma from that event contributed to other destructive events in the family's life.  *Kirkus Reviews* described the book as "a brilliantly constructed first novel that untangles an intricate web of sexual and caste conflict."  *The God of Small Things* won the prestigious Man Booker Prize in 1997.

75.    Baggett challenged *The God of Small Things* on the grounds that it "encourages pedophilia," "sexual abuse," and "incest."  Ex. 7.  She questioned whether it had any strengths or purpose as educational media.  On that basis, *The God of Small Things* was placed on restricted access pending completion of the review process.  As of this date, the book does not appear to have been scheduled

for committee review.

*76.*    Likewise, many books that raise feminist themes were automatically restricted under this policy, especially to the extent that they explore such topics as the prevalence of rape and sexual assault.  One such book is *The Handmaid's Tale* by Margaret Atwood, which is also published by Plaintiff PRH.  *The Handmaid's Tale* is an award-winning dystopian novel that explores the author's criticisms of certain political and cultural elements of contemporary American society by imagining a future in which the U.S. government is overthrown by a patriarchal cult.  Though the book does not, by any conceivable metric, qualify as "pornography," or otherwise fall within F.S. 847.012, it was (and continues to be) subject to restricted access in all high schools in the School District based on Baggett's complaint that the book contains "[g]raphic sexual depictions + language." Ex. 8.

77.    In addition, the School Board's zeal to remove or restrict access to books deemed objectionable by some members of the community has led to a number of classic works of American literature being restricted.  For instance, under the School Board's policy of automatically restricting access to any book challenged on the ground that it contains content that is pornographic or prohibited under F.S. 847.012, the School Board has restricted access to (among other books): (a) *Slaughterhouse-Five* by Kurt Vonnegut, which is published by Plaintiff PRH,

(b) *Beloved* by Toni Morrison, which is also published by Plaintiff PRH, and (c) *Forever. . .* by PEN America member Judy Blume.  The School Board has done this even though none of those books could possibly be characterized as pornography or otherwise subject to F.S. 847.012.

78.    Second, starting sometime between October 2022 and early 2023, the School Board adopted a new (albeit not codified) practice of automatically subjecting to restricted access any book challenged on the ground that it violates Florida HB 1557, the "Parental Rights in Education Act," also commonly known as the "Don't Say Gay Bill."  However, Florida HB 1557, on its face, applies only to "[c]lassroom instruction," and not to library materials.  *See id.* § 1 (amending Fla. Stat. § 1001.42(8)(c)(3)).  Indeed, the Florida State Board of Education and the Attorney General of Florida have, in other litigation, explicitly disclaimed any application of that law to library materials.   *See* State Defendants' Second Motion to Dismiss, ECF 112, *Cousins v. Grady*, No. 6:22-cv-1312, at 8 (M.D. Fla. Dec. 16, 2022) ("[T]he statute regulates only 'classroom instruction,' not the availability of library books.").

79.    Nonetheless, as a result of this practice, challenged books that merely recognize the *existence* of same-sex relationships or transgender persons were subject to restricted access for an extended period of time.

80.    For example, the book *Uncle Bobby's Wedding* was subject to restricted access within elementary school libraries for over a year, from the time it was challenged in March 2023 until April 2024.   The picture book, which is intended for children between ages 3 and 6, contains no explicit sexual content. The sole ground of the objection is that the "Uncle Bobby" character marries another man.  Ex. 9 at 1.

81.    Another revealing example is Matt de la Pena's book *Milo Imagines the World*, which is published by Plaintiff PRH.  *Milo Imagines the World* is an award-winning book for young children that depicts its lead character passing the time during a long subway ride by imagining the people around him in different situations.   While the challenge to the book acknowledged that it has "[c]olorful pictures and a good story line about creativity and imagination," it objected to one image in which Milo imagines two women marrying each other.  Ex. 10 at 2.  On that basis, the complaint asserted that the "book contains subtle alternate sexual ideology," and was in violation of "HB 1557/Parental Rights Law."  *Id.* at 1.  *Milo Imagines the World* was restricted in all elementary school libraries in the School District for over a year, from the time it was challenged in March 2023 until April 2024.

82.    The barriers for students to access restricted books were significant. To access them, a student first had to find a librarian, ask the librarian for

permission to access a book that has been designated objectionable for one reason or another—however far-fetched—and then wait while that librarian verifies that the student, in fact, has parental permission to access it. Forcing students to undertake these steps, and endure the stigma that goes along with undertaking them, had a profound chilling effect on students seeking access to a wide range of books.

**E.    The School Board Ratifies Baggett's Book Challenges by Removing Books**

83.    The process of reviewing the challenged books began in November 2022, starting with *Wallflower*.

84.    The process included community input via online forms as well as an assessment of the book by a district review committee. This process ultimately resulted in a decision that *Wallflower* was appropriate for high school seniors.

85.    Baggett appealed the decision, and the School Board, overruling the district review committee, voted to remove *Wallflower* as an optional novel study.

86.    Around the same time, Adams, the School Board Chair, was quoted admitting that he was largely deferring to Baggett in his assessments, saying: "I'm not gonna sit here and read 125 books. Fortunately, it don't take long, ***particularly with this English teacher because she's identified every page in there***. I don't have to read a smut book all the way from the very beginning to the very end."

87.    When a book is challenged in the School District, it first goes to a
district review committee.[5]    The district review committees consisted of media
specialists, school staff, parents, and community members.    When the review
committees operated, as part of the review process, after an initial meeting,
committees reviewed the written complaint against the book, the books themselves,
multiple secondary materials relating to the book, including book reviews and the
National Council for Teachers of English explanation of the educational value of
the books, multiple secondary materials as to state laws and the School District's
procedures, and community input gathered about the challenge.

88.    About a month later, after reviewing these materials, the committees
met to discuss the book challenge and vote on its resolution, evaluating the
following:

- whether the book is offensive;

- whether questionable elements are an important part of the story's
  development;

- which grade levels the book is appropriate for;

- whether the work as a whole has literary, artistic, political or scientific
  value for the suggested audience;

---

[5] The challenge to *Wallflower* first went to a school review committee, but that
practice was discontinued for subsequent challenges, which went directly to a
district review committee.

- what the overall purpose or theme of the book is;

- whether concepts are presented in a manner appropriate to the ability and maturity level of the suggested audience;

- whether illustrations are appropriate for the suggested audience's developmental age;

- whether reading the book will result in a more compassionate understanding of human beings;

- whether the book offers an opportunity to understand and appreciate the aspirations, achievements, and problems of different cultures or minority groups; and

- for nonfiction books, whether the material contributes to the evolution of ideas or supports state education standards.

89.    The committee documents its process and the reasons for its decision in writing.  If the complainant appeals the district review committee's decision, the challenge goes before the School Board.

90.    Thus far, after the initial decision to remove *Wallflower* as an optional 12th grade novel study, there have been three waves of library book removals by the School Board, resulting in the removal of nine books:  five removed from all school libraries, two removed from elementary school libraries and two removed

from circulation for 9th and 10th graders in high school libraries.[6]  In each instance, the School Board voted for removal over the recommendations of the district review committee, which had deemed the book educationally suitable.

91.     To date, there has not been a *single* instance in which the School Board has rejected a Baggett or other challenge.[7]

92.     On February 20, 2023, the School Board voted to remove three books from all School District libraries: *All Boys Aren't Blue* by Plaintiff Johnson, *And Tango Makes Three* by Peter Parnell and Justin Richardson, and *When Aidan Became a Brother* by Plaintiff Lukoff.   It did so despite the district review committees' conclusions that the books were appropriate for the grades served by the libraries in question and its recommendation, in all three cases, that the books not be removed from any libraries.

93.     On March 20, 2023, the School Board voted to remove four additional books from some libraries: *New Kid* by Jerry Craft and *Drama* by Raina

---

[6] An additional six books have been removed upon the recommendation of the district review committee, rather than by order of the School Board: *Looking for Alaska* by John Green, which was removed from middle school libraries only; *Ground Zero* by Alan Gratz, which was removed from elementary school libraries only; and four books from Sarah J. Maas's *A Court of Thorns and Roses* series, which were removed from all libraries.

[7] In some instances, such as with regard to *When Wilma Rudolph Played Basketball* by Mark Weakland, Baggett chose not to appeal the district review committee's decision to the School Board.

Telgemeier, which were removed from elementary school libraries; and *The Bluest Eye* by Toni Morrison and *The Nowhere Girls* by Amy Reed, which were removed from middle school libraries in the School District (to the extent the books had been in middle school libraries), and restricted to 11th and 12th graders within high school libraries. Once again, the School Board overrode the recommendations of the district review committees.

94.    On April 13, 2023, the School Board voted to remove *Push* by Sapphire and *Lucky* by Alice Sebold from all School District libraries, again overriding the recommendation of the district review committees that the titles be made available in high school libraries.

95.    In all, nine books have so far been removed (the "Removed Books") from some or all libraries by the School Board, while over 250 additional books have been targeted for removal and are awaiting review.

96.    A chart summarizing the School Board's decisions as to each of the Removed Books is below:

| Book | Author | Basis of Challenge[8] | District Review Committee Decision | School Board Decision |
|------|--------|----------------------|-----------------------------------|----------------------|
| *All Boys* | George M. | "Extreme sexual | Keep in | Removed from all |

---

[8] The language in this column is all quoted from the challenge forms submitted by Baggett.

| Book | Author | Basis of Challenge[8] | District Review Committee Decision | School Board Decision |
|------|--------|-----------------------|-----------------------------------|-----------------------|
| *Aren't Blue* | Johnson | content; violent language; disturbing scenes; LGBTQ content" | high school libraries | libraries |
| *And Tango Makes Three* | Peter Parnell & Justin Richardson | "LGBTQ agenda using penguins" | Keep in all libraries | Removed from all libraries |
| *When Aidan Became a Brother* | Kyle Lukoff | "LGBTQ introduction; not age appropriate" | Keep in all libraries | Removed from all libraries |
| *New Kid* | Jerry Craft | "Race-baiting; anti-whiteness; woke agenda" | Keep in all libraries | Removed from elementary schools; keep only in middle and high school libraries |
| *Drama* | Raina Telgemeier | "Indoctrination of LGBTQ; age-inappropriate + content not relevant" | Keep in all libraries | Removed from elementary schools; keep only in middle and high school libraries |
| *The Bluest Eye* | Toni Morrison | "Graphic rape scenes; pedophilia glorified; violent acts" | Keep in high school libraries | Removed from 9th-10th grade; keep only for 11th-12th grade |
| *The Nowhere* | Amy Reed | "Graphic sexual content; sexual | Keep in high school | Removed from 9th-10th grade; |

| Book | Author | Basis of Challenge[8] | District Review Committee Decision | School Board Decision |
|------|--------|----------------------|-----------------------------------|----------------------|
| *Girls* | | introductions; sexually excite" | libraries | keep only for 11th-12th grade |
| *Push* | Sapphire | "Graphic sexual content" | Keep in high school libraries | Removed from all libraries |
| *Lucky* | Alice Sebold | "Graphic sexual content; violence; language" | Keep in high school libraries | Removed from all libraries |

97.     No district review committee has met since March 2023 and the School Board has not considered any book challenges—or removed any additional books—since April 13, 2023.

98.     On May 16, 2023, the School Board voted to terminate its then-Superintendent, Tim Smith.  As then-Superintendent Smith commented at the time, the Board had developed a process to deal with appeals of book challenges and had asked its general counsel whether the superintendent could himself pull controversial or challenged books from the shelves.  She recommended against such a practice as contrary to the intent of the law.  Mr. Smith noted that nevertheless,

> You [the Board] hammer away [that] the superintendent should pull these books.  Why?  Because you don't want to deal with it. You get the emails, you get the phone calls, you get the chaos.  But, yeah, it's easy to throw the

superintendent under the bus. It's your policy that you led, and you're asking me to violate your policy. What is that?

99.    On information and belief, one of the reasons for the termination was because Mr. Smith was not sufficiently aggressive with respect to book removals and restrictions.

### F.    The School Board Has Removed Books Based on Viewpoint

100.    Although the School Board's General Counsel has acknowledged that the School Board cannot order removal of books from its libraries "simply because it disagrees with the message of a book or it offends the personal morals of an individual," it is clear that books are, in fact, being removed on such impermissible grounds.

101.    The ideological bases for the removals are apparent from, *inter alia*: (a) the contents, characters, and themes of many of the books, (b) the nature of the asserted objections to them, (c) the fact that, in every instance, the School Board's removal decision overrode the considered judgment of the district review committee, which had deemed the book educationally appropriate, and recommended that it be retained, and (d) the fact that there are no instances in which the School Board rejected a challenge from Baggett, despite the transparently ideological nature of her challenges. Indeed, the School Board has

consistently acceded to, and ratified, Baggett's blatantly political and message-based objections.

102.  *Wallflower*, the book that kicked off this slate of removals is discussed in detail above.  The other Removed Books exhibit the same basic pattern of targeting books based on ideological objections to their message, theme, or the identities of their characters and/or authors.

103.  For instance, *And Tango Makes Three* ("*Tango*") is a 2005 picture book based on the true story of Roy and Silo, two male penguins at the Central Park Zoo who formed a pair bond, successfully incubated an egg that another penguin couple was unable to care for, and raised the resulting baby penguin, a female named Tango, after she hatched.  *Tango* received numerous awards.  The book was listed by the American Library Association as a Notable Children's Book in 2005 and won the ASPCA's Henry Bergh Children's Book Award for books promoting the humane and compassionate treatment of animals that same year.

104.  Baggett's sole listed reason for objecting to *Tango* was disagreement with its message.  She asserted that the book was serving an "***LGBTQ agenda using penguins***."  Ex. 11.  No basis was offered for the removal of *Tango* other than the mere fact that it is based on the true story of two male zoo penguins who formed a pair bond and hatched and raised a baby penguin.

105.    At the School Board meeting at which *Tango* was addressed, School Board members made clear that they, too, believed that the mere fact that the book depicts two male penguins jointly raising a chick warranted removing it from school libraries.  One School Board member observed: "The fascination is still on that it's two male penguins raising a chick.  And, most people that came up and spoke were talking about that fascination, so I'll be voting to remove the book from our libraries."  Another School Board member stated that he would be fine with the book being available if *Tango* was "edited or rewritten to make it less and less of a sexual or even a romantic thing and more of the compassion and nature that nature has."

106.    Ultimately, despite the review process having deemed the book educationally suitable and recommending retaining it, the School Board sided with Baggett and removed the title from all School District libraries.[9]

107.    The grounds for removing *When Aidan Became a Brother* by Plaintiff Lukoff ("*Aidan*") were similarly ideological.  *Aidan* is a 2019 picture book about a young transgender boy helping his family welcome a new baby.  The book has

---

[9] Included in the appeal record considered by the School Board was a set of "Relevant Florida State Statutes," among which was HB 1557.  HB 1557 does not apply to library materials, and, accordingly, does not provide a basis to restrict or remove any title.  Nevertheless, excerpts of HB 1557 were included in the packet of materials provided to the School Board for its consideration of the appeal regarding every Removed Book.

received multiple awards, including a Charlotte Huck Honor, which recognizes "outstanding children's fiction that invites compassion, imagination, and wonder," and the Stonewall Book Award, which is given out by the American Library Association to honor "books that have exceptional merit relating to the LGBTQIA+ experience." *Aidan* is used in classrooms throughout the country.

108.  In her challenge, Baggett condemned *Aidan* as: "LGBTQ introduction," and "not age appropriate."  Ex. 12.  No basis was offered for the removal of *Aidan* other than the mere fact that it is about a transgender character.

109.  The district review committee recommended retaining *Aidan*.  In addition, at the School Board meeting at which the book was addressed, one School Board member spoke in favor of retaining the book, saying: "I happen to know someone who shared with me how important this book was to her child. And, I know that I appreciate those people who keep reminding us that reading a book does not change someone.  If it did, all of the hundreds of gay children out there who have to read the books that are [about] heterosexual companions, they'd all change.  So I'm one of those people that think reading books opened your mind, but it doesn't necessarily change who you are or what you are.  But it makes you a more compassionate, caring person."

110.  Nonetheless, the School Board as a whole sided with Baggett, and removed the title from all School District libraries.  At the meeting, the School

Board chair expressed the view that, while some parents may find the perspective *Aidan* offers valuable, "it's just something that should not be in the school district. We should be concentrating on the education of these students, and if I can't fit those dots, I won't approve the book."

111.    The grounds for removing *All Boys Aren't Blue* by Plaintiff Johnson were likewise ideological. *All Boys Aren't Blue* was published in 2020. It is, as the district review committee put it, a "memoir of growing up black and gay." Ex. 13 at 2. While the book contains depictions of sex (including a sexual assault), the district review committee recognized that these depictions are critical to the story and "extremely important to understand the trajectory of [the narrator's] life. . . . Without these moments, the memoir would not make sense." *Id.* at 1. As the committee further noted, the sexual content is "clearly not intended to be arousing." *Id.* at 3. The district review committee found that "[t]here are teenagers in our community who benefit from hearing [the narrator's] experiences and perspectives," and voted unanimously to retain it as high school library material. *Id.* at 2.

112.    *All Boys Aren't Blue* has received numerous awards and recognitions. *Kirkus Review* named it one of the best young adult biographies/memoirs of 2020. The New York Public Library and Chicago Public Library both included it in their list of the top ten books of 2020 for young adults.

41

113.   Baggett's challenge characterized the purpose of *All Boys Aren't Blue* as "indoctrination" and included "LGBTQ content" among her objections.  Ex. 14. After the district review committee voted to retain the book, Baggett's appeal characterized the book as pornographic.  Ex. 15 at 2.  At the School Board meeting at which the book was discussed, multiple Board members characterized it as "pornographic."

114.   Ultimately, despite the review committee's findings and unanimous vote in favor of retaining *All Boys Aren't Blue*, the School Board sided with Baggett and ordered the book removed from all libraries within the School District.

115.   Another of the Removed Books is *New Kid* by Jerry Craft, which was part of the March 20, 2023 removals.   *New Kid* is a Newbery Medal Award-winning graphic novel that tells the story of a 12-year-old Black boy who experiences culture shock when he enrolls at a private school.  It was published in 2019.  There is no sexual content of any kind in *New Kid*.  Baggett objected to the book because, in her opinion, it involved "race-baiting," reflected "anti-whiteness," and promoted a "woke agenda."  Ex. 16.  Even though the book is intended for young audiences, the School Board ordered that *New Kid* be removed from all elementary school libraries within the School District.  In doing so, it overruled the district review committee, which had voted 7-2 to keep *New Kid* in libraries at all levels.

116.    Another Removed Book, *Drama* by Raina Telgemeier, was published over a decade ago, in 2012.  It is a graphic novel about a seventh-grade girl who joins the stage crew for her middle school musical.  She has a secret crush on one boy; a different boy has a crush on her.  One character is openly gay.  At the story's climax, when the female lead in the musical refuses to perform, a male character saves the show by dressing in her outfit and performing the role, including sharing a stage kiss with the male lead.  As the district review committee noted, "[t]here is nothing in this work that could be considered offensive. . . . ***There is no sex in any part of the story***."  Ex. 17 at 2.  *Drama* enjoyed wide critical praise and appeared on the American Library Association's 2013 list of Notable Children's Books.

117.    Baggett objected to the book as "[i]ndoctrination of LGBTQ; age inappropriate + content not relevant."  Ex. 18.  She asserted that the purpose of the book to be "[i]ndoctrination."  *Id.*  Despite the district review committee voting 6–3 to retain the book in all elementary, middle, and high school libraries, the School Board ordered *Drama* removed from all elementary school libraries.

118.    Another Removed Book is *The Bluest Eye*, which was Toni Morrison's first novel.  It is published by Plaintiff PRH.  Published over 50 years ago, *The Bluest Eye* is set primarily in Morrison's Ohio hometown in 1941.  It is told from the perspective of a nine-year-old Black girl.  The central character, eleven-year-old Pecola, is taken in temporarily by the narrator's family.  Pecola,

friendless and tormented because of her chaotic home life, dark skin, and "ugliness," prays for God to give her blue eyes. Pecola is eventually raped and impregnated by her abusive father. The baby is stillborn and Pecola loses her sense of reality, believing that her wish for blue eyes has been granted. While the book received relatively little attention when it was originally published, it has since become part of the canon of American literature. In 1993, Morrison was awarded the Nobel Prize in Literature for "novels characterized by visionary force and poetic import" that "give[] life to an essential aspect of American reality."

119. *The Bluest Eye* is frequently taught in AP Literature courses throughout the country. It is an example of the kind of narratively and thematically challenging works that students in high school are asked to navigate to become more sophisticated readers and students of literature and to prepare for post-secondary study.

120. *The Bluest Eye* undisputedly contains difficult and graphic content. However, as the district review committee noted, it explores "[t]he harsh truth of racism in the 1940s" and themes of "self-loathing" and "preconceived notions of beauty." Ex. 19 at 1, 2. As the committee also pointed out, "[m]any classics," including *The Great Gatsby*, *The Sun Also Rises*, and *The Sound and the Fury*, "deal with sexual themes." The difference is that *The Bluest Eye* moves the reader's attention "away from the implied off-stage tragedy to a sensory-oriented

language from which the readers cannot look away or pretend the tragedy is not occurring or is not important. . . . The strength of Morrison's work, which critics seem disturbed by, is that the disturbing is disturbing." *Id.* at 5. The committee further noted that *The Bluest Eye* is the only one of Morrison's novels "told from the viewpoint of adolescents." *Id.* at 3. All five members of the committee unanimously agreed to keep the book in high school libraries.

121. Notwithstanding that the sexual content of *The Bluest Eye* is inextricably linked to the book's exploration of themes of race, racism, and sexual exploitation, Baggett's objection dismissed the book as "pedophilia glorified," and declared that it contained *no* strengths as educational media and that its only purpose was "shock." Ex. 20. Such naked hostility to a book that is widely recognized as a classic makes plain that Baggett's real objection was to the themes the book explores, not the fact that it explores those themes (in part) by depicting sexual situations.

122. At the March 20, 2023 meeting at which the book was discussed, a School Board member noted that *The Bluest Eye* had been optional reading material in one district school's International Baccalaureate program (along with Toni Morrison's most famous novel, *Beloved*) for nearly two decades and had never received a single parental complaint. Nonetheless, the School Board voted

3–2 to restrict the book to 11th and 12th graders.  (The two dissenters would have removed the book entirely.)

123.   Another of the Removed Books, *The Nowhere Girls*, is a 2017 novel by Amy Reed.  The book is a feminist work, which concerns three misfit teenage girls who, outraged by an unpunished rape at their high school, band together to combat their school's misogynistic culture.  As the district review committee noted, "[s]exual assault (rape) is an act of violence and is integral to the novel and plot."  Ex. 21 at 1.  The review committee praised the diverse personalities and backgrounds of the characters, as well as the way the novel "address[es] an important theme of activism, self-acceptance, and empowerment.  It has value for any high school student."  *Id.* at 2.  The committee unanimously agreed that the book should remain in high school libraries; one member would have kept it in middle school libraries as well.

124.  As with other books she challenged, Baggett declared that *The Nowhere Girls* had no educational strengths.  Although she purported to object to the book on the ground that its purpose is "sexual introductions; [to] sexually excite," Ex. 22, given the profound inaptness of describing a book about rape and the social response to it in that manner, it is clear that her real objection was a disagreement with the book's feminist message.  Despite the review committee's

recommendation, the School Board voted 3–2 to restrict the book to 11th and 12th graders.

125.   Another Removed Book is *Push*, the first novel by the author who goes by the pen name Sapphire, which was published by Plaintiff PRH.  First published over 25 years ago, the book concerns the struggles of a 16-year-old Black girl named Precious who lives in desperate poverty and endures unspeakable abuse at the hands of both her mother and father.  When the book opens, Precious is pregnant with her second child—like the first, the product of rape by her father.  Precious enrolls at an alternative school where she finds a teacher who helps her learn to read and write, as well as to escape from her abusive situation and give herself and her children a chance for a better future.  Stylistically, the book is told in Precious's voice and tracks her increasing English proficiency and self-esteem as she overcomes the functional illiteracy with which she begins the novel.  In 2009, *Push* was adapted into a feature film, *Precious*, that was nominated for six Academy Awards and won two, including for Best Adapted Screenplay.

126.   Like *The Bluest Eye*, *Push* depicts difficult and upsetting situations, sometimes in graphic terms.  However, as with that novel, the district review committee noted that these elements were "an important part of developing Precious' background and creating a greater understanding of her circumstances, trials, and ultimately, her ability to begin to see herself as a whole and worthy

person despite her circumstances." Ex. 23 at 2. The committee also noted its "very artistic presentation of a journey from complete illiteracy to English language competency" and that "[t]hrough reading about Precious and her circumstances we are able to have a more developed understanding of the human condition, and hopefully a deeper compassion for someone who may be very different from ourselves." *Id.* The district review committee voted 4–1 to retain *Push* as a high school library material.[10]

127.   In her appeal of the district review committee's decision, Baggett asserted as part of her criticism of the book that "[t]he purpose of fiction writing is simply **TO ENTERTAIN**. It is not to inform or educate." Ex. 24 at 1. As with her objection to *The Bluest Eye*, it is apparent that Baggett's real objection is to the book's exploration of themes of race, racism, and sexual assault, not her purported objections to the book's sexual content.

128.   At the April 13, 2023 School Board meeting at which *Push* was discussed, one School Board member observed: "While I concur with the board members who've spoken, while I do believe that it is a story of triumph, it is a story of somebody saving themselves, someone who has resilience and discovered her self-worth, it is not a book that I believe that should be available in public high

---

[10] The dissenting voter did not dispute the novel's literary or artistic merit, but believed that due to its difficult content "[i]t is best read with the support of a teacher or trusted adult." *Id.* at 5.

schools." That subjective reaction carried the day, and the School Board voted to overrule the district review committee and remove *Push* from School District high school libraries.

129. The ideological nature of these book removals is further underscored by what books have *not* been removed.

130. Even though a number of books have been removed simply because they allude to, or acknowledge the existence of, same-sex relationships and/or transgender persons, there have not been any instances in which a book has been removed simply because it alludes to, or recognizes the existence of, heterosexual relationships or cis gendered persons. For instance, among the children's books that remain unchallenged on elementary school shelves in the School District are *Just Me and My Little Brother* by Mercer Mayer and *The Wedding* by Eve Bunting, each of which depicts heterosexual relationships and/or cis gendered persons in family settings similar to those in which *Tango* and *Aidan* present same-sex relationships and transgender persons.

131. Likewise, even though many books addressing themes related to race, racism, feminism, and/or sexual assault have been removed on the ostensible grounds that they contain sexually explicit content, there are numerous books that remain in School District libraries that are also sexual explicit, but were not singled out for removal because they do not address such themes. For instance, the

following books, each of which contains sexually explicit content and/or language, remain, unchallenged in high school libraries in the School District: *1984* by George Orwell, *Brave New World* by Aldous Huxley, *The Catcher in the Rye* by J.D. Salinger, *The World According to Garp* by John Irving, *Catch 22* by Joseph Heller, *A Farewell to Arms* by Ernest Hemingway, and the complete works of William Shakespeare.

132.   To be clear, Plaintiffs do not believe that *any* of the books referenced in the preceding paragraph should be removed from high school libraries. Nonetheless, that not one of those books has been removed, or targeted for removal, makes plain that, for the books the School Board has removed, it is not the sexual content *per se* that is driving the objections.

## G.    The School Board Also Indefinitely Restricted Access to Books Based on Viewpoint

133.   It is also apparent that books were being subject to restricted access for indefinite periods of time on ideological, not pedagogical, grounds.

134.   Indeed, as detailed above, the School Board amended its procedures for challenged books so as to make it easier to restrict access to books that are subject to ideological objections.

135.   The School Board did this in two ways.  First, under the School Board's policies (at least as they existed prior to July 1, 2023), books were being subject to restricted access pending further review simply because they reference

the existence of same-sex relationships or transgender persons, without regard to anything else about their content. Second, under those policies, citizens who objected to books on ideological or political grounds were able to restrict access to those books simply by opportunistically highlighting the fact that—like plenty of other books that remain unchallenged on library shelves—they contain some sexual content.

136.    For example, one of the targeted books is *Out of Darkness* by Plaintiff Pérez. *Out of Darkness* is a historical young adult novel involving a secret romance between a Mexican-American girl and a Black boy in a small town in East Texas in the 1930s, in the months preceding a catastrophic real-life gas explosion that destroyed the town's school and killed hundreds of students and faculty. The story ends violently and tragically.

137. *Booklist* named *Out of Darkness* one of its "50 Best YA Books of All Time" in 2017, saying "Pérez's elegant and devastating Printz Honor winner begins with a real-life 1937 school explosion that killed 300 people in Texas before backtracking to Mexican American Naomi, who struggles with racism, love, and Henry—the father of her siblings and one of the most vivid, complicated villains in YA history." In 2015, the book was named as one of the "Best Teen" books of the year by *Kirkus Reviews*, and one of the "Best Books of 2015" by *School Library Journal* magazine.

