# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| PEN AMERICAN CENTER, INC., ~~SARAH BRANNEN, LINDSAY DURTSCHI, on behalf of herself and her minor children,~~ BENJAMIN GLASS, on behalf of himself and his minor child, GEORGE M. JOHNSON ~~, DAVID LEVITHAN~~, KYLE LUKOFF, ANN NOVAKOWSKI, on behalf of herself and her minor child, PENGUIN RANDOM HOUSE LLC, SEAN PARKER, on behalf of himself and his minor child, ASHLEY HOPE PÉREZ, ~~ERICA ROY, on behalf of herself and her minor children,~~ and CHRISTOPHER SCOTT SATTERWHITE, on behalf of himself and his minor child, ~~and CARIN SMITH, on behalf of herself and her minor children.~~ <br><br> *Plaintiffs*, <br><br> v. <br><br> ESCAMBIA COUNTY SCHOOL BOARD, <br><br> *Defendant*. | CASE NO.: 3:23-CV-10385-TKW-ZCB <br><br> JURY TRIAL DEMANDED |

## SECOND AMENDED COMPLAINT

This lawsuit, on behalf of PEN American Center, Inc. ("PEN America"), select book authors, a book publisher, and a number of parents of students attending public schools in Escambia County (collectively, "Plaintiffs"), challenges the decisions of the Escambia County School Board (the "School

Board") to remove and restrict books from public school libraries within the Escambia County School District (the "School District"). The School Board has done so based on its disagreements with the ideas expressed in those books. In every decision to remove a book, the School Board sided with a challenger expressing openly discriminatory bases for the challenge, overruling in the process the recommendations of review committees at the ~~school and~~ district ~~levels~~level. These restrictions and removals have disproportionately targeted books by or about people of color and/or LGBTQ people, and have prescribed an orthodoxy of opinion that violates the First and Fourteenth ~~Amendments.~~ Amendment. In addition, the School Board has adopted a policy and practice of indefinitely restricting access to challenged books that may contain depictions or descriptions of sexual conduct, resulting in many books having been unavailable to students—in many cases for two years now. The School Board's failure to adopt and implement a timely and effective process for resolution of the book challenges violates the First Amendment by indefinitely suppressing protected speech and effectively providing a heckler's veto over school library materials.

## I.    INTRODUCTION

1.    The Supreme Court has long recognized that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools," which serve as a "marketplace of ideas." *Tinker v. Des*

*Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969).  That is because "the Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." *Id.* (cleaned up).

2.    School libraries, where students discover new areas of interest and engage in voluntary inquiry outside the context of required curriculum, are an essential part of this exchange of ideas.

3.    While school administrators concededly "possess significant discretion to determine the content of their school libraries," including determining whether books are age-appropriate, that "discretion may not be exercised in a ***narrowly partisan or political manner***."  *Board of Education v. Pico*, 457 U.S. 853, 870 (1982) (emphasis added).  That is because "[o]ur Constitution does not permit the official suppression of ideas." *Id.* at 871.  Accordingly, the First Amendment bars a school district from removing books from school libraries, or restricting access to such books, based on political or ideological disagreement with the ideas they express.

4.    Moreover, in the First Amendment context, "[a] scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech."  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 227 (1990).

3

5.      Plaintiffs bring this lawsuit because that is exactly what is happening in Escambia County.  Books are being ordered removed from libraries, or subject to restricted access within those libraries, based on ideologically-driven efforts to push certain ideas out of schools.  Even though parents can already opt their child out of having access to particular books, the School Board is summarily ordering the district-wide removal of books based on the openly ideological, political, and discriminatory views of a small minority and *against* the recommendations of review committees—composed of parents, teachers, principals, media specialists, and other community members within the School District—that follow a robust review process focused on whether materials are age-appropriate and educational. This disregard for professional deliberation and guidance underscores that the removals are ideological and political, not pedagogical.

6.      In addition, the School Board has failed to set reasonable time limits on deciding whether challenged books contain depictions or descriptions of sexual conduct and, if they do, for what grade levels or age groups such books are appropriate.

7.      As a result, the School Board is depriving students of access to a wide range of viewpoints, and depriving the authors and publishers of the removed and restricted books of the opportunity to engage with readers and disseminate their ideas to their intended audiences.  Such viewpoint discrimination and indefinite

delay resulting in the extended suppression of protected speech violates the First Amendment.

8.    Today, Escambia County seeks to remove or limit access to books a small minority views as too "woke."  In the 1970s, schools sought to bar books by Langston Hughes (among others).    Tomorrow, it could be books about Christianity,[1] the country's founders, or our nation's war heroes.    All of these removals run afoul of the First Amendment, which is rightly disinterested in the cause du jour.

The actions of the School Board also violate the Equal Protection Clause because the books being singled out for possible removal are disproportionately books by non-white and/or LGBTQ authors, or which address topics related to race or LGBTQ identity.  This is no accident.  Government action may not be premised on such discriminatory motivations.

9.    The plaintiffs bringing this suit include (a) PEN AmericaAmerican Center, a nonprofit member-based organization that represents authors throughout

---

[1] Notably, the Bible has been subject to challenge in Escambia County public school libraries, although it was not removed because it is authorized as an appropriate educational resource under a separate Florida statute.  But, in other jurisdictions, book challenges havehad resulted in the removal of the Bible from public school libraries.  *See* Tilda Wilson, A Utah school district has removed the Bible from some schools' shelves, NPR, June 2, 2023, https://www.npr.org/2023/06/02/1179906120/utah-bible-book-challenge.https://www.npr.org/2023/06/02/1179906120/utah-bible-book-challenge.

the United States, including authors whose books already have been removed from libraries in the School District and authors whose books have been targeted for future removal and have been subjected to indefinite restricted access in the meantime; (b) authors whose books have been ordered removed from or subjected to indefinite restricted access in theseSchool District libraries; (c) Penguin Random House LLC ("PRH"), the publisher of many books that have been ordered removed from, or subjected to indefinite restricted access in, theseSchool District libraries; and (d) parents of students who attend schools in the School District, who are suing on behalf of both themselves and their minor children for access to removed and indefinitely restricted books.

10.    The plaintiffs have joined together in this lawsuit to vindicate the rights of parents, students, authors, and book publishers to ensure that public school libraries continue to serve all communities and provide spaces dedicated to the exploration and dissemination of a wide variety of ideas, points of view, and experiences, free from viewpoint discrimination and discrimination based on race, sexuality, or gender identityarbitrary and indefinite suppression of speech.

## II.    PARTIES

### A.    Plaintiffs

11.    Plaintiff PEN American Center ("PEN America") is a nonprofit membership organization headquartered in New York.  Founded in 1922, PEN

America works to ensure that people everywhere have the freedom to create literature, to convey information and ideas, to express their views, and to access the views, ideas, and literatures of others.  PEN America's membership is made up of more than ~~7,500~~5,000 novelists, journalists, nonfiction writers, editors, poets, essayists, playwrights, publishers, translators, agents, and other writing professionals.  Members of PEN America live in every state in the country.

12.    PEN America operates "Free Expression Programs" that serve to defend writers and journalists and protect free expression rights in the United States and around the world.  These efforts typically include research and reports, public advocacy, and campaigns on behalf of particular policy issues or individuals.  Topics for these programs have included campus free speech, online harassment, and writers and artists facing political persecution abroad.

13.    PEN America's mission is to unite writers and their allies to celebrate creative expression and defend the liberties that make it possible.  Historically, this has included work to celebrate literature through awards, grants and public programming, offering public support for threatened writers, and seeking to bolster the freedom of expression worldwide.  Since approximately 2021, with the rise of efforts to remove and restrict books in K-12 public school libraries, PEN America began dedicating time to documenting these removals and restrictions; publishing periodic reports on book bans as part of the *Banned in the USA* series; and working

7

with authors and community members to raise public awareness of the harms of educational censorship. The prolific book removals and restrictions by the Escambia County School Board further pulled PEN America away from other programming. PEN America's work to address book removals and restrictions has only increased in recent years as many school districts and states have followed Defendant's lead.

14.    PEN America includes among its members many authors whose books have been removed or subject to restricted access within the School District. These include each of the Author Plaintiffs, as well as other award-winning authors such as Margaret Atwood, Judy Blume, Alex Gino, John Green, Khaled Hosseini, Susan Kuklin, and Jodi Picoult.

15.    Plaintiffs Sarah Brannen, George M. Johnson, David Levithan, Kyle Lukoff, and Ashely Hope Pérez (collectively, the "Author Plaintiffs") are each authors whose books have either been removed from libraries within the School District, or are currently targeted for such removal and subject to indefinite restricted access during the review period.

Plaintiff Brannen resides in Massachusetts. She has authored and/or illustrated 23 books for children. Her book *Uncle Bobby's Wedding* was challenged in February 2023 and is currently subject to restricted access in

~~elementary school libraries pending review.  No schedule has yet been set for the review of *Uncle Bobby's Wedding*.~~

16.    Plaintiff Johnson is a resident of California and Black and non-binary; they are the author of young adult books.  Johnson's book *All Boys Aren't Blue* is a "memoir of growing up Black and gay" in the form of a series of coming-of-age essays.  *All Boys Aren't Blue* was challenged in September 2022.  Despite a unanimous vote by the district review committee in favor of retaining the book in high school libraries, the School Board voted to remove *All Boys Aren't Blue* from all libraries on February ~~21~~20, 2023.

~~Plaintiff Levithan is a New Jersey resident.  He is a white, gay author of young adult fiction.  Levithan's book *Two Boys Kissing*, which was previously generally accessible within high school libraries in the School District, was challenged in September 2022, and is currently subject to restricted access pending review.  No schedule has been set for the review of *Two Boys Kissing*.~~

17.    Plaintiff Lukoff is a Pennsylvania resident.  He is a white, transgender man, and the author of multiple children's books.  Prior to becoming a published author, he was an elementary school librarian.  His book *When Aidan Became a Brother* was challenged in September 2022.  Despite a district review committee recommending 4–1 that the book be retained in libraries at all levels, the School

Board voted to remove *When Aidan Became a Brother* from all libraries on February 20, 2023.

~~Another book, *Too Bright to See*, also by Plaintiff Lukoff and published by Plaintiff PRH, was challenged in February 2023 and is currently subject to restricted access in elementary school libraries pending review.  No schedule has been set for the review of *Too Bright to See*.~~

18.    Plaintiff Pérez is a white woman and resident of Ohio.  She is an author of young adult fiction, a former public school teacher of high school English, and, currently, a literature professor at The Ohio State University.  Her book *Out of Darkness*, which was previously generally accessible within high school libraries in the School District, was challenged in ~~September~~late August 2022, and is currently subject to indefinite restricted access pending review of the challenge.  No schedule has been set for the review of *Out of Darkness*.

19.    For each Author Plaintiff, public school libraries are a critical means of reaching their intended audiences~~,~~ and obtaining the broadest possible readership.  Accordingly, it causes serious harm for them, personally and professionally, for their books to be removed from public school libraries or subject to restricted access within such libraries.

20.    Plaintiff PRH is a Delaware Limited Liability Corporation headquartered in New York.  It is a general interest publisher committed to

publishing books for everyone.  Two books published by PRH have already been removed from some School District libraries:  *The Bluest Eye* by Toni Morrison and *Push* by Sapphire.

21.    Several more books published by PRH have been targeted for removal and are currently subject to indefinite restricted access pending completion of the review process.  Among such books are: *Beloved* by Toni Morrison, *The Freedom Writers Diary: How a Teacher and 150 Teens Used Writing to Change Themselves and the World Around Them* by Erin Gruwell, *The God of Small Things* by Arundhati Roy, ~~*The*~~ *Handmaid's Tale* by Margaret Atwood, *The Kite Runner* by Khaled Hosseini, ~~*Milo Imagines the World* by Matt de La Pena,~~ and *Slaughterhouse-Five* by Kurt Vonnegut~~, *Too Bright to See* by Plaintiff Lukoff, and *Two Boys Kissing* by Plaintiff David Levithan~~.

22.    PRH's mission is to lay the seeds for the future of reading for generations to come by promoting literacy, giving voice to many and varied experiences and stories and fostering empathy and inspiring free and open debate.  PRH aims to publish books that provide children with a gateway to the whole world.  Continued inclusion in public school libraries is critical to PRH's mission~~, especially for books intended for elementary and young-adult readers~~.

23.    Plaintiffs ~~Lindsay Durtschi,~~ Benjamin Glass, Ann Novakowski, Sean Parker, ~~Erica Roy,~~and Christopher Scott Satterwhite~~, and Carin Smith~~

11

(collectively, the "Parent Plaintiffs") are parents of students currently attending elementary~~, middle,~~ or high schools in the School District.  They bring these claims both on behalf of themselves, as parents who want their children to have access to books that have been removed from, or indefinitely restricted within, their children's ~~school~~or other schools' library, and their minor children, who also want such access.

~~Plaintiff Durtschi is white and a Florida resident.  She is the mother, next of friend, and general guardian of rising second grade and fourth grade students at A.K. Suter Elementary School in the School District.  In the upcoming school year, her children would like to check out specific books from their school library that are currently unavailable because they have been removed or restricted.  In addition, Durtschi wants her children to have access to these books, and others like them, among other reasons, for her children to be presented with a wide range of different viewpoints and experiences so that they will be better prepared to engage with a wide range of people.~~

24.    Plaintiff Glass is white and a Florida resident.  He is the father, next of friend, and general guardian of a ~~rising eighth~~ninth grade student at ~~Ferry Pass Middle~~Washington High School in the School District.  In the ~~upcoming~~current school year, his daughter wants to check out specific books from her school library that are currently unavailable because they have been removed or indefinitely

restricted.  In addition, Glass wants his child to have access to these books, and others like them, among other reasons, so that she is exposed to the dangers of sexual assault and the importance of consent, and, thus, better prepared to navigate these issues.  He further sees value in her reading about the intersection between stories about minority communities and stories involving sexual assault so that she will appreciate the unique challenges that people from other backgrounds face.

