1       **UNITED STATES DISTRICT COURT**
        **NORTHERN DISTRICT OF FLORIDA**
2            **PENSACOLA DIVISION**

3

PEN AMERICA CENTER, INC.; SARAH        )
4  BRANNEN; LINDSAY DURTSCHI, on behalf  )
   of herself and her minor children;   )
5  BENJAMIN GLASS, on behalf of himself  )
   and his minor child; GEORGE M.        )
6  JOHNSON; DAVID LEVITHAN; KYLE LUKOFF;  )
   ANN NOVAKOWSKI, on behalf of herself  )
7  and her minor child; PENGUIN RANDOM   )
   HOUSE LLC; SEAN PARKER, on behalf of  )
8  himself and his minor child; ASHLEY   ) Case No: 3:23-CV-10385
   HOPE PEREZ; ERICA ROY, on behalf of   )
9  herself and her minor children;       )
   CHRISTOPHER SCOTT SATTERWHITE, on     ) Pensacola, Florida
10 behalf of himself and his minor       ) September 12, 2024
   child; and CARIN SMITH, on behalf of  )
11 herself and her minor children,       ) 1:03 p.m.
                                         )
12            Plaintiffs,                )
                                         )
      v.                                 )
13                                       )
   ESCAMBIA COUNTY SCHOOL BOARD,         )
14                                       )
              Defendant.                 )
15 _____)

16

17

18        **TRANSCRIPT OF ORAL ARGUMENT**
     **BEFORE THE HONORABLE ZACHARY C. BOLITHO**
19        **UNITED STATES MAGISTRATE JUDGE**
              **(Pages 1 through 97)**
20

21

22

23

24        *Julie A. Wycoff, RMR, CRR*
      *Official United States Court Reporter*
25      *(850) 470-8196 * julieawycoff@gmail.com*

```
 1   APPEARANCES:

 2

 3   For Plaintiffs:          Ballard Spahr, LLP
                              by:  PAUL JOSEPH SAFIER and
                                   LYNN BETH OBERLANDER
 4                            1735 Market Street
                              51st Floor
 5                            Philadelphia, Pennsylvania 19103
                              (215) 864-8266
 6                            safierp@ballardspahr.com
                              oberlanderl@ballardspahr.com
 7

 8

 9   For the Defendant:       Rumberger Kirk & Caldwell PA
                              by:  NICOLE S. SMITH and
                                   JEFFREY J. GROSHOLZ
10                            101 North Monroe Street
                              Suite 1050
11                            Tallahassee, Florida 32301
                              (850) 222-6550
12                            nsmith@rumberger.com
                              jgrosholz@rumberger.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          **P R O C E E D I N G S**

2          *(Call to Order of the Court.)*

3               THE COURT:  Good afternoon, everyone.  Welcome to the

4     U.S. District Court here in Pensacola.  We're on the record now

5     in PEN America Center Incorporated v. Escambia County Schools,

6     Case Number 3:23cv10385.

7               Counsel, please make your appearances for the record.

8               MS. OBERLANDER:  Lynn Oberlander for plaintiffs.

9               MR. SAFIER:  Paul Safier for plaintiffs.

10              THE COURT:  And who will be handling your argument?

11    Ms. Oberlander, will that be you?

12              MS. OBERLANDER:  I'll be handling the waiver, the

13    inadvertent disclosure argument, and Paul will be handing the

14    legislative privilege.

15              THE COURT:  Okay.  Thank you.

16              MS. SMITH:  Good afternoon.  Nicole Smith on behalf of

17    Defendant Escambia County School Board.  I'll be handling the

18    argument as to the inadvertent disclosure.

19              THE COURT:  Okay.

20              MR. GROSHOLZ:  Good afternoon, Your Honor.  Jeffrey

21    Grosholz, also on behalf of Escambia County School Board.  I

22    will be handling the argument on the Motion for Protective Order

23    and Motion for Restrictions.

24              THE COURT:  Thank you.

25              This matter is on the docket today for oral argument

1    regarding a number of motions.  First, we have the School

2    District's renewed Motion for Protective Order Asserting

3    Legislative Privilege, which is Document Number 107.  We then

4    have the School District's Motion for Restrictions on Any Board

5    Member Depositions that may be authorized, Docket Number 108.

6    Then we have the School District's Motion for an Order

7    Permitting the Defendant to Retain Inadvertently Disclosed

8    Information, which is Docket 110.

9         The plaintiffs have responded in opposition to all

10   three of those motions.

11        I've reviewed all of your papers, as well as the case

12   law here, and my hope today is primarily to get some questions

13   answered and also clarify a couple of things.  There may be --

14   narrow a couple of things that will hopefully help me as I work

15   towards drafting an order resolving all of these various issues.

16        Procedurally speaking, what I would like to do is to

17   first take up the legislative privilege issue.  I think that's

18   the more complicated issue that will probably take a little more

19   time, or at least that I have more questions on; and then after

20   we have exhausted our discussion of that question, then we will

21   go to the inadvertent disclosure issue.

22        I promise everybody that I'll give you an opportunity

23   to say all that you have to say.  Of course, we have a court

24   reporter here, so please come to the podium.  Please make sure

25   that we're not having cross-talk.  Again, everybody will get an

```
 1    opportunity.  There's no need to interject.  If you don't like
 2    something the other side has said, I'll give you an opportunity
 3    to respond to that when it is your chance.
 4            And I apologize in advance that I will be interrupting
 5    you with questions.  I think that probably, although I'm sure
 6    you have things that you want to say, the best use of probably
 7    all of our time is for you to address questions that I have.
 8    But I assure you that I will give you ample time if my questions
 9    haven't touched on something that you think I need to know.
10    I'll certainly give you an opportunity to discuss whatever it is
11    that you want to discuss.
12            So because these are the defendants' motions with
13    respect here first to the legislative privilege issue,
14    Mr. Grosholz, the floor is all users.
15            MR. GROSHOLZ:  Thank you, Your Honor.  And may it
16    please the Court.
17            I've -- the light's on, so I think I'm good to go; is
18    that...
19            THE COURT:  You're good, yes.
20            MR. GROSHOLZ:  Okay.  Thank you, Your Honor.
21            The Court should grant the Board's motion for
22    legislative privilege because the act by the School Board of
23    voting to either remove or restrict access to these books was
24    legislative in nature, and therefore the school board members
25    are entitled to the legislative privilege.
```

1          I think it's important to get out of the way that

2     plaintiffs do not dispute that the school board members, if they

3     are acting within their legislative capacity, would fall within

4     the protection of the privilege.  And plaintiffs also do not

5     dispute that the Board, the legal entity, can raise legislative

6     privilege on behalf of its school board members.

7          Today's dispute focuses on whether the actions were

8     legislative in nature.  And while there is no case that is on

9     all fours, I think looking at the case law, specifically the

10    examples that we've been given by the Eleventh Circuit, show why

11    these actions were legislative rather than what the Eleventh

12    Circuit has generally referred to as administrative.

13         And when you look at the cases, the only two examples

14    that we are aware of where the Eleventh Circuit has carved out

15    actions by legislative members as being not legislative are

16    actions related to personnel decisions and actions related to

17    zoning enforcement.  The other cases that are cited and the

18    other cases that exist in the Eleventh Circuit where the

19    legislative body is acting, they are considered legislative and

20    therefore entitled to the privilege.  And so I think it can help

21    to look at how this all began.

22         So the School Board's duty here begins with the

23    legislative mandate in Section 1006.28.  And that requires that

24    the Board maintain the contents of its school libraries, and it

25    also requires that the Board have a process and policy in place

1    that allows interested citizens to object to materials in those

2    libraries.  And within that statute, it says the Board must

3    provide for a resolution.

4           So if we look at the *Hernandez* case, which was the

5    Fifth Circuit when it was binding on this Court, in *Hernandez*

6    the old Fifth Circuit said actions taken in furtherance of

7    duties are legislative in nature.  So here the Board is acting

8    pursuant to a duty, but -- and I think this is an important

9    point to make -- even without this legislative mandate, the

10   Board would still be entitled to the legislative privilege

11   because the ultimate decision by the individual board members,

12   those board members are acting within their discretionary

13   authority each granted to them.

14          THE COURT:  So I noticed that, I think in the briefing

15   and in some of the cases, there are cases that seem to harp on

16   the man -- that there was some mandatory duty, and then there

17   are other cases that -- and they use that, it seems like, to say

18   that's one of the factors favoring it being found legislative.

19   Then there are other cases where they're saying, you know, they

20   were doing this in an exercise of their discretion, and

21   therefore that is why it was legislative.

22          So how do you think I reconcile those two things?  And

23   is it one or the other?  Does it just depend?  Is it both?

24          MR. GROSHOLZ:  Yes, Your Honor.  And I think -- I

25   think I can walk you through with a couple examples.

1        So I don't think it's an either-or, and I think this

2    is a good example of where it is both.

3        So at the beginning, it is mandatory in that the Board

4    must have this policy, but it is discretionary in that each

5    board member can decide how they're going to vote.  So this is

6    not a mechanical application of a policy; it's not simply a

7    rubber-stamping.

8        And so to use some of the examples the Eleventh

9    Circuit has given, personnel decisions, right?  The Eleventh

10    Circuit has said personnel decisions are not legislative, and

11    Florida law actually supports that, specific with school boards.

12    In Florida the way personnel decisions are made, the

13    superintendent offers up names for appointment, retention, or

14    termination to the School Board.  The School Board, by Florida

15    law, can only reject the superintendent's recommendations for

16    good cause.

17        So essentially, the Board is more or less bound by the

18    superintendent's recommendations.  So there you have a mandatory

19    duty, but also the actions by the Board itself are more

20    mandatory in nature, hence administrative.

21        On the other side of that, you have budgetary reasons,

22    and budget-making is an example that has been considered

23    legislative.  So, again, under Florida law, the School Board

24    must have a budget.  It must set a budget.  However -- and this

25    is where the discretionary factor comes in -- the Board has the

1  discretion in which how much money, for example, to set aside

2  for cash reserves, how much money to set aside for capital

3  outlay projects.  So again, it's beginning with the mandatory

4  duty, but the end result is the Board exercising its discretion.

5  And in exercising --

6      THE COURT:  So is that -- I think it's the *Woods* case

7  from the Eleventh Circuit that deals with this question about

8  some jailed inmates have sued county commissioners about them

9  not adequately equipping the jail or jail conditions.  And in

10  finding that that particular action by the commissioners was

11  legislative, the court talked about how they had a mandatory

12  duty to adopt a budget.

13      So if I'm understanding you correctly, your argument

14  is that just as the county commissioners in *Woods* had a

15  legislative -- a statutory duty to create a budget, the School

16  Board here had a statutory duty to create a book-review policy?

17      MR. GROSHOLZ:  Yes, Your Honor.

18      THE COURT:  And then taking that just one step, just

19  make sure I'm understand how you viewed these things.  So then

20  that's the mandatory part is that there was a state statute

21  saying thou shall do.  But then underneath that, how things were

22  actually done under that policy or that legislative state

23  mandate is discretionary?

24      MR. GROSHOLZ:  Absolutely, Your Honor.  And *Woods*, I

25  think, is a perfect example from that, right?  In *Woods*, the

1     state says thou shall -- to use Your Honor's words -- thou shall

2     have a budget.  But the county commissioners there had the

3     discretion in how to allocate those resources, right?  The

4     plaintiffs in *Woods* were upset that -- I forget the specifics,

5     but something to the effect of the jail was not receiving enough

6     resources.  And in finding that the decision was legislative, it

7     was because the county commissioners had the discretion over how

8     they allocate their resources.

9            Here, too, the Board must have a policy, but in

10    deciding whether to vote or how to vote on these books --

11    whether to remove them, to restrict them -- the Board is

12    exercising its discretion.  And we can actually see that with

13    the books that are being challenged.  Some were removed from all

14    the libraries; some are restricted to certain grade levels; some

15    are restricted for elementary, high school, middle school.

16           So, again, it is not this mechanical rubber stamp.

17    And, in fact, the Board actually went against its own District

18    Review Committee.  So these decisions coming up, the Board is

19    not, again, rubber-stamping something from a subordinate entity.

20           THE COURT:  So if I got you a process question, just

21    to make sure that I'm accurate on how this worked on the ground,

22    at the board level, the -- there was a challenge made by a

23    member of the community.

24           MR. GROSHOLZ:  Yes, Your Honor.

25           THE COURT:  And then that triggers a review.

1          MR. GROSHOLZ:  Yes, Your Honor.

2          THE COURT:  That review is done by this committee.

3          MR. GROSHOLZ:  Yes, Your Honor.  The Board has what's

4    called a District Review Committee; that is, media specialists,

5    teachers.  They review the book, come to a decision, and that

6    decision can be final.  However, the policy allows for an appeal

7    up to the Board.

8          THE COURT:  Okay.

9          MR. GROSHOLZ:  And so the challenger in this instance

10   appealed the District Review Committee -- well, in all

11   instances, rather -- appealed the District Review's Committee

12   decision to the Board, and then the Board made a decision.

13         THE COURT:  Okay.  And so as a logistical matter, once

14   that appeal of the review committee is lodged, what happens?  It

15   gets put on a Board agenda?

16         MR. GROSHOLZ:  Yes, Your Honor.

17         THE COURT:  So walk me through that process.

18         MR. GROSHOLZ:  Yes, Your Honor.  And so the way that

19   works is -- exactly:  It becomes a Board item on an agenda.  The

20   Board considers it in a public forum.  Public opinion is

21   permitted, public comment.  The Board deliberates, it debates,

22   then it ultimately votes.

23         And if we look at the *DeSisto* case, the Eleventh

24   Circuit said public -- acting in response to public opinion,

25   debating, and voting all were the hallmarks of the legislative

1    process.  And so that is exactly what happens in these cases.

2            THE COURT:  In terms of the placement on the agenda, I

3    mean, is it placed on there as a particular book, or are

4    there -- is it all these books at once?  Are they being taken up

5    one at a time at different board meetings or all at the same

6    board meeting?

7            MR. GROSHOLZ:  So it -- the books in question, the ten

8    that were removed were -- some were considered at the same

9    meeting; some were considered at different meetings.  It's just

10   a matter of, you know, when those challenges came in.  However,

11   the votes themselves are individual.  So the Board is voting.

12           So, for example, one of the books in question -- a

13   good example is a February 2023 board meeting.  There, three

14   books were under consideration:  *And Tango Makes Three, All Boys*

15   *Aren't Blue, When Aiden Became a Brother.*  The Board

16   individually voted on all three of those books, and individual

17   determinations were made for all three books.  It was not:

18   We're voting to remove all three of these books in one fell

19   swoop.  Each book was offered its own agenda item.

20           So they are -- I don't know if you've ever seen a

21   school board agenda, but there's a consent agenda and then

22   there's action items, usually.  And the consent agenda is where

23   things are kind of lumped together.  These are in the action

24   items, which means they are individually taken up by the School

25   Board and the school board members offer their opinions, they

1    deliberate, they debate.

2         A good example is *The Bluest Eye*.  *The Bluest Eye* was

3    originally going to be removed from all libraries across the

4    entirety of the school district.  However, the Board came to a

5    consensus and decided to restrict it only to 11th and

6    12th grade.

7         THE COURT:  And so with respect to these particular

8    books that we're talking about here, was there actually public

9    comment on all of them, or were -- I know from the Complaint it

10   appears that there was public comment at least on some of them,

11   but were members of the community there talking about each one

12   of the books?

13        MR. GROSHOLZ:  To my knowledge, yes.  And what I would

14   say is that there would have been the opportunity for all of

15   them as well, Your Honor.  I would have to go review the

16   YouTube -- all these meetings were publicly available.  The

17   Board broadcasts and archives all of its meetings online.  But I

18   know that the opportunity was there for public comment on all

19   these books.  So the public was given an opportunity, and I

20   believe there was public comment on all of them.

21        So again --

22        THE COURT:  And then my recollection from the -- from

23   the Complaint to the other documents is that some of these votes

24   were close in -- there were different, for lack of a better

25   description, different alignments of board members on particular

1    books; is that correct?

2         MR. GROSHOLZ:  Absolutely, Your Honor.  *And Tango*

3    *Makes Three* was a 3-2 vote, for example.  Some were 5-0; some

4    were 3-2.  So -- and the makeup of the majority also differed at

5    times.  So, for example, *And Tango Makes Three*, the three board

6    members voting to remove the book were Board Members Williams,

7    Adams, and Fetsko.  On *The Bluest Eye*, however, the vote to

8    restrict the book was Board Members Williams, Slayton, and

9    Hightower.

10        So, again, each book is different.  Each book is a

11   specific individualized determination, and that's where that

12   discretion comes in.  Because each board member is individually

13   exercising their discretion on how they are going to vote.

14        THE COURT:  So as a practical matter then, let's

15   contrast that -- or, you know, you help me.  You're the board

16   lawyer; I'm not.  If the board was going to fire an employee or

17   make a personnel decision, which we know -- as you've said, we

18   don't have a lot of guidance on a whole bunch of different

19   areas, but we do have some guidance that personnel decisions are

20   on a non-legislative side of the line.  What's the process look

21   like for a personnel decision when the Board decides that it's

22   going to fire a teacher?

23        MR. GROSHOLZ:  Yes, Your Honor.  As I said, the way

24   that works is the superintendent compiles the personnel

25   recommendations, submits -- it's usually in the form of a list,

1    and it's usually -- obviously it differs, but usually it's a

2    grouping.  So there will be multiple personnel decisions, and

3    then the board votes on whether to accept or reject.

4         THE COURT:  Would there be public comment on -- is

5    that something that's put out for public comment, that they can

6    have -- that they put out in advance that they're going to be

7    considering this agenda item with respect to these particular

8    teachers, and the public can come and comment and --

9         MR. GROSHOLZ:  So it would be publicly available.  The

10   public would have the opportunity -- generally speaking, not on

11   that specific item, but the public still would have an

12   opportunity to comment or make a public comment just in general.

13   That's -- public comment is a part of the board meeting.

14        But there it would not be, as I said, a -- generally

15   going to set aside a specific public comment section for those

16   types of personnel decisions.

17        THE COURT:  And then there would be a vote on

18   whether -- an up-down vote on whether to accept the

19   superintendent's recommendation.

20        MR. GROSHOLZ:  Unless a board -- yes, unless a board

21   member wanted to take an individual personnel recommendation

22   separately, and that would only be permissible for good cause,

23   as I said.  So, again, it's much more of a mechanical

24   application, and that is why I think that fits very neatly with

25   the Eleventh Circuit's finding that personnel decisions are

1    administrative.

2            Contrasting that is decisions to essentially abolish

3    or eliminate a personnel position.  That is considered

4    legislative.  Because in saying we only need, for example, ten

5    teachers as -- at the school --

6            THE COURT:  But I think the hard thing there is

7    that -- that elimination of positions really, to me, is just an

8    out -- an outplay of the idea of budgetary decisions being

9    legislative in that when you are shutting down a particular

10   program or you are eliminating a position, oftentimes that is a

11   budgetary decision or it has some budgetary implications.

12           Where, here, it doesn't really -- I'm guessing that

13   removing a library book doesn't have a budgetary implication

14   because -- and I guess what I'm getting at is the way that I, in

15   my mind at least -- and you can tell me I'm wrong -- separated

16   an employment decision that this employee is fired versus we're

17   eliminating your position is that there's kind of that budgetary

18   larger picture at issue versus we just don't like you and we

19   don't want you.

20           MR. GROSHOLZ:  Sure.  And I would agree with the Court

21   that removing a book is not necessarily a budgetary decision.

22   What it is is it is a decision which reflects the priorities of

23   the legislative body in saying this book shall not be within the

24   district's libraries because it violates our policy.  The

25   district is policymaking.  It is expressing the priorities of

