UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

PEN AMERICAN CENTER, INC., et al.,
    Plaintiffs,

vs.                                       Case No.: 3:23cv10385/TKW/ZCB

ESCAMBIA COUNTY SCHOOL BOARD,
    Defendant.
_____/

## ORDER

Currently before the Court is Defendant Escambia County School Board's Renewed Motion for Protective Order Asserting Legislative Privilege. (Doc. 107). Plaintiffs have responded in opposition (Doc. 113), and the Court held an oral argument hearing (Doc. 133). The matter is ripe for resolution. For the reasons below, the motion will be granted.

### I.

This case involves a First Amendment challenge to the Escambia County School Board's decision to remove or restrict access to certain library books. Plaintiffs allege that the books were improperly removed or restricted based on viewpoint discrimination. Plaintiffs have noticed the depositions of the five elected School Board members. On June 21, 2024, the School Board moved for a protective order to prevent the

1

depositions. (Doc. 82). The motion argued, among other things, that legislative privilege barred the depositions. On July 19, 2024, the Court denied that motion without prejudice to the School Board filing a new motion stating that the individual members wished to assert the privilege. (Doc. 98).

The School Board has now re-filed the motion with supporting affidavits from the five members expressing their desire to invoke legislative privilege. (Doc. 107). Plaintiffs have responded in opposition, arguing that legislative privilege does not apply.[1] (Doc. 113).

## II.

Legislative privilege is an "important" doctrine with "deep roots in federal common law." *In re Hubbard*, 803 F.3d 1298, 1307 (11th Cir. 2015). It protects legislators "from deterrents to the uninhibited discharge of their legislative duty for the purpose of the public good." *Pernell v. Fla. Bd. of Governors*, 84 F.4th 1339, 1343 (11th Cir. 2023) (cleaned up). And it reflects that "it simply is not consonant with our

---

[1] Plaintiffs do not dispute that the Board members' affidavits are sufficient to express their desire to assert legislative privilege. (Doc. 133 at 31). Nor do Plaintiffs dispute that members of a school board may assert legislative privilege. (*Id.*).

scheme of government for a court to inquire into the motives of legislators." *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998) (cleaned up). If a discovery request "inquires into legislative acts or the motivation for actual performance of legislative acts, . . . legislators can protect the integrity of the legislative process by invoking the privilege to quash the request." *Pernell*, 84 F.4th at 1343 (cleaned up).

Not everything a legislator does is a legislative action; some things are administrative in nature. The privilege, however, only applies to legislative actions. Thus, the privilege's applicability often hinges (as it does here) on whether a legislator's action was legislative or administrative. "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan*, 523 U.S. at 54. An act is legislative "when it is policymaking and of general application." *Woods v. Gamel*, 132 F.3d 1417, 1420 (11th Cir. 1998). Or stated differently, legislative acts "involve[] line-drawing" on matters of general concern. *Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1062-63 (11th Cir. 1992). "Voting, debate and reacting to public opinion are manifestly in furtherance of legislative duties." *Woods*, 132 F.3d at 1420 (cleaned up). But voting alone is insufficient to make an

action legislative. *Id.*

Although these words are easy enough to type, they have proven harder to apply. Thus, it has been said that the "line dividing legislative and administrative decisions is not always clear." *Parnell v. Sch. Bd. of Lake Cnty.*, No. 4:23-cv-414/AW/MAF, Doc. 191 at 3 (N.D. Fla. Sept. 24, 2024). That is perhaps true because of the variety of factual scenarios where legislative privilege has been raised. Over the years, however, there have been several recurring scenarios. Those recurring scenarios have resulted in some things being well recognized as legislative and some things being well recognized as administrative.

On the well-recognized-as-legislative side, are cases involving budgetary decisions, the elimination of government offices/positions, and the regulation of land use. *See Bogan*, 523 U.S. at 55-56 (finding that budgetary decision to eliminate a government office/position was legislative); *see also Woods*, 132 F.3d at 1420 (holding that budgeting decision was legislative); *Brown v. Crawford Cnty.*, 960 F.2d 1002, 1012 (11th Cir. 1992) (explaining that "land use decisions by local government officials normally are characterized as a legislative function"). On the well-recognized-as-administrative side, are cases involving the hiring

4

and firing of individual employees and the enforcement of zoning regulations. *See Yeldell*, 956 F.2d at 1062-63 (holding that decisions to hire and fire certain individuals were administrative); *see also Corn v. City of Lauderdale Lakes*, 997 F.2d 1369, 1392 (11th Cir. 1993) (explaining that enforcement of zoning ordinances is administrative, but the enactment of zoning regulations is legislative).

The current case does not involve hiring and firing employees, eliminating offices/positions, zoning enforcement, land use regulations, or budgeting. So the question of whether the School Board was acting legislatively or administratively cannot be answered simply by pointing to a prior Eleventh Circuit case. Instead, the Court must look at what the School Board did and determine whether its actions "bore all the hallmarks of traditional legislation," *Bogan*, 523 U.S. at 56, and involved a "policymaking function and general application," *Brown*, 960 F.2d at 1011.

