IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| **PEN AMERICAN CENTER, INC., ET AL.,**<br><br>**PLAINTIFFS,**<br><br>**VS.**<br><br>**ESCAMBIA COUNTY SCHOOL BOARD,**<br><br>**DEFENDANT.** | **CASE NO.: 3:23-CV-10385-TKW-ZCB** |

# PLAINTIFFS' RULE 72(a) OBJECTIONS TO MAGISTRATE JUDGE BOLITHO'S ORDER GRANTING ESCAMBIA COUNTY SCHOOL BOARD'S RENEWED MOTION FOR PROTECTIVE ORDER ASSERTING LEGISLATIVE PRIVILEGE

Pursuant to 28 U.S.C. § 636 and Federal Rule of Civil Procedure 72(a), Plaintiffs hereby submit the following Brief in Support of Rule 72(a) Objections to Magistrate Judge Bolitho's Order Granting Escambia County School Board's (the "Board") Renewed Motion for Protective Order Asserting Legislative Privilege (the "Order"), ECF 138.

## I. PRELIMINARY STATEMENT

In granting the Board's Renewed Motion for Protective Order Asserting Legislative Privilege (the "Motion") (ECF 107), Magistrate Judge Bolitho held that (1) the Board's decisions to remove or restrict certain library books constituted legislative action, and (2) legislative privilege could not be waived by the Board on behalf of individual Board Members. The Magistrate Judge further noted that, even if waiver was applicable, Plaintiffs' identification of three documents disclosing the Board Members' motives did not sufficiently demonstrate a waiver. *See generally* Order. Plaintiffs challenge both elements of the Order pursuant to Federal Rule of Civil Procedure 72(a).

First, the Order's determination that legislative privilege shields Board Members from depositions related to their decision to remove or restrict access to specific books in Escambia County school libraries is contrary to Eleventh Circuit law. Eleventh Circuit precedent distinguishes legislative acts—defined by a policy-making function and general applicability—from administrative decisions. Only

legislative acts are protected by legislative privilege. Administrative decisions—that is, those decisions that apply policy to specific facts—are not protected by the legislative privilege. The Order improperly ignores this distinction between policy-making, which involves rule-making for the general population, and application of those policies to specific individuals (here, specific books).

Second, Plaintiffs' objection to the finding on waiver should be sustained. The Order improperly concludes that the Board's production of School Board Members' communications cannot waive privilege even though the Board is the entity asserting privilege on behalf of School Board Members, who have not individually appeared in this action. Moreover, only in the past few weeks has the Board produced many communications from School Board Members bearing directly on their decisions to remove and restrict the books at issue in this case. This production waives legislative privilege.

## II.   RELEVANT BACKGROUND

Plaintiffs are challenging the Board's decisions to remove certain books from Escambia County public school libraries and to restrict access to others pending review. Am. Compl. ¶¶ 88, 98, 105 (ECF 27). Plaintiffs allege that these actions were based on hostility toward the books' ideas or themes. *Id*. ¶¶ 3-7. To support their claim, Plaintiffs seek to depose Board Members. The Board objected, asserting

that legislative privilege protects discovery into the Board Members' motives in voting to restrict or remove certain books.

On August 2, 2024, the Board filed the Motion after a prior motion to bar Plaintiffs from deposing the Board Members was denied without prejudice. *See generally* Motion. Plaintiffs opposed the Motion, arguing that (1) the Board's decisions—removing or restricting certain library books—were administrative, not legislative, and (2) even if legislative privilege applies, the Board waived it by producing communications revealing Board Members' motives. *See generally* Pls.' Opp. (ECF 113).

On October 18, 2024, the Magistrate Judge granted the Motion, finding that (1) the Board Members' votes to remove or restrict certain library books were legislative in nature, and (2) the Board could not waive the personal legislative privilege of individual Board Members. Even if waiver were possible, the Magistrate Judge found that Plaintiffs' identification of three documents revealing the Board Members' motives was insufficient to constitute a waiver. *See generally* Order.

### III.   ARGUMENT

Federal Rule of Civil Procedure 72(a) requires a district court to modify or set aside any part of a magistrate judge's order on non-dispositive pre-trial matters that the district court finds to be "clearly erroneous or . . . contrary to law." Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A) ("A judge of the court may reconsider

any pretrial matter . . . where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law.").

