## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | | |
|---|---|---|
| PEN AMERICAN CENTER, INC., GEORGE M. JOHNSON, KYLE LUKOFF, ANN NOVAKOWSKI, on behalf of herself and her minor child, PENGUIN RANDOM HOUSE LLC, SEAN PARKER, on behalf of himself and his minor child, ASHLEY HOPE PÉREZ, and CHRISTOPHER SCOTT SATTERWHITE, on behalf of himself and his minor child. | : : : : : : : : : : : : : : | CASE NO.: 3:23-CV-10385-TKW-ZCB<br><br>JURY TRIAL DEMANDED |
| *Plaintiffs*, | : | |
| v. | : : | |
| ESCAMBIA COUNTY SCHOOL BOARD, | : : : | |
| *Defendant*. | : | |

## <u>SECOND AMENDED COMPLAINT</u>

This lawsuit, on behalf of PEN American Center, Inc. ("PEN America"), select book authors, a book publisher, and a number of parents of students attending public schools in Escambia County (collectively, "Plaintiffs"), challenges the decisions of the Escambia County School Board (the "School Board") to remove and restrict books from public school libraries within the Escambia County School District (the "School District"). The School Board has done so based on its disagreements with the ideas expressed in those books. In every decision by the

Board to remove an individual book, the School Board sided with a challenger expressing openly discriminatory bases for the challenge, overruling in the process the recommendations of review committees at the district level.  These restrictions and removals have disproportionately targeted books by or about people of color and/or LGBTQ people, and have prescribed an orthodoxy of opinion that violates the First and Fourteenth Amendments.  More recently, the School Board removed many books at issue in this case along with several hundred others en masse—all with zero review—purportedly based on a list of books removed in school districts throughout the state.  However, these other districts, in several cases, removed the books on viewpoint discriminatory grounds.  The School Board's removal of these same books because of their inclusion on a list implicitly adopts this viewpoint discrimination, is pretextual, and amounts to a wholesale delegation of standardless discretion as to what books are age appropriate in Escambia school libraries that violates the First Amendment.

## I.    INTRODUCTION

1.    The Supreme Court has long recognized that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools," which serve as a "marketplace of ideas."  *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969).  That is because "the Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas

which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." *Id.* (cleaned up).

2.    School libraries, where students discover new areas of interest and engage in voluntary inquiry outside the context of required curriculum, are an essential part of this exchange of ideas.

3.    While school administrators concededly "possess significant discretion to determine the content of their school libraries," including determining whether books are age-appropriate, that "discretion may not be exercised in a ***narrowly partisan or political manner***." *Board of Education v. Pico*, 457 U.S. 853, 870 (1982) (emphasis added).  That is because "[o]ur Constitution does not permit the official suppression of ideas." *Id.* at 871.  Accordingly, the First Amendment bars a school district from removing books from school libraries, or restricting access to such books, based on political or ideological disagreement with the ideas they express.

4.    Moreover, in the First Amendment context, "[l]aws without discernible standards threaten enforcement that is 'impermissibly based on context or viewpoint.'" *HM Florida-ORL, LLC v. Governor of Florida*, 137 F.4th 1207, 1226 (11th Cir. 2025) (citation omitted).

5.    Plaintiffs bring this lawsuit because that is exactly what is happening in Escambia County.  Books are being ordered removed from libraries, or subjected to

3

restricted access within those libraries, based on ideologically-driven efforts to push certain ideas out of schools. Even though parents can already opt their child out of having access to particular books (or all books), the School Board is summarily ordering the district-wide removal of books based on the openly ideological, political, and discriminatory views of a small minority and *against* the recommendations of review committees—composed of parents, teachers, principals, media specialists, and other community members within the School District—that follow a robust review process focused on whether materials are age-appropriate and educational. This disregard for professional deliberation and guidance underscores that the removals are ideological and political, not pedagogical.

6.    In addition, the School Board has impermissibly delegated its decision-making authority as to which books are age-appropriate to a list of removals from other school districts across the state that are themselves imbued with viewpoint discrimination. This delegation of standardless discretion with zero review of the books at issue—in several cases overruling the School Board's or Review Committees' earlier review and decision to keep books for at least some grade levels—does not adequately protect First Amendment rights.

7.    As a result, the School Board is depriving students of access to a wide range of viewpoints, and depriving the authors and publishers of the removed and restricted books of the opportunity to engage with readers and disseminate their ideas

to their intended audiences.  Such viewpoint discrimination and delegation of standardless discretion violates the First Amendment.

8.    Today, Escambia County seeks to remove or limit access to books a small minority views as too "woke."  In the 1970s, schools sought to bar books by Langston Hughes (among others).  Tomorrow, it could be books about Christianity,[1] the country's founders, or our nation's war heroes.  All of these removals run afoul of the First Amendment, which is rightly disinterested in the cause du jour.

9.    The plaintiffs bringing this suit include (a) PEN American Center ("PEN America"), a nonprofit member-based organization that represents authors throughout the United States, including authors whose books already have been removed from libraries in the School District and authors whose books have been targeted for future removal and have been subjected to restricted access in the meantime; (b) authors whose books have been removed from or subjected to restricted access in School District libraries; (c) Penguin Random House LLC ("PRH"), the publisher of many books that have been ordered removed from, or subjected to restricted access in, these libraries; and (d) parents of students who

---

[1] Notably, the Bible has been subject to challenge in Escambia County public school libraries, although it was not removed because it is authorized as an appropriate educational resource under a separate Florida statute.  But, in other jurisdictions, book challenges had resulted in the removal of the Bible from public school libraries. *See* Tilda Wilson, A Utah school district has removed the Bible from some schools' shelves, NPR, June 2, 2023, https://www.npr.org/2023/06/02/1179906120/utah-bible-book-challenge.

attend schools in the School District, who are suing on behalf of both themselves and their minor children for access to removed and restricted books.

10.    The plaintiffs have joined together in this lawsuit to vindicate the rights of parents, students, authors, and book publishers to ensure that public school libraries continue to serve all communities and provide spaces dedicated to the exploration and dissemination of a wide variety of ideas, points of view, and experiences, free from viewpoint discrimination and arbitrary removals based on a delegation of standardless discretion.

## II.    PARTIES

### A.    Plaintiffs

11.    Plaintiff PEN America is a nonprofit membership organization headquartered in New York.  Founded in 1922, PEN America works to ensure that people everywhere have the freedom to create literature, to convey information and ideas, to express their views, and to access the views, ideas, and literatures of others. PEN America's membership is made up of more than 5,000 novelists, journalists, nonfiction writers, editors, poets, essayists, playwrights, publishers, translators, agents, and other writing professionals.  Members of PEN America live in every state in the country.

12.    PEN America operates "Free Expression Programs" that serve to defend writers and journalists and protect free expression rights in the United States

and around the world.  These efforts typically include research and reports, public advocacy, and campaigns on behalf of particular policy issues or individuals.  Topics for these programs have included campus free speech, online harassment, and writers and artists facing political persecution abroad.

13.    PEN America's mission is to unite writers and their allies to celebrate creative expression and defend the liberties that make it possible.  Historically, this has included work to celebrate literature through awards, grants and public programming, offering public support for threatened writers, and seeking to bolster the freedom of expression worldwide.  Since approximately 2021, with the rise of efforts to remove and restrict books in K-12 public school libraries, PEN America began dedicating time to documenting these removals and restrictions; publishing periodic reports on book bans as part of the Banned in the USA series; and working with authors and community members to raise public awareness of the harms of educational censorship.  The prolific book removals and restrictions by the Escambia County School Board further pulled PEN America away from other programming. PEN America's work to address book removals and restrictions has only increased in recent years as many school districts and states have followed Defendant's lead.

14.    PEN America includes among its members many authors whose books have been removed or subject to restricted access within the School District.  These include each of the Author Plaintiffs, as well as other award-winning authors such

as Margaret Atwood, Judy Blume, Alex Gino, John Green, Khaled Hosseini, Susan Kuklin, and Jodi Picoult.

15.    Plaintiffs George M. Johnson, Kyle Lukoff, and Ashley Hope Pérez (collectively, the "Author Plaintiffs") are each authors whose books have been removed from libraries within the School District.

16.    Plaintiff Johnson is a resident of California and Black and non-binary; they are the author of young adult books.  Johnson's book *All Boys Aren't Blue* is a "memoir of growing up Black and gay" in the form of a series of coming-of-age essays.  *All Boys Aren't Blue* was challenged in September 2022.  Despite a unanimous vote by the district review committee in favor of retaining the book in high school libraries, the School Board voted to remove *All Boys Aren't Blue* from all libraries on February 20, 2023.

17.    Plaintiff Lukoff is a Connecticut resident.  He is a white, transgender man, and the author of multiple children's books.  Prior to becoming a published author, he was an elementary school librarian.  His book *When Aidan Became a Brother* was challenged in September 2022.  Despite a district review committee recommending 4–1 that the book be retained in libraries at all levels, the School Board voted to remove *When Aidan Became a Brother* from all libraries on February 20, 2023.

18.     Another book, *Too Bright to See*, also by Plaintiff Lukoff and published by Plaintiff PRH, was challenged in February 2023 and was subject to restricted access in elementary school libraries until April 2024, when it was returned to library shelves after the School District's librarians determined it did not contain depictions or descriptions of sexual conduct under HB 1069.  On October 10, 2024, the book was removed from all libraries based on animus toward transgender individuals.

19.     Plaintiff Pérez is a white woman and resident of Ohio.  She is an author of young adult fiction, a former public school teacher of high school English, and, currently, a literature professor at The Ohio State University.  Her book *Out of Darkness*, which was previously generally accessible within high school libraries in the School District, was challenged in late August 2022, and was subject to restricted access pending review of the challenge for two and a half years.  On July 15, 2025, the School Board voted to remove *Out of Darkness* from all libraries without reviewing the book, despite a district review committee previously determining it was appropriate for 11th and 12th grade students.

20.     For each Author Plaintiff, public school libraries are a critical means of reaching their intended audiences, and obtaining the broadest possible readership.  Accordingly, it causes serious harm for them, personally and professionally, for their books to be removed from public school libraries or subject to restricted access within such libraries.

21. Plaintiff PRH is a Delaware Limited Liability Corporation headquartered in New York. It is a general interest publisher committed to publishing books for everyone. Two books published by PRH had already been removed from at least some School District libraries as of July 2023: *The Bluest Eye* by Toni Morrison and *Push* by Sapphire. While *The Bluest Eye* had previously been removed for all grades except 11th and 12th, on July 15, 2025, the School Board voted to remove this book from all libraries without reviewing the book.

22. Several more books published by PRH have been targeted for removal and were subject to indefinite restricted access pending completion of the review process. Among such books are: *Beloved* by Toni Morrison, *The Freedom Writers Diary: How a Teacher and 150 Teens Used Writing to Change Themselves and the World Around Them* by Erin Gruwell, *The Handmaid's Tale* by Margaret Atwood, *The Kite Runner* by Khaled Hosseini, *Slaughterhouse-Five* by Kurt Vonnegut, *Too Bright to See* by Plaintiff Lukoff, and *Two Boys Kissing* by David Levithan.[2] In June and July of 2025, the School Board voted to remove each of these books from all libraries without reviewing the books. Other books published by PRH have been restricted for as long as three years pending a determination of the challenge to the book.

---

[2] *Two Boys Kissing* was restricted for many months before it was returned to library shelves after the School District's librarians determined it did not contain depictions or descriptions of sexual conduct under HB 1069.

23.    PRH's mission is to lay the seeds for the future of reading for generations to come by promoting literacy, giving voice to many and varied experiences and stories and fostering empathy and inspiring free and open debate.  PRH aims to publish books that provide children with a gateway to the whole world.  Continued inclusion in public school libraries is critical to PRH's mission, especially for books intended for elementary and young-adult readers.

24.    Plaintiffs Ann Novakowski, Sean Parker, and Christopher Scott Satterwhite (collectively, the "Parent Plaintiffs") are parents of students currently attending elementary or high schools in the School District.  They bring these claims both on behalf of themselves, as parents who want their children to have access to books that have been removed from, or restricted within, their children's or other schools' library, and their minor children, who also want such access.

25.    Plaintiff Novakowski is white and a Florida resident.  She is the mother, next of friend, and general guardian of a rising third grade student at A.K. Suter Elementary School in the School District.  In the upcoming school year, her child wants to check out specific books from her school library that are currently unavailable because they have been removed.  In addition, Novakowski wants her child to have access to these books, and others like them, among other reasons, so that she is presented with different viewpoints and experiences and, thus, better prepared to engage with a wide range of people.

26.    Plaintiff Parker is Black and a Florida resident.  He is the father, next of friend, and general guardian of a rising tenth grade student at Pine Forest High School in the School District.  In the upcoming school year, his child wants to check out specific books from his school library that are currently unavailable because they have been removed.  In addition, Parker wants his child to have access to these books, and others like them, among other reasons, in order to be exposed to books by and about Black people to help him develop a stronger sense of his cultural identity.

27.    Plaintiff Satterwhite is biracial and a Florida resident.  He is the father, next of friend, and general guardian of a rising twelfth grade student at Pensacola High School in the School District.  In the upcoming school year, his son wants to check out specific books from his school library that are currently unavailable because they have been removed.  In addition, Satterwhite wants his son to have access to these books, and others like them, so that he can use his school experience to explore Black history and a wide array of other subjects and experiences based on his own interests.

28.    For each Parent Plaintiff, they have a fundamental right to direct their child's upbringing and an interest in public school libraries not removing or restricting books by and about people of color and LGBTQ individuals, suggesting that these identities and discussions about them are taboo and preventing their

children from coming across such books in the school library. Accordingly, it causes serious harm for the Parent Plaintiffs' interest in directing their child's education for the Board to remove or restrict these books.

