**FOR PUBLICATION**

In the

# United States Court of Appeals

For the Eleventh Circuit

---

No. 25-13298

---

PEN AMERICAN CENTER, INC.,
GEORGE M. JOHNSON,
KYLE LUKOFF,
ANN NOVAKOWSKI,
on behalf of herself and her minor child,
PENGUIN RANDOM HOUSE, LLC, et al.,

*Plaintiffs-Appellees,*

SARAH BRANNEN, et al.,

*Plaintiffs,*

*versus*

ESCAMBIA COUNTY SCHOOL DISTRICT, et al.,

*Defendants,*

KEVIN ADAMS,

*Defendant-Appellant,*

PAUL FETSKO,

PATRICIA HIGHTOWER,
WILLIAM SLAYTON,
DAVID WILLIAMS,

*Interested Parties-Appellants.*

---

Appeals from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:23-cv-10385-TKW-ZCB

---

---

No. 25-13698

---

PEN AMERICAN CENTER, INC.,
GEORGE M. JOHNSON,
KYLE LUKOFF,
ANN NOVAKOWSKI,
on behalf of herself and her minor child,
PENGUIN RANDOM HOUSE, LLC, et al.,

*Plaintiffs-Appellees,*

SARAH BRANNEN, et al.,

*Plaintiffs,*

*versus*

ESCAMBIA COUNTY SCHOOL DISTRICT, et al.,

*Defendants,*

CARISSA BERGOSH,
TOM HARRELL,

*Interested Parties-Appellants.*

---

Appeals from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:23-cv-10385-TKW-ZCB

---

Before WILLIAM PRYOR, Chief Judge, and JILL PRYOR and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

This appeal is about whether legislative privilege shields members of the Escambia County School Board from being compelled to testify about why they determined that specific library books are inconsistent with the Board's preexisting policies. As required by Florida law, *see* FLA. STAT. § 1006.28(2)(a)(2), the Board has adopted a policy that requires its employees to remove any library or instructional materials that are, among other things, pornographic, or that "depict[] or describe[] sexual conduct." Policy 4.06 at 9(D)(8), Dkt. 219-1 at 14; Policy 2522, Dkt. 219-1 at 61–62. The Board has also adopted a process for members of the public to object to material as falling under this standard. *See* Policy 4.06 at 10, Dkt. 219-1 at 14–18; Policy 2522, Dkt. 219-1 at 60–62. After a complainant files a written objection, Policy 4.06 at 10(B)(2), Dkt. 219-1 at 15; Policy 2522, Dkt. 219-1 at 60, the Superintendent and the Coordinator of Media Services must decide whether to remove

the material or forward the complaint to a committee of several community members who review all evidence submitted by the complainant. Policy 4.06 at 10(B)(3)(d), (f)–(g), Dkt. 219-1 at 16; Policy 2522, Dkt. 219-1 at 61.

If the material is not removed as part of that process, the complainant may appeal to the School Board within ten business days. Policy 4.06 at 10(B)(4)(a), Dkt. 219-1 at 17; Policy 2522, Dkt. 219-1 at 62. Then, at a public meeting, the Board reviews the "appeal," Policy 4.06 at 10(B)(4)(a)–(b), Dkt. 219-1 at 17–18, or "the case" that is on "appeal," Policy 2522, Dkt. 219-1 at 62, "including all evidence proffered by the complainant," and "shall announce during the meeting whether the challenged material meets the requirements of this policy." Policy 2522, Dkt. 219-1 at 62. "Any Board action to remove material will be accompanied by the Board's statement of its reasons for the removal." *Id.*

After the Board members voted several times to remove books under this policy, the plaintiffs in this case sought to depose them about why they did so. In response, the Board members have invoked legislative privilege to bar these depositions. Legislative privilege protects its holder from being compelled to testify about his or her legislative acts. *United States v. Brewster,* 408 U.S. 501, 525 (1972). But it does not protect against being compelled to give evidence about administrative or other nonlegislative acts. *Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1062 (11th Cir. 1992). The district court concluded that when the Board members voted to

remove specific books as inconsistent with the Board's existing policies, they acted as administrators, not legislators. We agree and affirm.

**I.**

Before proceeding to the merits, we outline the state law and school board policies in the background of this appeal and then summarize the book removal votes and procedural history of this lawsuit.

*A.*

Florida law requires school boards to be "responsible for the content of all instructional materials and any other materials . . . made available in a school or classroom library." FLA. STAT. § 1006.28(2)(a)(1). Florida law also directs that if a school library book "[i]s pornographic or prohibited under § 847.012," "[d]epicts or describes sexual conduct as defined in § 847.001(19)," "[i]s not suited to student needs and their ability to comprehend the material presented," or "[i]s inappropriate for the grade level and age group for which the material is used," then the district "shall discontinue use of the material" either altogether or for the relevant age group. *Id.* § 1006.28(2)(a)(2)(b). The Escambia County School Board has adopted multiple policies that require its employees to remove any library or instructional materials that are, among other things, pornographic, or that "depict[] or describe[] sexual conduct." Policy 4.06 at 9(D)(8), Dkt. 219-1 at 14; Policy 2522, Dkt. 219-1 at 61–62.

Florida law also instructs that local school boards must adopt a process to resolve objections to school library books, FLA. STAT. § 1006.28(2)(a)(2), and provides for an appeal from the local school board's decision to deny an objection to a book, *id.* § 1006.28(2)(a)(6). If a parent is unsatisfied with the local school board's decision to keep a book, he or she can request that the Florida Commissioner of Education appoint a special magistrate to recommend a decision to the Florida Board of Education, which can vote on the special magistrate's recommendation. *Id.* The substance of the appeal is about the process that the Board used to resolve the objection, that is, "to determine whether a district considered a parental objection under" the appropriate procedures. FLA. ADMIN. CODE r. 6A-1.094126(4); *see* FLA. STAT. § 1006.28(2)(a). To that end, the special magistrate must be "a member of The Florida Bar in good standing and who has at least 5 years' experience in administrative law." FLA. STAT. § 1006.28(2)(a)(6).

The Escambia County School Board adopted two successive policies about how to handle book objections. The first was Policy 4.06. Under that policy, if someone challenged a school library book, the Superintendent could remove the book without further review (upon making an evidentiary determination) or a District Materials Review Committee could review the challenge. The committee, composed of five or more community members, would read the challenged book and consider the objections. The complainant could proffer evidence that the book conflicts with Florida law or "is not suited to student needs and their ability to comprehend the material presented, or is inappropriate for the

grade level and age group." Policy 4.06 at 10(B)(3)(k), Dkt. 219-1 at 17. The committee would then vote by simple majority to keep, restrict, or remove the book. If the complainant was unsatisfied with the result of the vote, he or she could appeal to the School Board.

The newest version of the School Board's policy is Policy 2522. It amended Policy 4.06 by tying the objection process even more closely with Florida law. For example, Policy 2522 requires complainants to specify how a book conflicts with Florida Statute Section 1006.28(2)(a)(2) and whether the book is pornographic, prohibited under Section 847.012, describes sexual conduct, is unsuited to student needs, or is inappropriate for a certain age group. It also explicitly repeats the state statutory requirement that the School Board remove books if they violate Florida law on pornography or sexual material. Policy 2522 also requires the Board to state its reasons for voting to remove a book.

The Board has also adopted two other relevant policies. First, the Board adopted Policy 2520, which specified that books that other school districts had removed would not be selected for Escambia County school libraries without specific approval by the School Board. Escambia Cnty. Pub. Schs., *2520 - Selection and Adoption of Instructional Materials*, https://perma.cc/H7LF-KUB5.[1] Second, the Board adopted a directive on June 17, 2025. That directive

---

[1] Both parties have asked the Court to take judicial notice of publications on the Board's website, including Policy 2520 and a Board meeting agenda. We agree that we can take judicial notice of such publications because they are

instructed the Superintendent to "eliminate all pornographic or age-inappropriate books from district media centers, as identified on the Department of Education's book removal list, without further review." Sch. Bd. of Escambia County, Fla., Regular Meeting Agenda, Item 43.B (June 17, 2025) [hereinafter Meeting Agenda (June 17, 2025)], https://perma.cc/5EUW-3GJP.