138.    Although the book's depictions of sexual situations are central to the story it tells, Baggett objected to *Out of Darkness* on the ground that it includes "graphic depictions of abuse + sexual scenes."  She listed the strengths of the book as "none," and listed its purpose as "sexual introductions; sexually excite."  Ex. 25. The book has been restricted since October 2022 within high school libraries in the School District, where it was previously generally available, and does not appear to be scheduled for committee review.

139.    Another targeted book is *Beyond Magenta: Transgender Teens Speak Out* ("*Beyond Magenta*") by PEN America member Susan Kuklin.   *Beyond Magenta* is a young adult nonfiction book based on interviews with six transgender or nonbinary teenagers.  *Beyond Magenta* received numerous awards and positive reviews from *Booklist, Kirkus Reviews*, and *Publishers Weekly*, with the latter calling it "a sorely needed resource for teens and, frankly, many adults" that captures its subjects as "full, complex, and imperfect human beings."

140.    Baggett challenged *Beyond Magenta* on the grounds that it was "sexually explicit" and contained "LGBTQIA content."  Ex. 26.  She claimed it had no strengths as educational media and its sole purpose was "total indoctrination."  Access to *Beyond Magenta* has been restricted since October 2022 in school libraries in the School District, where it was previously generally available, and the book does not yet appear to have been scheduled for committee

review.

141.   Another targeted book is *The Freedom Writers Diary: How a Teacher and 150 Teens Used Writing to Change Themselves and the World Around Them* by Erin Gruwell.  *The Freedom Writers Diary*, which is published by Plaintiff PRH, is a non-fiction book that collects diary entries from the largely minority students at the "at risk" high school where the book's main author, Gruwell, taught.  Modeled after *The Diary of Anne Frank* and *Zlata's Diary: A Child's Life in Sarajevo*, the diary entries draw parallels between those books and the students' lives and chronicle their challenges dealing with issues like gang violence, racism, getting evicted, and drug and alcohol abuse, and the students' efforts to rise above them.

142.   In her challenge, Baggett asserted that the purpose of the book was to "incite racial division," and objected to the book as having "extremely sexual content; nudity; alternative sexualities; profanity; child abuse; molestation; [and] racial slurs."  Ex. 27.  The book has been restricted since October 2022 within high school libraries in the School District (where it was previously generally available), and does not appear to be scheduled for committee review.

143.   Another targeted book is *Concrete Rose* by Angie Thomas.  *Concrete Rose* is a prequel to Thomas's acclaimed 2017 book *The Hate U Give*, and tells the backstory of Maverick ("Mav"), the father of the main character in *The Hate U Give*.  In the book, Mav must navigate competing pressures—dealing with gang

culture as the son of one of the gang's leaders who is incarcerated, fathering a child out of wedlock, and falling in love with his girlfriend and planning a future together. As described in *Publishers Weekly*, "Through its portrayal of loss and upheaval, this story acts as a tender love letter to a close Black family and community—one that isn't without problems but is always full of love." *Kirkus Reviews* named it as one of the best young adult novels of 2021, and it was a Michael L. Printz Honor book, awarded for excellence in young adult literature.

144.    Baggett challenged *Concrete Rose* on the basis that it includes "sexual activities," "excessive and frequent profanity" and "controversial racial and social commentary." Among the passages she objected to were one in which a character described his disengagement with a history class that lionizes white people who had done problematic things, like the notion that Columbus "discover[ed]" America, a place where people already lived. Another objected-to passage was about the character's hatred of his coach who had a Confederate flag on his truck and implied that he was the coach's slave. Ex. 28. A third passage described a sexual encounter between Mav and his girlfriend. The book has been restricted since January 2023 within high school and middle school libraries in the School District (where it was previously generally available), and does not appear to be scheduled for committee review.

54

**H.    Defendant Has Disproportionately Targeted Books by Minority and LGBTQ Authors or Books Addressing Themes Involving Race and LGBTQ Identity**

145.    The removal efforts of the School Board have been focused disproportionately on minority and LGBTQ authors and/or books that pursue themes related to minority or LGBTQ identity.

146.    Of the nine books permanently removed from one or more libraries or grades by the School Board, 6 have authors who are non-white and/or identify as LGBTQ, while 8 address themes relating to race or LGBTQ identity, or feature prominent non-white and/or LGBTQ characters.

147.    In addition, on information and belief, relative to their presence in School District libraries as a whole, the books at issue in this lawsuit that have been indefinitely restricted have disproportionately been books with non-white and/or LGBTQ authors, or which address themes relating to race or LGBTQ identity, or feature prominent non-white and/or LGBTQ characters.

148.    Of the 119 books challenged before July 1, 2023 that have been indefinitely restricted, approximately 30% have authors who are non-white and/or identify as LGBTQ, while approximately 50% address themes relating to race or LGBTQ identity.

149.    The disproportionate focus of the removal and restriction efforts is not an accident.    Baggett and other challengers have routinely expressed the

categorical view that a book is inappropriate for inclusion in a school library simply because it explores themes relating to race or LGBTQ identity.  And, the School Board has repeatedly ratified—over the objections of the district review committee—Baggett's removal preferences.

## I.    Students in the School District Are Being Deprived Access to Books to which They Previously Had Access

150.   The book removals and restrictions enacted by the School Board are denying students access to books they would like to read or chilling such access.

151.   Students in Escambia County Public Schools can typically check books out of their school libraries or the district's online system; if their library does not have a book, it may be available through inter-library loan from another school library.

152.   Plaintiff Glass is the parent of a current ninth grader at Washington High School.  His daughter visits the library at her school.  She is particularly interested in books about coming of age and that deal with some of the issues she faces as a teenager.

153.   Glass's daughter would like to access and check out books that are no longer available in or through her school's library because of the book removals and restrictions.  In particular, she would like to check out *The Nowhere Girls* and *The Freedom Writers Diary*.  Each of those books is currently unavailable or restricted in  or through her school library as a result of the actions of the School

Board.

154.   Glass himself would like those particular books, and other books like them, to be available to his daughter in or through her school library.  It is important to him that his daughter has opportunities to be learn about the dangers of sexual assault and the importance of consent so that she is prepared for situations she may encounter in high school.  He further sees value in her reading about the intersection between stories about minority communities and stories involving sexual assault so that she will appreciate the unique challenges that people from other backgrounds face.  He believes that learning about relationships and sexuality is critical for his daughter's development as a teenage girl.

155.   Plaintiff Novakowski is the parent of a current second grader at A.K. Suter Elementary School.  Her daughter visits the library at her school at least once a week and routinely checks out books.  Her daughter is particularly interested in books about families and different family arrangements.

156.   Novakowski's daughter would like to access and check out books that are no longer available in or through her school's library because of the book removals and restrictions.  In particular, she would like to check out *Tango* and *Aidan*.  Each of those books is currently unavailable or restricted in or through her school library as a result of the actions of the School Board.

157.   Novakowski herself would like those particular books, and other

books like them, to be available to her daughter in or through her school library.  It is important to her that her daughter has opportunities to be exposed to points of view, backgrounds, and experiences different from her own and that of her family. She believes such exposure is critical to learning acceptance of people with different backgrounds and experiences and to being able to participate in our wider society.

158.   Plaintiff Parker is the parent of a current ninth grader at Pine Forest High School.  His son visits the library at his school and checks out books.  His son is particularly interested in books about civil rights.

159.   Parker's son would like to access and check out books that are no longer available in or through his school's library because of the book removals and restrictions.   In particular, he would like to check out *The Freedom Writers Diary, Concrete Rose* and *The Hate U Give*.   Each of those books is currently unavailable or restricted in or through his school library as a result of the actions of the School Board.

160.   Parker himself would like those particular books, and other books like them, to be available to his son in or through his school library.  It is important to him that his son have opportunities to be exposed to books that reflect Black culture, including works by celebrated Black authors, and not to shy away from stories reflecting the raw experiences that Black people face.  He believes such

exposure is critical for his son to develop resilience.

161. Plaintiff Satterwhite is the parent of a current eleventh grader at Pensacola High School. His son visits the library at his school and is particularly interested in graphic novels and books about race and racism.

162. Satterwhite's son would like to access and check out books that are no longer available in or through his school's library because of the book removals and restrictions. In particular, he would like to check out *Slaughterhouse Five* and *All Boys Aren't Blue*. Each of those books is currently unavailable or restricted in or through his school library as a result of the actions of the School Board.

163. Satterwhite himself would like those particular books, and other books like them, to be available to his son in or through his school library. It is important to him that his son has opportunities to read about Black experiences in the United States, in part because his own family felt the need to dissociate themselves from their Black heritage. Beyond that, he wants books to be available to his son in or through the school library for him to explore Black experiences and any other subjects he is interested in at his own pace and driven by his own interests.

**J.    Defendant's Book Removals and Restrictions Harm PEN America, Its Members, the Author Plaintiffs, PRH, and the Parent Plaintiffs and Their Children**

164. Plaintiff PEN America has standing to sue to enjoin the Defendants' book removals and restrictions because the actions of the School Board have

caused direct organizational injury to PEN America.

165.    As a consequence of efforts in Escambia County and elsewhere to remove books from public school libraries based on political or ideological objections, PEN America has had to reallocate significant financial resources and time to addressing this issue and away from other priorities.  For example, PEN America has had to hire full-time staff to work solely on (a) tracking and reporting on book removals, (b) supporting author-members who have concerns about what is happening to their own books, and (c) responding to a consistent onslaught of inquiries and notifications from parents, teachers, students and media concerned about the situation regarding book removals and looking to PEN America for insight and guidance.  In addition, because of the focus on book removals, PEN America has had fewer personnel dedicated to free speech education for youth or to free speech issues on college campuses, two other areas related to education on which PEN America has typically focused its resources.

166.    Another consequence of these efforts is interference with PEN America's core business activities—namely, protecting writers in the United States and around the world from discrimination and censorship, championing the written word, and defending freedom of expression.  The time and effort PEN America has had to spend on addressing efforts to remove and restrict books in Escambia County and elsewhere has required PEN America to focus its work

disproportionately on the freedom to read in K-12 and has detracted from a breadth of other core business activities and necessary work by the organization. This includes, for example, programming on campus free speech such as convenings of PEN America's higher education-focused Freedom to Learn coalition, online harassment training such as trainings on digital safety for authors, and protecting writers and artists facing political persecution abroad.

167.   PEN America also has associational standing on behalf of its members. Among the PEN America members whose books have been removed from libraries within the School District and/or subjected to restricted access within libraries in the School District are each of the Author Plaintiffs, as well as Margaret Atwood, Judy Blume, John Green, Khaled Hosseini, Susan Kuklin, and Jodi Picoult.

168.   Each of those affected author-members of PEN America would have standing to sue based on the School District's violation of their rights under the First and Fourteenth Amendments.

169.   The interests at stake in this case are germane to PEN America's purpose of protecting the rights of its author-members and the right to free expression generally.

170.   Neither the claims asserted nor the relief requested in this case requires the participation of the named non-plaintiff author-members above or any

other of PEN America's author-members as the relief being sought is declaratory and injunctive in nature.

171.   The Author Plaintiffs have standing to sue to enjoin Defendants' book removals and restrictions because their books have been (a) removed from libraries within the School District, and/or (b) subject to restricted access of an indefinite period pending adjudication of a challenge.  Specifically:

   a.   Plaintiff Johnson's book *All Boys Aren't Blue* is one of the Removed Books.

   b.   Plaintiff Lukoff's book *Aidan* is one of the Removed Books.

   c.   Plaintiff Pérez's book *Out of Darkness* is one of the Restricted Books and currently restricted from School District libraries indefinitely pending an as-yet unscheduled review.

172.   Millions of books published by PRH are sold into Florida each year, including to school districts and public libraries.  PRH has standing to sue to enjoin Defendants' book removal and restrictions because certain of the books it publishes, including books by Toni Morrison, Kurt Vonnegut, Kyle Lukoff, and Sapphire have been (a) removed from libraries within the School District, and/or (b) subject to restricted access of an indefinite period pending adjudication of a challenge.  A publisher's ability to publish and sell books freely is affected when state or local officials restrict circulation or remove the publisher's books.

173.   The Parent Plaintiffs have standing, on behalf of both themselves and their children, to sue to enjoin Defendants' book removals and restrictions because both they and their children have been harmed by the book removals and restrictions.

174.   Plaintiff Glass is the parent of a student who attends Washington High School in the School District.  As a result of the actions of the School Board, Glass's daughter is unable to access books in or through her school library that were previously available.  Glass's daughter wants to access and check out those books and Glass wants her to have that opportunity.

175.   Plaintiff Novakowski is the parent of a student who attends A.K. Suter Elementary School in the School District.  As a result of the actions of the School Board, Novakowski's daughter is unable to access books in or through her school library that were previously available.  Novakowski's daughter wants to access and check out those books and Novakowski wants her to have that opportunity.

176.   Plaintiff Parker is the parent of a student who attends Pine Forest High School in the School District.  As a result of the actions of the School Board, Parker's son is unable to access books in or through his school library that were previously available.  Parker's son wants to access and check out those books, and Parker wants him to have that opportunity.

177.   Plaintiff Satterwhite is the parent of a student who attends Pensacola

High School in the School District.  As a result of the actions of the School Board, Satterwhite's son is unable to access books in or through his school library that were previously available.  Satterwhite's son wants to access and check out those books and Satterwhite wants him to have that opportunity.

### K.    The School Board Adopts New Policies and Procedures Based on HB 1069

178.   In the Spring of 2023, the Florida legislature passed HB 1069, through which the legislature amended FS 1006.28.

179.   The amended FS 1006.28, which went into effect on July 1, 2023, provides that any material available in a school or classroom library can be challenged on the ground, inter alia, that it is "pornographic" or prohibited under FS 847.012, or that it "depicts or describes sexual conduct" as defined by Florida law.  The statute further requires that any book challenged on one of these bases must be removed from circulation within 5 days and remain so during the pendency of the challenge.  The amendments mandated by HB 1069 do not allow parents to opt in to allowing their children to access the challenged books and do not contain any time limits on how quickly a book challenge must be adjudicated.

180.   The amendments mandated by HB 1069 require that books ultimately found to contain depictions or descriptions of "sexual conduct" as defined by Florida law shall be made unavailable for any age group or grade level for which such use is inappropriate or unsuitable.  The statute does not require the removal of

such books from all libraries or age levels; in fact, the statute allows the retention of such materials for those age groups or grade levels for which they are deemed appropriate and suitable.

181.   Florida law requires the School Board to adopt a policy for handling book challenges under HB 1069 that clearly describes a process to handle all challenges and provides for resolution.   The First Amendment requires that the policy provide for timely resolution of challenges that result in restriction of books while the challenge is pending.

182.   In response to the passage of HB 1069, the School Board amended the section of its Policy Manual governing the handling of library book challenges. Ex. 1.  Among other changes, the revised Policy Manual:

- Requires that books challenged on the basis that they contain content that is pornographic or prohibited by FS 847.012 or depict or describe "sexual conduct" as defined by Florida law be placed in a restricted area of the library/media center within five school days of receipt of the book challenges and remain unavailable to students of the school at which the material was challenged pending resolution of the challenge;

- Deleted the provision authorizing parents or guardians to grant permission for their children to check out such restricted materials;

- Deleted the provision authorizing the Superintendent to make a determination that a challenge lacks sufficient facts to support a preliminary finding that a book contains content that is pornographic or prohibited by FS 847.012;

- Added a provision empowering the Superintendent, in consultation with the Coordinator of Media Services, to make a determination that a challenge to a title on the basis that it contains content that is pornographic or prohibited by FS 847.012 or depicts or describes "sexual conduct" as defined by Florida law provides sufficient evidence to remove the title without review by the district review committee or the School Board (the "peremptory removal process").

183.   The revised Policy Manual contains no time limit by which book challenges need to be decided.  In fact, the School District and the School Board have not made any decisions regarding any book challenges since April 2023, and no district review committee has met since March 2023.

**L.    The School Board Removes All Library Books for Review Under HB 1069**

184.   The School Board also interpreted the amendments made by HB 1069 as requiring a review of every book in every Escambia County Public School library to determine if the book contains depictions or descriptions of "sexual

66

conduct" as defined by Florida law. The School Board removed from circulation *all* library books so that they could be reviewed by school librarians. If that review determined that a book "may" contain depictions or descriptions of sexual conduct, the book continued to be withheld from circulation. Given the ambiguity in the statutory definition of "sexual conduct," and the School District's changing understanding of the term's meaning, this meant that many books that might not ultimately meet the statutory standard were withheld from circulation. Over time, librarians slowly released books they had "cleared" back to circulation.

185. Beginning in October 2023, the District's Coordinator of Media Services began meetings with high school librarians to review books that had not been returned to circulation. Those meetings determined whether a book contained depictions or descriptions of "sexual conduct" as defined by Florida law and, if so, whether the book was age-group or grade-level appropriate for high school (and in some cases, middle school) libraries. Those books determined not to contain "sexual conduct" as defined by Florida law, or determined to nevertheless be age-group or grade-level appropriate for middle or high school, were to be returned to circulation in middle or high school libraries.

186. In some instances, where the librarian group could not reach a decision, the result of these meetings was to hold books over for further review. Those books remain out of circulation pending review by a district review

committee.

187.   In the spring of 2024, a similar review began with middle school librarians to review those middle school books that were not initially cleared for return to the shelves.  And a similar process is planned for an unspecified time in the future to review elementary school books that were not initially cleared for return to the shelves.

188.   As of July 31, 2024, there were over 1,000 unique titles that have been initially reviewed by school librarians that are still awaiting further review to determine whether they contain depictions or descriptions of "sexual conduct" as defined by Florida law, and, if so, whether they are appropriate for any public school libraries.  In addition, an unspecified number of books at a number of middle and high schools have not yet been subject to the initial 1069 review process and are not available for circulation.

## M.    The School Board Further Restricts Challenged Books

189.   Those books that had been challenged prior to the enactment of HB 1069 have been subject to a separate 1069 review process.  The District's Coordinator of Media Services and a Teacher on Special Assignment to assist her separately reviewed the challenged books to determine whether they "may" contain depictions or descriptions of "sexual conduct" as defined by Florida Law.  Unlike the regular 1069 review described above, however, this review did not assess

whether those books that contain depictions or descriptions of "sexual conduct" as defined by Florida Law were age-group or grade-level appropriate for any school libraries or any grades within those libraries. Instead, if the review determined that the challenged book "may" contain depictions or descriptions of "sexual conduct" as defined by Florida law—without regard to considering the book as a whole and whether it contained serious literary, artistic, political, or scientific value for minors—the book was withheld from circulation at all school libraries pending either unilateral removal by the Superintendent pursuant to the peremptory removal process or review by a district review committee. Such restricted books remain completely unavailable to students; the prior parental opt-in allowing access to restricted books is no longer applicable to these titles.

190.  The review of previously challenged books discussed in the prior paragraph identified at least twenty books that had been restricted pending review where the books did not contain any "sexual conduct" as defined by Florida law. Indeed, those reviewing these books "could not see a consistent reason" for why these books were restricted. Although these titles were identified as not containing depictions or descriptions of "sexual conduct" as defined by Florida law as early as September 2023, the books were not un-restricted until April 2024, when the Superintendent was finally convinced that HB 1557 did not apply to library materials.

191.   As of August 12, 2024, 119 books that had been challenged prior to July 1, 2023 remain restricted pending resolution of the challenge on the grounds that the book "may" contain "sexual conduct" as defined by Florida law.  Ex. 29. These are the "Restricted Books" that are at issue in this lawsuit.[11]  Virtually all of these books were first restricted at or near the time they were first challenged.

192.   The next step for these Restricted Books, as well as the other challenged books subject to restriction, is either peremptory removal by the Superintendent in consultation with the Coordinator of Media Services or the formation of a district review committee to consider the challenge to the book.

193.   The peremptory removal process is set forth in the revised version of the Policy Manual.  Although the Policy Manual was revised in June 2023, the School Board still has not adopted any process to implement this review process, although the Superintendent and Coordinator of Media Service have "discussed the possibility" of these decisions being a recommendation to be presented to the School Board for approval.  The peremptory removal process only allows for book removals; the Policy Manual does not authorize a similar process to determine that a challenged book should be retained in any school library without going through the district review committee process.

194.   Those books not removed through the peremptory removal process are

---

[11] An additional approximately 40 books challenged after July 1, 2023 are also currently restricted due to the fact that the District has determined that the book "may" contain "sexual conduct" as defined by Florida law.

slated for consideration by a district review committee.  The School Board intends to change the composition of these committees so that each committee includes members appointed by each of the School Board Members.  No such committees have been formed since March 2023 and there is no timeline for their formation or for their completion of the review of the Restricted Books.

195.   Although virtually all of these books have been restricted for well over a year—and in some cases for nearly two years—at this time the School Board has no timeline for resolution of the underlying book challenges.  There is no specific date by which the School Board intends to finalize the peremptory removal process, convene new district review committees, or make final decisions on the pending books challenges.

### N.    The Books at Issue in this Litigation

196.   This lawsuit challenges two sets of books: the nine Removed Books set forth in paragraph 96 that the School Board has decided to remove from some or all Escambia Public School libraries (or from some grades within those libraries) and the 119 Restricted Books set forth in Ex. 29 that were challenged before July 1, 2023 and that the School Board has restricted indefinitely pending resolution of the challenge.

## V.    CLAIMS FOR RELIEF

### COUNT ONE:
### FIRST AMENDMENT—VIEWPOINT DISCRIMINATION

**(On Behalf of PEN America, Its Members, the Author Plaintiffs and PRH)**

197.   The foregoing paragraphs are incorporated by reference as if fully set forth herein.

198.   The Fourteenth Amendment to the United States Constitution incorporates the protections of the First Amendment as applied to and binding on the State of Florida.

199.   The School Board is a state actor operating under color of state law.

200.   The libraries within the School District constitute, at a minimum, non-public forums.  Because they are non-public forums, the School Board cannot remove an author's or publisher's book from school libraries, or relegate it to restricted sections of such libraries, based on viewpoint discrimination.

201.   However, as detailed above with respect to the Removed Books, the School Board has been ordering books removed based on ideological objections to their contents or disagreement with their messages or themes, rather than for pedagogical reasons.

202.   The result is that the School Board is systematically excluding certain viewpoints and perspectives from school libraries.

203.   Such removals constitute viewpoint discrimination in violation of the First Amendment.

**COUNT TWO:**
**FIRST AMENDMENT—RIGHT TO RECEIVE INFORMATION**
**FREE FROM VIEWPOINT DISCRIMINATION**
**(On Behalf of the Parent Plaintiffs and Their Minor Children)**

204.   The foregoing paragraphs are incorporated by reference as if fully set forth herein.

205.   The Fourteenth Amendment to the United States Constitution incorporates the protections of the First Amendment as applied to and binding on the State of Florida.

206.   The School Board is a state actor operating under color of state law.

207.   In the setting of a public school library, the First Amendment "protects the right to receive information and ideas." *Pico*, 457 U.S. at 867-68. This right is violated when a school district or school board removes or restricts access to library books "in a ***narrowly partisan or political manner***," and for the purpose of "deny[ing] students access to ideas with which" the school district or school board disagrees. *Id.* at 870-71 (emphasis added). It is likewise violated when books are removed for reasons other than legitimate pedagogical concerns. As detailed above, that is what has occurred here.

208.   The Parent Plaintiffs want their student children to have access to some or all of the Removed Books.

209.   The students on whose behalf the Parent Plaintiffs also bring this

73

lawsuit likewise want to have access to some or all of the Removed Books.

210.   The unlawful conduct of the School Board has injured the rights of the Parent Plaintiffs that their student children have access to information and ideas within school libraries, and the rights of those student children to receive information and ideas.

## COUNT THREE:
### FIRST AMENDMENT—INDEFINITE DELAY
#### (On Behalf of All Plaintiffs)

211.   The foregoing paragraphs are incorporated by reference as if fully set forth herein.

212.   The Fourteenth Amendment to the United States Constitution incorporates the protections of the First Amendment as applied to and binding on the State of Florida.

213.   The School Board is a state actor operating under color of state law.

214.   Authors and publishers have the right to communicate their ideas to students without undue interference from the government.  And students have a corresponding right to receive those ideas.

215.   PEN America, its members, the Author Plaintiffs and PRH all desire to have the Restricted Books available to students in Escambia County Public School libraries.  The Parent Plaintiffs want their student children to be able to access some or all of the Restricted Books.  The students on whose behalf the

Parent Plaintiffs also bring this lawsuit likewise want to be able to access some or all of the Restricted Books.

216.   "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975).

217.   First Amendment doctrine also clearly holds that "[a] scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 227 (1990); *see also Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781, 802 (1988) ("[D]elay compels the speaker's silence. Under these circumstances, the licensing provision cannot stand."); *Vance v. Universal Amusement Co., Inc.*, 445 U.S. 308, 315-17 (1980) (statute authorizing "prior restraints of indefinite duration" of content "not finally adjudicated to be obscene" is unconstitutional); *United States v. Frandsen*, 212 F.3d 1231, 1240 (11th Cir. 2000).

218.   The Escambia County School Board's policy implementing HB 1069 is devoid of any time limits for when the Board must render a final decision on the status of the 119 library books challenged before July 1, 2023 and now restricted under HB 1069.  Nor has the Board adopted any such time limit in implementing

its 1069 review.   Instead, each book is restricted indefinitely because it "may" contain descriptions or depictions of sexual conduct, without the Board making any determination that the book in fact contains such content and without regard to the appropriateness of the book as a whole for any grade level—even though HB 1069 expressly allows that analysis.

219.   As a consequence, all of these 119 books have been restricted for over a year—and many for over two years—with no plan or prospect for when their status might be finally resolved by the Board.

220.   The Board's policy and practice implementing HB 1069 with respect to the 119 Restricted Books violates the First Amendment.

221.   The unlawful conduct of the School Board has injured the rights of all of the Plaintiffs to either communicate their ideas to students or to receive information and ideas within public school libraries.

## VI.    PRAYER FOR RELIEF

**WHEREFORE**, in light of the foregoing facts, Plaintiffs respectfully request that this Court:

A.    Issue declaratory relief declaring the School Board's removal of books to constitute unconstitutional viewpoint discrimination and its indefinite restriction of books to constitute an unconstitutional restraint on protected speech.

B.    Issue preliminary and permanent injunctive relief requiring the School

Board and its agents, employees, and successors in office to restore to the libraries within the School District the Removed Books, consistent with the recommendations of the District Review Committees.