25.    Plaintiff Novakowski is white and a Florida resident.  She is the mother, next of friend, and general guardian of a ~~rising first~~second grade student at A.K. Suter Elementary School in the School District.  In the ~~upcoming~~current school year, her child wants to check out specific books from her school library that are currently unavailable because they have been removed or indefinitely restricted.  In addition, Novakowski wants her child to have access to these books, and others like them, among other reasons, so that she is presented with different viewpoints and experiences and, thus, better prepared to engage with a wide range of people.

26.    Plaintiff Parker is Black and a Florida resident.  He is the father, next of friend, and general guardian of a ~~rising eighth~~ninth grade student at ~~Beulah Middle~~Pine Forest High School in the School District.  In the ~~upcoming~~current school year, his child wants to check out specific books from his school library that are currently unavailable because they have been removed or indefinitely

restricted.  In addition, Parker wants his child to have access to these books, and others like them, among other reasons, in order to be exposed to books by and about Black people to help him develop a stronger sense of his cultural identity.

~~Plaintiff Roy is white and a Florida resident.  She is the mother, next of friend, and a general guardian of a rising fifth grade student at Scenic Heights Elementary School and a rising ninth grade student at West Florida High School in the School District.  In the upcoming school year, her children would like to check out specific books from their school library that are currently unavailable because they have been removed or restricted.  In addition, Roy wants her children to have access to these books, and others like them, among other reasons, in order to be exposed to books by South Asian authors and about South Asian culture to help them to better understand their heritage.  She also wants them to be exposed to books that present different viewpoints and experiences so that they will be better prepared to engage with a wide range of people.~~

27.    Plaintiff Satterwhite is biracial and a Florida resident.  He is the father, next of friend, and general guardian of ~~a rising tenth~~an eleventh grade student at Pensacola High School in the School District.  In the ~~upcoming~~current school year, his son wants to check out specific books from his school library that are currently unavailable because they have been removed or indefinitely restricted.  In addition, Satterwhite wants his son to have access to these books, and

others like them, so that he can use his school experience to explore Black history and a wide array of other subjects and experiences based on his own interests.

~~Plaintiff Smith is Black and a Florida resident. She is the mother, next of friend, and general guardian of two rising twelfth grade students at Pine Forest High School in the School District. In the upcoming school year, her children want to check out specific books from their school library that are currently unavailable because they have been removed or restricted. In addition, Smith wants her children to have access to these books, and others like them, among other reasons, in order to encounter books by and about Black people to help them develop a stronger sense of their cultural identity.~~

28.    For each Parent Plaintiff, they have a fundamental right to direct their child's upbringing and an interest in public school libraries not removing or indefinitely restricting books by and about people of color and LGBTQ individuals, suggesting that these identities and discussions about them are taboo and preventing their children from coming across such books in the school library. Accordingly, it causes serious harm for the Parent Plaintiffs' interest in directing their child's education for the Board to remove or restrict these books.

## B.    Defendant

29.    Defendant School Board is the five-member governing body of the School District, elected from geographical districts within Escambia County.

30.     The School Board oversees and manages all schools within the School District, and, by statute, has the capacity to sue and be sued.

## III.    JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the First and Fourteenth Amendments to the United States Constitution, and under 42 U.S.C. § 1983.

32.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because the Defendant resides in this district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## IV.    FACTUAL ALLEGATIONS

### A.    The Unique and Important Function of Public School Libraries

33.     Libraries occupy a unique and important role within public schools. Like schools more generally, school libraries are spaces for learning and the exploration of ideas.  But, unlike a structured classroom setting, libraries afford students opportunities to learn and explore ideas in self-directed ways, guided by their own interests, curiosities, and questions about the world.  They provide students with the opportunity to engage with and explore new and unfamiliar perspectives and ideas, as well as to see representations of their own experiences, communities, and ideas.

34.    As the Supreme Court has emphasized, it is fundamental to our understanding of what schools are that "students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding." *Pico*, 457 U.S. at 868.   And, "***[t]he school library is the principal locus of such freedom***." *Id.* at 869 (emphasis added).   That is because, "in the school library a student can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum. The student learns that a library is a place to test or expand upon ideas presented to him, in or out of the classroom." *Id.* (cleaned up).

35.    Accordingly, public school libraries are crucial spaces for student learning.   In libraries, students can explore their own interests, and encounter different ideas and experiences in ways that help prepare them for citizenship in our diverse, democratic society.

36.    The School Board's own Policy Manual reflects this understanding of the role and purpose of school libraries.   It provides that one of the "function[s]" of libraries within the School District "is to contribute to the development of informed and responsible citizens," and that "[i]t is the duty of the [School] District to provide a wide range of materials of different levels of difficulty, with diversity of appeal and representing different points of view taking into account the

varied interests, abilities, and maturity levels of the pupils being served." Ex. 1 at 8̶9.

37.    The Policy Manual further provides that "school libraries media centers . . . shall," *inter alia*, "provide education media that reflects differing and/or opposing viewpoints; [and] provide materials which reflect the ideas and beliefs of many ethnic, religious, and political groups that have contributed to . . . American and world heritage and culture." *Id.* at 8̲-9.

38.    School libraries are also of great importance to book authors and book publishers, especially with regard to books aimed at children and young adults. The right to speak means little without the ability to reach listeners. It is, thus, extraordinarily important to book authors and book publishers that their books continue to be fully accessible in public school libraries. This is especially so with respect to those students who lack easy access to books and learning material outside of school. For such students, public school libraries may be the only way for them to access an author's or publisher's book.

**B.    The Push to Remove Books**

39.    The wave of book removals and restrictions at issue in this lawsuit began on or about May 23, 2022. On that date, Vicki Baggett, a language arts teacher at the School District's Northview High School, filled out a form for the "Request for the Reconsideration of Educational Media." This would be the

beginning of what turned out to be a widespread—and largely successful—campaign to restrict access to books throughout the School District.

40.    Baggett's efforts have borrowed heavily from, and formed part of, a national campaign to remove books from public school libraries based on ideological objections to their contents, particularly, their exploration of themes related to race and/or LGBTQ identity.

41.    That campaign has been spearheaded by certain national organizations, such as the Florida-based "Moms for Liberty."  Moms for Liberty is a politically conservative organization that is focused on combating what it describes as the "woke" influence in public schools.  The organization shares and disseminates lists of books it finds politically objectionable, and urges individuals to seek the removal of those books from school libraries.

42.    Baggett has since spoken at a Moms for Liberty meeting in neighboring Santa Rosa County about her efforts to remove books in Escambia County public schools and reportedly "shared tips on how to get content removed."[2]

---

[2]  Romi White, *New Legislation Will Help Local Moms for Liberty More Quickly Remove ~~Potnographic~~Pornographic Materials from Schools*, South Santa Rosa News, May 31, 2023, ~~https://ssrnews.com/new-legislation-will-help-local-moms-for-liberty-more-quickly-remove-pornographic-material-from-schools/.~~https://ssrnews.com/new-legislation-will-help-local-moms-for-liberty-more-quickly-remove-pornographic-material-from-schools/.

19

43.    The subject of the first form Baggett filled out was *The Perks of Being a Wallflower* ("*Wallflower*") by Stephen Chbosky.  Baggett objected to the book's inclusion in classroom sets for potential use as an optional novel for study in high schools.[3]

44.    *Wallflower*, based on the author's own experiences growing up in suburban Pittsburgh in the 1980s, deals with common adolescent struggles, including drugs, sexuality, mental illness, and family difficulties, and the characters' personal growth past these challenges.

45.    Baggett would later admit that she had not heard of *Wallflower* prior to her efforts to prevent it from being read in the School District.  It appears that the book came to her attention only because it was one of the books that has been frequently targeted for removal or restriction in recent years.

46.    Following Baggett's challenge, in July 2022, a panel consisting of Northview leadership, faculty, staff, and a parent reviewed the book, discussed its use, and voted 4–3 to retain *Wallflower* as optional study material, noting that "[t]he concerns raised in the complaint are part of the characters' development

---

[3] Plaintiffs' claims in this action do not involve, rely on, or challenge any action taken by Defendants with respect to any classroom curricular materials, whether optional or required——including any decisions regarding the inclusion of *Wallflower* in the curriculum.  Plaintiffs' claims are limited solely to the removal of materials from the School District's libraries, and/or the restriction of access to such materials within such libraries.

throughout the novel. These concerns do not outweigh the potential discussions and literary value of the novel enough to remove it" from the school. Ex. 2 at 3̶1.

47.     On July 28, 2022, Baggett appealed the panel's determination with a letter to the School District's Assistant Superintendent for Curriculum and Instruction, copying, among others, the members of the School Board, the superintendent, and the Governor of Florida. *Id*. at 4̶-7̶3-5.

48.     The Assistant Superintendent responded by convening a "district review committee" to review the book, as dictated by the School District's procedures governing book challenges.

49.     On o̶r̶ ̶b̶e̶f̶o̶r̶e̶ ̶O̶c̶t̶o̶b̶e̶r̶ ̶4̶September 21, 2022, the district review committee, consisting of two high school media specialists, two high school teachers, one high school administrator, one parent of a school student, and one community member evaluated the appeal. This included reviewing the written complaint against the book, and also reviewing materials relating to the book including lesson plans, the National Council for Teachers of English rationale, relevant state laws, the School District's procedures, the book itself, book reviews, the novel study selection process, justification for use of outside media form, parent opt out letter for novel studies, the complainant's appeal, and community input submitted on the media services website. After this thorough review, and meeting to discuss these materials, the district materials review committee voted

4–3 to retain *Wallflower* for 12th grade students, citing the same justification as had the Northview panel in July.  Ex. 3.

50.    Baggett then wrote letters to the School District's superintendent, assistant superintendent, and the School Board again protesting the inclusion of *Wallflower*.  Ex. 4.  Baggett explicitly linked her effort to get *Wallflower* removed to removal efforts in other jurisdictions.  She attached to one of her submissions an image showing a section of Plaintiff PEN America's "Index of School Book Bans."  The image showed eight nationwide instances in which *Wallflower* had been removed from school libraries, classrooms, or both.  *Id.* at ~~109~~.

51.    Baggett's October 4 letter also referenced a "parental book rating" for Wallflower and attached several excerpts from the book.  *Id.* at ~~3, 5-9~~2, 4-8.  Although Baggett's letter did not state the source for the "parental book rating," both that rating and the selected excerpts appear to have been taken directly from a report created by a website called Book Looks.org, which comprises hundreds of such reports about books containing material that the website's operators consider objectionable.

52.    While Book Looks disclaims affiliation with Moms for Liberty, it was founded by a former member of, and uses the same rating criteria as, the Moms for Liberty chapter of Brevard County, Florida.

22

**C.    One Teacher Adopts Talking Points from National Groups to Get Books Removed from Libraries**

53.    On the heels of her initial efforts with respect to *Wallflower*, Baggett broadened her efforts to limit access to reading material considerably, focusing now on school libraries, rather than curriculum.

54.    In August, while the *Wallflower* review process was ongoing, Baggett prepared several lists of books that she targeted for removal.  She ultimately identified ~~116~~115 such titles~~,~~ (not including *Wallflower*~~.~~).  She stated that the books "should be evaluated based on explicit sexual content, graphic language, themes, vulgarity and ***political pushes***," noting that she had confirmed the titles were at that time available in School District libraries.

55.    These titles run the gamut from picture books to teen and adult novels, and include both works of fiction and nonfiction.  A substantial portion of the titles on Baggett's lists address LGBTQ themes and/or deal with issues of race or racism.

56.    Like her initial challenge to *Wallflower*, Baggett's subsequent challenges drew heavily from materials that are part of the broader campaign to single out particular books for removal from libraries.  For instance, in connection with her challenge to Raina Telgemeier's book *Drama*, Baggett submitted a list of quotes from the book relating to one character's identification as gay (which was the sole ground on which she objected to the book).  Each quote is identical to a

23

quote the Book Looks website had identified as objectionable. The same pattern exists for numerous other books Baggett challenged. In some instances, typos from the Book Looks website were carried over into her challenges.

57.    In other instances, Baggett's challenges employ the same language previously used as part of parallel book-removal campaigns. For instance, in her challenge to Mark Weakland's book *When Wilma Rudolph Played Basketball*—a picture book about the childhood of Olympic athlete Wilma Rudolph that includes descriptions of her experiences growing up Black in the segregated South—Baggett objected that the book "opines prejudice based on race." Ex. 5. The identical objection was included in a challenge form previously submitted in a Texas school district.

The bases for Baggett's challenges are blatantly ideological. ~~In~~As detailed below, in many instances, her objections to specific books have been couched explicitly in political terms. ~~For example, one book she challenged is Race and Policing in Modern America by Duchess Harris, a non-fiction resource guide intended for middle school readers that deals with race and policing. In her challenge, Baggett objected to the book on the sole basis that it "[p]ush[es] the idea that all police are bad + non-blacks are racist," and claimed the purpose of the book was "[t]o race-bait." Ex. 6. Baggett did not provide any specific examples of objectionable content, challenge any of the facts in the book, or make any~~

~~allegation that the material in *Race and Policing in Modern America* was otherwise inappropriate for its targeted middle school audience.  Her sole objection was that the book addresses a topic—the intersection of race and policing—that she did not consider suitable for discussion in schools.  Baggett's challenge to that book is still outstanding.~~

~~Another book Baggett has challenged is *Black Girl Unlimited: The Remarkable Story of a Teenage Wizard* by Echo Brown.  *Black Girl Unlimited* is an uplifting and empowering graphic novel about a Black girl growing up under difficult circumstances who has magical powers.  Baggett's challenge to the book described it as "race-baiting," and listed her objections as "racial bias; white grievances."  Ex. 7.  Her challenge to that book is still outstanding.~~

58.    In other instances~~, as detailed below~~, the challenges have been more subtle, as Baggett has raised concerns about sexually explicit content as a pretext for targeting books by and about people of color and LGBTQ people or otherwise on topics—such as feminism or sexual assault— that are ideologically based.