```
1    the board, and that is where we also see that with the personnel
2    abolishment decisions, right?  Because budgetary decisions --
3            THE COURT:  Talk to me about that policy issue.  So
4    what is the -- what is the policy that the Board is making?  Why
5    isn't the Board just enforcing the state legislature's policy?
6    As I understand the state legislation, the state legislature
7    said these type of books should -- books that do these things or
8    have these things in them shouldn't be in our libraries.  That
9    was the policy judgment.  And then why isn't the School Board
10   just executing the state legislature's policy judgment as
11   opposed to making its own?
12           MR. GROSHOLZ:  Because the Board is ultimately
13   independently, in its discretionary authority, determining
14   whether these books fell within those prohibited categories.
15   So --
16           THE COURT:  I think what I'm getting at is -- this may
17   not be the best analogy, but it's just what came to me, so --
18   those are not always the best things.
19           But is -- you know, I've got young children, and
20   they're learning the three branches of government.  And we talk
21   about the difference between the legislative branch and the
22   executive branch, and it's kind of the Schoolhouse Rock, which
23   is the legislature makes the laws and the executive enforces
24   them.  Why isn't what is being done at the School Board here
25   almost like an executive function where the state legislature
```

```
 1    has made the policy judgment that books that contain these types
 2    of things shouldn't be in there, and the School Board is just
 3    executing that by saying, Well, that book, that book fits that
 4    definition, that book fits that definition.  Similar to how a
 5    police officer takes the -- the legislature has said people
 6    shouldn't do this.  The police officer's out there and says,
 7    Well, that person did that, they go to jail.  Why isn't that
 8    what is happening here?
 9              MR. GROSHOLZ:  So within the context of the School
10    Board, the Board itself is on the legislative side.  It would be
11    the superintendent that is the enforcement.
12              THE COURT:  Well, I understand that.  I'm just asking
13    as a practical matter.  I'm not saying that the School Board
14    here is acting as the executive branch.  I'm just saying isn't
15    that administrative category kind of like an executory function
16    category where you're not actually making policy, you're just
17    executing things.
18              And I'm just trying to see why that's not what the
19    School Board is doing here.  Or maybe it is and you think that
20    even if that is what they're doing, that that's still
21    legislative.  And maybe that's right.  You're not forced to
22    accept my characterization, but I think that's probably how --
23    how, probably, they see it.  So just what's your response to
24    that?
25              MR. GROSHOLZ:  So I would agree with the Court that,
```

1    yes, it does start with the duty.  And within its policy, the

2    Board is acting pursuant to that legislative mandate.  But

3    again, I would go back to the fact that how the Board carries

4    out that policy and the value judgments that the Board is

5    making, that is where that discretionary authority comes in.

6          So the Board is -- in a sense, it is a step removed

7    from the legislative mandate.  Because the criteria that the

8    legislature has handed down, it permits the Board that

9    discretionary authority to determine where the book falls within

10   that.  It is not, as I said, this rote rubber-stamping.  It --

11   the Board is making these individualized determinations for each

12   book, and so there, it creates -- if we're looking at, as you

13   said, that executory action, that -- from our perspective, that

14   discretionary action is kind of that circuit breaker there, if

15   that makes sense.

16         THE COURT:  So what do you think then is your best

17   case?  So if I'm looking here for -- again, I don't have --

18   nothing is going to be on all fours here, but if I'm looking to

19   see, okay, what's the case that supports your view the most?  It

20   doesn't have to be an Eleventh Circuit case.  Just if I could

21   write an opinion here and use a decision as a model, what case

22   do you think I should use as the model?

23         MR. GROSHOLZ:  I think the *Ellis* case is an excellent

24   example, Your Honor.  The *Ellis* case dealt with the local board

25   of registrars whose role was to maintain the local voter rolls.

1          THE COURT:  Depurging the voter rolls.

2          MR. GROSHOLZ:  This is depurging the voter rolls.

3  Exactly.

4          So there you have a state-mandated duty.  The board of

5  registrars is responsible for maintaining the integrity of these

6  voter rolls.  But the board itself -- I believe it was a board.

7  The board of registrars.  Sorry.  County commissioners, town

8  councils -- it's tough to keep them straight.

9          The registrar board there undertook that investigation

10  and, in its discretionary authority, determined that the

11  plaintiffs were not eligible to vote within that county.  So

12  there again, it starts with a mandate.

13          THE COURT:  In there they said the county attorney was

14  also acting legislatively, right?

15          MR. GROSHOLZ:  I believe that is the case.  Yes, Your

16  Honor.

17          THE COURT:  He was just carrying out the board's --

18          MR. GROSHOLZ:  Will.

19          THE COURT:  -- decision to exclude the voters?

20          MR. GROSHOLZ:  Exactly.  So that would be, I would

21  think -- obviously I think many cases support our proposition,

22  but I think the *Ellis* case really reflects that dichotomy well

23  where you -- I think at the beginning, Your Honor said is it an

24  either-or, and, respectfully, I would disagree with that.

25          THE COURT:  I was just asking.

1          MR. GROSHOLZ:  Yeah, I think it -- I think this is an

2     excellent example, as is *Ellis*, of where it's both.  It starts

3     with mandatory, and it finishes with discretionary, and there we

4     see the legislative.  It harmonizes together.

5          THE COURT:  And this might not be a question that you

6     know the answer to, and that's fine.  If you don't, just tell

7     me.  But these -- these books that are at issue in this case,

8     are those books on the library shelves in other school

9     districts?

10         MR. GROSHOLZ:  Yes.  And some I -- yes.  I could not

11    give you the full list, but I am sure -- I know at least some

12    because they've been challenged in other districts.

13         THE COURT:  So in those other districts, the books

14    have been challenged and then the school board has --

15         MR. GROSHOLZ:  A similar --

16         THE COURT:  -- allowed them under a similar process?

17         MR. GROSHOLZ:  Some have -- I know in some districts,

18    some districts have voted to keep some of these books, some have

19    voted to remove them as well.

20          So, for example, Lake County is a good example.  Lake

21    County, in *Tango Makes Three*, the superintendent originally

22    removed the book.  Now it's back on the shelf there.  So Lake

23    County*, And Tango Makes Three* is also a book that is challenged

24    here *as well.  The Bluest Eye* is another book that I know has

25    drawn challenges.

1          THE COURT:  And so all of these school boards would be

2     under the same obligation, though, from the state statute,

3     right?

4          MR. GROSHOLZ:  Yes, Your Honor.  They would all be

5     operating under 1006.28.

6          THE COURT:  And so does the fact that different school

7     boards have done different things with the same book under the

8     same statute help or hurt your argument?

9          MR. GROSHOLZ:  I would think it helps, Your Honor.

10    Because, again, they all operate under the same statute, but

11    varying results shows each individual school board.  The

12    direct -- for example, the direction that the Escambia County

13    School Board, the priorities of the Escambia County School Board

14    are different than the priorities of the Bay County School

15    Board, the Okaloosa County School Board, the St. Johns County

16    School Board.  All 67 counties have individualized priorities,

17    individualized discretionary authority.

18         THE COURT:  But I think that may be some of the

19    complication here is, isn't the question under the statute just,

20    Does the book have this or have that?  How does that individual

21    perspective play into whether the book does or does not have

22    what the statute says that it can't have?

23         MR. GROSHOLZ:  Because I think if you look at the text

24    of the statute itself, it shows how that discretion plays out.

25    And if Your Honor will permit me --

1          THE COURT:  Yeah.

2          MR. GROSHOLZ:  -- I will...

3          So this -- and this is the version of the statute that

4   was in effect for these books.  It is not the current version.

5   So this would have been the 2022 version, but it is materially

6   identical with the -- with one exception.

7          So 1006.28(2)(a), (2)(b):  Any material that is

8          available in a school library must be discontinued if

9          it contains, one, material that is pornographic or

10          prohibited; two, is not suited to students' needs and

11          their ability to comprehend the material presented;

12          three, or is inappropriate for the grade level and

13          age group from which the material is used.

14          So looking at that first factor, the pornographic one,

15   there we have a statutory reference and a statutory definition.

16   But those second and third prongs, Your Honor, the "not suited

17   to student needs and ability" and "inappropriate for grade level

18   and age group," that is a discretionary decision that the Board

19   must make.  The Board has to make that determination.  Are the

20   students -- in our example for the students of the Escambia

21   County School District, does this book, is it suited to their

22   needs and their ability to comprehend the material presented, or

23   is it inappropriate for the grade level and age group?

24          The legislature has given the Board that discretionary

25   ability to make that determination; and in making that

1    determination, that is why the vote is legislative.

2            THE COURT:  So under the -- you said the pornographic

3    reference in the statute cross-references to another definition?

4            MR. GROSHOLZ:  Yes, Your Honor.  It references

5    Section 847.012, which is a criminal statute that defines -- it

6    generally incorporates the obscene -- the Miller obscenity test.

7            THE COURT:  Predominantly appeals to prurient interest

8    and is without serious literary, artistic, political, or

9    scientific value --

10           MR. GROSHOLZ:  And is harmful to minors.  Yes, Your

11   Honor.

12           THE COURT:  Okay.

13           MR. GROSHOLZ:  But those other --

14           THE COURT:  So to make the determination that it is

15   going to be excluded because it's pornographic, then the School

16   Board has to make a determination if it predominantly appeals to

17   the prurient, shameful, or morbid interests and is without

18   serious literary, artistic, political, or scientific value and

19   is harmful to minors, they have to -- the School Board has to

20   make that call too?

21           MR. GROSHOLZ:  If that is the criteria under which the

22   Board is deciding to remove or restrict a book, yes, that would

23   be -- it would have to incorporate that definition.

24           THE COURT:  I want to give you an opportunity because

25   I know the other side is going to -- and I'll give you a chance

1    to speak after them as well, but if you want to preemptively

2    address the waiver issue, I'll give you an opportunity.

3            MR. GROSHOLZ:  Yes, Your Honor.  And --

4            THE COURT:  Before you get to that, I guess there was

5    one other question I forgot to ask, which is, you know, I think

6    in some of the earlier briefing on maybe the apex doctrine

7    issue, there was a reference to -- as to why these particular

8    officials should or should not be opposed to them performing

9    ministerial functions.

10           Why doesn't that undercut the argument here with

11   respect to the legislative privilege?

12           MR. GROSHOLZ:  Yes, Your Honor.  And when using the

13   term "ministerial," the Board's argument related to actually

14   its -- the policy and processes of its staff, not the board

15   members itself.  So the board members, their actions are not

16   ministerial.  The actions of the subordinate staff, that would

17   be where that falls in that ministerial.  And I would have to

18   review our papers.

19           THE COURT:  So you weren't referring to the

20   decision -- the board members were making a ministerial

21   decision; you were saying that whatever function staff members

22   may be performing to carry out the Board's --

23           MR. GROSHOLZ:  Will.

24           THE COURT:  -- will or to prepare them, or whatever,

25   was ministerial?

1          MR. GROSHOLZ:  Yes, Your Honor.  That would be that

2    dichotomy --

3          THE COURT:  All right.  Thank you.

4          MR. GROSHOLZ:  -- that we would --

5          THE COURT:  So now go ahead on the waiver issue.

6          And I have read the briefs you filed last night in

7    Judge Winsor's case with respect to the issue of state public

8    record law.  So I am up to speed on what you guys have filed

9    there, and I think I understand the disagreement, but go right

10   ahead.

11         MR. GROSHOLZ:  Yes, Your Honor.  As to the waiver

12   argument, plaintiffs' argument is that because the Board has

13   participated in discovery and produced documents that

14   essentially the board members -- or that the Board, rather, has

15   waived, on a blanket level, its legislative privilege as to the

16   board members.  And we respectfully disagree obviously.  We do

17   not believe that the waiver has existed here.

18         To start, plaintiffs admit that the Board has produced

19   thousands of documents, and it's probably more like tens of

20   thousands of documents.  But as evidence of the alleged waiver,

21   plaintiffs have put forth three documents, one document for

22   three different board members.  And that does not meet the

23   burden that plaintiffs have to show for a blanket level of

24   waiver of legislative privilege across the board.

25         Plaintiffs are not arguing that these documents are a

1   limited waiver or a waiver only to the subject matter of that

2   document.  Plaintiffs are arguing that those single documents

3   are apparently enough to eviscerate the privilege altogether,

4   and that is simply not the case.

5            THE COURT:  And those are the -- the documents are

6   these email exchanges with what appear to be constituents?

7            MR. GROSHOLZ:  Yes, Your Honor.  Two of them are; one

8   is a bullet-point memo.  And an important thing to note about

9   those is those communications themselves, those are actually not

10  a waiver.  Because as the Northern District held in *League of*

11  *Women Voters v. Lee*, communications with constituents is not a

12  waiver of the legislative privilege.  So this communication with

13  a third party, because it was part of the overall legislative

14  process for that board member, that is not a waiver.

15           So, you see Mr. Adams communicating with a constituent

16  via email; you see Ms. Hightower communicating with a

17  constituent after the fact by email; and Mr. Williams, that

18  bullet-point memo, he actually read that out at the public

19  meeting to the public the night of the vote on *All Boys Aren't*

20  *Blue*, which is what that bullet-point memo are.

21           So each of those are communications with --

22           THE COURT:  And were the -- I read them last night,

23  but I don't remember off the top of my head.  The emails were,

24  they didn't -- they were in reference to a particular book or to

25  all of these books?

1          MR. GROSHOLZ:  So we can take them one at a time.

2          Ms. Hightower was emailed after the fact, and this

3     followed the Board's vote on three books*:  When Aiden Become a*

4     *Brother, And Tango Makes Three, All Boys Aren't Blue*.  However,

5     Ms. Hightower only specifically references *Tango*.  And more

6     importantly, Ms. Hightower actually voted to retain *Tango*, and

7     nothing within her response to that constituent actually reveals

8     her reason.  It does not intrude upon her privileged thoughts.

9     It is merely a communication with a constituent as part of the

10    overall legislative process.

11         For Mr. Adam -- Adams, excuse me -- the concerned

12    constituent also emailed about the same three books:  *Aiden, All*

13    *Boys Aren't Blue, And Tango Makes Three*.  And even there, all

14    Mr. Adams says is I agree with your concerns, I will vote

15    accordingly.  He does not lay out in detail, this is why I am

16    voting to remove these books, this is why I will be voting to

17    remove these books.  Again, you just have a communication with a

18    constituent.

19         As for Mr. Williams, it's a bullet-point list of his

20    understanding, the pros and the cons of *All Boys Aren't Blue*.

21    And, again, this is an expression by a legislative individual,

22    no different than if a congressman was asked, Will you be

23    supporting this piece of legislation.  Right?

24         Marco Rubio --

25         THE COURT:  So I guess that -- so accepting the way --

1    your position is accepting their waiver argument would mean that

2    if a constituent emailed a congressman and said, I want you to

3    vote, you know, against this bill and the congressman said, I

4    plan to, that then you could depose the congressman about why he

5    voted in favor of the bill?

6              MR. GROSHOLZ:  Absolutely, Your Honor.  To accept

7    plaintiffs' position would mean that any communications with

8    constituents by legislators as part of the legislative process

9    would abrogate the legislative privilege, and it would create a

10   chilling effect that would prohibit legislators in the discharge

11   of their duties, part of which is communicating with the public.

12   And that is the precise reason -- one of the reasons why we have

13   legislative privilege is so that legislative officials can

14   discharge their duties unencumbered by these types of lawsuits,

15   civil liability, things of that nature.  And that is why this

16   Court in the *Lee* case said these types of communications are not

17   a waiver of the legislative privilege.

18             So the documents that they have put forth do not even

19   meet the burden of waiver as is.

20             Secondly, the fact is that to accept plaintiffs --

21   again, to accept plaintiffs' argument would mean that the Board

22   by virtue of participating in the suit -- and we raised, I

23   think, some of these arguments on our 119 briefing that the

24   Court reviewed.  The mere fact of participation in suit would

25   essentially mean that the Board, the legal entity, the Board's

1  participation in the suit waives legislative privilege on behalf

2  of all five individual legislators.  And Judge Winsor made a

3  very apt example at our hearing about this when he asked

4  opposing counsel, Are you saying the Florida legislature could

5  waive legislative privilege on behalf of every congressperson in

6  the legislature?  And that's just simply not the case.  That is

7  not how the waiver works.

8          THE COURT:  All right.  I think I understand it.  I'll

9  give you an opportunity to be heard again, if you want to, after

10  I hear from Mr. Safier.

11          Am I saying your last name, correctly?

12          MR. SAFIER:  You are, actually.

13          THE COURT:  All right.  Mr. Safier, the floor is

14  yours.

15          MR. SAFIER:  Very good, Your Honor.

16          MR. GROSHOLZ:  Thank you, Your Honor.

17          THE COURT:  Thank you.

18          MR. SAFIER:  Thank you, Your Honor.

19          So I want to begin with emphasizing the points of

20  agreement.  So we agree that the only issue at stake is are

21  these book-removal decisions legislative or administrative.  We

22  also agree -- and I have one, two -- come as close as I can to

23  quoting Mr. Grosholz that each book removal is a specific

24  individualized determination.  We also agree that the

25  book-removal decisions are not budgetary.

1          I think that's it.  I think that exhausted the areas

2     of agreement.

3          THE COURT:  Well, let me ask you this, because there

4     might be some more that maybe are important to me --

5          MR. SAFIER:  Okay.

6          THE COURT:  -- that they may be inherent in your first

7     statement that the only issue is if they're legislative or

8     administrative.  You're not challenging whether the School Board

9     has appropriately asserted the legislative privilege?

10         MR. SAFIER:  We are not, Your Honor.

11         THE COURT:  Okay.  And you're not challenging whether

12    the affidavit submitted by the board members are sufficient for

13    them to state their desire to have the legislative privilege

14    asserted on their behalf?

15         MR. SAFIER:  We are not, Your Honor.

16         THE COURT:  Okay.  Good.  That is helpful, at least --

17    hey, any narrowing is helpful.

18         MR. SAFIER:  Always helpful.  Always happy to be of

19    service.

20         THE COURT:  Go ahead.

21         MR. SAFIER:  So one of the points that

22    Mr. Grosholz began with is this idea that there's a legislative

23    privilege that has certain carve-outs for personnel decisions

24    and budgetary decisions.  I think that's not the right way to

25    think about it at all.

1          The right way to think about it is there are two types

2  of decisions, legislative decisions and administrative

3  decisions, and there's a test to determine which side a

4  particular decision falls on.  And to be pedantic, I want to

5  begin with the test.  Right?

6          So this is the *Crymes*' decision, right?  It says,

7  "Legislative act involves policymaking."  That's a quote.

8  That's how you define a legislative act.  An administrative act

9  involves "mere administrative application of existing policy*.*"

10          Crymes' decision again:  "A decision by a government

11  body is likely to be, quote/unquote, 'administrative' where,

12  one, the facts utilized in making decision are specific rather

13  than general in nature; two, decision impacts specific

14  individuals rather than the general population."

15          *Woods* decision, which Your Honor referenced:  "An act

16  is deemed legislative rather than administrative or managerial

17  when it is policymaking in a general application."

18          *Brown*:  "A legislative act is characterized by having

19  a policymaking and general application," and so on and so forth,

20  right?

21          So that is the basic test.  And I think, getting back

22  to our agreement about these are decisions focused on individual

23  books, I think it's pretty clear on what side of the dividing

24  line these particular decisions fall.  And I want to make --

25          THE COURT:  I'm going to give you a pet peeve here.

| | |
|---|---|
| 1 | See, when you tell me it's clear, I'm up here thinking, I spent |
| 2 | a lot of time looking at all of this, and I'm hoping this |
| 3 | hearing helps me figure out -- |
| 4 | MR. SAFIER:  Sure. |
| 5 | THE COURT:  -- which side of it -- |
| 6 | MR. SAFIER:  Sure. |
| 7 | THE COURT:  -- it is on.  So I don't think it's fair |
| 8 | to say it's clear.  I actually feel like it's a quite difficult |
| 9 | decision.  Because I think the reality here is that -- it's like |
| 10 | another -- a previous decision I had in a case where I described |
| 11 | the case law as a little bit like going to Baskin-Robbins: |
| 12 | There's a flavor that everybody likes. |
| 13 | And I think that's -- I can look at all of these |
| 14 | cases, and you guys have cited a lot of cases, and I've looked |
| 15 | at all of them.  And I think I can look at -- I can pick out, |
| 16 | oh, this language is helpful for the defendant.  Oh, well, this |
| 17 | case says this, and this is really helpful for the plaintiff. |
| 18 | And then, oh, but this fact here seems really helpful there. |
| 19 | And then at the end of the day, I'm left with, really, I've got |
| 20 | cases on one side that seem to support one view; I've got cases |
| 21 | on the other that seem to support another view.  And there |
| 22 | really isn't anything that I have found that is a -- certainly |
| 23 | not on all fours, and I don't even know that there's anything |
| 24 | that's on threes. |
| 25 | So I think I'm really at, like, you know, is there two |

```
 1   and a half or maybe when the stool falls, it, you know, gets

 2   held up by that half leg.  So --

 3              MR. SAFIER:  I think --

 4              THE COURT:  -- don't tell me it's clear, please,

 5   because then I'm feeling like I'm not very bright because it

 6   seems awful complicated to me.

 7              MR. SAFIER:  That was -- sometimes advocates use

 8   stronger language --

 9              THE COURT:  I understand.

10              MR. SAFIER:  -- than perhaps the circumstances

11   warrant, but I appreciate the admonition.

12              I would say at a minimum, we're at two-and-a-half

13   fours.  I agree that there's no specific, you know, book-removal

14   decision.  The point I was making -- maybe I shouldn't use the

15   word "clear" -- is that it's not like the default is whenever

16   legislature acts, it's a legislative decision, except where it's

17   personnel or zoning.  The law -- the rule is there's a test or

18   it factors.