### III.

Under Florida law, school boards are "responsible for the content of all instructional materials and any other materials . . . made available in a school or classroom library . . . ." Fla. Stat. § 1006.28(2)(a)1. Florida

law further provides that each "school board must adopt a policy regarding an objection by a parent or a resident of the county to the use of a specific material," and the policy must "clearly describe[] a process to handle all objections and provide[] for resolution." Fla. Stat. 1006.28(2)(a)2. The process must permit the objecting party to present evidence showing that that the challenged material is (1) pornographic, (2) depicts or describes sexual conduct, (3) is not suited to student needs and their ability to comprehend the material presented, or (4) is inappropriate for the grade level and age group for which the material is used. Fla. Stat. § 1006.28(2)(a)2.b(I)-(IV).

Consistent with that statutory directive, the School Board adopted a policy for addressing objections to books found in the Escambia County School District's libraries. (*See* Doc. 133 at 10-11). Under the policy, a committee was formed to review challenged books. (*Id*. at 11). After conducting a review, the committee would vote on whether to permit, exclude, or limit access to a challenged book. (*Id*.). The committee's decision could be appealed to the School Board. (*Id*.). After considering constituents' comments and having debate during public meetings, School Board members would vote on whether a challenged book should

6

be removed or restricted. (*Id.*).

According to Plaintiffs' allegations, the School Board at various times adopted different policies regarding access to challenged books during the review process. At one point, the School Board's policy allegedly allowed challenged books to remain accessible while under review. (Doc. 27 at 25). The School Board then allegedly changed its policy and restricted access to challenged books while they were under review. (*Id.* at 26). And it is claimed that the School Board later instituted a new policy, under which challenged books were restricted pending review if they allegedly contained pornographic material or discussed same-sex relationships or transgender persons. (*Id.* at 27, 30-31). According to Plaintiffs, the School Board's review process has often taken a considerable period of time. (*Id.* at 31).

The amended complaint alleges that numerous books have been either removed or restricted after completing the review process. (*Id.* at 37-38). With respect to each of the books, the School Board placed the consideration of the books on its meeting agenda, reviewed the committee's recommendations, considered public comment from constituents and interested persons, and had debate among the Board

7

members. The Board members then voted regarding each challenged book. In some instances, the Board voted to remove books from all libraries, and in other instances the Board voted to allow access only by older students.

Plaintiffs now seek to depose the Board members. During those depositions, Plaintiffs want to ask the members what motivated their actions. If the Board's actions fall on the legislative side of the line, then the privilege prevents the depositions because "[t]he privilege applies with full force against requests for information about the motives for legislative votes and legislative enactments." *In re Hubbard*, 803 F.3d at 1310. On the other hand, the depositions may proceed if the Board's actions fall on the administrative side of the line.

## IV.

Having considered the record and the applicable law, the Court finds that the School Board's actions were legislative. Let's first discuss the policy regarding access to challenged books pending review. As Plaintiffs' counsel admitted at oral argument (Doc. 133 at 38-39), the creation of a districtwide policy regarding access to challenged books

8

pending completion of the review process was a legislative decision.[2] *See generally Brown v. Crawford Cnty.*, 960 F.2d 1002, 1011 (11th Cir. 1992) (explaining that "a legislative act is characterized by having a policymaking function and general application").

Although the result is the same, more discussion is required regarding the School Board's decision to remove or restrict access to the books listed in the amended complaint. As explained below, the School Board's decision regarding those books "bore all the hallmarks of traditional legislation." *Bogan*, 523 U.S. at 55.

First, from a procedural perspective, the Board "took the actions at issue by means of an established and legitimate process." *Schlegel v. Koteski*, 307 F. App'x 657, 660 (3d Cir. 2009). The Board members' votes were preceded by public notice, the consideration of input from constituents and interested parties, and debate and discussion by the Board members. And as the Eleventh Circuit has recognized, "voting,

---

[2] The amended complaint attributes this policy decision to the School Board. (Doc. 27 at 25-30). At oral argument, Plaintiffs' counsel stated that based on the discovery conducted it appears this policy may have been made by the Superintendent and not the School Board. (Doc. 133 at 37-38). For purposes of ruling on the current motion, the Court relies on the amended complaint's allegations that the policy was adopted by the School Board.

9

debate, and reacting to public opinion are manifestly in furtherance of legislative duties." *Woods*, 132 F.3d at 1420 (cleaned up).