### A. The Order's Conclusion – that the Board's Decisions to Remove or Restrict Certain Library Books is Legislative in Nature – is Contrary to Law.

The Order "is contrary to law" because "it fails to apply or misapplies relevant" law. *Malibu Media, LLC v. Doe*, 923 F. Supp. 2d 1339, 1347 (M.D. Fla. 2013) (internal citations omitted) (collecting authority). The Order conflates policy-making with the application of those policies by treating the Board's individualized decisions as if they were setting district-wide policy, rather than applying an existing book reconsideration policy to individual books.

In doing so, the Order misapplies Eleventh Circuit precedent, which limits legislative decisions to those with "a policymaking function and general application." *Brown v. Crawford Cnty.*, 960 F.2d 1002, 1011 (11th Cir. 1992). Notably, the Order fails even to reference *Crymes v. DeKalb Cnty.*, 923 F.2d 1482 (11th Cir. 1991), the leading Eleventh Circuit case on distinguishing legislative from administrative acts. In *Crymes*, the Court explained that, whereas "[a] legislative act involves policy-making," an administrative act involves the "mere administrative application of existing policies." *Id.* at 1485. Thus, a decision by a government body is likely to be "administrative" where (1) "the facts utilized in making the decision are specific, rather than general, in nature," or (2) "the decision impacts specific

individuals, rather than the general population." *Id.* As the Eleventh Circuit subsequently clarified: "a legislative act is characterized by having a policymaking function and general application." *Brown*, 960 F.2d at 1011; *see also Bryant v. Jones*, 575 F.3d 1281, 1306-07 (11th Cir. 2009) (explaining that legislative "immunity applies to prospective, legislative-type rules that have general application," whereas administrative action is primarily backward-looking and focused on the facts of a particular case (internal marks omitted)).

Although the Magistrate Judge recognized that the "privilege's applicability often hinges (as it does here) on whether a legislator's action was legislative or administrative," Order at 3, he erred in determining that the Board's actions in deciding whether to "remove or restrict access to the books listed in the amended complaint," "bore all the hallmarks of traditional legislation." *Id.* at 9 (quoting *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998)). The Magistrate Judge's considerations were: (1) the Board members' votes followed public notice and debate; (2) "[w]hen the Board [Members] voted to remove or restrict a book, that decision had general application across the district" and was "a prospective one that would remain in effect indefinitely"; (3) that different school boards have made different decisions about particular books "tends to show that the School Board members were not just mechanically applying a state law that required a particular outcome nor were they merely performing a managerial function when they voted";

and (4) therefore the Board Members were "making a judgment call and engaging in 'line-drawing' on a matter of public concern" when voting to remove or restrict a book. *Id.* at 9-11.

But the Order reflects a misapplication of the law. That the board members voted is not a determinative factor in whether their actions were legislative or administrative. The Eleventh Circuit has "expressly rejected the argument that the act of voting, in itself, constitutes legislative action giving rise to immunity." *Smith v. Lomax*, 45 F.3d 402, 406 (11th Cir. 1995) (quoting *Crymes*, 923 F.2d at 1485). Instead, a "legislator's vote constitutes the act of legislating, and thus cloaks the legislator with immunity, if the vote is cast for or against the enactment of a law." *Id.* at 405.

Here, there is no dispute that the Board's decisions as to the specific books were made under an existing policy for handling book challenges, not through a discretionary, policy-formulating process. The decision to remove or restrict a specific book from school libraries under this policy is precisely the type of individualized decision-making that *Crymes* characterizes as administrative, not legislative. It would be impossible to establish a "policy" from the removal from ECSD libraries of the books at issue here—for example, what is the policy established by the removal of And Tango Makes Three or the restriction of The Bluest Eye to just eleventh and twelfth graders? As *Crymes* emphasizes, an act

limited to a particular occurrence, rather than establishing general policy, is administrative.[1] Unlike legislative action creating prospective, broad-based rules of general applicability, each book removal impacted only the specific book at issue and did not establish a rule of general applicability. The removal or restriction of individual books based on complaints about their content is inherently specific and retrospective.