### B. Defendant

29.    Defendant School Board is the five-member governing body of the School District, elected from geographical districts within Escambia County.

30.    The School Board oversees and manages all schools within the School District, and, by statute, has the capacity to sue and be sued.

## III.    JURISDICTION AND VENUE

31.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the First and Fourteenth Amendments to the United States Constitution, and under 42 U.S.C. § 1983.

32.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because the Defendant resides in this district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## IV.    FACTUAL ALLEGATIONS

### A.    Categories of Books at Issue

33.    There are 161 books at issue in this Second Amended Complaint. These are a subset of the 170 books at issue in Plaintiffs' First Amended Complaint,

accounting for 9 books that the School District has lost and for which a challenge was dismissed.[3]

34.    For clarity's sake, Plaintiffs will use the following shorthand to describe the books at issue, and attach as Exhibit 12 a list of the books in each category and subcategory:

    a. <u>Original Removed Books</u>: This category includes the 9 books removed from at least some libraries by the School Board in 2023.

    b. <u>Recent Removed Books</u>: This category includes the 120 books removed from at least some libraries by the School Board or Review Committees in 2024 and 2025, which encompasses the following subcategories:

        i. <u>Committee-Removed Books</u>: This subcategory includes the 3 books at issue in this lawsuit removed from at least some libraries by reconstituted district review committees beginning in October 2024, for which no appeal has been filed with the School Board, and which are not among the Superintendent-Removed Books or the Mass-Removed Books.

---

[3] The list of 170 books at issue in the case was shared in discovery and identified as Ex. 3 to the 30(b)(6) deposition of the School Board (the deposition of Bradley Vinson).

ii. <u>Superintendent-Removed Books</u>:  This subcategory includes the 16 books at issue in this lawsuit removed from all libraries by the School Board on June 17, 2025, based on recommendation of the Superintendent.

iii. <u>Mass-Removed Books</u>:  This subcategory includes the 101 books at issue in this lawsuit removed from all libraries by the School Board on July 15, 2025, based on inclusion in the Florida Department of Education lists of books removed in at least one other county in 2022-2023 or 2023-2024. This category includes the 98 Mass-Removed Books listed on Exhibit 12, as well as the 3 Original Removed Books that the Board voted to remove from all school libraries on July 15, although it had previously removed the books only for some grade levels.

c. <u>Current Restricted Books</u>:  This category includes the 15 books at issue in this lawsuit still subject to challenge and currently restricted pending resolution of the challenge.

d. <u>Contingent Books</u>: This category includes 20 books at issue in this lawsuit that, while currently available, may be subject to future

restriction or removal by the School Board,[4] which encompasses the following subcategories:

    i.   <u>Pending Challenge Books</u>:  This subcategory includes 15 books at issue in this lawsuit still subject to challenge and currently unrestricted pending resolution of the challenge.

    ii.   <u>Challenge Resolved Books</u>: This subcategory includes 5 books at issue in this lawsuit that district review committees voted to retain without an appeal or further action by the School Board to date.

## B.    The Unique and Important Function of Public School Libraries

35.    Libraries occupy a unique and important role within public schools. Like schools more generally, school libraries are spaces for learning and the exploration of ideas.  But, unlike a structured classroom setting, libraries afford students opportunities to learn and explore ideas in self-directed ways, guided by their own interests, curiosities, and questions about the world.  They provide students with the opportunity to engage with and explore new and unfamiliar perspectives

---

[4] While the Contingent Books are currently on the School District's library shelves, Plaintiffs consider these books to still be at issue here, given the volatile nature of the School Board's actions in restricting and removing books on the shelves, including those under challenge and those that review committees or the Board have recommended or decided to retain in at least some libraries.

and ideas, as well as to see representations of their own experiences, communities, and ideas.

36.    As the Supreme Court has emphasized, it is fundamental to our understanding of what schools are that "students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding." *Pico*, 457 U.S. at 868.  And, "***[t]he school library is the principal locus of such freedom***." *Id.* at 869 (emphasis added).  That is because, "in the school library a student can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum. The student learns that a library is a place to test or expand upon ideas presented to him, in or out of the classroom." *Id.* (cleaned up).

37.    Accordingly, public school libraries are crucial spaces for student learning.  In libraries, students can explore their own interests, and encounter different ideas and experiences in ways that help prepare them for citizenship in our diverse, democratic society.

38.    The School Board's own Policy Manual in place at the time of the book challenges here at issue reflected this understanding of the role and purpose of school libraries.  It provided that one of the "function[s]" of libraries within the School District "is to contribute to the development of informed and responsible citizens," and that "[i]t is the duty of the [School] District to provide a wide range of materials of different levels of difficulty, with diversity of appeal and representing different

points of view taking into account the varied interests, abilities, and maturity levels of the pupils being served." Ex. 1 at 9.

39.    The Policy Manual further provided that "school libraries media centers . . . shall," *inter alia*, "provide education media that reflects differing and/or opposing viewpoints; [and] provide materials which reflect the ideas and beliefs of many ethnic, religious, and political groups that have contributed to . . . American and world heritage and culture." *Id.* at 8.

40.    School libraries are also of great importance to book authors and book publishers, especially with regard to books aimed at children and young adults. The right to speak means little without the ability to reach listeners. It is, thus, extraordinarily important to book authors and book publishers that their books continue to be fully accessible in public school libraries. This is especially so with respect to those students who lack easy access to books and learning material outside of school. For such students, public school libraries may be the only way for them to access an author's or publisher's book.

## C.    The Push to Remove Books

41.    The wave of book removals and restrictions at issue in this lawsuit began on or about May 23, 2022. On that date, Vicki Baggett, a language arts teacher at the School District's Northview High School, filled out a form for the "Request for the Reconsideration of Educational Media." This would be the beginning of

what turned out to be a widespread—and largely successful—campaign to restrict access to books throughout the School District.

42.    Baggett's efforts have borrowed heavily from, and formed part of, a national campaign to remove books from public school libraries based on ideological objections to their contents, particularly, their exploration of themes related to race and/or LGBTQ identity.

43.    That campaign has been spearheaded by certain national organizations, such as the Florida-based "Moms for Liberty."  Moms for Liberty is a politically conservative organization that is focused on combating what it describes as the "woke" influence in public schools.  The organization shares and disseminates lists of books it finds politically objectionable, and urges individuals to seek the removal of those books from school libraries.

44.    Baggett has since spoken at a Moms for Liberty meeting in neighboring Santa Rosa County about her efforts to remove books in Escambia County public schools and reportedly "shared tips on how to get content removed."[5]

45.    The subject of the first form Baggett filled out was *The Perks of Being a Wallflower* ("*Wallflower*") by Stephen Chbosky.  Baggett objected to the book's

---

[5] Romi White, *New Legislation Will Help Local Moms for Liberty More Quickly Remove Pornographic Materials from Schools*, South Santa Rosa News, May 31, 2023, https://ssrnews.com/new-legislation-will-help-local-moms-for-liberty-more-quickly-remove-pornographic-material-from-schools/.

inclusion in classroom sets for potential use as an optional novel for study in high schools.[6]

46.    *Wallflower*, based on the author's own experiences growing up in suburban Pittsburgh in the 1980s, deals with common adolescent struggles, including drugs, sexuality, mental illness, and family difficulties, and the characters' personal growth past these challenges.

47.    Baggett would later admit that she had not heard of *Wallflower* prior to her efforts to prevent it from being read in the School District.  It appears that the book came to her attention only because it was one of the books that has been frequently targeted for removal or restriction in recent years.

48.    Following Baggett's challenge, in July 2022, a panel consisting of Northview leadership, faculty, staff, and a parent reviewed the book, discussed its use, and voted 4–3 to retain *Wallflower* as optional study material, noting that "[t]he concerns raised in the complaint are part of the characters' development throughout the novel.  These concerns do not outweigh the potential discussions and literary value of the novel enough to remove it" from the school.  Ex. 2 at 2.

---

[6] Plaintiffs' claims in this action do not involve, rely on, or challenge any action taken by Defendants with respect to any classroom curricular materials, whether optional or required—including any decisions regarding the inclusion of *Wallflower* in the curriculum.  Plaintiffs' claims are limited solely to the removal of materials from the School District's libraries, and/or the restriction of access to such materials within such libraries.  Thus, Plaintiffs challenge the removal of *Wallflower* from libraries as part of the Mass-Removed Books.

49.     On July 28, 2022, Baggett appealed the panel's determination with a letter to the School District's Assistant Superintendent for Curriculum and Instruction, copying, among others, the members of the School Board, the superintendent, and the Governor of Florida. *Id*. at 3-6.

50.     The Assistant Superintendent responded by convening a "district review committee" to review the book, as dictated by the School District's procedures governing book challenges.

51.     On or before September 21, 2022, the district review committee, consisting of two high school media specialists, two high school teachers, one high school administrator, one parent of a school student, and one community member evaluated the appeal.  This included reviewing the written complaint against the book, and also reviewing materials relating to the book including lesson plans, the National Council for Teachers of English rationale, relevant state laws, the School District's procedures, the book itself, book reviews, the novel study selection process, justification for use of outside media form, parent opt out letter for novel studies, the complainant's appeal, and community input submitted on the media services website.  After this thorough review, and meeting to discuss these materials, the district materials review committee voted 4–3 to retain *Wallflower* for 12th grade students, citing the same justification as had the Northview panel in July.  Ex. 3.

52.    Baggett then wrote letters to the School District's superintendent, assistant superintendent, and the School Board again protesting the inclusion of *Wallflower*. Ex. 4.  Baggett explicitly linked her effort to get *Wallflower* removed to removal efforts in other jurisdictions.  She attached to one of her submissions an image showing a section of Plaintiff PEN America's "Index of School Book Bans." The image showed eight nationwide instances in which *Wallflower* had been removed from school libraries, classrooms, or both.  *Id.* at 9.

53.    Baggett's October 4 letter also referenced a "parental book rating" for *Wallflower* and attached several excerpts from the book.  *Id.* at 2, 4-8.  Although Baggett's letter did not state the source for the "parental book rating," both that rating and the selected excerpts appear to have been taken directly from a report created by a website called Book Looks, which comprises hundreds of such reports about books containing material that the website's operators consider objectionable.

54.    While Book Looks disclaims affiliation with Moms for Liberty, it was founded by a former member of, and uses the same rating criteria as, the Moms for Liberty chapter of Brevard County, Florida.

### D.    One Teacher Adopts Talking Points from National Groups to Get Books Removed from Libraries

55.    On the heels of her initial efforts with respect to *Wallflower*, Baggett broadened her efforts to limit access to reading material considerably, focusing now on school libraries, rather than curriculum.

22

56.    In August, while the *Wallflower* review process was ongoing, Baggett prepared several lists of books that she targeted for removal.  She ultimately identified 115 such titles (not including *Wallflower*).  She stated that the books "should be evaluated based on explicit sexual content, graphic language, themes, vulgarity and ***political pushes***," noting that she had confirmed the titles were at that time available in School District libraries.

57.    These titles run the gamut from picture books to teen and adult novels, and include both works of fiction and nonfiction.  A substantial portion of the titles on Baggett's lists address LGBTQ themes and/or deal with issues of race or racism.

58.    Like her initial challenge to *Wallflower*, Baggett's subsequent challenges drew heavily from materials that are part of the broader campaign to single out particular books for removal from libraries.  For instance, in connection with her challenge to Raina Telgemeier's book *Drama*, Baggett submitted a list of quotes from the book relating to one character's identification as gay (which was the sole ground on which she objected to the book).  Each quote is identical to a quote the Book Looks website had identified as objectionable.  The same pattern exists for numerous other books Baggett challenged.  In some instances, typos from the Book Looks website were carried over into her challenges.

59.    In other instances, Baggett's challenges employ the same language previously used as part of parallel book-removal campaigns.  For instance, in her

challenge to Mark Weakland's book *When Wilma Rudolph Played Basketball*—a picture book about the childhood of Olympic athlete Wilma Rudolph that includes descriptions of her experiences growing up Black in the segregated South—Baggett objected that the book "opines prejudice based on race." Ex. 5. The identical objection was included in a challenge form previously submitted in a Texas school district.

60.    The bases for Baggett's challenges are blatantly ideological. As detailed below, in many instances, her objections to specific books have been couched explicitly in political terms.

61.    In other instances, the challenges have been more subtle, as Baggett has raised concerns about sexually explicit content as a pretext for targeting books by and about people of color and LGBTQ people or otherwise on topics—such as feminism or sexual assault— that are ideologically based.

62.    By early September 2022, Baggett had shared her list with School District administrators, including members of the School Board, and prepared "Request for Reconsideration of Educational Media" forms for the more than 100 books on her list.

63.    As of August 6, 2025, the total number of books challenged in the School District—by Baggett or someone else—reached 286. According to Defendant's website, 66 of these challenges have been resolved.[7]

64.    The School District maintains a publicly available spreadsheet of all library books that have been challenged, which can be found here: https://docs.google.com/spreadsheets/d/1hv6Wtu55zY3t5bmbksY2ie7Q-L3zAQdjrtaFh4duLC4/edit#gid=0.

65.    The spreadsheet includes, for each challenged book, links to the original challenge form, and information about where the challenge to the book stands, including whether access to the book is being restricted pending adjudication of the challenge.

66.    Many of the challenged books were published decades ago, and have been on library shelves in the School District—and throughout the country—for years without objection or incident.

---

[7] Although these are the numbers currently reflected on the School District's website, the 220 pending challenges listed appear to include many of the books the School Board removed en masse on July 15, 2025.

**E.    In Response to the Onslaught of Challenges, the School Board Changes Its Review Procedures**

67.    Prior to Baggett's challenges, the School Board's policies required that any challenged book remain on library shelves during the pendency of the review process unless and until a decision was made to remove it.