*B.*

At issue in this appeal are three categories of book removals, which the parties refer to as the 9 Original Removed Books, the 16 Superintendent-Removed Books, and the 101 Mass-Removed Books.

The Board voted to remove the nine Original Removed Books in 2023 under Policy 4.06. The process to remove these nine books began when a teacher filed written challenges to them, explaining that the books included, among other things, "[e]xtreme sexual content," "LGBTQ agenda," "[r]ace-baiting," "[g]raphic rape scenes," and "language." Dkt. 219 ¶ 108. A District Materials Review Committee reviewed the teacher's challenges and recommended against removing the books.

The teacher appealed to the School Board. The Board considered these appeals over the course of three meetings, entitling each agenda item (with some typographical variations), "[t]o Consider a Citizen Challenge to [book title] by [author] Pursuant to

---

"from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b)(2).

Section 1006.28(2), Fla. Stat." Sch. Bd. of Escambia County, Fla., Special Meeting Agenda, Items 2.B., 2.D., 2.F. (Feb. 20, 2023) [hereinafter Special Meeting Agenda (Feb. 20, 2023)], https://perma.cc/WF2E-H6Z3; Sch. Bd. of Escambia County, Fla., Special Meeting Agenda, Items 3.F., 3.G., 3.H., 3.I. (Mar. 20, 2023) [hereinafter Special Meeting Agenda (Mar. 20, 2023)], https://perma.cc/WD4A-VSLU; Sch. Bd. of Escambia County, Fla., Special Meeting Agenda, Items 3.D., 3.E. (Apr. 13, 2023) [hereinafter Special Meeting Agenda (Apr. 13, 2023)], https://perma.cc/UPS9-XK6E. Before voting on each appeal, a Board member made a motion; these motions were phrased in varying ways, including "approve the citizen's appeal . . . (remove the material)," Special Meeting Agenda (Feb. 20, 2023), *supra*, at Item 2.B., "[s]upport the committee's recommendation," *id.* at Item 2.D., and "[r]emove" a book, Special Meeting Agenda (Mar. 20, 2023), *supra*, at Item 3.H.; Special Meeting Agenda (Apr. 13, 2023), *supra*, at Items 3.D., 3.E. Ultimately, the School Board overruled the committee's decisions, voting to remove the nine challenged books from some or all school libraries.

Next came two additional categories of removals: the Superintendent- and Mass-Removed Books. Although the same teacher challenged several books that were part of these removals, the Superintendent's recommendation—not a citizen challenge—precipitated these removals.

The Board voted to remove the sixteen Superintendent-Removed Books in 2025 under Policy 2522. The Superintendent submitted a recommendation to remove these books "[p]ursuant to School Board Policy 2522," explaining that the books were "classified as adult novels," and "contain graphic descriptions and depictions of sexual conduct which are not appropriate for minors," citing Florida Statute Section 1006.28(2)(d)(1). Meeting Agenda (June 17, 2025), *supra*, at Item 44.A & attach. The Board unanimously approved this recommendation. *Id.* at Item 44.A.

The Board next voted to remove the 101 Mass-Removed Books as an application of Policy 2522 and its June 17, 2025, directive. The Superintendent submitted to the Board a list of books to which the Florida Department of Education had objected. Sch. Bd. of Escambia Cnty., Fla., Regular Meeting Agenda, Item 44.A (July 15, 2025) [hereinafter Meeting Agenda (July 15, 2025)], https://perma.cc/F298-ML9N. The Board then moved to "[a]pprove [the Superintendent's] recommendation" to remove books "in compliance with the School Board Directive approved on June 17, 2025, to remove the books listed by the Florida Department of Education's book removal list, without further review." *Id.* As with the Superintendent-Removed Books, the Board unanimously approved this recommendation. *See id.*

*C.*

A group of parents, authors, a free speech interest group called PEN American Center, Inc., and Penguin Random House

sued the Escambia School Board for violating the First Amendment. When they sought to depose members of the Board about their book removal votes, the Board moved for a protective order based on legislative privilege. The district court denied the motion, explaining that legislative privilege did not apply because the book removal votes were administrative acts. *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 787 F. Supp. 3d 1292, 1297–98 (N.D. Fla. 2024). The district court elaborated that the Board's book removal votes were administrative because the votes were based on specific facts about the content of books, involved the case-by-case application of law and policy to specific books, and did not formulate general standards that apply to all books. *Id.* at 1297.

Eventually, the plaintiffs served the Board members with notices of depositions and subpoenas. The Board members individually moved to quash the subpoenas and for protective orders, which the district court denied "for the reasons stated" in its previous order. The Board members filed two appeals, which we consolidated.

## II.

We review a district court's decision whether to quash a subpoena for abuse of discretion. *In re Hubbard*, 803 F.3d 1298, 1307 (11th Cir. 2015). It is an abuse of discretion for the district court to make a clear error of judgment or to apply the wrong legal standard. *Id.*

**III.**

Federal common law, which applies to evidentiary privileges in federal court, FED. R. EVID. 501, provides a legislative privilege to state and local legislators. *Pernell v. Fla. Bd. of Governors of State Univ.*, 84 F.4th 1339, 1343 (11th Cir. 2023). The legislative privilege protects its holder from being compelled to testify about his or her legislative acts. *Brewster,* 408 U.S. at 525. Specifically, the privilege "protects against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts." *Id.* But it does not protect against being compelled to give evidence about administrative or other nonlegislative acts. *Yeldell*, 956 F.2d at 1062. Accordingly, the privilege "covers . . . actions in the proposal, formulation, and passage of legislation." *In re Hubbard*, 803 F.3d at 1308 (citation modified). The burden of proving that an act is legislative rests on the person asserting the privilege. *Cf. In re Grand Jury Investigation*, 842 F.2d 1223, 1225 (11th Cir. 1987) ("The person invoking the privilege does bear the burden of proving its existence."); *Hafer v. Melo*, 502 U.S. 21, 29 (1991) ("[O]fficials seeking absolute immunity must show that such immunity is justified for the governmental function at issue . . . .").

We have said that the touchstone of a legislative act is that it involves "policy-making rather than mere administrative application of existing policies." *Crymes v. DeKalb County*, 923 F.2d 1482,

1485 (11th Cir. 1991).[2] Legislative acts include matters intimately involved in the legislative process, such voting on legislation, speech-making on the floor of a legislative assembly, preparing committee reports, participating in committee investigations and proceedings, *Yeldell*, 956 F.2d at 1062; *see also Tenney v. Brandhove*, 341 U.S. 367, 377–78 (1951) (committee investigation), introducing a budget, *Bogan v. Scott-Harris*, 523 U.S. 44, 55–56 (1998), issuing an executive veto, *see Espanola Way Corp. v. Meyerson*, 690 F.2d 827, 829 (11th Cir. 1982), and proposing, formulating, or passing legislation, *In re Hubbard*, 803 F.3d at 1308; *see also Women's Emergency Network v. Bush*, 323 F.3d 937, 950 (11th Cir. 2003) (signing a bill). When confronted with mixed administrative and legislative bodies like a school board, we have recognized equivalent acts as legislative in nature, such as amending a zoning code, *Baytree of Inverrary Realty Partners v. City of Lauderhill*, 873 F.2d 1407, 1409 (11th Cir. 1989), and amending a county code to remove a truck route, *Crymes*, 923 F.2d at 1485. We have explained an act is "more apt to be administrative in nature" if "the facts utilized in making a decision are specific, rather than general, in nature." *Id.*

---

[2] Like the parties, we rely on precedents that address whether an act is legislative in nature, even if that precedent arose in the context of legislative immunity. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) (citing legislative immunity precedent *Tenney v. Brandhove*, 341 U.S. 367 (1951) when discussing legislative privilege); *In re Hubbard*, 803 F.3d at 1307–08 (relying on legislative immunity precedents to assess claim of legislative privilege); *EEOC v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 180–81 (4th Cir. 2011) (explaining that legislative privilege and immunity are "parallel concept[s]").