C.    Issue preliminary and permanent injunctive relief requiring the School Board to resolve all pending book challenges in a reasonable time period, but no later than 30 days after issuance of such an injunction, and restore to the libraries within the School District the Restricted Books found to be appropriate for the age group or grade level with access to those libraries;

D.    Award Plaintiffs' costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. § 1988; and

E.    Grant such other and further relief as the interests of justice may require.

Respectfully submitted,

Dated: October 4, 2024                /s/ Shalini Goel Agarwal

Lynn B. Oberlander*
**Ballard Spahr LLP**
1675 Broadway, 19th Floor
New York, NY 10019-5820
Telephone: 212.223.0200
Facsimile: 212.223.1942

Mike Kilgarriff**
Catherine Warren
**Ballard Spahr LLP**

77

1225 17th Street, Suite 2300
Denver, CO 80202
Telephone: 303.292.2400
Facsimile: 303.296.3956

Matthew G. Kussmaul**
Facundo Bouzat*
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA  19103
Telephone: 215.864.8500
Facsimile: 215.864.8999

Kirsten Fehlan*
**BALLARD SPAHR LLP**
999 Peachtree Street, Suite 1600
Atlanta, GA 30309
Telephone: 678.420.3000
Facsimile: 678.420.9401

Kristen A. Petagna**
**BALLARD SPAHR LLP**
700 East Gate Drive, Suite 330
Mount Laurel, NJ 08054
Telephone: 856.761.3400
Facsimile: 856.761.1020

Goldie Fields*
**BALLARD SPAHR LLP**
2029 Century Park E, Ste 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4338
Facsimile: 424.204.4350

Shalini Goel Agarwal (FBN 90843)
Ori Lev*
**PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006

Telephone: 202.579.4582
Facsimile: 929.777.8428

*Admitted pro hac vice*

**Pro hac vice application forthcoming*

*Attorneys for Plaintiffs PEN American Center, Inc., Benjamin Glass, George M. Johnson, Kyle Lukoff, Ann Novakowski, Sean Parker, Penguin Random House LLC, Ashley Hope Pérez, and Christopher Scott Satterwhite*

**INDEX OF EXHIBITS TO SECOND AMENDED COMPLAINT**

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| Exhibit 1 | Escambia County School Board Policy Manual for Educational Media Materials |
| Exhibit 2 | School Materials Review Committee Recommendation for *The Perks of Being a Wallflower* |
| Exhibit 3 | District Review Committee Decision on *The Perks of Being a Wallflower* |
| Exhibit 4 | Appeal of Decision on *The Perks of Being a Wallflower* |
| Exhibit 5 | Challenge Form for *When Wilma Rudolph Played Basketball* |
| Exhibit 6 | Challenge Form for *The Kite Runner* |
| Exhibit 7 | Challenge Form for *The God of Small Things* |
| Exhibit 8 | Challenge Form for *The Handmaid's Tale* |
| Exhibit 9 | Challenge Form for *Uncle Bobby's Wedding* |
| Exhibit 10 | Challenge Form for *Milo Imagines the World* |
| Exhibit 11 | Challenge Form for *And Tango Makes Three* |
| Exhibit 12 | Challenge Form for *When Aidan Became a Brother* |
| Exhibit 13 | District Review Committee Decision on *All Boys Aren't Blue* |
| Exhibit 14 | Challenge Form for *All Boys Aren't Blue* |
| Exhibit 15 | Appeal of Decision on *All Boys Aren't Blue* |
| Exhibit 16 | Challenge Form for *New Kid* |
| Exhibit 17 | District Review Committee Decision on *Drama* |
| Exhibit 18 | Challenge Form for *Drama* |

| Exhibit 19 | District Review Committee Decision on *The Bluest Eye* |
| --- | --- |
| Exhibit 20 | Challenge Form for *The Bluest Eye* |
| Exhibit 21 | District Review Committee Decision on *The Nowhere Girls* |
| Exhibit 22 | Challenge Form for *The Nowhere Girls* |
| Exhibit 23 | District Review Committee Decision on *Push* |
| Exhibit 24 | Appeal of Decision on *Push* |
| Exhibit 25 | Challenge Form for *Out of Darkness* |
| Exhibit 26 | Challenge Form for *Beyond Magenta* |
| Exhibit 27 | Challenge Form for *The Freedom Writers Diary* |
| Exhibit 28 | Challenge Form for *Concrete Rose* |
| Exhibit 29 | List of 119 Books Challenged Prior to July 1, 2023 that Remain Restricted |

# Exhibit 1

| | |
|---|---|
| Book | Policy Manual |
| Section | Chapter 4 - Instruction |
| Title | Educational Media Materials |
| Code | 4.06 |
| Status | Active |
| Adopted | 06/26/90 |
| Last Revised | 12/19/22 |
| Prior Revised Dates | 08/25/92; 10/21/03; 01/16/10; 04/19/11; 12/16/14; |

The Board has the constitutional duty and responsibility to select and provide adequate instructional materials for all students in accordance with F.S. 1006.28 and 1006.283. For core subject areas, the Board must either (1) adopt instructional materials selected from the State-approved materials according to the state adoption cycles, (2) adopt instructional materials pursuant to a (local) Board instructional materials review program prescribed by this policy, or (3) a combination of both. Core subject areas are mathematics, language arts, science, social studies, reading, and literature for kindergarten through grade 12.

The Board is responsible for the content of all instructional materials and any other materials used in a classroom, made available in a school library/media center, classroom library, or included on a reading list whether adopted and purchased from the state-adopted instructional materials list, adopted and purchased through the District instructional materials program or otherwise purchased or made available in the classroom.

Instructional materials and resources shall be provided in a variety of formats that are appropriate, timely, and essential to the attainment of specified educational objectives and are free of bias, stereotypes, distortions, and prejudices.

This policy provides a parent or resident the opportunity to proffer evidence to the district school board that:

A.    An instructional material does not meet the criteria of F.S. 1006.31(2) or 1006.40(3)(d) if it was selected for use in a course or otherwise made available to students in the school district but was not subject to the public notice, review, comment, and hearing procedures under F.S. 1006.283(2)(b)8., 9., and 11.

B.    Any material used in a classroom, made available in a school library, classroom library, or included on a reading list that contains content that is pornographic or prohibited under F.S. 847.012, is not suited to student needs and their ability to comprehend the material presented, or is inappropriate for the grade level and age group for which the material is used. Materials found to violate these criteria will be discontinued for any grade level or age group for which such use is inappropriate or unsuitable.

1.    Definition of Instructional Materials

F.S. 1006.29(2) defines the terms "instructional materials" as items having intellectual content that by design serve as a major tool for assisting in the instruction of a subject or course. These items may be available in bound, unbound, kit, or

package form and may consist of hardbacked or soft backed textbooks, electronic content, consumables, learning laboratories, manipulatives, electronic media, and computer courseware or software. Pursuant to F.S. 1006.28(1)(a)(1), "adequate instructional materials" means a sufficient number of student or site licenses or sets of materials.

2.    Use of Instructional Materials

A.    Each school shall purchase sufficient current instructional materials to provide each student with a textbook or other instructional materials as a major tool of instruction in core courses in mathematics, language arts, science, social studies, reading, and literature for kindergarten through grade 12 except for instruction approved by the School Advisory Council that does not include a textbook as a major tool of instruction. Such purchase must be made within the first three (3) years of the effective date of the adoption cycle.

Principals are also responsible for overseeing compliance with school district procedures for selecting school library/media center materials and classroom libraries at the school to which they are assigned. Use of materials must adhere to the "fair use" doctrine permitting the use of copyrighted works for instructional purposes.
(See https://www.copyright.gov/help/faq/)

B.    Allocations shall be made to individual schools on an equitable basis. Up to fifty (50) percent of the annual allocation may be used for the purchase of instructional materials, including library and reference books and non-print materials, not including the District-adopted list, and for the repair and renovation of textbooks and library books.

C.    Principals shall communicate to parents/guardians the manner in which instructional materials are used to implement the curricular activities of the school and how instructional materials funds are allocated and spent.

D.    Schools shall notify parents/guardians of their student's ability to access their instructional materials through the district's local instructional improvement system and/or website. This notification will be displayed prominently on the school's website and will be provided annually in written format to all parents/guardians of enrolled students.

3.    Adoptions of Core Subject Instructional Materials

Each school year, no later than March 15th, a district subject area Instructional Materials Review Committee shall be established for recommending instructional materials from the state adopted list or materials from appropriate publishers to be included on the District adopted textbook list for purchase by district schools. ~~The School Board shall also annually approve instructional materials used to teach reproductive health or any disease, including HIV/AIDS, its symptoms, development and treatment.~~ All materials used to teach reproductive health or any disease, including HIV/AIDS, its symptoms, development and treatment must be approved by the Florida Department of Education.

No school shall participate in a pilot program of instructional materials under consideration for adoption during the eighteen (18) months prior to state adoption or for the first two (2) years after official adoption of materials.

4.    Instructional Materials Adoption Procedure

    A.    Instructional Materials Review Committee Membership

        1.    The Instructional Materials Review Committee shall be composed of persons actively engaged in teaching or in the supervision of teaching in the public elementary, middle, or high schools and shall represent the major fields and levels in which instructional materials are used in the public schools. In addition, the Instructional Materials Review Committee must include at least one parent of district students.

        2.    All persons serving on the Instructional Materials Review Committees must complete a District developed instructional materials selection training program prior to reviewing and selecting materials. The training must assist viewers in complying with Section 1006.31(2), F.S. which requires, among other things, reviews to include materials portraying the ethnic, socioeconomic, cultural, religious, physical, and racial diversity of our society, and to exclude materials containing pornography and prohibited under s. 847.012, F.S.

        3.    Members of the district subject area Instructional Materials Review Committee must sign an "Instructional Materials Review Committee Member Affidavit" form before conducting committee business. The form specifies that Instructional Materials Review Committee members are prohibited from accepting gifts, money, emoluments, or other valuables which shall directly or indirectly influence the adoption or purchase of any instructional materials. A copy of the form can be found on the District's Media Services website. Instructional Materials Review Committee members' conduct should be in the best interest of the students and the District.

        4.    The Instructional Materials Review Committees shall meet as often as necessary to carry out their duties and responsibilities and make recommendations to the Superintendent. Meetings of Instructional Materials Review Committees convened for the purpose of ranking, eliminating, or selecting instructional materials for recommendation to the district school board must be noticed and open to the public in accordance with s. 286.011, F.S. Adoption of textbooks from such recommendations shall be considered as separate actionable items in meetings of the Board.

5.    The District's Instructional Materials Adoption Policy Follows the Criteria Listed Below.

    A.    The District's instructional materials adoption cycle shall correspond with the State adoption cycle except when determined to best serve the District's needs.

    B.    The focus of the District review will be to evaluate materials submitted by publishers for State adoption or other appropriate materials with the purpose of recommending materials for District adoption.

C.    Content Standards for Instructional Materials
Pursuant to F.S. 1006.34, in the selection of instructional materials, library material, <u>classroom library</u>, and other reading material used in the public school system, the standards used to determine the propriety of the instructional material shall include: the age of the students who normally could be expected to have access to the material; the educational purpose to be served by the material with priority given to the selection of materials that align with Florida State Standards as provided for in F.S. 1003.41 and include instructional objectives contained within the curriculum frameworks for career and technical education.

1.    Alignment with Subject Standards
Textbooks and instructional materials should provide quality learning experiences for students, enrich and support the curriculum, and be consistent with the Florida State Standards. The Instructional Materials Review Committee shall evaluate instructional materials utilizing the procedural guidelines provided by the District's Media Services department. Listed below are the major components of the review guidelines.

a.    Content (Alignment with curriculum and Florida State Standards; level of treatment; expertise for content development; accuracy of content; currency of content; authenticity of content; multicultural representation; humanity and compassion)

b.    Presentation (Comprehensiveness of student and teacher resources; alignment of instructional components; organization of instructional materials; readability of instructional materials; pacing of content; ease of use and durability of materials)

c.    Learning (Motivational strategies; teaching a few "big ideas"; explicit instruction; guidance and support; active participation of students; targeted instructional strategies; targeted assessment strategies)

2.    Accurate, Objective, Balanced, Current, Free of Pornography and Prohibited Material and Suited for Student Needs
Pursuant to F.S. 1006.40(3)(d), any materials purchased shall be free of pornography and material prohibited under F.S. 847.012, suited to student needs and their ability to comprehend the material presented, and appropriate for the grade level and age group for which the materials are used or made available.
Pursuant to F.S. 1006.31, instructional materials recommended by each reviewer shall be accurate, objective, balanced, noninflammatory, current, free of pornography and material prohibited under F.S. 847.012, and suited to student needs and their ability to comprehend the material presented.

The District shall rely on Florida Department of Education rules to determine what is age-appropriate, or in the absence of rules, on a preponderance of reviews by subject experts and/or professionally recognized periodicals or organizations.

3.    Bias-Free

Instructional materials must also be evaluated for bias-free content. There are five (5) areas in which bias is evidenced in instructional materials:

   a.    Contextual Invisibility

   b.    Stereotyping and Characterization

   c.    Historical Distortions and Omissions

   d.    Language Bias

   e.    Inaccurate and Stereotypical Visual Images

4.    Additional Considerations for Selection of Instructional Materials

   a.    When recommending instructional materials, each reviewer shall:

      i.    Include instructional materials that accurately portray the ethnic, socioeconomic, cultural, religious, physical, and racial diversity of our society, including men and women in professional, career, and executive roles, and the role and contributions of the entrepreneur and labor in the total development of this state and the United States.

      ii.    Include materials that accurately portray, whenever appropriate, humankind's place in ecological systems, including the necessity for the protection of our environment and conservation of our natural resources and the effects on the human system of the use of tobacco, alcohol, controlled substances, and other dangerous substances.

      iii.    Include materials that encourage thrift, fire prevention, and humane treatment of people and animals.

      iv.    Require, when appropriate to the comprehension of students, that materials for social science, history, or civics classes contain the Declaration of Independence and the Constitution of the United States.

   b.    Consideration should be given to the broad racial, ethnic, socioeconomic, and cultural diversity of this state. A reviewer may not recommend any instructional materials that contain any matter reflecting unfairly upon persons because of their race,

color, creed, national origin, ancestry, gender, religion, disability, socioeconomic status, or occupation.

6.    Instructional Materials Adoption Evaluation Procedure

A.    Members of an Instructional Materials Review Committee shall apply the standards set forth in Section IV above in evaluating all instructional materials.

B.    Members of an Instructional Materials Review Committee shall receive instructions and training in the evaluation techniques to be used, characteristics of effective instructional materials, and the skills necessary to make valid and objective decisions regarding the content and rigor of instructional materials.

C.    The evaluation process shall include, as available, collection and review of the research about the instructional materials under consideration, as well as other districts' experiences with the instructional materials being reviewed.

D.    The review process shall include scrutiny of each program's correlation to the State Standards and the assessments that are based on such standards.

E.    Evaluation instruments employed by the Instructional Materials Review Committee members in its evaluation and selection process may be instruments developed by the Florida Department of Education or district-modified versions of the same.

F.    If an Instructional Materials Review Committee elects to have publisher presentations, every publisher submitting materials for consideration in a specific subject area shall be provided an equal opportunity to present. All publishers shall be given equal time for the presentation. The Instructional Materials Review Committee chair shall be responsible for ensuring equity.

G.    Instructional Materials Review Committee members shall review materials and return recommendations to the Assistant Superintendent over Instructional Materials.

7.    Public Input for the Adoption of Instructional Materials

The public may review and comment on materials being considered and/or recommended for adoption. In addition, Escambia County public school parents/guardians or residents of Escambia County may contest a specific adopted material. Opportunities for public input are listed below.

A.    The public may review all materials being considered for adoption. Print and/or online samples of a student edition will be made available during the Instructional Materials Review Committee review process. Student editions of materials recommended for adoption will be made available online at least twenty (20) calendar days before the school board hearing.

B.    An open, noticed public meeting will be held to review the district's annual instructional materials plan, preview print/online samples, and provide online access instructions.

C.    An open, noticed school board meeting will be held to receive public comment on recommended instructional materials.

D.    The parent/guardian of a student enrolled in an Escambia County public school/resident of Escambia County may contest the district school board's adoption of a specific instructional material by filing a petition, on the "Motion to Contest the Adoption of an Instructional Material" form, within thirty (30) calendar days after the adoption by the school board.

   1.    The "Motion to Contest the Adoption of an Instructional Material" form must be signed by the parent/guardian or resident, include the required contact information, and state the objection to the instructional material.

   2.    Within thirty (30) calendar days after the thirty (30) day period has expired, the school board will conduct at least one open public hearing on all petitions timely received before an unbiased and qualified hearing officer. The hearing officer may not be an employee or agent of the school district. While not subject to Chapter 120 provisions, the hearing must provide sufficient procedural protections to allow each petitioner an adequate and fair opportunity to be heard and present evidence to the hearing officer.

   3.    The school board's decision after convening a public hearing is final and not subject to further petition or review

8.    Lost/Damaged Instructional Materials and Disposal of Instructional Materials

A.    Principals shall make a reasonable effort to collect from each pupil or pupil's parent/guardian the purchase price of any instructional materials the pupil has lost, destroyed, or unnecessarily damaged and to report and transmit the amount collected to the Superintendent. Failure to satisfy the debt may result in suspension of the pupil from participation in extra-curricular activities or an assignment to community service at the school site until the debt is satisfied.

B.    The District shall dispose of instructional materials when they have become unserviceable or surplus or are no longer on state contract by

   1.    giving materials to other public education programs within the District or State, giving materials to teachers to use in developing supplementary teaching materials, or giving materials to students or others that may include any charitable organization, governmental agency, private school, or State; or

   2.    selling the materials to used book dealers, recycling plants, pulp mills, or other persons, firms, or corporations upon such terms as are most economically advantageous to the District. All moneys received because of sale, exchange, or other disposition of instructional materials shall be deposited in the District school fund and added to the District appropriation for instructional materials.

9.    School Library/Media Center and Other Educational Materials

In accordance with F.S. 1006.28(2)(d), the School Board shall establish and maintain a program of school library media services for all public schools in the district, including school library/media centers, or school library/media centers open to the public, and, in addition, such traveling or circulating libraries as may be needed for the proper operation of the district school system.

The media specialist will stay informed about appropriate new publications, by using multiple sources, such as discussions with colleagues, attendance at conferences, and reading a variety of periodicals and book reviews. The media specialist will also receive and consider suggestions or requests brought forward by other faculty, students and parents/guardians. Potential new books for the school library media center, classroom library, and reading lists will be evaluated to determine if they would be suitable for student needs and whether they would be appropriate for the intended grade level and age group. In considering possible new acquisitions, the media specialist will consult reputable, professionally recognized reviewing periodicals and school community stakeholders. The media specialist will also assess the level of student interest in the subject(s) presented and the ability of students to comprehend the material. Books that are selected must be free of pornography and material prohibited under F.S. 847.012. After evaluation, the media specialist will inform the principal of those books that have been evaluated and are approved for inclusion in the collections. The procedure for developing library media center, classroom library, and reading list collections will be posted on the website for each school in the District.

A wide choice of materials that support the instructional program shall be available to students and professional staff to allow for varying achievement levels, free choice reading interests, and teaching/learning styles. Materials should be available in a variety of formats and reading levels, offer a well-balanced coverage of subjects, and support the diverse interests, needs, and viewpoints of the school community.

School librarians, media specialists, and other personnel involved in the selection of school district library and classroom library materials must complete a training program developed pursuant to F.S. 1006.29(6) before reviewing and selecting age-appropriate materials and library resources.

Upon written request, the District shall provide access to any materials or book specified in the request that is maintained in the school library and classroom library and is available for review. The school principal shall arrange a convenient time to provide such access.

A.    Purpose of the Library/Media Center and Classroom Library Materials

       The library/media center and classroom library shall contain a comprehensive collection of materials and equipment in a variety of media formats to:

       1.    provide a broad background of information resources in all areas of knowledge; and

       2.    support the general educational goals of the District and the objectives of specific courses, including materials that represent diverse points of view.

       3.    Meet the personal needs and interests of students, including materials that:

a.  nurture the development of recreational/listening/viewing, cultural appreciation, and aesthetic values;

b.  represent the many religious, racial, ethnic, linguistic, and cultural groups in our society and reflect their contributions to the heritage and culture of our civilization;

c.  foster respect for the diverse roles available to all people in today's society;

d.  provide education media that reflect differing and/or opposing viewpoints; and

e.  provide a comprehensive collection appropriate for the users of the library media center and classroom library.

4.  Support the professional needs of teachers and administrators; and

5.  Introduce new instructional strategies into the learning environment.

B.  Student Access to Library/Media Center and Classroom Library Collections

Parents have the right to determine what they believe is and is not appropriate reading material for their student. Parents will be given the opportunity to choose Open Access, Limited Access, or No Access to the library/media center and classroom library collection. The access will be noted in the Student Information System and in the Library Catalog.

Parents of middle school students, grade six (6) through eight (8) shall also have the opportunity to opt in for their student to have access to the "young adult" section in the library/media center and classroom library. The access will be noted in the Student Information System and the Library Catalog.

C.  Objectives of Selection

The primary objective of educational media is to implement, enrich, and support the educational program of the District; its secondary function is to contribute to the development of informed and responsible citizens. It is the duty of the District to provide a wide range of materials of different levels of difficulty, with diversity of appeal and representing different points of view taking into account the varied interests, abilities, and maturity levels of the pupils being served. The utilization of any specific item in educational media does not necessarily mean that the school or the District advocates or endorses the contents of the item.

To this end, the School Board of the Escambia District affirms that school library media centers and classroom libraries shall:

1.  provide a comprehensive collection of instructional materials that will support the curriculum;

2.      provide materials for teachers and students that will stimulate growth in knowledge, literacy appreciation, aesthetic values, and ethical standards;

3.      provide information that will enable students to make intelligent decisions and to understand the consequences of their decisions;

4.      provide education media that reflects differing and/or opposing viewpoints;

5.      provide materials which reflect the ideas and beliefs of the many ethnic, religious, and political groups that have contributed to the American and world heritage and culture; and

6.      provide age-appropriate materials in multiple genres to encourage students to read for pleasure and information.

D.      Responsibility for Selection of Materials

Selection of educational media is a continuous process which involves teachers, administrators, lay persons, other instructional personnel, and students as appropriate.

1.      The responsibility for coordinating the selection process and making the final selection for library-media and classroom library materials rests with the school library media specialist who holds a valid educational media specialist certificate.

2.      Beginning January 1, 2023, School library media specialists, and other personnel involved in the selection of school district library materials must complete the online training program developed by the Florida Department of Education prior to reviewing and selecting age-appropriate materials and library resources.

3.      School principals are responsible for overseeing compliance with school district procedures for selecting school library media and classroom library materials.

4.      Teachers are responsible for fully reviewing and evaluating outside media that will be used as classroom curriculum material.

5.      Final selection of classroom curriculum material shall be the responsibility of the principal or principal's designee.

E.      Evaluation and Selection of Library/Media Center Materials

In addition to supporting the curriculum, the school library/media center and classroom library affords students the opportunity to explore areas of interest and thought not covered by the prescribed curriculum; therefore, it should contain materials that allow for free inquiry, study, and evaluation. The selection process may include consultation with school administrators, other teachers, students, and parents/guardians to assure a comprehensive

collection appropriate for users of the library/media center and classroom library. School principals are responsible for overseeing compliance with school district procedures for selecting school library/media center materials at the school to which they are assigned.

1.  Each book made available to students through a school district library/media center, classroom library or included in a recommended or assigned school or grade level reading list must be selected by a school district employee who holds a valid educational media specialist certificate, regardless of whether the book is purchased, donated, or otherwise made available to students.

2.  Each new title purchased to be available to students through a district library/media center and classroom library must be presented to the school's Library Advisory Council for input. The Library Advisory Council shall be comprised of at least the school's media specialist, two teachers, one parent and one community member. The principal will ensure the committee is representative of the school community.

3.  Materials placed in media collections shall meet the criteria set forth in Section 1006.40(3)(d) F.S. The process of evaluating materials for inclusion in collections is continuous and systematic. Selections are based upon consultation with reputable professionally recognized reviewing periodicals and school community stakeholders. Materials for inclusion shall be considered according to the following criteria:

    a.  First consideration is given to the need of the individual school based on:

        i.   reader interest;

        ii.  support of state academic standards and aligned curriculum;

        iii. existing collection;

        iv.  academic needs of students and faculty; and

        v.   requests from users of the collection (administrators, faculty, parents/guardians, students) are given high priority.

    b.  Materials for purchase are considered on the basis of overall purpose, timeliness, importance of the subject matter, quality of writing or production; readability and popular appeal; authoritativeness; reputation of the author, artists, publisher, producer, format; and cost.

    c.  In the selection of educational media, special consideration is given to the following:

        i.   Ideologies: factual information on any ideology or philosophy present in society;

ii. ~~Profanity: the fact that profanity appears in media does not automatically disqualify a selection. Care is taken to exclude media using profanity in a lewd or detrimental manner;~~

~~iii~~ ii. Religion: factual unbiased media which represents all major religions;

~~iv~~ iii. Science: theories and factual information about scientific knowledge appropriate to the age level for which it is intended;

~~v~~ iv. Sex: pornographic, sensation, or titillating media are not included, but the fact of sexual incidents appearing in the media does not automatically disqualify them.

No book or other materials containing pornography shall be used or be available in the District as prohibited by Section 847.012, F.S. No book or other materials shall be used or be available that depicts or describes sexual conduct as defined in F.S. 847.001(19) for any grade level or age group for which such use is inappropriate or unsuitable, unless such material is for a course required by F.S. 1003.46, 1003.42(2) (n)1.g., or Fla. State. 1003.42(2) (n)3., or identified by State Board of Education rule.

~~Vi~~ v. Sex education: factual information appropriate for the age group or related to the school curriculum; and

~~Vii~~ vi. Stereo-type and sex biases: educational media shall be freed from stereo-type and sex biases.

vii. Race, sexuality, gender identify, profanity, drugs/alcohol and violence; selection will be based on community standards as established by the Board. In the absence of standards, professional reviews will be consulted.

4. Each school must publish on its website, in a searchable format prescribed by the Florida Department of Education, a list of all materials maintained in the school library/media center and elementary classroom libraries.

5. Each elementary school must publish on its website, in a searchable format prescribed by the Florida Department of Education, a list of all required school or grade level reading lists.

D. Discontinuation of Library Media Materials and Classroom Library Materials

Personnel holding responsibility for evaluation and selection of educational media should reexamine materials periodically to ensure they continue to meet selection criteria. Objective criteria for removing materials include:

1.   condition of material (worn and damaged);

2.   duplication of seldom-used materials;

3.   obsolescence and/or inaccuracy of information;

4.   inappropriate content based on age interest level;

5.   lack of circulation;

6.   supersession of serial materials; and

7.   alignment to state academic standards and relevancy to curriculum; and

8.   required removal pursuant to s. 1006.28(2)(a)2., F.S.

10.   Challenged Materials

Objections Regarding Non-Adopted Instructional, Library/Media Center, Classroom Library, and/or other Educational Material.

Challenged materials may be removed from use only after the following procedures have been completed in sequence.

Interested citizens may challenge materials being used in a school according to procedures established by the Board and published in the Challenged Materials document on the Media Services website.

A.   Reconsideration of Challenged Media

1.   The School District of Escambia County supports the principles of freedom of speech and the right to a redress of grievances inherent in the First Amendment of the United States as well as appropriate Federal and State Statutes, and subsequent court decisions that have been rendered.

2.   Any parent/guardian or resident of the county of the school district may raise objections to resources used in the educational program despite the fact that the individuals selecting such resources were duly qualified to make these selections and observed the criteria for selecting resources.

3.   No parent, guardian or resident of the county has the right to determine the reading, viewing or listening resources for students other than their own children.

4.   Access to Materials Under Review

a.   Any material challenged on the basis that it contains content that is pornographic or prohibited under F.S. 847.012 or depicts or describes sexual conduct as defined in F.S. 847.001 (19), unless such material is for a course required by F.S.

> 1003.46, 1003.42(2) (n)1.g., or F.S. 1003.42(2) (n)3. Or identified by State Board of Education rule shall be placed in a Restricted Access Area of the Library/Media Center within five (5) school days of receipt of the objection and remain unavailable to students of that school until a decision has been made by the Superintendent in consultation with the Coordinator of Media Services, District Materials Review Committee or Board. Parent/Guardians may grant permission for their student to check out the material by completing the Permission to Access Restricted Materials form located on the Media Services website and submitting the completed form to the student's school administrator.

> b.    The Superintendent, in consultation with the Coordinator of Media Services, shall retain the right to make a determination that a challenge lacks sufficient facts to support a preliminary finding that the material contains content that is pornographic or prohibited under F.S. 847.012. In such case, the challenged material will remain in circulation during the review process.

> c.b.    All other challenged material will remain in circulation during the pendency of the review process.  Parents may at any time opt their child out of all materials currently under review which remain in circulation. See section 9.B. Student Access to Library/Media Center and Classroom Library Collections.

5.    A decision to sustain a challenge shall not be interpreted as a judgment of irresponsibility on the part of the professionals involved in the original selection and/or use of the resource. Professional personnel shall not be punished or have their employment affected by decisions reached by the District Materials Review Committee or the Board.

B.    Procedures for Reconsideration of Materials

Objections to some materials may be voiced by the public not withstanding the care taken in the selection process and despite the qualifications of persons selecting materials. If a complaint is made, the following procedures should be observed:

1.    Inform the complainant of the selection procedures and make no comments.

2.    All concerns shall be presented in writing on a printed Reconsideration of Educational Media form that is available through the principal of the school or the District website. A complainant who does not complete and return the form shall receive no consideration.

3.    These procedures shall be followed for reconsideration:

a.    The completed Request for Reconsideration of Educational Media forms are submitted to the school principal or to the Coordinator of Media Services.

b.    The principal shall notify the Assistant Superintendent of Curriculum and Instruction and the Coordinator of Media Services.

c.    ~~The availability of the challenged materials is changed to "Restricted Status" in the Library Catalog and placed in an area not accessible by students. Parent/Guardians may grant permission for their student to check out the material by completing the Permission to Access Restricted Materials form located on the Media Services website and submitting the completed form to the student's school administrator.~~ Any material challenged on the basis that it contains content that is pornographic or prohibited under F.S. 847.012 or depicts or describes sexual conduct as defined in F.S. 847.001 (19), unless such material is a course required by F.S. 1003.46, 1003.42(2) (n)1.g., or F.S. 1003.42(2) (n)3., or identified by State Board of Education rule, shall be placed in a Restricted Access Area of the Library/Media Center within five (5) school days of receipt of the objection.

d.    The Superintendent, in consultation with the Coordinator of Media Services, shall retain the right to make a determination that the challenge to a title on the basis that it contains content that is pornographic or prohibited under F.S. 847.012 or depicts or describes sexual conduct as defined in Fla. Stat 847.001(19), unless such material is for a course required by Fla. Stat 1003.46, 1003.42(2) (n)1.g., or F.S. 1003.42(2) (n)3., or identified by State Board of Education rule, provides sufficient evidence to remove the title without review by the District Materials Review committee or the Board.