59.    By early September 2022, Baggett had shared her list with School District administrators, including members of the School Board, and prepared "Request for Reconsideration of Educational Media" forms for the more than 100 books on her list.

60.    As of ~~now~~October 2, 2024, the total number of books challenged in the School District—by Baggett or someone else—has reached ~~218~~264.

61.    The School District maintains a publicly available spreadsheet of all library books that have been challenged, which can be found here: https://docs.google.com/spreadsheets/d/1hv6Wtu55zY3t5bmbksY2ie7Q-L3zAQdjrtaFh4duLC4/edit#gid=0.

62.    The spreadsheet includes, for each challenged book, links to the original challenge form, and ~~up-to-date~~ information about where the challenge to the book stands, including whether access to the book is being restricted pending adjudication of the challenge.

63.    Many of the challenged books were published decades ago~~,~~ and have been on library shelves in the School District—and throughout the country—for years without objection or incident.

**D.    In Response to the Onslaught of Challenges, the School Board Changes Its Review Procedures**

64.    Prior to Baggett's challenges, the School Board's policies required that any challenged book remain on library shelves during the pendency of the review process unless and until a decision was made to remove it.[4]

---

[4] ~~As discussed below, following the filing of this lawsuit, the School Board amended its procedures governing challenges to library books in response to changes in Florida law. The new procedures went into effect on July 1, 2023. For now, Plaintiffs are only challenging actions undertaken by the School Board prior~~

65.     However, in its eagerness to cater to the political objections of Baggett and others, the School Board altered the School District's review policies. Shortly after the wave of challenges began, the then-Chair of the School Board, Kevin Adams, was quoted in local media announcing a plan to short-circuit the review process, saying that he had "asked the superintendent to quarantine or remove from circulation the challenged books until a review consistent with [an unspecified] state statute is conducted."

66.     Around the same time, the School Board's general counsel stated that, although the School Board has the power to remove titles from School District libraries, "***it cannot do so simply because it disagrees with the message of a book or it offends the personal morals of an individual***."

67.     Under the new procedure, any challenged book was automatically subjected to restricted access during the pendency of the review process.  Such books were physically moved in each school to the restricted access area of the library/media center.  Students were then prohibited from accessing the restricted books without an "opt-in" form signed by the student's parent allowing access to the restricted section, either for all titles or for specific individual titles.  This

to implementation of the new rules/procedures, though they reserve the right to further amend their complaint in response to new developments.

empowered book challengers to ensure that any book they objected to for any reason would automatically be subject to restricted access.

68.    ~~Following public meetings~~After a challenge to the Bible and ~~extensive public comment over the ensuing months~~concerns about its restriction under the "restrict all challenged books" practice, the School ~~Board~~District amended its ~~policy~~practice so that not all challenged books were automatically subject to restricted access during the review process.    Nonetheless, the School Board instituted two ~~policies~~practices that continued to give challengers substantial power to restrict access to books to which they objected.  These practices were applied to previously challenged books that had already been restricted to determine which should remain restricted, as well as to subsequently challenged books.  This practice was ultimately adopted as the School Board's policy in December 2022.

69.    First, the School Board ~~began~~ automatically ~~restricting~~restricted access to any book where the challenge could be interpreted as alleging that the book contains content that is pornographic or prohibited under F.S. 847.012.

70.    Florida Statute 847.012 prohibits the sale or distribution to minors of "harmful" material.    As applied to books, it incorporates F.S. 847.001, which defines material "harmful to minors" as material that, *inter alia*, "***[p]redominately appeals*** to a prurient, shameful, or morbid interest," *and* "[t]aken as a whole, is ***without serious literary, artistic, political, or scientific value for minors***."    Fla.

Stat., § 847.001(7)(a)-(c) (emphases added).  None of the books at issue here qualify as harmful material under this standard.[5]

71.    Despite this statutory language, the School Board has been using F.S. 847.012 as a pretext to restrict access to books that address other topics it finds objectionable.

72.    For instance, many books that deal with the topic of sexual assault have been automatically restricted under this policy.  One revealing example is *The Kite Runner* by PEN America member Khaled Hosseini, which is published by Plaintiff PRH.  *The Kite Runner* follows an Afghan boy named Amir into adulthood, including his flight from Afghanistan to the United States after the 1979 Soviet invasion, and his later return to the country under the rule of the Taliban. One key scene in the novel involves Amir's failure to protect his friend from a sexual assault, and his subsequent guilt and shame over that failure.  The book sold over seven million copies, spent two years on the *New York Times* bestseller list, and was made into a major motion picture in 2007.

73.    Baggett challenged *The Kite Runner* based on its depiction of sexual assault, as well as unspecified "horrific language," and stated that the purpose of the book was "[i]ndoctrination."  Ex. 86.  On that basis, *The Kite Runner* was

---

[5] Additionally, F.S. 847.012 expressly exempts material approved for use in schools.  Fla. Stat., § 847.012(5).  It, therefore, cannot be an independent basis for excluding books from a school library.

placed on restricted access pending completion of the review process.  As of this date, the book does not appear to have been scheduled for committee review.

74.    Another similar example of a book subject to such treatment is *The God of Small Things* by Arundhati Roy, which is also published by Plaintiff PRH. *The God of Small Things* is a novel set in Kerala, India, about young twins Rahel and Estha whose lives are upended when their mother has a secret affair with a lower-caste servant.  This violation of the social order sets off a chain of events leading to the drowning of a young girl, the murder of the servant wrongly implicated in her death by the twins, and years later an incestuous encounter between the guilt-ridden twins.  One pivotal scene in the book is when Estha is molested in a movie theater, and how his trauma from that event contributed to other destructive events in the family's life.  *Kirkus Reviews* described the book as "a brilliantly constructed first novel that untangles an intricate web of sexual and caste conflict."  *The God of Small Things* won the prestigious Man Booker Prize in 1997.

75.    Baggett challenged *The God of Small Things* on the grounds that it "encourages pedophilia," "sexual abuse," and "incest."  Ex. 97.  She questioned whether it had any strengths or purpose as educational media.  On that basis, *The God of Small Things* was placed on restricted access pending completion of the review process.  As of this date, the book does not appear to have been scheduled

for committee review.

76.     Likewise, many books that raise feminist themes ~~are being~~were automatically restricted under this policy, especially to the extent that they explore such topics as the prevalence of rape and sexual assault.  One such book is *The Handmaid's Tale* by Margaret Atwood, which is also published by Plaintiff PRH. *The* *Handmaid's Tale* is an award-winning dystopian novel that explores the author's criticisms of certain political and cultural elements of contemporary American society by imagining a future in which the U.S. government is overthrown by a patriarchal cult.  Though the book does not, by any conceivable metric, qualify as "pornography," or otherwise fall within F.S. 847.012, it ~~is currently being~~was (and continues to be) subject to restricted access in all high schools in the School District based on Baggett's complaint that the book contains "[g]raphic sexual depictions + language."  Ex. ~~10~~8.

77.     In addition, the School Board's zeal to remove or restrict access to books deemed objectionable by some members of the community has led to a number of classic works of American literature being restricted.  For instance, under the School Board's policy of automatically restricting access to any book challenged on the ground that it contains content that is pornographic or prohibited under F.S. 847.012, the School Board has restricted access to (among other books): (a) *Slaughterhouse-Five* by Kurt Vonnegut, which is published by Plaintiff PRH,

(b) *Beloved* by Toni Morrison, which is also published by Plaintiff PRH, and (c) *Forever. . .* by PEN America member Judy Blume.  The School Board has done this even though none of those books could possibly be characterized as pornography or otherwise subject to F.S. 847.012.

78.    Second, starting ~~in~~sometime between October 2022 and early 2023, the School Board adopted a new (albeit not codified) practice of automatically subjecting to restricted access any book challenged on the ground that it violates Florida HB 1557, the "Parental Rights in Education Act," also commonly known as the "Don't Say Gay Bill."  However, Florida HB 1557, on its face, applies only to "[c]lassroom instruction," and not to library materials.  *See id.* § 1 (amending Fla. Stat. § 1001.42(8)(c)(3)).  Indeed, the Florida State Board of Education and the Attorney General of Florida have, in other litigation, explicitly disclaimed any application of that law to library materials.  *See* State Defendants' Second Motion to Dismiss, ECF 112, *Cousins v. Grady*, No. 6:22-cv-1312, at 8 (M.D. Fla. Dec. 16, 2022) ("[T]he statute regulates only 'classroom instruction,' not the availability of library books.").

79.    Nonetheless, as a result of this practice, challenged books that merely recognize the *existence* of same-sex relationships or transgender persons ~~have been~~were subject to restricted access for ~~the pendency of the often indefinite review~~an extended period of time.

32

80.    For example, ~~Plaintiff Brannen's~~the book *Uncle Bobby's Wedding* ~~has been~~was subject to restricted access within elementary school libraries ~~since~~for over a year, from the time it was challenged in March 2023 until April 2024.  The picture book, which is intended for children between ages 3 and 6, contains no explicit sexual content.  The sole ground of the objection is that the "Uncle Bobby" character marries another man.  Ex. ~~11~~9 at ~~2~~1.

81.    Another revealing example is Matt de la Pena's book *Milo Imagines the World*, which is published by Plaintiff PRH.  *Milo Imagines the World* is an award-winning book for young children that depicts its lead character passing the time during a long subway ride by imagining the people around him in different situations.  While the challenge to the book acknowledged that it has "[c]olorful pictures and a good story line about creativity and imagination," it objected to one image in which Milo imagines two women marrying each other.  Ex. ~~12~~10 at 2.  On that basis, the complaint asserted that the "book contains subtle alternate sexual ideology," and was in violation of "HB 1557/Parental Rights Law."  *Id.* at 1.  *Milo Imagines the World* ~~is currently~~was restricted in all elementary school libraries in the School District for over a year, from the time it was challenged in March 2023 until April 2024.

82.    The barriers for students to access restricted books ~~are~~were significant.  To access them, a student ~~must~~first had to find a librarian, ask the

librarian for permission to access a book that has been designated objectionable for one reason or another—however far-fetched—and then wait while that librarian verifies that the student, in fact, has parental permission to access it. Forcing students to undertake these steps, and endure the stigma that goes along with undertaking them, ~~is having~~had a profound chilling effect on students seeking access to a wide range of books.

~~Of the 218 books targeted for removal in the district, 155 are restricted as of this filing, slightly more than 70%.~~

### E. The School Board Ratifies Baggett's Book Challenges by Removing Books

83.    The process of reviewing the challenged books began in November 2022, starting with *Wallflower*.

84.    The process included community input via online forms as well as an assessment of the book by a district review committee. This process ultimately resulted in a decision that *Wallflower* was appropriate for high school seniors.

85.    Baggett appealed the decision, and the School Board, overruling the district review committee, voted to remove *Wallflower* ~~from School District libraries~~as an optional novel study.

86.    Around the same time, Adams, the School Board Chair, was quoted admitting that he was largely deferring to Baggett in his assessments, saying: "I'm not gonna sit here and read 125 books. Fortunately, it don't take long, ***particularly***

***with this English teacher because she's identified every page in there***.  I don't have to read a smut book all the way from the very beginning to the very end."

When a book is challenged in the School District, it first goes to a ~~school review committee consisting of teachers, media specialists, parents, and other qualified personnel.  The committee reads and re-evaluates the specific objections.  In its deliberations, the school review committee considers the School District's educational philosophy, the professional opinions of other teachers of the same subject, reputable reviews of the book, and public input.  It then votes on whether to keep the book, remove it, or move it to a different grade level.  The committee records its decision and the reasons for it in writing.~~

~~If the complainant disagrees and appeals the school review committee's decision, the challenge goes to a~~ district review committee.~~–~~

87.  [6]  The district review committees ~~consist~~consisted of media specialists, school staff, parents, and community members.  ~~As~~When the review committees operated, as part of the review process, after an initial meeting, committees ~~review~~reviewed the written ~~complaints~~complaint against the book, the books themselves, multiple secondary materials relating to the book, including book reviews and the National Council for Teachers of English explanation of the

---

[6] The challenge to *Wallflower* first went to a school review committee, but that practice was discontinued for subsequent challenges, which went directly to a district review committee.

educational value of the books, multiple secondary materials as to state laws and the School District's procedures, ~~the complainant's appeal of the school review committee decision,~~ and community input gathered about the challenge.

88.   About a month later, after reviewing these materials, the ~~committee meets~~committees met to discuss the book challenge and vote on its resolution, evaluating the following:

- whether the book is offensive;

- whether questionable elements are an important part of the story's development;

- which grade levels the book is appropriate for;

- whether the work as a whole has literary, artistic, political or scientific value for the suggested audience;

- what the overall purpose or theme of the book is;

- whether concepts are presented in a manner appropriate to the ability and maturity level of the suggested audience;

- whether illustrations are appropriate for the suggested audience's developmental age;

- whether reading the book will result in a more compassionate understanding of human beings;

- whether the book offers an opportunity to understand and appreciate the aspirations, ~~achievement~~achievements, and problems of different cultures or minority groups; and

- for nonfiction books, whether the material contributes to the evolution of ideas or supports state education standards.

89.    The committee documents its process and the reasons for its decision in writing.  If the complainant appeals the district review committee's decision, the challenge goes before the School Board.