19              THE COURT:  And I think that's a fair point, and I

20   didn't take --

21              MR. SAFIER:  Right.

22              THE COURT:  -- Mr. Grosholz as saying it had to be one

23   or the other.  I think it's just -- because I think what we're

24   all try to do here --

25              MR. SAFIER:  Sure.
```

1          THE COURT:  -- is find some analogies and to try to

2     take all of these cases and categorize them some way.  And so I

3     think you're right.  I mean, that really is the question.  But

4     let me ask you something, and you tell me why I'm --

5          MR. SAFIER:  Mm-hmm.

6          THE COURT:  -- wrong.

7          So you were talking about policymaking, right?

8          MR. SAFIER:  True.

9          THE COURT:  And would you agree that if the School

10    Board is making a policy decision, that that's a pretty good

11    indication that it's on the legislative side of the aisle?

12         MR. SAFIER:  It depends on what you mean by policy

13    decision, right?  If it's applying policy to an individual case,

14    that's administrative.

15         THE COURT:  If it's making -- if it made a -- if it

16    made a policy, if it was you decided this is going to be our

17    policy that we're going to do this, that would be on the

18    legislative side.

19         MR. SAFIER:  Right.  So if the School Board passed a

20    resolution that said all books about growing up as a black woman

21    in the south will be removed from all school libraries, that

22    would be legislative.  We'd also have a really easy case.

23         THE COURT:  So here's my, kind of, question, though.

24    I read your Complaint.

25         MR. SAFIER:  Mm-hmm.

1          THE COURT:  And your Complaint, in laying out kind of

2     how this all happened, in talking about what the School District

3     is doing here, you say in paragraph 66:  "The School District is

4     reaching this result through two policies."  And then you go

5     through and talk about, you know, under this -- there are

6     multiple paragraphs throughout the general allegations of your

7     Complaint that say, Under this policy, *Slaughterhouse-Five* was

8     this; under this policy, this; under this policy, that.

9          It seems like your Complaint is alleging that the

10    School Board has adopted a policy and is applying that policy

11    and that the application of that policy is what has resulted in

12    the banning of the books.  And so how then would I write a

13    decision that says the School Board wasn't making a policy when

14    it's littered throughout your Complaint?

15         MR. SAFIER:  Sure.  There's a nuance to our case that

16    I don't think either side sort of fully explored in the

17    briefing, but there are essentially two different sets of book

18    decisions we're challenging.  We're challenging book removals --

19    and those are the ten books, and those are what Mr. Grosholz

20    primarily talked about.  So the process there is there's, you

21    know, a citizen complaint; it goes to District Review Committee;

22    it's put on the School Board agenda; and they vote to remove or

23    keep.

24         There's another set of decisions which involve

25    something like 150 books that are book-removal decisions.  And

 1    what happened there is there were policies that were created and

 2    then they're removed in executive way by a superintendent

 3    pursuant to those policies.

 4          So that portion of the Complaint that you're focusing

 5    on just focuses on the restricted books, not the removed books.

 6    But I'll say one additional thing and, sort of, you know, one

 7    thing that discovery does is it sort of allows you to get a

 8    clear picture of the facts.  What's emerging is that --

 9          THE COURT:  But if I could just take you back.  Okay,

10    even if I -- okay, maybe I didn't pick that nuance up in the

11    briefing, but if you're right that -- those are still your

12    allegations in this case, those are still -- it still sounds

13    like that's an aspect of your case.  And are you going to

14    concede, then, at least as it relates to that aspect of your

15    case, that the School Board's -- was making a policy judgment

16    and that the school board members are entitled to legislative

17    privilege with respect to that aspect of your case?

18          MR. SAFIER:  The book restriction as opposed to the

19    book removals?

20          THE COURT:  Yeah, that's what you were --

21          MR. SAFIER:  And that was the point I was just about

22    to get to.  I think what discovery is showing is that the School

23    Board itself did not actually create those policies.  Those

24    policies are created by the superintendent.  And what we're

25    learning through discovery is that the School Board was

1    influential in that process; that they, you know, spoke to the

2    superintendent, spoke to citizens about what the policy should

3    be.  But in, you know --

4         Ms. Smith, you should correct me if I'm wrong because

5    you were at the deposition.

6         But I believe at the 30(b)(6) deposition that was

7    taken a few weeks ago, the deponent --

8         THE COURT:  I don't have any of that in front of me,

9    right?

10        MR. SAFIER:  Right.

11        THE COURT:  So I don't see how I can -- I don't want

12   to -- I don't want to go too far afield.  I just want to kind of

13   come back to -- maybe you're going to amend your Complaint, but

14   that hasn't been done yet --

15        MR. SAFIER:  Correct.

16        THE COURT:  -- and I'm being asked to make a decision

17   here, kind of as the -- what I have as the pleadings and the

18   briefing.  And what that says to me is that at least a fair

19   number of your allegations that go directly to claims that are

20   subject to discovery, that I would assume are things that would

21   be discussed during deposition of the board members, at least as

22   it relates to those, your Complaint specifically refers to them

23   as policies of the defendants.

24        MR. SAFIER:  So there are two ways -- a number of

25   ways, but there are two suggestions that I'd make.  One

1    possibility is just you write the decision a way that says

2    Insofar as alleged, these are policies of the School Board.  The

3    creation of those policies would be subject to the legislative

4    privilege.  I think that would be, you know, a perfectly

5    adequate statement of the law.

6            The other possibility is that the parties could submit

7    supplemental briefing and sort of update, you know, the Court on

8    the state of the law.  Because my understanding, based on the

9    30(b)(6) deposition, which, again, is not in front of Your

10   Honor, is that the Board's position is they didn't create those

11   policies.  The policies were created by the superintendent.

12           THE COURT:  Okay.  So what you're telling me, then, is

13   maybe the -- there's things that if I were to allow deposition

14   of the school board member, there were things that could not be

15   discussed and that we would have to parse out what questions are

16   being asked about the larger group of books, that restriction

17   policy versus the -- I'll just say "banning" decision.  Is that

18   what you're saying?

19           MR. SAFIER:  Yeah.  That's a possibility, and that

20   would be a perfectly coherent and justifiable line to draw.

21           THE COURT:  Okay.  Thank you.

22           MR. SAFIER:  I want to -- you know, getting back to

23   Mr. Grosholz's argument, one of the distinctions that he relied

24   a lot on was mandatory versus discretionary.  And I must

25   confess.  I don't see the cases making that particular

 1    distinction.  I mean, I read out earlier the tests and factors

 2    that the courts rely on.  And even based on some of his

 3    representations about what's happening, as I understood his

 4    description of personnel decisions --

 5            THE COURT:  Well, if we look at --

 6            MR. SAFIER:  -- those are mandatory, right?

 7            THE COURT:  Well, if we look at *Bogan*, I think, you

 8    know, the part where that discretionary discussion may be coming

 9    is *Bogan* says that the substance at issue there bore the

10    hallmarks of traditional legislation, and it says -- it

11    reflected a discretionary decision.

12            So I think that's why there's been a discussion of

13    discretionary versus mandatory.

14            MR. SAFIER:  Right.  But the key to *Bogan*s is that it

15    was a budgetary decision, right?

16            THE COURT:  Mm-hmm.

17            MR. SAFIER:  What the court said is if you just fired

18    this person directly, that's administrative; but if you go

19    through the step of doing so by limiting the department or

20    office for budgetary reasons, that's legislative.  The

21    discretionary piece didn't seem to drive the holding.

22            But the other point I was going to make is that based

23    on Mr. Grosholz's description, and maybe I misunderstood, is

24    that when the School Board makes personnel decisions, those are

25    also mandatory in the sense it has to make a decision.  Right?

1    The superintendent brings an issue and says, you know, we have

2    an issue with this teacher, either you vote up or down.  We know

3    the resulting decision is administrative.  Right?  The law is

4    crystal clear that if you fire just one employee, that's

5    administrative.  So that means that the mandatory-ness of the

6    decision can't be doing any work here.

7            THE COURT:  So how do you -- how do you explain or

8    address one of the things that's really been bothering me here,

9    which is there's either overruling the committee, there's debate

10   and discussion between the board members, there's disagreement

11   by the board members, there are divided votes on books, there

12   are restrictions being imposed on certain books that aren't

13   being opposed on other books.  And it just -- it's hard for me

14   to kind of just place that easily on the administrative side

15   because it just seems like there's a lot of -- a lot of thought

16   and, for lack of better description, line-drawing being done.

17           And one of the things that the Eleventh Circuit has

18   said in the *Yarnell* decision is that a hallmark of legislative

19   activity is line-drawing.  And when there is line-drawing in

20   that the legislative body is finding where the line is, that

21   that's a legislative decision.

22           So how do you get away from -- how do you kind of

23   alleviate my concern there?

24           MR. SAFIER:  I think the cases do say repeatedly that

25   the, kind of, "looks like a duck, quacks like a duck" analysis