Second, from a substantive perspective, the Board's actions had "a policymaking function and general application." *Brown*, 960 F.2d at 1011. When the Board voted to remove or restrict a book, that decision had general application across the district. The decision was also a prospective one that would remain in effect indefinitely. And when the Board decided that a particular book should not be available to students, it was making a policy judgment. *See Parnell v. Sch. Bd. of Lake Cnty.*, No. 4:23-cv-414/AW/MAF, Doc. 191 at 4-5 (N.D. Fla. Sept. 24, 2024) (holding that the decision to remove a book from school library shelves "was a quintessential policy decision about how to best educate Escambia County children"). Indeed, deciding what educational materials should be used in schools and what things are age-appropriate for students to be learning is what School Board members are elected to do. Or stated differently, "educational suitability questions . . . . are the perfect example of a core educational policy matter within the exclusive province of local school boards." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1225 (11th Cir. 2009).

As was discussed during oral argument, different school boards across the State of Florida have made different decisions about whether particular books should be on library shelves in their respective districts. (Doc. 133 at 21-22). This tends to show that the School Board members were not just mechanically applying a state law that required a particular outcome nor were they merely performing a managerial function when they voted (after considering public comment and having debate) to remove or restrict the books.[3] Instead, the School Board members were making a judgment call and engaging in "line-drawing" on a matter of public concern. *Yeldell*, 956 F.2d at 1062-63. Thus, this is a situation where the "legislative privilege protects against inquiry . . . into the motivation" for the School Board members' decision. *In re Hubbard*, 803 F.3d at 1310 (cleaned up).

## V.

Having concluded that legislative privilege applies, it is necessary to consider Plaintiffs' argument that the privilege has been waived.

---

[3] It bears noting that in several instances the School Board's decisions were at odds with the determinations made by the review committee. Thus, it is not as though the School Board was simply engaged in the ministerial task of rubberstamping the review committee's determinations.

11

According to Plaintiffs, the School Board waived legislative privilege by producing documents in discovery without making a privilege objection. The Court disagrees.

The legislative privilege belongs to the individual legislator. *See In re Hubbard*, 803 F.3d at 1309 (stating that legislators "each unquestionably hold their own legislative privilege"); *see also In re Grand Jury Proc.*, 563 F.2d 577, 585 (3d Cir. 1977) (recognizing "the existence of a personal privilege which may be asserted by a legislator"). As such, it may be invoked or waived by the legislator. *See Parnell v. Sch. Bd. of Lake Cnty.*, No.4:23-cv-414/AW/MAF, Doc. 191 at 5 (N.D. Fla. Sept. 24, 2024) ("The privilege is personal to the individual legislator and may be asserted or waived as the bearer so chooses.") (cleaned up). In this case, the individual Board Members (who are not parties) were not responsible for responding to Plaintiffs' document production request. Rather, the School Board (as an entity) responded to the document production requests that were directed to it. Thus, the Court is not persuaded that the five School Board members who Plaintiffs seek to depose each waived their personal legislative privilege via the School Board's response to a document production request. *See generally Puente Arizona v. Arpaio*,

12

314 F.R.D. 664, 671 (D. Ariz. 2016) (explaining that "the legislative privilege is personal and must be waived by the individual legislator").

Even if the School Board could somehow waive the personal legislative privilege for all five members by producing documents in discovery, Plaintiffs have not shown a waiver in this case. In support of their argument, Plaintiffs have provided email exchanges between two Board members and two constituents and brief notes written by one Board member that the School Board turned over in discovery. (Doc. 113-1). The Court does not believe the production of these three documents is sufficient to constitute a waiver of the personal legislative privilege by the individual Board members. *See Parnell v. Sch. Bd. of Lake Cnty.*, No. 4:23-cv-414/AW/MAF, Doc. 191 at 6-7 (N.D. Fla. Sept. 24, 2024) (rejecting the argument that "a witness entitled to legislative privilege waives the privilege and subjects himself to a deposition when documents he created are gathered and produced in litigation"). By Plaintiffs' logic, if the U.S. House of Representatives turned over in discovery one email between one member of Congress and one constituent regarding a policy matter, then—Katy bar the door!—legislative privilege has been waived and all 435 representatives may be deposed. Because such a result would be

inconsistent with the purpose of the personal legislative privilege, Plaintiffs' waiver argument lacks merit.

## VI.

Upon a showing of good cause, a district court "may issue a protective order preventing a deposition." *Baratta v. Homeland Housewares, LLC*, 242 F.R.D. 641, 642 (S.D. Fla. 2007). Plaintiffs have noticed the deposition of five School Board members for the purpose of "inquir[ing] into legislative acts or the motivation for actual performance of legislative acts." *Pernell v. Fla. Bd. of Governors*, 84 F.4th 1339, 1343 (11th Cir. 2023). The doctrine of legislative privilege, as asserted by the School Board members, prevents such inquiries. Accordingly, there is good cause to issue a protective order that prevents Plaintiffs from taking the noticed depositions.

For the reasons above, the Renewed Motion for Protective Order Asserting Legislative Privilege (Doc. 107) is **GRANTED**, and the Motion for Restrictions of Any Board Member Depositions (Doc. 108) is **DENIED as moot**.

**SO ORDERED.** This the 18th day of October 2024.

*s/ Zachary C. Bolitho*

Zachary C. Bolitho
United States Magistrate Judge