Further, the Magistrate Judge's emphasis on "policy judgment" and any associated line-drawing, see Order at 11, contradicts established law by overlooking *Crymes*' key distinction between policy-making—"rule-making" that affects the general population—and the "application of policy to a specific party." *Crymes*, 923 F.2d at 1485-86. That application of policy to a specific case may involve "line-drawing" or the exercise of judgment—as opposed to mechanistic, non-discretionary action—does not itself render such conduct legislative, as it still does not establish

---

[1] Even cases that have found that school board decisions may be subject to legislative privilege have recognized that decisions that single out a particular individual are administrative. *See, e.g.*, *Doe v. Metro. Gov't of Nashville & Davidson Cnty.,* 2021 WL 5882653, at *3 (M.D. Tenn. Dec. 13, 2021) (holding that while a vote on school budget is "legislative," if "Plaintiffs uncover facts that tend to support their theory that . . . *specific individuals were targeted for adverse employment actions, they may request permission to take the depositions of the school board members*.")(emphasis added); *Cincotta v. Hempstead Union Free Sch. Dist.*, 313 F. Supp. 3d 386, 402-03 (E.D.N.Y. 2018) (cited in Mot. at 7-8) (noting that "terminations of positions and votes based on budgetary constraints are legislative in nature," while "[p]ersonnel decisions are administrative . . . if they are directed at a particular employee").

policy of general applicability. Indeed, the hiring and firing of individual employees necessarily entails exercising judgment or line-drawing about whether the employee meets the criteria for retention or separation, but such activities are recognized as administrative.[2] Allowing the Order to stand would set a precedent equating the application of an existing policy with policy-making.

Finally, the district-wide scope or indefinite effect of the decision does not make it legislative; it still reflects the application of an existing policy to individual complaints. *See, e.g.*, *Oakes Farm Food & Distrib. Servs. v. Sch. Dist. of Lee Cnty.*, 541 F. Supp. 3d 1334, 1349 (M.D. Fla. 2021) (rejecting school board members' claim of legislative immunity in a district-wide contract termination case arising from the plaintiff's social media posts, as the decision was "specific to Oakes Farms and its owner, not general" and did "not involve the kind of prospective, legislative-type rules that are protected by absolute legislative immunity").

---

[2] The Order recognizes that "on the well-recognized-as-administrative side are cases involving the hiring and firing of individual employees." Order at 4-5. Here, Plaintiffs contend that the former Superintendent Tim Smith was fired in part because the Board was unhappy with his handling of the book challenges, Am. Compl. ¶¶ 107-108, and sought discovery from the Board to inquire about his firing. *See* Pls.' First Request for Production of Documents No. 22 (Decl. of S. Agarwal in Supp. of Objections ("Agarwal Decl.") Ex. 1). ("All Documents and/or Communications describing the reasons for the termination of former School Superintendent Tim Smith"). It appears that depositions of the individual Board Members into their motives for firing Dr. Smith would not be barred by legislative privilege and at a minimum should be authorized.

Accordingly, the Order's conclusion—that the Board's decisions to remove or restrict certain books were legislative—is contrary to law.

### B. The Order's Determination That the Board Has Not Waived Legislative Privilege Through Its Discovery Production is Contrary to Law and Clearly Erroneous.

The Order's determination on waiver is contrary to law insofar as it held that the Board could not waive privilege in these circumstances and also "clearly erroneous" insofar as it held that the Board's production of relevant documents does not constitute waiver. A decision is clearly erroneous where, upon review of the entirety of the evidence, the court will be "left with the definite and firm conviction that a mistake has been committed." Malibu Media, LLC, 923 F. Supp. 2d at 1347 (internal citations omitted) (collecting authority).

#### 1. The Order Incorrectly Concluded that a Legislative Body Can Never Waive the Privilege of Its Members.

The Order relied on inapposite cases to conclude that legislative privilege must be waived by the individual School Board Members, such that any production of these Board Members' documents by the School Board does not waive the privilege. *See* Order at 12-14 (citing cases). Importantly, with one exception cited below, none of the cases cited in the Order addressed the relevant question here—whether a legislative body can, in certain circumstances, waive the privilege of its members. Here, the body at issue is comprised of only five members, many of the communications that constitute waiver of the privilege were produced from the

individual Board Members' personal phones (indicating their involvement in the process), the same counsel is representing the Board and the Members' asserted interests, and the Members have not appeared in the action. Under these facts, the Board's action in producing the relevant communications should constitute waiver.