68.    However, in its eagerness to cater to the political objections of Baggett and others, the School Board altered the School District's review policies. Shortly after the wave of challenges began, the then-Chair of the School Board, Kevin Adams, was quoted in local media announcing a plan to short-circuit the review process, saying that he had "asked the superintendent to quarantine or remove from circulation the challenged books until a review consistent with [an unspecified] state statute is conducted."

69.    Around the same time, the School Board's general counsel stated that, although the School Board has the power to remove titles from School District libraries, "***it cannot do so simply because it disagrees with the message of a book or it offends the personal morals of an individual***."

70.    Under the new procedure, any challenged book was automatically subjected to restricted access during the pendency of the review process. Such books were physically moved in each school to the restricted access area of the library/media center. Students were then prohibited from accessing the restricted books without an "opt-in" form signed by the student's parent allowing access to the

restricted section, either for all titles or for specific individual titles. This empowered book challengers to ensure that any book they objected to for any reason would automatically be subject to restricted access.

71.    After a challenge to the Bible and concerns about its restriction under the "restrict all challenged books" practice, the School District amended its practice so that not all challenged books were automatically subject to restricted access during the review process. Nonetheless, the School Board instituted two practices that continued to give challengers substantial power to restrict access to books to which they objected. These practices were applied to previously challenged books that had already been restricted to determine which should remain restricted, as well as to subsequently challenged books. This practice was ultimately adopted as the School Board's policy in December 2022.

72.    First, the School Board automatically restricted access to any book where the challenge could be interpreted as alleging that the book contains content that is pornographic or prohibited under F.S. 847.012.

73.    Florida Statute 847.012 prohibits the sale or distribution to minors of "harmful" material. As applied to books, it incorporates F.S. 847.001, which defines material "harmful to minors" as material that, *inter alia*, "***[p]redominately appeals to a prurient, shameful, or morbid interest***," *and* "[t]aken as a whole, is ***without serious literary, artistic, political, or scientific value for minors***." Fla. Stat.,

§ 847.001(7)(a)-(c) (emphases added).  None of the books at issue here qualify as harmful material under this standard.

74.    Despite this statutory language, the School Board has been using F.S. 847.012 as a pretext to restrict access to books that address other topics it finds objectionable.

75.    For instance, many books that deal with the topic of sexual assault have been automatically restricted under this policy.  One revealing example is *The Kite Runner* by PEN America member Khaled Hosseini, which is published by Plaintiff PRH.  *The Kite Runner* follows an Afghan boy named Amir into adulthood, including his flight from Afghanistan to the United States after the 1979 Soviet invasion, and his later return to the country under the rule of the Taliban.  One key scene in the novel involves Amir's failure to protect his friend from a sexual assault, and his subsequent guilt and shame over that failure.  The book sold over seven million copies, spent two years on the *New York Times* bestseller list, and was made into a major motion picture in 2007.

76.    Baggett challenged *The Kite Runner* based on its depiction of sexual assault, as well as unspecified "horrific language," and stated that the purpose of the book was "[i]ndoctrination."  Ex. 6.  On that basis, *The Kite Runner* was placed on restricted access pending completion of the review process for years.  On July 15,

2025, the School Board voted to remove this book from all school libraries without reviewing the book.

77.    Another similar example of a book subject to such treatment is *The God of Small Things* by Arundhati Roy, which is also published by Plaintiff PRH. *The God of Small Things* is a novel set in Kerala, India, about young twins Rahel and Estha whose lives are upended when their mother has a secret affair with a lower-caste servant. This violation of the social order sets off a chain of events leading to the drowning of a young girl, the murder of the servant wrongly implicated in her death by the twins, and years later an incestuous encounter between the guilt-ridden twins. One pivotal scene in the book is when Estha is molested in a movie theater, and how his trauma from that event contributed to other destructive events in the family's life. *Kirkus Reviews* described the book as "a brilliantly constructed first novel that untangles an intricate web of sexual and caste conflict." *The God of Small Things* won the prestigious Man Booker Prize in 1997.

78.    Baggett challenged *The God of Small Things* on the grounds that it "encourages pedophilia," "sexual abuse," and "incest." Ex. 7. She questioned whether it had any strengths or purpose as educational media. On that basis, *The God of Small Things* was placed on restricted access pending completion of the review process for years. On July 15, 2025, the School Board voted to remove this book from all school libraries without reviewing the book.

79.    Likewise, many books that raise feminist themes were automatically restricted under this policy, especially to the extent that they explore such topics as the prevalence of rape and sexual assault.  One such book is *The Handmaid's Tale* by Margaret Atwood, which is also published by Plaintiff PRH.  *The Handmaid's Tale* is an award-winning dystopian novel that explores the author's criticisms of certain political and cultural elements of contemporary American society by imagining a future in which the U.S. government is overthrown by a patriarchal cult. Though the book does not, by any conceivable metric, qualify as "pornography," or otherwise fall within F.S. 847.012, it was subject to restricted access in all high schools in the School District based on Baggett's complaint that the book contains "[g]raphic sexual depictions + language." Ex. 8.  On July 15, 2025, the School Board voted to remove this book from all school libraries without reviewing the book.

80.    In addition, the School Board's zeal to remove or restrict access to books deemed objectionable by some members of the community has led to a number of classic works of American literature being restricted.  For instance, under the School Board's policy of automatically restricting access to any book challenged on the ground that it contains content that is pornographic or prohibited under F.S. 847.012, the School Board restricted access to (among other books): (a) *Slaughterhouse-Five* by Kurt Vonnegut, which is published by Plaintiff PRH, (b) *Beloved* by Toni Morrison, which is also published by Plaintiff PRH, and

(c) *Forever. . .* by PEN America member Judy Blume—for years. On July 15, 2025, the School Board voted to remove each of these books from all school libraries without reviewing the books. The School Board has done this even though none of those books could possibly be characterized as pornography or otherwise subject to F.S. 847.012.

81.    Second, starting sometime between October 2022 and early 2023, the School Board adopted a new (albeit not codified) practice of automatically subjecting to restricted access any book challenged on the ground that it violates Florida HB 1557, the "Parental Rights in Education Act," also commonly known as the "Don't Say Gay Bill." However, Florida HB 1557, on its face, applies only to "[c]lassroom instruction," and not to library materials. *See id.* § 1 (amending Fla. Stat. § 1001.42(8)(c)(3)). Indeed, the Florida State Board of Education and the Attorney General of Florida have, in other litigation, explicitly disclaimed any application of that law to library materials. *See* State Defendants' Second Motion to Dismiss, ECF 112, *Cousins v. Grady*, No. 6:22-cv-1312, at 8 (M.D. Fla. Dec. 16, 2022) ("[T]he statute regulates only 'classroom instruction,' not the availability of library books.").

82.    Nonetheless, as a result of this practice, challenged books that merely recognize the *existence* of same-sex relationships or transgender persons were subject to restricted access for an extended period of time.

83.    For example, the book *Uncle Bobby's Wedding* was subject to restricted access within elementary school libraries for over a year, from the time it was challenged in March 2023 until April 2024.  The picture book, which is intended for children between ages 3 and 6, contains no explicit sexual content.  The sole ground of the objection is that the "Uncle Bobby" character marries another man.  Ex. 9 at 1.

84.    Another revealing example is Matt de la Pena's book *Milo Imagines the World*, which is published by Plaintiff PRH.  *Milo Imagines the World* is an award-winning book for young children that depicts its lead character passing the time during a long subway ride by imagining the people around him in different situations.  While the challenge to the book acknowledged that it has "[c]olorful pictures and a good story line about creativity and imagination," it objected to one image in which Milo imagines two women marrying each other.  Ex. 10 at 2.  On that basis, the complaint asserted that the "book contains subtle alternate sexual ideology," and was in violation of "HB 1557/Parental Rights Law."  *Id.* at 1.  *Milo Imagines the World* was restricted in all elementary school libraries in the School District for over a year, from the time it was challenged in March 2023 until April 2024.

85.    The barriers for students to access restricted books were significant.  To access them, a student first had to find a librarian, ask the librarian for permission to

access a book that has been designated objectionable for one reason or another—however far-fetched—and then wait while that librarian verified that the student, in fact, had parental permission to access it. Forcing students to undertake these steps, and endure the stigma that goes along with undertaking them, had a profound chilling effect on students seeking access to a wide range of books.

### F.    The School Board Adopts New Policies and Procedures Purportedly Based on HB 1069

86.    In the spring of 2023, the Florida legislature passed HB 1069, through which the Florida legislature amended FS 1006.28.

87.    The amended FS 1006.28, which went into effect on July 1, 2023, provides that any material available in a school or classroom library can be challenged on the grounds, inter alia, that it is "pornographic" or prohibited under Fla. Stat. 847.012, or that it "depicts or describes sexual conduct" as defined by Florida law.[8]  The statute further requires that any book challenged on one of these bases be removed from circulation within 5 days and remain so during the pendency of the challenge.  The amendments mandated by HB 1069 do not allow parents to opt in to allowing their children to access the challenged books.

88.    The amendments mandated by HB 1069 require that books ultimately found to contain depictions or descriptions of sexual conduct shall be made

---

[8] Hereinafter, the term "sexual conduct" means "'sexual conduct' as defined by Florida law."

unavailable for any age group or grade level for which such use is inappropriate or unsuitable. The statute does not require the removal of such books from all libraries or age levels; in fact, the statute allows the retention of such materials for those age groups or grade levels for which they are deemed appropriate and suitable.

89.    In response to the passage of HB 1069, the School Board amended the section of its Policy Manual governing the handling of library book challenges. Ex. 1.[9]  Among other changes, the revised Policy Manual:

a.    Required that books challenged on the basis that they contain content that is pornographic or prohibited by FS 847.012 or depict or describe sexual conduct be restricted within five school days of receipt of the book challenges and remain unavailable to students pending resolution of the challenge;

b.    Deleted the provision authorizing parents or guardians to grant permission for their children to check out such restricted materials;

c.    Deleted the provision authorizing the Superintendent to make a determination that a challenge lacks sufficient facts to support a preliminary finding that a book contains content that is pornographic or prohibited by FS 847.012;

---

[9] A copy of the School Board's current policy relating to library book challenges, Policy 2522, which was adopted on October 15, 2024, and last revised on February 18, 2025, is attached hereto as Exhibit 11.

      d.   Added a provision empowering the Superintendent, in consultation with the Coordinator of Media Services, to make a determination that a challenge to a title on the basis that it contains content that is pornographic or prohibited by FS 847.012 or depicts or describes sexual conduct provides sufficient evidence to remove the title without review by the district review committee or the School Board (the "peremptory removal process").

90.    The School Board also interpreted the amendments made by HB 1069 as requiring a review of every book in every Escambia County Public School library to determine if the book contains depictions or descriptions of sexual conduct. The School Board removed from circulation all library books so that they could be reviewed by school librarians. If that review determined that a book "may" contain depictions or descriptions of sexual conduct, the book continued to be withheld from circulation until a determination was made by the librarians as to the age-level for which it is appropriate. Over time, librarians slowly released books they had "cleared" or for which they had made an age-level determination back to circulation.

91.    Those books that had been challenged prior to the enactment of HB 1069 have been subject to a separate HB 1069 review process. The District's Coordinator of Media Services and a Teacher on Special Assignment to assist her separately reviewed the challenged books to determine whether they "may" contain

depictions or descriptions of sexual conduct. Unlike the regular HB 1069 review described above, however, this review did not assess whether those books that contain depictions or descriptions of sexual conduct were age-group or grade-level appropriate for any school libraries or any grades within those libraries. Instead, if the review determined that the challenged book "may" contain depictions or descriptions of sexual conduct—without regard to considering the book as a whole and whether it contained serious literary, artistic, political, or scientific value for minors—the book was withheld from circulation at all school libraries pending resolution of the challenge. Such restricted books remain completely unavailable to students; the prior parental opt-in allowing access to restricted books is no longer applicable to these titles.

92. The review of previously challenged books discussed in the prior paragraph identified at least twenty books that had been restricted pending review where the books did not contain any sexual conduct. Indeed, those reviewing these books "could not see a consistent reason" for why these books were restricted. Although these titles were identified as not containing depictions or descriptions of sexual conduct as early as September 2023, the books were not un-restricted until April 2024, when the Superintendent was finally convinced that HB 1557 did not apply to library materials. At least three of these cleared books were among the

books the School Board voted to remove from all of its school libraries on July 15, 2025 without reviewing the book (as part of the "Mass-Removed Books").

93.     As of August 6, 2025, 15 books at issue in this lawsuit remain subject to a pending challenge and restricted under the Board's policies (the "Current Restricted Books").

### G.    The School Board Ratifies Baggett's Book Challenges by Removing Books

94.     The process of reviewing the challenged books began in November 2022, starting with *Wallflower*.

95.     The process included community input via online forms as well as an assessment of the book by a district review committee.  This process ultimately resulted in a decision that *Wallflower* was appropriate for high school seniors.

96.     Baggett appealed the decision, and the School Board, overruling the district review committee, voted to remove *Wallflower* as an optional novel study. On July 15, 2025, the School Board voted to remove this book from all school libraries as well without further review.

97.     Around the same time the Board voted to remove *Wallflower* as an optional novel study, Adams, the School Board Chair, was quoted admitting that he was largely deferring to Baggett in his assessments, saying: "I'm not gonna sit here and read 125 books.  Fortunately, it don't take long, ***particularly with this English***

***teacher because she's identified every page in there***.  I don't have to read a smut

book all the way from the very beginning to the very end."

98.    When a book is challenged in the School District, it first goes to a

district review committee.[10]

99.    The district review committees consisted of media specialists, school

staff, parents, and community members.  When the review committees initially

operated, as part of the review process, after an initial meeting, committees reviewed

the written complaint against the book, the books themselves, multiple secondary

materials relating to the book, including book reviews and the National Council for

Teachers of English explanation of the educational value of the books, multiple

secondary materials as to state laws and the School District's procedures, and

community input gathered about the challenge.