The plaintiffs concede that they intend to depose the Board members about their motives for their book removal votes. And, as no party disputes, local school boards exercise a combination of proprietary, administrative, and legislative powers. The parties' dispute is about whether the Board members have met their burden to establish that their votes to remove these specific books are legislative acts.

We agree with the plaintiffs that the Board members have not met their burden. These book removal votes were not part of the "regular course of the legislative process." *Brewster*, 408 U.S. at 525. They did not involve the "proposal, formulation, and passage of legislation." *In re Hubbard*, 803 F.3d at 1308. And they did not make new policies or amend existing policies. *Bogan*, 523 U.S. at 55. The Board's votes to adopt Policy 4.06, Policy 2522, Policy 2520, and the June 17, 2025, directive were legislative.[3] But their votes to remove specific books as an *application* of those policies were quite literally the "mere administrative application of existing policies" to specific facts. *Crymes*, 923 F.2d at 1485. Accordingly, they are not protected from discovery by legislative privilege.

We start with the all-too-obvious fact that, although several acts of legislative policymaking preceded the Board's book removal

[3] Although the plaintiffs do not explicitly concede that the decision to issue the June 17, 2025, directive was a legislative act, their arguments presuppose that it was. Specifically, they characterize the directive as a policy that the Superintendent and Board later applied to a specific set of facts. In any event, it is clear under our precedent that the decision to adopt the June 17, 2025, directive was a legislative act.

votes, none of the book removal votes themselves are connected to the "regular course of the legislative process." *Brewster*, 408 U.S. at 525. The state legislature proposed, formulated, and passed legislation requiring that local school boards remove certain books from school libraries, FLA. STAT. § 1006.28(2)(a)(2)(b), and that they create a process for evaluating book objections, *id.* § 1006.28(2)(a)(2). Then, the Escambia County School Board exercised its legislative power by incorporating the standards in state law into such a policy and designing such a process. *See* Policy 4.06, Dkt. 219-1 at 4–18; Policy 2522, Dkt. 219-1 at 59–63. The School Board again exercised its legislative power by adopting the June 17, 2025, directive, which directed the Superintendent to perform the administrative task of eliminating "all pornographic or age-inappropriate books from district media centers, as identified on the Department of Education's book removal list, without further review." Meeting Agenda (June 17, 2025), *supra*, at Item 43.B.

But that is when the legislative policymaking ended. Under the Board's policies, the Superintendent and the District Materials Review Committee are charged with applying the Board's policies to specific books and removing those books that fail. Policy 4.06 at 10(B)(3)(d), (l), Dkt. 219-1 at 16–17; Policy 2522, Dkt. 219-1 at 61–62. After the District Materials Review Committee makes a removal decision, the complainant can appeal to the School Board. But, at that point, the School Board—like the committee—asks only whether a challenged book fails under preexisting policies. *See* Policy 2522, Dkt. 219-1 at 62. Then, if the Board votes to remove a book as failing under preexisting policies, it must state its reasons.

*Id.* On the other hand, if the Board decides to keep a book, a parent may appeal that decision to the Florida Board of Education, which appoints a magistrate judge with experience in administrative law to determine whether the local school board gave the complainant sufficient process. FLA. ADMIN. CODE r. 6A-1.094126(4); *see* FLA. STAT. § 1006.28(2)(a)(6). The legislative process is ordinarily not constrained by administrative law. *Cf. Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915) (citizens have no right to "a chance to be heard" in the passage of legislation); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 432 (1982) (explaining that a "legislature may elect not to confer a property interest" without implicating the Due Process Clause (quoting *Vitek v. Jones*, 445 U.S. 480, 490 n.6 (1980))).

The form of these book removal votes also suggests that the votes were administrative in nature. When the Board voted to remove the nine Original Removed Books, it was expressly adjudicating a complaint and applying Florida law and Policy 4.06 to a specific set of facts—each book. The agenda items for considering these books were phrased (with some typographical variations), "[t]o Consider a Citizen Challenge to [book title] by [author] Pursuant to Section 1006.28(2), Fla. Stat." Special Meeting Agenda (Feb. 20, 2023), *supra*, at Items 2.B., 2.D., 2.F.; Special Meeting Agenda (Mar. 20, 2023), *supra*, at Items 3.F., 3.G., 3.H., 3.I.; Special Meeting Agenda (Apr. 13, 2023), *supra*, at Items 3.D., 3.E. Some of the motions phrased the vote as a vote to "approve the citizen's appeal . . . (remove the material)," Special Meeting Agenda (Feb.

20, 2023), *supra*, at Item 2.B., or "[s]upport the committee's recommendation," *id.* at Item 2.D. By ruling on a complainant's appeal of the District Materials Review Committee's decision, the Board was merely applying the standards in Policy 4.06 (which incorporated Florida law's standards) to the specific record before it.

Further, when the Board voted to remove the Superintendent- and Mass-Removed books, it was applying its established policy to a set of facts. The agenda item for considering the Superintendent-Removed Books was phrased to "[a]pprove [the Superintendent's] recommendation to remove the titles in the attached list . . . ." Meeting Agenda (June 17, 2025), *supra*, at Item 44.A. And the Superintendent was recommending removal of books "[p]ursuant to . . . policy 2522," because the books were "classified as adult novels," and "contain graphic descriptions and depictions of sexual conduct which are not appropriate for minors," citing Florida Statute Section 1006.28(2)(d)(1). *Id.* at Item 44.A attach. Similarly, the agenda item for considering the Mass-Removed Books was phrased: to "[a]pprove [the Superintendent's] recommendation to remove the titles listed . . . in compliance with the School Board Directive approved on June 17, 2025, to remove the books listed by the Florida Department of Education's book removal list, without further review." Meeting Agenda (July 15, 2025), *supra*, at Item 44.A. The Board voted unanimously each time to approve the Superintendent's recommendation. *See* Meeting Agenda (June 17, 2025), *supra*, at Item 44.A. (Superintendent-Removed Books); Meeting Agenda (July 15, 2025), *supra*, at Item 44.A. (Mass-Re-

moved Books). Because these book removal votes were "mere administrative application of existing policies," *Crymes*, 923 F.2d at 1485, they were administrative, not legislative.

Let's consider the substance of the votes as well. When it voted on whether to remove these books, the Board was doing no more than what the Superintendent could already do. The Board had exercised its policymaking discretion by passing Policy 4.06, Policy 2522, Policy 2520, and the June 17, 2025, directive. Policy 4.06 and Policy 2522 authorized the Superintendent to remove or restrict books if he found that the books violated the policies' standards or Florida law. *See* Policy 4.06 at 10(B)(3)(d), Dkt. 219-1 at 16; Policy 2522, Dkt. 219-1 at 62. And the June 17, 2025, directive required that the Superintendent "eliminate" all books identified as pornographic or age-inappropriate on the Department of Education's book removal list "without further review." Meeting Agenda (June 17, 2025), *supra*, at Item 43.B. The Superintendent created a list of those books and, rather than using the authority he possessed under Policy 2522 and the June 17, 2025, directive to remove them "without further review," *id.*, he asked for Board approval. *See* Meeting Agenda (July 15, 2025), *supra*, at Item 44.A. Just as the Superintendent was not exercising legislative power when he determined that these books violated existing policy, the Board was not exercising legislative power when it agreed with him.