~~d.~~ e.    Information regarding the challenge shall be posted on the Media Services website for additional public input.

e. f.    A District Materials Review Committee shall be appointed by the Assistant Superintendent of Curriculum and Instruction to review the appeal.

~~f.~~ g.    The District Materials Review Committee shall be comprised of five or more members to include community members, school administrators, teachers, parents/guardians, and media specialists of the same level(s) of school(s) containing the title. The District Materials Review Committee reserves the right to use outside expertise if necessary to help in its decision making.

h.    Meetings of committees convened for the purpose of resolving an objection by a parent or resident to specific materials must be noticed and open to the public in accordance with s. 286.001.

~~g.~~ i.    School Library Councils of the same level(s) of school(s) containing the title in question shall be given the opportunity to provide input for the District Materials Review Committee to consider.

h. j.   Challenged materials shall be read and re-evaluated by the District Materials Review Committee considering the specific objections. In the deliberations of challenged materials, the District Materials Review Committee shall consider the educational philosophy of the school district, the professional opinions of other teachers of the same subject and other competent authorities, reviews of the materials by reputable bodies, input from School Library Advisory Councils of the same level(s) of school(s) containing the title, the teacher's own stated objectives in using the materials, public input, and the objection of the complainant.

i. k.   The complainant shall have the right to proffer evidence, in a written format, for the District Materials Review Committee's consideration that:

    i.    An instructional material does not meet the criteria of s. 1006.31(2), Fla. Stat., or s. 1006.40(3)(d), Fla. Stat., if it was selected for use in a course or otherwise made available to students in the school district but was not subject to the public notice, review, comment, and hearing procedures under s. 1006.283(2)(b), F.S.

    ii.    Any material used in a classroom, made available in a school library, or classroom library, or included on a reading list contains content that is pornographic or prohibited under s. 847.012, Fla. Stat., depicts or describes sexual conduct as defined in F.S. 847.001(19), unless such material is for a course required by Fla. Sta. 1003.46, 1003.42(2) (n)1.g., or Fla. Sta. 1003.42(2) (n)3., or identified by State Board of Education rule, is not suited to student needs and their ability to comprehend the material presented, or is inappropriate for the grade level and age group for which the material is used.

j. l.   The District Materials Review Committee will make its decision determined by the simple majority to retain the item in the collection without restriction, move the resources to a different level, or remove the resources. This will be a secret ballot vote; however, all ballots must be maintained as public records.

k. m.   The Assistant Superintendent of Curriculum and Instruction shall receive a written report concerning the District Materials Review Committee's decision.

l. n.   The Assistant Superintendent of Curriculum shall inform the complainant, in writing, by certified US mail, of the District Materials Review Committee's decision.

m. o.    District Materials Review Committee decisions on reconsidered materials will stand for one (1) calendar year before new requests for reconsideration of those items will be entertained, unless the decision is appealed and overturned at a higher level.

n. p.    The District Materials Review Committee's decision shall apply to all schools.

4.    These procedures shall be followed for an appeal to the School Board if the complainant disagrees with the decision by the District Materials Review Committee.

a.    An appeal of the decision made by the District Materials Review Committee must be made in writing to the superintendent within ten (10) days of receipt of the District Materials Review Committee's decision.

b.    Decision on the complaint will be made at the next regularly scheduled Board meeting unless the date of the decision being appealed is filed within fourteen (14) days of the Board meeting. In that instance, the matter will be heard at the following regular Board meeting. The Board reserves the right to schedule a special meeting for consideration of challenged materials.

c.    The Board shall review all evidence and materials presented at the District Materials Review Committee level. If the complainant wishes to offer any additional evidence, it must be submitted to the superintendent no less than eight (8) days prior to the meeting at which the matter will be heard.

d.    The public shall be afforded an opportunity to comment before the Board makes a final decision.

e.    The Board reserves the right to use outside expertise if necessary to help in its decision making.

f.    The Board decision will be final, and the superintendent will implement the decision.

g.    Board decisions on reconsidered materials will stand for five (5) calendar years before new requests for reconsideration of those items will be entertained.

h.    The Board's decision shall apply to all schools.

i.    If a parent disagrees with the determination made by the district school board on the objections to the use of a specific material, a parent may request the Commissioner of Education to appoint a special magistrate who is a member of the Florida Bar in good standing and who has a least five (5) years' experience in administrative law.  The special magistrate shall determine facts relating to the school district's determination, consider information provided by the parent and the school district, and

render a recommended decision for resolution to the State Board of Education within thirty (30) days after receipt of the request by the parent.  The State Board of Education must approve or reject the recommended decision at is next regularly scheduled meeting that is more than seven (7) calendar days and nor more than thirty (30) days after the date the recommended decision is transmitted.  The costs of the special magistrate shall be borne by the school district.  The State Board of Education shall adopt rules, including forms, necessary to implement this subparagraph.

Rulemaking Authority: Sections 1001.41; 1001.42; 1001.43, F.S.

Law Implemented: Sections 847.02; 1006.28; 1006.34; 1006.40; 1010.215, F.S.

Exhibit 2

# THE SCHOOL DISTRICT OF ESCAMBIA COUNTY
## LIBRARY MEDIA SERVICES
### School Materials Review Committee Recommendation

Attach Citizen's Request for Recommendation of Instructional Materials (Name of Form)

Author: Stephen  Chlosky  Title or Item: The Perks of Being a Wallflower

School: Northview High School                School no. 1231  Date  7/13/22

1. Name and titles of School Review Committee Members:
   - Name: Raja Atallah, Academic Advisor
   - Name: Michael Sherrill , Principal
   - Name: Megan Carroll, Librarian
   - Name: Gerry Pippins, Assistant Principal
   - Name: Wes Summerford, PE/Football Coach
   - Name: Brandy White, Dean/Parent
   - Name: Michelle White, Coordinator of Media Services

2. Meeting date(s), time(s) and location(s):

   | Date | 6/13/22 | Time | 8:00 a.m. | Location | Northview High School |
   |------|---------|------|-----------|----------|----------------------|
   | Date | 7/13/22 | Time | 11:30 a.m. | Location | Northview High School |

3. Committee recommendations:

The committee voted 4:3 recommending the novel remain as an optional title for a teacher to use as a ¹ass novel study for seniors at Northview High School.  The Justification for Use of Outside Media form will still need to be submitted to and approved by the school administration before use in the classroom . An approved letter must also be sent home for parent approval.

4. Reason(s):

The concerns raised in the complaint are part of the characters' development throughout the novel.  These concerns do not outweigh the potential discussions and literary value of the novel enough to remove it as an option for any teacher to use at Northview High School.  A teacher wishing to conduct a novel study with this title will still need to follow the ECSD guidelines and procedures for the use of outside media.

5. Next Steps:
The principal will inform the complainant, in writing, of the committee's decision.

The complainant may appeal the decision, in writing, to the Assistant Superintendent of Curriculum and Instruction.  A district committee will then be formed to evaluate the material.  The complainant shall have the right to proffer evidence for the committee's consideration that:

Any material used in a classroom, made available in a school library, or included on a reading list contains content that is pornographic or prohibited under s.847.012, F.S., is not suited to student needs and their ability to comprehend the material presented, or is inappropriate for the grade level and age ⁻roup for which the material is used.

Vicki Baggett
Northview High School
Escambia County, FL
Bratt, FL
July 28, 2022

Mr. Steve Marcanio, Asst. Supt. Curriculum/Instruction
All Escambia County Board Members
Supt. Tim Smith
Gov. Ron DeSantis
Principal Michael Sherrill
Asst. Principal Gerry Pippins
Michelle White

RE: School Materials Review Committee Recommendation/"Perks of Being a Wallflower"

Dear Mr. Marcanio:

I have been informed that filing an appeal with you would necessitate the next step in my attempt to have a particular book removed as an optional one within our school district. It is my understanding that instead of simply removing a book filled with obscene situations, words and questionable content, a person must appeal to a school committee first. Then if that fails (which unbelievably has happened in my case), one must then send the request to you to form a committee. This situation is concerning a book by Stephen Chlosky called "The Perks of Being a Wallflower." However, this is not the only book that should be considered for removal by our district, or any adult who has been entrusted with the minds and hearts of children and young adults.

As a veteran teacher with over 31 years of high school and college teaching experience, I never, in a million years, thought I would ever have to defend and beg my own school professionals, colleagues, and district personnel to be in agreement as to what constitutes goodness and values in literature. What I see taking place in the curriculum of public education is beyond alarming, and if those same adults who have been given the privilege to teach our children do not take their roles seriously, our county will end up in a world of trouble, similar to what is happening in Clay County currently.

What does it mean when a district orders entire classroom sets of books for teachers to use in their classrooms as a novel study and that book has sections on masturbation, beastiality, and teenage sex and lesbianism? With the new My Perspectives Curriculum with the English curriculum, teachers were allowed to vote for one classroom novel per grade level. The book in question is certainly not one I voted for. I had never even heard of this book; however, this particular book won the 12th English teacher vote throughout our district. Later when I questioned the English Supervisor, Jessica Rowell, why this book and another one selected for 11th grade called "Into the Wild," which had an entire section about "blow jobs," was even on the list, she replied "I have read both novels mentioned, but it is not best practice for an individual to make a district decision. That is why multiple teacher leaders and other departments were included in this process" (Email on May 13, 2022).

My question to you is this: If we, as teachers, cannot depend on our supervisors and department and ultimately the district to use decent guidelines in selecting classroom novels, then why have these positions? Let me share with you a few passages from "Perks of Being a Wallflower," the book that serves no literary purpose, even though my school committee voted 4 to 3 to keep it as an option for "any teacher to use at Northview High School" because the passages in question "are part of the characters' developments" (Letter sent by School Materials Review Committee at Northview High on July 14, 2022).

Below are a few of the passages in this book that, I hope, would cause any teacher NOT to use this as a classroom novel discussion. These are just a few.

p. 12—"And I opened the door to the basement, and my sister and this boy were naked. He was on top of her, and her legs were draped over either side of the couch."

p. 21—"I was with Sam. We were both naked. And her legs were spread over the sides of the couch. And I woke up. And I had never felt that good in my life."

p. 21—"Do you know what 'masturbation' is? I think you probably do because you are older than me. But just in case, I will tell you. Masturbation is when you rub your genitals until you have an orgasm. Wow!

p. 31—"She grabbed his penis with her hands and started moving it. I wish I could describe this a little more nicely without using words like penis, but that was the way it was. After a few minutes, the boy pushed the girl's head down, and she started to kiss his penis. She was still crying. Finally, she stopped crying because he put his penis in her mouth, and I don't think you can cry in that position."

p. 44—When most people left, Brad and Patrick went into Patrick's room. They had sex for the first time that night. I don't want to go into detail about it because it's pretty private stuff, but I will say that Brad assumed the role of the girl in terms of where you put things."

p. 110—"Patrick kept making jokes that I would get an 'erection.' I really hoped this wouldn't happen. Once, I got an erection in class and had to go to the blackboard."

p. 158—"They start to make out. The stereo's playing, and they're just about to 'do it' when Parker realizes he forgot the condoms. They're both naked on this putting green. They both want each other. There's no condom. So, what do you think happened? ...They did it doggie-style with one of the sandwich bags!"

p. 159—"There was a guy named Carl Burns and everyone called him C.B. And one day C.B. got so drunk at a party that he tried to "f—k" the host's dog.

p. 159—"And there was this guy they called 'Action Jack' because supposedly he was caught masturbating at a drunk party..."

There is plenty of more about masturbation, beastialty, and sex in this book. I hope you get my point.

The 11th grade book, purchased by our district for an optional classroom novel, uses the "F" word in every chapter. I did not take the time to fill out a removal form for this book. See below. I have marked the pages with explicit language .

***I took the time to go through and show you which words were on which pages below. **Explicit Language from "Into the Wild" by John Krakauer.**

Chapter 1: p. 6--"Hell"; "F--k"
Chapter 3: p. 17--"godd--n"; p. 18--"da-n"
Chapter 4: p. 26--"hell"; "sh-t"

Chapter 7: p. 62--"God---n"; "God---n"; p. 64--"hell"; "fu-k"; "bi--h";
"God--n"  p. 65--"Get laid"; p. 66--"Godd--n"; p. 68--"da-n"
Chapter 8: p. 71--"da-n"' "dumbassedness"; p. 79--"sh-t"; p. 84--"hell"; "sh-t"; p. 84--
"fu-kin" Chapter 9: p. 96--"da-n"; "hell"
Chapter 10--p. 101--"Fu--yu"; "da-n"
Chapter 11--p. 116--"da-n"
Chapter 12--p. 118--"ass"; p. 125--"Fu--ing"
Chapter 15--p. 148--"ass"; p. 151--"fu--ed up"; (twice); "orgy"; p. 152--"making
love"; p.154--"fu--ing rest"
Chapter 17--p. 176--"hell"; p. 177-"hell"
Chapter 18--p. 189--"hell"

My question to you and now a district committee is this: What are we doing? Why in the name of
everything that we are supposed to stand for am I, as a veteran English teacher, having to beg the district
to get rid of these classroom novels and start having expectations of those put in positions of leadership
just as we do our own students. We do not allow our students to speak this way in class. Why would we
have this as a topic or in audio for a classroom novel? Why would our district EVER approve this? This is
not literature. Do you think Shakespeare ever had to resort to these sorts of situations? No, he was a real writer and did not need to do implement shock-effect to get the audience's attention. What
does it mean, though, when a school district gives the green light on classroom sets of novels such as
these? Someone is not being diligent for the sake of our children.

I was told over and over that these books were optional. Mr. Marcanio, you and I both know that now
many "teachers" do not have degrees in their fields, and they are desperate to utilize anything that the
school district sends their way. Our district has provided these classroom sets of novels, which means that
they are fair game for any teacher to utilize in the classroom. And actually, because the district has
purchased them, as long as the themes coordinate with something a so-called teacher may be covering, he
or she is at liberty to implement these novels within the classroom. Out of 2,000 books that were
available to our district for free classroom novel sets, our Language Arts Department narrowed the list
down to just a few, and these two mentioned in this letter were part of that list. But again, our supervisor
admitted to reading these.

What does this say for our school district? Who is standing in the gap for our students. It is so easy to
pass the buck to the teacher, but when a district itself approves this sort of unconscionable book for the
classroom (much less for the libraries), what else can a teacher do? I will be the voice for my students,
my community and the parents I know who would not approve of this. This book, as well as others, that
our district has provided are pornographic, and there is no justification whatsoever for these being
anywhere near our children. As a matter of fact, someone needs to be held accountable for actually
making these sorts of books available to our children, especially under the guise of a classroom novel
option. We all know that any material that has been made available, whether in a library, on a reading list
or even in a classroom and contains pornographic content  is a violation of Florida Statute 847.012.3(b),
and according to 847.012.6, "Any person violating any provision of this section commits a felony of the
third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

I have email after email requesting to know who was responsible for approving these books and
authorizing their usage as a classroom novel. The only answer I ever got was from Ms. Rowell who
informed me that she had read them, but would not make an individual decision on them. I met with Ms.
Lesa Morgan and Michelle White, the Director of Media Services,  before school was out and even
suggested a review committee of various books throughout the district. We need to get a hold on this.

Mr. Marcanio, these book choices are not limited to just classroom novel sets, but also library choices. Before school was out, our "superintendent, along with Michelle White and our school board approved a book distribution to take place with all of our students. These are fiction and non-fiction titles, over 1300 in all, that are of high-interest to young adults" (Email from Alison Robinson, Retired Librarian at Northview, May 19, 2022). Several students picked up a graphic novel called "The "The Girl from the Sea," which was a book encouraging secret lesbian relationships. (See pictures below.)



So, perhaps unknowingly to you, our school board actually approved this graphic book which was made free to students throughout the district. If you were not aware that this sort of thing is going on in our district, why not? Don't we have checks and balances throughout? Isn't that the purpose of organizational leadership?

I am absolutely sickened to think that anyone would think these sorts of books are appropriate for our students and are considered literature and the above passages add to "character development." In essence, four members of my own Northview committee have openly admitted to allowing pornographic material at my school, siding with Escambia County School District and ultimately the Language Arts Department who purchased these particular books to begin with, an act that the State of Florida has deemed to be a third-degree felony. ("Any person violating any provision of this section commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084).

We need accountability for questionable content that is blatantly coming into our curriculum, but we also need district leaders and board members to stand up and do their part to protect our children. Any adult in this district who reads these books and approves of an Escambia County teacher having high school class discussions about sex with a dog or masturbation for the sake of "character development" needs to be legally challenged indeed.

I await your input and am hopeful that you demand and desire decent literary choices for our students. After all, they deserve the best we have to offer.

Sincerely,

Vicki Baggett, M.A.T.

Exhibit 3

# Escambia County Public Schools
## District Materials Review Committee Decision

**Attach Request for Reconsideration of Educational Media**

**Author**: Stephen Chbosky    **Title or Item**: The Perks of Being a Wallflower

**Material Type:** Non-adopted class novel set to be used as an optional novel study in 12th grade ELA classes

1. **District Committee Review Committee**

   2 high school media specialists, 2 high school teachers, 1 high school administrator, 1 parent of a school student, 1 community member

2. **Meeting date(s), time(s) and location(s):**

   | 8/31/22 | 5:30 pm - 6:30 pm | Spencer Bibbs |
   |---------|-------------------|---------------|
   | 9/21/22 | 5:00 pm - 6:00 pm | Spencer Bibbs |

3. **Committee Recommendations**

   The committee voted 4:3 recommending the novel remain as an optional title for an English Language Arts teacher to use as a novel study for 12th grade students.  The Justification for Use of Outside Media form must be submitted to and approved by the school administration before use in the classroom.  An approved parent opt out letter must also be sent home for each student.

   Purchased class sets of the Perks of Being a Wallflower will be collected and stored at a centralized district location.  Copies of the title will be given to teachers as requested if the following criteria are met:
   - Class is a 12th grade English Language Arts class
   - Justification for Use of Outside Media form has been approved by school administration
   - The opt-out parent letter has been approved by school administration

4. **Reasons**

   The concerns raised in the complaint are part of the characters' development throughout the novel.  These concerns do not outweigh the potential discussions and literary value of the novel enough to remove it as an option for an ELA teacher to use with 12th grade students.  The district level distribution process will be established to ensure school administrator approval, parental input, and limited use to 12th grade students.

# Escambia County Public Schools
## District Materials Review Committee Decision

### 5. Next Steps

The Assistant Superintendent of Curriculum and Instruction will inform the complainant, in writing, by certified US mail, of the committee's decision.

The complainant may appeal the decision to the School Board. The appeal must be made in writing to the Superintendent within ten (10) days of receipt of notification of the district-level committee decision.

A decision on the complaint will be made at the next regularly scheduled Board meeting unless the request for appeal is filed within fourteen (14) days of the Board meeting.  In that instance, the matter will be heard at the following regular Board meeting.

The Board shall review all evidence and materials presented at the district committee level.  If the complainant wishes to proffer additional evidence, it must be presented to the Superintendent no less than eight (8) days prior to the meeting at which the matter will be heard.

The complainant will be afforded the opportunity to offer additional arguments in support of their position.

The public shall be afforded an opportunity to comment before the Board makes a final decision.

The Board reserves the right to use outside expertise if necessary to help in its decision making.

The Board decision will be final, and the Superintendent will implement the decision.

Decisions on reconsidered materials will stand for five (5) years before new requests for reconsideration of those items will be entertained.

Exhibit 4

---------- Forwarded message ---------
From: **Baggett, Vicki** <VBaggett@ecsdfl.us>
Date: Tue, Oct 4, 2022 at 9:02 PM
Subject: Appeal to Oct. 4 District Review Materials Committee Decision
To: Timothy Smith <tsmith@ecsdfl.us>, Steve Marcanio <smarcanio@ecsdfl.us>, Kevin Adams
<KAdams2@ecsdfl.us>, Paul Fetsko <pfetsko@ecsdfl.us>, Patricia Hightower
<phightower@ecsdfl.us>, Laura Edler <ledler@ecsdfl.us>, William Slayton
<BSlayton@ecsdfl.us>


Northview High School
Bratt, FL 32535
Oct. 4, 2022

Escambia County Public Schools School Board
Pensacola, FL

RE:  Additional Appeal to District Materials Review Decision Regarding "Perks of Being a Wallflower" by
Stephen Chbosky

Dear Supt. Smith, Asst. Supt. Marcanio,  and School Board Members:

I have received the District Materials Review Committee Decision today (Oct. 4, 2022), indicating that
the committee voted 4 to 3 to allow this book, "Perks of Being a Wallflower" to remain as an optional
novel use for 12th grade ELA teachers with  an opt-out letter and a Justification for Use form approved by
school administrators. This committee has based its finding on the characters' development throughout
the novel, and although some may agree with the committee's findings regarding character
development, I will offer the following based on simple facts, and not subjectivity.

1.  Using this novel (or any novel that has this level of obscene content) in a classroom environment
would  certainly necessitate that the teacher be trained in the required field.  Sadly, many English
teachers throughout our district are neither trained nor certified in English. In other words, although a
12th English teacher may have the desire to "teach" the course, he or she may not have the background
knowledge and/or experience. (Look at your own agenda slated for Oct. 6. There are 7 pages of teachers
being hired out of field.)  Why, then, would a district offer a controversial book as such to someone in
this situation? And because this is happening all throughout our district, why have the book  for
classroom usage at all? There are so many others from which to choose.  This book is currently removed
or under investigation in so many states and districts **(See Attachment  1**) because of sexual and
obscene content, including references to bestiality.  Can our county really afford to put ourselves in the
position that many of our neighboring counties have found themselves in regarding this book and others
like it?

2.  This letter states that administrators must approve a teacher's usage. What if the administrator does not approve it?  Now you have opened the door for a potential situation between that principal and teacher.  What about the student or students who may opt out of this classroom novel?  What if that student is one of many ? What will happen to this student during class discussion, etc.? Is it fair to single this student out by sending him/her elsewhere? What is the point here? Again, there are so many other books from which a teacher may choose.

3. Thirdly, your letter states that this book is only available for 12th English students. Do you realize that many students taking 12th grade English are under 18; therefore, they are minors.  I currently have a senior English student who is 15 years old!  I also currently have three students who are homeless. Who would opt-out  on their behalf?  The days of having a general age group in one class are over with.

4. The parental book rating for this book is 4/5, meaning it is NOT FOR MINORS because it contains sexual activities, assault and battery; sexual nudity; violence; alcohol and drug use.  Florida Statutes prohibit a school district from knowingly providing minors with "any printed matter that contains explicit and detailed verbal descriptions or narrative accounts of sexual excitement or sexual conduct and that is harmful to minors." I here with provide the board with four and a half pages of excerpts straight from the book, so that the board can decide if this book fits the above criteria. **(See Attachment 2).**

5. Finally, in Mr. Marcanio's email to me dated August 11, 2022, he stated  that decisions on reconsidered materials will stand for **one (1)** year before new requests will be entertained; however, in the letter received on October 4, with the District Review Committee's Decision, it is stated that "Decisions on reconsidered materials will stand for **five (5) years** before new requests for reconsideration of those items will be entertained."   Why has this  gone from one year to five? Surely this is a typographical error on someone's part or the committee's part.  I, and the public need this clarified, please.  **(See Attachment 3—last two lines on the page).**

In closing, it is my hope that our School Board , using FS 847.012 as a guide, considers the definition of what constitutes a minor; what constitutes detailed verbal descriptions or narrative accounts of sexual excitement or sexual conduct that is harmful to minors; and what business any high school English teacher would have discussing various passages  from this book with minor children in a senior English class.

Sincerely,

Vicki Baggett, M.A.T.

cc: Supt. Tim Smith; All Board Members; Asst. Supt. Marcanio

School District of Escambia County Mail - Request for District Review...              https://mail.google.com/mail/u/0/?ik=74f4aacace&view=pt&search=al...



**Baggett, Vicki <vbaggett@ecsdfl.us>**

## Request for District Review: The Perks of Being a Wallflower
11 messages

**Marcanio, Steve** <SMarcanio@ecsdfl.us>                                             Thu, Aug 11, 2022 at 7:43 AM
To: "Baggett, Vicki" <VBaggett@ecsdfl.us>
Cc: Michelle White <MWhite5@ecsdfl.us>, Brian Alaback <BAlaback@ecsdfl.us>

Mrs. Baggett

I received your letter asking for a district committee to review *The Perks of Being a Wallflower* by
Stephen Closky as an optional novel study for twelfth-grade students.  All reconsideration requests must
start at the school level, therefore the committee will only consider *The Perks of Being a Wallflower* by
Stephen Closky and not the additional titles presented in the July 28, 2022 letter to me.

A district review committee of lay persons, media specialists, administrators, teachers, and parents is
currently being formed.  The committee will read *The Perks of Being a Wallflower* by Stephen Closky
and then consider the educational philosophy of the school district, the professional opinions of other
teachers of the same subject and other competent authorities, reviews of the materials by reputable
bodies, the teacher's own stated objectives in using the materials, public input, and the objection of the
complainant.

The committee will also review the original Reconsideration of Educational Media form you submitted to
Mr. Sherrill and the letter you submitted to Mr. Marcanio asking for a district committee review.  You may
also proffer additional evidence for the committee's consideration that:

    A. An instructional material does not meet the criteria of s. 1006.31(2), F.S., or s. 1006.40(3)(d),
       F.S., if it was selected for use in a course or otherwise made available to students in the school
       district but was not subject to the public notice, review, comment, and hearing procedures under
       s. 1006.283(2)(b), F.S.

    B. Any material used in a classroom, made available in a school library, or included on a reading
       list contains content that is pornographic or prohibited under s. 847.012, F.S., is not suited to
       student needs and their ability to comprehend the material presented or is inappropriate for the
       grade level and age group for which the material is used.

If you wish to submit such additional information for the district review committee to consider, please
communicate this in writing via email to Michelle White, Coordinator of Media Services,
mwhite5@ecsdfl.us by August 18, 2022.

The findings of the district level committee shall be a matter of written record and transmitted to the
Assistant Superintendent of Curriculum and Instruction. The Assistant Superintendent of Curriculum and
Instruction shall inform the complainant, Coordinator of Media Services, the Superintendent, and School
Board in writing of the action taken.

Decisions on reconsidered materials will stand for one (1) year before new requests for reconsideration
of those items will be entertained, unless the decision is appealed and overturned at a higher level.