90.    Thus far, after the initial decision to remove *Wallflower* as an optional 12th grade novel study, there have been ~~four~~three waves of library book removals by the School Board, resulting in the removal of ~~10~~nine books:  five removed from all school libraries, two removed from elementary school libraries and two removed from circulation for 9th and 10th graders in high school libraries.[7]  In each

---

[7] ~~Five~~ An additional six books have been removed upon the recommendation of the district review committee, rather than by order of the School Board: *Looking for Alaska* by John Green, which was removed from middle school libraries only~~;~~; *Ground Zero* by Alan Gratz, which was removed from elementary school libraries only; and four books from Sarah J. ~~Mass's~~Maas's *A Court of Thorns and Roses* series, which were removed from all libraries.

instance, the School Board voted for removal over the recommendations of the district review committee, which had deemed the book educationally suitable.

91.    To date, there has not been a *single* instance in which the School Board has rejected a Baggett or other challenge.[8]

On November 1, 2022, the School Board voted to remove *Wallflower* from all School District libraries.  As noted above, it did so despite the recommendation of the district review committee that the book be retained for 12th grade students.

92.    On February 2120, 2023, the School Board voted to remove three books from all School District libraries: *All Boys Aren't Blue* by Plaintiff Johnson, *And Tango Makes Three* by Peter Parnell and Justin Richardson, and *When Aidan Became a Brother* by Plaintiff Lukoff.  Again, itIt did so despite the district review committee'scommittees' conclusions that the books were appropriate for the grades served by the libraries in question and its recommendation, in all three cases, that the books not be removed from any libraries.

93.    On March 20, 2023, the School Board voted to remove four additional books from some libraries: *New Kid* by Jerry Craft and *Drama* by Raina Telgemeier, which were removed from elementary school libraries; and *The Bluest Eye* by Toni Morrison and *The Nowhere Girls* by Amy Reed, which were removed

---

[8] In some instances, such as with regard to *When Wilma Rudolph Played Basketball* by Mark Weakland, Baggett chose not to appeal the district review committee's decision to the School Board.

from elementary and middle school libraries in the School District, (to the extent the books had been in middle school libraries), and restricted to 11th and 12th graders within high school libraries.  Once again, the School Board overrode the recommendations of the district review committeecommittees.

94.    On April 13, 2023, the School Board voted to remove *Push* by Sapphire and *Lucky* by Alice Sebold from all School District libraries, again overriding the recommendation of the district review committeecommittees that the titles be made available in high school libraries.

95.    In all, 10nine books have so far been removed (the "Removed Books");") from some or all libraries by the School Board, while 208over 250 additional books have been targeted for removal (the "Targeted Books"), and are currently underawaiting review.

96.    A chart summarizing the School Board's decisions as to each of the Removed Books is below:

| Book | Author | Basis of Challenge[9] | District Review Committee Decision | School Board Decision |
|------|--------|----------------------|-----------------------------------|----------------------|
| *The Perks of Being a Wallflower* | Stephen Chbosky | "Extreme sexual conduct descriptions; | Keep as optional novel study | Removed from all libraries, including 12th grade, and may |

_____

[9] The language in this column is all quoted from the challenge forms submitted by Baggett.

|  |  | ~~bestiality; language alert"~~ | ~~for 12th grade~~ | ~~not be used as novel study~~ |
|---|---|---|---|---|
| *All Boys Aren't Blue* | George M. Johnson | "Extreme sexual content; violent language; disturbing scenes; LGBTQ content" | Keep in high school libraries | Removed from all libraries |
| *And Tango Makes Three* | Peter Parnell & Justin Richardson | "LGBTQ agenda using penguins" | Keep in all libraries | Removed from all libraries |

| ~~Book~~ | ~~Author~~ | ~~Basis of Challenge~~ | ~~District Review Committee Decision~~ | ~~School Board Decision~~ |
|---|---|---|---|---|
| *When Aidan Became a Brother* | Kyle Lukoff | "LGBTQ introduction; not age appropriate" | Keep in all libraries | Removed from all libraries |
| *New Kid* | Jerry Craft | "Race-baiting; anti-whiteness; woke agenda" | Keep in all libraries | Removed from elementary schools; keep only in middle and high school libraries |
| *Drama* | Raina Telgemeier | "Indoctrination of LGBTQ; age-inappropriate + content not relevant" | Keep in all libraries | Removed from elementary schools; keep only in middle and high school libraries |
| *The Bluest Eye* | Toni Morrison | "Graphic rape scenes; | Keep in high school | Removed from 9th-10th grade; keep |

| | | pedophilia glorified; violent acts" | libraries | only for 11th-12th grade |
|---|---|---|---|---|
| *The Nowhere Girls* | Amy Reed | "Graphic sexual content; sexual introductions; sexually excite" | Keep in high school libraries | Removed from 9th-10th grade; keep only for 11th-12th grade |
| *Push* | Sapphire | "Graphic sexual content" | Keep in high school libraries | Removed from all libraries |
| *Lucky* | Alice Sebold | "Graphic sexual content; violence; language" | Keep in high school libraries | Removed from all libraries |

97.    ~~The~~No district review committee has met since March 2023 and the School Board has not considered any book challenges—or removed any additional books~~—~~since April 13, 2023.

98.    On May 16, 2023, the School Board voted to terminate its then-Superintendent, Tim Smith.  As then-Superintendent Smith commented at the time, the Board had developed a process to deal with appeals of book challenges and had asked its general counsel whether the superintendent could himself pull controversial or challenged books from the shelves.  She recommended against such a practice as contrary to the intent of the law.  Mr. Smith noted that nevertheless,

> You [the Board] hammer away [that] the superintendent should pull these books.  Why?  Because you don't want to deal with it. You get the emails,

you get the phone calls, you get the chaos.  But, yeah, it's easy to throw the superintendent under the bus.  It's your policy that you led, and you're asking me to violate your policy.  What is that?

99.    On information and belief, one of the reasons for the termination was ~~the School Board's desire to accelerate the pace at which books are removed from school libraries.~~because Mr. Smith was not sufficiently aggressive with respect to book removals and restrictions.

**F.    The School Board Has Removed Books Based on Viewpoint**

100.    Although the School Board's General Counsel has acknowledged that the School Board cannot order removal of books from its libraries "simply because it disagrees with the message of a book or it offends the personal morals of an individual," it is clear that books are, in fact, being removed on such impermissible grounds.

101.    The ideological bases for the removals are apparent from, *inter alia*: (a) the contents, characters, and themes of many of the books, (b) the nature of the asserted objections to them, (c) the fact that, in every instance, the School Board's removal decision overrode the ~~expert~~considered judgment of the district review committee, which had deemed the book educationally appropriate, and recommended that it be retained, and (d) the fact that there are no instances in which the School Board rejected a challenge from Baggett, despite the transparently ideological nature of her challenges.  Indeed, the School Board

~~have~~has consistently acceded to, and ratified, Baggett's blatantly political and message-based objections.

102.  *Wallflower*, the book that kicked off this slate of removals is discussed in detail above.  The other Removed Books exhibit the same basic pattern of targeting books based on ideological objections to their message, theme, or the identities of their characters and/or authors.

103.  For instance, *And Tango Makes Three* ("*Tango*") is a 2005 picture book based on the true story of Roy and Silo, two male penguins at the Central Park Zoo who formed a pair bond, successfully incubated an egg that another penguin couple was unable to care for, and raised the resulting baby penguin, a female named Tango, after she hatched.  *Tango* received numerous awards.  The book was listed by the American Library Association as a Notable Children's Book in 2005 and won the ASPCA's Henry Bergh Children's Book Award for books promoting the humane and compassionate treatment of animals that same year.

104.  Baggett's sole listed reason for objecting to *Tango* was disagreement with its message.  She asserted that the book was serving an "***LGBTQ agenda using penguins***."  Ex. ~~13~~11.  No basis was offered for the removal of *Tango* other than the mere fact that it is based on the true story of two male zoo penguins who formed a pair bond and hatched and raised a baby penguin.

43

105.    At the School Board meeting at which *Tango* was addressed, School Board members made clear that they, too, believed that the mere fact that the book depicts two male penguins jointly raising a chick warranted removing it from school libraries.  One School Board member observed: "The fascination is still on that it's two male penguins raising a chick.  And, most people that came up and spoke were talking about that fascination, so I'll be voting to remove the book from our libraries."  Another School Board member stated that he would be fine with the book being available if *Tango* was "edited or rewritten to make it less and less of a sexual or even a romantic thing and more of the compassion and nature that nature has."

106.    Ultimately, despite the review process having deemed the book educationally suitable and recommending retaining it, the School Board sided with Baggett and removed the title from all School District libraries.[10]

107.    The grounds for removing *When Aidan Became a Brother* by Plaintiff Lukoff ("*Aidan*") were similarly ideological.  *Aidan* is a 2019 picture book about a young transgender boy helping his family welcome a new baby.  The book has

---

[10] Included in the appeal record considered by the School Board was a set of "Relevant Florida State Statutes," among which was HB 1557.  HB 1557 does not apply to library materials, and, accordingly, does not provide a basis to restrict or remove any title.  Nevertheless, excerpts of HB 1557 were included in the packet of materials provided to the School Board for its consideration of the appeal regarding every Removed Book.

received multiple awards, including a Charlotte Huck Honor, which recognizes "outstanding children's fiction that invites compassion, imagination, and wonder," and the Stonewall Book Award, which is given out by the American Library Association to honor "books that have exceptional merit relating to the LGBTQIA+ experience." *Aidan* is used in classrooms throughout the country.

108. In her challenge, Baggett condemned *Aidan* as: "LGBTQ introduction," and "not age appropriate." Ex. ~~14~~12. No basis was offered for the removal of *Aidan* other than the mere fact that it is about a transgender character.

109. The district review committee recommended retaining *Aidan*. In addition, at the School Board meeting at which the book was addressed, one School Board member spoke in favor of retaining the book, saying: "I happen to know someone who shared with me how important this book was to her child. And, I know that I appreciate those people who keep reminding us that reading a book does not change someone. If it did, all of the hundreds of gay children out there who have to read the books that are [about] heterosexual companions, they'd all change. So I'm one of those people that think reading books opened your mind, but it doesn't necessarily change who you are or what you are. But it makes you a more compassionate, caring person."

110. Nonetheless, the School Board as a whole sided with Baggett, and removed the title from all School District libraries. At the meeting, the School

45

Board chair expressed the view that, while some parents may find the perspective *Aidan* offers valuable, "it's just something that should not be in the school district. We should be concentrating on the education of these students, and if I can't fit those dots, I won't approve the book."

111.  The grounds for removing *All Boys Aren't Blue* by Plaintiff Johnson were likewise ideological.  *All Boys Aren't Blue* was published in 2020.  It is, as the district review committee put it, a "memoir of growing up black and gay."  Ex. ~~15~~13 at ~~3.~~2.  While the book contains depictions of sex (including a sexual assault), the district review committee recognized that these depictions are critical to the story and "extremely important to understand the trajectory of [the narrator's] life. . . . Without these moments, the memoir would not make sense." *Id.* at ~~2~~1.  As the committee further noted, the sexual content is "clearly not intended to be arousing."  *Id.* at ~~4~~3.  The district review committee found that "[t]here are teenagers in our community who benefit from hearing [the narrator's] experiences and perspectives," and voted unanimously to retain it as high school library material.  *Id.* at ~~3~~2.

112.  *All Boys Aren't Blue* has received numerous awards and recognitions. *Kirkus Review* named it one of the best young adult biographies/memoirs of 2020. The New York Public Library and Chicago Public Library both included it in their list of the top ten books of 2020 for young adults.

46

113.    Baggett's challenge characterized the purpose of *All Boys Aren't Blue* as "indoctrination" and included "LGBTQ content" among her objections.  Ex. ~~16~~14.   After the district review committee voted to retain the book, Baggett's appeal characterized the book as pornographic.  Ex. ~~17~~15 at 2.   At the School Board meeting at which the book was discussed, multiple Board members characterized it as "pornographic."

114.    Ultimately, despite the review committee's findings and unanimous vote in favor of retaining *All Boys Aren't Blue*, the School Board sided with Baggett and ordered the book removed from all libraries within the School District.

115.    Another of the Removed Books is *New Kid* by Jerry Craft, which was part of the March 20, 2023 removals.   *New Kid* is a Newbery Medal Award-winning graphic novel that tells the story of a 12-year-old Black boy who experiences culture shock when he enrolls at a private school.  It was published in 2019.  There is no sexual content of any kind in *New Kid*.  Baggett objected to the book because, in her opinion, it involved "race-baiting," reflected "anti-whiteness," and promoted a "woke agenda."  Ex. ~~18~~16.  Even though the book is intended for young audiences, the School Board ordered that *New Kid* be removed from all elementary school libraries within the School District.  In doing so, it overruled the district review committee, which had voted 7-2 to keep *New Kid* in libraries at all levels.

47

116.    Another Removed Book, *Drama* by Raina Telgemeier, was published over a decade ago, in 2012.  It is a graphic novel about a seventh-grade girl who joins the stage crew for her middle school musical.  She has a secret crush on one boy; a different boy has a crush on her.  One character is openly gay.  At the story's climax, when the female lead in the musical refuses to perform, a male character saves the show by dressing in her outfit and performing the role, including sharing a stage kiss with the male lead.  As the district review committee noted, "[t]here is nothing in this work that could be considered offensive. . . . ***There is no sex in any part of the story***."  Ex. ~~19~~17 at ~~3~~2.  *Drama* enjoyed wide critical praise and appeared on the American Library Association's 2013 list of Notable Children's Books.

117.    Baggett objected to the book as "[i]ndoctrination of LGBTQ; age inappropriate + content not relevant."  Ex. ~~20~~18.  She asserted that the purpose of the book to be "[i]ndoctrination."  *Id.*  Despite the district review committee voting 6–3 to retain the book in all elementary, middle, and high school libraries, the School Board ordered *Drama* removed from all elementary school libraries.