```
 1    doesn't carry the day, right, when legislators are voting, when
 2    they're deliberating.  Ultimately, whether that's going to lead
 3    to something legislative or administrative is going to depend on
 4    whether it's focused on a specific individual or entity, whether
 5    it has rule-like qualities -- and I want to just quote some
 6    decisions, right?
 7              So the Crymes case:  The mere fact that a, quote,
 8    "local legislator may have voted on issue does not necessarily
 9    determine that he or she was acting -- "
10              THE COURT:  Agree.
11              MR. SAFIER:  " -- in a legislative capacity."
12              THE COURT:  Yep, right.
13              MR. SAFIER:  And the cases say that over and over
14    again.
15              A paradigmatic example of administrative decision, as,
16    you know, Mr. Grosholz said, is zoning decisions.  Those are,
17    you know, variance -- decisions to deny a variance, to grant a
18    variance, approve a plan.  Those are public meetings.  People
19    say things --
20              THE COURT:  But there are --
21              MR. SAFIER:  -- and they vote.
22              THE COURT:  I think it's only the zoning enforcement
23    decisions that fall on the non-legislative side.  There are a
24    series of decisions where they're making zoning decisions where
25    there -- decisions where the, you know, the board of whatever it
```

might be, has actually flipped a zoning commission's decisions,

and they've, you know, said that those were legislative.

MR. SAFIER:  I think it depends on whether it's a

zoning ordinance or rule or whether it's a one-off decision.  So

if there's a variance -- I want to reference the *Crymes* decision

which involved a denial of development permits.

So the Court says there at -- I will get the pincite

for you -- 1487.  The Court says, "Based on the above factors,

the vote of the Board of Commissioners to remove Pleasant Hill

Road from the list of truck routes was probably legislative in

nature."

So there, you have a board saying we're going to

remove this.  That's a sort of ordinance application.  That's a

sort of creation of policy.

That action, however, did not apply to *Crymes*.

Rather*, Crymes*' complaint focuses on the Board's decision to

uphold the denial of the development permit for *Crymes*' property

on the ground that surrounding roads were in need of

improvement.  The decision to deny *Crymes*' application is the

application of policy -- right, the policy about trucks and

roads -- to a specific party.

So I think that lays it out pretty clearly, right,

when a board is meeting, deliberating, getting public comment,

and it makes a rule or a general policy like, you know, we're

going to create a zoning moratorium, a building moratorium,

1    we're going to change the zoning classification of these roads.

2    That's legislative.  But when it makes a one-off decision

3    focused on a specific person or entity --

4             THE COURT:  Then what do you do with *Ellis*?

5             MR. SAFIER:  Which case?

6             THE COURT:  *Ellis*, which is Eleventh Circuit decision

7    where there was these --

8             MR. SAFIER:  Right.

9             THE COURT:  -- specific voters were removed from the

10   rolls by the Board of Elections, or whatever the entity --

11            MR. SAFIER:  Right.

12            THE COURT:  -- was, and the Eleventh Circuit says that

13   the Board was entitled to legislative immunity because the

14   decision to remove this specific voter from the rolls was

15   legislative.

16            MR. SAFIER:  The way I read the *Ellis* decision is the

17   key driving it was that there was a legislative committee that

18   did investigation.  Right?  And so -- I mean, there's this sort

19   of main --

20            THE COURT:  But here, there was a library review

21   committee that did an investigation and made a recommendation

22   that -- I mean, that's the same thing that happened in *Ellis*.

23   There's a committee that made a recommendation.

24            MR. SAFIER:  The review committee is not part of the

25   Board.  So what happened in *Ellis* is just like, you know, the

1    House will have an investigation or the Senate will have an

2    investigation.  It was similar to that.  So it was investigation

3    that took place within the legislative body --

4              THE COURT:  I guess -- sorry to interrupt, but I guess

5    what I'm getting at is this is where I see, you know, the

6    difficulty is.  Because you are telling me it's -- if it's just

7    this decision about this single person and it relates to this

8    kind of one-off, as opposed to a general thing, then it's

9    necessarily administrative.  Well, then *Ellis* doesn't -- if

10   that's the rule, then *Ellis* was wrongly decided, and the

11   Eleventh Circuit hasn't said that.

12             MR. SAFIER:  The -- most of the cases do say that

13   *Ellis* is slightly different, but the way I understand *Ellis* is

14   as follows:  There's a distinction that's like the one I've been

15   talking about between is it specific versus is it general.  Then

16   there's another distinction the law draws, which is, is it part

17   and parcel of the legislative process.

18             And I think if you look at *Ellis*, what the Court was

19   saying there is part of what legislators paradigmatically do is

20   have these investigative committees that go and investigate

21   things.  And that, not the fact that it involved individual

22   people, was what made it ultimately legislative in that case.

23             So I think *Ellis* falls in a slightly different

24   category.

25             THE COURT:  What would you -- tell me what you think

1    are the hallmarks of traditional legislation.  Because we see --

2    a number of cases will say it was legislative because it had the

3    hallmarks of traditional legislation.  Other cases say it's

4    legislative if it has the hallmarks of traditional legislation.

5              What are the hallmarks of traditional legislation from

6    your perspective?

7              MR. SAFIER:  Generalized rulemaking.  You know, you

8    write down a decision, maybe you don't necessarily have to, but

9    it's not an action.  Right?  Part of the way I'm thinking about

10   it is when the Board -- you know, think of a, you know, a

11   contrast we discussed earlier.  If the Board had passed a rule

12   that said no books about growing up black in the south will be

13   in our libraries -- not that they would, I'm not saying they

14   would, but let's say they did that.  Right?  That's legislative.

15   It would be written down.  And if we did a challenge to it, we

16   would know how to challenge.  It would say that's facially

17   unconstitutional.  We'd say it's over-inclusive,

18   under-inclusive.  We'd have a general sort of framework to work

19   with.  Administrative decisions, again, focus on specific

20   individuals.

21             You know, I think part of why we need to get at the

22   motivational piece of this is because you don't have what you

23   have when you have legislation, which is a lot to look at and

24   sort of say is it over-inclusive, is it under-inclusive, is it

25   facially discriminatory -- all the things you do when you're

1    challenging rules or legislation.

2         THE COURT:  Because I would have thought -- I mean, to

3    me, when I read that, I think hallmark's there -- but again,

4    maybe it's because I'm stuck in this, you know, fifth grade

5    civics with my son -- is, you know, hallmarks of traditional

6    legislation, you know, we have public comment, we have a

7    hearing, we have a debate, we have a vote by a legislative body,

8    and then an execution by the executive branch official.

9         And, you know, you even see -- I think it's the *Brown*

10   case where the Eleventh Circuit says:  "Voting, debating, and

11   reacting to public opinion are manifestly legislative duties."

12        And if we look at that, I mean, you would agree,

13   wouldn't you, there was voting, there was debating, and there

14   was reacting to public opinion?

15        MR. SAFIER:  The Court also says in *Brown*:  "A

16   legislative act is characterized by having a policymaking

17   function and a general application."  So I'll say that point.

18        But I think the response to that argument, I get this

19   sort of intuitive appeal, is the cases say over and over again

20   voting isn't determinative, right?

21        THE COURT:  I'm not just saying voting.  I'm saying --

22        MR. SAFIER:  Right.

23        THE COURT:  -- because I think, you know, you can have

24   situations where we know, like, consent agenda items, right,

25   things just go on there, and they vote and everything gets voted

1    on.  And, you know, you've been to board meetings, I've been to

2    board meetings.  You've probably been counsel to boards or

3    corporations.  And we know, you know, there are things that are

4    voted on that are just pro forma.  We have to vote.  Everybody

5    agrees, you know, we vote.  And then there are other things that

6    are robustly discussed, debated.  And those things are also

7    voted on, and there -- I think the case law is trying to divide

8    those two things.

9         MR. SAFIER:  I mean, to give you an example that's

10   germane to this case, one of the things that happened sort of in

11   the history of the Board's grappling with this book-removal

12   decision is that they fired the superintendent.  They fired Tim

13   Smith.

14        Now, I've seen a YouTube video of that meeting.

15   People debated.  People had comments.  There was a vote.  It's

16   unambiguous under Eleventh Circuit law that was administrative.

17   Right?  We know that.  We're all clear on that -- not to use the

18   word "clear," but we're all -- that's -- I think that's pretty

19   well settled.

20        So it can't be the case that those sort of formal

21   indicia of legislation -- was there voting, was there

22   deliberation, was there public comment -- carries the day.  It

23   has to be something else.

24        THE COURT:  I know in the briefing and I think in

25   your -- in the hearing with Judge Winsor that I read the

1    transcript of, you know, one of the things I heard being said

2    there that I haven't heard you say was about this prospective

3    issue, about whether it's prospective.  And I don't -- didn't

4    really understand that argument because -- so can you explain to

5    me why you think that is key and why it's not met here.

6              MR. SAFIER:  Sure.

7              THE COURT:  Why these aren't prospective.

8              MR. SAFIER:  Sure.  I mean, every decision,

9    administrative or legislative, is going to have some, you know,

10   down -- you know, downstream effects, right?  We all know that.

11   That's -- time moves forward, not backward.  So we all agree on

12   that, right?  I think what the cases say is the prospective part

13   of the decision has to be that the fact that the rule or law is

14   still in effect, continues to have implications, apart from the

15   specific person issue.

16             So when you fire someone -- and you just fire them,

17   right?  They're fired -- there are implications for that, you

18   know, district-wide.  They can't, you know, do their job

19   anymore.  If you were, you know, a visiting music teacher, they

20   can't go to all the schools, you know, that kind of thing,

21   district-wide implications, that's administrative.  But it

22   doesn't have -- there's no law or rule that's still in effect

23   still having implications.

24             THE COURT:  And that's why --

25             MR. SAFIER:  If you eliminate a position, right, we

1   get rid of music teachers completely in our school, then, right,

2   you have prospective.

3          THE COURT:  Correct.

4          MR. SAFIER:  Right.

5          THE COURT:  I'm with you.  And here's why, though, I'm

6   confused.  Because you're seeking injunctive relief, and in

7   order to seek injunctive relief, you have to show there is

8   prospective harm.  That's one of the key things to get an

9   injunction is you have to show that you've been harmed.  If

10  you've just been harmed in the past, you don't get an

11  injunction.  If you get a declaratory judgment that you were

12  harmed, maybe you get damages, but you can't get an injunction

13  unless you have prospective activity.

14         So how can you seek an injunction and, at the same

15  time, argue that there's not prospective activity?  Seems like

16  those are fundamentally inconsistent.

17         MR. SAFIER:  There're prospective implications.  I

18  don't think there's prospective activity.  And the way I

19  would --

20         THE COURT:  Well, then what are you going to enjoin?

21  What are --

22         MR. SAFIER:  Right.  The way I would elaborate on that

23  is by analogy to an employment context.  Right?  People in the

24  employment context seek injunctive relief all the time.  I want

25  my job back.  Right?  Tim Smith, we don't know.  If the statute

1    of limitations hasn't run, he may still bring a lawsuit saying I

2    want injunctive relief restoring me to my prior position.

3    Clearly, that would be administrative.  We know that, right?

4            THE COURT:  But part of what -- but that's not all

5    you've asked for though.

6            MR. SAFIER:  I mean, we have asked --

7            THE COURT:  You've asked for -- you not only -- you've

8    asked for the books to be restored.

9            MR. SAFIER:  Yes.

10           THE COURT:  Then you've asked for a "preliminary and

11   permanent injunction restraining defendants and their agents,

12   employees, and successors from removing and/or restricting

13   access to the books."

14           So to do that, don't you have to -- aren't you

15   necessarily admitting that there is some prospective application

16   here of some board action because you want to enjoin them from

17   doing it in the future?

18           MR. SAFIER:  I just -- I think the employment

19   situation would be the same, right?  You want to be restored to

20   the position.  I guess your point is --

21           THE COURT:  You're saying -- what you would be -- to

22   use your analogy of the employment, I think, one, to say you

23   want an injunction requiring them to go back; and then, two, if

24   you wanted an injunction saying and in the future, you can't do

25   X, Y, and Z under your policy, is essentially what you're

1    saying.

2            MR. SAFIER:  Right.  It may ultimately be that that

3    part of the relief is relief that, you know, under our theory

4    is -- we can't get, right?  But our theory is these books were

5    removed -- let's just focus on removal, not restriction.  But

6    these books were removed for unconstitutional reasons, right?

7    The motivations were based on viewpoint discrimination.

8            At least so far, it's no different than an employment

9    case where you say I was removed based on some prohibited

10   criteria.  I think where it might be different is our

11   position -- maybe this is a stretch -- is that there are no

12   legitimate reasons to remove the *Tango* book, right?  You

13   couldn't imagine a case in which the future --

14           THE COURT:  I'm just --

15           MR. SAFIER:  Right.

16           THE COURT:  This kind of goes to my policy -- like the

17   use of the policy thing in the Complaint.  And one of the things

18   I'm a little, just, concerned about is that, you know, sometimes