Moreover, where, as here, the legislative body itself is the party to the action and has itself asserted the legislative privilege on behalf of its individual members, it should not also be permitted to argue that none of its actions have any waiver implications with respect to that privilege. In the first instance, the Board—and not the Board Members—filed a motion asserting legislative privilege on its Members' behalf. When this was dismissed, the Board—and not the Board Members—filed a renewed motion on its Members' behalf, attaching declarations from its Members. And even when the parties were discussing whether it would be necessary to file motions to quash Plaintiffs' subpoenas for the Board Members' testimony, Defendant's counsel proposed this in terms of the Board—and not the Board Members—filing these motions.[3] It cannot be the case that the Board has the power both to assert legislative privilege on School Board Members' behalf but cannot

---

[3] *See* Agarwal Decl. ¶ 2 & Ex. 2 (N. Smith 8/29/24 Email Chain) (Defendant's counsel saying variously that "we will be filing a motion to quash," "for Defendant to respond to the subpoenas, i.e., to file motions to quash," "[seeking] an extension for Defendant to respond to the subpoenas" and not correcting Plaintiffs' counsel's characterizations that "Defendant plans to file a motion to quash").

waive such privilege when it produces messages from Board Members' personal phones in close coordination with the Board Members.

The cases cited in the Order, with one incorrect and noncontrolling exception, do not address the situation here. The Order cites to *In re Hubbard*, 803 F.3d 1298 (11th Cir. 2015) for the proposition that legislative privilege protects legislative motive and belongs to the individual legislators, which Plaintiffs do not dispute. The Order also cites to *Puente Arizona v. Arpaio*, 314 F.R.D. 664, 671 (D. Az. 2016), which is distinguishable because the court found no waiver of legislative privilege where the plaintiffs failed to identify the produced documents that allegedly constituted waiver and failed to explain why their disclosure amounted to waiver. Plaintiffs here are being much more specific, attaching the documents at issue and explaining them at length below.

As to *Parnell v. School Board of Lake County, Florida*, No. 4:23-cv-414-AW-MAF (N.D. Fla.), this case is not controlling on this Court. *Parnell* comes to the incorrect conclusion that the Board's production of documents cannot waive individual Board Members' privilege by relying on dicta from two cases that do not address the issue of waiver or grapple with the question presented here.

*Parnell* cites first to *Common Cause Florida v. Byrd*, 674 F. Supp. 3d 1097, 1107 (N.D. Fla. 2023) (quoting *Marylanders for Fair Representation, Inc. v. Schaefer*, 144 F.R.D. 292, 299 (D. Md. 1992)), for the general proposition that the

privilege may be asserted or waived by the individual legislator. But the quotation in *Byrd* was focused on the fact that a deponent chose to waive the privilege with respect to some issues and not others; it did not address whether a legislative body could waive the member's privilege under certain circumstances. And *Schaefer*, the case on which *Byrd* relied, similarly had nothing to do with waiver. The quotation there was focused on the fact that individual legislators need to invoke the privilege (as evidenced by the footnote appended to the end of the quotation, which is not referenced in *Byrd* or *Parnell*, and which notes that plaintiffs could require each legislator to assert the privilege on his own behalf). *Parnell* next cites to *League of Women Voters of Florida, Inc. v. Lee*, 340 F.R.D. 446, 453 (N.D. Fla. 2021), in the single paragraph of the *Parnell* opinion that addresses the question of whether production of documents by the Board constitutes waiver of the privilege. But *Lee* also does not address whether a legislative body can waive the privilege. It simply notes, without discussing, that the legislators agreed to provide documents in response to a subpoena but asserted privilege with respect to the proposed depositions; there is no discussion of whether the documents were themselves privileged and the question of whether their production would constitute a waiver was not before the court. Because *Parnell* is not controlling and is not based on any case addressing this issue directly, this Court can and should determine that the Order's waiver conclusion is contrary to law.