100.    About a month later, after reviewing these materials, the committees

met to discuss the book challenge and vote on its resolution, evaluating the

following:

- whether the book is offensive;

- whether questionable elements are an important part of the story's

    development;

---

[10] The challenge to *Wallflower* first went to a school review committee, but that practice was discontinued for subsequent challenges, which went directly to a district review committee.

- which grade levels the book is appropriate for;

- whether the work as a whole has literary, artistic, political or scientific value for the suggested audience;

- what the overall purpose or theme of the book is;

- whether concepts are presented in a manner appropriate to the ability and maturity level of the suggested audience;

- whether illustrations are appropriate for the suggested audience's developmental age;

- whether reading the book will result in a more compassionate understanding of human beings;

- whether the book offers an opportunity to understand and appreciate the aspirations, achievements, and problems of different cultures or minority groups; and

- for nonfiction books, whether the material contributes to the evolution of ideas or supports state education standards.

101.   The committee documents its process and the reasons for its decision in writing.  If the complainant appeals the district review committee's decision, the challenge goes before the School Board.

102.   After the initial decision to remove *Wallflower* as an optional 12th grade novel study, and until June 2025, there were three waves of book removals by

the School Board, resulting in the removal of 9 books: five removed from all school libraries, two removed from elementary school libraries, and two removed from circulation for 9th and 10th graders in high school libraries.[11]  In each instance, the School Board voted for removal over the recommendations of the district review committee, which had deemed the book educationally suitable.

103.   To date, there has not been a *single* instance in which the School Board has rejected a Baggett or other challenge.[12]

104.   On February 20, 2023, the School Board voted to remove three books from all School District libraries: *All Boys Aren't Blue* by Plaintiff Johnson, *And Tango Makes Three* by Peter Parnell and Justin Richardson, and *When Aidan Became a Brother* by Plaintiff Lukoff.  It did so despite the district review committees' conclusions that the books were appropriate for the grades served by the libraries in question and its recommendation, in all three cases, that the books not be removed from any libraries.

---

[11] An additional six books were removed upon the recommendation of the district review committee in 2022 and 2023, rather than by order of the School Board: *Looking for Alaska* by John Green, which was removed from middle school libraries only; *Ground Zero* by Alan Gratz, which was removed from elementary school libraries only; and four books from Sarah J. Mass's *A Court of Thorns and Roses* series, which were removed from all libraries.

[12] In some instances, such as with regard to *When Wilma Rudolph Played Basketball* by Mark Weakland, Baggett chose not to appeal the district review committee's decision to the School Board.

105.   On March 20, 2023, the School Board voted to remove four additional books from some libraries: *New Kid* by Jerry Craft and *Drama* by Raina Telgemeier, which were removed from elementary school libraries; and *The Bluest Eye* by Toni Morrison and *The Nowhere Girls* by Amy Reed, which were removed from middle school libraries in the School District (to the extent the books had been in middle school libraries), and restricted to 11th and 12th graders within high school libraries. Once again, the School Board overrode the recommendations of the district review committees.  Subsequently, on July 15, 2025, the School Board voted to remove *Drama*, *The Bluest Eye*, and *The Nowhere Girls* from all school libraries without further review.

106.   On April 13, 2023, the School Board voted to remove *Push* by Sapphire and *Lucky* by Alice Sebold from all School District libraries, again overriding the recommendation of the district review committees that the titles be made available in high school libraries.

107.   In all, before late 2024, 9 books had been removed (the "Original Removed Books"), from some or all libraries by the School Board, while over 250 additional books were targeted for removal and awaiting review.

108.   A chart summarizing the School Board's decisions as to each of the Original Removed Books is below:

| Book | Author | Basis of Challenge[13] | District Review Committee Decision | School Board Decision |
|---|---|---|---|---|
| *All Boys Aren't Blue* | George M. Johnson | "Extreme sexual content; violent language; disturbing scenes; LGBTQ content" | Keep in high school libraries | Removed from all libraries |
| *And Tango Makes Three* | Peter Parnell & Justin Richardson | "LGBTQ agenda using penguins" | Keep in all libraries | Removed from all libraries |
| *When Aidan Became a Brother* | Kyle Lukoff | "LGBTQ introduction; not age appropriate" | Keep in all libraries | Removed from all libraries |
| *New Kid* | Jerry Craft | "Race-baiting; anti-whiteness; woke agenda" | Keep in all libraries | Removed from elementary schools; keep only in middle and high school libraries |
| *Drama* | Raina Telgemeier | "Indoctrination of LGBTQ; age-inappropriate + content not relevant" | Keep in all libraries | Removed from elementary schools; keep only in middle and high school libraries |

[13] The language in this column is all quoted from the challenge forms submitted by Baggett.

| *The Bluest Eye* | Toni Morrison | "Graphic rape scenes; pedophilia glorified; violent acts" | Keep in high school libraries | Removed from 9th-10th grade; keep only for 11th-12th grade |
|---|---|---|---|---|
| *The Nowhere Girls* | Amy Reed | "Graphic sexual content; sexual introductions; sexually excite" | Keep in high school libraries | Removed from 9th-10th grade; keep only for 11th-12th grade |
| *Push* | Sapphire | "Graphic sexual content" | Keep in high school libraries | Removed from all libraries |
| *Lucky* | Alice Sebold | "Graphic sexual content; violence; language" | Keep in high school libraries | Removed from all libraries |

109.  District review committees stopped meeting in March 2023 and restarted in October 2024 under a revised process.  Between April 2023 and October 2024, the School Board did not consider any additional books.

110.  On May 16, 2023, the School Board voted to terminate its then-Superintendent, Tim Smith.  As then-Superintendent Smith commented at the time, the Board had developed a process to deal with appeals of book challenges and had asked its general counsel whether the superintendent could himself pull controversial or challenged books from the shelves.  She recommended against such a practice as contrary to the intent of the law.  Mr. Smith noted that nevertheless,

> You [the Board] hammer away [that] the superintendent should pull these books.  Why?  Because you don't want to deal with it. You get the emails, you

get the phone calls, you get the chaos.  But, yeah, it's easy to throw the superintendent under the bus.  It's your policy that you led, and you're asking me to violate your policy.  What is that?

111.   On information and belief, one of the reasons for the termination was because Mr. Smith was not sufficiently aggressive with respect to book removals and restrictions.

### H.    The School Board Has Removed Books Based on Viewpoint

112.   Although the School Board's General Counsel has acknowledged that the School Board cannot order removal of books from its libraries "simply because it disagrees with the message of a book or it offends the personal morals of an individual," it is clear that books are, in fact, being removed on such impermissible grounds.

113.   The ideological bases for the removals are apparent from, *inter alia*: (a) the contents, characters, and themes of many of the books, (b) the nature of the asserted objections to them, (c) the fact that, as to the Original Removed Books, in every instance, the School Board's removal decision overrode the considered judgment of the district review committee, which had deemed the book educationally appropriate, and recommended that it be retained, and (d) the fact that there are no instances in which the School Board rejected a challenge from Baggett, despite the transparently ideological nature of her challenges.  Indeed, the School

Board has consistently acceded to, and ratified, Baggett's blatantly political and message-based objections.

114.    *Wallflower*, the book that kicked off this slate of removals is discussed in detail above.  The other Original Removed Books exhibit the same basic pattern of targeting books based on ideological objections to their message, theme, or the identities of their characters and/or authors.

115.    For instance, *And Tango Makes Three* ("*Tango*") is a 2005 picture book based on the true story of Roy and Silo, two male penguins at the Central Park Zoo who formed a pair bond, successfully incubated an egg that another penguin couple was unable to care for, and raised the resulting baby penguin, a female named Tango, after she hatched.  *Tango* received numerous awards.  The book was listed by the American Library Association as a Notable Children's Book in 2005 and won the ASPCA's Henry Bergh Children's Book Award for books promoting the humane and compassionate treatment of animals that same year.

116.    Baggett's sole listed reason for objecting to *Tango* was disagreement with its message.  She asserted that the book was serving an "***LGBTQ agenda using penguins***."  Ex. 13.  No basis was offered for the removal of *Tango* other than the mere fact that it is based on the true story of two male zoo penguins who formed a pair bond and hatched and raised a baby penguin.

117.    At the School Board meeting at which *Tango* was addressed, School Board members made clear that they, too, believed that the mere fact that the book depicts two male penguins jointly raising a chick warranted removing it from school libraries.  One School Board member observed: "The fascination is still on that it's two male penguins raising a chick.  And, most people that came up and spoke were talking about that fascination, so I'll be voting to remove the book from our libraries."  Another School Board member stated that he would be fine with the book being available if *Tango* was "edited or rewritten to make it less and less of a sexual or even a romantic thing and more of the compassion and nature that nature has."

118.    Ultimately, despite the review process having deemed the book educationally suitable and recommending retaining it, the School Board sided with Baggett and removed the title from all School District libraries.[14]

119.    The grounds for removing *When Aidan Became a Brother* by Plaintiff Lukoff ("*Aidan*") were similarly ideological.  *Aidan* is a 2019 picture book about a young transgender boy helping his family welcome a new baby.  The book has received multiple awards, including a Charlotte Huck Honor, which recognizes

---

[14] Included in the appeal record considered by the School Board was a set of "Relevant Florida State Statutes," among which was HB 1557. HB 1557 does not apply to library materials, and, accordingly, does not provide a basis to restrict or remove any title.  Nevertheless, excerpts of HB 1557 were included in the packet of materials provided to the School Board for its consideration of the appeal regarding every Original Removed Book.

"outstanding children's fiction that invites compassion, imagination, and wonder," and the Stonewall Book Award, which is given out by the American Library Association to honor "books that have exceptional merit relating to the LGBTQIA+ experience." *Aidan* is used in classrooms throughout the country.

120.  In her challenge, Baggett condemned *Aidan* as: "LGBTQ introduction," and "not age appropriate." Ex. 14. No basis was offered for the removal of *Aidan* other than the mere fact that it is about a transgender character.

121.  The district review committee recommended retaining *Aidan*. In addition, at the School Board meeting at which the book was addressed, one School Board member spoke in favor of retaining the book, saying: "I happen to know someone who shared with me how important this book was to her child. And, I know that I appreciate those people who keep reminding us that reading a book does not change someone. If it did, all of the hundreds of gay children out there who have to read the books that are [about] heterosexual companions, they'd all change. So I'm one of those people that think reading books opened your mind, but it doesn't necessarily change who you are or what you are. But it makes you a more compassionate, caring person."

122.  Nonetheless, the School Board as a whole sided with Baggett, and removed the title from all School District libraries. At the meeting, the School Board chair expressed the view that, while some parents may find the perspective *Aidan*

47

offers valuable, "it's just something that should not be in the school district.  We should be concentrating on the education of these students, and if I can't fit those dots, I won't approve the book."

123.    The grounds for removing *All Boys Aren't Blue* by Plaintiff Johnson were likewise ideological.  *All Boys Aren't Blue* was published in 2020.  It is, as the district review committee put it, a "memoir of growing up black and gay."  Ex. 15 at 2.    While the book contains depictions of sex (including a sexual assault), the district review committee recognized that these depictions are critical to the story and "extremely important to understand the trajectory of [the narrator's] life. . . . Without these moments, the memoir would not make sense."  *Id.* at 1.  As the committee further noted, the sexual content is "clearly not intended to be arousing."  *Id.* at 3.  The district review committee found that "[t]here are teenagers in our community who benefit from hearing [the narrator's] experiences and perspectives," and voted unanimously to retain it as high school library material.  *Id.* at 2.

124.    *All Boys Aren't Blue* has received numerous awards and recognitions. *Kirkus Review* named it one of the best young adult biographies/memoirs of 2020. The New York Public Library and Chicago Public Library both included it in their list of the top ten books of 2020 for young adults.

125.   Baggett's challenge characterized the purpose of *All Boys Aren't Blue* as "indoctrination" and included "LGBTQ content" among her objections.  Ex. 16. After the district review committee voted to retain the book, Baggett's appeal characterized the book as pornographic.  Ex. 17 at 2. At the School Board meeting at which the book was discussed, multiple Board members characterized it as "pornographic."

126.   Ultimately, despite the review committee's findings and unanimous vote in favor of retaining *All Boys Aren't Blue*, the School Board sided with Baggett and ordered the book removed from all libraries within the School District.

127.   Another of the Original Removed Books is *New Kid* by Jerry Craft, which was part of the March 20, 2023 removals.  *New Kid* is a Newbery Medal Award-winning graphic novel that tells the story of a 12-year-old Black boy who experiences culture shock when he enrolls at a private school.  It was published in 2019.  There is no sexual content of any kind in *New Kid*.  Baggett objected to the book because, in her opinion, it involved "race-baiting," reflected "anti-whiteness," and promoted a "woke agenda."  Ex. 18.  Even though the book is intended for young audiences, the School Board ordered that *New Kid* be removed from all elementary school libraries within the School District.  In doing so, it overruled the district review committee, which had voted 7-2 to keep *New Kid* in libraries at all levels.

128.    Another Original Removed Book, *Drama* by Raina Telgemeier, was published over a decade ago, in 2012.  It is a graphic novel about a seventh-grade girl who joins the stage crew for her middle school musical.  She has a secret crush on one boy; a different boy has a crush on her.  One character is openly gay.  At the story's climax, when the female lead in the musical refuses to perform, a male character saves the show by dressing in her outfit and performing the role, including sharing a stage kiss with the male lead.  As the district review committee noted, "[t]here is nothing in this work that could be considered offensive. . . . ***There is no sex in any part of the story***."  Ex. 19 at 2.  *Drama* enjoyed wide critical praise and appeared on the American Library Association's 2013 list of Notable Children's Books.