In sum, nothing about the Board's process resembles what a legislator does, *i.e.*, the "proposal, formulation, and passage of legislation." *In re Hubbard*, 803 F.3d at 1308; *cf. Bogan*, 523 U.S. at 55

(concluding that an ordinance was legislative where, "in substance, [it] bore all the hallmarks of traditional legislation"). Instead, at every step, this system calls for the decisionmaker (whether the Superintendent, the District Materials Review Committee, or the School Board) to apply preexisting policies to a specific set of facts. As Justice Gorsuch has observed in the separation-of-powers context, a legislature exercises policymaking discretion by "prescrib[ing] the rule," and then, "the application of that rule depend[s] on executive fact-finding." *Gundy v. United States*, 588 U.S. 128, 158 (2019) (Gorsuch, J., dissenting). Such administrative fact-finding is not rote: it requires judgment and decision-making. But the act of applying a preexisting policy to a specific set of facts, without more, is not a legislative act. *Cf. Hughes v. Tarrant County*, 948 F.2d 918, 920 (5th Cir. 1991) ("The courts have made a distinction between establishing a policy, act, or law and enforcing or administering it.").

What is more, none of the acts that we have previously recognized as legislative are comparable to what the Board did here. The Board members try, but fail, to analogize this case to *Ellis v. Coffee County Board of Registrars*, 981 F.2d 1185 (11th Cir. 1993). There, a county commission investigated the eligibility of thousands of potential voters at the request of the board of registrars to help draw district lines as part of a consent decree in a vote dilution lawsuit. *Id.* at 1187. At the conclusion of that investigation, the commission voted to recommend that the board of registrars purge a number of voters (including the four individuals who sued) from

the voting list. *Id.* at 1188. We concluded that the commission's investigation and vote was in furtherance of the legislative function of drawing district lines. *Id.* at 1190; *see Moore v. Brown*, 448 U.S. 1335, 1339 (1980) ("[T]he responsibility for drawing political boundaries is generally committed to the legislative process." (citation modified)). The Board members have not articulated how the book removal votes were in furtherance of a similar legislative function.

Our dissenting colleague says that the Board's actions are comparable to the zoning decision that we held a legislative act in *Baytree*. Because *Baytree* involved a challenge to the denial of the "plaintiff's application to rezone its property," 873 F.2d at 1409, the dissent characterizes the opinion as holding that the application of a preexisting legal framework can be legislative. Not so. *Baytree* involved a request to *amend* the zoning ordinance, not a request to *apply* the zoning ordinance in effect. In other words, the question in *Baytree* was whether a decision not to "amend a city zoning ordinance to allow Baytree to build a low-income residential complex" was legislative in nature. *Id.* at 1408. And we held it was; a decision not to amend an ordinance, just like a decision to enact an ordinance in the first place, is an unconstrained, policy-making decision. But the plaintiffs in this case do not seek to depose the Board members about their decisions to create, repeal, or amend any policies in response to book-related complaints. Instead, the plaintiffs seek to depose the Board members about why they determined that specific books fit under the policies that the Board had already adopted. Even in the zoning context, we have held that an act like

this one—*i.e.* applying existing policies to specific facts—is not legislative in nature. *See Crymes*, 923 F.2d at 1486 (holding that board's "decision to uphold the denial of the development permit" was not legislative).

Returning to the arguments of the parties, the Board members also say that the act of voting—no matter what the vote is on—suggests a legislative act. But, under our precedents, the key inquiry is what the vote was about. The Board members selectively quote from *DeSisto College, Inc. v. Line* that "voting, debate and reacting to public opinion are manifestly in furtherance of legislative duties." 888 F.2d 755, 765 (11th Cir. 1989). But the point of *DeSisto* is that these actions were "in furtherance of [the legislators'] duties" in that case, *id.* (alteration in original) (quoting *Hernandez v. City of Lafayette*, 643 F.2d 1188, 1193 (5th Cir. Unit A June 1981)), not that these actions are uniquely legislative in nature. In fact, we have often characterized actions by local governments to be administrative even when they involved voting. *See Yeldell*, 956 F.2d at 1062 (denial of licenses) (citing *Polenz v. Parrott*, 694 F. Supp. 599 (E.D. Wis. 1988)); *Smith v. Lomax*, 45 F.3d 402, 405 (11th Cir. 1995) (termination of employment); *Crymes*, 923 F.2d at 1485 (zoning law enforcement). In *Crymes*, as here, one party argued that "the Commissioners' actions must have been legislative in nature because all of the challenged actions involved defendants' votes at official meetings." *Crymes*, 923 F.2d at 1485. But we explained that voting "alone does not necessarily determine that [a person] was acting in

a legislative capacity." *Id.* (quoting *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 580 (9th Cir. 1984), *cert. denied*, 471 U.S. 1054 (1985)).

Finally, the Board members argue that the Board's votes were legislative because the Board had discretion about how to vote on these books. But they misconstrue the legal standard. Of course, the Board members exercised some discretion in how they applied their policies to these specific books. But these votes were not an exercise in *policymaking* discretion, which is what we and the Supreme Court have always emphasized as the key component of the legislative act. *Bogan*, 523 U.S. at 55 (holding that to be legislative, an act must reflect a "discretionary, policymaking" character); *see Crymes*, 923 F.2d at 1485 (citing *Minton v. St. Bernard Par. Sch. Bd.*, 803 F.2d 129, 135 (5th Cir. 1986)). Non-legislative officers often must exercise discretion, which is why executive officers are afforded qualified immunity for certain *discretionary* acts. *See Sammons v. Taylor*, 967 F.2d 1533, 1539 (11th Cir. 1992). And indeed, many actions that we have characterized as administrative in the context of legislative privilege have involved some discretion. *See, e.g.*, *Yeldell*, 956 F.2d at 1062 (discussing the administration of penal facilities and the denial of licenses as administrative actions); *Lomax*, 45 F.3d at 405 (holding that a vote about who to hire was administrative); *Crymes*, 923 F.2d at 1485 (explaining that zoning enforcement is not legislative). The key question is not whether an existing policy leaves some avenue for the exercise of discretion in applying the policy to a specific set of facts; the question is whether a particular act was an exercise of *policymaking* discretion.

For his part, our dissenting colleague accuses us of "ignoring" various things, such as judicial opinions and treatises no party has cited. Because our own case law governs this dispute, our dissenting colleague is correct that we see no need to discuss, for example, an obviously distinguishable 1880 decision from California on which no party relies. Our dissenting colleague's independent research may have been comprehensive. But we respectfully suggest that his resort to unraised arguments about far-flung authorities merely underscores that this Court's precedents (which we have obviously addressed in depth) do not support his position.

In short, the Board members have not met their burden to establish that their actions were legislative in nature. They cannot be questioned about why they adopted Policy 4.06, Policy 2522, Policy 2520, or the June 17, 2025, directive because these policymaking decisions were legislative acts. But, notwithstanding their invocation of legislative privilege, they can be deposed about their determination that specific books should be removed as an application of existing policies because these determinations were administrative acts.

Our decision today is a narrow one. We do not address whether other privileges or discovery rules may warrant quashing these subpoenas, curtailing the depositions, or the like. Nor do we suggest that every decision to stock or remove a book is administrative in nature. Legislative privilege serves important interests in preserving legislative independence and protecting legislators from compelled inquiry into legitimate legislative acts. Those interests

warrant robust protection. Determining whether and to what extent the privilege applies, however, requires careful consideration of the particular circumstances presented. We hold only that, on the facts of this case, the district court correctly concluded that the Board members' votes to remove specific books as an application of their existing policies were not legislative acts.

## IV.

The district court is **AFFIRMED**.