# Attachment 2

| Page | Content |
|---|---|
| 2 | I just need to know that someone out there listens and understands and doesn't try to sleep with people even if they could have.<br>I need to know that these people exist. |
| 4 | That's maybe why he felt all alone and killed himself. |
| 6 | But over the summer she had her braces taken off, and she got a little taller and prettier and grew new breasts. |
| 12 | And I opened the door to the basement, and my sister and this boy were naked. He was on top of her, and her legs were draped over either side of the couch. And she screamed at me in a whisper.<br>"Get out. You pervert." |
| 21 | I had a weird dream. I was with Sam. And we were both naked. And her legs were spread over the sides of the couch. And I woke up. And I had never felt that good in my life. But I also felt bad because I saw her naked without her permission.<br>...Do you know what "masturbation" is? I think you probably do because you are older than me. But just in case, I will tell you. Masturbation is when you rub your genitals until you have an orgasm. Wow!<br>I thought that in those movies and television shows when they talk about having a coffee break that they should have a masturbation break.<br>...I told Sam that I dreamt that she and I were naked on the sofa, and I started crying because I felt bad, and do you what she did? She laughed. |
| 30 | This one couple, whom I was told later were very popular and in love, stumbled into my room and asked if I minded them using it. I told them that my brother and sister said I had to stay here, and they asked if they could use the room anyway with me still in it. I sad I didn't see why not, so they closed the door and started kissing. Kissing very hard. After a few minutes, the boy's hand went up the girl's shirt, and she started protesting.<br>"C'mon, Dave."<br>"What?"<br>"The kid's in here."<br>"It's okay."<br>And the boy kept working up the girl's shirt, and as much as she sat no, he kept working it. After a few minutes, she stopped protesting, and he pulled her shirt off, and she had a white bra on with lace. I honestly didn't know what to do by this point. Pretty soon, he took off her bra and started to kiss her breasts. And then he put his hand down her pants, and she started moaning. I think they were both very drunk. He reached to take off her pants, but she started crying really hard, so he reached for his own. He pulled his pants and underwear down to his knees.<br>"Please. Dave. No."<br>But the boy just talked soft to her about how good she looked and things like that, and she grabbed his penis with her hands and started moving it. I wish I could describe this a little more nicely without using words like penis, but that was the way it was.<br>After a few minutes, the boy pushed the girl's head down, and she started to kiss his penis. She was still crying. Finally, she stopped crying because he put his penis |

| Page | Content |
|---|---|
| | in her mouth, and I don't think you can cry in that position. I had to stop watching at that point because I started to feel sick, but it kept going on, and they kept doing other things, and she kept saying "no." Even when I covered my ears, I could still hear her say that. <br> ..."Did they know you were in there?" <br> "Yes. They asked if they could use the room." <br> "Why didn't you stop them?" <br> "I didn't know what they were doing." <br> "You pervert,"... |
| 33 | Sam told me as we were hanging up our coats that Bob was "baked like a fucking cake." |
| 44 | When most people left, Brad and Patrick went into Patrick's room. They had sex for the first time that night. <br> I don't want to go into detail about it because it's pretty private stuff, but I will say that Brad assumed the role of the girl in terms of where you put things. I think that's pretty important to tell you. When they were finished, Brad started to cry really hard. He had been drinking a lot. And getting really really stoned. |
| 45 | He was also crying pretty bad, and he decided if anyone asked him, he would say his eyes were red from smoking pot. |
| 49 | According to my sister, Sam used to be a "blow queen." I hope you know what that means because I really can't think about Sam and describe it to you. |
| 56 | They usually start when my mom's dad (my grandfather) finishes his third drink. It is around this time that he starts to talk a lot. My grandfather usually just complains about black people moving into the old neighborhood, and then my sister gets upset at him, and then my grandfather tells her that she doesn't know what she's talking about because she lives in the suburbs. |
| 66 | And I wasn't shy because we were trying to act like grown-ups, and we drank brandy. And I was warm. I'm still a little warm, but I have to tell you. <br> ...That's when Patrick put on the second side of the tape I made for him and poured everyone another glass of brandy. I guess we all looked a little silly drinking it, but we didn't feel silly. |
| 70 | She told me about the first time she was kissed. She told me that it was with one of her dad's friends. She was seven. |
| 72 | And he caught his sister making out on the back porch <br> ...That made him cough when he kissed her but he kissed her anyway because that was the thing to do <br> And he called it "Absolutely Nothing" because that's what it was really all about <br> And he gave himself an A <br> and a slash on each damned wrist <br> And he hung it on the bathroom door because this time he didn't think he could reach the kitchen. |
| 81 | I agreed, but then my brother started saying how my sister was just a "bitchy dyke." <br> ...I am probably the only one in the family with a friend who is gay. |
| 94 | Everyone else is either asleep or having sex. |

| Page | Content |
|---|---|
| 95 | That's what Bob said before he went to his bedroom with Jill, a girl that I don't know. |
| 96 | But the thing is that I can hear Sam and Craig having sex, and for the first time in my life, I understand the end of that poem. And I never wanted to. |
| 100 | Regardless, I decided to never take LSD again. |
| 101 | The book said that sometimes people take LSD, and they don't really get out of it. |
| 110 | Patrick kept making jokes that I would get an "erection." I really hoped this wouldn't happen. Once, I got an erection in class and had to go to the blackboard. |
| 113 | Sam did say that sex things were tricky with Mary Elizabeth since she's had boyfriends before and is a lot more experienced than I am. She said that the best thing to do when you don't know what to do during anything sexual is pay attention to how that person is kissing you and kiss them back the same way. |
| 116 | That's when she told me she was pregnant. |
| 119 | "Charlie, are you smoking?!" ..."I can't believe you're smoking!" |
| 123 | So, I told him a little about Mary Elizabeth, leaving out the part about the tattoo and belly button ring. ...He lit a cigarette and started telling me about sex. |
| 124 | ..."wear protection,"... ...Things like sex don't embarrass him. ...I think he was especially happy because I used to kiss this boy in the neighborhood a lot when I was very little, and even though the psychiatrist said it was very natural for little boys and girls to explore things like that, I think my father was afraid anyway. |
| 126 | And then she leaned down and started kissing my neck and ears. Then my cheeks. Then my lips. And everything kind of melted away. She took my hand and slid it up her sweater, and I couldn't believe what was happening to me. Or what breasts felt like. Or later, what they looked like. Or how difficult bras are. After we had done everything you can do from the stomach up, I lay on the floor, and Mary Elizabeth put her head on my chest. |
| 130 | Sex things are so weird, too. It's like after that first night, we have this pattern where we basically do what we did that first time, but there is no fire or Billie Holiday record because we are in a car, and everything is rushed. Maybe this is the way things are supposed to be, but it doesn't feel right. ...So, I asked her about Mary Elizabeth (leaving out the sex part) because I knew she could be neutral about it, especially since she "stayed clear" of dinner. |
| 144 | They were all laughing and making sex jokes, and Susan was doing her best to laugh along with them. |
| 158 | "So, they've been going out for a long time, and I think they've even had sex before, but this was going to be a special night..." ..."They start to make out. The stereo's playing, and they're just about to 'do it' when Parker realizes he forgot the condoms. They're both naked on this putting green. They both want each other. There's no condom. So, what do you think |

| Page | Content |
|---|---|
|  | happened?"<br>"I don't know."<br>"They did it doggie-style with one of the sandwich bags!" |
| 160 | We hugged good night, and when I was just about to let go, he held me a little tighter. And he moved his face to mine. And he kissed me. A real kiss. Then, he pulled away real slow.<br>...So, he said "thanks" and hugged me again. And moved in to kiss me again. And I just let him.<br>...We didn't do anything other than kiss. |
| 161 | We drink a lot. Actually, it's more like Patrick drinks, and I sip.<br>...He said that eye contact is how you agree to fool around anonymously. |
| 171 | It was fun watching my sister dance the Time Warp on stage, but I don't think I could have handled her pretending to have sex with a large stuffed Gumby. |
| 178 | "Don't blame me that you fucked around on her since the beginning!..." |
| 186 | "This is good champagne."<br>I don't think he knew the difference because he's a beer drinker. Sometimes, whiskey.<br>...I went with all my Ohio cousins, who promptly pulled out a "joint" and passed it around. |
| 187 | "Jesus. Look at these bleachers. How many colored people-" |
| 188 | Then, Mr. Small and the vice principal, whom Patrick swears is gay... |
| 190 | On the way home for the party, my Ohio cousins lit up another joint. |
| 192 | After about half an hour looking around the dance club, I finally saw Mary Elizabeth with Peter. They were both drinking scotch and sodas, which Peter bought since he is older and had his hand stamped.<br>...She told me that Alice was getting high in the ladies' room and Sam and Patrick were on the floor dancing.<br>...Then, he took Mary Elizabeth's drink out of her hand and drank it. "Hey, asshole" was her response. I think he was drunk, even though he hasn't been drinking lately, but Patrick does stuff sober, so it's hard to tell. |
| 193 | Her whisper smelled like cranberry juice and vodka. |
| 196 | After I ate my Ho-Ho, I lit up a cigarette,... |
| 197 | She was scared, and it wasn't until she had a sip of whatever we were drinking or a hit off of whatever we were smoking that she would calm down and be the same Sam. |
| 202 | So, I kissed her. And she kissed me back. And we lay down on the floor and kept kissing. And it was soft. And we made quiet noises. And kept silent. And still. We went over to the bed and lay down on all the things that weren't put in suitcases. And we touched each other from the waist up over our clothes. And then under out clothes. And then without clothes. And it was so beautiful. She was so beautiful. She took my hand and slid it under her pants. And I touched her. And I just couldn't believe it.<br>...Until she moved her hand under my pants, and she touched me. |

| Page | Content |
|------|---------|
| 205 | I just keep seeing him, and he keeps hitting my sister, and he won't stop, and I want him to stop because he doesn't mean it, but he just doesn't listen, and I don't know what to do. |

| Profanity | Count |
|-----------|-------|
| Faggot | 2 |
| Fuck | 6 |
| Prick | 2 |
| Pussy | 2 |
| Shit | 2 |

100% ▾ | ▾ | fx | Acevedo, Elizabeth

| | A | B | C | Secondary Auth |
|---|---|---|---|---|

**PEN AMERICA'S INDEX OF SCHOOL BOOK BAN**

PEN America's Index of School Book Bans lists instances occurring 2021 through June 30, 2022, where students' access to books in sch classrooms in the United States was restricted or diminished, for eith indefinite periods of time. Some of these bans have since been resci remain in place. PEN America's definition of school book bans can t Methodology tab and here.

| Author | Title | Type of Ban | Secondary Auth |
|---|---|---|---|
| | | Banned Pending Investigation | |
| 374 | Chbosky, Stephen | The Perks of Being a Wallflower | Banned Pending Investigation |
| 375 | Chbosky, Stephen | The Perks of Being a Wallflower | Banned in Libraries and Classrooms |
| 376 | Chbosky, Stephen | The Perks of Being a Wallflower | Banned Pending Investigation |
| 377 | Chbosky, Stephen | The Perks of Being a Wallflower | Banned in Libraries |
| 378 | Chbosky, Stephen | The Perks of Being a Wallflower | Banned in Libraries and Classrooms |
| 379 | Chbosky, Stephen | The Perks of Being a Wallflower | Banned Pending Investigation |
| 380 | Chbosky, Stephen | The Perks of Being a Wallflower | Banned in Libraries and Classrooms |
| 381 | Chbosky, Stephen | The Perks of Being a Wallflower | Banned in Libraries |
| 382 | Cheng, Andrea | Etched in Clay: The Life of Dave, Enslaved Potter | |

Sorted by Author & Title ▾    Sorted by State & District ▾    Methodology ▾

"Perks of Being a Wallflower", ECPS Board Appeal
November 1, 2022

Northview High School
Bratt, FL 32535
Oct. 19, 2022

Escambia County Public Schools School Board
Pensacola, FL

RE:  Letter 2- Additional Appeal to District Reviews Process on "Perks of Being a Wall Flower" by Chbosky

Dear Supt. , Asst. Supt. , and Board Members:

Please consider this letter an additional part of my District Review Committee Appeal, concerning the green-light approval of Stephen Chbosky's "The Perks of Being a Wallflower," a 1999 coming-of age novel that has won many literary awards but has also been highly challenged in high schools and libraries across America, after it was added to their optional or required curriculum.

I'm sure all of us can agree that books are very important in the development of a child's mind. Readers can get lost in the fantasies or the realities that words and situations can provide. Most of the time, authors (rather effortlessly) can subtly convince the reader into a particular stance on a subject or idea. Usually this occurs without the reader even realizing what he or she has fallen prey to, especially when the audience is a child. Contrary to what many want to admit, children are any persons beneath the age of 18.  This is the group that I, as a veteran English teacher in Escambia County, FL, have foremost in my heart and mind as I am writing this letter to you.

Giving permission for our school district to offer "Perks of Being a Wallflower" as an optional novel study is providing a plethora of controversial topics and themes to children. This is true even if parental permission is required. The assumption is that the "teacher" in the classroom would be able to utilize and effectively discuss this novel in a way that would be beneficial to the student and the class.  Since you were tasked with reading this novel, I assume you realize that the plot follows Charlie, a high school ninth grader, as he writes letters to an anonymous pen pal. He watches activities all during the novel. His writing is a form of therapy for his depression. After all he has just lost his best friend to suicide. He later befriends a high school senior, who happens to be gay, and also happens to be observed by Charlie having sex with another male. His new best friend introduces Charlie to his own stepsister, who reveals to Charlie that she was a drunkard and a person who is known for having multiple sex partners. She gets an abortion without her parents' consent. She also reveals to Charlie that as an 11-year-old, her father's boss raped her.  As Charlie continues to grow and "come of age," he delves into LSD and marijuana, alcohol and sex also. The reader gets bird-eye scenes of masturbation and attempts at bestiality as well. By the end of the novel, Charlie realizes that his own Aunt Hellen, whom he had loved and trusted, had actually sexually abused him when he was a child, thus leading to one of the reasons for Charlie's attempt at suicide.

As people who are entrusted with children, we can look at the above themes and agree that all of these are very important issues in today's society; however, as those who have been entrusted with the curriculum of minors, let me ask you this? What is a good age for children to start learning about drugs, sex, and abuse? We know these things exist, but is it our public school's responsibility to discuss this with students? A teacher's job is to teach students HOW to think, not WHAT to think.  This sort of

mature and sexual content should be governed and discussed between minors and their parents, not minors and their teachers (many of whom are not even certified in their fields). Is our job not to safeguard children (Yes, seniors are still children if they are under 18.)? We have laws against pornography in our educational curriculum. Parents want their children to go to school to learn academia, not be indoctrinated on ways to have child-on-child sex, adult-on-child sex,  child-on-child anal sex, and ways to create makeshift condoms using plastic Ziploc bags when real condoms are not available, all of which are available for discussion thanks to what is in this  book in question. Teachers are not trained sex therapists, psychologists, psychiatrists or even mental health therapists.  Why would our district offer this book (even as an optional one) for a senior English teacher to utilize in his/her classroom, under the guise of offering an opt-out for the student and parent? What happens to the student whose parents do opt out? Where does this student go during class discussions? Is this student not being discriminated against for not following the majority in the classroom?

The issue is this: Pornography in any form or fashion cannot be allowed in the public classroom or public school library. If we purchase books with these scenarios in them, then we are implicitly giving permission to use them and advising to our employees that we promote this. Our district has said that the principal has to have the final say. The principal is not the deciding factor for our district. It is you, the school board members, that will decide what is appropriate for our children as far as curriculum goes. Children have the right to innocence, and parents have the right to protect that innocence without having their children singled out for opting out of a pornographic book that should not be in the school's novel choices to begin with. How many students are we going to lose each year to homeschooling, private schooling, or virtual schooling before we realize that some knowledge is just too heavy for children?

As a teacher, I cannot believe I am even having to argue that pornographic material should be kept away from minors while they are at a public educational institution. This is true for both the classroom and the library. Of all of the books available to discuss things that actually MATCH the state required objectives for an ELA classroom, this book should not be considered.

Sincerely,

Vicki Baggett

-----------------------------------------------------------------------------------------------------------------------------------------

Northview High School
Bratt, FL 32535
Oct. 4, 2022

Escambia County Public Schools School Board
Pensacola, FL

RE:   Additional Appeal to District Materials Review Decision Regarding "Perks of Being a Wallflower" by Stephen Chbosky

Dear Supt. Smith, Asst. Supt. Marcanio,  and School Board Members:

I have received the District Materials Review Committee Decision today (Oct. 4, 2022), indicating that the committee voted 4 to 3 to allow this book, "Perks of Being a Wallflower" to remain as an optional novel use for 12th grade ELA teachers with  an opt-out letter and a Justification for Use form approved by school administrators. This committee has based its finding on the characters' development throughout the novel, and although some may agree with the committee's findings regarding character development, I will offer the following based on simple facts, and not subjectivity.

1.  Using this novel (or any novel that has this level of obscene content) in a classroom environment would  certainly necessitate that the teacher be trained in the required field.  Sadly, many English teachers throughout our district are neither trained nor certified in English. In other words, although a 12th English teacher may have the desire to "teach" the course, he or she may not have the background knowledge and/or experience. (Look at your own agenda slated for Oct. 6. There are 7 pages of teachers being hired out of field.)  Why, then, would a district offer a controversial book as such to someone in this situation? And because this is happening all throughout our district, why have the book  for classroom usage at all? There are so many others from which to choose.  This book is currently removed  or under investigation in so many states and districts **(See Attachment  1)** because of sexual and obscene content, including references to bestiality.  Can our county really afford to put ourselves in the position that many of our neighboring counties have found themselves in regarding this book and others like it?

2.  This letter states that administrators must approve a teacher's usage. What if the administrator does not approve it?  Now you have opened the door for a potential situation between that principal and teacher.  What about the student or students who may opt out of this classroom novel?  What if that student is one of many ? What will happen to this student during class discussion, etc.? Is it fair to single this student out by sending him/her elsewhere? What is the point here? Again, there are so many other books from which a teacher may choose.

3. Thirdly, your letter states that this book is only available for 12th English students. Do you realize that many students taking 12th grade English are under 18; therefore, they are minors.  I currently have a senior English student who is 15 years old!  I also currently have three students who are homeless. Who would opt-out  on their behalf?  The days of having a general age group in one class are over with.

4. The parental book rating for this book is 4/5, meaning it is NOT FOR MINORS because it contains sexual activities, assault and battery; sexual nudity; violence; alcohol and drug use.  Florida Statutes prohibit a school district from knowingly providing minors with "any printed matter that contains explicit and detailed verbal descriptions or narrative accounts of sexual excitement or sexual conduct and that is harmful to minors." I here with provide the board with four and a half pages of excerpts straight from the book, so that the board can decide if this book fits the above criteria. **(See Attachment 2).**

5.  Finally, in Mr. Marcanio's email to me dated August 11, 2022, he stated  that decisions on reconsidered materials will stand for **one (1)** year before new requests will be entertained; however, in the letter received on October 4, with the District Review Committee's Decision, it is stated that "Decisions on reconsidered materials will stand for **five (5) years** before new requests for reconsideration of those items will be entertained."   Why has this  gone from one year to five? Surely this is a typographical error on someone's part or the committee's part.  I, and the public need this clarified, please.  **(See Attachment 3—last two lines on the page).**

In closing, it is my hope that our School Board , using FS 847.012 as a guide, considers the definition of what constitutes a minor; what constitutes detailed verbal descriptions or narrative accounts of sexual excitement or sexual conduct that is harmful to minors; and what business any high school English teacher would have discussing various passages  from this book with minor children in a senior English class.


Sincerely,


Vicki Baggett, M.A.T.

cc: Supt. Tim Smith; All Board Members; Asst. Supt. Marcanio

Exhibit 5

# REQUEST FOR THE RECONSIDERATION OF EDUCATIONAL MEDIA

School: _____ Northview High School _____

Requested Initiated By: _____ Vicki Baggett _____

Telephone: _____ Address: _____

City: Century _____ State: FL Zip code: 32535

### Please Check Media Type

| | | | |
|---|---|---|---|
| X Book | ___ Film | ___ Videocassette | Set 2 |
| ___ Periodical | ___ Filmstrip | ___ Record | # 33 |
| ___ Pamphlet | ___ Cassette | ___ Computer Software | |
| ___ Laser Videodisc | ___ Kit | Other:_____ | |

Title: _____ When Wilma Rudolph Played Basketball _____

Author: _____ Mark Weakland _____

Publisher or Producer: _____

1. Reasons for Objections: _____ Opines prejudice based on race _____

2. Have you read, viewed, and/or listened to the entire educational media to which you object? _____ yes

3. What are the strengths of this educational media? _____ historical athletics

4. Are you aware of the judgment of this educational media by literary and authoritative critics? _____ yes

5. What do you believe is the purpose of this educational media? _____ race-baiting

6. For what age group would you recommend this educational media? _____ none

7. Where was the educational media located in the school system? _____ elementary schools

8. On what date(s) was the material utilized for instruction? _____ N/A

Signature of Complainant: _____ Vicki Baggett _____ Date: _____ 8-24-22

# Exhibit 6

REQUEST FOR RECONSIDERATION OF EDUCATIONAL MEDIA

School: _Northview High School_

Requested Initiated By: _Vicki Baggett_

Telephone: ▮▮▮▮▮▮▮▮ Address: ▮▮▮▮▮▮▮▮

City: _Century_ State: _FL_ Zip code: _32535_

### Please Check Media Type

Set 2
#19

X Book _____ Film _____ Videocassette

_____ Periodical _____ Filmstrip _____ Record

_____ Pamphlet _____ Cassette _____ Computer Software

_____ Laser Videodisc _____ Kit _____ Other: _____

Title: _The Kite Runner_

Author: _Khaled Hosseini_

Publisher or Producer: _____

1. Reasons for Objections: _extremely graphic of child rape both of man on boy & others! horrific language_

2. Have you read, viewed, and/or listened to the entire educational media to which you object? _yes_

3. What are the strengths of this educational media? _none_

4. Are you aware of the judgment of this educational media by literary and authoritative critics? _yes_

5. What do you believe is the purpose of this educational media? _Indoctrination_

6. For what age group would you recommend this educational media? _None_

7. Where was the educational media located in the school system? _middle & high schools_

8. On what date(s) was the material utilized for instruction? _N/A_

Signature of Complainant: _Vicki Baggett_ Date: _8·24·22_

Exhibit 7

School: _____ Northview High School _____

Requested Initiated By: _____ Vicki Baggett _____

Telephone: _____ Address: _____

City: _____ Century _____ State: _FL_ Zip code: _32535_

Set 3
# 12

**Please Check Media Type**

X Book
___ Film
___ Videocassette

___ Periodical
___ Filmstrip
___ Record

___ Pamphlet
___ Cassette
___ Computer Software

___ Laser Videodisc
___ Kit
___ Other: _____

Title: _The God of Small Things_

Author: _Arundhati Roy_

Publisher or Producer: _____

1. Reasons for Objections: _Age inappropriate; encourages pedophilia; Sexual abuse; incest_

2. Have you read, viewed, and/or listened to the entire educational media to which you object? _Yes_

3. What are the strengths of this educational media? _?_

4. Are you aware of the judgment of this educational media by literary and authoritative critics? _Yes_

5. What do you believe is the purpose of this educational media? _?_

6. For what age group would you recommend this educational media? _None_

7. Where was the educational media located in the school system? _Middle Schools_

8. On what date(s) was the material utilized for instruction? _N/A_

Signature of Complainant: _Vicki Baggett_ Date: _8-24-22_

# Exhibit 8

## REQUEST FOR RECONSIDERATION OF EDUCATIONAL MEDIA

School: _____ Northview High School _____

Requested Initiated By: _____ Vicki Baggett _____

Telephone: [redacted] Address: [redacted]

City: _____ Century _____ State: FL Zip code: 32535

### Please Check Media Type

| | | |
|---|---|---|
| X Book | __ Film | __ Videocassette |
| __ Periodical | __ Filmstrip | __ Record |
| __ Pamphlet | __ Cassette | __ Computer Software |
| __ Laser Videodisc | __ Kit | __ Other: _____ |

Set 1
# 14

Title: _____ The Handmaid's Tale _____

Author: _____ Margaret Atwood _____

Publisher or Producer: _____

1. Reasons for Objections: _____ Graphic sexual depictions & language; violence _____

2. Have you read, viewed, and/or listened to the entire educational media to which you object? _____ yes _____

3. What are the strengths of this educational media? _____ none _____

4. Are you aware of the judgment of this educational media by literary and authoritative critics? _____ yes _____

5. What do you believe is the purpose of this educational media? _____ Sexual introduction _____

6. For what age group would you recommend this educational media? _____ adults _____

7. Where was the educational media located in the school system? _____ high schools _____

8. On what date(s) was the material utilized for instruction? _____ N/A _____

Signature of Complainant: _____ Vicki Baggett _____ Date: _____ 8-24-22 _____

# Exhibit 9

**ECPS Request for Reconsideration of Educational Media**

A parent or resident of Escambia County, Florida may proffer evidence that any material used in a classroom, made available in a school library, or included in a reading list contains content that is pornographic or prohibited under F.S. 847.012, is not suited to student needs and their ability to comprehend the material presented, or is inappropriate for the grade level or age group for which the material is being used.

**Please complete all applicable information:**

Before bringing a challenge to a material found at a school, the complainant must read, listened to or viewed the material in its entirety.

Have you read or viewed entire material? **yes**

Date of Request: **Feb. 28, 2023**

Author: **Sarah Brannen**

Title: **Uncle Bobby's Wedding**

Publisher or Producer, Date of Publication/Production, Type of Media: **Little Bee Books, 2020**

<span style="color:red">**Request Initiated by (first and last name): Kaye Dickerson**</span>



School(s) in which item is used: **O.J. Semmes Elementary**

1. What first prompted your concern**? This book contains alternate sexual ideologies, a violation of HB 1557/ Parental Rights Law and is prohibited to be available to K-3. It is content and age inappropriate.**

2. To what in the material do you object? (Please be specific, cite pages, frames, etc. Attach additional

pages if necessary**.** <span style="color:red">**Uncle Bobby and his boyfriend Jamie end up announcing they will get married, and now the niece has two "uncles."  See a few pictures below.**</span>


<u>Cover</u>


<u>Uncle Bobby and Jamie hold hands while announcing their marriage to everyone.</u>

3. What are the strengths of the educational media?  **Colorful pictures**

4. What do you believe is the purpose of this educational media? **Encroach on parents' rights and guidelines**

5. Are you aware of the judgment of this educational media by literary and/or authoritative critics?

__x_ Yes ___ No **This has won many awards, especially from the lgbtq+ groups.**

6. What do you wish to be the outcome of the reconsideration? **K-3 are too young to understand same-sex ideas. This book should not be in lower levels in elementary at all.**

a. Available in the following libraries: **Elementary**

b. Remain available in libraries but removed for use in classroom instruction:

___ Yes __**x**_ No **Violates HB 1557**

Signature of Complainant:   **Kaye Dickerson**     Date: **2-28-23**

ECPS, Media Services, 11-8-22Pg 2 of 2

# Exhibit 10

**ECPS Request for Reconsideration of Educational Media**

A parent or resident of Escambia County, Florida may proffer evidence that any material used in a classroom, made available in a school library, or included in a reading list contains content that is pornographic or prohibited under F.S. 847.012, is not suited to student needs and their ability to comprehend the material presented, or is inappropriate for the grade level or age group for which the material is being used.

**Please complete all applicable information:**

Before bringing a challenge to a material found at a school, the complainant must read, listened to or viewed the material in its entirety.

Have you read or viewed entire material?  **yes**

Date of Request: **March 9, 2023**

Author: **Matt de la Pena**

Title: **Milo Imagines the World**

Publisher or Producer, Date of Publication/Production, Type of Media: G.P. Putnam's Sons, an Imprint of Penguin Random House LLC, 2021.

Request Initiated by: **Melanie Eubanks**



School(s) in which item is used: **Beulah Elementary, Ensley Elementary, Holm Elementary, Lincoln Elementary, Longleaf Elementary, O.J. Semmes Elementary, Sherwood Elementary, West Pensacola Elementary**

1. What first prompted your concern**? This book contains subtle alternate sexual ideology, a violation of HB 1557/ Parental Rights Law and is prohibited to be available to K-3. It is content and age inappropriate, based on pictures.**

2. To what in the material do you object? (Please be specific, cite pages, frames, etc. Attach additional pages if necessary.



3. What are the strengths of the educational media? **Colorful pictures and good story line about creativity and imagination.**

4. What do you believe is the purpose of this educational media? **Show all types of people and situations.**

5. Are you aware of the judgment of this educational media by literary and/or authoritative

critics**?**

___ Yes ___x_ No

6. What do you wish to be the outcome of the reconsideration? **K-3 are too young to understand same-sex ideas, and the subtle picture is a subliminal message to impressionable minds.**

a. Available in the following libraries: **Elementary**

b. Remain available in libraries but removed for use in classroom instruction:

___ Yes __**x**_ No **Violates HB 1557**

Signature of Complainant:                                    Date: **3-9-23**

ECPS, Media Services, 11-8-22Pg 2 of 2

# Exhibit 11

# RECONSIDERATION OF EDUCATIONAL MEDIA

School: _Northview High School_

Requested Initiated By: _Vicki Baggett_

Telephone: ▮▮▮▮ Address: ▮▮▮▮

City: _Century_ State: _FL_ Zip code: _32535_

## Please Check Media Type

X Book     ___ Film     ___ Videocassette

___ Periodical     ___ Filmstrip     ___ Record    _Set I_

___ Pamphlet     ___ Cassette     ___ Computer Software   _# 7_

___ Laser Videodisc     ___ Kit     Other: _____

Title: _And Tango Makes Three_

Author: _Justin Richardson_

Publisher or Producer: _____

1. Reasons for Objections: _LGBTQ agenda using penguins_

2. Have you read, viewed, and/or listened to the entire educational media to which you object?
   _Yes_

3. What are the strengths of this educational media? _none_

4. Are you aware of the judgment of this educational media by literary and authoritative critics?
   _Yes_

5. What do you believe is the purpose of this educational media? _Indoctrination_

6. For what age group would you recommend this educational media? _none_

7. Where was the educational media located in the school system? _elementary schools_

8. On what date(s) was the material utilized for instruction? _N/A_

Signature of Complainant: _Vicki Baggett_    Date: _8-24-22_

# Exhibit 12

School: _____ Northview High School _____

Requested Initiated By: _____ Vicki Baggett _____

Telephone: ███████████   Address: ███████████

City: __Century__   State: _FL_  Zip code: __32535__

### Please Check Media Type

X Book       ___ Film       ___ Videocassette

___ Periodical       ___ Filmstrip       ___ Record     *Set 2*

___ Pamphlet       ___ Cassette       ___ Computer Software

___ Laser Videodisc       ___ Kit       Other: _____     *# 32*

Title: _____ When Aidan Became a Brother _____

Author: _____ Kyle Lukoff _____

Publisher or Producer: _____

1. Reasons for Objections: ___ LGBTQ introduction; not age appropriate

2. Have you read, viewed, and/or listened to the entire educational media to which you object? _____ yes

3. What are the strengths of this educational media? _____ none

4. Are you aware of the judgment of this educational media by literary and authoritative critics? _____ yes

5. What do you believe is the purpose of this educational media? __ indoctrination of LGBTQ

6. For what age group would you recommend this educational media? __ adults

7. Where was the educational media located in the school system? __ elementary school

8. On what date(s) was the material utilized for instruction? _____ N/A

Signature of Complainant: __ Vicki Baggett __   Date: __ 8-24-22

# Exhibit 13

# Escambia County Public Schools
## District Materials Review Committee Decision

**Attach Request for Reconsideration of Educational Media**

**Author**: George M. Johnson        **Title or Item**: All Boys Aren't Bue

**Material Type:** High school library book

1. **District Committee Review Committee**

   1 high school media specialist, 1 high school administrator, 1 high school teacher, 1 high school parent, 1 community member

2. **Meeting date(s), time(s) and location(s):**

   12/12/22    5:30 pm - 6:30 pm   Spencer Bibbs

   1/9/23      5:30 pm - 6:30 pm   Spencer Bibbs

3. **Committee Decision (will stand for 1 year unless appealed to the ECSD School Board)**

   The committee voted 5:0 recommending that All Boys Aren't Blue be available in all high school ECPS libraries.