118.    Another Removed Book is *The Bluest Eye*, which was Toni Morrison's first novel.  It is published by Plaintiff PRH.  Published over 50 years ago, *The Bluest Eye* is set primarily in Morrison's Ohio hometown in 1941.  It is told from the perspective of a nine-year-old Black girl.  The central character,

eleven-year-old Pecola, is taken in temporarily by the narrator's family. Pecola, friendless and tormented because of her chaotic home life, dark skin, and "ugliness," prays for God to give her blue eyes. Pecola is eventually raped and impregnated by her abusive father. The baby is stillborn and Pecola loses her sense of reality, believing that her wish for blue eyes has been granted. While the book received relatively little attention when it was originally published, it has since become part of the canon of American literature. In 1993, Morrison was awarded the Nobel Prize in Literature for "novels characterized by visionary force and poetic import" that "give[] life to an essential aspect of American reality."

119. *The Bluest Eye* is frequently taught in AP Literature courses throughout the country. It is an example of the kind of narratively and thematically challenging works that students in high school are asked to navigate to become more sophisticated readers and students of literature and to prepare for post-secondary study.

120. *The Bluest Eye* undisputedly contains difficult and graphic content. However, as the district review committee noted, it explores "[t]he harsh truth of racism in the 1940s" and themes of "self-loathing" and "preconceived notions of beauty." Ex. ~~21~~19 at ~~1,~~ 2~~, 3~~. As the committee also pointed out, "[m]any classics," including *The Great Gatsby*, *The Sun Also Rises*, and *The Sound and the Fury*, "deal with sexual themes." The difference is that *The Bluest Eye* moves the

49

reader's attention "away from the implied off-stage tragedy to a sensory-oriented language from which the readers cannot look away or pretend the tragedy is not occurring or is not important. . . . The strength of Morrison's work, which critics seem disturbed by, is that the disturbing is disturbing." *Id.* at 6̶5. The committee further noted that *The Bluest Eye* is the only one of Morrison's novels "told from the viewpoint of adolescents." *Id.* at 4̶3. All five members of the committee unanimously agreed to keep the book in high school libraries.

121. Notwithstanding that the sexual content of *The Bluest Eye* is inextricably linked to the book's exploration of themes of race, racism, and sexual exploitation, Baggett's objection dismissed the book as "pedophilia glorified," and declared that it contained *no* strengths as educational media and that its only purpose was "shock." Ex. 2̶2̶20. Such naked hostility to a book that is widely recognized as a classic makes plain that Baggett's real objection was to the themes the book explores, not the fact that it explores those themes (in part) by depicting sexual situations.

122. At the March 20, 2023 meeting at which the book was discussed, a School Board member noted that *The Bluest Eye* had been optional reading material in one district school's International Baccalaureate program (along with Toni Morrison's most famous novel, *Beloved*) for nearly two decades and had never received a single parental complaint. Nonetheless, the School Board voted

3–2 to restrict the book to 11th and 12th graders.  (The two dissenters would have removed the book entirely.)

123.   Another of the Removed Books, *The Nowhere Girls*, is a 2017 novel by Amy Reed.  The book is a feminist work, which concerns three misfit teenage girls who, outraged by an unpunished rape at their high school, band together to combat their school's misogynistic culture.   As the district review committee noted, "[s]exual assault (rape) is an act of violence and is integral to the novel and plot."  Ex. 2321 at 21.  The review committee praised the diverse personalities and backgrounds of the characters, as well as the way the novel "address[es] an important theme of activism, self-acceptance, and empowerment.  It has value for any high school student."  *Id.* at 32.  The committee unanimously agreed that the book should remain in high school libraries; one member would have kept it in middle school libraries as well.

124.  As with other books she challenged, Baggett declared that *The Nowhere Girls* had no educational strengths.  Although she purported to object to the book on the ground that its purpose is "sexual introductions; [to] sexually excite," Ex. 2422, given the profound inaptness of describing a book about rape and the social response to it in that manner, it is clear that her real objection was a disagreement with the book's feminist message.  Despite the review committee's

recommendation, the School Board voted 3–2 to restrict the book to 11th and 12th graders.

125.   Another Removed Book is *Push*, the first novel by the author who goes by the pen name Sapphire, which was published by Plaintiff PRH.   First published over 25 years ago, the book concerns the struggles of a 16-year-old Black girl named Precious who lives in desperate poverty and endures unspeakable abuse at the hands of both her mother and father.   When the book opens, Precious is pregnant with her second child—like the first, the product of rape by her father.   Precious enrolls at an alternative school where she finds a teacher who helps her learn to read and write, as well as to escape from her abusive situation and give herself and her children a chance for a better future.   Stylistically, the book is told in Precious's voice and tracks her increasing English proficiency and self-esteem as she overcomes the functional illiteracy with which she begins the novel.   In 2009, *Push* was adapted into a feature film, *Precious*, that was nominated for six Academy Awards and won two, including for Best Adapted Screenplay.

126.   Like *The Bluest Eye*, *Push* depicts difficult and upsetting situations, sometimes in graphic terms.   However, as with that novel, the district review committee noted that these elements were "an important part of developing Precious' background and creating a greater understanding of her circumstances, trials, and ultimately, her ability to begin to see herself as a whole and worthy

person despite her circumstances." Ex. ~~25~~23 at ~~3~~2.  The committee also noted its "very artistic presentation of a journey from complete illiteracy to English language competency" and that "[t]hrough reading about Precious and her circumstances we are able to have a more developed understanding of the human condition, and hopefully a deeper compassion for someone who may be very different from ourselves."  *Id.*  The district review committee voted 4–1 to retain *Push* as a high school library material.[11]

127.  In her appeal of the district review committee's decision, Baggett asserted as part of her criticism of the book that "[t]he purpose of fiction writing is simply **TO ENTERTAIN**.  It is not to inform or educate."  Ex. ~~26~~24 at ~~2~~1.  As with her objection to *The Bluest Eye*, it is apparent that Baggett's real objection is to the book's exploration of themes of race, racism, and sexual assault, not her purported objections to the book's sexual content.

128.  At the April 13, 2023 School Board meeting at which *Push* was discussed, one School Board member observed: "While I concur with the board members who've spoken, while I do believe that it is a story of triumph, it is a story of somebody saving themselves, someone who has resilience and discovered her self-worth, it is not a book that I believe that should be available in public high

---

[11] The dissenting voter did not dispute the novel's literary or artistic merit, but believed that due to its difficult content "[i]t is best read with the support of a teacher or trusted adult."  *Id.* at 5.

schools." That subjective reaction carried the day, and the School Board voted to overrule the district review committee and remove *Push* from School District high school libraries.[12]

129. The ideological nature of these book removals is further underscored by what books have *not* been removed.

130. Even though a number of books have been removed simply because they allude to, or acknowledge the existence of, same-sex relationships and/or transgender persons, there have not been any instances in which a book has been removed simply because it alludes to, or recognizes the existence of, heterosexual relationships or cis gendered persons. For instance, among the children's books that remain unchallenged on elementary school shelves in the School District are *Just Me and My Little Brother* by Mercer Mayer and *The Wedding* by Eve Bunting, each of which depicts heterosexual relationships and/or cis gendered persons in family settings similar to those in which *Tango* and *Aidan* present same-sex relationships and transgender persons.

131. Likewise, even though many books addressing themes related to race, racism, feminism, and/or sexual assault have been removed on the ostensible

---

[12] Included in the appeal record considered by the School Board was a set of "Relevant Florida State Statutes," among which was HB 1557. HB 1557 does not apply to library materials, and, accordingly, does not provide a basis to restrict or remove any title.

grounds that they contain sexually explicit content, there are numerous books that remain in School District libraries that are also sexual explicit, but were not singled out for removal because they do not address such themes.  For instance, the following books, each of which contains sexually explicit content and/or language, remain, unchallenged, in high school libraries in the School District: *1984* by George Orwell, *Brave New World* by Aldous Huxley, *The Catcher in the Rye* by J.D. Salinger, *Flowers in the Attic* by V.C. Andrews, *The World According to Garp* by John Irving, *Catch-22* by Joseph Heller, *Madame Bovary* by Gustave Flaubert, *A Farewell to Arms* by Ernest Hemingway, and the complete works of William Shakespeare.

132.   To be clear, Plaintiffs do not believe that *any* of the books referenced in the preceding paragraph should be removed from high school libraries. Nonetheless, that not one of those books has been removed, or targeted for removal, makes plain that, for the books the School Board has removed, it is not the sexual content *per se* that is driving the objections.

### G.   The School Board Is Also Indefinitely RestrictingRestricted Access to Books Based on Viewpoint

133.   It is also apparent that books arewere being subject to restricted access for indefinite periods of time on ideological, not pedagogical, grounds.

134.   Indeed, as detailed above, the School Board amended its procedures for challenged books so as to make it easier to restrict access to books that are

subject to ideological objections.

135.   The School Board did this in two ways.   First, under the School Board's policies (at least as they existed prior to July 1, 2023), books were being subject to restricted access pending further review simply because they reference the existence of same-sex relationships or transgender persons, without regard to anything else about their content.   Second, under those policies, citizens who objected to books on ideological or political grounds were able to restrict access to those books simply by opportunistically highlighting the fact that—like plenty of other books that remain unchallenged on library shelves—they contain some sexual content.

~~For instance, one of the Targeted Books is *Uncle Bobby's Wedding* by Plaintiff Brannen.   *Uncle Bobby's Wedding* is a picture book about the wedding of the narrator's "Uncle Bobby" to his boyfriend Jamie.   The book has received numerous awards, including being recognized as one of the "Best Books of the Year" by both *Kirkus Reviews* and Bank Street in 2020, and being identified as one of the 100 Best Children's Books of the Past 100 Years by Booktrust.   *Uncle Bobby's Wedding* is used in classrooms throughout the country.~~

~~The sole basis on which *Uncle Bobby's Wedding*'s was challenged was that it "contains alternate sexual ideologies, a violation of HB 1557/Parental Rights Law and is prohibited to be available to K-3." Ex. 11 at 2.   The complaint objected~~

in particular to one picture showing "Uncle Bobby and Jamie hold[ing] hands while announcing their marriage to everyone." *Id.* at 3. There is no sexual content in the book.

On the basis of this challenge, access to *Uncle Bobby's Wedding* is currently restricted within elementary school libraries in the School District. The book does not appear to have been scheduled for committee review.

Another Targeted Book is *Too Bright to See*, a novel by Plaintiff Lukoff, published by Plaintiff PRH. *Too Bright to See* is intended for students in grades 4–7. The book involves two friends (Bug and Moira), and the ghost that haunts Bug's house, as Bug realizes over the course of the story he is a transgender boy. *Too Bright to See* was one of five children's books selected in 2022 as a Newbery Honor Book, and one of five selected as a finalist for the 2022 National Book Award for Young People's Literature.

As with *Uncle Bobby's Wedding*, the sole stated objection to *Too Bright to See* is that the book "contains sexualities and alternate gender identities, a violation of HB 1557 and Parental Rights Law," and the claimed purpose of the book is "indoctrination." Ex. For example, one of the targeted books is *Out of Darkness* by Plaintiff Pérez.27. There is no claim that the book contains any explicit material. On the basis of this challenge, access to *Too Bright to See* is currently

restricted within elementary school libraries in the School District. The book does not appear to have been scheduled for committee review.

Another Targeted Book is *Two Boys Kissing*, a young adult novel by Plaintiff Levithan, published by Plaintiff PRH. The title characters in *Two Boys Kissing* are two teenage boys who, in protest of a homophobic attack on another character, attempt to break the record for the world's longest kiss. The book also includes other gay or transgender characters in various situations related to the main story, as well as a metafictional "Greek chorus" made up of gay men who died during the worst years of the AIDS crisis, who comment on the story, the characters, and the momentous changes in society's acceptance of gay people between the 1980s and the book's 2010s setting. *Two Boys Kissing* has received multiple awards, including a Stonewall Honor, and the Lambda Literary Award, and was placed on the longlist for the 2013 National Book Awards.

Baggett's objections to *Two Boys Kissing* include "LGBTQ push/indoctrination." Ex. 28. She also listed "indoctrination" as the book's purpose. *Id.* On the basis of this challenge, access to *Two Boys Kissing* is currently restricted within high school libraries in the School District, where it was previously generally available. The book does not appear to have been scheduled for committee review.

136.    Another Targeted Book is *Out of Darkness* by Plaintiff Pérez. *Out of*

58

*Darkness* is a historical young adult novel involving a secret romance between a Mexican-American girl and a Black boy in a small town in East Texas in the 1930s, in the months preceding a catastrophic real-life gas explosion that destroyed the town's school and killed hundreds of students and faculty.  The story ends violently and tragically.

137.   *Booklist* named *Out of Darkness* one of its "50 Best YA Books of All Time" in 2017, saying "Pérez's elegant and devastating Printz Honor winner begins with a real-life 1937 school explosion that killed 300 people in Texas before backtracking to Mexican American Naomi, who struggles with racism, love, and Henry—the father of her siblings and one of the most vivid, complicated villains in YA history."  In 2015, the book was named as one of the "Best Teen" books of the year by *Kirkus Reviews*, and one of the "Best Books of 2015" by *School Library Journal* magazine.

138.   Although the book's depictions of sexual situations are central to the story it tells, Baggett objected to *Out of Darkness* on the ground that it includes "graphic depictions of abuse + sexual scenes."  She listed the strengths of the book as "none," and listed its purpose as "sexual introductions; sexually excite."  Ex. ~~29~~25.  The book ~~is currently being~~has been restricted since October 2022 within high school libraries in the School District, where it was previously generally available, and does not appear to be scheduled for committee review.

139.  Another ~~Targeted Book~~targeted book is *Beyond Magenta: Transgender Teens Speak Out* ("*Beyond Magenta*") by PEN America member Susan Kuklin.  *Beyond Magenta* is a young adult nonfiction book based on interviews with six transgender or nonbinary teenagers.  *Beyond Magenta* received numerous awards and positive reviews from *Booklist, Kirkus Reviews*, and *Publishers Weekly*, with the latter calling it "a sorely needed resource for teens and, frankly, many adults" that captures its subjects as "full, complex, and imperfect human beings."