19   it seems like, okay, we want to say it's a policy because

20   calling it a policy, you know, benefits us for this particular

21   way that we want to frame this particular claim in this

22   particular relief; but then we don't want to call it a policy

23   for these other purposes, because if we call it a policy, then

24   it's kind of admitting that it's legislative in nature.

25           MR. SAFIER:  I mean, I completely concede that as for

1     the restricted books, as we have pleaded our case, that's a

2     policy and those decisions are legislative.  I was sort of

3     surprised that opposing counsel didn't make that argument, so I

4     thought it would be -- you know, see if the judge picked up on

5     that.

6               THE COURT:  All right.  Well, I did, so --

7               MR. SAFIER:  Which the judge apparently did.

8               But, no, that's absolutely right.  As it turns out,

9     that, as I understand the facts that developed, in fact, it

10    wasn't the Board that was creating the policies that we thought

11    when we pleaded the Complaint the Board had created.  It was

12    created by the superintendent.

13              But you're absolutely right.  As to the restricted

14    books, our argument is they create a policy under which these

15    books were impermissibly restricted, and I think that probably

16    is legislative.

17              THE COURT:  That's fair.  And let me ask you about the

18    waiver.

19              MR. SAFIER:  Mm-hmm.

20              THE COURT:  Is it your -- first as a matter of the

21    order of operations, if you will, do I need to -- if I were to

22    accept your waiver argument, do I first have to decide that they

23    were subject to legislative privilege?  Because if they're not

24    subject to legislative privilege, then there could be no

25    privilege to waive, or could I just assume arguendo that they

1    are and then find the waiver?

2             MR. SAFIER:  I mean, you can certainly say there's no

3    reason for the Court to reach the legislative privilege issue

4    because if it exists --

5             THE REPORTER:  I'm sorry.  Can you please keep your

6    voice up?

7             MR. SAFIER:  Sorry.

8             You can certainly say there's no reason for the Court

9    to reach the legislative privilege issue, because even if there

10   was a privilege, it's been waived.  Certainly, that's --

11            THE COURT:  Okay.  And your position is that those --

12   the document production has waived that privilege for all books

13   for all purposes for all board members?

14            MR. SAFIER:  Can you say that one more time?

15            THE COURT:  So your position would be those documents

16   that you've attached to the Response waived the privilege as to

17   all books for all board members?

18            MR. SAFIER:  As to the reasons behind -- and the

19   reason -- I want to clarify a point.  Our argument is not

20   that -- the fact that Mr. Adams, who's a board member, spoke to

21   a constituent about his reasons for voting for or against the

22   removal, that that's a waiver.  The law's clear.  That's not a

23   waiver.  Right?  You can talk to constituents; you can talk to

24   lobbyists.  I mean, otherwise, you know, legislative privilege,

25   it doesn't -- it's not like attorney-client privilege, right?

1    It's a different type of privilege.  So we agree.

2           Our position is what led the waiver here isn't the

3    email.  It's the fact that the email was produced to us, they

4    didn't claim any privilege with respect to it, they didn't

5    produce any privilege log, they didn't --

6           THE COURT:  But wouldn't the email itself have to -- I

7    think that -- I don't think that circle gets completed there,

8    though, because if the email was not legislative privilege,

9    producing it could not have waived it.  You can't --

10          MR. SAFIER:  Oh, we agree.  Yeah.  This is our

11   fall-back in the alternative.

12          THE COURT:  Okay.

13          MR. SAFIER:  Right.  No, our primary position is none

14   of those emails that we attached or the documents -- one, it's

15   not a email -- but the documents that we attached in Exhibit 1

16   to our Opposition, none of them are subject to legislative

17   privilege.  That's our core position.  Our fall-back position is

18   if they are, the fact that the Board produced them --

19          THE COURT:  Yeah, but --

20          MR. SAFIER:  -- without a priv log, without asserting

21   any privilege.

22          THE COURT:  But you say "them," and that's what I

23   guess I'm not understanding because --

24          MR. SAFIER:  Right.

25          THE COURT:  -- all I have are the three documents that

1    you've attached.  And looking at those, for the reasons you just

2    articulated, those are -- two of the three are communications

3    with constituents which wouldn't -- even if there was a

4    legislative privilege, a communication with a constituent would

5    not have waived it.  So I don't see how the production of that

6    would have been a waiver.  And if there's other stuff, well, I

7    don't have it.

8            MR. SAFIER:  Right.  And I think that gets into what

9    the parameters of the privilege are.  So I thought I brought my

10   list of emails...

11           THE COURT:  That's okay.

12           MR. SAFIER:  Stack of emails up to the podium, but I

13   might have forgotten.

14           THE COURT:  You can go back to your seat if you want

15   to grab it.

16           MR. SAFIER:  The chances that I'll find it are very

17   slim, Your Honor.

18           Ah, yes.

19           So I think -- so looking at the first email from, you

20   know, Mr. Adams to a constituent, Samantha Lee.  So we agree --

21   we agree that the fact that the email exists doesn't waive the

22   privilege.  So we all agree about that, right?  And I guess my

23   question is --

24           THE COURT:  But if I just stop you there, so if I --

25   if you admit that, then how could the production of something

1    that would not be the waiver of the privilege waive the

2    privilege?

3          MR. SAFIER:  Because what the law says -- and this is

4    the decision -- I think it's the *Lee* decision that Mr. Grosholz

5    referenced -- is it says -- and it's confusing because we're

6    used to thinking about attorney-client privilege and how waiver

7    works in that context -- is that disclosing information about

8    your vote as part of the legislative process -- which includes

9    talking to constituents, talking to lobbyists, talking to

10   experts -- doesn't waive the privilege, because otherwise, you

11   know, legislation wouldn't function.  Disclosing those same

12   communications the context of litigation does.

13          And where I was getting at -- and this is sort of my

14   confusion about how even legislative privilege would operate in

15   this case, if Your Honor rules that it does -- do we get to ask

16   Mr. Adams about that email?  Right?  Do we get to say, What did

17   you mean when you said, I agree with your concerns and will vote

18   accordingly?  Or is that outside the bounds based on the

19   legislative privilege?  I don't know the answer.  It's very

20   confusing to me.

21          Similarly --

22          THE COURT:  But I guess what I'm --

23          MR. SAFIER:  Right.

24          THE COURT:  -- struggling with on the waiver issue is

25   just -- I understand kind of conceptually how you could have a

1    situation where this could occur through a document production,

2    but I'm having a hard time getting from my conceptual

3    understanding of it to seeing how -- it's your burden to show

4    the waiver.  I'm having a hard time seeing how you're meeting

5    your burden practically, getting from the conceptual to the

6    practical, with the three documents that I've got to look at.

7           And what I think I'm being asked to do -- and correct

8    me if I'm wrong -- is I'm being asked to look at those three

9    documents because that's all I have evidence-wise, and I'm being

10   asked to decide if those three documents waive the privilege for

11   all board members for all purposes in this case.

12          MR. SAFIER:  Right.  I mean, the -- two responses to

13   that, Your Honor.  One is as I understand the Board's argument,

14   and maybe I'm misunderstanding it, you know, we couldn't -- if

15   they're right that legislative privilege attaches, we

16   couldn't -- let's say we cut off this email just before we get

17   to Kevin Adams.  We just have Samantha Lee saying her position

18   about these books.  We couldn't ask Mr. Adams, Do you agree with

19   her concerns and did you vote accordingly.  We can't ask her

20   that.

21          THE COURT:  Okay.  So --

22          MR. SAFIER:  But now they've sent us a document in

23   which he admits that that's his position.

24          THE COURT:  But maybe -- I guess --

25          MR. SAFIER:  And that's the waiver.

1          THE COURT:  And maybe, though -- maybe I could get

2     there if you were saying, as it relates to Mr. Adams with

3     respect to this book, there has been a waiver.  But then I don't

4     see how I get from there to the non- -- the board members who

5     you have no emails from, who didn't -- who have not talked about

6     any of these books and saying now because Mr. Adams sent an

7     email that was disclosed to one person, it -- Katy bar the door.

8     We're going to go to everybody else.

9          MR. SAFIER:  Right.  No, I appreciate your point.  Now

10    I'm understanding more fully.

11          I think our position, and it may not get us there, but

12    what we would say is the fact that -- so the Board is asserting

13    this privilege.  So from that, it follows that the Board can

14    also waive it.  And the Board in its document production hasn't

15    asserted legislative privilege once.  It hasn't produced a priv

16    log with legislative privilege entries on it.  So that's --

17    that's how we get there.  And they may not ultimately, you know,

18    satisfy you.

19          THE COURT:  Yeah, I understand the argument, and I --

20    yeah, it just may be one of those situations where you may be

21    aware of more things than I've been provided, and I only have

22    what I've been provided; and when it's your burden on it, it

23    kind of makes it hard for me to go beyond those three emails

24    when that's all I've got.

25          MR. SAFIER:  Understood, Your Honor.  And you asked

1    Mr. Grosholz what his favorite case was.  If you asked me what

2    my favorite argument was, I would say it's that there's no

3    legislative --

4            THE COURT:  I'm guessing if I asked you what your

5    favorite case was, you're going to say the *Crymes* case.

6            MR. SAFIER:  I am going to say the *Crymes* case.  You

7    are correct, Your Honor.

8            I want to make one last point about my second-favorite

9    case, which is sort of, if you look at the argument from Judge

10   Winsor, one of the points that came out of that argument was

11   that the implications for these individual book-removal

12   decisions are district-wide, right?  It comes from every

13   library.  And I don't think that matters under the analysis.

14           And the case I would cite to Your Honor is the *Oakes*

15   *Farms* case.  That's out of the Middle District of Florida.  It

16   involved a vendor who was suppling fruits and vegetables.  And

17   it was district-wide, right?  So, you know, they fire the vendor

18   based on his political Facebook posts.  There's no doubt that

19   there are implications that are district-wide.  There are kids

20   in every school in the district that aren't getting the same

21   kind of fruits and vegetables, but it's still administrative for

22   the reasons, you know, we just discussed.

23           THE COURT:  All right.  Thank you.  I appreciate that.

24           Mr. Grosholz, is there anything -- we've been pretty

25   exhaustive here, but if there's a couple points, I'll give you a

little bit of time, not a whole lot.  I told you I'd give you

the time, so I'll give it to you.

          MR. GROSHOLZ:  Thank you, Your Honor.  And I think

Your Honor hit the nail on the head when you said that there's

no case on all fours.  So I think the best thing to do is look

at the totality of the circumstances:

          Was there a vote?  Yes.  That's what *Bryant* says.

That's legislative.

          Was it in furtherance of duties?  That's *Hernandez*.

Yes.  That makes it legislative.

          Was there public opinion, debate, deliberation, and a

vote?  That's *DeSisto*.  Yes.  That's legislative.

          Were the board members exercising their discretionary

authority?  The *Bogan* case and the *Bryant* case.  Yes.  That's

legislative.

          Is this an action that reflects the priorities of the

legislative body with prospective implications?  Yes.  That's

legislative.

          And to go back to Mr. Safier's argument about

prospective, the reason this is prospective, when you fire

someone, that's not prospective.  Because if I fire my music

teacher, I hire someone to replace them.  Abolishing the music

teacher position entirely is prospective because you're not

hiring someone to replace them.

          Here, we are not removing these books to replace them

1    with new versions.  Right?  We did not say this copy of *And*
2    *Tango Makes Three* is old, it's dog-eared, we're going to buy a
3    new one.  *And Tango Makes Three* was taken off the shelves.  It's
4    gone.  Those decisions stand for five years.  So that is what
5    makes it prospective.  That also make it legislative.

6            Does it have general application to the entirety of
7    the district, not just specific application?  That's *Woods*.
8    This applies district-wide.  This was not you're removing *And*
9    *Tango Makes Three* from this elementary school or grouping of
10   elementary schools.  It is every school in the entirety of the
11   district this book has been removed.  If that is not general
12   application, then I don't know how it is defined.

13           And to the broader point, Mr. Safier also mentioned
14   that plaintiffs' position is that there's no legitimate reason
15   for these decisions.  Well, as the Supreme Court has clearly
16   said:  "An improper purpose does not destroy the privilege."
17   That is in the *Tenney* decision.  And as the Eleventh Circuit
18   recently held --

19           THE COURT:  I didn't understand.  If he said that, I
20   don't think that is what he meant to say.  I didn't understand
21   him to be saying that the -- whether they were or were not
22   legitimate means they are or are not privilege.  I think the law
23   is pretty clear on that.

24           So I agree.  I don't think he meant to say that if he
25   did say it.  I didn't hear him say it.

1          MR. GROSHOLZ:  That's fine.  And I think my broader

2   point there is to use the *Pernell* decision.  There the Eleventh

3   Circuit said:  "In civil private matters under 1983, the

4   privilege is insurmountable."

5          So if it applies here, it cannot be that plaintiffs

6   can ask questions, for example, about these documents that they

7   have attached to their motion because those all go to the

8   legislative privilege.  The privilege -- this is a phrase that I

9   said a lot to myself in thinking about this:  The privilege is

10  the privilege is the privilege, and because that privilege is

11  individual to each legislator, the legislative body cannot waive