> **2. The Order's Finding that the Board's Production of Its Members' Communications About the Reasons for Their Decisions is Clearly Erroneous, Given the Volume and Nature of these Communications.**

It was clear error for the Magistrate Judge to find that Board Member communications produced by the Board did not waive legislative privilege. As Plaintiff explained in its opposition to the Motion for protective order, Defendant had earlier produced at least three communications by Board Members disclosing the bases for their decisions on particular books that are worth examining at length:

- Pls.' Opp. at 2-3: Board Chair Adams expressed in response to a community member's email that keeping *All Boys Aren't Blue*, *And Tango Makes Three*, and *When Aidan Became a Brother* on Escambia County school library shelves amounted to "exposing children as young as kindergarten to books that promote transexual decisions and homosexual ideas," which is "inappropriate" and that he "agreed with [these] concerns and w[ould] vote accordingly" during the 2/20/23 School Board Meeting where these books were considered.

- *Id.* at 4-5: Board Member Williams emailed notes to himself for the 2/20/23 School Board Meeting about *All Boys Aren't Blue*, indicating that he viewed the book as violating the law prohibiting pornography in public schools.

- *Id.* at 6-7: Board Member Hightower, upon receipt of a community member's email shortly after the 2/20/23 School Board Meeting expressing disappointment at the decision to remove *And Tango Makes Three* as erasing families that may have two moms or dads and signaling disapproval to students from such families, responding "I agree with you . . . This is normal behavior in that they take care of those in their community."

Each of these communications, coming so close in time to the School Board's vote to remove the school library books on which the Board Members opined supports

waiver of any legislative privilege. *See SE Prop. Holdings, LLC v. Gulfsouth Private Bank*, 2015 WL 12868077, at *3 (S.D. Fla. Feb. 27, 2015) (production of emails addressing purportedly privileged topic waived any associated privilege).

Further, Defendant finally produced a privilege log earlier this week, but did not invoke legislative privilege as to a single document, notwithstanding the fact that many additional documents Defendant has produced since the parties briefed and argued the renewed motion for a protective order explicitly address individual Board Members' specific motivations for wanting to remove or keep particular books in school libraries:[4]

---

[4] Apart from the communications set forth in the text, all produced by the Board on October 16, 2024, Plaintiffs note that since they briefed the renewed motion for a protective order, they have identified several other documents in Defendant's earlier productions in which individual Board Members disclose their reasons for voting to remove or keep particular books. Plaintiffs note a couple of these documents here:

- E-ECSD_0000242 (Agarwal Decl. Ex. 3): On 2/13/23, Board Chair Adams emailed himself linking to a Fox News article about Lake County School District removing access to *And Tango Makes Three* from schools and school libraries for K-3rd grade students because of concerns it would violate HB 1557, one week before the School Board Meeting where Adams voted to remove the book from all Escambia County School District libraries.

- E-ECSD_0020598 (Agarwal Decl. Ex. 4): On 2/14/23, Board Chair Adams emailed a community member listing possible reasons each of three challenged books "could be considered offensive in any way" to share with an outside group (as to *All Boys Aren't Blue*, "[p]rofanity, brutality, sexual behavior, drug/alcohol, violence, language, manner characters are presented, political positions, religion, or portrayal of religious/ideologies"; as to *And Tango Makes Three*, "[m]anner characters are presented"; and as to *When*

- ADAMS 10-12 (Agarwal Decl. Ex. 5): Board Chair Adams messaged a community member on 10/13/22 that the "Bible never should have been on the restricted list." This message suggests possible religious motivations for Adams' votes on the books at issue.

- ADAMS 17-18 (Agarwal Decl. Ex. 6): Board Chair Adams messaged a community member on an unknown date that "We definitely need more conservative school board members. If Paul Fetsko loses to his leftist opponent it would swing our board to a majority left board. And I would be a very lonely guy." The community member responded with reference to Fetsko's opponent's willingness to keep "those books in schools," and Adams solicited her support for Fetsko. This message suggests possible partisan motivations for Adams' votes on the books at issue.

- ADAMS 28-30 (Agarwal Decl. Ex. 7): In response to a community member's message on 2/20/23, the day of the School Board Meeting on *All Boys Aren't Blue*, *Tango*, and *Aidan*, noting that "our elementary schools have plenty of transgender and lesbian related books in them that clearly violate the law of God, and also violate hb1557 as well," and pressing for the removal of the current superintendent as a result, Board Chair Adams expressed his affirmation of this viewpoint with a thumbs-up sign.