129.    Baggett objected to the book as "[i]ndoctrination of LGBTQ; age inappropriate + content not relevant."  Ex. 20.  She asserted that the purpose of the book is "[i]ndoctrination."  *Id.*  Despite the district review committee voting 6–3 to retain the book in all elementary, middle, and high school libraries, the School Board ordered *Drama* removed from all elementary school libraries.  Subsequently, on July 15, 2025, the School Board voted to remove *Drama* from all school libraries without further review, overriding its earlier determination to keep the book for some grades.

130.    Another Original Removed Book is *The Bluest Eye*, which was Toni Morrison's first novel.  It is published by Plaintiff PRH.  Published over 50 years

ago, *The Bluest Eye* is set primarily in Morrison's Ohio hometown in 1941. It is told from the perspective of a nine-year-old Black girl. The central character, eleven-year-old Pecola, is taken in temporarily by the narrator's family. Pecola, friendless and tormented because of her chaotic home life, dark skin, and "ugliness," prays for God to give her blue eyes. Pecola is eventually raped and impregnated by her abusive father. The baby is stillborn and Pecola loses her sense of reality, believing that her wish for blue eyes has been granted. While the book received relatively little attention when it was originally published, it has since become part of the canon of American literature. In 1993, Morrison was awarded the Nobel Prize in Literature for "novels characterized by visionary force and poetic import" that "give[] life to an essential aspect of American reality."

131.   *The Bluest Eye* is frequently taught in AP Literature courses throughout the country. It is an example of the kind of narratively and thematically challenging works that students in high school are asked to navigate to become more sophisticated readers and students of literature and to prepare for post-secondary study.

132.   *The Bluest Eye* undisputedly contains difficult and graphic content. However, as the district review committee noted, it explores "[t]he harsh truth of racism in the 1940s" and themes of "self-loathing" and "preconceived notions of beauty." Ex. 21 at 1, 2. As the committee also pointed out, "[m]any classics,"

including *The Great Gatsby*, *The Sun Also Rises*, and *The Sound and the Fury*, "deal with sexual themes."  The difference is that *The Bluest Eye* moves the reader's attention "away from the implied off-stage tragedy to a sensory-oriented language from which the readers cannot look away or pretend the tragedy is not occurring or is not important. . . . The strength of Morrison's work, which critics seem disturbed by, is that the disturbing is disturbing."  *Id.* at 5.  The committee further noted that *The Bluest Eye* is the only one of Morrison's novels "told from the viewpoint of adolescents."  *Id.* at 3.  All five members of the committee unanimously agreed to keep the book in high school libraries.

133.  Notwithstanding that the sexual content of *The Bluest Eye* is inextricably linked to the book's exploration of themes of race, racism, and sexual exploitation, Baggett's objection dismissed the book as "pedophilia glorified," and declared that it contained *no* strengths as educational media and that its only purpose was "shock."  Ex. 22.  Such naked hostility to a book that is widely recognized as a classic makes plain that Baggett's real objection was to the themes the book explores, not the fact that it explores those themes (in part) by depicting sexual situations.

134.  At the March 20, 2023 meeting at which the book was discussed, a School Board member noted that *The Bluest Eye* had been optional reading material in one district school's International Baccalaureate program (along with Toni

Morrison's most famous novel, *Beloved*) for nearly two decades and had never received a single parental complaint. Nonetheless, the School Board voted 3–2 to restrict the book to 11th and 12th graders. (The two dissenters would have removed the book entirely.) Subsequently, on July 15, 2025, the School Board voted to remove *The Bluest Eye* from all school libraries without further review, overriding its earlier determination to keep the book for some grades.

135.   Another of the Original Removed Books, *The Nowhere Girls*, is a 2017 novel by Amy Reed. The book is a feminist work, which concerns three misfit teenage girls who, outraged by an unpunished rape at their high school, band together to combat their school's misogynistic culture. As the district review committee noted, "[s]exual assault (rape) is an act of violence and is integral to the novel and plot." Ex. 23 at 1. The review committee praised the diverse personalities and backgrounds of the characters, as well as the way the novel "address[es] an important theme of activism, self-acceptance, and empowerment. It has value for any high school student." *Id.* at 2. The committee unanimously agreed that the book should remain in high school libraries; one member would have kept it in middle school libraries as well.

136.   As with other books she challenged, Baggett declared that *The Nowhere Girls* had no educational strengths. Although she purported to object to the book on the ground that its purpose is "sexual introductions; [to] sexually excite," Ex. 24,

given the profound inaptness of describing a book about rape and the social response to it in that manner, it is clear that her real objection was a disagreement with the book's feminist message. Despite the review committee's recommendation, the School Board voted 3–2 to restrict the book to 11th and 12th graders. Subsequently, on July 15, 2025, the School Board voted to remove *The Nowhere Girls* from all school libraries without further review, overriding its earlier determination to keep the book for some grades.

137. Another Original Removed Book is *Push*, the first novel by the author who goes by the pen name Sapphire, which was published by Plaintiff PRH. First published over 25 years ago, the book concerns the struggles of a 16-year-old Black girl named Precious who lives in desperate poverty and endures unspeakable abuse at the hands of both her mother and father. When the book opens, Precious is pregnant with her second child—like the first, the product of rape by her father. Precious enrolls at an alternative school where she finds a teacher who helps her learn to read and write, as well as to escape from her abusive situation and give herself and her children a chance for a better future. Stylistically, the book is told in Precious's voice and tracks her increasing English proficiency and self-esteem as she overcomes the functional illiteracy with which she begins the novel. In 2009, *Push* was adapted into a feature film, *Precious*, that was nominated for six Academy Awards and won two, including for Best Adapted Screenplay.

138.   Like *The Bluest Eye*, *Push* depicts difficult and upsetting situations, sometimes in graphic terms.   However, as with that novel, the district review committee noted that these elements were "an important part of developing Precious' background and creating a greater understanding of her circumstances, trials, and ultimately, her ability to begin to see herself as a whole and worthy person despite her circumstances."  Ex. 25 at 2.  The committee also noted its "very artistic presentation of a journey from complete illiteracy to English language competency" and that "[t]hrough reading about Precious and her circumstances we are able to have a more developed understanding of the human condition, and hopefully a deeper compassion for someone who may be very different from ourselves."  *Id.* The district review committee voted 4–1 to retain *Push* as a high school library material.[15]

139.   In her appeal of the district review committee's decision, Baggett asserted as part of her criticism of the book that "[t]he purpose of fiction writing is simply **TO ENTERTAIN**.  It is not to inform or educate."  Ex. 26 at 1.  As with her objection to *The Bluest Eye*, it is apparent that Baggett's real objection is to the book's exploration of themes of race, racism, and sexual assault, not her purported objections to the book's sexual content.

---

[15] The dissenting voter did not dispute the novel's literary or artistic merit, but believed that due to its difficult content "[i]t is best read with the support of a teacher or trusted adult."  *Id.* at 5.

140.  At the April 13, 2023 School Board meeting at which *Push* was discussed, one School Board member observed: "While I concur with the board members who've spoken, while I do believe that it is a story of triumph, it is a story of somebody saving themselves, someone who has resilience and discovered her self-worth, it is not a book that I believe that should be available in public high schools."  That subjective reaction carried the day, and the School Board voted to overrule the district review committee and remove *Push* from School District high school libraries.

141.  The ideological nature of these book removals is further underscored by what books have *not* been removed.

142.  Even though a number of books have been removed simply because they allude to, or acknowledge the existence of, same-sex relationships and/or transgender persons, there have not been any instances in which a book has been removed simply because it alludes to, or recognizes the existence of, heterosexual relationships or cis gendered persons.  For instance, among the children's books that remain unchallenged on elementary school shelves in the School District are *Just Me and My Little Brother* by Mercer Mayer and *The Wedding* by Eve Bunting, each of which depicts heterosexual relationships and/or cis gendered persons in family settings similar to those in which *Tango* and *Aidan* present same-sex relationships and transgender persons.

143.   Likewise, even though many books addressing themes related to race, racism, feminism, and/or sexual assault have been removed on the ostensible grounds that they contain sexually explicit content, there are numerous books that remain in School District libraries that are also sexually explicit, but were not singled out for removal because they do not address such themes.   For instance, the following books, each of which contains sexually explicit content and/or language, remain, unchallenged, in high school libraries in the School District: *1984* by George Orwell, *Brave New World* by Aldous Huxley, *The Catcher in the Rye* by J.D. Salinger, *The World According to Garp* by John Irving, *Catch-22* by Joseph Heller, *A Farewell to Arms* by Ernest Hemingway, and the complete works of William Shakespeare.

144.   To be clear, Plaintiffs do not believe that *any* of the books referenced in the preceding paragraph should be removed from high school libraries. Nonetheless, that not one of those books has been removed, or targeted for removal, makes plain that, for the books the School Board has removed, it is not the sexual content *per se* that is driving the objections.

## I.    The School Board Also Indefinitely Restricted Access to Books Based on Viewpoint

142.   It is also apparent that books were subject to restricted access for indefinite periods of time on ideological, not pedagogical, grounds.

143.    Indeed, as detailed above, the School Board amended its procedures for challenged books so as to make it easier to restrict access to books that are subject to ideological objections.

144.    The School Board did this in two ways.  First, under the School Board's policies (at least as they existed prior to July 1, 2023), books were being subject to restricted access pending further review simply because they reference the existence of same-sex relationships or transgender persons, without regard to anything else about their content.  Second, under those policies, citizens who objected to books on ideological or political grounds were able to restrict access to those books simply by opportunistically highlighting the fact that—like plenty of other books that remain unchallenged on library shelves—they contain some sexual content.

145.    For example, one of the targeted books is *Too Bright to See*, a novel by Plaintiff Lukoff, published by Plaintiff PRH.  *Too Bright to See* is intended for students in grades 4–7.  The book involves two friends (Bug and Moira), and the ghost that haunts Bug's house, as Bug realizes over the course of the story he is a transgender boy.  *Too Bright to See* was one of five children's books selected in 2022 as a Newbery Honor Book, and one of five selected as a finalist for the 2022 National Book Award for Young People's Literature.

146.    The sole stated objection to *Too Bright to See* is that the book "contains sexualities and alternate gender identities, a violation of HB 1557 and Parental

Rights Law," and the claimed purpose of the book is "indoctrination." Ex. 27. There is no claim that the book contains any explicit material. On the basis of this challenge, access to *Too Bright to See* was restricted within elementary school libraries in the School District for months, where it was previously generally available. The School Board returned the book to library shelves in April 2024 after concluding that it did not contain depictions or descriptions of sexual conduct. However, on October 10, 2024, the book was removed by a newly reconstituted district review committee based on animus toward transgender individuals.

147.    Another targeted book is *Two Boys Kissing*, a young adult novel by Plaintiff Levithan, published by Plaintiff PRH. The title characters in *Two Boys Kissing* are two teenage boys who, in protest of a homophobic attack on another character, attempt to break the record for the world's longest kiss. The book also includes other gay or transgender characters in various situations related to the main story, as well as a metafictional "Greek chorus" made up of gay men who died during the worst years of the AIDS crisis, who comment on the story, the characters, and the momentous changes in society's acceptance of gay people between the 1980s and the book's 2010s setting. *Two Boys Kissing* has received multiple awards, including a Stonewall Honor, and the Lambda Literary Award, and was placed on the longlist for the 2013 National Book Awards.

148.  Baggett's objections to *Two Boys Kissing* include "LGBTQ push/indoctrination." Ex. 28.  She also listed "indoctrination" as the book's purpose. *Id.*  On the basis of this challenge, access to *Two Boys Kissing* was restricted within high school libraries in the School District for months, where it was previously generally available.  The School Board returned the book to library shelves in April 2024 after concluding that it did not contain depictions or descriptions of sexual conduct.  However, on July 15, 2025, the School Board voted to remove *Two Boys Kissing* from all school libraries as part of its Mass-Removed Books without further review, overriding the earlier determination that the book should be returned to libraries.

149.  Another targeted book is *Out of Darkness* by Plaintiff Pérez.  *Out of Darkness* is a historical young adult novel involving a secret romance between a Mexican-American girl and a Black boy in a small town in East Texas in the 1930s, in the months preceding a catastrophic real-life gas explosion that destroyed the town's school and killed hundreds of students and faculty.  The story ends violently and tragically.

150.  *Booklist* named *Out of Darkness* one of its "50 Best YA Books of All Time" in 2017, saying "Pérez's elegant and devastating Printz Honor winner begins with a real-life 1937 school explosion that killed 300 people in Texas before backtracking to Mexican American Naomi, who struggles with racism, love, and

Henry—the father of her siblings and one of the most vivid, complicated villains in YA history."  In 2015, the book was named as one of the "Best Teen" books of the year by *Kirkus Reviews*, and one of the "Best Books of 2015" by *School Library Journal* magazine.

151.  Although the book's depictions of sexual situations are central to the story it tells, Baggett objected to *Out of Darkness* on the ground that it includes "graphic depictions of abuse + sexual scenes."  She listed the strengths of the book as "none," and listed its purpose as "sexual introductions; sexually excite."  Ex. 29. The book was restricted within high school libraries in the School District beginning in October 2022, where it was previously generally available.  On March 24, 2025, a newly reconstituted district review committee voted to keep the book for 11th and 12th grade students within high school libraries.  However, on July 15, 2025, the School Board voted to remove *Out of Darkness* from all school libraries as part of its Mass-Removed Books without further review, overriding the recommendation of the district review committee that the title be made available for at least some grade levels.

152.  Another targeted book is *Beyond Magenta: Transgender Teens Speak Out* ("*Beyond Magenta*") by PEN America member Susan Kuklin.  *Beyond Magenta* is a young adult nonfiction book based on interviews with six transgender or nonbinary teenagers.  *Beyond Magenta* received numerous awards and positive

reviews from *Booklist, Kirkus Reviews*, and *Publishers Weekly*, with the latter calling it "a sorely needed resource for teens and, frankly, many adults" that captures its subjects as "full, complex, and imperfect human beings."