WILLIAM PRYOR, Chief Judge, Dissenting:

Local officials enjoy a common-law privilege that protects them from being compelled to testify about their legislative acts. At common law, their acts were legislative if they were discretionary instead of ministerial and of a public instead of a private character. Because the members of the Escambia County School Board exercise discretion over a matter of public policy when voting to remove books from school libraries, the majority wrongly strips them of their privilege to avoid testifying about those votes. In doing so, it ignores the common law that the Supreme Court has explained defines the privilege. It misreads our precedents too. We should instead reverse the district court. I respectfully dissent.

## I. DISCUSSION

In *Bogan v. Scott-Harris*, the Supreme Court held that local officials enjoy a common-law immunity from suit for discretionary acts of a public character. *See* 523 U.S. 44, 49–50 (1998); *see also* FED. R. EVID. 501 ("The common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege . . . ."). Legislative privilege covers the same legislative acts to which legislative immunity applies. *See In re Hubbard*, 803 F.3d 1298, 1307–08 (11th Cir. 2015) (considering interchangeably cases concerning the scope of legislative immunity and legislative privilege). To determine whether a local official's acts are protected by that immunity and privilege, we consider whether the acts are legislative both in substance and in form. *See Bogan*, 523 U.S. at 55.

An act is legislative in substance if it "reflect[s] a discretionary, policymaking decision." *Id.* And an act is legislative in form if it is "quintessentially legislative," like "voting for an ordinance," "introduc[ing] a budget[,] and signing into law an ordinance." *Bogan*, 523 U.S. at 55; *cf. Ellis v. Coffee Cnty. Bd. of Registrars*, 981 F.2d 1185, 1191–92 (11th Cir. 1993) (defining legislative acts as those that are "an integral part of the deliberative and communicative *processes* regarding the consideration and action of a legislative body for matters statutorily placed within its jurisdiction" (citation modified) (emphasis added)).

Legislative acts often are generally applicable. *See Brown v. Crawford County*, 960 F.2d 1002, 1011 (11th Cir. 1992); *Bryant v. Jones*, 575 F.3d 1281, 1306 (11th Cir. 2009). And we sometimes describe nonlegislative acts as "administrative" because they involve the "mere administrative application of existing policies." *Crymes v. DeKalb County*, 923 F.2d 1482, 1485 (11th Cir. 1991). An act is "more likely" to be "administrative" if "the facts utilized in making a decision are specific, rather than general," and "the decision impacts specific individuals, rather than the general population." *Id.* But that shorthand terminology can carry connotations that make it imprecise if we fail to appreciate its common-law background.

Because the majority ignores this history, it fails to appreciate the nature of the privilege that the Board members enjoy. It declares that a local school board's subjective, discretion-laden, and public-policy determinations about what books do not belong in school libraries are administrative, not legislative. In its view, the

Board was not engaged in "policymaking" but instead applying a concededly indeterminate policy to decide each book's appropriateness for the school libraries. This reasoning is foreign to the common law and the precedents that govern us.

At common law, local officials' acts were legislative when they were both discretionary—instead of ministerial—and of a public character—instead of a private one. And our precedents reflect this understanding. Both the common law and our precedents make the Board members' votes legislative in substance and in form.

*A. At Common Law, Acts Were Legislative if They Were Discretionary Acts of a Public Character.*

*Bogan* recognized that when Congress permitted civil-rights actions against local governments and officials, 42 U.S.C. § 1983, it never intended to supplant the common-law immunities of the officials. 523 U.S. at 49–52. And the Court made clear that we must look to the common law that governed local governments and their officials when section 1983 was enacted. *See id.* Although it cites snippets from *Bogan*, the majority ignores this framework. *See, e.g.*, Maj. Op. at 19, 22. But under this background understanding about local governments, "municipal corporations . . . possess . . . a double character: the one governmental, legislative, or public; the other, in a sense, proprietary or private." 1 JOHN F. DILLON, COMMENTARIES ON THE LAW OF MUNICIPAL CORPORATIONS § 66, at 88 (Boston, Little, Brown, & Co. 3d ed. 1881) (emphases omitted) [*hereinafter* DILLON 3D].

At common law, "there were two doctrines that afforded municipal corporations some measure of protection from tort liability. The first sought to distinguish between a municipality's 'governmental' and 'proprietary' functions . . . . The second doctrine immunized a municipality for its 'discretionary' or 'legislative' activities, but not for those which were 'ministerial' in nature." *Owen v. City of Independence*, 445 U.S. 622, 644 (1980). This appeal concerns only the second doctrine, discretionary-act immunity, which is the common-law basis for the immunity of local officials for their legislative acts and their corresponding privilege. *See Bogan*, 523 U.S. at 49–51. The majority ignores this distinction.

Discretionary-act immunity covered only "the exercise of discretionary powers of a public nature." 28 WILLIAM MACK, CYCLOPEDIA OF LAW AND PROCEDURE 1262 (1908); *see also* FLOYD R. MECHEM, A TREATISE ON THE LAW OF PUBLIC OFFICES AND OFFICERS §§ 672–73, at 448 (Chicago, Callaghan & Co. 1890) ("[W]here the duty is one owing solely to the public, no liability for its non-performance is incurred to the individual however much he may be injured," but not if an "individual has in it a distinctive and direct interest and the legal right to require its performance"); *Wilson v. Mayor of New York*, 1 Denio 595, 600 (N.Y. 1845) ("[N]or is such . . . officer answerable in any form of action, for the manner in which any duty, of a . . . discretionary nature, shall have been performed."); *cf. Ex parte Virginia*, 100 U.S. 339, 348 (1880) (holding that an official was not immune for acts that "might as well have been committed to a private person as to one holding the office"). When a municipality "makes contracts, employs men, owns property, and

transacts business in the same way as individuals and private corporations," for example, it acts "[i]n its private capacity." *People v. City of Chicago*, 100 N.E. 194, 196 (Ill. 1912).

Discretionary-act immunity provided immunity not only for the municipal body, 2 JOHN F. DILLON, THE LAW OF MUNICIPAL CORPORATIONS § 753, at 862 (New York, James Cockcroft & Co. 2d ed. 1873), but also for its officials, *see* 1 DILLON 3D, *supra*, § 313, at 326–27. "Whenever the officers of a municipal corporation [we]re vested with legislative powers," common-law courts found them "clothed with all the immunities of government, and . . . exempt from all liability for their mistaken use." *Jones v. Loving*, 55 Miss. 109, 111 (1877). A local official's exercise of discretion was the hallmark of an act for which he was immune—that is, a legislative act. Courts even referred to local officials' discretionary acts and their legislative acts interchangeably. *See Weightman v. Corporation of Washington*, 66 U.S. (1 Black) 39, 49 (1862) ("Municipal corporations undoubtedly are invested with certain powers, which, from their nature, are discretionary . . . . Such powers are generally regarded as discretionary, because, in their nature, they are legislative . . . .").