4. **Committee Comments Regarding the Titles:**

   **Could this work be considered offensive in any way due to:**

   Profanity, brutality, sexual behavior, drugs/alcohol, violence, language, manner characters are presented, political positions, religion or portrayal of religious practices/ideologies

   **Are questionable elements of this work an important part of the overall development of the story or text?**

   Yes:

   The sexual assault and experiences of the narrator are extremely important to understand the trajectory of his life.  Without mentioning these experiences, the reader would not get the full experience of what his childhood was like as a queer, black man. The point of this memoir is to give a first-hand account of a queer, black young adult and without these moments, the memoir would not make sense.

# Escambia County Public Schools
## District Materials Review Committee Decision

Throughout, the author's experiences are connected to his beliefs.  He does not glamorize his experiences.  He seeks to tell his truth for readers who may share circumstances.

This book is a memoir of growing up black and gay. The author's experience was complex and he discusses many circumstances and situations that shaped/influenced him.

As stated in the introduction "as heavy as these subjects may be, it is necessary that they are not only told but also read by teens who may have to navigate many of these same experiences in their own lives.

Author writes of an incident of child molestation and two sexual encounters.


**This work is most suitable for which grades?**

9-12


**Taken as a whole, does this work have literary, artistic, political or scientific value for the suggested audience?**

Yes:

Absolutely. This memoir gives a voice to many marginalized communities that represent our students.

There are teenagers in our community who benefit from hearing his experiences and perspectives.  His life is part of the American experience.

This book discusses the experience of being black and gay, it touches on trauma (and processing trauma), family, death, etc.  All of the things the author experienced in his (continuing) formative years.

It is expressly written so others in similar circumstances will be able to earn from his experiences and hopefully have an easier time with it.

The book details the importance of family and how the love of family provides a strong foundation and support through life's challenges.  As a male who is black and gay, the author emphasizes that having that strong familial support is what can get any young person through any of life's challenges, especially those that he personally encountered.

# Escambia County Public Schools
## District Materials Review Committee Decision

**What is the overall purpose, theme or message of the material?**

Besides giving a voice to oppressed communities, this memoir gives the reader hope despite the hardships one may have in their youth.

Memoir. Breakdown isolation for LBGTQ youths and help them avoid mistakes the author has made.

The overall message is "Be who you are" and "Be proud of who you are" and "Find the people who love you unconditionally."

That it is ok to be a black homosexual and the damage which can occur as a result of expecting everyone to conform to a single viewpoint.

The book details the importance of family and how the love of family provides a strong foundation and support through life's challenges.  As a male who is black and gay, the author emphasizes that having that strong familial support is what can get any young person through any of life's challenges, especially those that he personally encountered.

**Are the concepts presented in a manner appropriate to the ability and maturity level of the suggested audience?**

Yes:

Many of our students do align themselves as black or queer, so this memoir does focus on experiences that our students do go through.  Our students are already exposed to dating violence, stigmas of mental illness, supporting friends with mental illness, and child trafficking through mandatory Suite 360 training, so this memoir can actually be used to support our students who have gone through the same experiences as Johnson.

This is written very simply and straight forward. There is a lot of explanation that accompanies more challenging parts.

It's a memoir - the author's experience - not a textbook or how-to book.  It touches on mental health that most if not all high school students are dealing.

He explains the language (and uses less than many of my students). The sex
Is somewhat expected but clearly not intended to be arousing. Rather, it is descriptive as a way of explaining the full situation and consequences.

For the majority of the book, the author writes about experiences in his life that are when he was of a younger age or similar age group for students grades 9-12. He writes of his elementary, middle school, high school and college experiences.

# Escambia County Public Schools
## District Materials Review Committee Decision

**Are illustrations appropriate for the suggested audience's developmental age?**

Yes

**Will reading or listening to this work result in a more compassionate understanding of human beings?**

Yes:

What this memoir does is give a voice to marginalized communities. It shows the struggles of both black children and gay children.

Hearing about other people's lives and struggles. The book also demonstrates compassion for people the author is in conflict. The author attempts to understand the struggles and perspectives of others.

Even among the gay community, there's no "one size fits all" label - the author did a great job expressing his compassion for friends and family (even those that hurt him). This book is about a human experience.

He shows some of the negatives of his situation but does not present them a martyrdom. He works hard to humanize his characters.

Yes, reading or listening to this work will result in a more compassionate understanding of human beings. The author writes about being an African American male and a gay male. He wrote about his experiences being a part of both subgroups of general society and his general experiences and feeling of how sometimes each subgroup was viewed through a lens of negative bias.

**Does the work offer an opportunity to understand and better appreciate the aspirations, achievements, and problems of different cultures or minority groups?**

Yes:

Absolutely. This memoir shows acceptance of the LGBTQIAP+ community. The author even states himself that he was unable to fully see himself represented in history books. Per the author, "It's an important reminder of just how important it is for Black kids to see themselves in the subjects they learn and the people they learn it from." This author told a story that was not able to be told before, which now gives hope to our students that see themselves in this memoir.

# Escambia County Public Schools
## District Materials Review Committee Decision

That is the core of this work. It comes from a place of wanting more understanding for the author's culture and sexuality.

The author discusses a lot of problems in the gay community, black community, gay and black community and also discusses achievements and aspirations.

He is describing himself: a minority within a minority and the negative impact the oppression of the majority has had.

The author chronicles being bullied and physically assaulted because of his race. He describes the circumstances of his attack and the emotions he experienced as a result of the attack.

**NON-FICTION ONLY: Does the material contribute to the evolution of ideas and/or support state education standards?**

Yes:

This memoir can definitely be used as a supplement to the mental health modules as well as the following ELA B.E.S.T. Standards.
ELA.K12.EE.2.1 Read and comprehend grade level complex texts proficiently
R.2.1 Structure (9th - 12th grade)
R.2.2 Central Idea (9th - 12th grade)
R.2.3 Author's Purpose and Perspective (9th - 12th grade)
R.2.4 Argument (9th - 12th grade)
R.3.1 Figurative Language (9th - 12th grade)
R.3.2 Paraphrase and Summarize (9th - 12th grade)
R.3.3 Comparative Reading (11th grade specifically: Compare and contrast how contemporaneous authors address related topics, comparing author's use of reasoning, and analyzing the author's use of reasoning, and analyzing the texts within the context of the time period)
R.3.4 Understanding Rhetoric  (9th - 12th grade)
C.1.2 Narrative Writing (9th - 12th grade)
V.1.3 Context and Connotation (9th - 12th grade)

It's a library book in high school - it provides insight into this person's experience - it provides his information, which could be of value to anyone at the high school level or older.

Characterization, point of view, struggle for equality, rhetoric, purpose and perspective, style

V.1.3 Context and Connotation
R.1.2 Theme
R.1.3 Perspective and Point of View
R.2.2 Central Idea

# Escambia County Public Schools
## District Materials Review Committee Decision

R.2.3 Author's Purpose and Perspective

## 5. Next Steps

The Assistant Superintendent of Curriculum and Instruction will inform the complainant, in writing, by certified US mail, of the committee's decision.

The complainant may appeal the decision to the School Board. The appeal must be made in writing to the Superintendent within ten (10) days of receipt of notification of the district-level committee decision.

A decision on the complaint will be made at the next regularly scheduled Board meeting unless the request for appeal is filed within fourteen (14) days of the Board meeting.  In that instance, the matter will be heard at the following regular Board meeting.

The Board shall review all evidence and materials presented at the district committee level. If the complainant wishes to proffer additional evidence, it must be presented to the Superintendent no less than eight (8) days prior to the meeting at which the matter will be heard.

The complainant will be afforded the opportunity to offer additional arguments in support of their position.

The public shall be afforded an opportunity to comment before the Board makes a final decision.

The Board reserves the right to use outside expertise if necessary to help in its decision making.

The Board decision will be final, and the Superintendent will implement the decision.

Decisions on reconsidered materials will stand for five (5) years before new requests for reconsideration of those items will be entertained.

Exhibit 14

RECONSIDERATION FOR EDUCATIONAL MEDIA

School: _Northview High School_

Requested Initiated By: _Vicki Baggett_

Telephone: ██████ Address: ██████

City: _Century_ State: _FL_ Zip code: _32535_

**Please Check Media Type**

X Book          ___ Film          ___ Videocassette

___ Periodical   ___ Filmstrip     ___ Record          Set 1

___ Pamphlet     ___ Cassette      ___ Computer Software   #6

___ Laser Videodisc   ___ Kit      Other: _____

Title: _All Boys Aren't Blue_

Author: _George M. Johnson_

Publisher or Producer: _____

1. Reasons for Objections: _extreme sexual content; violent language; disturbing scenes; LGBTQ content_

2. Have you read, viewed, and/or listened to the entire educational media to which you object? _yes_

3. What are the strengths of this educational media? _none_

4. Are you aware of the judgment of this educational media by literary and authoritative critics? _yes_

5. What do you believe is the purpose of this educational media? _indoctrination_

6. For what age group would you recommend this educational media? _none_

7. Where was the educational media located in the school system? _high school_

8. On what date(s) was the material utilized for instruction? _N/A_

Signature of Complainant: _Vicki Baggett_   Date: _8-24-22_

* Submitted for review on 8/4/22. No response until I emailed inquiring on 8/23/22. Was told it has not been reviewed yet.

Exhibit 15

Jan. 27, 2023

RE:   Appeal for "All Boys Aren't Blue"

Dear Escambia County School Board Members:

Please find attached additional evidence for the appeal of the District Materials Review Committee's decision for **"All Boys Aren't Blue."**

According to Cornell Law, the definition of pornography is material that depicts nudity or sexual acts for the purpose of sexual stimulation. Consequently, our own District's Policy Manual claims the following: Chapter 4, Instruction: E:3:v concerning Media Center selections, **"No book or other materials containing pornography shall be used or be available in the District as prohibited by Section 847.012, F.S."**

By now, surely we all know that District employees who offer such material to minors are guilty of a third-degree felony.   We also know that the **new HB1467** law guidelines for school and classroom libraries require that books **must be free of pornography, suited to student needs and their ability to comprehend, and grade and age-level appropriate**. Ultimately, the decision on this book and every other book that is appealed is left up to the school board. Unlike the District Review Committee, whose identity is hidden to the public, your decisions will be front and center for all concerned parents, employees and other community members to see. This is a good thing, because it will show exactly where you stand for the sake of our minor children who have been entrusted in our care.

Our District Materials Review Committee ( who voted 5 to 0 to keep this book available to our minor children, by the way),   wrote that this author "explains the language (and uses less than many of my [sic] students. The sex is somewhat expected but clearly not intended to be arousing. Rather, it is descriptive as a way of explaining the full situation and consequences," and that this "memoir can actually be used to support our students who have gone through the same experiences as Johnson" (the author). The committee further states that this memoir can "definitely be used as a supplement to mental health modules as well as ELA standards . . . "

My question to the school board is where do we draw the line between providing a narrative sexual account for minor student connection? Just because an author is providing a step-by-step narrative of something that happened to him or her

does not mean that the way it is written and the words and situations used are acceptable and beneficial for minors.

I herewith attach several excerpts for you. How many excerpts does it take to decide if a book is **pornographic, age inappropriate, or not suited for students' needs**? So because the committee thinks this memoir aligns with ELA Standards, does this mean any high school ELA teacher can use this book as a supplement within the classroom to teach the 11 ELA B.E.S.T. Standards that the committee listed? Do minor students need to read about cousins "tasting" and performing "oral sex" and then "humping" each other? Or what about "ejaculating so much that you bust?"

Many states have already pulled this book because of the **sexually graphic content and violent language**. Although you are charged with reading this book in its entirety, I am providing you many pornographic and obscene sections direct from the work itself, hopefully to assist you in this serious task at hand.


**<u>EXCERPTS:</u>**
"Yeah." But I laughed and said, "Get your hand off my butt."
You giggled. "That's not my hand."
"You're lying," I said. You then placed both hands on my hips, as we lay side by side. There was still something poking me.
You were fully erect at this point. I was nervous. "We gonna get in trouble."
"You can't tell anybody, okay?" you said. "You promise that you not gonna tell anyone?"
I promised. You then grabbed my hand and made me touch it. It was the first time I had ever touched a penis that wasn't my own. I knew what was happening wasn't supposed to happen. Cousins weren't supposed to do these things with cousins. But my body didn't react that way. My body on the inside was doing something, too. **(p. 201)**

The whole time I knew it was wrong, not because I was having sexual intercourse with a guy, but that you were my family. I only did that for about forty-five seconds before you had me stop. Then you got down on your knees and told me to close my eyes. That's when you began oral sex on me as well. It was the strangest feeling in the world. Unfortunately, I didn't have a handbook to earn sexuality as a queer boy. My crash course was happening right in front of me, and despite the guilt I was feeling, there was also euphoria. Things were happening to me that I couldn't explain. Feelings and emotions I had not known existed.
After a minute or so, you stopped. You then laid me on the ground and got on top of me. You began humping me— back and forth back and forth—never penetrating me, though. It was just our bodies on top of each other going back and forth for several minutes while the music on the TV played in the background. Aretha Franklin was singing "A Rose Is Still a Rose." The irony of a song playing in

the background about the deflowering of a young girl being used by a man. The irony of me lying on the basement floor.

You eventually got up off me and told me to come to the bathroom, that you wanted to show me one more thing. You turned on the light and closed the door. You began stroking yourself in front of me. I just stood there nervous because I didn't know what to expect next. You said, "Just keep watching, Matt." So I stood there and watched you for several minutes.

Then you began to moan slightly. I took a step back because I didn't know what was about to happen, and then it did. You ejaculated into the toilet in front of me. I was very unaware of what sex involved at the time— primarily because I stayed away from it. I knew I didn't like girls that way, and the first thing folks would ask you if you inquired about sex was whether "you were fucking or not." And I wasn't. We also had the bare minimum of sex education in school, so I was unaware of a lot of things.

Watching you **ejaculate** was shocking. I remember you telling me, "It's semen. One day when nobody is around, you should do this until you get this feeling you never felt before and bust."
**(p. 203)**

Two weeks after that night, I **masturbated** for the first time, and you were right. I was old enough to experience that feeling of what I would later learn is called an orgasm. Despite knowing that what happened with you was wrong, I now knew that I was definitely attracted to boys.

...I was soon a high school freshman, with sexually active teens all around me. **(p. 207)**

As we kissed, he began unzipping my pants. It was clear to me in this moment that he wasn't new to this.

He reached his hand down and pulled out my **dick**. He quickly went to giving me head. I just sat back and enjoyed it as I could tell he was, too. He was also definitely experienced in what he was doing, because he went to work quite confidently. He then came up and asked me if I wanted to try on him. I said sure. I began and he said, "Watch your teeth." I didn't want to let him know I was inexperienced. So, I slowed down and took my time and luckily got into a good **rhythm.** He didn't know I was a virgin, and I did my best to act dominant like my favorite porn star. I was an actor, and this was my movie.

There was so much excitement running through my body: This was much more than losing my virginity. For once, I was consenting to the sexual satisfaction of my body. This moment also confirmed that sex could look how I wanted it to look. And that it could be passionate and kind, but most importantly, fun and satisfying. **His body felt great in my mouth**.

I came up after a while and kissed him again. We both got up and went into his bedroom, where we got completely naked. He took off his clothes and immediately lay on his stomach. I then took off my shirt, and then my boxer briefs. I got behind him. There was moonlight coming through the shades of the dark room. Two Black boys under the glow of blue moonlight. How poetic, dare I

say ironic?

Now, I was scared as hell. One, because I didn't know what I was doing and clearly, he did. Two, because it was still college, and my fear of word getting out that I was inexperienced or bad in bed would have been too big of a campus rumor. Let alone that I was having sex with men and a friend of someone in my chapter.

**For the first few minutes, we dry humped and grinded. I was behind him, with my stomach on his back as we kissed. After a few minutes of fun and games, he got up and went to his nightstand, where he pulled out a condom and some lube. He then lay down on his stomach. I knew what I had to do even if I had never done it before. I had one point of reference, though, and that was seven-plus years of watching pornography. Although the porn was heterosexual, it was enough of a reference point for me to get the job done.**

**I remember the condom was blue and flavored like cotton candy. I put some lube on and got him up on his knees, and I began to slide into him from behind. I tried not to force it because I imagined that it would be painful; I didn't want this moment to be painful. So I eased in, slowly, until I heard him moan.**

**As we moved, I could tell he was excited and I was, too, but the pride in me told me not to show it. I felt like I was in control and proud of myself for getting it right on the first try—all the while still being nervous. I wanted to stay dominant in that moment. We went at it for about fifteen minutes before I started to get that feeling. Weakness in the legs, numbness in the waist. I finally came and let out a loud moan—to the point where he asked me to quiet down for the neighbors. I pulled out of him and kissed him while he masturbated. Then, he also came. That night was glorious. I had conquered a fear and had sex with a man on my own terms (p. 266).**

For me, I was finally on my journey of sexual exploration and couldn't't' wait to do it again.

He and I had sex a second time two weeks later, before school let out for summer.

...I had several sexual encounters that involved **mutual masturbation and kissing** and fooling around, but I just couldn't bring myself to have penetrative sex again. I was hesitant because I still had a lot of questions. As much as I enjoyed being on top, I wasn't sure if I always wanted to be the dominant person in the bedroom. I was still a novice at sex, and even more at gay culture and sexual positions. I wasn't sure if **because I "topped" him, that meant I always had to be the top.** I also wanted to try the bottom position, which I associated with being the more submissive person.

...I just needed time to reflect, and figure out if sex for me was going to be the casual hookup thing or if I was ready to now seek something more. **(p. 269)**

I got to his apartment and we both began drinking while watching TV. This lasted all of ten minutes before we started kissing and undressing each other.

He then stood up and grabbed me by the hands and led me into his bedroom. We took each other's clothes off, fast but deliberate. After, he told me to lie down on the bed. He asked me to "turn over" while he slipped a condom on himself.

My heart immediately started to race. Nervously, I asked him what he was doing, and he said, "You." I laughed at first but then told him that I had never been the bottom. He looked at me and said, "Well, that's about to change tonight."

I was extremely nervous. There is a fear, as with most things that you are doing for the first time. But this was my ass, and I was struggling to imagine someone inside me. And he was . . . large. But, I was gonna try.

it **I had previously topped someone who clearly enjoyed**, but he had been enjoying anal sex before I ever came along. He knew what to expect. I didn't. As an avid porn watcher, the only thing I knew about anal sex previously was that it was painful, or at least played up as such on the cameras.

Nervous and drunk, I listened and got on my stomach. He got on top and slowly inserted himself into me. It was the worst pain I think I had ever felt in my life. He then added more lube and tried again, which felt better but not by much. He began his stroking motion. Eventually, I felt a mix of pleasure with the pain.

I can't say that I didn't enjoy it, because I did. But it was painful for sure. In those few minutes though, I can say that he was gentle. His aim wasn't to hurt me, and my aim was for him to be pleasured, too. He didn't last long inside of me, thankfully. He gave me a kiss before he pulled out. I didn't stay long, nor did I masturbate after. I was in a state of shock. I just wanted to get back home. **(p. 271).**


Again, I ask you, do students actually need to read, at a Florida public high school library, what it means to have an experience of someone being "inside their ass" in order to master our Florida BEST Standards? If that's the case, then many of us apparently are very shallow in our knowledge, based on what was provided to us in our schools' libraries from earlier years.

Vicki Baggett, M.A.T.

# Exhibit 16

REQUEST FOR RECONSIDERATION OF EDUCATIONAL MEDIA

School: _____ Northview High School _____

Requested Initiated By: _____ Vicki Baggett _____

Telephone: [redacted] Address: [redacted]

City: _Century_ State: _FL_ Zip code: _32535_

**Please Check Media Type**

Set 1
# 23

X Book     ___Film     ___Videocassette

___ Periodical     ___Filmstrip     ___Record

___ Pamphlet     ___Cassette     ___Computer Software

___ Laser Videodisc     ___Kit     Other:_____

Title: _____ New Kid _____

Author: _____ Jerry Craft _____

Publisher or Producer: _____

1. Reasons for Objections: _____ race-baiting; anti-whiteness _____

2. Have you read, viewed, and/or listened to the entire educational media to which you object?
_____ yes _____

3. What are the strengths of this educational media? _____ none _____

4. Are you aware of the judgment of this educational media by literary and authoritative critics?
_____ yes _____

5. What do you believe is the purpose of this educational media? _____ Woke agenda; race-baiting _____

6. For what age group would you recommend this educational media? _____ none _____

7. Where was the educational media located in the school system? _____ elementary, middle + high schools _____

8. On what date(s) was the material utilized for instruction? _____ N/A _____

Signature of Complainant: _Vicki Baggett_ Date: _8-24-22_

# Exhibit 17

# Escambia County Public Schools
## District Materials Review Committee Decision

**Attach Request for Reconsideration of Educational Media**

**Author**: Raina Telgemeier          **Title or Item**: Drama

**Material Type:** Elementary and Middle School library book

1. **District Committee Review Committee**

   1 elementary media specialist, 1 middle school media specialist, 1 elementary administrator, 1 middle school administrator, 1 elementary teacher, 1 middle school teacher, 1 elementary parent, 1 middle school parent, 1 community member

2. **Meeting date(s), time(s) and location(s):**

   | | | |
   |---|---|---|
   | 1/5/23 | 5:30 pm - 6:30 pm | Spencer Bibbs |
   | 1/30/23 | 6:00 pm - 7:00 pm | Spencer Bibbs |

3. **Committee Decision (will stand for 1 year unless appealed to the ECSD School Board)**

   The committee voted 6:3 recommending that Drama be available in all elementary, middle, and high school ECPS libraries.

4. **Committee Comments Regarding the Titles:**

   **Could this work be considered offensive in any way due to:**

   Sexual behavior - attraction, kiss, aberrant behavior

   **Are questionable elements of this work an important part of the overall development of the story or text?**

   Yes

   This is a story of a 7th grade girl who loves being in Drama club and working behind the scenes. She has a crush on a boy who doesn't like her back. She also meets twin brothers and develops a close friendship with them. One of the twins is gay and has a crush on another boy. The book covers basic middle school issues like developing feelings for someone and becoming more independent.

# Escambia County Public Schools
## District Materials Review Committee Decision

Elementary students may find the kissing in a graphic novel "icky" because of their immaturity.  "Going Out" and physical intimacy doesn't begin as a recognized behavior/relatable until later in grade school.

Sexuality is a touchy subject.

No

There is no depiction of romantic contact between any of the characters.  The story is about friendship and middle school crushes.

There is nothing in this work that could be considered offensive.  This book tells the story of the main character's romantic interest.  There is no sex in any part of the story.  The characters reflect real-life situations.

I didn't find any questionable elements in this story.

While a conflict involves a student's attraction (romantically) to another, any "sexual behavior" is incidental to the main plot of the story: conflicts that arise between students working together on a play.

The story is not built around any questionable element. It is about Callie and the issues she deals with day to day.

The book does not qualify as indoctrination: there is no evidence of trying to make the reader accept the belief of the author nor characters.

**This work is most suitable for which grades?**

>   3-5, 6-8, 6-8 YA, 9-12

**Taken as a whole, does this work have literary, artistic, political or scientific value for the suggested audience?**

>   Yes

>   This book's message is about working hard to accomplish a goal while working through regular middle school challenges.

# Escambia County Public Schools
## District Materials Review Committee Decision

This is like a middle school playbook. Every student can somehow relate to one of the characters in the book because they are experiencing the exact same discoveries and emotions at this age.

This book has literary and artistic value in the themes that are presented due to the idea that all readers will be able to identify with the idea of an adolescent navigating relationships as well as the ups and downs of life and love. This book also includes the value of hard work and stick-with-it-ness. The main character of the story continues to come against challenges to her vision of what the scenes in the play "Moon Over Mississippi" should look like. She continues to work toward her goal of making a cannon until she creates the scenes she wants. This work shows the value of art through the steps of putting on a production. This book speaks to students who are going through similar situations and introduces those who may not have had this experience to multiple layers of putting on a production. there are characters in this story that all readers can relate to.

I feel the book as a whole shows the preteen experience with middle school "crushes" in a real and honest way.  It also shows different types of relationships and does not focus on only one type.

Students are exposed to students every day that are struggling with their identity. This story encourages empathy in relationships with others.

Drama gives realistic portrayals of middle school/teen angst.  Discovering who you are and how you fit into the larger scheme of things is is part of everyday life for this age group.

Drama is a well written middle/high school novel.  It reflects age appropriate concerns.

THEME: This work emphasizes the importance of teamwork and how there are many "STARS in the show".  *Artistically*, this work encourages kids and young teens to BE CREATIVE in problem solving and to think critically to achieve personal goals.

Covers a lot of what young teens go through and different relationships.

**What is the overall purpose, theme or message of the material?**

Work hard to overcome and succeed.

# Escambia County Public Schools
## District Materials Review Committee Decision

How much middle school is just DRAMA! Students are learning to navigate dating, affection, and who they want to be. Awkward age is summed up perfectly in this book.

The overall purpose or theme of this story is friendship, teamwork, inclusion, and determination.

Don't make assumptions about people.  Get to know them and accept them for who they are. I also enjoyed the very diverse group of friends in the story.

Working hard to accomplish goals, the importance of empathy in all relationships, communication among peers for understanding, dealing with confusing feelings, and handling conflicts among peers.

Drama depicts what might be happening in any middle or high school on any given day. Teamwork is a dominant theme as is the importance of accepting yourself and others for what they are.

The message of Drama is that of acceptance by peers, as well as being determined towards goals.

The importance of teamwork to achieve a common goal. Many "stars" in "the show".

Friendships, teamwork.

**Are the concepts presented in a manner appropriate to the ability and maturity level of the suggested audience?**

Yes

The book uses real-life situations and humor to convey the importance of teamwork and perseverance.

Yes, it is a direct reflection of what they are experiencing right now. They are learning about who they are and who they want to be. These are all typical age-appropriate situations for this age group.

The concepts in this book are suitable for readers in the recommended age group from the publisher.

# Escambia County Public Schools
## District Materials Review Committee Decision

The concepts are presented in a way that is easily understood.  As a middle school media specialist, I feel the maturity level is on point.

There are students that identify as homosexual and others who are struggling with identity in middle school.  Middle/high schoolers I've encountered struggle with similar issues.  Show them possible ways of handling these conflicts in their relationships with others and themselves.

This book is very realistic in portraying middle/high schoolers and the drama they face every day.  Middle school students may not date, but they definitely deal with crushes and the broken heart.

Middle/high school students are seeking peer relationships and are goal oriented.

I think older grade school children will find this story very relatable and fun to read.  Grades K-3 might not understand some of the larger, overarching concepts/they may go over their heads.

Happening in the same age group.

**Are illustrations appropriate for the suggested audience's developmental age?**

Yes

**Will reading or listening to this work result in a more compassionate understanding of human beings?**

Yes

This book has "geeks", "cool kids", "jocks" as well as characters of many ethnicities.  They are all trying to figure out who they are and the challenges they face help the reader understand each of the characters more.

I believe it will result in a better understanding of human beings.  This book provided similar problems to what students face everyday in school without judging.

This book will absolutely result in more compassion and understanding of human beings.  The characters in this story are very relatable and realistic. It is important for readers to see themselves in books as well as see the struggles that others go

## Escambia County Public Schools
### District Materials Review Committee Decision

through. These experiences humanize others and help to build empathy and compassion as well as an understanding of others.

I thought the material was handled very well throughout the story.  I did not see it as a story only focused on a gay relationship, there were many middle school relationships that were part of the story.

Being exposed to people that are different from us helps build understanding and compassion (even if they are fictional characters).

Middle/high school is a time of much sexual confusion for many.  Seeing characters deal with the same issues might open the doors for meaningful conversations about acceptance and compassion.