140.  Baggett challenged *Beyond Magenta* on the grounds that it was "sexually explicit" and contained "LGBTQIA content."  Ex. ~~30~~26.  She claimed it had no strengths as educational media and its sole purpose was "total indoctrination."  Access to *Beyond Magenta* ~~is being~~has been restricted since October 2022 in ~~middle school and high~~ school libraries in the School District, where it was previously generally available, and the book does not yet appear to have been scheduled for committee review.

141.  Another targeted book is *The Freedom Writers Diary: How a Teacher and 150 Teens Used Writing to Change Themselves and the World Around Them* by Erin Gruwell.  *The Freedom Writers Diary*, which is published by Plaintiff PRH, is a non-fiction book that collects diary entries from the largely minority students at the "at risk" high school where the book's main author, Gruwell,

taught.  Modeled after *The Diary of Anne Frank* and *Zlata's Diary: A Child's Life in Sarajevo*, the diary entries draw parallels between those books and the students' lives and chronicle their challenges dealing with issues like gang violence, racism, getting evicted, and drug and alcohol abuse, and the students' efforts to rise above them.

142.   In her challenge, Baggett asserted that the purpose of the book was to "incite racial division," and objected to the book as having "extremely sexual content; nudity; alternative sexualities; profanity; child abuse; molestation; [and] racial slurs." Ex. 27.  ~~31.  On the basis of that challenge, the~~The book ~~is currently being~~has been restricted since October 2022 within ~~middle school and~~ high school libraries in the School District (where it was previously generally available), and does not appear to be scheduled for committee review.~~–~~

143.   Another targeted book is *Concrete Rose* by Angie Thomas.  *Concrete Rose* is a prequel to Thomas's acclaimed 2017 book *The Hate U Give*, and tells the backstory of Maverick ("Mav"), the father of the main character in *The Hate U Give*.  In the book, Mav must navigate competing pressures—dealing with gang culture as the son of one of the gang's leaders who is incarcerated, fathering a child out of wedlock, and falling in love with his girlfriend and planning a future together.  As described in *Publishers Weekly*, "Through its portrayal of loss and upheaval, this story acts as a tender love letter to a close Black family and

community—one that isn't without problems but is always full of love." *Kirkus Reviews* named it as one of the best young adult novels of 2021, and it was a Michael L. Printz Honor book, awarded for excellence in young adult literature.

144.    Baggett challenged *Concrete Rose* on the basis that it includes "sexual activities," "excessive and frequent profanity" and "controversial racial and social commentary."   Among the passages she objected to were one in which a character described his disengagement with a history class that lionizes white people who had done problematic things, like the notion that Columbus "discover[ed]" America, a place where people already lived.   Another objected-to passage was about the character's hatred of his coach who had a Confederate flag on his truck and implied that he was the coach's slave.   Ex. ~~32~~28.   A third passage described a sexual encounter between Mav and his girlfriend.   ~~On the basis of Baggett's challenge, the~~The book ~~is currently~~has been restricted since January 2023 within high school and middle school libraries in the School District (where it was previously generally available), and does not appear to be scheduled for committee review.

## H.    Defendant Has Disproportionately Targeted Books by Minority and LGBTQ Authors or Books Addressing Themes Involving Race and LGBTQ Identity

145.   The removal efforts of the School Board have been focused disproportionately on minority and LGBTQ authors and/or books that pursue

themes related to minority or LGBTQ identity.

146.   Of the ~~10~~nine books permanently removed from one or more libraries or grades by the School Board, 6 have authors who are non-white and/or identify as LGBTQ, while ~~9~~8 address themes relating to race or LGBTQ identity, or feature prominent non-white and/or LGBTQ characters.

147.   In addition, on information and belief, relative to their presence in School District libraries as a whole, the books at issue in this lawsuit that have been ~~subjected to~~indefinitely restricted ~~access, or at least targeted for potential removal,~~ have disproportionately been books with non-white and/or LGBTQ authors, or which address themes relating to race or LGBTQ identity, or feature prominent non-white and/or LGBTQ characters.

148.   ~~For example, of~~Of the ~~218~~119 books challenged before July 1, 2023 that have been ~~targeted for removal~~indefinitely restricted, approximately ~~40~~30% have authors who are non-white and/or identify as LGBTQ, while approximately ~~60~~50% address themes relating to race or LGBTQ identity. ~~And, of the 171 books that have either been removed or restricted, approximately 40% have authors who are non-white and/or identify as LGBTQ, while approximately 60% address themes relating to race or LGBTQ identity, or feature prominent non-white and/or LGBTQ characters.~~

149.   The disproportionate focus of the removal and restriction efforts is not

an accident. Baggett and other challengers have routinely expressed the categorical view that a book is inappropriate for inclusion in a school library simply because it explores themes relating to race or LGBTQ identity. And, the School Board has repeatedly ratified—over the objections of the district review committee—Baggett's removal preferences.

In addition, all or most books singled out for removal because they reference same-sex relationships or transgender people are being automatically placed under restriction during the review period.

As a consequence of this targeting of books by non-white and LGBTQ authors, authors belonging to such groups are disproportionately hindered in their ability to reach young audiences, including non-white and LGBTQ students.

In addition, as a consequence of this disproportionate targeting of books by non-white and LGBTQ authors and/or books that pursue themes related to minority or LGBTQ identity, students in the School District who are non-white and/or identify as LGBTQ are being deprived of access to books of special interest to them and their experiences.

I.    **Students in the School District Are Being Deprived Access, or Restricted in Their Access, to Books to which They Previously Had Access**

150.    The book removals and restrictions enacted by the School Board are denying students access to books they would like to read or chilling such access.

For example, Plaintiff Durtschi is the parent of two students who currently attend A.K. Suter Elementary School, which is Students in the School District.  The students are entering the fourth and second grades.  Both of Plaintiff Durtschi's children go to Escambia County Public Schools can typically check books out of their school libraries or the district's online system; if their library at least once does not have a week, where they check out books.

151.  Durtschi's rising fourth-grader would like to access and check out books that are no longer available in her school's book, it may be available through inter-library because of the book removals and restrictions.  In particular, she would like to access and check out *Too Bright to See*, *Drama*, and *New Kid*.  Each of those books is currently unavailable or restricted in her loan from another school library as a result of the actions of the School Board.

Durtschi's rising second-grader would also like to access and check out books that are no longer available in her school's library because of the book removals and book restrictions.  In particular, she would like to access and check out *Tango*, *Aidan*, and *Uncle Bobby's Wedding*.  Each of those books is currently unavailable or restricted in her school library as a result of the actions of the School Board.

Durtschi herself would like those particular books, and others like them, to be available to her children in their school library.  It is very important to her that

~~her children have opportunities to be exposed to points of view, backgrounds, and experiences different from their own and attend a school in which children have opportunities to be exposed to points of view, backgrounds, and experiences different from their own. She believes such exposure is critical for preparing them for participation in our wider society.~~

~~Durtschi expressed these views at the School Board meeting at which it was decided that Plaintiff's Johnson's book *All Boys Aren't Blue* would be removed. She stated: "George Johnson has said that works like mine have saved their lives. I'm the parent of two little girls at A.K. Suter Elementary. . . . Each book brought for appeal this evening has been challenged on the basis of LGBTQ indoctrination and content, but storytelling is not indoctrination. Indoctrination means teach[ing] someone to accept a set of beliefs without questioning them. By not allowing our children to consume the entire world around them in and out of the classroom we aren't allowing them to question much of anything. I want my girls to question intolerance. I want my girls to question bigotry and misogyny. I want to prepare them to be loving, kind, and empathetic friends. I know many have said our children already receive so much information in the real world. Well that's all the more reason to increase positive discussion regarding otherwise taboo topics."~~

152. Plaintiff Glass is the parent of a ~~rising eighth~~ <u>current ninth</u> grader at ~~Ferry Pass Middle~~<u>Washington High</u> School. His daughter visits the library at her

school.  She is particularly interested in books about coming of age and that deal with some of the issues she faces as a teenager.

153.   Glass's daughter would like to access and check out books that are no longer available in or through her school's library because of the book removals and restrictions.  In particular, she would like to check out *The Nowhere Girls* and *The Freedom Writers Diary*.  Each of those books is currently unavailable or restricted in  or through her school library as a result of the actions of the School Board.

154.   Glass himself would like those particular books, and other books like them, to be available to his daughter in or through her school library.  It is important to him that his daughter has opportunities to be learn about the dangers of sexual assault and the importance of consent so that she is prepared for situations she may encounter in middle school or high school.  He further sees value in her reading about the intersection between stories about minority communities and stories involving sexual assault so that she will appreciate the unique challenges that people from other backgrounds face.  He believes that learning about relationships and sexuality is critical for his daughter's development as a teenage girl.

155.  Plaintiff Novakowski is the parent of a rising first current second grader at A.K. Suter Elementary School.  Her daughter visits the library at her

school at least once a week and routinely checks out books. Her daughter is particularly interested in books about families and different family arrangements.

156.   Novakowski's daughter would like to access and check out books that are no longer available in or through her school's library because of the book removals and restrictions. In particular, she would like to check out *Tango*, and *Aidan*, and *Uncle Bobby's Wedding*. Each of those books is currently unavailable or restricted in or through her school library as a result of the actions of the School Board.

157.   Novakowski herself would like those particular books, and other books like them, to be available to her daughter in or through her school library. It is important to her that her daughter has opportunities to be exposed to points of view, backgrounds, and experiences different from her own and that of her family. She believes such exposure is critical to learning acceptance of people with different backgrounds and experiences and to being able to participate in our wider society.

158.   Plaintiff Parker is the parent of a rising eighth current ninth grader at Beulah Middle Pine Forest High School. His son visits the library at his school and checks out books. His son is particularly interested in books about technology, gaming, and computers, as well as books about civil rights.

159.   Parker's son would like to access and check out books that are no

longer available in ~~or through~~ his school's library because of the book removals and restrictions.  In particular, he would like to check out *The Freedom Writers Diary* ~~and~~, *Concrete Rose*~~.~~ *and The Hate U Give.*  Each of those books is currently unavailable or restricted in or through his school library as a result of the actions of the School Board.

160.    Parker himself would like those particular books, and other books like them, to be available to his son in ~~or through~~ his school library.  It is important to him that his son have opportunities to be exposed to books that reflect Black culture, including works by celebrated Black authors, and not to shy away from stories reflecting the raw experiences that Black people face.  He believes such exposure is critical for his son to develop resilience.

~~Plaintiff Roy is the parent of a rising fifth grader at Scenic Heights Middle School and a rising ninth grader at West Florida High School.  Her children visit the library at their school regularly and check out books.  Her fifth grade son is particularly interested in nonfiction books, largely history and science.  Her ninth grade daughter is particularly interested in popular fiction, including books about teenagers, friendships, and social dynamics at school.~~

~~Roy's children would like to access and check out books that are no longer available in their school libraries because of the book removals and restrictions.  In particular, her son would like to check out *New Kid* and *Too Bright to See*.  Her~~

daughter would like to check out *The Kite Runner*, *The God of Small Things*, *All Boys Aren't Blue*, and *The Perks of Being a Wallflower*. Each of those books is currently unavailable or restricted in their school library as a result of the actions of the School Board.

Roy herself would like those particular books, and other books like them, to be available to her children in their school library. It is important to her that her children be exposed to books with which they can identify, including books about being a racial minority at a school where their peers come from very different backgrounds. She is especially interested in exposing them to books about South Asian culture because the children's family members on their father's side are South Asian Muslim immigrants and she wants them to understand their culture. In addition, she thinks it vital that her children to have access to books where young people tackle difficult issues, including their own sexuality, drugs, and even abuse, so that her children can learn how to develop resilience themselves in the face of challenges. Roy also wants her children to have access to books on these topics that trained educators and media specialists have identified as adding value to school libraries.

Roy is alarmed by the School Board's removal and restriction of books from Escambia County public school libraries based on objections to the ideas presented in those books, as she associates that type of censorship with authoritarian

governments.  She and her family previously lived in Myanmar, whose repressive government broadly censors speech and ideas.  She was thankful to move back to the United States where censorship should not be an issue.

161.  Plaintiff Satterwhite is the parent of a rising tenthcurrent eleventh grader at Pensacola High School.  His son visits the library at his school and is particularly interested in graphic novels and books about race and racism.

162.  This coming school year, Satterwhite's son would like to access and check out books that are no longer available in or through his school's library because of the book removals and restrictions.  In particular, he would like to check out *Slaughterhouse Five* and *All Boys Aren't Blue*.  Each of those books is currently unavailable or restricted in or through his school library as a result of the actions of the School Board.

163.  Satterwhite himself would like those particular books, and other books like them, to be available to his son in or through his school library.  It is important to him that his son has opportunities to read about Black experiences in the United States, in part because his own family felt the need to dissociate themselves from their Black heritage.  Beyond that, he wants books to be available to his son in or through the school library for him to explore Black experiences and any other subjects he is interested in at his own pace and driven by his own interests.

71

~~Plaintiff Smith is the parent of two rising twelfth graders at Pine Forest High School.  Her daughters visit the library at their school and check out books.  Her daughters are particularly interested in books written by Black authors and about Black culture and history because they feel they can relate to those topics and are excited to learn about them.~~

~~Smith's daughters would like to access and check out books that are no longer available in their school's library because of the book removals and restrictions.  In particular, they would like to check out *Push*, *The Freedom Writers Diary*, *Beloved*, and *The Handmaid's Tale*.  Each of those books is currently unavailable or restricted in their school library as a result of the actions of the School Board.~~

~~Smith herself would like those particular books, and other books like them, to be available to her daughters in their school library.  It is important to her that her daughters have opportunities to be exposed to books that reflect Black culture, including works by celebrated Black authors, and not to shy away from stories reflecting the raw experiences that Black people and women face.  She believes such exposure is critical for them to develop resilience.~~

**J.    Defendant's Book Removals and Restrictions Harm PEN America, Its Members, the Author Plaintiffs, PRH, and the Parent Plaintiffs and Their Children**

164.   Plaintiff PEN America has standing to sue to enjoin the Defendants'

book removals and restrictions because the actions of the School Board have caused direct organizational injury to PEN America.