12  it on behalf of them.

13         And as far as the documents, the Board is not claiming

14  legislative privilege over those documents because, as we said,

15  communications with third parties is a part of the legislative

16  process, there's no waiver there.  So there would be no

17  reason -- and I think the Court picked up on this fact.  There

18  would be no reason for us to file a privilege log or withhold

19  documents.

20         What we are attempting or what we are asserting

21  legislative privilege is on these depositions.  On plaintiffs'

22  efforts to get to the privileged thoughts, motivations, and

23  reasons behind their votes.  And that encompasses those

24  communications with the constituents, because as, again, to go

25  back to *Pernell*, the privilege is the privilege is the

1    privilege.  The Eleventh Circuit there reversed the District

2    Court because the District Court had distinguished between

3    factual matter and more subjective motivations and impression.

4    And the Eleventh Circuit said that was erroneous.  Privilege

5    encompasses everything.

6            So here we do not believe there has been a waiver

7    because these communications are not waiver pursuant to the *Lee*

8    case, and under *Pernell* the privilege encompasses all of this

9    activity.

10           THE COURT:  Thank you.

11           Ms. Smith, do you want to take the floor and talk

12   about the inadvertent disclosure issue?

13           MS. SMITH:  Yes, Your Honor.  May it please the Court.

14           The Board has filed the Motion for Order Permitting

15   Defendant to Retain and Use Inadvertently Disclosed Information.

16   And the reason we felt compelled to title our motion as such is

17   obviously because there is a confidentiality order at issue in

18   this case and because plaintiffs' counsel during the corporate

19   rep deposition did assert that it was inadvertently disclosed.

20           So I want to start from the proposition, though, Your

21   Honor, we do not believe, number one, this was an inadvertent

22   disclosure, nor do we believe that the document is protected by

23   work-product privilege.

24           THE COURT:  And I think that goes to the question --

25   as I read your briefing, I think there may be a disagreement

1    between the parties as it relates to what inadvertent -- what

2    inadvertently disclosed means.

3         MS. SMITH:  Yes.

4         THE COURT:  I think the way I understand what you're

5    saying is the document was not inadvertently disclosed.  We

6    asked for it, and they intentionally emailed it.

7         MS. SMITH:  Correct.

8         THE COURT:  But as I understand their argument, I

9    don't think they're disputing that fact.  I think their argument

10   is, yes, but we didn't realize that there was attorney-client or

11   work-product privileged stuff in there because of the way in

12   which they explained that the document was created.  And so as I

13   understood their argument, they're not saying we inadvertently

14   gave you the document, they're saying we didn't know the

15   document that we gave you had in it what it has in it.

16        MS. SMITH:  Absolutely agree, Your Honor.  I just

17   wanted to explain why we titled it the way we did --

18        THE COURT:  Okay.

19        MS. SMITH:  -- and say we weren't, you know, admitting

20   that it was work product or inadvertent disclosure.  It wasn't

21   until I read the plaintiffs' papers and the three declarations

22   that I understood what had happened because obviously during the

23   course of the deposition -- and we had to file our motion within

24   five days, so we didn't understand.  So I completely agree that

25   that is their position.

1          THE COURT:  And what do you -- I mean, I think this --

2     I understand your technical point, but I struggle a little bit

3     with your big-picture idea here.  If there is stuff in there

4     that is the mental impressions of the attorney or that has some

5     attorney-client privilege information in it, do you really think

6     you should have it?

7          MS. SMITH:  Yes.  And here's why.  Two answers:  First

8     is the confidentiality order doesn't define what inadvertent is.

9     So I think we do need to turn to what the Federal Rules of

10    Evidence in 502(b) provides.  And so part of what 502(b)(2)

11    requires is that the holder of the privilege or protection took

12    reasonable steps to prevent disclosure.  And I think plaintiffs

13    fail there at the outset.  We can talk about why that is.

14         But the larger picture, if I could take a step back --

15    and you might have gleaned this, Your Honor, from reading

16    Ms. Oberlander, Ms. Lopez, and Ms. Brinkley's declarations.  The

17    reason that they prepared what we'll call the disputed document

18    was because the defendants had just taken the 30(b)(6)

19    deposition of the Penguin representative, or witness.

20         So we asked all of these questions to that witness.

21    It's very clear that they understood that, and that's why they

22    were preparing this document in the first place.  At least from

23    Ms. Brinkley and Ms. Lopez's perspective was we need to be able

24    to answer the questions of the defense counsel, which are the

25    ultimate questions in this case in which the plaintiff --

1  meaning PEN -- need to answer in this lawsuit.

2            THE COURT:  It just bothers me that -- and I would ask

3  you to just put the shoe on the other foot.  We've all been

4  involved in litigation.  We've all been involved in document

5  reviews and discoveries -- discovery issues.  People make

6  mistakes.  And shouldn't we be just -- if someone on your team

7  had made a mistake and put some stuff in there and you got it at

8  10:00 o'clock at night the night before a deposition and you're

9  in the throes of trying to prepare for the -- to defend the

10  deposition and you didn't -- it's a lengthy document and you

11  didn't read through all of it and you made a mistake, is it --

12  why do you get to capitalize on that?

13            MS. SMITH:  So first of all --

14            THE COURT:  And wouldn't you want them to give it back

15  to you?

16            MS. SMITH:  -- I adore Ms. Oberlander, and I by no

17  means wanted her to have to fly on an airplane to, you know, the

18  Panhandle --

19            THE COURT:  Especially during a hurricane.

20            MS. SMITH:  Yeah, during a hurricane.

21            THE COURT:  It's usually much nicer here.  Sorry.

22            MS. SMITH:  So in my view, Your Honor, here's my

23  problem, as sympathetic as I am.  We make mistakes every single

24  day.  Completely agree.  But here's my trouble, Your Honor.

25  We're almost at the finish line.  October 31st, the parties have

1    stipulated, is the close of discovery.  And why can't I get

2    answers to my questions which are for each of these books, PEN

3    American, please tell me what viewpoint do you believe was

4    discriminated against; what viewpoint is being expressed by this

5    book; and, additionally, do you believe that there is sexual

6    content in this book according to Florida law?  These are

7    critical --

8              THE COURT:  Why do you need that?

9              MS. SMITH:  -- questions in this case.

10             THE COURT:  Why do you need that document -- but why

11   do you need work product to do that?

12             MS. SMITH:  My understanding from reading their

13   declarations, though, Your Honor, is they took about a week in

14   advance of the deposition putting together this packet that

15   Ms. Oberlander instructed Ms. Brinkley to try to answer exactly

16   these questions that are in this template.  This template

17   mirrors the questions that we asked in the Penguin deposition,

18   which the witness there struggled to answer because -- and there

19   were only about 40 books.  Here, there's 164 books.

20             So how can you answer --

21             THE COURT:  So did you --

22             MS. SMITH:  -- all those questions?

23             THE COURT:  Did you get -- I know you've given me

24   deposition excerpts.  I didn't read the entirety of --

25             MS. SMITH:  Yes.

1          THE COURT:  -- Ms. Lopez's deposition, but did you not

2     get answers to the questions?

3          MS. SMITH:  We, for the most part, did not.  Here's

4     our problem, is now we left the deposition open because we

5     needed a ruling on this.  The next step probably will have to be

6     a motion to compel better answers so that we actually have a

7     prepared witness.  She was able to riff on some of these

8     answers.  She did the best she could.  She's a really nice lady,

9     but it's 164 books.

10          THE COURT:  Yeah.

11          MS. SMITH:  They should have been prepared, and we

12     were not surprised at all, Your Honor, that they sent us this.

13          THE COURT:  And maybe you're right on everything.

14     Maybe all of that is correct and -- but I don't think from the

15     declarations that Ms. Oberlander intended for -- I don't know

16     what all the -- I've looked at the template and looked at the

17     spreadsheet.  I don't know exactly everything that she claims is

18     work product and not if it's not marked on there, but it's clear

19     that there's something in there that she doesn't -- did not

20     intend for that witness to have or for you to have.

21          So can't you get all of those things that -- have an

22     opportunity to get those things when you have to go back and to

23     reopen that deposition and ask those questions?  Can't you do

24     all that without having work-product doctrine from the other

25     side?

1          MS. SMITH:  Well, and here's the other problem I'm

2    having, Your Honor, is a lot of what Ms. Oberlander's now

3    claiming work product over on this template is not work product.

4          THE COURT:  That's -- I'm going to ask her about

5    that --

6          MS. SMITH:  Yeah.

7          THE COURT:  -- which is what is the work product, and

8    what part's on there.  Because it seems to me that -- well, I

9    see one thing on there that I'm guessing is what they're going

10   to say is work product, and that is the checkbox as to what is

11   the basis of standing for these particular books.  Maybe it's

12   not.

13         MS. SMITH:  Believe it or not, that's not one of the

14   ones that they're --

15         THE COURT:  I thought that was maybe going to be a

16   litigation position or something that you didn't want to

17   disclose.  Maybe she's going to assert that now.  She just

18   changed her mind.

19         But I guess is there not a way -- do you think that --

20   it seems like you can -- have worked well together.  Is there

21   not a way to go through that and to redact the things that they

22   say are work product, and then, if I need to, get involved to,

23   you know, resolve whether a particular thing is or is not work

24   product.  Could we do that or you just think:  She gave it to

25   us, maybe it was an accident, but we get it now?

1          MS. SMITH:  So, Your Honor, I think -- let's take a

2     step back and understand what work product is and isn't.  If you

3     prepare a document to use in a deposition, that is not work

4     product.  Ms. Oberlander instructed Ms. Brinkley to formulate

5     this package, and some of that is, you know, talking about the

6     content of the books.  She knew what was coming based on the

7     Penguin deposition.  So I don't know how they can answer

8     questions for 164 books without including some work product

9     because it's their person.

10          THE COURT:  And you may be right, but I think that --

11     to me, that's a different question from the waiver question.  I

12     think there is a question of whether there is a waiver of it,

13     and there's a question of whether it actually is work product.

14          MS. SMITH:  Right.  Right.  And I think my -- where

15     I'm perhaps respectfully differing with the Court is you're

16     looking at this --

17          THE COURT:  I'm just asking questions at this point.

18          MS. SMITH:  But what I'm hearing the Court say --

19          THE COURT:  I don't know what I'm doing.  That's what

20     we're having the hearing for.

21          MS. SMITH:  I appreciate that.  What I'm hearing the

22     Court say is that we should be able to call out the work

23     product --

24          THE COURT:  I'm just asking if you could.

25          MS. SMITH:  -- within the document.

1    THE COURT:  I'm just asking if you could.  If that

2    would be something you're amenable to, or if that just

3    doesn't -- we just don't think that's possible.  And what you're

4    saying is nothing in there could be work product?

5    MS. SMITH:  Nothing in there could be work product

6    because if the document itself, 190-some pages, was prepared by

7    Ms. Brinkley specifically for Ms. Lopez to use during the

8    deposition --

9    THE COURT:  And where do you get that that's not --

10   that nothing that the witness, you know, is provided can be work

11   product?

12   MS. SMITH:  So, Your Honor, we get that from starting

13   from the -- well, starting from Rule 26.

14   THE COURT:  Mm-hmm.

15   MS. SMITH:  And obviously if there are protected

16   mental impressions that -- strategies, thought processes -- then

17   that is the opposite of creating a document for a deponent to

18   use during a deposition.  The two cannot --

19   THE COURT:  What if they accidentally -- I mean,

20   again, what if you accidentally put -- what if, you know, you're

21   preparing a witness for a deposition and you accidentally put in

22   there, like you thought you were making a note to yourself, like

23   a Track Changes' thing, and you accidentally, you know, had a

24   bullet that you left in, and it says, you know, this is really

25   going to be the key point in our motion for summary judgment.

1  Remember this later.  And then in the haste of trying to get

2  this out the door, they forgot to turn off the Track Changes

3  when they printed it, and they printed that and they gave it to

4  you, then that no longer is work product, that bubble?

5          MS. SMITH:  Completely different situation there

6  because that was my protected mental impressions.  It was work

7  product at the beginning.

8          THE COURT:  So you're -- okay.  I think I see what

9  you're saying.  So you're saying that because the purpose of the

10 document was to assist the deponent --

11         MS. SMITH:  Yes.

12         THE COURT:  -- that it --

13         MS. SMITH:  By definition.

14         THE COURT:  By definition, it could not have been

15 produced for the purpose of --

16         MS. SMITH:  Right.

17         THE COURT:  -- the attorney's mental impressions?

18         MS. SMITH:  Right.  Right.  The document itself was

19 called "Book Pages for Summer Deposition PDF" when it was sent

20 to us by Ms. Oberlander.  The email said in the subject line

21 "Documents for PEN 30(b)(6) Deposition."

22         The declarations make clear, and I think that

23 Ms. Oberlander doesn't disagree with that part, it was prepared

24 to use as a part of the deposition testimony, and Ms. Brinkley,

25 the -- I'm not sure if she was a lawyer at the time.

1          THE COURT:  She --

2          MS. SMITH:  She was a --

3          THE COURT:  It sounded like she was a lawyer.

4          MS. SMITH:  -- a legal fellow, I think she had --