- ADAMS 40 (Agarwal Decl. Ex. 8): In a Facebook group with Christina Pushaw, a press spokesperson for Governor DeSantis, and Tiffany Justice, a co-founder of Moms for Liberty, on 2/23/23, Board Chair Adams sent a press release from the Escambia County Democrats condemning the School Board's removal of books from school libraries on 2/20/23, and Adams responded "I am on the democrats honorable mention again! We have a big battle shaping up in Escambia County over books." This message again suggests possible partisan motivations for Adams' votes.

- ADAMS 43, 47, 52 (Agarwal Decl. Exs. 9-11): In various messages with Vicki Baggett (on 3/19/23 and 3/20/23, in conjunction with the 3/20/23 School Board Meeting when the Board voted to remove *Drama* and *New Kid* from elementary school libraries and to remove access to *The Bluest Eye* and *The Nowhere Girls* by 9th and 10th graders; and some time in May 2023, in conjunction with the 5/16/23 School Board Meeting), Board Chair Adams

---

*Aidan Became a Brother*, "[a]berrant behavior, [m]anner characters are presented").

collaborates with Baggett in advance of the Board Meetings at issue on the best way to present their objections to the books discussed. These messages suggest that Adams agrees with Ms. Baggett's explicitly discriminatory bases for challenging many of the books at issue.

- HIGHP 2 (Agarwal Decl. Ex. 12): In response to a reporter's question as to whether the three books up for discussion at the 2/20/23 School Board Meeting should be banned, Board Member Hightower texted that she "plan[ned] to support the District Committee's recommendation" to keep the books (though noting that she may not support all of the recommendations) and screen-shotted a community comment on *Aidan* expressing "As some who has know [*sic*] a family with a situation very much like the one described in this book, I am compelled to speak up in support . . . . Shouldn't every child have the hope to read a book that describes someone like them?" This text thread suggests some endorsement by Hightower of the views expressed in the community comment and that this was part of the reason she voted to keep *Aidan* during the School Board Meeting on the book that evening.

- WILLD 1 (Agarwal Decl. Ex. 13): On 2/20/23, Board Member Williams sent a text message to a community member stating "The book review tonight is not about African American study's [*sic*] but homosexuality, gender identity, and transgender books in our media centers." This was on the morning of the School Board Meeting to discuss *All Boys Aren't Blue*, *Tango*, and *Aidan*. His characterization of the books in this manner suggests that his perception that these subjects are not appropriate for students were a basis for him to vote against keeping these books for some grade levels.

Given the extent of the Board's production of communications about individuals Board Members' motivations to make the decisions they did with respect to the books at issue in this case, any privilege that might have conceivably shielded the Board Members from being required to testify regarding their reasons for removing specific books has been waived.

## IV.  CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court sustain their Rule 72(a) Objections to Magistrate Judge Bolitho's Order Granting the Board's Renewed Motion for Protective Order Asserting Legislative Privilege and issue an order compelling the depositions of the Board Members.

Respectfully submitted,

Dated: November 1, 2024

*/s/ Lynn B. Oberlander*
Lynn B. Oberlander*
**BALLARD SPAHR LLP**
1675 Broadway, 19th Floor
New York, NY  10019-5820
Telephone: 212.223.0200
Facsimile: 212.223.1942

Mike Kilgarriff**
Ballard Spahr LLP
1225 17th Street, Suite 2300
Denver, CO 80202
Telephone: 303.292.2400
Facsimile: 303.296.3956

Matthew G. Kussmaul**
Facundo Bouzat*
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA  19103
Telephone: 215.864.8500
Facsimile: 215.864.8999

Kirsten Fehlan*
**BALLARD SPAHR LLP**
999 Peachtree Street, Suite 1600

Atlanta, GA 30309
Telephone:678.420.3000
Facsimile: 678.420.9401

Goldie Fields*
**BALLARD SPAHR LLP**
2029 Century Park East, Suite 1400
Los Angeles, CA 90067
Telephone: 424.204.4338
Facsimile: 424.204.4350

Shalini Goel Agarwal (FBN 90843)
Ori Lev*
**PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
Telephone: 202.579.4582
Facsimile: 929.777.8428

*Admitted pro hac vice*

**Pro hac vice motion forthcoming*

*Attorneys for Plaintiffs*