153.    Baggett challenged *Beyond Magenta* on the grounds that it was "sexually explicit" and contained "LGBTQIA content."  Ex. 30.  She claimed it had no strengths as educational media and its sole purpose was "total indoctrination." Access to *Beyond Magenta* was restricted in libraries in the School District beginning in October 2022, where it was previously generally available.  On July 15, 2025, the School Board voted to remove *Beyond Magenta* from all school libraries as part of its Mass-Removed Books without further review.

154.    Another targeted book is *The Freedom Writers Diary: How a Teacher and 150 Teens Used Writing to Change Themselves and the World Around Them* by Erin Gruwell.  *The Freedom Writers Diary*, which is published by Plaintiff PRH, is a non-fiction book that collects diary entries from the largely minority students at the "at risk" high school where the book's main author, Gruwell, taught.  Modeled after *The Diary of Anne Frank* and *Zlata's Diary: A Child's Life in Sarajevo*, the diary entries draw parallels between those books and the students' lives and chronicle their challenges dealing with issues like gang violence, racism, getting evicted, and drug and alcohol abuse, and the students' efforts to rise above them.

155.    In her challenge, Baggett asserted that the purpose of the book was to

"incite racial division," and objected to the book as having "extremely sexual content; nudity; alternative sexualities; profanity; child abuse; molestation; [and] racial slurs." Ex. 31. The book was restricted within high school libraries in the School District beginning in October 2022, where it was previously generally available. On April 9, 2025, a newly reconstituted district review committee voted 6-2 to keep the book within high school libraries. However, on July 15, 2025, the School Board voted to remove *The Freedom Writers Diary* from all school libraries as part of its Mass-Removed Books without further review, overriding the recommendation of the district review committee that the title be made available in high school libraries.

156. Another targeted book is *Concrete Rose* by Angie Thomas. *Concrete Rose* is a prequel to Thomas's acclaimed 2017 book *The Hate U Give*, and tells the backstory of Maverick ("Mav"), the father of the main character in *The Hate U Give*. In the book, Mav must navigate competing pressures—dealing with gang culture as the son of one of the gang's leaders who is incarcerated, fathering a child out of wedlock, and falling in love with his girlfriend and planning a future together. As described in *Publishers Weekly*, "Through its portrayal of loss and upheaval, this story acts as a tender love letter to a close Black family and community—one that isn't without problems but is always full of love." *Kirkus Reviews* named it as one of the best young adult novels of 2021, and it was a Michael L. Printz Honor book,

awarded for excellence in young adult literature.

157.    Baggett challenged *Concrete Rose* on the basis that it includes "sexual activities," "excessive and frequent profanity" and "controversial racial and social commentary."  Among the passages she objected to were one in which a character described his disengagement with a history class that lionizes white people who had done problematic things, like the notion that Columbus "discover[ed]" America, a place where people already lived.  Another objected-to passage was about the character's hatred of his coach who had a Confederate flag on his truck and implied that he was the coach's slave.  Ex. 32.  A third passage described a sexual encounter between Mav and his girlfriend.  The book was restricted within high school and middle school libraries in the School District beginning in January 2023, where it was previously generally available.  On March 26, 2025, a newly reconstituted district review committee voted 7-0 to keep the book within high school libraries. However, on July 15, 2025, the School Board voted to remove *Concrete Rose* (in addition to *The Hate U Give*) from all school libraries as part of its Mass-Removed Books without further review, overriding the recommendation of the district review committee that the title be retained in high school libraries.

**J.    New Challenge Policy and Reconstituted Review Committees**

158.    In October 2024, the Board adopted a new policy governing challenges to library books. Ex.11  The new policy continued the earlier policy of requiring the

restriction of any books challenged as pornographic, prohibited under F.S. 847.012, or containing depictions or descriptions of sexual conduct as defined by Florida law, as well as the prior policy's peremptory removal process, by which the Superintendent could determine to remove a book based on a challenge without review by the Board or a district review committee.  The policy expressly recognizes that material found to contain depictions or descriptions of sexual conduct as defined by Florida law will be discontinued "for any grade level or age group for which such use is inappropriate or unsuitable."  Ex. 11.  That is, the policy contemplates continued use of such material for grade levels or age groups for which it is appropriate.  The new policy also revamped the composition of district review committees, as described below.

159.  The earlier iteration of the district review committee process was suspended by the Board in April 2023, ostensibly because of, among other reasons, a disconnect between the committees and the School Board.  The committees were voting to retain books that the School Board chose to remove.  These included the 9 Original Removed Books that the School Board permanently removed before July 1, 2023 from one or more libraries or grades against the recommendations of committees.

160.  The School Board resumed the district review committee process in October 2024, with significant changes to align the views of committees with those

of the School Board. The School Board changed the composition of committees so that they now each had five School Board appointees (in addition to three School District personnel) chosen by each of the five School Board members. Ex. 11 at 2 ¶ B. Previously, each committee had only one or two community members and three or four School District personnel. In the new iteration, community members outnumbered School District personnel on each committee. Further, in the event of a tie vote as to whether to remove a book, only School Board Member-appointees' votes would count and not those of School District personnel on the committees. Previously, each committee member's vote counted equally.

161. Even with the new district review committee structure with a supermajority of committee members handpicked by the School Board, the committees voted to keep many challenged books in one or more libraries for at least some grade levels.

162. Beginning in October 2024, based on the status reports filed by the School Board during the stay, the district review committees met to discuss 21 books at issue in this lawsuit and voted to remove 2 of these books from all libraries and to remove 8 more books from some grade levels.

163. Among the 8 books the committee voted to remove from some or all grade-levels, were 3 books where the decision was not appealed to the School Board and the book was not included in the Superintendent-Removed Books or the Mass-

Removed Books (the "Committee-Removed Books").  Among these was *Better Nate Than Ever*, which is intended for students in grades 4-8 and tells the story of a young boy who travels to New York City to crash an audition for a Broadway show and the adventures that ensue.  The book, which has a subplot about the character starting to take notice of his attraction to other boys, has been recognized as a *New York Times* Notable Book, an ALA Notable Children's Book, and a Stonewall Honor Book.  It had previously been returned to school libraries pending resolution of the challenge to the book.

164.    The book was challenged in August 2022 by Baggett because of an alleged "gay agenda," and a purpose of "indoctrination." Ex. 37. After initially restricting access to the book, the School Board unrestricted it in April 2024 after district librarians determined that it did not contain depictions or descriptions of sexual conduct.

165.    However, when it was considered by a newly constituted district review committee, on October 9, 2024, the committee voted to remove *Better Nate Than Ever* from elementary school libraries in the district.

166.    Another Committee-Removed Book is *Too Bright to See*, involving a transgender boy.  The School Board restricted the book within elementary school libraries for months, until returning the book to library shelves in April 2024, when

librarians determined that it did not contain depictions or descriptions of sexual conduct.

167.    The district review committee voted on *Too Bright to See* on October 10, 2024.    The committee had 8 members—3 school personnel and 5 board appointees.    Because the committee tied 4-4 on whether to keep the book, the school personnel committee members' votes did not count, and the Board-appointees' votes 4-1 to remove the book carried the day.

168.    Per the ballot results, those voting to remove the book did so because it is about a transgender child.    The no-voters commented variously that it "targets mis gender identity [*sic*]," that its overall message is "errant and evil," and that "[t]his is absolute indoctrination of transgenderism." Ex. 33.

169.    Also in this category of Committee-Removed Books is *Man O' War*, a coming-of-age story published by Plaintiff PRH about a transgender Arab American teenager who is a competitive swimmer growing up in a small town in the Midwest. They navigate gender dysphoria, internalized homophobia, and bigotry while coming to terms with their identity.    The book won the 2023 Stonewall Book Award.

170.    The book was challenged in May 2023 based, in part, on "sexual scenes."    Ex. 38.    The challenger described the purpose of the book as "ideas concerning alternate genders."    The School Board restricted access to the book for over two years until a newly reconstituted district review committee voted to remove

the book.  As with *Better Nate Than Ever*, the committee of 3 school personnel and 5 board appointees tied 4-4 on whether to keep the book, and only the Board-appointees' votes counted, resulting in a 3-2 decision to remove the book.  *See* ECF 187.

171.   Despite the School Board's attempts to develop a district review committee process aligned with its own preferences about book removals and restrictions, the revamped committees' actions to remove 2 books from all libraries and 8 books for some grade levels but to retain the remainder of the books they reviewed proved insufficiently censorious for the School Board.

### K.    June 17, 2025 Removals

172.   At a June 16, 2025 workshop, the School Board discussed a directive proposed by School Board member Kevin Adams that the superintendent eliminate all allegedly pornographic and age-inappropriate books from school libraries, as identified on the Florida Department of Education's compilation of books removed from school libraries in districts across Florida.  Mr. Adams invoked this lawsuit as a reason for the motion, noting that "the federal judge wanted us to make the process quicker . . . and this motion will help us speed up that process."  The Superintendent noted that in addition to expediting the process of removing books, removing books from the state list could "provide a buffer from a political standpoint for you as a school board."  As another School Board member, Paul Fetsko, put it, "I'm good

with taking every one of the books that have been reviewed like we said by other districts and removed and just automatically they're gone." He continued, "I believe 'when taken as a whole' is not appropriate defense of materials that have this type of verbiage and depictions and just trash, this type of fecal matter does not belong in the books that we're serving to our kids."

173.    Separately, the Superintendent recommended the removal of 18 books, including 15 that allegedly contain "graphic descriptions and depictions of sexual conduct" and 3 books that the Florida Attorney General allegedly identified as "pornographic."   At the June 17, 2025 School Board meeting, School Board members approved the recommendation to remove the 18 books.  Ex. 34.  Among the books removed were 16 of the books at issue in this lawsuit (13 removed for alleged sexual conduct and 3 as allegedly pornographic) (the "Superintendent-Removed Books").

**L.    July 15, 2025 Removals**

174.    The following month, at the July 10, 2025 workshop, the School Board discussed a recommendation to go further and remove books from School District libraries included on the Florida DOE list of over 700 books that had been removed from any grade level in public school libraries anywhere in Florida.  While some School Board members also raised the prospect of disbanding the district review committees, the School Board opted not to do that at that time because, as School

Board member Tom Harrell explained, "We don't want to look like that we're shutting out the community. We don't want to look like that the community is not going to have a chance for input."

175.    At the subsequent School Board meeting on July 15, 2025, the School Board voted to remove all books from its libraries that were on the Florida DOE's book removal list and also in Escambia school libraries "without further review." Ex. 35.

176.    The Florida DOE compiled a book removal list of over 700 books that were "removed or discontinued" for all or some grade levels in any school district in Florida, based on a statutory requirement for school districts to report to the state every objection to a library book and the result of the objection.[16] These were self-reported removals from school districts during the 2022-23 and 2023-24 school years. Upon information and belief, there was no further vetting of the legitimacy of these book removals by the Florida DOE. The School Board's Coordinator of Media Services then compared the state list with the collections in Escambia County School libraries (minus books the Board had already removed) to produce a list of

---

[16] Florida Department of Education, *2023-2024 School District Reporting Pursuant to Section 1006.28(2), Florida Statutes*, https://www.fldoe.org/file/5574/2324-SDRPS-100628-2.pdf; Florida Department of Education, *2022-2023 School District Reporting Pursuant to Section 1006.28(2), Florida Statutes*, https://www.fldoe.org/core/fileparse.php/5574/urlt/2223ObjectionList.pdf.

over 400 books for removal from all libraries in the School District without review (the "Escambia Mass Removals List").  Ex. 36.

177.   The Escambia Mass Removals list includes 253 books that had never been challenged in Escambia County Public Schools, which the School Board removed from all libraries.  This list also includes 14 books at issue in this lawsuit that district review committees and/or the School Board had already reviewed and voted to retain for at least some grade levels:   11 books that district review committees had voted to retain in at least some school libraries, including, for example, *Freedom Writers Diary* and *Out of Darkness*, and three of the Original Removed Books that the School Board had previously retained for some grades: *Drama*, *The Bluest Eye*, and *Nowhere Girls*.  With this vote, the Board essentially reversed itself without further (or in the case of the new Board members, ever) reviewing these books.

## M.    Defendant Has Disproportionately Targeted Books by Minority and LGBTQ Authors or Books Addressing Themes Involving Race and LGBTQ Identity

178.  The removal efforts of the School Board have been focused disproportionately on minority and LGBTQ authors and/or books with themes related to minority or LGBTQ identity.

179.   Of the 9 Original Removed Books, 7 have authors who are non-white and/or identify as LGBTQ, while at least 8 address themes relating to race or LGBTQ identity, or feature prominent non-white and/or LGBTQ characters.

180.   The same is true of the books targeted in the most recent rounds of removals (the "Recent Removed Books").[17]   *See* Ex. 12.

181.   Of the Recent Removed Books (not including the 3 books that are also part of the Original Removed Books), 39% have authors who are non-white and/or identify as LGBTQ, while 60% address themes relating to race or LGBTQ identity, or feature prominent non-white and/or LGBTQ characters.

182.   And the same is true of the Mass-Removed Books (again excluding the 3 books that are also part of the Original Removed Books), of which 39% have authors who are non-white and/or identify as LGBTQ, while 60% address themes relating to race or LGBTQ identity, or feature prominent non-white and/or LGBTQ characters. This is not surprising as the Escambia Mass Removals List, derived from the state DOE lists of removals in Florida, is similarly skewed, with 29% of authors and 54% of books, respectively, fitting the above descriptions.