Indeed, local legislators enjoyed this immunity *so* that it would protect their discretion. As one treatise put it, "[b]ecause legislative functions are discretionary, and especially because the lawmaking body should be independent of those who are to expound and enforce its enactments, no member of such body can be called to account . . . for acts done in or in connection with the exercise of his legislative powers." JOEL PRENTISS BISHOP, COMMENTARIES

ON THE NON-CONTRACT LAW § 777, at 360–61 (Chicago, T. H. Flood & Co. 1889) (footnote omitted). Another treatise added that "if every dissatisfied person could compel [officials] to vindicate the wisdom of their enactments in an action for damages," "they would certainly perform their duties" "to exercise their judgment and discretion as to what the people need and what will best supply the requirements" "in a timid and time-serving manner." MECHEM, *supra*, § 644, at 431. As Thomas Cooley explained, "it is not consistent with" local officials' "full discretionary authority in all matters of legislation" to "be called to account at the suit of individuals for their acts and neglects" related to their legislative duties. THOMAS M. COOLEY, A TREATISE ON THE LAW OF TORTS 376 (Chicago, Callaghan & Co. 1879). After all, "[d]iscretionary power is, in its nature, independent," and "to make those who wield it liable to be called to account by some other authority is to take away discretion and destroy independence." *Id.*

Local legislators enjoyed this immunity even though "the legislative . . . duties that devolve upon municipal corporations are not strictly those of the legislator." WATERMAN L. WILLIAMS, THE LIABILITY OF MUNICIPAL CORPORATIONS FOR TORT § 6, at 16 (1901). That is, they are not identical to the powers and duties that state or federal legislators wield and perform. *See id.* (explaining that "[t]he immunity of municipal corporations" for "exercise[s] of their discretionary powers is based upon that public policy which protects the legislator" because those powers "so far partake of the nature of such duties that the same reasons which make it desirable to

protect the legislator . . . apply with equal force to the case of municipal authorities"); *see also* COOLEY, *supra*, at 376 (explaining that legislative immunity applies not only to "legislative bodies proper," but "also to inferior legislative bodies, such as boards of supervisors, county commissioners, city councils, and the like"). In contrast, the common law supplied no immunity for acts done under "some particular duty of a ministerial character . . . imposed upon a legislative body, in the performance of which its members severally are required to act." COOLEY, *supra*, at 377. For ministerial acts, where "no liberty of action [is] allowed, and no discretion[,] . . . a private action" could lie. *Id.*; *accord* MECHEM, *supra*, § 647, at 432 ("But the legislative officer . . . may be called upon to act ministerially, as when he is required to do some act in a prescribed manner irrespective of his own judgment as to the propriety or desirability of its being done, and in such a case he will be liable . . . ."); MONTGOMERY H. THROOP, A TREATISE ON THE LAW RELATING TO PUBLIC OFFICERS AND SURETIES IN OFFICIAL BONDS § 709, at 671 (Chicago, T. H. Flood & Co. 1892) ("[T]his immunity is confined strictly to the exercise of legislative functions. It often happens that bodies possessing powers of local legislation[] also exercise ministerial functions. With respect to the latter, the members are liable in the same manner as other officers, performing ministerial acts, as judicial officers are under like circumstances.").

The distinction between discretionary and ministerial public acts resolved the immunity question throughout the nineteenth century. *Compare Baker v. State*, 27 Ind. 485, 489 (1867) ("The appellants, as members of the common council, were in the exercise of

a discretion given them by law. In such case, there is no individual liability . . . ."), *and Amperse v. Winslow*, 42 N.W. 823, 827 (Mich. 1889) ("[N]o action will lie against a" member of a city council for his acts that were "to be exercised according to his judgment or discretion." (citation modified)), *with Amy v. Supervisors*, 78 U.S (11 Wall.) 136, 136–38 (1871) (where a writ of mandamus directed county supervisors to levy a tax, they could be liable for failing to do so because the writ of mandamus made the act ministerial), *Caswell v. Allen*, 7 Johns. 63, 67–68 (N.Y. 1810) (county supervisors could be liable for an act that was "mandatory" and for which "[n]o discretion appear[ed] to [have] be[en] given to the supervisors"), *and Cnty. Comm'rs of Anne Arundel Cnty. v. Duckett*, 20 Md. 468, 477–78 (1864) (county commissioners' liability turned on whether they "were invested with a legislative discretion, which they had the liberty of exercising as their sense of duty to their constituents dictated," or instead held a "minister[i]al" power). Despite our precedents' use of shorthand terms like "administrative," which today can carry different connotations, the common-law distinction between discretionary and ministerial public acts marks the boundary between legislative and nonlegislative acts in this context. The majority offers nothing from the common law suggesting otherwise—because it cannot—so it instead ignores the common law.

### *B. Our Precedents Confirm that Discretionary Acts of a Public Character Are Legislative.*

When modern precedents differentiate between legislative and "administrative" acts, they describe the line that the common law drew between discretionary and ministerial public acts. That

terminology has confused the majority. Yet, despite our modern nomenclature, our precedents correctly distinguish between legislative and nonlegislative acts as the common law did.

When federal courts began referring to nonlegislative acts as "administrative" decades ago, they used the term "administrative" as a synonym for ministerial. *See, e.g.*, *Crymes*, 923 F.2d at 1485; *Minton v. St. Bernard Par. Sch. Bd.*, 803 F.2d 129, 135 (5th Cir. 1986). At that time, "[a]dministrative acts" meant "[t]hose acts which are necessary to be done to carry out legislative policies and purposes already declared by the legislative body." *Administrative Acts*, BLACK'S LAW DICTIONARY (6th ed. 1990) [hereinafter BLACK'S 6th]. The term "[a]dministrative" described action that has an "executive or ministerial" "character." *Administrative*, BLACK'S 6th, *supra*. An act that is "ministerial," meanwhile, was "[t]hat which involves obedience to instructions, but demands no special discretion, judgment, or skill." *Ministerial Act*, BLACK'S 6th, *supra*; *accord Ministerial Duty*, BLACK'S 6th, *supra*; *Ministerial Function*, BLACK'S 6th, *supra*. The majority missteps by giving predominance to the connotations of "administrative" today. *See Administrative,* BLACK'S LAW DICTIONARY (12th ed. 2024) [hereinafter BLACK'S 12th] ("Of, relating to, or involving the work of managing a company or organization; executive."); *Act*, BLACK'S 12th, *supra* (defining "administrative act" as "[a]n act made in a management capacity" without reference to discretionary or ministerial acts). But under our precedents, the terms "administrative" and "ministerial" have been nearly interchangeable. *Cf. McKinney v. Pate*, 20 F.3d 1550, 1557 n.9 (11th Cir. 1994) (en banc) (describing executive acts as those "typically aris[ing] from

the ministerial or administrative activities of members of the executive branch"), *abrogation on other grounds recognized by Littlejohn v. Sch. Bd. of Leon Cnty.*, 132 F.4th 1232, 1239–40 (11th Cir. 2025). So, when our precedents differentiated between "administrative" and legislative acts, we respected the common-law distinction between discretionary and ministerial acts. Yet, the majority declines to account for what our own precedents meant when they were written.

Take *Crymes*, for instance. 923 F.2d 1482. There, we stated that amending a county code was legislative but held that a county board's decision to approve or deny a development permit was "administrative" because it was "the application of policy to a specific party." *Id.* at 1484–86. The majority takes this language to mean that any fact-based application of a local policy to a concrete scenario is "administrative," not legislative. But the majority ignores that the development-permit decision in *Crymes* was ministerial, not discretionary. Under local law, the Development Director could approve a development permit only where the "truck traffic routes and entrances to" the property were "reviewed and approved by the director of public works." *Crymes Enters., Inc. v. Maloof*, 389 S.E.2d 229, 230 (Ga. 1990) (citation modified). Because the director of public works denied approval, the Development Director denied the permit, and the county Board had to affirm. *Id.*

We then considered whether the defendants "who [we]re members of the [county] Board of Commissioners [had] absolute legislative immunity" for affirming the Development Director's de-

nial of the permit. 923 F.2d at 1485. We described "the Board's decision to uphold the denial of the development permit" as being "on the ground that surrounding roads were in need of improvement." *Id.* And that decision was "the application of policy to a specific party" in the sense that county policy *required* the Board to affirm the denial. *See id. Crymes* correctly held that the Board's members could be individually liable for that ministerial decision, consistent with the common law. *See also Minton*, 803 F.2d at 135 (using the word "administrative" to distinguish nonlegislative acts from those that "involve the degree of discretion and public-policy-making traditionally associated with legislative functions").