Everyone has felt peer rejection, as Callie and others work through situational circumstances that are reader relatable.

In this story, there is a lot of elevated emotional stakes.  Kindness and open-affirmation of others talents, preferences, communication style, and level of emotional intelligence is offered as an overarching theme.

**Does the work offer an opportunity to understand and better appreciate the aspirations, achievements, and problems of different cultures or minority groups?**

Yes

This book has "geeks", "cool kids", "jocks" as well as characters of many ethnicities. They are all trying to figure out who they are an the challenges they face help the reader understand each of the characters more.

It opened up the reader's eyes to what the boy was experiencing as he told his friend he was gay. She openly accepted him.

There are characters of color in this story, though it does not delve deeply into cultural differences, you can see that the aspirations of all groups of people are similar.  That as humans we are all connected.

Gives readers exposure to people struggling with attraction to same-sex peers and opposite-sex peers.

# Escambia County Public Schools
## District Materials Review Committee Decision

The book touches on the LGBTQ population.  The confusion, stigma are mentioned.  Again, the issue is <u>not</u> central to the story at all.

Agreed, through the character interactions the reader will reflect on the diversity among people.  There can be compassion felt that will be used in real life situations.

There is an incredibly diverse student body in this graphic novel.  None of which impacts the ultimate themes (or limitly impacts it) but because this is a graphic novel - it's important to show this diversity for inclusion and to break down stereotypes.

**NON-FICTION ONLY: Does the material contribute to the evolution of ideas and/or support state education standards?**

NA

**Additional Thoughts:**

5. **Next Steps**

The Assistant Superintendent of Curriculum and Instruction will inform the complainant, in writing, by certified US mail, of the committee's decision.

The complainant may appeal the decision to the School Board. The appeal must be made in writing to the Superintendent within ten (10) days of receipt of notification of the district-level committee decision.

A decision on the complaint will be made at the next regularly scheduled Board meeting unless the request for appeal is filed within fourteen (14) days of the Board meeting.  In that instance, the matter will be heard at the following regular Board meeting.

The Board shall review all evidence and materials presented at the district committee level.  If the complainant wishes to proffer additional evidence, it must be presented to the Superintendent no less than eight (8) days prior to the meeting at which the matter will be heard.

The complainant will be afforded the opportunity to offer additional arguments in support of their position.

The public shall be afforded an opportunity to comment before the Board makes a final decision.

The Board reserves the right to use outside expertise if necessary to help in its decision making.

## Escambia County Public Schools
### District Materials Review Committee Decision

The Board decision will be final, and the Superintendent will implement the decision.

Decisions on reconsidered materials will stand for five (5) years before new requests for reconsideration of those items will be entertained.

Exhibit 18

REQUEST FOR RECONSIDERATION OF EDUCATIONAL MEDIA

School: _____ Northview High School _____

Requested Initiated By: _____ Vicki Baggett _____

Telephone: ▓▓▓▓▓    Address: ▓▓▓▓▓

City: _____ Century _____ State: F L   Zip code: 32535

## Please Check Media Type

X Book      ___Film      ___Videocassette

___ Periodical      ___Filmstrip      ___Record

___ Pamphlet      ___Cassette      ___Computer Software    *Set 2*

___ Laser Videodisc      ___Kit      Other:_____    *# 11*

Title: _____ Drama _____

Author: _____ Raina Telgeimeier _____

Publisher or Producer: _____

1. Reasons for Objections: _____ Indoctrination of LGBTQ; age inappropriate & content not relevant

2. Have you read, viewed, and/or listened to the entire educational media to which you object? _____ yes

3. What are the strengths of this educational media? _____ None

4. Are you aware of the judgment of this educational media by literary and authoritative critics? _____ yes

5. What do you believe is the purpose of this educational media? _____ Indoctrination

6. For what age group would you recommend this educational media? _____ None

7. Where was the educational media located in the school system? _____ Elementary & Middle Schools

8. On what date(s) was the material utilized for instruction? _____ N/A

Signature of Complainant: Vicki Baggett     Date: 8/24/22

Exhibit 19

# Escambia County Public Schools
## District Materials Review Committee Decision

**Attach Request for Reconsideration of Educational Media**

**Author**: Toni Morrison        **Title or Item**: The Bluest Eye

**Material Type:** High school library book

1. **District Committee Review Committee**

   1 high school media specialist, 1 high school administrator, 1 high school teacher, 1 high school parent, 1 community member

2. **Meeting date(s), time(s) and location(s):**

   12/15/22    5:30 pm - 6:30 pm    Spencer Bibbs

   1/18/23     6:30 pm - 7:30 pm    Spencer Bibbs

3. **Committee Decision (will stand for 1 year unless appealed to the ECSD School Board)**

   The committee voted that the title be available in High School library collections.

   > 3 votes to keep in High School libraries
   > 2 votes to keep in Middle School Young Adult Opt-In and High School libraries

4. **Committee Comments Regarding the Titles:**

   **Could this work be considered offensive in any way due to:**

   The following items were selected:

   profanity, sexual behavior, prurient behavior, drugs/alcohol, brutality, violence, aberrant behavior, cruelty, religion or portrayal of religious ideologies

   **Are questionable elements of this work an important part of the overall development of the story or text?**

   Yes:

   The harsh truth of racism in the 1940s.  The effects of self-loathing are just as relevant today and many young people will be able to relate to the main characters.

# Escambia County Public Schools
## District Materials Review Committee Decision

The behavior leads to Pecola's coming undone.  Past behaviors lead to many characters' outcomes.

The Bluest Eye is told by an adolescent who is trying to find a place in the "we" of a community that includes adults suffering and doing harm to each other and to her friends.

The novel describes a scene of intense racism where white men force a black man to sexually abuse a black woman.  This is important for the novel because it shows how the severe anti-black racism of some dehumanizes African Americans and, in this instance, leaves both people scarred for nothing other than the pleasure of racists.  The South's history is full of such moments and they need to be known and understood to understand present racism in the U.S.

The sexual behavior contained within "The Bluest Eye" works as a type of violent oppression.

**This work is most suitable for which grades?**

The following were selected:

6-8, 9-12, 11-12

**Taken as a whole, does this work have literary, artistic, political or scientific value for the suggested audience?**

Yes:

The book dares the reader to challenge his or her beliefs or preconceived notions of beauty. The novel looks at the continuing effects of racism and its pervasiveness for a community.

Long-term effect of self-hatred/loathing.

Toni Morrison is considered one of the most accomplished writers of a generation. The use of the "we" as a viewpoint and her intensive attention to sensory experience is unique, especially for the time in which her career began.  She specifically states in interviews that she wanted to write books she could not find to read.

This book describes the effects of anti-black racism on black women as well as black men. The novel offers a look at working class black life in the early half of the 20th century. Besides Toni Morrison won the Nobel Prize, the highest award in World Literature, making her work essential in telling the American story and a role model for black women.

Yes, "The Bluest Eye" has literary, artistic, and political value for grades 9-12.

# Escambia County Public Schools
## District Materials Review Committee Decision

**What is the overall purpose, theme or message of the material?**

The novel looks at the continuing effects of racism and its pervasiveness for a community. It also addresses the roles of women of color in a community (interactions, involvements, opportunities, or lack thereof).

Coming of age in a world that isn't kind to them.  Struggles and trials facing young children.  Self-hatred, loathing, racism.

As stated above, the adolescents in The Bluest Eye are trying to understand their place in a community in which harm is occurring.  They are trying to understand the nature and reason for the harm.

The overall purpose of the novel is to express the detrimental effects of racism, especially anti-black racism, on the entire community.  Besides that, the novel is written in beautiful prose that is unmatched in American literature.  Also, the effects of a community that knows sexual violence and blames children for the acts of adults.

"The Bluest Eye" gives a detailed account of the impact of white beauty standards on black girls and women.

**Are the concepts presented in a manner appropriate to the ability and maturity level of the suggested audience?**

Yes:

Mature readers shall have access to this book.  While the narrator is young, it is not a typical YA narrator and may be too complex for less sophisticated readers.

Students are dealing with these issues or know someone who is or has.

Of all Morrison's novels, this is the only one told from the viewpoint of adolescents.  Teens who are not reading at grade level might find the text difficult, but that is true of most classics.

For students of the age range of high school students, the content is surely known.  Racism presents itself every day in society, as well as anti-black and anti-women instances are around from TV, the internet, books, magazines, and even in classroom discussions. Same with sex and sexuality. While the text is sometimes graphic, the book represents true life stories that students need to know about to hopefully overcome racist, sexist, and oppressive attitudes.

# Escambia County Public Schools
## District Materials Review Committee Decision

"The Bluest Eye" is an 8th-grade reading level; nevertheless, the mature content requires a more mature audience of the 9th-12th grade level.

**Are illustrations appropriate for the suggested audience's developmental age?**

Not applicable

**Will reading or listening to this work result in a more compassionate understanding of human beings?**

Yes:

The book explains the failures of the world and our society that mature readers will question.  Compassion, understanding, and insight into communities of color.

Opens the door to a world many students have never seen/felt/experienced.

Intergenerational suffering and harm is something that teens need to reckon with and do reckon with.  It is developmentally appropriate for their age.  Understanding the suffering of others increases compassion.

The characters are presented in a very sympathetic light and one learns how they become the people they are through Toni Morrison's exquisitely beautiful prose.  Further, one cannot help but feel sympathy towards Pecola as she feels the only way to survive her ordeal is to get blue eyes like Shirley Temple. So sad.

"The Bluest Eye" allows readers to understand how the main character's coming-of-age story was affected by white beauty standards.

**Does the work offer an opportunity to understand and better appreciate the aspirations, achievements, and problems of different cultures or minority groups?**

Yes:

The book explains the failures of the world and our society that mature readers will question.  Compassion, understanding, and insight into communities of color.

Problems

The problem of child abuse and child sexual abuse is not specific to any culture; it is pervasive.  That being said, the novel also explores challenges unique to African American persons in the middle of the last century.  As for achievement, Toni Morrison's literary significance is the achievement.

# Escambia County Public Schools
## District Materials Review Committee Decision

By reading this book, one cannot help but feel concerned and have a better understanding of Pecola. In a divided society, books hold a key to understanding other cultures, as well as recognition of similarities between peoples. Representation, especially representing the works of Black Nobel Prize-winning authors, is incredibly important.

"The Bluest Eye" allows readers an opportunity to understand the aspirations and problems of different cultures and minority groups.

**NON-FICTION ONLY: Does the material contribute to the evolution of ideas and/or support state education standards?**

Not applicable

**Additional Notes**

Many classics deal with sexual themes. The Sun Also Rise is an entire book about impotency. The Great Gatsby is about adultery and murder. Toni Morrison's writing was a movement away from the implied off-stage tragedy to a sensory-oriented language from which the readers cannot look away or pretend the tragedy is not occurring or is not important. The use of the "we" in her writing asks the reader to engage in questions about their role in the community. This is a departure from the removed narrator of early and mid-century texts or the "I" of more individualistic writing. Faulkner wrote on many of the same themes in this book, but either through a removed narrator or in such a way, for instance, in The Sound and the Fury, could read it and have not realized what happened. The strength of Morrison's work, which critics seem disturbed by, is that the disturbing is disturbing. That and obviously her skilled use of language.

This was one of the best novels I've ever read. Morrison's style is incredible and her literary voice holds a remarkable ability to convey a powerful story, complex in nature, but in a very accessible manner. I'm a better person for having read this book and could see having a positive impact on so many students who are grappling with many issues that this book covers. Not to mention Toni Morrison won the Nobel Prize for literature. So many people need to see diverse faces in the literary canon, it would be criminal to remove this book.

## 5. Next Steps

The Assistant Superintendent of Curriculum and Instruction will inform the complainant, in writing, by certified US mail, of the committee's decision.

The complainant may appeal the decision to the School Board. The appeal must be made in writing to the Superintendent within ten (10) days of receipt of notification of the district-level committee decision.

# Escambia County Public Schools
## District Materials Review Committee Decision

A decision on the complaint will be made at the next regularly scheduled Board meeting unless the request for appeal is filed within fourteen (14) days of the Board meeting.  In that instance, the matter will be heard at the following regular Board meeting.

The Board shall review all evidence and materials presented at the district committee level. If the complainant wishes to proffer additional evidence, it must be presented to the Superintendent no less than eight (8) days prior to the meeting at which the matter will be heard.

The complainant will be afforded the opportunity to offer additional arguments in support of their position.

The public shall be afforded an opportunity to comment before the Board makes a final decision.

The Board reserves the right to use outside expertise if necessary to help in its decision making.

The Board decision will be final, and the Superintendent will implement the decision.

Decisions on reconsidered materials will stand for five (5) years before new requests for reconsideration of those items will be entertained.

Exhibit 20

Case 3:23-cv-10385-TKW-ZCB Document 127-10 Filed 10/04/24 Page 180 of 217

School: _____ Northview High School _____

Requested Initiated By: _____ Vicki Baggett _____

Telephone: _____ Address: _____

City: Century _____ State: FL Zip code: 32535

**Please Check Media Type**

X Book ___Film ___Videocassette

___Periodical ___Filmstrip ___Record

___Pamphlet ___Cassette ___Computer Software

___Laser Videodisc ___Kit Other:_____

Title: _____ The Bluest Eye _____

Author: _____ Toni Morrison _____

Set # 2
#5

Publisher or Producer: _____

1. Reasons for Objections: _Graphic rape scenes; pedophilia glorified; violent acts_

2. Have you read, viewed, and/or listened to the entire educational media to which you object? _yes_

3. What are the strengths of this educational media? _None_

4. Are you aware of the judgment of this educational media by literary and authoritative critics? _yes_

5. What do you believe is the purpose of this educational media? _Shock_

6. For what age group would you recommend this educational media? _adult_

7. Where was the educational media located in the school system? _middle & high school_

8. On what date(s) was the material utilized for instruction? _N/A_

Signature of Complainant: _Vicki Baggett_ Date: _8-24-22_

Submitted on 8-4-22
→ Nothing done;
Resubmitting on 8-24-22.

Exhibit 21

# Escambia County Public Schools
## District Materials Review Committee Decision

**Attach Request for Reconsideration of Educational Media**

**Author**: Amy Reed          **Title or Item**: The Nowhere Girls

**Material Type:** school library book

1. **District Committee Review Committee**

   1 high school media specialist, 1 high school administrator, 1 high school teacher, 1 high school parent, 1 community member

2. **Meeting date(s), time(s) and location(s):**

   | January 12, 2023 | 5:30 pm | Spencer Bibbs |
   | February 16, 2023 | 5:30 pm | Spencer Bibbs |

3. **Committee Decision (will stand for 1 year unless appealed to the ECSD School Board)**

   The committee voted 5:0 that the title be available in high school libraries.

   > 4 votes to keep in high schools libraries
   > 1 vote to keep in middle and high school libraries

4. **Committee Comments Regarding the Titles:**

   **Could this work be considered offensive in any way due to (the following were checked:**

   > Profanity, sexual behavior, prurient behavior, brutality, violence, language, religion or portrayal of religious practices/ideologies, drugs/alcohol, aberrant behavior

   **Are questionable elements of this work an important part of the overall development of the story or text?**

   > Yes:

   > Sexual assault (rape) is an act of violence and is integral to the novel and plot.

# Escambia County Public Schools
## District Materials Review Committee Decision

The main characters are teenage girls in high school. Their behavior is typical of girls in that age. The other characters also typical high school.

The novel uses risque topics to address a misogynistic culture in a high school. The elements are often categorized as questionable, but they are relevant parts of the American teenage dialect and culture.

Having walked the halls of middle and high schools, there was nothing in this book that would warrant a deviation from the reality of today's secondary education society.

The dialogue is authentic to today's teenagers. The protagonists have distinct and unique personalities and very different life experiences.  Yet, each is touched by the culture of male entitlement and that is their unifying purpose.

**This work is most suitable for which grades?**

The following were selected:

9-12

**Taken as a whole, does this work have literary, artistic, political or scientific value for the suggested audience?**

Yes:

Young adult novel that is representative of girls of different backgrounds uniting to help one another. The work fictionalizes events that are common occurrences in 2023.

This novel is very valuable for teenagers. 3 misfits and the changes they are able to make.

The novel address an important theme of activism, self-acceptance, and empowerment.  It has value for any high school student.

The reality is that rape culture and human trafficking does exist in our society. This book sheds light onto the situations that occur, how they occur, and what opportunities are possible to overcome and thrive when given proper channels of

# Escambia County Public Schools
## District Materials Review Committee Decision

support. This book can also be a cautionary tale of young men and women to help them protect themselves from potentially harmful situations.

Literary: well written; Political: important, cautionary tale about sex crimes and their consequences; Scientific: demonstrates well the manifestation of autism

**What is the overall purpose, theme or message of the material?**

Purpose is to entertain and inform its audience about the need for victims and non-victims, boys and girls alike, to speak out against sexual violence.

Expose the rape culture of the school. Different groups of girls coming together. Commitment and making positive change. Not giving up

The novel is an indictment of rape culture and condemns misogyny in several meaningful ways.

It is possible to overcome extreme trauma caused by manipulation with appropriate support.

There are many, but mainly it is a cautionary tale for young people who can too easily be victimized and the power of advocacy, even if it is reactive rather than proactive.

**Are the concepts presented in a manner appropriate to the ability and maturity level of the suggested audience?**

Yes:

Maybe cliched in some ways but appropriate for high school students.

The 3 main teenage girls represent 3 very realistic teens.

The themes and content of the novel are within the vocabulary and maturity level of high school students.

This book is truly a slice of the ugliness that exists in today's world. To bring it to the attention of young adults and help them know how to protect themselves is important.

# Escambia County Public Schools
## District Materials Review Committee Decision

This book does not speak "down" to teenagers. It was the language that even if they do not "use" it, they hear it, and are familiar with it.

**Are illustrations appropriate for the suggested audience's developmental age?**

Not applicable

**Will reading or listening to this work result in a more compassionate understanding of human beings?**

The autistic child, the child of immigrants, the child previously outcast through no fault of her own.  EVERY person, EVERY character has a story - realizing that there is more that CAN unite humanity than divide it can easily be taken from this book.

Readers see the sadness of Lucy and they can feel compassion. Readers understand the struggles of Rose and the timid Grace and the awkwardness of Erin.

The novel condemns rape, misogyny, violence, and teaches the value of tolerance and compassion.

There were multiple characters in this book that had all experienced sexual trauma and they all dealt with the burden of that pain in different ways. In several places in the book, the Nowhere Girls had meetings that provided opportunities for catharsis and for the girls to have a greater understanding of each other based on the fact that several of them had experienced rape, but felt shamed by the experience and did not feel comfortable opening up to others for fear of being labeled.  These girls grew into more compassionate people once they understood they were not alone.

We can only hope. In addition to the obvious - victims - it also explores topics of social cliques, dysfunctional families, child labor, the influence of faith, bigotry, stereotype casting, immigration, and autism.

**Does the work offer an opportunity to understand and better appreciate the aspirations, achievements, and problems of different cultures or minority groups?**

Yes:

See above - It is a story of the people - think stereotypical high school cliques - coming together to combat an evil.

Rosina - Mexican family and gay. Erin - awkward

# Escambia County Public Schools
## District Materials Review Committee Decision

One of the main characters is a queer Latin-X character. The novel touches on the struggles and development of this character through an appropriate cultural lens that is both appropriately displayed and accessible for high school students.

This book addressed the struggles of immigrant populations, differing sexual orientations, and mental health issues in a way that converts them from a "label" to someone who is trying to find their way in the world.

Back and brown, gender fluid, immigrants, African- American - all of these are represented in this book.

**NON-FICTION ONLY: Does the material contribute to the evolution of ideas and/or support state education standards?**

Not applicable

## 5. Next Steps

The Assistant Superintendent of Curriculum and Instruction will inform the complainant, in writing, by certified US mail, of the committee's decision.

The complainant may appeal the decision to the School Board. The appeal must be made in writing to the Superintendent within ten (10) days of receipt of notification of the district-level committee decision.

A decision on the complaint will be made at the next regularly scheduled Board meeting unless the request for appeal is filed within fourteen (14) days of the Board meeting.  In that instance, the matter will be heard at the following regular Board meeting.

The Board shall review all evidence and materials presented at the district committee level. If the complainant wishes to proffer additional evidence, it must be presented to the Superintendent no less than eight (8) days prior to the meeting at which the matter will be heard.

The complainant will be afforded the opportunity to offer additional arguments in support of their position.

The public shall be afforded an opportunity to comment before the Board makes a final decision.

The Board reserves the right to use outside expertise if necessary to help in its decision making.

# Escambia County Public Schools
## District Materials Review Committee Decision

The Board decision will be final, and the Superintendent will implement the decision.

Decisions on reconsidered materials will stand for five (5) years before new requests for reconsideration of those items will be entertained.

# Exhibit 22

School: _____ Northview High School _____

Requested Initiated By: _____ Vicki Baggett _____

Telephone: [redacted] Address: [redacted]

City: _Century_ State: _FL_ Zip code: _32535_

### Please Check Media Type

X Book          ___ Film          ___ Videocassette

___ Periodical     ___ Filmstrip     ___ Record

___ Pamphlet      ___ Cassette      ___ Computer Software

___ Laser Videodisc  ___ Kit        Other: _____

Set 1
# 24

Title: _____ The Nowhere Girls _____

Author: _____ Amy Reed _____

Publisher or Producer: _____

1. Reasons for Objections: _____ graphic sexual content _____

2. Have you read, viewed, and/or listened to the entire educational media to which you object?
_____ yes _____

3. What are the strengths of this educational media? _____ none _____

4. Are you aware of the judgment of this educational media by literary and authoritative critics?
_____ yes _____

5. What do you believe is the purpose of this educational media? _____ sexual introductions, sexually excite _____

6. For what age group would you recommend this educational media? _____ none _____

7. Where was the educational media located in the school system? _____ high school _____

8. On what date(s) was the material utilized for instruction? _____ N/A _____

Signature of Complainant: _____ Vicki Baggett _____ Date: _____ 8-24-22 _____

Exhibit 23

# Escambia County Public Schools
## District Materials Review Committee Decision

**Attach Request for Reconsideration of Educational Media**

**Author**: PUSH        **Title or Item**: Sapphire

**Material Type:** school library book

1. **District Committee Review Committee**

   1 high school media specialist, 1 high school administrator, 1 high school teacher, 1 high school parent, 1 community member

2. **Meeting date(s), time(s) and location(s):**

   | | | |
   |---|---|---|
   | 1-23-23 | 5:30 pm | Spencer Bibbs |
   | 2-28-23 | 6:30 pm | Spencer Bibbs |

3. **Committee Decision (will stand for 1 year unless appealed to the ECSD School Board)**

   The committee voted that the title be available in high school ECPS libraries.

   4 votes to keep the title in high school ECPS libraries
   1 vote to remove the title from all ECPS libraries

4. **Committee Comments Regarding the Titles:**

   **Could this work be considered offensive in any way due to:**

   The following were checked:

   Profanity, sexual behavior, brutality, violence, language, cruelty, drugs/alcohol, aberrant behavior, manner characters are presented, language

   **Are questionable elements of this work an important part of the overall development of the story or text?**

# Escambia County Public Schools
## District Materials Review Committee Decision

Yes:

Precious's sexual abuse is the catalyst for her story.

I feel like this answer can go both ways. The sexual violence that occurs is what drives this entire story. I feel like the language was not an important part and the comments made about gay men and HIV/AIDS were not an important part of the story. Character development and background.

The story can't be told without the "reality" of the situation presented, including language and details.

The questionable elements are an important part of developing Precious' background and creating a greater understanding of her circumstances, trials, and ultimately, her ability to begin to see herself as a whole and worthy person despite her circumstances.

Without the discussion of incest, we would not be able to be fully aware of Precious' situation. She is raped, has no one to help her, she feels alone, and has developed a hatred of people. The language that is present in the book is a result of the environment in which Precious is raised.

**This work is most suitable for which grades?**

The following were selected:

The following were checked:

9-12, None

**Taken as a whole, does this work have literary, artistic, political or scientific value for the suggested audience?**

Yes:

This story includes a very artistic presentation of a journey from complete illiteracy to English language competency. It also discusses the way in which students can fail by the wayside in their education regardless of how smart they are or how persistent they are in their attempts to understand what's being presented in the classroom.

# Escambia County Public Schools
## District Materials Review Committee Decision

This book is absolutely realistic and shows the inner dialogue of a teenager that has suffered unimaginable heartbreak and abuse.

H.S. students discovering who they are and where they belong in this world - need to be exposed to and understand different social, economic, political and educational levels other than their own.

Take as a whole, *Push* does have literary and artistic value. It is rare for a novel this raw and devastating to have such a profound effect on the reader. Partly, this story works because it is told from the first-person perspective of Precious, an illiterate, overweight young Black woman. From the first pages, the reader is transported into her mind, her views, and the inner workings of her feelings regarding herself and her relationship to the world around her.

I believe there is literary value in Sapphire's work. We would be naive to think that in our county there is not some teenagers who are experiencing the same trauma as Precious. Even if they are not experiencing the circumstances of incest, they may be the victim of rape.

**What is the overall purpose, theme or message of the material?**

The overall purpose of the material is to insight into the most marginalized members of our society. The book's title "Push" is exactly what the main character worked to do: push past the obstacles in her life that were no fault of her own to create a better life for herself and for her child.

Gives insight on problems that other young adults are enduring or to provide a support system for those who are already enduring similar obstacles.

Redemption. Growth/development/self-worth. Overcoming/surviving negative aspects in life.

Ultimately, this is a story of triumph, as Precious finds the strength to disentangle herself from her surrounding, move int a halfway house, and begin t learn how to read and write. While the story does not necessarily end on a glorious note, with Precious revealing her AIDS diagnosis, it does present the reader with a sense of hope, for all Precious has endured and survived, and will continue to do so.

Survival and rising above the circumstances of your life.

# Escambia County Public Schools
## District Materials Review Committee Decision

**Are the concepts presented in a manner appropriate to the ability and maturity level of the suggested audience?**

Yes:

This book is listed at 10th grade and higher or 11th grade and higher on different websites including NCTE, Scholastic, Mackin, etc. We have students that are facing the same situation as Precious, our narrator. That's why I believe this book is presented in a manner appropriate to the ability and maturity level of the suggested audience of grades 11 and 12.

H.S students are mature enough to handle this content. Most of them are exposed to more than this through social media and, unfortunately, from personal experience (for some). It provides for those who personally relate and can help their friends understand their challenges.

Most high school students have already been exposed to, through popular media, to much more graphic and profane material which has no literary value. Most, if not all 15-18-year-olds that I am familiar with would be mature enough to dissect the material in an appropriate manner.

No:

If the suggested audience is 9-12, it should not be read without guidance.

While many of the challenges Precious faces are not unique to many of the challenges our high school students face, it will take an extraordinary amount of maturity to be able to endure *Push* and Precious' story.  It is best read with the support of a teacher or trusted adult, or read as an adult.

**Are illustrations appropriate for the suggested audience's developmental age?**

N/A

**Will reading or listening to this work result in a more compassionate understanding of human beings?**

# Escambia County Public Schools
## District Materials Review Committee Decision

Yes:

When we remain in our own bubble of life that we create for ourselves, we are limited in our exposure to different life experiences. That moves us to act out of ignorance instead of information. Educators are encouraged to build relationships. Those relationships can not be without an openness to the possibility that students' lives may be more difficult than we could even imagine. This book reminds people that everyone has potential to them. It takes patience and willingness to learn on the part of both parties.

Absolutely, I felt gutted for Precious while I was reading this story. I gained a lot of compassion for her and other people that may deal with the same issues.  It shows Precious and her growth with literacy as well.

Anyone reading this book will feel compassion for the characters and their life stories. It may help some students realize the unfortunate things suffer through and treat them with more respect and compassion.

Through her journal entries, Precious' voice provides the reader with the opportunity to relate to someone who has endured unbelievable and devastating challenges. Yet, Precious is resilient and shows what can be accomplished through hopefulness, dedication, and hard work. Precious' story may not be relatable to all readers; however, it does serve to show the dignity that we all deserve as humans, regardless of our circumstances.

Through reading about Precious and her circumstances we are able to have a more developed understanding of the human condition, and hopefully a deeper compassion for someone who may be very different from ourselves.

**Does the work offer an opportunity to understand and better appreciate the aspirations, achievements, and problems of different cultures or minority groups?**

Yes:

This book focuses on the main character, a young Black woman. Many times the voices of Black women are silenced. Many Black students are dismissed because no one is willing to be patient with them and their journeys. Also, with the admission that the APA has focused mainly on the psyche and behaviors of white particularly white males, manifestations of the autism spectrum, ADHD, ADD, trauma-based mental illnesses and other mental disorders are unknown. This book calls educators and counselors to look at Black students in a holistic manner with a lens of grace.

# Escambia County Public Schools
## District Materials Review Committee Decision

Absolutely. Like I said above. Child and sexual abuse, teenage pregnancy, self-discovery, and the need to belong are all problems that can affect young adults.