165.   As a consequence of efforts in Escambia County and elsewhere to remove books from public school libraries based on political or ideological objections, PEN America has had to reallocate significant financial resources and time to addressing this issue and away from other priorities.  For example, PEN America has had to hire full-time staff to work solely on (a) tracking and reporting on book removals, (b) supporting author-members who have concerns about what is happening to their own books, and (c) responding to a consistent onslaught of inquiries and notifications from parents, teachers, students and media concerned about the situation regarding book removals and looking to PEN America for insight and guidance.  In addition, because of the focus on book removals, PEN America has had fewer personnel dedicated to free speech education for youth or to free speech issues on college campuses, two other areas related to education on which PEN America has typically focused its resources.

166.   Another consequence of these efforts is interference with PEN America's core business activities—namely, protecting writers in the United States and around the world from discrimination and censorship, championing the written word, and defending freedom of expression.  The time and effort PEN America has had to spend on addressing efforts to remove and restrict books in Escambia

County and elsewhere has required PEN America to focus its work disproportionately on the freedom to read in K-12 and has detracted from a breadth of other core business activities and necessary work by the organization.  This includes, for example, programming on campus free speech such as convenings of PEN America's higher education-focused Freedom to Learn coalition, online harassment training such as trainings on digital safety for authors, and protecting writers and artists facing political persecution abroad.

167.   PEN America also has associational standing on behalf of its members.  Among the PEN America members whose books have been removed from libraries within the School District and/or subjected to restricted access within libraries in the School District are each of the Author Plaintiffs, as well as Margaret Atwood, Judy Blume, ~~Alex Gino,~~ John Green, Khaled Hosseini, Susan Kuklin, and Jodi Picoult.

168.   Each of those affected author-members of PEN America would have standing to sue based on the School District's violation of their rights under the First and Fourteenth Amendments.

169.   The interests at stake in this case are germane to PEN America's purpose of protecting the rights of its author-members and the right to free expression generally.

170.   Neither the claims asserted nor the relief requested in this case

requires the participation of the named non-plaintiff author-members above or any other of PEN America's author-members as the relief being sought is declaratory and injunctive in nature.

171.   The Author Plaintiffs have standing to sue to enjoin Defendants' book removals and restrictions because their books have been (a)— removed from libraries within the School District, and/or (b) subject to restricted access of an indefinite period pending adjudication of a challenge.  Specifically:

> Plaintiff Brannen's book *Uncle Bobby's Wedding* is one of the Targeted Books and currently restricted from School District elementary libraries indefinitely pending an as-yet unscheduled review.

a.   Plaintiff Johnson's book *All Boys Aren't Blue* is one of the Removed Books.

> Plaintiff Levithan's book *Two Boys Kissing* is one of the Targeted Books and currently restricted from School District libraries indefinitely pending an as-yet unscheduled review.

b.   Plaintiff Lukoff's book *Aidan* is one of the Removed Books.  His book *Too Bright to See* is one of the Targeted Books and is currently restricted from School District elementary libraries indefinitely pending an as-yet unscheduled review.

c.  Plaintiff Pérez's book *Out of Darkness* is one of the ~~Targeted~~Restricted Books and currently restricted from School District libraries indefinitely pending an as-yet unscheduled review.

172.  Millions of books published by PRH are sold into Florida each year, including to school districts and public libraries.  PRH has standing to sue to enjoin Defendants' book removal and restrictions because certain of the books it publishes, including books by Toni Morrison, Kurt Vonnegut, Kyle Lukoff, and Sapphire~~, and David Levithan,~~ have been (a) removed from libraries within the School District, and/or (b) subject to restricted access of an indefinite period pending adjudication of a challenge.  A publisher's ability to publish and sell books freely is affected when state or local officials restrict circulation or remove the publisher's books.

173.  The Parent Plaintiffs have standing, on behalf of both themselves and their children, to sue to enjoin Defendants' book removals and restrictions because both they and their children have been harmed by the book removals and restrictions.

~~Plaintiff Durtschi is the parent of two students who attend A.K. Suter Elementary School in the School District.  As a result of the actions of the School Board, Durtschi's daughters are unable to access books in their school library that~~

were previously available.  Durtschi's daughters want to access and check out those books and Durtschi wants them to have that opportunity.

174.  Plaintiff Glass is the parent of a student who attends ~~Ferry Pass Middle~~Washington High School in the School District.  As a result of the actions of the School Board, Glass's daughter is unable to access books in or through her school library that were previously available.  Glass's daughter wants to access and check out those books and Glass wants her to have that opportunity.

175.  Plaintiff Novakowski is the parent of a student who attends A.K. Suter Elementary School in the School District.  As a result of the actions of the School Board, Novakowski's daughter is unable to access books in or through her school library that were previously available.  Novakowski's daughter wants to access and check out those books and Novakowski wants her to have that opportunity.

176.  Plaintiff Parker is the parent of a student who attends ~~Beulah Middle school~~ Pine Forest High School in the School District.  As a result of the actions of the School Board, Parker's son is unable to access books in or through his school library that were previously available.  Parker's son wants to access and check out those books, and Parker wants him to have that opportunity.

~~Plaintiff Roy is the parent of a student who attends Scenic Heights Elementary School and a student who attends West Florida High School in the School District.  As a result of the actions of the School Board, Roy's children are~~

~~unable to access books their school library that were previously available.  Roy's children want to access and check out those books, and Roy wants them to have that opportunity.~~

177.   Plaintiff Satterwhite is the parent of a student who attends Pensacola High School in the School District.  As a result of the actions of the School Board, Satterwhite's son is unable to access books in <u>or through </u>his school library that were previously available.  Satterwhite's son wants to access and check out those books and Satterwhite wants him to have that opportunity.

~~Plaintiff Smith is the parent of two students who attend Pine Forest High School in the School District.  As a result of the actions of the School Board, Smith's daughters are unable to access books in their school library that were previously available.  Smith's daughters want to access and check out those books and Smith wants them to have that opportunity.~~

**K.    The School Board Adopts New Policies ~~Purportedly~~<u>and Procedures</u> Based on HB 1069**

178.  ~~Following Plaintiffs' filing of this lawsuit, the School Board amended its policies relating to challenges to library books in response to~~<u>In the Spring of 2023, the Florida legislature passed</u> HB 1069, through which the ~~Florida~~ legislature amended FS 1006.28.

179.   The amended FS 1006.28, which went into effect on July 1, 2023, provides that any material available in a school or classroom library ~~that qualifies~~

as can be challenged on the ground, inter alia, that it is "pornographic" or prohibited under Florida lawFS 847.012, or that it "depicts or describes sexual conduct" as defined by Florida law, is subject to challenge..  The statute further prescribes procedures for adjudicating challenges to such materials, which require, inter alia, that requires that any challenged book challenged on one of these bases must be removed from circulation within 5 days and remain so during the pendency of the challenge.  The amendments mandated by HB 1069 do not allow parents to opt in to allowing their children to access the challenged books. and do not contain any time limits on how quickly a book challenge must be adjudicated.

On June 20, 2023, the School Board announced it had taken emergency action to adopt a revised School Board Rule 4.06, which purports to codify the changes enacted by HB 1069.

At the time of this filing, it is not clear what materials will be challenged and removed under the revised School Board Rule 4.06, or how the rule will be put into practice.¹³  Regardless, the restrictions and removals that commenced prior to July 1, 2023 are constitutionally impermissible for the reasons set forth herein.

180.  The amendments mandated by HB 1069 require that books ultimately

___

¹³ Depending on how enforcement of the revised School Board Rule 4.06 unfolds, Plaintiffs may seek to further amend the complaint, or otherwise file a challenge to the statute that the rule seeks to codify.  In the meantime, their challenge to the removals and restrictions encompassed in the amended complaint remains ripe for review.

found to contain depictions or descriptions of "sexual conduct" as defined by Florida law shall be made unavailable for any age group or grade level for which such use is inappropriate or unsuitable.  The statute does not require the removal of such books from all libraries or age levels; in fact, the statute allows the retention of such materials for those age groups or grade levels for which they are deemed appropriate and suitable.

181.    Florida law requires the School Board to adopt a policy for handling book challenges under HB 1069 that clearly describes a process to handle all challenges and provides for resolution.  The First Amendment requires that the policy provide for timely resolution of challenges that result in restriction of books while the challenge is pending.

182.    In response to the passage of HB 1069, the School Board amended the section of its Policy Manual governing the handling of library book challenges.  Ex. 1.  Among other changes, the revised Policy Manual:

- Requires that books challenged on the basis that they contain content that is pornographic or prohibited by FS 847.012 or depict or describe "sexual conduct" as defined by Florida law be placed in a restricted area of the library/media center within five school days of receipt of the book challenges and remain unavailable to students of the school at which the material was challenged pending resolution of the

challenge;

- Deleted the provision authorizing parents or guardians to grant permission for their children to check out such restricted materials;

- Deleted the provision authorizing the Superintendent to make a determination that a challenge lacks sufficient facts to support a preliminary finding that a book contains content that is pornographic or prohibited by FS 847.012;

- Added a provision empowering the Superintendent, in consultation with the Coordinator of Media Services, to make a determination that a challenge to a title on the basis that it contains content that is pornographic or prohibited by FS 847.012 or depicts or describes "sexual conduct" as defined by Florida law provides sufficient evidence to remove the title without review by the district review committee or the School Board (the "peremptory removal process").

183.  The revised Policy Manual contains no time limit by which book challenges need to be decided.  In fact, the School District and the School Board have not made any decisions regarding any book challenges since April 2023, and no district review committee has met since March 2023.

**L.    The School Board Removes All Library Books for Review Under HB 1069**

81

184.   The School Board also interpreted the amendments made by HB 1069 as requiring a review of every book in every Escambia County Public School library to determine if the book contains depictions or descriptions of "sexual conduct" as defined by Florida law.  The School Board removed from circulation *all* library books so that they could be reviewed by school librarians.  If that review determined that a book "may" contain depictions or descriptions of sexual conduct, the book continued to be withheld from circulation.  Given the ambiguity in the statutory definition of "sexual conduct," and the School District's changing understanding of the term's meaning, this meant that many books that might not ultimately meet the statutory standard were withheld from circulation.  Over time, librarians slowly released books they had "cleared" back to circulation.

185.   Beginning in October 2023, the District's Coordinator of Media Services began meetings with high school librarians to review books that had not been returned to circulation.  Those meetings determined whether a book contained depictions or descriptions of "sexual conduct" as defined by Florida law and, if so, whether the book was age-group or grade-level appropriate for high school (and in some cases, middle school) libraries.  Those books determined not to contain "sexual conduct" as defined by Florida law, or determined to nevertheless be age-group or grade-level appropriate for middle or high school, were to be returned to circulation in middle or high school libraries.

186.   In some instances, where the librarian group could not reach a decision, the result of these meetings was to hold books over for further review. Those books remain out of circulation pending review by a district review committee.

187.   In the spring of 2024, a similar review began with middle school librarians to review those middle school books that were not initially cleared for return to the shelves.  And a similar process is planned for an unspecified time in the future to review elementary school books that were not initially cleared for return to the shelves.

188.   As of July 31, 2024, there were over 1,000 unique titles that have been initially reviewed by school librarians that are still awaiting further review to determine whether they contain depictions or descriptions of "sexual conduct" as defined by Florida law, and, if so, whether they are appropriate for any public school libraries.  In addition, an unspecified number of books at a number of middle and high schools have not yet been subject to the initial 1069 review process and are not available for circulation.

**M.   The School Board Further Restricts Challenged Books**

189.   Those books that had been challenged prior to the enactment of HB 1069 have been subject to a separate 1069 review process.  The District's Coordinator of Media Services and a Teacher on Special Assignment to assist her

separately reviewed the challenged books to determine whether they "may" contain depictions or descriptions of "sexual conduct" as defined by Florida Law. Unlike the regular 1069 review described above, however, this review did not assess whether those books that contain depictions or descriptions of "sexual conduct" as defined by Florida Law were age-group or grade-level appropriate for any school libraries or any grades within those libraries. Instead, if the review determined that the challenged book "may" contain depictions or descriptions of "sexual conduct" as defined by Florida law—without regard to considering the book as a whole and whether it contained serious literary, artistic, political, or scientific value for minors—the book was withheld from circulation at all school libraries pending either unilateral removal by the Superintendent pursuant to the peremptory removal process or review by a district review committee. Such restricted books remain completely unavailable to students; the prior parental opt-in allowing access to restricted books is no longer applicable to these titles.

190.  The review of previously challenged books discussed in the prior paragraph identified at least twenty books that had been restricted pending review where the books did not contain any "sexual conduct" as defined by Florida law. Indeed, those reviewing these books "could not see a consistent reason" for why these books were restricted. Although these titles were identified as not containing depictions or descriptions of "sexual conduct" as defined by Florida law as early as

September 2023, the books were not un-restricted until April 2024, when the Superintendent was finally convinced that HB 1557 did not apply to library materials.

191.    As of August 12, 2024, 119 books that had been challenged prior to July 1, 2023 remain restricted pending resolution of the challenge on the grounds that the book "may" contain "sexual conduct" as defined by Florida law.  Ex. 29.  These are the "Restricted Books" that are at issue in this lawsuit.[14]  Virtually all of these books were first restricted at or near the time they were first challenged.

192.    The next step for these Restricted Books, as well as the other challenged books subject to restriction, is either peremptory removal by the Superintendent in consultation with the Coordinator of Media Services or the formation of a district review committee to consider the challenge to the book.