5          THE COURT:  I think she was doing --

6          MS. SMITH:  Maybe not.

7          THE COURT:  -- a fellowship after law school, but --

8      all right.  So --

9          MS. SMITH:  May I just read Ms. Brinkley?

10          THE COURT:  Yeah.

11          MS. SMITH:  Paragraph 21, she says her intent was for

12      the document "to be a resource to be able to be used by

13      Ms. Lopez during the deposition to refresh her recollection."

14          So that was the purpose.

15          She also says that she created the -- she calls it the

16      "Books Pages;" we're calling it the disputed document -- along

17      with legal analysis.

18          So she's creating legal analysis in the event such

19      information would be helpful to Ms. Lopez if and when defense

20      counsel questioned her about the specific books at issue in this

21      case.

22          THE COURT:  Now, is Ms. Brinkley the lawyer?  Is she

23      employed by the 30(b)(6)...

24          MS. SMITH:  That's a patent lawyer, correct.

25          THE COURT:  For the 30(b)(6) representative.  And so

1    would that be -- do you think that would be an attorney-client

2    communication?  If it was done -- I mean, is it -- if she was

3    doing it to, you know, as advice to her client, was that what

4    was going on?

5              MS. SMITH:  She's creating this document, in her own

6    words, "to be used by Ms. Lopez during the deposition to refresh

7    her recollection."  That's what she says in her declaration.  So

8    that's, I think, where I'm having --

9              THE COURT:  Let me ask --

10             MS. SMITH:  -- trouble.

11             THE COURT:  -- you my final -- my final line of

12   questioning.

13             MS. SMITH:  Sure.

14             THE COURT:  I don't want to say -- I'm trying not to

15   say I have one more question because it's like when lawyers say

16   "I'll be brief."

17             Not my final question, my final line of questioning,

18   is:  Rule 612 I think is the basis on which you requested this,

19   and they make a technical argument that has at least some

20   surface appeal to me of, Well, it wasn't -- you know, it wasn't

21   used to refresh her recollection and, therefore, 612 didn't, I

22   guess, overcome the work-product protection is essentially what

23   they're saying.

24             What's your response to that?

25             MS. SMITH:  Right.  So 612 is the inadvertent

1  disclosure definition that we're relying on.  I think -- oh, I'm

2  sorry.

3           THE COURT:  612.

4           MS. SMITH:  You had it.  I got it backwards.  Forgive

5  me.

6           THE COURT:  Rule of Evidence 612.

7           MS. SMITH:  So, yes.  612, of course, as Your Honor

8  noted, says:  "The rule gives an adverse party certain options

9  when a witness using a writing to refresh memory, and it's

10  (a)(1) while testifying; or --"

11           THE COURT:  So you would agree that one doesn't --

12           MS. SMITH:  That --

13           THE COURT:  -- apply.

14           MS. SMITH:  -- didn't happen.

15           THE COURT:  Okay.

16           MS. SMITH:  We have no disagreement there, Your Honor.

17  What we're traveling under is (a)(2), which is before

18  testifying, and then, of course:  "If the Court decides that

19  justice requires the party to have the options or that justice

20  requires we'll put a part aside."

21           So our point, Your Honor, is that it is undisputed

22  pursuant to the declarations here filed with the Court that she

23  did -- meaning Ms. Lopez -- did look at the document.  I know

24  that now plaintiffs are contending, you know, she didn't look at

25  it in detail.  But when I asked her during the deposition:

1              "So, you reviewed that document in preparation

2         for your deposition; correct?"

3              She said -- and this is at page 23, line 7

4         through 12 of her deposition.

5              "I looked generally through it, but I did not

6         spend significant amount of time on each page.  It

7         was more to make sure I was familiar with the format

8         and generally what information was in there, and then

9         I intended to make use of it during the deposition."

10             THE COURT:  All right.  But so let's take -- so let me

11    just play technocrat here.

12             MS. SMITH:  Yeah.

13             THE COURT:  But then (a), the preamble to that, says:

14    "This rule gives an adverse party certain options when a witness

15    uses a writing to refresh memory -- "

16             MS. SMITH:  Mm-hmm.

17             THE COURT:  " -- before testifying."

18             MS. SMITH:  Right.

19             THE COURT:  If she has just reviewed it, generally

20    speaking, to see the format and everything, do we have to show

21    that she -- does Rule 612 require that she didn't remember

22    something and that she was using that document beforehand to

23    refresh her recollection?  Because isn't that -- aren't those

24    two different things?

25             You could review a document just to make sure I knew

1    what was in there, to make sure that I understood the format; or

2    you could review a document because, you know -- the more common

3    situation is maybe I have given a statement to a police officer

4    at the scene of an accident or I have previously been deposed

5    and I'm shown this document because I don't remember what I

6    said, I don't remember what I said previously, and so I'm shown

7    the document to refresh my recollection.  But are we really

8    refreshing her memory?  Because it sounded to me from what you

9    were saying, these aren't necessarily things that she ever knew.

10   And so is it really -- did she ever have knowledge of it?  And

11   if she never had knowledge of it, how is it a memory refresher

12   as opposed to a memory provider?

13            MS. SMITH:  Right.  I'm trying to pull the language

14   because I did question that myself.  And, you know, in a future

15   case, if I ever have this again, God forbid, I will ask the

16   question about referring -- or refreshing recollection.

17            But here, Your Honor, because we do have her

18   declaration, she makes, to me at least, pretty clear in this

19   case in paragraph -- or, I'm sorry, in her declaration --

20   paragraph 13, she says -- well, let me start at 12.  She says,

21   "I spent significant time -- "

22            Well, we can skip that.  That is a separate thing I

23   did want to read before I sit down is the other spreadsheet that

24   was provided simultaneously.

25            But in paragraph 13, let me proceed with that one,

1    because that's where I meant to go.

2           "Notwithstanding I am not an expert in each of

3       the books at issue in this litigation, I'm able to

4       speak knowledgeably about PEN America's general

5       efforts across the country, and specifically in

6       Escambia County, to combat the removal and

7       restriction."

8          She says:  "I was also prepared generally to

9       review the challenged forms and to speak broadly

10      about the viewpoints PEN America asserts are subject

11      to discrimination."

12         So she 100 percent was knowledgeable about these books

13   because she was able to answer at least some of my questions

14   without referring to the document.  And when she was preparing

15   for her deposition, she -- my understanding, from reading

16   Ms. Brinkley and Ms. Lopez's declarations -- says that they

17   spent -- and now I'm at paragraph to 20 of Brinkley.

18         She says:  "The Book Pages" -- so this is the

19      disputed document -- "contains information pulled

20      from numerous sources both internal, that have

21      already been produced to defense counsel, and

22      external, publicly available sources.  Ms. Lopez and

23      I looked at various spreadsheets and both [sic]

24      tracking sources to prepare for her deposition, much

25      of which is also compiled in the Book Pages."

1          So what she's saying there is she, as part of her

2     preparation, was educating herself about this.  This is

3     distinguishable from that Middle District patent case that I

4     think both parties cited, the *Medtronic* case, where the Court

5     made that distinction to say this guy had no knowledge

6     whatsoever about anything.

7          She's acknowledging, as is Ms. Brinkley, they were

8     knowledgeable about this.  They were just preparing this

9     spreadsheet so that she could have an easy reference, handy tool

10    in order to make the deposition easier.  And I think that at the

11    end of the day, Your Honor, you're hearing my frustration that

12    these should be easy answers.  They should be able to say, Okay,

13    let's talk about *And Tango Makes Three*.  What is -- you know,

14    what are the characters?  What are the --

15         THE COURT:  I think that's a separate issue from what

16    I have to decide, which is --

17         MS. SMITH:  I understand, but --

18         THE COURT:  That said, if you're having those

19    problems, then that's where you get a motion to compel better

20    answers.

21         MS. SMITH:  I understand.  I'm just saying we were

22    expecting this document because it had kind of gone off the

23    rails with the 30(b)(6) with Penguin where he was just

24    speculating, didn't really know the answers to many questions,

25    so we thought that they had better prepared the witness.

1          So when it was emailed us the morning of day one of

2     the deposition, we took it, Your Honor, and we studied it.  And

3     I based my questioning on day one, I spent a lot more time on

4     organizational structure of PEN and standing because I thought,

5     Oh, thank God I have this document so I don't have to spend as

6     much time going over the 164 books to understand what the

7     viewpoint discrimination is for each one, whether or not there's

8     sexual content in each book.

9          So we have it; we studied it.  You know, my colleague

10    put notes on it for me.  I went home, I read it, and then when

11    we got to day two and I started, you know, to pull it out is the

12    first time -- so I completely get it.  I don't want you to think

13    that I am being heartless, but as an advocate for my client, I

14    need to also -- you know, there's fairness on both sides --

15              THE COURT:  I understand.

16              MS. SMITH:  -- in the balancing of interests.

17              THE COURT:  I understand.

18              MS. SMITH:  Thank you.

19              THE COURT:  Ms. Oberlander.

20              MS. OBERLANDER:  Thank you.

21          Good afternoon.  May it please the Court.

22          So Ms. Smith is correct about a lot of what she -- how

23    she expressed what was going on here, not all of it, and I want

24    to clarify a few things.

25          But I do want to say that this was a mistake.  This

1   was, you know, my mistake.  It was absolutely not planned for.

2   It was a -- I did, in fact, as you can read, we did email the

3   document on the first day of deposition because we were trying

4   to be helpful.  Because I do understand that documents that are

5   used in a deposition that a deponent actually uses probably need

6   to be produced.  Although there is certainly a question under

7   612 in general about whether you need to do this.  And it wasn't

8   until, as Ms. Smith said, we went through the entire first day.

9   Nobody looked at the document because we were talking about

10  organizational standing, associational standing issues, how PEN

11  was set up.

12          The next morning as soon as the document -- as

13  Ms. Smith tried to introduce it, I realized, as is clear in the

14  declarations, that when I first thought I saw something that

15  looked like an error to me, I said, I think there are errors

16  here.  We took a break.  I discussed -- because Ms. Brinkley was

17  there with me -- what was there.  And at that point, I learned

18  that there was actually work product, significant amounts of

19  work product in this document which I did not know.

20          And then we immediately went in and said --

21          THE COURT:  So let me ask you for your response to the

22  argument that it necessarily couldn't have been work product

23  because you were sharing it with the witness for the purpose of

24  being used by her in the deposition and therefore it was never

25  intended to -- the document itself was never intended to

1    remain --

2          MS. OBERLANDER:  The document that I thought it was,

3    which I say in the declaration, which was essentially a -- what

4    would have been a spreadsheet.  We work it into individual

5    pages.  But a spreadsheet on these 164 books was, as I believed

6    it to be, all based on information -- purely information that

7    was publicly available or previously produced.

8          So it wasn't -- it was just an assemblage to make it

9    easy.  I did not real -- and if that was the case, you know, we

10   had no issue using it -- to have used it as a resource and --

11   but we never got there because it wasn't -- that wasn't what the

12   document was.  And then -- but perhaps even, you know -- and so

13   that just wasn't what it was, which is why we tried to claw it

14   back immediately upon discovering that it had the work product

15   in it.

16         But as you point out under Rule 6 -- I mean,

17   essentially they're arguing that under Rule 612(2) -- (a)(2)

18   this was a document that was actually -- doesn't really matter

19   what it was prepared for, because it was -- she's right:  It was

20   prepared to be an aid to the corporate deponent.  However, it

21   wasn't.  It wasn't actually used as an aid.  She didn't rely on

22   it.  She didn't -- she glanced at it the night before the

23   deposition, some night be -- you know, when it came in, to

24   generally look at the format so she would understand where she

25   could find information if asked about it, and that's all she

1   did.

2          She didn't -- I mean, we can -- she didn't, first of

3   all, use it to refresh her memory, although she certainly has

4   some knowledge of some of the books from her other work and from

5   the other review that she had done in preparation.  She had done

6   a lot of preparation --

7          THE COURT:  I mean, I think there are some cases that

8   say, although technically, you know, 612 says what it says, that

9   there are cases saying that producing it before the deposition

10  begins is appropriate and similar to, like, Jencks Act in the

11  criminal context.  You may not know this, but the Jencks Act

12  says that you provide a witness's statement after the witness

13  has testified, but it's -- the case law says, well, actually you

14  should provide Jencks before the witness testifies, because if

15  you wait till to the witness testifies to provide Jencks, then

16  we got to recall the witness, and it becomes -- and I think

17  there's some case law saying, just for practical purposes,

18  producing it before the deposition eliminates the need to reopen

19  the deposition or to, you know, ask for permission to exceed

20  seven hours, et cetera, et cetera.

21         MS. OBERLANDER:  I mean, I -- we produced it -- we

22  provided it.  It wasn't, you know, produced.  We provided it

23  really in effort to be helpful, and we put in another

24  spreadsheet which we did go through the first day.  It wasn't

25  a -- it was -- and as I said, it was a mistake.  It wasn't --