---

[17] The Recent Removed Books include the following: (1) the Committee-Removed Books; (2) the Superintendent-Removed Books; and (3) the Mass-Removed Books. These subcategories include fewer than all the books for which the action was taken because they represent the subset of recently-removed books that has been at issue in this case beginning when Plaintiffs filed their First Amended Complaint.

183.   Among the books on Escambia's Mass Removals List are a significant number that feature prominent black characters, people of color, and themes relating to race and racism.  These include both books that are not themselves at issue in this case (*e.g.*, *Little Rock Nine*, *The Fire Next Time*, *Dear Martin*, *Anti-Racist Baby*, *Black Girl Unlimited*, *The Color Purple*, *Stamped: Racism, Anti-Racism, and You*, *Savage Inequalities*, *All American Boys*, *The Black Friend: On Being a Better White Person*, *Native Son*) and books that are at issue in this case (*e.g.*, *Concrete Rose*, *The Hate U Give*, *Freedom Writers Diary*, *The Bluest Eye*, *I Am Not Your Perfect Mexican Daughter, The Kite Runner*, *Out of Darkness*, *The Absolutely True Diary of a Part-Time Indian*, *The God of Small Things*, *Beloved*).

184.   Likewise, there are a significant number of books on Escambia's Mass Removals List that feature prominent LGBTQ characters, including both books that are not themselves at issue in this case (*e.g.*, *Julian Is a Mermaid*, *Being Jazz*, *Being Transgender*, *Rethinking Normal: A Memoir in Transition*, *The Black Flamingo*) and books that are at issue in this case (*e.g.*, *Drama*, *Flamer*, *Beyond Magenta*, *Darius the Great Deserves Better*, *Rainbow Boys*, *Little & Lion*).

185.  Many books on Escambia's Mass Removals List also have themes relating to feminism, including books that are not themselves at issue in this case (*e.g.*, *League of Super Feminists*, *How the Garcia Girls Lost Their Accents*, *Persepolis*, *The House of Spirits*, *You Don't Have to Be Everything: Poems for Girls*

*Becoming Themselves*) and books that are at issue in this case (*e.g.*, *Nowhere Girls*, *The Handmaid's Tale*, *Wicked: The Life and Times of the Wicked Witch of the West*).

186.  In addition, on information and belief, relative to their presence in School District libraries as a whole, the books at issue in this lawsuit that have been indefinitely restricted have disproportionately been books which address themes relating to race or LGBTQ identity, or feature prominent non-white and/or LGBTQ characters.

187.  Of the Current Restricted Books, over half address themes relating to race or LGBTQ identity or feature prominent non-white and/or LGBTQ characters.

188.  In considering all of the 161 books at issue in this case (including Original Removed, Recent Removed, Current Restricted, and Contingent Books), 45% have authors who are non-white and/or identify as LGBTQ, while 66%—nearly two-thirds of the books at issue—address themes relating to race or LGBTQ identity, or feature prominent non-white and/or LGBTQ characters.

189.  The disproportionate focus of the removal and restriction efforts is not an accident.  Baggett and other challengers have routinely expressed the categorical view that a book is inappropriate for inclusion in a school library simply because it explores themes relating to race or LGBTQ identity.  And the School Board has repeatedly ratified—over the objections of the district review committees—Baggett's removal preferences.

190.   In addition, at least some of the books on the Escambia Mass Removals List were included in the list based on viewpoint-discriminatory removals in other school districts.

191.   The districts that appear most frequently on the Florida DOE list and on the Escambia Mass Removals List are Clay and Indian River counties. 313 of the books on the Escambia Mass Removals List are based on removals in Clay County and 118 are based on removals in Indian River County. In each of these counties, there is just one challenger who accounts for the overwhelming majority of challenges and removals. In both cases, those super-challengers have expressed viewpoint discriminatory reasons for why books should be removed from school libraries

192.   Virtually all the challenges in Clay County have been submitted by activist Bruce Friedman, who has objected to over a thousand books, often on explicitly ideological grounds. For example, Friedman has challenged books he perceives as espousing "critical race theory" or that mention homosexuality.[18] Friedman objected to a biography of Harriet Tubman on the basis that it instructs children "that the Civil War was all about slavery," and challenged a biography of

---

[18] Samuel Lovett, *I Am the 'Michael Jordan of Book Banning.' This Is Why I Do It*. The Times (London), February 18, 2025, https://www.thetimes.com/us/news-today/article/which-books-banned-us-schools-tpmm9226k.

Leonardo Da Vinci and *Anne Frank's Diary: The Graphic Adaptation* because each makes passing reference to homosexuality or same-sex attraction.[19]

193.    Most of the challenges in Indian River County have been made by Jennifer Pippin, president of the local chapter of Moms For Liberty.  Pippin objected to *Ban This Book*—a children's novel about book bans—on the ground that it purportedly contains sexual content.  Indian River school board members voted to remove *Ban This Book* because it makes reference to other books that have been removed from schools and "teach[es] rebellion of school board authority," with one board member describing it as "a liberal Marxist propaganda piece."[20]  Pippin also objected to *Anne Frank's Diary: The Graphic Adaptation* because, she said, it was "not a true adaptation of the Holocaust."[21]  Indian River school board members voted to remove the book due to "a minimization of the events of the Holocaust," as well

---

[19] Andrew Lapin, *Meet Bruce Friedman, the Jewish Dad Who Got a Version of Anne Frank's Diary and Hundreds of Other Books Banned from His Florida School District*, Jewish Telegraphic Agency, October 6, 2023, https://www.jta.org/2023/10/06/united-states/this-jewish-dad-got-a-version-of-anne-franks-diary-removed-from-his-florida-school-district.

[20] Douglas Soule, *'Challenges Our Authority': School Board in Florida Bans Book About Book Bans*, Tallahassee Democrat, June 13, 2024, https://www.tallahassee.com/story/news/politics/2024/06/11/florida-school-board-bans-book-about-book-bans/73970418007/.

[21] Andrew Lapin, *Florida High School Pulls Graphic Novel Adaptation of Anne Frank's Diary, Saying It Is 'Not Age Appropriate'*, Jewish Telegraphic Agency, April 5, 2023, https://www.jta.org/2023/04/05/united-states/florida-high-school-pulls-graphic-novel-adaptation-of-anne-franks-diary-saying-it-is-not-age-appropriate

as alleged sexual content, including Frank's attraction to another girl and nude statues.[22]

194.    The Escambia County School Board removed *Ban This Book* from all libraries based on Indian River school district's removal of the book from K-8 libraries.  The Escambia County School Board removed this book based on its inclusion on the state list, even though, pursuant to Board policy, a district review committee had reviewed the book and unanimously approved retaining it in all libraries in the district, and the book's challenger had not appealed that decision to the Board.

195.    Likewise, the Escambia County School Board removed *Anne Frank's Diary: The Graphic Adaptation* based on Clay County and Indian River County school districts' removal of the book.  The Escambia County School Board removed this book based on its inclusion on the state list even though it had never been challenged in Escambia County.

196.    Hernando County, whose removals account for 30 books on Escambia's Mass Removals List, self-reported removing 42 books in the 2022-23

---

[22] *'Anne Frank's Diary: The Graphic Adaptation' Pulled from Florida High School Library over Recollection of Anne's Sexual Curiosity, Depictions of Nude Statues*, Bounding into Comics, April 14, 2023, https://boundingintocomics.com/comic-books/anne-franks-diary-the-graphic-adaptation-pulled-from-florida-high-school-library-over-recollection-of-annes-sexual-curiosity-depictions-of-nude-statues/.

and 2023-24 school years.[23]   Like Clay and Indian River counties, Hernando

County's challenges are largely driven by a single Moms for Liberty member, Julia

Thomas.  In a May 7, 2024 meeting, the Hernando County school board voted to

remove 19 out of 20 books challenged by Thomas.  Several of Thomas's challenge

materials reference "alternate gender ideologies" and "alternate sexualities."[24]

197.   Like Baggett, Thomas's challenges appeared to be directly lifted from

BookLooks.org.[25]   Her challenge to *Cemetery Boys* by Aiden Thomas, which

Escambia relied on to remove the book, appears to be based entirely on the fact that

it discusses a transgender character and growing up in a Latinx community.[26]   The

book was removed, despite a committee voting 5-0 to retain it.  During the meeting,

one Hernando County school board member likened these committee members to

"activist" teachers, noting that if they don't make the "right" decision, they've "gotta

---

[23]  *Supra* n.16.

[24]  Mark Stone, *Hernando County School Board Meeting Results in Removal of 19 Books from School Libraries*, Hernando Sun (May 31, 2024), https://www.hernandosun.com/2024/05/31/hernando-county-school-board-meeting-results-in-removal-of-19-books-from-school-libraries/.

[25]  Hernando Sch. Dist., May 7, 2024 Special School Board Meeting Agenda Packet https://hernandoschools.legistar.com/MeetingDetail.aspx?ID=1187037&GUID=9A1FEEE3-B109-40B0-9955-A675A50C2B75&Search=# (pdf file named "Agenda Packet" contains links to each challenge form, where a BookLooks.org chart is attached).

[26]  *Id.* (navigate to "Cemetery Boys" CHALLENGE 48 CEMETERY BOYS REQUEST FOR RECONSIDERATION FORM and ARTIFACTS 053 23 M4L HHS).

go."[27]  She then stated that the committee members who reviewed *Cemetery Boys* "should be ashamed to have your signature on that list, claiming you approve that smut, pornography, and filth.  Don't get too comfortable in your position because you won't be staying."  The Escambia County School Board removed this book based on its inclusion on the state list even though it had never been challenged in Escambia County.

198.   Similarly, Thomas's challenge to *Little and Lion*, which the Escambia County School Board relied on to remove the book, quotes BookLooks.org and states the book contains "sexual age-inappropriate content: sexual activities; alternate sexualities; and profanity/derogatory terms."  *Little and Lion*'s main character is a black, bisexual high school girl in a mixed-race family, who must navigate her brother's bipolar diagnosis, acts of homophobia, and her own sexuality. Despite a committee voting 4-1 to retain *Little and Lion*, the Hernando County school board removed it.  The Escambia County School Board removed this book based on its inclusion on the state list, after having kept the book on restricted status since it was challenged on September 2, 2022.  Rather than scheduling a local district review committee to read the book, the Escambia County School Board simply

---

[27] Hernando Sch. Dist., Special School Board Meeting on 2024-05-07 8:30 AM at 2:25:25, https://hernandoschools.granicus.com/player/clip/248?view_id=1&meta_id=41175&redirect=true.

moved it from being restricted for nearly three years to being removed.

199.   In another instance, the Escambia County School Board removed *The Black Friend: On Being A Better White Person* from all libraries based on its removal by the Hernando County school district.  There, Thomas challenged the books because it "teaches young adults about the ideologies of white privilege, anti-racism, [and] cultural appropriations," among other reasons.[28]   The Hernando County school board voted to remove the book, reversing the review committee's recommendation that the book not be removed, after a number of board members professed their colorblindness and some commented, variously, that "[t]his book is nothing but divisive and racist" and promotes "critical race theory."[29]   The Escambia County School Board removed this book based on its inclusion on the state list even though it had never been challenged in Escambia County.

200.   The Escambia County School Board also removed *The Kite Runner* from all libraries based on its removal by the Hernando County school district.  Among other objections, Thomas described the inclusion of the book in the school

---

[28] Challenge 35 *The Black Friend* Request for Reconsideration Form and Artifacts, Hernando School District, February 6, 2024 School Board Meeting Details, https://hernandoschools.legistar.com/LegislationDetail.aspx?ID=6499974&GUID=688A4C31-34AD-4908-8951-83AA7852F7D7&Options=&Search=.

[29] Vincent F. Safuto, *Hernando School Board Removes Two Books Amid Heated Debate*, SunCoastNews.com, February 10, 2024, https://www.suncoastnews.com/news/hernando-school-board-removes-two-books-amid-heated-debate/article_eea5f0f0-c768-11ee-a63a-db6a2b131c59.html.

libraries as a "violation of HB 1557 for teaching and/or introducing sexual orientation and gender identity to children."[30]  The Hernando County school board voted to remove the book, reversing the review committee's unanimous recommendation that the book not be removed.  One school board member characterized a scene of homosexual rape described in detail in the book as pornography.  Another school board member characterized the book as "this smut."[31] The Escambia County School Board removed this book based on its inclusion on the state list, after having kept the book on restricted status since it was challenged on September 2, 2022.  Rather than scheduling a local district review committee to read the book, the Escambia County School Board simply changed it from being restricted for nearly three years to being removed.

201.   In another example, the Escambia County School Board also removed *Ace of Spades* from all libraries based on its removal by the Bay County school district.[32]  According to a Bay County school board member who voted to affirm the decision to remove the book despite having not read it, the Bay review committee

---

[30] Challenge 95 *The Kite Runner* Artifacts, Hernando School District, February 6, 2024 School Board Meeting Details, https://hernandoschools.legistar.com/LegislationDetail.aspx?ID=6499977&GUID=A8386C32-AF6A-4EFB-B887-8E958FFCF80E&Options=&Search=.

[31] *Supra* n.29.

[32] Although the Escambia Mass Removals list cites to Alachua as the school district that removed the book, this appears to be an error, as on the Florida DOE lists, the only school district listed as having removed *Ace of Spades* is Bay and not Alachua.

voted to remove the book for, among other reasons, "the homosexual relationships and homosexual sex part of it" as well as "the racism part of it."[33]  The Escambia County School Board removed this book based on its inclusion on the state list, after having kept the book on restricted status since it was challenged on September 2, 2022.  Rather than scheduling a local district review committee to read the book, the Escambia County School Board simply moved it from being restricted for nearly three years to being removed.