The majority's confusion becomes more apparent when it compares the Board's decision to a category of discretionary acts that we have described as nonlegislative: personnel decisions. *See Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1062 (11th Cir. 1992) (holding that "decisions to hire, fire, and demote certain" hospital employees were not legislative); *Smith v. Lomax*, 45 F.3d 402, 406 (11th Cir. 1995) (holding that vote of a county board "not to reappoint" its clerk was not legislative). To be sure, personnel decisions are discretionary, not "ministerial," because they "involv[e] the exercise of judgment." *Keim v. United States*, 177 U.S. 290, 293 (1900). But the majority fails to appreciate that personnel decisions are nonlegislative despite their discretionary nature because they are *not* of *public* character. The common law considered a municipal corporation's "hiring [of] laborers" to be like the "acts [of] a private individual." *Ryan v. City of New York*, 69 N.E. 599, 605 (1904) (O'Brien, J., concurring in the judgment); *see also City of Chicago*,

100 N.E. at 196 (municipality acts "[i]n its private capacity" in "employ[ing] men"); *Trump v. Cook*, 146 S. Ct. 2234, 2247–48 (2026) (explaining that, at common law, removal decisions did not necessarily escape judicial review). So, for personnel decisions, a municipality "stands upon the same footing with a private corporation." *See* 28 MACK, *supra*, at 1258. Its decisions "might as well" be "committed to a private person as to one holding [] office." *Virginia*, 100 U.S. at 348. And an individual injured by a personnel decision "has in it a distinctive and direct interest," so local officials' duties respecting such decisions are not "ow[ed] solely to the public," and discretionary-act immunity does not apply. *See* MECHEM, *supra*, §§ 672–73, at 448. Like *Crymes*, our precedents holding that personnel decisions are nonlegislative adhere to the common-law understanding of legislative and nonlegislative acts. *See also Pernell v. Fla. Bd. of Governors of State Univ.*, 84 F.4th 1339, 1343 (11th Cir. 2023) (describing legislative privilege as "protect[ing]" against "deterrents to the uninhibited discharge of . . . legislative duty for the purpose of the *public* good" (citation modified) (emphasis added)).

Unlike the majority and the district court, Magistrate Judge Bolitho—citing Judge Winsor's resolution of a similar issue in an earlier district-court case—got our precedents right. The majority ignores their disagreement. The magistrate judge began by acknowledging the common-law roots of legislative privilege. He stated the primacy of "the nature of the act," which turned on whether it "involve[d] line-drawing"—that is, discretion—"on matters of general concern"—that is, of a public character. Both he and

Judge Winsor recognized that, properly understood, our precedents are rooted in this common-law understanding.

*C. Our Precedents and the Common Law Dictate that the Board Members' Votes Were Legislative Acts.*

Both controlling precedents and the common law confirm that the Board members' votes were legislative in substance because they were discretionary acts of a public nature. The members' votes were also legislative in form. And the majority opinion fails to respect what traditionally has distinguished a legislative act from a ministerial or administrative one.

The Board members' decisions were of a public character. Their votes set a prospective and generally applicable Board policy. They eliminated access to the removed books for at least five years. Each vote was specific to a book or set of books but generally applicable because the removed books were inaccessible for all students in the district. *Crymes*, 923 F.2d at 1485 (suggesting that the removal of a single road from a list of truck routes was legislative). And unlike personnel decisions that mirror private entities' decisions, *see City of Chicago*, 100 N.E. at 196, the Board members' votes on what books belong in school libraries were public in character: No entity but a sovereign may decide what books should be available to all children attending public schools. Under state law, that public duty belongs to the local school board. FLA. STAT. § 1006.28(2). Moreover, no private entity or individual has any "distinctive and direct interest" over those decisions. *See* MECHEM, *supra*, §§ 672–73, at 448. Because the majority ignores the common

law, the majority elides the distinction between acts of a public nature and those of a private one.

The votes were also discretionary. Begin with the same state law that gives local school boards the "duty and responsibility to select and provide adequate instructional materials for all students." FLA. STAT. § 1006.28(2). That authority extends to the curation of "the content of all instructional materials and any other materials . . . made available in a school or classroom library." *Id.* § 1006.28(2)(a)(1). When resolving parental objections to library books, the school board considers whether the challenged material "[i]s pornographic," "[d]epicts or describes sexual conduct," "[i]s not suited to student needs and their ability to comprehend the material presented," or "[i]s inappropriate for the grade level and age group for which the material is used." *Id.* § 1006.28(2)(a)(2)(b)(I)–(IV). If a "school board finds that any material . . . contains prohibited content," "the school district shall discontinue use of the material." *Id.* § 1006.28(2)(a)(2) (flush language).

In assessing those factors, Board members make discretionary decisions. Their decisions are based on the evidence presented, public input, and the members' individual judgment. Underscoring the discretionary nature of their votes, the Board members were not always in agreement on these thorny policy judgments, and different boards have reached different conclusions about the same books—facts the majority fails to mention. *Cf. ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1225 (11th Cir. 2009) ("[E]ducational suitability questions . . . are the perfect example of

a core educational policy matter within the exclusive province of local school boards."). Those disagreements reveal the discretionary and legislative nature of the Board members' decisions.

The common law has long confirmed the legislative character of decisions like these. *See Donahoe v. Richards*, 38 Me. 379, 395 (1854) ("[T]he books prescribed by the superintending school committee are to be regarded as if established and prescribed by the Act of the Legislature. . . . The manner of" the "exercise" of that power "to prescribe . . . what books shall be used" in the public schools "must depend upon the judgment, discretion[,] and intelligence of the different committees" "of each town," which "depends upon the views and opinions of those upon whom the law devolves this duty."); *Roth v. Marshall*, 27 A. 945, 945 (Pa. 1893) (comparing "the exercise of official discretion of a board of school directors" over "the location of a district schoolhouse" to their discretion over "the selection of teachers and text-books"); *Clark v. Bd. of Dirs.*, 24 Iowa 266, 275 (1868) ("That the board of directors is clothed with certain discretionary powers as to the establishment, maintenance[,] and management of schools within its district cannot be denied."); FINLEY BURKE, A TREATISE ON THE LAW OF PUBLIC SCHOOLS 104–05 (New York, A. S. Barnes & Co. 1880) (Whether the Bible will be read in public schools "is usually left to the discretion of the board of directors, as are other rules prescribing studies, etc. Where the law leaves such a discretion with the board, as it generally does, the courts have refused to restrain, coerce, or interfere

with such discretion."). Because the common law refutes the majority's reasoning even as applied to the school context, the majority declines to engage with it.

Turning to whether the Board members' votes were legislative in form, the majority maintains that they were not because the Board members applied its policy to specific facts, because the Board sometimes reviewed the recommendations of the superintendent, and because some individuals could appeal some book-removal decisions on procedural grounds. But both our precedents and the common law foreclose this reasoning.

The Board's decisions were legislative in form because our precedents understand legislative acts to include not only legislative enactments, but also legislative decisions, which include any "actions taken in furtherance of legislative duties." *DeSisto Coll., Inc. v. Line*, 888 F.2d 755, 759 (11th Cir. 1989); *see also id.* at 765 (collecting cases). For instance, we have held that even fact-intensive investigations are legislative if in furtherance of a local body's public duty. *See Ellis*, 981 F.2d at 1191 (collecting cases and holding that county commission's investigation into family's residence for purposes of voter eligibility was legislative); *Cole v. Gray*, 638 F.2d 804, 808, 811 (5th Cir. 1981) (investigation targeting a single individual was legislative); *see also Bogan*, 523 U.S. at 55 (holding that the "introduction of a budget and signing into law an ordinance" are legislative in form). And here, "[t]he district school board has the constitutional duty and responsibility to select . . . the content of all instructional materials and any other materials . . . made available

in a school or classroom library." FLA. STAT. § 1006.28(2)(a)(1). That is, the Board members' votes were legislative in form because they parallel other "quintessentially legislative" acts, *see Bogan*, 523 U.S. at 55, and were "an integral part of the deliberative and communicative processes regarding the consideration and action of a legislative body for matters statutorily placed within its jurisdiction," *see Ellis*, 981 F.2d at 1192 (citation modified).