Although abuse is not limited by race or socio-economic status it is more prevalent, statistically, to minority groups, as depicted in this book.

*Push* is told through the first-person perspective of Precious, utilizing her voice to portray her illiteracy and, ultimately, growth both intellectually and personally. Through her journal entries, Precious' voice provides the reader with the opportunity to relate to someone who has endured unbelievable and devastating challenges. Yet, Precious is resilient and shows what can be accomplished through hopefulness, deviation, and hard work, Readers may relate to Precious' struggle to fit in and be part of a group, which Precious finds through Ms. Rain and her support group.

Through reading about Precious and her circumstances we are able to have a more developed understanding of the human condition; and hopefully, develop a deeper compassion for someone who may be very different from ourselves.

**NON-FICTION ONLY: Does the material contribute to the evolution of ideas and/or support state education standards?**

ELA 612.F.2AP.3a - Encode single syllable and multisyllabic words using the students' mode of communication.

SS.912.P.10.6 Discuss how privilege and power structures relate to stereotypes and discrimination

SS.912.p.10.12 Examine how perspectives affect stereotypes and treatment of minority and majority groups in society.

**Additional Notes**

5.  **Next Steps**

The Assistant Superintendent of Curriculum and Instruction will inform the complainant, in

# Escambia County Public Schools
## District Materials Review Committee Decision

writing, by certified US mail, of the committee's decision.

The complainant may appeal the decision to the School Board. The appeal must be made in writing to the Superintendent within ten (10) days of receipt of notification of the district-level committee decision.

A decision on the complaint will be made at the next regularly scheduled Board meeting unless the request for appeal is filed within fourteen (14) days of the Board meeting.  In that instance, the matter will be heard at the following regular Board meeting.

The Board shall review all evidence and materials presented at the district committee level. If the complainant wishes to proffer additional evidence, it must be presented to the Superintendent no less than eight (8) days prior to the meeting at which the matter will be heard.

The complainant will be afforded the opportunity to offer additional arguments in support of their position.

The public shall be afforded an opportunity to comment before the Board makes a final decision.

The Board reserves the right to use outside expertise if necessary to help in its decision making.

The Board decision will be final, and the Superintendent will implement the decision.

Decisions on reconsidered materials will stand for five (5) years before new requests for reconsideration of those items will be entertained.

# Exhibit 24

March 10, 2023

RE:   Appeal for "Push"

Dear Escambia County School Board Members:

Please find attached an appeal of the District Materials Review Committee's decision for **"Push,"** by Sapphire**.**

Once again, under the guidance of our District Media Specialist, Ms. Michelle White, a District Review Committee has ignored the law and voted **4 to 1 to keep the novel "Push"** in our high school libraries. In their typical fashion, the committee claims that most high school students are mature enough for this book because "**most of them are exposed to more than this through social media and, unfortunately, from personal experience (for some)."** The committee further suggests that apparently those of us who depend on our School Board to follow the law and remove books that are prurient or aberrant in nature, not age-appropriate or content-appropriate, **"remain in our own bubble of life that we create for ourselves;"** therefore, limiting **"our exposure to different life experiences,"** an act that the committee claims "moves us to act out of ignorance instead of information."

Not surprisingly, in their decision to me, the District Review Committee **assumed this book was non-fiction** and even listed three standards that they thought this book utilized. I find this interesting considering they took so much time to look up reviews about **WHY** high school minors need this book. Evidently, I need to move the committee out of ignorance with information that **this book is fiction**, and **fiction must follow certain writing rules**. The purpose of fiction writing is simply <span style="color:red">**TO ENTERTAIN**</span>. It is not to inform or educate.   Based on that fact alone, having a book available to minors whose primary purpose is to entertain about a child whose father **"slams his hips into me HARD. I scream pain he come. He slap my thighs like cowboys do horses on TV. Shiver. Orgasm in me, his body shaking, grab me, call me Fat Mama, Big Hole! You LOVE it! Say you love it! I wanna say I DON"T. I wanna say I'm a chile. But my pussy popping like grease in frying pan. He slam in me again. His dick soft. He start sucking my tittie" (p. 127)** would definitely be considered a violation of the law for our school district. Kuddos to the one committee member who obviously read the law and read the book before making an informed decision on facts rather than feelings.

Many states have already pulled this book because of the **sexually graphic content and violent language**, **and the horrific and inappropriate graphic acts of incest throughout the book**. This is one whose contents actually made me sick while trying to digest.

Perhaps our Board could give specific guidance to those in charge of our District Committees or even those who also have the authority to remove or restrict books when those books cross the line of "acceptable standards." Or better yet, perhaps our Board would simply start restricting or removing books based on the law, rather than waste so much time doing a dance. This book was originally submitted August 24, 2022.   Wouldn't we all agree that reading page after page of how a mother puts her hand between her 12-year old daughter's legs and **"the smell fill room," but then her hand eventually becomes a "creepy spider, up my legs, in my pussy" or how her own father   is "fucking me illegal. But I keep my mouf shut so's the fucking don't turn into a beating. I start to feel goo; stop being a video dancer and start coming."**

Do you wonder why parents and other community members are so concerned? <span style="color:red">THIS IS NOT LITERATURE,</span> and any attempt to disguise it as such should be concerning to all.

<u>**Please see excerpts below.    (Typed as written.)**</u>

**I was left back when I was twelve because I had a baby for my fahver.<span style="color:red">(p. 16)</span>**

**She staring at me, from behind her big wooden desk, she got her white bitch hands folded together on top her desk <span style="color:red">(p. 19)</span>.**

**She look at me like I said I wanna suck a dog's dick or some shit. <span style="color:red">(p. 20)</span>**

**I been knowing a man put his dick in you, gush white stuff in your booty you could get pregnant. I'm twelve now, I been knowing about that since I was five or six, maybe I always known about pussy and dick. I can't remember not knowing. No, I can't remember a time I did not know. <span style="color:red">(p. 25)</span>**

**Daddy put his pee-pee smelling thing in my mouth, my pussy, but never hold me. I see me, first grade, pink dress dirty sperm stuffs on it. No one comb my hair. <span style="color:red">(p. 32)</span>**

Second grade, third grade, fourth grade seem like one dark night.
...I look at her but see Mama's shoe coming at the side of my head like
a bullet, Carl's dick dangle dangle in my face and now the flat-face
baby with eyes like Koreans.
...About three months after baby born, I'm still twelve when all this
happen, Mama slap me. HARD. Then she pick up cast-iron skillet,
thank god it was no hot in it, and she hit me so hard on back I fall on
floor. Then she kick me in ribs. Then she say, "Thank you Miz
Claireece Precious Jones for fucking my husband you nasty little
slut!" I feel like I'm gonna die, can't breathe, from where I have baby
start to hurt.
"Fat cunt bucket slut! Nigger pig bitch! He done quit me! He done left
me 'cause of you. What you tell them mutherfuckers at the damn
hospital? I should KILL you!" she screaming at me.
I'm lying on the floor shaking, crying, scared she gonna kill me. "Get
up Miss Hot-to-Trot," Mama say. "Git your Jezebel ass up and fix
some dinner 'fore I give you something to cry about." **(p. 32)**

I feel Mama's hand between my legs, moving up my thigh. Her hand
stop, she getting ready to pinch me if I move. I just lay still, keep my
eyes close. I can tell Mama's other hand between her legs now 'cause
the smell fill room. Mama can't fit into the bathtub no more. Go sleep,
go sleep, go to sleep. I tell myself. Maman's hand creepy spider, up
my legs, in my pussy.
...I'm twelve, no I was twelve, when that shit happened.
...Mama jus' hit me wif fryin' pan? **(p. 35)**

This is my second baby for my daddy, it gonna be retarded too?
...This time I know Mama know. Umm hmmm, she know. She bring
him to me. I ain' crazy, that stinky hoe give me to him. Probably thas'
what he require to fuck her, some of me. Got to where he jus' come in
my room any ole time, not jus' night. He climb on me. Shut up! He say.
He slap my ass, You wide as the Mississippi, don't tell me a little bit of
dick hurt you heifer. Git usta it, he laff, you is usta it. I fall back on
bed, he fall on top of me. Then I change stations, change bodies...
..."I'm gonna marry you," he be saying. Hurry up, nigger, shut up! He
mess up dream talkin' 'n gruntin'. First he mess up my life fucking me,
then he mess up the fucking talkin'. I wanna scream, Oh shut up!
Nigger, how you gonna marry me and you is my daddy. I'm your

daughter, fucking me illegal. But I keep my mouf shut so's the fucking don't turn into a beating. I start to feel goo; stop being a video dancer and start coming. I try to go back to video but coming now, rocking under Carl now, my twat jumping juicy, it feel good. I feel shamed. "See, see," he slap
my thigh like cowboys do horses on TV, then he squeeze my nipple, bit down on it. I come some more. "See, you LIKE it! You jus' like your mama- you die for it!" He pull his dick out, the white cum stuff pour out my hole wet up the sheets **(p. 37).**

My pee pee open hot stinky down my thighs ssssss splatter splatter. ...Seven, he on me almost every night. First it's just in my mouth. Then it's more more. He is intercoursing me. Say I can take it. Look you don't even bleed, virgin girls bleed. You not virgin, I'm **seven (p. 53)**

I think my mind a TV set smell like between my muver's legs. ...I don't fucks boyz but I'm pregnant. My fahver fuck me. And she know it. She kick me in my head when I'm pregnant. ...I think my daddy. He stink, the white shit drip off his dick. Lick it lick it. I HATE that. But then I feel the hot sauce hot cha cha feeling when he be fucking me. I get so confuse. I HATE him. But my pussy be popping. He say that, "Bif Mama your pussy is popping!" I hate myself when I feel good. **(p. 72)**

I jus' want to lay down, listen to radio, look at picture of Farrakhan, a real man, who don't fuck his daughter, fuck children **(p. 73)**

I jus' want to lay down, listen to radio, look at picture of Farrakhan, a real man, who don't fuck his daughter, fuck children **(p. 74)**

"Nigger rape me. I not steal shit fat bitch your husband RAPE me RAPE ME!" ...My pussy hurt. **(p. 90)**

My clit swell up think Daddy. Daddy sick me, disgust me, but still he sex me up. I nawshus in my stomach but hot tight in my twat and I think I want it back, the smell of the bedroom, the hurt- he slap my face till it sting and my ears sing separate songs from each other, call me names, pump my pussy in out in out in out awww I come. He bite me hard. A hump! A hump! He slam his hips into me HARD. I scream

**pain he come. He slap my thighs like cowboys do horses on TV.
Shiver. Orgasm in me, his body shaking, grab me, call me Fat Mama,
Big Hole! You LOVE it! Say you love it! I wanna say I DON"T. I wanna
say I'm a chile. But my pussy popping like grease in frying pan. He
slam in me again. His dick soft. He start
sucking my tittie. (p. 127)**

**Tired of this honky askin' me questions.
...If she was to walk in on me now I turn around and slap her cracker
ass down. Problem not crack but the CRACKER! Farrakhn say. (p.
132)**

**A girl gave her father's dick in her mouth know things the other girls
don't know but it's not what you want to know.
...Bombs with hair and titties and dresses.
..."It started when I was, oh, about four or five years old with him
fondling me" (feeling her up). "By the time I was twelve he was having
intercourse with me three or four times a week."
...Carl, the way his knees on either side of my neck.
...My hand is going up through the smell of Mama, my hand is
pushing Daddy's dick out my face.
"I was raped by my father. And beat." No one is talking except me.
"Mama push my head down in her..." I can't talk no more. (p. 145)**

Shall I keep going? There are 100 plus more pages to go, but I am certain you
get the point. FS 847.012 says it is a blatant violation to offer obscene and
pornographic material to minors. Do we need an entertaining book about a
father pumping his 12-year-old daughter's **"pussy"** so much that he makes
her "**pussy pop like grease in a frying pan**" and then she **"comes."**   Do
high school students, "discovering who they are and where they belong in
this world" really "need to be exposed to and understand different social,
economic, political and educational levels other than their own," as the
committee claims – all through the assistance of **THIS** book? I'm sure we
are all in agreement in our answer to this.

Exhibit 25

School: _Northview High School_

Requested Initiated By: _Vicki Baggett_

Telephone: ▓▓▓▓▓ Address: ▓▓▓▓▓

City: _Century_ State: _FL_ Zip code: _32535_

### Please Check Media Type

X Book     ___ Film     ___ Videocassette    _Set 1_
_#25_

___ Periodical     ___ Filmstrip     ___ Record

___ Pamphlet     ___ Cassette     ___ Computer Software

___ Laser Videodisc     ___ Kit     Other:_____

Title: _Out of Darkness_

Author: _Ashley Perez_

Publisher or Producer: _____

1. Reasons for Objections: _graphic depictions of abuse & sexual Scenes, anal sex_

2. Have you read, viewed, and/or listened to the entire educational media to which you object? _yes_

3. What are the strengths of this educational media? _none_

4. Are you aware of the judgment of this educational media by literary and authoritative critics? _yes_

5. What do you believe is the purpose of this educational media? _Sexual introductions; Sexually excite_

6. For what age group would you recommend this educational media? _none_

7. Where was the educational media located in the school system? _high schools_

8. On what date(s) was the material utilized for instruction? _N/A_

Signature of Complainant: _Vicki Baggett_ Date: _8-24-22_

# Exhibit 26

REQUEST FOR RECONSIDERATION OF EDUCATIONAL MEDIA

School: _____ Northview High School

Requested Initiated By: _____ Vicki Baggett

Telephone: ▓▓▓▓▓▓▓    Address: ▓▓▓▓▓▓▓

City: _Century_    State: _FL_   Zip code: _32535_

**Please Check Media Type**

X Book _____ Film _____ Videocassette

___ Periodical _____ Filmstrip _____ Record          Set 1

___ Pamphlet _____ Cassette _____ Computer Software    # 9

___ Laser Videodisc _____ Kit     Other: _____

Title: _____ Beyond Magenta

Author: _____ Susan Kuklin

Publisher or Producer: _____

1. Reasons for Objections: _Sexually explicit; LGBTQIA content_

2. Have you read, viewed, and/or listened to the entire educational media to which you object?
_Yes_

3. What are the strengths of this educational media? _None_

4. Are you aware of the judgment of this educational media by literary and authoritative critics?
_Yes_

5. What do you believe is the purpose of this educational media? _total indoctrination_

6. For what age group would you recommend this educational media? _none_

7. Where was the educational media located in the school system? _Middle School + high school_

8. On what date(s) was the material utilized for instruction? _N/A_

Signature of Complainant: _Vicki Baggett_    Date: _8-24-22_

# Exhibit 27

# REQUEST FOR THE RECONSIDERATION OF EDUCATIONAL MEDIA

School: _Northview High School_

Requested Initiated By: _Vicki Baggett_

Telephone: [redacted]  Address: [redacted]

City: _Century_  State: _FL_  Zip code: _32535_

**Please Check Media Type**

| | | |
|---|---|---|
| X Book | ___Film | ___Videocassette |
| ___ Periodical | ___Filmstrip | ___Record |
| ___ Pamphlet | ___Cassette | ___Computer Software |
| ___ Laser Videodisc | ___Kit | ___Other: |

_Set #4_

Title: _The Freedom Writers Diary_  _#5_

Author: _Erin Gruwell_

Publisher or Producer: _____

1. Reasons for Objections: _extremely sexual content; nudity; alternate sexualities; profanity; child abuse; molestation; racial slurs_

2. Have you read, viewed, and/or listened to the entire educational media to which you object? _yes_

3. What are the strengths of this educational media? _None_

4. Are you aware of the judgment of this educational media by literary and authoritative critics? _yes; already banned in many districts_

5. What do you believe is the purpose of this educational media? _incite racial division_

6. For what age group would you recommend this educational media? _adults or none_

7. Where was the educational media located in the school system? _middle + high schools_  _entire classroom sets_

8. On what date(s) was the material utilized for instruction? _N/A_

Signature of Complainant: _Vicki Baggett_  Date: _9-15-22_

Exhibit 28

**ECPS Request for Reconsideration of Educational Media**

A parent or resident of Escambia County, Florida may proffer evidence that any material used in a classroom, made available in a school library, or included in a reading list contains content that is pornographic or prohibited under F.S. 847.012, is not suited to student needs and their ability to comprehend the material presented, or is inappropriate for the grade level or age group for which the material is being used.

**Please complete all applicable information:**

Before bringing a challenge to a material found at a school, the complainant must read, listened to or viewed the material in its entirety.

Have you read or viewed the entire material? _____**yes**

Date of Request: _____**1-13-23**

Author: _____**Angie Thomas**

Title: ____**Concrete Rose**

Publisher or Producer, Date of Publication/Production, Type of Media: _____**Balzar Bray, 2021**

Request Initiated by (first and last name): _____**Vicki Baggett**

School(s) in which item is used: **Escambia High; Pensacola High; West Florida High; Warrington Middle; Workman Middle**

1. What first prompted your concern**? This book contains sexual nudity; sexual activities; excessive and frequent profanity with derogatory terms, including "ass"-109 times and "shit"- 151 times; controversial racial and social commentary; controversial religious commentary and terms; alcohol and drug usage by minors**

2. To what in the material do you object? (Please be specific, cite pages, frames, etc. Attach additional

pages if necessary.

See sample excerpts below:

<span style="color:red">**She could ball, and she was fine as hell. Plus she had a ass. (p. 10)**</span>

<span style="color:red">**I fell asleep in US history. It was boring anyway. I'm tired of hearing 'bout all these fucked-up white people who did fucked-up stuff, yet people wanna call them heroes. Phillips talked 'bout how Columbus discovered America, and all I could think was how the hell can you "discover" a place where people already lived? (p. 87)**</span>

**Problem was he hated his coach. To be honest, everybody hated Coach Stevens. Dude was a straight-up redneck. He didn't throw around the N-word, nah. It was other stuff, like having a Confederate flag on his truck, calling it "heritage." Heritage my ass. One day last year he told King to wash his car before practice. King told Coach Stevens he wasn't his slave. Coach looked him dead in the face and said, "You are whatever the hell I say you are, boy." (p. 90)**

**Lisa look at it, too. Then she look me in the eye and unzip my pants.**
**It's on.**
**I help her get out that dress, and she help me get my pants off. We both down to nothing when we slide under her covers. I'm ready to put it down.**
**"Shit!" I hiss, and raise up. "I don't got a rubber."**
**Lisa sit up a little. "Seriously?"**
**"Yeah. I ain't have no reason to keep them on me. You on the pill, right?"**
**"No. Had no reason to be."**
**For a few seconds, our heavy breathing the only sound in the room.**
**The way she feel against me . . . it's driving me outta my mind. "I could be careful—"**
**"If you pull out before you—"**
**We spoke at the same time. Our eyes lock, and, goddamn, I want her bad.**
**"Do you wanna do this?" I ask.**
**Lisa bite her lip. "Yeah. Do you?"**
**I never wanted anything more in my life. "Yeah."**
**Lisa pull me back down and kiss my neck. "Then be careful."**
**That's all I need to hear (p. 137)**

**Damn. That was wild.**
**Me and Lisa lying in her bed, all sweaty and panting. We went at it for hours. A'ight, an hour. A'ight, a'ight, more like fifteen, twenty, ten minutes. Either way, I did the damn thing.**
**This was the first time we ever had sex without protection. I see what the homies mean, it do feel different. I was careful though, just like I said I'd be.**
**I brush Lisa's hair back and kiss her forehead. Your boy made her sweat them baby hairs out. Hell yeah. "Damn, I missed you."**
**She cuddle up against me. "I can't lie, I missed you too."**
**"I could tell, the way you were screaming. (p. 141)**

**"We were tryna get some ass, and you were cock-blocking," Shawn says (p. 156).**

3. What are the strengths of the educational media? **None for high school minors**

4. What do you believe is the purpose of this educational media? **Sexual stimulation and violence; racial divisions; religious commentaries**

5. Are you aware of the judgment of this educational media by literary and/or authoritative

critics

___ Yes _x_ No

6. What do you wish to be the outcome of the reconsideration? **Examine the content of this book based on the law in order to decide if this is age and content appropriate.**

a. Available in the following libraries (check all that apply):

___ K-5 (Elementary) ___ 6-8 (Middle School General Collection)

___ 6-8 (Opt-in Middle School Young Adult Collection) _**x**__ 9-12 (High School)

b. Remain available in libraries but removed for use in classroom instruction:

___ Yes __**x**_ No

Signature of Complainant: _____**Vicki Baggett**___ Date: __**1-13-23**_

ECPS, Media Services, 11-8-22Pg 2 of 2

# Exhibit 29

| 119 Restricted Book Titles | Author | Date of Book Challenge |
|---|---|---|
| Ace of Spades | Faridah Àbíké-Íyímídé | 08-24-22 |
| All the Things We Do in the Dark | Saundra Mitchell | 8-24-22 |
| Angus, Thongs and Full-Frontal Snogging | Georgia Nicolson | 08-24-22 |
| Art of Racing in the Rain | Garth Stein | 08-24-22 |
| Beloved | Toni Morrison | 08-24-22 |
| Beyond Magenta | Susan Kuklin | 08-24-22 |
| Breathless | Jennifer Niven | 08-24-22 |
| Bumped | Megan McCafferty | 08-24-22 |
| City of Thieves | David Benioff | 08-24-22 |
| Crank | Ellen Hopkins | 08-24-22 |
| Darius the Great Deserves Better | Adib Khorram | 08-24-22 |
| Deogratias: A Tale of Rwanda | Jean-Philippe Stassen | 08-24-22 |
| Dime | E.R. Frank | 08-24-22 |
| Doing It! | Hannah Witton | 08-24-22 |
| Empire of Storms | Sarah J. Maas | 08-24-22 |
| Extremely Loud and Incredibly Close | Jonathan Safran Foer | 08-24-22 |
| Fade | Lisa McMann | 08-24-22 |
| Forever | Judy Blume | 08-24-22 |
| Go Ask Alice | Anonymous | 08-24-22 |
| Graceling | Kristin Cashore | 08-24-22 |
| Hear These Voices: Youth at the Edge of the Millennium | Anthony Allison | 08-24-22 |
| Identical | Ellen Hopkins | 08-24-22 |
| Infandous | Elana K. Arnold | 08-24-22 |
| Jesus Land: A Memoir | Julia Scheeres | 08-24-22 |
| L8r G8r | Lauren Myracle | 08-24-22 |
| Lexicon | Max Barry | 08-24-22 |
| Little and Lion | Brandy Colbert | 08-24-22 |
| Lush | Natasha Friend | 08-24-22 |
| Me and Earl and the Dying Girl | Jesse Andrews | 08-24-22 |
| Milk and Honey | Rupi Kaur | 08-24-22 |
| Monday's Not Coming | Tiffany D. Jackson | 08-24-22 |
| More Happy Than Not | Adam Silvera | 08-24-22 |
| Nineteen Minutes | Jodi Picoult | 08-24-22 |
| Out of Darkness | Ashley Hope Pérez | 08-24-22 |
| Rainbow Boys | Alex Sanchez | 08-24-22 |
| Ready or Not (All-American Girl Series) | Meg Cabot | 08-24-22 |
| Slaughterhouse Five | Kurt Vonnegut | 08-24-22 |
| Sloppy Firsts | Megan McCafferty | 08-24-22 |
| The God of Small Things | Arundhati Roy | 08-24-22 |
| The Handmaid's Tale | Margaret Atwood | 08-24-22 |
| The Hate U Give | Angie Thomas | 08-24-22 |
| The House of Spirits | Isabel Allende | 08-24-22 |
| The Kingdom of Little Wounds | Susann Cokal | 08-24-22 |

| | | |
|---|---|---|
| The Kite Runner | Khaled Hosseini | 08-24-22 |
| The Music of What Happens | Bill Konigsberg | 08-24-22 |
| The Poet X | Elizabeth Acevedo | 08-24-22 |
| The Truth About Alice | Jennifer Mathieu | 08-24-22 |
| Thirteen Reasons Why | Jay Asher | 08-24-22 |
| Tricks | Ellen Hopkins | 08-24-22 |
| Unravel Me | Tahereh Mafi | 08-24-22 |
| Lady Midnight | Cassandra Clare | 03-31-23 |
| Water for Elephants | Sara Gruen | 08-24-22 |
| We are the Ants | Shaun David Hutchinson | 08-24-22 |
| What Girls Are Made Of | Elana K. Arnold | 08-24-22 |
| Bear Town: Book 1 | Fredrik Backman | 09-15-22 |
| Girl in Pieces | Kathleen Glasgow | 09-15-22 |
| Grit | Gillian French | 09-15-22 |
| Guyaholic | Carolyn Mackler | 09-15-22 |
| Leah on the Offbeat | Becky Albertalli | 09-15-22 |
| Ramona Blue | Julie Murphy | 09-15-22 |
| Scars | Cheryl Rainfield | 09-15-22 |
| Simon vs The Homo Sapiens Agenda | Becky Albertalli | 09-15-22 |
| Smoke | Ellen Hopkins | 09-15-22 |
| The Freedom Writers Diary | Erin Gruwell | 09-15-22 |
| The Upside of Unrequited | Becky Albertalli | 09-15-22 |
| Where I End and You Begin | Preston Norton | 09-15-22 |
| Oryx and Crake | Margaret Atwood | 10-05-22 |
| The Glass Castle | Jeannette Walls | 10-05-22 |
| Clockwork Princess | Cassandra Clare | 10-7-22 |
| Damsel | Elana K. Arnold | 10-07-22 |
| The Duff | Kody Keplinger | 10-07-22 |
| The Handmaid's Tale, graphic novel | Margaret Atwood | 10-07-22 |
| Beautiful | Amy Reed | 10-17-22 |
| Crescent City: House of Earth and Blood | Sarah J. Maas | 10-17-22 |
| I Never | Laura Hopper | 10-17-22 |
| It Ends with Us | Colleen Hoover | 10-17-22 |
| Kingdom of Ash | Sarah J. Maas | 10-17-22 |
| Red, White and Royal Blue | Casey McQuiston | 10-17-22 |
| Rumble | Ellen Hopkins | 10-17-22 |
| The Infinite Moment of Us | Lauren Myracle | 10-17-22 |
| Speak | Laurie Halse Anderson | 08-24-22 |
| The Year of the Flood | Margaret Atwood | 11-18-22 |
| Boy Girl Boy | Ron Koertge | 12-02-22 |
| Boy Toy | Barry Lyga | 12-02-22 |
| Burned | Ellen Hopkins | 12-02-22 |
| Chosen | P.C. and Kristin Cast | 12-02-22 |
| Finding Cinderella | Colleen Hoover | 12-02-22 |

| | | |
|---|---|---|
| Foul is Fair | Hannah Capin | 12-02-22 |
| I'll Give You the Sun | Jandy Nelson | 12-2-22 |
| The Female of the Species | Mindy McGinnis | 12-02-22 |
| Triangles | Ellen Hopkins | 12-02-22 |
| Wicked: The Life and Times of the Wicked Witch of the West | Gregory Maguire | 12-02-22 |
| Yolk | Mary H.K. Choi | 12-02-22 |
| Home After Dark: A Novel | David Small | 01-11-23 |
| Concrete Rose | Angie Thomas | 01-13-23 |
| Life is Funny | E.R. Frank | 01-13-23 |
| Home Body | Rupi Kaur | 01-18-23 |
| Tilt | Ellen Hopkins | 1-18-23 |
| Last Night at the Telegraph Club | Malindo Lo | 02-06-23 |
| Tower of Dawn | Sarah J. Maas | 02-06-23 |
| A Lesson in Vengeance | Victoria Lee | 02-07-23 |
| Sold | Patricia McCormick | 02-09-23 |
| Flamer | Mike Curato | 02-27-23 |
| Vanishing Acts | Jodi Picoult | 03-02-23 |
| My Dark Vanessa | Kate Russell | 03-20-23 |
| Midnight Lie | Marie Rutkoski | 04-21-23 |
| I am Not Your Perfect Mexican Daughter | Erika Sánchez | 04-26-23 |
| Living Dead Girl | Elizabeth Scott | 04-27-23 |
| Middlesex | Jeffrey Eugenides | 05-18-23 |
| Super Mutant Magic Academy | Jillian Tamaki | 05-18-23 |
| The Facts in the Case of the Departure of Miss Finch | Neil Gaiman | 05-18-23 |
| White Knight | Sean Murphy | 05-18-23 |
| Zahra's Paradise | Amir and Khalil | 05-21-23 |
| Man O'War | Cory McCarthy | 05-22-23 |
| Without Merit | Colleen Hoover | 5-22-23 |
| Relish: My Life in the Kitchen | Lucy Knisley | 05-26-23 |
| Collateral | Ellen Hopkins | 06-08-23 |
| It | Stephen King | 06-13-23 |
| 10 Things I Can See From Here | Carrie Mac | 06-29-23 |