193.    The peremptory removal process is set forth in the revised version of the Policy Manual.  Although the Policy Manual was revised in June 2023, the School Board still has not adopted any process to implement this review process, although the Superintendent and Coordinator of Media Service have "discussed the possibility" of these decisions being a recommendation to be presented to the School Board for approval.  The peremptory removal process only allows for book removals; the Policy Manual does not authorize a similar process to determine that

---

[14] An additional approximately 40 books challenged after July 1, 2023 are also currently restricted due to the fact that the District has determined that the book "may" contain "sexual conduct" as defined by Florida law.

a challenged book should be retained in any school library without going through the district review committee process.

194.   Those books not removed through the peremptory removal process are slated for consideration by a district review committee.  The School Board intends to change the composition of these committees so that each committee includes members appointed by each of the School Board Members.  No such committees have been formed since March 2023 and there is no timeline for their formation or for their completion of the review of the Restricted Books.

195.   Although virtually all of these books have been restricted for well over a year—and in some cases for nearly two years—at this time the School Board has no timeline for resolution of the underlying book challenges.  There is no specific date by which the School Board intends to finalize the peremptory removal process, convene new district review committees, or make final decisions on the pending books challenges.

**N.**     **The Books at Issue in this Litigation**

196.   This lawsuit challenges two sets of books: the nine Removed Books set forth in paragraph 96 that the School Board has decided to remove from some or all Escambia Public School libraries (or from some grades within those libraries) and the 119 Restricted Books set forth in Ex. 29 that were challenged before July 1, 2023 and that the School Board has restricted indefinitely pending

resolution of the challenge.

## V.    CLAIMS FOR RELIEF

### COUNT ONE:
### FIRST AMENDMENT—VIEWPOINT DISCRIMINATION
### (On Behalf of PEN America, Its Members, the Author Plaintiffs and PRH)

197.   The foregoing paragraphs are incorporated by reference as if fully set forth herein.

198.   The Fourteenth Amendment to the United States Constitution incorporates the protections of the First Amendment as applied to and binding on the State of Florida.

199.   The School Board is a state actor operating under color of state law.

200.   The libraries within the School District constitute, at a minimum, non-public forums.   Because they are non-public forums, the School Board cannot remove an author's or publisher's book from school libraries, or relegate it to restricted sections of such libraries, based on viewpoint discrimination.

201.   However, as detailed above with respect to the Removed Books, the School Board has been ordering books removed based on ideological objections to their contents or disagreement with their messages or themes, rather than for pedagogical reasons.

~~The School Board is likewise restricting access to books for indefinite periods of time based on ideological objections to their contents or disagreement with their messages.~~

202.    The result is that the School Board is systematically excluding certain viewpoints and perspectives from school libraries.

203.    Such removals~~, threatened removals, and restrictions of access~~ constitute viewpoint discrimination in violation of the First Amendment.

**COUNT TWO:**
**FIRST AMENDMENT—RIGHT TO RECEIVE INFORMATION**
**FREE FROM VIEWPOINT DISCRIMINATION**
**(On Behalf of the Parent Plaintiffs and Their Minor Children)**

204.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

205.    The Fourteenth Amendment to the United States Constitution incorporates the protections of the First Amendment as applied to and binding on the State of Florida.

206.    The School Board is a state actor operating under color of state law.

207.    In the setting of a public school library, the First Amendment "protects the right to receive information and ideas."  *Pico*, 457 U.S. at 867-68. This right is violated when a school district or school board removes or restricts access to library books "in a ***narrowly partisan or political manner***," and for the

purpose of "deny[ing] students access to ideas with which" the school district or school board disagrees. *Id.* at 870-71 (emphasis added). It is likewise violated when books are removed for reasons other than legitimate pedagogical concerns. As detailed above, that is what has occurred here.

208.  The Parent Plaintiffs want their student children to have access to some or all of the Removed Books.

~~The Parent Plaintiffs also want their student children to be able to access some or all of the Targeted Books without incurring the stigma of having to identify themselves as wishing to access material that has been falsely labelled as "pornographic" or otherwise deemed unsuitable for school.~~

209.  The students on whose behalf the Parent Plaintiffs also bring this lawsuit likewise want to have access to some or all of the Removed Books.

~~The students on whose behalf the Parent Plaintiffs also bring this lawsuit likewise want to be able to access some or all of the Targeted Books without incurring the stigma of having to identify themselves as wishing to access material that has been falsely labelled as "pornographic" or otherwise deemed unsuitable for school.~~

210.  The unlawful conduct of the School Board has injured the rights of the Parent Plaintiffs that their student children have access to information and ideas within school libraries, and the rights of those student children to receive

information and ideas.

### COUNT THREE:
### ~~FOURTEENTH~~FIRST AMENDMENT—~~EQUAL PROTECTION~~INDEFINITE DELAY
### (On Behalf of ~~PEN America, Its Members, the Author~~All Plaintiffs~~, and the Parent Plaintiffs and Their Minor Children~~)

211.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

212.    The Fourteenth Amendment to the United States Constitution ~~constrains~~incorporates the ~~ability~~protections of ~~state actors, including the School Board, from discriminating on the basis of race, gender, or sexual orientation.  This includes taking official action motivated by discriminatory animus based on race, gender, or sexual orientation~~the First Amendment as applied to and binding on the State of Florida.

213.    The School Board is a state actor operating under color of state law.

~~As set forth above, the books that have been removed, or targeted for removal, by the School Board are disproportionately books authored by non-white and/or LGBTQ authors, and/or books that explore themes relating to race, gender, or sexual orientation.~~

~~That disproportionate focus is evidence that the School Board is targeting books and/or authors based on prohibited animus.~~

In addition, such prohibited animus is manifest on the face of the objections leveled against the Removed Books and Targeted Books. Many of these books have been targeted simply because they address themes relating to race, sexuality, or gender identity. The clear intent is to exclude speech by authors based on their race, sexuality, or gender identity.

The School Board has consistently acceded to, and ratified, that animus in its book-removal and book-restriction decisions.

As a result of that discriminatory animus, non-white and/or LGBTQ authors are having their books removed and/or restricted on discriminatory grounds.

As a further result of that discriminatory animus, non-white and/or LGBTQ students are being denied access to books that reflect their identities and experiences on discriminatory grounds.

Such conduct violates the Equal Protection Clause of the Fourteenth Amendment.

214.    Authors and publishers have the right to communicate their ideas to students without undue interference from the government. And students have a corresponding right to receive those ideas.

215.    PEN America, its members, the Author Plaintiffs and PRH all desire to have the Restricted Books available to students in Escambia County Public School libraries. The Parent Plaintiffs want their student children to be able to

91

access some or all of the Restricted Books.  The students on whose behalf the Parent Plaintiffs also bring this lawsuit likewise want to be able to access some or all of the Restricted Books.

216.  "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975).

217.  First Amendment doctrine also clearly holds that "[a] scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 227 (1990); *see also Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781, 802 (1988) ("[D]elay compels the speaker's silence. Under these circumstances, the licensing provision cannot stand."); *Vance v. Universal Amusement Co., Inc.*, 445 U.S. 308, 315-17 (1980) (statute authorizing "prior restraints of indefinite duration" of content "not finally adjudicated to be obscene" is unconstitutional); *United States v. Frandsen*, 212 F.3d 1231, 1240 (11th Cir. 2000).

218.  The Escambia County School Board's policy implementing HB 1069 is devoid of any time limits for when the Board must render a final decision on the status of the 119 library books challenged before July 1, 2023 and now restricted

under HB 1069.  Nor has the Board adopted any such time limit in implementing its 1069 review.  Instead, each book is restricted indefinitely because it "may" contain descriptions or depictions of sexual conduct, without the Board making any determination that the book in fact contains such content and without regard to the appropriateness of the book as a whole for any grade level—even though HB 1069 expressly allows that analysis.

219.  As a consequence, all of these 119 books have been restricted for over a year—and many for over two years—with no plan or prospect for when their status might be finally resolved by the Board.

220.  The Board's policy and practice implementing HB 1069 with respect to the 119 Restricted Books violates the First Amendment.

221.  The unlawful conduct of the School Board has injured the rights of all of the Plaintiffs to either communicate their ideas to students or to receive information and ideas within public school libraries.

## VI. PRAYER FOR RELIEF

**WHEREFORE**, in light of the foregoing facts, Plaintiffs respectfully request that this Court:

A.  Issue declaratory relief declaring the School Board's removal of books to constitute unconstitutional viewpoint discrimination and its indefinite restriction of books to constitute an unconstitutional restraint on protected speech.

93

B.      Issue preliminary and permanent injunctive relief requiring the School Board and its agents, employees, and successors in office to restore to the libraries within the School District the Removed Books, consistent with the recommendations of the District Review Committees.

C.      Issue preliminary and permanent injunctive relief requiring the School Board ~~and its agents, employees, and successors to restore the Targeted Books currently subjected to restricted access to their previous status~~to resolve all pending book challenges in a reasonable time period, but no later than 30 days after issuance of such an injunction, and restore to the libraries within the School District the Restricted Books found to be appropriate for the age group or grade level with access to those libraries;

D.      Award Plaintiffs' costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. § 1988; and

E.      Grant such other and further relief as the interests of justice may require.

Respectfully submitted,


Dated: ~~July 21, 2023~~October 4, 2024    */s/ Shalini Goel Agarwal*

---

Lynn B. Oberlander*
~~Kamera E. Boyd~~*
**BALLARD SPAHR LLP**
1675 Broadway, 19th Floor
New York, NY  10019-5820
Telephone: 212.223.0200
Facsimile: 212.223.1942

~~Paul J. Safier~~*
~~Shawn F. Summers~~Mike Kilgarriff**
Catherine Warren
**BALLARD SPAHR LLP**
1225 17th Street, Suite 2300
Denver, CO 80202
Telephone: 303.292.2400
Facsimile: 303.296.3956

Matthew G. Kussmaul**
Facundo Bouzat*
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA  19103
Telephone: 215.864.8500
Facsimile: 215.864.8999

Kirsten Fehlan*
**BALLARD SPAHR LLP**
999 Peachtree Street, Suite 1600
Atlanta, GA 30309
Telephone: 678.420.3000
Facsimile: 678.420.9401

Kristen A. Petagna**
**BALLARD SPAHR LLP**
700 East Gate Drive, Suite 330

Mount Laurel, NJ 08054
Telephone: 856.761.3400
Facsimile: 856.761.1020

Goldie Fields*
**BALLARD SPAHR LLP**
2029 Century Park E, Ste 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4338
Facsimile: 424.204.4350

Shalini Goel Agarwal (FBN 90843)
~~Kristy Parker~~Ori Lev*
**PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
Telephone: 202.579.4582
Facsimile: 929.777.8428

~~John Langford*~~
~~**PROTECT DEMOCRACY PROJECT**~~
~~82 Nassau Street, #601~~
~~New York, NY 10038~~
~~Telephone: 202.579.4582~~
~~Facsimile: 929.777.8428~~

*Admitted pro hac vice*

***Pro hac vice application forthcoming*

*Attorneys for Plaintiffs PEN American Center, Inc., ~~Sarah Brannen, Lindsay Durtschi,~~ Benjamin Glass, George M. Johnson, ~~David Levithan,~~ Kyle Lukoff, Ann Novakowski, Sean Parker, Penguin Random House LLC, Ashley Hope Pérez, ~~Erica Roy,~~and Christopher Scott Satterwhite~~, and Carin Smith~~*

**INDEX OF EXHIBITS TO SECOND AMENDED COMPLAINT**

| **EXHIBIT NUMBER** | **DESCRIPTION** |
|---|---|
| Exhibit 1 | Escambia County School Board Policy Manual for Educational Media Materials |
| Exhibit 2 | School Materials Review Committee Recommendation for *The Perks of Being a Wallflower* |
| Exhibit 3 | District Review Committee Decision on *The Perks of Being a Wallflower* |
| Exhibit 4 | Appeal of Decision on *The Perks of Being a Wallflower* |

| Exhibit 5 | Challenge Form for *When Wilma Rudolph Played Basketball* |
| Exhibit 6 | Challenge Form for *The Kite Runner* |
| Exhibit 7 | Challenge Form for *The God of Small Things* |
| Exhibit 8 | Challenge Form for *The Handmaid's Tale* |
| Exhibit 9 | Challenge Form for *Uncle Bobby's Wedding* |
| Exhibit 10 | Challenge Form for *Milo Imagines the World* |
| Exhibit 11 | Challenge Form for *And Tango Makes Three* |
| Exhibit 12 | Challenge Form for *When Aidan Became a Brother* |
| Exhibit 13 | District Review Committee Decision on *All Boys Aren't Blue* |
| Exhibit 14 | Challenge Form for *All Boys Aren't Blue* |
| Exhibit 15 | Appeal of Decision on *All Boys Aren't Blue* |
| Exhibit 16 | Challenge Form for *New Kid* |
| Exhibit 17 | District Review Committee Decision on *Drama* |
| Exhibit 18 | Challenge Form for *Drama* |
| Exhibit 19 | District Review Committee Decision on *The Bluest Eye* |
| Exhibit 20 | Challenge Form for *The Bluest Eye* |
| Exhibit 21 | District Review Committee Decision on *The Nowhere Girls* |
| Exhibit 22 | Challenge Form for *The Nowhere Girls* |
| Exhibit 23 | District Review Committee Decision on *Push* |
| Exhibit 24 | Appeal of Decision on *Push* |
| Exhibit 25 | Challenge Form for *Out of Darkness* |
| Exhibit 26 | Challenge Form for *Beyond Magenta* |
| Exhibit 27 | Challenge Form for *The Freedom Writers Diary* |

| Exhibit 28 | Challenge Form for *Concrete Rose* |
| Exhibit 29 | List of 119 Books Challenged Prior to July 1, 2023 that Remain Restricted |