```
 1    listen, law school, Law Practice 101, you shouldn't provide

 2    anything until you absolutely know exactly what's fair.  And I

 3    really take full credit for that error, as it were, and it

 4    really -- but it was a mistake.  It was produced by mistake.  It

 5    wasn't -- she did not use it.  She didn't rely on it in the

 6    deposition.

 7            Under 612(a)(2), which is what we're talking about, to

 8    the degree she looked at it, we all agree it was only prior to

 9    the deposition.  And so consequently, the issue is if -- even if

10    you find -- which I don't think you should, but even if you

11    found that she did use it to -- in (1), that she did use it to

12    refresh her memory; and, (2), that it actually has to be used

13    during the deposition, which it was not, and I don't think

14    there's any doubt about that.  So that actually should end the

15    612 issue.

16            But even if you then found, for whatever reason, that

17    defendant has met their burden on this, and it is their burden

18    that -- to get to the interest of justice.  The interest of

19    justice are largely, the case law suggests, that you should be

20    looking at the Rule 26(b)(3) factors which are:  Do they show a

21    substantial need for it, and Have they shown undue hardship.

22            And I will tell you, there's zero substantial need

23    shown or undue hardship; that we left the deposition open; it --

24    they agreed it was a mistake; the deposition -- they can come

25    back, they can ask Summer or the corporate deponent all the
```

1    questions.  The deposition transcript that, as we went through,

2    she answered a lot of the questions.

3              THE COURT:  What's the --

4              MS. OBERLANDER:  And so -- I'm sorry, Judge.

5              THE COURT:  What is the -- it's work product, right?

6    That's -- you're not saying attorney-client privilege; it's work

7    product, right?

8              MS. OBERLANDER:  Yeah.

9              THE COURT:  Okay.  And is it the same -- is there a

10   particular box on each document that you think's work product?

11   I mean, is -- so going to my question to Ms. Smith about

12   whether, you know, there's some way to do some redactions, or is

13   it just the whole document is and therefore needs to be

14   completely struck?

15             MS. OBERLANDER:  No, Your Honor.  Actually, we have

16   offered to redact this document.  We offered -- at the

17   deposition, we offered it.  They rejected it.  We've offered

18   again.  And, in fact, before I got on the plane, I said, Hey --

19             I didn't say "Hey."  I said, you know, "Ms. Smith" --

20   and Mr. Grosholz because Ms. Smith was away.

21             -- I looked at your motion, and it looks like you're

22   focusing on the standing issues.  The standing issues we are not

23   claiming any privilege or work product, and we -- and so do you

24   want to have a meet and confer before I get on the plane?"

25             And then they said, "No, you should come down here."

1          So we said at the beginning --

2          THE COURT:  Well, you would have missed all the fun.

3          MS. OBERLANDER:  We said, So I am willing -- and I've

4    been willing from the getgo to say that we will redact -- we

5    will provide the standing information.  We have --

6          THE COURT:  So what all would be --

7          MS. OBERLANDER:  We are not claiming work product.

8          THE COURT:  So what all would be redacted?  I mean, is

9    it -- and this is what I'm meaning.  As I'm looking at it, it's

10   the same template on each.

11         MS. OBERLANDER:  Yes.

12         THE COURT:  Is there a particular --

13         MS. OBERLANDER:  Yeah.

14         THE COURT:  -- box that, you know, on each one you

15   think needs redacted, or is this like 165 page by 165 page,

16   like, Well, on this page, we said this and that shouldn't have

17   been there?

18         MS. OBERLANDER:  No, no, no.  So it would be -- so if

19   we were redacting to avoid all of the work-product

20   information -- and you're looking at the chart, the blank chart.

21         The first category which says Removed or Restricted,

22   we will produce that, not redact it.

23         The second category, PEN standing, which says

24   organizational or associational checkbox.  And in some of them

25   there's some narrative too.  We don't -- we're not claiming work

1    product.  We would produce that.

2         The Books Looks, the very last column, which is

3    whether or not it's on Book Looks, which is just, you know, a

4    website that contains challenge information for some of these

5    books, that is also not work product.

6         The other character -- the other categories, excuse

7    me -- we do believe all of them contain some element of work

8    product.  Now, the one that contains the most, I'll be honest,

9    as we said this in our pleadings, is sexual conduct under

10   847.01(19).  That, as Ms. Brinkley said in her deposition -- in

11   her declaration, was a -- she reviewed a lot of material and

12   wanted, in her own analysis, to determine whether anybody could

13   plausibly make an argument that the book in question may contain

14   sexual conduct in violation of 847.001(19).

15        Now, I have two points to say -- and that, we believe,

16   is actually opinion work product, which is, we believe, subject

17   to the highest level of protection and, as the Eleventh Circuit

18   said in *Cox*, really should not be produced at all.

19        The other categories are more --

20        THE COURT:  I'm going to have a hard time finding that

21   the "Accolades" is attorney work product or that the --

22        MS. OBERLANDER:  I mean, that's just -- those -- I

23   mean, those are -- to the degree that she was putting her own

24   analysis in it and pulling things out there, it -- we believe it

25   qualifies as work product.  But I understand.

1        So we are absolutely ready and have been ready --

2        THE COURT:  But I think --

3        MS. OBERLANDER:  -- to produce this document with the

4   standing information, which is what they claimed they've needed.

5        THE COURT:  So I think hearing you say that gives me

6   some pause.  Because I was totally following you, you know, if

7   it was related to, like, Look, there's this one part of this

8   form that, you know, I didn't really think about or notice; but,

9   I mean, you're kind of asserting that the entire thing, other

10  than, really, these kind of two small parts, are work product

11  and --

12       MS. OBERLANDER:  Three products -- three parts.

13       THE COURT:  Three parts.  And so if you would have --

14  it would seem like if you just scanned the document, then you

15  would have caught those things, and --

16       MS. OBERLANDER:  So I hear you, and I did -- you know,

17  again, this is a question of what went into it.  I did obviously

18  scan the document, and I believed that those categories were

19  sort of pulled from whole cloth from other produced documents,

20  and that's the difference.  I did not realize that, really, in

21  an effort to be helpful, Ms. Brinkley had had -- had done some

22  additional analysis.

23       Now, I do want to just --

24       THE COURT:  What do you think would have happened --

25       MS. OBERLANDER:  I'm sorry.

1          THE COURT:  -- if -- so what would have happened if,

2   you know, Ms. Smith had started asking -- asked a question, and

3   Ms. Lopez gave an answer that she got from reading through this

4   document?  Would you have objected and said that, you know, work

5   product?

6          MS. OBERLANDER:  Well, it didn't happen.  But if it

7   had happened, I would have -- yes.  I mean, I would have

8   objected because as soon as the document came out, we objected.

9   But that's not -- but, I mean, that is -- but that didn't happen

10  because she --

11         THE COURT:  Yeah, I know.  I'm just trying to --

12         MS. OBERLANDER:  Yeah.

13         THE COURT:  I'm just trying to see what you think

14  about it.

15         MS. OBERLANDER:  Now, I will -- can I add --

16         THE COURT:  Yes.

17         MS. OBERLANDER:  -- sort of one other part?

18         THE COURT:  Sure.

19         MS. OBERLANDER:  And I appreciate -- this was -- I

20  mean, really, it was a mistake.  I don't think it meets the

21  interest of justice under the third prong of 612.

22         As to inadvertent waiver, I will just point out that

23  in the pleadings that were filed last night in the *Parnell* case,

24  the School Board -- well, on the other side, the plaintiffs

25  there put forth a document that -- indicated in the exhibit that

1    in a document production last summer in the *Parnell* case -- of a

2    small document production, not thousands of documents, of 33

3    documents, I believe -- the exhibit said that in fact the School

4    Board had produced some attorney-client privileged information.

5    And in that case, the plaintiffs' counsel called them up and

6    said, Hey, it looks like you produced this. Was it inadvertent?

7    And Ms. Smith said, Yes, it was inadvertent, and they returned

8    the document, and that was it.

9           And so I do feel that that --

10          THE COURT: Why didn't you just say at the deposition

11   that it was -- Hey, look, this has attorney work product in it?

12   You just said --

13          MS. OBERLANDER: I did.

14          THE COURT: I thought you said there were errors.

15          MS. OBERLANDER: First -- no. So I first said there

16   were errors, and then we -- then because I said, Well, what's

17   this? And that looked like a wrong thing.

18          So I first said there are errors. We then -- and I

19   said, We need to look at this as claw it back. We then took a

20   break -- like immediately we took a break. I had a conference

21   with Ms. Blankenship and Ms. Brinkley, as it says here, during

22   which time they explained to me that what I thought were errors

23   were actually work-product commentary --

24          THE COURT: Okay. I see.

25          MS. OBERLANDER: -- and then we came right back in.

1    And this was five minutes, maybe it was ten minutes later, and

2    we said this is work product.

3              THE COURT:  Without getting into any privilege or

4    anything, I mean -- so I'm guessing, from what you're saying,

5    you looked at this document, and your initial thought was this

6    stuff came from things that have already been publicly available

7    in this case.  Then you have a conversation with Ms. Brinkley

8    along the lines of something like, Hey, where did you get this?

9    And she says, Oh, those were -- you know, those were my

10   thoughts, or, Oh, that was some independent research that I did

11   and summarized and put in here.

12             Is that accurate?

13             MS. OBERLANDER:  Yes.

14             THE COURT:  Okay.  My final question is it sounds

15   like, from what Ms. Smith is saying, is that -- I think this

16   goes to her need for it and substantial hardship -- is that she

17   seems to be indicating she's having a hard time getting answers

18   to some of these questions from the 30(b)(6) deponent and that

19   this would be helpful in that regard.

20             What's your response to that?

21             MS. OBERLANDER:  I would say that we left the

22   deposition open.  We -- and we're happy to come back.  We

23   acknowledge -- listen, we -- I acknowledged at the time it was a

24   mistake.  We left it open for that reason.  We are -- we are not

25   standing on the standing issue.  I mean, that -- we never stood

 1  on that.  I mean, I think this is --

 2          THE COURT:  So you're committed to getting your

 3  witness to answer --

 4          MS. OBERLANDER:  Yeah.  Well, to answer the questions

 5  that are called for in the Notice of Deposition, yeah,

 6  absolutely.  I mean, that is a -- in as full a way as would be

 7  appropriate, yes.

 8          THE COURT:  Okay.  All right.  Thank you.

 9          MS. OBERLANDER:  Thank you.

10          THE COURT:  Anything further, Ms. Smith?

11          MS. SMITH:  No, Your Honor.

12          THE COURT:  All right.  Thank you.

13          Well, thank you all for your arguments.  I appreciate

14  the briefing.  It was helpful.  Good lawyering always makes

15  things much more enjoyable, so I do appreciate that.

16          They're tricky issues, and I know -- I'm going to try

17  to do something as quickly as possible.  We -- of course, Judge

18  Winsor's also working on it, and in one of my questions I

19  think -- I guess I didn't ask, but Mr. Grosholz, Mr. Safier, how

20  does this play out in your mind if we -- if I do something

21  different than him or if he does something different than me?

22          MR. GROSHOLZ:  Well, ideally, in our dream scenario,

23  both and you Judge Winsor would grant the motion --

24          THE COURT:  Yes, of course.

25          MR. GROSHOLZ:  -- and we would be on our way.

1          Were that to play out, Your Honor, I think we would

2    have to look at whether it was -- for our perspective,

3    obviously, whether it was denied, denied in part, denied fully.

4          THE COURT:  And I guess what I'm really asking is, you

5    know, they're different cases and different books are involved

6    in this one, and so I guess that they're not -- they wouldn't

7    necessarily have to even be inconsistent rulings on the same

8    issue, because there could be ways of resolving, maybe with one

9    book, it looks different than with seven, or maybe you depose

10   people differently.  I don't know.  I'm just thinking out loud.

11         MR. GROSHOLZ:  Potentially, one thing I would point

12   out is that the waiver documents that plaintiffs pointed to, two

13   for Ms. Hightower and Mr. Adams, those speak -- those documents

14   that we argued were not waiver speak to *And Tango Makes Three*,

15   which is the book that is at issue in the *Parnell* case.

16         THE COURT:  Okay.  All right.

17         MR. GROSHOLZ:  There's also the issue of -- if either

18   yourself or -- you know, Your Honor or Judge Winsor denied the

19   motion, the Board would have the option to take it up on a

20   petition --

21         THE COURT:  Of course.

22         MR. GROSHOLZ:  -- for -- I believe it's a writ of

23   mandamus is what these are, so.  But that's obviously --

24         THE COURT:  You always have that ability.  And you can

25   take me to Judge Wetherell, so I guess that's the interim step

1    in between.

2            MR. GROSHOLZ:  As Your Honor points out, yes.

3            THE COURT:  Mr. Safier, anything on that?

4            MR. SAFIER:  Yeah.  I don't know exactly how that'd

5    play out, other than you can do what you want, Your Honor.  He's

6    not the boss of you.  But I do think, given the appellate

7    rights, right, so we would have the -- either side would have

8    the opportunity to go up to Wetherell, and then I believe they

9    would have the opportunity under the collateral order rule, if

10   they wanted, to go all the way up to the Eleventh Circuit.

11           THE COURT:  I think that's right.

12           MR. SAFIER:  I think, as a practical matter, I would

13   be very surprised if we ended up in a situation where they're

14   being deposed about *Tango* in our case and not --

15           THE COURT:  Okay.  That was the -- I think that's --

16   you've reassured me on that point.  Because, again, I don't know

17   what I'm going to do.  A lot of times I leave a hearing pretty

18   confident in what I'm doing or I come into a hearing with a

19   pretty good idea of what I'm doing and I just want to confirm it

20   for -- you know, I just want to be in court.  But on this, I'm

21   not -- I think it's tough, even though you think it's clear.

22   But I think it's tough, and -- what I can assure you is I'll do

23   something as quickly as possible, I'll be as thorough as

24   possible, and I appreciate, again, your well-briefed and

25   well-argued positions.

1          I'm sorry that you had to travel here in a hurricane.

2   Usually it's nice and sunny and beautiful beaches, but you're

3   not going to get to see that.

4          So anything further?

5          MR. SAFIER:  No, Your Honor.  Thank you very much.  We

6   appreciate your help.

7          THE COURT:  Anything further?

8          MR. GROSHOLZ:  No, Your Honor.  Thank you so much for

9   your time.

10         THE COURT:  All right.  Thank you.  I hope you guys

11   have a great rest of your evening and safe travels back.

12      *(Proceedings adjourned at 3:07 p.m.)*

13                    * * * * * * * *

14      I hereby certify that the foregoing is a true and correct
     transcript of the stenographically reported proceedings held in
15   the above-entitled matter, pursuant to the provisions of Section
     753, Title 28, United States Code.

16

17   *Julie A. Wycoff*                    10/9/24

18   _____     _____
     Julie A. Wycoff, RMR, CRR           Date
     Official U.S. Court Reporter

19

20

21

22

23

24

25

1                          **I N D E X**

2                                                    <u>PAGE</u>

3     Mr. Grosholz addresses the Court .............................5

4     Mr. Safier addresses the Court .............................30

5     Mr. Grosholz rebuttal ......................................60

6     Ms. Smith addresses the Court ..............................64

7     Ms. Oberlander addresses the Court .........................81

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25