202.  By refusing to follow through with its own review process for these books, the School Board impermissibly delegated its decision-making authority and any articulation or evaluation of local community standards to the Florida DOE list, which is merely an aggregation of removals in other school districts, many of which were themselves based on viewpoint discrimination.  The result of the School Board's wholesale abdication of its discretion is arbitrary removals of books.  This process violates Plaintiffs' First Amendment rights.

---

[33] Alex Schley, *Bay District School Bans a Book for the First Time Since the 80s*, MyPanhandle.com, May 9, 2023, https://www.mypanhandle.com/news/schools/bay-district-schools-bans-a-book-for-the-first-time-since-the-80s/.

N.    **Students in the School District Are Being Deprived Access to Books to which They Previously Had Access**

203.    The book removals and restrictions enacted by the School Board are denying students access to books they would like to read or chilling such access.

204.    Students in Escambia County Public Schools can typically check books out of their school libraries or the district's online system: if their library does not have a book, it may be available through inter-library loan from another school library.

205.    Plaintiff Novakowski is the parent of a rising third grader at A.K. Suter Elementary School. Her daughter visits the library at her school at least once a week and routinely checks out books. Her daughter is particularly interested in books about families and different family arrangements.

206.    Novakowski's daughter would like to access and check out books that are no longer available in or through her school's library because of the book removals and restrictions. In particular, she would like to check out *Tango*, *Aidan*, and *Uncle Bobby's Wedding*. *Tango* and *Aidan* are currently unavailable in or through her school library as a result of the actions of the School Board. *Uncle Bobby's Wedding* is a Contingent Book.

207.    Novakowski herself would like those particular books, and other books like them, to be available to her daughter in or through her school library. It is important to her that her daughter has opportunities to be exposed to points of view,

backgrounds, and experiences different from her own and that of her family. She believes such exposure is critical to learning acceptance of people with different backgrounds and experiences and to being able to participate in our wider society.

208.   Plaintiff Parker is the parent of a rising tenth grader at Pine Forest High School. His son visits the library at his school and checks out books. His son is particularly interested in books about civil rights.

209.   Parker's son would like to access and check out books that are no longer available in his school's library because of the book removals and restrictions. In particular, he would like to check out *The Freedom Writers Diary*, *Concrete Rose*, and *The Hate U Give*. Each of those books is currently unavailable in or through his school library as a result of the actions of the School Board.

210.   Parker himself would like those particular books, and other books like them, to be available to his son in or through his school library. It is important to him that his son have opportunities to be exposed to books that reflect Black culture, including works by celebrated Black authors, and not to shy away from stories reflecting the raw experiences that Black people face. He believes such exposure is critical for his son to develop resilience.

211.   Plaintiff Satterwhite is the parent of a rising twelfth grader at Pensacola High School. His son visits the library at his school and is particularly interested in graphic novels and books about race and racism.

212.    Satterwhite's son would like to access and check out books that are no longer available in or through his school's library because of the book removals and restrictions.  In particular, he would like to check out *Slaughterhouse Five* and *All Boys Aren't Blue*.  Each of those books is currently unavailable in or through his school library as a result of the actions of the School Board.

213.    Satterwhite himself would like those particular books, and other books like them, to be available to his son in or through his school library.  It is important to him that his son has opportunities to read about Black experiences in the United States, in part because his own family felt the need to dissociate themselves from their Black heritage.  Beyond that, he wants books to be available to his son in the school library for him to explore Black experiences and any other subjects he is interested in at his own pace and driven by his own interests.

**O.    Defendant's Book Removals and Restrictions Harm PEN America, Its Members, the Author Plaintiffs, PRH, and the Parent Plaintiffs and Their Children**

214.    Plaintiff PEN America has standing to sue to enjoin the Defendants' book removals and restrictions because the actions of the School Board have caused direct organizational injury to PEN America.

215.    As a consequence of efforts in Escambia County and elsewhere to remove books from public school libraries based on political or ideological objections, PEN America has had to reallocate significant financial resources and

time to addressing this issue and away from other priorities. For example, PEN America has had to hire full-time staff to work solely on (a) tracking and reporting on book removals, (b) supporting author-members who have concerns about what is happening to their own books, and (c) responding to a consistent onslaught of inquiries and notifications from parents, teachers, students and media concerned about the situation regarding book removals and looking to PEN America for insight and guidance. In addition, because of the focus on book removals, PEN America has had fewer personnel dedicated to free speech education for youth or to free speech issues on college campuses, two other areas related to education on which PEN America has typically focused its resources.

216. Another consequence of these efforts is interference with PEN America's core business activities—namely, protecting writers in the United States and around the world from discrimination and censorship, championing the written word, and defending freedom of expression. The time and effort PEN America has had to spend on addressing efforts to remove and restrict books in Escambia County and elsewhere has required PEN America to focus its work disproportionately on the freedom to read in K-12 and has detracted from a breadth of other core business activities and necessary work by the organization. This includes, for example, programming on campus free speech such as convenings of PEN America's higher education-focused Freedom to Learn coalition, online harassment training such as

trainings on digital safety for authors, and protecting writers and artists facing political persecution abroad.

217.  PEN America also has associational standing on behalf of its members. Among the PEN America members whose books have been removed from libraries within the School District and/or subjected to restricted access within libraries in the School District are each of the Author Plaintiffs, as well as, among others, Margaret Atwood, Judy Blume, Alex Gino, John Green, Khaled Hosseini, Susan Kuklin, David Levithan, and Jodi Picoult.

218.  Each of those affected author-members of PEN America would have standing to sue based on the School District's violation of their rights under the First and Fourteenth Amendments.

219.  The interests at stake in this case are germane to PEN America's purpose of protecting the rights of its author-members and the right to free expression generally.

220.  Neither the claims asserted nor the relief requested in this case requires the participation of the named non-plaintiff author-members above or any other of PEN America's author-members as the relief being sought is declaratory and injunctive in nature.

221.  The Author Plaintiffs have standing to sue to enjoin Defendants' book removals and restrictions because their books have been (a) removed from libraries

within the School District, and/or (b) subject to restricted access of an indefinite period pending adjudication of a challenge.  Specifically:

    a. Plaintiff Johnson's book *All Boys Aren't Blue* is one of the Original Removed Books.

    b. Plaintiff Lukoff's book *Aidan* is one of the Original Removed Books. His book *Too Bright to See* is one of the Recent Removed Books.

    c. Plaintiff Pérez's book *Out of Darkness* is one of the Recent Removed Books.

222.   Millions of books published by PRH are sold into Florida each year, including to school districts and public libraries.  PRH has standing to sue to enjoin Defendants' book removal and restrictions because certain of the books it publishes, including books by Toni Morrison, Kurt Vonnegut, Kyle Lukoff, Sapphire, and David Levithan, have been (a) removed from libraries within the School District, and/or (b) subject to restricted access of an indefinite period pending adjudication of a challenge.  A publisher's ability to publish and sell books freely is affected when state or local officials restrict circulation or remove the publisher's books.

223.   The Parent Plaintiffs have standing, on behalf of both themselves and their children, to sue to enjoin Defendants' book removals and restrictions because both they and their children have been harmed by the book removals and restrictions.

224.   Plaintiff Novakowski is the parent of a student who attends A.K. Suter Elementary School in the School District.  As a result of the actions of the School Board, Novakowski's daughter is unable to access books in or through her school library that were previously available.  Novakowski's daughter wants to access and check out those books and Novakowski wants her to have that opportunity.

225.   Plaintiff Parker is the parent of a student who attends Pine Forest High School in the School District.  As a result of the actions of the School Board, Parker's son is unable to access books in or through his school library that were previously available.  Parker's son wants to access and check out those books, and Parker wants him to have that opportunity.

226.   Plaintiff Satterwhite is the parent of a student who attends Pensacola High School in the School District.  As a result of the actions of the School Board, Satterwhite's son is unable to access books in or through his school library that were previously available.  Satterwhite's son wants to access and check out those books and Satterwhite wants him to have that opportunity.

227.   Each of the parents has a fundamental right to direct their child's upbringing and an interest in public school libraries not removing or restricting books by and about people of color and LGBTQ individuals, suggesting that these identities and discussions about them are taboo and preventing their children from

coming across such books in the school library. Accordingly, the Board's actions in removing and restricting these books causes the parents harm.

## V.    CLAIMS FOR RELIEF

**COUNT ONE:**
**FIRST AMENDMENT—VIEWPOINT DISCRIMINATION**
**(On Behalf of PEN America, Its Members, the Author Plaintiffs, and PRH**
**as to All Books at Issue in the Lawsuit)**

228.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

229.    The Fourteenth Amendment to the United States Constitution incorporates the protections of the First Amendment as applied to and binding on the State of Florida.

230.    The School Board is a state actor operating under color of state law.

231.    The libraries within the School District constitute, at a minimum, non-public forums. Because they are non-public forums, the School Board cannot remove an author's or publisher's book from school libraries, or relegate it to restricted sections of such libraries, based on viewpoint discrimination.

232.    However, as detailed above with respect to the Original Removed Books, the School Board has been ordering books removed based on ideological objections to their contents or disagreement with their messages or themes, rather than for pedagogical reasons.

233.   Likewise, for many of the Recent Removed Books, where there are indications that book removals in other school districts were based on ideological objections to their contents or disagreement with their messages or themes, rather than for pedagogical reasons, the School Board has implicitly adopted these ideological objections.

234.   The School Board is similarly restricting access to the Current Restricted Books for indefinite periods of time based on ideological objections to their contents or disagreement with their messages.

235.   Although the Board has yet to take action against the Contingent Books, Plaintiffs assert this claim as to those books in light of the likelihood of further Board action with respect to these books, as demonstrated by recent events.

236.   The result is that the School Board is systematically excluding certain viewpoints and perspectives from school libraries.

237.   Such removals, threatened removals, and restrictions of access constitute viewpoint discrimination in violation of the First Amendment.

**COUNT TWO:**
**FIRST AMENDMENT—RIGHT TO RECEIVE INFORMATION**
**(On Behalf of the Parent Plaintiffs and Their Minor Children as to the**
**Original Removed Books, Recent Removed Books, and Contingent Books)**

238.   The Fourteenth Amendment to the United States Constitution incorporates the protections of the First Amendment as applied to and binding on the State of Florida.

239.    The School Board is a state actor operating under color of state law.

240.    In the setting of a public school library, the First Amendment "protects the right to receive information and ideas." *Pico*, 457 U.S. at 867-68.  This right is violated when a school district or school board removes or restricts access to library books "in a ***narrowly partisan or political manner***," and for the purpose of "deny[ing] students access to ideas with which" the school district or school board disagrees.  *Id.* at 870-71 (emphasis added).  It is likewise violated when books are removed for reasons other than legitimate pedagogical concerns.  As detailed above, that is what has occurred here.

241.    The Parent Plaintiffs want their student children to have access to some or all of the Original Removed Books, the Recent Removed Books, and the Contingent Removed Books.

242.    The students on whose behalf the Parent Plaintiffs also bring this lawsuit likewise want to have access to some or all of the Original Removed Books, the Recent Removed Books, and the Contingent Removed Books.

243.    The unlawful conduct of the School Board has injured the rights of the Parent Plaintiffs that their student children have access to information and ideas within school libraries, and the rights of those student children to receive information and ideas.

## COUNT THREE
## FIRST AMENDMENT—DUE PROCESS
### (On Behalf of All Plaintiffs as to the Mass-Removed Books)

244.   The foregoing paragraphs are incorporated by reference as if fully set forth herein.

245.   Consistent with the First Amendment, government entities cannot delegate unbridled discretion in the area of free expression because it may result in censorship.

246.   Further, when government entities place restrictions on speech, they must provide procedures adequate to safeguard against infringement of First Amendment rights.

247.   Here, as to the Mass-Removed Books, the School Board's effective delegation of its determinations of whether books in its libraries are age-appropriate to an aggregated list of removals from other school districts in Florida violates Plaintiffs' First Amendment rights, particularly where the School Board removed the books at issue from all school libraries without regard to the age- or grade-levels at which they had been removed elsewhere and without regard to the previous determinations made by itself or its review committees.

248.   The result is that the School Board is tearing down safeguards for free expression and excluding certain viewpoints and perspectives from school libraries in violation of the First Amendment.

## VI.    PRAYER FOR RELIEF

**WHEREFORE**, in light of the foregoing facts, Plaintiffs respectfully request that this Court:

A.    Issue permanent injunctive relief requiring the School Board and its agents, employees, and successors in office to restore to the libraries within the School District the Original and Recent Removed Books.

B.    Issue permanent injunctive relief requiring the School Board and its agents, employees, and successors to restore the Current Restricted Books subjected to restricted access to their previous status;

C.    Award Plaintiffs' costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. § 1988; and

D.    Grant such other and further relief as the interests of justice may require.

Respectfully submitted,

Dated: August 8, 2025          /s/ Lynn B. Oberlander
                              Lynn B. Oberlander*
                              **BALLARD SPAHR LLP**
                              1675 Broadway, 19th Floor
                              New York, NY  10019-5820
                              Telephone: 212.223.0200
                              Facsimile: 212.223.1942

                              Matthew G. Kussmaul*
                              Facundo Bouzat*
                              **BALLARD SPAHR LLP**

95

1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: 215.864.8500
Facsimile: 215.864.8999

Kirsten Fehlan*
**BALLARD SPAHR LLP**
999 Peachtree Street, Suite 1600
Atlanta, GA 30309
Telephone:678.420.3000
Facsimile: 678.420.9401

Goldie Fields*
**BALLARD SPAHR LLP**
2029 Century Park East, Suite 1400
Los Angeles, CA 90067
Telephone: 424.204.4338
Facsimile: 424.204.4350

Shalini Goel Agarwal (FBN 90843)
Ori Lev*
**PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
Telephone: 202.579.4582
Facsimile: 929.777.8428

*Admitted pro hac vice*

*Attorneys for Plaintiffs*