*Baytree of Inverrary Realty Partners v. City of Lauderhill* is instructive. 873 F.2d 1407 (11th Cir. 1989). There, the plaintiff sued the City of Lauderhill and Broward County and associated individuals. *See id.* at 1407–08. The majority describes *Baytree* as holding that "amending a zoning code" is legislative. Maj. Op. at 13. But "[t]he complaint challenge[d] [individual] defendants' conduct in denying plaintiff's *application* to rezone its property." *Baytree*, 873 F.2d at 1409 (emphasis added). That is, in *Baytree*, we held that a local government's exercise of discretion about a single application turning on specific facts was legislative, not administrative. Under the majority's reasoning—where a decision about a single book must be nonlegislative—*Baytree* would come out differently. So *Baytree* shows why the majority is wrong. The majority's only response is that the application in *Baytree* was to amend the zoning ordinance. Maj. Op. at 20–21. But that response highlights the similarity to this case, where the Board considered a specific parental objection before setting a prospective policy for libraries.

*Baytree* also illustrates that the majority misunderstands the relevance of a decision by a local government being intertwined

with administrative procedures for review. We stated that the relevant application first went to "[t]he City Council," which made a "recommend[ation]" to "the County," which then made the decision. *Id.* at 1408. We held that all the individual defendants—that is, those associated with *both* the City who made the recommendation and the County who accepted it—were legislatively immune because "zoning and land use decision-making . . . is normally characterized as a legislative function." *Id.* at 1409. Administrative review was irrelevant.

The majority's reasoning cannot be squared with *Baytree*. If the Board members' decisions are not legislative in form because their decisions can be reviewed on appeal, then the officials in *Baytree* could not have been legislatively immune. And, if the Board members' decisions are not legislative in form because they reviewed the recommendations of the superintendent, then the County officials in *Baytree* could not have been legislatively immune. Moreover, in *Crymes*, we held that a county board's decision "uphold[ing] the decision by the [county] Development Department denying Crymes'[s] application"—which had already been upheld by a county Board of Appeals—was administrative without ever suggesting that our decision depended on the decision's interplay with administrative procedures. *See* 923 F.2d at 1484. Under our precedents, an official's decision to accept or reject another's recommendation does not render an act nonlegislative in form. Common-law courts held similarly. *Cf., e.g.*, *Denny v. Des Moines County*, 121 N.W. 1066, 1068–70 (Iowa 1909) (holding that a statute "authoriz[ing] an appeal . . . from the action of the board in its

judgment and discretion" violated the separation of powers because "no appeals to the courts can be given with reference to the exercise of a power by a legislative . . . tribunal which is in its nature discretionary"); *see also* WILLIAMS, *supra*, § 6, at 16 (explaining that local legislators act legislatively even though their "duties" are "not strictly those of the legislator"). The majority fails to account for the review processes present in both *Baytree* and *Crymes*.

It also defies common sense to say that the removal of a library book, when prompted by a parental objection, is administrative even though the Board members could have raised the same objection about the same book on their own initiative—an act the majority would surely recognize was legislative. *Compare* FLA. STAT. § 1006.28(2)(a)(4) (contemplating "[m]eetings of committees convened for the purpose of . . . eliminating[] or selecting instructional materials"), *with id.* § 1006.28(2)(a)(5) (separate subsection about "committees convened for the purpose of resolving an objection by a parent or resident to specific materials"). Under the majority's view, the Board members' votes would be legislative only if they resulted from their own initiative instead of in response to an objection. But the "nature of" a legislative act does not depend on who initiated it. *See Bogan*, 523 U.S. at 54 (explaining that "[a]bsolute legislative immunity attached to all actions taken in the sphere of legitimate legislative activity" and does not turn "on the motive or intent of the official performing it," but instead on "the nature of the act"). Yet, the majority does not disavow that implication of its reasoning.

A common-law precedent proves these points. In *People ex rel. Cochran v. Board of Education of Oakland*, the Supreme Court of California reviewed "the Board of Education of the City of Oakland['s] approv[al] [of] the report of a committee" recommending that the City's public schools change to a new series of textbooks. 54 Cal. 375, 375–76 (1880). The state supreme court did so to determine whether the Board was "exercis[ing] judicial functions" such that "a writ of certiorari will lie to review the action" or instead whether the writ was unavailable because the Board's decision was "legislative in its character." *Id.* at 376 (emphasis omitted).

The Supreme Court of California ruled that the board's approval of the committee recommendation of new textbooks was legislative:

> The Board acted upon the proposition before it as one of policy or expediency, aiming to adopt that which, in its judgment, would be best for the constituency which it represented. Its action was then political or legislative, and was in no proper sense judicial in its character. It is conceded that the Board exercised its judgment in the action which it took, but this it was called to do in the exercise of its legislative functions.

*Id.* at 377. The state supreme court explained that "[t]here was no party before [the board] upon whose rights it was passing with reference to any transaction whatever" because no party had "a right to control the sale of" any particular book to the school. *Id.* But it also reasoned that if an interested party was "present at all, the party was there as any other person had a right to be, urging the

policy of adopting the one series . . . and the impolicy of adopting the other." *Id.*

*Cochran* confirms that, at common law, this kind of decision was legislative both in form and in substance. It held that the local school board's textbook decision was of a public instead of a private character because it involved deciding the best policy for its constituency. The school board acted legislatively even though it was considering a recommendation. It did so by examining the merits of one series of textbooks over another—applying its discretion to particular facts. And it acted legislatively because it exercised discretion for a decision of a public character, even if its procedures looked adjudicatory with interested parties making their best case for using their respective books. So too here.

The majority dismisses *Cochran* and other common-law precedents as "far-flung authorities" no party cited. Maj. Op. at 23. Yet, in *Bogan*, the Court made clear that the common law of 1871 defines the distinction between legislative and nonlegislative acts. 523 U.S. at 48–52. Indeed, in holding that it turns on whether an act is "discretionary" or "ministerial," the Court relied on some of the same nineteenth-century treatises I have cited. *Id.* at 50–52. But the majority prefers to base its decision on our recent precedents about disparate contexts like personnel and zoning decisions that look nothing like an elected school board having to decide a political issue like removing a controversial book from school libraries.

## II. CONCLUSION

Because both controlling precedents and the common law make clear that the Board members' votes were legislative, they enjoy a legislative privilege from discovery about their votes. We should reverse the district court. Regrettably, the majority affirms because it ignores the common law and mangles our precedents.

I respectfully dissent.

**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

October 19, 2026

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 25-13298-EE ; 25-13698 -EE
Case Style: Pen American Center, Inc., et al v. Kevin Adams, et al
District Court Docket No: 3:23-cv-10385-TKW-ZCB

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP 41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing or rehearing en banc is governed by 11th Cir. R. 40-2. Please see FRAP 40 and the accompanying circuit rules for information concerning petitions for rehearing. The Court has proposed amending 11th Cir. R. 40-1 (Number of Copies) to no longer require paper copies of a petition for panel rehearing or a petition for rehearing en banc. Based on the proposed amendment, other than an original petition filed in paper by a non-electronic filer, **parties are asked not to submit any paper copies** of a petition for panel rehearing or a petition for rehearing en banc.

Costs
Costs are taxed against Appellant(s) / Petitioner(s).

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the Court's website at www.ca11.uscourts.gov. For more information regarding costs, see FRAP 39 and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation via the eVoucher system no later than 45 days after issuance of the mandate or the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or

cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Clerk's Office Phone Numbers

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1 Ntc of Issuance of Opinion